# Exhibit 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **MARJORIE MURTAGH COOKE,** | ) |
| **Plaintiff,** | ) |
| v. | ) **Case No. 06-748C** |
| | ) **Judge Thomas C. Wheeler** |
| **THE UNITED STATES OF AMERICA,** | ) |
| **Defendant.** | ) |

**FIRST AMENDED COMPLAINT**

1. This action arises out of Defendant the United States of America's agency, the National Transportation Safety Board's ("NTSB"), unlawful employment actions against Plaintiff Marjorie Murtagh Cooke ("Cooke"). Specifically, Cooke alleges that the NTSB failed to justly compensate her in violation of the Equal Pay Act (EPA), as amended 29 U.S.C. § 206(d) *et seq.*, when it paid other similarly situated NTSB male directors larger salaries and compensation than Cooke for similar work performed.

**Parties**

2. Plaintiff Cooke is resident of the city of Clifton, County of Fairfax, in the State of Virginia.

3. Defendant is the United States of America, in the persons of the NTSB, and NTSB Chairman Mark Rosenker ("Rosenker"). Rosenker is the Chairman of the NTSB and is the delegated administrator of the NTSB and is responsible for the lawful administration of the NTSB.

## Jurisdiction

4. This Honorable Court has jurisdiction over the claim presented herein pursuant to 28 U.S.C. § 1346, 28 U.S.C. § 1491, and 29 U.S.C. § 216(b).

## Factual Allegations

5. In 1994, Cooke was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety.

6. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS").

7. Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status.

8. Each surface office had similar responsibilities, with the exception of OMS, which had two additional responsibilities: conducting accident investigations involving military and commercial vessels, and conducting international accident investigations. The latter was similar to the additional responsibility handled by the Office of Aviation Safety. The Office of Aviation Safety had an additional senior level (SL) position to handle international investigations.

9. In 1997, as the result of a restructuring, Cooke was named the Director of OMS.

10. Soon after the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of ORPH.

11. In 2000, when the NTSB was reviewing an available SES slot, the Managing Director, Dan Campbell ("Campbell") suggested to then Agency Chairman, James Hall ("Hall") that Chipkevich be given the SES slot.

12. Campbell suggested that Chipkevich be given the SES slot because Chipkevich had supposedly the most seniority of the three directors and because ORPH was the most complex of the three offices.

13. Hall agreed with Campbell's suggestion, and Chipkevich, the Director of ORPH, applied, interviewed, and was awarded SES status.

14. In early 2003, the NTSB was once again reviewing an available SES slot. The Agency's leadership, then Chairman Ellen Engleman-Conners ("Conners") and Campbell assigned this SES slot to Joe Osterman ("Osterman"), the Director of OHS.

15. After Osterman was awarded the SES slot, Cooke became the only Director of the three safety offices without SES status.

16. Ostensibly because Cooke's Director Position did not have SES status, Cooke was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director of OAS, Osterman and Chipkevich.

17. Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872, and Chipkevich received a salary of $142,022, Cooke received a salary of $121,583.

18. In addition, in 2004, while Clark received a salary of $142,022 Osterman received a salary of $140,797 and Chipkevich received a salary of $142,022, Cooke received a salary of $126,963.

19. Ostensibly because Cooke's Director Position did not have SES status, Cooke was granted lower monetary awards than her male counterparts, Clark, Osterman and Chipkevich.

20. Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Cooke received an award of $5,400.

21. In addition, in 2004, while Clark received an award of $17,000, Osterman received an award of $9,500 and Chipkevich received an award of $16,000, Cooke received an award of $3,400.

22. Cooke, in her position as Director of OMS, performed work substantially equal to Clark in his position as Director of OAS, Chipkevich in his position as Director of OPHRMS and Osterman in his position as Director of OHS.

23. Cooke performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of OPHRMS and Osterman performed his work as Director of OHS.

24. Due to this inequality, in April of 2004, Cooke met with Conners and informed Conners that she was the only Director of the four modal investigation offices without SES status.

25. Further, Cooke informed Conners that the other three modal safety directors, all of whom are male, earned salaries much higher than hers because she lacked SES status.

26. Cooke explained to Conners that her concern was not the SES status *per se*, but rather she wanted equitable pay for similar work.

27. Conners responded by telling Cooke that if the NTSB acquired another SES slot, the slot would be assigned to the Director of OMS. However, Conners also stated that when the OMS Director position received SES status, the position would be advertised and that Cooke would have to apply and compete for the position.

28. Cooke suggested to Conners that she be allowed to receive overtime pay as one option for reducing the gap between her salary and that of the three male modal safety Directors.

29. Conners replied that she was not aware if that was a possible solution, but told Cooke she would look into it.

30. After the meeting Cooke met with Lisa Love ("Love") from Human Resources. Love confirmed for Cooke that she could receive overtime pay; however she needed approval from Conners, the NTSB Chairman.

31. After meeting with Love, Cooke made several attempts to meet with Conners to seek her approval for overtime pay.

32. Despite Cooke's efforts Conners refused to meet with her to discuss this subject.

33. Thus, Cooke continued to work as Director of OMS, doing substantially similar work to Clark, Osterman and Chipkevich, the other three Directors, and making significantly less money.

34. In July, 2004, the NTSB advertised the OMS Director position with SES status.

35. As instructed by Conners, Cooke applied for this position, but the advertisement was cancelled and she was not granted an interview.

36. In early 2005, the OMS Director position was re-advertised as having SES status.

37. Cooke applied for this position, but she was not granted an interview.

38. In response to years of unequal pay for similar work to that of her male counterparts, and not even being granted an interview for a position she held for eight years, Cooke filed a sexual discrimination complaint with the NTSB EEO Director on February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.

39. In her complaint, Cooke alleged that she received unequal pay as the Director of OMS because of her gender.

40. Cooke's discrimination complaint was investigated from August of 2005 through December of 2005.

41. In May, 2005, the new Managing Director, Joe Osterman ("Osterman"), notified Cooke of her non-selection for the Director of OMS position. Cooke noted that she had not been paid for the position during her tenure as Director of OMS. Osterman then offered her an SL position to compensate if she would submit bulleted responsibilities for a position description.

42. NTSB has used SL positions in the past to compensate senior level employees for pay over the GS-15 salary level.

43. In response, Cooke submitted the requested document. Osterman subsequently informed her that Conners and Campbell would not permit him to use an SL position for her.

