# Exhibit 5

A. You have to have the report.
Q. Okay. You have to have to report. What would be second of the list of her primary duties that would follow that?
A. After investigations and report development, it would be the general management of the office, I think.
Q. Okay. And after general management of the office, what would follow as third?
A. Her coordination with the other internal offices of the agency. And then fourth would be her coordination with outside organizations.
Q. And fifth?
A. Those four pretty much cover most of the broader categories, I think.
Q. Those are the primary, those are the most significant?
A. Those are the primary. Right.
Q. So investigation of accidents and reports, general management of the office, coordination with other offices within the agency and coordination with outside groups?



A. Right.
Q. Are the most significant of the responsibilities of the director, of Ms. Murtagh Cooke as the Director of Office of Marine Safety between 1997 -- between 1997 and 2005?
A. Right. I think that I would put those in those four categories.
Q. And, therefore, would you say that meeting with congressional staff would be insignificant to --
A. I put that in the outside organization.
Q. Okay. Meeting with congressional staff is outside. Okay. Now, aside from those four, what would you say additional responsibilities are insignificant related to Miss Murtagh's Cooke's responsibilities as the Director of Office of Marine Safety?
A. I think that those four categories covered the majority of her responsibilities.
Q. Okay. Now, can you also tell me what skills are necessary, are required for Miss Murtagh Cooke to perform her primary duties as the Director of Office of Marine Safety between 1997 and 2005?



A. I think the skills required for Miss Murtagh, the Director of Marine Safety would be, one, leadership and supervisory skills; two, logic and analytical process skills. Miss Murtagh needed to also have fundamental knowledge of the marine industry. And, finally, her ability to communicate both written and orally were fundamental skills necessary for that position.
Q. Okay. Aside from leadership and supervision, logic and analytical process skills, fundamental knowledge of the marine industry and written and oral communications, what other skills were required for Miss Murtagh Cooke to perform her position as Director of Office of Marine Safety?
A. Well, she needed to be able to coordinate and collaborate with other professionals, both internally within the NTSB and externally as part of the investigations or other advocacy work of the marine office. So coordination and collaboration with others is a highly useful skill.
Q. Okay. What about -- is there anything else other than leadership and supervision, logic and



analytical process skills, fundamental knowledge of the marine industry, written and oral communications and coordination and collaboration with other offices and outside offices of NTSB?
A. That covers the broad aspects of what she needed to have to -- the skills she needed to have to be effective in that position.
Q. Okay. And how would you rank those in importance?
A. I would rank them based on the mission needs of the agency. The analytical skills would rank Number 1. Supervisory skills primarily because Miss Murtagh's an individual could not perform the mission of the marine safety function of the NTSB. It was the staff working that office that had to conduct the mission. So her supervisory skills were paramount.
Collaboration and coordination with others for exactly the same reason. The nature of the NTSB is such that we are a small organization and must work with others. We in fact have a built-in collaborative arrangement called the party system in our legislative

authority that requires us at times and enables us at other times to work with outside agencies to get our work done, our investigative work done.
And what were the other categories that I gave you?
Q. Written and oral communications, and fundamental knowledge of the marine industry.
A. Fundamental knowledge of the marine industry probably would rank last, but it's not -- it's difficult to rank these. They are all equally important. The oral and written communications is sequentially critical, but you have to have cooperation and collaboration before you can get to the written communication product.
Without the written product, the work of the agency is -- it doesn't impact the safety of the transportation system. If we can't communicate the results of our investigation, we have failed to conduct our mission.
So it's very difficult to rank those in priority. Analytical skills would be Number 1 because for the agency we need to be right first. We need to



be accurate and relevant first. The other ones are all very close to each other in their priority.
Q. Okay. Are there any other efforts outside of the ones that you just mentioned, analytical skills, supervisory skills, collaboration, knowledge of the industry and oral and written communications that are significant requirements for the position of Director of Office of Marine Safety between 1997 and 2005?
A. No. If you consider those categories as a little broad to incorporate other relatively insignificant activities, I mean, there's -- for example, under supervisory skills, there's a long list of what you would expect to be very standard activities from disciplining employees, performance of employees, budget execution, process development, internal planning. Those are all very subsets of that supervisory.
Q. Okay?
A. Relationship.
Q. Let's talk about those substantive supervisory. It includes personnel issues, hiring?



A. Um-hmm.
Q. Evaluating, promoting?
A. Hiring, evaluating, promoting, attending to the normal personnel needs of the staff with that office. We could probably come up with a list of 20 or so fairly, you know, from creating position descriptions, to providing performance evaluations, to ensuring travel vouchers are executed properly, to ensuring that travel is done within the parameters of the rules. There's a very long list of fundamental supervisory activities that go on.
Q. Okay. So that's -- and then you said process. Can you describe to me what you meant by process?
A. I segregate the written communication and the development of investigation and reports kind of into two different categories. It is one thing to develop a process for the efficient work flow from an investigation into a report and the ultimate production of that report. It is a different thing to have the content of that report be relevant and accurate.



There are two different skills, process flow, industrial engineering, if you will, how do you get from A to Z, and the steps necessary, and designing those kinds of steps based on the general rules or the parameters of the organization, and the development of the content of the reports and the impact of those reports.
Q. I see. So as far as process, we are talking about the actual production of the report, the investigation and the report or just the production of the report?
A. Both.
Q. Both. Okay. So when we say processes as far as supervisory skills, what we are talking about is designing a means for investigating an accident, a marine accident?
A. Yes.
Q. And how to generate -- and the steps necessary -- the steps necessary along the way to conduct this investigation, as well as the steps necessary to prepare and obtain approval of -- or obtain approval of a report related to the

investigation of the accident?
A. Correct.
Q. Is there anything else related to process?
A. For the investigation report, that pretty much sums it up.
Q. Okay. What other processes or processes are involved in the supervisory skills necessary to or required to perform the position of director of OMS between 1997 and 2005?
A. The processes for the supervisory component of that.
Q. Right.
A. Well, supervisory also transcends into everything else that's going on. But if we are talking about personnel and dealing with personnel, it is the identification of positions, necessary positions within the confinements of budget parameters. It is the recruitment and hiring of personnel to fill those positions. It is the development of personnel within those positions that either hold those positions or are new to the positions, which is training and counseling and



performance.
It is the oversight of their work and also the oversight of their personnel activity. I'm talking about, you know, payroll and that kind of activity, travel and things like that. And it is also the, in a broader sense, the management of the office, ensuring that the staff have tools to do their job within budget parameters, computers, furniture, other tools in addition to things like training.
Q. I see. And then you mentioned as far as the supervisory, well, let me just go back to this, actually. With regard to the processes for personnel issue, you said recruitment and hiring, development of personnel and positions, training and counseling personnel, oversight of their work, oversight of their personal activity including, for example, travel and payroll, identification of positions and within the budgetary parameters, and the overall management of the office.
Other than those, are there anything else related to the processes for the personnel issues related to the requirements for the position of



Director of Office of Marine Safety?
A. No. I may not have included every fine detail of personnel management, but it is the general supervision of the staff.
Q. I see. What about budgeting? Describe to me what processes are required for budgeting as part of the supervisory skills for the Director of Office of Marine Safety between 1997 and 2005?
A. During that period the budget execution and budget development, start with budget development and the budget execution requirements for the offices changed slightly. But in general terms the offices were responsible for providing a request for budget, for money.
And that money -- each fiscal year, fiscal year process in the federal government, and that money request included money for personnel, for overtime, for training, for mission execution, for equipment, for uniforms, for supplies, all of what you would expect in a normal budget category. The budget was in the NTSB during that time for the most part translated down to the offices. It was not for the most part



centralized, translated down to the offices to design and submit a request.
Those requests were then collected by the chief financial officer and the managing director's offices. And based on the allocation provided by Congress, the appropriation provided by Congress to the agency, managing director's office and CFO's office allocated back to the offices the amounts that the agency could afford for the offices to execute their mission.
It was almost never heard of that, I don't know of any circumstances where an office's budget request was completely filled when the allocation was returned to the office, simply because the agency did not have the level of appropriations that equaled the net sum of the budget requests.
Q. Sure. You said during your -- during that recent -- during the most recent answer you said that the offices were required. So is it correct to say that each of the offices, Office of Marine Safety, Office of Aviation Safety, Office of Highway Safety, Office of Railroad, Pipeline and Hazardous Material

Page 50

Safety all have the same requirement of their directors that they have skills and budget tear processes?
A. Yes.
Q. And those, were those budgetary processes the same for all the offices?
A. Yes.
Q. Okay. What skills are involved in the collaboration with -- well, let me ask this. Let's strike the earlier part of the question.
You mentioned as far as collaboration that NTSB has a party system. Is that what you said it was a party system?
A. Yes.
Q. Can you describe the party system as it applies to the Office of Aviation Safety, the Office of Highway Safety, the Office of Railroad, Pipeline and Hazardous Materials Safety and Office of Marine Safety?
A. Again, I'll need to take them one at a time.
Q. Okay.

Page 51

A. Because it is slightly different.
Q. Okay.
A. In general terms the NTSB operates its investigations with parties. What that means is that we select organizations to work with us on the investigation. That can be federal agencies. It can be in the industry. It can be other organizational groups that are not part of manufacturing.
It can be the carriers in an accident. And they are responsible under this arrangement to provide work force to the investigation to assist us in the development of the factual information that we need to gather during each investigation.
The exchange is that they work for us essentially on the investigation. And we provide in return an open book on the factual information that we are gathering during the investigation. It does not include -- the party system does not include the analytical aspects of our investigation.
So it is really a work force of -- work force multiplier for us.
Q. So, I apologize for interrupting you, sir.

