# EXHIBIT A

000001

# NATIONAL TRANSPORTATION SAFETY BOARD

## REPORT OF INVESTIGATION

## I. DESCRIPTION OF COMPLAINT

| | |
|---|---|
| Name of Complainant: | Marjorie M. Murtagh<br>Case Number NTSB-2005-02 |
| Title and Grade of Complainant's Position: | Director, Office of Marine Safety<br>GS-1801-15/10 |
| Name and Location of Agency and Unit Involved in Complaint: | Office of Marine Safety<br>National Transportation Safety Board |
| Date of Alleged Discrimination: | January 28, 2005 |
| Kind of Discrimination Alleged: | Sex |
| Nature of Action, Decision, or Condition Giving Rise to Complaint: | Pay discrimination; unequal employment conditions |

## II. DESCRIPTION OF INVESTIGATION

| | |
|---|---|
| Identity of Investigator: | Paul Greenberg<br>DSZ<br>1730 N. Lynn Street, Suite 601<br>Arlington, Virginia 22209 |
| Date Report of Investigation Submitted to Agency: | December 6, 2005 |
| Place of Investigation: | Washington, DC |
| Dates of Investigation: | August 26, 2005 to December 1, 2005 |
| Method of Investigation: | On-site Interviews |

000002

## III. DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

Complainant alleges she was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she has received less compensation than the compensation received by similarly situated male Office Directors. Corning Glass Works v. Brennan, 417 U.S. 188 (1974); Goodrich v. International Brotherhood of Electrical Workers, 815 F.2d 1519 (D.C. Cir. 1987).

Complainant also alleges she was treated disparately based upon sex when on January 3, 2005, she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

## IV. SUMMARY

*The pay disparity issue*

From 1994 until 2005, Complainant (female) served as the head of the NTSB's Office of Marine Safety (OMS). The position was classified and paid as a GS-15 job throughout this period (Exhibit F2).

Between 1994 and 1997/98, OMS was a unit within NTSB's Office of Surface Transportation Safety, and Complainant's title was Chief. As part of a restructuring in 1997/98, the Office of Surface Transportation Safety was divided into four separate Offices: Highway Safety (OHS), Railroad Safety, Marine Safety, and Pipeline and Hazardous Materials Safety. Each Modal Office had a Director, initially paid at the GS-15 level (Exhibits F2, F3). Throughout this period, NTSB's Office of Aviation Safety existed as a separate unit (Exhibit F3).

Dan Campbell (male) served as NTSB's Managing Director (an SES position) from 2000 until 2005, and was Complainant's immediate superior during this period. According to Mr. Campbell, the position of Director of the pre-1998 Office of Surface Transportation Safety was classified as an SES job, and there may have been one other SES slot within the OST structure. When OST was divided – initially into four surface Modal Offices – NTSB made a request to the Office of Personnel Management (OPM) for additional SES slots so that each of the surface Modal Office Directors could be classified and paid at the SES level. However, OPM denied NTSB's request. As a result, the Agency did not have SES positions available to classify the surface Modal Office Directors at the SES level, and each of the four Directors were classified and paid at the GS-15 level. The persons filling these four positions were Joe Osterman (Highway Safety)(male), Bob Lauby (Railroad Safety)(male), Bob Chipkevich (Pipeline and Hazardous Materials Safety)(male), and Complainant Marjorie Murtagh (Marine Safety)(female). Later, the Railroad Safety and Pipeline and Hazardous Materials

000003

Safety Offices were merged to form the Office of Railroad, Pipeline and Hazardous Materials Safety (RPH) (Exhibit F3).

Sometime after 2000, an SES employee at the NTSB retired and an SES slot therefore became available to the Agency. Mr. Campbell recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of Director, Office of Railroad, Pipeline and Hazardous Materials Safety (RPH). This position was occupied by Bob Chipkevich. Mr. Campbell explains he made this recommendation because Mr. Chipkevich was the most senior of the surface Modal Office Directors and because RPH was the most complex of the three surface Modal Offices. Although Chairman Hall initially was inclined to assign the SES slot to the Director of Highway Safety position because of its greater visibility, Mr. Campbell explains Chairman Hall ultimately accepted the recommendation and the RPH position became an SES job (Exhibit F3).

