000140

and OHS Directors first, given the limitations on the number of SES positions available to the Agency.

An important factor is the significance of the undertaking within the respective offices. The RPH Director runs a larger organization than OMS, and also must be conversant in multiple disciplines. The OHS Director also runs a larger organization than OMS and has a much higher public profile because highway safety is a very visible matter of public concern.

By comparison, the role of OMS is not as large. Accident investigation jurisdiction over commercial maritime activities is a shared responsibility of NTSB and the Coast Guard. This is the only mode where NTSB is not the primary federal investigative authority for major transport accidents. Consequently, NTSB has a reduced ability to have a significant effect in the area of marine safety, except for promoting better safety practices in the recreational boating area.

7. **The Complainant has commented that the responsibilities of the OMS Director are virtually identical to the responsibilities of the other Office Directors, and require the same skill set. If this is the case, shouldn't the Office Directors receive the same compensation?**

Ms. Murtagh's argument about the comparability of skills is largely correct, but doesn't tell the whole story.

As I mentioned, the Railroad, Pipeline and Hazardous Materials Director needs to have a strong understanding of a broader range of transportation categories than the OMS Director. In addition, the Director needs to run the office, master the subject and be able to handle both external and internal responsibilities.

The skill set for the Aviation Safety Director may look similar on paper, but the number of times the Aviation Safety Director is called upon to perform investigations is dramatically higher than the Marine Safety Director. In truth, although all the Offices are important in their work, Aviation Safety is at the core of the NTSB's federal presence, from a budgetary standpoint, as well as from the standpoint of public recognition.

But I do believe OMS warrants an SES director. The issue for NTSB was always that of the allocation of a scarce resource. Of the modal offices, it was quite sensible to reach OMS last.

8. **Did the Complainant speak with you about her concerns regarding compensation? Please describe the conversation.**

I do not recall Ms. Murtagh complaining to me about when the OMS Director's position



Initials

would be reclassified as an SES job. Nor did she ever raise compensation with me. Generally, it was understood that all the Office Director positions would be converted to SES jobs as SES slots were made available to the Agency.

9. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

See #5, above.

10. **Did any SES positions open in lower-tiered levels of the Agency that could have been transferred to the OMS Director's position?**

No. One that came open was used for Highway Safety.

I want to note that the Agency has senior female employees who are in the SES. For example, during the time period when we were creating the separate Modal Offices and trying to get SES slots for the Office Directors, we created the NTSB Academy. At one point, there were two SES employees at the Academy, although there is now only one SES employee, Director Julie Beal, who is female.

The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female and occupies an SES position. Also, the Director of our Office of Administration, Lola Ward, is female and a member of the SES. In fact, three of the last four persons selected by the NTSB for SES positions have been female.

I want to add that we were having chronic problems with the pace and quality of work coming from the Office of Marine Safety, and as a result I have needed to have more interaction with OMS than would normally be the case. I am providing the EEO Investigator with a copy of an employee exit interview that was conducted by the Assistant Managing Director, Barbara Czech, in August 2002. I had conducted several exit interviews with departing OMS employees, as turnover seemed high in the office. In this instance I asked Barbara to do the interview with Jamie Estock. The departing employee, Ms. Estock, had worked in OMS for over a year on a cooperative program and, I believe, had converted at Ms. Murtagh's request to full-time federal service. She had been a good performer. She left for a private sector job. When explaining why she left, she commented that the "progress of work products [in OMS] was too slow and she was afraid it would affect her work ethic." This was typical of the feedback that I was receiving from employees in OMS.

11. **The Complainant alleges she was not allowed by senior management to fill key**



Initials [signature]

**vacant positions in the Office of Marine Safety. If so, what was your role in this decision? If you did not have a role, who did? What is your understanding of the reason (if any) that Complainant was not allowed to fill vacancies in her unit?**

It is true that I stopped Ms. Murtagh from hiring several employees during my tenure as Managing Director.

With regard to the Marine Accident Investigator position, this job was being filled earlier this year around the time we had begun to advertise the OMS Director job as an SES position. Because there was a possibility there would be a change in the leadership of the Marine Safety Office, I became more interested in the staffing of the unit. With regard to the particular individual whom Ms. Murtagh selected for the Investigator position, I noted that the person also had applied for the OMS Director job. Frankly, I thought it was strange that a person applying for a mid level investigator position also felt qualified to run the office. I also thought that it was only fair that if a new person was hired as the OMS Director, the Director should have a chance to hire his or her own person into the Investigator position.

