# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DEFENDANT'S RULE 26(A)(1) INITIAL DISCLOSURES**

Pursuant to Rule 26(a)(1) of the Rules of the Court of Federal Claims ("RCFC"), defendant, the United States, provides the following initial disclosures to plaintiff:

A. The following witnesses may have discoverable information and may be relied upon by defendant in this matter:

1. Marjorie Murtagh Cooke (retired from Federal service), plaintiff. Cross-examination and refutation of claims in her Equal Pay Act complaint, including the damages she alleges. Witness may provide other necessary rebuttal testimony.
2. Daniel D. Campbell (retired from Federal service), former Managing Director of the National Transportation Safety Board ("NTSB"). Mr. Campbell served as Ms. Cooke's immediate supervisor from 2000 until early 2005 and thus has first-hand knowledge of Ms. Cooke's employment during this time. Mr. Campbell may testify regarding Ms. Cooke's duties, assignments, performance, and interaction with other offices of the agency. Mr. Campbell also supervised the other office directors, as well as the operations of the NTSB, so he may testify regarding the responsibilities, skills, and work

performed by the other office directors. Mr. Campbell may testify regarding the requesting and allocation of Senior Executive Service ("SES") positions.

3. Ellen Engleman Conners (resigned from the NTSB), former Chairman of the NTSB. Ms. Engleman Conners served as the Chairman of the five-member Safety Board. She was appointed by the President and confirmed by the U.S. Senate. She was responsible for the personnel and products of the Safety Board. Ms. Engleman Conners was Ms. Cooke's second-line supervisor. She may testify to the level of responsibility, skill and work performed by the office directors, including Ms. Cooke. Ms. Engleman Conners may testify, to the best of her recollection, to the conversation Ms. Cooke alleges took place in April 2004. Ms. Engleman Conners may testify to the reasons for the allocation of SES positions.

4. Ronald Battocchi (retired from Federal service), formerly General Counsel of the NTSB between 2000 and January 2006. Mr. Battocchi provided guidance and support to all offices of the NTSB. He participated in reviews of reports generated by each of the modal offices. He may testify to the level of responsibility, skill and work performed by the office directors.

5. Joseph Osterman, Managing Director, NTSB, Washington, DC. Mr. Osterman assumed the duties of Managing Director on March 17, 2005, and thus became Ms. Cooke's immediate supervisor for a short period, then secondary supervisor following Ms. Cooke's transfers to the Office of Safety Recommendations and the Managing Director's offices. He has responsibility

for the daily operations of the NTSB. He may testify to the level of responsibility, skill and work performed by the office directors. Prior to assuming the role of Managing Director, he was the Office Director for the Office of Highway Safety. He may testify to the structure of the Office of Highway Safety, the personnel, the subject matter expertise required, the number of launches each year, the number of reports produced, testimony before Congress and congressional staff, and other relevant information about the work of the Office of Highway Safety.

6. Robert Chipkevich, Office Director for the Office of Rail, Pipeline and Hazardous Materials ("ORPH"), NTSB, Washington, DC. Mr. Chipkevich may testify to the structure of the office, the personnel, the subject matter expertise required, the number of launches each year, the number of reports produced, testimony before Congress and congressional staff, and other relevant information about the work of the ORPH.

7. John Clark, former Office Director for the Office of Aviation Safety ("OAS"), NTSB, Washington, DC. Mr. Clark was the Office Director for Aviation Safety until November 2006. Mr. Clark may testify to the structure of the office, the personnel, the subject matter expertise required, the number of launches each year, the number of reports produced, testimony before Congress and congressional staff, and other relevant information about the work of the OAS.

8. Bruce Magladry, Office Director for the Office of Highway Safety ("OHS"),

NTSB, Washington, DC. Mr. Magladry became the Acting Office Director for the Office of Highway Safety upon Mr. Osterman's promotion to Managing Director on March 17, 2005. He was made the permanent Office Director in December 2006. Mr. Magladry may testify to the structure of the office, the personnel, the subject matter expertise required, the number of launches each year, the number of reports produced, testimony before Congress and congressional staff, and other relevant information about the work of the OHS.

