IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF EMILY T. CARROLL**

Pursuant to 28 U.S.C. § 1746, I, Emily T. Carroll, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as a Human Resources Specialist in the Human Resources Division of the Office of Administration at the NTSB. I have held this position since February 2000. Since April 1980, I have served in the Human Resources Division in various positions, such as Personnel Assistant and Human Resources Specialist.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate surface modal offices, each with its own director.

4. There are two ways for the NTSB to elevate a position to the Senior Executive Service ("SES") level. The NTSB can request and receive an allocation of an SES slot from the

Office of Personnel Management ("OPM"). Once the agency receives this allocation, it can use it as it deems necessary. Alternatively, when a vacancy occurs in one of the allotted slots that the agency has, that position can be filled by reassignment of a current SES employee to that position or through a competitive recruitment process. The NTSB cannot create a new SES position without OPM authorization.

5. In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied this request.

6. For a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale.

7. During the relevant time period, the positions of Director and Deputy Director of the Office of Aviation Safety ("OAS") were paid at the SES level.

8. Some time after 2000, an SES employee retired and an SES slot became available. Senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned an available SES slot.

9. Pursuant to OPM regulations, all SES positions must be advertised and competed. An employee who encumbers a GS-level position that is reclassified to the SES level, may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. See <u>OPM Guide to the Senior Executive Service</u> at page 11. Mrs. Cooke has never held a career SES appointment.

10. Once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position.

11. Mr. Robert Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES.

12. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM.

13. In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. This position was transferred to OHS and advertised as an SES position.

14. Mr. Joseph Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES.

15. In 2004, the NTSB requested and received an additional SES slot from OPM. Senior officials at the NTSB allocated this slot to the position of Director of the Office of Marine Safety (OMS). The position was advertised as an SES position. The advertisement was subsequently cancelled prior to a selection being made.

16. The NTSB again advertised the Director of OMS position as an SES position in early 2005. Ms. Cooke again submitted an application for this position.

17. The NTSB recommended Mr. John Spencer for this SES position to OPM, and he was approved for an appointment to the SES

18. Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006.

19. GS-15 employees are eligible for overtime pay within the Federal system. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10 or level V of the Executive Schedule. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, in overtime she was only eligible to receive an amount equal to the difference between her salary and the premium pay limitation.

20. Overtime is defined as hours of work that are officially ordered or approved by a supervisor before the hours are worked. However, overtime does not include hours of work that an employee incurs in connection with an accident investigation.

21. Pursuant to 5 C.F.R. § 575.301, an agency may pay a retention allowance

> [W]hen an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

22. Each GS pay grade has incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step.

23. From 2003 to 2005, Ms. Cooke received all step increases to which she was entitled.

24. NTSB employees who hold Senior Level ("SL") positions must demonstrate technical competencies.

25. SL employees may not perform supervisory duties more than 25 percent of the time.

26. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special act in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase.

27. Performance awards are based upon performance and are not intended meant to augment one's salary.

28. Between 2003 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beal, and Elaine Weinstein. Between 2001 and 2005, Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES.

29. Lola Ward, Julie Beal, and Elaine Weinstein are all female, and were required to compete for their positions. All of them competed against male applicants.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of November 2007, in Washington, D.C.

Emily T. Carroll
Human Resources Specialist
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF ROBERT J. CHIPKEVICH**

Pursuant to 28 U.S.C. § 1746, I, Robert J. Chipkevich, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH") at the NTSB. I have held this position since May 2001. Prior to becoming the Director of ORPH, I served as Director of the Office of Pipeline and Hazardous Materials Safety, Chief of the Pipeline and Hazardous Materials Division, Chief of the Hazardous Materials Division, and Hazardous Materials investigator-in-charge. I have been on staff at the NTSB since January 1984.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. Effective November 5, 2000, the NTSB Office of Railroad Safety and Office of Pipeline and Hazardous Materials Safety merged together to form ORPH. I became the Acting Director of ORPH.

4. In 2001, an SES slot was allocated to the position of Director of ORPH. The position was advertised as an SES position and the NTSB began accepting applications for this position. I applied for the position and was eventually selected.

5. From 2003 to 2005, ORPH had approximately 40-50 employees and three regional offices.

6. On average, 3,215 railroad accidents occur per year, resulting in 442 injuries and 17 deaths. In addition, on average, 355 fatalities per year occur at highway-rail crossings, and an average of 480 fatalities per year occur that involve trespassers around railways.

