1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------X
MARJORIE MURTAGH COOKE, :
Plaintiff, :
vs. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION SAFETY :
BOARD, :
Defendant. :
----------------X

Videotaped Deposition of DANIEL CAMPBELL
Washington, D.C.
Thursday, November 15, 2007
9:59 a.m.

Job No.: 1-115036
Pages: 1 - 200
Reported by: Dana C. Ryan, RPR, CRR

2

Videotaped Deposition of DANIEL CAMPBELL, held at the law offices of:

The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

Pursuant to agreement, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
R. SCOTT OSWALD, Esquire
DAVID SCHER, Esquire
BRIAN M. LOWINGER, Esquire
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

ON BEHALF OF THE DEFENDANT THE UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, Esquire
United States Department of Justice
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7978

4

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
ANDREA MCBARNETTE, Esquire
U.S. Attorney's Office
501 3rd Street, Northwest, Rm 4218
Washington, D.C. 20530
(202) 514-7153

ALSO PRESENT:
Denise M. D'Avella, Esquire, NTSB Office of General Counsel
Marjorie Murtagh Cooke, Plaintiff
Scott Forman, Videographer

93

having read it, and that would be my role.
BY MR. OSWALD:
Q In its entirety?
A I have no recollection of having done anything else.
Q I understand.
A Well, apparently --
Q Now, when did you -- who was responsible for the decision to rescind the vacancy announcement for the director of the Office of Marine Safety, a position that was announced the first time in late 2004, for the director of marine safety at the National Transportation Safety Board?
A I was.
Q And why did you rescind the first vacancy announcement?
A Well, that's a complicated question, but there were two principal things that were on my mind. One was I wasn't ready to have a selection made at that moment, and, two, I thought that the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an

94

internal candidate.
Q Now, what factors made up your decision to rescind the vacancy announcement for the director of marine safety at the NTSB -- this is the 2004 first vacancy announcement -- apart from your unwillingness or not being ready to make a selection and your belief that the pool of candidates was artificially narrowed based upon a preconceived notion that there was a preselection for the position; what other factors other than those?
A Well, I called -- when I got a list of who was -- who the panel had recommended, I put the list on the back of my desk and I didn't touch it very much for a period of time because, as I say, I wasn't really interested in seeing the selection process go forward at that point in time.
I can't remember why I finally decided I had to do something with it, but when I did, the first name on the list was a captain from the Coast Guard who I knew, and I called him and he told me that he was now employed by Johns Hopkins and was no longer a candidate, and I told him that I was kind of surprised

95

that there -- he was the only guy that was interested. Captain Brusseau was the guy who told me that it was understood it was kind of wired for the plaintiff and that that may have limited it, and, so, that conversation with one of the applicants would have been the only additional factor that I -- that went into it.
Q Who were the other four candidates on the list that was provided to you by the panel after the first vacancy announcement --
A I don't remember them by name, but there was a -- there was a Coast Guard guy from the operational side of the Coast Guard, and then there were two people from the private sector, and I don't remember their names. I do remember that I was not impressed.
Q And who else?
A The plaintiff.
Q Marjorie Murtagh was?
A Yes.
Q Why did you -- so what was it about the -- the five candidates that were sent to you by the first panel of the selection committee that led you to

96

believe that it was -- it was artificially narrowed? This is the same group that include, what, Captain Prudo (sic), a Coast Guard captain and two private sector folks and Marjorie Murtagh Cooke; how is it --
A Could you repeat the -- I lost your question and -- could you rephrase it?
Q Well, what was it about the list that the panel had supplied you, the list of five candidates, which included Captain Prudo (sic), two private sector employees, another captain in the Coast Guard and Marjorie Murtagh Cooke, the incumbent in the position, that led you to believe that the list was too narrow?
A Well, it wasn't the list that led me to believe that -- that -- that the -- it was too narrow. I mean, the list -- the list didn't have any good candidates in it except the first guy that I -- well, I don't want to say it didn't have any good candidates. The two private sector guys I found deficiencies with just looking at the -- the applications. I don't know that I -- if I had met with them and talked to them that they might not have been able to explain a lot of that, but I looked at it

and I thought to myself, well, there's a couple of glaring probabilities -- possibilities here that I'm not -- I'm not very happy with.
The one guy that was on the top, the first name there who I -- was somebody that I had dealt with in Coast Guard and thought was an -- an estimable person, I gave him a call and he was no longer a candidate. So now I was left with an operational guy, with Marjorie Murtagh and with the two private sector types who -- who had credentials that both didn't really speak to the job, but also had holes in them that made me very -- very nervous; periods of time where people had gone from a senior vice president, 170,000 or $180,000 a year to a GS-12. That's not the kind of career advancement that -- that makes you comfortable when you're thinking of turning someone into an SES. So it wasn't -- it wasn't a very -- it wasn't a pool that I was particularly delighted with.
Q And why wasn't Marjorie Murtagh Cooke a good candidate for the position?
A Well, she might have been a good candidate, but I would have had to take it to the chairman, and



