IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE, | ) |
| Plaintiff | ) |
| vs. | ) No. 06-748C |
| THE UNITED STATES, | ) (Judge Wheeler) |
| Defendant | ) |

Deposition of Marjorie Murtagh Cooke

Washington, D.C.

October 23, 2007

Reported by: Bonnie L. Russo

JOB NO. 183364

October 23, 2007
9:53 a.m.

Deposition of Marjorie Murtagh Cooke held at:

United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.

Pursuant to notice, before Bonnie L. Russo, Notary Public



APPEARANCES:
For the Plaintiff
BRIAN M. LOWINGER, Esq.
DAVID SCHER, Esq.
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
202-261-2806

For the Defendant
MEREDYTH D. COHEN, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, N.W.
Washington, D.C. 20530
202-353-7978

For the Agency
DENISE M. D'AVELLA, Esq.
NATIONAL TRANSPORTATION Safety Board
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
202-314-6086



CONTENTS


EXAMINATION OF MARJORIE MURTAGH COOKE PAGE
BY MS. COHEN 5

EXHIBITS
1 Marine Launches 67
2 Recommendations and Controlled Documents Processed 111
3 Memorandum of Understanding Between the National Transportation Safety Board and the United States Coast Guard Regarding Marine Accident Investigation 117
4 Handwritten Note dated 5-24-05 246
5 E-Mail dated 5-26-05 252
6 Performance Agreement: Office of Marine Safety August 2001 through July 2002 269
7 Memorandum dated 8-2-02 275

(Exhibits included with transcript.)




P-R-O-C-E-E-D-I-N-G-S
MAJORIE MURTAGH COOKE,
was called for examination by counsel and, after having been duly sworn by the Notary, was examined and testified as follows:
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. COHEN:
Q. Ms. Cooke, we have met before. As you know, I'm the attorney representing the United States in the court of federal claims case, Cooke v. United States.
Do you prefer to be called Ms. Cooke or Ms. Murtagh Cooke?
A. Ms. Cooke is fine.
Q. Can you please state your full name for the record.
A. It's Marjorie Murtagh Cooke.
Q. Ms. Cooke, have you ever taken a deposition before -- had your deposition taken?
A. Yes.
Q. How many times?
A. I think three.

Page 6

Q. And what were the circumstances of each one?

A. They were personnel cases. The last one was about, I guess, it's in the last few months, it was for a personnel case that was being handled by private a company with an individual that formerly worked for me and they deposed me in that.

Q. What were the individual's allegations?

A. What were the individual's allegations?

Q. In that case.

A. I don't think it was an individual's allegations. I think it was the company's allegations. I don't know the details of it, to be honest with you. It was more a matter of what -- who the person was, he worked for me at one point in his career. There were questions about paperwork that he had -- he being the general counsel's office -- had prepared was that accurate information, that kind of thing.

Page 7

Q. Was it someone that worked for you at the NTSB?

A. Correct.

Q. In what capacity?

A. As a Marine accident investigator.

Q. And the second deposition that you gave, what was that for?

A. The other two depositions, I believe they were two depositions, was in another personnel case for someone who worked for me at NTSB.

Q. And what capacity did those individuals work for you?

A. As a Marine accident investor.

Q. Do you remember what their claims were?

MR. LOWINGER: Objection. Misstatement of testimony. I believe she just said it was one person, two depositions.

BY MS. COHEN:

Q. Two depositions in the same case?

A. I believe so, but I wasn't -- I'm

Page 8

not positive about that.

Q. What was that individual's claims in that case?

A. That there was a discrimination for -- I believe -- I believe the case was -- let me see if I can recall. There were two parts to it. The first part was that she had been discriminated against as a white American female. A U.S. born citizen.

Q. What was her name?

A. Paula Sindprunier.

Q. Can you spell that, please?

A. P-A-U-L-A, S-I-N-D-P-R-U-N-I-E-R, I believe.

Q. And what was the name of the employee involved in the other personnel case?

MR. LOWINGER: Objection. Misstatement of testimony.

THE WITNESS: Yes. Which other?

BY MS. COHEN:

Q. The first one that you were discussing.

Page 9

A. Oh, James Walsh, W-A-L-S-H.

Q. What were Mr. Walsh's claims in that case?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: Again, I don't know the details of the case that I was deposed for. It was really between Mr. Walsh and I believe Carnival Cruise Lines.

BY MS. COHEN:

Q. I will be asking you a series of questions today. If you don't understand a question or if you can't hear it, just please let me know and I will repeat the question or rephrase it. Okay?

A. Okay.

Q. As you can see, there is a court reporter that's recording everything that we're saying. She can only record oral testimony. She cannot record head nods or gestures, so please make sure that you always give a verbal response to all questions. Okay?

Page 14

current position?
A. About a year.
Q. Since what date?
A. I don't have the specific date. It's the fall of 2006.
Q. And where were you employed prior to that?
A. The National Transportation Safety Board.
Q. And what was your last position at the NTSB?
A. I don't recall the title of the position.
Q. What were your duties in that position that you were in?
A. I was working in the office of the managing director. I was reviewing reports that had been completed by government and private organizations analyzing the work of NTSB, and determining if the recommendations they had made had been fulfilled by the different offices within NTSB.

Page 15

Q. And when you say offices within NTSB, which specific offices are you talking about?
A. The chief financial officer, human resources, managing director, I think some of those things may have involved the Office of Administration when it was -- when it was put together.
Q. Did that involve the work of the mobile offices at all?
A. I -- it may have. It may have.
Q. How long did you have that position in the managing director's office?
A. From October of 2005 until July 3rd of 2006.
Q. What was your position prior to that?
A. Again, I don't know the title that I had. I was working for the office of safety recommendations and accomplishments.
Q. What were your primary duties in that position?

