SES positions in the agency?
A. You're asking questions that I, again, I'm not -- are you asking was I a member of some group that filled out a piece of paper or something? I don't -- I'm sorry. I just don't understand.
Q. In response to my question you said that you -- your personal opinions, I guess, on SES, the number of SES positions within the agency, but did you have any official role as the director of OMS in advising the managing director regarding the number of SES positions within the NTSB?
A. I think the answer to that is no.
Q. Did you have any official role in the selection of SES candidates in the NTSB?
A. No.
Q. Did you have any role in the decision to redistribute SES positions within the agency?
A. You mean official role?
Q. Yes.



A. No.
Q. Did you have any role in developing SES staffing plans for the agency?
A. When you ask that question I want to be sure, again, that I'm answering -- I'm answering accurately. So when you say did I have an official role with regard to SES staffing, could I -- as the director of the Office of Marine Safety I certainly knew what the responsibilities of that office were and therefore that information, if it were included in a -- an official document of the agency, that information would be included in there.
Q. When you say information included in an official document of the agency, what information are you referring to?
A. Responsibilities of the office, the director of the Office of Marine Safety.
Q. Did you have any official role in the development of policy for performance awards for SES employees at the NTSB?
A. Performance awards for SES?



Q. Yes.
A. No.
Q. Did you have any role in the development of policy on discipline and removal of SES employees at the NTSB?
A. No.
Q. Did you have any responsibilities for agency wide planning and program activity?
A. Yes.
Q. What were those?
A. The first thing that comes to mind is the reauthorization for the agency. The agency wouldn't exist if Congress didn't reauthorize them every few years. So planning for the future of the agency was included in that document and I contributed to that document the official request to Congress for reauthorization.
Q. Did you -- go ahead.
MR. LOWINGER: Are you done?
BY MS. COHEN:
Q. Were you finished?



A. No, I wasn't.
Q. Go ahead.
A. Okay. Agency wide planning in the development of an academy. I was involved in developing the plans for that. Budget requests. I was certainly involved in the development of the agency wide policy and planning for that. Those are the things that immediately come to mind.
Q. When you say you were involved with the reauthorization documents, was your contribution limited to the Office of Marine Safety?
A. Gee, I don't know.
Q. What information did you contribute to the reauthorization document?
A. For reauthorization you have to justify the existence of the agency and so that certainly is a collaborative effort with the general counsel's office requests for changes in the -- there was a definition in the act that said territorial seas and there was a

Page 170

2000 to 2005?
A. They would have changed over that time period. Lucille Waldrin, who was the assistive assistant. Jim Scheffer, who was the chief of major investigations, Don Tyrrell, who was -- he had -- he wore several hats during that time period before he retired, and Rob Henry, Robert Henry who was an associate, I believe, from 2000 to 2005.
Q. Did you ever directly supervise less than four employees during that time period in 2000 to 2005?
A. I believe so.
Q. When was that?
A. Between the time when Don Tyrrell retired and in 2005 when I got a chief of the report development division, and that was Gloria Ruggerio.
Q. When did Mr. Tyrrell retire?
MR. LOWINGER: Objection. Asked and answered.
THE WITNESS: I believe it was in

Page 171

2002.
BY MS. COHEN:
Q. So from 2000 to 2005, you supervised directly less than four employees?
A. I think so.
Q. How many employees did you supervise indirectly?
A. The average in the office, I believe, during that time period was 14 or 15. So it would depend upon the fluctuation of -- for example, when Don retired and Gloria came in. That number. It would have been -- I'm going to say a maximum of 15 for the entire office.
Q. Maximum of 15 throughout the entire time period of 2000 to 2005?
MR. LOWINGER: Objection. Vague. Are we talking about every one in the office or are we talking about people that she's supervised directly or just the people that she supervised indirectly? I just want to make sure that she is clear on what she's

Page 172

answering.
BY MS. COHEN:
Q. Answer the question, please.
A. Okay. Can you repeat your question, please?
Q. From 2000 to 2005, you would say you never supervised more than 15 employees directly or indirectly?
A. I think that's an accurate number.
Q. Did any employees leave OMS from 2000 to 2005?
A. Yes.
Q. How many?
A. Without looking at a roster I would not be able to tell that.
Q. Can you give me an approximate number of how many employees left the office during that time?
A. Three, maybe.
Q. Who were those individuals?
A. I'm giving you an approximation so I don't -- without looking at a roster, I

Page 173

honestly couldn't tell you. Other than Don. I remembered Don's retirement, but...
Q. Do you recall the name of anyone else who left the office from 2000 to 2005?
A. Yes. Jim Walsh. I take that back.
Q. Anyone else?
A. I think Leon Katcharian also left.
Q. Anyone else?
A. That's all that comes to mind.
Q. When did Jim Walsh leave the office?
A. I think it was 2002.
Q. Do you know what the reason for his departure was?
MR. LOWINGER: Objection. Asked and answered.
Go ahead.
THE WITNESS: He was a -- he was a -- an employee who came in from private industry. He was on probation for a year. He left before his probation period was up at a year. That was negotiated through the general counsel's office.

