operate -- he was the operational manager for investigation -- for personnel issues. He was responsible for the conduct of investigations.

And factors in that you assert are press and people and interest in these investigations. Besides those, what other responsibilities were his primary responsibilities between 1997 and 2005 or during his tenure as the Deputy Director?

MS. COHEN: Objection. Mischaracterization of testimony.

A. The responsibilities of Mr. Haueter as I said before were to be the deputy for the director, and to execute the primary duties of operational oversight for the major investigations and also other assignments provided by the director.

Q. Well, do you know what those other assignments are?

A. In detail, I do not.

Q. Okay. Which of -- when you say conduct of investigations, can you describe to me what Mr. Haueter's role was with regard to the conduct of investigations?

A. Day-to-day oversight of the execution of major accident investigations, aviation accident investigations. It is for major aviation accident investigations a much more complicated process flow. Similar steps than some of the other modes, but far more involvement and far more scrutiny by parties and outside interests.

Q. How is there more -- how is it a more complicated flow? How is there more interest in an airline accident than there is in, for example, an aviation accident where there's still a -- in a highway accident in which there's a fatality or a marine accident in which a ferry goes down or something like that?

A. It's a fairly common sense answer in that all you have to do is read the paper. A major airline accident is a enormous public confidence and public interest issue in the United States.

In the year the TWA 800 crashed off of East Moriches, Long Island, it was the biggest news story during the year, even though we had a presidential election. It caused more public interest and

congressional interest than the presidential election that year. That's how large that kind of activity becomes.

And the demands of the public, and we are a sunshine agency, therefore our activity is done in the open. And the interests of hundreds and thousands of individuals and parties are applied to major aviation accidents that are not seen by the -- in that volume by the other modes.

Q. So, I guess my question then is, sir, is explain to me just because there's press involved, how do the duties change when the press becomes involved?

A. The duties don't change particularly by their nature. They change mostly by their volume. The press are involved in most of the accident investigations, not all, but most of the accident investigations conducted by the agency, even small investigations that are conducted.

But the sheer of volume and persistence of political officials, the industry at large, the press, and the public to a major aviation accident is not comparable to the other modes.

Q. Are you aware whether Mr. Haueter has any assistance in dealing with the press when there's an investigation that the press has an interest in?

A. It is not exclusively the press that I am speaking of that has an interest. We do have a public affairs office. It is relatively small. There are only four individuals in it at the moment.

But the nature of the interested parties and the size and scope of the investigation are always larger. I'll give you a comparison. A major marine accident investigation may involve on average four or five of our investigators plus twenty or so party representatives from different organizations that we spoke of earlier, the Coast Guard, the carriers and so on. A major airline accident investigation may involve 150 to 200 different people involved in our investigation.

Q. Is there a difference though in the actual accident? It would seem that a marine accident involves a sunken ship, whereas an aviation accident involves a plane that crashes on generally on land or floats -- or floats or is recovered?

always taking calls on the weekend. You are not always taking calls at night in some of these modes. Aviation always is doing it; highway, mostly; rail, frequently; marine, not so frequently; and pipeline infrequently.

Q. I see. Do you need a break?

MS. COHEN: Yes. We'd like to take our lunch break now.

- - -

(Recessed for lunch at 1:13 p.m.)

(Reconvened at 2:04 p.m.)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman, we are back on the record. It's 2:05. During the break did you have any communications about your testimony with your counsel?

MS. COHEN: Objection. Attorney-client privilege. Don't answer that.

Q. I am not asking what your communication is, sir. I'm just asking whether you had any communications about your testimony?

A. No.

Q. Thank you. Could you please tell me, sir, whether Mr. Haueter during his tenure had the authority to hire and fire personnel?

A. Mr. Haueter as a supervisor.

Q. Yes.

A. Did have the authority to, within the parameters of the federal rules, to hire and attend to personnel matters.

Q. Okay. And what about -- how did the job of director of office of -- how did the requirements of the job of Director of Office and Marine Safety change in May 2005?

A. The requirements of the position in May of 2005, I am not sure that -- the requirements of the position didn't particularly change in May of 2005. They were relatively the same.

The requirements of the position changed with the advertisement of the position as an SES. And that happened earlier than May 2005. May 2005 was a selection of someone to fill that advertisement.

Q. I understand. Did the requirements of the actual job of Director of OMS change after

Miss Murtagh Cooke left the position?
A. Yes.
Q. Well, how did the requirements of the job change?
A. The nature of the fundamental job that we spoke about earlier, the accident investigation, supervision of the office and the other functions remained the same. But as an SES-level employee, the position was now responsible for broader agency-wide planning and program development activity.
Q. Can you --
A. The position became part of the executive resource board.
Q. What is the implication of you said a broader responsibility planning and what?
A. Process development for the agency.
Q. Can you explain how the responsibilities changed as far as planning and process development?
The senior executive service member, the position, the person who holds that now is responsible for participating in agency-wide planning, program development and decision-making for agency activities

responsibilities of the office.
Q. Those would be the same requirements of the job that Miss Murtagh Cooke got?
A. Yes.
Q. I see. What percentage of Mr. Spencer's work is evaluating planning and program development for the agency?
A. I would think probably ten to fifteen percent maybe.
Q. When you say maybe?
A. Roughly.
Q. Could it be less?
A. No. It's about 10 to 15 percent. The Executive Resources Board, executive committee meets every week. The Executive Resources Board meets every quarter.
We have over the last year put in play a comprehensive strategic plan, and the guidelines for operating the plans, the guidelines for performance management. We have established a number of policies and operational bulletins from the committee on performance management, so, 10 to 15 percent.

