awards, cash awards.
Q. So, and what about agency end-of-the-year awards, the agency-wide awards? Was Miss Murtagh Cooke eligible for those?
A. She was eligible for those, but again it was tradition that the office directors, if nominated for those awards, declined to participate.
Q. Where is this, when you say tradition?
A. It is -- I was nominated for the chairman's award one year. I asked that my name be withdrawn. Mr. Chipkevich was nominated for the award one year. He asked that his name be withdrawn. It was simply tradition.
I don't believe that Ms. Murtagh was nominated any year that I am aware of between 1997 and 2005, but traditionally the office directors would withdraw themselves from consideration.
Q. What year were you nominated, sir?
A. We have a record of it, but maybe 2001.
Q. And what year was Mr. Chipkevich nominated for?
A. 2003 maybe. I am not exactly sure of the

these positions.

And they began a process of requesting through OPM additional billets in the SES to assign to those positions.

Q. But why would OMS be the last of all the modal offices to receive a billet?

A. Because the Office of Railroad, Pipeline and Hazardous Material and the Office of Highway Safety were both larger in size. They were -- both had regional operations. The Office of Railroad, Pipeline and Hazardous Material had multimodal internal functions in addition to multimodal external functions.

And the Office of Highway Safety had original component and safety report and safety study component that was not prevalent in the Office of Marine Safety. Size, scope, the cascade for the agency was what I told you before. Aviation, for size and scope; rail pipeline, hazardous material; highway; marine.

- - -

(Discussion off the Record)

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------x

MARJORIE MURTAGH COOKE, :

Plaintiff, :
: Case No. 06-748C
vs. : Judge Thomas C.
: Wheeler
THE UNITED STATES, :
:
Defendant. :
:
:
--------------x

Deposition of JOHN S. SPENCER

Washington, D.C.

Wednesday, August 15, 2007

9:55 a.m.

Job No. 1-110022
Pages 1 - 255
Reported by: Paula J. Eastes

2

Deposition of JOHN S. SPENCER, held at the offices of:

THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Paula J. Eastes, Court Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF THE DEFENDANT:

LESLIE CAYER OHTA, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-2061

4

APPEARANCES

ON BEHALF OF THE DEFENDANT:

KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
Office of the General Counsel
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6084

ALSO PRESENT:
MARJORIE MURTAGH COOKE

CONTENTS

EXAMINATION OF JOHN S. SPENCER PAGE
By Mr. Lowinger 6

EXHIBITS

(Exhibits attached to the transcript.)

SPENCER DEPOSITION EXHIBITS PAGE
No. 1 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements State Issues Enhance Recreational Boating Safety 216
No. 2 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements Federal Issues Marine - Reduce Accidents and Incidents Caused by Human Fatigue 218
No. 3 MOU Between NTSB and United States Coast Guard Regarding Marine Accident Investigation 223
No. 4 Application of John S. Spencer 224
No. 5 Weekly Reports 225
No. 6 Position Description of John S. Spencer 232
No. 7 Notifications of Personnel Action 233
No. 8 NTSB Senior Executive Service Performance Plan and Appraisal 235
No. 9 SES Rating Sheet for John Spencer 247



PROCEEDINGS

JOHN S. SPENCER

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:

Q Good morning, sir.
My name is Brian Lowinger. I am an attorney for the Employment Law Group. We are representing Marjorie Murtagh Cooke in this action against the United States currently before the Court of Federal Claims.
Can you please state your name for the record?
A **John S. Spencer.**
**Do you want my middle name?**
Q Sure.
A **John Sherman Spencer.**
Q Thank you.
Spencer, can you spell Spencer for the Court Reporter?
A **S-P-E-N-C-E-R.**
Q Mr. Spencer, just a few preliminary issues before we start today.



Have you ever been deposed before?
A **No.**
Q Really it is like a question and answer period.
I mean, given your years of experience, I am sure it is no different than some of the other things you have done in your life.
I am just going to ask a series of questions of you today. I ask that you wait for me to finish the question and then you respond. I will try not to interrupt you as well.
A **Okay.**
Q The next part of it all is this isn't going to be videotaped. This is all stenographic. So, we ask that your answers be verbal. Head nods and head shakes, they don't translate on to the record really.
The next part is that if you are thinking yes or uh-huh, if you would answer yes or no, because sometimes uh-huh looks like yes and sometimes it looks like it could also mean no just depending on what was meant by it the way it gets on to the record.



