IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br>Defendant. | Case No. 06-748C<br>Judge Thomas C. Wheeler |

## PLAINTIFF MARJORIE MURTAGH-PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims ("RCFC"), Plaintiff, Marjorie Murtagh Cooke ("Plaintiff"), provides the following responses to Defendant, United States of America's ("USA"), First Set of Interrogatories to Plaintiff.

### INTRODUCTION APPLICABLE TO ALL RESPONSES

1. Any response contained herein is based on certain non-privileged information presently available to Plaintiff or her counsel. The response may not necessarily reflect information that is currently within the possession, custody or control of other persons or entities. The investigation and discovery of this action is ongoing, and Plaintiff reserves the right to modify, amend or supplement her responses in accordance with the Rules of the Court of Federal Claims.

2. To the extent that Defendant has failed to state the Interrogatories with the degree of clarity and specificity necessary to determine a proper scope of interrogatory and to identify information responsive thereto, Plaintiff reserves the right to modify, amend or supplement her

responses to these Interrogatories accordingly.

3. Plaintiff is responding to these Interrogatories on behalf of herself and is not responding on behalf of any individual, entity or organization other than Plaintiff.

4. The exact wording of the responses and certain information contained herein may be that of Plaintiff's counsel and does not necessarily purport to be that of Plaintiff.

5. Plaintiff's response to any of these Interrogatories is not an admission as to the truth of any factual claim or allegation made in that Interrogatory.

6. By responding to these Interrogatories, Plaintiff is not waiving any potential objection as to the admissibility of the information provided in any part of any response, and Plaintiff is hereby specifically reserving the right to raise any and all such objections to admissibility as are appropriate at trial or in any evidentiary hearing in this case.

## GENERAL OBJECTIONS

1. Plaintiff objects to the Interrogatories to the extent that the definitions and/or instructions set forth therein seek to impose requirements for production beyond those contained in the Rules of the Court of Federal Claims or other U.S. law.

2. Plaintiff objects to the Interrogatories to the extent that they seek information which is within the exclusive possession, custody or control of any individual, entity or organization other than Plaintiff.

3. Plaintiff objects to the Interrogatories to the extent that the information they seek is equally accessible and available to Defendant or already in its possession, or as a matter of public record.

4. Plaintiff objects to the Interrogatories to the extent that they are vague or ambiguous or fail to describe the information or documents sought with sufficient particularity to

allow for a meaningful response by Plaintiff.

5. Plaintiff objects to the Interrogatories to the extent that they fail to specify or limit the applicable time period.

6. Plaintiff objects to all interrogatories propounded by Defendant in which they request information, answers or materials that, contrary to the spirit and letter of Rule 33 of the Rules of the Court of Federal Claims, are not relevant to the issues in dispute in this litigation.

7. Plaintiff objects to all interrogatories propounded by Defendant in which they request information, answers or materials that, contrary to the spirit and letter of Rule 33 of the Rules of the Court of Federal Claims, are not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the forgoing, Plaintiff responds as follows:

## ANSWERS TO INTERROGATORIES

**Interrogatory No. 1**

Identify each and every person who provided information for or participated in the preparation of responses to these interrogatories, and for each person, identify the specific interrogatory for which he or she provided information and state whether he or she has personal knowledge of the information set forth in the response(s).

**Plaintiff's Answer to Interrogatory No. 1:** Plaintiff objects to this Request on the ground that asks for information protected by the attorney-client privilege and/or work product doctrine and for information that was prepared in anticipation of litigation. Subject to and without waiving this objection, Plaintiff responded to these interrogatories with the assistance of her counsel.

**Interrogatory No. 2**

Identify each and every fact you intend to use during a trial or dispositive motion hearing in your case that supports your contention that the NTSB violated the Equal Pay Act as alleged

in paragraph one of your complaint.

