000001

# NATIONAL TRANSPORTATION SAFETY BOARD

## REPORT OF INVESTIGATION

## I. DESCRIPTION OF COMPLAINT

| | |
|---|---|
| Name of Complainant: | Marjorie M. Murtagh<br>Case Number NTSB-2005-02 |
| Title and Grade of Complainant's Position: | Director, Office of Marine Safety<br>GS-1801-15/10 |
| Name and Location of Agency and Unit Involved in Complaint: | Office of Marine Safety<br>National Transportation Safety Board |
| Date of Alleged Discrimination: | January 28, 2005 |
| Kind of Discrimination Alleged: | Sex |
| Nature of Action, Decision, or Condition Giving Rise to Complaint: | Pay discrimination; unequal employment conditions |

## II. DESCRIPTION OF INVESTIGATION

| | |
|---|---|
| Identity of Investigator: | Paul Greenberg<br>DSZ<br>1730 N. Lynn Street, Suite 601<br>Arlington, Virginia 22209 |
| Date Report of Investigation Submitted to Agency: | December 6, 2005 |
| Place of Investigation: | Washington, DC |
| Dates of Investigation: | August 26, 2005 to December 1, 2005 |
| Method of Investigation: | On-site Interviews |

A152

000002

## III. DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

Complainant alleges she was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she has received less compensation than the compensation received by similarly situated male Office Directors. Corning Glass Works v. Brennan, 417 U.S. 188 (1974); Goodrich v. International Brotherhood of Electrical Workers, 815 F.2d 1519 (D.C. Cir. 1987).

Complainant also alleges she was treated disparately based upon sex when on January 3, 2005, she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

## IV. SUMMARY

*The pay disparity issue*

From 1994 until 2005, Complainant (female) served as the head of the NTSB's Office of Marine Safety (OMS). The position was classified and paid as a GS-15 job throughout this period (Exhibit F2).

Between 1994 and 1997/98, OMS was a unit within NTSB's Office of Surface Transportation Safety, and Complainant's title was Chief. As part of a restructuring in 1997/98, the Office of Surface Transportation Safety was divided into four separate Offices: Highway Safety (OHS), Railroad Safety, Marine Safety, and Pipeline and Hazardous Materials Safety. Each Modal Office had a Director, initially paid at the GS-15 level (Exhibits F2, F3). Throughout this period, NTSB's Office of Aviation Safety existed as a separate unit (Exhibit F3).

Dan Campbell (male) served as NTSB's Managing Director (an SES position) from 2000 until 2005, and was Complainant's immediate superior during this period. According to Mr. Campbell, the position of Director of the pre-1998 Office of Surface Transportation Safety was classified as an SES job, and there may have been one other SES slot within the OST structure. When OST was divided – initially into four surface Modal Offices – NTSB made a request to the Office of Personnel Management (OPM) for additional SES slots so that each of the surface Modal Office Directors could be classified and paid at the SES level. However, OPM denied NTSB's request. As a result, the Agency did not have SES positions available to classify the surface Modal Office Directors at the SES level, and each of the four Directors were classified and paid at the GS-15 level. The persons filling these four positions were Joe Osterman (Highway Safety)(male), Bob Lauby (Railroad Safety)(male), Bob Chipkevich (Pipeline and Hazardous Materials Safety)(male), and Complainant Marjorie Murtagh (Marine Safety)(female). Later, the Railroad Safety and Pipeline and Hazardous Materials

A153

000003

Safety Offices were merged to form the Office of Railroad, Pipeline and Hazardous Materials Safety (RPH) (Exhibit F3).

Sometime after 2000, an SES employee at the NTSB retired and an SES slot therefore became available to the Agency. Mr. Campbell recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of Director, Office of Railroad, Pipeline and Hazardous Materials Safety (RPH). This position was occupied by Bob Chipkevich. Mr. Campbell explains he made this recommendation because Mr. Chipkevich was the most senior of the surface Modal Office Directors and because RPH was the most complex of the three surface Modal Offices. Although Chairman Hall initially was inclined to assign the SES slot to the Director of Highway Safety position because of its greater visibility, Mr. Campbell explains Chairman Hall ultimately accepted the recommendation and the RPH position became an SES job (Exhibit F3).

Around 2003, an SES position was eliminated at the NTSB Academy after the then-office holder voluntarily left the Agency, which made an additional SES slot available. NTSB leadership assigned this SES slot to the position of Director, Office of Highway Safety, which was encumbered by Joe Osterman. In 2004, NTSB received authorization from OPM for an addition Senior Executive Service position, which was assigned to the Director, Office of Marine Safety job. Mr. Campbell notes it always was the Agency's goal to elevate all the surface Modal Office Directors to the SES level, and if OPM had authorized enough SES slots when requested after the 1997/98 reorganization, all the positions would have been reclassified and the Director positions advertised at the SES level. However, because OPM did not authorize the requested SES slots, the process took place gradually both by gaining new slots from OPM and by reassigning slots from elsewhere within the NTSB (Exhibit F3).

