IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT**

Pursuant to Rule 56 of the Rules of Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits these proposed findings of uncontroverted fact in support of defendant's cross-motion for summary judgment.

Background

1. The National Transportation Safety Board ("NTSB") is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. DA 183.[1]

2. Between 2003 and 2005, the NTSB had approximately 400 to 450 employees. See Pl. Ex. 3, F3 at 2; F4 at 5.[2]

3. As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous

---

[1] "DA" refers to defendant's Appendix to its Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment.

[2] "Pl. Ex." refers to an exhibit to Plaintiff's Motion for Summary Judgment, filed on October 9, 2007.

Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS"). First Am. Compl. ¶ 6; DA 1, Declaration of Emily T. Carroll ("Carroll Decl.") ¶ 3.

4. From 1994 until 1997, plaintiff Marjorie Murtagh Cooke served as the Chief of the Marine Division, an office within the NTSB's Office of Surface Transportation Safety. First Am. Compl. ¶ 5-6; DA 153.

5. In 1997, as a result of the restructuring, Ms. Cooke's title changed to Director of OMS. First Am. Compl. ¶ 9.

6. The individuals who occupied the director positions for each of the other three offices immediately following the restructuring were Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS). Pl. Ex. 3, F3 at 2; DA 153.

7. The Directors of OHS, ORS, OPHS, and OMS (collectively the "surface modal offices") reported directly to the Managing Director ("MD"). See First Am. Compl. ¶ 7.

SES Allocations

8. Following the restructuring, it was the NTSB's intent that each of the four modal office directors be classified and paid at the Senior Executive Service ("SES") level. Pl. Ex. 3, F4 at 3; DA 98, Rule 30(b)(6) Deposition of Joseph G. Osterman ("30(b)(6) Dep.") at 165; DA 38, Deposition of Ellen Engleman Conners ("Conners Dep.") at 34-35. However, at the time of the restructuring, there were no available SES slots to allocate to the modal office directors. See Pl. Ex. 3, F3 at 2.

9. There are two ways for the NTSB to elevate a position to the SES level. The NTSB can request and receive an allocation of an SES slot from the Office of Personnel Management ("OPM"). Once the agency receives this allocation, it can use it as it deems necessary. Alternatively, when a vacancy occurs in one of the allotted slots that the agency has, that

position can be filled by reassignment of a current SES employee to that position or through a competitive recruitment process. The NTSB cannot create a new SES position without OPM authorization. DA 1-2, Carroll Decl. ¶ 4.

10. In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied this request. DA 2, Carroll Decl. ¶ 5.

11. Thus, for a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale. DA 2, Carroll Decl. ¶ 6; see also First Am. Compl. ¶ 7.

12. During all relevant time periods, NTSB's Office of Aviation Safety ("OAS") existed as a separate unit and its director was paid at the SES level. See First Am. Compl. ¶ 7. During all relevant time periods, John Clark was the Director of OAS. DA 34, Deposition of John Clark ("Clark Dep.") at 59.

13. During all relevant time periods, OAS had a Deputy Director who was paid at the SES level. DA 2, Carroll Decl. ¶ 7; see also Declaration of Thomas E. Haueter ("Haueter Decl.") ¶ 3. From November 2000 to March 2007, the individual occupying that position was Thomas Haueter. DA 13, Haueter Decl. ¶ 1.

14. From July 2001 to the present, OAS had a Chief Advisor for International Aviation Safety Affairs who was paid at the Senior Level ("SL"). During the entire existence of the position, it has been occupied by Robert MacIntosh, Jr. DA 17, Declaration of Robert M. MacIntosh, Jr. ("MacIntosh Decl.") ¶¶ 1, 3.

15. Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became

the Acting Director of ORPH. DA 7, Declaration of Robert J. Chipkevich ("Chipkevich Decl.") ¶ 3.

16. In 2001, an SES employee at the NTSB retired, and therefore an SES slot became available. This SES slot was allocated to the position of the Director of ORPH. DA 2, Carroll Decl. ¶ 8; DA8, Chipkevich Decl. ¶ 4.

Daniel Campbell, the MD at the time, recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of the Director of ORPH because Mr. Chipkevich was the most senior of the modal office directors and ran the most complex of the three surface modal offices (OHS, ORPH, and OMS). Pl. Ex. 3, F3 at 2.

In addition, the SES slot was allocated to the position of the Director of ORPH because of ORPH's multi-modal functions. That is, ORPH was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. DA 85, 30(b)(6) Dep. at 74, 200; Pl. Ex. 3, F4 at 4.

17. Pursuant to OPM regulations, all SES positions must be advertised and competed. An employee who encumbers a GS-level position that is reclassified to the SES level may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. Ms. Cooke has never held a career SES appointment. DA 2, Carroll Decl. ¶ 9.

18. Accordingly, once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position, and applications for the position were accepted. DA 8, Chipkevich Decl. ¶ 4; DA 3, Carroll Decl. ¶ 10.

19. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES. DA 8, Chipkevich Decl. ¶ 4; DA 3, Carroll Decl. ¶ 11.

20. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. DA 164. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. DA 165-66. Again, OPM denied those requests. DA 174-75; DA 3, Carroll Decl. ¶ 12.

21. In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy after the incumbent voluntarily left the agency. DA 3, Carroll Decl. ¶ 13; Pl. Ex. 3, F3 at 3. Because the Academy was just getting started, the NTSB believed that it did not need an SES position, but that SES positions were needed in the operating system. DA 37, Conners Dep. at 29. That slot was allocated to the position of Director of OHS. A 21, Osterman Decl. ¶ 3.

