IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 06-748C |
| v. | ) | (Judge Thomas C. Wheeler) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S RESPONSE TO PLAINTIFF'S
PROPOSED FINDINGS OF UNCONTROVERTED FACT

Pursuant to Rule 56(h)(2) of the Rules of this Court, defendant respectfully responds to plaintiff's proposed findings of uncontroverted fact as follows:

1. Defendant is the United States of America, in the persons of the National Transportation Safety Board ("NTSB"), and NTSB Chairman Mark Rosenker ("Rosenker"). *See* Ex. 1 Amended Complaint, ¶ 3 and Ex. 2 Answer, ¶ 3.

Response:

Defendant does not dispute this fact.

2. In 1994, Plaintiff was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety. *See* Ex. 1 Amended Complaint, ¶ 5 and Ex. 2 Answer, ¶ 5.

Response:

Defendant does not dispute this fact.

3. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS"). *See* Ex. 1 Amended Complaint, ¶ 6 and Ex. 2 Answer, ¶ 6.

Response:

Defendant does not dispute this fact.

4. Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status. The Director and Deputy Director of the Office of Surface Transportation Safety also had SES status. *See* Ex. 1 Amended Complaint, ¶ 7 and Ex. 2 Answer, ¶ 7.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that "each surface office had a director" and "the Director and Deputy Director of the Office of Surface Transportation Safety also had SES status" during the same time period. Prior to a restructuring that began in 1997 and ended in 1998, the Director and Deputy Director of the Office of Surface Transportation Safety were paid at the SES level. As part of the restructuring, the Office of Surface Transportation safety was divided into four separate surface modal offices. Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 3. At that point, the individuals who had been chiefs within the Office of Surface Transportation Safety became directors of separate surface modal offices. DPFUF ¶¶ 5-6. Following the restructuring, the Office of Surface Transportation no longer existed, therefore it had no Director or Deputy Director.

5. The core functions required for the Director of OMS, OHS, OAS and ORPH were all the same. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2f at 1.

Response:

Defendant does not dispute this proposed fact to the extent that it refers to the core functions, on their most basic level, to the extent listed in the document cited. However, defendant dispute this fact to the extent that it can be construed to imply that each of the modal office directors' jobs required equal skill, effort, and responsibility, and were performed under similar working conditions. While the core functions listed in the document cited were the same for each office directors, the specific skill, efforts, and responsibilities required for carrying out those functions were very different. See Def. Br. at 26-39. The core functions were also carried out under different working conditions. See Def. Br. at 39-40. Additionally, there were functions other than those listed in the document cited that were required for the Directors of OHS, OAS, and ORPH, but were not required for the Director of OMS. See Def. Br. at 26-40.

6. Each modal office director was responsible for ordering an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2f at 1.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that the skills, efforts, responsibilities, and working conditions related to accident investigation were the same for all of the modal office directors. While all modal office directors were responsible for accident investigations, marine was the only mode in which NTSB was not the primary investigative authority for major transportation accidents. DPFUF ¶ 44. The statutory and regulatory authority of the agency for conducting investigations related to transportation safety is not identical among the modes of transportation. See 49 U.S.C. § 1131; 49 C.F.R. Part 831. Furthermore, because of the number of accidents, the size and scope of each accident investigation, and the public, press, and Congressional interest in each type of accident,

the skills, efforts, responsibilities, and working conditions of each modal office director related to accident investigation varied greatly. See Def. Br. at 26-40.

7. Each modal office director was responsible to disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch. VIII. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2f at 1.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that each modal office director's responsibility to disclose factual information was the same. This responsibility was greater for the Directors of OAS, OHS, and ORPH than for the Director of OMS because of the greater number of accident and incident investigations handled by OAS, OHS, and ORPH. DPFUF ¶¶ 79-94. Additionally, this responsibility was greater for the Director of OAS than OMS because aviation accident investigations were generally more complex than marine accident investigations. See DPFUF ¶ 97.

8. Each modal office director was responsible to determine the probable causes of accidents. *See* Ex. 3 EEO Investigative Report Produced by Defendant F2f at 1.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that each modal office was responsible for determining the probable cause of all transportation accidents in that mode. Marine was the only mode in which the NTSB was not the primary agency responsible for transportation accident investigations. DPFUF ¶ 44. OMS and the United States Coast Guard had concurrent jurisdiction over any marine accident that took place in the United States' navigable waters. DPFUF ¶ 50. In any investigation in which the Coast Guard took the lead between 2003 and 2005, the NTSB did not issue a report of

investigation, and thus did not determine probable cause; the Coast Guard determined probable cause. Furthermore, the modal office directors only have authority to determine the probable cause of accidents in which the determination is issued in the "Brief of Accident" format. Otherwise, the five-member Board is responsible for determining probable cause. 49 C.F.R § 800.25.

9. Each modal office director was responsible to investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2f at 1.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that the statute cited provides the same investigation standards for all transportation modes. Pursuant to 49 U.S.C. §§ 1131 and 1132 and 49 C.F.R. part 850, the standards governing accident investigation are different for each transportation mode. DPFUF ¶¶ 45-54. Most notably, OAS is required to investigate all civil accidents, whereas the other offices do not have the same requirement. See id. Furthermore, OMS was the only office with concurrent jurisdiction with another agency (the Coast Guard) over accident investigation. See id.

10. In 1997, as the result of a restructuring, Plaintiff was named the Director of OMS. *See* Ex. 1 Amended Complaint, ¶ 9 and Ex. 2 Answer, ¶ 9.

Response:

Defendant does not dispute this fact.

11. 1999 the Agency requested OPM authorize SES slots for all the Modal Office Directors. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F3 at 2.

Response:

Defendant does not dispute this fact. Defendant notes, however, that the request was made for all surface modal office directors; the Director of OAS was already an SES position. Defendant also notes that OPM denied this request. DPFUF ¶ 10.

12. After the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of ORPH. *See* Ex. 1 Amended Complaint, ¶ 10 and Ex. 2 Answer, ¶ 10.

Response:

Defendant does not dispute this fact.

13. In early 2003, the NTSB was once again reviewing an available SES slot. This SES slot went to Joe Osterman ("Osterman"), the Director of OHS. After Osterman was awarded the SES slot, Plaintiff became the only Director of the four modal safety offices without SES status. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F3 at 3.

Response:

Defendant does not dispute that in early 2003, the NTSB was reviewing an available SES slot. Defendant disputes the allegation that the SES slot "went to" Mr. Osterman and that Mr. Osterman was "awarded" the slot. The slot was assigned to the position of Director of OHS, not specifically to Mr. Osterman. Once the slot was assigned to that position, it was competed as required by OPM regulations. Mr. Osterman applied for the position. Following the application process, Mr. Osterman was selected for the position at the SES level. The NTSB recommended Mr. Osterman for this SES position to Office of Personnel Management ("OPM"), and he was approved for appointment to the SES. DPFUF ¶¶ 21-23. Defendant does not dispute the

proposed fact that, following Mr. Osterman's approval by OPM, Ms. Cooke became the only modal office director not paid at the SES level.

14. Plaintiff was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director of OAS, Osterman and Chipkevich. *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2i.

Response:

Defendant does not dispute that, as set forth in the document cited by Ms. Cooke, Ms. Cooke was paid less, to varying degrees, than Mr. Clark, Mr. Osterman, and Mr. Chipkevich in 2003 and 2004. Defendant objects to the term "significantly less." Defendant also objects to the term "male counterparts" to the extent that it can be construed to imply that Mr. Clark, Mr. Osterman, and Mr. Chipkevich performed work that required equal skill, effort, and responsibility and that such work was performed under similar working conditions as Ms. Cooke. Defendant further objects to the term "male counterparts" to the extent that it can be construed to imply that any difference in salary between Ms. Cooke and the other modal office directors was attributable to her gender. Defendant further notes that Mr. Clark was the Director of OAS during all time periods relevant to Ms. Cooke's complaint.

15. Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $121,583. Currently John Spencer ("Spencer"), the new OMS Director, who replaced Plaintiff, is paid at the SES level for performing equal work to that of Plaintiff. *See* Ex. 1 Amended Complaint, ¶ 17, Ex. 2 Answer, ¶ 17.

Response:

Defendant does not dispute that, in 2003, Mr. Clark received a salary of $142,022, Mr. Osterman received a salary of $136,872, Mr. Chipkevich received a salary of $142,022, and Ms. Cooke received a salary of $121,583. Defendant does not dispute that Mr. Spencer is the current Director of OMS and is paid at the SES level. However, defendant disputes the statement that Mr. Spencer performs equal work to that of Ms. Cooke. See Def. Br. at 38-39.

16. In addition, in 2004, while Clark received a salary of $142,022, Osterman received a salary of $140,797 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $126,963. *See* Ex. 1 Amended Complaint, ¶ 18, Ex. 2 Answer, ¶ 18.

Response:

Defendant does not dispute these facts.

17. Plaintiff has requested and is awaiting Defendant's disclosure of the 2005 NTSB salary and monetary award compensation for Clark, Osterman and Chipkevich. *See* Ex. 11 ¶ 5 and Ex. 12 ¶ 2.

Response:

Defendant disputes this proposed fact. Defendant produced information regarding the 2005 compensation for Mr. Clark, Mr. Osterman, and Mr. Chipkevch to Ms. Cooke on October 18, 2007.

18. Plaintiff received lower monetary awards than her male counterparts, Clark, Osterman and Chipkevich. Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Plaintiff received an award of $5,400. And in 2004, while Clark received an award of $17, 000, Osterman received an award of $9,500, and Chipkevich received an award of $16,000, Plaintiff

received an award of $3,400. *See* Ex. 1 Amended Complaint, ¶ 20 and ¶21, Ex. 2 Answer, ¶ 20 and ¶ 21.

Response:

Defendant does not dispute these facts. Defendant objects to the term “male counterparts” for the reasons set forth in response to paragraph 14.

19. As the Director of the Office of Highway Safety, Osterman had virtually the same duties and responsibilities as Plaintiff when she was the director of OMS. *See* Ex. 4 Osterman Deposition at 74-85.

Response:

Defendant disputes this proposed fact. Among other differences, Mr. Osterman supervised a greater number of employees than Ms. Cooke. DPFUF ¶¶ 34-35. Mr. Osterman was responsible for five regional offices, whereas Ms. Cooke was not responsible for any. DPFUF ¶¶ 37, 39. Mr. Osterman was responsible for a considerably larger budget than Ms. Cooke. DPFUF ¶¶ 41-43. Mr. Osterman had greater discretion than Ms. Cooke to determine whether to investigate an accident. DPFUF ¶¶ 76-75. OHS received many more accident notifications than OMS and, therefore, had more decisions to make on whether to initiate an accident investigation. DPFUF ¶¶ 70, 74. OHS investigated a greater number of accidents and issued a greater number of reports than OMS. DPFUF ¶¶ 85-87, 92-94, 117-19, 125-27. OHS often deals with parties to the investigation who have never acted as parties before and, therefore, there is an educational component that does not exist to the same degree in OMS. DPFUF ¶ 103. OHS has a much higher public profile than OMS and, therefore, Mr. Osterman had greater responsibilities with respect to the public and press. See DPFUF ¶ 106. OHS was responsible for issuing considerably more safety recommendations than OMS. DPFUF ¶¶ 120,

128. Mr. Osterman testified before Congress three times between 2003 and 2005, whereas Ms. Cooke never did. DPFUF ¶¶ 154-55. Between 2003 and 2005, Mr. Osterman traveled to an accident site approximately twice per year, whereas Ms. Cooke never did. DPFUF ¶¶ 162, 169. Mr. Osterman was a member of the Executive Resources Board, whereas Ms. Cooke was not. DPFUF ¶ 172, 175. Mr. Osterman was significantly responsible for state recommendation advocacy, whereas Ms. Cooke did not have the same level of responsibility. DPFUF ¶ 191. Finally, Mr. Osterman was responsible for handling more multi-modal investigations than Ms. Cooke. DPFUF ¶ 193.

20. Both Osterman's position at OHS and Plaintiff's position at OMS had the virtually the same job description as follows:

- Planned, managed and evaluated the work of the OHS. See Ex. 4 Osterman Deposition at 74; Exhibit 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1;
- Exercised important policy making and policy determining decision that impacted highway safety at international organizations, federal agencies, and international and domestic industries. See Ex. 4 Osterman Deposition at 74; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1;
- Provided for overall direction and technical accuracy of the investigation and reporting process for major highway safety accidents. See Ex. 4 Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Developed overall requirements and schedules to accomplish the highway safety program. See Ex. 4 Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Reviewed, approved and promulgated schedules and milestones for assigned activities. See Ex. 4 Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Reviewed, evaluated and approved, disapproved or modified requests for changes to milestones in schedules. See Ex. 4 Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Developed overall program review documentation and provided status reports on a regular basis. See Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Determined the level of response and resources allocation for the NTSB highway safety program. See Ex. 4 Osterman Deposition at 75; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1.

- Notified NTSB's chairman and managing director, federal and international agencies and managing director of the accident. See Ex. 4 Osterman Deposition at 76; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 1-2.

- Notified foreign embassies and/or flag representatives as appropriate. See Ex. 4 Osterman Deposition at 77; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Coordinated the allocation of staff resources with other office directors involved in the investigation. See Ex. 4 Osterman Deposition at 76; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Resolved differences between modal and support staff views regarding accident investigation, scope, required resources and analysis. See Ex. 4 Osterman Deposition at 77; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Ensured through the completed and comprehensive review of the draft report that essential issues were adequately addressed. See Ex. 4 Osterman Deposition at 77 -78; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Ensured reviewed of the draft report that all findings and recommendations are supported by analysis and that the board and that the draft sent forward is of the best quality. See Ex. 4 Osterman Deposition at 78; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Ensured the proper presentation of the draft report before the board at board hearings. See Ex. 4 Osterman Deposition at 78; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Reviewed work product of other modal and support offices. See Ex. 4 Osterman Deposition at 76. See Ex. 4 Osterman Deposition at 78; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Ensured that the quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program, including investigations, reports, safety

recommendations and highway safety advocacy. See Ex. 4 Osterman Deposition at 78-79; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Established and maintained liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, and Federal regulators. See Ex. 4 Osterman Deposition at 79; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Provided authoritative advice and expertise to these groups in the development of industry standards and regulations and new applications of existing technology. See Ex. 4 Osterman Deposition at 80; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Provided Congressional testimony. See Ex. 4 Osterman Deposition at 80; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Participated in international meetings on highway safety issues as a representative of the NTSB. See Ex. 4 Osterman Deposition at 81; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Developed and justified estimates for staff resources requirements including personnel funding, equipment, and office, space. See Ex. 4 Osterman Deposition at 81; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Justified and defended budgets on all levels of management. See Ex. 4 Osterman Deposition at 81; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Implemented concepts to get results through people and make selections assign work, train and reward employees. See Ex. 4 Osterman Deposition at 81; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Corrected poor performance in a manner that maximizes the use of staff skills and achieving organizational skills. See Ex. 4 Osterman Deposition at 82; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Monitored work status through formal and informal means and procedures. See Ex. 4 Osterman Deposition at 82; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Ensured appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated. See Ex. 4 Osterman Deposition at 82; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors. See Ex. 4 Osterman Deposition at 82; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Ensure that employees are given real and continuing opportunity to influence their work environment and ensure that employees are given a real and continuing opportunity to be able to participate in discussions related to methods of work accomplishments. See Ex. 4 Osterman Deposition at 83; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Ensured reasonable equity within OHS of performance standards and rating techniques developed by subordinates and ensure equity in the subordinates' assessment

of the adequacy of contractor capabilities and contractor completed work. See Ex. 4 Osterman Deposition at 83; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory employees rated by subordinate supervisors. See Ex. 4 Osterman Deposition at 83-84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Evaluated program accomplishments and their overall effectiveness. See Ex. 4 Osterman Deposition at 84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Identified program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed. See Ex. 4 Osterman Deposition at 84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Worked closely with human resources in approving their recruitment, placement and retention of a high quality OHS work force. See Ex. 4 Osterman Deposition at 84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Ensured that crucial training courses needed to keep pace with today's technological improvements in highway transportation safety are provided to staff for their technical and operational currency. See Ex. 4 Osterman Deposition at 84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Ensured crucial training sessions needed to keep pace with today's technological improvements in highway transportation safety are provided to the staff for their

technical and operational currency. See Ex. 4 Osterman Deposition at 84; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.

- Provide effective management training to maintain a highway motivated and cohesive force. See Ex. 4 Osterman Deposition at 85; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Relate equal employment opportunity concepts to overall responsibilities. See Ex. 4 Osterman Deposition at 85; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Support affirmative action plan while performing assigned responsibilities. See Ex. 4 Osterman Deposition at 85; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 2.
- Available 24 hours a day 7 days a week. See Ex. 4 Osterman Deposition at 85.
- Support board members, agency initiatives, and meetings with regard to agency staff awards. See Ex. 4 Osterman Deposition at 86; Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F2d at 4.

Response:

Defendant does not dispute that the duties and responsibilities listed in paragraph 20 are contained in the draft position description for the Director of OMS cited by Ms. Cooke.[1] However, this fact is not material because "[a]pplication of the equal pay standard . . . depends . . . on actual job requirements and performance," not upon job descriptions. See 29 C.F.R.

[1] Of course, the OMS draft position description refers to OMS, marine accidents, and similar matters, not OHS and highway accidents.

§ 1620.13(e); see also Epstein v. Sec'y, United States Dep't of Treasury, 739 F.2d 274, 277 (7th Cir. 1984) (stating that even though two jobs may have identical job descriptions, a court is not required to find a prima facie equal pay violation). Therefore, the duties and responsibilities contained in the position description are irrelevant absent evidence that Ms. Cooke actually performed those duties and responsibilities. Ms. Cooke cites no such evidence. Just because a duty is contained in a position description does not mean that it was actually performed. Further, the duties and responsibilities listed are broad and general, and they do not provide specific information as to the tasks performed.

Defendant also does not dispute that the duties and responsibilities listed above were duties and responsibilities of Mr. Osterman, except to the extent that this paragraph can be construed to imply that Mr. Osterman's duties and responsibilities were limited to those listed.

21. The skills required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those skills included, essentially, technical expertise in their transportation mode; knowledge of, and expertise in, accident investigation processes and procedures from the investigation stage through report completion, leadership and supervisory skills; logic and analytical process skills; a fundamental knowledge of their respective modal industries; the ability to communicate both written and orally and to coordinate and collaborate with other professionals both internally within the NTSB and externally as part of the investigations or other advocacy work for each respective office. *See* Ex. 5 30(b)(6) Deposition 39-48 and 49-50.

Response:

Defendant disputes the allegation that the skills required for the Director of OAS, OMS, ORPH, and OHS were all virtually identical. Defendant does not dispute that, on a general level, each of the skills listed in the second sentence of paragraph 21were required for each of the

modal office director positions. However, defendant notes that many of the skills listed are requirements for almost any position in any organization, especially any management or executive position. Moreover, within each of the very broad categories listed by Ms. Cooke, the skills required for each office director were very different. See Def. Br. at 30-32.

22. The efforts required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those efforts included: effectively managing large volumes of information related to accident investigation; assessing and evaluating issues; evaluating resources necessary and available; juggling multiple priorities; dealing with contingencies and uniqueness of each investigation; decision making; supervising and evaluating staff both in the office and in the field; providing support and essential information for internal personnel including Board members, the Managing Director and other executives and managerial staff, supervisors, investigators, report writers, and administrative personnel and external personnel including the transportation mode regulator (e.g. FAA and USCG), party representatives (e.g. Cruise ship owners) Congressional staff, and, in the case of international/foreign investigations, State Department and foreign government officials, and in the case of public/non public investigations, Department of Defense officials; developing, establishing, and assuring fulfillment through supervision and oversight of multiple processes for accident investigation from accident/incident notification through report development; reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission, communication of results, collaboration with internal and external professionals; complying with all rules, regulations, and guidelines that apply to human and monetary resource management; and conducting business on a year round 24 hour/ 7 day schedule. *See* Ex. 4 Osterman Deposition 74-86 and Ex. 5 30(b)(6) Deposition 77-80.

Response:

Defendant disputes the allegation that the efforts required for the Director of OAS, OMS, ORPH, and OHS were all virtually identical. Defendant does not dispute that, on a general level, most of the efforts listed in the second sentence of paragraph 22 were required for each of the modal office director positions. Defendant disputes that "reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission" was one of Ms. Cooke's efforts. See PFUF ¶ 187. Defendant also notes that many of the efforts listed are requirements for almost any position in any organization, especially any management or executive position. Moreover, within each of the broad categories of efforts listed by Ms. Cooke, the actual efforts required by each of the modal office directors were very different. See Def. Br. at 32-34.

23. The responsibilities required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those skills include but are not limited to managing a major modal program for the agency which included: conducting accident investigations to determine their cause and preparing justifications for safety recommendations to prevent accident repetition in the future; overseeing the analysis, development and preparation of detailed reports and proposing probable cause determinations of major and field accidents and incidents; preparing accident investigation reports in a timely manner; preparing Special Investigations, responses to proposed rulemakings, responses to requests for technical support, and Public Hearings. *See* Ex. 6 Clark Deposition 60-75, Ex. 4 Osterman Deposition 74-86, Ex. 5 30(b)(6) Deposition 77-81, 98-100 and 114-119. Additionally, the list of responsibilities included management responsibilities related to internal and external communications (e.g. keeping the Chairman, other Board members, the Managing Director, other agency executives and managers, party

representatives and Congressional members and staff, informed either verbally and/or in writing.) human resources (e.g. managing modal professionals, recruiting and hiring personnel, supervising, training and tracking career goals and progression, developing performance standards and evaluating personnel; tracking leave and overtime); budget management (e.g. exercising budget authority, using funds for training, travel, overtime, and on-scene investigation support); project tracking and quality control of all Modal Office products. *See* Ex. 6 Clark Deposition 60-75 and Ex. 5 30(b)(6) Deposition 77-80.

Response:

Defendant disputes the allegation that the responsibilities required for the Directors of OAS, OMS, ORPH, and OHS were all virtually identical. Defendant does not dispute that, on a general level, the responsibilities listed in the second and third sentences of paragraph 22 were required for each of the modal office director positions. However, within each of the broad categories listed by Ms. Cooke, the scope of responsibility was much greater for the Directors of OAS, OHS, and ORPH than for the Director of OMS. See Def. Br. at 35-39.

24. Plaintiff performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of ORPH and Osterman performed his work as Director of OHS. Each worked primarily in an office environment using electronic devices, computers and telephones for communication. The critical nature of each Director's work requires him/her to be available 24 hours a day/ seven days a week (24/7) in case of an accident that requires an investigation. Each Office Director was expected to deal effectively with the pressure of accident launches, the on-scene investigation phase including coordination and collaboration with internal and external staff, subsequent analysis and report preparation stage, preparation of written and oral communications

and presentation to the Board and to the public. Each director reported directly to the Managing Director, their second level supervisor was the Chairman. Each of the Office Directors was relatively independent to do their work. *See* Ex. 4 Osterman Deposition 74-86 and Ex. 5 30(b)(6) Deposition 80-82 and 130-131.

Response:

Defendant disputes the allegation that Ms. Cooke performed her work under similar conditions as Mr. Clark, Mr. Chipkevich, and Mr. Osterman. Defendant admits the fact that each modal office director worked primarily in an office environment. However, defendant notes that Mr. Clark and Mr. Osterman traveled to accident sites, while Ms. Cooke did not, and that the working conditions at accidents sites were different from, and more hazardous than, working conditions in an office environment. PFUF ¶ 162, 164, 169, 171. Additionally, the facts contained in the third, fourth, fifth, and sixth sentences of paragraph 24 are not material to the "working conditions" aspect of Ms. Cooke's prima facie case because they do not constitute working conditions as defined by the Equal Pay Act. See 29 C.F.R. § 1629.18. To the extent that they may be considered working conditions, defendant disputes that they were the same for all modal office directors. See Def. Br. at 39-40.

25. When asked if the duties of the modal office directors are identical, and require the same skill, effort and responsibility under the same working conditions, Ellen Engleman Conners, former Chairman of the NTSB, and ultimately responsible for all modal directors, responded under oath stating "I agree". *See* Ex. 3 EEO Investigative Report Produced by Defendant Exhibit F4 at 2.

Response:

Defendant disputes this proposed fact. During the investigation, Ms. Engleman Conners was asked the following question: "[Ms. Cooke] has asserted that the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond." EEO Investigative Report Exhibit F4 at 2. Ms. Engleman Conners responded as follows: "I agree, <u>although the differentiating factor is the workload</u>." <u>Id.</u> (emphasis added). Ms. Engleman Conners did not state that the duties of the modal office directors were "identical" or that the skill, effort, and responsibility were "the same" and did not say anything about the working conditions. Ms. Engleman Conners agreed that the duties, skill, effort, and responsibility of the modal office directors were <u>similar</u>, but qualified her response by pointing to the differing workloads.

26. In July 2004, and in early 2005, NTSB advertised Plaintiff's position for SES status. Each time, Plaintiff submitted an application for the position. In May 2005, NTSB's Managing Director notified Plaintiff of her non-selection for the same position that she performed since 1997. Shortly thereafter, in June 2005, NTSB transferred Plaintiff to the Office of Safety Recommendation and Communication. Plaintiff later retired. *See* Ex. 1 Amended Complaint, ¶ 34, 36, 41, 44, and 45; Ex. 2 Answer, ¶ 34, 36, 41, 44, and 45**.**

<u>Response</u>:

Defendant does not dispute the fact that, in July 2004 and in early 2005, the NTSB advertised the position of Director of OMS at the SES level. Defendant disputes the statement that the NTSB advertised "Plaintiff's position for SES status," as Ms. Cooke did not hold the position of Director of OMS at the SES level. Defendant does not dispute that, in May 2005, the Managing Director notified Ms. Cooke of her non-selection for the position of Director of OMS at the SES level. Defendant disputes that the Director of OMS position at the SES level was "the

same position that [Ms. Cooke] performed since 1997." The Director of OMS position at the SES level is distinguishable from the position at the GS-15 level. See Def. Br. at 38-39. Defendant does not dispute the facts contained in the third and fourth sentences of paragraph 26.

27. On April 28, 2006, Plaintiff filed a complaint in the United States District Court for the District of Columbia against Defendant, asserting claims for violations of the Equal Pay Act, 29 U.S.C. § 206(d) and the retaliation provision contained in the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). *See* Ex. 7.

Response:

Defendant does not dispute this fact.

28. On October 26, 2006, the District Court transferred the Equal Pay Act claim to this Court. On November 9, 2006, this Court accepted for filing the case as transferred from the District Court. *See* Ex. 8 and Ex. 9.

Response:

Defendant does not dispute this fact.

29. On January 8, 2007, Defendant filed an Answer to the Complaint, which contained no affirmative defenses. *See* Ex. 2 Answer and Ex. 10, ¶ 6.

Response:

Defendant does not dispute this proposed fact, except to the extent that it can be construed to imply that defendant has not asserted affirmative defenses in this litigation or that Ms. Cooke has not been aware of defendant's intent to assert affirmative defenses throughout the course of this litigation. Furthermore, in the response to Plaintiff's First Requests for the Production of Documents cited by Ms. Cooke, defendant stated the following: "Defendant did

not assert any affirmative defenses in its answer. All documents produced [thus far] . . . support defendant's defense of the claims lodged by plaintiff." Pl. Ex. 10, ¶ 6 (emphasis added).

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
DENISE D'AVELLA
Office of General Counsel
National Transportation Safety Board

December 3, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 3rd day of December, 2007 a copy of the foregoing "DEFENDANT'S RESPONSE TO PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN