**No. 06-748C**
**(JUDGE WHEELER)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**MARJORIE MURTAGH COOKE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

**GREGORY G. KATSAS**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**MEREDYTH D. COHEN**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 353-7978**
**Fax: (202) 514-8624**

**Of Counsel:**

**KATHLEEN SILBAUGH**
**Office of General Counsel**
**National Transportation Safety Board**

**May 14, 2008**

**Attorneys for Defendant**

# TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . i

TABLE OF AUTHORITIES . . . . . iii

STATEMENT OF THE ISSUES . . . . . 2

STATEMENT OF THE CASE . . . . . 2

I. Nature Of The Case . . . . . 2

II. Statement of Facts . . . . . 3

A. Background . . . . . 3

B. SES Allocations . . . . . 4

C. Differences Between The Modal Offices . . . . . 9

D. Compensation . . . . . 20

E. Female Employees . . . . . 24

SUMMARY OF ARGUMENT . . . . . 24

ARGUMENT . . . . . 27

I. The Standard of Review For Summary Judgment . . . . . 27

II. The Standard Of Review For The Equal Pay Act . . . . . 28

III. Ms. Cooke Cannot Establish Her *Prima Facie* Case . . . . . 29

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . 29

B. The Effort Required For The Director Of OMS And The Alleged Comparators Was Not Equal . . . . . 31

C. The Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . 32

D. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

IV. Assuming That Ms. Cooke Has Established Her *Prima Facie* Case, The Pay Differential Was Not Based Upon Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

2. Ms. Cooke Could Not Have Been Given Overtime Pay . . . . . . . 40

3. Ms. Cooke Could Not Have Been Given A Retention Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

4. Ms. Cooke Could Not Have Been Given Any Additional Performance Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

5. Ms. Cooke Could Not Have Been Given A Senior Level Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex . . . . . . . . . . . . . . . . . . . . . . 43

V. Promotion, Reinstatement, And Front Pay Are Not Available As Remedies For Equal Pay Act Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

TABLE OF AUTHORITIES

**CASES**

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ........ 27

Behm v. United States,
68 Fed. Cl. 395 (2005) ........ 43

Belfi v. Prendergast,
191 F.3d 129 (2nd Cir. 1999) ........ 28

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ........ 27

Corning Glass Works v. Brennan,
417 U.S. 188 (1974) ........ 28, 29

Equal Employment Opportunity Commission v. Aetna Ins. Co.,
616 F.2d 719 (4th Cir. 1980) ........ 41, 43

Hildebrandt v. Illinois Dep't of Natural Res.,
347 F.3d 1014 (7th Cir. 2003) ........ 49

Hirsch v. United States.,
499 F.2d 1248 (Ct. Cl. 1974) ........ 49

Hodgson v. Brookhaven Gen. Hosp.,
346 F.2d 719 (5th Cir. 1990) ........ 33

Lissak v. United States,
49 Fed. Cl. 281 (2001) ........ 28, 43

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) ........ 27

Molden v. United States,
11 Cl. Ct. 604 (1987) ........ 24, 28, 29

Pearce v. Wichita County,
590 F.2d 128 (5th Cir. 1991) ........ 33

Raymond v. United States,
31 Fed. Cl. 514 (1994) .......... 38

Skrobot v. United States,
534 F.2d 237 (Ct. Cl. 1975) .......... 49

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 27

Warren v. Solo Cup Co.,
516 F.3d 627 (7th Cir. 2008) .......... 43

Wollenburg v. Comtech Manufacturing Co.,
201 F.3d 973 (7th Cir. 2000) .......... 43

## STATUTES

5 U.S.C. § 3133 .......... 4, 21, 39

5 U.S.C. § 5336 .......... 22, 38

5 U.S.C. § 5547(a) .......... 40

5 U.S.C. § 5754 .......... 22, 41

29 U.S.C. § 201 .......... 28

29 U.S.C. § 203(e)(2) .......... 28

29 U.S.C. § 206(d) .......... 1, 2, 24, 28, 48

29 U.S.C. § 215(a)(3) .......... 24

29 U.S.C. § 216(b) .......... 48

49 U.S.C. § 1131 .......... 10

49 U.S.C. § 1132 .......... 10

## REGULATIONS

5 C.F.R. § 1.1 .......... 38

5 C.F.R. § 1.2 .......... 38

5 C.F.R. § 317.501 .......... 40, 45

5 C.F.R. § 317.519 .......... 4

5 C.F.R. § 317.701 .......... 5, 40

5 C.F.R. § 317.702 .......... 5, 40

5 C.F.R. § 317.903 .......... 24, 39, 47

5 C.F.R. § 531.02 .......... 22, 38

5 C.F.R. § 531.03 .......... 22, 38

5 C.F.R. § 531.04 .......... 22, 38

5 C.F.R. § 531.05 .......... 22, 38

5 C.F.R. § 550.105 .......... 40

5 C.F.R. § 575.301 .......... 22, 41, 42

29 C.F.R. § 1620.13(a) .......... 29

29 C.F.R §1620.15(a) .......... 29

29 C.F.R. § 1620.16(a) .......... 31

29 C.F.R. §1620.17(a) .......... 32, 33

29 C.F.R. § 1629.18 .......... 37

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully requests that the Court grant summary judgment for defendant upon the grounds that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. The uncontroverted facts demonstrate that, at all times relevant to plaintiff Marjorie Murtagh Cooke's complaint, the National Transportation Safety Board ("NTSB") properly paid Ms. Cooke at the General Schedule ("GS")-15 pay grade. Ms. Cooke's job did not require equal skill, effort, and responsibility and was not performed under similar working conditions as her alleged comparators. Furthermore, the NTSB's decision to pay Ms. Cooke at the GS-15 level was based upon a merit system and other gender-neutral considerations. Accordingly, because Ms. Cooke's job was not equal to the jobs of her comparators, the NTSB did not violate the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying Ms. Cooke at the GS-15 level. Even assuming that Ms. Cooke's job was equal to the jobs of her comparators, the NTSB did not violate the EPA by paying Ms. Cooke at the GS-15 level because it had gender-neutral reasons for doing so. Finally, assuming Ms. Cooke prevails in this litigation, she is not entitled to reinstatement, promotion, or front pay. In support of its

motion, defendant relies upon the pleadings, the appended declarations, defendant's appendix ("DA"), and the following brief.

## STATEMENT OF THE ISSUES

1. Whether Ms. Cooke's job required equal skill, effort, and responsibility and was performed under similar working conditions as the jobs of her alleged comparators.

2. Whether the NTSB paid Ms. Cooke at the GS-15 level pursuant to "a merit system . . . or a differential based on any other factor other than sex." 29 U.S.C. § 206(d).

3. Whether, assuming this Court were to find that the NTSB violated the Equal Pay Act, it could award Ms. Cooke promotion, reinstatement, or front pay.

## STATEMENT OF THE CASE

### I. Nature Of The Case

From 1997 to 2005, Ms. Cooke served as the Director of the Office of Marine Safety ("OMS") at the NTSB. First Am. Compl. ¶¶ 9, 44. Ms. Cooke alleges that, during her tenure as Director of OMS, she was paid less than "other similarly situated NTSB male directors . . . for similar work performed."[1] First Am. Compl. ¶ 1. Accordingly, Ms. Cooke alleges that the NTSB violated the Equal Pay Act, 29 U.S.C. § 206(d). First Am. Compl. ¶ 1. Ms. Cooke seeks reinstatement, promotion, economic damages including front and back pay, reasonable attorney's

---

[1] The alleged comparators are Robert Chipkevich, Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations; Joseph Osterman, former Director of the Office of Highway Safety; John Clark, former Director of the Office of Aviation Safety; John Spencer, current Director of the Office of Marine Safety; Thomas Haueter, former Deputy Director of the Office of Aviation Safety; and Robert MacIntosh, Chief Advisor for International Aviation Safety Affairs. See DA 136.

fees and costs, liquidated damages, and any other relief that this Court deems just and equitable. First Am. Compl. ¶ 50.

## II. Statement of Facts

We incorporate by reference our proposed findings of uncontroverted fact, filed concurrently with this motion, and include only a summary of those facts below.

### A. Background

The NTSB is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. Defendant's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 1. Between 2003 and 2005, the NTSB had approximately 400 to 450 employees. PFUF ¶ 2.

As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS"). First Am. Compl. ¶ 6; PFUF ¶ 3. From 1994 until 1997, plaintiff, Marjorie Murtagh Cooke, served as the Chief of the Marine Division, an office within the NTSB's Office of Surface Transportation Safety. First Am. Compl. ¶ 5-6; PFUF ¶ 4. In 1997, as a result of the restructuring, Ms. Cooke's title changed to Director of OMS. First Am. Compl. ¶ 9; PFUF ¶ 5. The individuals who occupied the Director positions for each of the other three offices immediately following the restructuring were Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS). PFUF ¶ 6. The Directors of OHS, ORS, OPHS and OMS (collectively the "surface modal offices") reported directly to the Managing Director ("MD"). PFUF ¶ 7. Effective November 5, 2000, ORS and

OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became the Acting Director of ORPH. PFUF ¶ 19.

B. SES Allocations

Following the restructuring, it was the NTSB's intent that each of the four surface modal office directors be classified and paid at the Senior Executive Service ("SES") level. However, at the time of the restructuring, there were no available SES slots to allocate to the surface modal office directors. PFUF ¶ 8.

SES slots are allocated to the NTSB from the Office of Personnel Management ("OPM"). The NTSB cannot create new SES slots without OPM authorization. See 5 U.S.C. § 3133; PFUF ¶ 9. Once the NTSB is allocated an SES slot by OPM, that slot can be used either to create a new SES position or to change an existing non-SES-level position to an SES-level position. PFUF ¶ 10. When a vacancy occurs in one of the already allocated SES slots, the NTSB can fill that slot or can reallocate that slot to another position within the agency, then fill it. PFUF ¶ 11.

When an SES slot becomes available, either by an allocation from OPM or a vacancy in an already allocated slot, the decision of where to allocate that available slot is made by the Chairman of the NTSB, usually with input from his or her advisors, including the MD, General Counsel, other office directors, and his or her Chief of Staff. PFUF ¶ 12. In deciding where to allocate an available SES slot, Chairman Ellen Engleman Conners considered these recommendations in accordance with the NTSB's long-term staffing plan involving allocation of resources within the agency. PFUF ¶ 12.

An SES-level position can be filled either by reassignment of a current SES-level employee to the position, or by a competitive recruitment process. See 5 C.F.R. § 317.591;

PFUF ¶ 13. An employee who encumbers a GS-level position that is reclassified to the SES level may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. If that GS-level employee has not previously held a career SES appointment, the SES-level position must be advertised and competed. See 5 C.F.R. §§ 317.701 and 317.702; PFUF ¶ 23.

In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied the NTSB's request. PFUF ¶ 14. Thus, for a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the GS scale. PFUF ¶ 15; see also First Am. Compl. ¶ 7.

Historically and during all relevant time periods, the NTSB's Office of Aviation Safety ("OAS") existed as a separate unit, and its Director and Deputy Director were paid at the SES level. PFUF ¶ 16; see First Am. Compl. ¶ 7. From November 2000 to March 2007, the individual occupying the OAS Deputy Director position was Thomas Haueter. PFUF ¶ 13. From July 2001 to the present, OAS had a Chief Advisor for International Aviation Safety Affairs ("OAS Chief Advisor") who was paid at the Senior Level ("SL"). During the entire existence of the position, it has been occupied by Robert MacIntosh, Jr. PFUF ¶ 18.[2]

Due to the retirement of an SES-level employee, an SES slot became available. PFUF ¶ 20. In 2001, Daniel Campbell, the MD at the time, recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of the Director of ORPH because ORPH was the most complicated and variegated of the three surface modal offices (OPRH, OHS, and

---

[2] John Clark was the Director of OAS during all relevant time periods. PFUF ¶ 16.

OMS) in terms of subject matter and Mr. Chipkevich was the most accomplished and senior of the modal office directors.[3] The administrative tasks facing the Director of ORPH were among the most daunting in the agency, given the dispersed work force and the need to combine and coordinate the differing cultures of several modes. Additionally, as the Director responsible for hazardous materials, the Director of ORPH had trans-modal responsibilities, involving aviation, highway and marine accidents, as well as rail and pipeline. Finally, the Director of ORPH would frequently be the agency's principal public spokesman due to the intricacy of the field. PFUF ¶ 21. Chairman Hall initially believed that the SES slot should be allocated to the position of the Director of OHS because of the large highway death toll, but ultimately agreed with Mr. Campbell's recommendation. PFUF ¶ 22. Thus, the SES slot was allocated to the position of Director of ORPH. PFUF ¶ 20. Mr. Campbell understood that, should another SES slot become available during Chairman Hall's tenure as Chairman, that slot would go to the Director of OHS position. PFUF ¶ 22.

In addition to the reasons raised by Mr. Campbell, the SES slot was allocated to the position of the Director of ORPH because of ORPH's multi-modal functions. That is, ORPH was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. PFUF ¶ 23.

---

[3] Though Mr. Campbell partially recommended that the SES slot be allocated to the Director of ORPH position because of Mr. Chipkevich's seniority and accomplishments, Mr. Campbell knew that, because Mr. Chipkevich was a GS-15 employee, the position would have to be advertised and competed at the SES level. See PFUF ¶ 25.

Once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position, and applications for the position were accepted. PFUF ¶ 26. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. PFUF ¶ 27. At the conclusion of the competitive process, Mr. Chipkevich was selected for the position. The NTSB then recommended him for the position to OPM, and he was approved for appointment to the SES. PFUF ¶ 27.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, OPM denied those requests. PFUF ¶ 28.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy after the incumbent voluntarily left the agency. Because the Academy was just getting started, the NTSB believed that it did not need an SES position, but that SES positions were needed in the operating portion, rather than the training portion, of the agency. PFUF ¶ 29. Though Chairman Hall was no longer in office, Mr. Campbell recommended following his plan of allocating the next available SES slot to the Director of OHS position. He did so because of the enormity of OHS's task, the size and dispersion of its workforce, and the constant need for public outreach and visible leadership. Because there are approximately 44,000 highway deaths per year, highway is the area in which the NTSB can have the most impact upon transportation safety. Comparatively,

there are about 700 boating fatalities annually. Mr. Campbell's recommendation had nothing to do with gender. PFUF ¶ 30.

Ms. Ellen Engleman Conners agreed that the SES slot should go to the Director of OHS position because the scope of OHS's investigatory responsibilities was larger than that of OMS, OHS had a greater number of employees than OMS, and OHS had regional offices, whereas OMS did not.[4] Further, because of the approximately 44,000 highway deaths per year, in contrast to several hundred marine deaths per year, OHS had a much larger impact upon the agency's safety mission than OMS. Ms. Engleman-Conners's decision had nothing to do with gender. PFUF ¶ 31. Thus, the SES slot was allocated to the position of the Director of OHS. PFUF ¶ 29.

Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position, and applications for the position were accepted. PFUF ¶ 32. Ms. Engleman Conners had no role in the selection for the position. She never saw a list of candidates or interviewed anyone for this, or any other, SES-level position. PFUF ¶ 33. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. PFUF ¶ 34. At the conclusion of the competitive process, Mr. Campbell informed Ms. Engleman Conners that the panel had recommended Mr. Osterman as the best person for the position. PFUF ¶ 35. The NTSB then recommended him for this position to OPM, and he was approved for appointment to the SES. PFUF ¶ 36. Mr. Osterman has been paid at the SES level since early 2004. PFUF ¶ 36.

---

[4] OHS had five regional offices, while OMS did not have any. PFUF ¶¶ 50, 52.

In 2004, NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS. PFUF ¶ 37. Once the decision was made to allocate the SES slot to the Director of OMS, the position was advertised in July 2004 as an SES position and applications for the position were accepted. See First Am. Compl. ¶ 34. Ms. Cooke submitted an application for the position. PFUF ¶ 38; see First Am. Compl. ¶ 35. The advertisement was subsequently cancelled prior to a selection being made because the NTSB believed that the pool of qualified applicants was too narrow and insufficiently robust. According to Mr. Campbell, there was a rumor that the position had been wired for Ms. Cooke. PFUF ¶ 39. The position was readvertised as an SES position in early 2005, and Ms. Cooke again submitted an application. PFUF ¶ 40; see also First Am. Compl. ¶¶ 36-37. The NTSB recommended John Spencer for this position to OPM, and he was approved for appointment to the SES. PFUF ¶ 41. In June 2005, Ms. Cooke was transferred to the Office of Safety Recommendations. First Am. Compl. ¶ 44; PFUF ¶ 42.

C. Differences Between The Modal Offices

There are numerous significant differences between the modal offices and, therefore, numerous significant differences between the work of the directors of those offices. Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into

selected accidents involving safety issues of concern to the board. PFUF ¶ 43. However, the specifics of each modal office's conduct of these duties are significantly different.

The size of OMS is not comparable to the size of the other modal offices. Between 2003 and 2005, OMS had by the fewest number of employees of and the smallest budget of any of the modal offices. PFUF ¶¶ 44, 46-48, 53-56. During that time period, OMS was the only modal office without any regional offices. PFUF ¶¶ 49-52.

Marine is the only transportation mode in which NTSB is not the primary Federal investigative authority for major transportation accidents. PFUF ¶ 57. Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB is required to investigate all civil aviation accidents, including all general aviation accidents. See PFUF ¶ 45. 49 U.S.C. § 1131 also requires the NTSB to investigate highway, railroad, and pipeline accidents which meet certain criteria. See PFUF ¶¶ 59-61. In contrast, the United States Coast Guard ("Coast Guard") and the NTSB have concurrent jurisdiction over any major marine casualties that also fall within the NTSB's jurisdiction (i.e., major marine casualties that occur in United States territorial waters or involve United States-flagged vessels, and marine accidents that involve a public United States vessel). See 49 U.S.C. §§ 1131(a)(1)(E) & 1131(b); PFUF ¶ 63. Moreover, unlike the Coast Guard, the NTSB's jurisdiction beyond United States territorial waters is strictly limited to United States flagged or public United States vessels and, within United States territorial waters, does not include lesser accidents that do not qualify as major marine casualties. Id. In accordance with 49 U.S.C. § 1131(a)(1)(A), the NTSB investigates major marine casualties within its jurisdiction pursuant to regulations jointly prescribed by the NTSB and Coast Guard. PFUF ¶ 65-67. Additional criteria governing decisions about whether the NTSB will lead a specific major

marine casualty investigation has been established by an NTSB-Coast Guard memorandum of understanding ("MOU"), the most recent of which was signed in 2002. PFUF ¶ 68.

There are far fewer marine accidents, injuries, and fatalities than accidents, injuries, and fatalities in any other transportation mode. PFUF ¶¶ 70-80. Additionally, eighty to 85 percent of marine injuries and fatalities are attributable to recreational, not commercial boating. PFUF ¶ 80.

Each of the modal office directors received notification of accidents in all transportation modes. PFUF ¶ 81. Between 2003 and 2005, there were fewer notifications of marine accidents than accidents in any other mode. PFUF ¶¶ 82-87. Moreover, the frequency of notifications of accidents outside normal business hours, from most to least, was: aviation, highway, rail, marine, and pipeline. PFUF ¶ 88.

OMS does not have as much discretion as OHS and ORPH in deciding whether to investigate a particular accident. In deciding whether to investigate, OMS uses the bright-line score set forth in NTSB's MOU with the Coast Guard. PFUF ¶ 89. On the other hand, because of its legislative mandate, OHS has enormous discretion in deciding whether to investigate. Highway accidents must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation. PFUF ¶ 90. The Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 91. In general, ORPH evaluates the circumstances and safety issues of each accident, and the Director of ORPH makes a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident

prevention issue. Overall, the Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 91.

Between 2003 and 2005, OMS conducted the fewest number of accident investigations of all the modal offices. PFUF ¶¶ 92-107.

Investigations of accidents in transportation modes other than marine, particularly investigations of aviation accidents, are far more complex than investigations of marine accidents. The workload of a major aviation investigation is much larger than the workload of a major marine investigation. PFUF ¶ 108. Aviation investigations involve far more people, far more press, and far more interest than investigations in the other modes. PFUF ¶ 109. Major aviation accidents, such as TWA 800 and AA 587, take many resources and many years to complete. PFUF ¶ 110. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough and complete manner. PFUF ¶ 112. An investigation of a major aviation accident may involve up to 100 to150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. See 49 C.F.R. part 831. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals. PFUF ¶ 113. In general, approximately 10 to 12 NTSB employees launch on major aviation accident investigations. PFUF ¶ 115. In contrast, the investigation of a major marine accident may involve three to seven NTSB representatives and approximately four parties represented by approximately 20 individuals. PFUF ¶ 116.

Highway accident investigations are more complex than marine accident investigations, in part because the parties to a highway investigation are typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, OHS is required to educate and provide information to the parties each time. PFUF ¶ 117. In ORPH, the parties to an investigation also vary considerably. PFUF ¶ 119. In contrast, Coast Guard investigators frequently are parties to marine accident investigations, and are already well aware of the rules and regulations that pertain to accident investigation. See PFUF ¶ 118.

In general, there typically is much greater press and public interest in aviation and highway accidents than there is in marine accidents. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function on the NTSB. PFUF ¶ 121. Aviation safety is the core reason for the NTSB's existence, as the NTSB is a successor agency to the Civil Aeronautics Board. PFUF ¶ 121. Typically, hundreds of thousands of people are interested in aviation accidents, an interest which is not comparable to other transportation accidents.[5] PFUF ¶ 122. The sheer volume and persistence of political officials, the industry, the press, and public in a major aviation accident is not comparable to other modes. PFUF ¶ 123. Similarly, OHS has a much higher public profile than OMS because highway safety is a very visible matter of public concern. PFUF ¶ 120. In comparison, less than one percent of the Director of OMS's time is spent interacting with the press. PFUF ¶ 124.

---

[5] For example, in the year that TWA 800 crashed off Long Island, New York, it was the biggest news story during the year, even though it was a presidential election year. PFUF ¶ 122.

Each modal office is responsible for preparing reports setting forth the factual findings of an investigation, analyzing the probable cause of an investigation, and usually making safety recommendations based upon those findings. Once the modal office has prepared its draft of the report, that draft goes through a process called a directors' review. During the directors' review meeting, the modal office presents the report to the other modal office directors, the Managing Director, the Director of the Office of Research and Engineering ("RE"), the Director of the Office of Safety Recommendations, and the General Counsel. Based upon the outcome of the meeting and the review process, the Managing Director may require that changes be made to the report. After the office directors sign off on the report, the notation process occurs. In the notation process, the report is sent to all five members of the Board simultaneously for them to consider it prior to the report being presented to them formally in public in a Sunshine Meeting. At the Sunshine Meeting, the appropriate office director and investigators officially present the report to the Board. The Board may adopt the report as is or may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report. PFUF ¶ 125. Between 2003 and 2005, OMS completed fewer reports than any other modal office. PFUF ¶¶ 128-29, 131-33, 135-39, 139-41. In addition, major aviation accident reports are larger and more complex than reports in any other mode. PFUF ¶¶ 143. During that time period, OMS also issued fewer safety recommendations than any of the other modal offices. PFUF ¶¶ 130, 134, 138, 142.

OMS's international work is not comparable to the international work done by OAS. OMS's role in international accident investigation is vastly different from OAS's role. Pursuant to the International Maritime Organization ("IMO") code for the investigation of marine

casualties and incidents, the United States may investigate any international marine accidents involving United States flagged vessels or in which the United States has a substantial interest. The investigation may be conducted by the Coast Guard, NTSB, or both. PFUF ¶ 144. Unlike OMS, pursuant to the International Civil Aviation Organization ("ICAO") treaty, the NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. PFUF ¶ 148. Many major international aviation accidents involve one or more of these, so the NTSB is involved in many major international aviation accidents. PFUF ¶ 148. In addition, OAS is responsible for participating in accident investigations conducted by other nations per the entitlements conveyed in the ICAO treaty Annex 13. PFUF ¶ 149. Furthermore, OAS participates in a much greater number of international accident investigations than OMS. PFUF ¶¶ 145-47, 150-52.

Not only does OAS have a larger role than OMS in international accident investigation, but OAS also has a much larger role than OMS in the United States' representation at their respective international organizations, ICAO and IMO. The Coast Guard, not NTSB, is the agency that represents the United States at IMO. PFUF ¶ 154. The NTSB's interest in IMO has to flow through the Coast Guard. PFUF ¶ 161. For marine accident investigations, the Coast Guard serves as the head of the United States delegation to IMO. PFUF ¶ 156 The head of the delegation for the United States is the person who sits in the United States' seat at the plenary session of IMO. PFUF ¶ 157. The NTSB does not have an official role at IMO. The NTSB attends IMO meetings as part of the United States delegation and advises the head of the delegation about NTSB's position on issues before IMO. PFUF ¶ 155, 158. The NTSB does not have a seat at the plenary session of IMO. PFUF ¶ 159. If the NTSB wanted an issue to be

presented at the plenary session of IMO, that recommendation would have to be made through the Coast Guard. PFUF ¶ 160.

Unlike OMS, OAS is primarily responsible for United States representation at ICAO on matters pertaining to the investigation of accidents and incidents in civil aviation. PFUF ¶ 162. Mr. MacIntosh is responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to Aircraft Accident and Incident Investigation, Annex 13 to ICAO. OAS is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO. PFUF ¶ 163. In addition to ICAO activities, OAS (specifically Mr. MacIntosh) represents the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators. PFUF ¶ 164.

As OAS's Chief Advisor, Mr. MacIntosh's responsibilities involve both the international accident investigation and international representation aspects of OAS's international work. Mr. MacIntosh is responsible for coordinating technical matters and interface for each international launch with the host country and any other countries involved in the investigation. PFUF ¶ 219. Mr. MacIntosh also provides counsel to NTSB aviation safety investigators with regard to Annex 13 during the course of foreign aviation accident investigations. PFUF ¶ 165.

ORPH also does a significant amount of international work. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the

United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and 2005, the Director of ORPH communicated with officials in foreign countries approximately four to six times per year on various matters. PFUF ¶ 153.

Each modal office director, and Mr. Haueter and Mr. MacIntosh, were required to testify before Congress on issues related to their transportation modes, prepare NTSB Board members or other NTSB staff to testify before Congress, and brief Congressional staff members. Unlike the other modal office directors, Ms. Cooke never testified before Congress between 2003 and 2005. PFUF ¶¶ 166, 168-69. Moreover, between 2003 and 2005, Ms. Cooke prepared a Board member or other NTSB staff member to testify before Congress less frequently than the Director of OAS, the Director of OHS, Mr. Haueter, and Mr. MacIntosh. PFUF ¶¶ 170-75.

As Director of OMS between 2003 and 2005, Ms. Cooke traveled less frequently than any of her alleged comparators, both to accident sites and to events and gathers not involving accident investigation. PFUF ¶¶ 177-80, 182-85. In fact, Ms, Cooke never traveled to the site of an accident during that time. PFUF ¶ 184. The working conditions at the site of an accident, including detailed examination of wreckage, and interviews with survivors or associated personnel are different from, and more hazardous than, working conditions of any office environment. PFUF ¶ 186. In his capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, Mr. MacIntosh travels frequently, primarily to diplomatic meetings. On average, he travels eight to nine times per year, for at least one week to two weeks per trip.

His position requires much more travel than any of the modal office directors. His frequent travel and the associated long hours present a source of stress and mental fatigue that exceed that of any office environment. PFUF ¶ 183.

All of the SES-level modal office directors, including Mr. Spencer, were members of the Executive Resources Board ("ERB"), whereas Ms. Cooke was not a member. PFUF ¶ 187, 190. The SES-level directors spent up to 15 percent of their time on work for the ERB. PFUF ¶ 188. Ms. Cooke was not involved in any of the ERB duties during her tenure as Director of OMS. PFUF ¶¶ 191-203. Unlike the SES-level modal office directors (including Ms. Cooke's successor, Mr. Spencer), Ms. Cooke had no responsibility for broader agency-wide planning, that is, decision making for agency activity outside of OMS. PFUF ¶¶ 204-05.

There are a number of other areas in which the work of OMS and, accordingly, the work of the Director of OMS differs substantially from the work of the other modal offices and their directors. For example, the Director of OHS had significant responsibility for state recommendation advocacy. The other modal office directors did not have the same level of responsibility because regulation of those modes is primarily Federal. PFUF ¶ 206. The Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than OMS or ORPH. PFUF ¶ 207. OHS handles more mutli-modal investigations than the other modal offices. The primacy for investigating accidents involving highways and waterways or highways and railroads falls to OHS, as opposed to OMS or ORPH. PFUF ¶ 208. OHS is responsible for completing more safety reports that any other modal office. The safety reports examine a number of different accidents with a common issue. PFUF ¶ 209. The Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident

investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. In this regard, the division of ORPH that conducts hazardous materials investigations is unique, and it requires ORPH to interact closely with other offices, either as the primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation. PFUF ¶ 210.

In addition to the ERB, there are other areas in which Mr. Spencer's work differed from that of Ms. Cooke. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman. Specifically, Mr. Spencer was asked to reduce the backlog in the office, restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities. PFUF ¶ 222-225.

Because of the differences in the work of the modal offices, different skills are required for each of the modal office directors, for the Deputy Director of OAS, and for OAS Chief Advisor. As acknowledged by Ms. Cooke, the technical expertise required of the Director of OHS and ORPH differed from the technical expertise that she possessed. PFUF ¶ 211. Because of the fact that ORPH is responsible for multiple transportation modes, the Director of ORPH must maintain a considerable amount of expertise in all three areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transportation of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of accident investigations. PFUF ¶¶ 212-13. In contrast, in order to be the Director of OMS, it is not necessary to be educated in any transportation mode other than marine. PFUF ¶ 214. The position of Deputy Director of OAS requires a more

technical background than the modal office director positions, including OMS, because of the Deputy Director's involvement in the technical aspects of major investigations. PFUF ¶¶ 215. The position of OAS Chief Advisor requires unique international relations abilities not required by any of the modal office director positions. See PFUF ¶ 220. Mr. MacIntosh works with the State Department in a variety of different capacities and speaks several languages. PFUF ¶ 221.

Additionally, all SES employees throughout the Federal Government are required to possess certain skills that are not required for GS employees. There are five mandatory Executive Core qualifications common to all SES positions. They are leading change, leading people, results driven, business acumen, and building coalitions/communication. PFUF ¶ 226. SES-level positions, because they are at the highest level of civil service, require a certain level of professionalism, abilities, qualifications, and skills not necessary for GS-level positions. PFUF ¶ 227.

D. Compensation

The NTSB is required to work within the confines of Federal statutes and regulations when determining the pay of its employees. See PFUF ¶ 228. GS employees are eligible for overtime pay within the Federal system. PFUF ¶ 230. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was technically eligible to receive overtime pay to the extent that her total salary did not exceed the greater of GS-15, step 10 or level V of the Executive Schedule as set by Congress. PFUF ¶ 230. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS,[6] she was only

[6] Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005, until the date of her retirement, on July 3, 2006. PFUF ¶ 229.

eligible to receive in overtime an amount equal to the difference between her salary and the pay limitation. See 5 U.S.C. § 3133; PFUF ¶ 231. Between 2003 and 2005, this difference was no more than approximately $3,800 per year. PFUF ¶ 231. Overtime is defined as hours of work outside the employee's normal tour of duty that are officially ordered or approved by a supervisor before the hours are worked. PFUF ¶ 232. Furthermore, there was an unwritten policy that individuals in management positions at the NTSB, including modal office directors, would not receive overtime pay. PFUF ¶ 237. It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present. PFUF ¶ 238.

In April 2004, Ms. Engleman Conners had a brief meeting with Ms. Cooke. During that meeting, Ms. Cooke asked to be paid overtime to compensate for her GS-15 status. She did not say anything suggesting that her request for overtime pay had to do with "equalizing" her pay to that of the other modal office directors. She did not state that she was filing a complaint or alleging a violation of the Equal Pay Act. She also did not say anything suggesting that she believed her pay was different from that of the other modal office directors because of her gender. She did not provide any justification or rationale to support receipt of overtime pay. She did not ask about any type of compensation other than overtime pay. PFUF ¶ 233. Ms. Engleman Conners did not know whether managers were eligible for overtime pay pursuant to the civil service regulations, so she told Ms. Cooke that she would look into it and get back to her. Later that day, she relayed the conversation to Mr. Campbell and asked him to look into it. Ms. Engleman Conners did not follow up with Mr. Campbell because she assumed he had taken care of it. To this day, Ms. Engleman Conners does not know if overtime pay is available to managers at the NTSB. PFUF ¶ 234.

Ms. Engleman Conners never received documentation or other justification from Ms. Cooke for her request for overtime. Ms Engleman Conners does not recall receiving any documentation requiring or requesting her approval of Ms. Cooke's request for overtime pay. PFUF ¶ 235. Ms. Cooke never approached Mr. Campbell about receiving overtime pay, even though, because he was her first-line supervisor, this would have been the normal course. PFUF ¶ 236.

Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301, an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301; PFUF ¶ 239. The NTSB further requires that an employee have an offer in writing for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. PFUF ¶ 239. During her tenure as Director of OMS, Ms. Cooke never received an offer of outside employment. Thus, Ms. Cooke was ineligible for a retention allowance. PFUF ¶ 240.

Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. See 5 C.F.R. Part 531; PFUF ¶ 241. A GS-level employee may receive a quality step increase if he or she receives as outstanding performance rating and had not received a quality step increase within the last 52 weeks. See 5 U.S.C. § 5336; 5 C.F.R. §§ 531.502-531.505; PFUF ¶ 242. From 2003 to 2005, Ms. Cooke received all within-grade step increases when she met the necessary criteria. PFUF ¶ 243.

Employees may be eligible for "performance awards" based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, in the form of "special act awards," often concerning a specific project or the fulfillment of a specific goal. See PFUF ¶ 244. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment, are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase. PFUF ¶ 244. Performance awards are paid based upon performance and are not meant to augment an employee's salary. PFUF ¶ 245. Between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. PFUF ¶ 246. Further, it was tradition for the office directors to decline to participate in the third category of awards, the end-of-year agency-wide awards. See PFUF ¶ 247.

NTSB employees who hold SL positions must demonstrate technical competencies. PFUF ¶ 248. Additionally, SL employees may not perform supervisory duties more than 25 percent of the time. PFUF ¶ 249. The Director of OMS performs supervisory duties more than 25 percent of the time. PFUF ¶ 250. Ms. Cooke admits that her position as Director of OMS involved routine supervisory responsibilities for a staff of 14 to 15 people. PFUF ¶ 251.

A GS-level employee may be given a limited term appointment to an SES-level position or may be detailed to an SES-level position to meet emergency or short term needs. Typically, NTSB has used the detail authority to accomplish assignments of an SES position during staff

shortages and transition. When a GS-level employee is detailed, he or she continues to be compensated at the GS level. See 5 C.F.R. §317.903(a); PFUF ¶ 252.

E. Female Employees

During Mr. Campbell's tenure as General Counsel, four of his seven professional hires were female. These selections included individuals who were to become the Agency's Ethics Officer, a Deputy Managing Director (selected by him), and an Associate Managing Director (selected by his successor). PFUF ¶ 253.

Between 2003 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beale, and Elaine Weinstein. PFUF ¶ 254. Between 2001 and 2005, Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES. These were approximately half of the SES appointments made during that time. PFUF ¶ 255. All three were all required to compete for their positions and all three competed against male applicants. PFUF ¶ 256.

On April 28, 2006, Ms. Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. § 206(d) and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). On October 26, 2006, the district court transferred the Equal Pay Act claim to this Court. Ms. Cooke filed her First Amended Complaint in this Court on November 14, 2006. PFUF ¶¶ 257-59.

## SUMMARY OF ARGUMENT

The Equal Pay Act prohibits gender discrimination in the payment of wages and requires equal pay for equal work. See Molden v. United States, 11 Cl. Ct. 604, 608 (1987). To obtain recovery under that statute, the plaintiff has to satisfy numerous requirements. As an initial step,

Ms. Cooke must prove that her job at the NTSB required equal skill, effort, and responsibility and was performed under similar working conditions as her alleged comparators. She cannot satisfy that burden. OMS was a much smaller office than the other modal offices, in number of employees, number of regional offices, and budget, and, therefore, it required less skill, effort, and responsibility to manage. OMS investigated far fewer accidents and produced fewer accident reports than the other modal offices. OMS did not have nearly as large a role in the international community as OAS. OMS did not generate as much public interest as OAS and OHS, and, therefore, the Director of OMS was not required to have the same skills, effort, or responsibility in interacting with the public and press. Ms. Cooke did not travel as much as her alleged comparators and, thus, was not exposed to the more difficult working conditions related to travel. Finally, Ms. Cooke, unlike the other modal office directors, was not a member of the Executive Resources Board and did not have a role in broad agency-wide planning activities.

Even assuming Ms. Cooke could prove that her job was equal to the jobs of her alleged comparators, she still would not be entitled to recovery under the Equal Pay Act because any pay differential[7] between Ms. Cooke's pay and that of her alleged comparators was based upon a merit system. The NTSB was required to work within the confines of Federal statutes and regulations when determining Ms. Cooke's pay and the pay or her alleged comparators. Pursuant to these regulations, there was no way that Ms. Cooke could have been paid above the GS-15 level. Her position could not have been upgraded to the SES or SL level, nor could she have been given a retention allowance, additional performance awards, or additional quality step

[7] For purposes of this motion only, we assume that all of the alleged comparators were compensated at a higher rate than Ms. Cooke at some point during the relevant time period - that is, 2003 to 2005.

increases. If she were eligible for overtime pay at all, it would have been a minimal amount, and she certainly could not have been paid overtime for the purpose of remedying alleged unequal pay. Finally, while GS-level employees, such as Ms. Cooke, may, in rare circumstances, be given a limited term appointment to or detailed to an SES-level position, such employees continue to be compensated at the GS level.

Additionally, Ms. Cooke's pay was based upon a factor other than sex, namely, the gender-neutral allocation of available SES positions. The NTSB could not have made her position an SES-level position without either obtaining an SES allocation from OPM or reassigning a vacant SES slot to her position. When SES slots became available, the NTSB made legitimate business decisions to allocate those slots first to the position of the Director of ORPH, then to the position of the Director of OHS position, and finally to the Director of OMS. Pursuant to OPM regulations, the NTSB could not have simply promoted the existing GS-15 level Directors to those SES slots, but was required to advertise and compete the positions.

Accordingly, because there is no evidence to support Ms. Cooke's claim that her job was equal to that of her alleged comparators or that gender bias accounts for any of the pay differentials that she alleges, the NTSB did not violate the Equal Pay Act. Therefore, Ms. Cooke's complaint should be dismissed.

Assuming this Court were to find that the NTSB violated the Equal Pay Act, promotion, reinstatement, and front pay are not available remedies for such a violation.

ARGUMENT

I. The Standard of Review For Summary Judgment

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States , 812 F.2d 1387, 1390 (Fed. Cir. 1987); RCFC 56(c). Summary judgment is "a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). As the court of appeals emphasized in Sweats, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court of Federal Claims] -- that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325).

A "material fact" is one "that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, 477 U.S. at 248. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. As discussed below, there is no dispute over any fact that could affect the outcome of this case. Accordingly, disposition of Ms. Cooke's case through summary judgment is appropriate.

## II. The Standard Of Review For The Equal Pay Act

The Equal Pay Act ("EPA") was enacted in 1963 as an amendment to the Fair Labor Standards Act ("FLSA") and was extended from private industry to the Federal Government in 1974. 29 U.S.C. § 201, 203(e)(2). The EPA's purpose was to eradicate society's traditional belief in the inferiority of women and to alleviate the consequences stemming from that belief. See Molden, 11 Cl. Ct. at 608. The EPA provides that an employer may not discriminate between employees on the basis of sex by paying different wages to employees of the opposite sex who are performing jobs that require the same level of skill, effort, and responsibility and which are performed under similar working conditions, unless the differential falls into one of the EPA's four exceptions:

1. a seniority system;
2. a merit system;
3. a system which measures earnings by quantity or quality of production;
4. a differential based upon any factor other than sex.

29 U.S.C. § 206(d)(1).

Pursuant to the EPA, Ms. Cooke first has the burden of proving that she performed work similar to those of the opposite sex (that is, the "male comparators") involving equal skill, effort, and responsibility; that she and her male comparators performed the work under similar conditions; and the NTSB compensated Ms. Cooke and her male comparators differently for that work. See Lissak v. United States, 49 Fed. Cl. 281, 284 (2001); Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974); Belfi v. Prendergast, 191 F.3d 129, 135 (2nd Cir. 1999). Once Ms. Cooke establishes a prima facie case, the burden shifts to the NTSB to prove the

disparity can be accounted for by one of the four exceptions to the EPA. See Corning Glass Works, 417 U.S. at 196.

III. Ms. Cooke Cannot Establish Her *Prima Facie* Case

Pursuant to the EPA, Ms. Cooke has the burden of showing that her employer, the United States, paid a male employee higher wages than Ms. Cooke for work requiring equal skill, effort, and responsibility and performed under similar working conditions. Molden, 11 Cl. Ct. at 610. Although Ms. Cooke need not prove that her job was identical to that of her alleged comparators, she is required to demonstrate that the jobs were "substantially equal." 29 C.F.R. § 1620.13(a). Ms. Cooke has failed to establish that her job was substantially equal to the jobs of her alleged comparators, and therefore cannot establish her prima facie case.

An examination of the skills, efforts, responsibilities, and working conditions of the modal office directors, and of Mr. Haueter and Mr. MacIntosh, reveals that the job requirements and performance of the alleged comparators were substantially different from those of Ms. Cooke and that, therefore, Ms. Cooke has not established her prima facie case.

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal

"Skill includes such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a). Because, as detailed above and in our proposed findings of uncontroverted fact, the size and scope of the work of OAS, OHS, and ORPH are much larger than those of OMS, the directors of those three offices must have greater or, at the very least, different leadership and supervisory skills. For example, the Director of OAS must lead an office that has almost ten times as many employees than OMS and ten regional offices. See PFUF ¶¶ 44, 48, 49. The Directors of OHS and ORPH must also supervise more employees and more regional offices

than the Director of OMS. PFUF ¶¶ 46-47, 50-51. Moreover, the Director of OAS must lead and supervise a much greater number of participants in aviation accident investigations than those in marine accident investigations. PFUF ¶¶ 113, 116. Additionally, because of the greater public, press, and congressional interest in aviation and highway accidents, the Directors of OAS and OHS must have different communication skills than the Director of OMS. PFUF ¶¶ 120-24. Because OAS has a much larger international role, the Director of OAS must be conversant with a wide variety of issues that affect the international aviation community. See PFUF ¶¶ 144-47, 148-52. The Director of ORPH must communicate knowledgeably regarding three transportation modes (rail, pipeline, and hazardous materials), a skill not required for the Director of OMS. PFUF ¶¶ 212-14.

While technical expertise in the transportation mode is necessary for all modal office directors, that expertise is vastly different for each mode, as the modal office director positions are not interchangeable. PFUF ¶ 211. For example, the Director of ORPH must have technical expertise in three transportation modes (railroad, pipeline, and hazardous materials), whereas the Director of OMS need only have technical expertise in one mode. PFUF ¶¶ 213-14. Acquiring knowledge in three transportation modes requires much more and different experience, training, and education than acquiring knowledge in one mode. While both the Director of OMS and the Deputy Director of OAS require technical expertise in their fields, the Deputy Director requires a more technical background than the Director of OMS because of the Deputy Director's greater involvement in the technical aspects of accident investigations, particularly major investigations. PFUF ¶ 215. Finally, the skills required for OAS Chief Advisor are different from those required for Director of OMS because the OAS Chief Advisor must have unique international

relations skills, including education and training, in order to perform his or her duties. PFUF ¶ 220.

B. The Effort Required For The Director Of OMS And The Alleged Comparators Was Not Equal

"Effort is concerned with the measurement of the physical or mental exertion needed for performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered." 29 C.F.R. § 1620.16(a). The Director of OMS required a different effort to perform her job than her alleged comparators.

Because OMS handled far fewer accident investigations and prepared fewer reports than any other modal office, the Director of OMS required a different degree of effort related to accident investigations and preparation of reports. PFUF ¶¶ 92-107; 126-43. That is, the mental fatigue and stress related to accident investigations was not at the same level for the Director of OMS as for the other modal office directors. Additionally, while all of the modal office directors technically had to be available to respond to accident notifications 24 hours per day, seven days per week, the fact that there were fewer marine accidents than accidents in any other mode meant that the Director of OMS was called upon to respond to accident notifications less frequently than other modal office directors outside of normal business hours. See PFUF ¶81-88. Thus, the stress of being required to work outside of normal business hours did not occur to the same degree for the Director of OMS as for the other modal office directors. Further, OMS had a much smaller staff than the other modal offices and no regional offices. See PFUF ¶¶ 44-52. Therefore, the Director of OMS required less effort related to human resources and personnel issues. Finally, because OMS had a much smaller budget than the other modal offices, the

Director of OMS required less effort related to monetary resource management than the other modal office directors. PFUF ¶¶ 53-56.

Additionally, because OMS had a much smaller international role than OAS, the Director of OMS did not require as much effort as the Director of OAS (and as the Deputy Director and OAS Chief Advisor) in relation to international accidents or representation of the United States in the international community. See PFUF ¶¶ 144-52, 154-165. Because of the fact that marine accidents garner much less public, press, and congressional interest than highway or aviation accidents, the Director of OMS did not require as much effort as the Directors of OAS and OMS in handling inquiries from the public, press, and Congress. PFUF ¶¶ 121-24. Because OHS and ORPH had much greater discretion than OMS in deciding whether to investigate a particular accident, the Directors of OHS and ORPH were required to exert much greater effort in deciding whether to investigate than the Director of OMS, who followed the bright-line rule set forth in NTSB's MOU with the Coast Guard. PFUF ¶¶ 89-91.

Finally, there were efforts required by the OAS Chief Advisor that were not required for the Director of OMS. Mr. MacIntosh traveled much more frequently than Ms. Cooke, and that additional travel and associated long hours were sources of stress and mental fatigue that Ms. Cooke did not have. PFUF ¶¶ 183-85. Mr. MacIntosh also interacted with the international community more frequently than Ms. Cooke, which meant greater efforts in terms of collaboration with individuals outside of the NTSB. See PFUF ¶¶ 144-52, 183.

C. The Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R.

§ 1620.17(a). "Although job titles are entitled to some weight in the assessment of comparative responsibility, '[t]he controlling factor under the Equal Pay Act is job content - that actual duties that the respective employees are called upon to perform." Pearce v. Wichita County, 590 F.2d 128, 133 (5th Cir. 1991) (quoting Hodgson v. Brookhaven Gen. Hosp., 346 F.2d 719, 725 (5th Cir. 1970). The scope of responsibility was much greater for the Directors of OAS, OHS, and ORPH than for the Director of OMS.

Each of the modal office directors was responsible for overseeing accident investigations and the preparation of reports, including safety recommendations and probable cause determinations. See PFUF ¶ 43. However, the Directors of OHS and ORPH had much greater responsibility in deciding whether to investigate a particular accident than the Director of OMS. The Director of OHS had an enormous amount of discretion in deciding whether to investigate an accident and had to evaluate each accident to determine whether the relevant safety issues and level of impact on public confidence warranted an investigation. PFUF ¶ 90. The Director of ORPH also maintained broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 91. The Director of OMS followed the bright-line rule set forth in NTSB's MOU with the Coast Guard and, therefore, did not have as much accountability in the decision to investigate as the other modal office directors. PFUF ¶ 89.

In addition, as set forth in detail above and in our proposed findings of uncontroverted fact, there were more accidents investigated by OAS, OHS, and ORPH than by OMS. See PFUF ¶¶ 92-107. Therefore, the Directors of OAS, OHS, and ORPH had greater responsibility for accident investigation and report writing. Furthermore, aviation accidents investigations

involved many more participants than marine accident investigations. The investigation of a major marine accident may have involved three to seven NTSB investigators and approximately four parties represented by 20 individuals, while the investigation of a major aviation accident may involve 150 to 200 people, or more, including multiple investigative parties that participate at the direction of the NTSB. PFUF ¶ 113, 116. Because so many more participants are involved in aviation accident investigations, the Director of OAS has much greater responsibility in overseeing investigations than the Director of OMS.

The Director of OMS also did not have as many obligations in working with parties to an investigation as the Director of OHS. In OHS, the parties to each investigation tend to be different, and therefore the Director of OHS and his or her staff are responsible for educating parties about the investigation process for each accident. PFUF ¶ 117. In OMS, Coast Guard investigators frequently are parties to investigations, and thus the Director of OMS and his or her staff do not have the same responsibility to educate. See PFUF ¶ 118.

The management responsibilities of each of the modal office directors were also very different. While all of the modal office directors were responsible for internal and external communication, the scope of responsibility for communications was very different for each modal office director. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB. The NTSB is aviation-centric because aviation safety is the core reason for the NTSB's existence, as it is a successor agency of the Civil Aeronautics Board. PFUF ¶ 121. Thus, the Director of OAS had a central role in communicating the agency's mission to the public. Because of the great public interest in aviation accidents, the Director of OAS had a much greater responsibility in communicating with

the press than the Director of OMS. See PFUF ¶¶ 122-23. The same was true for the Director of OHS, given the public's interest in highway safety. PFUF ¶ 120. The Director of OMS spends less than one percent of the time communicating with the press. PFUF ¶ 124. Because of the greater number of participants in aviation accident investigations, the Director of OAS had a greater responsibility in communicating with parties than the Director of OMS. See PFUF ¶¶ 113, 115. The Directors of OHS and ORPH were called upon to testify before Congress and to prepare NTSB board members or staff to testify before Congress more frequently than the Director of OMS. PFUF ¶¶ 167-75. Accordingly, each of those directors had greater responsibility for communications with Congress than the Director of OMS.

While Ms. Cooke and the other modal office directors each had human resources responsibilities, the amount of human resources responsibilities was greater for the other modal offices because of the fact that each of the modal offices employed significantly more employees than OMS. PFUF ¶¶ 44-48. Handling human resources for 140 employees, as the Director of OAS did, is a much greater responsibility than handling human resources for 15 employees, as the Director of OMS did. PFUF ¶¶ 44, 48. While all office directors were responsible for their office's budget, as set forth in detail above and in our proposed findings of uncontroverted fact, the OMS budget was much smaller than the budget of the other modal offices. PFUF ¶¶ 53-56. Thus, the responsibilities of the other office directors with respect to budget were greater. Furthermore, because the size of OAS, OHS, and ORPH was larger than the size of OMS, the budgeting for each of these offices was necessarily more complex than budgeting for OMS. See PFUF ¶¶ 44-48.

Ms. Cooke's alleged comparators also had other responsibilities that she did not have. OAS, specifically the Director of OAS and the OAS Chief Advisor, had international responsibilities that Ms. Cooke did not have. As set forth in detail above, OAS had greater responsibility for international accident investigation than OMS. PFUF ¶¶ 144-52, 164. OAS also had a greater responsibility in representing the United States in the international aviation community than OMS had in representing the United States in the international marine community. PFUF ¶¶ 154-64. Most notably, OAS was the United States' primary representative to ICAO, whereas the Coast Guard, not OMS, was the United States' primary representative to IMO. PFUF ¶¶ 154, 162. As set forth in detail above and in our proposed findings of uncontroverted fact, all of the SES-level modal office directors (including Mr. Spencer) had responsibilities with respect to the ERB that Ms. Cooke did not have. PFUF ¶¶ 187-205. These included responsibilities for the agency's plans, goals, or objectives outside of those directly related to OMS, which Ms. Cooke did not have. See PFUF ¶¶ 187-205. These ERB responsibilities were significant, taking up to fifteen percent of each SES-level director's time. PFUF ¶ 188. In addition, as Deputy Director of OAS, Mr. Haueter had a significant responsibility for the day-to-day conduct of accident investigations; a responsibility greater than Ms. Cooke's for marine investigations. PFUF ¶ 217. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman, none of which were responsibilities assigned to Ms. Cooke when she was the Director of OMS. Specifically, Mr. Spencer was asked to restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities. PFUF ¶ 222-25.

### D. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar

A comparison of working conditions requires a practical judgment of whether the differences in working conditions are the kind customarily taken into account when setting wage levels. See 29 C.F.R. § 1629.18. Working conditions include surroundings, meaning elements commonly encountered by workers, and hazards, including the frequency and severity of injuries that they can cause. See id. Working conditions do not encompass shift differentials. Id. Each of the alleged comparators generally worked in an office environment. However, each of the alleged comparators, especially Mr. MacIntosh, traveled more frequently than Ms. Cooke. PFUF ¶¶ 176-185. Working conditions during travel are different from working conditions in the office. See PFUF ¶ 186. Furthermore, while Ms. Cooke never traveled to the site of an accident between 2003 and 2005, almost all of her alleged comparators did. PFUF ¶¶ 176, 178, 179, 184. The working conditions at the site of an accident are different from and more hazardous than conditions in the office. PFUF ¶ 186.

In sum, none of the alleged comparators performs work requiring equal skill, effort, and responsibility under similar working conditions as Ms. Cooke. Accordingly, Ms. Cooke has failed to establish her prima facie case. Thus, this Court should grant defendant's motion for summary judgment, and dismiss the complaint.

## IV. Assuming That Ms. Cooke Has Established Her Prima Facie Case, The Pay Differential Was Not Based Upon Gender

Assuming that this Court were to find that Ms. Cooke has established her prima facie case, this Court should nonetheless grant our motion for summary judgment because any pay disparity between Ms. Cooke and her alleged comparators was not based upon gender.

Specifically, the pay disparity falls within two of the four exceptions to the EPA, a merit system and differential based upon factors other than sex. See 29 U.S.C. § 206(d)(1).

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System

In order to qualify under the merit system defense, an employer must show that the merit system was "an organized and structured procedure by which employees were evaluated systematically and in accordance with predetermined criteria." Raymond v. United States, 31 Fed. Cl. 514, 518 (1994). In this case, Ms. Cooke's pay, as well as the pay of her alleged comparators, was determined by numerous statutes and regulations governing the Federal employee pay system. The NTSB was required to work within the confines of these statutes and regulations when determining Ms. Cooke's pay, as well as the pay of her alleged comparators. See 5 C.F.R §§ 1.1 and 1.2; PFUF ¶ 228. Within the Federal pay system, there was no way that Ms. Cooke could have been compensated at a rate equal to that of her alleged comparators. Ms. Cooke was paid at the GS-15 rate, as determined by OPM. See PFUF ¶ 229. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. See 5 C.F.R. Part 531; PFUF ¶ 241. Ms. Cooke alleges that she could have received a within-grade quality step increase sooner than she did. A GS-level employee may receive a quality step increase if he or she receives an outstanding performance rating and had not received a quality step increase within the last 52 weeks. See 5 U.S.C. § 5336; 5 C.F.R. §§ 531.502-531.505; PFUF ¶ 242. During the period in question, Ms. Cooke

received all quality step increases when which she met the necessary criteria.[8] PFUF ¶ 243. While Ms. Cooke theoretically could have been given detailed to an SES-level position (assuming one was available), such details are typically used only to meet emergency or short-term needs. PFUF ¶ 252. Furthermore, if Ms. Cooke had been given a limited term appointment or detailed to an SES-level position, she would have continued to be compensated at the GS-15 level. See 5 C.F.R. §317.903(a); PFUF ¶ 252.

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level

Ms. Cooke suggests that one way she could have been provided compensation in an amount equal to that of her alleged comparators was to have been promoted to the SES level. When Ms. Cooke became the Director of OMS,[9] it was the NTSB's intention to classify and pay her and the other modal directors at the SES level. PFUF ¶ 8. However, at the time, there were no available SES slots to allocate to the modal office directors. PFUF ¶ 8. A GS-level position can only become an SES-level position in two ways. Either the NTSB can obtain an additional SES slot from OPM, or a vacant SES slot can be reallocated to the GS-level position. The NTSB cannot create a new SES position without authorization from OPM. See U.S.C. § 3133; PFUF ¶¶ 9-11. In June 1999, the NTSB requested SES slots for the modal office directors from OPM, but that request was denied. PFUF ¶ 14. When slots eventually became available, they were

---

[8] Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke received a step increase effective January 2005 and was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006. PFUF ¶ 213.

[9] That is, when her title changed to Director of OMS following the restructuring described above.

properly allocated first to the Director of ORPH position, then to the Director of OHS position.[10] Even assuming that the first available SES slot had been allocated to the Director of OMS position, OPM regulations require the NTSB to advertise and compete all SES positions that will be filled by initial career appointment. 5 C.F.R. 317.501; PFUF ¶ 24. Thus, the NTSB could not have simply promoted Ms. Cooke to the SES level. Because she had not previously held a career SES position, she would have had to compete and be selected for the position. See 5 C.F.R. §§ 317.51, 317.701 and 317.702; PFUF ¶ 24. Any assumption made by Ms. Cooke that she would have been the most qualified applicant and, therefore, would have been selected for the position is purely speculative.[11] Thus, the NTSB could not have promoted Ms. Cooke to the SES level because of the unavailability of slots and the requirement to advertise and compete SES positions.

2. Ms. Cooke Could Not Have Been Given Overtime Pay

Ms. Cooke also alleges that she could have been given overtime pay to "equalize" her pay with that of her alleged comparators. While GS employees are eligible for overtime pay within the Federal pay system, there is a limit on the amount of overtime pay that can be provided to GS employees. See 5 U.S.C. § 5547(a); 5 C.F.R. § 550.105. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10, or level V of the Executive Schedule. 5 U.S.C. § 5547; PFUF ¶ 231. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS,

[10] The details of these allocation decisions and their propriety are addressed below.

[11] In fact, history belies this assumption. When the Director of OMS position eventually became an SES-level position, Ms. Cooke applied for it and was not selected. PFUF ¶¶ 38-41.

any overtime compensation between 2003 and 2005 could not have been more than approximately $3,800 per year, and would not have provided her with compensation equal to that of her alleged comparators. See PFUF ¶ 231. Additionally, overtime pay must be ordered or approved in advance by an employee's supervisor, regardless of grade. See PFUF ¶ 232. Ms. Cooke spoke to Ms. Engleman Conners about overtime in April 2004, but provided no justification or rationale for her request, and that request was never approved. PFUF ¶ 233, 235. Ms. Cooke never approached Mr. Campbell about overtime, even though, since he was her first-line supervisor, that would have been the normal course. PFUF ¶ 236. Finally, there was an unwritten policy that individuals in management positions, including modal office directors, would not receive overtime pay. PFUF ¶ 237. A merit system may be based upon unwritten policies if those policies are made clear to employees. See Equal Employment Opportunity Commission v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir. 1980). It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present. PFUF ¶ 238.

3. Ms. Cooke Could Not Have Been Given A Retention Allowance

Ms. Cooke alleges that she could have been paid a retention allowance to "equalize" her pay. Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301,[12] an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

[12] A recent amendment to 5 C.F.R. § 575.301 removed "Federal service" from the last sentence. That amendment went into effect in December 2007 and, therefore, is inapplicable to this case.

5 C.F.R. § 575.301 (2006); see PFUF ¶ 239. The NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. PFUF ¶ 239. There is no evidence that Ms. Cooke had unusually high or unique qualifications for her position. The fact that, when the position became SES and was competed, another individual was selected for the position strongly suggests that Ms. Cooke was not uniquely qualified. Of significance, there is no evidence that Ms. Cooke ever received an offer of outside employment during her tenure as the Director of OMS. PFUF ¶ 240. Therefore, Ms. Cooke was ineligible to receive a retention allowance.

4. Ms. Cooke Could Not Have Been Given Any Additional Performance Awards

Ms. Cooke asserts that her compensation could have been "equalized" by the NTSB giving her additional performance awards. While Ms. Cooke was eligible for a number of the types of performance awards available at the NTSB, performance awards are based upon performance and are not meant as a tool to augment an employee's salary. PFUF ¶ 245. Ms. Cooke never received a special act award because, between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. PFUF ¶ 246.

5. Ms. Cooke Could Not Have Been Given A Senior Level Position

Ms. Cooke further alleges that she could have been given an SL position to "equalize" her pay. SL positions are intended for technical positions with little to no supervisory responsibilities. See PFUF ¶¶ 248-49. There is no evidence to suggest that Ms. Cooke qualified for an SL slot when she was the Director of OMS. In addition, SL employees may not perform supervisory duties more than 25 percent of the time, and the Director of OMS performs

supervisory duties more than 25 percent of the time. PFUF ¶¶ 249-50. Ms. Cooke admits that her position as Director of OMS involved routine supervisory responsibilities of 14 to 15 employees, on average. PFUF ¶ 251. Thus, Ms. Cooke was ineligible for an SL position.

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex

Pursuant to the fourth exception of the EPA, even if a male comparator and Ms. Cooke performed the exact same work, the EPA is not violated if the differential stems from any factor other than gender. See Wollenburg v. Comtech Manufacturing Co., 201 F.3d 973, 976 (7th Cir. 2000). Federal courts do not agree on whether any factor is sufficient, or whether the factor must be a product of a legitimate business reason, although a majority of Federal courts of appeals espouse the legitimate business reason view. Lissak, 49 Fed.Cl. at 285. While the Federal Circuit has not spoken on this matter, the Court of Federal Claims has determined that the "rational basis" standard is appropriate for this analysis, in that it is enough that the factor be gender neutral on its face and used in good faith and not in a discriminatory manner. Behm v. United States, 68 Fed. Cl. 395, 399-400 (2005).[13] "The justification need not be a 'good reason,' but merely a gender-neutral one." Warren v. Solo Cup. Co., 516 F.3d 627, 630 (7th Cir. 2008). Additionally, non-gender-based pay differences, which are the result of separate pay and classification systems, are permissible under the Equal Pay Act. See EEOC v. Aetna Ins. Co., 616 F.2d 719, 723-26 (4th Cir. 1980).

[13] "Under rational basis review, the classifications made by the plan and rules are valid unless they bear no rational relationship to the Government's objectives. . . . All that the Government must show is that the plan and rules rationally relate to a legitimate interest, under any conceivable set of facts." Behm, 68 Fed. Cl. at 402 (internal quotation marks and citations omitted).

In this case, the reason for the pay differential between Ms. Cooke and her alleged comparators was the gender-neutral allocation of available SES positions. The NTSB both had a rational basis for its actions and possessed legitimate business reasons for allocating available SES positions to the Director of ORPH and the Director of OHS positions prior to the Director of OMS position. Ms. Cooke's pay was the result of the non-gender-based classification of her position as a GS-level position, and the classification of her alleged comparators' positions as SES or SL positions.

The OAS Director and Deputy Director positions have always been SES-level positions for legitimate business reasons. PFUF ¶¶ 16-17. Aviation safety is the core reason for the NTSB's existence. Thus, the work of OAS is central to the agency's mission. PFUF ¶ 121. In addition, as detailed above, OAS is much larger; handles many more accident investigations; handles more complex accident investigations; garners much more press, public, and congressional interest; and performs more international work than any of the surface modal offices. Furthermore, OAS is the only modal office required by statute to investigate all civil accidents in its mode. PFUF ¶ 58. For these reasons, OAS had the highest potential for impact in the area of transportation safety and has an extremely high profile with Congress as well as the general public. Thus, its Director and Deputy Director were properly designated SES-level positions.

Following the dividing of the NTSB's Office of Surface Transportation into four separate surface modal offices, it was the NTSB's intention that each of the four surface modal offices directors, including OMS, be headed by a member of the SES. However, there were no available slots to allocate to the surface modal office directors. PFUF ¶ 8. In June 1999, the NTSB

requested additional SES slots from OPM for all of the surface modal office directors, but OPM denied that request. PFUF ¶ 14. Thus, there was no way for the NTSB to make any of the surface modal office director positions SES-level positions, and each of the surface modal office directors were initially paid at the GS-15 level.

An SES employee retired, and, therefore, an SES slot became available. This SES slot was allocated to the position of Director of ORPH in 2001 based upon legitimate business reasons and in accordance with a rational plan. PFUF ¶ 21-23. ORPH was the most complex of the three surface modal offices (OHS, ORPH, and OMS) and was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. PFUF ¶ 23. Additionally, as the Director responsible for hazardous materials, the Director of ORPH had trans-modal responsibilities involving aviation, highway, marine, rail, and pipeline accidents. PFUF ¶ 21. Finally, because of the intricacy of the field, the Director of ORPH was frequently that agency's principal spokesperson. PFUF ¶ 21.

Pursuant to OPM regulations, the NTSB is required to advertise and compete all SES positions that will be filled by initial career appointment. See 5 C.F.R. §§ 317.501; PFUF ¶ 24. An employee who encumbers a GS-level position that is reclassified to the SES level may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. Id. Accordingly, once the decision was made to allocate the SES slot to the position of Director of ORPH, the position was advertised as an SES position and applications for the position were accepted. PFUF ¶ 26. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was

eventually selected for that position. PFUF ¶ 27. The advertisement and selection process was conducted pursuant to OPM regulations. Mr. Chipkevich was selected because he was the best candidate for the position, not for any gender-biased reasons.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In its request, the NTSB stated that its prioritization of these requests was first OHS, then OMS, indicating that the order of SES allocations proceeded according to a plan set forth long before another SES position became available. Again, those requests were denied by OPM. PFUF ¶ 28. Thus, the NTSB had a legitimate business reason for not making the Director of OMS position an SES-level position at that time.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. PFUF ¶ 29. That slot was allocated to the position of Director of OHS for legitimate business reasons, namely that OHS was a larger office than OMS, had regional offices, and had a constant need for public outreach and visible leadership, and because there are approximately 44,000 highway deaths each year, in contrast to several hundred marine deaths per year. PFUF ¶ 30-31. It was determined that OHS could have the greater positive impact on transportation safety. The allocation had nothing to do with gender. PFUF ¶ 31. Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position and applications for the position were accepted. PFUF ¶ 32. Ms. Engleman Conners had no role in the selection for the position. She never saw a list of candidates or interviewed anyone for this, or any other, SES-level position. PFUF ¶ 33. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level and was eventually selected for the position.

PFUF ¶ 34. Again, the advertisement and selection processes were conducted pursuant to OPM regulations. Mr. Osterman was selected because he was the best candidate for the position, not for any gender-biased reasons.

In 2004, NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS. PFUF ¶ 37.

In sum, the reason that Ms. Cooke was not paid at the SES-level was because the NTSB did not have enough available SES slots to assign to all of the surface modal office directors simultaneously. The order in which the available slots were assigned was dictated by legitimate business reasons - namely, they were prioritized based upon the complexity of the offices and the potential for positive effect upon transportation safety. OMS was smaller in size, conducted fewer investigations, had shared jurisdiction with the Coast Guard, and had fewer regional offices. Furthermore, there were comparatively fewer marine deaths than highway deaths per year. Thus, OMS had the least potential for impact in the area of transportation safety. Given that the NTSB's mission is to promote transportation safety, PFUF ¶ 1, it was legitimate to consider which modal office would have the greatest impact upon transportation safety when allocating SES slots.

Additionally, as set forth above, even if the Director of OMS position had been the first surface modal office director position to be given an SES slot, the NTSB could not have simply promoted Ms. Cooke to the SES-level. In accordance with Federal Government-wide OPM policies, the NTSB would have had to advertise and compete the position and select the best candidate from the pool of applicants. See 5 C.F.R. § 317.501. If Ms. Cooke had not been the best candidate for the position, the NTSB would have had a legitimate business reason for not

selecting her. The NTSB clearly has a business interest in hiring the best candidate possible for each position.

Finally, it is clear that the disparity in pay between Ms. Cooke and her alleged comparators was based upon factors other than sex because the NTSB had three female SES-level employees during the relevant time period: Lola Ward, Julie Beale, and Elaine Weinstein. PFUF ¶¶ 254-55. These were approximately half of the SES appointments made during that time. PFUF ¶ 255. All three of these women were required to apply and compete for their positions, and all three competed against male applicants. PFUF ¶ 256. Thus, the NTSB did not pay Ms. Cooke at the GS-15 level because of her gender, but because it was complying with Federal pay requirements and making legitimate business choices in its pay and SES allocation decisions.

## V. Promotion, Reinstatement, And Front Pay Are Not Available As Remedies For Equal Pay Act Violations

The EPA, as part of the FLSA, follows the damage provision of the FLSA, which states that "[a]ny employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional amount as liquidated damages." 29 U.S.C. § 216(b). The provision further states that "[t]he court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and the cost of the action." Id. Additionally, the EPA states that, "[f]or purposes of administration and enforcement, any amounts owing to any employee which have been withheld in violation of this subsection shall be deemed to be unpaid minimum wages or unpaid overtime compensation under this chapter." 29 U.S.C. § 206(d)(1).

Thus, a plain reading of the statutory language indicates that back pay, liquidated damages, and attorney fees are the only remedies available for violations of the EPA. Furthermore, courts have held that injunctive relief and front pay are not available for EPA violations. See Hildebrandt v. Illinois Dep't of Natural Res., 347 F.3d 1014, 1031-32 (7th Cir. 2003). Promotion and reinstatement are both forms of injunctive relief. Accordingly, Ms. Cooke's requests for front pay, promotion, and reinstatement are barred as a matter of law.

Additionally, this Court may not grant an appointment or promotion where the exercise of such a power would result in a substitution of the Court's judgment for the agency's discretion. Skrobot v. United States, 534 F.2d 237, 239 (Ct. Cl. 1975); Hirsch v. United States, 499 F.2d 1248, 1250 (Ct. Cl. 1974). This Court's power to grant promotions, if any, hinges upon a party's legal right to such a remedy based upon a statute or regulation. Skrobot, 534 F.2d at 239. The same would be true for granting reinstatement. Here, as set forth above, the applicable statutes do not grant this Court the power to grant a promotion or reinstatement for violation of the EPA. Thus, assuming this Court were to find that the NTSB violated the EPA, it could not reinstate or promote Ms. Cooke.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment should be granted.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
KATHLEEN SILBAUGH
Office of General Counsel
National Transportation Safety Board

May 14, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 14th day of May, 2008 a copy of the foregoing "DEFENDANT'S MOTION FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN