# APPENDIX

# INDEX TO APPENDIX


| Document | Page Number |
|---|---|
| Declaration of Daniel Campbell (dated April 20, 2008) | A1 |
| Declaration of Emily Carroll (dated May 14, 2008) | A6 |
| Declaration of Robert J. Chipkevich (dated Nov. 28, 2007) | A12 |
| Declaration of John Clark (dated May 13, 2008) | A18 |
| Declaration of Ellen Engleman Conners (dated Apr. 25, 2008) | A20 |
| Declaration of Thomas E. Haueter (Apr. 28, 2008) | A25 |
| Declaration of Robert M. MacIntosh, Jr. (dated Nov. 28, 2007) | A29 |
| Declaration of Joseph G. Osterman (dated May 9, 2008) | A33 |
| Declaration of John Spencer (dated May 9, 2008) | A38 |
| Selections from the deposition of John C. Clark (dated June 29, 2007) | A41 |
| Selections from the deposition of Ellen E. Engleman Conners (dated Oct. 25, 2007) | A44 |
| Selections from the deposition of Marjorie Murtagh Cooke (dated Oct. 23, 2007) | A52 |
| Selections from the Rule 30(b)(6) deposition of Joseph G. Osterman (dated May 24, 2007) | A84 |
| Selections from the deposition of John S. Spencer (dated Aug. 15, 2007) | A111 |
| Plaintiff's Responses to Defendant's First Set of Interrogatories (dated Sep. 19, 2007) | A120 |
| National Transportation Safety Board, EEO Report of Investigation for Marjorie M. Murtagh (dated Dec. 6, 2005) | A158 |
| EEO Investigation, Affidavit of Dan Campbell (dated Oct. 19, 2005) | A170 |
| National Transportation Safety Board letter with NTSB enclosure, from Dan Campbell to Anne Kirby (dated July 17, 2001) | A178 |
| Letter from the Office of Personnel Management, from Dan Campbell to Carol Carmody (dated Sep. 23, 2002) | A188 |
| EEO Investigation, Affidavit of Ellen Engleman Conners (dated Oct. 17, 2005) | A190 |

Selections from the 2002 National Transportation Safety Board,
Annual Report to Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A196

Selections from the 2003 National Transportation Safety Board,
Annual Report to Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A198

Selections from the 2004 National Transportation Safety Board,
Annual Report to Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A204

Selections from 2005 National Transportation Safety Board,
Annual Report to Congress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A209

National Transportation Safety Board, Senior Executive Service
Position Vacancy Announcement (dated Aug. 11, 2004) . . . . . . . . . . . . . . . . . . . . . . A215

Title 49-Transportation, Chapter VIII- National Transportation Safety Board . . . . . . . . . . A223

Coast Guard/NTSB Memorandum of Understanding (dated Sept. 12, 2002) . . . . . . . . . . . . A225

National Transportation Safety Board Publications,
Marine Accidents (dated Apr. 11, 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A232

National Transportation Safety Board, Operations Bulletin HR-PRF-001
Performance Management System (dated Aug. 19, 2005) . . . . . . . . . . . . . . . . . . . . A235

Letter from the Office of Personnel Management,
from Kay Coles James to Carol Carmody (dated May 26, 2004) . . . . . . . . . . . . . . . A255

RPH Accidental Launches and Reports (dated Mar. 26, 2007) . . . . . . . . . . . . . . . . . . . . . . . A256

OAS Organizational Listing Number of Employees (dated Oct. 1, 2003) . . . . . . . . . . . . . . A258

Selections from the deposition of Daniel Campbell (dated November 15, 2007) . . . . . . . . . A259

NTSB Order 1000 (dated Aug. 21, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A264

NTSB Order 1001 (dated Jan. 24, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A287

NTSB Order 1002 (dated Jan. 24, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A305

NTSB Order 1003 (dated Feb. 12, 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A322

OPM Guide to the Senior Executive Service (dated 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . A331

OPM Senior Executive Service Desk Guide (dated 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . A338

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, )
Plaintiff, )
v. ) No. 06-748C (Judge Wheeler)
THE UNITED STATES, )
Defendant. )

**DECLARATION OF DANIEL CAMPBELL**

Pursuant to 28 U.S.C. § 1746, I, Daniel Campbell, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. From 1990 through 1999, I served as General Counsel of the NTSB. From 1999 through January 2005, I served as Managing Director of the NTSB. From January 2005 through September 2005, I served as Executive Director of the NTSB. I retired in September 2005.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. At the time of their creation from the former multi-modal Office of Surface Transportation the Offices of Rail, Highway, Pipeline and Hazardous Materials and Marine Safety were all under the direction of GS-15 incumbents and remained so for several years.

4. One of the early initiatives I undertook as Managing Director was to request SES slots from the Office of Personnel Management ("OPM") to allocate to these positions. That request was denied.

5. When an SES slot becomes available, the decision of where to allocate that slot is ultimately made by the Chairman of the NTSB, usually with input from her advisors. (During most of my tenure the Chairman of the agency was one of three women.)

6. In 2001, an SES-level employee retired, and therefore an SES slot became available.

7. I recommended to then-Chairman Jim Hall that the SES slot be allocated to the position of Director of the newly combined Office of Rail, Pipeline, and Hazardous Materials, as this was the most complicated and variegated of the three surface modal offices in terms of subject matter, Robert Chipkevich, who was then Director of ORPH at the General Schedule ("GS") 15 level, was the most accomplished and senior of the surface modal office directors, and the administrative task facing the director were among the most daunting in the agency, given the dispersed work force and the need to combine and coordinate the differing cultures of several modes. Additionally, as the Director responsible for hazardous materials, the incumbent would have a trans-modal responsibility, involving aviation, highway and marine accidents, as well as rail and pipeline, and also would be frequently the agency's principal public spokesman due to the intricacy of the field. I knew, of course, that the position would be advertised and competed at the SES level. I also knew that Mr. Chipkevich would have the warm endorsement of his peers and was a likely selection. Chairman Hall initially believed the SES should be allocated to the Highway function largely because of the severity of the



A2

death toll in that area, but he ultimately agreed with my recommendation. I understood from our discussions that should another SES become available, the Office of Highway would be next, at least if he were still chairman.

8. In 2003, another internal SES-level position was made available for the surface modes – OPM had still not given a favorable response to the request for additional positions.

9. Although Chairman Hall was no longer in office, I continued to agree with his assessment that Highway Safety should be next inline, because of the enormity of the task, the size and dispersion of its workforce, the constant need for public outreach and visible leadership. Because there are approximately 44,000 highway deaths per year, highway is the area in which the NTSB can have the most impact upon transportation safety. (Comparatively, there are about 700 boating fatalities annually.) My recommendation to allocate the SES slot to the position of Director of OHS was accepted as a foregone conclusion, with the continuing understanding that I would seek OPM approval for additional positions so that the Marine Office might ultimately be advertised as well. None of these decisions had a wit to do with gender.

10. In 2004, we again requested and now received from OPM an additional SES slot, which was allocated to the position of Director of OMS. The agency advertised that position in summer 2004.

11. Ms. Cooke never complained to me that she believed she was treated disparately or felt that her rate of pay was unjust at any time during my six-year tenure as the agency's senior civil service manager.

12. Ms. Cooke never approached me about receiving overtime pay, though, as her first-line supervisor, this would have been the normal course.

13. I do not recall ever having been tasked by Chairman Engleman Conners to determine the legitimacy or propriety of paying overtime to an office head, Ms. Cooke, included.

14. During my tenure as General Counsel, four of my seven professional hires were female. These selections included individuals who were to become the Agency's Ethics Officer, a Deputy Managing Director (selected by me), and an Associate Managing Director (selected by my successor.) During my tenor as Managing/Executive Director three women were selected into the SES, to my recollection half the selections made during that period. None of these selections had anything to do with gender. All were selected on the basis of their exceptional qualifications and demonstrated performance.

13. I have, since our earliest interactions, questioned Ms. Cooke's judgment and her leadership skills and I never believed she would be selected by her peers for SES membership. This belief also has nothing whatsoever to do with gender.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 30 day of April 2008, in Washington, D.C.

Daniel Campbell



A4

INTENTIONALLY LEFT BLANK

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF EMILY CARROLL**

Pursuant to 28 U.S.C. § 1746, I, Emily Carroll, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as a Personnel Management Specialist in the Human Resources Division of the Office of Administration at the NTSB. I have held this position since February 2000. Since April 1980, I have served in the Human Resources Division in various positions at the NTSB, such as Personnel Assistant and Human Resources Specialist.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate surface modal offices, each with its own director.

4. Senior Executive Service ("SES") slots are allocated to the NTSB from the Office of Personnel Management ("OPM"). The NTSB cannot create new SES slots without OPM authorization.

5. Once the NTSB is allocated an SES slot by OPM, it can be used to create a new SES-level position or to change an existing non-SES-level position to an SES-level position.

6. When a vacancy occurs in one of the already allotted SES slots, the NTSB can fill that slot or reallocate that slot to another position within the agency.

7. An SES-level position can be filled by a reassignment of a current SES-level employee to the position, or by a competitive recruitment process.

8. In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be at the SES level. OPM denied this request.

9. For a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale.

10. During the relevant time period, the Director and Deputy Director of the Office of Aviation Safety ("OAS") were paid at the SES level.

11. Due to the retirement of a SES-level employee, a SES slot became available. In 2001, senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned the available SES slot.

12. Pursuant to OPM regulations, the NTSB is required to advertise and compete all SES vacancies that will be filled by initial career appointment. An employee who encumbers a GS-level position that is reclassified to the SES level, may not be noncompetitively promoted to the

SES level unless that employee has previously held a career SES appointment. See OPM Guide to the Senior Executive Service at 11. Mrs. Cooke has never held a career SES appointment.

13. Once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position.

14. Mr. Robert Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES.

15. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM.

16. In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. Senior officials at the NTSB determined that the position of Director of the Office of Highway Safety ("OHS") would be assigned the available SES slot. The position was advertised as an SES position.

17. Mr. Joseph Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES.

18. In 2004, the NTSB requested and received an additional SES slot from OPM. Senior officials at the NTSB allocated this slot to the position of Director of the Office of Marine Safety ("OMS"). The position was advertised as an SES position. The advertisement was subsequently cancelled prior to a selection being made.

19. The NTSB readvertised the Director of OMS position as an SES position in early 2005.

20. Ms. Cooke submitted an application under both announcements.

21. The NTSB recommended Mr. John Spencer for this SES position to OPM, and he was approved for an appointment to the SES

22. Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006.

23. GS-15 employees are eligible for overtime pay within the federal system. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was eligible to receive overtime pay to the extent that her total salary did not exceed the greater of GS-15, step 10 or level V of the Executive Schedule, as set by Congress. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, she was only eligible to receive in overtime pay an amount equal to the difference between her salary and the pay limitation. A chart detailing the annual limitation of premium pay is attached.

24. Overtime is defined as hours of work outside of the employee's normal tour of duty that are officially ordered or approved in advance by a supervisor before the hours are worked. Overtime incurred in connection with an accident investigation does not necessarily require prior approval, but may be discussed with a supervisor during the investigation and followed up with documentation requesting approval.

25. Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301, an agency may pay a retention allowance

> [W]hen an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301 (2006).

26. Each GS pay grade has incremental steps from step 1 to step 10, through which employees progress, based upon having satisfactory performance and meeting length of service requirements established by OPM for each intervening step.

27. A GS-level employee may receive a quality step increase if he or she receives an outstanding performance rating and had not received a quality step increase within the last 52 weeks.

28. From 2003 to 2005, Ms. Cooke received all within-grade step increases when she met the necessary criteria.

29. NTSB employees who hold Senior Level ("SL") positions must demonstrate technical competencies.

30. According to the SES Desk Guide, Working Draft, January 2007, p. 12-4, a SL designation is not appropriate for a position that requires the employee to perform supervisory duties more than 25 percent of the time.

31. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase.

32. Performance awards are based upon performance and are not intended to augment one's salary.

33. A GS-level employee may be given a limited term appointment to an SES-level position or may be detailed to an SES-level position to meet emergency or short term needs. Typically, NTSB has used the detail authority to accomplish assignments of an SES position during staff shortages and transition. When an employee is detailed, he/she continues to be compensated at the current rate of pay.

34. Between 2003 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beal, and Elaine Weinstein. Between 2001 and 2005, Lola Ward, Julie Beal, and Elaine Weinstein were each approved for appointments to the SES.

35. Lola Ward, Julie Beal, and Elaine Weinstein are all female, and were required to compete for their positions. All of them competed against male applicants.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of May 2008, in Washington, D.C.

Emily Carroll
Human Resources Specialist
National Transportation Safety Board

## Annual Limitation of Premium Pay

| | | U.S. Government Rates of Pay | | | | |
|---|---|---|---|---|---|---|
| **Year** | **Grade/Step** | **Rate of Pay** | **Scheduled Rate of Pay GS - 15/10** | **Scheduled Rate of Pay Executive Level V[1]** | **Annual Limitation** | **Annual Limitation Dollar Value[2]** |
| | | | | | | |
| 2002 | GS-15/09 | 116,613 | 119,682 | | GS-15/10 | 119,682.00 |
| 2003 | GS-15/09 | 121,583 | 124,783 | 125,400 | Executive Level V | 125,400.00 |
| 2004 | GS-15/09 | 126,963 | 130,305 | 128,200 | GS-15/10 | 130,305.00 |
| 2005 | GS-15/10 | 135,136 | 135,136 | 131,400 | GS-15/10 | 135,136.00 |
| 2006 | GS-15/10 | 139,774 | 139,774 | 133,900 | GS-15/10 | 139,297.60 |

[1] In 2003, 5 CFR 550.105 establish the limit for premium pay as the greater of the maximum rate of basic pay for GS-15 or the rate payable for Level V of the Executive Schedule. Prior to this the limitation was the maximum rate of  for GS-15.

[2] The annual limitation is computed by multiplying the hourly rate of pay 80 hours to determine the biweekly rate which is then multiplied by the number of pay periods in the pay year (26).

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 06-748C<br>(Judge Wheeler) |

## DECLARATION OF ROBERT J. CHIPKEVICH

Pursuant to 28 U.S.C. § 1746, I, Robert J. Chipkevich, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH") at the NTSB. I have held this position since May 2001. Prior to becoming the Director of ORPH, I served as Director of the Office of Pipeline and Hazardous Materials Safety, Chief of the Pipeline and Hazardous Materials Division, Chief of the Hazardous Materials Division, and Hazardous Materials investigator-in-charge. I have been on staff at the NTSB since January 1984.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. Effective November 5, 2000, the NTSB Office of Railroad Safety and Office of Pipeline and Hazardous Materials Safety merged together to form ORPH. I became the Acting Director of ORPH.

4. In 2001, an SES slot was allocated to the position of Director of ORPH. The position was advertised as an SES position and the NTSB began accepting applications for this position. I applied for the position and was eventually selected.

5. From 2003 to 2005, ORPH had approximately 40-50 employees and three regional offices.

6. On average, 3,215 railroad accidents occur per year, resulting in 442 injuries and 17 deaths. In addition, on average, 355 fatalities per year occur at highway-rail crossings, and an average of 480 fatalities per year occur that involve trespassers around railways.

7. In 2003, there were 370 pipeline accidents, 71 injuries, and 12 fatalities reported. In 2004, there were 443 pipeline accidents 60 injuries, and 23 fatalities reported. In 2005, there were 490 pipeline accidents, 47 injuries, and 16 fatalities reported.

8. In 2003, there were 15,156 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 119 injuries and 15 fatalities. In 2004, there were 14,846 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 288 injuries and 16 fatalities. In 2005, there were 15,928 such incidents reported, resulting in 945 injuries and 34 fatalities.

9. Between 2003 and 2005, ORPH received, on average, approximately 53 notifications of railroad incidents and accidents per week.

10. Between 2003 and 2005, ORPH received, on average, approximately 33 notifications of pipeline incidents and accidents per week.

11. Between 2003 and 2005, ORPH received, on average, approximately 119 notifications of hazardous materials incidents and accidents per week.

12. The NTSB exercises considerable discretion in determining whether to launch on certain rail, pipeline, and hazardous materials accidents. In general, ORPH evaluates the circumstances and safety issues of each accident, and I make a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident prevention issue. Overall, as Director of ORPH, I maintain broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation.

13. My position as the Director of ORPH requires me to maintain a considerable amount of expertise in three distinct areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transport of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of these different types of accident investigations. In addition, the Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. In this regard, the division of ORPH that conducts hazardous materials investigations is unique, and requires my office to interact closely with other offices, either as the primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation.

14. During the calendar year of 2003, ORPH launched on 10 railroad accidents, two pipeline accidents, and three hazardous materials accidents. Of the hazardous materials accidents in 2003, one of these accidents was also a marine accident.

15. During the calendar year of 2004, ORPH launched on 14 railroad accidents, two pipeline accidents, and two hazardous materials accidents. Of the hazardous materials accidents in 2004, one of these accidents was also a highway accident.

16. During the calendar year of 2005, ORPH launched to eight railroad accidents, one pipeline accident, and two hazardous materials accidents, one of which was a railroad accident, and the other of which was a highway accident.

17. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner. In ORPH, the parties to an accident investigation often vary considerably; some parties are frequently involved in NTSB investigations, while others require the NTSB to take extra steps to ensure that they are familiar with the structure, process, and general conduct that an investigation will entail.

18. During the calendar year of 2003, ORPH completed a total of 13 investigation reports, which included 11 railroad accident reports, one pipeline accident report, and one hazardous materials report. At any given time during 2003, ORPH was working on approximately 15-20 ongoing investigations.

19. During the calendar year of 2004, ORPH completed a total of 16 investigation reports, which included 10 railroad accident reports, three pipeline reports, and three hazardous materials reports. At any given time during 2004, ORPH was working on approximately 15-20 ongoing investigations.

20. During the calendar year of 2005, ORPH completed a total of 10 investigation reports and one pipeline report that was a safety study. These investigation reports included

nine railroad accident reports and one hazardous materials report. At any given time during 2005, ORPH was working on approximately 15-20 ongoing investigations.

21. From 2003 to 2005, ORPH developed 82 safety recommendations that were adopted by the Safety Board.

22. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and 2005, I communicated with officials in foreign countries approximately four to six times per year on various matters.

23. Between 2003 and 2005, as the Director of ORPH, I testified before Congress two times. At present, I have testified before Congress 10 times since 2001.

24. In preparing for my testimony before Congress, I was required to brief and interact with Congressional aides and members of Congress or the Senate on several occasions between 2003 and 2005. The purpose of such briefings was to help staff and members of Congress or the Senate understand railroad, pipeline, and hazardous materials safety investigations or issues.

25. As the Director of ORPH, I prepared the Chairman or a Board Member to testify before Congress two times between 2003 and 2005. At present, I have prepared the Chairman or a Board Member to testify before Congress 14 times since 2002.

26. My position as the Director of ORPH required me to travel three times during 2003, four times during 2004, and one time during 2005, in order to represent the NTSB at events or gatherings that did not involve accident investigations. Such events included providing presentations, participating in briefings, or representing the NTSB at conferences.

27. As Director of ORPH at the SES level, I was a member of the Executive Resources Board ("ERB").

28. I have participated in numerous ERB meetings and decisions affecting the management of the NTSB since assuming my position as Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations at the SES level.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November 2007, in Washington, D.C.

Robert J. Chipkevich
Director, ORPH
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF JOHN CLARK**

Pursuant to 28 U.S.C. § 1746, I, John Clark, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Chief Scientist of the Office of Aviation Safety ("OAS") at the NTSB. I have held this position since November 2006. I served as Director of OAS from January 2001 to November 2006. I have been on staff at the NTSB since 1981.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. During my tenure as Director of OAS, I was paid at the SES level.

4. Between 2003 and 2005, OAS completed approximately 5,560 reports, 12 of which were for major accident investigations.

5. Between 2003 and 2005, I was required to brief and interact with Congressional aides on numerous occasions.

6. On average, I prepared a Board member to testify before Congress twice per year between 2003 and 2005.

7. Between 2003 and 2005, I traveled to the site of an aviation accident four times.

8. Between 2003 and 2005, I traveled approximately 4-5 times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

9. The working conditions at the site of an accident are different from, and can be more hazardous than, working conditions at the office.

10. As Director of OAS, I was a member of the Executive Resources Board ("ERB").

11. As Director of OAS, I spent approximately two percent of my time on work for the ERB, and/or fulfilling obligations as a member of the SES separate from my duties as Director of OAS.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 5-13-08 day of May 2008, in Washington, D.C.

John Clark
Chief Scientist, Office of Aviation Safety
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF ELLEN ENGLEMAN CONNERS**

Pursuant to 28 U.S.C. § 1746, I, Ellen Engleman Conners, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Senior Deputy Bureau Chief of the Enforcement Bureau of the Federal Communications Commission (FCC). I have been at the FCC since March 2007. From March 2003 through March 2005, I served as Chairman of the NTSB. From March 2005 to December 2005, I was Chairman Designee of the NTSB. From March 2003 to May 2006, I was also a member of the Board at NTSB.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. When I became Chairman of the NTSB, the directors of the Office of Aviation Safety ("OAS") and the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH") were classified and paid at the Senior Executive Service

("SES") level. The directors of the Office of Highway Safety ("OHS") and the Office of Marine Safety ("OMS") were paid at the General Schedule ("GS") 15 level.

4. SES-level positions, because they are at the highest level of civil service, require a certain level of professionalism, abilities, qualifications, and skills not necessary for GS-level positions.

5. It was my intent that the positions of Director of OHS and OMS would eventually be classified and paid at the SES level as part of a long-term staffing plan concerning resource allocation for the agency.

6. However, it is my understanding that, pursuant to civil service rules, GS-level positions may not be converted to SES-level positions. The Office of Personnel Management ("OPM") allocates SES level position to each agency. If an SES-level position within an agency becomes vacant, that agency can reallocate that SES slot to another position.

7. As Chairman, the decision to reallocate an available SES slot was made by me in consultation with the Managing Director, the General Counsel, other office directors, and my Chief of Staff, as needed, and was based upon their recommendations in accordance with a long-term staffing plan involving allocation of resources within the agency.

8. As such, each decision to allocate an available SES slot was not an isolated decision, but rather was part of a larger and long-term plan concerning the allocation of resources within the agency.

9. The decision to allocate an available SES slot to a particular position was made based upon a number of factors, including the scope of work, the impact upon the agency,

the level of responsibility, that division's impact upon transportation safety, the number of employees supervised, and the number of regional offices.

10. During my tenure as Chairman, an SES slot that was previously allocated to a position at the NTSB Academy became available. I did not want to keep the slot at the Academy because the Academy was fairly new at the time, and an SES slot was needed more in the operating portion, rather than the training portion, of the agency.

11. That SES slot was allocated to the position of the Director of OHS because the scope of OHS's investigatory responsibilities was larger than that of OMS, OHS had a greater number of employees than OMS, and OHS had regional offices, whereas OMS did not. Further, due to the fact that there are approximately 44,000 highway deaths per year, OHS had a much larger impact upon the agency's safety mission than OMS. OHS also had the greatest number of outstanding NTSB safety recommendations. The allocation of the SES slot had nothing to do with gender.

12. Once it had been decided that the SES slot would be allocated to the Director of OHS position, I had no role in the selection for that position. I never saw a list of candidates or interviewed anyone for this, or any other, SES-level position. Following the selection process, the Managing Director, Daniel Campbell, told me that the panel had recommended Joseph Osterman as the best person for the position.

13. The NTSB is aviation-centric because aviation is the core reason for NTSB's existence, as the NTSB is a successor agency to the Civil Aeronautics Board ("CAB"). By law, the NTSB is required to investigate all civil aviation accidents within the United States, and there are approximately 1,700 of these per year. Additionally, major aviation

accidents, such as TWA 800 or AA 587, take many resources and many years to complete. Accident investigations in other modes are determined by a variety of factors.

14. In April 2004, I had a brief meeting with Marjorie Murtagh Cooke. During the meeting, she stated that she was not an SES-level employee and asked to be paid overtime pay to compensate for her GS-15 status. She did not say anything suggesting that her request for overtime pay had to do with "equalizing" her pay to that of the other modal office directors. She did not state she was filing a complaint or alleging a violation of the Equal Pay Act. She also did not say anything suggesting that she believed her pay was different from that of the other modal office directors because of her gender. She did not provide any justification or rationale to support receipt of overtime pay. She did not ask about any type of compensation other than overtime pay.

15. I did not know whether managers were eligible for overtime pay pursuant to the civil service regulations, so I told Ms. Cooke that I would look into it and get back to her. Later that day, I relayed the conversation to Mr. Campbell and asked him to look into it. Mr. Campbell, as Managing Director, was Ms. Cooke's first line supervisor. I did not follow up with Mr. Campbell because I assumed that he had taken care of it. To this day, I do not know if overtime pay is available to managers at the NTSB. I never received documentation or other justification from Ms. Cooke for her request for overtime. I do not remember receiving any documentation requiring or requesting my approval of Ms. Cooke's request for overtime pay.

16. All employees of the NTSB were paid according to the civil service pay scales. As Chairman, I was required to follow the civil service pay rules, and I am not aware of any exemption that would authorize me to make an exception to those rules. I do not

believe that I was authorized to change an employee's pay in any way that was not in accordance with those rules.

17. I have a positive attitude toward Ms. Cooke; I do not have negative feelings toward her as a person.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 25 day of April 2008, in Washington, D.C.

Ellen Engleman Conners
Senior Deputy Bureau Chief of the Enforcement Bureau
Federal Communications Commission

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF THOMAS E. HAUETER**

Pursuant to 28 U.S.C. § 1746, I, Thomas E. Haueter, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Director of the Office of Aviation Safety ("OAS") at the NTSB. I have held this position since March 2007. I served as Deputy Director of OAS from November 2000 to March 2007. Prior to assuming the position of Deputy Director of OAS, I served as Chief of the Major Investigations Division, as an investigator-in-charge, United States accredited representative, or structures investigator for numerous aviation investigations at the NTSB. I have been on staff at the NTSB since 1983.
2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.
3. During my tenure as Deputy Director of OAS, I was paid at the SES level.
4. From 2003 to 2005, OAS had approximately 120 to140 employees. Thus, the Director of OAS was responsible for 20 to 25 percent of the workforce of the NTSB.

5. From 2003 to 2005, OAS had ten regional offices.

6. From 2003 to 2005, there were approximately 40 aviation accidents per week and approximately 10 aviation accident fatalities per week.

7. From 2003 to 2005, there were approximately 38 notifications of aviation accidents per week, on average.

8. In 2003, OAS launched to four major domestic accidents and five foreign accident investigations.

9. In 2004, OAS launched to seven major domestic accidents and 10 foreign accident investigations.

10. In 2005, OAS launched to 16 major domestic and 17 foreign accident investigations.

11. From 2003 to 2005, OAS developed 185 safety recommendations that were adopted by the Safety Board.

12. In general, approximately 10 to 12 NTSB employees launch on major aviation accident investigations.

13. An investigation of a major aviation accident may involve up to 100 to150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. See 49 C.F.R. part 831. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals.

14. In 2003, OAS regional offices initiated 1,915 accident investigations and 50 serious incident investigations and completed 1,707 investigations.

15. In 2004, OAS regional offices initiated 1,865 accident investigations and 116 serious incident and accident investigations and completed 2,361 investigations.

16. In 2005, OAS regional offices initiated 1,927 accident investigations and 128 serious incident and accident investigations and completed 2,335 investigations.

17. In 2003, OAS completed four major reports and continued work on four other major investigations.

18. In 2004, OAS completed four major reports and continued work on six other major investigations.

19. In 2005, OAS completed four major reports and continued work on seven other major investigations.

20. Between 2003 and 2005, I was required to brief and interact with Congressional aides on numerous occasions.

21. On average, the Director of OAS prepared a Board Member to testify before Congress twice per year between 2003 and 2005. On average, I prepared a Board Member to testify before Congress twice per year between 2003 and 2005.

22. Between 2003 and 2005, the Director of OAS traveled to the site of an aviation accident four times.

23. Between 2003 and 2005, I traveled to the site of an aviation accident seven times.

24. The working conditions at the site of an accident are different from, and can be more hazardous than, working conditions at the office.

25. Between 2003 and 2005, my position required me to travel approximately three to four times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

26. In my role as Deputy Director of OAS, I was responsible for the general oversight and conduct of all major aviation investigations. This responsibility included supervising

the scope of accident investigations, and making decisions regarding the course, direction, duration, and general breadth of inquiry concerning certain aspects of investigations.

27. As Deputy Director of OAS, I had greater responsibility for the day-to-day conduct of accident investigations than any of the other modal office directors.

28. The position of Deputy Director of OAS requires a more technical background than the modal office director positions because of the Deputy Director's involvement in the technical aspects of major investigations.

29. The Director of OAS was a member of the Executive Resources Board ("ERB").

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November 2007, in Washington, D.C.

Thomas E. Haueter
Director, Office of Aviation Safety
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF ROBERT M. MACINTOSH, JR.**

Pursuant to 28 U.S.C. § 1746, I, Robert M. MacIntosh, Jr., declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Chief Advisor for International Aviation Safety Affairs in the Office of Aviation Safety ("OAS") at the NTSB. I have held this position since July 1, 2001. Prior to assuming the position of Chief Advisor for International Aviation Safety Affairs, I served as Assistant Director for International Operations and as an investigator-in-charge at OAS. I have been on staff at the NTSB since April 14, 1988.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. I have been paid at the Senior Level ("SL") since assuming the position of Chief Advisor for International Aviation Safety Affairs.

4. My responsibilities involve the coordination of NTSB's role and activity involving international aviation investigations.

5. Pursuant to the International Civil Aviation Organization ("ICAO") treaty, NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. Many major international aviation accidents involve one or more of these, so NTSB is involved in many major international aviation accidents.

6. OAS has a responsibility to participate in accident investigations conducted by other nations per the entitlements conveyed in ICAO Annex 13.

7. The NTSB is the agency primarily responsible for United States representation at the International Civil Aviation Organization on matters pertaining to the investigation of accidents and incidents in civil aviation.

8. I am responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to Aircraft Accident and Incident Investigation, Annex 13 to the Convention on International Civil Aviation (9th ed. 2001) (ICAO). My office is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO.

9. I am responsible for coordinating technical matters and interface for each international launch with the host country and any other countries involved in the investigation.

10. My position as the Chief Advisor for International Aviation Safety Affairs for the NTSB requires me to possess unique international relations abilities, including education and training on geopolitical subjects. I work with the Department of State in a variety of different capacities and am conversant in two different languages.

11. In addition to ICAO activities, I represent the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators.

12. I have been required to brief and interact with Congressional aides regarding international aviation matters or specific investigations on several occasions.

13. On average, I prepared a Board Member or other NTSB employee to testify before Congress three times per year between 2003 and 2005.

14. In my capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, I travel frequently, primarily to diplomatic meetings; on average, I travel eight to nine times per year, for at least one week to two weeks per trip. My position requires much more travel than any of the modal office directors. My frequent travel and the associated long hours present a source of stress, and physical and mental fatigue that exceed that of any office environment.

15. The working conditions at the site of an accident, detailed examination of wreckage, and interviews with survivors or associated personnel are different from, and more hazardous than working conditions of any office environment.

16. In 2003, OAS launched in response to five foreign accidents. In 2004, OAS launched in response to 10 foreign accidents. In 2005, OAS launched in response to 17 foreign aviation accidents.

17. In 2003, OAS participated in seven foreign accident investigations. In 2004, OAS participated in seven foreign accident investigations. In 2005, OAS participated in 20 foreign accident investigations.

18. In general, approximately three NTSB employees launch on foreign aviation major accident investigations.

19. In my role as the Chief Advisor for International Aviation Safety Affairs, I provide counsel to NTSB aviation safety investigators with regard to the application and interpretation of Annex 13 of ICAO during the course of such investigations.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of November 2007, in Washington, D.C.

[signature]

Robert M. MacIntosh, Jr.
Chief Advisor for International Aviation Safety Affairs
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | ) | |
| v. | ) | No. 06-748C (Judge Wheeler) |
| THE UNITED STATES, Defendant. | ) | |

**DECLARATION OF JOSEPH G. OSTERMAN**

Pursuant to 28 U.S.C. § 1746, I, Joseph G. Osterman, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Managing Director of the National Transportation Safety Board. I have held this position since March 17, 2005. Prior to becoming the Managing Director of the NTSB, I served as Director of the Office of Highway Safety ("OHS") for approximately eight years. Prior to assuming the position of Director of OHS, I served as Highway Division Chief, Major Investigations Branch Chief, Highway Investigator-In-Charge, and Highway Field Investigator at the NTSB. I have been on staff at the NTSB since 1986.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. In 2003, an SES slot was allocated to the position of Director of OHS. The position was advertised as an SES position and the NTSB began accepting applications for this position. I applied for this position, and ultimately was selected.

4. From 1991 until 1996, I was paid at the GS-15 level as the Chief of the Highway Safety Division. From 1996 to 2004, I continued to receive a GS-15 salary as the Director of the Office of Highway Safety. From mid-2004 until my promotion to Managing Director, I was paid at the SES level. I have also been paid at the SES level throughout my tenure as Managing Director.

5. From 2003 to 2005, OHS had approximately 30 to 40 employees and 5 regional offices.

6. Between 2003 and 2005, there were approximately 18 notifications of highway accidents per week.

7. Due to its broad legislative mandate, OHS has an enormous amount of discretion in deciding whether to investigate a highway accident. In OHS, each accident must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation.

8. In 2003, OHS initiated 49 investigations and launched on 34 accidents. "Launching" on an accident involves traveling to the accident site within hours after the appropriate senior official has made the determination to launch. "Initiating an investigation" involves commencing an investigation on a particular accident, but may not always involve immediate travel. Also in 2003, OHS completed 44 dockets, issued seven major reports, and continued work on 22 investigations. The "completion of a docket" refers to the completion of the fact-finding and analytical components of an investigation, which is a considerable undertaking that is critical to the NTSB's subsequent analysis of the accident during its investigation.

9. In 2004, OHS initiated 45 investigations and launched on 45 accidents. In addition, in 2004, OHS completed 36 dockets, issued six major reports, and continued work on 26 investigations.

10. In 2005, OHS initiated 33 investigations and launched on 28 accidents. In addition, in 2005, OHS completed 31 dockets, issued four major reports, and continued work on 29 investigations.

11. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner.

12. In OHS, the parties to an accident investigation are typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, there is an educational and information component to the party system in OHS that does not exist in some of the other investigative modal offices.

13. OHS is responsible for completing more safety reports than any other modal office. These safety reports examine a number of different accidents with a common issue.

14. Between 2003 and 2005, as the Director of OHS, I testified before Congress three times.

15. In preparing for my testimony before Congress as the Director of OHS, I was required to brief and interact with Congressional aides on numerous occasions.

16. On average, as the Director of OHS, I prepared a Board Member or other NTSB employee to testify before Congress six times per year between 2003 and 2005.

17. Between 2003 and 2005, in my role as the Director of OHS, I traveled to the site of a highway accident approximately twice per year, on average.

18. The working conditions at the site of an accident are different from, and more hazardous than, working conditions at the office.

19. Between 2003 and 2005, my position as the Director of OHS required me to travel approximately eight times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

20. As the Managing Director of the NTSB, I stay informed of all offices' duties, projects, and ongoing investigations. The frequency of accidents that the NTSB investigates, from most to least, for the transportation modes, is: aviation, highway, railroad, marine, pipeline.

21. The majority of the NTSB's budget is composed of fixed overhead costs, such as labor, benefits, and facilities; the remaining portion of the budget is discretionary, and divided among NTSB offices. Of the discretionary portion of the budget for fiscal year 2003, OAS received 28.04 percent, OHS received 7.61 percent, ORPH received 4.67 percent, and OMS received 2.09 percent. Of the discretionary portion of the budget for fiscal year 2004, OAS received 33.45 percent, OHS received 11.78 percent, ORPH received 7.52 percent, and OMS received 3.00 percent. Of the discretionary portion of the budget for fiscal year 2005, OAS received 45.04 percent, OHS received 7.81 percent, ORPH received 6.84 percent, and OMS received 1.84 percent.

22. Marine is a mode in which the NTSB is not the primary investigative authority for major transportation accidents.

23. The SES-level modal office directors were members of the Executive Resources Board ("ERB").

24. As the Director of OHS, I spent approximately ten to fifteen percent of my time performing work related to the ERB, and/or on my obligations as a member of the SES.

25. OHS has a high public profile because highway safety is a matter of great public concern.

26. As Director of OHS, I was responsible for advocating NTSB recommendations to state authorities.. The other modal office directors did not have this responsibility because regulation of those modes is primarily Federal.

27. The Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than other modes.

28. OHS handles more multi-modal investigations than the other modal offices. The primacy for investigating accidents involving highways and waterways or highways and railroads falls to OHS, as opposed to OMS or ORPH.

29. From 2003 to 2005, OHS developed 113 safety recommendations that were adopted by the Board.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 9 day of May 2008, in London, England.

Joseph G. Osterman
Managing Director
National Transportation Safety Board

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DECLARATION OF JOHN SPENCER**

Pursuant to 28 U.S.C. § 1746, I, John Spencer, declare that the following is true and correct and based upon my personal knowledge, my review of National Transportation Safety Board ("NTSB") files and records, my review of the records at issue in this litigation, and information I acquired from others in the course of my performance of my official duties, and that I am competent to testify to the matters contained herein.

1. I currently serve as the Director of the Office of Marine Safety ("OMS") at the NTSB. I have held this position since August 2005.

2. I am over the age of 18 and have personal knowledge of the matters set forth herein and if called as a witness could competently testify thereto.

3. There were between 16 and 31 major marine accidents that occurred each year, during the years of 2003 to 2005. Of these, OMS launched on approximately 15 percent. There are approximately 4,000 marine accidents, 4,150 injuries, and 850 marine accident fatalities per year reportable under the United States Coast Guard regulations, specifically 33 C.F.R. Part 173 and 46 C.F.R. § 4.05-1(a). Eighty to 85 percent of injuries and fatalities in marine accidents are attributable to recreational, not commercial, boating.

4. From 2003 to 2005, OMS received approximately 84 notifications of marine accidents or incidents.

5. Between 2003 and 2005, OMS launched to between five and six marine accidents per year.

6. The investigation of a major marine accident may involve approximately four NTSB investigators and approximately four party representatives.

7. The NTSB and Coast Guard have concurrent jurisdiction over any marine accident that takes place in the United States' navigable waters.

8. The Coast Guard usually is a party to NTSB marine accident investigations; and is aware of the rules and regulations that pertain to accident investigation.

9. Less than one percent of the Director of OMS's time is spent on interacting with the press.

10. Pursuant to the International Maritime Organization ("IMO") code for the investigation of marine casualties and incidents, the United States may investigate any international marine accidents involving United States flagged vessels or in which the United States has a substantial interest. The investigation may be conducted by the Coast Guard, NTSB, or both.

11. Between 2003 and 2005, OMS launched to approximately one foreign flag ship accident per year.

12. The Coast Guard, not NTSB, is the agency that represents the United States at IMO.

13. Between 2003 and 2005, the NTSB did not have an official role at IMO. The NTSB attended IMO meetings as part of the United States delegation and advised the head of the delegation (the Coast Guard) about NTSB's position on issues before IMO.

14. The Director of OMS performs supervisory duties more than 25 percent of the time.

15. From 2003 to 2005, OMS developed 20 safety recommendations that were adopted by the Board.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on this 9th day of May 2008, in London, England

John Spencer
Director of the Office of Marine Safety
National Transportation Safety Board

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, ) Case No. 06-748C
Plaintiff, ) Judge Thomas C. Wheeler
vs. )
THE UNITED STATES, )
Defendant. )

DEPOSITION OF
JOHN C. CLARK
Washington, D.C.
Friday, June 29, 2007
9:08 a.m.

Job No.: 1-106677
Pages 1 through 270
Reported by: John L. Harmonson, RPR

2

Deposition of
JOHN C. CLARK

Held at the offices of:
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202)331-2883

Taken pursuant to the Federal Rules of Civil Procedure, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.

3

APPEARANCES

ON BEHALF OF PLAINTIFF:
BRIAN M. LOWINGER, ESQ.
The Employment Law Group, PC
888 17th Street
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT:
MEREDYTH D. COHEN, ESQ.
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
8th Floor
Washington, D.C. 20530
(202)353-7978
KATHLEEN SILBAUGH, ESQ.
National Transportation Safety Board
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202)314-6084

ALSO PRESENT:
JONATHAN DUNN, Intern
MARLA DUNN, Intern

4

EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. LOWINGER | 7 |
| EXAMINATION BY MS. COHEN | 259 |
| EXAMINATION BY MR. LOWINGER | 266 |


* * * * *

EXHIBIT INDEX

(Exhibits attached to transcript.)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Various "Notification of Personnel Action" | 237 |
| 2 | Performance Appraisal Form for period 9/1/2000 to 8/31/2001 | 245 |
| 3 | Performance Appraisal Form for period 9/1/2002 to 8/31/2003 | 246 |
| 4 | SES Performance Plan and Appraisal, 11/22/06 | 246 |
| 5 | Progress Review, 11/20/06 | 247 |
| 6 | Performance Appraisal Form for period 9/1/2003 to 8/31/2004 | 247 |

EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Organizational Listing, October 1, 2002 | 248 |
| 8 | Organizational Listing, October 1, 2003 | 250 |
| 9 | Organizational Listing, October 1, 2005 | 250 |
| 10 | Weekly Reports | 251 |
| 11 | Memo from B. Strauch to B. Loeb; September 29, 1997 | 253 |
| 12 | Memo from B. Strauch to B. Loeb; July 2, 1999 | 253 |
| 13 | Incentive Award Recommendation Form, 11/23/99 | 254 |
| 14 | Memo from B. Strauch to B. Loeb; January 12, 2000 | 254 |
| 15 | Memo from B. Strauch to B. Loeb; June 28, 2000 | 254 |
| 16 | Memo from B. Strauch to D. Dampbell; December 19, 2001 | 256 |




EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Incentive Award Recommendation Form, 2/27 | 257 |
| 18 | Incentive Award Recommendation Form, 12/15/04 | 258 |
| 19 | Incentive Award Recommendation Form, 10/15/03 | 258 |




PROCEEDINGS

JOHN C. CLARK,

after having been first duly sworn, was examined and did testify under oath as follows:

EXAMINATION

BY MR. LOWINGER:

Q. Good morning.
A. **Good morning.**
Q. My name is Brian Lowinger. I'm an attorney at the Employment Law Group here to take your deposition today.
Could you just state your name for the record, sir.
A. **John Clark.**
Q. And could you spell your last name, sir.
A. **C-l-a-r-k.**
Q. And could you give your date of birth?
A. **9/6/47.**
Q. That's 1947?
A. **Right.**
Q. Just a few ground rules about the



deposition today. We're going to ask you a series of questions. It's really like a question-and-answer period except that it's extended. It's all being taken stenographically, so only what you say orally appears on the record. Nodding of your head to answer a question doesn't really appear on the record, so I'm going to ask that you respond to all questions with a verbal answer. If it's a yes or no answer, say "yes" or "no" rather than "uh-huh," because "uh-huh" always comes out with somebody thinking that means no or maybe later on down the road. So sometimes it doesn't really translate.
A. **Okay.**
Q. Thank you.
Have you ever been deposed before?
A. **Oh, yeah.**
Q. Can you tell me when you were last deposed?
A. **It's probably been in the last 10 or 15 years, but most of it was right after I came to the Board or right before I came to the Board.**
Q. In what context?
A. **Always in aircraft accident litigation.**

57

responsible for all the major investigations and also all of those, I'm going to say critical incident investigations, ones where an engine has failed or a piece of structure has failed that could have led to a catastrophic accident.

Q. Okay. I want to make sure I understand this. Through delegated authority, the regional deputy director can be responsible for the critical incident investigations and the major regional investigations through the delegated authority. Is that right?

A. I don't know what you're talking about, delegated authority. "Delegated authority" is a term that, as a director, the Board has given the director delegated authority to personally sign -- approve the probable cause of a lot of accidents. And when I was deputy or director, it may be 200 accidents at a time that don't go to the Board.

So it's the board's job to determine probable cause, but under delegated authority the director can sign for those. Now, the deputy director of the regional operations is responsible for all of

58

those investigations conducted by regional investigators, and there's a wide range of those. There are a few incidents, but most are accidents. And then there's a number of fatal accidents that the deputy director of regional operations is responsible for.

Then we have major investigations, the crash that makes the news, an airline crash with a lot of people and things like that. That's the deputy director at headquarters, the deputy director in OAS. He's the deputy director for major investigations. Those can be the big investigations and all of those technical -- complicated technical investigations that didn't involve an accident. But that's the deputy director of major investigations.

That's the way it's structured right now. And then there's a deputy director of regional investigations that has all those investigators out scattered around the country.

MR. LOWINGER: Does anyone need a break? We've been at it for a little while. Would you like a break?

59

THE WITNESS: Go ahead. I'm fine.

MR. LOWINGER: I'm fine as well.

BY MR. LOWINGER:

Q. Let's talk about -- I think we're getting ahead of ourselves a little bit, and I think we're kind of talking about the present right now, and I want to make sure we're all in the right time period.

You became the director of OAS in 2000 or 2001?

A. Yes.

Q. And you were an SES at the time?

A. Yes.

Q. From the beginning of the time that you were the director of OAS, can you describe to me your principal duties and responsibilities as the director of OAS?

A. The principal duties were to conduct aircraft accident investigations.

Q. Okay.

A. Have safety recommendations written that would improve the safety of aviation. The director is responsible for the overall maintenance of the

60

regional investigative offices. Or not the maintenance, but the existence of those offices. The director is responsible for determining which slots should be filled in which order, for example.

Q. For FTEs?

A. For FTEs, yes.

The director had that delegated authority to sign off on a lot of the regional investigations that wouldn't go to the Board.

The director is responsible for making sure that the reports on major investigations are completed in a timely manner, that the various aspects of an investigation are properly covered and properly investigated, and that the report is compiled and presented to the Board, and then to get those reports accepted by the Board members and get their endorsement of those reports.

Q. Okay. So as the director of OAS, your responsibilities, or your primarily responsibilities were accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, filling slots for human

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
-------------------------------X
MARJORIE MURTAGH COOKE :
Plaintiff :
v. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION :
SAFETY BOARD :
Defendant :
-------------------------------X

Videotaped Deposition of
ELLEN ENGLEMAN CONNERS

Washington, D.C.
Thursday, October 25, 2007
9:30 a.m.

COPY

Job No.: 1-115016
Pages 1 - 170
Reported by: Ellen L. Ford, RPR

2

Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006

Pursuant to agreement, before Ellen L. Ford, Registered Professional Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF PLAINTIFF:
R. SCOTT OSWALD, ESQUIRE
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
1100 L Street, Northwest
Washington, D.C.. 20005
(202) 353-7978

4

APPEARANCES (Continued)

ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
DENISE M. D'AVELLA, ESQUIRE
NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6086

ALSO PRESENT: Scott Forman, Videographer
Marjorie Murtagh Cooke, Plaintiff
Quan Luong, Esquire, US Dept. of Justice

CONTENTS

EXAMINATION OF ELLEN ENGLEMAN CONNERS PAGE
By Mr. Oswald 7 - 164
By Mr. Luong 164 - 165

---

EXHIBITS

(Exhibits retained by counsel.)

ENGLEMAN CONNERS EXHIBITS PAGE
No. 1 - Performance Appraisal Form 86
No. 2 - Affidavit 143
No. 3 - signed document 144
No. 4 - Performance Evaluation Form 145
No. 5A and B - e-mails 146



PROCEEDINGS

VIDEOGRAPHER: Here begins Tape No. 1 in the deposition of Ellen Engleman Conners in the matter of Marjorie Murtagh Cooke versus the United States, pending in the U.S. Court of Federal Claims, Case No. 6-748C and the related claim.

Today's date is October 25th, 2007. The time is 9:54 a.m.

The Video Operator is Scott Forman of LAD Reporting.

This deposition is taking place at the Employment Law Group, 888 17th Street, Northwest, Washington, D.C.

Would counsel please identify themselves and state whom they represent?

MR. OSWALD: Scott Oswald on behalf of the Plaintiff, Marjorie Murtagh Cooke. And in the room is Brian Lowinger and David Scher and Ms. Murtagh Cooke.

MR. LUONG: Quan Luong for the Defendant in the matter before the District Court. Just point of clarification that this deposition is



also for purposes of the District Court matter.

MR. OSWALD: Correct.

MS. COHEN: Meredyth Cohen for the United States in the Court of Federal Claims matter.

MS. D'AVELLA: Denise D'Avella representing National Transportation Safety Board.

VIDEOGRAPHER: Thank you, very much. The Court Reporter today is Ellen Ford of LAD Reporting. Would the Reporter please swear in the witness?

Whereupon,

ELLEN ENGLEMAN CONNERS,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

Q Ms. Engleman Conners, my name is Scott Oswald, and we've introduced ourselves briefly before we began today.

I'm going to ask you a series of questions today, and we'll be spending some time together.

But before we do, I want to go over a few items



before just as kind of a prelude.

Before I do, though, I want to know, how many times have you ever been in a deposition like this before?

A None that I'm aware of.

Q All right. And then what we're going to do today is I'm going ask you a series of questions, and I'll ask you to give me your true and complete answer.

If there is ever a point at which you don't understand a question that I have for you, please let me know --

A Okay.

Q -- and I will reformat it in a way that you do understand. If you answer a question, I'll assume you understand it.

To your right you have two very fine counsel, and there may be a point at which they interpose an objection. And we'll listen to that objection, and then I'll ask you to answer the question itself.

If -- unless they instruct you not to answer.

If there's any point at which you'd like to take a break, you let me know and --

when exactly it was. My memory it was fairly early on when I was Chairman, but I don't remember the exact date. I don't remember the exact date.

Q In or about 2003, 2000 --

A Again, my memory tells me it was the first year, but -- I mean, I'm thinking it was the first year, but I don't know exactly.

Q I understand. All right. And where did you assign that -- where did you place the marble, assign the SES slot when it became available because the incumbent at the Academy had left and left the SES slot available for reassignment?

A Well, we didn't want to keep it at the Academy because we didn't think we needed an SES at the Academy at the time. It was just starting.

We had a lot of issues that we had to do for business development and just figuring out what the Academy was or wasn't going to be.

At the moment it was a building that was still being constructed, and so -- and we really needed SESs more in the operating system.

So my goal was to get all the modes, the way I



would say it in speech is, to the same level of attention that Aviation had. Because the NTSB is very Aviation centric. By mission, by tradition, by reson detra.

So the goal was to have, what I would say is, the bar of safety be raised in all the modes, because I was a multi-modal person, not an Aviation person. I came from the surface world, not the Aviation world -- one of the few Chairman who wasn't Aviation centric -- to bring all the modes up to the same level.

Because, as I would say, if someone dies in a transportation accident, their family's grief isn't changed by whether it's an aviation accident or car accident; the grief and the loss is the same.

So we needed to move away from the Aviation centric view and try to include all the modes and all transportation safety. So --

Q So why did you want to bring the Highway, the Pipeline as one mode up to the Aviation mode and the Marine Division up to the Aviation mode, and the Pipeline, HAZMAT and Rail up to the Aviation level?

A For the reasons I just said. When someone



dies in a transportation accident, the loss to society, the loss to their family isn't mitigated by whether it's an aviation accident or rail accident or pipeline accident or a boating accident, the loss is the same, and yet the attention given, the ability to -- the amount of accidents that were investigated, the resources that were allocated within the Agency, the majority were aviation.

Now, there was a reason for that. Because if you look at the NTSB legislation, which created the Agency, if you look at the code, by law we were required to investigate every civil aviation accident in the United States. By law, required. That's the one thing we had to do. There was no we won't do that one. We had to investigate or cause to be investigated every civil aviation accident in the United States.

And that didn't require death. That could have been just an accident. So that was about 1700 a year. So it wasn't a small number by any means, but mostly those were general aviation.

When there would be a very large, if you will,



accident, a major airline accident, TWA 800 or American 587, which is -- people usually recognize because of all the media attention and, of course, the great trauma and horrible loss of life that accompanies those, those would take a lot of resources and many years, et cetera and so forth.

So there's nothing wrong about the NTSB being aviation centric because that's what it is by its very reason to exist.

But that being said, because we have responsibility for the other modes, and because my personal and professional belief was that all safety mattered in all modes, I wanted to raise the attention, raise the bar, raise the resources on all the other modes.

It would never be the same, but just to that awareness itself was a major change for the Agency.

Q And how did you feel that the -- was the most appropriate way to go about doing that, raising the bar for each one of the modes?

A Well, it was a combination of a desire to raise the bar, implement the President's Management

Agenda, which included human capital development and support, and what I considered just good business sense.
We looked at the entire Agency, not one office or one department, and said what do we need to do here? We had approximately 435 employees when I came on board, our budget was about 75 million, if memory serves; not a lot of money and not a lot of people for being the independent safety agency for the entire United States in all modes of travel and transportation.
So I tried to fill -- figure out where do we need people versus what I considered in the past people kind of raised their hand and said oh, me, me, me.
I want to hire somebody, and whoever was the squeakiest wheel would get the person. It seemed in the past that whoever had the squeakiest wheel would get the allocation versus a planned allocation of where we were going to put the resources.
So the Managing Director and I and with the team, which was the larger team, heads of all the departments, we basically said what are your needs?



Everybody tell us your needs.
And we came up with, I think it was about 93 positions, if memory serves. I want to say 93 because I used it in speeches, so I'm hoping it's 93. But it was a significant number, it was a little less than 100, but it was a significant number of positions.
And what we said to everybody is don't tell me you need six more people. That doesn't help me to go to Congress and sell that for you. Because obviously we couldn't do anything about an appropriation.
Tell me what you need and why. So it was by title, kind of a mini job description, and by grade. You know.
I need a -- I need a materials expert. I need a Navy architect. I need a pipeline specialist in flow design XYZ. That would be GS14 probably. And this would be, you know, probably the title -- you know, kind of a job description and title versus just I need the blank check.
So we put that together. And along with that was my desire to ensure that each of the divisions -- my goal was to have each of the department heads be an



SES, which is not what it was when I came in.
Q And why was that your goal?
A I thought that by raising the bar to having an SES, which is the highest level of Civil Service, it's a statement. An SES is a higher level of professionalism, abilities, et cetera and so forth.
When you put an SES in charge of a division or department or office or whatever that unit is called, it's making a statement about its importance. It's making a statement that -- about the qualifications and requirements. And this allows you to build a larger team.
And it also means that that person has a very significant level of skills that accompanies the ability to be an SES. Because an SES requires more than just having skills, there's a whole level of other skills that are attached. They are the Embassadors of Civil Service.
Q And to what extent were the Directors of each of the investigative modes Embassadors of their organizations?
A I'm sorry. I don't know what you mean by



that.
Q Well, to what extent -- when you say the SES were Embassadors for the responsibilities under their job, let's say, title and duties, to what extent was that the case with each of the Directors, if at all?
A Well, I would say Aviation definite -- I mean, again, I'm not -- when I say Embassador of Civil Service, that's how it's been described to me. And when I talk to people --
The concept behind an SES is that they could be placed in any government agency and be effective, which is different than a technical line operator who only knows accounting or law or something like that.
An SES is meant to be multi-facetted in their abilities and have a level of expertise so that you could --
The idea, when the SESs were created, if my understanding is correct, is that an SES at the Department of State could be taken over and become an SES at Department of Transportation and be equally effective because they had a greater skill set than just the technical knowledge or operational knowledge

49

Q I understand. When did you first -- strike that.
All right. When did you first become aware that some of the Directors of the four investigative modes were paid differently?
A Were paid differently.
Q Mm-hmm. Different levels.
A Meaning they all weren't SESs? Or what -- I don't --
Q When if ever did you become aware that the individuals who were in the Director positions of any of the four investigative modes at the NTSB -- Highway, Marine, Rail or Aviation -- were paid at a different base salary?
A I don't know what their base salaries were, so I can't answer that. I can -- I mean, I don't know what anyone was paid. I didn't sign their checks. So I don't actually know the salary of any one person other than myself.
Q My question is just a little bit different, though.
A Right. That's what I'm trying to

50

understand.
Q My question is, when if ever did you become aware that any of the Directors of the four investigative modes at the NTSB were paid differently?
MR. LUONG: I'm just going to object to the term "differently" as vague.
COURT REPORTER: As what?
MR. LUONG: Vague.
COURT REPORTER: Thank you.
A I'm sorry. I really don't understand your question.
Q All right. When if ever did you become aware that any of the Directors at the NTSB -- Highway, Marine, Aviation or Rail -- were concerned about the fact that he or she was paid differently from other Directors at the NTSB?
MS. COHEN: Objection; assumes facts not in evidence.
Q You may answer the question.
A It's the way you're phrasing it, I'm having a hard time understanding exactly what you're asking.
When we did -- when I was presented with the

51

first, what you would call the annual performance review, the recommendation of bonuses, there was an SES pool, and so I could see from the listing who was an SES and who was not an SES.
So at that point, I guess you could say I was aware that people were paid that had different -- they were in different grade levels.
Paid differently is confusing to me because everyone is paid under the Federal Civil Service System, and that has grade levels, and it has time, and it has all these other things.
So, I mean, just sundry, everybody is paid differently even within the same grade level. You can have two people who are in the same grade level, but because they have different years, then one is a Level 2 and one is a Level 8. They're technically paid differently, but they're paid legally according to the pay schedule.
Q I understand.1?
A So I'm just struggling with your paid differently statement because --
Q I understand. When if ever did you become

52

aware that any of the Directors of the four investigative functions, the modes at the NTSB, were paid a different amount of money over the course of an annual basis?
MS. COHEN: Objection; assumes facts not in evidence.
A I can't answer your question other than the way I just answered it. Everyone was paid differently. Everyone was paid according to the Civil Service schedule of their grade level, and where they came in at, and years experience, and all of this stuff. So everybody was paid differently. Everyone was paid according to where they were on the schedule.
Q And what concerns did you have that there was -- there were individuals who were different places on the schedule and, therefore, paid differently?
MS. COHEN: Objection; assumes facts not in evidence.
A I had -- I mean, I don't understand. What concerns could I have? I don't control the Civil Service pay scale.

53

Q I understand.
A This isn't the private sector where the CEO can change people with, you know, whatever decision they make. There's a set of rules, and everyone is paid according to where they are within the Civil Service schedule. I don't know how else to explain it.
Q I understand. All right. Let's now focus on April of 2004.
When if ever did Marjorie Murtagh Cooke come to your office and notify you that she believed that she was being paid differently than other Directors at her same level of the various modes in the investigative function at NTSB?
A We had a meeting, but I don't remember that that's the phrase that she used.
Q Okay. What do you remember?
A Marjorie came to my office -- and I don't remember exact words as in it's been years -- but it was -- she stated that she wasn't an SES, her office wasn't an SES, and she didn't make as much money as the folks who had an SES. So --

54

Q What else?
A And she wanted me to fix that, and she said -- she requested overtime.
Q What else?
A That was pretty much it.
Q Now, the meeting that you had with Marjorie Murtagh Cooke, was it scheduled or was it impromptu?
A Scheduled, I believe.
Q Okay. And how did Marjorie Murtagh Cooke go about scheduling the meeting with you?
A I don't remember.
Q How would anyone of your -- in the NTSB that had either first or second-line reporting schedule a meeting with you?
A Two ways, or three ways or four ways, actually.
You could check with my Chief of Staff who would schedule; you could grab me in the hallway; you could see me after a meeting or after a hearing; or we had open office hours like every Wednesday or ever other Wednesday, as often as -- unless I was out on an accident or something like that. But I kept like an

55

open office hour at least once a month where you just kind of walked in; and then the fifth way was people would just show up at my doorway.
Q Okay. And if one wanted to schedule a meeting with you, when if ever would be appropriate to send you an e-mail and ask you to schedule a meeting?
A Anytime.
Q That was appropriate to do that?
A Mm-hmm.
Q Is that -- I'm sorry. Is that a yes?
A Yes. I'm sorry. Yes. Mm-hmm is a yes.
Q Thank you. All right. So the meeting takes place in your office; is that right?
A Yes.
Q All right. And where were you seated?
A (non-verbal response.)
Q Behind your desk? Did you have the meeting at a conference table in your office?
A I don't remember specifically. I usually sat at a conference table rather than behind my desk. It would depend on the day. I mean if it was one of those -- if someone was just kind of coming in and

56

out, I might stay behind my desk, sometimes I would sit at the conference; it was kind of 50/50. I don't remember specifically.
Q All right. And then who spoke first at the meeting with Marjorie Murtagh Cooke?
A I have -- whoever said hello first.
Q What knowledge did you have that the topic that Marjorie Murtagh Cooke wanted to raise with you?
A I don't remember having any --
Q Any foreknowledge.
A No.
Q I understand. And what was -- after the general greeting of hello, what was the first thing you remember Marjorie Murtagh Cooke saying to you?
A I don't. I mean, I don't remember very much about the meeting other than the request for overtime, which I thought was bizarre.
Q Why was it bizarre?
A Because it was -- it was out of context. It was -- it was bizarre. It was just out of the blue.
Q Why was it out of the blue?
A Well, I remember -- one of the things I

remember of the meeting is it wasn't a very long meeting. This wasn't a long meeting or discussion or anything like that, it was just kind of out of the blue. And it was kind of like, "I'm here. I'm not an SES so you need to fix that by paying me overtime."
There was no justification, no rationale, no, "I've been working 60 hours a week and here are my hours," or anything.
It was just like, "You need to fix this, and here's what you need to do and." I felt like it was just a bizarre request. There was no -- I didn't understand where it was coming from.
Q Okay. And when if ever did you ask Marjorie Murtagh Cooke where her request was coming from, in your words?
A Well, I mean, during the -- I think I said something like, "Oh," or, "Whatever." But there was nothing else forthcoming. It was just kind of like, "I'm here. I want you to give me overtime." And there was nothing else behind it.
It was just out of the blue. It was kind of bizarre. My feeling was this is bizarre. That's all.



Q Why was it bizarre for Marjorie Murtagh Cooke to ask you to pay her overtime to equalize her wage with the other Directors of the divisions?
A Well --
MR. LUONG: Objection; I think that mischaracterizes the earlier testimony.
Q You can answer the question.
A First of all, she didn't say to equalize. She didn't suggest that. It's just like, "I'm not an SES so you have to make up for it." I mean, that was the context.
It was -- there was no anything like that. It was like a small child is upset that you didn't buy them the toy -- that their father didn't buy them the toy in the window, and you're the aunt, so therefore, you have to buy the toy.
I mean, it was just out of the blue. I didn't understand it. She was a manager. I didn't know if it was possible to pay a manager overtime.
There were a lot of things about it I didn't understand, so it was just a bizarre request.
I had never had a department head in government,



in my experience in government, make a request like that at either of the agencies that I had worked for. So it was not something I had experienced before, and it was, as I said, kind of out of the blue.
So bizarre is the only word -- I mean, bizarre meaning not bad, not good, but out of the blue, different than what normally one has as a conversation.
Q Well, why was it in your mind inappropriate for her to ask you to make up the differential between what she was being paid and what the other Directors were being paid?
MS. COHEN: Objection; mischaracterizes evidence.
MR. LUONG: Objection.
Q You may answer the question.
A I didn't say it was inappropriate, I said it was bizarre and I hadn't experienced it before.
I didn't know the answer, and I said I would look into it.
So I didn't judge it one way or another other than its uniqueness in the request. When I say



bizarre, I'm not saying negative, I'm saying unusual, different, something I hadn't experienced and I didn't completely understand.
And normally, when -- my experience has been if someone comes and says I want a raise or I want a new job or this or that, they kind of lay out their case. They pitch it to you. Not a declaratory sentence. So it was a unique -- it was just unique. I said I would look into it and, I mean, that's all I could do at the time.
I'm not in charge of the pay schedule for the Civil Service. I didn't hire her. I didn't know all the circumstances. There was no justification on her part when she met with me to explain what was her concerns. It was just kind of, as I said, like a declaratory sentence. "You need to do this." Okay.
Q Well, when Marjorie Murtagh Cooke said to you that she was entitled to be paid at the same level as the other Directors, what did you understand her to mean by that?
MR. LUONG: Objection; assumes facts not in evidence.

101

facts not in evidence.
Q You may answer the question.
A I don't remember the order, so I can't speak to whether that was the order or not. I don't remember the order of assignment.
You suggested to me that it was Highway, Research and Engineering, Administration, Marine. So I don't remember the order. If that was the order, fine. I don't remember it.
I remember Highway was first. That I do remember, but I don't remember the rest of the order.
There was also the issue of how many employees were in that department or division. So when you were talking about scope, it's the scope of the investigatory responsibilities as well as the scope of supervision, the existence of regional offices. Highway had regional offices. So again, the scope of the responsibility was much larger and more employees, and there are over 45,000 highway deaths a year in the United States. So the impact on the safety mission is pretty darn big.
Q All right.

102

A So that's why Highway was chosen first. The rest, following that same type of analysis would have been utilized with the goal of being able to bring in more SESs throughout the Agency.
Q And you made that decision --
A Yes.
Q -- of the order in which you were going to assign the SES tags to the various positions.
A Yes and no. It was pretty clear that Highway should be next. Again, for all the reasons I already stated.
The others, it came as part of a larger process. If you remember earlier I talked about the organizational review that we conducted and the requests that we made to all the Directors for the openings that they were proposing, et cetera and so forth. We looked at that in context of our mission, in context of all the items I just listed, scope of responsibility, amount of supervision, et cetera, and just trying to align it so that there was a little bit of equity to try to fill all the pots to some degree, knowing that we wouldn't ever have a perfect world

103

where we could have 100 percent where we wanted one of the departments to the detriment of the others. We were going to have to fill every pot a little bit as we could. And it wasn't just for SESs, it was for staff, it was everything from investigators to writers to admin to clerical.
So none of these decisions was a single point decision. They were part of a much larger deliberation over allocation of resources in the organization with the end goals as previously stated, and at the same time a nonstatic environment.
Q Who was the decision-maker other than you?
A It was the discussion with myself, it was debated, discussed, Dan Campbell, probably Ron Battocchi, we got input from other Office Directors, from my Chief of Staff.
Q Who had the authority to make the decision other than you?
A The authority for the SES assignment?
Q Yes.
A Well, I believe that ultimately was my determination, again, with recommendation and

104

discussion with the General Manager -- or Managing Director rather, I'm sorry, Dan Campbell. And Ron Battocchi would have been part of the discussion.
Q They couldn't overrule your determination, could they?
A Ron Battocchi could if I was doing something illegal. I would expect that he would.
Q Other than if you were doing something illegal. To the extent that you had that was not illegal to do, who else had the discretion to make the decision on which position would receive the SES --
A Where the SES would be allocated?
Q -- where it would be allocated other than you?
A I believe it was my decision.
Q Where do you work now?
A Federal Communication Commission.
Q What is your job title?
A It's a long one. Senior Deputy Bureau Chief of the Enforcement Bureau of the FCC.
Q How long have you been in that position?
A Since March of this year.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, )
Plaintiff )
vs. ) No. 06-748C
THE UNITED STATES, ) (Judge Wheeler)
Defendant )

Deposition of Marjorie Murtagh Cooke
Washington, D.C.
October 23, 2007

Reported by: Bonnie L. Russo
JOB NO. 183364

October 23, 2007
9:53 a.m.

Deposition of Marjorie Murtagh Cooke held at:

United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.

Pursuant to notice, before Bonnie L. Russo, Notary Public



APPEARANCES:

For the Plaintiff
BRIAN M. LOWINGER, Esq.
DAVID SCHER, Esq.
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
202-261-2806

For the Defendant
MEREDYTH D. COHEN, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, N.W.
Washington, D.C. 20530
202-353-7978

For the Agency
DENISE M. D'AVELLA, Esq.
NATIONAL TRANSPORTATION Safety Board
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
202-314-6086



CONTENTS


| EXAMINATION OF MARJORIE MURTAGH COOKE | PAGE |
|---|---|
| BY MS. COHEN | 5 |

EXHIBITS

| | | |
|---|---|---|
| 1 | Marine Launches | 67 |
| 2 | Recommendations and Controlled Documents Processed | 111 |
| 3 | Memorandum of Understanding Between the National Transportation Safety Board and the United States Coast Guard Regarding Marine Accident Investigation | 117 |
| 4 | Handwritten Note dated 5-24-05 | 246 |
| 5 | E-Mail dated 5-26-05 | 252 |
| 6 | Performance Agreement: Office of Marine Safety August 2001 through July 2002 | 269 |
| 7 | Memorandum dated 8-2-02 | 275 |


(Exhibits included with transcript.)



P-R-O-C-E-E-D-I-N-G-S

MAJORIE MURTAGH COOKE,
was called for examination by counsel and,
after having been duly sworn by the Notary, was
examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT
BY MS. COHEN:

Q. Ms. Cooke, we have met before. As you know, I'm the attorney representing the United States in the court of federal claims case, Cooke v. United States.
Do you prefer to be called Ms. Cooke or Ms. Murtagh Cooke?
A. Ms. Cooke is fine.
Q. Can you please state your full name for the record.
A. It's Marjorie Murtagh Cooke.
Q. Ms. Cooke, have you ever taken a deposition before -- had your deposition taken?
A. Yes.
Q. How many times?
A. I think three.

Q. And what were the circumstances of each one?
A. They were personnel cases. The last one was about, I guess, it's in the last few months, it was for a personnel case that was being handled by private a company with an individual that formerly worked for me and they deposed me in that.
Q. What were the individual's allegations?
A. What were the individual's allegations?
Q. In that case.
A. I don't think it was an individual's allegations. I think it was the company's allegations. I don't know the details of it, to be honest with you. It was more a matter of what -- who the person was, he worked for me at one point in his career. There were questions about paperwork that he had -- he being the general counsel's office -- had prepared was that accurate information, that kind of thing.



Q. Was it someone that worked for you at the NTSB?
A. Correct.
Q. In what capacity?
A. As a Marine accident investigator.
Q. And the second deposition that you gave, what was that for?
A. The other two depositions, I believe they were two depositions, was in another personnel case for someone who worked for me at NTSB.
Q. And what capacity did those individuals work for you?
A. As a Marine accident investor.
Q. Do you remember what their claims were?
MR. LOWINGER: Objection. Misstatement of testimony. I believe she just said it was one person, two depositions.
BY MS. COHEN:
Q. Two depositions in the same case?
A. I believe so, but I wasn't -- I'm



not positive about that.
Q. What was that individual's claims in that case?
A. That there was a discrimination for -- I believe -- I believe the case was -- let me see if I can recall. There were two parts to it. The first part was that she had been discriminated against as a white American female. A U.S. born citizen.
Q. What was her name?
A. Paula Sindprunier.
Q. Can you spell that, please?
A. P-A-U-L-A, S-I-N-D-P-R-U-N-I-E-R, I believe.
Q. And what was the name of the employee involved in the other personnel case?
MR. LOWINGER: Objection. Misstatement of testimony.
THE WITNESS: Yes. Which other?
BY MS. COHEN:
Q. The first one that you were discussing.



A. Oh, James Walsh, W-A-L-S-H.
Q. What were Mr. Walsh's claims in that case?
MR. LOWINGER: Objection. Asked and answered.
THE WITNESS: Again, I don't know the details of the case that I was deposed for. It was really between Mr. Walsh and I believe Carnival Cruise Lines.
BY MS. COHEN:
Q. I will be asking you a series of questions today. If you don't understand a question or if you can't hear it, just please let me know and I will repeat the question or rephrase it. Okay?
A. Okay.
Q. As you can see, there is a court reporter that's recording everything that we're saying. She can only record oral testimony. She cannot record head nods or gestures, so please make sure that you always give a verbal response to all questions. Okay?

current position?
A. About a year.
Q. Since what date?
A. I don't have the specific date. It's the fall of 2006.
Q. And where were you employed prior to that?
A. The National Transportation Safety Board.
Q. And what was your last position at the NTSB?
A. I don't recall the title of the position.
Q. What were your duties in that position that you were in?
A. I was working in the office of the managing director. I was reviewing reports that had been completed by government and private organizations analyzing the work of NTSB, and determining if the recommendations they had made had been fulfilled by the different offices within NTSB.



Q. And when you say offices within NTSB, which specific offices are you talking about?
A. The chief financial officer, human resources, managing director, I think some of those things may have involved the Office of Administration when it was -- when it was put together.
Q. Did that involve the work of the mobile offices at all?
A. I -- it may have. It may have.
Q. How long did you have that position in the managing director's office?
A. From October of 2005 until July 3rd of 2006.
Q. What was your position prior to that?
A. Again, I don't know the title that I had. I was working for the office of safety recommendations and accomplishments.
Q. What were your primary duties in that position?



MR. LOWINGER: Objection. Relevance.
Go ahead.
THE WITNESS: I would consider them administrative.
BY MS. COHEN:
Q. Can you be a little more specific, please?
A. I wrote a -- an award recommendation for a member of the office at the office director's request. I gathered information from each of the division chiefs to summarize the work that they had completed with regard to a management report for the Office of Safety Recommendations and Accomplishments.
MR. LOWINGER: If you're done with the question, I think Mr. Sheriff is here.
Can you hold on a second? I know you're asking questions.
MS. COHEN: We'll take a short break and I'll go get him.
MR. LOWINGER: I appreciate that.



Thank you very much.
(A short recess was taken.)
BY MS. COHEN:
Q. Before the break, Ms. Cooke, we were talking about your position at the NTSB and the Office of Safety Recommendations. How long were you at that position?
MR. LOWINGER: Objection. Relevance.
You may answer.
THE WITNESS: I was there from June of 2005 through October 2005.
BY MS. COHEN:
Q. And where were you prior to that?
A. I was in the Office of Marine Safety.
Q. What was your position?
A. Director.
Q. How long were you at that position?
A. The position changed in 1997 or 1998 to the director position. So from 1997, 1998 I was director until June of 2005.

MR. LOWINGER: Objection. Speculation.
You may answer.
THE WITNESS: Yeah. Again, I would really have to look at the list of accidents. I would be happy to do that for you if you would like to give them to me and I will tell you if they qualify as high public interest.
BY MS. COHEN:
Q. You also said repetitive accidents. What do you mean by repetitive?
A. Accidents that had issues that came up several times.
Q. Give me an example.
A. Fire safety on cruise ships.
Q. You said catastrophic accidents. What would be a catastrophic accident?
A. An example would be the Norway had a boiler explosion, cruise ship with a boiler explosion. That would be a catastrophic accident.
Q. Why would that be considered



catastrophic?
A. Because it would potentially have placed about four or 5000 people's lives at risk.
Q. How were you notified of accidents?
MR. LOWINGER: Objection. Vague.
Go ahead, if you understand.
THE WITNESS: There are a number of ways that I would be notified of accidents. We had a communications center at NTSB and the communications center would call me on the telephone. If I were at home, if I were in the office I had a pager that was on that I carried with me all the time and I would be notified of accidents that way. I would be notified of accidents by watching the news -- I would sometimes learn of an accident. So there were, I mean, a number of ways that the notification can come in.
Congress asked us to investigate an accident one time that had not come up on our radar as a standard Marine accident. In fact,



they asked us more than once. So there were multiple ways that notification of an accident could come in.
BY MS. COHEN:
Q. How frequently per week were you notified of an accident from 2000 to 2005 on average?
MR. LOWINGER: Objection. Vague.
If you can answer, please go ahead.
THE WITNESS: Between -- and I don't know the dates because it really did depend upon who was making the call on that, but I carried a pager that notified me of every accident that occurred that was within the board's purview. So I was notified of aviation accidents, I was notified of highway accidents as well as Marine.
BY MS. COHEN:
Q. Specifically as to Marine accidents, how frequently were you notified of a Marine accident between 2000 and 2005?
MR. LOWINGER: Objection. Vague.



You can answer if you know.
THE WITNESS: Yeah. I don't -- I really don't know an accurate way of telling you that. There are about -- there are between 40 and 60 major Marine accidents that occur every year, so we would receive notification of those, and, you know, other accidents that would come up on the radar. As I said, they would not necessarily qualify as a major Marine, but we would be notified of them.
BY MS. COHEN:
Q. Who would determine to notify you of an accident if it was not considered major?
MR. LOWINGER: Objection. Calls for speculation. How would she know who determined to give her a call?
Go ahead.
THE WITNESS: Yeah. Repeat the question please to make sure I understand it.
BY MS. COHEN:
Q. As I understand it, you were notified by phone call or by pager of an

If it were an accident that was in a place like Alaska it may be that they would have to, you know, travel and make changes of airplanes. We would also want to be sure that they had adequate rest; logistics for the hotels, for cars, for whatever kind of transportation they needed. We also needed to talk to the owner of the vessel because they would be a party to the investigation, so you would start notifying the parties. Talking to them, making sure they understood that we were seeking their cooperation.

In Marine accidents, many times there would be new people involved. We would have to explain the rules to them. So basically getting the team launched, making sure they had all the equipment that they needed to get out the door, responding to public affairs, making sure they had the basic information on what the accident was about so that we could answer to the news media, answering to congressional inquiries regarding



the accident; asking other offices for resources if we needed particular resources to supplement the team.

If I recall, you asked what was the next step after notification. All of those things take place immediately after notification.

Q. You had said one of the steps after notification was deciding whether an accident was in the NTSB purview.

Can you explain it what you mean by within the NTSB purview?

A. Yes. If it's -- if it, in fact, was an accident that NTSB had direct authority to investigate. For example, was it within the territorial seas of the United States.

Q. What types of accidents did NTSB have the direct authority to investigate?

A. Accidents that were within the territorial seas of the United States and any accident that involved a U.S. flag vessel anywhere in the world.



Q. Did the NTSB have direct authority to investigate accidents outside of the territorial seas of the United States involving United States manufactured vessels?

A. U.S. manufactured is not really -- you mean U.S. built. They don't consider it manufactured. I apologize for -- it's just terminology for me. But a U.S. built vessel, a U.S. flag vessel, yes.

Q. U.S. built vessel is my question.

A. Yes. U.S. built, U.S. flag vessel, correct, yes.

Q. So the NTSB was not required to investigate all Marine accidents throughout the world; is that correct?

A. Required to investigate?

Q. Yes.

A. No.

Q. Did the NTSB have the option of investigating Marine accidents that they were not required to investigate?

MR. LOWINGER: Objection. Asked and



answered.

You can answer it. It's vague, but go ahead.

THE WITNESS: I'm sorry. I'm not clear. Could you repeat that in a different way, perhaps, so I understand your question?

BY MS. COHEN:

Q. You said that NTSB had direct authority to investigate accidents that occurred in the territorial seas of the United States and the United States flagged vessels anywhere in the world?

A. Right.

Q. Did the NTSB have any authority to investigate other types of Marine accidents?

A. We had authority to investigate accidents that were beyond the territorial seas under the international regulations.

Q. What international regulations are you referring to?

A. The International Maritime Organization has international rules and

Page 46

regulations for investigating accidents and there is a Marine accident investigation code that is used which permits a -- they use the term "administration" usually, but it refers to countries if you have an interest. So, for example, if a U.S. passenger were -- a U.S. citizen were to become a fatality on a vessel that was either not within the territorial seas or were -- and was not a U.S. flag vessel, then we can participate in that investigation. It's an international investigation and we can participate in that investigation.

Q. Would NTSB take the lead in the investigation that you just described?

A. They might, but that would be up to a negotiating -- a negotiation. I mean, if they were all U.S. citizens, it might occur. But that would be a negotiation that would occur at the time of the accident.

Q. Negotiation with who?

A. With the flag administration.

Q. How often has it happened that NTSB

Page 47

has taken the lead in that type of investigation?

A. There have -- when you say, "that type of investigation," can you tell me precisely so I make sure I'm answering accurately?

Q. I am talking about an investigation that's outside of the territorial seas of the United States and that does not involve a United States flag vessel.

A. Okay.

MR. LOWINGER: Objection. I think you misstated your question. I think maybe you could ask -- read -- if you want to have the court reporter ask it back. But I think it was a little different.

BY MS. COHEN:

Q. Please answer the question.

A. Okay. I'm going to have to ask you to repeat it, please.

Q. How often has the NTSB taken the lead in an investigation that was not on the

Page 48

territorial seas of the United States and did not involve a United States flag vessel?

A. Is there a time period that you're talking about?

Q. 2000 to 2005?

A. Between 2000 and 2005, there probably was not any in that time period.

Q. You said the NTSB has direct authority to investigate the accidents in the territorial seas or a U.S. flag vessel.

Does it have -- is it -- are there any accidents that the NTSB is required to investigate?

A. Yes.

MR. LOWINGER: Objection. Asked and answered.

Please go ahead.

THE WITNESS: Yes.

BY MS. COHEN:

Q. What types of accidents are those?

A. Accidents that involve public and nonpublic vessels. There is a requirement for

Page 49

that. If it's a Coast Guard vessel involving $75,000 in damage or loss of life, for example.

BY MS. COHEN:

Q. When you say public and nonpublic vessels, what does that mean? What is a public vessel that the NTSB would be required to investigate?

A. A public vessel is a vessel that's owned by the United States. So, for example, vessels that are owned and operated by the United States would be, for example, a Coast Guard vessel. Coast Guard cutter say.

Q. And nonpublic vessels?

A. Would be a commercial vessel.

Q. The NTSB is required to investigate all accidents involving nonpublic vessels?

MR. LOWINGER: Objection. Misstatement of testimony.

THE WITNESS: No.

BY MS. COHEN:

Q. When are -- when is NTSB required to investigate an accident involving a nonpublic

what I am giving you an answer to. So if you would explain to me what it is you mean by required that would truly be helpful to me to make sure I am answering your question correctly.

BY MS. COHEN:

Q. Is the NTSB required by statute to investigate any Marine accidents other than those involving Coast Guard accidents?

A. Okay. As I understand -- because you're still using the same term, so I will -- I will clarify for you what my understanding is. The Independent Safety Board Act establishes the National Transportation Safety Board to investigate accidents. That is the primary mission of the agency. For me to say that they are not required to fulfill their mission would be totally ridiculous. So I can't -- I can't say that NTSB is not required to investigate Marine accidents other than what specifically is written in the regs as shall.

We're required by law to exist and



to investigate accidents. The statute lays out the authorities, the expectations of the agency. If we did not investigate accidents we would have a difficult time justifying reauthorization, which comes up every few years. So in order to be reauthorized we're required to fulfill our obligations.

Q. Let me try this a different way.

A. Okay.

Q. Does the NTSB have discretion to not investigate an accident?

A. The NTSB has discretion not to investigate an accident, yes.

Q. Does NTSB have discretion not to investigate an accident involving a Coast Guard vessel?

A. The NTSB has discretion if the accident doesn't meet certain criteria. However, and that's the $75,000 or loss of life. However, if the commandant asks the NTSB to investigate an accident that he feels involves Coast Guard safety functions, I do not



believe that the level of discretion is the same as it would be if a Coast Guard vessel merely bumped a dock.

Q. How often between 2000 and 2005 did the NTSB exercise it's discretion not to investigate a Marine accident?

A. I don't know that number offhand. Certainly, the records at the Safety Board would know notifications and which accidents we didn't investigate.

Q. Can you give me your best estimate of the number of accidents that the NTSB chose not to investigate?

MR. LOWINGER: Objection. Form. Speculation.

You may answer.

THE WITNESS: Again, you're asking me for a number that I want to be sure that I feel comfortable with using, and if I have the records in front of me I could certainly tell you. So if you have a document that has all of the notifications I can certainly tell you how



many of those we did not investigate.

Q. Please, again, just answer the question. I understand that you don't know the precise number, but please give me an estimate of how many accidents the NTSB chose not to investigate between 2000 and 2005.

MR. LOWINGER: Objection. Form, speculation. Asked and answered.

THE WITNESS: Okay. Between 2000 and 2005 what I can give you is an estimate of the number of accidents that we did investigate. And therefore, if you subtract that from the number that we knew of, that will give you your answer. So between 2000 and 2005 we investigated probably an average of let's say six or seven a year.

BY MS. COHEN:

Q. We talked earlier about notification of parties. What is a party to an accident?

A. Party to an NTSB investigation is someone who can contribute to the collection of factual information for the accident. So using