Q. How many parties would there be, for example, a fishing vessel investigation?

MR. LOWINGER: Objection. Vague.

You may answer.

THE WITNESS: Yeah. The fishing vessel investigations were specifically, I believe, excluded from some accident investigations. But for a fishing vessel it may be one or two parties. It could be the owner of the vessel would be a party. It could be if EPIRB didn't activate, it might be EPIRB manufacturer, for example. So it can range from a very small number to a very large number. It depends upon the accident.

BY MS. COHEN:

Q. When you say some fishing vessels were excluded from accident investigation, what do you mean?

A. We, I believe, did not specifically include fishing vessels in our new memorandum of understanding with the Coast Guard when we wrote that up.



Q. You mentioned EPIRB, I believe, in your answer?

A. Yes.

Q. What is that?

A. It's an electronic position indicating radio beacon. It's essentially a device that notifies the Coast Guard that a -- an accident has occurred. It's carried -- even individuals can buy an essential purpose. And, in fact, we encourage them for recreational vessels that are going out to sea to carry an EPIRB. Because it -- it immediately notifies. It doesn't require a radio transmission by that individual, but it notifies the Coast Guard that there is a vessel in distress.

Q. You also talked about some of the logistics of getting investigators to the accident site. How many investigators would you send to a typical cruise ship accident?

MR. LOWINGER: Objection. Vague.

You may answer.

THE WITNESS: There is no typical,



but -- and when you say investigators if you mean strictly my resources as opposed to the resources of the board, because those are two different things. So if we just consider my Marine resources it could be six, say, seven Marine accident investigators if they were available. If I didn't have that many, then I couldn't send them. So...

BY MS. COHEN:

Q. How many investigators would you send to a small passenger vessel accident?

A. Well, the normal team consisted of an investigator in charge, a group chairman for operations, group chairman for engineering, group chairman for survival factors, group chairman for human performance. So that would be five people and that's normally what a team would consist of for an accident investigation.

Q. Regardless of the size of the accident, a normal team would consist of those five people; is that correct?

A. It might. It would depend -- it



would really depend upon the -- there are just so many issues in an accident investigation. You can't -- there is no typical.

Can I take a break?

MS. COHEN: Oh, sure. No problem. Take ten minutes?

THE WITNESS: Yes. That would be great. Thank you.

(A short recess was taken.)

BY MS. COHEN:

Q. Back on the record.

A. Before we go back I just want to make sure that this is the right time. In our last discussions one of the things that occurred to me were some additional duties and responsibilities. Would you like me to add those to the record now?

Q. Sure. You can go ahead.

A. Okay. The additional responsibilities were to represent the United States and the National Transportation Safety Board at the International Maritime

Page 66

Organization meetings related to accident investigation, to also represent NTSB at other international conferences and meetings, symposia as well.

Q. Is there anything else?

A. That's all that came to mind based on our last series of discussions. So if anything else does come to mind I'll certainly let you know.

Q. We were talking before the break about parties and -- I'm sorry, investigators and how many investigators were sent to a particular accident?

A. Uh-huh.

Q. You had mentioned that occasionally there were investigators from other modal offices sent to tend to accidents; is that correct?

A. That's correct.

Q. How frequently did that happen?

A. Again, it would depend upon the accident. There would be, for example, we had

Page 67

a Staten Island ferry accident and we sent a -- an aviation regional investigator to stake our flag in New York. So it would depend. Sometimes we would have investigators from specialists, for example, from the office of research and engineering who would join the team. Again, it would depend upon the accident.

Q. What percentage of accidents would you say involved NTSB investigators outside of the Office of Marine Safety?

MR. LOWINGER: Objection. Speculation.

Go ahead.

THE WITNESS: Yeah. I don't know. Maybe 10 percent. I really don't -- I really don't have an accurate number.

BY MS. COHEN:

Q. I am giving the court reporter Exhibit 1.

(Deposition Exhibit No. 1 was marked for identification.)

Page 68

BY MS. COHEN:

Q. Can you tell me what this document is? Take your time to look at it.

A. It says Office of Marine Safety calendar year 2000 to March 28th of '05 Marine launches.

Q. Did you prepare this document?

A. I may have.

Q. Did you or did you not prepare the document?

A. I may have had someone in my office actually prepare the document, so I can't say that I specifically recall preparing the document.

Q. Have you seen the document before?

A. I believe so.

Q. Does it accurately reflect the number of accidents from calendar year 2000 to March 28th, 2005?

MR. LOWINGER: Objection. I think the document speaks for itself. According to the date on the top 2005 it lists 2004 for

Page 69

accidents.

BY MS. COHEN:

Q. Please answer the question.

A. I think it's probably fairly accurate. I would have to look at all of the records to make sure that it was precise.

Q. Starting at the top calendar year 2004 it says December 8 M/V Selendang Ayu. How many investigators were launched to that accident?

A. Four or five, I think. That's probably my best guess at this moment.

Q. What type of accident was it? Was it a large cruise ship or a smaller passenger ship?

MR. LOWINGER: Objection. The document speaks for itself.

Go ahead.

THE WITNESS: No, the Selendang Ayu was actually a foreign flag cargo ship, and it had -- it had lost power off the coast of Alaska and it ultimately ran aground and broke

Page 70

apart.
I hope I've answered your question. Maybe the court reporter wouldn't mind reading back precisely what the question was so I make sure I answered it correctly.
(The record was read as requested.)
THE WITNESS: So it was neither of those two.
BY MS. COHEN:
Q. How long was the investigative team on site for this accident?
A. They were on scene for a couple of weeks.
Q. How long did it take to prepare the report?
MR. LOWINGER: Objection. Vague. Which report?
Go ahead.
BY MS. COHEN:
Q. Please answer the question.
A. It's actually a very good question. The -- if you mean the final report of the

Page 71

investigation I would have to look at the hours that were used on it. That's something that we were doing that would be presented to the board, but I believe that that was actually adopted after I left the Office of Marine Safety.
BY MS. COHEN:
Q. Moving on to the next accident listed there, October 17th, the SPV Express Shuttle, how many investigators from the Office of Marine Safety were sent?
MR. LOWINGER: Objection. The document speaks for itself.
Go ahead.
THE WITNESS: Maybe one or two.
You said from the Office of Marine Safety?
BY MS. COHEN:
Q. Yes.
A. Maybe one or two. It was not a full team it says. So...
Q. How many were sent from other

Page 72

offices within NTSB?
A. I think one.
Q. From which office?
A. I think the Office of Research and Engineering, but I'm not positive.
Q. You sent for the Selendang Ayu that your report was finalized by the board after you left the NTSB; is that correct?
MR. LOWINGER: Objection. Asked and answered.
Go ahead.
THE WITNESS: I believe it was after I left NTSB, but it may have been just after I left the Office of Marine Safety. So I don't know the specific date on the Selendang Ayu.
BY MS. COHEN:
Q. Did the report go to a director's review before you left the NTSB?
A. I don't know.
Q. You don't recall or you don't know?
A. I don't know if the -- you're talking about the Selendang Ayu?

Page 73

Q. Yes.
A. Yes, I don't know if it went to a director's review before I left NTSB.
Q. Can you tell me in this document which of the accidents were finalized by the board during your time at the NTSB?
A. Finalized by the board?
MR. LOWINGER: Wait. Objection form.
THE WITNESS: Yeah.
MR. LOWINGER: I'm just -- I think there's a public record on this, but go ahead.
THE WITNESS: And there is a public -- there is a document that has all of the reports that were completed.
When you say by the board, do you mean the National Transportation Safety Board?
BY MS. COHEN:
Q. Yes.
A. Or do you mean the individuals on the National Transportation Safety Board?
Q. What would be the difference in your

Page 74

view?
A. Well, one is the organization and the other one are the members of the board.
I had delegated authority to adopt. reports. So for those that I have adopted, as the director of the office, I would consider them to be adopted by the National Transportation Safety Board. So I just want to be sure, again, I'm answering your question. And again, I believe that there is, in fact, a document that has that. I provided that information when I was at the board. So there is a document that I believe has that information on it.
Q. How many of the accidents listed in this document were adopted by the board, meaning the National Transportation Safety Board, during your tenure as the director of OMS?
A. Okay. Let's see. I don't remember the exact dates for these things.
I would say probably 18 or 19. It

Page 75

depends upon how you count it, but I think that's an accurate number.
Q. Which accident are you not sure would be considered in the count. You said 18 or 19?
A. Yeah. The Taki Tooo, which was -- it was adopted -- I got it to notation during my tenure as director of OMS, but it was presented to the board after that, a couple of weeks after that. So I would consider the notated document as an adopted report that I completed, although I was no longer in that position at that time.
Q. So all of the accidents below the Taki Tooo starting with the May 25th and the Columbia to the end of the document, all of those were adopted by the NTSB during your tenure?
A. Say that again. I'm sorry. Repeat that, please.
Q. All of the accidents listed on this document starting with the MV Columbia to the

Page 76

end of the document, all of those were adopted by the NTSB during your tenure as director; is that correct?
A. You said the MV Columbia. It actually starts, I believe, with the MV Carnival Destiny --
Q. Okay.
A. -- on the document that I have.
Did I -- am I looking at a different document?
Q. You had said 18 or 19. If it starts with the Carnival Destiny that would not be 18.
A. Maybe -- let's see. Oh, you're counting up from the bottom and counting 18 or 19. Is that what you're doing? Sorry. I just want to make sure I understand.
You're doing one, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17; is that correct? Is that the way you were counting?
Q. You had said 18. Why don't we just do it this way. Please tell me which of these

Page 77

accidents specifically were ones that were adopted by the NTSB during your tenure, not how many, but the actual names.
A. Okay.
MR. LOWINGER: Objection. Vague and mischaracterization. Form just in general.
But go ahead.
THE WITNESS: Okay. There are a couple on -- I might actually fair better if I were to tell you the ones that I know were not during my tenure, because if you were counting from the bottom and you were counting 18 or 19 up, you would have missed some that were adopted --
BY MS. COHEN:
Q. Okay.
A. -- above that. So --
Q. Which ones were not adopted by the board during your tenure?
A. Okay. And again, I think there's a document to -- so if I misspeak I want to be sure that I don't misspeak and set myself up

Page 90

THE WITNESS: Can I describe it, the answer is yes. Would you like me to?

BY MS. COHEN:

Q. Please go ahead.

A. Okay. The description of the preparation of the report from beginning to adoption or beginning to notation?

Q. Beginning to adoption?

A. Beginning to adoption.

MR. LOWINGER: Same objection. Please go ahead.

THE WITNESS: The report is -- actually starts from the day that the accident occurs. Some of the information that is gathered is -- started to be included in the report right from that date. All of the factual information that is collected is gathered. It is documented. Factual reports are put together by each of the accident investigators. They are reviewed, considered. The investigators also put together analytical reports.

Page 91

But from the time they come back from the on-scene investigation is actually when you start the process for report preparation. So there's a complex system. It's -- there isn't a start and stop date that begins. So I will say, as I said, that it starts actually from the time they come back from the accident scene. You start putting together your factual information. You start considering issues. You want to make sure that you have gathered all the information to support your issues so you consider that -- what are called work planning meetings. There is consideration and those things go on quite routinely, weekly almost where you're considering do we need to gather additional factual information. Do we have all the factual information from this party or that party or whatever.

If there are fatalities you may have to get autopsies. If there are problems with getting statements from people that were not

Page 92

gathered on scene. For example, in the Barberi where we actually had to go to court to try and elicit information from the captain on the Barberi. So it can depend obviously with the accident investigation. But you didn't consider additional work that needs to be done when that factual report is put together, the analytical reports are put together and during that time period the investigators are dealing with the report development group who are the writers and editors who will start asking additional questions about, you know, do you have the weather information; do you have the waterway information, missing certain pieces of information. So that's kind of a -- as I say a complex system.

Once the work planning meetings have been conducted and the factual portion of the report is put together you will start having what are called report planning meetings. And everything, of course, is in draft up to that point. In your report planning meetings you

Page 93

will have issues and you will start inviting the other offices in to these report planning meetings. The director of the Office of Research and Engineering will come in, the director of the Office of Safety Recommendations will come in, the general counsel if it were -- might send a representative.

It would really depend upon -- the Office of Public Affairs might come in to a meeting. You invite other offices who can contribute to asking questions about the issues identifying them. That's kind of a peer review process to make sure that as many of the issues are flushed out as -- as is possible.

The report then starts on that process. You will have multiple report development meetings to make sure that, you know, comments have been received, considered as you're progressing. You'll be coming up with draft recommendations, considering those. Have we -- you'll look to see if we have made a

recommendation like this in the past where there -- and, of course, even while they're on scene we will look at issues, perhaps, past recommendations to see if they might apply to this accident to make sure that those things are considered.

The analytical reports are, as I say, passed over to the writers and editors and that then starts to come in to what would be considered a draft report. The office will ultimately develop what's called an office draft and that office draft is handed out to as many people as might have been involved in the process up until then to be sure that their thoughts are considered.

Again, the people like the other office directors, the other investigators from other offices to make sure that their issues have been properly addressed. So once the office draft has been considered and reviewed and analyzed there may be changes that need to be made to that. You will consider those, put



those into the report that then goes to director's review.

And I did skip a step in there as well. When you're looking at safety recommendations you may consider doing either early recommendations or urgent recommendations. Urgent recommendations, of course, would be something that when you come back from the scene you realize it's an imminent danger issue and you may issue it as an urgent recommendation and that will take on a life of its own. That will go forward to the board for adoption and you will develop that almost as a mini report because you have to have all of the facts and the analysis in that as well.

And the same thing even with early recommendations, if you believe that it's necessary to get the early recommendations out prior to the report actually being presented to the board you will do that.

And report development, just as in



accident investigation you may have had contractors that you were using so we may have had reports that have come in from outside contractors and we will have to consider those as we're progressing through the report. And there's also another very important step that I didn't mention and that is what's called the technical review. We will take the factual portion of the report and we will send it out to the parties to the investigation and ask them to consider the facts, make sure that we have included all the facts. If they believe that there is either additional factual information that hasn't been included in there, we also ask them to propose analysis of the accident, if they have proposed conclusions, probable cause, recommendations, any of those things, we ask the parties to consider that.

But normally the technical review, if it is a major report we will have the parties either on the telephone or we will have them into the agency to consider their



comments, and then once that factual report -- portion of the report has been through technical review, then it will be incorporated into what goes to the director's draft. And the director's draft goes for a sit down meeting in the office of the managing director.

The report is given out a couple of weeks in advance so that people have an opportunity to review it and now it is the product that is considered one more time by Office of Research and Engineering, Office of Safety Recommendations, the general counsel attends those meetings, managing director clearly does. The office that is presenting the report attends those meetings, the investigator in charge will attend, the group chairman will potentially attend. Just depends on who is managing director at what time, whether they wanted all of the investigators in there or they didn't.

The report writers, the chief of the report development division, if you have one,

Page 98

will attend to take notes and make sure that all of the comments are considered that are made at the meeting.

After that meeting if there are some changes that need to be made, then those changes are made and the final report then is routed for final sign off by the office directors. The same people who participated in the director's review normally are the directors that sign off for this product to go on notation. And the notation process is a formal process in which the draft report with all of the facts, analysis, conclusions, draft probable cause recommendations are sent forward to each board member and they are issued simultaneously to the board members for them to consider prior to the report being presented in a -- what's called a Sunshine meeting where all of the members sit, consider the report in public.

As I say, they are given sometimes a couple of weeks, sometimes a month. It

Page 99

depended upon the board who wanted what when. We had a different time schedules for that, but then it would be calendared on the board's calendar and the members of the Safety Board would consider the report, as I said, in a public meeting.

As the director, I presented the report, completed report to the board along with my investigators and they were asked questions and answers. The only people who can answer or ask questions in the meeting even though it's a public meeting are the members of the board. The board is not permitted by law to meet as a group except in a Sunshine meeting to discuss report.

If they have changes that they want to recommendations, for example, they may change the wording of a recommendation, we had a board member who was an English major and he would highlight every comma and period that was missing. Any of those kinds of changes to the report are documented at the time. The board

Page 100

will agree to adopt the report and it is then brought back to the office if there are -- and they agree they will adopt the recommendations. They adopt the conclusions individually, the probable cause. They may change the probable cause and they will adopt each of those things individually.

The office then is responsible for getting those final changes into the report. You're dealing with Public Affairs, of course, at the same time simply because public affairs has invited the media in to the board presentation and the final conclusions, probable cause and recommendations are always issued to the media within hours of the meeting and so that has to be done. The report then has to be shepherded through the final process before it is published.

Now, that is the process through adoption if the Safety Board adopts it. The steps that would be different if I adopted it would be that it would not go on -- it would

Page 101

not necessarily go on notation and that process that follows.

BY MS. COHEN:

Q. So it would end then at the final report signed off by you and that would be the end of the process?

MR. LOWINGER: Objection. Vague. Which report are you referring to?

BY MS. COHEN:

Q. If it was not a specific report. If it was adopted by you and did not go on notation, then the final step would be your adoption?

A. Well, the final step would be my adoption, but then it would -- correct. In most instances except that it would then also go through the final process. Once I had adopted it, it would also go through the process for publication. So...

Q. During the technical review of OMS reports from 2000 to 2005, were there frequently corrections made by the parties to

Page 142

attended.
Meetings with the Coast Guard, as I said, were all of the meetings that I mentioned before. So, I mean, those were -- they're kind of routine. They were part of every week.
Q. Every week you attended a meeting for at least one of these organizations?
A. Close. I would say there would be a meeting with -- sure, somebody from outside the organization. Probably on average, I would say, sure.
Q. How many IMO meetings did you attend from 2000 to 2005?
A. I believe that there were -- between 2000 and 2005, there were five meetings and because the Barberi was scheduled for the same day as an IMO meeting I didn't attend that one. So I would probably say each of those annually, other than when it interfered with an accident investigation.
Q. How long was a typical IMO meeting?
A. It's a week.

Page 143

Q. You would attend for the whole week?
A. Correct.
Q. What is NTSB's role in IMO?
A. We are one of the U.S. representatives at IMO for Marine accident investigation. So there is a -- there's a sub committee that has an ad hoc working group on Marine accident investigation and our role is to attend that meeting.
Q. Does the Coast Guard have a role in IMO?
A. The Coast Guard has a role in IMO, yes.
Q. And what is that role?
A. Do you mean the entire Coast Guard or do you mean the Coast Guard for Marine accident investigation?
Q. Marine accident investigation.
A. For Marine accident investigation the Coast Guard serves as the head of delegation to IMO.
Q. Does that delegation include the

Page 144

NTSB?
A. Yes.
Q. So the NTSB isn't part of the Coast Guard delegations to the IMO?
A. No.
Q. You said that the Coast Guard is the head of delegation, correct?
A. That's correct.
Q. What does that mean?
A. But the delegation is part of the -- it's part of the U.N.. It's the United States is represented. It's a U.N. organization. So it is -- it's the U.S. Delegation. It is not the Coast Guard's delegation.
Q. The Coast Guard is the head of the U.S. Delegation; is that correct?
A. That's correct. They serve as the head of delegation, that's correct.
Q. So the NTSB, then, is not the head of the U.S. Delegation?
A. The NTSB is not the head of the U.S. Delegation, that's correct.

Page 145

Q. Does the NTSB have to express its interest through the Coast Guard since the Coast Guard is the head of the delegation?
A. The NTSB speaks freely at the international maritime organization meetings so any opinions that are expressed during that meeting are NTSB's.
Q. As the director of OMS from 2000 to 2005, what was your role in IMO?
A. To serve as a member of that delegation and to express the U.S. position from NTSB standpoint.
Q. Did you ever give any speeches or presentations at IMO meetings?
A. What do you mean by speeches or presentations?
Q. Just answer the question as best you can.
A. The way that it works is not a -- it is not done as a speech or presentation. It is a -- an ad hoc working group and each member of the different administration, which is

different countries, have their representatives in the meeting and we discuss Marine accident investigation protocols. We discuss how international Marine accident investigation work will be conducted. So if there are discussions on how those processes or procedures might effect an NTSB investigation, I speak freely for -- I raise my card, essentially, and am acknowledged and give my opinion.

So if you consider that a speech, then the answer to your question is yes. If you are thinking of a speech as a prepared, you know, five-minute talk, those are not necessarily given under those circumstances. It operates like the U.N..

Q. You said that the Coast Guard is the head of the U.S. Delegation to IMO and that NTSB is not the head. What additional responsibilities or rights does the Coast Guard have as head of the delegation that the NTSF does not have?



MR. LOWINGER: Objection. Personal knowledge.

Go ahead.

THE WITNESS: The head of delegation ushers the paperwork for one thing through the State Department. You have to be approved as a delegate. So the paperwork that goes through the State Department is ushered through by the Coast Guard.

The Coast Guard holds what are called United States Safety of Life at Sea working group meetings and the actual head of delegation for the Coast Guard is the person who sits at the United States seat in plenary session. It's P-L-E-N-A-R-Y session. It's in the main session.

So the Coast Guard is the head of that delegation and that delegation has Marine accident investigation. It has flag state implementation -- is the subcommittee. So at that subcommittee there are -- I think there is a maximum allowed of three ad hoc working



groups and there is the plenary session, and each of those working groups will be dealing with specific issues and the specific issue of Marine accident investigation is the person -- my counterpart is not the head of delegation. The head of delegation is the person who sits in plenary session. So I hope I have explained that to you so you understand it.

BY MS. COHEN:

Q. Does the NTSB have a seat at the plenary session?

A. For Marine accident investigations?

Q. Well, you had said that the Coast Guard was the organization who had a person sit at the plenary session.

Does the NTSB have a corresponding person sit at the plenary session?

A. No.

Q. Is the NTSB allowed to express the official United States position with regard to Marine accidents at IMO?

A. In the ad hoc working group on



Marine accident investigation, yes.

Q. During the plenary session?

A. It's not done in a plenary session. It's done in the ad hoc working group on Marine accident investigation.

Q. What occurs at the plenary session?

A. The plenary session is a -- as I said, it's flag state implementation. So at the plenary session the work of the plenary session is to discuss every issue that can come up under flag state implementation. So the issues may have nothing to do with Marine accident investigation. And those issues are all handled by the Coast Guard in the plenary session and they may at times have somebody else from industries sit in there with them as well.

But the plenary session representation is done by the Coast Guard and it is not -- sorry. I know it's confusing, but that's the way it works.

Q. So any opinion that NTSB would want

expressed at the plenary session would have to be done through the Coast Guard representative; is that correct?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: If the -- it's -- if the NTSB wanted a plenary session issue to be presented and that is not the group that's working on Marine accident investigation, this is -- for example, if we make a recommendation to the Coast Guard that we want a new international regulation developed, that goes through the Coast Guard. Our recommendations go through the Coast Guard, that's correct.

MR. LOWINGER: Can we take a break?

MS. COHEN: Sure. Ten minutes.

(A short recess was taken.)

BY MS. COHEN:

Q. You mentioned several times during your deposition that you have interactions with Congress?

A. Uh-huh.



Q. How many times have you personally testified before Congress from 2000 to 2005, if any?

A. Between 2000 and 2005, I did not.

Q. Did you testify before any congressional committees during that time?

A. I'm sorry. What was the difference between your last question and this one? I -- perhaps, I misunderstood your last question.

Q. All of Congress as opposed to a committee.

A. Oh. I didn't.

Q. Did you meet with congressional staff members in 2000 to 2005?

A. I believe so, yes.

Q. How many times?

A. I don't know.

Q. Can you give me an estimate of how many times?

A. Let's see if I can -- at least once is my estimate.

Q. Would it be more than five times?



A. At least once.

Q. Can you answer the question yes or no?

A. What's the question? Sorry.

Q. Did you meet with congressional staff members more than five times from 2000 to 2005?

A. I don't have an estimate of -- I don't have a estimate of that. I just can tell you that it was at least once.

Q. The one time that you met with a congressional staff member, that you recall, what was that about?

A. That was explaining what the Office of Marine Safety does.

Q. When was this meeting?

A. I think it was in 2002.

Q. Who requested the meeting?

A. Congressional staff.

Q. Did you ever prepare any other NTSB employees or board members to testify before Congress?



A. Yes.

Q. How frequently did you do that between 2000 and 2005?

A. Between 2000 and 2005, every time a chairman or a board member testified I would have been involved in the preparation of the speech before their testimony before Congress.

Q. How many times did that occur from 2000 to 2005?

A. We have appropriations every year and we have authorization, I believe, every few years. So I will say on average once a year, but that's a guess.

Q. Did anyone from the NTSB testify about Marine safety issues in front of Congress from 2000 to 2005?

A. Yes.

Q. Who was that?

A. The chairman.

Q. How many times did the chairman provide testimony concerning Marine safety?

A. Again, I'm going to say that every

Page 154

time the chairman talked about either reauthorization or budget for the agency Marine safety was included.
Q. Did you accompany the chairman to any of these hearings?
A. Yes.
Q. How many?
A. I don't know.
Q. Did you accompany the chairman to every meeting he or she attended?
MR. LOWINGER: Objection. Vague.
BY MS. COHEN:
Q. Every congressional testimony -- every time he or she gave congressional testimony, did you accompany the chairman?
MR. LOWINGER: Objection. Vague.
THE WITNESS: Yeah. I don't know.
BY MS. COHEN:
Q. Do you know what percentage of the time you accompanied the chairman to provide congressional testimony?
MR. LOWINGER: Objection. Vague.

Page 155

THE WITNESS: No.
BY MS. COHEN:
Q. Can you give me an estimate?
A. No.
Q. Would you say it was more than 50 percent of the time that the chairman gave testimony?
A. It could be.
Q. Would you say more than 75 percent?
A. Again, I don't know, because if the chairman gave testimony that I was dealing with an accident investigation or something like that, that may have fallen off my radar so I -- you're asking me to speculate and I don't feel comfortable doing that.
Q. As an OMS director from 2000 to 2005, were you a member of the Executive Review Board?
A. I believe that was the title that Mr. Osterman used in 2005, and that answer would be yes.
Q. What -- when I'm referring to

Page 156

Executive Review Board, what do you mean by the -- what -- in your response, what did you mean by the term "Executive Review Board"?
A. When Mr. Osterman became managing director he had executive meetings with the modal office directors, the director of Office Safety Recommendations and Accomplishments, Research and Engineering, and those meetings would discuss the plans and programs for the agency. They would discuss things like budget, the allocation of SES billets that had been determined, and I attended some of those meetings. I don't know if I attended all of them, but I know I attended some of them.
Q. Prior to 2005, was there an Executive Review Board at the NTSB?
A. I believe so.
Q. Were you a member of that board?
A. No.
MR. LOWINGER: Objection. Vague. Go ahead.
THE WITNESS: No.

Page 157

BY MS. COHEN:
Q. Did you have any responsibilities with respect to the work of the Executive Review Board prior to 2005?
A. Responsibilities with regard to the work of the Executive Review Board, I don't know.
Q. You don't know if you had any responsibilities as director?
MR. LOWINGER: Objection. Vague.
THE WITNESS: As director if I was not invited to the meeting, then I wouldn't know what work they discussed. So I can't give you an answer as to whether I was asked for input to something that was then discussed as work in that board or not. So you're asking -- me -- you're asking me to unfortunately read the minds of the people who are in the board and I just -- I can't do that. So...
BY MS. COHEN:
Q. Were you ever asked for input by any members of the board?

Page 158

MR. LOWINGER: Objection. Asked and answered and vague.

THE WITNESS: Was I ever asked for any information by members of the Executive Review Board, yes.

BY MS. COHEN:

Q. Related to the work of the Executive Review Board?

A. I don't know.

Q. Do you know what work the Executive Review Board did?

MR. LOWINGER: Objection. Vague.

THE WITNESS: No, I don't. No, not precisely.

BY MS. COHEN:

Q. Not precisely but even generally do you know what work the Executive Review Board did?

A. I don't have personal knowledge of it.

MR. LOWINGER: Objection. Vague.

Go ahead.

Page 159

THE WITNESS: I don't have any personal knowledge of it.

BY MS. COHEN:

Q. Not personal knowledge, but any knowledge, whatsoever, of the work of the Executive Review Board?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: Excuse me.

I believe that Mr. Osterman has spoken in his depositions about the Executive Review Board, so I know that he uses that term, but I don't have any knowledge of that.

BY MS. COHEN:

Q. Do you have any responsibilities as the director of OMS with respect to staffing or career appointments to the SES?

A. Repeat that. I'm sorry.

Q. As the director of OMS from 2000 to 2005, did you have any responsibilities with respect to staffing or career appointments to the SES?

Page 160

A. Staffing of the SES?

Q. Yes.

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: No.

BY MS. COHEN:

Q. Do you have any role in advising the managing director as to the number of SES positions needed by the agency?

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: Can you repeat that question, please?

(The record was read as requested.)

THE WITNESS: Any role in advising about the number of SES positions needed by the agency? I'm not sure if the question is -- when you say role, do you mean a -- an official role where somebody asks me to -- I guess I don't understand.

What is your question.

BY MS. COHEN:

Page 161

Q. Did you have any official role in advising the managing director regarding the number of SES positions needed by the NTSB?

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: I certainly provided personal information to the managing director.

BY MS. COHEN:

Q. What do you mean by that?

MR. LOWINGER: Just to clarify that the entire line of questioning, SES you mean the Senior Executive Service?

MS. COHEN: Yes.

MR. LOWINGER: Okay. Thank you. So there won't be anymore vague questions -- objections.

THE WITNESS: Yes, I certainly spoke to the managing director about SES positions at the agency.

BY MS. COHEN:

Q. Did you have an official role in terms of advising the managing director as to

SES positions in the agency?
A. You're asking questions that I, again, I'm not -- are you asking was I a member of some group that filled out a piece of paper or something? I don't -- I'm sorry. I just don't understand.
Q. In response to my question you said that you -- your personal opinions, I guess, on SES, the number of SES positions within the agency, but did you have any official role as the director of OMS in advising the managing director regarding the number of SES positions within the NTSB?
A. I think the answer to that is no.
Q. Did you have any official role in the selection of SES candidates in the NTSB?
A. No.
Q. Did you have any role in the decision to redistribute SES positions within the agency?
A. You mean official role?
Q. Yes.



A. No.
Q. Did you have any role in developing SES staffing plans for the agency?
A. When you ask that question I want to be sure, again, that I'm answering -- I'm answering accurately. So when you say did I have an official role with regard to SES staffing, could I -- as the director of the Office of Marine Safety I certainly knew what the responsibilities of that office were and therefore that information, if it were included in a -- an official document of the agency, that information would be included in there.
Q. When you say information included in an official document of the agency, what information are you referring to?
A. Responsibilities of the office, the director of the Office of Marine Safety.
Q. Did you have any official role in the development of policy for performance awards for SES employees at the NTSB?
A. Performance awards for SES?



Q. Yes.
A. No.
Q. Did you have any role in the development of policy on discipline and removal of SES employees at the NTSB?
A. No.
Q. Did you have any responsibilities for agency wide planning and program activity?
A. Yes.
Q. What were those?
A. The first thing that comes to mind is the reauthorization for the agency. The agency wouldn't exist if Congress didn't reauthorize them every few years. So planning for the future of the agency was included in that document and I contributed to that document the official request to Congress for reauthorization.
Q. Did you -- go ahead.
MR. LOWINGER: Are you done?
BY MS. COHEN:
Q. Were you finished?



A. No, I wasn't.
Q. Go ahead.
A. Okay. Agency wide planning in the development of an academy. I was involved in developing the plans for that. Budget requests. I was certainly involved in the development of the agency wide policy and planning for that. Those are the things that immediately come to mind.
Q. When you say you were involved with the reauthorization documents, was your contribution limited to the Office of Marine Safety?
A. Gee, I don't know.
Q. What information did you contribute to the reauthorization document?
A. For reauthorization you have to justify the existence of the agency and so that certainly is a collaborative effort with the general counsel's office requests for changes in the -- there was a definition in the act that said territorial seas and there was a

Page 170

2000 to 2005?
A. They would have changed over that time period. Lucille Waldrin, who was the assistive assistant. Jim Scheffer, who was the chief of major investigations, Don Tyrrell, who was -- he had -- he wore several hats during that time period before he retired, and Rob Henry, Robert Henry who was an associate, I believe, from 2000 to 2005.
Q. Did you ever directly supervise less than four employees during that time period in 2000 to 2005?
A. I believe so.
Q. When was that?
A. Between the time when Don Tyrrell retired and in 2005 when I got a chief of the report development division, and that was Gloria Ruggerio.
Q. When did Mr. Tyrrell retire?
MR. LOWINGER: Objection. Asked and answered.
THE WITNESS: I believe it was in

Page 171

2002.
BY MS. COHEN:
Q. So from 2000 to 2005, you supervised directly less than four employees?
A. I think so.
Q. How many employees did you supervise indirectly?
A. The average in the office, I believe, during that time period was 14 or 15. So it would depend upon the fluctuation of -- for example, when Don retired and Gloria came in. That number. It would have been -- I'm going to say a maximum of 15 for the entire office.
Q. Maximum of 15 throughout the entire time period of 2000 to 2005?
MR. LOWINGER: Objection. Vague.
Are we talking about every one in the office or are we talking about people that she's supervised directly or just the people that she supervised indirectly? I just want to make sure that she is clear on what she's

Page 172

answering.
BY MS. COHEN:
Q. Answer the question, please.
A. Okay. Can you repeat your question, please?
Q. From 2000 to 2005, you would say you never supervised more than 15 employees directly or indirectly?
A. I think that's an accurate number.
Q. Did any employees leave OMS from 2000 to 2005?
A. Yes.
Q. How many?
A. Without looking at a roster I would not be able to tell that.
Q. Can you give me an approximate number of how many employees left the office during that time?
A. Three, maybe.
Q. Who were those individuals?
A. I'm giving you an approximation so I don't -- without looking at a roster, I

Page 173

honestly couldn't tell you. Other than Don. I remembered Don's retirement, but...
Q. Do you recall the name of anyone else who left the office from 2000 to 2005?
A. Yes. Jim Walsh. I take that back.
Q. Anyone else?
A. I think Leon Katcharian also left.
Q. Anyone else?
A. That's all that comes to mind.
Q. When did Jim Walsh leave the office?
A. I think it was 2002.
Q. Do you know what the reason for his departure was?
MR. LOWINGER: Objection. Asked and answered.
Go ahead.
THE WITNESS: He was a -- he was a -- an employee who came in from private industry. He was on probation for a year. He left before his probation period was up at a year. That was negotiated through the general counsel's office.

Page 186

experience in accident investigation and report of production, and for the director of the Office of Marine Safety clearly education associated with operating the ship.

BY MS. COHEN:

Q. Would you say that knowledge about any transportation modes other than Marine is required?

A. Knowledge of any other transportation mode is required?

Q. Is a skill that's required for the OMS director?

A. So I understand, is it necessary -- you're asking me is it necessary to have education in any other mode of transportation in order to be able to do the job as the director of the Office of Marine Safety, other than Marine?

Q. Yes.

A. Necessary, no.

Q. Would you say that the director of the Office of Railroad, Pipeline & Hazardous

Page 187

Materials needs to have knowledge of more than one transportation mode to be director of that office?

A. Knowledge or education?

Q. Knowledge.

A. Prior to becoming or after becoming?

Q. Both.

A. Both? Then the answer would -- the answer would not necessarily be that that's necessary if -- I want to make sure I'm answering the right question. So let me go back and ask what was the -- what was the question again?

(The record was read as requested.)

THE WITNESS: You said it would be knowledge before as well as after?

BY MS. COHEN:

Q. Let's take it one at a time. Knowledge before?

A. In my opinion, the answer is it should be.

Q. And after?

Page 188

A. It should be.

Q. How many hours did you work per week?

MR. LOWINGER: Objection. Vague.

Are we still talking about 2000, 2005?

MS. COHEN: Yes.

THE WITNESS: Between 2000 and 2005? It would depend. And it would --

BY MS. COHEN:

Q. Let's do it year by year then. 2000?

A. Well, no; it's not by year that the determination is made. It's really more a matter of if you have an accident investigation, a major accident investigation that you're dealing with and under those conditions you can work almost 24 hours a day for days on end. You may take a few hours sleep and then get back up ans start again.

So if it were a major accident, as I said, it could be almost around the clock

Page 189

except for a few hours of sleep now and again. If it were a time period when you have people, as I say, even investigations where you have people in the field and you're juggling those priorities it can be at least 60 hours.

Q. How many hours would you say you worked per week on average, you personally, not a director in general, worked per week on average between 2000 and 2005?

A. How many hours did I personally work? You said not as director?

Q. As a director?

A. Oh, as the director?

Q. Yes.

A. Yeah. I would say an average of 60.

Q. Did you ever travel to the site of Marine accidents as director in 2000 to 2005?

A. From 2000 to 2005, no.

Q. Did you ever travel for any other reasons as director of OMS from 2000 to 2005?

A. Yes.

Q. What were those reasons?

Page 190

A. Travel to IMO, travel to MAIIF meetings, travel to the Coast Guard. Traveled to -- I mean -- if you mean travel in terms of getting on to a flight or if you mean travel up to the Hill and back. Travel -- I don't know. So...

Q. Travel as in getting on a flight and traveling elsewhere, not travel within the D.C. area?

A. Yes.

Q. How frequently did you travel?

A. I would say on average about two times a year.

Q. How long were those trips on average?

A. About a week.

Q. Which male employees do you believe were being paid more than you by doing substantially equal work from 2000 to 2005?

A. John Clark, Robert Chipkevitch; Joseph Osterman. When you say substantially equal work I'm going to add in two other

Page 191

employees whose duties I was performing, but they were not performing my duties. So my work is equal to theirs. Theirs wasn't equal to mine. And that would have been Thomas Haueter and Robert McIntosh.

Q. Can you describe Mr. Clark's duties as the director of aviation safety?

A. They are the same duties that I had.

Q. All of them are exactly the same?

A. I would say they are substantially the same, correct.

Q. Can you detail what his duties were, please?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: Accident investigation, report development, responsible for international investigations, responsible for -- I think he did have responsibility for public nonpublic accident investigations, budget -- managing budget, managing a resources, human resources, dealing with

Page 192

internal and external organizations.

BY MS. COHEN:

Q. Is there anything else?

A. Things that I mentioned all before that I also had. Development of policy, development of -- supervisory responsibilities. I'm trying to remember all the responsibilities that I had. I had leadership responsibilities. He had leadership responsibilities. I had supervisory responsibilities. He had them. I had budget responsibilities. He had them. I had internal and external communication responsibilities. He had them. I had responsibilities for providing representation at the International Maritime Organization to serve as the U.S. representative on accident investigation. He had it at ICAO. That's I-C-A-O, which is the civil aviation organization. It's a sister to IMO.

I had responsibilities for everything from notification through report development and completion and a published

Page 193

report. He had the same. I had responsibility to -- I had delegated authority to determine probable cause of accidents and he had that. I had responsibility for -- I actually had a responsibility that he did not necessarily have, so I have to think about the ones that are the same.

I had responsibility for public/nonpublic and I think he had responsibility for public/nonpublic accident investigation. So he also would have, for example, dealt with the Department of Defense, as did I. Responsibility for managing a major modal program. I had responsibility. He had the same.

I had responsibility to respond to requests from Congress. He did. I had responsibility for responding to and making sure that the managing director and the board members were fully apprised of everything that was related to accident investigations, ongoing accident investigations. He had that

Page 194

responsibility as well. I had responsibility for reporting on the output of the office. He had the same responsibility.

I think I mentioned budget authority and responsibility. We had the same budget and responsibility -- and budget authority and responsibility. Same responsibility for supervising and all of the human resources issues that are involved in having staff and making sure that they are trained, that they have standards for performance and are evaluated, that they are counseled as necessary. All of the things that go with those individual responsibilities. I had them. He had them. So...

Q. How many employees did Mr. Clark supervise as a director of OAS?

A. Directly supervise?

Q. Yes.

A. I believe four or five.

Q. How many employees did he indirectly supervise?

Page 195

A. His office had probably about 140, I think.

Q. How large was the budget of OMS from 2000 to 2005?

A. It was -- I think we had like three percent of the budget for the agency, so it covered personnel. It covered salaries, awards, training, travel, uniforms, equipment.

Q. Approximately how much money was in the OMS budget from 2000 to 2005?

A. $50,000.

Q. $50,000 per year?

A. Correct.

Q. How large was the budget of OAS from 2000 to 2005?

A. I don't know.

Q. Was it larger than the OMS budget?

A. Yes.

Q. What percentage of the agency budget went to OAS during 2000 and 2005?

A. Probably -- probably about 30 percent, I'm thinking. But I don't know.

Page 196

specifically.

Q. You said that the role of OAS or Mr. Clark in ICAO was similar to your role in IMO. Can you explain the similarities?

A. The role at IMO and the role at ICAO is to review the standards for International Accident Investigation. In ICAO, it's -- I think it's Annex 13 is what it's called, and in IMO it's held within the regulations and then there is a Marine accident investigation protocol and those two documents determine how an accident investigation is conducted for -- for Marine it is an International Accident Investigation. I believe for OAS they call it a Foreign Accident Investigation.

So those are base -- it's basically determining what the standards are and how the accident investigation will be conducted. And the role of those two organizations is to be sure that there is nothing in that standard that will preclude proper accident investigation.

Page 197

Can we take a five-minute break, please?

MS. COHEN: Sure. Ten minutes is fine.

(A short recess was taken.)

BY MS. COHEN:

Q. Is the NTSB the accredited United States representative to ICAO?

MR. LOWINGER: Objection. Personal knowledge.

Go ahead.

THE WITNESS: They are an accredited representative to ICAO.

BY MS. COHEN:

Q. Are there any United States accredited representatives to ICAO?

MR. LOWINGER: Objection. Same objection.

Go ahead.

THE WITNESS: FAA.

BY MS. COHEN:

Q. Does NTSB have the United States

Q. Can you give me an estimate of how many?
A. For a regional accident, if the regional accident were high profile even though it did not warrant a headquarter's launch, they might -- it would depend. They might send zero or they might send, you know, five or six. I honestly am -- I can't -- I can't -- I just can't give you a number that would be accurate.
Q. How many investigators on average would OAS send to a major aviation accident?
MR. LOWINGER: Objection. Asked and answered. Vague.
Go ahead.
Personal knowledge.
Go ahead.
THE WITNESS: A normal go team at NTSB across all of the modes would cover an investigator in charge, a group chairman depending upon the issue that was being investigated. So an average is not something that I can give you.



I mean, the -- each of the modes would make their decision depending upon the size of the accident, the location of the accident, the issues that were involved in the accident, the complexity of the accident, the public interest in the accident, the chairman, the managing director, the available resources. There are just so many factors involved in making that determination that I just can't give you an accurate answer.
BY MS. COHEN:
Q. How many times did OMS launch to an international investigation between 2000 and 2005?
A. I would say on average one a year.
Q. How many times did OAS launch to an international investigation between 2000 and 2005?
MR. LOWINGER: Objection. Vague. Lack of personal knowledge.
THE WITNESS: Yeah, I don't know.
BY MS. COHEN:



Q. Can you give me an estimate of how many?
A. I can't give you an estimate of how many. I was responsible for Marine not for aviation.
Q. Did OAS launch to more than five international accident investigations between 2000 and 2005?
A. I don't know.
MR. LOWINGER: I'm sorry. Was that OMS or OAS?
MS. COHEN: OAS.
THE WITNESS: OAS is what I understood she said.
BY MS. COHEN:
Q. You alleged in your complaint that your duties were substantially equal to those of the director of OAS, Office of Highway Safety, the Office of Railroad, Pipeline & Hazardous Material Safety.
How then can you not know what their specific responsibilities were?



MR. LOWINGER: Objection. It's argumentative. Really.
Please don't harass her with a question like that.
If you can answer it, do it, but go ahead.
That was uncalled for.
Go ahead.
THE WITNESS: I know what their duties and responsibilities were. I don't consider the number of accidents as -- or knowing the number of accidents as germane to that.
Q. Why not?
MR. LOWINGER: Objection. Argumentative. And relevance.
THE WITNESS: Responsibility is responsibility. It is not -- the responsibilities I went through. And I believe those responsibilities are laid out as duties and responsibilities for each of the office modal directors.

it.

Q. Did you personally prepare that paperwork?

A. Personally prepare it, what do you mean by personally prepare?

Q. Did you write up the paperwork?

A. Writing up the paperwork is -- you mean typing the paperwork? Again, I'm not sure what you mean by -- I was responsible for getting the paperwork prepared and through the system.

How is that?

Q. Okay. Does OMS have any regional offices?

A. No.

Q. Does OMS do work similar to those done by regional offices in other modes?

A. Yes.

Q. Please explain that.

A. We would do what would be considered regional accident investigations.

Q. Considered regional why?



A. We would send one investigator and it would be comparable to a regional accident investigation.

Q. How would it be comparable?

A. It was comparable to -- it was, perhaps, an issue that was a recurring issue and we wanted to gather information on it so we would send out one, maybe two investigators, but we would not necessarily do a major report.

Q. What was your understanding of the plan to allocate SES positions among the modal offices?

MR. LOWINGER: Actually, you know what? Objection. To the extent that this is asserting affirmative defense, this is outside the scope of the relevance and the position asserted by the defendant at this point. You may answer, but that's --

MS. COHEN: Can we go off the record a minute, please?

MR. LOWINGER: Sure.

(A short recess was taken.)



BY MS. COHEN:

Q. Can you read my prior question, please?

(The record was read as requested.)

MR. SCHER: Objection. Irrelevant. I'm not going to let her answer.

THE WITNESS: On the advice of counsel I'm not going to answer.

MR. SCHER: This relates to affirmative defenses. There is no affirmative defenses on the record. I can cite you a case if you want. You can't ask the question.

MS. COHEN: That's not a reason to instruct her not to answer.

MR. SCHER: You can file a motion. That's fine.

Here, let me cite you the case.

MS. COHEN: Can we go off the record, please?

(A short recess was taken.)

MR. SCHER: Marjorie, you can answer the question as it relates to your claim that



you were entitled to the same pay as the other modal directors. Okay?

Go ahead and repeat the question because she won't have any idea what the question was.

MS. COHEN: Will you please read back the question?

(The record was read as requested.)

THE WITNESS: I don't know what you mean by understanding and I don't know of any plan.

BY MS. COHEN:

Q. Did you know that -- or was there an intention by the agency to make the modal office director position SES positions?

MR. LOWINGER: Objection. Vague.

MR. SCHER: You can't. Sorry.

THE WITNESS: Repeat the question, please.

(The record was read as requested.)

THE WITNESS: Make sure I understand so I can answer properly. Did I understand

Page 222

that the agency requested SES positions, yes.
BY MS. COHEN:
Q. For the modal office directors?
A. Which modal office director?
Q. The modal office directors in general.
A. For the modal office directors, yes.
Q. How did you know that?
A. There was a letter sent by the agency to the Office of Personnel Management.
Q. What did that letter say?
A. I can't quote the letter.
Q. Generally, what did the letter say?
A. The letter asked for SES positions for the modal directors other than the Office of Aviation Safety because that already had an SES position assigned to it.
Q. When did you become aware that the agency was requesting SES positions for the modal office directors?
A. I believe Jim Hall -- when Jim Hall was chairman he indicated that the agency

Page 223

wanted each of the offices to be SES.
Q. Indicated to you?
A. Indicated that -- yes, for the reorganization he indicated that that would be -- that would be what would occur.
Q. What reorganization are you referring to?
A. There was a reorganization in 1997 and 1998.
Q. Did the NTSB receive any of those SES slots that it requested?
A. I don't know.
Q. Are you aware that Office of Highway Safety director position became an SES position?
A. Am I aware?
Q. Yes.
A. Yes.
Q. Do you know when that occurred?
A. I knew when it was advertised.
Q. When was that?
A. 2003.

Page 224

Q. Did you apply for the OHS director position when it was advertised?
A. No.
Q. Why not?
A. Because my expertise is in marine safety.
Q. Do you believe that you were qualified for the OHS director position when it became SES?
A. I don't have the technical expertise that I would expect the director of the Office of Highway Safety to have.
Q. Why do you believe the SES slot was allocated to the Office of Highway Safety when it was?
MR. SCHER: Objection. Speculation. Go ahead.
THE WITNESS: I personally believe it was granted to Mr. Osterman.
BY MS. COHEN:
Q. Why specifically was it granted to Mr. Osterman?

Page 225

A. Why? You will have to ask the chairman and the managing director that question.
Q. Why do you believe it was?
MR. SCHER: Objection. Speculation. We've got a standing objection on it. I'm sorry.
THE WITNESS: That's okay.
I had two conversations in which the managing director told me at the time that he was doing this for Joe and I had a conversation with Mr. Osterman in which he told me he had been promised the SES slot.
BY MS. COHEN:
Q. Conversation with the managing director, when did that take place?
A. In 2003.
Q. Do you remember what month in 2003?
A. No. It was when the advertisement came out for the Office of Highway Safety, SES position.
Q. Who initiated this conversation?

that conversation?
A. Did I say anything else during that conversation?
Q. Yes.
A. Other than what I just explained?
Q. Yes.
A. There were other issues that we were discussing, but with relationship to pay, I don't believe I did.
Q. What other issues were discussed during that conversation?
A. I believe that at that time we were talking about the accident investigation responsibilities that we had. We were talking about -- I can't remember all the specifics of the conversation, but I believe it was with regard to the accident investigation responsibilities we had, which is what prompted the conversation..
Q. You said earlier that you also had a conversation with Mr. Osterman regarding the OHS position becoming SES?



A. Correct.
Q. When was that conversation?
A. I had at least one conversation with him and that was when the advertisement came out for the position.
Q. What was discussed at that conversation?
A. The issue of -- he was about to get the pay for the modal director position in OHS and I congratulated him on getting it. And he said, well, they promised me this. I have been waiting for it for a long time.
Q. This was after he had already been given the position as an SES?
A. No. It was when the advertisement came out.
Q. So this was prior to him getting the position as an SES?
A. When he actually got the position as an SES was not clear to me. It was not an announcement that was made. So when he actually got that position was not clear.



Q. Was it prior to him being selected for the position as an SES?
A. That's what I'm saying. I don't know if he had been --
Q. When he stated that he had been promised the position, what do you think he meant by that?
A. I believed he was saying he had been preselected for the position.
Q. Other than the statement that he made, do you have any other reason to believe that he was preselected for the position?
A. Mr. Campbell's statement.
Q. Anything else?
A. Those two statements.
Q. Is Mr. Chipkevitch the director of ORPH as a GS-15 when it was advertised as an SES position?
A. I think so.
Q. Did he have to apply for the position as an SES?
A. I think so.



Q. Did you apply for the director of position at ORPH when it was advertised as an SES?
A. No.
Q. Why not?
A. Because I believe that technical expertise in the modal discipline is necessary.
Q. Do you believe that the OMS director position should have been made an SES position prior to the ORPH director position?
A. I believe the SES position assignments should have been based on responsibilities and not on the individuals occupying those positions.
Q. Can you please respond to the question, yes or no.
Do you believe that the OMS director position should have become an SES position prior to the ORPH director position?
MR. SCHER: Objection. Just to make sure it's clear, speculation. Vague. Ambiguous. Calls for personal opinion.

offices?
A. Yes.
Q. Does the Office of Highway Safety have regional offices?
A. Yes.
Q. How many modes are encompassed by ORPH?
A. Railroad and pipeline.
Q. Are there any other modes?
A. Modes, no.
Q. Are there any other areas of investigation encompassed within that office?
A. Other than modes?
Q. Yes.
A. Do you mean hazardous materials?
Q. Yes.
A. Yes.
Q. How many employees were there in the RPH office between 2000 and 2005?
A. Maybe 30 to 40.
Q. How many employees were there in the highway safety office between 2000 and 2005?



A. About the same.
Q. Other than being promoted to SES, how do you believe your pay could have been made equal to the male employees who you alleged did substantially the same work as you?
A. The agency has used the SL positions in the past to pay employees above the GS-15 level so they could have used a senior level position, for one.
Q. Were there any other possibilities?
A. They could have used within the -- within the civil service system, they could have supplemented my salary the same as they did Mr. Osterman's salary.
Q. What way was that?
A. They did it with a retention bonus between 2000 and 2005.
Q. Anything else?
A. They could have paid me for -- between 2000 and 2005 they could have given me a quality step increase to provide for my step as a 15. I didn't receive that 1510 until



2005. They could have supplemented my income, in part, by giving me overtime for the number of overtime hours that I had to work. That's all that comes to mind at the moment.
Q. Did you ever request a senior level or SL position?
A. Request?
Q. Yes.
A. No.
Q. Did you meet the administrative criteria required for an SL position in your job as director of OMS?
A. Yes.
Q. How did you do that?
A. I had technical expertise as a marine safety expert. I had technical expertise as a fire protection expert, a marine fire protection expert, in particular.
Q. Are there any or reasons you believe you met the criteria for an SL position?
A. Other than my technical expertise, certainly. I would say my technical expertise



would be the basis for an SL position.
Q. Does your job as director of OMS involve any supervisory responsibilities?
A. I'm going to go back and correct what I just said because the issue of an SL position was held by the Office of Aviation Safety and they used that for their international -- I believe at one point it was Ron Schleet who was deputy director for International Relations and then they changed that to the senior adviser for international within the Office of Aviation Safety. And so certainly the international experience and expertise that I had would have qualified me for an SL position.
So I apologize for interrupting your next question, and I don't recall what it was, but I wanted to make sure that I covered those things.
MS. COHEN: Can you please read back the previous question?
THE WITNESS: Did my position as

director of the Office of Marine Safety entail supervisory responsibilities, yes.

BY MS. COHEN:

Q. What percentage of your time would you say was spent on supervisory responsibilities?

A. To break that out is very difficult simply because that's a day-to-day responsibility that you have. There are certain -- there are certain things that you have to do with regard to human resources every week. So to break it out is very difficult in terms of percentage, for example.

Q. So you would say you engaged in some supervisory responsibilities every day?

A. Not every day. Routinely every week.

Q. What percentage of your time per week would be devoted to supervisory responsibilities from 2000 to 2005?

A. Again, I can't break that out. It's just so, you know, all of those



responsibilities are so integrated in terms of even for getting an accident investigation completed, getting a report prepared and completed, all of those things fall within the responsibilities of accident investigation and report development. So it's just a -- it's a routine responsibility.

Q. And you say it was more than 25 percent of your overall time?

A. I can't break it out by percentage.

Q. You said that you have international expertise that would have qualified you for an SL position. What is that expertise?

A. International negotiations, understanding of the international regulations and requirements for ships, the operation of ships, the construction of ships, the maintenance and repair of ships, the interpretation of the international regulations that are related to shipping, the international regulations for fire protection, a great deal of depth in that, expertise in dealing with



international -- essentially, foreign dignitaries, international accident investigators, international regulators.

Q. What experience did you have in international negotiations?

A. I had served in the U.S. Coast Guard as the U.S. representative to the International Maritime Organization subcommittee on fire protection. I had served as the chairman of that subcommittee. I had served as the vice chairman of that subcommittee. I served as the U.S. representative in plenary drafting, negotiating the fire protection regulations for passenger vessels, cargo vessels, and every other vessel that operates under the international rules.

I think I have covered it all. I hope I have.

Q. Did you discuss the possibility of an SL position with anyone at NTSB between 2000 and 2005?

A. Yes.



Q. With whom did you discuss that?

A. Mr. Osterman.

Q. When was that conversation?

A. That conversation took place in early May of 2005.

Q. Who initiated that conversation?

A. The conversation -- the entire conversation or the conversation related to SL?

Q. The entire conversation.

A. Mr. Osterman.

Q. What other topics were covered at this conversation?

A. Mr. Osterman told me that I had not been selected for an interview for the position I currently occupied.

Q. Meaning the OMS director position?

A. Correct.

Q. What was your response to that?

A. My response to that was you are essentially firing me from a position for which I have not been paid for ten years.

Q. What did Mr. Osterman say?

Page 262

Q. Did any of the other modal office directors ever receive overtime pay between 2000 and 2005?
MR. SCHER: Objection. Speculation. Just from your personal knowledge.
THE WITNESS: I think that -- that, in fact -- I mean, personally I think that being paid as an SES pays them for their overtime.
BY MS. COHEN:
Q. Can you please answer my question? Did they receive actual overtime pay between 2000 and 2005?
A. I don't know.
MS. COHEN: Take a ten-minute break here, please.
(A short recess was taken.)
BY MS. COHEN:
Q. You had said that one of the possible ways to increase your compensation to be equal to that of the male employees who allegedly did substantially similar work was a

Page 263

retention allowance?
A. (Witness nodding head.)
Q. Do you believe that you met the administrative criteria to receive the retention allowance?
A. Since the criteria that had been used at the Safety Board was not necessarily the criteria that I would expect, I believe they could have used that, that's correct.
Q. What do you believe were the criteria?
A. Which criteria?
Q. To receive a retention allowance.
A. Okay. My understanding of the requirements are that you should have a letter in hand with an offer for a position for higher pay outside the agency. And that is reviewed or supposed to be reviewed every year to determine if that is in effect.
Q. Did you ever seek employment outside of the agency between 2000 and 2005?
A. Yes.

Page 264

Q. When did you do so?
A. There was a position at -- there was an SES position at the -- I think it was the National Academy of Sciences that I started the application process for.
Q. What do you mean by started the application process?
A. I submitted the initial documentation.
Q. And what happened then?
A. I understand that I did not meet the minimum criteria, but I don't know specifically. I believe they were looking for a Ph.D..
Q. So you did not receive an offer for that position?
A. That's correct.
Q. Did you apply for any other positions outside of the NTSB between 2000 and 2005?
A. No.
Q. Did you ever receive an offer for a

Page 265

position outside of the NTSB between 2000 and 2005?
A. 2005, any particular date in 2005?
Q. 2005, during your tenure as director of OMS?
A. No.
Q. You just said that the requirements for retention allowance was an offer letter in the hand. How do you allege that you could have received a retention allowance if you never received an offer for employment between 2000 and 2005?
A. Because the agency had not set that as an annual requirement for retention allowance.
Q. When you say it was a requirement, then, what did you mean?
A. I believe it was an administrative requirement through OPM, but I do not believe that the agency adhered to that requirement.
Q. Why do you believe that?
A. Mr. Osterman testified to it.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

COPY

- - - - - - - - - - - - - - -x

MARJORIE MURTAGH COOKE, :

Plaintiff : Case No. 06-748C

vs. : (Judge Thomas C. Wheeler)

THE UNITED STATES, :

Defendants : PAGES 1 - 261

- - - - - - - - - - - - - - -x

Deposition of JOSEPH G. OSTERMAN, held at the offices of The Employment Law Group, 888 17th Street, N.W., Suite 900, Washington, D.C., commencing at 10:05 a.m., Thursday, May 24, 2007, before Elizabeth Mingione, Notary Public.

A P P E A R A N C E S O F C O U N S E L:

ON BEHALF OF THE PLAINTIFF:

THE EMPLOYMENT LAW GROUP, P.C.
BY: BRIAN M. LOWINGER, ESQUIRE
888 17th Street, Suite 900
Washington, D.C. 20006
(202) 261-2806

ON BEHALF OF THE DEFENDANT:

DEPARTMENT OF JUSTICE, COMMERCIAL
LITIGATION BRANCH
BY: MEREDYTH D. COHEN, ESQUIRE
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 353-7978

AND

NATIONAL TRANSPORTATION SAFETY BOARD
BY: KATHLEEN SILBAUGH, ESQUIRE
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202) 314-6084

C O N T E N T S

WITNESS: JOSEPH G. OSTERMAN

EXAMINATION BY: PAGE

Mr. Lowinger .................................. 6

DEPOSITION EXHIBITS
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | NTSB Position Description, Director, Office of Marine Safety . | 221 |
| 2 | Position Description beginning with Bates 00753 .. | 224 |
| 3 | Position Description beginning with Bates 000759 .. | 226 |
| 4 | Position Description beginning with Bates 000766 .. | 229 |
| 5 | Memorandum of Understanding, NTSB and Coast Guard | 232 |
| 6 | Position Description beginning with Bates 000772 .. | 233 |
| 7 | Position Description of Robert Macintosh, Jr., 11/29/05 ....... | 235 |
| 8 | Letter Dated July 18, 2003 to Delores Everett | 236 |
| 9 | Attachment F, Comparison of Average Compensation .. | 239 |
| 10 | NTSB Order 50, Marine Safety Program, Dated 11/25/96 | 241 |
| 11 | NTSB Order 20, Highway Safety Program, Dated 4/18/96 ........ | 243 |
| 12 | NTSB Order 20A, Highway Safety Program, 5/17/02 ....... | 244 |
| 13 | NTSB Order 40, Railroad Safety ....... | 245 |

DEPOSITION EXHIBITS (Continued)

JOSEPH G. OSTERMAN

| NUMBER | DESCRIPTION | PAGE |
| --- | --- | --- |
| 14 | NTSB Order 30, Hazardous Materials and Pipeline Safety Program, 4/18/96 ... | 247 |
| 15 | Notification of Personnel Action ...... | 248 |
| 16 | Position Description, Office of Railroad, Pipeline and Hazardous Materials ...... | 250 |
| 17 | Position Description, Director, Office of Aviation Safety ...... | 252 |
| 18 | NTSB Performance Appraisal Form, Bates 233-240 ..... | 252 |
| 19 | NTSB Performance Appraisal Form, Bates 231 and 232 ..... | 253 |
| 20 | NTSB Organizational Chart, Bates 001008 ..... | 256 |
| 21 | NTSB Draft Position Description, Director, Office of Marine Safety ..... | 258 |

- - -

most of the party representatives are well-known to us. And they know the NTSB and the process of the NTSB investigation because we have trained them in advance. That is not so dissimilar to marine.

The Coast Guard investigators that work on our accidents have done so in the past, and they generally understand the rules. In highway safety, it's the other end of the spectrum. The NTSB investigators are usually meeting up with people who have never been involved our investigations again.

And we find that it is a very different exercise because there is an educational and informational component to the party system that doesn't exist in some of the other modes. Our highway IICs and our highway managers must educate and inform and communicate the parties of not only the responsibilities and the advantages but how the rules of the investigation are conducted almost each and every time that they go to an accident.

The reason is because there are 43,000 deaths on the U.S. highways. We rarely go back to the same community in highway accident investigations, and