about that.

Q. Okay. And you said before that there's times where highway, you said that if highway safety becomes involved in an investigation, is there any discretion involved by highway safety in deciding to become involved in an investigation?

A. There's an enormous amount of discretion. In aviation, the statute says we will investigate or cause to be investigated every fatal aviation accident, civil or commercial. In marine safety there's a very established formula for the decision-making process on whether we would investigate or not.

It's a bright line score. It's part of the current MOU with the Coast Guard. In highway safety, however, it is each accident must be evaluated for its nature, the impact on the public confidence, the impact on safety in a national sense, can we make a difference by investigating this particular accident.

There's seven million accidents every year on the highways, three million injuries, 43,000 deaths, and less than 40 staff at the NTSB

Q. So it seems like that requires a lot of diplomacy by the director of OMS in order to get to the point where an -- where the OMS takes the lead in investigation of a marine accident.

A. I think that now that there's a bright line score and even before the bright line score there was a basic threshold. I think it does require some diplomacy by the marine director.

Q. I see. Are there any instances other than navigable waters not -- an accident not taking place in a navigable water in which the marine safety, the Office of Marine Safety has exclusive jurisdiction?

A. No. Over the Coast Guard?

Q. Yes.

A. No. I think that there is concurrent jurisdiction throughout. That is my understanding of the arrangement. When it's not, if it's on, you know, Lake Smith in the middle of Arkansas and doesn't lead to anywhere, there's no Coast Guard involvement. But otherwise, it is concurrent jurisdiction.

Q. What have it takes place outside of U.S. waters?

Q. Yes. Explain that part of it.

A. It is Railroad Pipeline and Hazardous Materials is the most complicated office in the agency, I believe because it is a mixture of three different similar and wholly dissimilar disciplines.

For railroad accident investigations it is analogous to aviation. We know there are not that many railroads in the United States, but they are relatively large. We have working relationships and familiarity with the majority of the major railroads in the United States. And that includes the majority of the major Metropolitan Transit Authorities in the United States.

In the pipeline area, it is more analogous to probably the highway area. There is lots of miles of pipeline in the U.S. and lots of pipeline companies. And frequently our pipeline investigators are introducing themselves to the pipeline parties when they go to their investigations.

And then there is the third component of the rail pipeline hazardous materials, and that is the exclusive hazardous material part of that. Our

Q. Can you describe to me the work that's involved in the Annex 13?

A. It involves representational duties at ICAO meetings and representational duties in the development and modification of any clauses of Annex 13. Every three years ICAO holds -- ICAO is a subset of the United Nations. And they hold a general assembly in which they consider changes and alterations to the treaty essentially.

And ICAO also conducts audits of member states. And they do a number of other functions. And our responsibility when it comes to the United States is the accident investigation part of that.

Q. I see.

A. So that office director has that responsibility.

Q. Is there any similar sort of responsibility for international treaty-based work for the Office of Marine Safety?

A. There is, but it resides with the Coast Guard. There is an international maritime organization. I think we spoke about this earlier.

responsibilities were between 1997 and 2005?

A. One, I don't believe that Mr. Haueter was the deputy during that entire period, but I -- we do know who they were. But I think for the majority of the time he was probably the deputy. As the deputy, either Mr. Haueter or his predecessor was responsible to be a chief advisor to the director and operational manager for the office director.

Mr. Haueter was also responsible for the conduct of most major investigations. Aviation investigations involve above other modes involve far more people, far more press and far more interest than some of the other modes.

And there is an enormous volume difference in the work load of the major aviation accidents than the workload of a major marine or even a major highway accident. And he was responsible for the conduct of those major investigations and reporting that operational work to the director.

Q. So how does -- how did the duties and responsibilities, well, let's just see. He's the chief, Mr. Haueter was the chief advisor. He was the

operate -- he was the operational manager for investigation -- for personnel issues. He was responsible for the conduct of investigations.

And factors in that you assert are press and people and interest in these investigations. Besides those, what other responsibilities were his primary responsibilities between 1997 and 2005 or during his tenure as the Deputy Director?

MS. COHEN: Objection. Mischaracterization of testimony.

A. The responsibilities of Mr. Haueter as I said before were to be the deputy for the director, and to execute the primary duties of operational oversight for the major investigations and also other assignments provided by the director.

Q. Well, do you know what those other assignments are?

A. In detail, I do not.

Q. Okay. Which of -- when you say conduct of investigations, can you describe to me what Mr. Haueter's role was with regard to the conduct of investigations?

A. Day-to-day oversight of the execution of major accident investigations, aviation accident investigations. It is for major aviation accident investigations a much more complicated process flow. Similar steps than some of the other modes, but far more involvement and far more scrutiny by parties and outside interests.

Q. How is there more -- how is it a more complicated flow? How is there more interest in an airline accident than there is in, for example, an aviation accident where there's still a -- in a highway accident in which there's a fatality or a marine accident in which a ferry goes down or something like that?

A. It's a fairly common sense answer in that all you have to do is read the paper. A major airline accident is a enormous public confidence and public interest issue in the United States.

In the year the TWA 800 crashed off of East Moriches, Long Island, it was the biggest news story during the year, even though we had a presidential election. It caused more public interest and

congressional interest than the presidential election that year. That's how large that kind of activity becomes.

And the demands of the public, and we are a sunshine agency, therefore our activity is done in the open. And the interests of hundreds and thousands of individuals and parties are applied to major aviation accidents that are not seen by the -- in that volume by the other modes.

Q. So, I guess my question then is, sir, is explain to me just because there's press involved, how do the duties change when the press becomes involved?

A. The duties don't change particularly by their nature. They change mostly by their volume. The press are involved in most of the accident investigations, not all, but most of the accident investigations conducted by the agency, even small investigations that are conducted.

But the sheer of volume and persistence of political officials, the industry at large, the press, and the public to a major aviation accident is not comparable to the other modes.

Q. Are you aware whether Mr. Haueter has any assistance in dealing with the press when there's an investigation that the press has an interest in?

A. It is not exclusively the press that I am speaking of that has an interest. We do have a public affairs office. It is relatively small. There are only four individuals in it at the moment.

But the nature of the interested parties and the size and scope of the investigation are always larger. I'll give you a comparison. A major marine accident investigation may involve on average four or five of our investigators plus twenty or so party representatives from different organizations that we spoke of earlier, the Coast Guard, the carriers and so on. A major airline accident investigation may involve 150 to 200 different people involved in our investigation.

Q. Is there a difference though in the actual accident? It would seem that a marine accident involves a sunken ship, whereas an aviation accident involves a plane that crashes on generally on land or floats -- or floats or is recovered?

always taking calls on the weekend. You are not always taking calls at night in some of these modes. Aviation always is doing it; highway, mostly; rail, frequently; marine, not so frequently; and pipeline infrequently.

Q. I see. Do you need a break?

MS. COHEN: Yes. We'd like to take our lunch break now.

- - -

(Recessed for lunch at 1:13 p.m.)

(Reconvened at 2:04 p.m.)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman, we are back on the record. It's 2:05. During the break did you have any communications about your testimony with your counsel?

MS. COHEN: Objection. Attorney-client privilege. Don't answer that.

Q. I am not asking what your communication is, sir. I'm just asking whether you had any communications about your testimony?

A. No.

Q. Thank you. Could you please tell me, sir, whether Mr. Haueter during his tenure had the authority to hire and fire personnel?
A. Mr. Haueter as a supervisor.
Q. Yes.
A. Did have the authority to, within the parameters of the federal rules, to hire and attend to personnel matters.
Q. Okay. And what about -- how did the job of director of office of -- how did the requirements of the job of Director of Office and Marine Safety change in May 2005?
A. The requirements of the position in May of 2005, I am not sure that -- the requirements of the position didn't particularly change in May of 2005. They were relatively the same.
The requirements of the position changed with the advertisement of the position as an SES. And that happened earlier than May 2005. May 2005 was a selection of someone to fill that advertisement.
Q. I understand. Did the requirements of the actual job of Director of OMS change after

Miss Murtagh Cooke left the position?
A. Yes.
Q. Well, how did the requirements of the job change?
A. The nature of the fundamental job that we spoke about earlier, the accident investigation, supervision of the office and the other functions remained the same. But as an SES-level employee, the position was now responsible for broader agency-wide planning and program development activity.
Q. Can you --
A. The position became part of the executive resource board.
Q. What is the implication of you said a broader responsibility planning and what?
A. Process development for the agency.
Q. Can you explain how the responsibilities changed as far as planning and process development?
The senior executive service member, the position, the person who holds that now is responsible for participating in agency-wide planning, program development and decision-making for agency activities

responsibilities of the office.
Q. Those would be the same requirements of the job that Miss Murtagh Cooke got?
A. Yes.
Q. I see. What percentage of Mr. Spencer's work is evaluating planning and program development for the agency?
A. I would think probably ten to fifteen percent maybe.
Q. When you say maybe?
A. Roughly.
Q. Could it be less?
A. No. It's about 10 to 15 percent. The Executive Resources Board, executive committee meets every week. The Executive Resources Board meets every quarter.
We have over the last year put in play a comprehensive strategic plan, and the guidelines for operating the plans, the guidelines for performance management. We have established a number of policies and operational bulletins from the committee on performance management, so, 10 to 15 percent.

Q. And was Miss Murtagh Cooke ever involved in any of those duties or requirements during her tenure?

A. No.

Q. She was never consulted as to planning and program development for the agency?

A. She may have been asked for input, but not as a comprehensive part of a executive resource board. There are a number of organizational units, some at the 15 level leadership and some subordinate to that that are requested for input into different products and activities of the board.

Q. I see. And was Miss Murtagh Cooke's -- was her input sought during her tenure as director of OMS?

A. I believe so. I believe that she was requested to provide input for a number of things, the agency's annual report, as were all the officers. A strategic plan that was developed I think in 2000 asked for some input specific to her.

When we go through our reauthorization every several years, each of the modal office directors are asked for their input and ideas on authorization language, and same thing for

director is always involved and always aware of the development of their reports.

But once that report is complete at his level in draft, and the director is satisfied with the draft report, he then hands off the responsibility of taking that report to the board to the director.

Q. I see. Before you had stated that the volume of accidents in aviation, can you describe for me what you mean by volume? Do you mean quantity or the size of the accident?

A. Both.

Q. Okay.

A. Quantity -- since we are responsible for investigating every aviation fatality, we get notifications on every single accident, and we have to do something about it. And then the size of the major aviation accident reports is not comparable to the other modes.

Q. I see. But there's more people working on the project along the way?

A. Yes.

Q. Thank you. To what extent is -- you had

Q. When you say it was understood, what was the understanding?

A. There's not a written document that says that. Fifteens are eligible for overtime in the federal system, considering that ceiling that I talked about. But at the NTSB the general understanding among the managers in conversations with the Managing Director and Chairman and various chairmen and various managing directors was that the office directors were not expected to apply for overtime.

Q. When you said there were -- the conversations, what conversations are you talking about?

A. Discussions about grade and positions.

Q. Are these discussions that you had?

A. Discussions that I had, yes.

Q. And who did you have -- which other GS-15 employees, management employees did you have discussions with about the unavailability of --

A. Frequently these discussions were held in groups. They included Miss Murtagh and many of the other 15-level employees including Mr. Chipkevich and

employees.

Q. And where is it determined that only supervisory employees are not entitled to regular overtime?

A. I don't believe that that's written anywhere. That was an understanding from the meetings that occurred.

Q. I see.

A. The OPM rules say essentially that employees at the GS level are eligible within the parameters of the overtime rules.

Q. And are you aware of any GS-15 level 8s or 9s that were -- that ever obtained regular overtime for report writing, budget or any other type of work over 40 hours?

A. I'm aware of GS-15 employees receiving true overtime. I am not aware of GS-15 employees, nonsupervisory employees receiving regular overtime, but it may have happened. And I'm not aware of GS-15 supervisory employees receiving either.

Q. Are you aware of any requests for it other than by Miss Murtagh Cooke?

have come forward and said -- and demonstrate that I am being given a job offer at a higher salary outside of the government. And the agency would then have had to decide that it was absolutely necessary for the government to retain her and, therefore, try to keep her by giving her a retention allowance.

Or, and this would not have applied to Miss Cooke, the skill for the position was so necessary to the government that we could not easily replace the person if they left. That does not happen very often, the second.

Q. What is it about Miss Murtagh Cooke's skills that are not unique enough to receive the retention bonus?

A. Generally the test is that if you can put out a job announcement and receive candidates that are equally qualified and equally capable of doing the position, then it is not so unique a skill that the government can't replace the person.

Q. And what about -- is that the only standard?

A. No, that plus leaving the government. If,

meritorious act to warrant the special act award?
A. What time frame?
Q. Between 2003 and 2005?
A. Yes. She didn't -- as far as I know, she did not perform such a discrete success or act to warrant the recommendation for a special act award. Okay.
Q. Okay. And the performance awards are only based on the evaluations?
A. The performance awards are based on the end of the year evaluations. Yes.
Q. I see. Does a level of performance -- a series of performance awards indicate that the person is -- can you describe to me between 1997 and 2005 whether Miss Murtagh Cooke received a series of performance awards?
A. Miss Murtagh Cooke did receive performance awards during that time period. I think the specific amounts probably have been provided to you. I can't recite them for you.
She received end-of-the-year performance ratings. And with those ratings came commensurate

awards, cash awards.
Q. So, and what about agency end-of-the-year awards, the agency-wide awards? Was Miss Murtagh Cooke eligible for those?
A. She was eligible for those, but again it was tradition that the office directors, if nominated for those awards, declined to participate.
Q. Where is this, when you say tradition?
A. It is -- I was nominated for the chairman's award one year. I asked that my name be withdrawn. Mr. Chipkevich was nominated for the award one year. He asked that his name be withdrawn. It was simply tradition.
I don't believe that Ms. Murtagh was nominated any year that I am aware of between 1997 and 2005, but traditionally the office directors would withdraw themselves from consideration.
Q. What year were you nominated, sir?
A. We have a record of it, but maybe 2001.
Q. And what year was Mr. Chipkevich nominated for?
A. 2003 maybe. I am not exactly sure of the

these positions.

And they began a process of requesting through OPM additional billets in the SES to assign to those positions.

Q. But why would OMS be the last of all the modal offices to receive a billet?

A. Because the Office of Railroad, Pipeline and Hazardous Material and the Office of Highway Safety were both larger in size. They were -- both had regional operations. The Office of Railroad, Pipeline and Hazardous Material had multimodal internal functions in addition to multimodal external functions.

And the Office of Highway Safety had original component and safety report and safety study component that was not prevalent in the Office of Marine Safety. Size, scope, the cascade for the agency was what I told you before. Aviation, for size and scope; rail pipeline, hazardous material; highway; marine.

- - - -

(Discussion off the Record)

1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

--------------x

MARJORIE MURTAGH COOKE, :

Plaintiff, : Case No. 06-748C

vs. : Judge Thomas C. Wheeler

THE UNITED STATES, :

Defendant. :

--------------x

Deposition of JOHN S. SPENCER

Washington, D.C.

Wednesday, August 15, 2007

9:55 a.m.

Job No. 1-110022

Pages 1 - 255

Reported by: Paula J. Eastes

2

Deposition of JOHN S. SPENCER, held at the offices of:

THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Paula J. Eastes, Court Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF THE DEFENDANT:

LESLIE CAYER OHTA, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-2061

4

APPEARANCES

ON BEHALF OF THE DEFENDANT:

KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
Office of the General Counsel
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6084

ALSO PRESENT:
MARJORIE MURTAGH COOKE

CONTENTS

EXAMINATION OF JOHN S. SPENCER — PAGE
By Mr. Lowinger 6

EXHIBITS
(Exhibits attached to the transcript.)

SPENCER DEPOSITION EXHIBITS — PAGE
No. 1 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements State Issues Enhance Recreational Boating Safety 216
No. 2 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements Federal Issues Marine - Reduce Accidents and Incidents Caused by Human Fatigue 218
No. 3 MOU Between NTSB and United States Coast Guard Regarding Marine Accident Investigation 223
No. 4 Application of John S. Spencer 224
No. 5 Weekly Reports 225
No. 6 Position Description of John S. Spencer 232
No. 7 Notifications of Personnel Action 233
No. 8 NTSB Senior Executive Service Performance Plan and Appraisal 235
No. 9 SES Rating Sheet for John Spencer 247



PROCEEDINGS

JOHN S. SPENCER

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:

Q Good morning, sir.
My name is Brian Lowinger. I am an attorney for the Employment Law Group. We are representing Marjorie Murtagh Cooke in this action against the United States currently before the Court of Federal Claims.
Can you please state your name for the record?
A John S. Spencer.
Do you want my middle name?
Q Sure.
A John Sherman Spencer.
Q Thank you.
Spencer, can you spell Spencer for the Court Reporter?
A S-P-E-N-C-E-R.
Q Mr. Spencer, just a few preliminary issues



before we start today.
Have you ever been deposed before?
A No.
Q Really it is like a question and answer period.
I mean, given your years of experience, I am sure it is no different than some of the other things you have done in your life.
I am just going to ask a series of questions of you today. I ask that you wait for me to finish the question and then you respond. I will try not to interrupt you as well.
A Okay.
Q The next part of it all is this isn't going to be videotaped. This is all stenographic. So, we ask that your answers be verbal. Head nods and head shakes, they don't translate on to the record really.
The next part is that if you are thinking yes or uh-huh, if you would answer yes or no, because sometimes uh-huh looks like yes and sometimes it looks like it could also mean no just depending on what was meant by it the way it gets on to the record.



Is that okay with you, sir?
A Yes. I understand.
Q Okay. Great.
I will be asking questions. Along the way your counsel, who is stepping in for Meredyth Cohen, Ms. Ohta, may assert some objections and that is perfectly normal. That is just part of the process. The judge will determine whether or not the objections are sustained or whether or not they are going to get into the record. I still ask that you respond. The only difference is if there is a claim of privilege and you are instructed not to respond, that is something different. We are not likely going to have that problem today.
Okay?
A Okay.
Q The next part is answering the questions. If you answer the question, I have assumed you heard it and understood it and are able to respond to it. So, if you don't understand any part of it, please just let me know and I will either have the Court Reporter read it back to you in case you didn't hear

73

Some supervision, first level supervision.
Q I'm sorry, sir. What about supervision?
A The way we have been set up recently is I supervise the Deputy Director and the Deputy Director supervises the people who are in my division in what is called the MS-1 division.
I am responsible for representing the Agency in the marine arena, marine field, to the Coast Guard, other federal and international agencies, the public, commercial organizations and what not.
I am responsible for the morale of the office and complying with the directives of the Managing Director.
I am responsible for coordinating the work of the office with other offices of NTSB.
I write speeches for the Chairman and Board members.
I am an interface between the Board members and other management at NTSB with the industry and with the Coast Guard.
I review all correspondence and reports and do some of the writing myself.

74

I sit in the various planning meetings that we have associated with investigations, such as work planning meetings or report planning meetings.
I represent the Office Of Marine Safety at our Sunshine Meetings.
I participate in some committees or working groups.
I interface with my counterparts in other countries.
That is all I can think of off the top of my head. I might have left off some big ones, but that is my stream of consciousness.
Q Sure.
So this is what we have here. We have launch Go Teams, quality and timeliness of reports, budget, hiring staff, training staff, complying with NTSB administrative directives, supervision of your Deputy, representing the Agency as its marine representative to the U.S. Coast Guard and other federal and international agencies, commercial entities and the public, et cetera, morale of the office, directives of the Managing Director,

75

coordinating work with other offices at NTSB, drafting speeches for the Chairman and the Board members, interface between the Board members and the Coast Guard, review of all correspondence and reports, planning meetings and reports, representing the office at Sunshine Meetings, some committee and working groups and working with representing the Agency with counterparts in other countries.
A I also set priorities.
Q For what? For the office?
A For the office.
And I establish schedules.
Q Anything else?
A Probably. But that is all I can think of right now.
Q Describe to me which of these are the most important in your duties and responsibilities.
A I don't know how to answer that because they are all important at one time or another. You can't ignore any of those things. The primary purpose of the office is to investigate marine accidents and write reports.

76

Now, since I arrived the Managing Director has given me some assignments that I work on that are important to me because he wants them done.
I can't say that one is more important than another because if you omit something that is supposed to be done, it is a problem.
Q I understand, sir.
For example, the assignments from the Managing Director, what are they for?
A When I came here he gave me some assignments.
Q Okay.
A One assignment he gave me was to reduce the backlog in the office.
Q Okay.
A Another assignment was to get the reports out more quickly.
Q Okay.
A Another assignment was to restore a good working relationship with the Coast Guard.
Q Okay.
A Another was to give NTSB a greater presence

in the marine industry.
Q Okay.
A Another was to become more active in international activities.
Then the last one was to find a replacement for myself before I leave.
Q Are you leaving, sir?
A Not any time soon. I do have plans to leave at some point.
Q Which of these are the least important?
In other words, you don't really have it as day-to-day work, you don't follow it on a day-to-day basis. It is really something you only touch upon on an occasional basis.
MS. OHTA: Objection. Vague and ambiguous. I don't know if you are referring to initiatives that the Director gave him or to the areas of his responsibility that he previously identified.
THE WITNESS: Well, I don't think that that is a good question because one thing that is very important is launching Go Teams on accidents, but that happens infrequently. So, does that make it



unimportant? It is not because it is one of our primary functions.
So, getting back to what I said before, when you say least important, they are all important. There may be some things that I do that I don't have to do that I would consider perhaps least important. Maybe reviewing a draft three times instead of once. Okay?
I consider everything I do as important and my workload changes from day-to-day.
BY MR. LOWINGER:
Q You mentioned that you have a Deputy. Who is your Deputy?
A Chris Julius is my Deputy.
Q Is that a new position within the office?
A It is not really a position. It is more responsibility. He is detailed as my Deputy from the General Counsel's Office.
Q Has anyone else joined the office on a detail other than through hiring?
MS. OHTA: Objection. Vague and ambiguous. A detail and hiring are two distinct activities.



MR. LOWINGER: That is right.
MS. OHTA: Would you please rephrase the question?
BY MR. LOWINGER:
Q Did you understand the question, sir?
A Probably not. Why don't you go ahead and ask it again?
Q Aside from Mr. Julius, has anyone else been detailed to your office since you started as the Director of OMS?
A Yes.
Q Who?
A People who are in these executive development programs from other agencies, I have taken a number of them into the office to work on some projects.
Q How many people from other offices?
A Four I think.
Not other offices. They are from outside the Agency.
Q Do they come from the private sector or other government offices?



A Other government offices.
Q Which other government agencies?
A One was from the Army.
One was from the Navy. Maybe two were from the Navy.
I believe one was from the Coast Guard.
Q And what did they do?
A Different assignments that they could work on for the time they were there.
They would work on qualifications. Trying to develop the qualifications program for investigators is one.
Another one was looking at how we could improve the communication between investigators and writers.
Another one helped me in reorganizing the office.
I don't remember what the fourth one did.
Q How many launches have there been since you started your tenure as the Director of OMS?
A Let's see. Not too many.
(Witness writing.)

101

AFTERNOON SESSION
(1:15 p.m.)
JOHN S. SPENCER
having been previously duly sworn, was further examined and testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. LOWINGER:
Q On the eight accidents that you have launched on, sir, how many people have you launched, NTSB employees have you launched, on each?
A On each one?
Q You have your list in front of you. Why don't you list the accidents and tell me how many people you launched.
A For each accident?
Q Please.
A The Ethan Allen I don't know. That was my first one. I would have to go back and look that up. But it was a good size team.
Q Did you launch on that?
A No.
The Crown Princess was one person.

102

Q Was that you?
A No.
The New Delhi Express was one person.
Q Was that you?
A No.
Q Let me just ask you have you launched on any of these?
A No.
Q Thank you. I apologize for interrupting.
MS. OHTA: I'm sorry. Was the question have you launched any of these?
MR. LOWINGER: Have you launched on any of these?
MS. OHTA: Okay.
BY MR. LOWINGER:
Q Please go ahead, sir.
A New Delhi Express was one person.
Massachusetts was a full team. I don't recall how many.
Q What is a full team?
A Well, it varies with the accident. It could be four, five, three, six.

103

Q But it is anywhere from three to six?
A As a generalization I think you could say that, but it could be more than six.
And we are just talking about marine investigators, is that right, or are you talking about the entire NTSB party?
Q I believe the question was the entire NTSB party.
A Okay.
I don't determine the size of the launch of members and that sort of thing. I only have control over my own investigators.
Q Well, for the Massachusetts then how many marine investigators did you send?
A Well, I told you I don't remember. I would have to go back and look it up.
There was at least two.
Q At least two, but less than ten?
A Yes. Less than ten.
Q Was it less than seven?
A I don't know.
Q Have you ever had a launch with more than seven?

104

A I don't believe so.
Q Have you ever had a launch with more than five?
A That I don't know.
Q Please go ahead, sir.
A The Empress of the North I believe there were six marine investigators on that one.
Q Okay.
A The Star Princess was one.
I'm sorry. Let's go back to the Crown Princess. That was two.
The Sidney Mae was one person.
The Athena 106 was at least three.
Q Was there more than six?
A No.
Q Somewhere between three and six?
A Yes.
Q Describe to me please, sir, your duties and responsibilities with regard to the press as it relates to an investigation.
A When there is a team on the scene I have

105

very little interaction with the press.
As the investigation progresses I may be called for a phone interview from the press, but it is rare.
After an investigation is completed I do get occasional calls from the press, which I take.
Also any press releases that go out involving a marine investigation are cleared by me.
Q When you say cleared, what do you mean by that, sir?
A As part of the review process before they go to the press I read them and comment on them, if necessary.
Q How many press releases has your office sent out during your tenure?
A We don't send any out. Public Affairs sends all the press releases out.
Q How many marine safety oriented press releases have been sent out that you have reviewed during your tenure?
A I couldn't tell you. I would say between 10 and 50, but I really don't have any idea.

106

Q Is that something that takes up a lot of your time?
A No.
Q Is it a small amount of your time?
A Yes.
Q Let's go down that list. I asked you which were most important. They are all important when they become due, but let me ask a question and you tell me.
Launch Go Teams, how much does that take of your time, sir?
A During a launch it probably takes about four-hours of my time.
Q What about quality and timeliness of reports?
A That takes a lot of my time. I would guess with every report we are talking about perhaps 40 hours of my time.
Q What about budget?
A In the course of a year perhaps 40 hours.
Q Has your budget grown, stayed the same or been reduced since you started at NTSB?
A It has been more or less the same.

107

Q More or less?
A Well, for example, I believe when I got there it was whatever budget existed before I got there and I don't know what that was.
With the following budget I think we were under a continuing resolution or something.
Then there was, I don't know. It has been about the same. I haven't received any increase.
Q Sure.
I know you said that you have never been deposed before. Just if you would, please don't look at counsel to see if they have any idea.
A Okay.
Q And I am not suggesting anything.
MS. OHTA: Excuse me.
I really object to that. I have not looked at him. I have been actually writing here. And the implication is that we were looking at each other for some untoward reason. That was really a totally unwarranted comment.
MR. LOWINGER: Actually while you were looking down he was looking at Ms. Silbaugh.

108

It is okay. I am just saying if you could just maintain focus with me.
It is okay. I am not suggesting that you did anything wrong and I am not suggesting that she did anything wrong. I am just asking that the deponent look toward me.
Thank you.
THE WITNESS: When I think I kind of look off into space.
BY MR. LOWINGER:
Q It is okay, sir.
What about hiring staff?
A We talked about that before and we haven't hired any since I have been there.
Q What about the whole application process? Have you gone through the whole application process for somebody, even though you may not have hired someone?
A Well, I consider the whole process including the hiring end of the thing.
With each position I would guess it takes upwards of 40 hours.

joint training program. And previously you also said that the Managing Director, who I believe at the time was Mr. Osterman, requested that you improve relations with the Coast Guard.
A Yes.
Q Can you describe for me why you have been asked to improve relations with the Coast Guard?
A My understanding is that our relationship with the Coast Guard before I was there was not very good.
Q And what about it was not good, sir?
A It appeared that the relationship between NTSB and the Coast Guard was adversarial. So, there was little cooperation and little communication.
Q Who at NTSB was an adversary to the Coast Guard?
A I don't know. I wasn't there.
Q Well, what is your understanding based upon what you have been told?
A I was just told to improve the relationship. So, I took it from there. I didn't bother to go back and figure out what was wrong.



Q Well, have you figured out what was wrong?
A Yes. There was a lack of trust between the two agencies.
Q What about NTSB did the Coast Guard not trust?
A Our motives. They felt that NTSB would take any opportunity to make the Coast Guard look bad.
Q Anything else?
A I can't think of anything else right now.
Q What examples have you been made aware of where NTSB's motive was to make the Coast Guard look bad?
A Well, I can't think of any specifics right now.
Q When you say you can't think of any specifics, are you saying you don't know or you don't remember?
A I don't remember. I know they exist. I would have to go back and look them up.
Q Is there any piece of information that I could give you that might help you remember it? If I showed you the MOU, would that help you remember?



A No. I think if you maybe showed me some reports that we had done.
Q Are you aware whether or not NTSB ever investigated the Coast Guard in its investigations?
A No. I am not.
Q What about representing NTSB and its marine related responsibilities to other federal agencies?
A Besides the Coast Guard?
Q Yes.
A And what do you mean by what about? What is your question?
Q Describe to me your work relating to representing NTSB in its marine responsibilities to other federal agencies.
A All right.
We did this with OSHA on the Athena 106 investigation.
We have spent considerable time in the last year with the U.S. Navy.
Those are the only agencies I can think of right now.
Q And did you spend a lot of time speaking



wing OSHA regarding the Athena?
A Not me personally, but my office did.
Q What about the U.S. Navy? What about your responsibilities related to the U.S. Navy?
A Well, my responsibilities are to apply the law and regulations concerning investigations. There was an accident involving a commercial vessel and a naval vessel. So, we were trying to get the cooperation of the Navy and it was very difficult and time-consuming.
Q I see.
Did you ever prevail on getting the cooperation?
A We are not finished yet. It is still going on.
Q Which accident is that, sir?
A This was the accident between the submarine Newport News and the -- don't ask me to spell this one -- the Japanese tanker Mogamigawa.
Q When did that accident occur?
A At the beginning of this year.
Q Did NTSB launch on that one?

161

A Well, I have to do some sort of a financial report. That is the only thing I can think of.
Q What is the financial report that you do, sir?
A Some report that one of our attorneys gives me and I fill it out on an annual basis. It basically is for me to say what my sources of income are.
Q Anything else that comes to your mind with regard to being a member of what is called the SES?
A Not as far as the government goes. No.
Q Okay.
What about travel? Have you been traveling as a representative of NTSB with regard to marine safety issues since you have come on board at NTSB?
A Yes.
Q Can you describe your travel, sir?
A I have traveled several times with the Chairman to accompany the Chairman when he wants to go someplace that he has an interest.
I have traveled to IMO meetings.
I have traveled to a couple of conferences, professional type conferences.

162

Last week I traveled with the Managing Director and one of the Board members to Miami to observe a mass evacuation exercise.
Q What is the role of NTSB at the IMO?
A Well, I don't believe NTSB has an official role, but I go as part of the U.S. delegation and what I do is advise the head of the delegation on NTSB positions on issues before the IMO that NTSB has an interest in.
Q What percentage of your work or how much time do you spend on IMO related issues?
A Three to four months a year.
Q Have you generated any reports for the IMO issued through the U.S. delegation?
A The only thing I have done is helped with the delegation memo that I believe goes to the Secretary of State on the parts of the meeting that I was participating in.
Q And with regard to counseling a delegate on NTSB related issues, have you had to write any reports related to that?
A No.

163

Q Just providing oral counsel?
A Right. Or if there is a U.S. paper, I may offer some comments on the paper. But it is basically advice to the U.S. delegation.
Q How many papers have you provided advice on?
MS. OHTA: In connection with the IMO?
MR. LOWINGER: Yes. Thank you.
THE WITNESS: All of the meetings that I have been to?
BY MR. LOWINGER:
Q Yes.
A I would say half a dozen.
Q How many IMO meetings have you been to as the Director of OMS?
A I have been to four or five.
Q What about notice of proposed rule makings? Have you provided any advice or any comments with regard to notice of proposed rule makings?
A Yes. I have.
Q Which notice of proposed rule makings have you provided advice on?

164

A We did one dealing with small passenger vessel stability.
We wrote one concerning proposed passenger weight.
I think there were others, but I don't remember what they were.
Q Do you know who were the agencies issuing proposed rules on the small passenger proposed and the passenger weight proposed rule makings?
A Yes. It was the Coast Guard.
Q How many times have you traveled with the Chairman?
A Four or five times.
Q Where have you traveled to with the Chairman?
A New York, Miami and Seattle.
Q Have you traveled to any of these more than once?
A With the Chairman?
Q Yes.
A I have traveled to New York twice with the Chairman.

193

or how I think the Board feels about it.
So, for example, the Ethan Allen, because it was the largest small passenger vessel accident we had, in memory anyway, became the top priority. And so when it came to trying to resolve conflicts in resources, I generally put them on the Ethan Allen to get that out quickly.
When I got to the Board there were several investigations that were still open and what I did was prioritize those and decided which ones I felt needed to come to the Board first and those were the ones we put most of our attention on to get them out.
So, that is what it is.
Q Is that something you do on a daily basis?
How often do you hold the meetings that you referred to?
A Well, they are not always meetings. I think about the priorities on a daily basis.
We only have to sit down and discuss those things when there is something new that comes up that might affect the priorities. For example, if some critical player gets sick for a while, how we are

194

going to handle that.
Q Is it a big part of your duties and responsibilities setting priorities?
A It is a big part as far as the impact on the office goes.
Q Is it something you spend a lot of time on?
A I would say so. I probably spend over five hours a week on that.
Q Are there any other factors in setting the priorities, including open investigations, the current issues that you are dealing with on investigations, resources available to do the work, additional work, contracting and the significance of issues?
A Yes. Input from the Managing Director and from the Board members.
Q Anything else?
A Not that I can think of.
Q What kind of input do you get from the Managing Director?
A As far as my work and priorities?
Q Yes.
A Very little unless I ask for it.

195

Q What about directives? Does he ever just give you directives?
A Not on the investigations. No.
Q What about outside other than investigations, sir?
A Yes. He might tell me to come to a meeting or something like that.
I don't think he singles me out for any directives. I think whatever directives he gives he gives to all the Directors pretty much across the board.
Q What did he say about reducing the backlog in the office?
A He just said that there was too much and it was taking too long to get reports out and what could I do to shorten it?
Q Anything else?
A About the backlog?
Q Yes.
A No.
Q Did you have meetings about the backlog with him?

196

A Yes. I did. We have regular meetings every three to four weeks and we go through all the ongoing work and where we are on it and what the key dates are.
Q Do you feel comfortable meeting with the Managing Director?
A Yes.
Q What did the Managing Director advise you with regard to enhancing or increasing the presence of the Office of Marine Safety in industry?
You had said that was something that he assigned to you.
A What I understood him to mean was that industry didn't particularly like us, they didn't particularly know what we did or who we were, and he knew that I had developed a lot of industry contacts in my prior jobs and that I was generally well-known and respected in the industry and he wanted me to use that to try to give us more credibility and more visibility.
Q And what have you done to do that, sir?
A Well, I have set up these trips with the

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, | |
| v. | Case No. 06-748C<br>Judge Thomas C. Wheeler |
| THE UNITED STATES OF AMERICA, Defendant. | |

PLAINTIFF MARJORIE MURTAGH-PLAINTIFF'S RESPONSES TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Rules of the Court of Federal Claims ("RCFC"), Plaintiff, Marjorie Murtagh Cooke ("Plaintiff"), provides the following responses to Defendant, United States of America's ("USA"), First Set of Interrogatories to Plaintiff.

INTRODUCTION APPLICABLE TO ALL RESPONSES

1. Any response contained herein is based on certain non-privileged information presently available to Plaintiff or her counsel. The response may not necessarily reflect information that is currently within the possession, custody or control of other persons or entities. The investigation and discovery of this action is ongoing, and Plaintiff reserves the right to modify, amend or supplement her responses in accordance with the Rules of the Court of Federal Claims.

2. To the extent that Defendant has failed to state the Interrogatories with the degree of clarity and specificity necessary to determine a proper scope of interrogatory and to identify information responsive thereto, Plaintiff reserves the right to modify, amend or supplement her

responses to these Interrogatories accordingly.

3. Plaintiff is responding to these Interrogatories on behalf of herself and is not responding on behalf of any individual, entity or organization other than Plaintiff.

4. The exact wording of the responses and certain information contained herein may be that of Plaintiff's counsel and does not necessarily purport to be that of Plaintiff.

5. Plaintiff's response to any of these Interrogatories is not an admission as to the truth of any factual claim or allegation made in that Interrogatory.

6. By responding to these Interrogatories, Plaintiff is not waiving any potential objection as to the admissibility of the information provided in any part of any response, and Plaintiff is hereby specifically reserving the right to raise any and all such objections to admissibility as are appropriate at trial or in any evidentiary hearing in this case.

**GENERAL OBJECTIONS**

1. Plaintiff objects to the Interrogatories to the extent that the definitions and/or instructions set forth therein seek to impose requirements for production beyond those contained in the Rules of the Court of Federal Claims or other U.S. law.

2. Plaintiff objects to the Interrogatories to the extent that they seek information which is within the exclusive possession, custody or control of any individual, entity or organization other than Plaintiff.

3. Plaintiff objects to the Interrogatories to the extent that the information they seek is equally accessible and available to Defendant or already in its possession, or as a matter of public record.

4. Plaintiff objects to the Interrogatories to the extent that they are vague or ambiguous or fail to describe the information or documents sought with sufficient particularity to

allow for a meaningful response by Plaintiff.

5. Plaintiff objects to the Interrogatories to the extent that they fail to specify or limit the applicable time period.

6. Plaintiff objects to all interrogatories propounded by Defendant in which they request information, answers or materials that, contrary to the spirit and letter of Rule 33 of the Rules of the Court of Federal Claims, are not relevant to the issues in dispute in this litigation.

7. Plaintiff objects to all interrogatories propounded by Defendant in which they request information, answers or materials that, contrary to the spirit and letter of Rule 33 of the Rules of the Court of Federal Claims, are not reasonably calculated to lead to the discovery of admissible evidence.

Without waiving the forgoing, Plaintiff responds as follows:

## ANSWERS TO INTERROGATORIES

**Interrogatory No. 1**

Identify each and every person who provided information for or participated in the preparation of responses to these interrogatories, and for each person, identify the specific interrogatory for which he or she provided information and state whether he or she has personal knowledge of the information set forth in the response(s).

**Plaintiff's Answer to Interrogatory No. 1:** Plaintiff objects to this Request on the ground that asks for information protected by the attorney-client privilege and/or work product doctrine and for information that was prepared in anticipation of litigation. Subject to and without waiving this objection, Plaintiff responded to these interrogatories with the assistance of her counsel.

**Interrogatory No. 2**

Identify each and every fact you intend to use during a trial or dispositive motion hearing in your case that supports your contention that the NTSB violated the Equal Pay Act as alleged

in paragraph one of your complaint.

**Plaintiff's Answer to Interrogatory No. 2:** Plaintiff objects to this Interrogatory based on the general objections and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Further, discovery is not complete and the below response may not reflect all facts responsive to the Interrogatory. Subject to and without waiving this objection Plaintiff states the following facts:

In 1994, Plaintiff was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS"). Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status. The Director and Deputy Director of the Office of Surface Transportation Safety also had SES status.

Each surface office had similar responsibilities, with the exception of OMS, which had two additional responsibilities: conducting accident investigations involving military and commercial vessels, and conducting international accident investigations. The latter was similar to the additional responsibility handled by the Office of Aviation Safety. The Office of Aviation Safety had an additional senior level (SL) position to handle international investigations.

In 1997, as the result of a restructuring, Plaintiff was named the Director of OMS. In 1999 the Agency requested OPM authorize SES slots for all the Modal Office Directors. After the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of

ORPH. In 2000, when the NTSB was reviewing an available SES slot, the Managing Director, Dan Campbell ("Campbell") suggested to then Agency Chairman, James Hall ("Hall") that Chipkevich be given the SES slot. Campbell suggested that Chipkevich be given the SES slot because Chipkevich was the most senior of the Modal Office Directors and ran the most complex modal office. Hall agreed with Campbell's suggestion, and Chipkevich, the Director of ORPH, applied, interviewed, and was awarded SES status.

In 1999 and 2001 the Agency requested OPM authorize SES slots for OMS. Between 2000 and 2003 as additional SES slots became available; the agency used them to create new positions other than assigning or transferring one of them to OMS.

In early 2003, the NTSB was once again reviewing an available SES slot. The Agency's leadership, then Chairman Ellen Engleman-Conners ("Conners") and Campbell assigned this SES slot to Joe Osterman ("Osterman"), the Director of OHS. After Osterman was awarded the SES slot, Plaintiff became the only Director of the four modal safety offices without SES status.

Ostensibly, because Plaintiff's Director Position did not have SES status, Plaintiff was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director of OAS, Osterman and Chipkevich. Further, Plaintiff was paid significantly less than the Deputy Director of OAS, Thomas Haueter ("Haueter"), a SES member, and the Chief Advisor for International Aviation Affairs in OAS, Robert MacIntosh ("MacIntosh"), a Senior Level ("SL") status employee. Haueter and MacIntosh's duties were encompassed within those of Plaintiff's.

Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872, Thomas Haueter ("Haueter"), Deputy Director of OAS, received a salary of $129,800 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $121,583, Robert MacIntosh ("MacIntosh"), Chief Advisor for International Aviation Affairs in OAS

received a Senior Level salary of $130,000. Currently John Spencer ("Spencer"), the new OMS Director, who replaced Plaintiff, is paid at the SES level for performing equal work to that of Plaintiff.

In addition, in 2004, while Clark received a salary of $142,022 Osterman received a salary of $140,797, Chipkevich received a salary of $142,022, Haueter received a salary of $133, 800, Macintosh received a salary of $136,000 and Plaintiff received a salary of $126,963.

Ostensibly because Plaintiff's Director Position did not have SES status, Plaintiff was granted lower monetary awards than her male counterparts, Clark, Osterman, Chipkevich, Haueter, and MacIntosh.

Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Plaintiff received an award of $5,400. In addition, in 2004, while Clark received an award of $17,000, Osterman received an award of $9,500 and Chipkevich received an award of $16,000, Plaintiff received an award of $3,400. Haueter and MacIntosh also received larger awards than Plaintiff between 2003 and 2005. Specifically, in 2003, Haueter received an award of $10,035 and MacIntosh received an award of $7,370. In 2004, Haueter received an award of $9,000 and MacIntosh received an award of $ 7,530. In 2005, Haueter received an award of 12, 325 and MacIntosh received an award of $8,280.

The work that Plaintiff performed as the Director of OMS required the same skills, efforts, and responsibility as the work required of Clark in his position as Director of OAS, Chipkevich in his position as Director of ORPH and Osterman in his position as Director of OHS, as well as Haueter in his position as the Deputy Director of OAS, and MacIntosh as the Chief Advisor for International Aviation Affairs in OAS.