Plaintiff, in her position as Director of OMS, performed work equal to Clark in his position as Director of OAS, Chipkevich in his position as Director of ORPH and Osterman in his position as Director of OHS, as well as Haueter in his role as the Deputy Director of OAS, and MacIntosh as the Chief Advisor for International Aviation Affairs in OAS.

Plaintiff performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of ORPH and Osterman performed his work as Director of OHS. This is further buttressed by Plaintiff's exemplary career at NTSB, including promotions, performance awards, raises, and positive evaluations.

Due to this inequality, in April of 2004, Plaintiff met with Conners and reminded Conners that she was the only Director of the four modal investigation offices without SES status. Further, Plaintiff reminded Conners that the other three modal safety directors, all of whom are male, earned salaries much higher than hers and that she lacked SES status. Conners responded by telling Plaintiff that she recognized that there were even Deputy Directors with SES status, and that if the NTSB acquired another SES slot, the slot would be assigned to the Director of OMS. However, Conners also stated that when the OMS Director position received SES status, the position would be advertised and that Plaintiff would have to apply and compete for the position.

Plaintiff explained to Conners that her concern was not the SES status 'per se', but rather she was seeking equitable pay for the same work. Plaintiff suggested to Conners that she be allowed to receive overtime pay as one option for reducing the gap between her salary and that of the three male modal safety Directors. Plaintiff also explained that overtime could help reduce the potential gap in the calculation of her retirement pay. Conners replied that she was not aware if overtime was a possible solution, but told Plaintiff she would look into it.

After the meeting Plaintiff met with Lisa Love ("Love") from Human Resources. Love confirmed for Plaintiff that she could receive overtime pay; however she needed approval in advance.

According to Conners, she considered Plaintiff's request for overtime as well as "a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors" and she discussed this with either Dan Campbell or Lisa Love. Conners also stated that she did not recall whether she made a specific decision to deny Plaintiff overtime, "but I would have." (Conners Affidavit, which is included in the EEO Investigative File)

After meeting with Love, Plaintiff made several attempts to meet with Conners to seek her approval for overtime pay

Despite Plaintiff's efforts, Conners refused to meet with her to discuss this subject. Conners acknowledges that Plaintiff requested follow up meetings on several occasions, but claims she was either too busy to meet with Plaintiff or later felt it was inappropriate to meet during the OMS SES recruitment and selection process. (Conners Affidavit, which is included in the EEO Investigative File)

Thus, Plaintiff continued to work as Director of OMS, doing equal work to Clark, Osterman and Chipkevich, the other three Directors, and making significantly less money.

In July 2004, the NTSB advertised the OMS Director position with SES status. As instructed by Conners, Plaintiff applied for this position. Plaintiff was deemed qualified for an interview, but the advertisement was cancelled and she was not granted an interview.

In early 2005, the OMS Director position was re-advertised as having SES status. Plaintiff applied for this position, but she was not granted an interview. A person who previously was not deemed qualified in 2004, John Spencer ("Spencer"), was awarded the

position. The work performed by Spencer, requires the same responsibilities, skills, and efforts, and is performed under similar circumstances as Plaintiff.

In response to years of unequal pay for equal work to that of her male counterparts, and not being granted an interview for a position she held for eight years, Plaintiff filed a discrimination complaint with the NTSB EEO Director on February 7, 2005, using the established NTSB protocol for lodging formal complaints of Equal Pay Act violations.

In her complaint, Plaintiff alleged that she received unequal pay as the Director of OMS because of her gender. Plaintiff's discrimination complaint was investigated from August of 2005 through December of 2005.

In May, 2005, the new Managing Director, Osterman, notified Plaintiff of her non-selection for the Director of OMS position. Plaintiff noted that she had not been paid for the position during her tenure as Director of OMS. Osterman then offered her an SL position to compensate if she would submit bulleted responsibilities for a position description. NTSB has used SL positions in the past to compensate senior level employees for pay over the GS-15 salary level. In response, Plaintiff submitted the requested document. Osterman subsequently informed her that Conners, Rosenker, and Campbell would not permit him to use an SL position for her.

In June, 2005, the NTSB transferred Plaintiff to the Office of Safety Recommendations and Communication. In October 2005, the NTSB transferred Plaintiff to the Office of the Managing Director. In July, 2006, Plaintiff retired from the NTSB.

**Interrogatory No. 3**

Describe in detail each and every individual with whom you spoke about the NTSB's alleged violation of the Equal Pay Act. For each individual you identify, include in your response the date(s) you spoke with that individual, the substance of the conversation, and what, if any, remedy you requested.

**Plaintiff's Answer to Interrogatory No. 3:** Plaintiff objects to this Interrogatory based on the above general objections and Plaintiff objects to this Interrogatory on the grounds that it is overbroad unduly vague and burdensome and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Specifically, the question is not limited to employees of NTSB, is not limited by time, including after Plaintiff was transferred out of OMS.

Subject to and without waiving any specific or general objection, Plaintiff incorporates her response to Interrogatory 2 and Plaintiff further states that she met with Engleman Conners and David Clark in April of 2004 to discuss the disparity in pay between her and her male counterparts. Conners said that when the NTSB received another SES slot it would go to OMS but Plaintiff would have to re-apply. Plaintiff then asked if she could earn overtime to close the disparity. Conners stated that she wasn't sure but she would follow up. Shortly after Plaintiff's meeting with Conners, Plaintiff met with the Director of Human Resources, Love, and her Deputy Director, Collette Magwood ("Magwood"), to ascertain her eligibility for overtime pay in lieu of SES status. They informed Plaintiff that she would be eligible for overtime but Conners would have to approve the request. Plaintiff made several more attempts to meet with Conners but Conners refused to meet with Plaintiff.

Plaintiff spoke with Campbell on several occasions prior to 2004 to discuss the inequity of her pay situation. During one such meeting with Campbell and Osterman, Osterman raised the issue of pay for doing the same job as Clark and Chipkevitch. Campbell said that NTSB was requesting SES positions. Osterman stated he didn't care about being an SES, it was the money he was concerned with. Plaintiff concurred with Osterman. Campbell indicated he understood.

During the advertisement period for the SES-OHS Director position Plaintiff met with Campbell to remind him that she would now be the only Modal Director without SES status and

thus without equitable pay. Campbell responded that he did not know when an SES for the OMS position would be advertised, but he "had to do this for Joe".

At least one more meeting occurred between Plaintiff and Campbell during which Plaintiff raised the issue of being paid overtime given the excessive hours she was working to compensate for a limited staff. Campbell stated that this extra work time was part of the 'privilege' of being a manager, and if she wanted to take a day off now and again he would 'look the other way'. Plaintiff pointed out that this would not serve any purpose given that it would simply serve to delay her office work products. Campbell indicated he understood.

Plaintiff met with EEO Director, Fara Guest ("Guest") on multiple occasions in the 2003 – 2004 time periods during which the inequity in her pay structure was discussed. Also Plaintiff met with HR Director, Love and Magwood on multiple occasions to discuss the inequity in pay in her position as Director of OMS.

Plaintiff spoke with the NTSB EEO Director on or about January 5, 2005 and on February 7, 2005 when she filed her formal complaint and on multiple occasions thereafter to discuss the complaint and the process.

Plaintiff also spoke with EEO Counselor, Chester Fischer ("Fischer") and EEO Investigator, Paul Greenberg ("Greenberg"), the dates and details of which are documented in the Report of Investigation, which was produced by Defendant.

Plaintiff also spoke with Osterman in May of 2005 about the disparity that existed between her and her male comparators after he became managing director. Plaintiff attempted to respond to Osterman's offer of SL status to equalize her pay in lieu of SES status. Osterman subsequently informed her that Conners, Rosenker, and Campbell would not permit him to use an SL position for her.

Plaintiff reserves the right to modify, amend or supplement her responses to this

Interrogatory accordingly.

**Interrogatory No. 4**

Identify each and every individual who can support your contention that the NTSB's actions violated the Equal Pay Act. For each individual identified, include in your response the substance of that individual's knowledge, when they gained the substance of their knowledge, and how they gained the substance of their knowledge.

**Plaintiff's Answer to Interrogatory No. 4:** Plaintiff objects to this Interrogatory based on the above general objections and Plaintiff objects to this Interrogatory on the grounds that it is overbroad unduly vague and burdensome and calls for information that is protected by the attorney-client privilege and/or work product doctrine, and that was prepared in anticipation of litigation. Further, the question is not limited to employees of NTSB, is not limited by time, including after Plaintiff was transferred out of her position as the Director of OMS. Moreover, it is unclear how Plaintiff should know how and when a person gained knowledge of the violation of the Equal Pay Act. Subject to and without waiving the aforementioned objections, Plaintiff states that the following individuals, can support her contention that the NTSB's actions violated the Equal Pay Act:

- Dan Campbell: As Managing Director from 1999 to 2005 he knew the skills, effort and responsibility for each of the Modal Directors were equal. He requested SES slots for all the Modal Office Directors in 1999 and 2001. As Managing Director he was consulted by each Chairman throughout his tenure regarding the pay and compensation of each of his Modal Office Directors as well as the assignment of SES slots as they became available. Plaintiff also incorporates her response to Interrogatory No. 3. 3023 Miller Heights Rd Oakton, VA 22124
- Joe Osterman: As Director of OHS, Osterman's skills, efforts and responsibilities were the same as Plaintiff's, and he performed his duties under similar circumstances as

Plaintiff. Osterman was aware of the pay and compensation disparities for SES and GS employees. Osterman, as Managing Director, stated to Plaintiff that she had not been treated fairly; not just the inequality in pay but in withholding staff. Plaintiff also incorporates her response to Interrogatory No. 3. Mr. Osterman was also a member of the Executive Review Board which discussed and advised the Managing Director on SES slots.

- Chester Fischer: NTSB employee. Fischer prepared the Comparison Chart of Core Functions of Office Director Positions and Comparison Chart of Average Compensation of Office Modal Directors that is included in the EEOC Investigation Report produced by Defendant, and conducted interviews as part of the initial EEOC complaint review process. Mr. Fischer obtained his knowledge of comparability of skills, duties, and responsibilities and the similar conditions as an employee of NTSB.
- Fara Guest: NTSB EEO Director. Plaintiff spoke with Guest about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities. Plaintiff also incorporates her response to Interrogatory No. 6.
- Paul Greenberg: NTSB EEO Investigator. Plaintiff spoke with Greenberg about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- John Clark: NTSB employee. As a former Director of OAS, his skills, efforts and responsibilities were the same as Plaintiff's. As a member of the SES and a modal office director, He was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors. Plaintiff also incorporates her response to Interrogatory No. 6
- Robert Chipkevitch: NTSB employee. As Director, ORPH, his skills, efforts and

responsibilities were the same as Plaintiff's. He was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors. Mr. Chipkevitch was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots. Mr. Chipkevich was also a member of the Executive Review Board's Ad Hoc Panels in 2004 and 2005 for the OMS position

- Thomas Haueter: NTSB, Director of the Office of Aviation Safety. As Director, OAS, his skills, efforts and responsibilities were the same as Plaintiff's. He was aware of the pay and compensation disparities for SES and GS Modal Office Directors
- Elaine Weinstein: Director, Office of Safety Recommendations and Accomplishments. Ms. Weinstein was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors, as well as their duties, efforts, responsibilities, and the conditions under which each comparator performs them. Elaine Weinstein was also a member of the Executive Review Board which discusses and advised the Managing Director on SES slots. Ms. Weinstein was also a member of the Executive Review Board's Ad Hoc Panels in 2004 and 2005 for the OMS position.
- Vernon Ellingstad: NTSB, Director, Office of Research and Engineering. Mr. Ellingstad was aware of the pay and compensation disparities for SES and GS-15 Modal Office Directors, as well as their duties, efforts, responsibilities, and the conditions under which each comparator performs them. Mr. Ellingstad was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots.
- Ron Battocchi: 5900 Fourth Road North, Arlington, VA 22203. As Managing Director and as General Counsel, he was aware that each of the Modal Directors' responsibilities and authorities were comparable. In particular as GC, he was aware that the unique

authority to determine Probable Cause was delegated by the Board only to the Modal Directors. Neither the Chairman nor the Managing Director, nor any other executive at the agency was granted this exceptional delegated authority. He was aware that Plaintiff was being paid and compensated less than her male counterparts. Mr. Battochi was also a member of the Executive Review Board which discusses and advises the Managing Director on the assignment of SES slots, and a member of the 2004 ERB Ad Hoc Panel.

- John Spencer: NTSB, Director of the Office of Marine Safety. Verified that his (Incumbent John Spencer) Position Description MS321519, which states Pay Plan Series and Grade as ES340 is identical to Plaintiff's Position Description MS321519 which states Pay Plan Series and Grade as GS-15.
- Lisa Love: NTSB Director of Human Resources. Plaintiff spoke with Love about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Colette Magwood- (301) 713-6364. Colette.Magwood@noaa.gov. Former Assistant Director of Human Resources. Plaintiff spoke with Magwood about receiving overtime and about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Carol Carmody – Telephone number: (202) 686-5579. NTSB Board member who was aware of the disparity in pay between Plaintiff and her male counterparts. Carmody told Plaintiff that she always thought or suspected that Campbell treated her differently.
- Emily Carroll – NTSB human resources employee responsible for processing pay and awards. Love spoke with her regarding overtime.

- Ellen Engleman Conners- 445 12th Street SW, Washington, DC 20554. Former Chairman. She was aware of both the pay and award disparities between Plaintiff and her male counterparts, as well as the skills, efforts, duties, and responsibilities of Osterman, Chipkevich, Clark, Haueter, and MacIntosh. Plaintiff states see response to Interrogatory No. 1-3, and 6.
- David Clark- Plaintiff states see response to Interrogatory No. 1-3, and 6. Believed to work for the White House.
- Mark Rosenker – NTSB, Chairman. He was aware of both the pay and award disparities between Plaintiff and her male counterparts. Plaintiff also incorporates her response to Interrogatory No. 1, 3, and 6.
- Gary Halbert – NTSB, General Counsel. Plaintiff spoke with Halbert about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities, and the conditions under which the work was performed.
- Karen Lanier – NTSB, Deputy General Counsel. Plaintiff spoke with Lanier about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Denise D'Avella – NTSB, counsel. Plaintiff spoke with D'Avella about the Agency's failure to pay her at the same level as her male comparators who were performing equal work that required the same effort, skills and responsibilities.
- Steve Goldberg – As Chief Financial Officer he was aware of both pay and award disparities between Plaintiff and her male counterparts. He was also responsible for responding to external audits of the agency.

Plaintiff reserves the right to modify, amend or supplement her responses to this

Interrogatory accordingly.

**Interrogatory No. 5**

Identify any and all "employees who were of the opposite sex, worked in the same 'establishment' as Plaintiff, performed work that was equal to the work performed by Plaintiff, and retained positions that required equal skill, effort, responsibility and was performed under similar conditions as compared to Plaintiff" as alleged in paragraph 48 of your complaint. For each employee, provide his name, position title, grade and series of the position.

**Plaintiff's Answer to Interrogatory No. 5:** P Plaintiff objects to this Interrogatory based on the above general objections and as it is vague and burdensome. Subject to and without waiving the aforementioned objections, Plaintiff incorporates her response to Interrogatory 2. Plaintiff further states that the following individuals performed equal work to that of Plaintiff which required equal skill, effort and responsibility, and under similar working conditions:

Robert Chipkevich, Director, ORPH, ES-340;

- Joseph Osterman, Director, OHS, ES-340;
- John Clark, Director, OAS, ES-340;
- John Spencer, Director, OMS, ES-340;
- Thomas Haueter, Director, OAS, ES-340,
- Robert MacIntosh, OAS, SL 1801.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 6**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of how you became aware that the employee was performing work that was equal to the work performed by you and that the employee's position required equal skill, effort, responsibility and was performed under similar conditions as compared to you but was compensated at a higher rate of pay.

**Plaintiff's Answer to Interrogatory No. 6:**

Subject to and without waiving the General Objections above, Plaintiff states that the responsibilities and functions are equal and are described in 49 C.F.R. § 800.2, and 49 C.F.R. § 800.25. The Agency routinely describes these functions in their annual budget submissions to OMB and the Congress.

Those of the Office of Marine Safety are most similar to those of the Office of Aviation Safety as they both have additional responsibilities related to international accident investigations as well as investigations of public/non-public accidents. The other modal offices do not have these additional responsibilities.

Plaintiff worked as the Director of OMS from 1994 through May 2005. During that time, Plaintiff regularly attended meetings with the Managing Director, other Directors of the modal offices, as well as Haueter, generally when Clark was not present. During the meetings, the Directors, Haueter, where applicable, regularly disclosed their work, including accident launches, investigations, report preparation, report production, work with Board members, the Chairman, other offices at NTSB, Congress, agencies, international organizations, trade organizations, private industry, etc., and it all matched with her duties, efforts, responsibilities, skills, and the conditions under which they were performed. Moreover, during these and other meetings, the Directors of the modal offices and Haueter, where applicable, also discussed other issues, relating to human resources, budgeting, training, etc.

Plaintiff also learned of the comparability of her work with that of her comparators through Board hearings, seminars, agency reports, third party reports that have been submitted with Plaintiff's initial disclosures.

Plaintiff states that a comparison was also conducted of the compensation of Modal

Office Directors for 2003 and 2004 as part of the EEOC Investigation Report. The comparison shows that the three male Modal Office Directors received greater compensation during both of these years.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 7**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar work to you that the employee performed and the time period that employee performed the same or similar work you describe.

**Plaintiff's Answer to Interrogatory No. 7:**

Plaintiff objects to this Interrogatory based on the general objections, and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation.

Subject to and without waiving any objection Plaintiff states that the responsibilities and functions are equal for each of the Modal Office Directors and are described in Title 49 of the Code of Federal Regulations, 49 CFR, Volume 5, Chapter VIII (National Transportation Safety Board) Part 800, Organization and Functions of the Board and Delegations of Authority, which is taken from the Independent Safety Board Act of 1974, as amended, (the Act). Plaintiff incorporates her response to Interrogatories 1, 6 and 10 herein.

Further, Plaintiff states that although the incumbents and position descriptions for Modal Office Directors have changed over the course of this complaint, they are all comparable and are hereby incorporated by reference. See EEOC Investigation Report produced by Defendant. Exhibits B1d, B1e, F8a, F8b, F8d and F8e. Also see Bates #'s 000753 through 000758, #'s 000899 through 00094, #'s 000766 through 000771

Incumbents: Osterman, Clark, Haueter, MacIntosh, Chipkevich all were tenured as

Directors, a deputy, or advisor between 2003 and 2005. Spencer began his tenure in 2005.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 8**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar skill(s) required for that employee's position as compared to the skill(s) required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 8:** Plaintiff objects to this Interrogatory based on the general objections above and on the grounds that it is overbroad, unduly vague and burdensome. Subject to and without waiving the objections, Plaintiff states that the skills for OAS, OMS, ORPH and OHS were all similar. Those skills include but are not limited to technical expertise in their transportation mode; knowledge of, and expertise in, accident investigation processes and procedures from the investigation stage through report completion, leadership and supervisory skills; logic and analytical process skills; a fundamental knowledge of their respective modal industries; the ability to communicate both written and orally and to coordinate and collaborate with other professionals both internally within the NTSB and externally as part of the investigations or other advocacy work for each respective office.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 9**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar effort(s) required for that employee's position as compared to the effort(s) required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 9:**

Plaintiff objects to this Interrogatory based on the general objections above and on the grounds that it is overbroad, unduly vague and burdensome. Subject to and without waiving any objection, Plaintiff states the effort(s) required for OAS, OMS, ORPH and OHS were all similar. The list of efforts included but were not limited to those involved with each of the responsibilities cited in Interrogatories 1, 6 and 10: effectively managing large volumes of information related to accident investigation; assessing and evaluating issues; evaluating resources necessary and available; juggling multiple priorities; dealing with contingencies and uniqueness of each investigation; decision making, including under pressure; supervising and evaluating staff both in the office and in the field; providing support and essential information for internal personnel including Board members, the Managing Director and other executives and managerial staff , supervisors, investigators, report writers, and administrative personnel and external personnel including the transportation mode regulator (e.g. FAA and USCG), Party representatives (e.g. Cruise ship owners) Congressional staff, and, in the case of international/foreign investigations, State Department and foreign government officials, and in the case of public/non public investigations, Department of Defense officials; developing, establishing, and assuring fulfillment through supervision and oversight of multiple processes for accident investigation from accident/incident notification through report development; reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission, communication of results, collaboration with internal and external professionals; complying with all rules, regulations, and guidelines that apply to human and monetary resource management; and conducting business on a year round 24 hour/ 7 day schedule.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 10**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar responsibilities required for that employee's position as compared to the responsibilities required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 10:** Plaintiff objects to this Interrogatory based on the general objections above and on the grounds that it is overbroad, unduly vague and burdensome. Subject to and without waiving any objection, Plaintiff states the responsibilities(s) required for OAS, OMS, ORPH and OHS were all similar. Each Modal Office Director and, where applicable, Haueter, was responsible for managing a major modal program for the agency: conducting accident investigations to determine their cause and preparing justifications for safety recommendations to prevent accident repetition in the future; overseeing the analysis, development and preparation of detailed reports and proposing probable cause determinations of major and field accidents and incidents; preparing accident investigation reports in a timely manner; preparing Special Investigations, responses to proposed rulemakings, responses to requests for technical support, and Public Hearings. Each Modal Office Director, and, where applicable, Haueter, was responsible for "getting it right." The impact of each investigation, report, probable cause determination, and safety recommendations was of such a high profile, with serious implications for every aspect of the public's safety and the modal industry's corporate health that not "getting it right" was not an option.

Each Modal Director and, where applicable, Haueter was also responsible for exercising his/her delegated authority to determine the probable cause of selected accidents. This unique authority was delegated by the Board only to the Modal Office Directors.

OAS and OMS also conduct international investigations, and represent the United States and NTSB at United Nations conferences. OMS was also responsible for preparing international

accident investigation reports. OAS and OMS were each responsible for comparable accident investigation and report preparation for military/public accidents. OMS was additionally responsible for assuring that standing subpoena authority, which was issued only to OMS investigators, was judiciously and effectively exercised. Moreover, Plaintiff carried out the duties and responsibilities of MacIntosh, including the coordinating responses to international accidents, participating in international non-governmental organizations, working with other federal agencies, international coordination work, and maintaining liaison with the international transportation industry.

Additionally, the list of responsibilities included but was not limited to management responsibilities related to internal and external communications (e.g. keeping the Chairman, other Board members, the Managing Director, other agency executives and managers, Party representatives and Congressional members and staff, informed either verbally and/or in writing.) human resources (e.g. managing modal professionals, recruiting and hiring personnel, supervising, training and tracking career goals and progression, developing performance standards and evaluating personnel; tracking leave and overtime); budget management (e.g. exercising budget authority, using funds for training, travel, overtime, and on-scene investigation support); project tracking and quality control of all Modal Office products.

Plaintiff reserves the right to modify, amend or supplement her responses to this Interrogatory accordingly.

**Interrogatory No. 11**

For each employee you identified in response to Interrogatory No. 5, provide a detailed description of the same or similar working conditions required for that employee's position as compared to the working conditions required for your position as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 11:** Plaintiff objects to this Interrogatory based

on the above general objections, and on the grounds that it is overbroad, unduly vague, and burdensome. Subject to and without waiving the objections, Plaintiff states that the working conditions required for Osterman, Haueter, MacIntosh, Chipkevich, Spencer, and Clark were all the same or similar. Each worked primarily in an office environment using electronic devices, computers and telephones for communication. The critical nature of each Director's work requires him/her to be available 24 hours a day; seven days a week in case of an accident that requires an investigation. Each Office Director was expected to deal effectively with the pressure of accident launches, the on-scene investigation phase including coordination and collaboration with internal and external staff, subsequent analysis and report preparation stage, preparation of written and oral communications and presentation to the Board and to the public.

With the exception of Haueter who reported to Clark, each Director reported directly to the Managing Director; their second level supervisor was the Chairman. Each of the Office Directors was relatively independent to do their work, which encompassed each of the items cited in Plaintiff's Answer to Interrogatories 7, 8, 9 and 10.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

Interrogatory No. 12

For each employee you identified in response to Interrogatory No. 5, identify all NTSB officials or employees who you contend were responsible for setting his rate of pay during the time period of your tenure as the Director of OMS.

**Plaintiff's Answer to Interrogatory No. 12:** Plaintiff objects to this Interrogatory based on the general objections above, and on the grounds that it is overbroad, unduly vague as it is unclear what is meant by "officials." Subject to and without waiving this General and aforementioned objections, Plaintiff states that she believes the financial compensation,

including the pay classifications, pay rates and awards for modal office directors is determined by the NTSB Chairman, in consultation with the managing director.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 13**

Identify all NTSB officials or employees who you contend were responsible for setting your rate of pay during your tenure as the Director of OMS. Include in your response what you contend you should have been paid during your tenure as the Director of OMS and every fact you rely upon to support this contention.

**Plaintiff's Answer to Interrogatory No. 13:** Plaintiff objects to this Interrogatory based on the general objections above, and on the basis that it is vague. Subject to and without waiving any objection Plaintiff incorporates her response to Interrogatory No. 12 and refers to Dan Campbell and Ellen Engleman Conners. Plaintiff also states that she should have been paid and compensated the same as the other male comparators, however that should be accomplished through the rules pertaining to civil servant employees, e.g. through awards, by providing SES status to the OMS position when SES slots became available, by using an SL position, as they had in the past to compensate other senior level employees, for pay over the GS-15 salary level, by providing overtime to reflect the work she did as director which was similar to her male counter parts that were being paid more for doing work that required the same skills, effort and responsibilities, bonuses and awards, or any other appropriate mechanism. Plaintiff refers Defendant to her expert witness's report pursuant to Rule 26(a)(2). Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 14**

Describe and identify each and every conversation (oral or written) you had with any NTSB employees or officials regarding your compensation, including, but not limited to, your allegations of unequal pay. For each oral or written communication you had, include in your response the date oral or written communication occurred, a detailed description of the oral or written communication, and who, if anyone, saw the communication (if written), or heard the communication (if oral).

**Plaintiff's Answer to Defendant's Interrogatory No. 14:** Plaintiff objects to this Interrogatory based on the general objections above, and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Subject to and without waiving this objection Plaintiff states that the following individuals, and those that they would have communicated with about Plaintiff's concerns, were aware of Plaintiff's compensation and unequal pay based on the investigation to her EEO complaint and their position as managers and human resources officers with access to this information, plaintiff also incorporates all previous interrogatories in her answer to this interrogatory:

1. Chester Fisher after February of 2005 - NTSB EEO counselor with whom plaintiff communicated about unequal pay and other discriminatory practices at the NTSB.
2. Collette Magwood – former Assistant Director of Human Resources with whom Plaintiff spoke, beginning in April of 2004, regarding her compensation and unequal pay. Lisa Love was present. (301) 713-6364. Colette.Magwood@noaa.gov.
3. Gary Halbert – NTSB General Counsel with whom Plaintiff spoke in the early part of 2006. Halbert has knowledge of the basis for Plaintiff's equal pay and discrimination claim.

4. Ellen Engleman Connors, former Chairman, NTSB, with whom Plaintiff spoke on April 9, 2004, at the meeting in which she requested equal pay. Federal Communications Commission, 445 12th Street SW, Washington, DC 20554.

5. David Clark, Special Assistant to Ellen Engleman Connors, was present at the meeting with Ellen Engleman Conners on April 9, 2004, during which Plaintiff notified Englemen Conners of the lack of Equal Pay.

6. Daniel Campbell, Managing Director, NTSB, with whom Plaintiff spoke in 2003 and 2004 regarding the disparity in pay between Plaintiff and her male counterparts. Joe Osterman was present.

7. Lisa Love, Director, Human Resources Division, with whom Plaintiff spoke as early as 2003 and throughout 2004 regarding her unequal pay. In follow-up to the meeting with Englemen Conners, Plaintiff met with Lisa Love and Colette Magwood regarding the possibility of obtaining overtime pay and the re-advertisement of the OMS Director position at the SES level.

8. Fara Guest, EEO Officer, in 2003 and throughout 2004 and 2005 regarding Plaintiff's unequal pay.

9. Joe Osterman, former Director, OHS and current Managing Director, NTSB. Osterman shared Plaintiff's concerns regarding pay for comparable work. Plaintiff met with Campbell on several occasions prior to 2004 to discuss the inequity of her situation. During one such meeting with Campbell and Osterman, Osterman raised the issue of pay for doing the same job as Clark and Chipkevitch. Campbell said that they were requesting SES positions. Osterman stated he didn't care about being an SES; it was the money he was concerned with. Plaintiff concurred with Osterman. Campbell indicated he understood. Plaintiff also

spoke to Osterman shortly after the recruitment closed for the SES – OHS Director Position. Osterman stated that he had been promised the position but agreed that OMS was also an SES level position.

10. Ron Battocchi, former General Counsel, NTSB with whom Plaintiff spoke on January 3 of 2005. 5900 Fourth Road North, Arlington, VA 22203.
11. Carol Carmody – Former Member of the Board, former acting chairman of the Board, in 2005. Spoke with Plaintiff regarding treatment of Plaintiff at the agency. Telephone number: (202) 686-5579.
12. Julie Beale. 981 Bay Dr., Deale, MD 20751. Spoke with Plaintiff at various times from 2003 to 2006 regarding her lack of equity with her male counterparts. Spoke with Plaintiff in 2005 regarding her status at NTSB.
13. Bruce Magladry, current Director, OHS. Spoke with Plaintiff in 2005 when he was serving as the Acting Director, OHS and complained that he was not being paid as an SES. Plaintiff told him "welcome to the club".
14. Barry Strauch, currently an NTSB employee in OMS. Spoke with Plaintiff in 2004 regarding his desire to become an SES employee and seeking Plaintiff's advice. Plaintiff clarified her status as a non-SES and non-SES earning employee.
15. Don Tyrrell, retired from OMS and NTSB. Telephone number 703-670-8851. Spoke with Plaintiff in 2005 regarding her status.
16. Jim Scheffer, current manager in OMS. Spoke with Plaintiff in 2005 regarding her status.
17. Chris Julius, current manager in OMS. Spoke with Plaintiff in the 2003 – 2004 time periods during the Staten Island Ferry accident investigation, when he

referred to her as an SES employee. Plaintiff clarified her status as a non-SES and non-SES earning employee.

Plaintiff incorporates responses to Interrogatories 3 and 4.

All responsive documents were produced with Plaintiff's initial disclosures.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 15**

Identify each and every fact to support any contention by you that the position of Director of OMS should have been an SES-level position.

**Plaintiff's Answer to Interrogatory No. 15:** Plaintiff objects to this Interrogatory on the on the general objections above, and grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation.

Subject to and without waiving any objections herein, Plaintiff states that Dan Campbell's letter dated July 17, 2001 to the Office of Personal Management also explains why the OMS director position should be an SES level position. See also the affidavit of Ellen Engleman Conners. The documents are contained in the EEOC Investigative Report produced by Defendant. See also the July 18, 2003 letter by Mr. Campbell to the Office of Personnel Management asserting the basis for making the OMS director position an SES level position. Further, numerous SES slots have been allocated to NTSB since 1998 and the agency decided not to designate the slot to the Office of Marine Safety for unclear reasons. See also the Senior Executive Service Chart included with the documents that are contained in the EEOC Investigative Report produced by Defendant.

Plaintiff hereby incorporates her response to Interrogatories 2, 5, 6, 7, 8, 9, 10, and 11.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 16**

Identify each and every fact to support any contention by you that the position of Director of OMS should have become an SES-level position prior to the positions of Director of ORPH or Director of OHS.

**Plaintiff's Answer to Interrogatory No. 16:** Plaintiff objects to this Interrogatory based on the general objections above. Subject to and without waiving the objections, Plaintiff states that information related to 2000, when ORPH was awarded SES status has not yet been produced by Defendant. However, with regard to OHS, The Safety Board had additional SES slots available several years earlier than the 2004 announcement for an SES Director. NTSB chose to assign them to new positions rather than to the OMS. See the Senior Executive Service Chart included with the documents that are contained in the EEOC Investigative Report produced by Defendant. Subject to and without waiving any objections herein, Plaintiff states that Dan Campbell's letter dated July 17, 2001 to the Office of Personal Management also explains why the OMS director position should be an SES level position. See also the affidavit of Ellen Engleman Conners. The documents are contained in the EEOC Investigative Report produced by Defendant. See also the July 18, 2003 letter by Mr. Campbell to the Office of Personnel Management asserting the basis for making the OMS director position should be an SES level position.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 17**

Identify each and every fact to support any contention by you that the NTSB could or should have promoted you to SL or provided you with overtime pay.

<u>**Plaintiff's Answer to Interrogatory No. 17:**</u> Plaintiff objects to this Interrogatory based on the general objections above, and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Plaintiff further objects because these are two separate interrogatories that are not related and should be counted as such. Subject to and without waiving this objection Plaintiff incorporates her responses all of her previous interrogatories in this answer.

Subsequent to meeting with Ellen Engleman Conners in April 2004, Plaintiff met with Lisa Love in Human Resources who verified that Plaintiff was eligible for overtime. Moreover, as noted in her affidavit to the EEOC, Engleman Conners refused to meet with Plaintiff regarding this issue. Additionally, plaintiff was eligible for overtime based on 5 U.S.C. § 5547 (a) and 5 CFR § 550 et seq. Support for the matters addressed in this paragraph have been provided in Plaintiff's initial disclosures and in the EEOC Investigative Report produced to Plaintiff by Defendant.

The agency had used the 'SL' position in the past to compensate GS-15's for compensation above the GS-15 level. Moreover, the agency had discretion to seek and determine the qualifications for the SL position. See 5 C.F.R. §§ 319.301-02. This position is further supported by NTSB's Merit Systems Plan, which Defendant produced to Plaintiff. Plaintiff's extensive naval architecture background, ship-based experience, extensive accident investigation experience, negotiating and international experiences, and other key experiences qualified her for a SL slot. Further, Osterman even suggested it in 2005.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 18**

Identify each and every fact to support your contention in paragraph 12 of the complaint that Dan Campbell suggested to James Hall that Robert Chipkevich "be given the SES slot because Chipkevich supposedly had the most seniority of the three directors and because ORPH was the most complex of the three offices."

**Plaintiff's Answer to Interrogatory No. 18:**

Plaintiff states see Dan Campbell's signed affidavit page 2 of 8 of the EEOC Investigative Report, which defendant produced for Plaintiff.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatories accordingly.

**Interrogatory No. 19**

Identify all NTSB officials and employees who you contend were responsible for allocating available SES slots between 2000 and 2006.

**Plaintiff's Answer to Interrogatory No. 19:** Plaintiff objects to this Interrogatory based on the general objections above and on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation. Subject to and without waiving this objection Plaintiff states that the NTSB Chairman, in consultation with the managing director, and employees in the office of human resources, were responsible for allocating available SES slots between 2000 and 20006. Additionally, Plaintiff incorporates her response to Interrogatory No. 15.

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

<u>**Interrogatory No. 20**</u>

Identify each and every investigative report completed by OMS from 2000-2004.

<u>**Plaintiff's Answer to Interrogatory No. 20:**</u> Plaintiff objects to this Interrogatory based on the general objections above and based on the grounds that it is overbroad, unduly vague, and burdensome. For example, it is unclear what is meant by "investigative report" and "completed." Further, only some of the information is publicly available, while other information, which is not accounted for below, is not.

Subject to and without waiving the General and this aforementioned objection, Plaintiff states that she does not have access to the Board's intranet or notation files to properly respond to this question. This is the subject of a Discovery request from Plaintiff. Plaintiff further states as follows:

- **Title:** Marine Accident Report: Fire On Board U.S. Small Passenger Vessel Express Shuttle II, Pithlachascotee River Near Port Richey, Florida, October 17, 2004 **NTSB Report Number:** MAR-06-02, adopted on 4/4/2006

- **Title:** Marine Accident Report: Capsizing of U.S. Small Passenger Vessel Lady D, Northwest Harbor, Baltimore, Maryland, March 6, 2004 **NTSB Report Number:** MAR-06-01, adopted on 3/7/2006

- **Title:** Sinking of Uninspected Small Passenger Vessel *Sydney Mae II* in Pacific Ocean at Entrance to Winchester Bay, Oregon, September 19, 2005 **NTSB Report Number:** MAB-05-04, adopted on 12/15/2005

- **Title:** Heavy-Weather Damage to Bahamas-Flag Passenger Vessel *Norwegian Dawn*, Atlantic Ocean, 120 Miles East of Charleston, South Carolina, April 16, 2005 **NTSB Report Number:** MAB-05-03, adopted on 11/30/2005

- **Title:** Grounding of the Alaska Marine Highway System Ferry *LeConte* Near Sitka, Alaska, May 10, 2004 **NTSB Report Number:** MAB-05-02, adopted on 7/28/2005

- **Title:** Collision between the U.S. Navy Submarine USS *Greeneville* and Japanese Motor Vessel *Ehime Maru* Near Oahu, Hawaii, February 9, 2001 **NTSB Report Number:** MAB-05-01, adopted on 9/29/2005

- **Title:** Marine Accident Report: Capsizing of U.S. Small Passenger Vessel *Taki-Tooo*, Tillamook Bay Inlet, Oregon, June 14, 2003 **NTSB Report Number:** MAR-05-02,

adopted on 6/28/2005

- **Title:** Allision of Staten Island Ferry *Andrew J. Barberi*, St. George, Staten Island, New York, October 15, 2003 **NTSB Report Number:** MAR-05-01, adopted on 3/8/2005

- **Title:** Highway/Marine Accident Report: U.S. Towboat *Robert Y. Love* Allision With Interstate 40 Highway Bridge Near Webbers Falls, Oklahoma May 26, 2002 **NTSB Report Number:** HAR-04-05, adopted on 8/31/2004

- **Title:** Marine Accident Brief: Engineroom Fire on the U.S. Passenger Vessel *Columbia* in Wrangell Narrows Near Wrangell, Alaska, May 28, 2003 **NTSB Report Number:** MAB-04-02, adopted on 4/19/2004

- **Title:** Grounding and Sinking of U.S. Passenger Vessel *Safari Spirit*, Kisameet Bay off Fisher Channel, about 20 miles Southeast of the Towns of Bella Bella and Shearwater, Denny Island, British Columbia, Canada on May 8, 2003 **NTSB Report Number:** MAB-04-01, adopted on 4/22/2004

- **Title:** Sinking of the U.S. Small Passenger Vessel *Panther* Near Everglades City, Florida, December 30, 2002 **NTSB Report Number:** MAR-04-01, adopted on 3/9/2004

- **Title:** Collision Between the U.S. Coast Guard Patrol Boat *CG242513* and the U.S. Small Passenger Vessel *Bayside Blaster*, Biscayne Bay, Florida, January 12, 2002 **NTSB Report Number:** MAR-02-05, adopted on 12/17/2002

- **Title:** Grounding of the Small Passenger Vessel *Finest* at Sandy Hook, New Jersey, January 4, 2001. **NTSB Report Number:** MAR-02-03, adopted on 9/17/2002

- **Title:** Fire On Board the Small Commuter Vessel *Seastreak New York* at Sandy Hook, New Jersey, September 28, 2001. **NTSB Report Number:** MAR-02-04, adopted on 9/17/2002

- **Title:** Marine Accident Report: Fire on Board the Small Passenger Vessel *Port Imperial Manhattan*, Hudson River, New York City, New York, November 17, 2000 **NTSB Report Number:** MAR-02-02, adopted on 6/11/2002

- **Title:** Marine Accident Report: Sinking of the Amphibious Passenger Vessel *Miss Majestic*, Lake Hamilton Near Hot Springs, Arkansas, May 1, 1999 **NTSB Report Number:** MAR-02-01, adopted on 4/2/2002

- **Title:** Marine Accident Report: Fire On Board the U.S. Passenger Ferry *Columbia*, Chatham Strait near Juneau, Alaska, June 6, 2000 **NTSB Report Number:** MAR-01-02, adopted on 9/18/2001

- **Title:** Marine Accident Brief Report: Fire on Board the Netherlands-Registered Passenger Ship *Nieuw Amsterdam* at Glacier Bay, Alaska, May 23, 2000 **NTSB Report Number:** MBR-01-01, adopted on 7/24/2001

- **Title:** Marine Accident Brief: Collision of U.S. Towboat *Christine Cenac*, U.S. Tank Barge *CTCO 211*, and U.S. Towboat *American Heritage*, Lower Mississippi River near Donaldsonville, Louisiana, January 28, 1998 **NTSB Report Number:** MAB-01-03, adopted on 8/21/2001

- **Title:** Marine Accident Brief: Collision of Liberian Containership *Columbus Canada* and U.S. Fishing Vessel *Black Sheep*, Gulf of Mexico near Galveston, Texas, December 21, 1998 **NTSB Report Number:** MAB-01-04, adopted on 8/22/2001

- **Title:** Marine Accident Brief: Sinking of the U.S. fishing vessel *Miss Penelope*, South of Montauk, New York, January 28, 1998 **NTSB Report Number:** MAB-01-02, adopted on 8/3/2001

- **Title:** Marine Accident Report: Fire On Board Liberian Passenger Ship *Ecstasy*, Miami, Florida, July 20, 1998 **NTSB Report Number:** MAR-01-01, adopted on 5/1/2001

- **Title:** Marine Accident Brief: Collision of Two Recreational Motorboats on the St. Croix River near Bayport, Minnesota, July 3, 1999 **NTSB Report Number:** MAB-01-01, adopted on 5/9/2001

- **Title:** Marine Accident Report: Ramming of the Eads Bridge by Barges in Tow of the M/V *Anne Holly* with Subsequent Ramming and Near Breakaway of the *President Casino on the Admiral*, St. Louis Harbor, Missouri, April 4, 1998 **NTSB Report Number:** MAR-00-01, adopted on 9/8/2000

Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

**Interrogatory No. 21**

Identify each and every document retained by you related to your employment with the NTSB, including, but not limited to, personnel, accident, mission, and project-related documents.

**Plaintiff's Answer to Interrogatory No. 21:** Plaintiff objects to this Request on the grounds that it is overbroad, unduly vague and calls for information that is protected by the attorney-client privilege and/or work product doctrine and that was prepared in anticipation of litigation, and is burdensome. Subject to and without waiving this objection, Plaintiff states see her initial disclosures provided to Defendant's on April 5, 2007 and responses to Defendant's

first set of requests for production of documents. Plaintiff reserves the right to modify, amend or supplement her response to this Interrogatory accordingly.

Respectfully Submitted,
By Counsel

/s/ Brian M. Lowinger

R. Scott OswaldBrian M. LowingerThe Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
blowinger@employmentlawgroup.net
*Counsel for Plaintiff*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 19, 2007, the foregoing Responses to Defendant's First Set of Interrogatories was served electronically upon the following attorney of record and by United States Mail:

Meredyth D. Cohen, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L St., N.W., Room 12016
Washington, D.C. 20530
Phone: (202) 353-7978
Fax: (202) 514-8624
meredyth.cohen@usdoj.gov

/s/ Brian M. Lowinger
Brian M. Lowinger

VERIFICATION

I, Marjorie Murtagh Cooke, declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

Marjorie Murtagh Cooke

000001

# NATIONAL TRANSPORTATION SAFETY BOARD

## REPORT OF INVESTIGATION

### I. DESCRIPTION OF COMPLAINT

| | |
|---|---|
| Name of Complainant: | Marjorie M. Murtagh<br>Case Number NTSB-2005-02 |
| Title and Grade of Complainant's Position: | Director, Office of Marine Safety<br>GS-1801-15/10 |
| Name and Location of Agency and Unit Involved in Complaint: | Office of Marine Safety<br>National Transportation Safety Board |
| Date of Alleged Discrimination: | January 28, 2005 |
| Kind of Discrimination Alleged: | Sex |
| Nature of Action, Decision, or Condition Giving Rise to Complaint: | Pay discrimination; unequal employment conditions |

### II. DESCRIPTION OF INVESTIGATION

| | |
|---|---|
| Identity of Investigator: | Paul Greenberg<br>DSZ<br>1730 N. Lynn Street, Suite 601<br>Arlington, Virginia 22209 |
| Date Report of Investigation Submitted to Agency: | December 6, 2005 |
| Place of Investigation: | Washington, DC |
| Dates of Investigation: | August 26, 2005 to December 1, 2005 |
| Method of Investigation: | On-site Interviews |

000002

## III. DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

Complainant alleges she was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she has received less compensation than the compensation received by similarly situated male Office Directors. Corning Glass Works v. Brennan, 417 U.S. 188 (1974); Goodrich v. International Brotherhood of Electrical Workers, 815 F.2d 1519 (D.C. Cir. 1987).

Complainant also alleges she was treated disparately based upon sex when on January 3, 2005, she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

## IV. SUMMARY

*The pay disparity issue*

From 1994 until 2005, Complainant (female) served as the head of the NTSB's Office of Marine Safety (OMS). The position was classified and paid as a GS-15 job throughout this period (Exhibit F2).

Between 1994 and 1997/98, OMS was a unit within NTSB's Office of Surface Transportation Safety, and Complainant's title was Chief. As part of a restructuring in 1997/98, the Office of Surface Transportation Safety was divided into four separate Offices: Highway Safety (OHS), Railroad Safety, Marine Safety, and Pipeline and Hazardous Materials Safety. Each Modal Office had a Director, initially paid at the GS-15 level (Exhibits F2, F3). Throughout this period, NTSB's Office of Aviation Safety existed as a separate unit (Exhibit F3).

Dan Campbell (male) served as NTSB's Managing Director (an SES position) from 2000 until 2005, and was Complainant's immediate superior during this period. According to Mr. Campbell, the position of Director of the pre-1998 Office of Surface Transportation Safety was classified as an SES job, and there may have been one other SES slot within the OST structure. When OST was divided – initially into four surface Modal Offices – NTSB made a request to the Office of Personnel Management (OPM) for additional SES slots so that each of the surface Modal Office Directors could be classified and paid at the SES level. However, OPM denied NTSB's request. As a result, the Agency did not have SES positions available to classify the surface Modal Office Directors at the SES level, and each of the four Directors were classified and paid at the GS-15 level. The persons filling these four positions were Joe Osterman (Highway Safety)(male), Bob Lauby (Railroad Safety)(male), Bob Chipkevich (Pipeline and Hazardous Materials Safety)(male), and Complainant Marjorie Murtagh (Marine Safety)(female). Later, the Railroad Safety and Pipeline and Hazardous Materials

000003

Safety Offices were merged to form the Office of Railroad, Pipeline and Hazardous Materials Safety (RPH) (Exhibit F3).

Sometime after 2000, an SES employee at the NTSB retired and an SES slot therefore became available to the Agency. Mr. Campbell recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of Director, Office of Railroad, Pipeline and Hazardous Materials Safety (RPH). This position was occupied by Bob Chipkevich. Mr. Campbell explains he made this recommendation because Mr. Chipkevich was the most senior of the surface Modal Office Directors and because RPH was the most complex of the three surface Modal Offices. Although Chairman Hall initially was inclined to assign the SES slot to the Director of Highway Safety position because of its greater visibility, Mr. Campbell explains Chairman Hall ultimately accepted the recommendation and the RPH position became an SES job (Exhibit F3).

Around 2003, an SES position was eliminated at the NTSB Academy after the then-office holder voluntarily left the Agency, which made an additional SES slot available. NTSB leadership assigned this SES slot to the position of Director, Office of Highway Safety, which was encumbered by Joe Osterman. In 2004, NTSB received authorization from OPM for an addition Senior Executive Service position, which was assigned to the Director, Office of Marine Safety job. Mr. Campbell notes it always was the Agency's goal to elevate all the surface Modal Office Directors to the SES level, and if OPM had authorized enough SES slots when requested after the 1997/98 reorganization, all the positions would have been reclassified and the Director positions advertised at the SES level. However, because OPM did not authorize the requested SES slots, the process took place gradually both by gaining new slots from OPM and by reassigning slots from elsewhere within the NTSB (Exhibit F3).

Complainant states the authority, responsibilities and functions of the Modal Office Directors are all very similar and are described in the Code of Federal Regulations. Position Descriptions for the various Director jobs are included as attachments to Complainant's affidavit, Exhibit F2. In Complainant's view, the responsibilities for the Marine Safety and Aviation Safety Directors are most similar because both Offices have duties related to international accident investigations as well as investigations of both public and non-public accidents. As the Director of OMS, Complainant was responsible for initiating and overseeing the investigations of marine accidents, major and non-major (field investigations and incidents), domestic and international, those involving public and non-public vessels, as well as those involving claims of government malfeasance and Special Investigation reports. It was also her responsibility to oversee the factual documentation, analysis, development and preparation of detailed reports, including the drafting of conclusions, probable cause and recommendations. She notes that while the Board itself has ultimate authority to determine probable cause in transportation accidents, since 1998 the Board has delegated this authority to the Modal Office Directors when they issue the accident report as a "Brief Report of Accident." Complainant states that as OMS Director she also was responsible for preparing responses to proposed marine safety rulemakings and requests for technical support,

000004

both internal and external, including the technical details for development of contracts issued by the NTSB (Exhibit F2).

Complainant believes pay classifications, pay rates and awards for Office Directors are determined by the NTSB Chairman, in consultation with the Managing Director. Between March 2003 and March 2005 the NTSB Chairman was Ellen Engleman Conners (female). Dan Campbell was the Managing Director during this period. *Id.*

Complainant states she met with Chairman Engleman Conners in April 2004 to discuss concerns about her compensation. She reminded Chairman Engleman Conners that she (Complainant) was being paid as a GS-15, and therefore was not receiving pay and awards comparable to her male counterparts who were NTSB Office Directors, all of whom were male. In addition, Complainant noted there even were some Deputy Directors at the NTSB who were classified and paid as SES members. Complainant indicated she wanted to find an equitable way to resolve this issue of pay disparity. According to Complainant, Chairman Engleman Conners emphasized the Agency was working hard to get an additional SES slot approved, which would be assigned to the OMS Director position; however, if the slot was granted, Chairman Engleman Conners noted the position would need to advertised and competed at the SES level. *Id.*

Complainant indicates she made it clear to Chairman Engleman Conners that her primary concern was to be compensated at the same level as the other Office Directors, rather than receive the SES classification *per se*. Complainant suggested that greater parity would be achieved if the Agency paid her (Complainant) overtime. Complainant noted the overtime payment would help close the pay gap between herself and the male Office Directors, and also would be helpful toward achieving her "high three" salary levels for calculating pension benefits. According to Complainant, Chairman Engleman Conners expressed doubts that overtime pay was possible, but committed to exploring the issue with Human Resources and she would consider it. Complainant states she had no further meetings about compensation with Chairman Engleman Conners after April 2004, and that she was not granted overtime pay nor did she receive bonuses comparable to the male Office Directors. Further, Chairman Engleman Conners did not respond to further attempts by Complainant to meet for further discussions about pay parity. *Id.*

Separately, Complainant states she spoke with Human Resources Director Lisa Love (female) about the overtime question. Complainant states Ms. Love advised her there were no OPM barriers to paying Complainant overtime, but the Chairman would need to approve such overtime. *Id.*

Complainant notes the substantial disparities between her compensation and that of the other [male] Office Directors, and alleges the pay disparities extend back at least seven years. She notes the Director, Office of Aviation Safety (the position she alleges is most comparable to her own) and the Director, Office of Railroad, Pipeline and Hazardous Materials Safety received annual pay more than $20,000 greater than she received, and triple the amount of bonus pay given her. In addition, even the Office of Highway Safety

000005

Director – also a GS-15 position until 2004 – was paid $12,000 more than a GS-15 in 2003. The OHS Director received about $14,000 more pay in 2003 than Complainant. *Id.*

Complainant states she has received exceptional performance evaluations throughout her tenure with the Agency, and most recently received an Outstanding rating from Managing Director Campbell and the reviewing official, Chairman Engleman Conners. In Complainant's view, the positions of the Modal Office Directors are comparable and she (Complainant) has successfully performed her work as the OMS Director. In Complainant's view, the only explanation for the lower level of compensation she has received is her gender. *Id.*

Complainant disputes the Agency's claim that Complainant's classification and pay were not elevated to the SES level because of a lack of SES slots. She notes that even without changing the classification of the OMS position, greater pay parity could have been achieved through overtime or bonuses. Complainant believes the Agency deliberately chose not to use these tools. Further, she asserts the Agency has received additional SES slots since 1998 but simply chose not to assign one of them to the OMS Director job. She notes the position of Deputy Director of the Office of Research and Engineering – an SES position – was advertised and filled at least three times since 1998. The persons hired into the position were all male. When the Deputy Directors were reassigned to new positions, they retained their pay in accordance with federal requirements. *Id.*

Complainant concedes that OMS was a smaller office than the other Modal Offices, but asserts her job function was equal to that of the other Modal Directors and merited equal pay. Further, she argues her Office had fewer staff members in part because the Agency was depriving her of staff resources needed to do her job (*see "denial of authority to fill vacant positions issue"* discussion, *infra*). Moreover, she notes that the classification of a position as eligible for SES pay is based on duties, level of responsibility and function, not on the number of staff supervised. *Id.*

The OMS Director position was advertised as an SES position early in 2005. Complainant applied for the position but was not among the candidates interviewed. Another candidate, John Spencer (male) was hired into the OMS Director position at the SES level. *Id.*

The statements of three management witnesses – Chairman Engleman Conners, Managing Director Campbell, and then-OHS Director Joseph Osterman[1] (male) – generally concur with the facts provided by Complainant regarding pay classification history and compensation. However, they uniformly deny Complainant's lower compensation (compared with other [male] Office Directors) was the result of gender-based pay discrimination, asserting the order for elevating the surface Modal Office Directors to the SES level – RPH first, OHS second, and OMS third – was justifiable

---

[1] Joe Osterman succeeded Dan Campbell as NTSB Managing Director in March 2005.

000006

based on the size and responsibilities of the respective organization units. *See* Exhibits F3, F4 & F5.

While these Agency managers acknowledge there are similarities in the overall duties of the different Office Directors, each suggest there also are significant differences that justified the decision to make the OMS job the last Office Director position to be upgraded to SES classification and pay. Mr. Campbell notes that the RPH Director runs a larger organization than OMS and must be conversant in multiple disciplines. Similarly, the OHS Director runs a larger unit and has a much higher-profile job because of the great public interest in highway safety. He notes by comparison that NTSB shares jurisdiction for investigating commercial maritime activities with the U.S. Coast Guard, and that marine accidents are the one transportation mode where the NTSB is not the primary federal investigative authority. As a consequence, NTSB has a reduced ability to have significant effect on marine safety except for promoting better safety practices in the recreational boating area (Exhibit F3).

Mr. Campbell also disputes Complainant's claim that the OMS Director job is closely comparable to the Director, Office of Aviation Safety. He states Aviation Safety is at the core of the NTSB's mission, both from a budgetary standpoint as well as public recognition. Further, the number of times the Aviation Safety Office is called upon to perform an investigation is dramatically higher than OMS. He states OMS warranted a Director at the SES level, but that SES slots are a scarce resource and it made sense for OMS to be the last Modal Office to be upgraded. He does not recall Complainant complaining to him about when the OMS Director job would be reclassified as SES, nor did Complainant raise compensation issues with him. *Id.*

Although Mr. Campbell acknowledges OMS was the last of the Modal Office Director jobs to be upgraded to SES, he notes there are other SES positions at the NTSB that have been occupied by females. He notes there were at one time two female SES employees working at the NTSB Academy, although that number has been reduced to one, Director Julie Beal. The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female, as well as the Director of the Office of Administration, Lola Ward. These are both SES positions. *Id.*

Further, Mr. Campbell observes there were chronic problems with the pace and quality of work generated by OMS under Complainant's leadership. Attached to Mr. Campbell's affidavit is a copy of an employee exit interview conducted with a departing OMS employee in 2002. The departing employee had worked for NTSB for about one year in a cooperative program, but left for the private sector. The employee commented she was leaving because the progress of work in OMS was too slow and she was afraid it would affect her work ethic. *Id.*

Mr. Campbell confirms there are two offices with Deputy Directors paid at the SES level – the Office of Aviation Safety, and the Office of Research and Engineering. He states this practice goes back decades. He asserts the high-level Deputy positions are justifiable. With regard to OAS, this unit is central to the NTSB's work and has about

A163

000007

140 staff members, while the other Offices have only 20 to 40 staffers. Having an SES-level Deputy in Research and Engineering is justifiable because the Office is staffed with a relatively large number of higher-level engineers who have advanced degrees, and the unit performs sophisticated, technical work. *Id.*

Chairman Engleman Conners states she arrived at the NTSB after all Office Director positions had been raised to the SES level except OMS and Highway Safety. She defends the decision to convert the OHS position first, noting there are 43,000 highway deaths each year in contrast to several hundred marine deaths (Exhibit F4).

Chairman Engleman Conners confirms she was approached by Complainant about being paid overtime, but comments she felt Complainant's proposal was "slightly bizarre." Chairman Engleman Conners states she advised Complainant that the OMS Director position would be elevated to an SES position as soon as a slot became available, at which point Complainant could apply for the job. She states she made an inquiry about ways to raise Complainant's pay, speaking either with Managing Director Campbell or HR Director Lisa Love. *Id.*

Joe Osterman was Director of the Office of Highway Safety until early 2005, and is now the NTSB Managing Director. Mr. Osterman became a member of the SES early in 2003. Prior to 2005, he served on the NTSB's Executive Performance Review Board (EPRB), which is responsible for reviewing the ratings and awards for SES employees. As the Managing Director, he now chairs the EPRB (Exhibit F5).

Mr. Osterman reports that in 2004 then-Managing Director Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the Agency. The EPRB recommended the next SES assignment should be for the OMS Director position because OPM had allocated NTSB additional SES slots. The actual assignment of the SES position was done by the NTSB Chairman. *Id.*

Mr. Osterman's account of the history of the elevating the Modal Office Director positions to the SES – and the rationale for their order – is consistent with the accounts of the other management witnesses, *supra*. Although Mr .Osterman agrees with Complainant that the Office Director positions require similar skill and effort, and their core mission is similar, he states the Offices have differing levels of responsibility. For example, RPH has responsibility for two modes of transportation (railroads and pipelines), and also provides support for the other Offices for accidents involving hazardous materials. Additionally, RPH maintains regional offices, while some Offices do not. *Id.*

Mr. Osterman asserts that like RPH, the Office of Highway Safety maintains regional offices. Although OHS does not have similar support functions for the other Offices, it generates the majority of recommendations to Congress or to state legislatures for regulatory changes. Highway accidents account for more than 43,000 deaths per year, while all the other modes of transportation combined account for fewer than 3,000 deaths per year. He notes the Office of Marine Safety is smaller than the other Offices,

A164

000008

and does not have regional offices. OMS provides few support functions for the other Offices. Although OMS has a limited international responsibility, this work largely involves conferences. *Id.*

With regard to the question of gender bias in deciding the order in which the Director jobs would be raised to the SES level, Mr. Osterman notes that the RPH Office Director, Bob Chipkevich, became an SES member three years before his position (OHS Director) was raised to the SES. Mr. Osterman observes that he would have liked his job at Highway Safety elevated earlier, but he knew the rationale for the order of SES assignments. In his view, Complainant understood this rationale fully as well. *Id.*

Lisa Love, Director, Human Resources Division, Office of Administration (female) states responsibility within NTSB for setting pay for SES classifications is handled by the Managing Director, with guidance from SES Program Manager Colette Magwood. She describes the process through which agencies are allocated SES slots. Each year, OPM invites agencies to request SES allocations for the upcoming fiscal year. NTSB does not always receive the number of SES positions requested (Exhibit F6).

Ms. Love is aware that some Office Directors have been paid as SES employees, while others have been paid as GS-15s. She believes the reason for the disparity in classification was due to program complexity, scope and impact of the work, and the qualifications required to perform the job. In addition, the number of SES slots allocated by OPM is a factor. She does not view it as an anomaly that some Deputy Director positions might be classified as SES while there were still Office Director positions paid on the GS scale. *Id.*

With regard to Complainant's interest in receiving overtime compensation, Ms. Love states she is advised by HR Specialist Emily Carroll that the personnel regulations do not prevent payment of overtime based on grade, but there is an overall premium pay limitation based on the amount of salary received. The applicable premium pay/overtime limitation is the biweekly salary of a GS-15 step 10 or Level V of the Executive Schedule, whichever is higher. As long as an employee's salary is below the limitation, the employee is eligible to earn premium pay/overtime. It therefore is probable Complainant could be paid some overtime compensation. However, she would need to make arrangements for overtime with her supervisor. *Id.*

A table comparing the compensation among Office Directors is found at Exhibit F1.

*The "denial of authority to fill vacancies" issue*

Although the letter accepting Complainant's EEO charge focuses on a "denial of authority to fill vacancies in the Office of Marine Safety" that occurred January 3, 2005, Complainant states the January 2005 event was simply the latest in a series of similar experiences that has been on-going since 1998. Complainant asserts this pattern made it extremely difficult for OMS to apply necessary resources to its investigations and required her to work excessively long hours (Exhibit F2).

The January 2005 incident related to Complainant's effort to fill the position Marine Accident Investigator. The position was advertised, interviews were conducted and a selection was made in 2004. Complainant states that at the end of the process, Managing Director Campbell advised her she could not hire the selectee because he had applied for more than one job at the Agency. Specifically, in addition to applying for the Marine Accident Investigator position, the selectee also had applied for the OMS Director position that finally had been advertised as an SES job. According to Complainant, Campbell questioned the judgment of an applicant who had applied both for an investigator position in an Office while also applying for the most senior management position in the unit. Complainant states she was not concerned by this issue, and believes Mr. Campbell's explanation was implausible. *Id.*

In 2001, the Chief, Report Development Division, OMS, retired. Complainant states this was position was the head of a major division within OMS. The vacant position was advertised within NTSB, applicants were interviewed and Complainant made a selection. She forwarded the name of the selectee to Mr. Campbell, who then spoke directly with the selectee and decided she was unsuitable for the position. Complainant states she was prohibited from hiring a person into the position, and instead had to "make do" with the staff within her office. *Id.*

Also in 2001, Complainant reports Mr. Campbell placed a Human Performance Investigator from OMS on detail to OHS. This later became a permanent transfer. Complainant states she was prohibited from recruiting a replacement employee. *Id.*

In 2000, Complainant's Deputy Director left NTSB for a position at another agency. Although Complainant made numerous requests to fill the vacant Deputy Director position, she was not permitted to do so. As a result, OMS was the only Modal Office to operate without a Deputy. Complainant states her successor, current OMS Director Spencer, was assigned an Acting Deputy Director and has been given permission to hire a permanent Deputy Director. *Id.*

Complainant notes that in his statement to the EEO Counselor, Mr. Campbell suggested all the Office Directors were treated badly and cited the Agency's budget as prompting an overall drop in the number of positions at the NTSB. However, she attaches budget materials which she asserts support her claim that OMS was singled out for unfavorable treatment regarding staffing. Complainant states other male Office Directors were allowed to fill key slots and to increase the overall number of staff in their offices. She also states then-OHS Director Osterman would comment at meetings that his unit did not need more people and that OMS had a greater need for additional staff. *Id.*

Complainant asserts the repeated denial of opportunities for her to fill positions in her unit was discriminatory because Agency officials felt that if OMS was very small in size, the small size of the Office would in some way justify limiting the pay of its Director, who was female. She sees no reason other than sex discrimination that would explain why she was treated differently from her male counterparts in the other Modal Offices. *Id.*

000010

Former Managing Director Campbell admits Complainant was refused opportunities to fill some positions, but denies this was discriminatory behavior motivated by Complainant's sex. With regard to the Marine Accident Investigator position, Mr. Campbell confirms Complainant's statement that he (Campbell) felt it was strange to hire a mid-level Investigator into OMS who simultaneously was seeking to become the Director of the Office. He notes also that the OMS Director position was being competed, and he thought it would be fair to delay the hire so that if a new person was hired as Director, the Director would have a chance to hire his or her own person into the job (Exhibit F3).

Mr. Campbell also confirms he stopped the hire of a new OMS Chief of Report Development. He explains Complainant wanted to fill the position with a person already working within OMS. The selectee informed Campbell that she had applied for the position because she wanted to block another co-worker from getting the job because they were incompatible. Campbell states he knew the selectee, and while he viewed her as a good editor he did not believe she would be able to manage the investigators who are a key part of the report-generating process. Mr. Campbell states he already had bad experiences with OMS' report generating abilities, citing problems with the accident report into the Staten Island Ferry crash. Mr. Campbell states he had to plead with an investigator to stay with the project rather than quit, and ultimately Campbell lifted the investigation out of OMS and personally supervised the project from the Managing Director's office. *Id.*

Mr. Campbell did not have a specific recollection with regard to the OMS Deputy Director position. *Id.*

Mr. Campbell states he normally did not view it as his role to intervene when Office Directors such as Complainant wanted to make a hire. However, he felt Complainant did not demonstrate good judgment in her selections. He recalls he once received a visit from the NTSB ethics office concerning an applicant for an OMS position. The applicant had a background with cruise ships. He was hired, and subsequently quit under a cloud. Mr. Campbell feels this experience vindicated his doubts concerning Complainant's hiring judgment. *Id.*

Mr. Campbell denies Complainant was singled out in her ability to hire staff for her Office. He states Complainant was allowed to fill many vacancies in her unit. Further, he states staffing levels generally are down at the Agency. He believes Complainant probably was allowed to hire more employees than other Directors because her Office had a relatively high turnover rate. *Id.*

Chairman Engleman Conners states she probably had some role in limiting some of the hiring. After she arrived at the Agency in 2003, she asked all senior managers to consider prioritizing the filling of positions based on the vision for the Agency, rather than simply backfilling open positions. NTSB identified 73 positions in the Agency and began a prioritizing process. Early in 2004, it was decided that the first positions to be

A167

000011

filled would be openings on the regional aviation investigation teams. At that time, the Agency had about 426 employee and was expecting to drop to about 415 positions, then 411. To avoid a RIF situation, many open positions at the Agency were not being filled. Jobs that were being filled were priority slots that had been mandated by Congress. *Id.*

Chairman Engleman Conners notes other Office Directors also were unhappy they were denied authorization to fill vacant positions, citing specifically the Director of the Office of Research and Engineering, Verne Ellenstad. She denies Complainant's being denied opportunities to fill vacancies related to her gender. *Id.*

Joe Osterman moved from the Director, OHS, position to the Managing Director job around the period when Complainant was attempting to fill the Marine Accident Investigator position in early 2005. He states the candidate selected by Complainant for the position was mediocre, and that he (Osterman) was the person who denied Complainant authority to complete the hire. This action was taken with Mr. Campbell's concurrence (Exhibit F5).

In Mr. Osterman's view, the restrictions on Complainant's ability to hire were not unique, and she was not singled out because of her gender. He states that other Office Directors also were prohibited from making hires at various times. He states his own unit, the Office of Highway Safety, lost about six positions between 200 and 2005 when he was denied authorization to hire against vacancies. This was happening throughout the Agency. *Id.*

In specific response to Complainant's assertion that he (Osterman) made several comments suggesting that OMS had a greater need for staff than OHS, Mr. Osterman states the comment was not made quite the way Complainant suggests. He states all the Offices were short-handed in some manner.

*Additional materials*

Position descriptions for the Modal Director jobs are found as Exhibit F8. Performance ratings for Complainant and the employees to whom she compares herself are found as Exhibit F9. Tabulations showing positions filled in the Modal Offices are found as Exhibit F10.

## V. SURVEY OF THE GENERAL ENVIRONMENT

Position descriptions for the Office Director positions are found at Exhibit F8. As both the Complainant and Agency Managers acknowledge, there are significant similarities among the Office Director positions, as described. As discussed above, Agency Managers contend the differences between the jobs relate to a number of factors including the size of the Office's staff, number of investigations conducted, public visibility, support for investigations performed by other NTSB units, etc.

A comparison of compensation of the Modal Office Directors for 2003 and 2004 is found at Exhibit F1. The comparison shows that Modal Office Directors Clark, Osterman and Chipkevich (all male) received greater compensation (salary and bonus) than Complainant during both years. During 2003, each of the male Office Directors received at least $13,000 more in compensation than Complainant. During 2004, each of the male Office Directors received at least $14,000 more in compensation than Complainant.

A listing of positions filled by each of the Offices between January 2003 and January 2005 is round at Exhibit F10. During this period, four positions were filled in the Office of Marine Safety, two positions were filled in the Office of Railroad, Pipeline and Hazardous Materials Investigations, nine positions were filled in the Office of Research and Engineering, twenty-five positions were filled in the Office of Aviation Safety, and two positions were filled in the Office of Highway Safety.

# AFFIDAVIT OF DAN CAMPBELL

City: Washington

State: District of Columbia

I, **Dan Campbell**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

1. **Please identify your position with the NTSB, including your position title, series, grade, and organizational units (from smallest to largest)?**

I currently am the NTSB Executive Director, an SES position. I have been in this position since January 2005. Between 2000 and the beginning of 2005, I was the NTSB's Managing Director. Before that, I was the NTSB's General Counsel.

The Managing Director is a career SES position, and has delegated authority over personnel issues. Historically, the Executive Director's position has been a Schedule C appointment and has been more concerned with policy issues. I assumed the Executive Director position for a few months in anticipation of my upcoming retirement so that I could mentor my successor as Managing Director, Joe Osterman.

2. **Who currently are your first and second-level supervisors, by name and position title? Who were your supervisors in January 2005?**

I report to the NSTB Chairman. Since March 2005, this has been Acting Chairman Mark Rosenker. Prior to that time, I reported to then-Chairman Ellen Engleman Conners.



Initials [signature]

000138

3. **Please identify your gender.**

Male.

4. **Who determines the pay classifications for Office Directors at NTSB?**

With specific regard to the assignment of SES positions, I have not been a decision maker. There are a limited number of SES slots allocated to the Agency, and the Chairman makes the decision where they will be assigned. As the Managing Director, I was consulted about the assignments, but the decision was the Chairman's. We are a relatively small agency with only 400 employees.

By way of background, at one time NTSB had a single Office of Surface Transportation (OST), and a separate Office of Aviation Safety. The OST Director was an SES position, and there may have been one other SES position within OST. During the period when James Hall was NTSB Chairman, the Office of Surface Transportation was divided into four Offices: Marine Safety, Highway Safety, Railroad Safety and Pipeline & Hazardous Materials Safety. The thinking at that time was that the Agency would have a higher profile if there were individual Offices dedicated to each of the four surface transportation modes. However, when OST was split into four separate Modal Offices, we did not have enough SES slots to raise each Director job to the SES level. This was around 1999, during a period when I still was serving as General Counsel and did not follow the SES issue closely.

In June 1999, around the time I was promoted from General Counsel to Managing Director, we made a request to OPM to authorize SES slots for all of the Modal Office Directors. I do not believe OPM granted any part of this request. As a result, all four of the Office Directors – Joe Osterman (Highway Safety), Bob Lauby (Railroad Safety), Bob Chipkevich (Pipeline & Hazardous Materials Safety), and Marjorie Murtagh (Marine Safety) were classified and paid as GS-15 employees.

Because we had issues with productivity within the Railroad Safety Office, we decided to replace its first director. I felt that Bob Chipkevich was highly qualified and underutilized in the Pipeline & Hazardous Materials Safety Office, so we merged his unit with the Railroad Safety Office. The resulting Office of Railroad, Pipeline and Hazardous Materials Safety was the largest and most complex of the surface transportation Modal Offices.

When one of our SES employees at NTSB retired, in about 2000, and an SES slot therefore became available, I recommended that Mr. Chipkevich's position be redesignated as an SES position because he was the most senior of the Modal Office Directors and ran the most complex group. Chairman Hall's initial preference was for

 Initials ______

highway safety, as the responsibility of that office is so visible, with 40,000 deaths on the road annually. Ultimately Chairman Hall accepted my recommendation and the RPH Office Director position was raised to the SES level.

Around 2003, we eliminated on SES from the personnel structure at the NTSB Academy by abolishing the office of President of the Academy. (The incumbent separated voluntarily.) We assigned the recovered SES slot to the Director of Office of Highway Safety position. Like Ms. Murtagh's job at OMS, the OHS Director until this time had continued to be a GS-15 position. Keep in mind that NTSB at the outset had requested SES slots to elevate all the Modal Transportation Office Directors; if we had received authorization from OPM, we would have advertised all the Director positions as SES jobs and filled them at the SES level. However, we acquired the needed slots only gradually, both by gaining new slots from OPM and by reassigning one slot from elsewhere within the Agency.

In 2004, we received authorization for another SES slot from OPM, and we assigned it to the OMS Director job. The position was filled at the SES level earlier this year.

5. **Do some NTSB Offices have Deputy Directors who are classified as SES employees? If so, why would these Deputy Directors be SES members, while the Director of OMS would be paid on the GS scale?**

The NTSB has two offices that have SES-level Deputy Directors: the Office of Aviation Safety, and the Office of Research and Engineering. This practice goes back decades. The reasons for the SES Deputy Director positions in the two offices are slightly different.

For Research and Engineering, it is important to understand that ORE is staffed with a relatively large number of higher-level engineers who have advanced degrees such as a Ph.D. It is sophisticated, technical work, and both the Director and the Deputy Director historically have been SES employees.

Aviation Safety has long been viewed as central to the NTSB's work. It is by far our largest Office. OAS has about 140 staff members, while the other Offices have about 20 to 40 staff members. In addition, Aviation Safety is a very high visibility function. Given the size and importance of OAS to the NTSB's mission, it is understandable the Deputy Director traditionally has been paid at the SES level.

6. **Why would the OMS Director be paid on the GS scale while the other Modal Office Directors would be classified as SES employees?**

There are several reasons why it was justifiable to elevate the classification for the ORPH



Initials DC

and OHS Directors first, given the limitations on the number of SES positions available to the Agency.

An important factor is the significance of the undertaking within the respective offices. The RPH Director runs a larger organization than OMS, and also must be conversant in multiple disciplines. The OHS Director also runs a larger organization than OMS and has a much higher public profile because highway safety is a very visible matter of public concern.

By comparison, the role of OMS is not as large. Accident investigation jurisdiction over commercial maritime activities is a shared responsibility of NTSB and the Coast Guard. This is the only mode where NTSB is not the primary federal investigative authority for major transport accidents. Consequently, NTSB has a reduced ability to have a significant effect in the area of marine safety, except for promoting better safety practices in the recreational boating area.

7. **The Complainant has commented that the responsibilities of the OMS Director are virtually identical to the responsibilities of the other Office Directors, and require the same skill set. If this is the case, shouldn't the Office Directors receive the same compensation?**

Ms. Murtagh's argument about the comparability of skills is largely correct, but doesn't tell the whole story.

As I mentioned, the Railroad, Pipeline and Hazardous Materials Director needs to have a strong understanding of a broader range of transportation categories than the OMS Director. In addition, the Director needs to run the office, master the subject and be able to handle both external and internal responsibilities.

The skill set for the Aviation Safety Director may look similar on paper, but the number of times the Aviation Safety Director is called upon to perform investigations is dramatically higher than the Marine Safety Director. In truth, although all the Offices are important in their work, Aviation Safety is at the core of the NTSB's federal presence, from a budgetary standpoint, as well as from the standpoint of public recognition.

But I do believe OMS warrants an SES director. The issue for NTSB was always that of the allocation of a scarce resource. Of the modal offices, it was quite sensible to reach OMS last.

8. **Did the Complainant speak with you about her concerns regarding compensation? Please describe the conversation.**

I do not recall Ms. Murtagh complaining to me about when the OMS Director's position



Initials

000141

would be reclassified as an SES job. Nor did she ever raise compensation with me. Generally, it was understood that all the Office Director positions would be converted to SES jobs as SES slots were made available to the Agency.

9. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

See #5, above.

10. **Did any SES positions open in lower-tiered levels of the Agency that could have been transferred to the OMS Director's position?**

No. One that came open was used for Highway Safety.

I want to note that the Agency has senior female employees who are in the SES. For example, during the time period when we were creating the separate Modal Offices and trying to get SES slots for the Office Directors, we created the NTSB Academy. At one point, there were two SES employees at the Academy, although there is now only one SES employee, Director Julie Beal, who is female.

The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female and occupies an SES position. Also, the Director of our Office of Administration, Lola Ward, is female and a member of the SES. In fact, three of the last four persons selected by the NTSB for SES positions have been female.

I want to add that we were having chronic problems with the pace and quality of work coming from the Office of Marine Safety, and as a result I have needed to have more interaction with OMS than would normally be the case. I am providing the EEO Investigator with a copy of an employee exit interview that was conducted by the Assistant Managing Director, Barbara Czech, in August 2002. I had conducted several exit interviews with departing OMS employees, as turnover seemed high in the office. In this instance I asked Barbara to do the interview with Jamie Estock. The departing employee, Ms. Estock, had worked in OMS for over a year on a cooperative program and, I believe, had converted at Ms. Murtagh's request to full-time federal service. She had been a good performer. She left for a private sector job. When explaining why she left, she commented that the "progress of work products [in OMS] was too slow and she was afraid it would affect her work ethic." This was typical of the feedback that I was receiving from employees in OMS.

11. **The Complainant alleges she was not allowed by senior management to fill key**



Initials

000142

**vacant positions in the Office of Marine Safety. If so, what was your role in this decision? If you did not have a role, who did? What is your understanding of the reason (if any) that Complainant was not allowed to fill vacancies in her unit?**

It is true that I stopped Ms. Murtagh from hiring several employees during my tenure as Managing Director.

With regard to the Marine Accident Investigator position, this job was being filled earlier this year around the time we had begun to advertise the OMS Director job as an SES position. Because there was a possibility there would be a change in the leadership of the Marine Safety Office, I became more interested in the staffing of the unit. With regard to the particular individual whom Ms. Murtagh selected for the Investigator position, I noted that the person also had applied for the OMS Director job. Frankly, I thought it was strange that a person applying for a mid level investigator position also felt qualified to run the office. I also thought that it was only fair that if a new person was hired as the OMS Director, the Director should have a chance to hire his or her own person into the Investigator position.

With regard to the Chief of Report Development, Ms. Murtagh wanted to fill the position with an employee who already was working for her within OMS. This individual informed me that she had applied for the position because she wanted to block another staff member from getting the job because they were incompatible. I knew the selectee, and although I felt she was a good editor, I did not feel she would be able to manage the investigators who are a key part of the report-generating process. I already had experienced problems getting good reports completed from the OMS unit, and I cite as one example the OMS investigation of the accident involving the Staten Island ferry crash, the Barberi. The investigator responsible for the investigation wanted to quit the Office before he completed the report. I personally had to plead with him to stay on to complete the work. He complained that the problem was the manner in which OMS and Ms. Murtagh were handling him and the investigation. In order to get the report finished, I ultimately lifted the investigation out of OMS and supervised the project myself from the Managing Director's office.

With regard to the Deputy Director position within OMS, this once had been occupied by Don Tyrell. Ms. Murtagh at one point was allowed to hire a Deputy Director, Paul Voorhees, who subsequently left the NTSB and went to the courts. He did not have a marine safety background. Personally, I do not recall a request to fill the Deputy Director position after Mr. Voorhees left.

Normally, I did not view it as my role to tell an Office Director like Ms. Murtagh that she could not hire the employees of their choice. However, I felt Ms. Murtagh did not have good judgment with selections. I recall that I once received a visit from the Agency's ethics office concerning an applicant for an OMS job who had a background with cruise



Initials

000143

ships. He was hired, and subsequently quit under a cloud. I became involved with this employee again through the exit interview process. I had been concerned about the initial hire; ultimately, I felt the experience showed that my instincts on this were right, and Ms. Murtagh's wrong.

Finally, although I am not sure it is relevant to Ms. Murtagh's complaint, I want to state that I was not involved in any way with the selection for the OMS Director position when it was posted as an SES job earlier this year.

12. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill, and why?**

First, I want to note that Ms. Murtagh was allowed to fill many vacancies in OMS during the period encompassed by her complaint, including some selectees who ultimately didn't work out.

Second, Ms. Murtagh was not treated differently from the male Office Directors. Generally, everyone's staffing level is down. In fact, relative to the size of her agency compared with the other Modal Offices, I think Ms. Murtagh actually has been allowed to hire more employees than the other Directors, in part because she had a relatively high turnover rate in OMS.

13. **What other witnesses do you believe have information that would be relevant to this discrimination claim?**

The Investigator might consider speaking with Bob Chipkevich and Joe Osterman with regard to the pay issue and the SES slots. Mr. Osterman might be asked whether he felt discriminated against when Mr. Chipkevich was given an SES slot, and Mr. Osterman was not.

14. **Do you have any documents that are relevant to the Complainant's allegation of sex and pay discrimination? If so, please provide them.**

I have attached three letters regarding the requests for new SES at OPM. They will show (1) that the agency allotment was 14 at the time we first requested new SES for each of the modal offices. (2) The request was denied in whole. (3) In 2004 we finally received an increase of one SES which was then allocated to the Office of Marine safety.

15. **To the extent other Office Directors were paid a higher salary than the Complainant, or were allowed to fill vacancies when the Complainant was not, was**



Initials [signature]

000144

**the different treatment accorded to the Complainant prompted by her sex?**

No, the determination which Office Director position would be classified as an SES position was not made based upon sex, and Ms. Murtagh was not discriminated against when we made these choices. With regard to the allegation she was denied opportunities to fill vacant positions, I do not believe this is true or that she was treated differently from her male counterparts. Moreover, even if this had occurred, it was not because of her sex.

16. **Is there anything else you would like to add?**

I want to add that I find it remarkable Ms. Murtagh never had a conversation with me about her feeling that the job classification for the OMS Director was discriminatory. She was fully aware I was seeking SES slots for all the Office Director jobs.

I have read the above statement consisting of 8 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10/19/05
Date

[signature]
Dan Campbell

[signature]
Witness



Initials DC

000147

(1)

National Transportation Safety Board

Washington, D.C. 20594

Office of the Managing Director

July 17, 2001

Ms. Anne Kirby
Acting Director, Office of Executive
Resources Management
Office of Personnel Management
1900 E Street, NW. Room 6484
Washington, D.C. 20415

Dear Ms. Edwards:

Currently, the National Transportation Safety Board's (NTSB) approved executive resources allocations are 14 Senior Executive Service (SES) and 3 Senior Level (SL) allocations. We have assessed our executive resources and determined that we would require 2 new SES and 5 new SL allocations for Fiscal Years 2002 and 2003.

The NTSB has increased in the last several years from 350 positions to 410 positions that represent a 17% increase in overall staff levels. We have determined that in order for the Board to continue to meet its transportation safety mission, the increase in overall staff levels would require additional permanent executive resources.

**New SES Needs**

The NTSB is a small, non-regulatory, independent agency with 410 employees. Our mission is very focused: to prevent future transportation accidents from occurring. We are mandated to investigate transportation accidents, which usually involve a breakdown in a transportation system. We then determine the probable cause and make recommendations to prevent them from happening again. The Board investigates about 2,000 aviation accidents and incidents a year, and about 500 accidents in the other modes of transportation – rail, highway, marine, pipeline and hazardous materials.

Most importantly, the Safety Board promotes transportation safety through the issuance of safety improvement recommendations, based on its investigations and studies, to federal, state, and local government agencies and to the transportation industry regarding actions that should be taken to prevent accidents. Our programs have resulted in countless lives being saved and numerous injuries being prevented.

000148



The expanded numbers of executive-level positions will allow us to continue to achieve these results, if our request for additional permanent executive allocations is approved. Specific justifications for each of the requested allocations appear below.

New SES Allocation #1. Director
Office of Highway Safety

The Office's positions have expanded to 33, including an increase in supervisory positions. The overall objectives of the highway program are to reduce the number of highway accidents and to minimize the consequences of such accidents. Through these activities, the Safety Board provides guidance to: the highway safety community regarding highway design and construction; to the motor vehicle industry regarding equipment and systems research and development to reduce highway accidents or injuries; and to Congress, federal, state, and local agencies, about the effectiveness of transportation safety programs and about ways to reduce accidents. In its highway safety program, the Safety Board identifies critical highway issues, conducts safety oversight of highway and inter-modal transportation practices, works to improve accident investigation procedures, and influences and motivates responsible agencies, companies, and advocacy groups to implement Board recommendations and accomplish meaningful improvements in highway safety.

The Safety Board devotes its limited highway investigation resources to accidents that have a significant impact on the public's confidence in highway safety; generate high media and/or public interest; or concern technical safety issues that cause or contribute to accidents or injuries on a national scale. The director's position is currently supervisory in nature at the GS-15 level and responsibilities include supervising employees in both headquarters and regional locations. After an in-depth evaluation, we have concluded that adequate guidance cannot be provided in resolving highway safety issues and producing timely and effective reports utilizing supervisory skills and knowledge. Executive-level management skills are required to exercise important policy-making and policy-determining decisions (which is not the role of a supervisor). Additionally, when compared with existing SES positions at the Board, the subject position is directly comparable in terms of organizational characteristics, functional and program responsibilities, degree and scope of executive responsibilities, level and purpose of contacts, and nature of the staff. Therefore, we have determined that an executive allocation for the position would be appropriate.

Funding

- reprogramming within the Safety Board would not be required. Funding would come from within current funding levels.

000149



Anticipated Outcome

- improvements in the quality and timeliness of highway investigations and final reports
- safety improvements that result in improvements in the safety of the highway system
- maintaining public confidence in the work of the Board

New SES Allocation #2. Director
Office of Marine Safety

The overall objectives of the marine safety program are to reduce the number of marine accidents to minimize the consequences of such accidents. Through these activities, the Board provides guidance to: the maritime safety community regarding ship design and construction, practices, conditions, equipment, systems, and operations; and to Congress, federal, state, and local agencies, and international agencies. In its marine safety program, the Board identifies critical maritime issues, conducts safety oversight of national and international marine transportation practices, works to improve accident investigation procedures, and influences and motivates responsible agencies, companies, and advocacy groups to implement Board recommendations and accomplish meaningful improvements in marine safety.

The Office's positions have expanded to 15 to more efficiently investigate marine accidents involving public and non-public vessels, and all other marine accidents under joint regulations with the U.S. Coast Guard (USCG), or separately under the Safety Board's own authority.

Other than the Safety Board and the USCG, there are no federal agencies that have the authority to investigate commercial vessel accidents in U.S. navigable waterways. The Safety Board's investigations are directed primarily towards developing safety improvement recommendations while determining the probable cause(s) of an accident. We also have an extensive monitoring system to ensure that implementation of the recommendations is not delayed or forgotten by the recipients. Through its independent and thorough accident investigations and safety promotion activities, the Safety Board has been the catalyst in moving the USCG and other organizations to improve marine safety by requiring certain safety equipment, and improving procedures and vessel design. Through its investigations and special studies, the agency has focused national attention upon system-wide marine safety problems that often require both immediate and long-term fixes.

In addition to supervising other supervisors, the current GS-15 supervisory position also has responsibility for ensuring the conduct of special studies involving specific marine safety issues. These may be based on previous Safety Board accident investigations, or on analytical reviews of marine regulations, practices, procedures, and

000150



standards. Similar to accident investigations and studies in the other modes, marine special studies result in the issuance of safety recommendations to federal and/or state agencies, private industry, and industry associations.

After analyzing the accident investigation and special study efforts in the office, we have determined that GS-15 supervisory skills, knowledge, and abilities were insufficient to properly perform duties at a level commensurate to the office's needs. Additionally, there are specific safety areas that warrant urgent attention. They include executive-level direction of boating and fishing vessel safety improvements and resolution of long-standing marine safety issues. Executive-level management skills are required to exercise important policy-making and policy-determining decisions (which is not the role of a supervisor). Additionally, when compared with existing SES positions at the Board, the subject position's comparability in complexity and scope are sufficient to warrant its designation in the SES.

Funding

- reprogramming within the Safety Board would not be required. Funding would come from within current funding levels.

Anticipated Outcome

- improvements in the quality and timeliness of marine investigations and final reports
- maintaining public confidence in the work of the Board

New SL Needs

The SL allocations below are as a result of an immediate need identified through a comprehensive examination of the Safety Board by the RAND Corporation:

New SL Allocation #1: Chief Technical Advisor (Medical Officer)
Office of Research and Engineering

This position will provide authoritative, substantial and unique advice related to medical issues in transportation related accident investigations. The advice will include medical technologies, concepts, issues, and approaches in the areas of human physiology and medical fitness, human toxicology and pathology, medical epidemiology, and biomechanics. As an authority and world-renown expert in the fields of medical fitness or incapacitation, toxicology, and occupational kinematics as they relate to the investigation of transportation accidents, this position will serve as the agency's representative to national and international authorities and industries.

000151



Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- recommendations that impact other industries with related medical fitness patterns and issues

New SL Allocation #2: Chief Technical Advisor (Vehicle Performance and Simulation)
Office of Research and Engineering

This position will provide substantial and unique advice regarding vehicle performance and simulation in all transportation modes. Analysis and simulation of vehicle performance is both an invaluable aid in transportation accident investigations, and a rapidly advancing technology. Trends indicate that future accidents will be more difficult to analyze, and as a result, rely more heavily on vehicle performance simulation and analysis to evaluate potential causes. The use of this technology in accident investigations will be multi-modal including highways, railroad, and marine vehicles.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- rapid advancements in desktop workstation computer technology

New SL Allocation # 3: Chief Technical Advisor (Materials Failure Analysis)
Office of Research and Engineering

This position will provide substantial and unique advice regarding equipment failures in all transportation modes that present some of the most difficult challenges in accident investigations. The application of the technical specialties of metallurgy, materials engineering, and materials failure analysis to accident investigations requires not only a thorough expertise in scientific and engineering disciplines, but also a strong understanding of the physical design limitation of transportation vehicles and their components.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- new materials failure analysis technologies for the investigation and analysis of transportation accidents

New SL Allocation # 4: Chief Technical Advisor (Human Factors Analysis)
Office of Research and Engineering

As a Chief Technical Advisor, this position will provide substantial and unique advice regarding human factors that continues to account for the greatest proportion of transportation accident causes in all transportation modes. Human performance and human factors specialists are employed by each of the Board's modal offices to collect appropriate data and perform human factors evaluation and analyses appropriate to the operating characteristics of that mode. The Chief Technical Advisor will provide needed coordination between the transportation modes and ensure that consistent attention is given to the important issues of human performance and ergonomic factors such as fatigue, workload, crew resource management, and automation.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- development of policy analysis and safety recommendations in the human factors area for all transportation modes

New SL Allocation # 5: Chief Technical Advisor (Chief Writer)
Office of Aviation Safety

As Chief Technical Advisor to the Director, Office of Aviation Safety, this position will provide substantial and unique advice regarding guiding the Office's technical writing programs, including the use of resources, establishment of operating policies, priorities and procedures, resolving technical considerations and problems which arise out of program operations and for the technical interpretation and application of the results. The work requires the application and integration of knowledge that allows others to determine the feasibility of developing extremely technical and highly

000153



controversial information designed for specific audiences, who are often times culturally diverse. The content, design, and development of these products must be presented in a manner that diffuses potential misunderstandings of written conclusions and findings of national and international highly publicized air disasters. The results of efforts directed by the incumbent have major impact on matters of great urgency and significance for other offices within the agency. The Chief Technical Advisor will be the widely recognized authority for all written products that emerge from the Office of Aviation Safety and will be responsible for the solution of problems of marked importance to the aviation transportation community. In many instances, there will have been no precedents established and the technical written products adopted will, in fact, become guidelines that will be promulgated by the Director of Aviation Safety, the Managing Director, and the Chairman of the NTSB.

Funding:

- reprogramming within the Safety Board would not be required. Funding would come from current funding levels.

Anticipated Outcome

- improvements in the quality and timeliness of the agency's investigative reports

Note: The NTSB has evaluated the new SES and SL positions above, in terms of classification factors, and determined that each position exceeds the GS-15 level and is properly placed in the SES or SL systems.

**Agency-wide SES and SL Priorities**

An organizational chart identifying all current and proposed SES and SL positions, with encumbered positions indicated by * is enclosed.

Below is a prioritization of all currently established vacant and encumbered SES and SL positions in terms of their relative contributions to the Safety Board's agency-wide mission requirements. They are all Category A positions in that they are most critical to the Safety Board's agency-wide mission accomplishments. Additionally, due to the nature of our mission, (i.e., to save lives through improving transportation safety worldwide), the list below does not contain any positions that present opportunities for redeployment of executive resources (i.e., positions that may be filled at a lower level or abolished) as turnover occurs, or positions which the present incumbent may be reassigned, if an appropriate opportunity is identified.

000154



Prioritized Current SES and SL Positions (vacant and encumbered) – Category A

SES

1. Executive Director (noncareer) – vacant
2. Managing Director – encumbered
3. Director, Office of Aviation Safety – encumbered
4. Director, Office of Research and Engineering – encumbered
5. Director, Office of Pipeline, Railroad, and Hazardous Materials - encumbered
6. Director, Office of Safety Recommendations and Accomplishments encumbered
7. General Counsel - encumbered
8. Chief Financial Officer – encumbered
9. Director, Office of Government, Public and Family Affairs (noncareer) encumbered
10. NTSB Academy Director – Selection in progress
11. Deputy Director, Office of Aviation Safety – encumbered
12. Deputy Director, Office of Research and Engineering – encumbered
13. Associate Managing Director for Planning and Operations - encumbered
14. Associate Managing Director for Quality Assurance – vacant

SL

15. Chief Technical Advisor (Information Technology) - encumbered
16. Chief Technical Advisor (Vehicle Recorders) - encumbered
17. Chief Technical Advisor (International Affairs) – encumbered

**Prioritized New SES and SL Positions - Category A**

SES

1. Director, Office of Highway Safety
2. Director, Office of Marine Safety

SL

3. Chief Technical Advisor (Medical Officer)
4. Chief Technical Advisor (Vehicle Performance and Simulation)
5. Chief Technical Advisor (Materials Failure Analysis)
6. Chief Technical Advisor (Human Factors Analysis)
7. Chief Technical Advisor (Chief Writer)

A positive response to this request will enable the Safety Board to maintain its 00015 excellence in accident investigation. If you have any questions, please do not hesitate to contact me directly on (202) 314-6060.

Sincerely,

Pamela E. Pearson

Dan Campbell
Managing Director

Enclosure

000156

# NATIONAL TRANSPOR ATION SAFETY BOARD




ENCLOSURE

0157

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-0001

OFFICE OF THE DIRECTOR

SEP 23 2002

The Honorable Carol J. Carmody
Acting Chairman
National Transportation Safety Board
490 L'Enfant Plaza East SW
Washington, DC 20594

Dear Ms. Carmody:

The Office of Personnel Management (OPM), in consultation with the Office of Management and Budget, has completed its review of executive resource allocations for the remainder of the Fiscal Year 2002-2003 biennial cycle. I am pleased to inform you that we have approved an increase in your allocation, but we were not able to grant your request in its entirety. Decisions about these requests were governed by several factors including the extent to which agencies have demonstrated effective corporate management of their executive resources, the resource implications of requested adjustments, the impact on governmentwide allocations, and the relationship to agency restructuring plans.

The final FY 2002-2003 allocations authorized for your agency are:

- Senior Executive Service (SES) allocation 14 NO CHANGE
  - SES career reserved floor 9
- Senior-Level (SL) allocation 5
- Scientific and Professional (ST) allocation 0

The SES allocation covers all SES positions, regardless of how they are filled, e.g., by career, noncareer, or limited appointment. Each agency is responsible for making sure that the established number of career reserved positions equals or exceeds the floor as listed above.

These final allocations do not indicate approval or disapproval of specific positions, whether existing or proposed. Each agency is responsible for managing its executive resources within its established levels, in line with agencywide priorities and changing needs. Similarly, agencies are responsible for determining, consistent with applicable legal and regulatory provisions, whether positions exceeding the GS-15 level are properly designated as SES, SL, or ST.



CON 131-64
September 1!

A positive response to this request will enable the Safety Board to maintain its excellence in accident investigation. If you have any questions, please do not hesitate to contact me directly on (202) 314-6060.

Sincerely,

Pamela E. Pearson

Dan Campbell
Managing Director

Enclosure

## AFFIDAVIT OF ELLEN ENGLEMAN CONNERS

City: Washington

State: District of Columbia

I, **Ellen Engleman Conners**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

**1. Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

**2. How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

**3. Please identify your gender.**

Female.

**4. Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel



Initials [initials]

000161

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5. **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6. **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7. **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**

Initials EE

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

8. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,



Initials [signature]

000163

during my first two years at the NTSB there were about six major marine accidents, but this is atypical. The work of the other Offices is simply greater. Aviation Safety is huge by comparison. Railway, Pipeline and Hazardous Materials is responsible for three modes of transport. And there are 43,000 highway deaths each year.

No one was isolating the Office of Marine Safety, but it logically was last in the queue. Actually, it is my hope ultimately to make all the Deputy Directors SES positions, also.

9. **Did the Complainant talk to you about being paid overtime as a means for bringing her compensation closer to that of the male Office Directors? Did you discuss this with the Managing Director, Dan Campbell, or with Human Resources? What was your decision and response.**

Yes, this is the method she proposed for raising her compensation. I thought it was bizarre for a manager to suggest being paid overtime.

Can it be done? I do not believe managers are entitled to overtime, unlike the investigators, for instance. I do not recall whether I made a specific decision to deny Ms. Murtagh overtime, but I would have. I do not even recall whether it would have been possible to pay her overtime.

10. **After the discussion about possible overtime, did you evade further requests by Ms. Murtagh to discuss her compensation request? Was Ms. Murtagh ever told she would not be paid overtime?**

On several occasions, Ms. Murtagh asked me for follow up meetings. On the initial occasions, I was genuinely busy and did not have the time to meet with her. Later, I knew the SES slot for the OMS Director job was being processed, so I felt it was not appropriate to meet.

I am not sure whether Ms. Murtagh ever was contacted to be told she would not be paid overtime, no.

11. **Was the decision to pay the OMS Director as a GS-15, rather than at the SES level, related to the fact that the OMS Director was female?**

Absolutely not.

12. **Complainant describes several situations in which she had advertised, interviewed and selected a candidate for various positions, only to be told that she could not fill the job with the selectee. For example, earlier in 2005 she states she was denied an opportunity to hire a Marine Accident Investigator. Do you have any information about this?**

I probably had a role in this. I had asked all senior managers to get together and consider

Initials