44. In June, 2005, the NTSB transferred Cooke to the Office of Safety Recommendations and Communication.

45. In July, 2006, Cooke retired from the NTSB.

**Count I**
**The Equal Pay Act (EPA)**
**29 U.S.C. § 206(d)**
**Unequal Pay**

46. Plaintiff incorporates the allegations in paragraphs 1 through 46 as though alleged herein.

47. Plaintiff is a an "employee" as the terms are defined at 29 U.S.C. § 203(e)(2)(ii) and Defendant the United States of America in the person of the NTSB is an "employer" as the term is defined at 29 U.S.C. § 203(d).

48. Defendant failed and/or refused to compensate Plaintiff comparable to employees who were of the opposite sex, worked in the same "establishment" as Plaintiff, performed work that was equal to the work performed by Plaintiff, and retained positions that required equal skill, effort, responsibility and was performed under similar conditions as compared to Plaintiff.

49. As the direct and proximate result of Defendant's violation of 29 U.S.C. § 206(d), Plaintiff was caused to suffer damages.

50. For violations of 29 U.S.C. § 206(d), Plaintiff demands such legal or equitable relief as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

a. Reinstatement;
b. Promotion;
c. Economic damages including front and back pay;
d. Reasonable attorney's fees and costs;
e. Liquidated Damages; and
f. Any other relief that this Court deems just and equitable.

**Prayer for Relief**

WHEREFORE, Cooke prays this Honorable Court for Judgment against the Defendant, in the amount of economic damages and compensatory damages to be determined at trial, plus attorneys' fees, costs of this action, equitable relief (including upgrading Plaintiff's employment status) and any other relief this Honorable Court deems just and proper to award.

Marjorie Murtagh Cooke
By Counsel

Date: November 9, 2006

R. Scott Oswald
Employment Law Group, P.C.
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006-3307
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*

# Exhibit 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-748C<br>(Judge Wheeler) |

DEFENDANT'S ANSWER

For its answer to the first amended complaint, defendant admits, denies, and alleges as follows:

1. The allegations contained in paragraph 1 constitute conclusions of law, and plaintiff's characterization of her case, to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

2. Denies the allegations contained in paragraph 2 for lack of knowledge or information sufficient to form a belief as to their truth.

3. Admits the allegations contained in the first sentence of paragraph 3. The allegations contained in the second sentence of paragraph 3 constitute conclusions of law, to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

4. The allegations contained in paragraph 4 constitute conclusions of law to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

5. Admits.

6. Admits.

7. Admits.

8. Denies.

9. Admits.

10. Objects to the vagueness of the term "soon," but admits the remainder of the allegations contained in paragraph 10 and avers that the merger referred to took place in 2000.

11. Denies.

12. Denies.

13. Denies the allegations contained in paragraph 13 that "Hall agreed with Campbell's suggestion" for lack of knowledge or information sufficient to form a belief as to their truth; admits that Mr. Chipkevich applied for, was interviewed, and was selected for the position of Director of the Office of Railroad, Pipeline and Hazardous Materials Safety, an SES-level position.

14. Denies.

15. Admits the allegation that Mr. Osterman was selected for the position of Director of the Office of Highway Safety, an SES-level position; admits the remainder of the allegations contained in paragraph 15.

16. Denies.

17. Admits.

18. Admits.

19. Denies.

20. Admits.

21. Admits.

22. Denies.

23. Denies.

24. The allegation contained in the first sentence of paragraph 24, "[d]ue to this inequality," constitutes a conclusion of law, and plaintiff's characterization of her case, to which no answer is required; to the extent it may be deemed an allegation of fact, it is denied. Admits that Ms. Cooke met with then National Transportation Safety Board ("NTSB") Chairman Ellen Engleman-Connors in April 2004; denies the remainder of the allegations contained in paragraph 24 for lack of knowledge or information sufficient to form a belief as to their truth.

25. Denies the allegations contained in paragraph 25 for lack of knowledge or information sufficient to form a belief as to their truth.

26. Denies the allegations contained in paragraph 26 for lack of knowledge or information sufficient to form a belief as to their truth.

27. Denies the allegations contained in paragraph 27 for lack of knowledge or information sufficient to form a belief as to their truth.

28. Admits that Ms. Cooke requested overtime pay; denies the remainder of the allegations contained in paragraph 28.

29. Admits that Ms. Engleman-Connors told Ms. Cooke that "she would look into it;" denies the remainder of the allegations contained in paragraph 29 for lack of knowledge or information sufficient to form a belief as to their truth.

30. Denies the allegations contained in paragraph 30 for lack of knowledge or information sufficient to form a belief as to their truth.

31. Admits that Ms. Cooke made several attempts to meet with Ms. Engleman-Connors; denies the remainder of the allegations contained in paragraph 31 for lack of

knowledge or information sufficient to form a belief as to their truth.

32. Denies.

33. Denies.

34. Admits.

35. Admits that Ms. Cook applied for the position, that she was not interviewed, and that the advertisement was later cancelled; denies the remainder of the allegations contained in paragraph 35.

36. Admits.

37. Admits.

38. Admits that Ms. Cooke filed an EEO complaint; denies the remainder of the allegations contained in paragraph 38.

39. Admits the allegation contained in paragraph 39 to the extent supported by the EEO complaint, which is the best evidence of its contents; otherwise denies.

40. Admits.

41. Admits the allegation contained in the first sentence of paragraph 41 that Mr. Osterman notified Ms. Cooke of her non-selection for the Director of OMS position in approximately May 2005; denies the allegations contained in the second sentence of paragraph 41 for lack of knowledge or information sufficient to form a belief as to their truth; admits the allegation contained in the third sentence of paragraph 41 that Mr. Osterman asked Ms. Cooke to submit bullet points to support the need for a Senior Level ("SL") position; denies the remainder of the allegations contained in paragraph 41.

42. Denies.

43. Admits that Ms. Cooke submitted the document; denies the remainder of the allegations contained in paragraph 43.

44. Admits.

45. Admits.

46. Defendant's responses to paragraphs 1 through 46 of the complaint are incorporated by reference.

47. The allegations contained in paragraph 47 constitute conclusions of law, to which no answer is required; to the extent they may be deemed allegations of fact, they are denied.

48. Denies.

49. Denies.

50. Denies that plaintiff is entitled to the relief set forth in paragraph 50, or to any relief whatsoever.

51. Denies that plaintiff is entitled to the relief set forth in the prayer for relief immediately following paragraph 50, or to any relief whatsoever.

52. Denies each and every allegation not previously admitted or otherwise qualified.

WHEREFORE, defendant requests that the Court enter judgment in its favor, order that the complaint be dismissed, and grant defendant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

/s/ KATHRYN A. BLEECKER
KATHRYN A. BLEECKER
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
KATHLEEN SILBAUGH
Office of General Counsel
National Transportation Safety Board

January 8, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 8th day of January, 2007 a copy of the foregoing "DEFENDANT'S ANSWER" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN

# Exhibit 3

~~ATTACHMENT I~~

## COMPARISON OF CORE FUNCTIONS OF OFFICE DIRECTOR POSITIONS

(By Delegation of Authority)[1]

| Director, OMS[2] | Director, OHS[3] | Director, OAS[4] | Director, RPH[5] |
|---|---|---|---|
| 1. Order an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate | Same as OMS | Same As OMS | Same as OMS |
| 2. Disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch VIII. | | | |
| 3. Determine the probable causes of accidents. | | | |
| 4. Investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). | | | |
| | | | |

[1] As provided in 49 Code of Federal Regulation ("CFR") Volume 5, Chapter VIII (National Transportation Safety Board) Part 800, Subpart B – Delegation of Authority to Staff Members.

[2] Per 49 CFR 800.2 (h), the **Office of Marine Safety** ("OMS") conducts investigations of marine accidents with the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; determines the probable cause(s) of accidents when



MC-NTSB000146

ATTACH EXHIBIT F2f

delegated authority to do so by the Board; initiates safety recommendations to prevent future marine accidents; participates in the investigation of accidents that occur in foreign countries and that involve U.S. registered vessels; and conducts special investigations into selected marine accidents involving safety issues of concern to the Board.

[3]Per 49 CFR 800.2 (g), the **Office of Highway Safety** ("OHS") conducts investigations of highway accidents, including railroad grade-crossing accidents, within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future highway accidents; and conducts special investigations into selected highway accidents involving safety issues of concern to the Board.

[4]Per 49 CFR 800.2(e), the **Office of Aviation Safety** ("OAS") conducts investigations of all aviation accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future aviation accidents; participates in the investigation of accidents that occur in foreign countries and involve U.S. registered and/or U.S. manufactured aircraft; and conducts special investigations into selected aviation accidents involving safety issues of concern to the Board.

[5] Per 49 CFR 800.2(f) and (i), the **Office of Railroad, Pipeline, and Hazardous Materials Investigations** conducts investigations of railroad, pipeline, and hazardous materials accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; including a recommendation as to the probable cause(s); determine the probable cause(s) of accidents when delegated authority to do so by the Board, initiates safety recommendations to prevent future railroad, pipeline, and hazardous materials accidents; and conducts special investigations into selected railroad, pipeline, and hazardous materials accidents involving safety issues of concern to the Board.

~~ATTACHMENT 1, PAGE2~~

ATTACHMENT F
PAGE 2



MC-NTSB000147

**EXHIBIT F3**

# AFFIDAVIT OF DAN CAMPBELL

City: Washington

State: District of Columbia

I, **Dan Campbell**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1. **Please identify your position with the NTSB, including your position title, series, grade, and organizational units (from smallest to largest)?**

   I currently am the NTSB Executive Director, an SES position. I have been in this position since January 2005. Between 2000 and the beginning of 2005, I was the NTSB's Managing Director. Before that, I was the NTSB's General Counsel.

   The Managing Director is a career SES position, and has delegated authority over personnel issues. Historically, the Executive Director's position has been a Schedule C appointment and has been more concerned with policy issues. I assumed the Executive Director position for a few months in anticipation of my upcoming retirement so that I could mentor my successor as Managing Director, Joe Osterman.

2. **Who currently are your first and second-level supervisors, by name and position title? Who were your supervisors in January 2005?**

   I report to the NSTB Chairman. Since March 2005, this has been Acting Chairman Mark Rosenker. Prior to that time, I reported to then-Chairman Ellen Engleman Conners.



Initials D

3. **Please identify your gender.**

Male.

4. **Who determines the pay classifications for Office Directors at NTSB?**

With specific regard to the assignment of SES positions, I have not been a decision maker. There are a limited number of SES slots allocated to the Agency, and the Chairman makes the decision where they will be assigned. As the Managing Director, I was consulted about the assignments, but the decision was the Chairman's. We are a relatively small agency with only 400 employees.

By way of background, at one time NTSB had a single Office of Surface Transportation (OST), and a separate Office of Aviation Safety. The OST Director was an SES position, and there may have been one other SES position within OST. During the period when James Hall was NTSB Chairman, the Office of Surface Transportation was divided into four Offices: Marine Safety, Highway Safety, Railroad Safety and Pipeline & Hazardous Materials Safety. The thinking at that time was that the Agency would have a higher profile if there were individual Offices dedicated to each of the four surface transportation modes. However, when OST was split into four separate Modal Offices, we did not have enough SES slots to raise each Director job to the SES level. This was around 1999, during a period when I still was serving as General Counsel and did not follow the SES issue closely.

In June 1999, around the time I was promoted from General Counsel to Managing Director, we made a request to OPM to authorize SES slots for all of the Modal Office Directors. I do not believe OPM granted any part of this request. As a result, all four of the Office Directors – Joe Osterman (Highway Safety), Bob Lauby (Railroad Safety), Bob Chipkevich (Pipeline & Hazardous Materials Safety), and Marjorie Murtagh (Marine Safety) were classified and paid as GS-15 employees.

Because we had issues with productivity within the Railroad Safety Office, we decided to replace its first director. I felt that Bob Chipkevich was highly qualified and underutilized in the Pipeline & Hazardous Materials Safety Office, so we merged his unit with the Railroad Safety Office. The resulting Office of Railroad, Pipeline and Hazardous Materials Safety was the largest and most complex of the surface transportation Modal Offices.

When one of our SES employees at NTSB retired, in about 2000, and an SES slot therefore became available, I recommended that Mr. Chipkevich's position be redesignated as an SES position because he was the most senior of the Modal Office Directors and ran the most complex group. Chairman Hall's initial preference was for



Initials DE

highway safety, as the responsibility of that office is so visible, with 40,000 deaths on the road annually. Ultimately Chairman Hall accepted my recommendation and the RPH Office Director position was raised to the SES level.

Around 2003, we eliminated on SES from the personnel structure at the NTSB Academy by abolishing the office of President of the Academy. (The incumbent separated voluntarily.) We assigned the recovered SES slot to the Director of Office of Highway Safety position. Like Ms. Murtagh's job at OMS, the OHS Director until this time had continued to be a GS-15 position. Keep in mind that NTSB at the outset had requested SES slots to elevate all the Modal Transportation Office Directors; if we had received authorization from OPM, we would have advertised all the Director positions as SES jobs and filled them at the SES level. However, we acquired the needed slots only gradually, both by gaining new slots from OPM and by reassigning one slot from elsewhere within the Agency.

In 2004, we received authorization for another SES slot from OPM, and we assigned it to the OMS Director job. The position was filled at the SES level earlier this year.

5. **Do some NTSB Offices have Deputy Directors who are classified as SES employees? If so, why would these Deputy Directors be SES members, while the Director of OMS would be paid on the GS scale?**

The NTSB has two offices that have SES-level Deputy Directors: the Office of Aviation Safety, and the Office of Research and Engineering. This practice goes back decades. The reasons for the SES Deputy Director positions in the two offices are slightly different.

For Research and Engineering, it is important to understand that ORE is staffed with a relatively large number of higher-level engineers who have advanced degrees such as a Ph.D. It is sophisticated, technical work, and both the Director and the Deputy Director historically have been SES employees.

Aviation Safety has long been viewed as central to the NTSB's work. It is by far our largest Office. OAS has about 140 staff members, while the other Offices have about 20 to 40 staff members. In addition, Aviation Safety is a very high visibility function. Given the size and importance of OAS to the NTSB's mission, it is understandable the Deputy Director traditionally has been paid at the SES level.

6. **Why would the OMS Director be paid on the GS scale while the other Modal Office Directors would be classified as SES employees?**

There are several reasons why it was justifiable to elevate the classification for the ORPH



Initials DC

and OHS Directors first, given the limitations on the number of SES positions available to the Agency.

An important factor is the significance of the undertaking within the respective offices. The RPH Director runs a larger organization than OMS, and also must be conversant in multiple disciplines. The OHS Director also runs a larger organization than OMS and has a much higher public profile because highway safety is a very visible matter of public concern.

By comparison, the role of OMS is not as large. Accident investigation jurisdiction over commercial maritime activities is a shared responsibility of NTSB and the Coast Guard. This is the only mode where NTSB is not the primary federal investigative authority for major transport accidents. Consequently, NTSB has a reduced ability to have a significant effect in the area of marine safety, except for promoting better safety practices in the recreational boating area.

7. **The Complainant has commented that the responsibilities of the OMS Director are virtually identical to the responsibilities of the other Office Directors, and require the same skill set. If this is the case, shouldn't the Office Directors receive the same compensation?**

Ms. Murtagh's argument about the comparability of skills is largely correct, but doesn't tell the whole story.

As I mentioned, the Railroad, Pipeline and Hazardous Materials Director needs to have a strong understanding of a broader range of transportation categories than the OMS Director. In addition, the Director needs to run the office, master the subject and be able to handle both external and internal responsibilities.

The skill set for the Aviation Safety Director may look similar on paper, but the number of times the Aviation Safety Director is called upon to perform investigations is dramatically higher than the Marine Safety Director. In truth, although all the Offices are important in their work, Aviation Safety is at the core of the NTSB's federal presence, from a budgetary standpoint, as well as from the standpoint of public recognition.

But I do believe OMS warrants an SES director. The issue for NTSB was always that of the allocation of a scarce resource. Of the modal offices, it was quite sensible to reach OMS last.

8. **Did the Complainant speak with you about her concerns regarding compensation? Please describe the conversation.**

I do not recall Ms. Murtagh complaining to me about when the OMS Director's position



Initials

would be reclassified as an SES job. Nor did she ever raise compensation with me. Generally, it was understood that all the Office Director positions would be converted to SES jobs as SES slots were made available to the Agency.

9. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

See #5, above.

10. **Did any SES positions open in lower-tiered levels of the Agency that could have been transferred to the OMS Director's position?**

No. One that came open was used for Highway Safety.

I want to note that the Agency has senior female employees who are in the SES. For example, during the time period when we were creating the separate Modal Offices and trying to get SES slots for the Office Directors, we created the NTSB Academy. At one point, there were two SES employees at the Academy, although there is now only one SES employee, Director Julie Beal, who is female.

The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female and occupies an SES position. Also, the Director of our Office of Administration, Lola Ward, is female and a member of the SES. In fact, three of the last four persons selected by the NTSB for SES positions have been female.

I want to add that we were having chronic problems with the pace and quality of work coming from the Office of Marine Safety, and as a result I have needed to have more interaction with OMS than would normally be the case. I am providing the EEO Investigator with a copy of an employee exit interview that was conducted by the Assistant Managing Director, Barbara Czech, in August 2002. I had conducted several exit interviews with departing OMS employees, as turnover seemed high in the office. In this instance I asked Barbara to do the interview with Jamie Estock. The departing employee, Ms. Estock, had worked in OMS for over a year on a cooperative program and, I believe, had converted at Ms. Murtagh's request to full-time federal service. She had been a good performer. She left for a private sector job. When explaining why she left, she commented that the "progress of work products [in OMS] was too slow and she was afraid it would affect her work ethic." This was typical of the feedback that I was receiving from employees in OMS.

11. **The Complainant alleges she was not allowed by senior management to fill key**



Initials

**vacant positions in the Office of Marine Safety. If so, what was your role in this decision? If you did not have a role, who did? What is your understanding of the reason (if any) that Complainant was not allowed to fill vacancies in her unit?**

It is true that I stopped Ms. Murtagh from hiring several employees during my tenure as Managing Director.

With regard to the Marine Accident Investigator position, this job was being filled earlier this year around the time we had begun to advertise the OMS Director job as an SES position. Because there was a possibility there would be a change in the leadership of the Marine Safety Office, I became more interested in the staffing of the unit. With regard to the particular individual whom Ms. Murtagh selected for the Investigator position, I noted that the person also had applied for the OMS Director job. Frankly, I thought it was strange that a person applying for a mid level investigator position also felt qualified to run the office. I also thought that it was only fair that if a new person was hired as the OMS Director, the Director should have a chance to hire his or her own person into the Investigator position.

With regard to the Chief of Report Development, Ms. Murtagh wanted to fill the position with an employee who already was working for her within OMS. This individual informed me that she had applied for the position because she wanted to block another staff member from getting the job because they were incompatible. I knew the selectee, and although I felt she was a good editor, I did not feel she would be able to manage the investigators who are a key part of the report-generating process. I already had experienced problems getting good reports completed from the OMS unit, and I cite as one example the OMS investigation of the accident involving the Staten Island ferry crash, the Barberi. The investigator responsible for the investigation wanted to quit the Office before he completed the report. I personally had to plead with him to stay on to complete the work. He complained that the problem was the manner in which OMS and Ms. Murtagh were handling him and the investigation. In order to get the report finished, I ultimately lifted the investigation out of OMS and supervised the project myself from the Managing Director's office.

With regard to the Deputy Director position within OMS, this once had been occupied by Don Tyrell. Ms. Murtagh at one point was allowed to hire a Deputy Director, Paul Voorhees, who subsequently left the NTSB and went to the courts. He did not have a marine safety background. Personally, I do not recall a request to fill the Deputy Director position after Mr. Voorhees left.

Normally, I did not view it as my role to tell an Office Director like Ms. Murtagh that she could not hire the employees of their choice. However, I felt Ms. Murtagh did not have good judgment with selections. I recall that I once received a visit from the Agency's ethics office concerning an applicant for an OMS job who had a background with cruise



Initials

ships. He was hired, and subsequently quit under a cloud. I became involved with this employee again through the exit interview process. I had been concerned about the initial hire; ultimately, I felt the experience showed that my instincts on this were right, and Ms. Murtagh's wrong.

Finally, although I am not sure it is relevant to Ms. Murtagh's complaint, I want to state that I was not involved in any way with the selection for the OMS Director position when it was posted as an SES job earlier this year.

12. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill, and why?**

First, I want to note that Ms. Murtagh was allowed to fill many vacancies in OMS during the period encompassed by her complaint, including some selectees who ultimately didn't work out.

Second, Ms. Murtagh was not treated differently from the male Office Directors. Generally, everyone's staffing level is down. In fact, relative to the size of her agency compared with the other Modal Offices, I think Ms. Murtagh actually has been allowed to hire more employees than the other Directors, in part because she had a relatively high turnover rate in OMS.

13. **What other witnesses do you believe have information that would be relevant to this discrimination claim?**

The Investigator might consider speaking with Bob Chipkevich and Joe Osterman with regard to the pay issue and the SES slots. Mr. Osterman might be asked whether he felt discriminated against when Mr. Chipkevich was given an SES slot, and Mr. Osterman was not.

14. **Do you have any documents that are relevant to the Complainant's allegation of sex and pay discrimination? If so, please provide them.**

I have attached three letters regarding the requests for new SES at OPM. They will show (1) that the agency allotment was 14 at the time we first requested new SES for each of the modal offices. (2) The request was denied in whole. (3) In 2004 we finally received an increase of one SES which was then allocated to the Office of Marine safety.

15. **To the extent other Office Directors were paid a higher salary than the Complainant, or were allowed to fill vacancies when the Complainant was not, was**



Initials [signature]

MC-NTSB000184

**the different treatment accorded to the Complainant prompted by her sex?**

No, the determination which Office Director position would be classified as an SES position was not made based upon sex, and Ms. Murtagh was not discriminated against when we made these choices. With regard to the allegation she was denied opportunities to fill vacant positions, I do not believe this is true or that she was treated differently from her male counterparts. Moreover, even if this had occurred, it was not because of her sex.

16. **Is there anything else you would like to add?**

I want to add that I find it remarkable Ms. Murtagh never had a conversation with me about her feeling that the job classification for the OMS Director was discriminatory. She was fully aware I was seeking SES slots for all the Office Director jobs.

I have read the above statement consisting of 8 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10/19/05
Date

Dan Campbell

Witness



Initials DC

ATTACH EXHIBIT F2i

~~ATTACHMENT F~~

**COMPARISON OF AVERAGE COMPENSATION**
**OF**
**MODAL OFFICE DIRECTORS**
(01/01/2003 – 12/31/2004)

| Name | 2003 Salary | 2003 SES Award | 2004 Salary | 2004 SES Award | Total Comp | Average annual Compensation |
|---|---|---|---|---|---|---|
| Clark | $142,022 | $16,080 | $142,022 | $17,000 | $317,124 | $158,562 |
| Osterman | $136,872 | $0 | $140,797 | $9,500 | $287,169 | $143,585 |
| Chipkevich | $142,022 | $16,056 | $142,022 | $16,000 | $316,100 | $158,050 |
| | | | | | $920,393 | $153,399 |
| Murtagh[1] | $121,583 | $5,400 | $126,963 | $3,400 | $257,346 | $128,673 |

DISCUSSION

This chart depicts the average compensation received by the Directors of the Offices of Aviation Safety ("OAS"), Highway Safety ("OHS"), Railroad, Pipeline, and Hazardous Materials Investigations ("RPH"), and Marine Safety ("OMS") during calendar years 2003 and 2004. Actual yearly salary was determined by dividing the annual salary by 2087[2] and multiplying the result by 80[3] x 26[4]. Total compensation includes salary and cash awards received by each individual during this period. Average annual compensation for the Directors of OAS, OHS, and RPH[5] was computed by dividing the total amount of compensation they received ($920,393) during the two years by six (6). Average annual compensation for the Director OMS was computed by dividing the total amount of compensation she received during the two years by two (2).

[1] Complainant
[2] To convert the annual salary to an hourly salary.
[3] The number of hours in a pay period.
[4] The number of pay periods in a calendar year.
[5] The Directors of OAS, OHS, and RPH are male.

EXHIBIT F4

**AFFIDAVIT OF ELLEN ENGLEMAN CONNERS**

City: Washington

State: District of Columbia

I, **Ellen Engleman Conners,** make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1. **Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

2. **How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

3. **Please identify your gender.**

Female.

4. **Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel

 Initials

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5. **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6. **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7. **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**



Initials [signature]

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

**8. Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,



Initials [signature]

during my first two years at the NTSB there were about six major marine accidents, but this is atypical. The work of the other Offices is simply greater. Aviation Safety is huge by comparison. Railway, Pipeline and Hazardous Materials is responsible for three modes of transport. And there are 43,000 highway deaths each year.

No one was isolating the Office of Marine Safety, but it logically was last in the queue. Actually, it is my hope ultimately to make all the Deputy Directors SES positions, also.

9. **Did the Complainant talk to you about being paid overtime as a means for bringing her compensation closer to that of the male Office Directors? Did you discuss this with the Managing Director, Dan Campbell, or with Human Resources? What was your decision and response.**

Yes, this is the method she proposed for raising her compensation. I thought it was bizarre for a manager to suggest being paid overtime.

Can it be done? I do not believe managers are entitled to overtime, unlike the investigators, for instance. I do not recall whether I made a specific decision to deny Ms. Murtagh overtime, but I would have. I do not even recall whether it would have been possible to pay her overtime.

10. **After the discussion about possible overtime, did you evade further requests by Ms. Murtagh to discuss her compensation request? Was Ms. Murtagh ever told she would not be paid overtime?**

On several occasions, Ms. Murtagh asked me for follow up meetings. On the initial occasions, I was genuinely busy and did not have the time to meet with her. Later, I knew the SES slot for the OMS Director job was being processed, so I felt it was not appropriate to meet.

I am not sure whether Ms. Murtagh ever was contacted to be told she would not be paid overtime, no.

11. **Was the decision to pay the OMS Director as a GS-15, rather than at the SES level, related to the fact that the OMS Director was female?**

Absolutely not.

12. **Complainant describes several situations in which she had advertised, interviewed and selected a candidate for various positions, only to be told that she could not fill the job with the selectee. For example, earlier in 2005 she states she was denied an opportunity to hire a Marine Accident Investigator. Do you have any information about this?**

I probably had a role in this. I had asked all senior managers to get together and consider



Initials

filling positions based upon our vision for the agency, rather than just backfilling open positions.

We identified 73 positions in the agency and began a process of prioritizing which would be filled. Early in 2004, we decided as a team that the first positions to be filled would be openings on the regional aviation investigation teams.

The agency had about 426 employees, and we were expecting to drop to about 415 positions, then 411. We were trying to avoid creating a situation where we would need to implement a reduction in force (RIF). Therefore, a lot of positions in each Office were not being filled to avoid having a RIF. We were very focused on filling just the priority slots, some of which had been mandated by Congress.

With regard to the Marine Accident Investigator position, I have no specific recollection.

13. **Complainant describes a situation several years ago in which she had advertised, interviewed and selected a candidate for the position of Chief, Report Development, only to be instructed she could not fill the job. Do you have any information about this position?**

I have no recollection of this.

14. **Around 2000, the then-Deputy Director of OMS left the NTSB. Complainant has claimed she was prohibited from hiring a new Deputy Director, making OMS the only Office without a Deputy. Do you have any information about this?**

I have a vague recollection that OMS was not allowed to fill the Deputy Director position, but I do not recall the circumstances.

15. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill?**

Some Office Directors were allowed to fill positions, and others were not allowed. It was all based on the needs of the agency and funding. For example, the Director of the Office of Research and Engineering, Verne Ellenstad, was very unhappy during this period that he was not allowed to fill some vacant positions in his unit.

16. **Was Ms. Murtagh's being denied opportunities to fill vacant positions related to her gender?**

Absolutely not. As an executive and as a woman, I find it insulting that she would even suggest this.

17. **What other witnesses do you believe have information that would be relevant to**



Initials ______

**your discrimination claim?**

Dan Campbell and Lisa Love

18. **Do you have any documents that are relevant to your claim of sex and pay discrimination? If so, please provide them.**

None.

19. **Is there anything else you would like to add?**

No.

I have read the above statement consisting of 6 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10-17-05
Date

Ellen Engleman Conners

Witness



Initials

– ATTACHME EXHIBIT F2d

Draft for Review

Position Description Number MS-321519


~~ATTACHMENT D~~

# National Transportation Safety Board
## POSITION DESCRIPTION

Organizational Title: Director, Office of Marine Safety
Organization: Office of Marine Safety
Pay Plan Series and Grade: TBD
Incumbent: Marjorie M. Murtagh

**INTRODUCTION**

This position is located in the Office of Marine Safety, National Transportation Safety Board (NTSB). The Office manages major marine transportation investigations for which go-teams are sent to the accident site. The Office investigates selected accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation regulations, requirements, policies, practices and systems in government and industry.

The incumbent serves as the Director, Office of Marine Safety (OMS), responsible for providing staff supervision and resource management, as well as overall management and direction of international and domestic marine accident investigations and reporting processes, recommendation development and marine safety program advocacy and oversight.

**MAJOR DUTIES**

Plans, manages, directs and evaluates the work of the Office of Marine Safety and exercises important policy-making and policy-determining decisions impacting marine safety at the Board, at international maritime organizations, other Federal agencies and the international and domestic industry. Provides for the overall direction and technical accuracy of the investigation and reporting processes for major marine accidents.

Develops the overall requirements and schedules to accomplish the marine safety program. Reviews, approves and promulgates schedules and milestones for assigned activities. Reviews, evaluates and approves, disapproves or modifies requests for changes to milestones and schedules. Develops overall program review documentation and provides status reports on a regular basis.

Determines level of response and resource allocation for NTSB marine safety program. Upon notification of marine accident that warrants NTSB response, notifies NTSB's Chairman and Managing Director, U.S. Coast Guard, international or domestic federal agencies, e.g., State Department, foreign embassy and/or flag state representatives, as appropriate. Serves as hearing officer for public hearings. Coordinates the allocation of staff resources with other Office Directors involved in the investigation. Resolves differences between modal and support staff views regarding accident investigation scope, required resources, and analysis. Ensures, through complete and comprehensive review of the draft report, that essential issues are adequately addressed, all findings and recommendations are supported by analysis and that the draft sent forward is of the best quality. Ensures the proper presentation of the draft report before

the Board at Board meetings.

Reviews work product of other modal and support offices. Ensures quality is commensurate with NTSB standards to promote success of NTSB marine safety program, including investigations, reports, safety recommendations and the marine safety advocacy.

Establishes and maintains liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, Federal regulators, etc. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. May be called upon to provide Congressional testimony.

Represents NTSB and serves as a member of the United States delegation at all International Maritime Organization (IMO) meetings regarding marine accident investigation issues.

Develops and justifies estimates for staff resource requirements, including personnel, funding, equipment and office space. Presents, justifies, and defends budget to all levels of management.

Implements concepts to get results through people. Makes selections, assigns work, trains and rewards employees, and corrects poor performance in a manner which maximizes the use of staff skills in achieving organizational goals. Monitors work status through formal and informal means and procedures. Ensures that appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated. Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communication between employees and their supervisors. Ensures that employees are given a real and continuing opportunity to influence their work environment and are able to participate in discussions related to methods of work accomplishment.

Essures reasonable equity within OMS of performance standards and rating techniques developed by subordinates. Ensures equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work. Evaluates subordinate supervisors and senior non-supervisory managers and serves as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors.

Evaluates program accomplishments and their overall effectiveness. Identifies program problem areas and solicits from Division Chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions, as needed.

Works closely with HR in improving the recruitment, placement and retention of a high-quality OMS workforce. Ensures that crucial training courses needed to keep pace with today's technological improvements in marine transportation safety are provided to the staff for their technical and operational currency, as well as their development in non-technological areas. Provides effective management training to maintain a highly motivated and cohesive workforce.

Relates Equal Employment Opportunity concepts to overall responsibilities. Supports Affirmative Action Plan items while performing assigned responsibilities.

The critical nature of the work of this position requires the incumbent to be available 24 hours per day, seven days a week.

**PROGRAM SCOPE AND EFFECT** Factor Level 1-x (xxx pts.)

**Draft for Review**



The Director, Office of Marine Safety heads a major operating program which investigates marine transportation accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation policies, practices and systems in government and industry. The program directly involves the Agency's national mission, has nationwide and international impact on public safety issues within the marine manufacturing and transportation industry, and receives frequent congressional and media attention.

**ORGANIZATIONAL SETTING** Factor Level 2-x (xxx pts)

The incumbent reports directly to the Managing Director, National Transportation Safety Board.

**SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED** Factor Level 3-x (xxx pts)

The incumbent operates under the general supervision and policy direction of the Managing Director. The Director, Office of Marine Safety, oversees the overall planning, direction and timely execution of the marine safety program which is carried out by approximately 22 employees in the Office of the Director, the Major Investigations Division, and the Report Development Division. The incumbent has the full range of supervisory and management authority for subordinate supervisors and employees in development, assignment, and clearance of long range goals and objectives for the program. Exercises discretionary authority for the allocation and expenditure of funds in the MS investigations and safety program. Exercises final authority for the full range of personnel actions recommended by subordinate supervisors.

Manages the development of policy changes and organizational changes in the OMS investigations and safety program in response to changing priorities and unanticipated needs.

**PERSONAL CONTACTS** Factor Level 4-x (xxx pts)

The incumbent represents the Safety Board and serves as a spokesperson for the Board with regard to marine safety activities in dealing with other domestic and international Federal, state and other government agencies, military services, Congress, marine industry groups, labor organizations, foreign governments, and public, civic and private safety groups, as appropriate. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. Often, the incumbent is placed in the position of defending agency actions or of persuading other interests to cooperate with approaches that have broad and controversial impact. Incumbent may be called upon to provide Congressional testimony.

**DIFFICULTY OF TYPICAL WORK DIRECTED** Factor Level 5-x (xxx pts)

The highest level of basic nonsupervisory work directed which constitutes 25 percent or more of the workload is GS-15.

**OTHER CONDITIONS** Factor Level 6-x (xxx pts)

Supervision exercised by the incumbent involves exceptional integration and coordination through subordinate supervisors who each direct substantial investigative workloads at the GS-14 or higher level. The incumbent's supervision and resource decisions have a direct and substantial impact on the organizations and programs managed. Decisions by the incumbent involve significant internal and external policy issues, major resource decisions to maximize the effectiveness of accident investigation

# PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

[signature]
Signature of Interviewer

9/30/05
Date

[signature]
Signature of Affiant

Washington DC
Place

# *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

| | |
|---|---|
| [signature] | [signature] |
| Signature of Interviewer | Signature of Affiant |
| 9/19/05 | Washington, DC |
| Date | Place |

and prevention, and the need for changes in program goals, organizational structure or delegated authorities to optimize OMS operations. Ensures that all administrative and technical programs are carried out with full conformance with the standards, policies and procedures of the Board.

**EVALUATION**

Total Points:
Point Range
Grade Level:

**FINAL CLASSIFICATION:**

# Exhibit 4

Page 74

Q As the director of Office of Highway Safety did you plan, manage, and evaluate the work of the Office of Highway Safety?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacted highway safety at the Board?
A Yes.
Q Did you exercise important policy making and policy determining decisions at international organizations?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other federal agencies?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other international domestic industry?
A Yes.
Q Okay. Did you provide for the overall direction and technical accuracy of the investigation

Page 75

and reporting process for major highway safety accidents?
A I did.
Q Did you develop the overall requirements and schedules to accomplish the highway safety program?
A Yes.
Q Did you review, approve and promulgate schedules and milestones for assigned activities?
A Yes.
Q Did you review, evaluate and approve, disapprove or modify requests for changes to milestones in schedules?
A Yes.
Q Did you develop overall program review documentation and provide status reports on a regular basis?
A Yes.
Q Did you determine the level of response and resource allocation for NTSB highway safety program?
A Yes.

Page 76

Q Upon notification of a highway accident that warrants NTSB response, did you notify NTSB's chairman and managing director, another federal agency -- did you notify NTSB's chairman and managing director of the accident?
A Yes.
Q Did you notify another federal agency?
A Yes.
Q Which agency?
A Depends on the accident.
Q But you would notify another agency depending on the accident?
A I would notify the Federal Highway Administration, the Federal Motor Carrier Safety Administration, the Research and Special Programs Administration. It depends on the nature of the accident.
Q I understand. Did you notify any international agencies as well?
A Yes.
Q Did you notify other federal agencies regarding international aspects of an accident,

Page 77

including, for example, the State Department?
A Yes.
Q Okay. Did you ever notify foreign embassies and/or flag state representatives as appropriate?
A Yes.
Q As a director of highway safety, do you serve as a hearing officer for public hearings?
A As the director of highway safety I did not. I served as hearing officer prior to my appointment as director of highway safety.
Q Thank you. Did you coordinate the allocation of staff resources with other office directors involved in the investigation?
A Yes.
Q Did you resolve differences between modal and support staff views regarding accident investigation, scope, required resources and analysis?
A Yes.
Q Did you ensure through complete and comprehensive review of the draft report that

Page 78

essential issues are adequately addressed?
A Yes.
Q Did you ensure that through the review of the draft report that all findings and recommendations are supported by analysis and that the board -- and that the draft sent forward is best of quality?
A Yes.
Q And did you ensure, as the director of highway safety, the proper presentation of the draft report before the board at board hearings?
A Yes.
Q As the director of highway safety, did you review work product of other modal and support offices?
A Yes.
Q As the director of highway safety, did you ensure that quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program -- of NTSB's highway safety program?

Page 79

A Yes.
Q Including investigations, reports, safety recommendations and the marine safe -- and marine -- highway safety advocacy?
A Yes.
Q As the director of highway safety, did you establish and maintain liaison with international and domestic industry?
A Yes.
Q And did you establish an maintain liaison with international -- I'm sorry, with safety groups?
A Yes.
Q Did you establish and maintain liaison with labor organizations?
A Yes.
Q With associations?
A Yes.
Q Did you establish and maintain liaison with societies?
A Yes.
Q Did you establish and maintain liaison with Congress?

Page 80

A Yes.
Q Did you establish and maintenance liaison with federal regulators?
A Yes.
Q Did you provide authoritative advice and expertise to these groups in the development of industry standards and regulations?
A Yes.
Q Did you provide authoritative advice and expertise in the development of industry standards and regulations?
A Yes.
Q Did you provide authoritative advice and expertise to these groups with regard to technology and new applications of existing technology?
A Yes.
Q As the director of highway safety were you called upon to provide congressional testimony?
A Yes.
Q As the director of highway safety did you represent NTSB and serve as a member of the United States delegation at any international meetings

Page 81

regarding highway safety accident investigation issues?
A I participated in many international meetings on highway safety issues. The phrase you used there is part of the delegation, delegation in an official capacity, no; delegation as U.S. representative -- as a representative of the NTSB, yes.
Q I see. Thank you. Did you develop and justify estimates for staff resource requirements including personnel funding, equipment, and office space?
A Yes.
Q Did you present, justify and defend budgets on all levels of management?
A Yes.
Q Did you implement concepts to get results through people?
A Yes.
Q And did you make selections, assign work, train and reward employees?
A Yes.

Q And did you correct poor performance in a manner that maximizes the use of staff skills and achieving organizational skills?
A Yes.
Q Did you monitor work status through formal and informal means and procedures?
A Yes.
Q Did you ensure the appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated?
A OHS, yes.
Q I'll ask it again. Did you ensure that appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated?
A Yes.
Q Were you as director of highway safety, were you responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors?
A Yes.



Q As the director of highway safety, did you ensure that employees are given real and continuing opportunity to influence their work environment?
A Yes.
Q Did you ensure that employees are given a real and continuing opportunity to be able to participate in discussions related to methods of work accomplishment?
A Yes.
Q As the director of highway safety, sir, did you ensure reasonable equity within the Office of Highway Safety of performance standards and rating techniques developed by subordinates?
A Yes.
Q As the director of highway safety, did you ensure equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work?
A Yes.
Q Did you evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory



employees rated by subordinate supervisors?
A Yes.
Q As the director of highway safety, did you evaluate program accomplishments and their overall effectiveness?
A Yes.
Q Did you identify program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed?
A Yes.
Q Did you work closely with human resources in approving their recruitment, placement and retention of a high quality Office of Highway Safety work force?
A Yes.
Q Did you ensure that crucial training courses needed to keep pace with today's technological improvements in marine -- in highway transportation safety are provided to the staff for their technical and operational currency?
A Within budget limitations, yes.



Q Okay. As well as with their development and nontechnological areas?
A Yes.
Q Do you provide effective management training to maintain a highly motivated and cohesive force?
A Yes.
Q As the director of highway safety, did you relate equal employment opportunity concepts to overall responsibilities?
A Yes.
Q Did you support an affirmative action plan while performing assigned responsibilities?
A Yes.
Q As the director of highway safety, were you available 24 hours a day, 7 days a week?
A Unfortunately, yes.
Q Is there any part of your job description as the director of highway safety that I did not discuss right here in regards to your responsibilities?
A That generally covers most of the duties.

Page 86

Q What else is there that you're aware of, sir?
A Support for board members and the broader agency initiatives such as planning, participation and discussions on awards, the larger awards for agency staff. Broader agency-wide responsibility.
Q Your support for board members, can you describe that to me, sir?
A Board members are an advocacy tool for the agency. They frequently speak and discuss -- speak about and discuss issues with various groups internationally and nationally and they require support, modal support specifically, on the issues and information, both personal knowledge that I would have and the preparation of support material for their activities.
Q Was that a regular part of your responsibilities, sir?
A It was.
Q You also said supporting agency initiatives. Can you describe that work to me, sir?
A Agency initiatives, when necessary. For a

Page 87

time, I was responsible for the supervision of the human resources office. Because of a change in management in that office, I had temporary management oversight of that particular function. I also had the EEO function through a subordinate employee for what was originally supposed to be a three month period. I had it for almost a year.
Q Is that it?
A Typical other duties as assigned.
Q And when were you involved in the human resources function?
A I am not sure this is correct, but 2001 maybe.
Q Okay. And when were you responsible for the EEO function through your subordinate for a one year period?
A Maybe 2000.
Q You've mentioned also that you had responsibility with regard to awards for staff?
A This is an office director-wide contribution to the discussion on agency-wide awards.
Q And describe that work for me, sir.

Page 88

A That is essentially a meeting where candidates for the agency-wide awards are evaluated by the office directors and determined to be, made recommendation for a particular candidate as suggested by the group.
Q And you did that from 2000 to 2005?
A Yes.
Q Other than support for board members, supporting agency initiatives and meetings with regard to agency staff awards, what other than the responsibilities that I mentioned in there did you perform as the director of highway safety?
A In 2004 when I became an SES, I also was -- participated in the executive resource board meetings that were convened by the managing director to discuss a variety of issues. Usually, issues having to do with the acquisition of SES billets from OPM, SES and SL billets from OPM, the agency strategic planning and strategies for appropriations and authorization activity on the Hill. That's primarily what the executive resource board did at that time.

Page 89

Q And how much time did you spend discussing with the managing director with regard to the acquisition of billets for SES and SL slots from OPM?
A Well, I was SES in 2004 and I did not participate in the ERB meetings prior to that. I don't know what happened in those meetings. At least two or three meetings, in 2004 ERB meetings, and at one meeting it was discussed the next year's request of OPM.
Q Did you attend meetings in 2005 as well?
A I did.
Q How much time between 2004 and 2005 would you say you spent attending ERB meetings discussing acquisition of billets for SES and SL slots?
A Maybe an hour and a half.
Q Altogether?
A Just that particular -- just that discreet topic, yes.
Q But altogether?
A Altogether.
Q And what about agency strategic planning? Can you describe that to me, please, sir?