Page 52

So each office is involved in this party system. Has each office director is -- has a skill requirement that he be able to engage in this party system that he or she actually the -- be able to engage in this party system and to actually execute that party system?
A. Correct.
Q. Concept?
A. Correct. With some variables between offices.
Q. Okay.
A. Okay.
Q. Can you describe the variables between the offices?
A. For aviation safety, the FAA is the only agency or entity that is automatically granted party status by the NTSB. It is in the statute. No other organizational entity or agency is automatically granted this statute.
Additionally, in aviation the parties to the investigation are generally well-known individuals and organizations to our aviation group. They are from Boeing or they are from Airbus or they are from

Page 53

General Electric or United Airlines, et cetera. They are the same groups. And we make a concerted effort to train those individuals in advance of the accident investigations.
We have the basic accident investigation school that we provide to these folks so that they can work on our investigation when the time comes to do that. So the industry, the aviation industry is rather large, but the individuals that we see as parties are people that we've seen before. And so there's familiarity there.
Q. Sure.
A. In the other modes, it is somewhat different.
Q. Okay. Let me just go back to aviation real quickly. What is the -- can you just describe to me a plane falls out of the sky or there's an aviation accident. Describe to me how the party system works between the FAA, NTSB and the private groups, Boeing and other groups that you train?
A. Certainly. A plane crashes. A commercial airliner crashes. And the NTSB arrives on the scene

Q. Yes. Explain that part of it.
A. It is Railroad Pipeline and Hazardous Materials is the most complicated office in the agency, I believe because it is a mixture of three different similar and wholly dissimilar disciplines.
For railroad accident investigations it is analogous to aviation. We know there are not that many railroads in the United States, but they are relatively large. We have working relationships and familiarity with the majority of the major railroads in the United States. And that includes the majority of the major Metropolitan Transit Authorities in the United States.
In the pipeline area, it is more analogous to probably the highway area. There is lots of miles of pipeline in the U.S. and lots of pipeline companies. And frequently our pipeline investigators are introducing themselves to the pipeline parties when they go to their investigations.
And then there is the third component of the rail pipeline hazardous materials, and that is the exclusive hazardous material part of that. Our



parties in hazardous material are generally new to the NTSB on each investigation, but the hazardous material function is as much a support role as it is a primary modal role.
Hazardous materials don't get there on their own. They go by truck or train or pipeline or ship or plane. So hazardous material is generally support activity for the agency.
We have occasionally issued hazardous material reports, but for the most part our hazardous material work and party system falls within the purview of another modal activity.
Q. I see. What type of education is required to perform the requirements of the Director of Office of Marine Safety between 1997 and 2005?
A. Well, the required education for the GS level employees that are not technical employees, not engineers, they are in federal government requires as you probably know degreed personnel for engineering positions, for lawyers, for some other billets. But for the Director of Marine Safety, there is no formal education requirement, but there is a practical



educational requirement and understanding of the marine industry within the United States and also internationally.
Q. And --
A. I think it would be difficult for a nonmariner -- it wouldn't be impossible but it would be difficult for a nonmariner to run the Office of Marine Safety. It would be difficult for a non-aviator or avionics engineer to run the Office of Aviation Safety. It would be difficult for a non-highway engineer or highway accident investigator to run the Office of Highway Safety.
Q. I see.
A. Not impossible but it's better with that background.
Q. Are there any specific educational requirements for the requirements of office of -- Director of the Office of Railroad, Pipeline and Hazardous Materials between 1997 and 2005?
A. There are no specific educational requirements required, but that is a relatively unique position in that you have to -- the gentleman who



holds that position now has a background and an understanding in all three disciplines that are contained within that organizational unit.
Q. Who's that individual?
A. Robert Chipkevich.
Q. I see.
A. C-H-I-P-K-E-V-I-C-H.
Q. And that's applicable, your statement that there's no educational requirement per se to fulfill the requirements of the position of Director of Office of Railroad, Pipeline and Hazardous Materials; Office of Marine Safety; Office of Aviation Safety and Office of Highway Safety; that's correct?
A. That's correct.
Q. Okay. Can you describe the abilities that are required for the position of Director of Office and Marine Safety between 1997 and 2005?
A. The abilities fall within the categories that we previously discussed, leadership, the ability to supervise employees and lead a -- the practical functional application of an office, process development skills, coordination, communication, oral

Page 78

and written, analytical skills and an understanding of the marine industry.
Q. Anything else apart from those?
A. No. I think that we covered those in the previous answer.
Q. Sure. And can you describe the efforts that are required to perform the position of office -- Director of Office of Marine Safety between 1997 and 2005, what specific efforts or I guess efforts in general are required to perform that position?
A. The Director of the Office of Marine Safety needed to evaluate accidents, notifications, select accidents to recommend that the agency investigate, supervise and oversee the investigation of the accidents, supervise and oversee the development of the report and recommendations from those accidents, develop and put in place agreements and processes for all of those activities, collaborate and coordinate with other offices within the agency and outside of the agency to conduct those activities, and then represent with some organizational unit outside the agency and congressional staff essentially the results

Page 79

of those investigations.
Q. So aside from evaluating accidents and selecting accidents and recommending accidents for investigation, supervising staff in the field, development of processes, collaboration and communication of results, is there any other -- are there any other efforts that are required in order to perform the position of Director of Office of Marine Safety between 1997 and 2005?
A. Well, broad categories cover the majority of the work, yes.
Q. We discussed a lot of these already; am I correct?
A. We did.
Q. We didn't discuss evaluating and selecting accidents to investigate. Can you describe the requirements in order to evaluate and select and recommend an accident to investigate?
A. Each of the office directors in the modes have the responsibility of ensuring that a robust notification system exists, not only through our communications center but through the organizations

Page 80

that we generally work with, that our office directors work with, and Office of Marine Safety would be for example the Coast Guard as the primary and then potentially department of natural resource units within the states and the international community for notification.
Once the -- because that's the key, learning about the accidents that exist, that occur. Once that knowledge comes in, and once that system's been established, the office director would assess the nature of the accident, the number of deaths, location, issues involved, and based on their specific criteria, and each criteria is different for each mode, make a recommendation to the chairman, essentially to investigate a major accident.
Q. The criteria are different but all the directors between 1997 and 2005, all had the same I guess requirements that they obtain -- that once they obtain communication that they evaluate and determine whether it's an accident that should be investigated, determining to investigate it and then recommending the investigation. Is that correct?

Page 81

A. Basically. It -- the office directors would need to evaluate the circumstances of the accident, then also look at their specific mandatory criteria or thresholds, evaluate resources, consider implications for other investigations and then make a recommendation.
Q. I see. And can you describe to me the working conditions under which Miss Murtagh Cooke was required to -- was required to perform her job between 1997 and 2005 as Director of Marine Safety?
A. The Managing Director between -- between 2000, 2005?
Q. I'm sorry, 1997 and 2005. I apologize.
A. In '97 and 2005 the managing directors were different during that time. The supervisors were different. And the chairman of the board were different. We had several different chairman and at least two, maybe three managing directors, both in a supervisory chain for Ms. Murtagh.
So the particular nuances of each of those individuals changed somewhat regarding notification and the process for notification. But the same

Page 78

and written, analytical skills and an understanding of the marine industry.
Q. Anything else apart from those?
A. No. I think that we covered those in the previous answer.
Q. Sure. And can you describe the efforts that are required to perform the position of office -- Director of Office of Marine Safety between 1997 and 2005, what specific efforts or I guess efforts in general are required to perform that position?
A. The Director of the Office of Marine Safety needed to evaluate accidents, notifications, select accidents to recommend that the agency investigate, supervise and oversee the investigation of the accidents, supervise and oversee the development of the report and recommendations from those accidents, develop and put in place agreements and processes for all of those activities, collaborate and coordinate with other offices within the agency and outside of the agency to conduct those activities, and then represent with some organizational unit outside the agency and congressional staff essentially the results

Page 79

of those investigations.
Q. So aside from evaluating accidents and selecting accidents and recommending accidents for investigation, supervising staff in the field, development of processes, collaboration and communication of results, is there any other -- are there any other efforts that are required in order to perform the position of Director of Office of Marine Safety between 1997 and 2005?
A. Well, broad categories cover the majority of the work, yes.
Q. We discussed a lot of these already; am I correct?
A. We did.
Q. We didn't discuss evaluating and selecting accidents to investigate. Can you describe the requirements in order to evaluate and select and recommend an accident to investigate?
A. Each of the office directors in the modes have the responsibility of ensuring that a robust notification system exists, not only through our communications center but through the organizations

Page 80

that we generally work with, that our office directors work with, and Office of Marine Safety would be for example the Coast Guard as the primary and then potentially department of natural resource units within the states and the international community for notification.
Once the -- because that's the key, learning about the accidents that exist, that occur. Once that knowledge comes in, and once that system's been established, the office director would assess the nature of the accident, the number of deaths, location, issues involved, and based on their specific criteria, and each criteria is different for each mode, make a recommendation to the chairman, essentially to investigate a major accident.
Q. The criteria are different but all the directors between 1997 and 2005, all had the same I guess requirements that they obtain -- that once they obtain communication that they evaluate and determine whether it's an accident that should be investigated, determining to investigate it and then recommending the investigation. Is that correct?

Page 81

A. Basically. It -- the office directors would need to evaluate the circumstances of the accident, then also look at their specific mandatory criteria or thresholds, evaluate resources, consider implications for other investigations and then make a recommendation.
Q. I see. And can you describe to me the working conditions under which Miss Murtagh Cooke was required to -- was required to perform her job between 1997 and 2005 as Director of Marine Safety?
A. The Managing Director between -- between 2000, 2005?
Q. I'm sorry, 1997 and 2005. I apologize.
A. In '97 and 2005 the managing directors were different during that time. The supervisors were different. And the chairman of the board were different. We had several different chairman and at least two, maybe three managing directors, both in a supervisory chain for Ms. Murtagh.
So the particular nuances of each of those individuals changed somewhat regarding notification and the process for notification. But the same

general parameters existed. And those were that the offices were relatively independent to do their work, expected to conduct the work assigned to them and the mission of the office, and to report upward through the Managing Director to the chairman the decisions and the progress and the developmental aspects of their work.

Q. So every time a Managing Director or a chairman changed or someone higher than the modal office director changed, the working conditions would be changed in the same manner for each of the office directors?

A. More so for the Managing Director and chairman. I am not sure, you mean, if the change in the office director?

Q. No, not officer.

A. Okay. With nuances for different chairmen, some chairmen wanted immediate contact on accidents and notifications. Some wanted to wait for the office director to gather more information and make a recommendation. Some managing directors wanted immediate contact first before the chairman was



notified. Others did not.

Those are the kinds of nuances. But the basic parameters of the office and running the office were left up to the office director.

Q. Okay. Can you describe to me the duties, the primary duties of the Office of Highway Safety between the requirements of the director of the Office of Highway Safety between 1997 and 2005?

A. Duties of the office of -- director of the Office of Highway Safety were to evaluate accident notifications, set up the accident notification process, evaluate accident notifications, make recommendations on those accidents that the office believed -- the office director believed should be investigated, then supervise and oversee the investigation of those accidents and the development of reports and recommendations.

The Office of Highway Safety director had an additional responsibility in the development of advocacy programs for state recommendation advocacy which the other modes do not have. And because there are 50 states, it is a different organizational



requirement. Everything else is federal for the most part, and the other modes from the investigative and from a regulatory perspective.

However, highway safety is regulated mostly at the state level. So that organizational and advocacy activity was required of the Office Director for Highway Safety. Additionally, the nature of highway safety issues lend themselves to the development of safety studies and public forums and hearings more conveniently than maybe some other modes.

And, therefore, the Director of Highway Safety had the responsibility of establishing and developing and deploying public hearings, public forums and safety studies more frequently than the other office directors.

MS. COHEN: I'd like to take a break here, if you don't mind.

MR. LOWINGER: Are you done, sir?

THE WITNESS: I am done. Yeah.

MS. COHEN: Can we take a ten-minute break please.



MR. LOWINGER: Sure.

\- - -

(Recessed at 11:53 a.m.)

(Reconvened at 12:05 p.m.)

\- - -

BY MR. LOWINGER:

Q. It's 12:05, 12:06. We are just coming back from a break. Mr. Osterman, during the break I understand that I was asked to come back because you were speaking with counsel. Can you tell me what you spoke about with your counsel during the break?

MS. COHEN: Objection. Attorney-client privilege. Don't answer the question.

MR. LOWINGER: There's no attorney-client privilege during a break, a recess in a deposition. Can you please tell me?

THE WITNESS: I am not going to answer it if my attorney tells me not to.

MR. LOWINGER: All right. We are going to go off the record.

\- - -

(Recessed at 12:06 p.m.)

Page 98

Q. Can you describe to me the work that's involved in the Annex 13?

A. It involves representational duties at ICAO meetings and representational duties in the development and modification of any clauses of Annex 13. Every three years ICAO holds -- ICAO is a subset of the United Nations. And they hold a general assembly in which they consider changes and alterations to the treaty essentially.

And ICAO also conducts audits of member states. And they do a number of other functions. And our responsibility when it comes to the United States is the accident investigation part of that.

Q. I see.

A. So that office director has that responsibility.

Q. Is there any similar sort of responsibility for international treaty-based work for the Office of Marine Safety?

A. There is, but it resides with the Coast Guard. There is an international maritime organization. I think we spoke about this earlier.

Page 99

It is a equivalent organization to ICAO. It is part of the UN.

They do the same kind of work. And there is marine accident investigation components to the IMO Treaty. However, the NTSB is not the responsible party for the United States government on that. It is the U.S. Coast Guard.

Q. But would the -- would the director between 1997 and 2005 have responsibilities to IMO even though it's not primary responsibility?

A. We have an interest in being involved in the International Maritime Organization. And we have an interest, a very significant interest in being involved in the development of changes or modifications to the Marine Accident Investigation Treaty. And our interest has to flow through the Coast Guard.

Q. So the agency is still represented with regard to international matters, and there's still a requirement of performance of duties related to international matters, it's just that it's not -- it's just that it's through the Coast Guard?

Page 100

A. The Coast Guard, the Coast Guard has a responsibility for representing the United States at IMO. The NTSB does not. But the NTSB has an interest in the outcome of the work done there.

So we attempt to influence the Coast Guard to include us and consider our concerns in their discussions with IMO. Whereas in the aviation side, we are the representatives for the accident investigation part. We do represent the U.S. government on that part.

Q. I understand. With regard to unique duties between regional and general investigations and regional reports and the maintaining the database and producing the report and working with ICAO, are there any other unique duties of the office of direct -- the director of the Office of Aviation Safety between 1997 and 2005?

A. We talked about, I know you covered -- I don't know that you covered everything we talked about, but it is in the testimony, the regional -- overseeing the regional activities. And we mentioned earlier that the international work of the Office of

Page 101

Aviation Safety is significant because of our responsibilities in the treaty. So we do a lot of international work in aviation and safety.

We are responsible for supplying investigators to accidents worldwide that involve U.S. carriers, U.S. manufactured aircraft or components. And it's pretty difficult nowadays to find a major aviation accident that doesn't involve a U.S. manufactured air craft or component. Airbus puts Pratt and Whitney and GE engines on their aircraft. So we are involved in most international major events.

And we also have a responsibility to assist other nations at their request. And they have done that frequently, especially South America and Africa where they don't have the capacity to do it themselves.

Q. And that's all?

A. That's pretty much it for aviation. You had asked about railway.

Q. Right. Other than the general duties that we had discussed, the supervision of investigation of reports and production of reports, staffing of

Page 114

prescribed steps that the modes use in producing a report. Several drafts are reviewed by staff and ultimately will -- we get to the director's review that I mentioned previously and then ultimately is delivered to the board for their deliberation.

In highway safety area, the office director is also responsible for as I said previously safety studies, more often than other modal directors. And they are also responsible because of the nature of highway accidents for providing safety reports in addition to accident reports. Accident reports are generally discrete reports on a particular accident event.

Safety reports are generally a collection of a number of different accidents with the common issue in which the issue is thoroughly examined, for example, bus crash worthiness. I don't remember how many investigations were included in that safety report, but maybe a dozen in which we did a number of analytical activities to produce a report on the issue of bus crash worthiness.

Q. And did the Office of Marine Safety between

Page 115

1997 and 2005 produce safety reports?

A. I don't believe they did. I believe they produced accident investigation reports.

Q. And to what extent would -- to what extent is it -- is marine safety -- let me see if I can rephrase that. Okay. So let's just go back to this.

You said before that there are a few prescribed steps in producing a report that's common to all the offices. What are those prescribed steps that are common?

A. Well, I can give you the basic steps. There are more finite detailed steps within the production of a report, but once the investigators are finished with their on-scene investigation, and that is a relatively fluid statement because on-scene investigations can sometimes be wrapped up in several weeks, and sometimes it will take much longer period. Like a TWA 800 that's at the bottom of the ocean, it may take months or even years to get all the data.

They will have a work planning meeting or series of work planning meetings in which the investigative staff and the office heads, not all of

Page 116

them but the office heads that are involved in the investigation, namely the modal office director and frequently the director of research and engineering, if it's a technical problem, will evaluate the progress of the investigation and do two things. One is to evaluate what additional work needs to be done; and, two, what general time line and what general production flow should occur as far as when they think the investigation will be complete and assignment of resources and things like that.

Following the completion of the investigation, a writer will begin to take from a public document which is all of the factual information we compiled from the investigation, take that data and begin to craft it into a comprehensive report for the agency. Our data for TWA 800, for example, filled up an entire room full of file boxes, but the report is only several hundred pages long.

We talk the pertinent information from the investigation and write a report based on established format guidelines for the agency for the report. That report then once in draft goes through a series of

Page 117

reviews, beginning at the investigative team review, then a review through the office, that is the originating office, marine safety or aviation safety.

It then goes to a technical review which is where the parties to the investigation, and sometimes we will hire experts from the outside to review our reports if they are very complicated, get an opportunity to look at the factual information only to make sure that what we've got is accurate; that we are representing it correctly, but only the factual part. Once that is all done, it goes through a series of editing and formatting cleansing operations and then comes to the director's review that I mentioned early on in the deposition.

Following the conclusion of the director's review, the report is modified based on the direction from the directors, Managing Director and the director of RE and SR, and then presented to the board for deliberation. Many of the reports, most of the major reports go to a sunshine meeting, a board meeting, public meeting where the board deliberates the report and the recommendation and votes on adoption or

Page 118

changes, the content of the recommendations. And some are sent to the board for only a review without a public meeting. And they still vote on it.
Q. When it leaves editing and goes to the director review, you said other entities or other parties are involved in the director's review. Am I correct?
A. No. I said technical review.
Q. Okay. It goes from --
A. Technical review where we involve the parties in a review of the factual information to make sure one last time that it's correct.
Q. Okay. And who does this technical review for in general?
A. The parties who are involved in the investigation. And if we don't have -- in our opinion if we don't have satisfactory technical skill from the parties to ensure accuracy, we will occasionally enlist non-aligned technical experts to review some reports.
Q. I see. With regard to --
A. I think I have to pull one more piece of

Page 119

that puzzle in for you because especially in aviation, but also in highway and rail, the office directors also have the responsibility of producing and approving reports on accidents that do not have recommendations associated with the reports without the process of going to the board. They have delegated authority to approve a report that is not -- does not contain recommendations.
Q. You said each office director has that authority?
A. The Office of Aviation, Rail, and, yeah, I think the Office of Marine Safety has it as well. It's mostly the majority of those cases come out of aviation, all the general aviation cases. Next would be highway and then rail and then marine, but I am not sure that marine frequently uses their delegated authority.
This is a report that does not have -- of an investigation we may have conducted where we do not have recommendations to present to the board. And it does not have other national implications.
I know that our current marine safety

Page 120

director has signed one or two investigation reports as a delegated authority. I'm not sure. I would have to look for those episodes between '97 and 2005 for the former marine safety director. I just don't know.
Q. Is there any information anywhere that you are aware of that would list all the delegated reports produced between 1997 and 2005?
A. We can gather that. It's a brief extrapolation. If it was not adopted by the board through a vote, it was a delegated report to the office director.
Q. Are the delegated reports still published?
A. Yes.
Q. Back to Deputy Haueter, I just wanted to get back to this for a quick second. I apologize. But does Deputy Haueter have any budgetary responsibilities?
A. His budgetary responsibilities would be executed through authority delegated to him by the director. So if the aviation director wanted him to manage part of the budget, he could do that or would do that.

Page 121

Q. Are you aware whether or not, well, describe to me the instances in which Deputy Haueter actually did do budgeting work for the Office of Aviation Safety during his tenure?
A. I do know that the Deputy of Aviation Safety managed a number of our contracts involved in major aviation investigation and activity. We frequently will contract with outside vendors to conduct technical work and sometimes recovery work.
747, for example, dropped an engine in Lake Michigan, and we contracted with a vendor to recover that engine. And he managed that contract.
Q. I see.
A. I know that he did that function while he was the deputy.
Q. What about, for example, coordination with outside organizations?
A. The deputy of Office of Aviation Safety had some activity and some responsibility for coordinating with outside organizations, specifically with the investigations that he was overseeing, but in a more general sense for the Office of Aviation Safety, that

authorship of the report?
A. I think each director to different levels was involved in modifying draft reports. Writing a report from a blank piece of paper, there were staff in each of the offices that conducted that activity. The office directors reviewed reports. And before those reports left the office, they had a hand in modifying the report.
Q. Okay. And what type of prior experience and training and education is required to be the Deputy Director, Mr. Haueter, to fill Mr. Haueter's role?
A. For aviation safety?
Q. Um-hmm.
A. Again it is not an engineering or professional GS position. Therefore, there's not a mandatory educational component. But the practical requirements are that the deputy of AS has a very specific understanding of aviation, why planes fly and why they don't, sometimes.
Q. I see. Would you say that Ms. Murtagh Cooke's job was a 24-hour 7-day-a-week job like the



other directors' jobs?
A. I would say that it was 24/7 but it was not like the other directors' jobs. As I mentioned with the office of aviation safety, the level of notification and deployment of resources is constant and regular and always. Every weekend the NTSB is deploying aviation investigators to an accident somewhere, and frequently many accidents.
In highway safety, that is probably the next most cumbersome 24/7 job. All of the directors need to be available or have someone available 24/7 to take these responsibilities of evaluating accidents and deploying resources. But by volume, aviation certainly is -- happens all the time. Highway accident notifications are very frequent because of the nature of the sheer volume of accidents that occur nationally.
Railroad accident investigations are next. I would put marine in the fourth position and probably pipeline last.
Q. I see.
A. So you don't have to always -- you are not



always taking calls on the weekend. You are not always taking calls at night in some of these modes. Aviation always is doing it; highway, mostly; rail, frequently; marine, not so frequently; and pipeline infrequently.
Q. I see. Do you need a break?
MS. COHEN: Yes. We'd like to take our lunch break now.
- - -
(Recessed for lunch at 1:13 p.m.)
(Reconvened at 2:04 p.m.)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, we are back on the record. It's 2:05. During the break did you have any communications about your testimony with your counsel?
MS. COHEN: Objection. Attorney-client privilege. Don't answer that.
Q. I am not asking what your communication is, sir. I'm just asking whether you had any communications about your testimony?
A. No.



Q. Thank you. Could you please tell me, sir, whether Mr. Haueter during his tenure had the authority to hire and fire personnel?
A. Mr. Haueter as a supervisor.
Q. Yes.
A. Did have the authority to, within the parameters of the federal rules, to hire and attend to personnel matters.
Q. Okay. And what about -- how did the job of director of office of -- how did the requirements of the job of Director of Office and Marine Safety change in May 2005?
A. The requirements of the position in May of 2005, I am not sure that -- the requirements of the position didn't particularly change in May of 2005. They were relatively the same.
The requirements of the position changed with the advertisement of the position as an SES. And that happened earlier than May 2005. May 2005 was a selection of someone to fill that advertisement.
Q. I understand. Did the requirements of the actual job of Director of OMS change after

# Exhibit 6

those investigations conducted by regional investigators, and there's a wide range of those. There are a few incidents, but most are accidents. And then there's a number of fatal accidents that the deputy director of regional operations is responsible for.

Then we have major investigations, the crash that makes the news, an airline crash with a lot of people and things like that. That's the deputy director at headquarters, the deputy director in OAS. He's the deputy director for major investigations. Those can be the big investigations and all of those technical -- complicated technical investigations that didn't involve an accident. But that's the deputy director of major investigations.

That's the way it's structured right now. And then there's a deputy director of regional investigations that has all those investigators out scattered around the country.

MR. LOWINGER: Does anyone need a break? We've been at it for a little while. Would you like a break?



THE WITNESS: Go ahead. I'm fine.

MR. LOWINGER: I'm fine as well.

BY MR. LOWINGER:

Q. Let's talk about -- I think we're getting ahead of ourselves a little bit, and I think we're kind of talking about the present right now, and I want to make sure we're all in the right time period.

You became the director of OAS in 2000 or 2001?

A. Yes.

Q. And you were an SES at the time?

A. Yes.

Q. From the beginning of the time that you were the director of OAS, can you describe to me your principal duties and responsibilities as the director of OAS?

A. The principal duties were to conduct aircraft accident investigations.

Q. Okay.

A. Have safety recommendations written that would improve the safety of aviation. The director is responsible for the overall maintenance of the



regional investigative offices. Or not the maintenance, but the existence of those offices. The director is responsible for determining which slots should be filled in which order, for example.

Q. For FTEs?

A. For FTEs, yes.

The director had that delegated authority to sign off on a lot of the regional investigations that wouldn't go to the Board.

The director is responsible for making sure that the reports on major investigations are completed in a timely manner, that the various aspects of an investigation are properly covered and properly investigated, and that the report is compiled and presented to the Board, and then to get those reports accepted by the Board members and get their endorsement of those reports.

Q. Okay. So as the director of OAS, your responsibilities, or your primarily responsibilities were accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, filling slots for human



resources or for individuals for employees, delegated authority for investigations that don't go to the Board, major investigation reports completed in a timely manner, proper investigation of major investigations, a report completed to the Board and accepted by the Board.

Would you say that's the complete list of your primarily responsibilities as the director of OAS?

A. Well --

Q. You can add to it, sir. We've got time.

A. And I will. I think that's kind of a top end. One thing I did forget is we have a major responsibility in participating in and coordinating foreign investigations.

Q. Okay.

A. That's a big operation in the sense of our responsibilities for U.S. products, U.S.-operated equipment, U.S.-manufactured equipment that are involved in accidents around the world.

Q. Right.

A. So there's a huge amount of our resources

Page 62

that go to investigating foreign accidents. And fortunately, in the last number of years, we've had not too many major accidents in the United States, but it's never-ending overseas.

Q. Okay. So in addition to the list that we just said before, and participating in and coordinating foreign investigations for accidents occurring abroad that contain U.S. products, what other principal or primary responsibilities did you have as the director of OAS?

A. Well, one aspect of the job was to keep the managing director and the chairman informed, keep the Board members informed of what was going on in our world, provide testimony for the Hill, meet with Congressional staffers on a relatively routine basis.

Q. Okay.

A. I mean, things keep popping in my head, but that's all I can think of right now.

Q. All right. Well, let's go through the list again. So now it's accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, human

Page 63

resources, delegated authority for regional investigations not going to the Board, major investigation reports completed in a timely manner, proper investigation for major investigations, reports completed to the Board and accepted by the Board, participating in investigations of accidents occurring abroad that involve U.S. products, keeping the managing director and the members of the Board informed of what's going on in the Office of Aviation Safety, testifying on Capitol Hill, and meeting with staffers on a routine basis.

MS. COHEN: Objection. Mischaracterization of testimony.

You can answer.

BY MR. LOWINGER:

Q. Is there anything else, sir, other than what I've just mentioned? And if I'm wrong, if any of what I just said is wrong, feel free to --

A. If it's wrong, I didn't pick up on it. And I wouldn't characterize that as everything. That's all I can remember at this time. There's a multitude of things.

Page 64

Q. Let me throw some other things out there and see if any of it jars your memory a little bit.

A. Okay.

Q. Budget authority.

A. We have some budget authority in the sense that we're allocated some funds that go to the offices. We're allocated some funds to buy equipment. We have investigative funds that we can use either for headquarters or regional offices to help in the investigations.

Most of our authority is -- The budget is very limited in the sense that we don't control salary, wages. We have some control over overtime expenditures. The actual leasing and renting of facilities are handled separately.

So the budget authority is kind of -- I would say it's limited in a lot of ways. If there is a major investigation, we're going to get the funds to do the investigation.

Q. I see.

A. Our limitation, primarily, is we have more things we can do than we have people, so we

Page 65

investigate as many things as much as we can, and there's very little budget authority in the sense of trying to do program plans or budgeting that you would see at a typical federal office. I guess the attitude is we could be absolutely flat broke and if there is a major crash, we're going. You know, somebody will find the way to get the money to us.

So the budget issue is pretty minor in a way. We just have to be careful that we don't exceed overtime. Or if we're getting short on travel money, for example, if we have a need for the travel, the agency always supports us. We're just careful with it.

Q. I see.

Who is responsible for the budgeting work?

A. Well, the office director would be, but primarily in our office, Annette Willis keeps track of all of that. If there's not a major launch or a major flurry of investigations going overseas, she'll keep track of overtime and -- We have a training budget. They give us so much money. So we kind of divvy up the training of people at their request or what we

Page 66

require of them and then parse out that money and get as much training as we can. Basically, Annette Willis watches all of that.

Q. I see.

A. It would be the director's responsibility, but she takes care of it and it doesn't take a lot of time of the office director.

Q. When you say it doesn't take a lot of time, would you say it takes five minutes a week? Does it take ten minutes a week? Are we talking about --

A. Good weeks, zero, because Annette takes care of it. Several times a year you meet with the managing director and discuss budget issues and FTEs and what we may expect for the year. Those meetings may last a half a day or a day a couple of times a year. It's minimal.

Q. Okay. Was there anything else that you would consider your primary responsibilities that you had to expend your efforts on as the director of OAS?

A. I don't recall any right now. If it comes up, I'll mention them.

Q. Do you remember any that were not primary,

Page 67

just little ones? Sometimes the little ones kind of stick out the most.

A. I didn't distinguish between -- No.

Q. Okay.

A. I can't think of anything other than that right now.

Q. All right. Of this list we just mentioned, which are the most important? If you were to rate them, which are the most important, all the way from top to bottom, that you would spend your time and efforts and expend your work time on it? Which of these are the most important?

A. Oh, the accident investigations and safety recommendations.

Q. Which is more important, accident investigations or safety recommendations?

A. You have to do the first to have the second.

Q. Okay. And then what about the maintaining of the regional offices? Is that a primary important responsibility?

A. Well, it's important, but it takes very

Page 68

little effort on my part, or did.

Q. When you say "little effort," sir, can you tell me, would you say it takes an hour a week max? Does it take less than that?

A. Probably less. It's between the deputy director of the regional operations and the budget person. That's usually taken care of.

Q. With regard to maintaining the regional offices, which was a responsibility of yours but not necessarily -- I guess when you said maintaining of the regional offices, were you only referring to budgetary issues to make sure that they're still up and running, or were you referring to their investigation work in their regional office investigations, the regional offices -- I don't know -- their employees or --

A. I'm not sure of the distinction you're making there. I thought we were talking about budget. So in that sense there is not a lot of budgetary things under our control. The salaries and benefits and all of that are taken care of separately. If we get an FTE, he's going to be paid. We have overtime;

Page 69

that's the budgetary.

There's a certain amount of the offices, equipment, office rental space, leases coming due, and our budget person keeps track of that and the deputy director of regional operations are aware of when each one of those -- It all gets taken care of, and very seldom would the director have to weigh in and spend a lot of time worrying about that. It's part of his responsibility, but we're so nicely structured that a lot of that takes care of itself and doesn't require a lot of time from the director.

Q. Sure. Let me just ask a question. I want to make sure we're 100 percent clear. When you just gave this entire list of primary responsibilities, were you under the impression that we were only talking about it as far as financial operations, or were you thinking -- When you said accident investigations are the most important, you weren't referring to any budgetary issue with regard to that, you were just talking about accident investigations in general are the most important?

A. Out of that whole list, there's some

Page 70

budgetary things that come into it. But it's like I just described the regional offices, it's the director's responsibility, but the director doesn't have to spend a lot of time worrying about it. It's important that the offices are taken care of, and people take care of it.

So there's a mix and a match. There's some budgetary. And like I said, kind of the budgetary side is not a lot of -- it doesn't create a lot of work for the director.

Q. Okay.

A. We either get FTEs, we're going to get investigators. We're careful with our money. We're careful in when we travel, why we travel on lesser accidents. So we always seem to have the money for that. You know, we get that.

Our big issue is we need big chunks of money for persons, and that's not a budgetary issue that is in my control, or was in my control.

Q. All right. So we've dealt with accident investigations, safety recommendations, maintaining the regional offices. The next one was -- What would

Page 71

be next? What would be the primary responsibility that we discussed?

A. If you want to look at your list, we can go down it.

Q. Next on the list is filling slots. Was that a primary responsibility? Was that a low amount of work for you?

A. It's a low amount of work. It's very important, but if we were authorized to hire one or two investigators a year, it doesn't take a lot of time.

Q. Is that, on the average, how many you were authorized to hire?

A. Sometimes one or two, sometimes three or four. Very few.

Q. Very few? So not a big chunk of your time?

A. No, it didn't require a lot of time.

Q. All right. What about delegated authority for regional investigations not going to the Board?

A. That's minimum time.

Q. Minimum? Less than budget and less than filling slots?

Page 72

A. They're all down there pretty small.

Q. Near the bottom?

A. Yeah.

Q. Major investigation reports completed in a timely manner?

A. That's pretty big.

Q. Is that near the top?

A. Yeah. I would say that's No. 3.

Q. No. 3?

A. Uh-huh.

Q. Okay. Making sure investigations are conducted in a proper manner?

A. Those would be the three. I would combine those two. You can't do one without the other, but they're somewhat distinct.

Q. Completing the report for delivery to the Board and accepted by the Board. Are those separate?

A. I would say that's probably 4.

Q. So both of those together is 4, or separate?

A. I don't know what both you're talking about.

Page 73

Q. Completing a report for delivery to the Board, is that No. 4?

A. Yeah.

Q. Making sure the report gets accepted by the Board?

A. That would be the same thing.

Q. Okay. Participating and coordinating foreign investigations of accidents that involve U.S. products?

A. Right now, I would say that's 5. It might change depending on what year.

Q. Keeping the managing director and the Board informed of what's going on.

A. It's down below those, but I'll have to see what the rest are.

Q. Testimony for Capitol Hill?

A. That's minimal. I group that down there as a minimum effort.

Q. Meeting with staffers on a routine basis, I think you said.

A. I'd say that's a minimum. Those you said that are all at the bottom, I would say all of those

Page 74

in a group, it depends from week to week, but they're all a minimum effort from the director.

Q. I think we're actually at the end. So what about --

A. Where was foreign? Is that the fifth one there?

Q. Yes.

A. Okay.

Q. Let's start going through these lists, okay? Do you want to talk about some other topic first?

A. I'm just thinking, on the foreign, the workload effort at the director's level, it's kind of hard to sort out because it's part of the investigations we do. I mean, it can be grouped right up there with 1 and 2. We don't write reports on foreign investigations, but it's a huge resource. It's a lot of coordination of manpower. There's all of that that goes on with an investigation except for writing the report.

Q. So participating in and coordinating foreign investigations is really, while it's listed as

Page 75

5, it can go all the way to 1 because once you have an accident --

A. An accident is an accident.

Q. An accident is an accident no matter if it happens in Geneva, Switzerland, or --

A. There is a difference. If it's in the United States, there's a lot of volatility. The investigations in the United States can be huge. We may have 100 to 200 investigators working for us out of our whole staff. Foreign investigations are typically smaller and they're a little more streamlined because of the complexity.

In the United States, we may launch -- We have 50 investigators in the regions, or we should. Sometimes we're way down. We would like to have 50 at headquarters. We would like to have 50 in the regions, but we may have 40.

Q. Together, or in each region?

A. No, that's total.

And at headquarters, we would like to have 50 and we may have 35. So if we have a major launch here, we may launch about half of those people in that

Page 76

first wave. But with all the parties coming in and the people participating in our investigation, there may be 100 or more people that we're managing out on the scene.

Q. Okay.

A. I mean, it's just a huge operation. It's very intense. So the foreign ones, we may launch three or four investigators, or one or two, and then we will get some -- it will be a lesser number -- qualified people from the manufacturer or the pilots union, for example. But the investigation is conducted by the foreign government typically, and we will participate with them.

But it's critically important. It's not like a major investigation here, but the importance is just as great.

Q. So you mentioned that you work with foreign governments.

A. Uh-huh.

Q. Do you work in a supporting role when there is a foreign accident? Is it limited to just a supporting role?

Page 77

A. It's very defined. We will provide an accredited representative under the rules of IKO Annex 13, and our accredited representative that we send is essentially one of our investigators in charge.

Q. Uh-huh.

A. And our accredited representative will have advisors. For example, Boeing and FAA will be advisors to our accredited representative. That's the U.S. team, and that team is provided the opportunity to participate in the investigation. And each foreign country has different rules, as we handle foreign investigative teams coming into our investigations in the United States.

Q. So under IKO, you don't take over investigation for a government?

A. No, no. If it's in the United States, it's our investigation. If it's in international waters, it's our operation if it's U.S.-operated.

In a foreign country, we can participate if that accident involves a U.S.-manufactured airplane, is U.S.-operated. There's a limited participation if it's a number of U.S. citizens on board.

# Exhibit 7

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MARJORIE MURTAGH COOKE
8475 Sylvan Way
Clifton, VA 20124

Plaintiff,

v.

CASE NUMBER 1:06CV00788

JUDGE: Paul L. Friedman

DECK TYPE: Labor/ERISA (non-employmer

DATE STAMP: 04/28/2006

MARK ROSENKER, ACTING CHAIRMAN, NATIONAL TRANSPORTATION SAFETY BOARD

Defendant.

Serve:

UNITED STATES ATTORNEY'S OFFICE
FOR THE DISTRICT OF COLUMBIA
Attn: Civil Process Clerk
United States Attorney's Office
555 4th Street, NW
Washington, DC 20530
-*Via Certified Mail*

) Case No. ______________

UNITED STATES ATTORNEY GENERAL
10th & Pennsylvania Avenue, NW
Washington, DC 20530
-*Via Certified Mail*

MARK ROSENKER
490 L'Enfant Plaza, SW
Washington, D.C. 20594
-*Via Certified Mail*

NATIONAL TRANSPORTATION SAFETY BOARD
Office of General Counsel
-*Via Certified Mail*

490 L'Enfant Plaza, SW
Washington, D.C. 20551
-*Via Certified Mail*

**CIVIL COMPLAINT FOR EQUITABLE AND MONETARY RELIEF AND DEMAND FOR JURY**

1. This action arises out of the Defendant National Transportation Safety Board's unlawful employment actions against the Plaintiff Marjorie Murtagh Cooke. Specifically, Ms. Murtagh Cooke alleges that the National Transportation Safety Board failed to justly compensate Ms. Murtagh Cooke in violation of the Equal Pay Act (EPA), as amended 29 U.S.C. § 206(d) *et seq.*, when it paid other similarly situated NTSB male directors larger salaries and compensation than Ms. Murtagh Cooke for similar work performed.

2. Ms. Murtagh Cooke also alleges that the National Transportation Safety Board retaliated against her in violation of the Fair Labor Standards Act (FLSA), as amended, 29 U.S.C. § 215(a)(3) *et seq.*, when the NTSB denied Ms. Murtagh Cooke an interview for the Office of Marine Safety Director position (and hired an alternate candidate), denied Ms. Murtagh Cooke the opportunity to review her evaluation for 2004, withdrew an offer for a senior level position, denied her an evaluation for 2005, denied her the opportunity for monetary awards, transferred Ms. Murtagh Cooke to the Office of Safety Recommendations and Communication, subsequently transferred her to the Office of the Managing Director, and denied her performance standards for her current position, for complaining about disparate pay and filing a sexual discrimination complaint.

**Parties**

3. Plaintiff Marjorie Murtagh Cooke ("Ms. Cooke" or "Plaintiff") is resident of the city of Clifton, County of Fairfax, in the State of Virginia.

4. Defendant Mark Rosenker is the Acting Chairman of the National Transportation Safety Board and is the delegated administrator of the National Transportation Safety Board ("NTSB" or "Defendant") and is responsible for the lawful administration of the

Agency. As such, Acting Chairman Rosenker is the proper defendant in this action pursuant to 29 U.S.C. § 203(d).

**Jurisdiction and Venue**

5. This Honorable Court has jurisdiction over the claims presented herein pursuant to 29 U.S.C. § 216(b), as it asserts a claims that arise under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et. seq.*, and specifically under the provisions of the Equal Pay Act (EPA), 29 U.S.C. § 206(d), and the FLSA, 29 U.S.C. § 215(a)(3).

6. Venue is proper in the District of Columbia under 28 U.S.C. § 1391(c) because the Defendant has its principal office in the District of Columbia and under 28 U.S.C. § 1391(e) because a substantial part of the events or omissions giving rise to Ms. Cooke's claims occurred in the District of Columbia.

**Factual Allegations**

7. In 1994, Ms. Cooke was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety.

8. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS").

9. Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status.

10. Each surface office had similar responsibilities, with the exception of OMS, which had two additional responsibilities: conducting accident investigations involving

military and commercial vessels, and conducting international accident investigations. The latter was similar to the additional responsibility handled by the Office of Aviation Safety. The Office of Aviation Safety had an additional senior level (SL) position to handle international investigations.

11. In 1997, during this restructuring Ms. Cooke was named the Director of OMS.

12. Soon after the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of ORPH.

13. In 2000, when the NTSB was reviewing an available SES slot, the Managing Director, Dan Campbell ("Campbell") suggested to then Agency Chairman, James Hall ("Hall") that Chipkevich be given the SES slot.

14. Campbell suggested that Chipkevich be given the SES slot because Chipkevich had supposedly the most seniority of the three directors and because ORPH was the most complex of the three offices.

15. Hall agreed with Campbell's suggestion, and Chipkevich, the Director of ORPH, applied, interviewed, and was awarded SES status.

16. In early 2003, the NTSB was once again reviewing an available SES slot. The Agency's leadership, then Chairman Ellen Engleman-Conners and then Managing Director Campbell assigned this SES slot to Joe Osterman ("Osterman"), the Director of OHS.

17. After Osterman was awarded the SES slot, Ms. Cooke became the only Director of the three safety offices without SES status.

18. Ostensibly because Ms. Cooke's Director Position did not have SES status, Ms. Cooke was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director OAS, Osterman and Chipkevich.

19. Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872, and Chipkevich received a salary of $142,022, Ms. Cooke received a salary of $121,583.

20. In addition, in 2004, while Clark received a salary of $142,022 Osterman received a salary of $140,797 and Chipkevich received a salary of $142,022, Ms. Cooke received a salary of $126,963.

21. Ostensibly because Ms. Cooke's Director Position did not have SES status, Ms. Cooke was granted lower monetary awards than her male counterparts, Clark, Osterman and Chipkevich.

22. Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Ms. Cooke received an award of $5,400.

23. In addition, in 2004, while Clark received an award of $17,000, Osterman received an award of $9,500 and Chipkevich received an award of $16,000, Ms. Cooke received an award of $3,400.

24. Ms. Cooke, in her position as Director of OMS, performed work substantially equal to Clark in his position as Director of OAS, Chipkevich in his position as Director of OPHRMS and Osterman in his position as Director of OHS.

25. Ms. Cooke performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of OPHRMS and Osterman performed his work as Director of OHS.

26. Due to this inequality, in April of 2004, Ms. Cooke met with the then NTSB Chairman Ellen Engelman-Conners ("Conners") and informed Conners that she was the only Director of the four modal investigation offices without SES status.

27. Further, Ms. Cooke informed Conners that the other three modal safety directors, all of whom are male, earned salaries much higher than hers because she lacked SES status.

28. Ms. Cooke explained to Conners that her concern was not the SES status *per se*, but rather she wanted equitable pay for similar work.

29. Conners responded by telling Ms. Cooke that if the NTSB acquired another SES slot, the slot would be assigned to the Director of OMS. However, Conners also stated that when the OMS Director position received SES status, the position would be advertised and that Ms. Cooke would have to apply and compete for the position.

30. Ms. Cooke suggested to Conners that she be allowed to receive overtime pay as one option for reducing the gap between her salary and that of the three male modal safety Directors.

31. Conners replied that she was not aware if that was a possible solution, but told Ms. Cooke she would look into it.

32. After the meeting Ms. Cooke met with Lisa Love ("Love") from Human Resources. Love confirmed for Ms. Cooke that she could receive overtime pay; however she needed approval from Conners, the NTSB Chairman.

33. After meeting with Love, Ms. Cooke made several attempts to meet with Conners to seek her approval for overtime pay.

34. Despite Ms. Cooke's efforts Conners refused to meet with her to discuss this subject.

35. Thus, Ms. Cooke continued to work as Director of OMS, doing substantially similar work to Clark, Osterman and Chipkevich, the other three Directors, and making significantly less money.

36. In July, 2004 the OMS Director position was advertised as having SES status.

37. As instructed by Conners, Ms. Cooke applied for this position, but the advertisement was cancelled; she was not granted an interview.

38. In January, 2005 when Ms. Cooke had not yet received an evaluation for the performance period ending in 2004, she requested a meeting with then Chairman Engleman-Conners. Conners refused to meet with her to discuss Ms. Cooke's performance evaluation.

39. Finally, in early 2005, the OMS Director position was re-advertised as having SES status.

40. Ms. Cooke applied for this position, but she was not granted an interview.

41. In response to years of unequal pay for similar work to that of her male counterparts, and not even being granted an interview for a position she held for eight years, Ms. Cooke filed a sexual discrimination complaint with the NTSB EEO Director on February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.

42. In her complaint, Ms. Cooke alleged that she received unequal pay as the Director of OMS because of her gender.

43. Ms. Cooke's discrimination complaint was investigated from August of 2005 through December of 2005.

44. In May, 2005 the new Managing Director, Joe Osterman ("Osterman"), notified Ms. Cooke of her non-selection for the Director of OMS position. Ms. Cooke noted that she had not been paid for the position during her tenure as Director, OMS. Osterman then offered her an SL position to compensate if she would submit bulleted responsibilities for a position description.

45. NTSB has used SL positions in the past to compensate senior level employees for pay over the GS-15 salary level.

46. In response, Ms. Cooke submitted the requested document. Osterman subsequently informed her that Chairman Engleman-Conners and Executive Director Dan Campbell would not permit him to use an SL position for her.

47. Instead, NTSB transferred Ms. Cooke to the Office of Safety Recommendations and Communication in June 2005.

48. In October, 2005, Ms. Cooke was transferred to the Office of the Managing Director.

49. Ms. Cooke has not received an evaluation for the performance period ending in 2005, thus precluding any opportunity for an award for her performance in 2005.

50. Ms. Cooke has not been issued new performance standards for her current position thus precluding any opportunity to improve her career status or to obtain awards for 2006.

**Count I**
**The Equal Pay Act (EPA)**
**29 U.S.C. § 206(d)**
**Unequal Pay**

51. Plaintiff incorporates the allegations in paragraphs 1 through 50 as though alleged herein.

52. Plaintiff is a an "employee" as the terms are defined at 29 U.S.C. § 203(e)(2)(ii) and the Defendant National Transportation Safety Board is an "employer" as the term is defined at 29 U.S.C. § 203(d).

53. Defendant failed and/or refused to compensate Plaintiff comparable to employees who were of the opposite sex, worked in the same "establishment" as Plaintiff,

performed work that was equal to the work performed by Plaintiff, and retained positions that required equal skill, effort, responsibility and was performed under similar conditions as compared to Plaintiff.

54. As the direct and proximate result of Defendant's violation of 29 U.S.C. § 206(d), Plaintiff was caused to suffer damages.

55. For violations of 29 U.S.C. § 206(d), Plaintiff demands such legal or equitable relief as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

a. Reinstatement;
b. Promotion;
c. Economic damages including front and back pay;
d. Reasonable attorney's fees and costs;
e. Liquidated Damages; and
f. Any other relief that this Court deems just and equitable.

**Count II**
**Fair Labor Standards Act (FLSA)**
**29 U.S.C. § 215(a)(3)**
**Retaliation**

56. Plaintiff incorporates the allegations in paragraphs 1 through 55 as though alleged herein.

57. Plaintiff is an "employee" as the terms are defined at 29 U.S.C. § 203(e)(2)(ii) and the Defendant National Transportation Safety Board is an "employer" as the term is defined at 29 U.S.C. § 203(d).

58. Defendant has limited, segregated, and classified the Plaintiff in a way which deprives her of employment opportunities and otherwise adversely affects her status as an employee because of Plaintiff's complaints of unequal pay and sexual discrimination.

59. As a direct and proximate result of the Defendant's conduct, Plaintiff was caused to suffer damages.

60. For violations of 29 U.S.C. § 215(a)(3), Plaintiff demands such legal or equitable relief as provided by 29 U.S.C. § 216(b), including, but not limited to, the following:

g. Reinstatement;
h. Promotion;
i. Economic damages including front and back pay;
j. Reasonable attorney's fees and costs;
k. Compensatory Damages;
l. Liquidated Damages; and
m. Any other relief that this Court deems just and equitable.

**Prayer for Relief**

WHEREFORE, Ms. Cooke prays this Honorable Court for Judgment against the Defendant, in the amount of economic damages and compensatory damages to be determined at trial, plus attorneys' fees, costs of this action, equitable relief (including upgrading Plaintiff's employment status) and any other relief this Honorable Court deems just and proper to award.

Marjorie Murtagh Cooke
By Counsel

R Scott Oswald /JJB

R. Scott Oswald, D.C. Bar No. 458859
Employment Law Group, P.C.
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006-3307
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*

**Jury Demand**

Plaintiff Cooke demands a jury for all issues proper to be so tried.

R. Scott Oswald /JJB

R. Scott Oswald

# Exhibit 8

# U.S. District Court
# District of Columbia (Washington, DC)
# CIVIL DOCKET FOR CASE #: 1:06-cv-00788-PLF

COOKE v. ROSENKER
Assigned to: Judge Paul L. Friedman
Case: 1:06-cv-01928-JDB
Cause: 29:216 Fair Labor Standards Act

Date Filed: 04/28/2006
Date Terminated: 10/13/2006
Jury Demand: Plaintiff
Nature of Suit: 710 Labor: Fair Standards
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**MARJORIE MURTAGH COOKE** represented by **R. Scott Oswald**
EMPLOYMENT LAW GROUP, PC
888 17th Street, NW
Suite 900
Washington, DC 20006-3307
(202) 261-2806
Fax: (202) 261-2835
Email: soswald@employmentlawgroup.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**MARK ROSENKER**
*Acting Chairman, National Transportation Safety Board*
represented by **Kathleen M. Konopka**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530
(202) 616-5309
Fax: (202) 514-8781
Email: kathleen.konopka3@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/28/2006 | 1 | COMPLAINT against MARK ROSENKER (Filing fee $ 350) filed by MARJORIE MURTAGH COOKE.(jf, ) (Entered: 05/01/2006) |

| | | |
|---|---|---|
| 04/28/2006 | | SUMMONS (3) Issued as to MARK ROSENKER, U.S. Attorney and U.S. Attorney General (jf, ) (Entered: 05/01/2006) |
| 05/30/2006 | 2 | NOTICE of Appearance by Kathleen M. Konopka on behalf of MARK ROSENKER (Konopka, Kathleen) (Entered: 05/30/2006) |
| 06/12/2006 | 3 | RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed on Attorney General. Date of Service Upon Attorney General 05/23/2006., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to MARK ROSENKER served on 5/23/2006, answer due 7/24/2006., RETURN OF SERVICE/AFFIDAVIT of Summons and Complaint Executed as to the US Attorney. MARK ROSENKER served on 5/23/2006, answer due 7/24/2006 (Oswald, R.) (Entered: 06/12/2006) |
| 07/11/2006 | 4 | Joint MOTION to Stay *All Proceedings Pending Mediation* by MARK ROSENKER. (Attachments: # 1 Text of Proposed Order)(Konopka, Kathleen) (Entered: 07/11/2006) |
| 07/12/2006 | 5 | ORDER referring this case for mediation to commence July 12, 2006 and conclude on or before August 31, 2006, and granting 4 the parties' joint motion to stay proceedings pending mediation. Signed by Judge Paul L. Friedman on July 12, 2006. (MA) (Entered: 07/12/2006) |
| 08/27/2006 | 6 | Consent MOTION for Extension of Time to Complete Mediation by MARK ROSENKER. (Attachments: # 1 Text of Proposed Order)(Konopka, Kathleen) (Entered: 08/27/2006) |
| 08/28/2006 | | MINUTE ORDER granting 6 defendant's consent Motion for Extension of Time to Complete Mediation. All further proceedings in this case shall be stayed and mediation shall continue until October 2, 2006. Signed by Judge Paul L. Friedman on 8/28/06. (lcplf2) (Entered: 08/28/2006) |
| 10/09/2006 | 7 | AMENDED COMPLAINT against MARK ROSENKER filed by MARJORIE MURTAGH COOKE.(td, ) (Entered: 10/11/2006) |
| 10/11/2006 | 8 | Unopposed MOTION to Transfer Case *to U.S. Court of Federal Claims* by MARJORIE MURTAGH COOKE. (Attachments: # 1 Text of Proposed Order)(Oswald, R.) (Entered: 10/11/2006) |
| 10/11/2006 | 9 | VACATED PURUSANT TO MINUTE ORDER ENTERED 10/11/06.....ORDER that the parties shall submit on or before October 20, 2006 a joint report updating the court on the status of this case and any ongoing settlement negotiations. Signed by Judge Paul L. Friedman on October 11, 2006. (MA) Modified on 10/19/2006 (ks, ). (Entered: 10/11/2006) |
| 10/11/2006 | | MINUTE ORDER vacating minute order 9 entered this same day |

| | | |
|---|---|---|
| | | requesting a joint report updating the court on the status of this case, and granting 8 plaintiff's unopposed motion to transfer venue. Signed by Judge Paul L. Friedman on October 11, 2006. (MA) (Entered: 10/11/2006) |
| 10/11/2006 | | Set Deadline: Joint Report due by 10/20/2006. (mm) (Entered: 10/13/2006) |
| 10/26/2006 | | Case transferred to Court of Federal Claims. Case mailed US Postal Service, return receipt requested. (td, ) (Entered: 10/26/2006) |
| 11/15/2006 | | Receipt on 11/09/06 of Transfer Papers. Other Court Number: 06-748C sent by US Court of Federal Claims. (jf, ) (Entered: 11/16/2006) |

# Exhibit 9

## US Court of Federal Claims
## United States Court of Federal Claims (COFC)
## CIVIL DOCKET FOR CASE #: 1:06-cv-00748-TCW

COOKE v. USA
Assigned to: Judge Thomas C. Wheeler
Case in other court: U.S. District Court for the District of Columbia, 06-cv-788
Cause: 28:1491 Tucker Act

Date Filed: 11/09/2006
Jury Demand: None
Nature of Suit: 304 Civilian Pay - FLSA
Jurisdiction: U.S. Government Defendant

**Plaintiff**

**MARJORIE MURTAGH COOKE** represented by **Robert Scott Oswald**
Employment Law Group, P.C.
888 17th Street. NW
Suite 900
Washington, DC 20006
(202) 331-2883
Fax: (202) 261-2835
Email: soswald@employmentlawgroup.net
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brian Marc Lowinger**
Employment Law Group, PC
888 17th Street, N.W.
Suite 900
Washington, DC 20006
(202) 261-2817
Fax: (202) 261-2835
Email: blowinger@employmentlawgroup.net
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**USA** represented by **Meredyth Dawn Cohen**
U.S. Department of Justice - Civil Division
1100 L Street, NW
Washington, DC 20530
(202) 353-7978

Fax: (202) 514-7965
Email: meredyth.cohen@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 11/09/2006 | 1 | Case transferred in from United States District Court for the District of Columbia; Case Number 06-cv-788. Original file certified copy of transfer order and docket sheet received. Filed by MARJORIE MURTAGH COOKE. (Attachments: # 1 Docket Sheet)(dw1) Additional attachment(s) added on 11/9/2006 (dw1, ). (Entered: 11/09/2006) |
| 11/09/2006 | 2 | NOTICE of Assignment to Judge Thomas C. Wheeler. (dw1) (Entered: 11/09/2006) |
| 11/09/2006 | 3 | NOTICE of Designation of Electronic Case. (dw1) (Entered: 11/09/2006) |
| 11/15/2006 | 4 | FIRST AMENDED COMPLAINT filed by MARJORIE MURTAGH COOKE, by leave of the Judge. Service: 11/9/06.(dw1) (Entered: 11/15/2006) |
| 11/28/2006 | 5 | NOTICE of Appearance by Meredyth Dawn Cohen for USA. (Cohen, Meredyth) (Entered: 11/28/2006) |
| 01/08/2007 | 6 | ANSWER to 4 Amended Complaint, filed by USA.**JPSR due by 3/1/2007.**(Cohen, Meredyth) (Entered: 01/08/2007) |
| 02/27/2007 | 7 | JOINT PRELIMINARY STATUS REPORT. (Cohen, Meredyth) (Entered: 02/27/2007) |
| 03/05/2007 | 8 | NOTICE of Appearance by Brian Marc Lowinger for MARJORIE MURTAGH COOKE. (Lowinger, Brian) (Entered: 03/05/2007) |
| 03/07/2007 | 9 | DISCOVERY SCHEDULING ORDER. Signed by Judge Thomas C. Wheeler. (ck1) (Entered: 03/07/2007) |
| 03/15/2007 | 10 | MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA.**Response due by 4/16/2007.**(Cohen, Meredyth) (Entered: 03/15/2007) |
| 03/28/2007 | 11 | TRANSCRIPT of Proceedings (pages 1-8) held on March 6, 2007 before Judge Thomas C. Wheeler. (dw1) (Entered: 03/28/2007) |
| 04/16/2007 | 12 | Consent MOTION for Extension of Time until 04/18/2007 to File Response or Reply as to 10 MOTION to Dismiss pursuant to |

| | | |
|---|---|---|
| | | Rule 12(b)(1), filed by MARJORIE MURTAGH COOKE.**Response due by 5/3/2007.** (Attachments: # 1 Text of Proposed Order Proposed Order)(Lowinger, Brian) (Entered: 04/16/2007) |
| 04/18/2007 | 13 | RESPONSE to 10 MOTION to Dismiss pursuant to Rule 12(b)(1), filed by MARJORIE MURTAGH COOKE.**Reply due by 5/7/2007.** (Lowinger, Brian) (Entered: 04/18/2007) |
| 04/20/2007 | 14 | ORDER granting 12 Motion for Extension of Time to File Response/Reply Signed by Judge Thomas C. Wheeler. (MO) (Entered: 04/20/2007) |
| 05/07/2007 | 15 | REPLY to Response to Motion re 10 MOTION to Dismiss pursuant to Rule 12(b)(1), filed by USA. (Cohen, Meredyth) (Entered: 05/07/2007) |
| 05/16/2007 | 16 | MOTION for Leave to File Surreply, filed by MARJORIE MURTAGH COOKE.**Response due by 6/4/2007.** (Attachments: # 1 Surreply)(Lowinger, Brian) (Entered: 05/16/2007) |
| 05/16/2007 | 17 | MOTION to Strike, filed by MARJORIE MURTAGH COOKE.**Response due by 6/4/2007.**(Lowinger, Brian) (Entered: 05/16/2007) |
| 05/18/2007 | 18 | Consent MOTION to Amend/Correct *Surreply*, filed by MARJORIE MURTAGH COOKE.**Response due by 6/4/2007.** (Attachments: # 1 Exhibit)(Lowinger, Brian) (Entered: 05/18/2007) |
| 05/18/2007 | 19 | Consent MOTION to Amend/Correct *Motion to Strike*, filed by MARJORIE MURTAGH COOKE.**Response due by 6/4/2007.** (Attachments: # 1)(Lowinger, Brian) (Entered: 05/18/2007) |
| 05/29/2007 | 20 | ORDER: The Court this day entered the following Orders on pending motions: (1) Plaintiff's May 16, 2007 Motion to Strike References to Discovery Requests in Defendant's Reply 17 is DENIED; (2) Plaintiff's May 16, 2007 Motion for Leave to File Surreply 16 is GRANTED; (3) Plaintiff's May 18, 2007 Consent Motion to Correct Motion to Strike 19 is GRANTED; (4) Plaintiff's May 18, 2007 Consent Motion to Correct Surreply 18 is GRANTED. Signed by Judge Thomas C. Wheeler.(mo) (Entered: 05/29/2007) |
| 05/29/2007 | 21 | MOTION for Clarification of [20] Order on Motion for Leave to File, Order on Motion to Strike, Order on Motion to Amend/Correct,,,,,,,,, filed by USA.**Response due by 6/12/2007.**(Cohen, Meredyth) (Entered: 05/29/2007) |

| | | |
|---|---|---|
| 06/20/2007 | | Set/Reset Transcript Deadlines: Transcript due by 7/19/2007. (vp1, ) (Entered: 06/20/2007) |
| 06/22/2007 | 22 | MOTION for Leave to File Supplemental Brief, filed by MARJORIE MURTAGH COOKE.**Response due by 7/9/2007.** (Attachments: # 1 Supplement)(Lowinger, Brian) (Entered: 06/22/2007) |
| 06/28/2007 | 23 | RESPONSE to 22 MOTION for Leave to File Supplemental Brief, filed by USA.**Reply due by 7/13/2007.** (Cohen, Meredyth) (Entered: 06/28/2007) |
| 06/28/2007 | 24 | ORDER DENYING 22 Plaintiff's Motion for Leave to File Plaintiff's Supplemental Memorandum of Law in Support of Her Opposition to Defendant's Motion to Dismiss. Signed by Judge Thomas C. Wheeler. (mon) (Entered: 06/28/2007) |
| 06/28/2007 | 25 | ORDER denying 10 Motion to Dismiss - Rule 12(b)(1). Signed by Judge Thomas C. Wheeler. (mon/mk) (Entered: 06/28/2007) |
| 07/19/2007 | 26 | TRANSCRIPT of Proceedings (pages 1-38) held on June 19, 2007 before Judge Thomas C. Wheeler. (dw1) (Entered: 07/19/2007) |
| 07/19/2007 | 27 | AMENDED SCHEDULING ORDER: Signed by Judge Thomas C. Wheeler. (mo) (Entered: 07/19/2007) |
| 07/31/2007 | 28 | TRANSCRIPT of Proceedings (pages 1-10) held on July 19, 2007 before Judge Thomas C. Wheeler. (dw1) (Entered: 07/31/2007) |

# Exhibit 10

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06-748C |
| v. | ) | (Judge Thomas C. Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RESPONSES TO PLAINTIFF'S FIRST REQUESTS FOR THE PRODUCTION OF DOCUMENTS**

Pursuant to Rules 26 and 34 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following response to Plaintiff's First Requests for Production of Documents to Defendant United States of America, served by mail on or about March 6, 2007. The following response is based upon defendant's current knowledge, information and belief after making reasonable inquiry. Defendant expressly reserves the right to modify or supplement its response as further information becomes available through discovery or otherwise.

GENERAL OBJECTIONS

Defendant asserts and incorporates by reference the following general objections to plaintiff's requests for production of documents as though they were set forth in full in each response to each request:

1. Defendant objects to each request to the extent that it seeks information or documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable privilege or immunity, or any statutory or regulatory restriction upon disclosure, including the Privacy Act of 1974, 5 U.S.C. § 552(a). In objecting to and responding to a document request, the fact that the United States provides

6. All documents which the defendant contends support the defenses asserted in the defendant's answer or that relate to any claims asserted by the defendant.

RESPONSE: Defendant did not assert any affirmative defenses in its answer. All documents produced on April 5, 2007 as part of the initial disclosures, as well as all the documents produced with these responses support defendant's defense of the claims lodged by plaintiff. Discovery is ongoing; if additional responsive non-privileged documents are found, they will be produced.

7. Documents that would tend to support or refute any of Defendant's Affirmative Defenses.

RESPONSE: See response to #6.

8. Documents that would tend to support or refute any of Defendant's denials contained in Defendant's Answer or responses to Plaintiff's Requests for Admissions.

RESPONSE: All documents produced on April 5, 2007 as part of the initial disclosures, as well as all the documents produced with these responses support defendant's denials in its answer and responses to Plaintiff's Requests for Admissions. Discovery is ongoing; if additional responsive non-privileged documents are found, they will be produced.

9. All Documents that would tend to support or refute any of Defendant's denials contained in Defendant's responses to Plaintiff's Requests for Admissions.

RESPONSE: See response to #8.

10. All documents and communications used, referenced, referred to, relating to or described in responding to Plaintiff's Interrogatories, if not previously produced.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KATHRYN A. BLEECKER
Assistant Director

MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

April 30, 2007

Attorneys for Defendant

# Exhibit 11

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

Case No. 06-748C
Judge Thomas C. Wheeler

**PLAINTIFF MARJORIE MURTAGH COOKE'S THIRD REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT UNITED STATES OF AMERICA**

Plaintiff Marjorie Murtagh Cooke, by and through Counsel and pursuant to Rule 34 of the Rules of the Court of Federal Claims, hereby requests that the Defendant United States of America, produce the documents described below at The Employment Law Group, PC, 888 17th Street, NW, Suite 900, Washington, D.C. 20006, within thirty (30) days of service.

**Definitions**

For the purposes of these Document Requests, the terms used herein shall have the following meanings unless the context requires otherwise:

1. "You," "your," means Defendant United States Government, National Transportation Safety Board ("NTSB"), and all other persons acting on behalf of Defendant.

2. "Murtagh Cooke" or "Plaintiff" means Plaintiff Marjorie Murtagh Cooke.

3. "Complaint" means any formal or informal reports resulting in investigation or disciplinary action by the Defendant regarding its employees.

4. "Communication" means all oral conversations, discussions, e-mail and/or "IM" messages, letters, telegrams, memoranda, and any other transmission of information in any other form, both oral and written.

5. All documents prepared by NTSB's chief financial officer detailing the amount the compensation paid to each Director, Tom Haueter, and Bob MacIntosh from January 1, 2000 through December 31, 2005.

6. All documents, including emails, referring or relating to performance award guidelines in effect at NTSB from January 1, 2000 through December 31, 2005.

7. All notification of personnel actions and supporting documents for the Directors, Thomas Haueter, and Bob MacIntosh beginning in January 1, 2000 through December 31, 2005 that detail the compensation paid to each.

8. Each Board Order pertaining to performance management in effect at NTSB from January 1, 2000 through December 31, 2005.

9. All documents related to the standards and policies for the issuance of a retention allowance.

10. All documents relating to the amounts authorized to be awarded as bonuses to Directors, Tom Haueter, and Bob MacIntosh from January 1, 2000 through December 31, 2005.

11. Each performance evaluation for Plaintiff for her employment with NTSB.

12. Each performance evaluation for each Director, Tom Haueter, and Bob MacIntosh from January 1, 2000 through December 31, 2005.

13. All documents that describe, in addition to annual salary, any and all sources of compensation, that were available to compensate a GS-15 level employee at NTSB from January 1, 2000 and December 31, 2005.

14. All documents related to and including Murtagh Cooke's application for the position of Director of OMS at the SES level in 2004.

15. All documents related to and including John Spencer's application for the position of Director of OMS at the SES level in 2004.

16. All documents related to the first Executive Resources Board Ad Hoc Panel in 2005 that convened to consider the applications for the position of Director of OMS at the SES level.

29. All documents, including e-mails, by Ellen Engleman Conners relating to her April 2004 meeting with Murtagh Cooke.

30. All documents, including e-mails, by David Clarke relating to the April 2004 meeting between Ellen Engleman Conners and Murtagh Cooke.

31. All documents, including emails, by any member of the Executive Resource Board that relates to Murtagh Cooke's candidacy for the position of Director of OMS at the SES level that was advertised in 2004 and 2005.

32. All documents, including emails, by Ellen Engleman Conners relating to Murtagh Cooke's candidacy for the position of Director of OMS at the SES level that was advertised in 2004 and 2005.

33. All documents, including emails, by Dan Campbell relating to Murtagh Cooke's candidacy for the position of Director of OMS at the SES level that was advertised in 2004 and 2005.

34. All documents, including emails and meeting minutes, relating to the decisions by Dan Campbell to re-advertise the position of Director of OMS position in 2004.

Marjorie Murtagh Cooke
By Counsel

R. Scott Oswald
Brian M. Lowinger
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Plaintiff Marjorie Murtagh-Cooke's Second Requests for Production of Documents to Defendant United States of America, was served via electronic mail and hand delivery this 1st day of October, 2007 upon:

Meredyth D. Cohen, Esq.
Trial Attorney
Commercial Litigation Branch, Civil Division
United States Department of Justice
1100 L St., N.W., Room 12016
Washington, D.C. 20530
Phone: (202) 353-7978
Fax: (202) 514-8624
meredyth.cohen@usdoj.gov

Brian M. Lowinger

# Exhibit 12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE,

Plaintiff,

v.

THE UNITED STATES OF AMERICA,

Defendant.

) Case No. 06-748C
) Judge Thomas C. Wheeler

**PLAINTIFF MAJORIE MURTAGH-COOKE'S SECOND SET OF INTERROGATORIES TO DEFENDANT UNITED STATES OF AMERICA**

These Interrogatories are served pursuant to Rule 33 of the Rules of the Court of Federal Claims. You are requested to make answer within thirty (30) from the date of service.

Answer each Interrogatory separately, in writing and under oath. In answering the interrogatories, please furnish all information available to you, including information possessed by any agent, employee, or attorney representing you.

**Definitions**

For the purposes of these Interrogatories, the terms used herein shall have the following meanings unless the context requires otherwise:

a. "You," "Your," "Defendant," or "NTSB" means Defendant United States Government, National Transportation Safety Board ("NTSB"), and all other persons acting on behalf of Defendant.

b. "Murtagh Cooke," or "Plaintiff" means Plaintiff Marjorie Murtagh Cooke.

c. "Communication" means all oral conversations, discussions, e-mail, letters, telegrams, voicemail, facsimile, instant messages, memoranda, and

1. Identify any and all sources of compensation that were available to compensate a GS-15 level employee of NTSB between January 1, 2000 and December 31, 2005.

2. Describe all compensation paid to the Directors, Tom Haueter, and Bob MacIntosh between January 1, 2000 and December 31, 2005.

Marjorie Murtagh Cooke
By Counsel

R. Scott Oswald
Brian M. Lowinger
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Plaintiff Marjorie Murtagh Cooke's Second Interrogatories to Defendant United States of America, was served hand delivery this 1st day of October, 2007 upon:

Meredyth D. Cohen, Esq.
Trial Attorney
Commercial Litigation Branch, Civil Division
United States Department of Justice
1100 L St., N.W., Room 12016
Washington, D.C. 20530
Phone: (202) 353-7978
Fax: (202) 514-8624
meredyth.cohen@usdoj.gov

Brian M. Lowinger