Around 2003, an SES position was eliminated at the NTSB Academy after the then-office holder voluntarily left the Agency, which made an additional SES slot available. NTSB leadership assigned this SES slot to the position of Director, Office of Highway Safety, which was encumbered by Joe Osterman. In 2004, NTSB received authorization from OPM for an addition Senior Executive Service position, which was assigned to the Director, Office of Marine Safety job. Mr. Campbell notes it always was the Agency's goal to elevate all the surface Modal Office Directors to the SES level, and if OPM had authorized enough SES slots when requested after the 1997/98 reorganization, all the positions would have been reclassified and the Director positions advertised at the SES level. However, because OPM did not authorize the requested SES slots, the process took place gradually both by gaining new slots from OPM and by reassigning slots from elsewhere within the NTSB (Exhibit F3).

Complainant states the authority, responsibilities and functions of the Modal Office Directors are all very similar and are described in the Code of Federal Regulations. Position Descriptions for the various Director jobs are included as attachments to Complainant's affidavit, Exhibit F2. In Complainant's view, the responsibilities for the Marine Safety and Aviation Safety Directors are most similar because both Offices have duties related to international accident investigations as well as investigations of both public and non-public accidents. As the Director of OMS, Complainant was responsible for initiating and overseeing the investigations of marine accidents, major and non-major (field investigations and incidents), domestic and international, those involving public and non-public vessels, as well as those involving claims of government malfeasance and Special Investigation reports. It was also her responsibility to oversee the factual documentation, analysis, development and preparation of detailed reports, including the drafting of conclusions, probable cause and recommendations. She notes that while the Board itself has ultimate authority to determine probable cause in transportation accidents, since 1998 the Board has delegated this authority to the Modal Office Directors when they issue the accident report as a "Brief Report of Accident." Complainant states that as OMS Director she also was responsible for preparing responses to proposed marine safety rulemakings and requests for technical support,

both internal and external, including the technical details for development of contracts issued by the NTSB (Exhibit F2).

Complainant believes pay classifications, pay rates and awards for Office Directors are determined by the NTSB Chairman, in consultation with the Managing Director. Between March 2003 and March 2005 the NTSB Chairman was Ellen Engleman Conners (female). Dan Campbell was the Managing Director during this period. *Id.*

Complainant states she met with Chairman Engleman Conners in April 2004 to discuss concerns about her compensation. She reminded Chairman Engleman Conners that she (Complainant) was being paid as a GS-15, and therefore was not receiving pay and awards comparable to her male counterparts who were NTSB Office Directors, all of whom were male. In addition, Complainant noted there even were some Deputy Directors at the NTSB who were classified and paid as SES members. Complainant indicated she wanted to find an equitable way to resolve this issue of pay disparity. According to Complainant, Chairman Engleman Conners emphasized the Agency was working hard to get an additional SES slot approved, which would be assigned to the OMS Director position; however, if the slot was granted, Chairman Engleman Conners noted the position would need to advertised and competed at the SES level. *Id.*

Complainant indicates she made it clear to Chairman Engleman Conners that her primary concern was to be compensated at the same level as the other Office Directors, rather than receive the SES classification *per se*. Complainant suggested that greater parity would be achieved if the Agency paid her (Complainant) overtime. Complainant noted the overtime payment would help close the pay gap between herself and the male Office Directors, and also would be helpful toward achieving her "high three" salary levels for calculating pension benefits. According to Complainant, Chairman Engleman Conners expressed doubts that overtime pay was possible, but committed to exploring the issue with Human Resources and she would consider it. Complainant states she had no further meetings about compensation with Chairman Engleman Conners after April 2004, and that she was not granted overtime pay nor did she receive bonuses comparable to the male Office Directors. Further, Chairman Engleman Conners did not respond to further attempts by Complainant to meet for further discussions about pay parity. *Id.*

Separately, Complainant states she spoke with Human Resources Director Lisa Love (female) about the overtime question. Complainant states Ms. Love advised her there were no OPM barriers to paying Complainant overtime, but the Chairman would need to approve such overtime. *Id.*

Complainant notes the substantial disparities between her compensation and that of the other [male] Office Directors, and alleges the pay disparities extend back at least seven years. She notes the Director, Office of Aviation Safety (the position she alleges is most comparable to her own) and the Director, Office of Railroad, Pipeline and Hazardous Materials Safety received annual pay more than $20,000 greater than she received, and triple the amount of bonus pay given her. In addition, even the Office of Highway Safety

Director – also a GS-15 position until 2004 – was paid $12,000 more than a GS-15 in 2003. The OHS Director received about $14,000 more pay in 2003 than Complainant. *Id.*

Complainant states she has received exceptional performance evaluations throughout her tenure with the Agency, and most recently received an Outstanding rating from Managing Director Campbell and the reviewing official, Chairman Engleman Conners. In Complainant's view, the positions of the Modal Office Directors are comparable and she (Complainant) has successfully performed her work as the OMS Director. In Complainant's view, the only explanation for the lower level of compensation she has received is her gender. *Id.*

Complainant disputes the Agency's claim that Complainant's classification and pay were not elevated to the SES level because of a lack of SES slots. She notes that even without changing the classification of the OMS position, greater pay parity could have been achieved through overtime or bonuses. Complainant believes the Agency deliberately chose not to use these tools. Further, she asserts the Agency has received additional SES slots since 1998 but simply chose not to assign one of them to the OMS Director job. She notes the position of Deputy Director of the Office of Research and Engineering – an SES position – was advertised and filled at least three times since 1998. The persons hired into the position were all male. When the Deputy Directors were reassigned to new positions, they retained their pay in accordance with federal requirements. *Id.*

Complainant concedes that OMS was a smaller office than the other Modal Offices, but asserts her job function was equal to that of the other Modal Directors and merited equal pay. Further, she argues her Office had fewer staff members in part because the Agency was depriving her of staff resources needed to do her job (*see "denial of authority to fill vacant positions issue"* discussion, *infra*). Moreover, she notes that the classification of a position as eligible for SES pay is based on duties, level of responsibility and function, not on the number of staff supervised. *Id.*

The OMS Director position was advertised as an SES position early in 2005. Complainant applied for the position but was not among the candidates interviewed. Another candidate, John Spencer (male) was hired into the OMS Director position at the SES level. *Id.*

The statements of three management witnesses – Chairman Engleman Conners, Managing Director Campbell, and then-OHS Director Joseph Osterman[1] (male) – generally concur with the facts provided by Complainant regarding pay classification history and compensation. However, they uniformly deny Complainant's lower compensation (compared with other [male] Office Directors) was the result of gender-based pay discrimination, asserting the order for elevating the surface Modal Office Directors to the SES level – RPH first, OHS second, and OMS third – was justifiable

---

[1] Joe Osterman succeeded Dan Campbell as NTSB Managing Director in March 2005.

000006

based on the size and responsibilities of the respective organization units. *See* Exhibits F3, F4 & F5.

While these Agency managers acknowledge there are similarities in the overall duties of the different Office Directors, each suggest there also are significant differences that justified the decision to make the OMS job the last Office Director position to be upgraded to SES classification and pay. Mr. Campbell notes that the RPH Director runs a larger organization than OMS and must be conversant in multiple disciplines. Similarly, the OHS Director runs a larger unit and has a much higher-profile job because of the great public interest in highway safety. He notes by comparison that NTSB shares jurisdiction for investigating commercial maritime activities with the U.S. Coast Guard, and that marine accidents are the one transportation mode where the NTSB is not the primary federal investigative authority. As a consequence, NTSB has a reduced ability to have significant effect on marine safety except for promoting better safety practices in the recreational boating area (Exhibit F3).

Mr. Campbell also disputes Complainant's claim that the OMS Director job is closely comparable to the Director, Office of Aviation Safety. He states Aviation Safety is at the core of the NTSB's mission, both from a budgetary standpoint as well as public recognition. Further, the number of times the Aviation Safety Office is called upon to perform an investigation is dramatically higher than OMS. He states OMS warranted a Director at the SES level, but that SES slots are a scarce resource and it made sense for OMS to be the last Modal Office to be upgraded. He does not recall Complainant complaining to him about when the OMS Director job would be reclassified as SES, nor did Complainant raise compensation issues with him. *Id.*

Although Mr. Campbell acknowledges OMS was the last of the Modal Office Director jobs to be upgraded to SES, he notes there are other SES positions at the NTSB that have been occupied by females. He notes there were at one time two female SES employees working at the NTSB Academy, although that number has been reduced to one, Director Julie Beal. The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female, as well as the Director of the Office of Administration, Lola Ward. These are both SES positions. *Id.*

Further, Mr. Campbell observes there were chronic problems with the pace and quality of work generated by OMS under Complainant's leadership. Attached to Mr. Campbell's affidavit is a copy of an employee exit interview conducted with a departing OMS employee in 2002. The departing employee had worked for NTSB for about one year in a cooperative program, but left for the private sector. The employee commented she was leaving because the progress of work in OMS was too slow and she was afraid it would affect her work ethic. *Id.*

Mr. Campbell confirms there are two offices with Deputy Directors paid at the SES level – the Office of Aviation Safety, and the Office of Research and Engineering. He states this practice goes back decades. He asserts the high-level Deputy positions are justifiable. With regard to OAS, this unit is central to the NTSB's work and has about

140 staff members, while the other Offices have only 20 to 40 staffers. Having an SES-level Deputy in Research and Engineering is justifiable because the Office is staffed with a relatively large number of higher-level engineers who have advanced degrees, and the unit performs sophisticated, technical work. *Id.*

Chairman Engleman Conners states she arrived at the NTSB after all Office Director positions had been raised to the SES level except OMS and Highway Safety. She defends the decision to convert the OHS position first, noting there are 43,000 highway deaths each year in contrast to several hundred marine deaths (Exhibit F4).

Chairman Engleman Conners confirms she was approached by Complainant about being paid overtime, but comments she felt Complainant's proposal was "slightly bizarre." Chairman Engleman Conners states she advised Complainant that the OMS Director position would be elevated to an SES position as soon as a slot became available, at which point Complainant could apply for the job. She states she made an inquiry about ways to raise Complainant's pay, speaking either with Managing Director Campbell or HR Director Lisa Love. *Id.*

Joe Osterman was Director of the Office of Highway Safety until early 2005, and is now the NTSB Managing Director. Mr. Osterman became a member of the SES early in 2003. Prior to 2005, he served on the NTSB's Executive Performance Review Board (EPRB), which is responsible for reviewing the ratings and awards for SES employees. As the Managing Director, he now chairs the EPRB (Exhibit F5).

Mr. Osterman reports that in 2004 then-Managing Director Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the Agency. The EPRB recommended the next SES assignment should be for the OMS Director position because OPM had allocated NTSB additional SES slots. The actual assignment of the SES position was done by the NTSB Chairman. *Id.*

Mr. Osterman's account of the history of the elevating the Modal Office Director positions to the SES – and the rationale for their order – is consistent with the accounts of the other management witnesses, *supra*. Although Mr .Osterman agrees with Complainant that the Office Director positions require similar skill and effort, and their core mission is similar, he states the Offices have differing levels of responsibility. For example, RPH has responsibility for two modes of transportation (railroads and pipelines), and also provides support for the other Offices for accidents involving hazardous materials. Additionally, RPH maintains regional offices, while some Offices do not. *Id.*

Mr. Osterman asserts that like RPH, the Office of Highway Safety maintains regional offices. Although OHS does not have similar support functions for the other Offices, it generates the majority of recommendations to Congress or to state legislatures for regulatory changes. Highway accidents account for more than 43,000 deaths per year, while all the other modes of transportation combined account for fewer than 3,000 deaths per year. He notes the Office of Marine Safety is smaller than the other Offices,

and does not have regional offices. OMS provides few support functions for the other Offices. Although OMS has a limited international responsibility, this work largely involves conferences. *Id.*

With regard to the question of gender bias in deciding the order in which the Director jobs would be raised to the SES level, Mr. Osterman notes that the RPH Office Director, Bob Chipkevich, became an SES member three years before his position (OHS Director) was raised to the SES. Mr. Osterman observes that he would have liked his job at Highway Safety elevated earlier, but he knew the rationale for the order of SES assignments. In his view, Complainant understood this rationale fully as well. *Id.*

Lisa Love, Director, Human Resources Division, Office of Administration (female) states responsibility within NTSB for setting pay for SES classifications is handled by the Managing Director, with guidance from SES Program Manager Colette Magwood. She describes the process through which agencies are allocated SES slots. Each year, OPM invites agencies to request SES allocations for the upcoming fiscal year. NTSB does not always receive the number of SES positions requested (Exhibit F6).

Ms. Love is aware that some Office Directors have been paid as SES employees, while others have been paid as GS-15s. She believes the reason for the disparity in classification was due to program complexity, scope and impact of the work, and the qualifications required to perform the job. In addition, the number of SES slots allocated by OPM is a factor. She does not view it as an anomaly that some Deputy Director positions might be classified as SES while there were still Office Director positions paid on the GS scale. *Id.*

With regard to Complainant's interest in receiving overtime compensation, Ms. Love states she is advised by HR Specialist Emily Carroll that the personnel regulations do not prevent payment of overtime based on grade, but there is an overall premium pay limitation based on the amount of salary received. The applicable premium pay/overtime limitation is the biweekly salary of a GS-15 step 10 or Level V of the Executive Schedule, whichever is higher. As long as an employee's salary is below the limitation, the employee is eligible to earn premium pay/overtime. It therefore is probable Complainant could be paid some overtime compensation. However, she would need to make arrangements for overtime with her supervisor. *Id.*

A table comparing the compensation among Office Directors is found at Exhibit F1.

*The "denial of authority to fill vacancies" issue*

Although the letter accepting Complainant's EEO charge focuses on a "denial of authority to fill vacancies in the Office of Marine Safety" that occurred January 3, 2005, Complainant states the January 2005 event was simply the latest in a series of similar experiences that has been on-going since 1998. Complainant asserts this pattern made it extremely difficult for OMS to apply necessary resources to its investigations and required her to work excessively long hours (Exhibit F2).

The January 2005 incident related to Complainant's effort to fill the position Marine Accident Investigator. The position was advertised, interviews were conducted and a selection was made in 2004. Complainant states that at the end of the process, Managing Director Campbell advised her she could not hire the selectee because he had applied for more than one job at the Agency. Specifically, in addition to applying for the Marine Accident Investigator position, the selectee also had applied for the OMS Director position that finally had been advertised as an SES job. According to Complainant, Campbell questioned the judgment of an applicant who had applied both for an investigator position in an Office while also applying for the most senior management position in the unit. Complainant states she was not concerned by this issue, and believes Mr. Campbell's explanation was implausible. *Id.*

In 2001, the Chief, Report Development Division, OMS, retired. Complainant states this was position was the head of a major division within OMS. The vacant position was advertised within NTSB, applicants were interviewed and Complainant made a selection. She forwarded the name of the selectee to Mr. Campbell, who then spoke directly with the selectee and decided she was unsuitable for the position. Complainant states she was prohibited from hiring a person into the position, and instead had to "make do" with the staff within her office. *Id.*

Also in 2001, Complainant reports Mr. Campbell placed a Human Performance Investigator from OMS on detail to OHS. This later became a permanent transfer. Complainant states she was prohibited from recruiting a replacement employee. *Id.*

In 2000, Complainant's Deputy Director left NTSB for a position at another agency. Although Complainant made numerous requests to fill the vacant Deputy Director position, she was not permitted to do so. As a result, OMS was the only Modal Office to operate without a Deputy. Complainant states her successor, current OMS Director Spencer, was assigned an Acting Deputy Director and has been given permission to hire a permanent Deputy Director. *Id.*

Complainant notes that in his statement to the EEO Counselor, Mr. Campbell suggested all the Office Directors were treated badly and cited the Agency's budget as prompting an overall drop in the number of positions at the NTSB. However, she attaches budget materials which she asserts support her claim that OMS was singled out for unfavorable treatment regarding staffing. Complainant states other male Office Directors were allowed to fill key slots and to increase the overall number of staff in their offices. She also states then-OHS Director Osterman would comment at meetings that his unit did not need more people and that OMS had a greater need for additional staff. *Id.*

Complainant asserts the repeated denial of opportunities for her to fill positions in her unit was discriminatory because Agency officials felt that if OMS was very small in size, the small size of the Office would in some way justify limiting the pay of its Director, who was female. She sees no reason other than sex discrimination that would explain why she was treated differently from her male counterparts in the other Modal Offices. *Id.*

Former Managing Director Campbell admits Complainant was refused opportunities to fill some positions, but denies this was discriminatory behavior motivated by Complainant's sex. With regard to the Marine Accident Investigator position, Mr. Campbell confirms Complainant's statement that he (Campbell) felt it was strange to hire a mid-level Investigator into OMS who simultaneously was seeking to become the Director of the Office. He notes also that the OMS Director position was being competed, and he thought it would be fair to delay the hire so that if a new person was hired as Director, the Director would have a chance to hire his or her own person into the job (Exhibit F3).

Mr. Campbell also confirms he stopped the hire of a new OMS Chief of Report Development. He explains Complainant wanted to fill the position with a person already working within OMS. The selectee informed Campbell that she had applied for the position because she wanted to block another co-worker from getting the job because they were incompatible. Campbell states he knew the selectee, and while he viewed her as a good editor he did not believe she would be able to manage the investigators who are a key part of the report-generating process. Mr. Campbell states he already had bad experiences with OMS' report generating abilities, citing problems with the accident report into the Staten Island Ferry crash. Mr. Campbell states he had to plead with an investigator to stay with the project rather than quit, and ultimately Campbell lifted the investigation out of OMS and personally supervised the project from the Managing Director's office. *Id.*

Mr. Campbell did not have a specific recollection with regard to the OMS Deputy Director position. *Id.*

Mr. Campbell states he normally did not view it as his role to intervene when Office Directors such as Complainant wanted to make a hire. However, he felt Complainant did not demonstrate good judgment in her selections. He recalls he once received a visit from the NTSB ethics office concerning an applicant for an OMS position. The applicant had a background with cruise ships. He was hired, and subsequently quit under a cloud. Mr. Campbell feels this experience vindicated his doubts concerning Complainant's hiring judgment. *Id.*

Mr. Campbell denies Complainant was singled out in her ability to hire staff for her Office. He states Complainant was allowed to fill many vacancies in her unit. Further, he states staffing levels generally are down at the Agency. He believes Complainant probably was allowed to hire more employees than other Directors because her Office had a relatively high turnover rate. *Id.*

Chairman Engleman Conners states she probably had some role in limiting some of the hiring. After she arrived at the Agency in 2003, she asked all senior managers to consider prioritizing the filling of positions based on the vision for the Agency, rather than simply backfilling open positions. NTSB identified 73 positions in the Agency and began a prioritizing process. Early in 2004, it was decided that the first positions to be

000011

filled would be openings on the regional aviation investigation teams. At that time, the Agency had about 426 employee and was expecting to drop to about 415 positions, then 411. To avoid a RIF situation, many open positions at the Agency were not being filled. Jobs that were being filled were priority slots that had been mandated by Congress. *Id.*

Chairman Engleman Conners notes other Office Directors also were unhappy they were denied authorization to fill vacant positions, citing specifically the Director of the Office of Research and Engineering, Verne Ellenstad. She denies Complainant's being denied opportunities to fill vacancies related to her gender. *Id.*

Joe Osterman moved from the Director, OHS, position to the Managing Director job around the period when Complainant was attempting to fill the Marine Accident Investigator position in early 2005. He states the candidate selected by Complainant for the position was mediocre, and that he (Osterman) was the person who denied Complainant authority to complete the hire. This action was taken with Mr. Campbell's concurrence (Exhibit F5).

In Mr. Osterman's view, the restrictions on Complainant's ability to hire were not unique, and she was not singled out because of her gender. He states that other Office Directors also were prohibited from making hires at various times. He states his own unit, the Office of Highway Safety, lost about six positions between 200 and 2005 when he was denied authorization to hire against vacancies. This was happening throughout the Agency. *Id.*

In specific response to Complainant's assertion that he (Osterman) made several comments suggesting that OMS had a greater need for staff than OHS, Mr. Osterman states the comment was not made quite the way Complainant suggests. He states all the Offices were short-handed in some manner.

*Additional materials*

Position descriptions for the Modal Director jobs are found as Exhibit F8. Performance ratings for Complainant and the employees to whom she compares herself are found as Exhibit F9. Tabulations showing positions filled in the Modal Offices are found as Exhibit F10.

## V. SURVEY OF THE GENERAL ENVIRONMENT

Position descriptions for the Office Director positions are found at Exhibit F8. As both the Complainant and Agency Managers acknowledge, there are significant similarities among the Office Director positions, as described. As discussed above, Agency Managers contend the differences between the jobs relate to a number of factors including the size of the Office's staff, number of investigations conducted, public visibility, support for investigations performed by other NTSB units, etc.

A comparison of compensation of the Modal Office Directors for 2003 and 2004 is found at Exhibit F1. The comparison shows that Modal Office Directors Clark, Osterman and Chipkevich (all male) received greater compensation (salary and bonus) than Complainant during both years. During 2003, each of the male Office Directors received at least $13,000 more in compensation than Complainant. During 2004, each of the male Office Directors received at least $14,000 more in compensation than Complainant.

A listing of positions filled by each of the Offices between January 2003 and January 2005 is round at Exhibit F10. During this period, four positions were filled in the Office of Marine Safety, two positions were filled in the Office of Railroad, Pipeline and Hazardous Materials Investigations, nine positions were filled in the Office of Research and Engineering, twenty-five positions were filled in the Office of Aviation Safety, and two positions were filled in the Office of Highway Safety.

# AFFIDAVIT OF DAN CAMPBELL

City: Washington

State: District of Columbia

I, **Dan Campbell**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

**1. Please identify your position with the NTSB, including your position title, series, grade, and organizational units (from smallest to largest)?**

I currently am the NTSB Executive Director, an SES position. I have been in this position since January 2005. Between 2000 and the beginning of 2005, I was the NTSB's Managing Director. Before that, I was the NTSB's General Counsel.

The Managing Director is a career SES position, and has delegated authority over personnel issues. Historically, the Executive Director's position has been a Schedule C appointment and has been more concerned with policy issues. I assumed the Executive Director position for a few months in anticipation of my upcoming retirement so that I could mentor my successor as Managing Director, Joe Osterman.

**2. Who currently are your first and second-level supervisors, by name and position title? Who were your supervisors in January 2005?**

I report to the NSTB Chairman. Since March 2005, this has been Acting Chairman Mark Rosenker. Prior to that time, I reported to then-Chairman Ellen Engleman Conners.



Initials

000138

3. **Please identify your gender.**

Male.

4. **Who determines the pay classifications for Office Directors at NTSB?**

With specific regard to the assignment of SES positions, I have not been a decision maker. There are a limited number of SES slots allocated to the Agency, and the Chairman makes the decision where they will be assigned. As the Managing Director, I was consulted about the assignments, but the decision was the Chairman's. We are a relatively small agency with only 400 employees.

By way of background, at one time NTSB had a single Office of Surface Transportation (OST), and a separate Office of Aviation Safety. The OST Director was an SES position, and there may have been one other SES position within OST. During the period when James Hall was NTSB Chairman, the Office of Surface Transportation was divided into four Offices: Marine Safety, Highway Safety, Railroad Safety and Pipeline & Hazardous Materials Safety. The thinking at that time was that the Agency would have a higher profile if there were individual Offices dedicated to each of the four surface transportation modes. However, when OST was split into four separate Modal Offices, we did not have enough SES slots to raise each Director job to the SES level. This was around 1999, during a period when I still was serving as General Counsel and did not follow the SES issue closely.

In June 1999, around the time I was promoted from General Counsel to Managing Director, we made a request to OPM to authorize SES slots for all of the Modal Office Directors. I do not believe OPM granted any part of this request. As a result, all four of the Office Directors – Joe Osterman (Highway Safety), Bob Lauby (Railroad Safety), Bob Chipkevich (Pipeline & Hazardous Materials Safety), and Marjorie Murtagh (Marine Safety) were classified and paid as GS-15 employees.

Because we had issues with productivity within the Railroad Safety Office, we decided to replace its first director. I felt that Bob Chipkevich was highly qualified and underutilized in the Pipeline & Hazardous Materials Safety Office, so we merged his unit with the Railroad Safety Office. The resulting Office of Railroad, Pipeline and Hazardous Materials Safety was the largest and most complex of the surface transportation Modal Offices.

When one of our SES employees at NTSB retired, in about 2000, and an SES slot therefore became available, I recommended that Mr. Chipkevich's position be redesignated as an SES position because he was the most senior of the Modal Office Directors and ran the most complex group. Chairman Hall's initial preference was for



Initials

highway safety, as the responsibility of that office is so visible, with 40,000 deaths on the road annually. Ultimately Chairman Hall accepted my recommendation and the RPH Office Director position was raised to the SES level.

Around 2003, we eliminated on SES from the personnel structure at the NTSB Academy by abolishing the office of President of the Academy. (The incumbent separated voluntarily.) We assigned the recovered SES slot to the Director of Office of Highway Safety position. Like Ms. Murtagh's job at OMS, the OHS Director until this time had continued to be a GS-15 position. Keep in mind that NTSB at the outset had requested SES slots to elevate all the Modal Transportation Office Directors; if we had received authorization from OPM, we would have advertised all the Director positions as SES jobs and filled them at the SES level. However, we acquired the needed slots only gradually, both by gaining new slots from OPM and by reassigning one slot from elsewhere within the Agency.

In 2004, we received authorization for another SES slot from OPM, and we assigned it to the OMS Director job. The position was filled at the SES level earlier this year.

5. **Do some NTSB Offices have Deputy Directors who are classified as SES employees? If so, why would these Deputy Directors be SES members, while the Director of OMS would be paid on the GS scale?**

The NTSB has two offices that have SES-level Deputy Directors: the Office of Aviation Safety, and the Office of Research and Engineering. This practice goes back decades. The reasons for the SES Deputy Director positions in the two offices are slightly different.

For Research and Engineering, it is important to understand that ORE is staffed with a relatively large number of higher-level engineers who have advanced degrees such as a Ph.D. It is sophisticated, technical work, and both the Director and the Deputy Director historically have been SES employees.

Aviation Safety has long been viewed as central to the NTSB's work. It is by far our largest Office. OAS has about 140 staff members, while the other Offices have about 20 to 40 staff members. In addition, Aviation Safety is a very high visibility function. Given the size and importance of OAS to the NTSB's mission, it is understandable the Deputy Director traditionally has been paid at the SES level.

6. **Why would the OMS Director be paid on the GS scale while the other Modal Office Directors would be classified as SES employees?**

There are several reasons why it was justifiable to elevate the classification for the ORPH



Initials DC