With regard to the Chief of Report Development, Ms. Murtagh wanted to fill the position with an employee who already was working for her within OMS. This individual informed me that she had applied for the position because she wanted to block another staff member from getting the job because they were incompatible. I knew the selectee, and although I felt she was a good editor, I did not feel she would be able to manage the investigators who are a key part of the report-generating process. I already had experienced problems getting good reports completed from the OMS unit, and I cite as one example the OMS investigation of the accident involving the Staten Island ferry crash, the Barberi. The investigator responsible for the investigation wanted to quit the Office before he completed the report. I personally had to plead with him to stay on to complete the work. He complained that the problem was the manner in which OMS and Ms. Murtagh were handling him and the investigation. In order to get the report finished, I ultimately lifted the investigation out of OMS and supervised the project myself from the Managing Director's office.

With regard to the Deputy Director position within OMS, this once had been occupied by Don Tyrell. Ms. Murtagh at one point was allowed to hire a Deputy Director, Paul Voorhees, who subsequently left the NTSB and went to the courts. He did not have a marine safety background. Personally, I do not recall a request to fill the Deputy Director position after Mr. Voorhees left.

Normally, I did not view it as my role to tell an Office Director like Ms. Murtagh that she could not hire the employees of their choice. However, I felt Ms. Murtagh did not have good judgment with selections. I recall that I once received a visit from the Agency's ethics office concerning an applicant for an OMS job who had a background with cruise



Initials

000143

ships. He was hired, and subsequently quit under a cloud. I became involved with this employee again through the exit interview process. I had been concerned about the initial hire; ultimately, I felt the experience showed that my instincts on this were right, and Ms. Murtagh's wrong.

Finally, although I am not sure it is relevant to Ms. Murtagh's complaint, I want to state that I was not involved in any way with the selection for the OMS Director position when it was posted as an SES job earlier this year.

12. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill, and why?**

First, I want to note that Ms. Murtagh was allowed to fill many vacancies in OMS during the period encompassed by her complaint, including some selectees who ultimately didn't work out.

Second, Ms. Murtagh was not treated differently from the male Office Directors. Generally, everyone's staffing level is down. In fact, relative to the size of her agency compared with the other Modal Offices, I think Ms. Murtagh actually has been allowed to hire more employees than the other Directors, in part because she had a relatively high turnover rate in OMS.

13. **What other witnesses do you believe have information that would be relevant to this discrimination claim?**

The Investigator might consider speaking with Bob Chipkevich and Joe Osterman with regard to the pay issue and the SES slots. Mr. Osterman might be asked whether he felt discriminated against when Mr. Chipkevich was given an SES slot, and Mr. Osterman was not.

14. **Do you have any documents that are relevant to the Complainant's allegation of sex and pay discrimination? If so, please provide them.**

I have attached three letters regarding the requests for new SES at OPM. They will show (1) that the agency allotment was 14 at the time we first requested new SES for each of the modal offices. (2) The request was denied in whole. (3) In 2004 we finally received an increase of one SES which was then allocated to the Office of Marine safety.

15. **To the extent other Office Directors were paid a higher salary than the Complainant, or were allowed to fill vacancies when the Complainant was not, was**



Initials

000144

**the different treatment accorded to the Complainant prompted by her sex?**

No, the determination which Office Director position would be classified as an SES position was not made based upon sex, and Ms. Murtagh was not discriminated against when we made these choices. With regard to the allegation she was denied opportunities to fill vacant positions, I do not believe this is true or that she was treated differently from her male counterparts. Moreover, even if this had occurred, it was not because of her sex.

16. **Is there anything else you would like to add?**

I want to add that I find it remarkable Ms. Murtagh never had a conversation with me about her feeling that the job classification for the OMS Director was discriminatory. She was fully aware I was seeking SES slots for all the Office Director jobs.

I have read the above statement consisting of 8 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10/19/06
Date

Dan Campbell

Witness



Initials

000145

# PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

[signature]
Signature of Interviewer

9/19/05
Date

[signature]
Signature of Affiant

Washington, DC
Place

000160

EXHIBIT F4

# AFFIDAVIT OF ELLEN ENGLEMAN CONNERS

City: Washington

State: District of Columbia

I, **Ellen Engleman Conners**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1. **Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

2. **How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

3. **Please identify your gender.**

Female.

4. **Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5. **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6. **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7. **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**





Initials [signature]

000162

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

8. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,



Initials [signature]

000163

during my first two years at the NTSB there were about six major marine accidents, but this is atypical. The work of the other Offices is simply greater. Aviation Safety is huge by comparison. Railway, Pipeline and Hazardous Materials is responsible for three modes of transport. And there are 43,000 highway deaths each year.

No one was isolating the Office of Marine Safety, but it logically was last in the queue. Actually, it is my hope ultimately to make all the Deputy Directors SES positions, also.

9. **Did the Complainant talk to you about being paid overtime as a means for bringing her compensation closer to that of the male Office Directors? Did you discuss this with the Managing Director, Dan Campbell, or with Human Resources? What was your decision and response.**

Yes, this is the method she proposed for raising her compensation. I thought it was bizarre for a manager to suggest being paid overtime.

Can it be done? I do not believe managers are entitled to overtime, unlike the investigators, for instance. I do not recall whether I made a specific decision to deny Ms. Murtagh overtime, but I would have. I do not even recall whether it would have been possible to pay her overtime.

10. **After the discussion about possible overtime, did you evade further requests by Ms. Murtagh to discuss her compensation request? Was Ms. Murtagh ever told she would not be paid overtime?**

On several occasions, Ms. Murtagh asked me for follow up meetings. On the initial occasions, I was genuinely busy and did not have the time to meet with her. Later, I knew the SES slot for the OMS Director job was being processed, so I felt it was not appropriate to meet.

I am not sure whether Ms. Murtagh ever was contacted to be told she would not be paid overtime, no.

11. **Was the decision to pay the OMS Director as a GS-15, rather than at the SES level, related to the fact that the OMS Director was female?**

Absolutely not.

12. **Complainant describes several situations in which she had advertised, interviewed and selected a candidate for various positions, only to be told that she could not fill the job with the selectee. For example, earlier in 2005 she states she was denied an opportunity to hire a Marine Accident Investigator. Do you have any information about this?**

I probably had a role in this. I had asked all senior managers to get together and consider



Initials [signature]

000164

filling positions based upon our vision for the agency, rather than just backfilling open positions.

We identified 73 positions in the agency and began a process of prioritizing which would be filled. Early in 2004, we decided as a team that the first positions to be filled would be openings on the regional aviation investigation teams.

The agency had about 426 employees, and we were expecting to drop to about 415 positions, then 411. We were trying to avoid creating a situation where we would need to implement a reduction in force (RIF). Therefore, a lot of positions in each Office were not being filled to avoid having a RIF. We were very focused on filling just the priority slots, some of which had been mandated by Congress.

With regard to the Marine Accident Investigator position, I have no specific recollection.

13. **Complainant describes a situation several years ago in which she had advertised, interviewed and selected a candidate for the position of Chief, Report Development, only to be instructed she could not fill the job. Do you have any information about this position?**

I have no recollection of this.

14. **Around 2000, the then-Deputy Director of OMS left the NTSB. Complainant has claimed she was prohibited from hiring a new Deputy Director, making OMS the only Office without a Deputy. Do you have any information about this?**

I have a vague recollection that OMS was not allowed to fill the Deputy Director position, but I do not recall the circumstances.

15. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill?**

Some Office Directors were allowed to fill positions, and others were not allowed. It was all based on the needs of the agency and funding. For example, the Director of the Office of Research and Engineering, Verne Ellenstad, was very unhappy during this period that he was not allowed to fill some vacant positions in his unit.

16. **Was Ms. Murtagh's being denied opportunities to fill vacant positions related to her gender?**

Absolutely not. As an executive and as a woman, I find it insulting that she would even suggest this.

17. **What other witnesses do you believe have information that would be relevant to**

000165

**your discrimination claim?**

Dan Campbell and Lisa Love

18. **Do you have any documents that are relevant to your claim of sex and pay discrimination? If so, please provide them.**

None.

19. **Is there anything else you would like to add?**

No.

I have read the above statement consisting of 6 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10-17-05
Date

Ellen Engleman Conners

Witness



Initials

100166

# *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer

9/30/05
Date

Signature of Affiant

Washington DC
Place

# AFFIDAVIT OF JOSEPH OSTERMAN

City: Washington

State: District of Columbia

I, **Joseph Osterman**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1. **Please identify your position with the NTSB, including your position title, series, grade, and organizational units (from smallest to largest)?**

I currently am the NTSB Managing Director, an SES position. I have been in this position since March 17, 2005. Previously, I was Director of the Office of Highway Safety, which also was an SES position at the time I was promoted. I served as the OHS Director from 1996 until 2005.

2. **Who currently are your first and second-level supervisors, by name and position title? Who were your supervisors in January 2005?**

I report to the NSTB Executive Director, Dan Campbell, who is my first-level supervisor. My second-level supervisor is the NSTB Chairman. The Acting Chairman is Mark Rosenker. Mr. Campbell recently retired at the beginning of October 2005.

Prior to March 2005 (when I was Director of the Office of Highway Safety) there was no NTSB Executive Director. My first level supervisor was then-Managing Director, Dan Campbell. Because the Executive Director position was vacant, my second-level

supervisor was the Chairman. At that time, Ellen Engleman Conners was serving as Chairman.

3. **Please identify your gender.**

Male.

4. **Who determines the pay classifications for Office Directors at NTSB?**

Prior to March 2005, I was part of the NTSB's Executive Performance Review Board. This Board is responsible for reviewing the ratings and awards of SES employees, including making SES qualification and disqualification determinations. This process applied only to SES-level employees at the agency, so it would not have included any review of the Director, Office of Marine Safety, position, which was not an SES job then.

As the Managing Director, I now am responsible for setting SES pay rates at the agency and I now chair the Executive Performance Review Board.

5. **Prior to March 2005, did the Executive Performance Review Board have any role in deciding which positions within the NTSB would be assigned SES slots?**

The EPRB can be involved in these questions, in 2004 the Managing Director – Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the agency. At that time he solicited opinions and we discussed the possible location of SES billets. The EPRB determined that the next SES announcement should be for the Director, Office of Marine Safety. The EPRB meeting occurred because the NTSB had been allocated additional SES & SL slots by OPM. These additional allocations were the result of requests made by the NTSB. We did not request additional slots this year.

The actual assignment of the SES positions was done by the Chairman based on recommendations from Managing Director and the EPRB.

My position as Director, OHS, became an SES job early in 2003, and I was selected and ultimately approved by OPM in early 2004. This was when I became a member of the EPRB.

6. **Are you aware of disparities in pay classifications or pay rates among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

For the Directors at the SES level, there are two tiers of pay, depending on the nature of the Office they supervise. The higher pay goes to Offices directly involved with the NTSB's mission, such as the Office of Highway Safety. A lower pay level is paid to SES members who head Offices devoted to mission support, such as Administration. Also,





Initials

000169

another lower SES pay level generally goes to probationary SES employees.

In the past, some of the Office Directors were paid at the GS-15 level, while others were SES. This is no longer the case.
With regard to the Office Directors who were classified at the GS-15 level, this was dependent on the number of SES positions allocated for the NTSB by OPM. We just did not have enough SES allocations to make all the Office Directors SES.

In late 2000, or early 2001 The SES positions allocated by OPM were all occupied. The agency decided it would work toward making all the Office Directors members of the SES, either by obtaining approval for new SES slots or by shifting existing SES positions as the jobs became vacant. At that time, GS-15 level employees headed three Offices. The Office of Railroad, Pipeline and Hazardous Materials Safety, the Office of Highway Safety, and the Office of Marine Safety.

In terms of sequence, the first of the GS-15 Office Director jobs to be raised was the Director of the Office of Railroad, Pipeline and Hazardous Material Safety (ORPH). This was the largest of the three Offices headed by a GS-15 Director. It also was an Office with multi-modal responsibilities, and regional offices. The Director, Office of Highway Safety was the next to be elevated to the SES as the billet became available. This Office was smaller than RPH, but had multimodal responsibilities and regional offices. This office also had greater program-driven responsibilities than Marine Safety. The Director, Office of Marine Safety was the last GS-15 Office Director position to be elevated to SES. OMS is about half the size of OHS., and had no regional offices.

At one point, we managed to open up one SES position when Jim Arena became the Associate Managing Director. Mr. Arena at one time had been the Director of the Office of Surface Transportation. When OST was divided into the individual Modal Offices, Dan Campbell negotiated with Mr. Arena to change his pay classification to a Senior Level position, which opened up one of the SES slot that was assigned to one of the Modal Office Directors.

7. **The Complainant has commented that the responsibilities of the OMS Director are virtually identical to the responsibilities of the other Office Directors, and require the same skill set. If this is the case, shouldn't the Office Directors receive the same compensation?**

The Office Director positions require similar skill and effort, and their core mission is similar. But there are differing levels of responsibility depending on the office. For example, RPH has responsibility for two modes, railroads and pipelines, and also must provide support for all the other Offices for accidents involving hazardous materials. Also, RPH has regional offices to supervise, which some other Offices do not.

Highway Safety also has regional offices, like RPH, but does not have the kind of support



Initials

function for other modes that RPH has. However, OHS generates the majority of the agency's "most wanted" recommendations, *i.e.*, recommendations to Congress or to state legislatures for regulatory changes. More than 43,000 deaths occur on the highways each year, whereas the total number of deaths for all the other modes of transportation combined is less than 3,000.

Marine Safety is smaller, and does not have regional offices. It provides few support functions for the other Offices, although there is limited responsibility for international work. In practice, the international work mostly involves conferences.

ORPH and OHS share multi-modal responsibility for grade crossing accidents.

The agency was moving toward pay level parity for the Office Directors, however, the agency could only provide such parity as SES allocations became available.

8. **Did the Complainant speak with you about her concerns regarding compensation? Please describe the conversation.**

I recall that Ms. Murtagh spoke with me when the OHS Director job was made an SES position and announced. Essentially, she asked "Why you, and not me?" I directed her to the Managing Director, Dan Campbell. But Ms. Murtagh knew the plan for raising the Office Director jobs in sequence, and the rationale behind it. For that matter, I would have liked the OHS Director position – *i.e.*, my job – to be raised to the SES level earlier, but I understood the limitations facing the agency. Mr. Chipkevich at RPH became an SES member about three years before I did, I understood the rationale at that time.

9. **Did the Complainant ever speak with you about being paid overtime as a means to bring her compensation closer to that of the male Office Directors?**

No, I never heard about this.

10. **Do you believe the OMS Director position was paid less than the other Director jobs because of Ms. Murtagh's gender?**

No.

11. **The Complainant alleges she was not allowed by senior management to fill key vacant positions in the Office of Marine Safety. Specifically, she was denied the opportunity to fill a Marine Accident Investigator position earlier in 2005. What is your understanding of the reason (if any) that Complainant was not allowed to fill this vacancy in her unit?**





Initials

I am familiar with this because I became Managing Director around this period. The candidate Ms. Murtagh selected for the position was mediocre. I denied her the authority to fill the position, and Mr. Campbell agreed with me. At that time OMS did not have another acceptable candidate from the hiring action. OMS was allowed to readvertise the position, and in fact the position was filled at the end of the summer.

12. **Complainant describes a situation several years ago in which she had advertised, interviewed and selected a candidate for the position of Chief, Report Development, only to be instructed she could not fill the job. Do you have any information about this position?**

I have some understanding of this from group meetings of managers. At some point, Ms. Murtagh was allowed to fill the position, but I don't know the particulars. I know the incumbent Chief was there when I became the Managing Director earlier this year. At one point when I was the OHS Director, I loaned Ms. Murtagh my Report Development Chief to help her screen applicants for the job.

13. **Around 2000, the then-Deputy Director of OMS left the NTSB. Complainant has claimed she was prohibited from hiring a new Deputy Director, making OMS the only Office without a Deputy. Do you have any information about this?**

No.

14. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill?**

It is hard to make comparisons. Throughout this period, there were times when Office Directors were restricted in their ability to hire because of budget limits, even when there were vacancies.

Agency management was playing an active role in deciding which positions to fill. At some points, we essentially had a hiring freeze. Between 2000 and 2005, my unit (Highway Safety) lost about six positions when I was not allowed to hire against vacancies. This was happening throughout the NTSB.

15. **Did you ever comment to the Managing Director that the Complainant had a greater need to fill positions in Marine Safety than you did at Highway Safety? Please explain.**

I did not make the comment quite that way. All the Offices were short-handed in some manner.



Initials

For example, when I became Managing Director, our first priority was to fill positions in Aviation Safety where we had made a commitment to Congress. Next, we had a few priority vacancies, such as the Director of Administration. Third, there were some slots in Marine Safety that needed to be filled, as well as a slot in RPH.

16. **Was Ms. Murtagh's being denied opportunities to fill vacant positions related to her gender?**

No.

17. **What other witnesses do you believe have information that would be relevant to this discrimination claim?**

Dan Campbell would have information relevant to the charges. Our General Counsel, Mr. Battocci, might have some useful information. In addition, the Investigator might consider speaking with Bob Chipkevich and the other Office Directors.

18. **Do you have any documents that are relevant to the Complainant's allegation of sex and pay discrimination? If so, please provide them.**

No.

19. **Is there anything else you would like to add?**

I would simply add that the events surrounding the SES assignments are straightforward. Ms. Murtagh never was singled out because of her gender. The approach to assigning the available SES slots was strategic. We did not have enough authorized SES positions available, nor did we have funding to provide full staffing of the agency. But the agency had a plan that it was implementing to get the needed tasks done. Generally, all the Offices are operating with reduced numbers of staff compared with prior years.

Although Marine Safety may have waited for an SES allocation a bit longer in some respects, Highway Safety – the Office which I headed – also had to wait.

I have read the above statement consisting of 7 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10-24-05
Date

Joseph Osterman





Initials

Witness





Initials

000174

# *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

Signature of Interviewer

9/30/05

Date

Signature of Affiant

WASHINGTON, DC

Place