9. John Spencer, Office Director for the Office of Marine Safety ("OMS"), NTSB, Washington, DC. Mr. Spencer became the Office Director for the Office of Marine Safety in August 2005. Mr. Spencer may testify to the structure of the office, the personnel, the subject matter expertise required, the number of launches each year, the number of reports produced, testimony before Congress and congressional staff, and other relevant information about the work of the OMS.

10. Vernon Ellingstad, Director, Office of Research and Engineering, NTSB, Washington, DC. Mr. Ellingstad supports all of the modal offices in accident investigation work. He also participates in reviews of reports to be presented to the Safety Board. He may testify to the level of responsibility, skill and work performed by the office directors, and the utilization of his staff in investigative work.

11. Elaine Weinstein, Director, Office of Safety Recommendations and Advocacy,

NTSB, Washington, DC. Ms. Weinstein supports all of the modal offices in formulating, promoting and advocating for safety recommendations. She also participates in reviews of reports to be presented to the Safety Board. She may testify to the level of responsibility, skill and work performed by the office directors, and the utilization of her staff in promoting transportation safety.

12. Emily Carroll, Human Resources Specialist, Washington, DC. Ms. Carroll may testify regarding general Human Resources ("HR") practices, including pay regulations and procedures, and compensation paid to agency employees. She also may testify to the NTSB's administration of its SES program in accordance with regulations, guidelines, and procedures of the agency and the Office of Personnel Management ("OPM"); and how the NTSB has filled its SES positions in the past.

B. The following documents and things may be relied upon by defendant in this matter, copies of which are attached:

1. The Report of Investigation in U.S. Equal Employment Opportunity Commission Case No. NTSB-2005-02, submitted to the NTSB on December 6, 2005. Plaintiff received a copy as well.
2. Comparison of Average Compensation of Modal Office Directors from January 1, 2003 to December 31, 2004.
3. Chart of SES Allocations and Placements.
4. Employee Performance Folder for Marjorie Murtagh Cooke, dated from October 15, 2002

until December 20, 2004.

5. Segment of Office Personnel File for Marjorie Murtagh Cooke, dated from January 27, 2002 until July 3, 2006.
6. 2002 NTSB Annual Report to Congress.
7. 2003 NTSB Annual Report to Congress.
8. 2004 NTSB Annual Report to Congress.
9. 2005 NTSB Annual Report to Congress.
10. SES Position Description ("PD") for Director, Office of Marine Safety.
11. SES PD for Director, Office of Aviation Safety.
12. SES PD for Director, Office of Highway Safety.
13. SES PD for Director, Office of Rail, Pipeline and Hazardous Materials.
14. SES PD for Director, Office of Research and Engineering.
15. SES PD for Director, Office of Safety Recommendations.
16. PD for Director, Office of Marine Safety. Description of the position prior to the announcement for the SES-level Director of the Office of Marine Safety.

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

KATHRYN A. BLEECKER
Assistant Director

MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

April 5, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of April 2007, I caused to be sent by messenger a copy of the foregoing "DEFENDANT'S RULE 26(a)(1) INITIAL DISCLOSURES" with attached documents addressed as follows:

Brian M. Lowinger, Esq.
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2806

[signature]

# EXHIBIT C

Q. Did the requirements of the position and the efforts and the skills, did they change because it went down to a GS-15?

A. They did.

Q. They did?

A. They did. He was no longer, as I was as an SES director for the Office of Highway Safety, I was involved with the executive resource board. I was involved in agency-wide strategic planning and policy decisions. He was not included in those discussions. He is now that he is an SES employee, but he was not as a GS-15 employee.

Q. And what percentage of Mr. Magladry's time became involvement in planning and policy for the executive board?

A. About ten to fifteen percent of his time as an SES employee is now involved in the executive board work and policy decisions of the agency.

Q. I see. You had said that at some point during Miss Murtagh Cooke's tenure that there was, actually, I'll come back to that topic.

Question for you, sir. Why was

Miss Murtagh Cooke paid less than the other modal directors during her tenure from -- during from 2003 through 2005?

A. The understanding or the issue is one of SES billet deployments. And I'll go back to that in a second. In 1997, '98, when the reorganization of the former Office of Surface Transportation occurred, four new groups were evolved from that.

Q. I understand.

A. The four divisions. And pipeline and rail were segregated at that time. The agency began an attempt to acquire additional SES positions.

The two SES members who had been the director and Deputy Director of the Office of Surface Transportation were still occupying the SES billets that they had previously had. And the agency attempted through OPM, you have to make a request through OPM to get more assigned billets.

Each year the agency requested more billets. We were not given the billets. And the requests were made with the intention of making the office directors for Rail and Pipeline and Highway and

# EXHIBIT D

A She was working at NTSB.
Q All right.
A I think. Was she working or was she not working at NTSB? I don't remember whether she was working at NTSB or not working at NTSB at the time it happened. I'm sorry.
Q All right. I understand.
A I don't remember the time line on that one.
Q All right. The Deputy Director of Engineering, was that position competed when it was changed from a General Schedule to an SES?
A Again, I don't know if it was changed to a General Schedule or not or already -- as I stated earlier, I don't remember if that was already an SES or not so I can't answer -- I can't say it was changed because I don't remember if it was already an SES and it had to be filled or whether we put an SES there.
Q Okay. Let me refine my question. What I'm interested in are positions similar to Joe Osterman's position at Highway and the position at Marine that were General Schedule and, during your tenure, were converted, changed, slotted, whatever word you want to



use, to an SES position.
What other positions were assigned an SES that were not an SES at the time during your tenure other than Highway -- Director of Highway and Director of Marine?
A Administration didn't exist before, so that was new, and I don't remember about Research and Engineering.
Q All right. When was the -- did you make the decision to assign an SES position to the Administration position?
A I don't remember when.
Q It was during your tenure, though?
A Mm-hmm.
Q Okay. And then the Deputy Director of Engineering, when was that that you assigned an SES slot for that position?
MR. LUONG: Objection; asked and answered.
A I don't remember when. It was --
Q During your tenure?
A -- during that time period, right.



Q Why did you decide to assign the SES moniker to the Deputy Director of Engineering position before you decided to assign the SES moniker to the Director of Marine position?
MS. COHEN: Objection; assumes facts not in evidence.
MR. LUONG: I'm also going to object to the term "moniker".
Q Do you understand my question?
A You're talking about the priority of the assignments.
Q Yes.
A Yes. That was based on the much larger scope of the organization, the scope of the work, the level of responsibility, the need for the expertise; there were a lot of different elements that went into it.
Mostly it was scope of work and impact on the organization. Those would be the two primary reasons which led to need. So --
Q Okay. What other reasons other than scope of work and impact on the organization?



A Those are pretty good ones.
Q All right. I just want to understand this.
A I mean, they were level of responsibility, overall impact on the organization and the growth of the organization, supporting our mission for transportation safety --
Q Okay.
A -- direct relationship to the safety mission.
Q Okay.
A Those were all reasons.
Q All right. I just want to understand -- make sure I understand.
So other than the scope of work, the impact on the organization, furthering the safety mission, and the need, what were the other reasons that you decided to assign the SES tag to the Deputy Director for Research and Engineering, the Director of Highway, and the Director of Administration before you assigned the SES tag to the Director of Marine position, if any?
MS. COHEN: Objection; mischaracterization of earlier testimony and assumes

101

facts not in evidence.
Q You may answer the question.
A I don't remember the order, so I can't speak to whether that was the order or not. I don't remember the order of assignment.
You suggested to me that it was Highway, Research and Engineering, Administration, Marine. So I don't remember the order. If that was the order, fine. I don't remember it.
I remember Highway was first. That I do remember, but I don't remember the rest of the order.
There was also the issue of how many employees were in that department or division. So when you were talking about scope, it's the scope of the investigatory responsibilities as well as the scope of supervision, the existence of regional offices. Highway had regional offices. So again, the scope of the responsibility was much larger and more employees, and there are over 45,000 highway deaths a year in the United States. So the impact on the safety mission is pretty darn big.
Q All right.

102

A So that's why Highway was chosen first. The rest, following that same type of analysis would have been utilized with the goal of being able to bring in more SESs throughout the Agency.
Q And you made that decision --
A Yes.
Q -- of the order in which you were going to assign the SES tags to the various positions.
A Yes and no. It was pretty clear that Highway should be next. Again, for all the reasons I already stated.
The others, it came as part of a larger process. If you remember earlier I talked about the organizational review that we conducted and the requests that we made to all the Directors for the openings that they were proposing, et cetera and so forth. We looked at that in context of our mission, in context of all the items I just listed, scope of responsibility, amount of supervision, et cetera, and just trying to align it so that there was a little bit of equity to try to fill all the pots to some degree, knowing that we wouldn't ever have a perfect world

103

where we could have 100 percent where we wanted one of the departments to the detriment of the others. We were going to have to fill every pot a little bit as we could. And it wasn't just for SESs, it was for staff, it was everything from investigators to writers to admin to clerical.
So none of these decisions was a single point decision. They were part of a much larger deliberation over allocation of resources in the organization with the end goals as previously stated, and at the same time a nonstatic environment.
Q Who was the decision-maker other than you?
A It was the discussion with myself, it was debated, discussed, Dan Campbell, probably Ron Battocchi, we got input from other Office Directors, from my Chief of Staff.
Q Who had the authority to make the decision other than you?
A The authority for the SES assignment?
Q Yes.
A Well, I believe that ultimately was my determination, again, with recommendation and

104

discussion with the General Manager -- or Managing Director rather, I'm sorry, Dan Campbell. And Ron Battocchi would have been part of the discussion.
Q They couldn't overrule your determination, could they?
A Ron Battocchi could if I was doing something illegal. I would expect that he would.
Q Other than if you were doing something illegal. To the extent that you had that was not illegal to do, who else had the discretion to make the decision on which position would receive the SES --
A Where the SES would be allocated?
Q -- where it would be allocated other than you?
A I believe it was my decision.
Q Where do you work now?
A Federal Communication Commission.
Q What is your job title?
A It's a long one. Senior Deputy Bureau Chief of the Enforcement Bureau of the FCC.
Q How long have you been in that position?
A Since March of this year.

# EXHIBIT E

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE,<br>Plaintiff,<br>v.<br>THE UNITED STATES OF AMERICA,<br>Defendant. | ) Case No. 06-748C<br>) Judge Thomas C. Wheeler |

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Marjorie Murtagh Cooke ("Plaintiff"), by and through counsel and pursuant to Rule 56 of the Court of Federal Claims, hereby moves this Court for an order granting summary judgment in the above captioned case. There is no genuine dispute as to any uncontroverted fact related to Plaintiff's cause of action, as stated in her First Amended Complaint, that Defendant violated the Equal Pay Act, 29 U.S.C. § 206, and Defendant has raised no affirmative defenses. Plaintiff is therefore entitled to judgment as a matter of law.

Plaintiff respectfully refers the Court to the accompanying Plaintiff's Proposed Findings of Uncontroverted Fact and her Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment.

Respectfully Submitted,
By Counsel

/s/ Brian M. Lowinger
R. Scott Oswald
Brian M. Lowinger
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806

(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
blowinger@employmentlawgroup.net
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing Plaintiff's Motion for Summary Judgment, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment, Plaintiff's Proposed Findings of Uncontroverted Fact, and a proposed Order was served via hand delivery this 9th day of October, 2007 upon:

Meredyth D. Cohen, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L St., N.W., Room 12016
Washington, D.C. 20530
Phone: (202) 353-7978
Fax: (202) 514-8624
meredyth.cohen@usdoj.gov

/s/ Brian M. Lowinger
Brian M. Lowinger