7. In 2003, there were 370 pipeline accidents, 71 injuries, and 12 fatalities reported. In 2004, there were 443 pipeline accidents 60 injuries, and 23 fatalities reported. In 2005, there were 490 pipeline accidents, 47 injuries, and 16 fatalities reported.

8. In 2003, there were 15,156 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 119 injuries and 15 fatalities. In 2004, there were 14,846 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 288 injuries and 16 fatalities. In 2005, there were 15,928 such incidents reported, resulting in 945 injuries and 34 fatalities.

9. Between 2003 and 2005, ORPH received, on average, approximately 53 notifications of railroad incidents and accidents per week.

10. Between 2003 and 2005, ORPH received, on average, approximately 33 notifications of pipeline incidents and accidents per week.

11. Between 2003 and 2005, ORPH received, on average, approximately 119 notifications of hazardous materials incidents and accidents per week.

12. The NTSB exercises considerable discretion in determining whether to launch on certain rail, pipeline, and hazardous materials accidents. In general, ORPH evaluates the circumstances and safety issues of each accident, and I make a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident prevention issue. Overall, as Director of ORPH, I maintain broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation.

13. My position as the Director of ORPH requires me to maintain a considerable amount of expertise in three distinct areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transport of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of these different types of accident investigations. In addition, the Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. In this regard, the division of ORPH that conducts hazardous materials investigations is unique, and requires my office to interact closely with other offices, either as the primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation.

14. During the calendar year of 2003, ORPH launched on 10 railroad accidents, two pipeline accidents, and three hazardous materials accidents. Of the hazardous materials accidents in 2003, one of these accidents was also a marine accident.

15. During the calendar year of 2004, ORPH launched on 14 railroad accidents, two pipeline accidents, and two hazardous materials accidents. Of the hazardous materials accidents in 2004, one of these accidents was also a highway accident.

16. During the calendar year of 2005, ORPH launched to eight railroad accidents, one pipeline accident, and two hazardous materials accidents, one of which was a railroad accident, and the other of which was a highway accident.

17. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner. In ORPH, the parties to an accident investigation often vary considerably; some parties are frequently involved in NTSB investigations, while others require the NTSB to take extra steps to ensure that they are familiar with the structure, process, and general conduct that an investigation will entail.

18. During the calendar year of 2003, ORPH completed a total of 13 investigation reports, which included 11 railroad accident reports, one pipeline accident report, and one hazardous materials report. At any given time during 2003, ORPH was working on approximately 15-20 ongoing investigations.

19. During the calendar year of 2004, ORPH completed a total of 16 investigation reports, which included 10 railroad accident reports, three pipeline reports, and three hazardous materials reports. At any given time during 2004, ORPH was working on approximately 15-20 ongoing investigations.

20. During the calendar year of 2005, ORPH completed a total of 10 investigation reports and one pipeline report that was a safety study. These investigation reports included

nine railroad accident reports and one hazardous materials report. At any given time during 2005, ORPH was working on approximately 15-20 ongoing investigations.

21. From 2003 to 2005, ORPH developed 82 safety recommendations that were adopted by the Safety Board.

22. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and 2005, I communicated with officials in foreign countries approximately four to six times per year on various matters.

23. Between 2003 and 2005, as the Director of ORPH, I testified before Congress two times. At present, I have testified before Congress 10 times since 2001.

24. In preparing for my testimony before Congress, I was required to brief and interact with Congressional aides and members of Congress or the Senate on several occasions between 2003 and 2005. The purpose of such briefings was to help staff and members of Congress or the Senate understand railroad, pipeline, and hazardous materials safety investigations or issues.

25. As the Director of ORPH, I prepared the Chairman or a Board Member to testify before Congress two times between 2003 and 2005. At present, I have prepared the Chairman or a Board Member to testify before Congress 14 times since 2002.

26. My position as the Director of ORPH required me to travel three times during 2003, four times during 2004, and one time during 2005, in order to represent the NTSB at events or gatherings that did not involve accident investigations. Such events included providing presentations, participating in briefings, or representing the NTSB at conferences.

27. As Director of ORPH at the SES level, I was a member of the Executive Resources Board ("ERB").

28. I have participated in numerous ERB meetings and decisions affecting the management of the NTSB since assuming my position as Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations at the SES level.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November 2007, in Washington, D.C.

Robert J. Chipkevich
Director, ORPH
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF THOMAS E. HAUETER**

Pursuant to 28 U.S.C. § 1746, I, Thomas E. Haueter, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Director of the Office of Aviation Safety ("OAS") at the NTSB. I have held this position since March 2007. I served as Deputy Director of OAS from November 2000 to March 2007. Prior to assuming the position of Deputy Director of OAS, I served as Chief of the Major Investigations Division, as an investigator-in-charge, United States accredited representative, or structures investigator for numerous aviation investigations at the NTSB. I have been on staff at the NTSB since 1983.
2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. During my tenure as Deputy Director of OAS, I was paid at the SES level.
4. From 2003 to 2005, OAS had approximately 120 to140 employees. Thus, the Director of OAS was responsible for 20 to 25 percent of the workforce of the NTSB.

5. From 2003 to 2005, OAS had ten regional offices.

6. From 2003 to 2005, there were approximately 40 aviation accidents per week and approximately 10 aviation accident fatalities per week.

7. From 2003 to 2005, there were approximately 38 notifications of aviation accidents per week, on average.

8. In 2003, OAS launched to four major domestic accidents and five foreign accident investigations.

9. In 2004, OAS launched to seven major domestic accidents and 10 foreign accident investigations.

10. In 2005, OAS launched to 16 major domestic and 17 foreign accident investigations.

11. From 2003 to 2005, OAS developed 185 safety recommendations that were adopted by the Safety Board.

12. In general, approximately 10 to 12 NTSB employees launch on major aviation accident investigations.

13. An investigation of a major aviation accident may involve up to 100 to150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. See 49 C.F.R. part 831. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals.

14. In 2003, OAS regional offices initiated 1,915 accident investigations and 50 serious incident investigations and completed 1,707 investigations.

15. In 2004, OAS regional offices initiated 1,865 accident investigations and 116 serious incident and accident investigations and completed 2,361 investigations.

16. In 2005, OAS regional offices initiated 1,927 accident investigations and 128 serious incident and accident investigations and completed 2,335 investigations.

17. In 2003, OAS completed four major reports and continued work on four other major investigations.

18. In 2004, OAS completed four major reports and continued work on six other major investigations.

19. In 2005, OAS completed four major reports and continued work on seven other major investigations.

20. Between 2003 and 2005, I was required to brief and interact with Congressional aides on numerous occasions.

21. On average, the Director of OAS prepared a Board Member to testify before Congress twice per year between 2003 and 2005. On average, I prepared a Board Member to testify before Congress twice per year between 2003 and 2005.

22. Between 2003 and 2005, the Director of OAS traveled to the site of an aviation accident four times.

23. Between 2003 and 2005, I traveled to the site of an aviation accident seven times.

24. The working conditions at the site of an accident are different from, and can be more hazardous than, working conditions at the office.

25. Between 2003 and 2005, my position required me to travel approximately three to four times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

26. In my role as Deputy Director of OAS, I was responsible for the general oversight and conduct of all major aviation investigations. This responsibility included supervising

the scope of accident investigations, and making decisions regarding the course, direction, duration, and general breadth of inquiry concerning certain aspects of investigations.

27. As Deputy Director of OAS, I had greater responsibility for the day-to-day conduct of accident investigations than any of the other modal office directors.

28. The position of Deputy Director of OAS requires a more technical background than the modal office director positions because of the Deputy Director's involvement in the technical aspects of major investigations.

29. The Director of OAS was a member of the Executive Resources Board ("ERB").

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November 2007, in Washington, D.C.

Thomas E. Haueter
Director, Office of Aviation Safety
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**DECLARATION OF ROBERT M. MACINTOSH, JR.**

Pursuant to 28 U.S.C. § 1746, I, Robert M. MacIntosh, Jr., declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Chief Advisor for International Aviation Safety Affairs in the Office of Aviation Safety ("OAS") at the NTSB. I have held this position since July 1, 2001. Prior to assuming the position of Chief Advisor for International Aviation Safety Affairs, I served as Assistant Director for International Operations and as an investigator-in-charge at OAS. I have been on staff at the NTSB since April 14, 1988.
2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. I have been paid at the Senior Level ("SL") since assuming the position of Chief Advisor for International Aviation Safety Affairs.
4. My responsibilities involve the coordination of NTSB's role and activity involving international aviation investigations.

5. Pursuant to the International Civil Aviation Organization ("ICAO") treaty, NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. Many major international aviation accidents involve one or more of these, so NTSB is involved in many major international aviation accidents.

6. OAS has a responsibility to participate in accident investigations conducted by other nations per the entitlements conveyed in ICAO Annex 13.

7. The NTSB is the agency primarily responsible for United States representation at the International Civil Aviation Organization on matters pertaining to the investigation of accidents and incidents in civil aviation.

8. I am responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to Aircraft Accident and Incident Investigation, Annex 13 to the Convention on International Civil Aviation (9th ed. 2001) (ICAO). My office is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO.

9. I am responsible for coordinating technical matters and interface for each international launch with the host country and any other countries involved in the investigation.

10. My position as the Chief Advisor for International Aviation Safety Affairs for the NTSB requires me to possess unique international relations abilities, including education and training on geopolitical subjects. I work with the Department of State in a variety of different capacities and am conversant in two different languages.

11. In addition to ICAO activities, I represent the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators.

12. I have been required to brief and interact with Congressional aides regarding international aviation matters or specific investigations on several occasions.

13. On average, I prepared a Board Member or other NTSB employee to testify before Congress three times per year between 2003 and 2005.

14. In my capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, I travel frequently, primarily to diplomatic meetings; on average, I travel eight to nine times per year, for at least one week to two weeks per trip. My position requires much more travel than any of the modal office directors. My frequent travel and the associated long hours present a source of stress, and physical and mental fatigue that exceed that of any office environment.

15. The working conditions at the site of an accident, detailed examination of wreckage, and interviews with survivors or associated personnel are different from, and more hazardous than working conditions of any office environment.

16. In 2003, OAS launched in response to five foreign accidents. In 2004, OAS launched in response to 10 foreign accidents. In 2005, OAS launched in response to 17 foreign aviation accidents.

17. In 2003, OAS participated in seven foreign accident investigations. In 2004, OAS participated in seven foreign accident investigations. In 2005, OAS participated in 20 foreign accident investigations.

18. In general, approximately three NTSB employees launch on foreign aviation major accident investigations.

19. In my role as the Chief Advisor for International Aviation Safety Affairs, I provide counsel to NTSB aviation safety investigators with regard to the application and interpretation of Annex 13 of ICAO during the course of such investigations.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28rd day of November 2007, in Washington, D.C.

Robert M. MacIntosh, Jr.
Chief Advisor for International Aviation Safety Affairs
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOSEPH G. OSTERMAN**

Pursuant to 28 U.S.C. § 1746, I, Joseph G. Osterman, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Managing Director of the National Transportation Safety Board. I have held this position since March 18, 2005. Prior to becoming the Managing Director of the NTSB, I served as Director of the Office of Highway Safety ("OHS") for approximately eight years. Prior to assuming the position of Director of OHS, I served as Highway Division Chief, Major Investigations Branch Chief, Highway investigator-in-charge, and Highway Field Investigator at the NTSB. I have been on staff at the NTSB since 1986.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. In 2003, an SES slot was allocated to the position of Director of OHS. The position was advertised as an SES position and the NTSB began accepting applications for this position. I applied for this position, and was ultimately selected.

4. From 1991 until 1996, I was paid at the GS-15 level as the Chief of the Highway Safety Division. From 1996 until 2004, I continued to receive a GS-15 salary as the Director of the Office of Highway Safety. From early 2004 until my promotion to Managing Director, I was paid at the SES level. I have also been paid at the SES level throughout my tenure as Managing Director of the NTSB.

5. From 2003 to 2005, OHS had approximately 30 to 40 employees and 5 regional offices.

6. Between 2003 and 2005, there were approximately 18 notifications of highway accidents per week.

7. Due to its broad legislative mandate, OHS has an enormous amount of discretion in deciding whether to investigate a highway accident. In OHS, each accident must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation.

8. In 2003, OHS initiated 49 investigations and launched on 34 accidents. "Launching" on an accident involves traveling to the accident site immediately after the appropriate senior official has made the determination to launch. "Initiating an investigation" involves commencing an investigation on a particular accident, but may not always involve immediate travel. Also in 2003, OHS completed 44 dockets, issued seven major reports, and continued work on 22 investigations. The "completion of a docket" refers to the completion of the fact-finding and analytical components of an

investigation, which is a considerable undertaking that is critical to the NTSB's subsequent analysis of the accident during its investigation.

9. In 2004, OHS initiated 45 investigations and launched on 45 accidents. In addition, in 2004, OHS completed 36 dockets, issued six major reports, and continued work on 26 investigations.

10. In 2005, OHS initiated 33 investigations and launched on 28 accidents. In addition, in 2005, OHS completed 31 dockets, issued four major reports, and continued work on 29 investigations.

11. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner.

12. In OHS, the parties to an accident investigation are typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, there is an educational and information component to the party system in OHS that does not exist as often in some of the other investigative modal offices.

13. OHS is responsible for completing more safety reports than any other modal office. These safety reports examine a number of different accidents with a common issue.

14. Between 2003 and 2005, as the Director of OHS, I testified before Congress three times.

15. As the Director of OHS, in preparing for my testimony before Congress, and providing technical information regarding highway safety issues, I was required to brief and interact with Congressional aides on numerous occasions.

16. On average, as the Director of OHS, I prepared a Board Member or other NTSB employee to testify before Congress six times per year between 2003 and 2005.

17. Between 2003 and 2005, in my role as the Director of OHS, I traveled to the site of a highway accident approximately twice per year, on average.

18. The working conditions at the site of an accident are different from, and more hazardous than, working conditions at the office.

19. Between 2003 and 2005, my position as the Director of OHS required me to travel approximately eight times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

20. As the Managing Director of the NTSB, I stay informed of all offices' duties, projects, and ongoing investigations. The frequency of accidents that the NTSB investigates, from most to least, the order of transportation modes, is: aviation, highway, railroad, marine, pipeline. Between 2003 and 2005, OAS completed approximately 5,560 reports, 12 of which were for major accident investigations.

21. The majority of the NTSB's budget is composed of fixed overhead costs, such as labor, benefits, and facilities; the remaining portion of the budget is discretionary, and divided among NTSB offices. Of the discretionary portion of the budget for Fiscal Year 2003, OAS received 28.04 percent, OHS received 7.61 percent, ORPH received 4.67 percent, and OMS received 2.09 percent. Of the discretionary portion of the budget for Fiscal Year 2004, OAS received 33.45 percent, OHS received 11.78 percent, ORPH received 7.52 percent, and OMS received 3.00 percent. Of the discretionary portion of the budget for Fiscal Year 2005, OAS received 45.04 percent, OHS received 7.81 percent, ORPH received 6.84 percent, and OMS received 1.84 percent.

22. There are between 40 and 60 major marine accidents that occur each year. Of these, the Office of Marine Safety launches on approximately ten percent. There are approximately 700 marine accident fatalities per year. The majority of fatalities in marine accidents are attributable to recreational, not commercial, boating.

23. In Fiscal Year 2003, OMS received approximately 44 notifications of marine accidents or incidents. In Fiscal Year 2004, OMS received approximately 28 notifications of marine accidents or incidents. In Fiscal Year 2005, OMS received approximately 23 notifications of marine accidents or incidents.

24. The SES-level modal office directors were and are members of the Executive Resources Board ("ERB").

25. As the Director of OHS, I spent approximately ten percent of my time performing work related to the ERB.

26. OHS has a high public profile because highway safety is a matter of great public concern.

27. As Director of OHS, I was responsible for significant state recommendation advocacy. The other modal office directors did not have the same level of responsibility because regulation of those modes is primarily Federal.

28. The Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than OMS or ORPH.

29. OHS handles more multi-modal investigations than the other modal offices. The primacy for investigating accidents involving highways and waterways or highways and railroads falls to OHS, as opposed to OMS or ORPH.

30. From 2003 to 2005, OHS developed 113 safety recommendations that were adopted by the Safety Board. From 2003 to 2005, OMS developed 20 safety recommendations that were adopted by the Safety Board.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 29 day of November 2007, in Washington, D.C.

Joseph G. Osterman
Managing Director
National Transportation Safety Board

WITNESS
TOWANNA PRICE
Towanna J. Price