she would not probably have been selected, and that's one of the reasons I was not in a hurry to do this. When I say I procrastinated, I procrastinated because I believed that I was going to lose the office director that was there; that was going to be the outcome.
Q What led you to believe that?
A Well, I knew who the chairman was. I knew what the -- what the -- the -- the -- as I say, I allowed the modal directors to make their own impressions on a chairman. I -- I gave them every opportunity to prove themselves. If I had made a suggestion that Marjorie Murtagh ought to be the office director during the period of time that the Barberi was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, Dan, have you lost your mind. I think -- I think that that would not have been a sensible thing for me to do.
Q Why not?
A Well, because to make somebody -- to pay



somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible. It's just -- it's not a sensible thing to do.
Q All right. Well, what were the other factors that led you not to believe that Marjorie Murtagh Cooke would be a good candidate for the position other than the fact that you believe that if the -- you went and took her name to the chairman that -- that she would ask you whether or not you were crazy?
A Marjorie Murtagh and I have been known to one another since probably 1995. So I've had a long history to develop my view of whether or not she would be the right candidate to run the office at the SES level. And I could, if you like, spend all the time from now to lunch describing to you the difficulties that I have encountered over that period of time that suggest to me that -- that it's not a good idea to make somebody an SES for doing something that they're only accomplishing, in my view, marginally at the



GS-15 level.
Q What was your view about whether or not Marjorie Murtagh Cooke would be a good candidate for the director of marine safety at the NTSB?
A I didn't think that that was sensible. I didn't think that she should be made an SES.
Q And therefore selected for the director of marine safety position?
A Yes, I had -- I had serious, serious difficulties with Marjorie's performance as the director over her -- her office, both in terms of the way she managed the office and in the quality of the product that came out of it.
Q I understand. Now, in 1995 what was -- what was your exposure to Marjorie Murtagh Cooke in 1995?
A Well, I'm not really sure when it -- when it first -- it might have been '97. The first time that -- that -- that I had a direct role to play in a Coast Guard matter was, I think, shortly after the Office of the Secretary of Transportation had been changed into the four modal offices, so I think it would be very early in Marjorie's leadership in the



A29

129

might be or there's a draft report that's brought to a managing director's meeting for consideration by the peer-review process.

The difficulty with the Barberi was that apparently there had been some scheduling and some -- some -- some issues about when it was to go forward, and the chairman had to ask for a briefing from the plaintiff as to the status of it. And I, again, think this is sometime around August, but I can't -- I can't be more -- August or September. I'm not really sure.

But, in any event, there had -- there was a briefing about it, and as a result of the briefing the chairman was of the opinion that things were -- were not proceeding as they were supposed to proceed, and I -- it was -- it was a -- a fairly unpleasant meeting from the standpoint of -- of, I think, the plaintiff and -- and the chairman. There was -- there were disagreements about things, and -- and I think it was -- in fact, I think it was at the close of that meeting that Marjorie came to me one day -- the plaintiff came to me in the kitchen that is

130

located right next to the chairman's office and told me that I should fire her if that's the way that this was going to go. I assured the plaintiff that I had no intention of firing her, but apparently she had taken the -- the consequences of the meet -- the outcome of the meeting as a fairly significant event in her career.

As it were to turn out, the issues that seemed to be precluding the finishing of it turned out to be disputes at the staff level, and the chairman asked me if I would intervene, and I did and actually hosted a -- a progress meeting and -- the kind of thing that would normally be done by an office director -- hosted a progress meeting, found out what the problems were. We reached agreement on how some of them might be resolved.

I actually took some of them under -- in -- in -- in my own hand and wrote some portions of a -- a draft accident report, and we had another meeting or maybe another two meetings and produced a report, but it involved activity on my part far beyond what I would normally be involved in from any other

131

mode in accident investigation. And I think the report was produced in the early spring of 2005, about two or three months later, after -- well, late -- beyond what the original target had been, but I'm not -- I'm not sure, because I -- I may not even have been the one who gave the original target. I just know that the chairman was upset that it was not proceeding very rapidly.

BY MS. MCBARNETTE:

Q Were you asked to take on duties that you considered were, in fact, Ms. Cooke's duties in this accident -- regarding this accident?

MR. OSWALD: Objection, ambiguous.

THE WITNESS: Yes.

BY MS. MCBARNETTE:

Q What duties were you asked to take on?

A Well, as I -- I just mentioned, we -- we had at least one or two, and maybe as many as three, what I would refer to as -- as progress or production meetings that I chaired to see who had an issue that was unresolved at the director's level that we needed to resolve.

132

And my recollection was the principal issue was between our resident human resources -- I mean human performance investigator, who was a Ph.D. on the psychology side, and our medical officer, who was an M.D., and how to describe some of the behaviors and some of the activities of the operator of the vessel, and I managed to reach some accord between those folks on that. And I think that's actually the section that I ended up writing up myself. So for the managing director who hopes that a -- when an -- when an accident report is presented at a managing director's meeting, I'm hoping it's a two-hour meeting, and I'm hoping at the end that I can sign a document sending it to the board, but instead of that I'm actually involved in the nitty-gritty of the process and even one of the -- the authors in the process, and that's -- that's unique.

Q Okay. You said you chaired three meetings regarding --

A Two or three.

Q -- this accident?

A Yeah.

181

BY MS. MCBARNETTE:
Q He was an applicant?
A Yes.
Q Okay. Please continue.
MR. OSWALD: Can we -- we're going to run out of tape here. You have seconds.
MS. MCBARNETTE: Okay. So --
MR. OSWALD: Can we take a break here? Let's go off the Record and change the tape.
THE VIDEOGRAPHER: This marks the end of tape 2 in the deposition of Mr. Campbell. We're going off the Record. The time is 2:54 p.m.
(Recess -- 2:54 p.m.)
(After recess -- 2:56 p.m.)
THE VIDEOGRAPHER: This marks the beginning of tape 3 in the deposition of Mr. Campbell. We're back on the Record. The time is 2:56 p.m.
BY MS. MCBARNETTE:
Q Okay. Let's back up a little bit. You mentioned that you had procrastinated. What did you mean by that?
A I think that the first group was brought to

182

me and that it might have been a month, it might have been two months, it might have been three months before I actually turned my attention to it full-time and said, all right, I need to -- I need to move forward on this. So I'm not sure what the elapse was, but -- but like a lot of people, I procrastinate and I also know when I'm procrastinating, so at some point I said, you can't do this and you need to move forward.
Q Why did you choose to procrastinate?
A I wasn't anxious to -- to proceed to the selection of an SES that I didn't necessarily think was going to work satisfactorily. I didn't think that Marjorie Murtagh Cooke, the plaintiff here, was going to be selected. I would not have recommended her selection, but I also didn't think that the pool that -- that I looked at when I initially went through was attractive.
Q After the position was readvertised, did you select a panel to review the incoming applications?
A Yes.
Q Do you know if that panel is -- was the final panel that actually selected the person who was

183

selected?
A Panels themselves don't select --
Q Right.
A -- so the panel wouldn't have selected. I believe that the panel that I suggested was the panel that made the review of the applications, so that's a yes. Were they a selector, I think that that's probably going to be a no.
Q Were you the selecting official for that particular position?
A No, for two reasons. One, I think I was no longer the managing director; and, two, as a matter of reality, the selection of any SES is going to be the chairman. As I mentioned earlier, the managing director works on a delegation with the chairman's authority, but only on a delegation. And at the level of SES, a chairman will be the determining call.
Q Did you have any input on who was ultimately selected?
A No.
Q Did you tell the panel members for the second panel who they should select or review?

184

A No, I didn't communicate with them on the merits of the panel at all.
Q Did -- did you give your opinion about who should be selected to the chairperson or to any other officer who had input into sel -- selecting?
A No.
Q Are you aware if Ms. Cooke was ranked within the top five for the second panel's selection in the applicant pool?
MR. OSWALD: Objection as to form, misleading.
THE WITNESS: I -- I'm not sure how many people the panel actually considered at the top. I'm not sure what they went forward with. I did hear at some point that Marjorie was not to be offered an interview, so she was not in their top group, but that's -- that's what I know about it. I was told -- I've forgotten who told me that the panel was making a -- a recommendation -- I don't know whether it was a recommendation of one person or five people, but they were making a recommendation -- and that Marjorie was not included in the group that would be interviewed.

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, ) Case No. 06-748C
Plaintiff, ) Judge Thomas C. Wheeler
vs. )
THE UNITED STATES, )
Defendant. )

DEPOSITION OF
JOHN C. CLARK
Washington, D.C.
Friday, June 29, 2007
9:08 a.m.

Job No.: 1-106677
Pages 1 through 270
Reported by: John L. Harmonson, RPR

2

Deposition of
JOHN C. CLARK

Held at the offices of:
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202)331-2883

Taken pursuant to the Federal Rules of Civil Procedure, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.

3

APPEARANCES

ON BEHALF OF PLAINTIFF:
BRIAN M. LOWINGER, ESQ.
The Employment Law Group, PC
888 17th Street
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT:
MEREDYTH D. COHEN, ESQ.
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
8th Floor
Washington, D.C. 20530
(202)353-7978
KATHLEEN SILBAUGH, ESQ.
National Transportation Safety Board
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202)314-6084

ALSO PRESENT:
JONATHAN DUNN, Intern
MARLA DUNN, Intern

4

EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. LOWINGER | 7 |
| EXAMINATION BY MS. COHEN | 259 |
| EXAMINATION BY MR. LOWINGER | 266 |


* * * * *

EXHIBIT INDEX

(Exhibits attached to transcript.)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Various "Notification of Personnel Action" | 237 |
| 2 | Performance Appraisal Form for period 9/1/2000 to 8/31/2001 | 245 |
| 3 | Performance Appraisal Form for period 9/1/2002 to 8/31/2003 | 246 |
| 4 | SES Performance Plan and Appraisal, 11/22/06 | 246 |
| 5 | Progress Review, 11/20/06 | 247 |
| 6 | Performance Appraisal Form for period 9/1/2003 to 8/31/2004 | 247 |

EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Organizational Listing, October 1, 2002 | 248 |
| 8 | Organizational Listing, October 1, 2003 | 250 |
| 9 | Organizational Listing, October 1, 2005 | 250 |
| 10 | Weekly Reports | 251 |
| 11 | Memo from B. Strauch to B. Loeb; September 29, 1997 | 253 |
| 12 | Memo from B. Strauch to B. Loeb; July 2, 1999 | 253 |
| 13 | Incentive Award Recommendation Form, 11/23/99 | 254 |
| 14 | Memo from B. Strauch to B. Loeb; January 12, 2000 | 254 |
| 15 | Memo from B. Strauch to B. Loeb; June 28, 2000 | 254 |
| 16 | Memo from B. Strauch to D. Dampbell; December 19, 2001 | 256 |




EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Incentive Award Recommendation Form, 2/27 | 257 |
| 18 | Incentive Award Recommendation Form, 12/15/04 | 258 |
| 19 | Incentive Award Recommendation Form, 10/15/03 | 258 |




PROCEEDINGS

JOHN C. CLARK,

after having been first duly sworn, was examined and did testify under oath as follows:

EXAMINATION

BY MR. LOWINGER:

Q. Good morning.
A. **Good morning.**
Q. My name is Brian Lowinger. I'm an attorney at the Employment Law Group here to take your deposition today.
Could you just state your name for the record, sir.
A. **John Clark.**
Q. And could you spell your last name, sir.
A. **C-l-a-r-k.**
Q. And could you give your date of birth?
A. **9/6/47.**
Q. That's 1947?
A. **Right.**
Q. Just a few ground rules about the



deposition today. We're going to ask you a series of questions. It's really like a question-and-answer period except that it's extended. It's all being taken stenographically, so only what you say orally appears on the record. Nodding of your head to answer a question doesn't really appear on the record, so I'm going to ask that you respond to all questions with a verbal answer. If it's a yes or no answer, say "yes" or "no" rather than "uh-huh," because "uh-huh" always comes out with somebody thinking that means no or maybe later on down the road. So sometimes it doesn't really translate.
A. **Okay.**
Q. Thank you.
Have you ever been deposed before?
A. **Oh, yeah.**
Q. Can you tell me when you were last deposed?
A. **It's probably been in the last 10 or 15 years, but most of it was right after I came to the Board or right before I came to the Board.**
Q. In what context?
A. **Always in aircraft accident litigation.**

57

responsible for all the major investigations and also all of those, I'm going to say critical incident investigations, ones where an engine has failed or a piece of structure has failed that could have led to a catastrophic accident.
Q. Okay. I want to make sure I understand this. Through delegated authority, the regional deputy director can be responsible for the critical incident investigations and the major regional investigations through the delegated authority. Is that right?
A. I don't know what you're talking about, delegated authority. "Delegated authority" is a term that, as a director, the Board has given the director delegated authority to personally sign -- approve the probable cause of a lot of accidents. And when I was deputy or director, it may be 200 accidents at a time that don't go to the Board.
So it's the board's job to determine probable cause, but under delegated authority the director can sign for those. Now, the deputy director of the regional operations is responsible for all of

58

those investigations conducted by regional investigators, and there's a wide range of those. There are a few incidents, but most are accidents. And then there's a number of fatal accidents that the deputy director of regional operations is responsible for.
Then we have major investigations, the crash that makes the news, an airline crash with a lot of people and things like that. That's the deputy director at headquarters, the deputy director in OAS. He's the deputy director for major investigations. Those can be the big investigations and all of those technical -- complicated technical investigations that didn't involve an accident. But that's the deputy director of major investigations.
That's the way it's structured right now. And then there's a deputy director of regional investigations that has all those investigators out scattered around the country.
MR. LOWINGER: Does anyone need a break? We've been at it for a little while. Would you like a break?

59

THE WITNESS: Go ahead. I'm fine.
MR. LOWINGER: I'm fine as well.
BY MR. LOWINGER:
Q. Let's talk about -- I think we're getting ahead of ourselves a little bit, and I think we're kind of talking about the present right now, and I want to make sure we're all in the right time period.
You became the director of OAS in 2000 or 2001?
A. Yes.
Q. And you were an SES at the time?
A. Yes.
Q. From the beginning of the time that you were the director of OAS, can you describe to me your principal duties and responsibilities as the director of OAS?
A. The principal duties were to conduct aircraft accident investigations.
Q. Okay.
A. Have safety recommendations written that would improve the safety of aviation. The director is responsible for the overall maintenance of the

60

regional investigative offices. Or not the maintenance, but the existence of those offices. The director is responsible for determining which slots should be filled in which order, for example.
Q. For FTEs?
A. For FTEs, yes.
The director had that delegated authority to sign off on a lot of the regional investigations that wouldn't go to the Board.
The director is responsible for making sure that the reports on major investigations are completed in a timely manner, that the various aspects of an investigation are properly covered and properly investigated, and that the report is compiled and presented to the Board, and then to get those reports accepted by the Board members and get their endorsement of those reports.
Q. Okay. So as the director of OAS, your responsibilities, or your primarily responsibilities were accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, filling slots for human

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-----------------------------------X
MARJORIE MURTAGH COOKE :
Plaintiff :
v. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION :
SAFETY BOARD :
Defendant :
-----------------------------------X

Videotaped Deposition of
ELLEN ENGLEMAN CONNERS

Washington, D.C.
Thursday, October 25, 2007
9:30 a.m.

COPY

Job No.: 1-115016
Pages 1 - 170
Reported by: Ellen L. Ford, RPR

2

Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006

Pursuant to agreement, before Ellen L. Ford, Registered Professional Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF PLAINTIFF:
R. SCOTT OSWALD, ESQUIRE
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
1100 L Street, Northwest
Washington, D.C.. 20005
(202) 353-7978

4

APPEARANCES (Continued)

ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
DENISE M. D'AVELLA, ESQUIRE
NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6086

ALSO PRESENT: Scott Forman, Videographer
Marjorie Murtagh Cooke, Plaintiff
Quan Luong, Esquire, US Dept. of Justice

5

CONTENTS

EXAMINATION OF ELLEN ENGLEMAN CONNERS PAGE
By Mr. Oswald 7 - 164
By Mr. Luong 164 - 165

---

EXHIBITS

(Exhibits retained by counsel.)

ENGLEMAN CONNERS EXHIBITS PAGE
No. 1 - Performance Appraisal Form 86
No. 2 - Affidavit 143
No. 3 - signed document 144
No. 4 - Performance Evaluation Form 145
No. 5A and B - e-mails 146

6

PROCEEDINGS

VIDEOGRAPHER: Here begins Tape No. 1 in the deposition of Ellen Engleman Conners in the matter of Marjorie Murtagh Cooke versus the United States, pending in the U.S. Court of Federal Claims, Case No. 6-748C and the related claim.

Today's date is October 25th, 2007. The time is 9:54 a.m.

The Video Operator is Scott Forman of LAD Reporting.

This deposition is taking place at the Employment Law Group, 888 17th Street, Northwest, Washington, D.C.

Would counsel please identify themselves and state whom they represent?

MR. OSWALD: Scott Oswald on behalf of the Plaintiff, Marjorie Murtagh Cooke. And in the room is Brian Lowinger and David Scher and Ms. Murtagh Cooke.

MR. LUONG: Quan Luong for the Defendant in the matter before the District Court. Just point of clarification that this deposition is

7

also for purposes of the District Court matter.

MR. OSWALD: Correct.

MS. COHEN: Meredyth Cohen for the United States in the Court of Federal Claims matter.

MS. D'AVELLA: Denise D'Avella representing National Transportation Safety Board.

VIDEOGRAPHER: Thank you, very much. The Court Reporter today is Ellen Ford of LAD Reporting. Would the Reporter please swear in the witness?

Whereupon,

ELLEN ENGLEMAN CONNERS,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

Q Ms. Engleman Conners, my name is Scott Oswald, and we've introduced ourselves briefly before we began today.

I'm going to ask you a series of questions today, and we'll be spending some time together.

But before we do, I want to go over a few items

8

before just as kind of a prelude.

Before I do, though, I want to know, how many times have you ever been in a deposition like this before?

A **None that I'm aware of.**

Q All right. And then what we're going to do today is I'm going ask you a series of questions, and I'll ask you to give me your true and complete answer.

If there is ever a point at which you don't understand a question that I have for you, please let me know --

A **Okay.**

Q -- and I will reformat it in a way that you do understand. If you answer a question, I'll assume you understand it.

To your right you have two very fine counsel, and there may be a point at which they interpose an objection. And we'll listen to that objection, and then I'll ask you to answer the question itself. If -- unless they instruct you not to answer.

If there's any point at which you'd like to take a break, you let me know and --

when exactly it was. My memory it was fairly early on when I was Chairman, but I don't remember the exact date. I don't remember the exact date.
Q In or about 2003, 2000 --
A Again, my memory tells me it was the first year, but -- I mean, I'm thinking it was the first year, but I don't know exactly.
Q I understand. All right. And where did you assign that -- where did you place the marble, assign the SES slot when it became available because the incumbent at the Academy had left and left the SES slot available for reassignment?
A Well, we didn't want to keep it at the Academy because we didn't think we needed an SES at the Academy at the time. It was just starting.
We had a lot of issues that we had to do for business development and just figuring out what the Academy was or wasn't going to be.
At the moment it was a building that was still being constructed, and so -- and we really needed SESs more in the operating system.
So my goal was to get all the modes, the way I



would say it in speech is, to the same level of attention that Aviation had. Because the NTSB is very Aviation centric. By mission, by tradition, by reson detra.
So the goal was to have, what I would say is, the bar of safety be raised in all the modes, because I was a multi-modal person, not an Aviation person. I came from the surface world, not the Aviation world -- one of the few Chairman who wasn't Aviation centric -- to bring all the modes up to the same level.
Because, as I would say, if someone dies in a transportation accident, their family's grief isn't changed by whether it's an aviation accident or car accident; the grief and the loss is the same.
So we needed to move away from the Aviation centric view and try to include all the modes and all transportation safety. So --
Q So why did you want to bring the Highway, the Pipeline as one mode up to the Aviation mode and the Marine Division up to the Aviation mode, and the Pipeline, HAZMAT and Rail up to the Aviation level?
A For the reasons I just said. When someone



dies in a transportation accident, the loss to society, the loss to their family isn't mitigated by whether it's an aviation accident or rail accident or pipeline accident or a boating accident, the loss is the same, and yet the attention given, the ability to -- the amount of accidents that were investigated, the resources that were allocated within the Agency, the majority were aviation.
Now, there was a reason for that. Because if you look at the NTSB legislation, which created the Agency, if you look at the code, by law we were required to investigate every civil aviation accident in the United States. By law, required. That's the one thing we had to do. There was no we won't do that one. We had to investigate or cause to be investigated every civil aviation accident in the United States.
And that didn't require death. That could have been just an accident. So that was about 1700 a year. So it wasn't a small number by any means, but mostly those were general aviation.
When there would be a very large, if you will,



accident, a major airline accident, TWA 800 or American 587, which is -- people usually recognize because of all the media attention and, of course, the great trauma and horrible loss of life that accompanies those, those would take a lot of resources and many years, et cetera and so forth.
So there's nothing wrong about the NTSB being aviation centric because that's what it is by its very reason to exist.
But that being said, because we have responsibility for the other modes, and because my personal and professional belief was that all safety mattered in all modes, I wanted to raise the attention, raise the bar, raise the resources on all the other modes.
It would never be the same, but just to that awareness itself was a major change for the Agency.
Q And how did you feel that the -- was the most appropriate way to go about doing that, raising the bar for each one of the modes?
A Well, it was a combination of a desire to raise the bar, implement the President's Management

Agenda, which included human capital development and support, and what I considered just good business sense.
We looked at the entire Agency, not one office or one department, and said what do we need to do here? We had approximately 435 employees when I came on board, our budget was about 75 million, if memory serves; not a lot of money and not a lot of people for being the independent safety agency for the entire United States in all modes of travel and transportation.
So I tried to fill -- figure out where do we need people versus what I considered in the past people kind of raised their hand and said oh, me, me, me.
I want to hire somebody, and whoever was the squeakiest wheel would get the person. It seemed in the past that whoever had the squeakiest wheel would get the allocation versus a planned allocation of where we were going to put the resources.
So the Managing Director and I and with the team, which was the larger team, heads of all the departments, we basically said what are your needs?



Everybody tell us your needs.
And we came up with, I think it was about 93 positions, if memory serves. I want to say 93 because I used it in speeches, so I'm hoping it's 93. But it was a significant number, it was a little less than 100, but it was a significant number of positions.
And what we said to everybody is don't tell me you need six more people. That doesn't help me to go to Congress and sell that for you. Because obviously we couldn't do anything about an appropriation.
Tell me what you need and why. So it was by title, kind of a mini job description, and by grade. You know.
I need a -- I need a materials expert. I need a Navy architect. I need a pipeline specialist in flow design XYZ. That would be GS14 probably. And this would be, you know, probably the title -- you know, kind of a job description and title versus just I need the blank check.
So we put that together. And along with that was my desire to ensure that each of the divisions -- my goal was to have each of the department heads be an



SES, which is not what it was when I came in.
Q And why was that your goal?
A I thought that by raising the bar to having an SES, which is the highest level of Civil Service, it's a statement. An SES is a higher level of professionalism, abilities, et cetera and so forth.
When you put an SES in charge of a division or department or office or whatever that unit is called, it's making a statement about its importance. It's making a statement that -- about the qualifications and requirements. And this allows you to build a larger team.
And it also means that that person has a very significant level of skills that accompanies the ability to be an SES. Because an SES requires more than just having skills, there's a whole level of other skills that are attached. They are the Embassadors of Civil Service.
Q And to what extent were the Directors of each of the investigative modes Embassadors of their organizations?
A I'm sorry. I don't know what you mean by



that.
Q Well, to what extent -- when you say the SES were Embassadors for the responsibilities under their job, let's say, title and duties, to what extent was that the case with each of the Directors, if at all?
A Well, I would say Aviation definite -- I mean, again, I'm not -- when I say Embassador of Civil Service, that's how it's been described to me. And when I talk to people --
The concept behind an SES is that they could be placed in any government agency and be effective, which is different than a technical line operator who only knows accounting or law or something like that.
An SES is meant to be multi-facetted in their abilities and have a level of expertise so that you could --
The idea, when the SESs were created, if my understanding is correct, is that an SES at the Department of State could be taken over and become an SES at Department of Transportation and be equally effective because they had a greater skill set than just the technical knowledge or operational knowledge

Q I understand. When did you first -- strike that.
All right. When did you first become aware that some of the Directors of the four investigative modes were paid differently?
A Were paid differently.
Q Mm-hmm. Different levels.
A Meaning they all weren't SESs? Or what -- I don't --
Q When if ever did you become aware that the individuals who were in the Director positions of any of the four investigative modes at the NTSB -- Highway, Marine, Rail or Aviation -- were paid at a different base salary?
A I don't know what their base salaries were, so I can't answer that. I can -- I mean, I don't know what anyone was paid. I didn't sign their checks. So I don't actually know the salary of any one person other than myself.
Q My question is just a little bit different, though.
A Right. That's what I'm trying to



understand.
Q My question is, when if ever did you become aware that any of the Directors of the four investigative modes at the NTSB were paid differently?
MR. LUONG: I'm just going to object to the term "differently" as vague.
COURT REPORTER: As what?
MR. LUONG: Vague.
COURT REPORTER: Thank you.
A I'm sorry. I really don't understand your question.
Q All right. When if ever did you become aware that any of the Directors at the NTSB -- Highway, Marine, Aviation or Rail -- were concerned about the fact that he or she was paid differently from other Directors at the NTSB?
MS. COHEN: Objection; assumes facts not in evidence.
Q You may answer the question.
A It's the way you're phrasing it, I'm having a hard time understanding exactly what you're asking. When we did -- when I was presented with the



first, what you would call the annual performance review, the recommendation of bonuses, there was an SES pool, and so I could see from the listing who was an SES and who was not an SES.
So at that point, I guess you could say I was aware that people were paid that had different -- they were in different grade levels.
Paid differently is confusing to me because everyone is paid under the Federal Civil Service System, and that has grade levels, and it has time, and it has all these other things.
So, I mean, just sundry, everybody is paid differently even within the same grade level. You can have two people who are in the same grade level, but because they have different years, then one is a Level 2 and one is a Level 8. They're technically paid differently, but they're paid legally according to the pay schedule.
Q I understand.1?
A So I'm just struggling with your paid differently statement because --
Q I understand. When if ever did you become



aware that any of the Directors of the four investigative functions, the modes at the NTSB, were paid a different amount of money over the course of an annual basis?
MS. COHEN: Objection; assumes facts not in evidence.
A I can't answer your question other than the way I just answered it. Everyone was paid differently. Everyone was paid according to the Civil Service schedule of their grade level, and where they came in at, and years experience, and all of this stuff. So everybody was paid differently. Everyone was paid according to where they were on the schedule.
Q And what concerns did you have that there was -- there were individuals who were different places on the schedule and, therefore, paid differently?
MS. COHEN: Objection; assumes facts not in evidence.
A I had -- I mean, I don't understand. What concerns could I have? I don't control the Civil Service pay scale.

53

Q I understand.
A This isn't the private sector where the CEO can change people with, you know, whatever decision they make. There's a set of rules, and everyone is paid according to where they are within the Civil Service schedule. I don't know how else to explain it.
Q I understand. All right. Let's now focus on April of 2004.
When if ever did Marjorie Murtagh Cooke come to your office and notify you that she believed that she was being paid differently than other Directors at her same level of the various modes in the investigative function at NTSB?
A We had a meeting, but I don't remember that that's the phrase that she used.
Q Okay. What do you remember?
A Marjorie came to my office -- and I don't remember exact words as in it's been years -- but it was -- she stated that she wasn't an SES, her office wasn't an SES, and she didn't make as much money as the folks who had an SES. So --

54

Q What else?
A And she wanted me to fix that, and she said -- she requested overtime.
Q What else?
A That was pretty much it.
Q Now, the meeting that you had with Marjorie Murtagh Cooke, was it scheduled or was it impromptu?
A Scheduled, I believe.
Q Okay. And how did Marjorie Murtagh Cooke go about scheduling the meeting with you?
A I don't remember.
Q How would anyone of your -- in the NTSB that had either first or second-line reporting schedule a meeting with you?
A Two ways, or three ways or four ways, actually.
You could check with my Chief of Staff who would schedule; you could grab me in the hallway; you could see me after a meeting or after a hearing; or we had open office hours like every Wednesday or ever other Wednesday, as often as -- unless I was out on an accident or something like that. But I kept like an

55

open office hour at least once a month where you just kind of walked in; and then the fifth way was people would just show up at my doorway.
Q Okay. And if one wanted to schedule a meeting with you, when if ever would be appropriate to send you an e-mail and ask you to schedule a meeting?
A Anytime.
Q That was appropriate to do that?
A Mm-hmm.
Q Is that -- I'm sorry. Is that a yes?
A Yes. I'm sorry. Yes. Mm-hmm is a yes.
Q Thank you. All right. So the meeting takes place in your office; is that right?
A Yes.
Q All right. And where were you seated?
A (non-verbal response.)
Q Behind your desk? Did you have the meeting at a conference table in your office?
A I don't remember specifically. I usually sat at a conference table rather than behind my desk. It would depend on the day. I mean if it was one of those -- if someone was just kind of coming in and

56

out, I might stay behind my desk, sometimes I would sit at the conference; it was kind of 50/50. I don't remember specifically.
Q All right. And then who spoke first at the meeting with Marjorie Murtagh Cooke?
A I have -- whoever said hello first.
Q What knowledge did you have that the topic that Marjorie Murtagh Cooke wanted to raise with you?
A I don't remember having any --
Q Any foreknowledge.
A No.
Q I understand. And what was -- after the general greeting of hello, what was the first thing you remember Marjorie Murtagh Cooke saying to you?
A I don't. I mean, I don't remember very much about the meeting other than the request for overtime, which I thought was bizarre.
Q Why was it bizarre?
A Because it was -- it was out of context. It was -- it was bizarre. It was just out of the blue.
Q Why was it out of the blue?
A Well, I remember -- one of the things I

57

remember of the meeting is it wasn't a very long meeting. This wasn't a long meeting or discussion or anything like that, it was just kind of out of the blue. And it was kind of like, "I'm here. I'm not an SES so you need to fix that by paying me overtime."
There was no justification, no rationale, no, "I've been working 60 hours a week and here are my hours," or anything.
It was just like, "You need to fix this, and here's what you need to do and." I felt like it was just a bizarre request. There was no -- I didn't understand where it was coming from.
Q Okay. And when if ever did you ask Marjorie Murtagh Cooke where her request was coming from, in your words?
A Well, I mean, during the -- I think I said something like, "Oh," or, "Whatever." But there was nothing else forthcoming. It was just kind of like, "I'm here. I want you to give me overtime." And there was nothing else behind it.
It was just out of the blue. It was kind of bizarre. My feeling was this is bizarre. That's all.

58

Q Why was it bizarre for Marjorie Murtagh Cooke to ask you to pay her overtime to equalize her wage with the other Directors of the divisions?
A Well --
MR. LUONG: Objection; I think that mischaracterizes the earlier testimony.
Q You can answer the question.
A First of all, she didn't say to equalize. She didn't suggest that. It's just like, "I'm not an SES so you have to make up for it." I mean, that was the context.
It was -- there was no anything like that. It was like a small child is upset that you didn't buy them the toy -- that their father didn't buy them the toy in the window, and you're the aunt, so therefore, you have to buy the toy.
I mean, it was just out of the blue. I didn't understand it. She was a manager. I didn't know if it was possible to pay a manager overtime.
There were a lot of things about it I didn't understand, so it was just a bizarre request.
I had never had a department head in government,

59

in my experience in government, make a request like that at either of the agencies that I had worked for. So it was not something I had experienced before, and it was, as I said, kind of out of the blue.
So bizarre is the only word -- I mean, bizarre meaning not bad, not good, but out of the blue, different than what normally one has as a conversation.
Q Well, why was it in your mind inappropriate for her to ask you to make up the differential between what she was being paid and what the other Directors were being paid?
MS. COHEN: Objection; mischaracterizes evidence.
MR. LUONG: Objection.
Q You may answer the question.
A I didn't say it was inappropriate, I said it was bizarre and I hadn't experienced it before.
I didn't know the answer, and I said I would look into it.
So I didn't judge it one way or another other than its uniqueness in the request. When I say

60

bizarre, I'm not saying negative, I'm saying unusual, different, something I hadn't experienced and I didn't completely understand.
And normally, when -- my experience has been if someone comes and says I want a raise or I want a new job or this or that, they kind of lay out their case. They pitch it to you. Not a declaratory sentence. So it was a unique -- it was just unique. I said I would look into it and, I mean, that's all I could do at the time.
I'm not in charge of the pay schedule for the Civil Service. I didn't hire her. I didn't know all the circumstances. There was no justification on her part when she met with me to explain what was her concerns. It was just kind of, as I said, like a declaratory sentence. "You need to do this." Okay.
Q Well, when Marjorie Murtagh Cooke said to you that she was entitled to be paid at the same level as the other Directors, what did you understand her to mean by that?
MR. LUONG: Objection; assumes facts not in evidence.

101

facts not in evidence.
Q You may answer the question.
A I don't remember the order, so I can't speak to whether that was the order or not. I don't remember the order of assignment.
You suggested to me that it was Highway, Research and Engineering, Administration, Marine. So I don't remember the order. If that was the order, fine. I don't remember it.
I remember Highway was first. That I do remember, but I don't remember the rest of the order.
There was also the issue of how many employees were in that department or division. So when you were talking about scope, it's the scope of the investigatory responsibilities as well as the scope of supervision, the existence of regional offices. Highway had regional offices. So again, the scope of the responsibility was much larger and more employees, and there are over 45,000 highway deaths a year in the United States. So the impact on the safety mission is pretty darn big.
Q All right.

102

A So that's why Highway was chosen first. The rest, following that same type of analysis would have been utilized with the goal of being able to bring in more SESs throughout the Agency.
Q And you made that decision --
A Yes.
Q -- of the order in which you were going to assign the SES tags to the various positions.
A Yes and no. It was pretty clear that Highway should be next. Again, for all the reasons I already stated.
The others, it came as part of a larger process. If you remember earlier I talked about the organizational review that we conducted and the requests that we made to all the Directors for the openings that they were proposing, et cetera and so forth. We looked at that in context of our mission, in context of all the items I just listed, scope of responsibility, amount of supervision, et cetera, and just trying to align it so that there was a little bit of equity to try to fill all the pots to some degree, knowing that we wouldn't ever have a perfect world

103

where we could have 100 percent where we wanted one of the departments to the detriment of the others. We were going to have to fill every pot a little bit as we could. And it wasn't just for SESs, it was for staff, it was everything from investigators to writers to admin to clerical.
So none of these decisions was a single point decision. They were part of a much larger deliberation over allocation of resources in the organization with the end goals as previously stated, and at the same time a nonstatic environment.
Q Who was the decision-maker other than you?
A It was the discussion with myself, it was debated, discussed, Dan Campbell, probably Ron Battocchi, we got input from other Office Directors, from my Chief of Staff.
Q Who had the authority to make the decision other than you?
A The authority for the SES assignment?
Q Yes.
A Well, I believe that ultimately was my determination, again, with recommendation and

104

discussion with the General Manager -- or Managing Director rather, I'm sorry, Dan Campbell. And Ron Battocchi would have been part of the discussion.
Q They couldn't overrule your determination, could they?
A Ron Battocchi could if I was doing something illegal. I would expect that he would.
Q Other than if you were doing something illegal. To the extent that you had that was not illegal to do, who else had the discretion to make the decision on which position would receive the SES --
A Where the SES would be allocated?
Q -- where it would be allocated other than you?
A I believe it was my decision.
Q Where do you work now?
A Federal Communication Commission.
Q What is your job title?
A It's a long one. Senior Deputy Bureau Chief of the Enforcement Bureau of the FCC.
Q How long have you been in that position?
A Since March of this year.