Page 16

MR. LOWINGER: Objection. Relevance.
Go ahead.
THE WITNESS: I would consider them administrative.
BY MS. COHEN:
Q. Can you be a little more specific, please?
A. I wrote a -- an award recommendation for a member of the office at the office director's request. I gathered information from each of the division chiefs to summarize the work that they had completed with regard to a management report for the Office of Safety Recommendations and Accomplishments.
MR. LOWINGER: If you're done with the question, I think Mr. Sheriff is here.
Can you hold on a second? I know you're asking questions.
MS. COHEN: We'll take a short break and I'll go get him.
MR. LOWINGER: I appreciate that.

Page 17

Thank you very much.
(A short recess was taken.)
BY MS. COHEN:
Q. Before the break, Ms. Cooke, we were talking about your position at the NTSB and the Office of Safety Recommendations. How long were you at that position?
MR. LOWINGER: Objection. Relevance.
You may answer.
THE WITNESS: I was there from June of 2005 through October 2005.
BY MS. COHEN:
Q. And where were you prior to that?
A. I was in the Office of Marine Safety.
Q. What was your position?
A. Director.
Q. How long were you at that position?
A. The position changed in 1997 or 1998 to the director position. So from 1997, 1998 I was director until June of 2005.

Page 30

MR. LOWINGER: Objection. Speculation.

You may answer.

THE WITNESS: Yeah. Again, I would really have to look at the list of accidents. I would be happy to do that for you if you would like to give them to me and I will tell you if they qualify as high public interest.

BY MS. COHEN:

Q. You also said repetitive accidents. What do you mean by repetitive?

A. Accidents that had issues that came up several times.

Q. Give me an example.

A. Fire safety on cruise ships.

Q. You said catastrophic accidents. What would be a catastrophic accident?

A. An example would be the Norway had a boiler explosion, cruise ship with a boiler explosion. That would be a catastrophic accident.

Q. Why would that be considered

Page 31

catastrophic?

A. Because it would potentially have placed about four or 5000 people's lives at risk.

Q. How were you notified of accidents?

MR. LOWINGER: Objection. Vague.

Go ahead, if you understand.

THE WITNESS: There are a number of ways that I would be notified of accidents. We had a communications center at NTSB and the communications center would call me on the telephone. If I were at home, if I were in the office I had a pager that was on that I carried with me all the time and I would be notified of accidents that way. I would be notified of accidents by watching the news -- I would sometimes learn of an accident. So there were, I mean, a number of ways that the notification can come in.

Congress asked us to investigate an accident one time that had not come up on our radar as a standard Marine accident. In fact,

Page 32

they asked us more than once. So there were multiple ways that notification of an accident could come in.

BY MS. COHEN:

Q. How frequently per week were you notified of an accident from 2000 to 2005 on average?

MR. LOWINGER: Objection. Vague.

If you can answer, please go ahead.

THE WITNESS: Between -- and I don't know the dates because it really did depend upon who was making the call on that, but I carried a pager that notified me of every accident that occurred that was within the board's purview. So I was notified of aviation accidents, I was notified of highway accidents as well as Marine.

BY MS. COHEN:

Q. Specifically as to Marine accidents, how frequently were you notified of a Marine accident between 2000 and 2005?

MR. LOWINGER: Objection. Vague.

Page 33

You can answer if you know.

THE WITNESS: Yeah. I don't -- I really don't know an accurate way of telling you that. There are about -- there are between 40 and 60 major Marine accidents that occur every year, so we would receive notification of those, and, you know, other accidents that would come up on the radar. As I said, they would not necessarily qualify as a major Marine, but we would be notified of them.

BY MS. COHEN:

Q. Who would determine to notify you of an accident if it was not considered major?

MR. LOWINGER: Objection. Calls for speculation. How would she know who determined to give her a call?

Go ahead.

THE WITNESS: Yeah. Repeat the question please to make sure I understand it.

BY MS. COHEN:

Q. As I understand it, you were notified by phone call or by pager of an

If it were an accident that was in a place like Alaska it may be that they would have to, you know, travel and make changes of airplanes. We would also want to be sure that they had adequate rest; logistics for the hotels, for cars, for whatever kind of transportation they needed. We also needed to talk to the owner of the vessel because they would be a party to the investigation, so you would start notifying the parties. Talking to them, making sure they understood that we were seeking their cooperation.

In Marine accidents, many times there would be new people involved. We would have to explain the rules to them. So basically getting the team launched, making sure they had all the equipment that they needed to get out the door, responding to public affairs, making sure they had the basic information on what the accident was about so that we could answer to the news media, answering to congressional inquiries regarding



the accident; asking other offices for resources if we needed particular resources to supplement the team.

If I recall, you asked what was the next step after notification. All of those things take place immediately after notification.

Q. You had said one of the steps after notification was deciding whether an accident was in the NTSB purview.

Can you explain it what you mean by within the NTSB purview?

A. Yes. If it's -- if it, in fact, was an accident that NTSB had direct authority to investigate. For example, was it within the territorial seas of the United States.

Q. What types of accidents did NTSB have the direct authority to investigate?

A. Accidents that were within the territorial seas of the United States and any accident that involved a U.S. flag vessel anywhere in the world.



Q. Did the NTSB have direct authority to investigate accidents outside of the territorial seas of the United States involving United States manufactured vessels?

A. U.S. manufactured is not really -- you mean U.S. built. They don't consider it manufactured. I apologize for -- it's just terminology for me. But a U.S. built vessel, a U.S. flag vessel, yes.

Q. U.S. built vessel is my question.

A. Yes. U.S. built, U.S. flag vessel, correct, yes.

Q. So the NTSB was not required to investigate all Marine accidents throughout the world; is that correct?

A. Required to investigate?

Q. Yes.

A. No.

Q. Did the NTSB have the option of investigating Marine accidents that they were not required to investigate?

MR. LOWINGER: Objection. Asked and



answered.

You can answer it. It's vague, but go ahead.

THE WITNESS: I'm sorry. I'm not clear. Could you repeat that in a different way, perhaps, so I understand your question?

BY MS. COHEN:

Q. You said that NTSB had direct authority to investigate accidents that occurred in the territorial seas of the United States and the United States flagged vessels anywhere in the world?

A. Right.

Q. Did the NTSB have any authority to investigate other types of Marine accidents?

A. We had authority to investigate accidents that were beyond the territorial seas under the international regulations.

Q. What international regulations are you referring to?

A. The International Maritime Organization has international rules and

regulations for investigating accidents and there is a Marine accident investigation code that is used which permits a -- they use the term "administration" usually, but it refers to countries if you have an interest. So, for example, if a U.S. passenger were -- a U.S. citizen were to become a fatality on a vessel that was either not within the territorial seas or were -- and was not a U.S. flag vessel, then we can participate in that investigation. It's an international investigation and we can participate in that investigation.

Q. Would NTSB take the lead in the investigation that you just described?

A. They might, but that would be up to a negotiating -- a negotiation. I mean, if they were all U.S. citizens, it might occur. But that would be a negotiation that would occur at the time of the accident.

Q. Negotiation with who?

A. With the flag administration.

Q. How often has it happened that NTSB



has taken the lead in that type of investigation?

A. There have -- when you say, "that type of investigation," can you tell me precisely so I make sure I'm answering accurately?

Q. I am talking about an investigation that's outside of the territorial seas of the United States and that does not involve a United States flag vessel.

A. Okay.

MR. LOWINGER: Objection. I think you misstated your question. I think maybe you could ask -- read -- if you want to have the court reporter ask it back. But I think it was a little different.

BY MS. COHEN:

Q. Please answer the question.

A. Okay. I'm going to have to ask you to repeat it, please.

Q. How often has the NTSB taken the lead in an investigation that was not on the



territorial seas of the United States and did not involve a United States flag vessel?

A. Is there a time period that you're talking about?

Q. 2000 to 2005?

A. Between 2000 and 2005, there probably was not any in that time period.

Q. You said the NTSB has direct authority to investigate the accidents in the territorial seas or a U.S. flag vessel.

Does it have -- is it -- are there any accidents that the NTSB is required to investigate?

A. Yes.

MR. LOWINGER: Objection. Asked and answered.

Please go ahead.

THE WITNESS: Yes.

BY MS. COHEN:

Q. What types of accidents are those?

A. Accidents that involve public and nonpublic vessels. There is a requirement for



that. If it's a Coast Guard vessel involving $75,000 in damage or loss of life, for example.

BY MS. COHEN:

Q. When you say public and nonpublic vessels, what does that mean? What is a public vessel that the NTSB would be required to investigate?

A. A public vessel is a vessel that's owned by the United States. So, for example, vessels that are owned and operated by the United States would be, for example, a Coast Guard vessel. Coast Guard cutter say.

Q. And nonpublic vessels?

A. Would be a commercial vessel.

Q. The NTSB is required to investigate all accidents involving nonpublic vessels?

MR. LOWINGER: Objection. Misstatement of testimony.

THE WITNESS: No.

BY MS. COHEN:

Q. When are -- when is NTSB required to investigate an accident involving a nonpublic

Page 54

what I am giving you an answer to. So if you would explain to me what it is you mean by required that would truly be helpful to me to make sure I am answering your question correctly.

BY MS. COHEN:

Q. Is the NTSB required by statute to investigate any Marine accidents other than those involving Coast Guard accidents?

A. Okay. As I understand -- because you're still using the same term, so I will -- I will clarify for you what my understanding is. The Independent Safety Board Act establishes the National Transportation Safety Board to investigate accidents. That is the primary mission of the agency. For me to say that they are not required to fulfill their mission would be totally ridiculous. So I can't -- I can't say that NTSB is not required to investigate Marine accidents other than what specifically is written in the regs as shall.

We're required by law to exist and

Page 55

to investigate accidents. The statute lays out the authorities, the expectations of the agency. If we did not investigate accidents we would have a difficult time justifying reauthorization, which comes up every few years. So in order to be reauthorized we're required to fulfill our obligations.

Q. Let me try this a different way.

A. Okay.

Q. Does the NTSB have discretion to not investigate an accident?

A. The NTSB has discretion not to investigate an accident, yes.

Q. Does NTSB have discretion not to investigate an accident involving a Coast Guard vessel?

A. The NTSB has discretion if the accident doesn't meet certain criteria. However, and that's the $75,000 or loss of life. However, if the commandant asks the NTSB to investigate an accident that he feels involves Coast Guard safety functions, I do not

Page 56

believe that the level of discretion is the same as it would be if a Coast Guard vessel merely bumped a dock.

Q. How often between 2000 and 2005 did the NTSB exercise it's discretion not to investigate a Marine accident?

A. I don't know that number offhand. Certainly, the records at the Safety Board would know notifications and which accidents we didn't investigate.

Q. Can you give me your best estimate of the number of accidents that the NTSB chose not to investigate?

MR. LOWINGER: Objection. Form. Speculation.

You may answer.

THE WITNESS: Again, you're asking me for a number that I want to be sure that I feel comfortable with using, and if I have the records in front of me I could certainly tell you. So if you have a document that has all of the notifications I can certainly tell you how

Page 57

many of those we did not investigate.

Q. Please, again, just answer the question. I understand that you don't know the precise number, but please give me an estimate of how many accidents the NTSB chose not to investigate between 2000 and 2005.

MR. LOWINGER: Objection. Form, speculation. Asked and answered.

THE WITNESS: Okay. Between 2000 and 2005 what I can give you is an estimate of the number of accidents that we did investigate. And therefore, if you subtract that from the number that we knew of, that will give you your answer. So between 2000 and 2005 we investigated probably an average of let's say six or seven a year.

BY MS. COHEN:

Q. We talked earlier about notification of parties. What is a party to an accident?

A. Party to an NTSB investigation is someone who can contribute to the collection of factual information for the accident. So using

Q. How many parties would there be, for example, a fishing vessel investigation?
MR. LOWINGER: Objection. Vague.
You may answer.
THE WITNESS: Yeah. The fishing vessel investigations were specifically, I believe, excluded from some accident investigations. But for a fishing vessel it may be one or two parties. It could be the owner of the vessel would be a party. It could be if EPIRB didn't activate, it might be EPIRB manufacturer, for example. So it can range from a very small number to a very large number. It depends upon the accident.
BY MS. COHEN:
Q. When you say some fishing vessels were excluded from accident investigation, what do you mean?
A. We, I believe, did not specifically include fishing vessels in our new memorandum of understanding with the Coast Guard when we wrote that up.



Q. You mentioned EPIRB, I believe, in your answer?
A. Yes.
Q. What is that?
A. It's an electronic position indicating radio beacon. It's essentially a device that notifies the Coast Guard that a -- an accident has occurred. It's carried -- even individuals can buy an essential purpose. And, in fact, we encourage them for recreational vessels that are going out to sea to carry an EPIRB. Because it -- it immediately notifies. It doesn't require a radio transmission by that individual, but it notifies the Coast Guard that there is a vessel in distress.
Q. You also talked about some of the logistics of getting investigators to the accident site. How many investigators would you send to a typical cruise ship accident?
MR. LOWINGER: Objection. Vague.
You may answer.
THE WITNESS: There is no typical,



but -- and when you say investigators if you mean strictly my resources as opposed to the resources of the board, because those are two different things. So if we just consider my Marine resources it could be six, say, seven Marine accident investigators if they were available. If I didn't have that many, then I couldn't send them. So...
BY MS. COHEN:
Q. How many investigators would you send to a small passenger vessel accident?
A. Well, the normal team consisted of an investigator in charge, a group chairman for operations, group chairman for engineering, group chairman for survival factors, group chairman for human performance. So that would be five people and that's normally what a team would consist of for an accident investigation.
Q. Regardless of the size of the accident, a normal team would consist of those five people; is that correct?
A. It might. It would depend -- it



would really depend upon the -- there are just so many issues in an accident investigation. You can't -- there is no typical.
Can I take a break?
MS. COHEN: Oh, sure. No problem. Take ten minutes?
THE WITNESS: Yes. That would be great. Thank you.
(A short recess was taken.)
BY MS. COHEN:
Q. Back on the record.
A. Before we go back I just want to make sure that this is the right time. In our last discussions one of the things that occurred to me were some additional duties and responsibilities. Would you like me to add those to the record now?
Q. Sure. You can go ahead.
A. Okay. The additional responsibilities were to represent the United States and the National Transportation Safety Board at the International Maritime

Page 66

Organization meetings related to accident investigation, to also represent NTSB at other international conferences and meetings, symposia as well.

Q. Is there anything else?

A. That's all that came to mind based on our last series of discussions. So if anything else does come to mind I'll certainly let you know.

Q. We were talking before the break about parties and -- I'm sorry, investigators and how many investigators were sent to a particular accident?

A. Uh-huh.

Q. You had mentioned that occasionally there were investigators from other modal offices sent to tend to accidents; is that correct?

A. That's correct.

Q. How frequently did that happen?

A. Again, it would depend upon the accident. There would be, for example, we had

Page 67

a Staten Island ferry accident and we sent a -- an aviation regional investigator to stake our flag in New York. So it would depend. Sometimes we would have investigators from specialists, for example, from the office of research and engineering who would join the team. Again, it would depend upon the accident.

Q. What percentage of accidents would you say involved NTSB investigators outside of the Office of Marine Safety?

MR. LOWINGER: Objection. Speculation.

Go ahead.

THE WITNESS: Yeah. I don't know. Maybe 10 percent. I really don't -- I really don't have an accurate number.

BY MS. COHEN:

Q. I am giving the court reporter Exhibit 1.

(Deposition Exhibit No. 1 was marked for identification.)

Page 68

BY MS. COHEN:

Q. Can you tell me what this document is? Take your time to look at it.

A. It says Office of Marine Safety calendar year 2000 to March 28th of '05 Marine launches.

Q. Did you prepare this document?

A. I may have.

Q. Did you or did you not prepare the document?

A. I may have had someone in my office actually prepare the document, so I can't say that I specifically recall preparing the document.

Q. Have you seen the document before?

A. I believe so.

Q. Does it accurately reflect the number of accidents from calendar year 2000 to March 28th, 2005?

MR. LOWINGER: Objection. I think the document speaks for itself. According to the date on the top 2005 it lists 2004 for

Page 69

accidents.

BY MS. COHEN:

Q. Please answer the question.

A. I think it's probably fairly accurate. I would have to look at all of the records to make sure that it was precise.

Q. Starting at the top calendar year 2004 it says December 8 M/V Selendang Ayu. How many investigators were launched to that accident?

A. Four or five, I think. That's probably my best guess at this moment.

Q. What type of accident was it? Was it a large cruise ship or a smaller passenger ship?

MR. LOWINGER: Objection. The document speaks for itself.

Go ahead.

THE WITNESS: No, the Selendang Ayu was actually a foreign flag cargo ship, and it had -- it had lost power off the coast of Alaska and it ultimately ran aground and broke

Page 70

apart.
I hope I've answered your question. Maybe the court reporter wouldn't mind reading back precisely what the question was so I make sure I answered it correctly.
(The record was read as requested.)
THE WITNESS: So it was neither of those two.
BY MS. COHEN:
Q. How long was the investigative team on site for this accident?
A. They were on scene for a couple of weeks.
Q. How long did it take to prepare the report?
MR. LOWINGER: Objection. Vague. Which report?
Go ahead.
BY MS. COHEN:
Q. Please answer the question.
A. It's actually a very good question. The -- if you mean the final report of the

Page 71

investigation I would have to look at the hours that were used on it. That's something that we were doing that would be presented to the board, but I believe that that was actually adopted after I left the Office of Marine Safety.
BY MS. COHEN:
Q. Moving on to the next accident listed there, October 17th, the SPV Express Shuttle, how many investigators from the Office of Marine Safety were sent?
MR. LOWINGER: Objection. The document speaks for itself.
Go ahead.
THE WITNESS: Maybe one or two.
You said from the Office of Marine Safety?
BY MS. COHEN:
Q. Yes.
A. Maybe one or two. It was not a full team it says. So...
Q. How many were sent from other

Page 72

offices within NTSB?
A. I think one.
Q. From which office?
A. I think the Office of Research and Engineering, but I'm not positive.
Q. You sent for the Selendang Ayu that your report was finalized by the board after you left the NTSB; is that correct?
MR. LOWINGER: Objection. Asked and answered.
Go ahead.
THE WITNESS: I believe it was after I left NTSB, but it may have been just after I left the Office of Marine Safety. So I don't know the specific date on the Selendang Ayu.
BY MS. COHEN:
Q. Did the report go to a director's review before you left the NTSB?
A. I don't know.
Q. You don't recall or you don't know?
A. I don't know if the -- you're talking about the Selendang Ayu?

Page 73

Q. Yes.
A. Yes, I don't know if it went to a director's review before I left NTSB.
Q. Can you tell me in this document which of the accidents were finalized by the board during your time at the NTSB?
A. Finalized by the board?
MR. LOWINGER: Wait. Objection form.
THE WITNESS: Yeah.
MR. LOWINGER: I'm just -- I think there's a public record on this, but go ahead.
THE WITNESS: And there is a public -- there is a document that has all of the reports that were completed.
When you say by the board, do you mean the National Transportation Safety Board?
BY MS. COHEN:
Q. Yes.
A. Or do you mean the individuals on the National Transportation Safety Board?
Q. What would be the difference in your

view?
A. Well, one is the organization and the other one are the members of the board.
I had delegated authority to adopt reports. So for those that I have adopted, as the director of the office, I would consider them to be adopted by the National Transportation Safety Board. So I just want to be sure, again, I'm answering your question. And again, I believe that there is, in fact, a document that has that. I provided that information when I was at the board. So there is a document that I believe has that information on it.
Q. How many of the accidents listed in this document were adopted by the board, meaning the National Transportation Safety Board, during your tenure as the director of OMS?
A. Okay. Let's see. I don't remember the exact dates for these things.
I would say probably 18 or 19. It



depends upon how you count it, but I think that's an accurate number.
Q. Which accident are you not sure would be considered in the count. You said 18 or 19?
A. Yeah. The Taki Tooo, which was -- it was adopted -- I got it to notation during my tenure as director of OMS, but it was presented to the board after that, a couple of weeks after that. So I would consider the notated document as an adopted report that I completed, although I was no longer in that position at that time.
Q. So all of the accidents below the Taki Tooo starting with the May 25th and the Columbia to the end of the document, all of those were adopted by the NTSB during your tenure?
A. Say that again. I'm sorry. Repeat that, please.
Q. All of the accidents listed on this document starting with the MV Columbia to the



end of the document, all of those were adopted by the NTSB during your tenure as director; is that correct?
A. You said the MV Columbia. It actually starts, I believe, with the MV Carnival Destiny --
Q. Okay.
A. -- on the document that I have.
Did I -- am I looking at a different document?
Q. You had said 18 or 19. If it starts with the Carnival Destiny that would not be 18.
A. Maybe -- let's see. Oh, you're counting up from the bottom and counting 18 or 19. Is that what you're doing? Sorry. I just want to make sure I understand.
You're doing one, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17; is that correct? Is that the way you were counting?
Q. You had said 18. Why don't we just do it this way. Please tell me which of these



accidents specifically were ones that were adopted by the NTSB during your tenure, not how many, but the actual names.
A. Okay.
MR. LOWINGER: Objection. Vague and mischaracterization. Form just in general.
But go ahead.
THE WITNESS: Okay. There are a couple on -- I might actually fair better if I were to tell you the ones that I know were not during my tenure, because if you were counting from the bottom and you were counting 18 or 19 up, you would have missed some that were adopted --
BY MS. COHEN:
Q. Okay.
A. -- above that. So --
Q. Which ones were not adopted by the board during your tenure?
A. Okay. And again, I think there's a document to -- so if I misspeak I want to be sure that I don't misspeak and set myself up

THE WITNESS: Can I describe it, the answer is yes. Would you like me to?

BY MS. COHEN:

Q. Please go ahead.

A. Okay. The description of the preparation of the report from beginning to adoption or beginning to notation?

Q. Beginning to adoption?

A. Beginning to adoption.

MR. LOWINGER: Same objection. Please go ahead.

THE WITNESS: The report is -- actually starts from the day that the accident occurs. Some of the information that is gathered is -- started to be included in the report right from that date. All of the factual information that is collected is gathered. It is documented. Factual reports are put together by each of the accident investigators. They are reviewed, considered. The investigators also put together analytical reports.



But from the time they come back from the on-scene investigation is actually when you start the process for report preparation. So there's a complex system. It's -- there isn't a start and stop date that begins. So I will say, as I said, that it starts actually from the time they come back from the accident scene. You start putting together your factual information. You start considering issues. You want to make sure that you have gathered all the information to support your issues so you consider that -- what are called work planning meetings. There is consideration and those things go on quite routinely, weekly almost where you're considering do we need to gather additional factual information. Do we have all the factual information from this party or that party or whatever.

If there are fatalities you may have to get autopsies. If there are problems with getting statements from people that were not



gathered on scene. For example, in the Barberi where we actually had to go to court to try and elicit information from the captain on the Barberi. So it can depend obviously with the accident investigation. But you didn't consider additional work that needs to be done when that factual report is put together, the analytical reports are put together and during that time period the investigators are dealing with the report development group who are the writers and editors who will start asking additional questions about, you know, do you have the weather information; do you have the waterway information, missing certain pieces of information. So that's kind of a -- as I say a complex system.

Once the work planning meetings have been conducted and the factual portion of the report is put together you will start having what are called report planning meetings. And everything, of course, is in draft up to that point. In your report planning meetings you



will have issues and you will start inviting the other offices in to these report planning meetings. The director of the Office of Research and Engineering will come in, the director of the Office of Safety Recommendations will come in, the general counsel if it were -- might send a representative.

It would really depend upon -- the Office of Public Affairs might come in to a meeting. You invite other offices who can contribute to asking questions about the issues identifying them. That's kind of a peer review process to make sure that as many of the issues are flushed out as -- as is possible.

The report then starts on that process. You will have multiple report development meetings to make sure that, you know, comments have been received, considered as you're progressing. You'll be coming up with draft recommendations, considering those. Have we -- you'll look to see if we have made a

Page 94

recommendation like this in the past where there -- and, of course, even while they're on scene we will look at issues, perhaps, past recommendations to see if they might apply to this accident to make sure that those things are considered.

The analytical reports are, as I say, passed over to the writers and editors and that then starts to come in to what would be considered a draft report. The office will ultimately develop what's called an office draft and that office draft is handed out to as many people as might have been involved in the process up until then to be sure that their thoughts are considered.

Again, the people like the other office directors, the other investigators from other offices to make sure that their issues have been properly addressed. So once the office draft has been considered and reviewed and analyzed there may be changes that need to be made to that. You will consider those, put

Page 95

those into the report that then goes to director's review.

And I did skip a step in there as well. When you're looking at safety recommendations you may consider doing either early recommendations or urgent recommendations. Urgent recommendations, of course, would be something that when you come back from the scene you realize it's an imminent danger issue and you may issue it as an urgent recommendation and that will take on a life of its own. That will go forward to the board for adoption and you will develop that almost as a mini report because you have to have all of the facts and the analysis in that as well.

And the same thing even with early recommendations, if you believe that it's necessary to get the early recommendations out prior to the report actually being presented to the board you will do that.

And report development, just as in

Page 96

accident investigation you may have had contractors that you were using so we may have had reports that have come in from outside contractors and we will have to consider those as we're progressing through the report. And there's also another very important step that I didn't mention and that is what's called the technical review. We will take the factual portion of the report and we will send it out to the parties to the investigation and ask them to consider the facts, make sure that we have included all the facts. If they believe that there is either additional factual information that hasn't been included in there, we also ask them to propose analysis of the accident, if they have proposed conclusions, probable cause, recommendations, any of those things, we ask the parties to consider that.

But normally the technical review, if it is a major report we will have the parties either on the telephone or we will have them into the agency to consider their

Page 97

comments, and then once that factual report -- portion of the report has been through technical review, then it will be incorporated into what goes to the director's draft. And the director's draft goes for a sit down meeting in the office of the managing director.

The report is given out a couple of weeks in advance so that people have an opportunity to review it and now it is the product that is considered one more time by Office of Research and Engineering, Office of Safety Recommendations, the general counsel attends those meetings, managing director clearly does. The office that is presenting the report attends those meetings, the investigator in charge will attend, the group chairman will potentially attend. Just depends on who is managing director at what time, whether they wanted all of the investigators in there or they didn't.

The report writers, the chief of the report development division, if you have one,

will attend to take notes and make sure that all of the comments are considered that are made at the meeting.

After that meeting if there are some changes that need to be made, then those changes are made and the final report then is routed for final sign off by the office directors. The same people who participated in the director's review normally are the directors that sign off for this product to go on notation. And the notation process is a formal process in which the draft report with all of the facts, analysis, conclusions, draft probable cause recommendations are sent forward to each board member and they are issued simultaneously to the board members for them to consider prior to the report being presented in a -- what's called a Sunshine meeting where all of the members sit, consider the report in public.

As I say, they are given sometimes a couple of weeks, sometimes a month. It



depended upon the board who wanted what when. We had a different time schedules for that, but then it would be calendared on the board's calendar and the members of the Safety Board would consider the report, as I said, in a public meeting.

As the director, I presented the report, completed report to the board along with my investigators and they were asked questions and answers. The only people who can answer or ask questions in the meeting even though it's a public meeting are the members of the board. The board is not permitted by law to meet as a group except in a Sunshine meeting to discuss report.

If they have changes that they want to recommendations, for example, they may change the wording of a recommendation, we had a board member who was an English major and he would highlight every comma and period that was missing. Any of those kinds of changes to the report are documented at the time. The board



will agree to adopt the report and it is then brought back to the office if there are -- and they agree they will adopt the recommendations. They adopt the conclusions individually, the probable cause. They may change the probable cause and they will adopt each of those things individually.

The office then is responsible for getting those final changes into the report. You're dealing with Public Affairs, of course, at the same time simply because public affairs has invited the media in to the board presentation and the final conclusions, probable cause and recommendations are always issued to the media within hours of the meeting and so that has to be done. The report then has to be shepherded through the final process before it is published.

Now, that is the process through adoption if the Safety Board adopts it. The steps that would be different if I adopted it would be that it would not go on -- it would



not necessarily go on notation and that process that follows.

BY MS. COHEN:

Q. So it would end then at the final report signed off by you and that would be the end of the process?

MR. LOWINGER: Objection. Vague. Which report are you referring to?

BY MS. COHEN:

Q. If it was not a specific report. If it was adopted by you and did not go on notation, then the final step would be your adoption?

A. Well, the final step would be my adoption, but then it would -- correct. In most instances except that it would then also go through the final process. Once I had adopted it, it would also go through the process for publication. So...

Q. During the technical review of OMS reports from 2000 to 2005, were there frequently corrections made by the parties to

Page 142

attended.
Meetings with the Coast Guard, as I said, were all of the meetings that I mentioned before. So, I mean, those were -- they're kind of routine. They were part of every week.
Q. Every week you attended a meeting for at least one of these organizations?
A. Close. I would say there would be a meeting with -- sure, somebody from outside the organization. Probably on average, I would say, sure.
Q. How many IMO meetings did you attend from 2000 to 2005?
A. I believe that there were -- between 2000 and 2005, there were five meetings and because the Barberi was scheduled for the same day as an IMO meeting I didn't attend that one. So I would probably say each of those annually, other than when it interfered with an accident investigation.
Q. How long was a typical IMO meeting?
A. It's a week.

Page 143

Q. You would attend for the whole week?
A. Correct.
Q. What is NTSB's role in IMO?
A. We are one of the U.S. representatives at IMO for Marine accident investigation. So there is a -- there's a sub committee that has an ad hoc working group on Marine accident investigation and our role is to attend that meeting.
Q. Does the Coast Guard have a role in IMO?
A. The Coast Guard has a role in IMO, yes.
Q. And what is that role?
A. Do you mean the entire Coast Guard or do you mean the Coast Guard for Marine accident investigation?
Q. Marine accident investigation.
A. For Marine accident investigation the Coast Guard serves as the head of delegation to IMO.
Q. Does that delegation include the

Page 144

NTSB?
A. Yes.
Q. So the NTSB isn't part of the Coast Guard delegations to the IMO?
A. No.
Q. You said that the Coast Guard is the head of delegation, correct?
A. That's correct.
Q. What does that mean?
A. But the delegation is part of the -- it's part of the U.N.. It's the United States is represented. It's a U.N. organization. So it is -- it's the U.S. Delegation. It is not the Coast Guard's delegation.
Q. The Coast Guard is the head of the U.S. Delegation; is that correct?
A. That's correct. They serve as the head of delegation, that's correct.
Q. So the NTSB, then, is not the head of the U.S. Delegation?
A. The NTSB is not the head of the U.S. Delegation, that's correct.

Page 145

Q. Does the NTSB have to express its interest through the Coast Guard since the Coast Guard is the head of the delegation?
A. The NTSB speaks freely at the international maritime organization meetings so any opinions that are expressed during that meeting are NTSB's.
Q. As the director of OMS from 2000 to 2005, what was your role in IMO?
A. To serve as a member of that delegation and to express the U.S. position from NTSB standpoint.
Q. Did you ever give any speeches or presentations at IMO meetings?
A. What do you mean by speeches or presentations?
Q. Just answer the question as best you can.
A. The way that it works is not a -- it is not done as a speech or presentation. It is a -- an ad hoc working group and each member of the different administration, which is

different countries, have their representatives in the meeting and we discuss Marine accident investigation protocols. We discuss how international Marine accident investigation work will be conducted. So if there are discussions on how those processes or procedures might effect an NTSB investigation, I speak freely for -- I raise my card, essentially, and am acknowledged and give my opinion.

So if you consider that a speech, then the answer to your question is yes. If you are thinking of a speech as a prepared, you know, five-minute talk, those are not necessarily given under those circumstances. It operates like the U.N..

Q. You said that the Coast Guard is the head of the U.S. Delegation to IMO and that NTSB is not the head. What additional responsibilities or rights does the Coast Guard have as head of the delegation that the NTSF does not have?



MR. LOWINGER: Objection. Personal knowledge.

Go ahead.

THE WITNESS: The head of delegation ushers the paperwork for one thing through the State Department. You have to be approved as a delegate. So the paperwork that goes through the State Department is ushered through by the Coast Guard.

The Coast Guard holds what are called United States Safety of Life at Sea working group meetings and the actual head of delegation for the Coast Guard is the person who sits at the United States seat in plenary session. It's P-L-E-N-A-R-Y session. It's in the main session.

So the Coast Guard is the head of that delegation and that delegation has Marine accident investigation. It has flag state implementation -- is the subcommittee. So at that subcommittee there are -- I think there is a maximum allowed of three ad hoc working



groups and there is the plenary session, and each of those working groups will be dealing with specific issues and the specific issue of Marine accident investigation is the person -- my counterpart is not the head of delegation. The head of delegation is the person who sits in plenary session. So I hope I have explained that to you so you understand it.

BY MS. COHEN:

Q. Does the NTSB have a seat at the plenary session?

A. For Marine accident investigations?

Q. Well, you had said that the Coast Guard was the organization who had a person sit at the plenary session.

Does the NTSB have a corresponding person sit at the plenary session?

A. No.

Q. Is the NTSB allowed to express the official United States position with regard to Marine accidents at IMO?

A. In the ad hoc working group on



Marine accident investigation, yes.

Q. During the plenary session?

A. It's not done in a plenary session. It's done in the ad hoc working group on Marine accident investigation.

Q. What occurs at the plenary session?

A. The plenary session is a -- as I said, it's flag state implementation. So at the plenary session the work of the plenary session is to discuss every issue that can come up under flag state implementation. So the issues may have nothing to do with Marine accident investigation. And those issues are all handled by the Coast Guard in the plenary session and they may at times have somebody else from industries sit in there with them as -- well.

But the plenary session representation is done by the Coast Guard and it is not -- sorry. I know it's confusing, but that's the way it works.

Q. So any opinion that NTSB would want

Page 150

expressed at the plenary session would have to be done through the Coast Guard representative; is that correct?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: If the -- it's -- if the NTSB wanted a plenary session issue to be presented and that is not the group that's working on Marine accident investigation, this is -- for example, if we make a recommendation to the Coast Guard that we want a new international regulation developed, that goes through the Coast Guard. Our recommendations go through the Coast Guard, that's correct.

MR. LOWINGER: Can we take a break?

MS. COHEN: Sure. Ten minutes.

(A short recess was taken.)

BY MS. COHEN:

Q. You mentioned several times during your deposition that you have interactions with Congress?

A. Uh-huh.

Page 151

Q. How many times have you personally testified before Congress from 2000 to 2005, if any?

A. Between 2000 and 2005, I did not.

Q. Did you testify before any congressional committees during that time?

A. I'm sorry. What was the difference between your last question and this one? I -- perhaps, I misunderstood your last question.

Q. All of Congress as opposed to a committee.

A. Oh. I didn't.

Q. Did you meet with congressional staff members in 2000 to 2005?

A. I believe so, yes.

Q. How many times?

A. I don't know.

Q. Can you give me an estimate of how many times?

A. Let's see if I can -- at least once is my estimate.

Q. Would it be more than five times?

Page 152

A. At least once.

Q. Can you answer the question yes or no?

A. What's the question? Sorry.

Q. Did you meet with congressional staff members more than five times from 2000 to 2005?

A. I don't have an estimate of -- I don't have a estimate of that. I just can tell you that it was at least once.

Q. The one time that you met with a congressional staff member, that you recall, what was that about?

A. That was explaining what the Office of Marine Safety does.

Q. When was this meeting?

A. I think it was in 2002.

Q. Who requested the meeting?

A. Congressional staff.

Q. Did you ever prepare any other NTSB employees or board members to testify before Congress?

Page 153

A. Yes.

Q. How frequently did you do that between 2000 and 2005?

A. Between 2000 and 2005, every time a chairman or a board member testified I would have been involved in the preparation of the speech before their testimony before Congress.

Q. How many times did that occur from 2000 to 2005?

A. We have appropriations every year and we have authorization, I believe, every few years. So I will say on average once a year, but that's a guess.

Q. Did anyone from the NTSB testify about Marine safety issues in front of Congress from 2000 to 2005?

A. Yes.

Q. Who was that?

A. The chairman.

Q. How many times did the chairman provide testimony concerning Marine safety?

A. Again, I'm going to say that every

time the chairman talked about either reauthorization or budget for the agency Marine safety was included.

Q. Did you accompany the chairman to any of these hearings?

A. Yes.

Q. How many?

A. I don't know.

Q. Did you accompany the chairman to every meeting he or she attended?

MR. LOWINGER: Objection. Vague.

BY MS. COHEN:

Q. Every congressional testimony -- every time he or she gave congressional testimony, did you accompany the chairman?

MR. LOWINGER: Objection. Vague.

THE WITNESS: Yeah. I don't know.

BY MS. COHEN:

Q. Do you know what percentage of the time you accompanied the chairman to provide congressional testimony?

MR. LOWINGER: Objection. Vague.



THE WITNESS: No.

BY MS. COHEN:

Q. Can you give me an estimate?

A. No.

Q. Would you say it was more than 50 percent of the time that the chairman gave testimony?

A. It could be.

Q. Would you say more than 75 percent?

A. Again, I don't know, because if the chairman gave testimony that I was dealing with an accident investigation or something like that, that may have fallen off my radar so I -- you're asking me to speculate and I don't feel comfortable doing that.

Q. As an OMS director from 2000 to 2005, were you a member of the Executive Review Board?

A. I believe that was the title that Mr. Osterman used in 2005, and that answer would be yes.

Q. What -- when I'm referring to



Executive Review Board, what do you mean by the -- what -- in your response, what did you mean by the term "Executive Review Board"?

A. When Mr. Osterman became managing director he had executive meetings with the modal office directors, the director of Office Safety Recommendations and Accomplishments, Research and Engineering, and those meetings would discuss the plans and programs for the agency. They would discuss things like budget, the allocation of SES billets that had been determined, and I attended some of those meetings. I don't know if I attended all of them, but I know I attended some of them.

Q. Prior to 2005, was there an Executive Review Board at the NTSB?

A. I believe so.

Q. Were you a member of that board?

A. No.

MR. LOWINGER: Objection. Vague. Go ahead.

THE WITNESS: No.



BY MS. COHEN:

Q. Did you have any responsibilities with respect to the work of the Executive Review Board prior to 2005?

A. Responsibilities with regard to the work of the Executive Review Board, I don't know.

Q. You don't know if you had any responsibilities as director?

MR. LOWINGER: Objection. Vague.

THE WITNESS: As director if I was not invited to the meeting, then I wouldn't know what work they discussed. So I can't give you an answer as to whether I was asked for input to something that was then discussed as work in that board or not. So you're asking -- me -- you're asking me to unfortunately read the minds of the people who are in the board and I just -- I can't do that. So...

BY MS. COHEN:

Q. Were you ever asked for input by any members of the board?

Page 158

MR. LOWINGER: Objection. Asked and answered and vague.

THE WITNESS: Was I ever asked for any information by members of the Executive Review Board, yes.

BY MS. COHEN:

Q. Related to the work of the Executive Review Board?

A. I don't know.

Q. Do you know what work the Executive Review Board did?

MR. LOWINGER: Objection. Vague.

THE WITNESS: No, I don't. No, not precisely.

BY MS. COHEN:

Q. Not precisely but even generally do you know what work the Executive Review Board did?

A. I don't have personal knowledge of it.

MR. LOWINGER: Objection. Vague.

Go ahead.

Page 159

THE WITNESS: I don't have any personal knowledge of it.

BY MS. COHEN:

Q. Not personal knowledge, but any knowledge, whatsoever, of the work of the Executive Review Board?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: Excuse me.

I believe that Mr. Osterman has spoken in his depositions about the Executive Review Board, so I know that he uses that term, but I don't have any knowledge of that.

BY MS. COHEN:

Q. Do you have any responsibilities as the director of OMS with respect to staffing or career appointments to the SES?

A. Repeat that. I'm sorry.

Q. As the director of OMS from 2000 to 2005, did you have any responsibilities with respect to staffing or career appointments to the SES?

Page 160

A. Staffing of the SES?

Q. Yes.

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: No.

BY MS. COHEN:

Q. Do you have any role in advising the managing director as to the number of SES positions needed by the agency?

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: Can you repeat that question, please?

(The record was read as requested.)

THE WITNESS: Any role in advising about the number of SES positions needed by the agency? I'm not sure if the question is -- when you say role, do you mean a -- an official role where somebody asks me to -- I guess I don't understand.

What is your question.

BY MS. COHEN:

Page 161

Q. Did you have any official role in advising the managing director regarding the number of SES positions needed by the NTSB?

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: I certainly provided personal information to the managing director.

BY MS. COHEN:

Q. What do you mean by that?

MR. LOWINGER: Just to clarify that the entire line of questioning, SES you mean the Senior Executive Service?

MS. COHEN: Yes.

MR. LOWINGER: Okay. Thank you. So there won't be anymore vague questions -- objections.

THE WITNESS: Yes, I certainly spoke to the managing director about SES positions at the agency.

BY MS. COHEN:

Q. Did you have an official role in terms of advising the managing director as to