Page 186

experience in accident investigation and report of production, and for the director of the Office of Marine Safety clearly education associated with operating the ship.

BY MS. COHEN:

Q. Would you say that knowledge about any transportation modes other than Marine is required?

A. Knowledge of any other transportation mode is required?

Q. Is a skill that's required for the OMS director?

A. So I understand, is it necessary -- you're asking me is it necessary to have education in any other mode of transportation in order to be able to do the job as the director of the Office of Marine Safety, other than Marine?

Q. Yes.

A. Necessary, no.

Q. Would you say that the director of the Office of Railroad, Pipeline & Hazardous

Page 187

Materials needs to have knowledge of more than one transportation mode to be director of that office?

A. Knowledge or education?

Q. Knowledge.

A. Prior to becoming or after becoming?

Q. Both.

A. Both? Then the answer would -- the answer would not necessarily be that that's necessary if -- I want to make sure I'm answering the right question. So let me go back and ask what was the -- what was the question again?

(The record was read as requested.)

THE WITNESS: You said it would be knowledge before as well as after?

BY MS. COHEN:

Q. Let's take it one at a time. Knowledge before?

A. In my opinion, the answer is it should be.

Q. And after?

Page 188

A. It should be.

Q. How many hours did you work per week?

MR. LOWINGER: Objection. Vague. Are we still talking about 2000, 2005?

MS. COHEN: Yes.

THE WITNESS: Between 2000 and 2005? It would depend. And it would --

BY MS. COHEN:

Q. Let's do it year by year then. 2000?

A. Well, no; it's not by year that the determination is made. It's really more a matter of if you have an accident investigation, a major accident investigation that you're dealing with and under those conditions you can work almost 24 hours a day for days on end. You may take a few hours sleep and then get back up ans start again.

So if it were a major accident, as I said, it could be almost around the clock

Page 189

except for a few hours of sleep now and again. If it were a time period when you have people, as I say, even investigations where you have people in the field and you're juggling those priorities it can be at least 60 hours.

Q. How many hours would you say you worked per week on average, you personally, not a director in general, worked per week on average between 2000 and 2005?

A. How many hours did I personally work? You said not as director?

Q. As a director?

A. Oh, as the director?

Q. Yes.

A. Yeah. I would say an average of 60.

Q. Did you ever travel to the site of Marine accidents as director in 2000 to 2005?

A. From 2000 to 2005, no.

Q. Did you ever travel for any other reasons as director of OMS from 2000 to 2005?

A. Yes.

Q. What were those reasons?

A. Travel to IMO, travel to MAIIF meetings, travel to the Coast Guard. Traveled to -- I mean -- if you mean travel in terms of getting on to a flight or if you mean travel up to the Hill and back. Travel -- I don't know. So...

Q. Travel as in getting on a flight and traveling elsewhere, not travel within the D.C. area?

A. Yes.

Q. How frequently did you travel?

A. I would say on average about two times a year.

Q. How long were those trips on average?

A. About a week.

Q. Which male employees do you believe were being paid more than you by doing substantially equal work from 2000 to 2005?

A. John Clark, Robert Chipkevitch; Joseph Osterman. When you say substantially equal work I'm going to add in two other



employees whose duties I was performing, but they were not performing my duties. So my work is equal to theirs. Theirs wasn't equal to mine. And that would have been Thomas Haueter and Robert McIntosh.

Q. Can you describe Mr. Clark's duties as the director of aviation safety?

A. They are the same duties that I had.

Q. All of them are exactly the same?

A. I would say they are substantially the same, correct.

Q. Can you detail what his duties were, please?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: Accident investigation, report development, responsible for international investigations, responsible for -- I think he did have responsibility for public nonpublic accident investigations, budget -- managing budget, managing a resources, human resources, dealing with



internal and external organizations.

BY MS. COHEN:

Q. Is there anything else?

A. Things that I mentioned all before that I also had. Development of policy, development of -- supervisory responsibilities. I'm trying to remember all the responsibilities that I had. I had leadership responsibilities. He had leadership responsibilities. I had supervisory responsibilities. He had them. I had budget responsibilities. He had them. I had internal and external communication responsibilities. He had them. I had responsibilities for providing representation at the International Maritime Organization to serve as the U.S. representative on accident investigation. He had it at ICAO. That's I-C-A-O, which is the civil aviation organization. It's a sister to IMO.

I had responsibilities for everything from notification through report development and completion and a published



report. He had the same. I had responsibility to -- I had delegated authority to determine probable cause of accidents and he had that. I had responsibility for -- I actually had a responsibility that he did not necessarily have, so I have to think about the ones that are the same.

I had responsibility for public/nonpublic and I think he had responsibility for public/nonpublic accident investigation. So he also would have, for example, dealt with the Department of Defense, as did I. Responsibility for managing a major modal program. I had responsibility. He had the same.

I had responsibility to respond to requests from Congress. He did. I had responsibility for responding to and making sure that the managing director and the board members were fully apprised of everything that was related to accident investigations, ongoing accident investigations. He had that

Page 194

responsibility as well. I had responsibility for reporting on the output of the office. He had the same responsibility.

I think I mentioned budget authority and responsibility. We had the same budget and responsibility -- and budget authority and responsibility. Same responsibility for supervising and all of the human resources issues that are involved in having staff and making sure that they are trained, that they have standards for performance and are evaluated, that they are counseled as necessary. All of the things that go with those individual responsibilities. I had them. He had them. So...

Q. How many employees did Mr. Clark supervise as a director of OAS?
A. Directly supervise?
Q. Yes.
A. I believe four or five.
Q. How many employees did he indirectly supervise?

Page 195

A. His office had probably about 140, I think.
Q. How large was the budget of OMS from 2000 to 2005?
A. It was -- I think we had like three percent of the budget for the agency, so it covered personnel. It covered salaries, awards, training, travel, uniforms, equipment.
Q. Approximately how much money was in the OMS budget from 2000 to 2005?
A. $50,000.
Q. $50,000 per year?
A. Correct.
Q. How large was the budget of OAS from 2000 to 2005?
A. I don't know.
Q. Was it larger than the OMS budget?
A. Yes.
Q. What percentage of the agency budget went to OAS during 2000 and 2005?
A. Probably -- probably about 30 percent, I'm thinking. But I don't know

Page 196

specifically.
Q. You said that the role of OAS or Mr. Clark in ICAO was similar to your role in IMO. Can you explain the similarities?
A. The role at IMO and the role at ICAO is to review the standards for International Accident Investigation. In ICAO, it's -- I think it's Annex 13 is what it's called, and in IMO it's held within the regulations and then there is a Marine accident investigation protocol and those two documents determine how an accident investigation is conducted for -- for Marine it is an International Accident Investigation. I believe for OAS they call it a Foreign Accident Investigation.

So those are base -- it's basically determining what the standards are and how the accident investigation will be conducted. And the role of those two organizations is to be sure that there is nothing in that standard that will preclude proper accident investigation.

Page 197

Can we take a five-minute break, please?

MS. COHEN: Sure. Ten minutes is fine.

(A short recess was taken.)

BY MS. COHEN:
Q. Is the NTSB the accredited United States representative to ICAO?

MR. LOWINGER: Objection. Personal knowledge.

Go ahead.

THE WITNESS: They are an accredited representative to ICAO.

BY MS. COHEN:
Q. Are there any United States accredited representatives to ICAO?

MR. LOWINGER: Objection. Same objection.

Go ahead.

THE WITNESS: FAA.

BY MS. COHEN:
Q. Does NTSB have the United States

Q. Can you give me an estimate of how many?
A. For a regional accident, if the regional accident were high profile even though it did not warrant a headquarter's launch, they might -- it would depend. They might send zero or they might send, you know, five or six. I honestly am -- I can't -- I can't -- I just can't give you a number that would be accurate.
Q. How many investigators on average would OAS send to a major aviation accident?
MR. LOWINGER: Objection. Asked and answered. Vague.
Go ahead.
Personal knowledge.
Go ahead.
THE WITNESS: A normal go team at NTSB across all of the modes would cover an investigator in charge, a group chairman depending upon the issue that was being investigated. So an average is not something that I can give you.



I mean, the -- each of the modes would make their decision depending upon the size of the accident, the location of the accident, the issues that were involved in the accident, the complexity of the accident, the public interest in the accident, the chairman, the managing director, the available resources. There are just so many factors involved in making that determination that I just can't give you an accurate answer.
BY MS. COHEN:
Q. How many times did OMS launch to an international investigation between 2000 and 2005?
A. I would say on average one a year.
Q. How many times did OAS launch to an international investigation between 2000 and 2005?
MR. LOWINGER: Objection. Vague. Lack of personal knowledge.
THE WITNESS: Yeah, I don't know.
BY MS. COHEN:



Q. Can you give me an estimate of how many?
A. I can't give you an estimate of how many. I was responsible for Marine not for aviation.
Q. Did OAS launch to more than five international accident investigations between 2000 and 2005?
A. I don't know.
MR. LOWINGER: I'm sorry. Was that OMS or OAS?
MS. COHEN: OAS.
THE WITNESS: OAS is what I understood she said.
BY MS. COHEN:
Q. You alleged in your complaint that your duties were substantially equal to those of the director of OAS, Office of Highway Safety, the Office of Railroad, Pipeline & Hazardous Material Safety.
How then can you not know what their specific responsibilities were?



MR. LOWINGER: Objection. It's argumentative. Really.
Please don't harass her with a question like that.
If you can answer it, do it, but go ahead.
That was uncalled for.
Go ahead.
THE WITNESS: I know what their duties and responsibilities were. I don't consider the number of accidents as -- or knowing the number of accidents as germane to that.
Q. Why not?
MR. LOWINGER: Objection. Argumentative. And relevance.
THE WITNESS: Responsibility is responsibility. It is not -- the responsibilities I went through. And I believe those responsibilities are laid out as duties and responsibilities for each of the office modal directors.

Page 218

it.
Q. Did you personally prepare that paperwork?
A. Personally prepare it, what do you mean by personally prepare?
Q. Did you write up the paperwork?
A. Writing up the paperwork is -- you mean typing the paperwork? Again, I'm not sure what you mean by -- I was responsible for getting the paperwork prepared and through the system.
How is that?
Q. Okay. Does OMS have any regional offices?
A. No.
Q. Does OMS do work similar to those done by regional offices in other modes?
A. Yes.
Q. Please explain that.
A. We would do what would be considered regional accident investigations.
Q. Considered regional why?

Page 219

A. We would send one investigator and it would be comparable to a regional accident investigation.
Q. How would it be comparable?
A. It was comparable to -- it was, perhaps, an issue that was a recurring issue and we wanted to gather information on it so we would send out one, maybe two investigators, but we would not necessarily do a major report.
Q. What was your understanding of the plan to allocate SES positions among the modal offices?
MR. LOWINGER: Actually, you know what? Objection. To the extent that this is asserting affirmative defense, this is outside the scope of the relevance and the position asserted by the defendant at this point. You may answer, but that's --
MS. COHEN: Can we go off the record a minute, please?
MR. LOWINGER: Sure.
(A short recess was taken.)

Page 220

BY MS. COHEN:
Q. Can you read my prior question, please?
(The record was read as requested.)
MR. SCHER: Objection. Irrelevant. I'm not going to let her answer.
THE WITNESS: On the advice of counsel I'm not going to answer.
MR. SCHER: This relates to affirmative defenses. There is no affirmative defenses on the record. I can cite you a case if you want. You can't ask the question.
MS. COHEN: That's not a reason to instruct her not to answer.
MR. SCHER: You can file a motion. That's fine.
Here, let me cite you the case.
MS. COHEN: Can we go off the record, please?
(A short recess was taken.)
MR. SCHER: Marjorie, you can answer the question as it relates to your claim that

Page 221

you were entitled to the same pay as the other modal directors. Okay?
Go ahead and repeat the question because she won't have any idea what the question was.
MS. COHEN: Will you please read back the question?
(The record was read as requested.)
THE WITNESS: I don't know what you mean by understanding and I don't know of any plan.
BY MS. COHEN:
Q. Did you know that -- or was there an intention by the agency to make the modal office director position SES positions?
MR. LOWINGER: Objection. Vague.
MR. SCHER: You can't. Sorry.
THE WITNESS: Repeat the question, please.
(The record was read as requested.)
THE WITNESS: Make sure I understand so I can answer properly. Did I understand

Page 222

that the agency requested SES positions, yes.
BY MS. COHEN:
Q. For the modal office directors?
A. Which modal office director?
Q. The modal office directors in general.
A. For the modal office directors, yes.
Q. How did you know that?
A. There was a letter sent by the agency to the Office of Personnel Management.
Q. What did that letter say?
A. I can't quote the letter.
Q. Generally, what did the letter say?
A. The letter asked for SES positions for the modal directors other than the Office of Aviation Safety because that already had an SES position assigned to it.
Q. When did you become aware that the agency was requesting SES positions for the modal office directors?
A. I believe Jim Hall -- when Jim Hall was chairman he indicated that the agency

Page 223

wanted each of the offices to be SES.
Q. Indicated to you?
A. Indicated that -- yes, for the reorganization he indicated that that would be -- that would be what would occur.
Q. What reorganization are you referring to?
A. There was a reorganization in 1997 and 1998.
Q. Did the NTSB receive any of those SES slots that it requested?
A. I don't know.
Q. Are you aware that Office of Highway Safety director position became an SES position?
A. Am I aware?
Q. Yes.
A. Yes.
Q. Do you know when that occurred?
A. I knew when it was advertised.
Q. When was that?
A. 2003.

Page 224

Q. Did you apply for the OHS director position when it was advertised?
A. No.
Q. Why not?
A. Because my expertise is in marine safety.
Q. Do you believe that you were qualified for the OHS director position when it became SES?
A. I don't have the technical expertise that I would expect the director of the Office of Highway Safety to have.
Q. Why do you believe the SES slot was allocated to the Office of Highway Safety when it was?
MR. SCHER: Objection. Speculation.
Go ahead.
THE WITNESS: I personally believe it was granted to Mr. Osterman.
BY MS. COHEN:
Q. Why specifically was it granted to Mr. Osterman?

Page 225

A. Why? You will have to ask the chairman and the managing director that question.
Q. Why do you believe it was?
MR. SCHER: Objection. Speculation. We've got a standing objection on it. I'm sorry.
THE WITNESS: That's okay.
I had two conversations in which the managing director told me at the time that he was doing this for Joe and I had a conversation with Mr. Osterman in which he told me he had been promised the SES slot.
BY MS. COHEN:
Q. Conversation with the managing director, when did that take place?
A. In 2003.
Q. Do you remember what month in 2003?
A. No. It was when the advertisement came out for the Office of Highway Safety, SES position.
Q. Who initiated this conversation?

Page 230

that conversation?
A. Did I say anything else during that conversation?
Q. Yes.
A. Other than what I just explained?
Q. Yes.
A. There were other issues that we were discussing, but with relationship to pay, I don't believe I did.
Q. What other issues were discussed during that conversation?
A. I believe that at that time we were talking about the accident investigation responsibilities that we had. We were talking about -- I can't remember all the specifics of the conversation, but I believe it was with regard to the accident investigation responsibilities we had, which is what prompted the conversation.
Q. You said earlier that you also had a conversation with Mr. Osterman regarding the OHS position becoming SES?

Page 231

A. Correct.
Q. When was that conversation?
A. I had at least one conversation with him and that was when the advertisement came out for the position.
Q. What was discussed at that conversation?
A. The issue of -- he was about to get the pay for the modal director position in OHS and I congratulated him on getting it. And he said, well, they promised me this. I have been waiting for it for a long time.
Q. This was after he had already been given the position as an SES?
A. No. It was when the advertisement came out.
Q. So this was prior to him getting the position as an SES?
A. When he actually got the position as an SES was not clear to me. It was not an announcement that was made. So when he actually got that position was not clear.

Page 232

Q. Was it prior to him being selected for the position as an SES?
A. That's what I'm saying. I don't know if he had been --
Q. When he stated that he had been promised the position, what do you think he meant by that?
A. I believed he was saying he had been preselected for the position.
Q. Other than the statement that he made, do you have any other reason to believe that he was preselected for the position?
A. Mr. Campbell's statement.
Q. Anything else?
A. Those two statements.
Q. Is Mr. Chipkevitch the director of ORPH as a GS-15 when it was advertised as an SES position?
A. I think so.
Q. Did he have to apply for the position as an SES?
A. I think so.

Page 233

Q. Did you apply for the director of position at ORPH when it was advertised as an SES?
A. No.
Q. Why not?
A. Because I believe that technical expertise in the modal discipline is necessary.
Q. Do you believe that the OMS director position should have been made an SES position prior to the ORPH director position?
A. I believe the SES position assignments should have been based on responsibilities and not on the individuals occupying those positions.
Q. Can you please respond to the question, yes or no.
Do you believe that the OMS director position should have become an SES position prior to the ORPH director position?
MR. SCHER: Objection. Just to make sure it's clear, speculation. Vague. Ambiguous. Calls for personal opinion.

Page 238

offices?
A. Yes.
Q. Does the Office of Highway Safety have regional offices?
A. Yes.
Q. How many modes are encompassed by ORPH?
A. Railroad and pipeline.
Q. Are there any other modes?
A. Modes, no.
Q. Are there any other areas of investigation encompassed within that office?
A. Other than modes?
Q. Yes.
A. Do you mean hazardous materials?
Q. Yes.
A. Yes.
Q. How many employees were there in the RPH office between 2000 and 2005?
A. Maybe 30 to 40.
Q. How many employees were there in the highway safety office between 2000 and 2005?

Page 239

A. About the same.
Q. Other than being promoted to SES, how do you believe your pay could have been made equal to the male employees who you alleged did substantially the same work as you?
A. The agency has used the SL positions in the past to pay employees above the GS-15 level so they could have used a senior level position, for one.
Q. Were there any other possibilities?
A. They could have used within the -- within the civil service system, they could have supplemented my salary the same as they did Mr. Osterman's salary.
Q. What way was that?
A. They did it with a retention bonus between 2000 and 2005.
Q. Anything else?
A. They could have paid me for -- between 2000 and 2005 they could have given me a quality step increase to provide for my step as a 15. I didn't receive that 1510 until

Page 240

2005. They could have supplemented my income, in part, by giving me overtime for the number of overtime hours that I had to work. That's all that comes to mind at the moment.
Q. Did you ever request a senior level or SL position?
A. Request?
Q. Yes.
A. No.
Q. Did you meet the administrative criteria required for an SL position in your job as director of OMS?
A. Yes.
Q. How did you do that?
A. I had technical expertise as a marine safety expert. I had technical expertise as a fire protection expert, a marine fire protection expert, in particular.
Q. Are there any or reasons you believe you met the criteria for an SL position?
A. Other than my technical expertise, certainly. I would say my technical expertise

Page 241

would be the basis for an SL position.
Q. Does your job as director of OMS involve any supervisory responsibilities?
A. I'm going to go back and correct what I just said because the issue of an SL position was held by the Office of Aviation Safety and they used that for their international -- I believe at one point it was Ron Schleet who was deputy director for International Relations and then they changed that to the senior adviser for international within the Office of Aviation Safety. And so certainly the international experience and expertise that I had would have qualified me for an SL position.
So I apologize for interrupting your next question, and I don't recall what it was, but I wanted to make sure that I covered those things.
MS. COHEN: Can you please read back the previous question?
THE WITNESS: Did my position as

Page 242

director of the Office of Marine Safety entail supervisory responsibilities, yes.

BY MS. COHEN:

Q. What percentage of your time would you say was spent on supervisory responsibilities?

A. To break that out is very difficult simply because that's a day-to-day responsibility that you have. There are certain -- there are certain things that you have to do with regard to human resources every week. So to break it out is very difficult in terms of percentage, for example.

Q. So you would say you engaged in some supervisory responsibilities every day?

A. Not every day. Routinely every week.

Q. What percentage of your time per week would be devoted to supervisory responsibilities from 2000 to 2005?

A. Again, I can't break that out. It's just so, you know, all of those

Page 243

responsibilities are so integrated in terms of even for getting an accident investigation completed, getting a report prepared and completed, all of those things fall within the responsibilities of accident investigation and report development. So it's just a -- it's a routine responsibility.

Q. And you say it was more than 25 percent of your overall time?

A. I can't break it out by percentage.

Q. You said that you have international expertise that would have qualified you for an SL position. What is that expertise?

A. International negotiations, understanding of the international regulations and requirements for ships, the operation of ships, the construction of ships, the maintenance and repair of ships, the interpretation of the international regulations that are related to shipping, the international regulations for fire protection, a great deal of depth in that, expertise in dealing with

Page 244

international -- essentially, foreign dignitaries, international accident investigators, international regulators.

Q. What experience did you have in international negotiations?

A. I had served in the U.S. Coast Guard as the U.S. representative to the International Maritime Organization subcommittee on fire protection. I had served as the chairman of that subcommittee. I had served as the vice chairman of that subcommittee. I served as the U.S. representative in plenary drafting, negotiating the fire protection regulations for passenger vessels, cargo vessels, and every other vessel that operates under the international rules.

I think I have covered it all. I hope I have.

Q. Did you discuss the possibility of an SL position with anyone at NTSB between 2000 and 2005?

A. Yes.

Page 245

Q. With whom did you discuss that?

A. Mr. Osterman.

Q. When was that conversation?

A. That conversation took place in early May of 2005.

Q. Who initiated that conversation?

A. The conversation -- the entire conversation or the conversation related to SL?

Q. The entire conversation.

A. Mr. Osterman.

Q. What other topics were covered at this conversation?

A. Mr. Osterman told me that I had not been selected for an interview for the position I currently occupied.

Q. Meaning the OMS director position?

A. Correct.

Q. What was your response to that?

A. My response to that was you are essentially firing me from a position for which I have not been paid for ten years.

Q. What did Mr. Osterman say?

Q. Did any of the other modal office directors ever receive overtime pay between 2000 and 2005?
MR. SCHER: Objection. Speculation. Just from your personal knowledge.
THE WITNESS: I think that -- that, in fact -- I mean, personally I think that being paid as an SES pays them for their overtime.
BY MS. COHEN:
Q. Can you please answer my question? Did they receive actual overtime pay between 2000 and 2005?
A. I don't know.
MS. COHEN: Take a ten-minute break here, please.
(A short recess was taken.)
BY MS. COHEN:
Q. You had said that one of the possible ways to increase your compensation to be equal to that of the male employees who allegedly did substantially similar work was a



retention allowance?
A. (Witness nodding head.)
Q. Do you believe that you met the administrative criteria to receive the retention allowance?
A. Since the criteria that had been used at the Safety Board was not necessarily the criteria that I would expect, I believe they could have used that, that's correct.
Q. What do you believe were the criteria?
A. Which criteria?
Q. To receive a retention allowance.
A. Okay. My understanding of the requirements are that you should have a letter in hand with an offer for a position for higher pay outside the agency. And that is reviewed or supposed to be reviewed every year to determine if that is in effect.
Q. Did you ever seek employment outside of the agency between 2000 and 2005?
A. Yes.



Q. When did you do so?
A. There was a position at -- there was an SES position at the -- I think it was the National Academy of Sciences that I started the application process for.
Q. What do you mean by started the application process?
A. I submitted the initial documentation.
Q. And what happened then?
A. I understand that I did not meet the minimum criteria, but I don't know specifically. I believe they were looking for a Ph.D..
Q. So you did not receive an offer for that position?
A. That's correct.
Q. Did you apply for any other positions outside of the NTSB between 2000 and 2005?
A. No.
Q. Did you ever receive an offer for a



position outside of the NTSB between 2000 and 2005?
A. 2005, any particular date in 2005?
Q. 2005, during your tenure as director of OMS?
A. No.
Q. You just said that the requirements for retention allowance was an offer letter in the hand. How do you allege that you could have received a retention allowance if you never received an offer for employment between 2000 and 2005?
A. Because the agency had not set that as an annual requirement for retention allowance.
Q. When you say it was a requirement, then, what did you mean?
A. I believe it was an administrative requirement through OPM, but I do not believe that the agency adhered to that requirement.
Q. Why do you believe that?
A. Mr. Osterman testified to it.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

- - - - - - - - - - - - - - -x

MARJORIE MURTAGH COOKE, :

Plaintiff : Case No. 06-748C

vs. : (Judge Thomas C. Wheeler)

THE UNITED STATES, :

Defendants : PAGES 1 - 261

- - - - - - - - - - - - - - -x

Deposition of JOSEPH G. OSTERMAN, held at the offices of The Employment Law Group, 888 17th Street, N.W., Suite 900, Washington, D.C., commencing at 10:05 a.m., Thursday, May 24, 2007, before Elizabeth Mingione, Notary Public.

A P P E A R A N C E S O F C O U N S E L:

ON BEHALF OF THE PLAINTIFF:

THE EMPLOYMENT LAW GROUP, P.C.
BY: BRIAN M. LOWINGER, ESQUIRE
888 17th Street, Suite 900
Washington, D.C. 20006
(202) 261-2806

ON BEHALF OF THE DEFENDANT:

DEPARTMENT OF JUSTICE, COMMERCIAL
LITIGATION BRANCH
BY: MEREDYTH D. COHEN, ESQUIRE
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 353-7978

AND

NATIONAL TRANSPORTATION SAFETY BOARD
BY: KATHLEEN SILBAUGH, ESQUIRE
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202) 314-6084

C O N T E N T S

WITNESS: JOSEPH G. OSTERMAN

EXAMINATION BY: PAGE

Mr. Lowinger .............................. 6

DEPOSITION EXHIBITS
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | NTSB Position Description, Director, Office of Marine Safety . | 221 |
| 2 | Position Description beginning with Bates 00753 .. | 224 |
| 3 | Position Description beginning with Bates 000759 .. | 226 |
| 4 | Position Description beginning with Bates 000766 .. | 229 |
| 5 | Memorandum of Understanding, NTSB and Coast Guard | 232 |
| 6 | Position Description beginning with Bates 000772 .. | 233 |
| 7 | Position Description of Robert Macintosh, Jr., 11/29/05 ....... | 235 |
| 8 | Letter Dated July 18, 2003 to Delores Everett | 236 |
| 9 | Attachment F, Comparison of Average Compensation ... | 239 |
| 10 | NTSB Order 50, Marine Safety Program, Dated 11/25/96 | 241 |
| 11 | NTSB Order 20, Highway Safety Program, Dated 4/18/96 ........ | 243 |
| 12 | NTSB Order 20A, Highway Safety Program, 5/17/02 ....... | 244 |
| 13 | NTSB Order 40, Railroad Safety ....... | 245 |

DEPOSITION EXHIBITS (Continued)

JOSEPH G. OSTERMAN

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 14 | NTSB Order 30, Hazardous Materials and Pipeline Safety Program, 4/18/96 ... | 247 |
| 15 | Notification of Personnel Action ...... | 248 |
| 16 | Position Description, Office of Railroad, Pipeline and Hazardous Materials ...... | 250 |
| 17 | Position Description, Director, Office of Aviation Safety ...... | 252 |
| 18 | NTSB Performance Appraisal Form, Bates 233-240 ..... | 252 |
| 19 | NTSB Performance Appraisal Form, Bates 231 and 232 ..... | 253 |
| 20 | NTSB Organizational Chart, Bates 001008 ..... | 256 |
| 21 | NTSB Draft Position Description, Director, Office of Marine Safety ..... | 258 |

- - -

2005, can you please describe me how the party system works for a marine accident between 1997 and 2005?

A. There is a difference in the party system between aviation and the other modes and marine for several reasons. One is the legislative authority of the agency. The agency in aviation, for example, is required to investigate every fatal commercial aviation accident that occurs in the United States.

That is not the case for Marine. Marine, the NTSB investigates marine accidents in conjunction with agreements with the Coast Guard. The Coast Guard has the primary responsibility in the United States for the investigation of marine accidents. Within their responsibility is a clause that allows the NTSB to investigate certain accidents.

Between 1997 and 2002, there was some significant disagreement between the NTSB and the Coast Guard on what those agreements meant, what that entry, NTSB's entry into the investigation meant. And I don't want to go off on a tangent on what ultimately became our new Memorandum of Understanding with the Coast Guard in 2002, because I want to get back to

most of the party representatives are well-known to us. And they know the NTSB and the process of the NTSB investigation because we have trained them in advance. That is not so dissimilar to marine.

The Coast Guard investigators that work on our accidents have done so in the past, and they generally understand the rules. In highway safety, it's the other end of the spectrum. The NTSB investigators are usually meeting up with people who have never been involved our investigations again.

And we find that it is a very different exercise because there is an educational and informational component to the party system that doesn't exist in some of the other modes. Our highway IICs and our highway managers must educate and inform and communicate the parties of not only the responsibilities and the advantages but how the rules of the investigation are conducted almost each and every time that they go to an accident.

The reason is because there are 43,000 deaths on the U.S. highways. We rarely go back to the same community in highway accident investigations, and

about that.

Q. Okay. And you said before that there's times where highway, you said that if highway safety becomes involved in an investigation, is there any discretion involved by highway safety in deciding to become involved in an investigation?

A. There's an enormous amount of discretion. In aviation, the statute says we will investigate or cause to be investigated every fatal aviation accident, civil or commercial. In marine safety there's a very established formula for the decision-making process on whether we would investigate or not.

It's a bright line score. It's part of the current MOU with the Coast Guard. In highway safety, however, it is each accident must be evaluated for its nature, the impact on the public confidence, the impact on safety in a national sense, can we make a difference by investigating this particular accident.

There's seven million accidents every year on the highways, three million injuries, 43,000 deaths, and less than 40 staff at the NTSB

Q. So it seems like that requires a lot of diplomacy by the director of OMS in order to get to the point where an -- where the OMS takes the lead in investigation of a marine accident.

A. I think that now that there's a bright line score and even before the bright line score there was a basic threshold. I think it does require some diplomacy by the marine director.

Q. I see. Are there any instances other than navigable waters not -- an accident not taking place in a navigable water in which the marine safety, the Office of Marine Safety has exclusive jurisdiction?

A. No. Over the Coast Guard?

Q. Yes.

A. No. I think that there is concurrent jurisdiction throughout. That is my understanding of the arrangement. When it's not, if it's on, you know, Lake Smith in the middle of Arkansas and doesn't lead to anywhere, there's no Coast Guard involvement. But otherwise, it is concurrent jurisdiction.

Q. What have it takes place outside of U.S. waters?

A. There is an IMO Treaty, International Maritime Organization Treaty regarding U.S. flagged or U.S. manufactured vessels. There are very few of those anymore that are applying the waterways of the world, very few U.S. flag vessels, quite a difference from 30 or 40 years ago. And the Coast Guard has primacy. They have the responsibility under the international treaty to investigate those accidents.

We have a similar international treaty, ICAO, the International Civil Aviation Organization Treaty in which that primacy falls to the NTSB. So for U.S. flagged, U.S. manufactured, U.S. operated aircraft that crash overseas, we have -- the NTSB has the primary responsibility of providing a technical representative for the investigation.

The state where the plane will crash, for example, will conduct the investigation most times, if they are capable. And the NTSB will provide through treaty the investigators to participate in that investigation. Often we find especially in places like Africa, that we are actually doing the investigation because the state where it involved just

Q. Yes. Explain that part of it.
A. It is Railroad Pipeline and Hazardous Materials is the most complicated office in the agency, I believe because it is a mixture of three different similar and wholly dissimilar disciplines.

For railroad accident investigations it is analogous to aviation. We know there are not that many railroads in the United States, but they are relatively large. We have working relationships and familiarity with the majority of the major railroads in the United States. And that includes the majority of the major Metropolitan Transit Authorities in the United States.

In the pipeline area, it is more analogous to probably the highway area. There is lots of miles of pipeline in the U.S. and lots of pipeline companies. And frequently our pipeline investigators are introducing themselves to the pipeline parties when they go to their investigations.

And then there is the third component of the rail pipeline hazardous materials, and that is the exclusive hazardous material part of that. Our

Q. Can you describe to me the work that's involved in the Annex 13?

A. It involves representational duties at ICAO meetings and representational duties in the development and modification of any clauses of Annex 13. Every three years ICAO holds -- ICAO is a subset of the United Nations. And they hold a general assembly in which they consider changes and alterations to the treaty essentially.

And ICAO also conducts audits of member states. And they do a number of other functions. And our responsibility when it comes to the United States is the accident investigation part of that.

Q. I see.

A. So that office director has that responsibility.

Q. Is there any similar sort of responsibility for international treaty-based work for the Office of Marine Safety?

A. There is, but it resides with the Coast Guard. There is an international maritime organization. I think we spoke about this earlier.

responsibilities were between 1997 and 2005?

A. One, I don't believe that Mr. Haueter was the deputy during that entire period, but I -- we do know who they were. But I think for the majority of the time he was probably the deputy. As the deputy, either Mr. Haueter or his predecessor was responsible to be a chief advisor to the director and operational manager for the office director.

Mr. Haueter was also responsible for the conduct of most major investigations. Aviation investigations involve above other modes involve far more people, far more press and far more interest than some of the other modes.

And there is an enormous volume difference in the work load of the major aviation accidents than the workload of a major marine or even a major highway accident. And he was responsible for the conduct of those major investigations and reporting that operational work to the director.

Q. So how does -- how did the duties and responsibilities, well, let's just see. He's the chief, Mr. Haueter was the chief advisor. He was the