Q. And was Miss Murtagh Cooke ever involved in any of those duties or requirements during her tenure?
A. No.
Q. She was never consulted as to planning and program development for the agency?
A. She may have been asked for input, but not as a comprehensive part of a executive resource board. There are a number of organizational units, some at the 15 level leadership and some subordinate to that that are requested for input into different products and activities of the board.
Q. I see. And was Miss Murtagh Cooke's -- was her input sought during her tenure as director of OMS?
A. I believe so. I believe that she was requested to provide input for a number of things, the agency's annual report, as were all the officers. A strategic plan that was developed I think in 2000 asked for some input specific to her.
When we go through our reauthorization every several years, each of the modal office directors are asked for their input and ideas on authorization language, and same thing for

director is always involved and always aware of the development of their reports.

But once that report is complete at his level in draft, and the director is satisfied with the draft report, he then hands off the responsibility of taking that report to the board to the director.

Q. I see. Before you had stated that the volume of accidents in aviation, can you describe for me what you mean by volume? Do you mean quantity or the size of the accident?

A. Both.

Q. Okay.

A. Quantity -- since we are responsible for investigating every aviation fatality, we get notifications on every single accident, and we have to do something about it. And then the size of the major aviation accident reports is not comparable to the other modes.

Q. I see. But there's more people working on the project along the way?

A. Yes.

Q. Thank you. To what extent is -- you had

Marine, eligible for the SES, once the billets were distributed from OPM, from the Office of Personnel Management.

We had some difficulty obtaining -- the agency had some difficulty obtaining those additional billets. They just weren't approved by OPM. You can't just give them out.

And finally in 2002, one billet became available. And that billet was assigned to what at that time had been the combined Office of Rail Pipeline and Hazardous Material. Between '97 and 2002, and I think nearer 2000, maybe 2001, those two offices were put together. The railroad director left, was reassigned, and the two were combined.

Because the -- that office had the most complicated assignment and was the largest of the groups at the time, and the SES billet was assigned to the Office of Railroad Safety. Following 2002, the agency continued to try to gain additional SES billets from OPM and were unable to. But through transfer of some individuals from the SES to the SL, and the departure of other individuals who were occupying SES

Q. When you say it was understood, what was the understanding?
A. There's not a written document that says that. Fifteens are eligible for overtime in the federal system, considering that ceiling that I talked about. But at the NTSB the general understanding among the managers in conversations with the Managing Director and Chairman and various chairmen and various managing directors was that the office directors were not expected to apply for overtime.
Q. When you said there were -- the conversations, what conversations are you talking about?
A. Discussions about grade and positions.
Q. Are these discussions that you had?
A. Discussions that I had, yes.
Q. And who did you have -- which other GS-15 employees, management employees did you have discussions with about the unavailability of --
A. Frequently these discussions were held in groups. They included Miss Murtagh and many of the other 15-level employees including Mr. Chipkevich and

employees.

Q. And where is it determined that only supervisory employees are not entitled to regular overtime?

A. I don't believe that that's written anywhere. That was an understanding from the meetings that occurred.

Q. I see.

A. The OPM rules say essentially that employees at the GS level are eligible within the parameters of the overtime rules.

Q. And are you aware of any GS-15 level 8s or 9s that were -- that ever obtained regular overtime for report writing, budget or any other type of work over 40 hours?

A. I'm aware of GS-15 employees receiving true overtime. I am not aware of GS-15 employees, nonsupervisory employees receiving regular overtime, but it may have happened. And I'm not aware of GS-15 supervisory employees receiving either.

Q. Are you aware of any requests for it other than by Miss Murtagh Cooke?

have come forward and said -- and demonstrate that I am being given a job offer at a higher salary outside of the government. And the agency would then have had to decide that it was absolutely necessary for the government to retain her and, therefore, try to keep her by giving her a retention allowance.

Or, and this would not have applied to Miss Cooke, the skill for the position was so necessary to the government that we could not easily replace the person if they left. That does not happen very often, the second.

Q. What is it about Miss Murtagh Cooke's skills that are not unique enough to receive the retention bonus?

A. Generally the test is that if you can put out a job announcement and receive candidates that are equally qualified and equally capable of doing the position, then it is not so unique a skill that the government can't replace the person.

Q. And what about -- is that the only standard?

A. No, that plus leaving the government. If,

meritorious act to warrant the special act award?
A. What time frame?
Q. Between 2003 and 2005?
A. Yes. She didn't -- as far as I know, she did not perform such a discrete success or act to warrant the recommendation for a special act award. Okay.
Q. Okay. And the performance awards are only based on the evaluations?
A. The performance awards are based on the end of the year evaluations. Yes.
Q. I see. Does a level of performance -- a series of performance awards indicate that the person is -- can you describe to me between 1997 and 2005 whether Miss Murtagh Cooke received a series of performance awards?
A. Miss Murtagh Cooke did receive performance awards during that time period. I think the specific amounts probably have been provided to you. I can't recite them for you.
She received end-of-the-year performance ratings. And with those ratings came commensurate