Is that okay with you, sir?
A **Yes. I understand.**
Q Okay. Great.
I will be asking questions. Along the way your counsel, who is stepping in for Meredyth Cohen, Ms. Ohta, may assert some objections and that is perfectly normal. That is just part of the process. The judge will determine whether or not the objections are sustained or whether or not they are going to get into the record. I still ask that you respond. The only difference is if there is a claim of privilege and you are instructed not to respond, that is something different. We are not likely going to have that problem today.
Okay?
A **Okay.**
Q The next part is answering the questions. If you answer the question, I have assumed you heard it and understood it and are able to respond to it. So, if you don't understand any part of it, please just let me know and I will either have the Court Reporter read it back to you in case you didn't hear



A106

Some supervision, first level supervision.
Q I'm sorry, sir. What about supervision?
A The way we have been set up recently is I supervise the Deputy Director and the Deputy Director supervises the people who are in my division in what is called the MS-1 division.

I am responsible for representing the Agency in the marine arena, marine field, to the Coast Guard, other federal and international agencies, the public, commercial organizations and what not.

I am responsible for the morale of the office and complying with the directives of the Managing Director.

I am responsible for coordinating the work of the office with other offices of NTSB.

I write speeches for the Chairman and Board members.

I am an interface between the Board members and other management at NTSB with the industry and with the Coast Guard.

I review all correspondence and reports and do some of the writing myself.



I sit in the various planning meetings that we have associated with investigations, such as work planning meetings or report planning meetings.

I represent the Office Of Marine Safety at our Sunshine Meetings.

I participate in some committees or working groups.

I interface with my counterparts in other countries.

That is all I can think of off the top of my head. I might have left off some big ones, but that is my stream of consciousness.
Q Sure.

So this is what we have here. We have launch Go Teams, quality and timeliness of reports, budget, hiring staff, training staff, complying with NTSB administrative directives, supervision of your Deputy, representing the Agency as its marine representative to the U.S. Coast Guard and other federal and international agencies, commercial entities and the public, et cetera, morale of the office, directives of the Managing Director,



coordinating work with other offices at NTSB, drafting speeches for the Chairman and the Board members, interface between the Board members and the Coast Guard, review of all correspondence and reports, planning meetings and reports, representing the office at Sunshine Meetings, some committee and working groups and working with representing the Agency with counterparts in other countries.
A I also set priorities.
Q For what? For the office?
A For the office.

And I establish schedules.
Q Anything else?
A Probably. But that is all I can think of right now.
Q Describe to me which of these are the most important in your duties and responsibilities.
A I don't know how to answer that because they are all important at one time or another. You can't ignore any of those things. The primary purpose of the office is to investigate marine accidents and write reports.



Now, since I arrived the Managing Director has given me some assignments that I work on that are important to me because he wants them done.

I can't say that one is more important than another because if you omit something that is supposed to be done, it is a problem.
Q I understand, sir.

For example, the assignments from the Managing Director, what are they for?
A When I came here he gave me some assignments.
Q Okay.
A One assignment he gave me was to reduce the backlog in the office.
Q Okay.
A Another assignment was to get the reports out more quickly.
Q Okay.
A Another assignment was to restore a good working relationship with the Coast Guard.
Q Okay.
A Another was to give NTSB a greater presence

77

in the marine industry.
Q Okay.
A Another was to become more active in international activities.
Then the last one was to find a replacement for myself before I leave.
Q Are you leaving, sir?
A Not any time soon. I do have plans to leave at some point.
Q Which of these are the least important?
In other words, you don't really have it as day-to-day work, you don't follow it on a day-to-day basis. It is really something you only touch upon on an occasional basis.
MS. OHTA: Objection. Vague and ambiguous. I don't know if you are referring to initiatives that the Director gave him or to the areas of his responsibility that he previously identified.
THE WITNESS: Well, I don't think that that is a good question because one thing that is very important is launching Go Teams on accidents, but that happens infrequently. So, does that make it

78

unimportant? It is not because it is one of our primary functions.
So, getting back to what I said before, when you say least important, they are all important. There may be some things that I do that I don't have to do that I would consider perhaps least important. Maybe reviewing a draft three times instead of once. Okay?
I consider everything I do as important and my workload changes from day-to-day.
BY MR. LOWINGER:
Q You mentioned that you have a Deputy. Who is your Deputy?
A Chris Julius is my Deputy.
Q Is that a new position within the office?
A It is not really a position. It is more responsibility. He is detailed as my Deputy from the General Counsel's Office.
Q Has anyone else joined the office on a detail other than through hiring?
MS. OHTA: Objection. Vague and ambiguous. A detail and hiring are two distinct activities.

79

MR. LOWINGER: That is right.
MS. OHTA: Would you please rephrase the question?
BY MR. LOWINGER:
Q Did you understand the question, sir?
A Probably not. Why don't you go ahead and ask it again?
Q Aside from Mr. Julius, has anyone else been detailed to your office since you started as the Director of OMS?
A Yes.
Q Who?
A People who are in these executive development programs from other agencies, I have taken a number of them into the office to work on some projects.
Q How many people from other offices?
A Four I think.
Not other offices. They are from outside the Agency.
Q Do they come from the private sector or other government offices?

80

A Other government offices.
Q Which other government agencies?
A One was from the Army.
One was from the Navy. Maybe two were from the Navy.
I believe one was from the Coast Guard.
Q And what did they do?
A Different assignments that they could work on for the time they were there.
They would work on qualifications. Trying to develop the qualifications program for investigators is one.
Another one was looking at how we could improve the communication between investigators and writers.
Another one helped me in reorganizing the office.
I don't remember what the fourth one did.
Q How many launches have there been since you started your tenure as the Director of OMS?
A Let's see. Not too many.
(Witness writing.)

AFTERNOON SESSION
(1:15 p.m.)
JOHN S. SPENCER
having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. LOWINGER:
Q On the eight accidents that you have launched on, sir, how many people have you launched, NTSB employees have you launched, on each?
A On each one?
Q You have your list in front of you. Why don't you list the accidents and tell me how many people you launched.
A For each accident?
Q. Please.
A The Ethan Allen I don't know. That was my first one. I would have to go back and look that up. But it was a good size team.
Q Did you launch on that?
A No.
The Crown Princess was one person.



Q Was that you?
A No.
The New Delhi Express was one person.
Q Was that you?
A No.
Q Let me just ask you have you launched on any of these?
A No.
Q Thank you. I apologize for interrupting.
MS. OHTA: I'm sorry. Was the question have you launched any of these?
MR. LOWINGER: Have you launched on any of these?
MS. OHTA: Okay.
BY MR. LOWINGER:
Q Please go ahead, sir.
A New Delhi Express was one person.
Massachusetts was a full team. I don't recall how many.
Q What is a full team?
A Well, it varies with the accident. It could be four, five, three, six.



Q But it is anywhere from three to six?
A As a generalization I think you could say that, but it could be more than six.
And we are just talking about marine investigators, is that right, or are you talking about the entire NTSB party?
Q I believe the question was the entire NTSB party.
A Okay.
I don't determine the size of the launch of members and that sort of thing. I only have control over my own investigators.
Q Well, for the Massachusetts then how many marine investigators did you send?
A Well, I told you I don't remember. I would have to go back and look it up.
There was at least two.
Q At least two, but less than ten?
A Yes. Less than ten.
Q Was it less than seven?
A I don't know.
Q Have you ever had a launch with more than



seven?
A I don't believe so.
Q Have you ever had a launch with more than five?
A That I don't know.
Q Please go ahead, sir.
A The Empress of the North I believe there were six marine investigators on that one.
Q Okay.
A The Star Princess was one.
I'm sorry. Let's go back to the Crown Princess. That was two.
The Sidney Mae was one person.
The Athena 106 was at least three.
Q Was there more than six?
A No.
Q Somewhere between three and six?
A Yes.
Q Describe to me please, sir, your duties and responsibilities with regard to the press as it relates to an investigation.
A When there is a team on the scene I have

very little interaction with the press.
As the investigation progresses I may be called for a phone interview from the press, but it is rare.
After an investigation is completed I do get occasional calls from the press, which I take.
Also any press releases that go out involving a marine investigation are cleared by me.
Q When you say cleared, what do you mean by that, sir?
A As part of the review process before they go to the press I read them and comment on them, if necessary.
Q How many press releases has your office sent out during your tenure?
A We don't send any out. Public Affairs sends all the press releases out.
Q How many marine safety oriented press releases have been sent out that you have reviewed during your tenure?
A I couldn't tell you. I would say between 10 and 50, but I really don't have any idea.



Q Is that something that takes up a lot of your time?
A No.
Q Is it a small amount of your time?
A Yes.
Q Let's go down that list. I asked you which were most important. They are all important when they become due, but let me ask a question and you tell me.
Launch Go Teams, how much does that take of your time, sir?
A During a launch it probably takes about four-hours of my time.
Q What about quality and timeliness of reports?
A That takes a lot of my time. I would guess with every report we are talking about perhaps 40 hours of my time.
Q What about budget?
A In the course of a year perhaps 40 hours.
Q Has your budget grown, stayed the same or been reduced since you started at NTSB?
A It has been more or less the same.



Q More or less?
A Well, for example, I believe when I got there it was whatever budget existed before I got there and I don't know what that was.
With the following budget I think we were under a continuing resolution or something.
Then there was, I don't know. It has been about the same. I haven't received any increase.
Q Sure.
I know you said that you have never been deposed before. Just if you would, please don't look at counsel to see if they have any idea.
A Okay.
Q And I am not suggesting anything.
MS. OHTA: Excuse me.
I really object to that. I have not looked at him. I have been actually writing here. And the implication is that we were looking at each other for some untoward reason. That was really a totally unwarranted comment.
MR. LOWINGER: Actually while you were looking down he was looking at Ms. Silbaugh.



It is okay. I am just saying if you could just maintain focus with me.
It is okay. I am not suggesting that you did anything wrong and I am not suggesting that she did anything wrong. I am just asking that the deponent look toward me.
Thank you.
THE WITNESS: When I think I kind of look off into space.
BY MR. LOWINGER:
Q It is okay, sir.
What about hiring staff?
A We talked about that before and we haven't hired any since I have been there.
Q What about the whole application process? Have you gone through the whole application process for somebody, even though you may not have hired someone?
A Well, I consider the whole process including the hiring end of the thing.
With each position I would guess it takes upwards of 40 hours.

joint training program. And previously you also said that the Managing Director, who I believe at the time was Mr. Osterman, requested that you improve relations with the Coast Guard.
A Yes.
Q Can you describe for me why you have been asked to improve relations with the Coast Guard?
A My understanding is that our relationship with the Coast Guard before I was there was not very good.
Q And what about it was not good, sir?
A It appeared that the relationship between NTSB and the Coast Guard was adversarial. So, there was little cooperation and little communication.
Q Who at NTSB was an adversary to the Coast Guard?
A I don't know. I wasn't there.
Q Well, what is your understanding based upon what you have been told?
A I was just told to improve the relationship. So, I took it from there. I didn't bother to go back and figure out what was wrong.



Q Well, have you figured out what was wrong?
A Yes. There was a lack of trust between the two agencies.
Q What about NTSB did the Coast Guard not trust?
A Our motives. They felt that NTSB would take any opportunity to make the Coast Guard look bad.
Q Anything else?
A I can't think of anything else right now.
Q What examples have you been made aware of where NTSB's motive was to make the Coast Guard look bad?
A Well, I can't think of any specifics right now.
Q When you say you can't think of any specifics, are you saying you don't know or you don't remember?
A I don't remember. I know they exist. I would have to go back and look them up.
Q Is there any piece of information that I could give you that might help you remember it? If I showed you the MOU, would that help you remember?



A No. I think if you maybe showed me some reports that we had done.
Q Are you aware whether or not NTSB ever investigated the Coast Guard in its investigations?
A No. I am not.
Q What about representing NTSB and its marine related responsibilities to other federal agencies?
A Besides the Coast Guard?
Q Yes.
A And what do you mean by what about? What is your question?
Q Describe to me your work relating to representing NTSB in its marine responsibilities to other federal agencies.
A All right.
We did this with OSHA on the Athena 106 investigation.
We have spent considerable time in the last year with the U.S. Navy.
Those are the only agencies I can think of right now.
Q And did you spend a lot of time speaking



wing OSHA regarding the Athena?
A Not me personally, but my office did.
Q What about the U.S. Navy? What about your responsibilities related to the U.S. Navy?
A Well, my responsibilities are to apply the law and regulations concerning investigations. There was an accident involving a commercial vessel and a naval vessel. So, we were trying to get the cooperation of the Navy and it was very difficult and time-consuming.
Q I see.
Did you ever prevail on getting the cooperation?
A We are not finished yet. It is still going on.
Q Which accident is that, sir?
A This was the accident between the submarine Newport News and the -- don't ask me to spell this one -- the Japanese tanker Mogamigawa.
Q When did that accident occur?
A At the beginning of this year.
Q Did NTSB launch on that one?

A Well, I have to do some sort of a financial report. That is the only thing I can think of.
Q What is the financial report that you do, sir?
A Some report that one of our attorneys gives me and I fill it out on an annual basis. It basically is for me to say what my sources of income are.
Q Anything else that comes to your mind with regard to being a member of what is called the SES?
A Not as far as the government goes. No.
Q Okay.
What about travel? Have you been traveling as a representative of NTSB with regard to marine safety issues since you have come on board at NTSB?
A Yes.
Q Can you describe your travel, sir?
A I have traveled several times with the Chairman to accompany the Chairman when he wants to go someplace that he has an interest.
I have traveled to IMO meetings.
I have traveled to a couple of conferences, professional type conferences.



Last week I traveled with the Managing Director and one of the Board members to Miami to observe a mass evacuation exercise.
Q What is the role of NTSB at the IMO?
A Well, I don't believe NTSB has an official role, but I go as part of the U.S. delegation and what I do is advise the head of the delegation on NTSB positions on issues before the IMO that NTSB has an interest in.
Q What percentage of your work or how much time do you spend on IMO related issues?
A Three to four months a year.
Q Have you generated any reports for the IMO issued through the U.S. delegation?
A The only thing I have done is helped with the delegation memo that I believe goes to the Secretary of State on the parts of the meeting that I was participating in.
Q And with regard to counseling a delegate on NTSB related issues, have you had to write any reports related to that?
A No.



Q Just providing oral counsel?
A Right. Or if there is a U.S. paper, I may offer some comments on the paper. But it is basically advice to the U.S. delegation.
Q How many papers have you provided advice on?
MS. OHTA: In connection with the IMO?
MR. LOWINGER: Yes. Thank you.
THE WITNESS: All of the meetings that I have been to?
BY MR. LOWINGER:
Q Yes.
A I would say half a dozen.
Q How many IMO meetings have you been to as the Director of OMS?
A I have been to four or five.
Q What about notice of proposed rule makings? Have you provided any advice or any comments with regard to notice of proposed rule makings?
A Yes. I have.
Q Which notice of proposed rule makings have you provided advice on?



A We did one dealing with small passenger vessel stability.
We wrote one concerning proposed passenger weight.
I think there were others, but I don't remember what they were.
Q Do you know who were the agencies issuing proposed rules on the small passenger proposed and the passenger weight proposed rule makings?
A Yes. It was the Coast Guard.
Q How many times have you traveled with the Chairman?
A Four or five times.
Q Where have you traveled to with the Chairman?
A New York, Miami and Seattle.
Q Have you traveled to any of these more than once?
A With the Chairman?
Q Yes.
A I have traveled to New York twice with the Chairman.

or how I think the Board feels about it.
So, for example, the Ethan Allen, because it was the largest small passenger vessel accident we had, in memory anyway, became the top priority. And so when it came to trying to resolve conflicts in resources, I generally put them on the Ethan Allen to get that out quickly.
When I got to the Board there were several investigations that were still open and what I did was prioritize those and decided which ones I felt needed to come to the Board first and those were the ones we put most of our attention on to get them out.
So, that is what it is.
Q Is that something you do on a daily basis?
How often do you hold the meetings that you referred to?
A Well, they are not always meetings. I think about the priorities on a daily basis.
We only have to sit down and discuss those things when there is something new that comes up that might affect the priorities. For example, if some critical player gets sick for a while, how we are



going to handle that.
Q Is it a big part of your duties and responsibilities setting priorities?
A It is a big part as far as the impact on the office goes.
Q Is it something you spend a lot of time on?
A I would say so. I probably spend over five hours a week on that.
Q Are there any other factors in setting the priorities, including open investigations, the current issues that you are dealing with on investigations, resources available to do the work, additional work, contracting and the significance of issues?
A Yes. Input from the Managing Director and from the Board members.
Q Anything else?
A Not that I can think of.
Q What kind of input do you get from the Managing Director?
A As far as my work and priorities?
Q Yes.
A Very little unless I ask for it.



Q What about directives? Does he ever just give you directives?
A Not on the investigations. No.
Q What about outside other than investigations, sir?
A Yes. He might tell me to come to a meeting or something like that.
I don't think he singles me out for any directives. I think whatever directives he gives he gives to all the Directors pretty much across the board.
Q What did he say about reducing the backlog in the office?
A He just said that there was too much and it was taking too long to get reports out and what could I do to shorten it?
Q Anything else?
A About the backlog?
Q Yes.
A No.
Q Did you have meetings about the backlog with him?



A Yes. I did. We have regular meetings every three to four weeks and we go through all the ongoing work and where we are on it and what the key dates are.
Q Do you feel comfortable meeting with the Managing Director?
A Yes.
Q What did the Managing Director advise you with regard to enhancing or increasing the presence of the Office of Marine Safety in industry?
You had said that was something that he assigned to you.
A What I understood him to mean was that industry didn't particularly like us, they didn't particularly know what we did or who we were, and he knew that I had developed a lot of industry contacts in my prior jobs and that I was generally well-known and respected in the industry and he wanted me to use that to try to give us more credibility and more visibility.
Q And what have you done to do that, sir?
A Well, I have set up these trips with the