**<u>Plaintiff's Answer to Interrogatory No. 2:</u>** Plaintiff objects to this Interrogatory based on the general objections and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Further, discovery is not complete and the below response may not reflect all facts responsive to the Interrogatory. Subject to and without waiving this objection Plaintiff states the following facts:

In 1994, Plaintiff was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS"). Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status. The Director and Deputy Director of the Office of Surface Transportation Safety also had SES status.

Each surface office had similar responsibilities, with the exception of OMS, which had two additional responsibilities: conducting accident investigations involving military and commercial vessels, and conducting international accident investigations. The latter was similar to the additional responsibility handled by the Office of Aviation Safety. The Office of Aviation Safety had an additional senior level (SL) position to handle international investigations.

In 1997, as the result of a restructuring, Plaintiff was named the Director of OMS. In 1999 the Agency requested OPM authorize SES slots for all the Modal Office Directors. After the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of

ORPH. In 2000, when the NTSB was reviewing an available SES slot, the Managing Director, Dan Campbell ("Campbell") suggested to then Agency Chairman, James Hall ("Hall") that Chipkevich be given the SES slot. Campbell suggested that Chipkevich be given the SES slot because Chipkevich was the most senior of the Modal Office Directors and ran the most complex modal office. Hall agreed with Campbell's suggestion, and Chipkevich, the Director of ORPH, applied, interviewed, and was awarded SES status.

In 1999 and 2001 the Agency requested OPM authorize SES slots for OMS. Between 2000 and 2003 as additional SES slots became available; the agency used them to create new positions other than assigning or transferring one of them to OMS.

In early 2003, the NTSB was once again reviewing an available SES slot. The Agency's leadership, then Chairman Ellen Engleman-Conners ("Conners") and Campbell assigned this SES slot to Joe Osterman ("Osterman"), the Director of OHS. After Osterman was awarded the SES slot, Plaintiff became the only Director of the four modal safety offices without SES status.

Ostensibly, because Plaintiff's Director Position did not have SES status, Plaintiff was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director of OAS, Osterman and Chipkevich. Further, Plaintiff was paid significantly less than the Deputy Director of OAS, Thomas Haueter ("Haueter"), a SES member, and the Chief Advisor for International Aviation Affairs in OAS, Robert MacIntosh ("MacIntosh"), a Senior Level ("SL") status employee. Haueter and MacIntosh's duties were encompassed within those of Plaintiff's.

Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872, Thomas Haueter ("Haueter"), Deputy Director of OAS, received a salary of $129,800 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $121,583, Robert MacIntosh ("MacIntosh"), Chief Advisor for International Aviation Affairs in OAS

received a Senior Level salary of $130,000. Currently John Spencer ("Spencer"), the new OMS Director, who replaced Plaintiff, is paid at the SES level for performing equal work to that of Plaintiff.

In addition, in 2004, while Clark received a salary of $142,022 Osterman received a salary of $140,797, Chipkevich received a salary of $142,022, Haueter received a salary of $133, 800, Macintosh received a salary of $136,000 and Plaintiff received a salary of $126,963.

Ostensibly because Plaintiff's Director Position did not have SES status, Plaintiff was granted lower monetary awards than her male counterparts, Clark, Osterman, Chipkevich, Haueter, and MacIntosh.

Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Plaintiff received an award of $5,400. In addition, in 2004, while Clark received an award of $17,000, Osterman received an award of $9,500 and Chipkevich received an award of $16,000, Plaintiff received an award of $3,400. Haueter and MacIntosh also received larger awards than Plaintiff between 2003 and 2005. Specifically, in 2003, Haueter received an award of $10,035 and MacIntosh received an award of $7,370. In 2004, Haueter received an award of $9,000 and MacIntosh received an award of $ 7,530. In 2005, Haueter received an award of 12, 325 and MacIntosh received an award of $8,280.

The work that Plaintiff performed as the Director of OMS required the same skills, efforts, and responsibility as the work required of Clark in his position as Director of OAS, Chipkevich in his position as Director of ORPH and Osterman in his position as Director of OHS, as well as Haueter in his position as the Deputy Director of OAS, and MacIntosh as the Chief Advisor for International Aviation Affairs in OAS.

Plaintiff, in her position as Director of OMS, performed work equal to Clark in his position as Director of OAS, Chipkevich in his position as Director of ORPH and Osterman in his position as Director of OHS, as well as Haueter in his role as the Deputy Director of OAS, and MacIntosh as the Chief Advisor for International Aviation Affairs in OAS.

Plaintiff performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of ORPH and Osterman performed his work as Director of OHS. This is further buttressed by Plaintiff's exemplary career at NTSB, including promotions, performance awards, raises, and positive evaluations.

Due to this inequality, in April of 2004, Plaintiff met with Conners and reminded Conners that she was the only Director of the four modal investigation offices without SES status. Further, Plaintiff reminded Conners that the other three modal safety directors, all of whom are male, earned salaries much higher than hers and that she lacked SES status. Conners responded by telling Plaintiff that she recognized that there were even Deputy Directors with SES status, and that if the NTSB acquired another SES slot, the slot would be assigned to the Director of OMS. However, Conners also stated that when the OMS Director position received SES status, the position would be advertised and that Plaintiff would have to apply and compete for the position.

Plaintiff explained to Conners that her concern was not the SES status 'per se', but rather she was seeking equitable pay for the same work. Plaintiff suggested to Conners that she be allowed to receive overtime pay as one option for reducing the gap between her salary and that of the three male modal safety Directors. Plaintiff also explained that overtime could help reduce the potential gap in the calculation of her retirement pay. Conners replied that she was not aware if overtime was a possible solution, but told Plaintiff she would look into it.

After the meeting Plaintiff met with Lisa Love ("Love") from Human Resources. Love confirmed for Plaintiff that she could receive overtime pay; however she needed approval in advance.

According to Conners, she considered Plaintiff's request for overtime as well as "a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors" and she discussed this with either Dan Campbell or Lisa Love. Conners also stated that she did not recall whether she made a specific decision to deny Plaintiff overtime, "but I would have." (Conners Affidavit, which is included in the EEO Investigative File)

After meeting with Love, Plaintiff made several attempts to meet with Conners to seek her approval for overtime pay

Despite Plaintiff's efforts, Conners refused to meet with her to discuss this subject. Conners acknowledges that Plaintiff requested follow up meetings on several occasions, but claims she was either too busy to meet with Plaintiff or later felt it was inappropriate to meet during the OMS SES recruitment and selection process. (Conners Affidavit, which is included in the EEO Investigative File)

Thus, Plaintiff continued to work as Director of OMS, doing equal work to Clark, Osterman and Chipkevich, the other three Directors, and making significantly less money.

In July 2004, the NTSB advertised the OMS Director position with SES status. As instructed by Conners, Plaintiff applied for this position. Plaintiff was deemed qualified for an interview, but the advertisement was cancelled and she was not granted an interview.

In early 2005, the OMS Director position was re-advertised as having SES status. Plaintiff applied for this position, but she was not granted an interview. A person who previously was not deemed qualified in 2004, John Spencer ("Spencer"), was awarded the

position. The work performed by Spencer, requires the same responsibilities, skills, and efforts, and is performed under similar circumstances as Plaintiff.

In response to years of unequal pay for equal work to that of her male counterparts, and not being granted an interview for a position she held for eight years, Plaintiff filed a discrimination complaint with the NTSB EEO Director on February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.

In her complaint, Plaintiff alleged that she received unequal pay as the Director of OMS because of her gender. Plaintiff's discrimination complaint was investigated from August of 2005 through December of 2005.

In May, 2005, the new Managing Director, Osterman, notified Plaintiff of her non-selection for the Director of OMS position. Plaintiff noted that she had not been paid for the position during her tenure as Director of OMS. Osterman then offered her an SL position to compensate if she would submit bulleted responsibilities for a position description. NTSB has used SL positions in the past to compensate senior level employees for pay over the GS-15 salary level. In response, Plaintiff submitted the requested document. Osterman subsequently informed her that Conners, Rosenker, and Campbell would not permit him to use an SL position for her.

In June, 2005, the NTSB transferred Plaintiff to the Office of Safety Recommendations and Communication. In October 2005, the NTSB transferred Plaintiff to the Office of the Managing Director. In July, 2006, Plaintiff retired from the NTSB.

**Interrogatory No. 3**

Describe in detail each and every individual with whom you spoke about the NTSB's alleged violation of the Equal Pay Act. For each individual you identify, include in your response the date(s) you spoke with that individual, the substance of the conversation, and what, if any, remedy you requested.

**Plaintiff's Answer to Interrogatory No. 3:** Plaintiff objects to this Interrogatory based on the above general objections and Plaintiff objects to this Interrogatory on the grounds that it is overbroad unduly vague and burdensome and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Specifically, the question is not limited to employees of NTSB, is not limited by time, including after Plaintiff was transferred out of OMS.

Subject to and without waiving any specific or general objection, Plaintiff incorporates her response to Interrogatory 2 and Plaintiff further states that she met with Engleman Conners and David Clark in April of 2004 to discuss the disparity in pay between her and her male counterparts. Conners said that when the NTSB received another SES slot it would go to OMS but Plaintiff would have to re-apply. Plaintiff then asked if she could earn overtime to close the disparity. Conners stated that she wasn't sure but she would follow up. Shortly after Plaintiff's meeting with Conners, Plaintiff met with the Director of Human Resources, Love, and her Deputy Director, Collette Magwood ("Magwood"), to ascertain her eligibility for overtime pay in lieu of SES status. They informed Plaintiff that she would be eligible for overtime but Conners would have to approve the request. Plaintiff made several more attempts to meet with Conners but Conners refused to meet with Plaintiff.

Plaintiff spoke with Campbell on several occasions prior to 2004 to discuss the inequity of her pay situation. During one such meeting with Campbell and Osterman, Osterman raised the issue of pay for doing the same job as Clark and Chipkevitch. Campbell said that NTSB was requesting SES positions. Osterman stated he didn't care about being an SES, it was the money he was concerned with. Plaintiff concurred with Osterman. Campbell indicated he understood.

During the advertisement period for the SES-OHS Director position Plaintiff met with Campbell to remind him that she would now be the only Modal Director without SES status and

thus without equitable pay. Campbell responded that he did not know when an SES for the OMS position would be advertised, but he "had to do this for Joe".

At least one more meeting occurred between Plaintiff and Campbell during which Plaintiff raised the issue of being paid overtime given the excessive hours she was working to compensate for a limited staff. Campbell stated that this extra work time was part of the 'privilege' of being a manager, and if she wanted to take a day off now and again he would 'look the other way'. Plaintiff pointed out that this would not serve any purpose given that it would simply serve to delay her office work products. Campbell indicated he understood.

Plaintiff met with EEO Director, Fara Guest ("Guest") on multiple occasions in the 2003 – 2004 time periods during which the inequity in her pay structure was discussed. Also Plaintiff met with HR Director, Love and Magwood on multiple occasions to discuss the inequity in pay in her position as Director of OMS.

Plaintiff spoke with the NTSB EEO Director on or about January 5, 2005 and on February 7, 2005 when she filed her formal complaint and on multiple occasions thereafter to discuss the complaint and the process.

Plaintiff also spoke with EEO Counselor, Chester Fischer ("Fischer") and EEO Investigator, Paul Greenberg ("Greenberg"), the dates and details of which are documented in the Report of Investigation, which was produced by Defendant.

Plaintiff also spoke with Osterman in May of 2005 about the disparity that existed between her and her male comparators after he became managing director. Plaintiff attempted to respond to Osterman's offer of SL status to equalize her pay in lieu of SES status. Osterman subsequently informed her that Conners, Rosenker, and Campbell would not permit him to use an SL position for her.

Plaintiff reserves the right to modify, amend or supplement her responses to this

Interrogatory accordingly.

**Interrogatory No. 4**

Identify each and every individual who can support your contention that the NTSB's actions violated the Equal Pay Act. For each individual identified, include in your response the substance of that individual's knowledge, when they gained the substance of their knowledge, and how they gained the substance of their knowledge.

**Plaintiff's Answer to Interrogatory No. 4:** Plaintiff objects to this Interrogatory based on the above general objections and Plaintiff objects to this Interrogatory on the grounds that it is overbroad unduly vague and burdensome and calls for information that is protected by the attorney-client privilege and/or work product doctrine, and that was prepared in anticipation of litigation. Further, the question is not limited to employees of NTSB, is not limited by time, including after Plaintiff was transferred out of her position as the Director of OMS. Moreover, it is unclear how Plaintiff should know how and when a person gained knowledge of the violation of the Equal Pay Act. Subject to and without waiving the aforementioned objections, Plaintiff states that the following individuals, can support her contention that the NTSB's actions violated the Equal Pay Act:

- Dan Campbell: As Managing Director from 1999 to 2005 he knew the skills, effort and responsibility for each of the Modal Directors were equal. He requested SES slots for all the Modal Office Directors in 1999 and 2001. As Managing Director he was consulted by each Chairman throughout his tenure regarding the pay and compensation of each of his Modal Office Directors as well as the assignment of SES slots as they became available. Plaintiff also incorporates her response to Interrogatory No. 3. 3023 Miller Heights Rd Oakton, VA 22124
- Joe Osterman: As Director of OHS, Osterman's skills, efforts and responsibilities were the same as Plaintiff's, and he performed his duties under similar circumstances as

Plaintiff. Osterman was aware of the pay and compensation disparities for SES and GS employees. Osterman, as Managing Director, stated to Plaintiff that she had not been treated fairly; not just the inequality in pay but in withholding staff. Plaintiff also incorporates her response to Interrogatory No. 3. Mr. Osterman was also a member of the Executive Review Board which discussed and advised the Managing Director on SES slots.

- Chester Fischer: NTSB employee. Fischer prepared the Comparison Chart of Core Functions of Office Director Positions and Comparison Chart of Average Compensation of Office Modal Directors that is included in the EEOC Investigation Report produced by Defendant, and conducted interviews as part of the initial EEOC complaint review process. Mr. Fischer obtained his knowledge of comparability of skills, duties, and responsibilities and the similar conditions as an employee of NTSB.
- Fara Guest: NTSB EEO Director. Plaintiff spoke with Guest about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities. Plaintiff also incorporates her response to Interrogatory No. 6.
- Paul Greenberg: NTSB EEO Investigator. Plaintiff spoke with Greenberg about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- John Clark: NTSB employee. As a former Director of OAS, his skills, efforts and responsibilities were the same as Plaintiff's. As a member of the SES and a modal office director, He was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors. Plaintiff also incorporates her response to Interrogatory No. 6
- Robert Chipkevitch: NTSB employee. As Director, ORPH, his skills, efforts and

responsibilities were the same as Plaintiff's. He was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors. Mr. Chipkevitch was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots. Mr. Chipkevich was also a member of the Executive Review Board's Ad Hoc Panels in 2004 and 2005 for the OMS position

- Thomas Haueter: NTSB, Director of the Office of Aviation Safety. As Director, OAS, his skills, efforts and responsibilities were the same as Plaintiff's. He was aware of the pay and compensation disparities for SES and GS Modal Office Directors
- Elaine Weinstein: Director, Office of Safety Recommendations and Accomplishments. Ms. Weinstein was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors, as well as their duties, efforts, responsibilities, and the conditions under which each comparator performs them. Elaine Weinstein was also a member of the Executive Review Board which discusses and advised the Managing Director on SES slots. Ms. Weinstein was also a member of the Executive Review Board's Ad Hoc Panels in 2004 and 2005 for the OMS position.
- Vernon Ellingstad: NTSB, Director, Office of Research and Engineering. Mr. Ellingstad was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors, as well as their duties, efforts, responsibilities, and the conditions under which each comparator performs them. Mr. Ellingstad was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots.
- Ron Battocchi: 5900 Fourth Road North, Arlington, VA 22203. As Managing Director and as General Counsel, he was aware that each of the Modal Directors' responsibilities and authorities were comparable. In particular as GC, he was aware that the unique

authority to determine Probable Cause was delegated by the Board only to the Modal Directors. Neither the Chairman nor the Managing Director, nor any other executive at the agency was granted this exceptional delegated authority. He was aware that Plaintiff was being paid and compensated less than her male counterparts. Mr. Battochi was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots, and a member of the 2004 ERB Ad Hoc Panel.

- John Spencer: NTSB, Director of the Office of Marine Safety. Verified that his (Incumbent John Spencer) Position Description MS321519, which states Pay Plan Series and Grade as ES340 is identical to Plaintiff's Position Description MS321519 which states Pay Plan Series and Grade as GS-15.
- Lisa Love: NTSB Director of Human Resources. Plaintiff spoke with Love about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Colette Magwood- (301) 713-6364. Colette.Magwood@noaa.gov. Former Assistant Director of Human Resources. Plaintiff spoke with Magwood about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Carol Carmody – Telephone number: (202) 686-5579. NTSB Board member who was aware of the disparity in pay between Plaintiff and her male counterparts. Carmody told Plaintiff that she always thought or suspected that Campbell treated her differently.
- Emily Carroll – NTSB human resources employee responsible for processing pay and awards. Love spoke with her regarding overtime.

- Ellen Engleman Conners- 445 12th Street SW, Washington, DC 20554. Former Chairman. She was aware of both the pay and award disparities between Plaintiff and her male counterparts, as well as the skills, efforts, duties, and responsibilities of Osterman, Chipkevich, Clark, Haueter, and MacIntosh. Plaintiff states see response to Interrogatory No. 1-3, and 6.
- David Clark- Plaintiff states see response to Interrogatory No. 1-3, and 6. Believed to work for the White House.
- Mark Rosenker – NTSB, Chairman. He was aware of both the pay and award disparities between Plaintiff and her male counterparts. Plaintiff also incorporates her response to Interrogatory No. 1, 3, and 6.
- Gary Halbert – NTSB, General Counsel. Plaintiff spoke with Halbert about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities, and the conditions under which the work was performed.
- Karen Lanier – NTSB, Deputy General Counsel. Plaintiff spoke with Lanier about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Denise D'Avella – NTSB, counsel. Plaintiff spoke with D'Avella about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Steve Goldberg – As Chief Financial Officer he was aware of both pay and award disparities between Plaintiff and her male counterparts. He was also responsible for responding to external audits of the agency.

Plaintiff reserves the right to modify, amend or supplement her responses to this

Interrogatory accordingly.

**Interrogatory No. 5**

Identify any and all "employees who were of the opposite sex, worked in the same 'establishment' as Plaintiff, performed work that was equal to the work performed by Plaintiff, and retained positions that required equal skill, effort, responsibility and was performed under similar conditions as compared to Plaintiff" as alleged in paragraph 48 of your complaint. For each employee, provide his name, position title, grade and series of the position.

**Plaintiff's Answer to Interrogatory No. 5:** P Plaintiff objects to this Interrogatory based on the above general objections and as it is vague and burdensome. Subject to and without waiving the aforementioned objections, Plaintiff incorporates her response to Interrogatory 2. Plaintiff further states that the following individuals performed equal work to that of Plaintiff which required equal skill, effort and responsibility, and under similar working conditions: Robert Chipkevich, Director, ORPH, ES-340;

- Joseph Osterman, Director, OHS, ES-340;
- John Clark, Director, OAS, ES-340;
- John Spencer, Director, OMS, ES-340;
- Thomas Haueter, Director, OAS, ES-340,
- Robert MacIntosh, OAS, SL 1801.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 6**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of how you became aware that the employee was performing work that was equal to the work performed by you and that the employee's position required equal skill, effort, responsibility and was performed under similar conditions as compared to you but was compensated at a higher rate of pay.

**<u>Plaintiff's Answer to Interrogatory No. 6:</u>**

Subject to and without waiving the General Objections above, Plaintiff states that the responsibilities and functions are equal and are described in 49 C.F.R. § 800.2, and 49 C.F.R. § 800.25. The Agency routinely describes these functions in their annual budget submissions to OMB and the Congress.

Those of the Office of Marine Safety are most similar to those of the Office of Aviation Safety as they both have additional responsibilities related to international accident investigations as well as investigations of public/non-public accidents. The other modal offices do not have these additional responsibilities.

Plaintiff worked as the Director of OMS from 1994 through May 2005. During that time, Plaintiff regularly attended meetings with the Managing Director, other Directors of the modal offices, as well as Haueter, generally when Clark was not present. During the meetings, the Directors, Haueter, where applicable, regularly disclosed their work, including accident launches, investigations, report preparation, report production, work with Board members, the Chairman, other offices at NTSB, Congress, agencies, international organizations, trade organizations, private industry, etc., and it all matched with her duties, efforts, responsibilities, skills, and the conditions under which they were performed. Moreover, during these and other meetings, the Directors of the modal offices and Haueter, where applicable, also discussed other issues, relating to human resources, budgeting, training, etc.

Plaintiff also learned of the comparability of her work with that of her comparators through Board hearings, seminars, agency reports, third party reports that have been submitted with Plaintiff's initial disclosures.

Plaintiff states that a comparison was also conducted of the compensation of Modal

Office Directors for 2003 and 2004 as part of the EEOC Investigation Report. The comparison shows that the three male Modal Office Directors received greater compensation during both of these years.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 7**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar work to you that the employee performed and the time period that employee performed the same or similar work you describe.

**Plaintiff's Answer to Interrogatory No. 7:**

Plaintiff objects to this Interrogatory based on the general objections, and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation.

Subject to and without waiving any objection Plaintiff states that the responsibilities and functions are equal for each of the Modal Office Directors and are described in Title 49 of the Code of Federal Regulations, 49 CFR, Volume 5, Chapter VIII (National Transportation Safety Board) Part 800, Organization and Functions of the Board and Delegations of Authority, which is taken from the Independent Safety Board Act of 1974, as amended, (the Act). Plaintiff incorporates her response to Interrogatories 1, 6 and 10 herein.

Further, Plaintiff states that although the incumbents and position descriptions for Modal Office Directors have changed over the course of this complaint, they are all comparable and are hereby incorporated by reference. See EEOC Investigation Report produced by Defendant. Exhibits B1d, B1e, F8a, F8b, F8d and F8e. Also see Bates #'s 000753 through 000758, #'s 000899 through 00094, #'s 000766 through 000771

Incumbents: Osterman, Clark, Haueter, MacIntosh, Chipkevich all were tenured as

Directors, a deputy, or advisor between 2003 and 2005. Spencer began his tenure in 2005.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 8**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar skill(s) required for that employee's position as compared to the skill(s) required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 8:** Plaintiff objects to this Interrogatory based on the general objections above and on the grounds that it is overbroad, unduly vague and burdensome. Subject to and without waiving the objections, Plaintiff states that the skills for OAS, OMS, ORPH and OHS were all similar. Those skills include but are not limited to technical expertise in their transportation mode; knowledge of, and expertise in, accident investigation processes and procedures from the investigation stage through report completion, leadership and supervisory skills; logic and analytical process skills; a fundamental knowledge of their respective modal industries; the ability to communicate both written and orally and to coordinate and collaborate with other professionals both internally within the NTSB and externally as part of the investigations or other advocacy work for each respective office.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 9**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar effort(s) required for that employee's position as compared to the effort(s) required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 9:**