Complainant states the authority, responsibilities and functions of the Modal Office Directors are all very similar and are described in the Code of Federal Regulations. Position Descriptions for the various Director jobs are included as attachments to Complainant's affidavit, Exhibit F2. In Complainant's view, the responsibilities for the Marine Safety and Aviation Safety Directors are most similar because both Offices have duties related to international accident investigations as well as investigations of both public and non-public accidents. As the Director of OMS, Complainant was responsible for initiating and overseeing the investigations of marine accidents, major and non-major (field investigations and incidents), domestic and international, those involving public and non-public vessels, as well as those involving claims of government malfeasance and Special Investigation reports. It was also her responsibility to oversee the factual documentation, analysis, development and preparation of detailed reports, including the drafting of conclusions, probable cause and recommendations. She notes that while the Board itself has ultimate authority to determine probable cause in transportation accidents, since 1998 the Board has delegated this authority to the Modal Office Directors when they issue the accident report as a "Brief Report of Accident." Complainant states that as OMS Director she also was responsible for preparing responses to proposed marine safety rulemakings and requests for technical support,

000004

both internal and external, including the technical details for development of contracts issued by the NTSB (Exhibit F2).

Complainant believes pay classifications, pay rates and awards for Office Directors are determined by the NTSB Chairman, in consultation with the Managing Director. Between March 2003 and March 2005 the NTSB Chairman was Ellen Engleman Conners (female). Dan Campbell was the Managing Director during this period. *Id.*

Complainant states she met with Chairman Engleman Conners in April 2004 to discuss concerns about her compensation. She reminded Chairman Engleman Conners that she (Complainant) was being paid as a GS-15, and therefore was not receiving pay and awards comparable to her male counterparts who were NTSB Office Directors, all of whom were male. In addition, Complainant noted there even were some Deputy Directors at the NTSB who were classified and paid as SES members. Complainant indicated she wanted to find an equitable way to resolve this issue of pay disparity. According to Complainant, Chairman Engleman Conners emphasized the Agency was working hard to get an additional SES slot approved, which would be assigned to the OMS Director position; however, if the slot was granted, Chairman Engleman Conners noted the position would need to advertised and competed at the SES level. *Id.*

Complainant indicates she made it clear to Chairman Engleman Conners that her primary concern was to be compensated at the same level as the other Office Directors, rather than receive the SES classification *per se*. Complainant suggested that greater parity would be achieved if the Agency paid her (Complainant) overtime. Complainant noted the overtime payment would help close the pay gap between herself and the male Office Directors, and also would be helpful toward achieving her "high three" salary levels for calculating pension benefits. According to Complainant, Chairman Engleman Conners expressed doubts that overtime pay was possible, but committed to exploring the issue with Human Resources and she would consider it. Complainant states she had no further meetings about compensation with Chairman Engleman Conners after April 2004, and that she was not granted overtime pay nor did she receive bonuses comparable to the male Office Directors. Further, Chairman Engleman Conners did not respond to further attempts by Complainant to meet for further discussions about pay parity. *Id.*

Separately, Complainant states she spoke with Human Resources Director Lisa Love (female) about the overtime question. Complainant states Ms. Love advised her there were no OPM barriers to paying Complainant overtime, but the Chairman would need to approve such overtime. *Id.*

Complainant notes the substantial disparities between her compensation and that of the other [male] Office Directors, and alleges the pay disparities extend back at least seven years. She notes the Director, Office of Aviation Safety (the position she alleges is most comparable to her own) and the Director, Office of Railroad, Pipeline and Hazardous Materials Safety received annual pay more than $20,000 greater than she received, and triple the amount of bonus pay given her. In addition, even the Office of Highway Safety

A155

000005

Director – also a GS-15 position until 2004 – was paid $12,000 more than a GS-15 in 2003. The OHS Director received about $14,000 more pay in 2003 than Complainant. *Id.*

Complainant states she has received exceptional performance evaluations throughout her tenure with the Agency, and most recently received an Outstanding rating from Managing Director Campbell and the reviewing official, Chairman Engleman Conners. In Complainant's view, the positions of the Modal Office Directors are comparable and she (Complainant) has successfully performed her work as the OMS Director. In Complainant's view, the only explanation for the lower level of compensation she has received is her gender. *Id.*

Complainant disputes the Agency's claim that Complainant's classification and pay were not elevated to the SES level because of a lack of SES slots. She notes that even without changing the classification of the OMS position, greater pay parity could have been achieved through overtime or bonuses. Complainant believes the Agency deliberately chose not to use these tools. Further, she asserts the Agency has received additional SES slots since 1998 but simply chose not to assign one of them to the OMS Director job. She notes the position of Deputy Director of the Office of Research and Engineering – an SES position – was advertised and filled at least three times since 1998. The persons hired into the position were all male. When the Deputy Directors were reassigned to new positions, they retained their pay in accordance with federal requirements. *Id.*

Complainant concedes that OMS was a smaller office than the other Modal Offices, but asserts her job function was equal to that of the other Modal Directors and merited equal pay. Further, she argues her Office had fewer staff members in part because the Agency was depriving her of staff resources needed to do her job (*see "denial of authority to fill vacant positions issue"* discussion, *infra*). Moreover, she notes that the classification of a position as eligible for SES pay is based on duties, level of responsibility and function, not on the number of staff supervised. *Id.*

The OMS Director position was advertised as an SES position early in 2005. Complainant applied for the position but was not among the candidates interviewed. Another candidate, John Spencer (male) was hired into the OMS Director position at the SES level. *Id.*

The statements of three management witnesses – Chairman Engleman Conners, Managing Director Campbell, and then-OHS Director Joseph Osterman[1] (male) – generally concur with the facts provided by Complainant regarding pay classification history and compensation. However, they uniformly deny Complainant's lower compensation (compared with other [male] Office Directors) was the result of gender-based pay discrimination, asserting the order for elevating the surface Modal Office Directors to the SES level – RPH first, OHS second, and OMS third – was justifiable

---

1 Joe Osterman succeeded Dan Campbell as NTSB Managing Director in March 2005.

A156

000006

based on the size and responsibilities of the respective organization units. *See* Exhibits F3, F4 & F5.

While these Agency managers acknowledge there are similarities in the overall duties of the different Office Directors, each suggest there also are significant differences that justified the decision to make the OMS job the last Office Director position to be upgraded to SES classification and pay. Mr. Campbell notes that the RPH Director runs a larger organization than OMS and must be conversant in multiple disciplines. Similarly, the OHS Director runs a larger unit and has a much higher-profile job because of the great public interest in highway safety. He notes by comparison that NTSB shares jurisdiction for investigating commercial maritime activities with the U.S. Coast Guard, and that marine accidents are the one transportation mode where the NTSB is not the primary federal investigative authority. As a consequence, NTSB has a reduced ability to have significant effect on marine safety except for promoting better safety practices in the recreational boating area (Exhibit F3).

Mr. Campbell also disputes Complainant's claim that the OMS Director job is closely comparable to the Director, Office of Aviation Safety. He states Aviation Safety is at the core of the NTSB's mission, both from a budgetary standpoint as well as public recognition. Further, the number of times the Aviation Safety Office is called upon to perform an investigation is dramatically higher than OMS. He states OMS warranted a Director at the SES level, but that SES slots are a scarce resource and it made sense for OMS to be the last Modal Office to be upgraded. He does not recall Complainant complaining to him about when the OMS Director job would be reclassified as SES, nor did Complainant raise compensation issues with him. *Id.*

Although Mr. Campbell acknowledges OMS was the last of the Modal Office Director jobs to be upgraded to SES, he notes there are other SES positions at the NTSB that have been occupied by females. He notes there were at one time two female SES employees working at the NTSB Academy, although that number has been reduced to one, Director Julie Beal. The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female, as well as the Director of the Office of Administration, Lola Ward. These are both SES positions. *Id.*

Further, Mr. Campbell observes there were chronic problems with the pace and quality of work generated by OMS under Complainant's leadership. Attached to Mr. Campbell's affidavit is a copy of an employee exit interview conducted with a departing OMS employee in 2002. The departing employee had worked for NTSB for about one year in a cooperative program, but left for the private sector. The employee commented she was leaving because the progress of work in OMS was too slow and she was afraid it would affect her work ethic. *Id.*

Mr. Campbell confirms there are two offices with Deputy Directors paid at the SES level – the Office of Aviation Safety, and the Office of Research and Engineering. He states this practice goes back decades. He asserts the high-level Deputy positions are justifiable. With regard to OAS, this unit is central to the NTSB's work and has about

A157

140 staff members, while the other Offices have only 20 to 40 staffers. Having an SES-level Deputy in Research and Engineering is justifiable because the Office is staffed with a relatively large number of higher-level engineers who have advanced degrees, and the unit performs sophisticated, technical work. *Id.*

Chairman Engleman Conners states she arrived at the NTSB after all Office Director positions had been raised to the SES level except OMS and Highway Safety. She defends the decision to convert the OHS position first, noting there are 43,000 highway deaths each year in contrast to several hundred marine deaths (Exhibit F4).

Chairman Engleman Conners confirms she was approached by Complainant about being paid overtime, but comments she felt Complainant's proposal was "slightly bizarre." Chairman Engleman Conners states she advised Complainant that the OMS Director position would be elevated to an SES position as soon as a slot became available, at which point Complainant could apply for the job. She states she made an inquiry about ways to raise Complainant's pay, speaking either with Managing Director Campbell or HR Director Lisa Love. *Id.*

Joe Osterman was Director of the Office of Highway Safety until early 2005, and is now the NTSB Managing Director. Mr. Osterman became a member of the SES early in 2003. Prior to 2005, he served on the NTSB's Executive Performance Review Board (EPRB), which is responsible for reviewing the ratings and awards for SES employees. As the Managing Director, he now chairs the EPRB (Exhibit F5).

Mr. Osterman reports that in 2004 then-Managing Director Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the Agency. The EPRB recommended the next SES assignment should be for the OMS Director position because OPM had allocated NTSB additional SES slots. The actual assignment of the SES position was done by the NTSB Chairman. *Id.*

Mr. Osterman's account of the history of the elevating the Modal Office Director positions to the SES – and the rationale for their order – is consistent with the accounts of the other management witnesses, *supra*. Although Mr .Osterman agrees with Complainant that the Office Director positions require similar skill and effort, and their core mission is similar, he states the Offices have differing levels of responsibility. For example, RPH has responsibility for two modes of transportation (railroads and pipelines), and also provides support for the other Offices for accidents involving hazardous materials. Additionally, RPH maintains regional offices, while some Offices do not. *Id.*

Mr. Osterman asserts that like RPH, the Office of Highway Safety maintains regional offices. Although OHS does not have similar support functions for the other Offices, it generates the majority of recommendations to Congress or to state legislatures for regulatory changes. Highway accidents account for more than 43,000 deaths per year, while all the other modes of transportation combined account for fewer than 3,000 deaths per year. He notes the Office of Marine Safety is smaller than the other Offices,

000008

and does not have regional offices. OMS provides few support functions for the other Offices. Although OMS has a limited international responsibility, this work largely involves conferences. *Id.*

With regard to the question of gender bias in deciding the order in which the Director jobs would be raised to the SES level, Mr. Osterman notes that the RPH Office Director, Bob Chipkevich, became an SES member three years before his position (OHS Director) was raised to the SES. Mr. Osterman observes that he would have liked his job at Highway Safety elevated earlier, but he knew the rationale for the order of SES assignments. In his view, Complainant understood this rationale fully as well. *Id.*

Lisa Love, Director, Human Resources Division, Office of Administration (female) states responsibility within NTSB for setting pay for SES classifications is handled by the Managing Director, with guidance from SES Program Manager Colette Magwood. She describes the process through which agencies are allocated SES slots. Each year, OPM invites agencies to request SES allocations for the upcoming fiscal year. NTSB does not always receive the number of SES positions requested (Exhibit F6).

Ms. Love is aware that some Office Directors have been paid as SES employees, while others have been paid as GS-15s. She believes the reason for the disparity in classification was due to program complexity, scope and impact of the work, and the qualifications required to perform the job. In addition, the number of SES slots allocated by OPM is a factor. She does not view it as an anomaly that some Deputy Director positions might be classified as SES while there were still Office Director positions paid on the GS scale. *Id.*

With regard to Complainant's interest in receiving overtime compensation, Ms. Love states she is advised by HR Specialist Emily Carroll that the personnel regulations do not prevent payment of overtime based on grade, but there is an overall premium pay limitation based on the amount of salary received. The applicable premium pay/overtime limitation is the biweekly salary of a GS-15 step 10 or Level V of the Executive Schedule, whichever is higher. As long as an employee's salary is below the limitation, the employee is eligible to earn premium pay/overtime. It therefore is probable Complainant could be paid some overtime compensation. However, she would need to make arrangements for overtime with her supervisor. *Id.*

A table comparing the compensation among Office Directors is found at Exhibit F1.

*The "denial of authority to fill vacancies" issue*

Although the letter accepting Complainant's EEO charge focuses on a "denial of authority to fill vacancies in the Office of Marine Safety" that occurred January 3, 2005, Complainant states the January 2005 event was simply the latest in a series of similar experiences that has been on-going since 1998. Complainant asserts this pattern made it extremely difficult for OMS to apply necessary resources to its investigations and required her to work excessively long hours (Exhibit F2).

A159

000009

The January 2005 incident related to Complainant's effort to fill the position Marine Accident Investigator. The position was advertised, interviews were conducted and a selection was made in 2004. Complainant states that at the end of the process, Managing Director Campbell advised her she could not hire the selectee because he had applied for more than one job at the Agency. Specifically, in addition to applying for the Marine Accident Investigator position, the selectee also had applied for the OMS Director position that finally had been advertised as an SES job. According to Complainant, Campbell questioned the judgment of an applicant who had applied both for an investigator position in an Office while also applying for the most senior management position in the unit. Complainant states she was not concerned by this issue, and believes Mr. Campbell's explanation was implausible. *Id.*

In 2001, the Chief, Report Development Division, OMS, retired. Complainant states this was position was the head of a major division within OMS. The vacant position was advertised within NTSB, applicants were interviewed and Complainant made a selection. She forwarded the name of the selectee to Mr. Campbell, who then spoke directly with the selectee and decided she was unsuitable for the position. Complainant states she was prohibited from hiring a person into the position, and instead had to "make do" with the staff within her office. *Id.*

Also in 2001, Complainant reports Mr. Campbell placed a Human Performance Investigator from OMS on detail to OHS. This later became a permanent transfer. Complainant states she was prohibited from recruiting a replacement employee. *Id.*

In 2000, Complainant's Deputy Director left NTSB for a position at another agency. Although Complainant made numerous requests to fill the vacant Deputy Director position, she was not permitted to do so. As a result, OMS was the only Modal Office to operate without a Deputy. Complainant states her successor, current OMS Director Spencer, was assigned an Acting Deputy Director and has been given permission to hire a permanent Deputy Director. *Id.*

Complainant notes that in his statement to the EEO Counselor, Mr. Campbell suggested all the Office Directors were treated badly and cited the Agency's budget as prompting an overall drop in the number of positions at the NTSB. However, she attaches budget materials which she asserts support her claim that OMS was singled out for unfavorable treatment regarding staffing. Complainant states other male Office Directors were allowed to fill key slots and to increase the overall number of staff in their offices. She also states then-OHS Director Osterman would comment at meetings that his unit did not need more people and that OMS had a greater need for additional staff. *Id.*

Complainant asserts the repeated denial of opportunities for her to fill positions in her unit was discriminatory because Agency officials felt that if OMS was very small in size, the small size of the Office would in some way justify limiting the pay of its Director, who was female. She sees no reason other than sex discrimination that would explain why she was treated differently from her male counterparts in the other Modal Offices. *Id.*

A160

000010

Former Managing Director Campbell admits Complainant was refused opportunities to fill some positions, but denies this was discriminatory behavior motivated by Complainant's sex. With regard to the Marine Accident Investigator position, Mr. Campbell confirms Complainant's statement that he (Campbell) felt it was strange to hire a mid-level Investigator into OMS who simultaneously was seeking to become the Director of the Office. He notes also that the OMS Director position was being competed, and he thought it would be fair to delay the hire so that if a new person was hired as Director, the Director would have a chance to hire his or her own person into the job (Exhibit F3).

Mr. Campbell also confirms he stopped the hire of a new OMS Chief of Report Development. He explains Complainant wanted to fill the position with a person already working within OMS. The selectee informed Campbell that she had applied for the position because she wanted to block another co-worker from getting the job because they were incompatible. Campbell states he knew the selectee, and while he viewed her as a good editor he did not believe she would be able to manage the investigators who are a key part of the report-generating process. Mr. Campbell states he already had bad experiences with OMS' report generating abilities, citing problems with the accident report into the Staten Island Ferry crash. Mr. Campbell states he had to plead with an investigator to stay with the project rather than quit, and ultimately Campbell lifted the investigation out of OMS and personally supervised the project from the Managing Director's office. *Id.*

Mr. Campbell did not have a specific recollection with regard to the OMS Deputy Director position. *Id.*

Mr. Campbell states he normally did not view it as his role to intervene when Office Directors such as Complainant wanted to make a hire. However, he felt Complainant did not demonstrate good judgment in her selections. He recalls he once received a visit from the NTSB ethics office concerning an applicant for an OMS position. The applicant had a background with cruise ships. He was hired, and subsequently quit under a cloud. Mr. Campbell feels this experience vindicated his doubts concerning Complainant's hiring judgment. *Id.*

Mr. Campbell denies Complainant was singled out in her ability to hire staff for her Office. He states Complainant was allowed to fill many vacancies in her unit. Further, he states staffing levels generally are down at the Agency. He believes Complainant probably was allowed to hire more employees than other Directors because her Office had a relatively high turnover rate. *Id.*

Chairman Engleman Conners states she probably had some role in limiting some of the hiring. After she arrived at the Agency in 2003, she asked all senior managers to consider prioritizing the filling of positions based on the vision for the Agency, rather than simply backfilling open positions. NTSB identified 73 positions in the Agency and began a prioritizing process. Early in 2004, it was decided that the first positions to be

A161

filled would be openings on the regional aviation investigation teams. At that time, the Agency had about 426 employee and was expecting to drop to about 415 positions, then 411. To avoid a RIF situation, many open positions at the Agency were not being filled. Jobs that were being filled were priority slots that had been mandated by Congress. *Id.*

Chairman Engleman Conners notes other Office Directors also were unhappy they were denied authorization to fill vacant positions, citing specifically the Director of the Office of Research and Engineering, Verne Ellenstad. She denies Complainant's being denied opportunities to fill vacancies related to her gender. *Id.*

Joe Osterman moved from the Director, OHS, position to the Managing Director job around the period when Complainant was attempting to fill the Marine Accident Investigator position in early 2005. He states the candidate selected by Complainant for the position was mediocre, and that he (Osterman) was the person who denied Complainant authority to complete the hire. This action was taken with Mr. Campbell's concurrence (Exhibit F5).

In Mr. Osterman's view, the restrictions on Complainant's ability to hire were not unique, and she was not singled out because of her gender. He states that other Office Directors also were prohibited from making hires at various times. He states his own unit, the Office of Highway Safety, lost about six positions between 200 and 2005 when he was denied authorization to hire against vacancies. This was happening throughout the Agency. *Id.*

In specific response to Complainant's assertion that he (Osterman) made several comments suggesting that OMS had a greater need for staff than OHS, Mr. Osterman states the comment was not made quite the way Complainant suggests. He states all the Offices were short-handed in some manner.

*Additional materials*

Position descriptions for the Modal Director jobs are found as Exhibit F8. Performance ratings for Complainant and the employees to whom she compares herself are found as Exhibit F9. Tabulations showing positions filled in the Modal Offices are found as Exhibit F10.

## V. SURVEY OF THE GENERAL ENVIRONMENT

Position descriptions for the Office Director positions are found at Exhibit F8. As both the Complainant and Agency Managers acknowledge, there are significant similarities among the Office Director positions, as described. As discussed above, Agency Managers contend the differences between the jobs relate to a number of factors including the size of the Office's staff, number of investigations conducted, public visibility, support for investigations performed by other NTSB units, etc.

000012

A comparison of compensation of the Modal Office Directors for 2003 and 2004 is found at Exhibit F1. The comparison shows that Modal Office Directors Clark, Osterman and Chipkevich (all male) received greater compensation (salary and bonus) than Complainant during both years. During 2003, each of the male Office Directors received at least $13,000 more in compensation than Complainant. During 2004, each of the male Office Directors received at least $14,000 more in compensation than Complainant.

A listing of positions filled by each of the Offices between January 2003 and January 2005 is round at Exhibit F10. During this period, four positions were filled in the Office of Marine Safety, two positions were filled in the Office of Railroad, Pipeline and Hazardous Materials Investigations, nine positions were filled in the Office of Research and Engineering, twenty-five positions were filled in the Office of Aviation Safety, and two positions were filled in the Office of Highway Safety.

A163

000147

(1)

National Transportation Safety Board

Washington, D.C. 20594

Office of the Managing Director

July 17, 2001

Ms. Anne Kirby
Acting Director, Office of Executive
Resources Management
Office of Personnel Management
1900 E Street, NW. Room 6484
Washington, D.C. 20415

Dear Ms. Edwards:

Currently, the National Transportation Safety Board's (NTSB) approved executive resources allocations are 14 Senior Executive Service (SES) and 3 Senior Level (SL) allocations. We have assessed our executive resources and determined that we would require 2 new SES and 5 new SL allocations for Fiscal Years 2002 and 2003.

The NTSB has increased in the last several years from 350 positions to 410 positions that represent a 17% increase in overall staff levels. We have determined that in order for the Board to continue to meet its transportation safety mission, the increase in overall staff levels would require additional permanent executive resources.

**New SES Needs**

The NTSB is a small, non-regulatory, independent agency with 410 employees. Our mission is very focused: to prevent future transportation accidents from occurring. We are mandated to investigate transportation accidents, which usually involve a breakdown in a transportation system. We then determine the probable cause and make recommendations to prevent them from happening again. The Board investigates about 2,000 aviation accidents and incidents a year, and about 500 accidents in the other modes of transportation – rail, highway, marine, pipeline and hazardous materials.

Most importantly, the Safety Board promotes transportation safety through the issuance of safety improvement recommendations, based on its investigations and studies, to federal, state, and local government agencies and to the transportation industry regarding actions that should be taken to prevent accidents. Our programs have resulted in countless lives being saved and numerous injuries being prevented.

000148



The expanded numbers of executive-level positions will allow us to continue to achieve these results, if our request for additional permanent executive allocations is approved. Specific justifications for each of the requested allocations appear below.

New SES Allocation #1. Director
Office of Highway Safety

The Office's positions have expanded to 33, including an increase in supervisory positions. The overall objectives of the highway program are to reduce the number of highway accidents and to minimize the consequences of such accidents. Through these activities, the Safety Board provides guidance to: the highway safety community regarding highway design and construction; to the motor vehicle industry regarding equipment and systems research and development to reduce highway accidents or injuries; and to Congress, federal, state, and local agencies, about the effectiveness of transportation safety programs and about ways to reduce accidents. In its highway safety program, the Safety Board identifies critical highway issues, conducts safety oversight of highway and inter-modal transportation practices, works to improve accident investigation procedures, and influences and motivates responsible agencies, companies, and advocacy groups to implement Board recommendations and accomplish meaningful improvements in highway safety.

The Safety Board devotes its limited highway investigation resources to accidents that have a significant impact on the public's confidence in highway safety; generate high media and/or public interest; or concern technical safety issues that cause or contribute to accidents or injuries on a national scale. The director's position is currently supervisory in nature at the GS-15 level and responsibilities include supervising employees in both headquarters and regional locations. After an in-depth evaluation, we have concluded that adequate guidance cannot be provided in resolving highway safety issues and producing timely and effective reports utilizing supervisory skills and knowledge. Executive-level management skills are required to exercise important policy-making and policy-determining decisions (which is not the role of a supervisor). Additionally, when compared with existing SES positions at the Board, the subject position is directly comparable in terms of organizational characteristics, functional and program responsibilities, degree and scope of executive responsibilities, level and purpose of contacts, and nature of the staff. Therefore, we have determined that an executive allocation for the position would be appropriate.

Funding

- reprogramming within the Safety Board would not be required. Funding would come from within current funding levels.

000149



Anticipated Outcome

- improvements in the quality and timeliness of highway investigations and final reports
- safety improvements that result in improvements in the safety of the highway system
- maintaining public confidence in the work of the Board

New SES Allocation #2. Director
Office of Marine Safety

The overall objectives of the marine safety program are to reduce the number of marine accidents to minimize the consequences of such accidents. Through these activities, the Board provides guidance to: the maritime safety community regarding ship design and construction, practices, conditions, equipment, systems, and operations; and to Congress, federal, state, and local agencies, and international agencies. In its marine safety program, the Board identifies critical maritime issues, conducts safety oversight of national and international marine transportation practices, works to improve accident investigation procedures, and influences and motivates responsible agencies, companies, and advocacy groups to implement Board recommendations and accomplish meaningful improvements in marine safety.

The Office's positions have expanded to 15 to more efficiently investigate marine accidents involving public and non-public vessels, and all other marine accidents under joint regulations with the U.S. Coast Guard (USCG), or separately under the Safety Board's own authority.

Other than the Safety Board and the USCG, there are no federal agencies that have the authority to investigate commercial vessel accidents in U.S. navigable waterways. The Safety Board's investigations are directed primarily towards developing safety improvement recommendations while determining the probable cause(s) of an accident. We also have an extensive monitoring system to ensure that implementation of the recommendations is not delayed or forgotten by the recipients. Through its independent and thorough accident investigations and safety promotion activities, the Safety Board has been the catalyst in moving the USCG and other organizations to improve marine safety by requiring certain safety equipment, and improving procedures and vessel design. Through its investigations and special studies, the agency has focused national attention upon system-wide marine safety problems that often require both immediate and long-term fixes.

In addition to supervising other supervisors, the current GS-15 supervisory position also has responsibility for ensuring the conduct of special studies involving specific marine safety issues. These may be based on previous Safety Board accident investigations, or on analytical reviews of marine regulations, practices, procedures, and

standards. Similar to accident investigations and studies in the other modes, marine special studies result in the issuance of safety recommendations to federal and/or state agencies, private industry, and industry associations.

After analyzing the accident investigation and special study efforts in the office, we have determined that GS-15 supervisory skills, knowledge, and abilities were insufficient to properly perform duties at a level commensurate to the office's needs. Additionally, there are specific safety areas that warrant urgent attention. They include executive-level direction of boating and fishing vessel safety improvements and resolution of long-standing marine safety issues. Executive-level management skills are required to exercise important policy-making and policy-determining decisions (which is not the role of a supervisor). Additionally, when compared with existing SES positions at the Board, the subject position's comparability in complexity and scope are sufficient to warrant its designation in the SES.

Funding

- reprogramming within the Safety Board would not be required. Funding would come from within current funding levels.

Anticipated Outcome

- improvements in the quality and timeliness of marine investigations and final reports
- maintaining public confidence in the work of the Board

New SL Needs

The SL allocations below are as a result of an immediate need identified through a comprehensive examination of the Safety Board by the RAND Corporation:

New SL Allocation #1: Chief Technical Advisor (Medical Officer)
Office of Research and Engineering

This position will provide authoritative, substantial and unique advice related to medical issues in transportation related accident investigations. The advice will include medical technologies, concepts, issues, and approaches in the areas of human physiology and medical fitness, human toxicology and pathology, medical epidemiology, and biomechanics. As an authority and world-renown expert in the fields of medical fitness or incapacitation, toxicology, and occupational kinematics as they relate to the investigation of transportation accidents, this position will serve as the agency's representative to national and international authorities and industries.

000151



Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- recommendations that impact other industries with related medical fitness patterns and issues

New SL Allocation #2: Chief Technical Advisor (Vehicle Performance and Simulation)
Office of Research and Engineering

This position will provide substantial and unique advice regarding vehicle performance and simulation in all transportation modes. Analysis and simulation of vehicle performance is both an invaluable aid in transportation accident investigations, and a rapidly advancing technology. Trends indicate that future accidents will be more difficult to analyze, and as a result, rely more heavily on vehicle performance simulation and analysis to evaluate potential causes. The use of this technology in accident investigations will be multi-modal including highways, railroad, and marine vehicles.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- rapid advancements in desktop workstation computer technology

New SL Allocation # 3: Chief Technical Advisor (Materials Failure Analysis)
Office of Research and Engineering

This position will provide substantial and unique advice regarding equipment failures in all transportation modes that present some of the most difficult challenges in accident investigations. The application of the technical specialties of metallurgy, materials engineering, and materials failure analysis to accident investigations requires not only a thorough expertise in scientific and engineering disciplines, but also a strong understanding of the physical design limitation of transportation vehicles and their components.

000152



Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- new materials failure analysis technologies for the investigation and analysis of transportation accidents

New SL Allocation # 4: Chief Technical Advisor (Human Factors Analysis)
Office of Research and Engineering

As a Chief Technical Advisor, this position will provide substantial and unique advice regarding human factors that continues to account for the greatest proportion of transportation accident causes in all transportation modes. Human performance and human factors specialists are employed by each of the Board's modal offices to collect appropriate data and perform human factors evaluation and analyses appropriate to the operating characteristics of that mode. The Chief Technical Advisor will provide needed coordination between the transportation modes and ensure that consistent attention is given to the important issues of human performance and ergonomic factors such as fatigue, workload, crew resource management, and automation.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- development of policy analysis and safety recommendations in the human factors area for all transportation modes

New SL Allocation # 5: Chief Technical Advisor (Chief Writer)
Office of Aviation Safety

As Chief Technical Advisor to the Director, Office of Aviation Safety, this position will provide substantial and unique advice regarding guiding the Office's technical writing programs, including the use of resources, establishment of operating policies, priorities and procedures, resolving technical considerations and problems which arise out of program operations and for the technical interpretation and application of the results. The work requires the application and integration of knowledge that allows others to determine the feasibility of developing extremely technical and highly

000153



controversial information designed for specific audiences, who are often times culturally diverse. The content, design, and development of these products must be presented in a manner that diffuses potential misunderstandings of written conclusions and findings of national and international highly publicized air disasters. The results of efforts directed by the incumbent have major impact on matters of great urgency and significance for other offices within the agency. The Chief Technical Advisor will be the widely recognized authority for all written products that emerge from the Office of Aviation Safety and will be responsible for the solution of problems of marked importance to the aviation transportation community. In many instances, there will have been no precedents established and the technical written products adopted will, in fact, become guidelines that will be promulgated by the Director of Aviation Safety, the Managing Director, and the Chairman of the NTSB.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- improvements in the quality and timeliness of the agency's investigative reports

Note: The NTSB has evaluated the new SES and SL positions above, in terms of classification factors, and determined that each position exceeds the GS-15 level and is properly placed in the SES or SL systems.

**Agency-wide SES and SL Priorities**

An organizational chart identifying all current and proposed SES and SL positions, with encumbered positions indicated by * is enclosed.

Below is a prioritization of all currently established vacant and encumbered SES and SL positions in terms of their relative contributions to the Safety Board's agency-wide mission requirements. They are all Category A positions in that they are most critical to the Safety Board's agency-wide mission accomplishments. Additionally, due to the nature of our mission, (i.e., to save lives through improving transportation safety worldwide), the list below does not contain any positions that present opportunities for redeployment of executive resources (i.e., positions that may be filled at a lower level or abolished) as turnover occurs, or positions which the present incumbent may be reassigned, if an appropriate opportunity is identified.

000154



**Prioritized Current SES and SL Positions (vacant and encumbered) – Category A**

SES

1. Executive Director (noncareer) – vacant
2. Managing Director – encumbered
3. Director, Office of Aviation Safety – encumbered
4. Director, Office of Research and Engineering – encumbered
5. Director, Office of Pipeline, Railroad, and Hazardous Materials - encumbered
6. Director, Office of Safety Recommendations and Accomplishments encumbered
7. General Counsel - encumbered
8. Chief Financial Officer – encumbered
9. Director, Office of Government, Public and Family Affairs (noncareer) encumbered
10. NTSB Academy Director – Selection in progress
11. Deputy Director, Office of Aviation Safety – encumbered
12. Deputy Director, Office of Research and Engineering – encumbered
13. Associate Managing Director for Planning and Operations - encumbered
14. Associate Managing Director for Quality Assurance – vacant

SL

15. Chief Technical Advisor (Information Technology) - encumbered
16. Chief Technical Advisor (Vehicle Recorders) - encumbered
17. Chief Technical Advisor (International Affairs) – encumbered

**Prioritized New SES and SL Positions - Category A**

SES

1. Director, Office of Highway Safety
2. Director, Office of Marine Safety

SL

3. Chief Technical Advisor (Medical Officer)
4. Chief Technical Advisor (Vehicle Performance and Simulation)
5. Chief Technical Advisor (Materials Failure Analysis)
6. Chief Technical Advisor (Human Factors Analysis)
7. Chief Technical Advisor (Chief Writer)

000155 A positive response to this request will enable the Safety Board to maintain its excellence in accident investigation. If you have any questions, please do not hesitate to contact me directly on (202) 314-6060.

Sincerely,

Pamela E. Pearson

Dan Campbell
Managing Director

Enclosure

000156

# NATIONAL TRANSPORTATION SAFETY BOARD




A173

ENCLOSURE

0157

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-0001

OFFICE OF THE DIRECTOR

SEP 23 2002

The Honorable Carol J. Carmody
Acting Chairman
National Transportation Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

Dear Ms. Carmody:

The Office of Personnel Management (OPM), in consultation with the Office of Management and Budget, has completed its review of executive resource allocations for the remainder of the Fiscal Year 2002-2003 biennial cycle. I am pleased to inform you that we have approved an increase in your allocation, but we were not able to grant your request in its entirety. Decisions about these requests were governed by several factors including the extent to which agencies have demonstrated effective corporate management of their executive resources, the resource implications of requested adjustments, the impact on governmentwide allocations, and the relationship to agency restructuring plans.

The final FY 2002-2003 allocations authorized for your agency are:

- Senior Executive Service (SES) allocation — 14 NO CHANGE
  - SES career reserved floor — 9
- Senior-Level (SL) allocation — 5
- Scientific and Professional (ST) allocation — 0

The SES allocation covers all SES positions, regardless of how they are filled, e.g., by career, noncareer, or limited appointment. Each agency is responsible for making sure that the established number of career reserved positions equals or exceeds the floor as listed above.

These final allocations do not indicate approval or disapproval of specific positions, whether existing or proposed. Each agency is responsible for managing its executive resources within its established levels, in line with agencywide priorities and changing needs. Similarly, agencies are responsible for determining, consistent with applicable legal and regulatory provisions, whether positions exceeding the GS-15 level are properly designated as SES, SL, or ST.



CON 131-64
September 1!

000158



A positive response to this request will enable the Safety Board to maintain its excellence in accident investigation. If you have any questions, please do not hesitate to contact me directly on (202) 314-6060.

Sincerely,

Pamela E. Pearson for
Dan Campbell
Managing Director

Enclosure