The slot went to the Director of OHS position because OHS was a larger office than OMS and because there are approximately 43,000 highway deaths each year, in contrast to several hundred marine deaths per year. Pl. Ex. 3, F4 at 3. Thus, it was determined that OHS could have a greater effect on transportation safety than OMS. See Pl. Ex. 3, F3 at 4. In addition, the scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS, including investigatory responsibilities, supervision, and responsibilities for regional offices. DA 42, Conners Dep. at 101.

22. Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position, and applications for the position were accepted. DA 3, Carroll Decl. ¶ 13; DA 22, Osterman Decl. ¶ 3.

23. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES. DA 3, Carroll Decl. ¶ 14. Mr. Osterman has been paid at the SES level since early 2004. DA 22, Osterman Decl. ¶ 4.

24. In 2004, NTSB requested and received an additional SES slot from OPM. DA 227. That slot was allocated to the position of Director of OMS. DA 3, Carroll Decl. ¶ 15.

25. Once the decision was made to allocate the SES slot to the Director of OMS, the position was advertised in July 2004 as an SES position, and applications for the position were accepted. See First Am. Compl. ¶ 34; DA 3, Carroll Decl. ¶ 15. Ms. Cooke submitted an application for the position. See First Am. Compl. ¶ 35.

26. The 2004 OMS position advertisement was subsequently cancelled prior to a selection being made. DA 3, Carroll Decl. ¶ 15. It was cancelled because the NTSB believed that the pool of qualified applicants was too narrow and insufficiently robust. According to Mr. Campbell, there was a rumor that the position had been wired for Ms. Cooke. DA 28-31, Deposition of Daniel Campbell ("Campbell Dep.") at 93-97, 132, 182.

27. The Director of OMS position was readvertised as an SES position in early 2005. See First Am. Compl. ¶ 36. Ms. Cooke again submitted an application for the position. See First Am. Compl. ¶ 37. DA 4, Carroll Decl. ¶ 16.

28. The NTSB recommended John Spencer for this SES position to OPM, and he was approved for an appointment to the SES. DA 4, Carroll Decl. ¶ 17.

29. In June 2005, Ms. Cooke was transferred to the Office of Safety Recommendations. First Am. Compl. ¶ 44. DA 46, Deposition of Marjorie Murtagh Cooke ("Cooke Dep.") at 17.

The Modal Offices

30. Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the board. See 49 C.F.R. § 800.2.

Size

31. From 2003 to 2005, OAS had approximately 120 to 140 employees. DA 13, Haueter Decl. ¶ 4.

32. Thus, the Director of OAS was responsible for 20 to 25 percent of the workforce of the NTSB. DA 13, Haueter Decl. ¶ 4.

33. From 2003 to 2005, ORPH had approximately 40 to 50 employees. DA 8, Chipkevich Decl. ¶ 5.

34. From 2003 to 2005, OHS had approximately 30 to 40 employees. DA 22, Osterman Decl. ¶ 5.

35. From 2003 to 2005, OMS had approximately 14 to15 employees. During that time period, OMS never had more than 15 employees. DA 64, Cooke Dep. at 171.

36. During all relevant time periods, OAS had ten regional offices. DA 14, Haueter Decl. ¶ 5.

37. During all relevant time periods, OHS had five regional offices. DA 22, Osterman Decl. ¶ 5.

38. During all relevant time periods, ORPH had three regional offices. DA 8, Chipkevich Decl. ¶ 5.

39. During all relevant time periods, OMS did not have any regional offices. See DA 69, DA 72, Cooke Dep. at 218, 238.

Budget

40. The majority of the NTSB's budget is composed of fixed overhead costs, such as labor, benefits, and facilities; the remaining portion of the budget is discretionary, and divided among NTSB offices. DA 24, Osterman Decl. ¶ 21.

41. Of the discretionary portion of the budget for fiscal year 2003, OAS received 28.04 percent, OHS received 7.61 percent, ORPH received 4.67 percent, and OMS received 2.09 percent. DA 24, Osterman Decl. ¶ 21.

42. Of the discretionary portion of the budget for fiscal year 2004, OAS received 33.45 percent, OHS received 11.78 percent, ORPH received 7.52 percent, and OMS received 3.00 percent. DA 24, Osterman Decl. ¶ 21.

43. Of the discretionary portion of the budget for fiscal year 2005, OAS received 45.04 percent, OHS received 7.81 percent, ORPH received 6.84 percent, and OMS received 1.84 percent. DA 24, Osterman Decl. ¶ 21.

Accident Investigation

44. Marine is the only mode in which the NTSB is not the primary investigative authority for major transportation accidents. Pl. Ex. 3, F3 at 4.

45. Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB is required to investigate and establish the facts, circumstances, and cause or probable cause of all accidents involving civil aircraft and, with the participation of appropriate military authorities, all accidents involving both military and civil aircraft. This includes all general aviation accidents. 30(b)(6) Dep. at 92.

46. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a highway accident, including a railroad grade crossing accident, that the NTSB selects in cooperation with a state.

47. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a railroad accident in which there is a fatality or substantial property damage, or that involves a passenger train.

48. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a pipeline accident in which there is a fatality, substantial property damage, or significant injury to the environment.

49. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a major marine casualty (except a casualty involving only public vessels) occurring on the navigable waters or territorial sea of the United States or involving a vessel of the United States, under regulations prescribed jointly by the NTSB and the head of the department in which the Coast Guard is operating. See DA 55, Cooke Dep. at 93.

50. The NTSB and Coast Guard have concurrent jurisdiction over any marine accident that takes place in the United States' navigable waters. DA 83, 30(b)(6) Dep. at 69.

51. The Coast Guard has the primary responsibility in the United States for the investigation of marine accidents. DA 83, 30(b)(6) Dep. at 69.

52. Pursuant to 49 C.F.R. §850.10, the Coast Guard conducts the preliminary investigation of a marine casualty and notifies the NTSB of any marine casualties fitting the criteria set forth in 49 C.F.R. §850.10(b) . DA 195.

53. Pursuant to 49 C.F.R. §850.15, the NTSB may conduct an investigation of any major marine casualty or any casualty involving public and nonpublic vessels. DA 195.

54. Pursuant to 49 C.F.R. §850.15, the NTSB is only required to conduct a marine casualty investigation when:

> (1) The casualty involves a Coast Guard and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (2) The Commandant [of the Coast Guard] and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty involves a public and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (3) The Commandant and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty is a major marine casualty which involves significant safety issues relating to Coast Guard safety functions.

49 C.F.R. §850.15.

55. Additional criteria governing decisions about whether the NTSB will lead a specific major marine casualty investigation has been established by a NTSB-Coast Guard memorandum of understanding ("MOU"), the most recent of which was signed in 2002. DA 197-203.

56. The frequency of accidents that the NTSB investigates, from most to least, the order of transportation modes, is: aviation, highway, railroad, marine, pipeline. DA 24, Osterman Decl. ¶ 20.

57. From 2003 to 2005, there were, on average, approximately 40 aviation accidents per week and approximately 10 aviation accident fatalities per week. DA 14, Haueter Decl. ¶ 6.

58. There are approximately seven million highway accidents per year, three million injuries, and 43,000 deaths. DA 82, 30(b)(6) Dep. at 65.

59. On average, 3,215 railroad accidents occur per year, resulting in 442 injuries and 17 deaths. In addition, on average, 355 fatalities per year occur at highway-rail crossings, and an average of 480 fatalities per year occur that involve trespassers around railways. DA 8, Chipkevich Decl. ¶ 6.

560. In 2003, there were 370 pipeline accidents, 71 injuries, and 12 fatalities reported. DA 8, Chipkevich Decl.¶ 7.

61. In 2004, there were 443 pipeline accidents, 60 injuries, and 23 fatalities reported. DA 8, Chipkevich Decl. ¶ 7.

62. In 2005, there were 490 pipeline accidents, 47 injuries, and 16 fatalities reported. DA 8, Chipkevich Decl. ¶ 7.

63. In 2003, there were 15,156 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 119 injuries and 15 fatalities. DA 8, Chipkevich Decl. ¶ 8.

64. In 2004, there were 14,846 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 288 injuries and 16 fatalities. DA 8, Chipkevich Decl. ¶ 8.

65. In 2005, there were 15,928 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 945 injuries and 34 fatalities. DA 8, Chipkevich Decl. ¶ 8.

66. There are between 40 and 60 major marine accidents that occur each year. DA 47, Cooke Dep. at 33. Of these, OMS launches on approximately 10 percent. Osterman Decl. ¶ 22.

67. There are approximately 700 marine accident fatalities per year. The majority of these fatalities are attributable to recreational, not commercial, boating. DA 25, Osterman Decl. ¶ 22.

68. The modal office directors receive notifications of accidents in all transportation modes. DA 47, Cooke Dep. at 32.

69. Between 2003 and 2005, there were approximately 38 notifications of aviation accidents per week. DA 14, Haueter Decl. ¶ 7.

70. Between 2003 and 2005, there were approximately 18 notifications of highway accidents per week. DA 22, Osterman Decl. ¶ 6.

71. Between 2003 and 2005, ORPH received, on average, approximately 53 notifications of railroad incidents and accidents per week. DA 8, Chipkevich Decl. ¶ 9.

72. Between 2003 and 2005, ORPH received, on average, approximately 33 notifications of pipeline incidents and accidents per week. DA 8, Chipkevich Decl. ¶ 10.

73. Between 2003 and 2005, ORPH received, on average, approximately 119 notifications of hazardous materials incidents and accidents per week. DA 8, Chipkevich Decl. ¶ 11.

74. In fiscal year 2003, OMS received approximately 44 notifications of marine accidents or incidents. In fiscal year 2004, OMS received approximately 28 notifications of marine accidents or incidents. In fiscal year 2005, OMS received approximately 23 notifications of marine accidents or incidents. DA 25, Osterman Decl. ¶ 23.

75. The order of frequency for notifications of accidents outside of normal business hours was: aviation, highway, rail, marine, pipeline. DA 92-93, 30(b)(6) Dep. at 132-33.

76. OMS decides whether to investigate a marine accident using the bright-line score set forth in the NTSB's Memorandum of Understanding ("MOU") with the Coast Guard. DA 82, 30(b)(6) Dep. at 65; DA 197-203.

77. Because of its broad legislative mandate, OHS has an enormous amount of discretion in deciding whether to investigate a highway accident. In OHS, each accident must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation. DA 22, Osterman Decl. ¶ 7.

78. The NTSB exercises considerable discretion in determining whether to launch on certain rail, pipeline, and hazardous materials accidents. In general, ORPH evaluates the circumstances and safety issues of each accident, and the Director of ORPH makes a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident prevention issue. Overall, the Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. DA 9, Chipkevich Decl. ¶ 12.

79. In 2003, OAS launched to four major domestic accidents and five foreign accident investigations. DA 14, Haueter Decl. ¶ 8; DA 19, MacIntosh Decl. ¶ 16.

80. In 2004, OAS launched to 7 major domestic accidents and 10 foreign accident investigations. DA 14, Haueter Decl. ¶ 8; DA 19, MacIntosh Decl. ¶ 16.

81. In 2005, OAS launched to 16 major domestic and 17 foreign accident investigations. DA 14, Haueter Decl. ¶ 8; DA 19, MacIntosh Decl. ¶ 16.

82. In 2003, OAS regional offices initiated 1,915 accident investigations and 50 serious incident investigations and completed 1,707 investigations. DA 14, Haueter Decl. ¶ 14.

83. In 2004, OAS regional offices initiated 1,865 accident investigations and 116 serious incident and accident investigations and completed 2,361 investigations. DA 14, Haueter Decl. ¶ 15.

84. In 2005, OAS regional offices initiated 1,927 accident investigations and 128 serious incident and accident investigations and completed 2,335 investigations. DA 15, Haueter Decl. ¶ 16.

85. In 2003, OHS initiated 49 investigations and launched on 34 accidents. "Launching" on an accident involves traveling to the accident site immediately after the appropriate senior official has made the determination to launch. "Initiating an investigation" involves commencing an investigation on a particular accident, but may not always involve immediate travel. DA 22, Osterman Decl. ¶ 8.

86. In 2004, OHS initiated 45 investigations and launched on 45 accidents. DA 23, Osterman Decl. ¶ 9.

87. In 2005, OHS initiated 33 investigations and launched on 28 accidents. DA 23, Osterman Decl. ¶ 10.

88. During the calendar year of 2003, ORPH launched on 10 railroad accidents, two pipeline accidents, and three hazardous materials accidents. Of the hazardous materials accidents in 2003, one of these accidents was also a marine accident. DA 9, Chipkevich Decl. ¶ 14.

89. During the calendar year of 2004, ORPH launched on 14 railroad accidents, two pipeline accidents, and two hazardous materials accidents. Of the hazardous materials accidents in 2004, one of these accidents was also a highway accident. DA 10, Chipkevich Decl. ¶ 15.

90. During the calendar year of 2005, ORPH launched to eight railroad accidents, one pipeline accident, and two hazardous materials accidents, one of which was a railroad accident, and the other of which was a highway accident. DA10, Chipkevich Decl. ¶ 16.

91. Between 2003 and 2005, OMS launched to approximately six or seven marine accidents per year. See DA 50, Cooke Dep. at 57.

92. In 2003, OMS investigated eight accidents and launched on three accidents. DA 177, 205.

93. In 2004, OMS investigated seven new accidents and launched on four accidents. DA 181, 204.

94. In 2005, OMS investigated three new accidents and launched on three accidents. DA 186, 204.

95. The workload of a major aviation investigation is much larger than the workload of a major marine investigation. DA 87, 30(b)(6) Dep. at 105.

96. Aviation investigations involve far more people, far more press, and far more interest than investigations in the other modes. DA 87, 30(b)(6) Dep. at 105.

97. The process flow for aviation accident investigations is much more complicated than for other transportation modes. DA 89, 30(b)(6) Dep. at 107.

98. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its

fact-finding regarding each accident in the most thorough, complete manner. DA 23, Osterman Decl. ¶ 11.

99. An investigation of a major aviation accident may involve up to 100 to 150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. See 49 C.F.R. part 831. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals. DA 14, Haueter Decl. ¶ 13.

100. In general, approximately three NTSB employees launch on foreign aviation major accident investigations. DA 20, MacIntosh Decl. ¶ 18.

101. In general, approximately 10 to 12 NTSB employees launch on major aviation accident investigations. DA 14, Haueter Decl. ¶ 12.

102. The investigation of a major marine accident may involve three to seven NTSB investigators and approximately 20 party representatives. See DA 109, Deposition of John Spencer ("Spencer Dep.") at 102-03; DA 91, 30(b)(6) Dep. at 109; DA 51, DA 52-54, Cooke Dep. at 64, 69-75.

103. In OHS, the parties to an accident investigation are typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, there is an educational and information component to the party system in OHS that does not exist in some of the other investigative modal offices. DA 23, Osterman Decl. ¶ 12.

104. In OMS, Coast Guard investigators frequently are parties to marine accident investigations, and therefore are already aware of the rules and regulations that pertain to accident investigation. DA 79, 30(b)(6) Dep. at 62.

105. In ORPH, the parties to an accident investigation often vary considerably; some parties are frequently involved in NTSB investigations, while others require the NTSB to take extra steps to ensure that they are familiar with the structure, process, and general conduct that an investigation will entail. DA 10, Chipkevich Decl. ¶ 17.

Public Interest/Press

106. OHS has a much higher public profile than OMS because highway safety is a very visible matter of public concern. Pl. Ex. 3, F3 at 4; DA 25, Osterman Decl. ¶ 26.

107. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB. Pl. Ex. 3, F3 at 3. The NTSB is aviation-centric because aviation safety is the reason the NTSB exists. DA 37, Conners Dep. at 31.

108. Hundreds of thousands of individuals are interested in major aviation accidents, an interest that is not seen in other modes. DA 90, 30(b)(6) Dep. at 108. For example, in the year that TWA 800 crashed off Long Island, New York, it was the biggest news story during the year, even though it was a presidential election year. DA 89-90, 30(b)(6) Dep. at 107-08.

109. The sheer volume and persistence of political officials, the industry, the press, and the public in a major aviation accident is not comparable to other modes. DA 90, 30(b)(6) Dep. at 108; see also DA 37, Conners Dep. at 32.

110. Very little of the Director of OMS's time is spent on interacting with the press. See DA 110, Spencer Dep. at 106.

Reports

111. Each modal office is responsible for preparing reports setting forth the factual findings of an investigation, analyzing the probable cause of an investigation, and usually containing safety recommendations based upon those findings. Once the modal office has

prepared its draft of the report, that draft goes through a process called directors' review. During the directors' review meeting, the modal office presents the report to the other modal office directors, the Managing Director, the Director of the Office of Research and Engineering ("RE"), the Director of the Office of Safety Recommendations, and the General Counsel. Based upon the outcome of the meeting and the review process, the Managing Director may require that changes be made to the report. After the office directors sign off on the report, the notation process occurs. In the notation process the report is sent to all five members of the Board simultaneously for them to consider it prior to the report being presented to them formally in public in a Sunshine Meeting. At the Sunshine Meeting, the appropriate office director and investigators officially present the report to the Board. The Board may adopt the report as is, or it may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report. See DA 55-DA 57, Cooke Dep. at 90-100.

112. In 2003, OAS completed four major reports and continued work on four other major investigations. DA 15, Haueter Decl. ¶ 17.

113. In 2004, OAS completed four major reports and continued work on six other major investigations. DA 15, Haueter Decl. ¶ 18.

114. In 2005, OAS completed four major reports and continued work on seven other major investigations. DA 15, Haueter Decl. ¶ 19.

115. Between 2003 and 2005, OAS completed a total of approximately 5,560 reports. DA 24, Osterman Decl. ¶ 20.

116. From 2003 to 2005, OAS developed 185 safety recommendations that were adopted by the Safety Board. DA 14, Haueter Decl. ¶ 11.

117. In 2003, OHS completed 44 dockets, issued seven reports, and continued work on 22 investigations. The "completion of a docket" refers to the completion of the fact-finding and analytical components of an investigation, which is a considerable undertaking that is critical to the NTSB's subsequent analysis of the accident during its investigation. DA 22, Osterman Decl. ¶ 8.

118. In 2004, OHS completed 36 dockets, issued 6 major reports, and continued work on 26 investigations. DA 23, Osterman Decl. ¶ 9.

119. In 2005, OHS completed 31 dockets, issued four major reports, and continued work on 29 investigations. DA 23, Osterman Decl. ¶ 10.

120. From 2003 to 2005, OHS developed 113 safety recommendations that were adopted by the Safety Board. DA 26, Osterman Decl. ¶ 30.

121. During the calendar year of 2003, ORPH completed a total of 13 investigation reports, which included 11 railroad accident reports, one pipeline accident report, and one hazardous materials report. At any given time during 2003, ORPH was working on approximately 15 to 20 ongoing investigations. DA 10, Chipkevich Decl. ¶ 18.

122. During the calendar year of 2004, ORPH completed a total of 16 investigation reports, which included 10 railroad accident reports, three pipeline reports, and two hazardous materials reports. At any given time during 2004, ORPH was working on approximately 15 to 20 ongoing investigations. DA 10, Chipkevich Decl. ¶ 19.

123. During the calendar year of 2005, ORPH completed a total of 10 investigation reports and one pipeline report that was a safety study. These investigation reports included nine railroad accident reports and one hazardous materials report. At any given time during 2005,

ORPH was working on approximately 15-20 ongoing investigations. DA 10, Chipkevich Decl. ¶ 20.

124. From 2003 to 2005, ORPH developed 82 safety recommendations that were adopted by the Safety Board. DA 11, Chipkevich Decl. ¶ 21.

125. In 2003, OMS completed one report and continued work on 10 investigations. DA 177.

126. In 2004, OMS completed four reports and continued work on 18 accident investigations. DA 181, 205.

127. In 2005, OMS completed six reports and continued work on seven accident investigations. DA 186, 205.

128. From 2003 to 2005, OMS developed 20 safety recommendations that were adopted by the Safety Board. DA 26, Osterman Decl. ¶ 30.

129. The size of major aviation accident reports is not comparable to other modes. DA 97, 30(b)(6) Dep. at 150.

International Work

130. Pursuant to the International Maritime Organization ("IMO") treaty, the Coast Guard has responsibility and primacy to investigate any international marine accidents involving United States flagged or Unites States manufactured vessels. DA 84, 30(b)(6) Dep. at 70.

131. Between 2000 and 2005, the NTSB never took the lead on a marine investigation outside of the territorial seas of the United States and not involving a United States flagged vessel. DA 49, Cooke Dep. at 47-48.

132. In 2005, the NTSB did not investigate any overseas marine accidents. DA 186.

133. Between 1999 and 2005, OMS launched to approximately one international accident per year. DA 69, Cooke Dep. at 207.

134. Pursuant to the International Civil Aviation Organization ("ICAO") treaty, NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. Many major international aviation accidents involve one or more of these, so NTSB is involved in many major international aviation accidents. DA 18, MacIntosh Decl. ¶ 5.

135. OAS has a responsibility to participate in accident investigations conducted by other nations per the entitlements conveyed in the ICAO treaty Annex 13. DA 18, MacIntosh Decl. ¶ 6.

136. In 2003, OAS participated in seven foreign accident investigations. DA 19, MacIntosh Decl. ¶ 17.

137. In 2004, OAS participated in seven foreign accident investigations. DA 19, MacIntosh Decl. ¶ 17.

138. In 2005, OAS participated in 20 foreign accident investigations. DA 19, MacIntosh Decl. ¶ 17.

139. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and

2005, the Director of ORPH communicated with officials in foreign countries approximately four to six times per year on various matters. DA 11, Chipkevich Decl. ¶ 22.

140. The Coast Guard, not OMS, is primarily responsible for United States representation at IMO. See DA 86, 30(b)(6) Dep. at 98.

141. The NTSB does not have an official role at IMO. The NTSB attends IMO meetings as part of the United States delegation and advises the head of the delegation about NTSB's position on issues before IMO. See DA 112, Spencer Dep. at 162.

142. For marine accident investigations, the Coast Guard serves as the head of the United States delegation to IMO. DA 58, Cooke Dep. at 143.

143. The head of the delegation for the Coast Guard is the person who sits in the United States' seat at the plenary session of IMO. DA 59, Cooke Dep. at 147.

144. The NTSB is one of the United States' representatives at IMO for marine accident investigation. DA 59, Cooke Dep. at 147.

145. The NTSB does not have a seat at the plenary session of IMO. DA 59, Cooke Dep. at 148.

146. If the NTSB wanted an issue to be presented at the plenary session of IMO, that recommendation would have to be made through the Coast Guard. See DA 60, Cooke Dep. at 150.

147. NTSB's interest in IMO has to flow through the Coast Guard. DA 86, 30(b)(6) Dep. at 98.

148. The NTSB is the agency primarily responsible for United States representation at ICAO on matters pertaining to the investigation of accidents and incidents in civil aviation. DA 18, MacIntosh Decl. ¶ 7.

149. Mr. MacIntosh is responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to Aircraft Accident and Incident Investigation, Annex 13 to ICAO. OAS is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO. DA 18, MacIntosh Decl. ¶ 8.

150. In addition to ICAO activities, OAS (specifically Mr. MacIntosh) represents the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators. DA 19, MacIntosh Decl. ¶ 11.

151. Mr. MacIntosh provides counsel to NTSB aviation safety investigators with regard to the application and interpretation of Annex 13 of ICAO during the course of foreign aviation accident investigations. DA 20, MacIntosh Decl. ¶ 19.

Congressional Testimony

152. Between 2003 and 2005, the Director of ORPH testified before Congress twice. To date, the Director of ORPH has testified before Congress 10 times since 2001. DA 11, Chipkevich Decl. ¶ 23.

153. In preparing for his testimony before Congress, the Director of ORPH was required to brief and interact with Congressional aides and members of Congress on several occasions between 2003 and 2005. The purpose of such briefings was to help staff and members of Congress understand railroad, pipeline, and hazardous materials safety investigations or issues. DA 11, Chipkevich Decl. ¶ 24.

154. Between 2003 and 2005, the Director of OHS testified before Congress three times. DA 23, Osterman Decl. ¶ 14.

155. Between 2003 and 2005, Ms. Cooke never testified before Congress. DA 60, Cooke Dep. at 151.

156. On average, Ms. Cooke prepared a board member or other NTSB employee to testify before Congress once per year between 2003 and 2005. DA 60, Cooke Dep. at 153.

157. The Director of ORPH prepared the Chairman or a Board member to testify before Congress two times between 2003 and 2005. To date, the Director of ORPH has prepared the Chairman or a Board Member to testify before Congress 14 times since 2002. DA 11, Chipkevich Decl. ¶ 25.

158. On average, the Director of OHS prepared a board member or other NTSB employee to testify before Congress six times per year between 2003 and 2005. DA 24, Osterman Decl. ¶ 16.

159. On average, the Director of OAS prepared a Board member to testify before Congress twice per year between 2003 and 2005. DA 15, Haueter Decl. ¶ 21.

160. On average, the Deputy Director of OAS prepared a Board member to testify before Congress twice per year between 2003 and 2005. DA 15, Haueter Decl. ¶ 21.

161. On average, the OAS Chief Advisor prepared a board member or other NTSB employee to testify before Congress three times per year between 2003 and 2005. DA 19, MacIntosh Decl. ¶ 13.

<u>Travel</u>

162. Between 2003 and 2005, the Director of OHS traveled to the site of a highway accident approximately twice per year, on average. DA 24, Osterman Decl. ¶ 17.

163. Between 2003 and 2005, the Director of OHS traveled approximately eight times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations. DA 24, Osterman Decl. ¶ 19.

164. Between 2003 and 2005, the Director of OAS traveled to the site of an aviation accident four times. DA 15, Haueter Decl. ¶ 22.

165. Between 2003 and 2005, the Deputy Director of OAS traveled to the site of an aviation accident seven times. DA 15, Haueter Decl. ¶ 23.

166. Between 2003 and 2005, the Deputy Director of OAS traveled approximately three to four times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations. DA 15, Haueter Decl. ¶ 25.

167. The Director of ORPH traveled three times during 2003, four times during 2004, and one time during 2005, in order to represent the NTSB at events or gatherings that did not involve accident investigations. Such events included providing presentations, participating in briefings, or representing the NTSB at conferences. DA 12, Chipkevich Decl. ¶ 26.

168. In his capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, Mr. MacIntosh travels frequently, primarily to diplomatic meetings. On average, he travels eight to nine times per year, for at least one week to two weeks per trip. His position requires much more travel than any of the modal office directors. His frequent travel and the associated long hours present a source of stress, and physical and mental fatigue that exceed that of any office environment. DA 19, MacIntosh Decl. ¶ 14.

169. Ms. Cooke never traveled to the site of an accident between 2003 and 2005. DA 65, Cooke Dep. at 189.

170. Ms. Cooke traveled approximately twice per year between 2003 and 2005. Each trip lasted approximately one week. DA 66, Cooke Dep. at 190.

171. The working conditions at the site of an accident, including detailed examination of wreckage, and interviews with survivors or associated personnel are different from, and more hazardous than, working conditions of any office environment. DA 19, MacIntosh Decl. ¶ 15; see also DA 15, Haueter Decl. ¶ 24; DA 24, Osterman Decl. ¶ 18.

Executive Resources Board

172. The SES-level modal office directors were members of the Executive Resources Board ("ERB"). DA 25, Osterman Decl. ¶ 24; DA 16, Haueter Decl. ¶ 29; DA 12, Chipkevich Decl. ¶ 27.

173. The SES-level modal office directors spend approximately 10 to 15 percent of their time on their work for the ERB. See DA 95, 30(b)(6) Dep. at 138; DA 25, Osterman Decl. ¶ 25.

174. The Director of ORPH has participated in numerous ERB meetings and decisions affecting the management of the NTSB since assuming the position at the SES level. DA 12, Chipkevich Decl. ¶ 28.

175. As Director of OMS, Ms. Cooke was not a member of the ERB. DA 61, Cooke Dep. at 156.

176. Ms. Cooke was not involved in any of the ERB's duties during her tenure as Director of OMS. DA 96, 30(b)(6) Dep. at 139.

177. The members of the ERB were responsible for staffing and career appointments to the SES. DA 209.

178. Between 2002 and 2005, Ms. Cooke had no responsibilities with respect to staffing or career appointments to the SES. DA 62, Cooke Dep. at 159.

179. The members of the ERB advised the MD regarding the number of SES positions needed by the agency. DA 209.

180. Ms. Cooke had no official role in advising the MD regarding the number of SES positions within the NTSB. DA 63, Cooke Dep. at 162.

181. The members of the ERB had a role in the selection of SES candidates in the NTSB. DA 210.

182. Ms. Cooke had no official role in the selection of SES candidates in the NTSB. DA 63, Cooke Dep. at 162.

183. The ERB had a role in decisions to redistribute SES positions within the NTSB. DA 210.

184. Ms. Cooke had no official role regarding redistribution of SES positions within the NTSB. DA 63, Cooke Dep. at 162.

185. The ERB had a role in the development of policy for performance awards for SES employees at the NTSB. DA 210.

186. Ms. Cooke had no role in the development of policy for performance awards for SES employees at the NTSB. DA 63, Cooke Dep. at 163.

187. The ERB had a role in the development of policy in discipline and removal of SES employees. DA 210.

188. Ms. Cooke had no role in the development of policy in discipline and removal of SES employees. DA 63, Cooke Dep. at 164.

189. As an SES-level position, the Director of OMS was responsible for broad agency-wide planning and program development activity. That is, the SES-level OMS director was

responsible for decision-making for agency activity outside of OMS. See DA 94, 30(b)(6) Dep. at 134.

190. As Director of OMS, Ms. Cooke was not responsible for broader agency-wide planning and program development activity. See DA 95-96, 30(b)(6) Dep. at 138-39.

Additional Differences Between Ms. Cooke And Her Alleged Comparators

191. The Director of OHS had responsibility for significant state recommendation advocacy. The other modal office directors did not have the same level of responsibility because regulation of those modes is primarily federal. DA 25, Osterman Decl. ¶ 27.

192. The Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than OMS or ORPH. DA 25, Osterman Decl. ¶ 28.

193. OHS handles more mutli-modal investigations than the other modal offices. The primacy for investigating accidents involving highways and waterways or highways and railroads falls to OHS, as opposed to OMS or ORPH. DA 25, Osterman Decl. ¶ 29.

194. OHS is responsible for completing more safety reports than any other modal office. These safety reports examine a number of different accidents with a common issue. DA 23, Osterman Decl. ¶ 13.

195. The Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. In this regard, the division of ORPH that conducts hazardous materials investigations is unique, and requires ORPH to interact closely with other offices, either as the primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation. DA 9, Chipkevich Decl. ¶ 13.

196. The technical expertise required of the Director of OHS and ORPH differed from the technical expertise possessed by Ms. Cooke. DA 70-DA 71, Cooke Dep. at 224, 233.

197. The Director of ORPH must be conversant in multiple transportation modes. See DA 65, Cooke Dep. at 187; DA 9, Chipkevich Decl. ¶ 13.

198. The Director of ORPH must maintain a considerable amount of expertise in three distinct areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transport of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of these different types of accident investigations. DA 9, Chipkevich Decl. ¶ 13.

199. It is not necessary to be educated in any transportation modes other than marine to be the Director of OMS. DA 65, Cooke Dep. at 186.

200. The position of Deputy Director of OAS requires a more technical background than the other modal office director positions because of the Deputy Director's involvement in the technical aspects of major investigations. DA 16, Haueter Decl. ¶ 28.

201. The Deputy Director is the chief advisor to the Director and is the operational manager for the Office Director. DA 87-89, 30(b)(6) Dep. at 105-07. The Deputy Director of OAS was responsible for the general oversight and conduct of all major aviation investigations. This responsibility included supervising the scope of accident investigations, and making decisions regarding the course, direction, duration, and general breadth of inquiry concerning certain aspects of investigations. DA 15, Haueter Decl. ¶ 26.

202. The Deputy Director of OAS had greater responsibility for the day-to-day conduct of accident investigations than any of the modal office directors. DA 16, Haueter Decl. ¶ 27.

203. The OAS Chief Advisor's responsibilities involve the coordination of NTSB's role and activity involving international aviation investigation. DA 17, MacIntosh Decl. ¶ 4.

204. Mr. MacIntosh is responsible for coordinating technical matters and interface for each international launch with the host country and any other countries involved in the investigation. DA 18, MacIntosh Decl. ¶ 9.

205. The OAS Chief Advisor must possess unique international relations abilities, including education and training on geopolitical subjects. DA 18, MacIntosh Decl. ¶ 10.

206. Mr. MacIntosh works with the Department of State in a variety of different capacities and is conversant in two different languages. DA 18, MacIntosh Decl. ¶ 10.

207. When Mr. Spencer began his tenure as the Director of OMS, one of his assignments from the MD was to reduce the backlog in the office. DA 107, Spencer Dep. at 76. The MD told Mr. Spencer that it was taking too long to get reports out and asked him what he could do to shorten the time. DA 113, Spencer Dep. at 195.

208. When Mr. Spencer began his tenure as the Director of OMS, one of his assignments from the MD was to restore a good working relationship with the Coast Guard. DA 107, Spencer Dep. at 76. Mr. Spencer was told that the NTSB's relationship with the Coast Guard before he arrived was not very good - that is, that it was adversarial. DA 111, Spencer Dep. at 129.

209. When Mr. Spencer began his tenure as the Director of OMS, one of his assignments from the MD was to give NTSB a greater presence in the marine industry. DA 107-DA 108, Spencer Dep. at 76-77. The MD told Mr. Spencer that he wanted him to use his industry contacts to gain more visibility and credibility for the NTSB. DA 113, Spencer Dep. at 196.

210. When Mr. Spencer began his tenure as the Director of OMS, one of his assignments from the MD was to become more active in international activities. DA 108, Spencer Dep. at 77.

211. There are five mandatory Executive Core qualifications common to all SES positions. They are leading change, leading people, results driven, business acumen, and building coalitions/communication. DA 188-90.

Compensation

212. The NTSB was required to work within the confines of Federal statutes and regulations when determining Ms. Cooke's pay, as well as the pay of her alleged comparators. DA 39-DA 40, Conners Dep. at 52-53.

213. Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005, until the date of her retirement, on July 3, 2006. DA 4, Carroll Decl. ¶ 18.

214. GS-15 employees are eligible for overtime within the Federal system. DA 4, Carroll Decl. ¶ 19.

215. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10 or level V of the Executive Schedule. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, she was only eligible to receive in overtime an amount equal to the difference between her salary and the premium pay limitation. DA 4, Carroll Decl. ¶ 19.

216. Overtime is defined as hours of work that are officially ordered or approved by a supervisor before the hours are worked. DA 4, Carroll Decl. ¶ 20.

217. Ms. Cooke arguably requested overtime from then Chairman Ellen Engleman Conners in April 2004, but provided no justification or rationale for her request. DA 40-DA 41, Conners Dep. at 56-57.

218. There was an unwritten policy that individuals in management positions at the NTSB, including modal officer directors, would not receive overtime pay. DA 99-100, 30(b)(6) Dep. at 172, 178.

219. It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present. DA 99, 30(b)(6) Dep. at 172.

220. Pursuant to 5 C.F.R. § 575.301, an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

DA 5, Carroll Decl. ¶ 21. The NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. DA 101, 30(b)(6) Dep. at 189.

221. During her tenure as Director of OMS, Ms. Cooke never received an offer of outside employment. DA 74, Cooke Dep. at 264-65. Thus, Ms. Cooke was ineligible for a retention allowance.

222. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. DA 5, Carroll Decl. ¶ 22.

223. From 2003 to 2005, Ms. Cooke received all step increases to which she was entitled. DA 5, Carroll Decl. ¶ 23.

224. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase. DA 5, Carroll Decl. ¶ 26.

225. Performance awards are paid based upon performance and are not meant to augment one's salary. DA 5, Carroll Decl. ¶ 27.

226. Between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. DA 102, 30(b)(6) Dep. at 195.

227. It was tradition for office directors to decline to participate in the end-of-year agency-wide awards. DA 103, 30(b)(6) Dep. at 196.

228. NTSB employees who hold SL positions must demonstrate technical competencies. DA 5, Carroll Decl. ¶ 24.

229. SL employees may not perform supervisory duties more than 25 percent of the time. DA 5, Carroll Decl. ¶ 25.

230. Ms. Cooke's position as Director of OMS involved routine supervisory responsibilities for a staff of 14 to 15 people. DA 64, DA 73, Cooke Dep. at 171, 242-43.

<u>Female SES Employees</u>

231. Between 2002 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beale, and Elaine Weinstein. DA 5, Carroll Decl. ¶ 28.

232. Between 2001 and 2005, Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES. DA 5, Carroll Decl. ¶ 28.

233. Lola Ward, Julie Beale, and Elaine Weinstein were all required to compete for their positions. All of them competed against male applicants. DA 5, Carroll Decl. ¶ 29.

Conclusion

234. On April 28, 2006, Ms. Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). Pl. Ex. 5.

235. On October 26, 2006, the district court transferred the Equal Pay Act claim to this Court. Pl. Ex. 8.

236. Ms. Cooke filed her complaint in this Court on November 14, 2006. See First Am. Compl.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
DENISE D'AVELLA
Office of General Counsel
National Transportation Safety Board

December 3, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 3rd day of December, 2007 a copy of the foregoing "DEFENDANT'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN