001037



whether the Coast Guard will conduct an investigation under the Act.

[47 FR 46090, Oct. 15, 1982]

**§850.30 Procedures for Coast Guard investigation.**

(a) The Coast Guard conducts an investigation under §850.25 using the procedures in 46 CFR 4.01-1 through 4.23-1.

(b) The Board may designate a person or persons to participate in every phase of an investigation, including onscene investigation, that is conducted under the provisions of §850.25.

(c) Consistent with Coast Guard responsibility to direct the course of the investigation, the person or persons designated by the Board under paragraph (b) of this section may:

(1) Make recommendations about the scope of the investigation.

(2) Call and examine witnesses.

(3) Submit or request additional evidence.

(d) The Commandant provides a record of the proceedings to the Board of an investigation of a major marine casualty under paragraph (a) of this section.

(e) The Board, under the Act, makes its determination of the facts, conditions, and circumstances, and the cause or probable cause of a major marine casualty, using the record of the proceedings provided by the Commandant under paragraph (d) of this section and any additional evidence the Board may acquire under its own authority.

(f) An investigation by the Coast Guard under this section is both an investigation under the Act and under R.S. 4450 (46 U.S.C. 239).

**§850.35 Records of the Coast Guard and the Board.**

(a) Records of the Coast Guard made under §850.30 are available to the public under 49 CFR Part 7.

(b) Records of the Board made under §§850.20 and 850.30 are available to the public under 49 CFR Part 801.

Signed at Washington, D.C. on this fourth day of October 1982.

Patricia A. Goldman,
Acting Chairman

[FR Doc. 82-28330 Filed 10-14-82; 8:45 am]

BILLING CODE 4910-58-M

001038

MEMORANDUM OF UNDERSTANDING BETWEEN THE NATIONAL TRANSPORTATION SAFETY BOARD AND THE UNITED STATES COAST GUARD REGARDING MARINE ACCIDENT INVESTIGATION

In accordance with Public Law 106-424 signed November 1, 2000, the National Transportation Safety Board (NTSB) and the United States Coast Guard (USCG) hereby revise and replace their Memorandum of Understanding (dated 28 September 1981) governing major marine accident investigation to (1) clarify the standards used to determine when the National Transportation Safety Board will lead an investigation, and (2) to develop new standards to determine when a major marine accident involves significant safety issues related to USCG safety functions.

Effective immediately, the following guidelines will apply in carrying out the provisions of the joint regulations governing "Coast Guard/NTSB Marine Casualty Investigations" (49CFR 850 and 46 CFR 4.40):

1. Upon report of a major marine casualty or a casualty involving public and non-public vessels, USCG will immediately notify NTSB of all information available regarding the casualty. Major marine casualty in this context is defined as a casualty involving a vessel, other than a public vessel, that results in:

- The loss of six or more lives;
- The loss of a mechanically propelled vessel of 100 or more gross tons;
- Property damage initially estimated at $500,000 or more; or
- Serious threat, as determined by the Commandant and concurred in by the Chairman, to life, property, or the environment by hazardous materials.

2. The designation of "lead" investigative agency (USCG or NTSB) will be based upon existing joint regulations and the criteria in paragraphs 3 and 4 below.

3. USCG and NTSB agree that NTSB may elect to lead the investigation of major marine casualties that risked or threatened high loss of life to innocent third parties, such as the following:

- a passenger vessel accident that placed passengers or crewmembers at serious risk, for example, fires, collisions, sinkings or groundings;
- a vessel accident that seriously threatened port facilities, for example, an allision with a permanently moored vessel or high occupancy waterfront facility;
- a cargo vessel accident that involved 3 or more crew fatalities; or

001039

- a multimodal marine accident that resulted in fatalities.

  Any such NTSB election will be pursuant to communication between the Chairman and the Commandant or their designees. In each instance where the NTSB elects to lead the investigation, the Coast Guard shall participate as a party and normally shall not convene a Marine Board of Investigation. In order to not interfere with the NTSB on-the-scene field investigation when the Commandant decides to convene a Marine Board of Investigation in these cases, the Coast Guard will delay publicly announcing and convening the Marine Board of Investigation for as long as considerations of preservation of evidence, witness availability, and enforcement requirements permit, or until NTSB has concluded its field investigation, whichever is earlier.

4. The USCG will apply the attached draft bright-line chart to all major marine casualties so as to make an initial determination if significant safety issues related to USCG safety functions may warrant an independent investigation by NTSB. In cases where the bright-line indicates the need for a third party review, NTSB will be notified and may elect to lead the investigation with USCG participation as a party.

5. The accident investigation roles of the NTSB and the USCG with respect to all other casualties within the scope of the joint regulations will continue unchanged for the interim.

In general, when NTSB conducts the marine casualty investigation in the cases cited above, the procedures followed will parallel, where applicable, those described in 49 CFR 831 with respect to aircraft accidents/incidents. When NTSB conducts a public hearing in connection with the accident investigation, the procedures followed will follow those described in 49 CFR 845. The respective activities of NTSB and the USCG, within the parameters of those regulations when the investigation is conducted by the NTSB, include the following:

001040

| NTSB | USCG |
|---|---|
| 1. Dispatch IIC, and an appropriate number of marine accident investigators and technical personnel to the scene.<br><br>2. Direct all onscene aspects of the investigation considering recommendations made by USCG.<br><br>3. Issue necessary subpoenas, hire stenographic services, contract for other necessary services in connection with the investigative command post.<br><br>4. Upon arrival at the scene and after obtaining preliminary data, establish investigative groups as appropriate. An NTSB staff member will serve as Chairman of each group. Designate appropriate representatives of onscene parties to participate in the investigative groups. The provisions of 49 CFR 831.11 will be applied to all parties. Such parties will always include the Coast Guard. Unions may be designated as parties.<br><br>5. Hold periodic progress meetings and keep parties informed.<br><br>6. Hold periodic news media briefings on the progress of the investigation and serve as the sole public spokesman with respect to the release of information resulting from the investigation. USCG shall be consulted and will participate with regard to USCG activities, as appropriate, to the maximum extent possible in media briefings.<br><br>7. Determine and approve the timing of the release of vessels and crewmen to depart the area, either to appear later at a public hearing or to be released from further participation in the NTSB-led investigation. This provision does not affect the authority of the COTP to control the movement of vessels pursuant to 33 CFR Part 160, or the Coast Guard to investigate pursuant to 46 CFR Part 4 and 5. | 1. Notify NTSB promptly.<br><br>2. Pursue the usual Coast Guard onscene activities as appropriate, such as search and rescue, pollution and fire emergency services, succoring the survivors, managing traffic in the waterway, or accommodating salvage activities of owners. Protection of life, property, and the environment are the highest priority and accident investigation needs will be properly accommodated bearing in mind their high priority.<br><br>3. Secure the accident site, as appropriate and reasonable considering all onscene activities.<br><br>4. Promptly identify eyewitnesses and make preliminary arrangements for their interviews by the witness group.<br><br>5. Detain vessels and crewmembers as appropriate and reasonable in accordance with applicable law. If unable to do so prior to arrival of NTSB investigators, perform those tasks identified by NTSB as essential to the investigation.<br><br>6. Assign appropriate personnel to participate in investigative groups and designate one person as Coast Guard liaison with the NTSB IIC.<br><br>7. Provide Coast Guard documentation of vessel inspection, certification and licensing history of vessels and persons involved as requested by IIC.<br><br>8. Designate an individual(s) to participate as the Coast Guard spokesman in media briefings, as appropriate, and at the NTSB public hearing. |

001041

| NTSB | USCG |
|---|---|
| 8. Identify and interview eyewitnesses and all crewmembers at the earliest time. Those with information pertaining to the accident should be deposed, or their statements taken and reduced to writing, as appropriate (in preparation for or in lieu of being a witness at a public hearing).<br><br>9. Arrange for any tests, research, readout of recorded data, transcription of radio recordings, and similar activity and the preparation of exhibits for later use.<br><br>10. Set the time and place and make all arrangements for the public hearing including the hearing room, the preparation of exhibits, subpoenaing of witnesses, and designation of parties to the hearing and their spokesman (Coast Guard will always be designated as a party to the hearing).<br><br>11. Conduct public hearing in accordance with 49 CFR 845.<br><br>12. Prepare an accident report based upon the investigation. | 9. Provide water/air transportation if needed onscene, subject to operational requirements.<br><br>10. Prosecute enforcement activities as a clearly separate activity from the NTSB accident investigation. |

001042

Close continuing liaison and cooperation will be maintained between the two agencies so that the common objective can be achieved with maximum harmony, and problems and differences can be minimized and resolved as expeditiously as possible.

An ongoing joint working group will be formed and will consider additional recommendations, which may evolve into a further realignment of investigative responsibilities ultimately leading to a revised interagency memorandum of understanding and revision of the joint regulations as appropriate. USCG and NTSB will continually evaluate the draft brightline chart to determine if it satisfactorily identifies accidents involving significant safety issues related to USCG safety functions and will propose any needed changes.

USCG will ensure that NTSB is invited to participate as a member of the US delegation to all IMO meetings where marine accident investigation issues are expected to arise.

Both agencies will, upon approval of this agreement, officially notify their respective OMB, Congressional and potentially affected private sector organizations of this agreement.

Nothing in this agreement is intended to conflict with current law or regulation or the directives of the USCG or the Department of Transportation or the NTSB. If a term of this agreement is inconsistent with such authority, then that term shall be invalid, but the remaining terms and conditions of this agreement shall remain in full force and effect.

This agreement is effective upon signature by both parties, and shall continue in effect until terminated. This agreement may be modified at any time upon written agreement of both parties. This agreement may be terminated by either party by written notice to the other. The terminating party will provide the other party and the Congress with at least 30 days notice.

Signed by:

| | |
|---|---|
| Chairman<br>National Transportation Safety Board | T. H. COLLINS<br>Commandant<br>United States Coast Guard |
| (Date) September 12 2002 | (Date) SEP 1 2 2002 |

001043

# Coast Guard/NTSB Bright-line Test

| MSIS Case No.:_________ | Reviewer(s):_________ | Vessel:_________ |
|---|---|---|



## Scoring Breakdown

| | |
|---|---|
| Recency | |
| Inspections | |
| CG Control | |
| Total Score | |
| Proposed Lead Agency | |
| NTSB Decline: Y / N | |
| Lead Agency | |

| *Recency* *(Note: Inspections only)* | Level 1 | Level 2 | Level 3 | Level 4 | Score |
|---|---|---|---|---|---|
| Inspection of U.S. certificated vessel | Within 61 to 90 days 10 | Within 46 to 60 days 40 | Within 31 to 45 days 70 | Within 0 to 30 days 100 | |
| Exam of foreign passenger vessel | Within 61 to 90 days 60 | Within 46 to 60 days 80 | Within 31 to 45 days 100 | Within 0 to 30 days 100 | |
| Port State Control boarding | Within 61 to 90 days 10 | Within 46 to 60 days 30 | Within 31 to 45 days 60 | Within 0 to 30 days 90 | |
| Exam of U.S. uninspected vessel | | | Within 31 to 45 days 20 | Within 0 to 30 days 40 | |
| CG LE/safety boarding (CG-4100) | | | Within 31 to 45 days 20 | Within 0 to 30 days 40 | |

| *Inspection* | Level 1 | Level 2 | Level 3 | Level 4 | Score |
|---|---|---|---|---|---|
| Not inspected/ boarded /examined when required by reg. or policy. | Deficiency follow-up of a vital system. 10 | Periodic inspection/ Boarding /exam. 70 | Deficiency follow-up of a system was not performed and the system was associated with the casualty. 90 | CG failed to examine a system and that system was associated with the casualty. 100 | |
| Failure of CG examined/inspected vital equipment or system. | Failure of: • Bridge navigation or communication system. • Main propulsion system on U.S. inspected vessel. 10 | Failure of: • Main or auxiliary steering systems. • Emergency power. • Bilge system (US). • Vessels hull (US). 40 | Failure of primary fire fighting system. 70 | Failure of primary lifesaving equipment. 100 | |

| *CG Control* | Level 1 | Level 2 | Level 3 | Level 4 | Score |
|---|---|---|---|---|---|
| Under COTP order | | | | COTP order associated with the casualty. 100 | |
| Under OCMI order | • Non-overdue CG-835 for non-vital system. • Non-overdue requirement for non-vital system. 10 | • Waiver or extension for compliance granted • Non-overdue CG-835 for vital system • Non-overdue requirement for vital system 40 | • Non-overdue CG-835 for vital system and that system is associated with casualty. • Non-overdue requirement for vital system and the system is associated with the casualty 70 | • Permit to Proceed. • Temporary load line certificate. • Waiver/extension for compliance granted and the system is associated with the casualty. 100 | |
| VTS | Vessel not properly checked in with VTS and no radio contact made. 10 | Vessel properly checked in (sailing plan filed) to VTS but not provided any traffic information or given any direction. 40 | Vessel requested VTS traffic information prior to casualty, but not under direction at the time of casualty. 70 | Vessel under required direction of or given misinformation by VTS, or granted deviation from rules by District or VTS CO. 100 | |
| SAR | SAR case number assigned. 10 | Death, serious injury, loss of vessel before CG unit on scene. 20 | Serious injury or loss of vessel after CG unit on scene. 40 | Loss of life after CG unit on scene. 60 | |
| ATON | | | Navigational casualty occurs where ATON off position or not lit. 50 | | |

March 28, 2000

001110

Publications

# Marine Accidents

NTSB Home | Availability

*Recent publications are available online in the Adobe Portable Document Format (PDF), which requires the free Acrobat Reader from Adobe for viewing. IMPORTANT: Some PDF publications are quite large - see the Summary description for each document to obtain file size.* (Questions/Problems/Tips)

**Title:** Marine Accident Brief: Fire on Board U.S. Small Passenger Vessel Massachusett - Boston Harbor, Massachusetts, June 12, 2006

**NTSB Report Number:** MAB-07-01, adopted on 3/21/2007 [Full Text]

**Title:** Marine Accident Brief: Grounding of Malaysian-flag Bulk Carrier M/V Selendang Ayu on North Shore of Unalaska Island, Alaska, December 8, 2004.

**NTSB Report Number:** MAB-06-01, adopted on 9/26/2006 [Full Text | PDF Document]

**Title:** Marine Accident Report: Capsizing of New York State-Certificated Vessel *Ethan Allen*, Lake George, New York, October 2, 2005

**NTSB Report Number:** MAR-06-03, adopted on 7/25/2006 [Summary | PDF Document]

**NTIS Report Number:** PB2006-916403

**Title:** Marine Accident Report: Fire On Board U.S. Small Passenger Vessel Express Shuttle II, Pithlachascotee River Near Port Richey, Florida, October 17, 2004

**NTSB Report Number:** MAR-06-02, adopted on 4/4/2006 [Summary | PDF Document]

**NTIS Report Number:** PB2006-916402

**Title:** Marine Accident Report: Capsizing of U.S. Small Passenger Vessel Lady D, Northwest Harbor, Baltimore, Maryland, March 6, 2004

**NTSB Report Number:** MAR-06-01, adopted on 3/7/2006 [Summary | PDF Document]

**NTIS Report Number:** PB2006-916401

**Title:** Sinking of Uninspected Small Passenger Vessel *Sydney Mae II* in Pacific Ocean at Entrance to Winchester Bay, Oregon, September 19, 2005

**NTSB Report Number:** MAB-05-04, adopted on 12/15/2005 [Full Text | PDF Document]

**Title:** Heavy-Weather Damage to Bahamas-Flag Passenger Vessel *Norwegian Dawn*, Atlantic Ocean, 120 Miles East of Charleston, South Carolina, April 16, 2005

**NTSB Report Number:** MAB-05-03, adopted on 11/30/2005 [Full Text | PDF Document]

**Title:** Grounding of the Alaska Marine Highway System Ferry *LeConte* Near Sitka, Alaska, May 10, 2004

**NTSB Report Number:** MAB-05-02, adopted on 7/28/2005 [Full Text | PDF Document]

**Title:** Collision between the U.S. Navy Submarine USS *Greeneville* and Japanese Motor Vessel *Ehime Maru* Near Oahu, Hawaii, February 9, 2001

A232

**NTSB Report Number:** MAB-05-01, adopted on 9/29/2005 [Full Text | PDF Document]

**Title:** Marine Accident Report: Capsizing of U.S. Small Passenger Vessel *Taki-Tooo*, Tillamook Bay Inlet, Oregon, June 14, 2003
**NTSB Report Number:** MAR-05-02, adopted on 6/28/2005 [Summary | PDF Document]
**NTIS Report Number:** PB2005-916402

**Title:** Allision of Staten Island Ferry *Andrew J. Barberi*, St. George, Staten Island, New York, October 15, 2003
**NTSB Report Number:** MAR-05-01, adopted on 3/8/2005 [Summary | PDF Document]
**NTIS Report Number:** PB2005-916401

**Title:** Highway/Marine Accident Report: U.S. Towboat *Robert Y. Love* Allision With Interstate 40 Highway Bridge Near Webbers Falls, Oklahoma May 26, 2002
**NTSB Report Number:** HAR-04-05, adopted on 8/31/2004 [Summary | PDF Document]
**NTIS Report Number:** PB2004-916205

**Title:** Marine Accident Brief: Engineroom Fire on the U.S. Passenger Vessel *Columbia* in Wrangell Narrows Near Wrangell, Alaska, May 28, 2003
**NTSB Report Number:** MAB-04-02, adopted on 4/19/2004 [Full Text | PDF Document]

**Title:** Grounding and Sinking of U.S. Passenger Vessel *Safari Spirit*, Kisameet Bay off Fisher Channel, about 20 miles Southeast of the Towns of Bella Bella and Shearwater, Denny Island, British Columbia, Canada on May 8, 2003
**NTSB Report Number:** MAB-04-01, adopted on 4/22/2004 [Full Text | PDF Document]

**Title:** Sinking of the U.S. Small Passenger Vessel *Panther* Near Everglades City, Florida, December 30, 2002
**NTSB Report Number:** MAR-04-01, adopted on 3/9/2004 [Summary | PDF Document]
**NTIS Report Number:** PB2004-916401

**Title:** Collision Between the U.S. Coast Guard Patrol Boat *CG242513* and the U.S. Small Passenger Vessel *Bayside Blaster*, Biscayne Bay, Florida, January 12, 2002
**NTSB Report Number:** MAR-02-05, adopted on 12/17/2002 [Summary | PDF Document]
**NTIS Report Number:** PB2002-916405

**Title:** Grounding of the Small Passenger Vessel *Finest* at Sandy Hook, New Jersey, January 4, 2001.
**NTSB Report Number:** MAR-02-03, adopted on 9/17/2002 [Summary | PDF Document]
**NTIS Report Number:** PB2002-916403

**Title:** Fire On Board the Small Commuter Vessel *Seastreak New York* at Sandy Hook, New Jersey, September 28, 2001.
**NTSB Report Number:** MAR-02-04, adopted on 9/17/2002 [Summary | PDF Document]
**NTIS Report Number:** PB2002-916404

**Title:** Marine Accident Report: Fire on Board the Small Passenger Vessel *Port Imperial Manhattan*, Hudson River, New York City, New York, November 17, 2000
**NTSB Report Number:** MAR-02-02, adopted on 6/11/2002 [Summary | PDF Document]

**NTIS Report Number:** PB2002-916402

**Title:** Marine Accident Report: Sinking of the Amphibious Passenger Vessel *Miss Majestic*, Lake Hamilton Near Hot Springs, Arkansas, May 1, 1999

**NTSB Report Number:** MAR-02-01, adopted on 4/2/2002 [Summary | PDF Document]

**NTIS Report Number:** PB2002-916401

**Title:** Marine Accident Report: Fire On Board the U.S. Passenger Ferry *Columbia*, Chatham Strait near Juneau, Alaska, June 6, 2000

**NTSB Report Number:** MAR-01-02, adopted on 9/18/2001 [Summary | PDF Document]

**NTIS Report Number:** PB2001-916403

**Title:** Marine Accident Brief Report: Fire on Board the Netherlands-Registered Passenger Ship *Nieuw Amsterdam* at Glacier Bay, Alaska, May 23, 2000

**NTSB Report Number:** MBR-01-01, adopted on 7/24/2001 [Summary | PDF Document]

**NTIS Report Number:** PB2001-916402

**Title:** Marine Accident Brief: Collision of U.S. Towboat *Christine Cenac*, U.S. Tank Barge *CTCO 211*, and U.S. Towboat *American Heritage*, Lower Mississippi River near Donaldsonville, Louisiana, January 28, 1998

**NTSB Report Number:** MAB-01-03, adopted on 8/21/2001 [Full Text | PDF Document]

**Title:** Marine Accident Brief: Collision of Liberian Containership *Columbus Canada* and U.S. Fishing Vessel *Black Sheep*, Gulf of Mexico near Galveston, Texas, December 21, 1998

**NTSB Report Number:** MAB-01-04, adopted on 8/22/2001 [Full Text | PDF Document]

**Title:** Marine Accident Brief: Sinking of the U.S. fishing vessel *Miss Penelope*, South of Montauk, New York, January 28, 1998

**NTSB Report Number:** MAB-01-02, adopted on 8/3/2001 [Full Text | PDF Document]

**Title:** Marine Accident Report: Fire On Board Liberian Passenger Ship *Ecstasy*, Miami, Florida, July 20, 1998

**NTSB Report Number:** MAR-01-01, adopted on 5/1/2001 [Summary | PDF Document]

**NTIS Report Number:** PB2001-916401

**Title:** Marine Accident Brief: Collision of Two Recreational Motorboats on the St. Croix River near Bayport, Minnesota, July 3, 1999

**NTSB Report Number:** MAB-01-01, adopted on 5/9/2001 [Full Text | PDF Document]

**Title:** Marine Accident Report: Ramming of the Eads Bridge by Barges in Tow of the M/V *Anne Holly* with Subsequent Ramming and Near Breakaway of the *President Casino on the Admiral*, St. Louis Harbor, Missouri, April 4, 1998

**NTSB Report Number:** MAR-00-01, adopted on 9/8/2000 [Summary | PDF Document]

**NTIS Report Number:** PB2000-916401

**Title:** Collision between Panamanian Container Ship *Ever Grade* and U.S. Coast Guard Buoy Tender *Cowslip*, Columbia River near Astoria, Oregon, May 14, 1997

**NTSB Report Number:** MAB-99-01, adopted on 12/30/1999 [Full Text | PDF Document]

001128

# National Transportation Safety Board

## Operations Bulletin HR-PRF-001
**Performance Management System**

1. Issuing Organization. Operations Bulletin HR-PRF-001 was developed by the Office of Human Resources Division, AD-30, and was issued August 19, 2005. It is due for review by August 19, 2007.

2. Purpose. Operations Bulletin HR-PRF-001 provides policies and procedures for staff to use to understand the performance management system (PMS) at the National Transportation Safety Board (NTSB).

   A. Performance management is the systematic process by which the NTSB involves its employees, as individuals and members of a group, in improving organizational effectiveness in the accomplishment of its mission and goals.

   B. Performance management should:

      (1) Communicate and clarify organizational goals to employees;

      (2) Identify individual and, where applicable, team accountability for accomplishing organizational goals;

      (3) Identify and address developmental needs for individuals and, where applicable, teams;

      (4) Assess and improve individual, team, and organizational performance;

      (5) Use appropriate measures of performance as the basis for recognizing and rewarding accomplishments; and

      (6) Use the results of performance appraisal as a basis for appropriate personnel actions.

3. Policy. It is NTSB policy that—

   A. The provisions of this Operations Bulletin do not apply to performance-based actions taken under Operations Bulletin HR-ELR-002, Disciplinary and Adverse Actions, and Grievances and Appeals.

   B. The performance management system includes senior executives (employees in the Senior Executive Service (SES)), supervisory, and nonsupervisory employees. The appraisal systems for these employees are used to recognize differences in the quality of performance, and as a basis for adjusting base pay, training, rewarding, reassigning, promoting, demoting, removing, or retaining employees.

C. The provisions of this Operations Bulletin do not apply to Presidential appointees, Administrative Law Judges, or non-SES positions in the excepted service in which employment is not reasonably expected to exceed 120 calendar days in a consecutive 12-month period.

4. Cancellation. Operations Bulletin HR-PRF-001 cancels NTSB Order 1000, dated August 21, 1996.

5. References/Links.

A. Title 5 Code of Federal Regulation (CFR) Parts...

239, Personnel Records

339, Medical Qualification Determination

351, Reduction In Force

359, Removal from the Senior Executive Service; guaranteed placement in other personnel systems.

430, Performance management

432, Performance based reduction in grade and removal actions.

451, Awards

531, Pay under the General Schedule

792, Federal employees' health and counseling programs

B. Operations Bulletins HR-ELR-002, Disciplinary and Adverse Actions, and Grievances and Appeals, and EEO-GEN-001, Equal Employment Opportunity and Complaints of Discrimination in Safety Board Employment Practices.

6. Responsibilities.

A. The Human Resources Division, AD-30, is responsible for the following:

(1) Ensuring compliance with the procedures set forth in this bulletin.

(2) Updating this bulletin according to the schedule or earlier if there is an identified need.

B. The Chairman is responsible for the following:

(1) Serving as the rating official for employees directly supervised and as the reviewing official for certain other employees; approving SES ranks and bonuses, SES awards, and SES performance pay decisions to assure overall agency performance appraisal consistency, and ensuring that SES performance-related awards are within funding availability.

(2) Ensuring that final approved actions are forwarded to the servicing human resources representative for processing.

C. The Managing Director is responsible for the following:

(1) Preparing progress reviews and performance appraisals of employees directly supervised and serves as reviewing official for other employees. Reviewing each organization's listing of progress reviews and performance appraisals for all employees to ensure equity and compliance with agency and administration goals.

(2) Directing revisions of ratings for supervisory and nonsupervisory employees, when necessary, providing the rationale for any revisions in writing. For SES members, providing higher level review of an initial rating, documents conclusions and recommendations without altering the initial rating, and forwarding to the SES Performance Review Board (SES PRB) for review and comment.

(3) Approving non-SES supervisory and nonsupervisory employees' performance appraisals, awards, promotions, pay decisions, etc., based on performance.

(4) Ensuring that organizational objectives are included in each SES member's rating elements and performance standards.

D. The Chief, Human Resources Division, and Staff are responsible for the following:

(1) Providing guidance to managers, supervisors, employees, and members of PRBs on all aspects of the performance management system.

(2) Monitoring and evaluating the systems, as appropriate.

E. Employees are responsible for the following:

(1) Reviewing, evaluating, and discussing position descriptions, rating elements, performance standards, progress reviews, and final ratings and provide feedback for corrections, at least annually.

(2) Providing written comments whenever applicable. Communicating to the rating official resources and managerial support needed to meet performance expectations.

(3) Recommending changes to or propose potential critical elements for the upcoming performance appraisal period.

(4) Assisting in establishing or revising standards, elements, and element weights. Initiating progress reviews, as appropriate.

F. The Executive Resources Board (ERB)—including the Chief, Human Resources Division, and the EEO Director, or their designees, who are advisors to the ERB—is responsible for the following:

(1) Merit staffing for career appointment to the SES.

(2) Advising the Managing Director, who advises the Chairman, as to the number of SES and non-SES positions needed, distribution of allocated authorities, development of executive staffing plans, forecasting of executive requirements, determination of how these needs will be met, and determination of executive development program objectives.

(3) Staffing of supervisory General Schedule positions, including conduct of the merit staffing process, selections, promotions, reassignments, and details.

(4) Career SES executive development, including selection of candidates for programs to develop executive qualifications, the planning and conduct of development programs, programs for the continuing development of senior executives, and evaluation of performance during development programs.

(5) Position management, including proper use of SES and other positions, and redistribution of functions to maximize the effectiveness of NTSB SESers.

(6) Pay management, including advising on the most effective use of pay flexibility provided by the SES.

(7) Development of policy on performance awards for the SES and their use to enhance employee effectiveness, and agency-wide coordination of performance awards with statutory requirements and central oversight of performance awards.

(8) Development of policy on discipline and removal of SESers for cause.

(9) Development of policy on removal from SES based on performance or during probation, and oversight of removal and fallback procedures.

(10) Nominations for the awarding of honorary rank to senior executives.

G. Performance Review Boards (PRBs) are responsible for the following:

(1) SES Career PRB. A panel composed of the Deputy Managing Director as SES PRB Chair, SES career office directors, with the Chief, Human Resources Division, and EEO Director as advisors. The SES career PRB's responsibilities are to:

(a) Monitor the SES performance review process, and recommend ways to improve and strengthen the SES performance appraisal system.

(b) Review and approve or recommend to the Chairman changes to the critical and non-critical elements, weights, and performance standards for all SES employees.

(c) Make written recommendations to the Chairman concerning the performance of each senior executive and the level of basic pay and bonuses to be granted to Fully Successful or above senior executives. The Chairman approves or revises appraisals only after considering the recommendations of the SES PRB.

(d) When recommending a less than Fully Successful rating, refer the senior executive's appraisal to the ERB for additional recommendation or action prior to the Chairman's final review and decision.

The Chairman may not be a member of the PRB. Notices of appointment are published in the Federal Register. In reaching a decision, the PRB may obtain additional information, either orally or in writing. Members shall have at least Fully Successful, or equivalent, performance ratings, consistently

001132



have applied NTSB appraisal systems effectively in their own organization, be objective and possess a thorough knowledge and understanding of the NTSB appraisal system gained through experience and training, will not be an executive whose performance appraisal was initially prepared by the incumbent under review, and will not be the supervisory official who made the initial appraisal of the employee. SES supervisory officials may be asked to appear before the PRB, and the SESer whose evaluation is being discussed will not participate in the discussions.

(2) SES Non-Career PRB. A panel composed of the Vice Chairman as PRB Chair, the Special Assistant to the Chairman, and the Chief, Human Resources Division. The SES-non-career PRB's responsibilities are to:

(a) Review and approve or recommend changes to the Chairman regarding any non-career executive's critical and non-critical elements, element weights, and performance standards.

(b) Make written recommendations to the Chairman concerning the performance of any non-career executive and the level of basic pay and award to be granted.

(3) Supervisory and Nonsupervisory Employees' PRB. An ad hoc panel composed of three members appointed by the Office Director or Deputy Managing Director to review performance disagreements.

7. Procedures.

A. Rating Periods.

(1) Rating Period Dates. The annual appraisal period for SES senior executives begins on September 1 and ends August 31; for supervisory employees it begins on August 1 and ends on July 31; for nonsupervisory employees it begins on June 1 and ends on May 31.

(2) Exceptions.

(a) The Minimum Appraisal Period for All Employees. All employees must have been given rating elements and performance standards 90 calendar days before an actual performance rating can be given. If an employee has less than 90 calendar days total service in the NTSB appraisal system, the rating period must be extended until the minimum appraisal period is met.

(b) Minimum Appraisal Period Under New Supervisor. No performance rating will be given by a rating official until he/she has directly supervised an employee for 90 calendar days. Examples of options:

(i) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The Deputy Office Director, or any other next higher official in the chain of command, may complete division employees' annual ratings.

(ii) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The division chief may extend the rating due date until she/he has supervised employees for 90 calendar days.

(iii) Division chief leaves position 5 months into the rating period. New division chief may complete annual ratings. (Departing division chief should complete summary ratings for incorporation in the final ratings.)

(c) Rating Period Procedures for All Employees Who Have Completed a Minimum Appraisal Period and Change Positions. If an employee has served in a position for the minimum appraisal period and changes positions during that rating period, his/her performance shall be evaluated and an element rating assigned to each performance element on which the employee had an opportunity to demonstrate performance prior to his/her departure and a summary rating shall be given. This summary rating must be taken into consideration in deriving the next rating of record.

(d) Rating Period Procedures for All Employees While on Detail or Temporary Promotion. Employees who are detailed or temporarily promoted within the NTSB for more than 90 days will receive written elements and standards no later than 30 calendar days after the detail/temporary promotion begins. Critical elements are established by the rating official in consultation with the employee. Ratings on the elements must be prepared for these details and temporary assignments and must be considered in deriving a final rating at the end of the performance appraisal period. When an NTSB employee is detailed outside NTSB at any time during the rating period, NTSB will make a reasonable effort to obtain appraisal information from the borrowing organization and consider that information in deriving the employee's next rating of record. If such an employee has served in NTSB for the minimum appraisal period, the employee must be rated at the end of the appraisal period. If the employee has served 90 calendar days or more outside the NTSB, but has not met the minimum appraisal period within the NTSB, NTSB will make a reasonable effort to prepare a rating using appraisal information obtained form the borrowing organization. A rating of record will then be derived following the normal NTSB appraisal procedures.

(e) Rating Period Procedures for Employees Transferring to Another Federal Agency During the Rating Period. All employees who have served at least the 90-day appraisal period will be evaluated and given a summary rating when they transfer to another agency. This rating, along with the performance appraisal, will be transferred with the employee's Official Personnel Folder (OPF).

B. <u>The Performance Appraisal Process</u>.

(1) A Step-by-Step Approach to Performance Determinations for Rating Officials.

(a) Establish/review/define position descriptions, elements, element weights, and performance standards, using employee input.

(b) Conduct progress review(s).

(c) Obtain employee feedback.

(d) Appraise end-of-year performance, and make a performance rating determination. (Do not release rating to employee until authorized.)

(e) Obtain employee feedback.

(f) Make personnel decisions based on the appraisal.

(2) Beginning of the Appraisal Process. Rating officials are required to inform new employees of performance expectations in writing, and ensure that performance expectations for current employees are updated annually, as needed. Rating officials should have completed the following steps normally within 30 days after the appraisal period begins.

(a) Review the position description, and elements and standards in performance plans for employees.

(b) Make necessary corrections to position descriptions, and to elements, element weights, and performance standards.

(c) Ask for input from employees.

(d) Finalize elements/standards and provide them to employees.

Note: If the review determines that changes are not necessary, standards should still be given in writing to an employee at the beginning of each appraisal process.

(3) Progress Reviews. By law, a progress review shall be held for each employee at least once during the appraisal period. Reviewing officials and employees are all involved in the performance review process with the rating officials being responsible for initiating and conducting the reviews. Progress reviews are important to let employees know how they are performing in relation to their performance appraisal so they are not surprised by their end-of-year rating. If deficiencies are prevalent, it also satisfies the legal requirement to inform the employee of below Fully Successful performance. Also, the Human Resources Division will provide additional progress review guidance annually. Rating officials should take the following steps to ensure that a proper progress review is completed.

(a) Ask employee for a list of accomplishments to date.

(b) Ask reviewing official for feedback.

(c) Determine performance to date of each element, and assign an overall summary rating.

(d) If performance is below Fully Successful on any element, contact the human resources representative for guidance on completing a Performance Improvement Plan (PIP). (See Part 7.D. for a discussion on PIPs.)

(e) Discuss performance to date with employee, and if a PIP is required, indicate any significant accomplishments or areas in which improvement is needed.

(f) Sign the form, get the reviewing official's signature and then the employee's signature. (If employee refuses to sign, so indicate on the form and notify employee that he/she may attach any comments.)

(g) Give a copy of the progress review to the employee, retain a copy, and forward the originals of the reviews for all your employees through supervisory channels to your servicing human resources representative.

(4) End of the Appraisal Process for Non-SES Employees. End-of-year appraisal information is important to employees because they need to know their performance levels. Awards, bonuses, promotions, training and career development, and performance-based actions are based on this information. Rating officials should take the following steps within the timeframes established in the Human Resources Division's annual end of the appraisal process guidance.

(a) Ask employees for a list of accomplishments that have occurred since the progress review.

(b) Ask reviewing official for feedback.

(c) Determine performance of each element, and assign an overall summary rating.

(d) Prepare a tentative ratings/awards list for all employees and forward through supervisory channels to the Human Resources Division.

(e) If performance is below Fully Successful on any element, contact the servicing human resources representative for guidance on completing a Performance Improvement Plan (PIP).

(f) Once the Managing Director has approved the tentative ratings/awards list, finalize the performance appraisal, and the PIP, if applicable.

(g) Discuss performance with employee, and the PIP, if required, indicating any significant accomplishments or areas in which improvement is needed.

(h) Sign the form, get the reviewing official's signature and then the employee's signature. (If employee refuses to sign, so indicate on the form and notify employee that he/she may attach any comments.)

(i) Inform the employee of the assistance and counseling to be provided throughout the PIP, if one is required.

(j) Forward the appraisal, the PIP, if one was accomplished, and any applicable awards through the Office Director to the human resources representative for processing and retention. Give the employee a copy.

Note: If performance is at Minimally Satisfactory or Unacceptable level, contact the servicing human resources representative for guidance.

(5) End of the Appraisal Process for SES Employees. For SES employees, rating officials discuss the proposed rating of record (initial rating) with the executive and give the executive an opportunity to respond in writing and an opportunity for review by someone other than the rating official who is in a higher executive level, unless there is no higher level executive. Forward the initial rating and any comments from the executive to the reviewing official. The reviewing official does not give prior approval to or revise an initial rating, but provides comments and recommendations on the completed initial rating to the SES PRB, the initial rater, and the SES member. (Most of the same steps under d. above should be followed for SES employees, as appropriate.)

(6) The Upcoming Rating Period for All Employees. If needed, hold a separate meeting about a week after the appraisal conference to review the elements, element weights, performance standards and employee training needs for the upcoming rating period. (See paragraph B(2) above.) Even if the elements and standards don't change frequently or significantly, a separate discussion is still suggested to allow for employee communication and update.

C. <u>Employee Recognition</u>.

(1) Quality Step Increases (QSIs). Initiated by rating officials with the reviewing official's concurrence for employees who have received an overall summary rating of record of Outstanding. QSIs may not be granted to an employee who has received an

overall summary rating of record below Outstanding. QSIs may not be granted to an employee who has received a QSI within the preceding 52 consecutive calendar weeks.

(2) Performance Awards. A performance award shall be based on the employee's rating of record for the current appraisal period for which performance awards are being paid. Each decision to grant a performance award must be approved by a higher level supervisor, except in cases where the employee reports directly to the Chairman. These reviewing officials should be the same ones as those responsible for making the performance appraisal decisions. The Human Resources Division will issue guidance on performance award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

(3) Special Act/Service Awards. These awards are described in Operations Bulletin HR-PRF-002, Incentive Awards. The Human Resources Division

01137



will issue guidance on Special Act/Service award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

(4) SES Awards. SES employees are eligible for SES Performance and Rank awards in accordance with OPM policies. They are also eligible for Special Act Awards in accordance with Operations Bulletin HR-PRF-002.

(5) Within-Grade Increases (WGIs). WGIs recognize employees in the General Schedule who are performing at an acceptable level of competence. WGIs are effective the first pay period following completion of the WGI waiting period. WGIs are an increase to basic pay equivalent to the next higher step in the grade. A waiting period must have been completed and the employee may not have received an equivalent increase during the waiting period. Employees already at the maximum step of their grade may not receive a WGI. WGIs are processed automatically by the Human Resources Division once the human resources representative has received a supervisory certification that the employee is performing at an acceptable level of competence.

D. <u>Actions Based on Performance below Fully Successful Level</u>.

(1) Application. This part applies to supervisory and nonsupervisory employees (non-Schedule "C" positions) who are being rated under the performance appraisal system.

(2) Assisting Employees In Improving Performance. Performance evaluation is more than the process of assigning performance ratings. When a supervisor determines that an employee has a performance deficiency at any point during the rating period, the supervisor should initiate appropriate corrective action. The supervisor should not wait until the end of the rating period to address the problem. Corrective action includes identifying the critical element(s) for which performance is less than Fully Successful, and structuring assignments that will provide the employee with an opportunity to improve performance to a Fully Successful level. Paragraphs D(3), D(4), and D(5) below are the recommended approaches for the supervisor to take when performance has fallen below Fully Successful, but has not been determined to be at the Unacceptable level.

(3) Performance Improvement Plan Notification and Employee Counseling. At any time during the performance appraisal cycle that an employee's performance is determined to be Unacceptable in one or more critical elements, the supervisor shall notify the employee of the element(s) for which performance is Unacceptable. Additionally, the supervisor shall inform the employee of the performance standard(s) that must be attained in order to demonstrate acceptable performance, and provide a reasonable opportunity to improve performance. The notification shall be in the form of a memorandum or letter to the employee and a PIP that identifies the element(s) and performance standard(s) for which the employee has failed to meet the Fully Successful level. The PIP shall be discussed with the

employee and the instances of less than Fully Successful performance relevant to each element and performance standard. Additionally, the supervisor shall describe what steps the employee must take to improve performance to the Fully Successful level for each element, and the specific assistance that will be offered to improve performance. Assistance may include, to the extent appropriate, structured job assignments, training, scheduled meetings with the supervisor for guidance and advice on how to improve work performance, and referral to the Employee Assistance Program Coordinator for assistance with resolving personal problems.

(4) Monitoring Performance. After the employee has been made aware of the performance problems and necessary correction action, the supervisor should continue to monitor the employee's work performance to ensure that the necessary corrective action has been taken. Monitoring performance means observing and gathering evidence of progress or lack of progress. It enables the supervisor to reinforce positive performance and to deal promptly with any instances of negative performance as soon as they occur. While it is at the supervisor's discretion to decide how closely to monitor the employee's performance, the supervisor should not limit monitoring to sporadic incidents of exceptionally good or poor performance.

(5) Providing Feedback. The supervisor should keep the employee informed orally and/or in writing of progress toward correcting the performance problem. If the employee's performance is deficient after a reasonable amount of time, the supervisor must determine if the employee is performing at the Unacceptable level based on consultation with the servicing human resources representative. If so, the employee must be given a formal opportunity to demonstrate at least Minimally Satisfactory performance. Reasonable time means an amount of time commensurate with the employee's duties and responsibilities which is sufficient to allow the employee to show whether he or she can meet minimum performance standards. If the employee alleges or the supervisor suspects that a handicapping condition (including drugs and/or alcohol use) is causing performance deficiencies, the supervisor shall follow the guidance provided in paragraphs D(15) and D(16) below. If the employee fails to improve to at least a Minimally Satisfactory level, a performance-based personnel action may be taken. See paragraph D(7).

(6) Addressing Unacceptable Performance. At any time during the performance appraisal period that an employee's performance is determined to be Unacceptable in one or more elements (and a PIP has already been attempted), the supervisor shall notify the employee of the element(s) for which performance is Unacceptable, and inform the employee of the performance standards that must be met in order to demonstrate acceptable performance. The supervisor shall also inform the employee that unless his or her performance in the critical element(s) improves to and is sustained at an acceptable level, the employee may be reduced in grade or removed. For each element in which the employee's performance is Unacceptable, the supervisor shall afford the employee a reasonable opportunity to

demonstrate acceptable performance, commensurate with the employee's duties and responsibilities. As part of the employee's opportunity to demonstrate acceptable performance, the supervisor shall offer assistance to the employee in improving Unacceptable performance. (See paragraphs D(2)–D(5) above.)

(7) Proposing And Taking Action Based On Unacceptable Performance.

(a) Once an employee has been afforded a reasonable opportunity to demonstrate acceptable performance but fails to do so, the supervisor may propose a reduction in grade or removal action. The action may only be proposed if the employee's performance during or following the opportunity to demonstrate acceptable performance is Unacceptable in one or more of the critical elements for which the employee was afforded an opportunity to demonstrate acceptable performance.

(b) If an employee has performed acceptably for 1 year from the beginning of an opportunity to demonstrate acceptable performance, and the performance again becomes Unacceptable, the supervisor shall afford the employee an additional opportunity to demonstrate acceptable performance (by again beginning the paragraph D(2)–D(5) procedures) before determining whether to propose a reduction in grade or removal action.

(c) A proposed action may be based on instances of Unacceptable performance that occur within a 1 year period ending on the date of advance written notice of proposed action.

(8) General. An employee against whom a reduction in grade or removal action is proposed is entitled to:

(a) A 30-day advance written notice of the proposed action. This time may be extended for a period not to exceed 30 days for the following reasons:

(i) Obtain and/or evaluate medical information when the employee has raised a medical issue in the answer to a proposed reduction in grade or removal;

(ii) Arrange for the employee's travel to make an oral reply to the deciding official, or the travel of the deciding official to hear the employee's oral reply;

(iii) Consider the employee's answer, if an extension to the period for answer has been granted (e.g., because of the employee's illness or incapacitation);

(iv) Consider reasonable accommodation of a handicapping condition;

(v) Consider positions to which the employee might be reassigned or reduced in grade; or

(vi) Comply with a stay ordered by the Merit Systems Protection Board (MSPB).

If the supervisor believes that an extension of the advance written notice is necessary for other than a reason described above, he/she may request prior approval for extension from OPM through the human resources representative.

(b) Time to answer, but not less than 24 hours, orally and in writing and to furnish affidavits and other documentary evidence in support of the answer.

(c) Representation by an attorney or other representative.

(d) A written decision and the specific reasons for the action at the earliest practicable date.

(9) Advance Written Notice. The notice must:

(a) Identify both the specific instances of Unacceptable performance and the critical element(s) involved in each instance of Unacceptable performance.

(b) State that the employee has a right to respond to the action within 15 calendar days, and that no decision will be made until after the response has been received and considered, or until the response time has passed, and that any action to be taken, if adverse to the employee, shall be taken usually within 60 calendar days from delivery of the notice. The notice shall indicate that, if an extension of time is needed, a written request should be made by the employee to the deciding official specifying the need for the extension.

(c) Advise the employee of the right to answer orally and/or in writing, and to furnish affidavits and other documentary evidence in support of an answer within 15 calendar days from receipt of the advance written notice. If the employee wishes the NTSB to consider any medical condition which may contribute to the problem, the employee shall be given a reasonable additional time, if needed, to furnish medical documentation of the condition. Whenever possible, the employee shall supply such documentation within the time limits allowed for an answer. The deciding official will summarize an oral response of the employee, if one is provided, and will include it in the file.

(d) Advise the employee of the right to representation by an attorney or another representative. The General Counsel may disallow as the employee's representative an individual whose activities as a representative could cause a conflict of interest or position, an NTSB employee whose release from his or her position could give rise to unreasonable costs to the Government, or an employee whose priority work assignment precludes his or her release.

(e) Advise the employee of the right and the right of his/her representative to review the material relied on to support the reasons for the proposed

action. Material that may not be disclosed to the employee, the employee's representative, or a designated physician, may not be used.

(f) Advise the employee and his/her representative of their right to have up to 8 hours of official time to prepare the answer.

(g) Identify the management official who will receive the written and/or oral answer (usually the management official at the next higher level than the official who proposed the action) and how to make contact.

(h) Identify the name of the person to be contacted for information about the notice.

(i) Be reviewed by the Human Resources Division and Office of the General Counsel before issuance.

(j) If the employee is in a duty status, the notice shall be hand delivered at least 30 calendar days before the proposed action becomes effective, and documented by management that it was received. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address —Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on the method used to mail the advance notice, it is presumed that it was received by the employee.)

(10) Deciding Official's Functions. The deciding official:

(a) Has the option to affirm the action as proposed, reduce it to a lesser action, or cancel it, if he or she believes the proposed action is not fully supported.

(b) May grant an extension of time.

(c) Makes a final decision within 30 days after expiration of the advance notice period. (A decision to reduce in grade or remove an employee for Unacceptable performance may be based only on those instances of Unacceptable performance that occurred during the 1 year period ending on the date of issuance of the advance notice of proposed action.)

(11) Final Written Decision. The management official who has been designated to receive the written and/or oral response will serve as the deciding official. The deciding official will consider only those reasons stated in the advance written notice, and will consider any answer of the employee or his or her representative in making a decision. If the employee provides an oral response, the deciding official will prepare a summary of the oral response and include it in the file and provide the employee with a copy. The decision must:

(a) Be in writing and addressed to the employee.

(b) State the nature of action to be taken against the employee and its effective date. (The day the notice was issued does not count towards the 30-day requirement.)

(c) Refer to the advance notice by date and any amendments or additions.

(d) State that the notice is withdrawn (along with amendments and additions) and the reason(s) for withdrawing the notice, if no action is to be taken against the employee.

(e) Specify the instances of Unacceptable performance on which the action is based.

(f) Indicate that the decision is supported by substantial evidence.

(g) State that the employee and/or his or her representative's oral and/or written answer, if one was provided, was given full consideration in making the decision.

(h) Inform the employee of any applicable appeal and/or grievance rights.

(i) Be reviewed by the Human Resources Division and Office of General Counsel before issuance.

(j) Be signed by the deciding official.

(k) If the employee is in a duty status, the notice shall be hand delivered at least 3 calendar days before the proposed action becomes effective. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address—Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on the method used to mail the written decision, it is presumed that it was received by the employee.)

(12) Concurring Official's Functions. The written decision shall be concurred in by the Managing Director, except in those cases where the Managing Director is the deciding or proposing official (in which case the Chairman will serve as the concurring official). The action may not be effected without the concurring official's signature.

(13) Allegations of Discrimination. When an allegation of discrimination is made in connection with a performance management system action, any information or evidence submitted by the employee or the employee's representative orally or in writing shall be made part of the employee's answer to the advance notice. Such information shall be given consideration, by the deciding official, along with other supporting and rebuttal information in the file, in reaching a decision. If the decision is to reduce in grade or remove the employee, no action is to be taken without prior consultation with the EEO Director or designee.

(14) Removal/Reassignment from SES Positions. Any career SES employee will be removed/reassigned from a position in the following instances: (1) reassignment or transfer within SES or removal from SES for an

Unsatisfactory rating; (2) removal from SES for two Unsatisfactory ratings in a consecutive 5-year period; and (3) removal from SES for two less than Fully Successful ratings in a consecutive 3-year period.

(15) Denying a Within-Grade Increase (WGI) Based on Performance. Performance below Fully Successful can result in a denial of a Within-Grade-Increase. A human resources representative must be contacted before actions to deny or withhold a WGI are initiated.

(16) Reasonable Accommodation. The Vocational Rehabilitation Act places an obligation on Federal employers to accommodate handicapping conditions of their employees. Accommodation refers to the alteration of the work environment and/or job in order to meet the individual needs of the employee. Generally, the balance between an accommodation that is reasonable as compared to one that imposes an undue hardship on the agency depends on the resources available to the agency.

(17) Alcohol and/or Drug Abuse. If the supervisor suspects that an employee's misconduct and/or performance problem is caused by alcohol or drug abuse, he/she shall:

(a) Consult a human resources representative.

(b) Together with the servicing human resources representative, meet with a staff member of the Office of General Counsel to discuss the legal aspects of the case.

(c) Meet with the Employee Assistance Program Coordinator (designated by the Chief, Human Resources Division) who will provide guidance on how to confront/refer the employee for assistance.

(d) Meet with the employee to discuss misconduct and/or performance deficiencies and the possibility of a future disciplinary or adverse action if the action(s) persists.

(e) Refer the employee to a specific counseling program as identified by the representative.

(f) Inform the employee that information that he or she provides during sessions with the counselor is confidential. If the employee claims that alcoholism and/or drug abuse caused the misconduct and/or performance deficiency, the supervisor must allow the employee the opportunity to enter a program and the opportunity to demonstrate successful rehabilitation.

(g) If there is an alcohol and/or drug problem, an employee should admit the problem, accept any offer of rehabilitative assistance or elect to participate in a program of choice. If such is the case, the employee should provide to the supervisor a report from the treatment facility. The report should outline the nature of the program and its expected duration. If no report is provided or the employee refuses to go for treatment, the supervisor may proceed with appropriate action against the employee.

(18) Physical and Mental Conditions. When an employee alleges that a physical or mental handicap is causing a misconduct and/or performance problem, the supervisor should request that the employee submit medical documentation from a licensed medical practitioner to substantiate the existence of the condition and its effect on job conduct. The medical documentation will be used by the supervisor in consultation with the servicing human resources representative to determine whether the employee is handicapped, if reasonable accommodation is warranted, and what accommodations are appropriate. The supervisor must allow the employee a reasonable amount of time to submit the medical documentation. If the employee requests an accommodation not indicated by his or her practitioner, the supervisor, in consultation with the human resources representative, should determine whether the type of accommodation requested is appropriate and feasible.

(19) Disability Retirement. If the employee has at least 5 years of Federal civilian service and a misconduct and/or performance problem may have been caused by a medical condition, the supervisor should inform the employee of his or her possible eligibility for disability retirement and refer the employee to the servicing human resources representative for retirement counseling. In most cases, the employee is responsible for filing the retirement application.

E. <u>Disagreements, Appeals, and Records</u>.

(1) Performance Disagreements.

(a) PIPs, position descriptions, performance standards, rating elements, ratings of record, and summary ratings, are all performance-related items that may be disputed at the NTSB.

(b) Supervisory and nonsupervisory employees are encouraged to resolve matters of disagreement concerning appraisals and ratings with the rating official and the reviewing official. Failing resolution of the matter, employees ~~may file a performance disagreement with their office~~ director, who will convene a PRB to review the matter. Supervisory and nonsupervisory employees should also consult their servicing human resources representative to discuss appeal procedures, especially for personnel actions based on Unacceptable performance. The PRBs review the appraisal and any relevant supporting documentation, and make recommendations to the management official above the reviewing official, who shall make the final decision. If the performance disagreement is filed by a supervisory employee, the Managing Director or Chairman will be the deciding official. Suggested times for the disagreement process are: 10 working days for presentation to a PRB; 10 working days for the PRB to make a recommendation; and 10 working days for a final decision.

(c) An SES executive who disagrees with the critical elements or the rating of record is encouraged to resolve the matter with the rating

official and the reviewing official. Failing resolution, any relevant supporting documentation should be forwarded to the SES PRB or the Chairman within a reasonable time (usually 10 working days). The Chairman will make the final decision on all disagreements.

(d) Performance disagreements are internal Board procedures and do not give rise to appeals outside the Board. See paragraph E(4) below.

(2) Canceling a Disagreement. An employee may cancel a performance disagreement at any time. Once canceled, the disagreement may not be reactivated.

(3) Matters That May Not Be Disputed or Appealed. Progress reviews may not be disputed. Assessments of performance at the time of progress reviews can change before the end of the rating period and disputes filed before that time would be premature. However, employees may attach descriptions of matters of concern. Performance appraisal and summary performance ratings of SES members' performance are not appealable.

(4) Appeals. Eligible employees (consult with the servicing human resources representative) may appeal a reduction in grade or removal to the MSPB within 30 calendar days after the effective date of the action. The servicing human resources representative is available to advise any employee about the appeal process.

(5) Official Records. When a performance-based action is effected, all relevant documentation concerning a reduction in grade or removal shall be available for review by the employee or his/her representative. At a minimum, the record shall consist of a copy of the notice of proposed action, the answer of the employee when it is in writing, a summary when the employee makes an oral reply, the written notice of decision and the reasons, and any supporting material including documentation regarding the opportunity afforded the employee to demonstrate acceptable performance. If an action ultimately is not effected, all documents should be destroyed after 1 year, unless they are a part of a negotiated settlement. See paragraph D(7)(c).

8. External Reporting Requirements. None.

9. Definitions.

A. Acceptable Performance: Performance that meets the written performance requirement(s) or standard(s) above the Unacceptable (PMS) or Unsatisfactory (SES) level for the critical element(s) at issue.

B. Appraisal: The act or process of reviewing and evaluating the performance of an employee against the described performance standard(s).

C. Critical Element: A written component of a position consisting of one or more duties and responsibilities that contributes toward accomplishing organizational goals and objectives, and that is of such importance that Unacceptable or Unsatisfactory performance on the element results in Unacceptable or Unsatisfactory performance in the position.

D. Executive Resources Board (ERB): A panel chaired by the Managing Director and including the Deputy Managing Director, all SES career office directors, and advisors (non-members) responsible for various SES and supervisory management policy and planning. Three members are required for a quorum.

E. Non-critical element: A component of an employee's position that does not meet the definition of a critical element, but is of sufficient importance to warrant written appraisal.

F. Performance Review Boards (PRB): Panels composed of at least three employees that are established by an office director, the Deputy Managing Director, Managing Director, or Chairman to review performance-related matters, and make recommendations to the office director, Deputy Managing Director, Managing Director, or Chairman. Three members are required for a quorum.

G. Performance Standards: The expressed measure of level of achievement, including quantity, quality, and timeliness, established for the duties and responsibilities of a position or a group of positions.

H. Progress Review(s): Interim review(s) of the employee's progress towards achieving the performance standards. In accordance with OPM regulations, at a minimum, these reviews should take place at least once during the rating period. (The Human Resources Division annually issues a memorandum to rating and reviewing officials to remind them to prepare progress reviews at least 90 days prior to the end of the rating period.) Progress reviews are not summary ratings.

I. Rating Levels: The levels of performance for critical elements: Outstanding, Excellent, Fully Successful, Minimally Satisfactory, and Unacceptable (for SES, Unsatisfactory). These levels may also be used for non-critical elements.

J. Rating Official: Establishes critical elements and noncritical elements and performance standards at the beginning of the appraisal period, determining and communicating to the employee the performance requirements for the position. Assigns work, assists in developing employees' capabilities in the job, and evaluates the employee's performance (interim and final). Prepares Performance Improvement Plans (PIPs). Recommends rating/award determinations and other performance-based actions.

K. Rating of Record: The summary rating required at the end of the appraisal period or at such other times for special circumstances, i.e., an employee's rating has fallen since the last rating period, and the rating official must prepare a rating of record in making a determination of within-grade increase eligibility.

L. Reviewing Official: Reviews, revises, and approves the rating official's assessment of the employee's performance, and reviews and approves rating elements and performance standards at the beginning of the rating period, and when they change. Reviews PIPs, rating/award determinations, and other performance-based actions. Determines and provides appropriate assistance in improving performance for senior executives rated Unsatisfactory.

M. Summary Rating: The written record of the appraisal of each critical and non-critical element and the assignment of an overall summary rating, normally given

at the end of the rating period. (All elements should be defined as critical). It may also be given throughout the rating period after completion of the minimum 90-day appraisal period. An employee may receive a summary rating for a 90-day period served on a detail, temporary promotion, or for work accomplished in a position from which the employee is being reassigned. Interim summary rating(s) will be considered when deriving the annual rating of record, i.e., at the end of the rating period.

N. Unacceptable/Unsatisfactory Performance: Performance that fails to meet established performance standards in one or more critical elements of the employee's position.

10. Attachments. None.

000159 05/27/04 09:56 FAX 202 606 1637 ASSOCIATE DIRECTORS 001/001

MAY 27 REC'D

MC2040249

UNITED STATES
OFFICE OF PERSONNEL MANAGEMENT
WASHINGTON, DC 20415-0001

OFFICE OF THE DIRECTOR

MAY 26 2004

The Honorable Carol Jones Carmody
Acting Chairman
National Transportation Safety Board
490 L'Enfant Plaza East, SW
Washington, DC 20594

1 NEW SES
2 or 3 NEW SL ?

Dear Ms. Carmody:

The Office of Personnel Management (OPM), in consultation with the Office of Management and Budget, has completed its review of executive resource allocations for the remainder of the Fiscal Year 2004-2005 biennial cycle. The final Fiscal Year 2004-2005 allocations authorized for your agency are:

- Senior Executive Service (SES) allocation — 15
  - SES career reserved floor — 9
- Senior Level (SL) allocation — 8
- Scientific and Professional (ST) allocation — 0

The SES allocation covers all SES positions, regardless of how they are filled, e.g., by career, noncareer, or limited appointment. Each agency is responsible for making sure that the established number of career reserved positions equals or exceeds the floor as listed above.

The next biennial cycle will cover Fiscal Years 2006 and 2007. Under the statutory provisions at 5 U.S.C. 3133, agencies must submit a request for allocations for the next biennial cycle to OPM by December 31, 2004. To facilitate this process, we will assume that your agency will accept continuation of the allocations authorized above for Fiscal Years 2006 and 2007, or give an alternate request to OPM. In early 2005, we will ask agencies requesting additional executive resources to provide a detailed justification for those increases.

If there are any questions about final allocations, your staff may contact Mr. Hughes Turner, Deputy Associate Director for Leadership and Executive Resources Policy on (202) 606-1811.

Sincerely,

Kay Coles James
Director

001108

1-RPH_Launches and Reports Mar_26_2007.xls

| RPH ACCIDENT LAUNCHES - 2001 | MODE | ACCIDENT DATE | RPH REPORTS COMPLETED - 2001 | MODE | COMPLETION DATE |
|---|---|---|---|---|---|
| 1 Los Angeles, CA (Transit-Angels Flight) | Rail | February 1, 2001 | 1 Knoxville, TN | Pipeline | March 1, 2001 |
| 2 Syracuse, NY (Amtrak) | Rail | February 5, 2001 | 2 Clymers, IN | HazMat | March 5, 2001 |
| 3 Carlisle, OH | Rail | February 17, 2001 | 3 Bryan, OH, | Rail | April 1, 2001 |
| 4 Nodaway, IA (Amtrak, BNSF Track) | Rail | March 17, 2001 | 4 Winchester, KY | Pipeline | May 1, 2001 |
| 5 Ramona, OK | HazMat | May 1, 2001 | 5 South Riding, VA | Pipeline | June 1, 2001 |
| 6 Far Rockaway, NY | Rail | May 18, 2001 | 6 Greenville, TX | Pipeline | July 1, 2001 |
| 7 Chicago, IL (Transit - CTA:1) | Rail | June 17, 2001 | 7 Arlington, TX (Amtrak, UP Track) | Rail | July 1, 2001 |
| 8 Wilmington, OH | Rail | June 17, 2001 | 8 McLean, IL (Transit - CTA) | Rail | September 1, 2001 |
| 9 Ashby, NE | Rail | June 26, 2001 | 9 Syracuse, NY (Amtrak) | Rail | November 1, 2001 |
| 10 Riverview, MI | HazMat | July 14, 2001 | 10 Glendale, CA | Rail/Hwy | November 1, 2001 |
| 11 Baltimore, MD (Tunnel) | Rail | July 18, 2001 | 11 Baltimore, MD (Transit - Balt.) | Rail | December 2, 2001 |
| 12 Annapolis, MO | Rail | July 29, 2001 | 12 Conausaga, TN | Rail | December 2, 2001 |
| 13 Chicago, IL (Transit - CTA:2) | Rail | August 3, 2001 | | | |
| 14 Clarkston, MI | Rail | November 15, 2001 | | | |
| 15 Arminto, WY | Rail | December 7, 2001 | | | |
| 16 Pacific, MO | Rail | December 13, 2001 | | | |
| **RPH ACCIDENT LAUNCHES - 2002** | **MODE** | **ACCIDENT DATE** | **RPH REPORTS COMPLETED - 2002** | **MODE** | **COMPLETION DATE** |
| 1 S. Charleston, WV | HazMat | January 5, 2002 | 1 Bourbonnais, IL (Amtrak) | Rail/Hwy | February 1, 2002 |
| 2 Shellman, GA | Rail | January 17, 2002 | 2 Nodaway, IA (Amtrak, BNSF Track) | Rail | March 1, 2002 |
| 3 Minot, ND | Rail | January 18, 2002 | 3 Bloomington, MD | Rail | March 1, 2002 |
| 4 Laporte, IN | Rail | February 3, 2002 | 4 Momence, IL | Rail | March 1, 2002 |
| 5 Chicago, IL (Transit - CTA, '02) | Rail | February 26, 2002 | 5 Eunice, LA | Rail | April 1, 2002 |
| 6 Atlanta, GA | Rail | March 16, 2002 | 6 Riverview, MI | HazMat | June 26, 2002 |
| 7 Crescent City, FL (Amtrak-CSX Track) | Rail | April 18, 2002 | 7 Intercession City, FL (Amtrak) | Rail/Hwy | July 1, 2002 |
| 8 Placentia, CA (Passenger - Metrolink) | Rail | April 23, 2002 | 8 Chalk Point, MD | Pipeline | July 1, 2002 |
| 9 Clarendon, TX | Rail | May 28, 2002 | 9 Chicago, IL (Transit - CTA:1&2) | Rail | September 1, 2002 |
| 10 Sedalia, CO | Rail | May 29, 2002 | 10 Ramona, OK | HazMat | September 17, 2002 |
| 11 Aurora, IL (Transit - METRA) | Rail | June 12, 2002 | 11 Bellingham, WA | Pipeline | October 1, 2002 |
| 12 Baltimore, MD (Amtrak/MARC) | Rail | June 17, 2002 | 12 Clarkston, MI | Rail | October 1, 2002 |
| 13 North Platte, NE | Rail | June 19, 2002 | | | |
| 14 Cohasset, MN | Pipeline | July 4, 2002 | | | |
| 15 Tallahassee, FL | Haz/Aviation | July 26, 2002 | | | |
| 16 Kensington, MD (Amtrak-CSX Track) | Rail | July 29, 2002 | | | |
| 17 Hayward, CA (Amtrak) | Rail | August 23, 2002 | | | |
| 18 Freeport, TX | HazMat | September 13, 2002 | | | |
| 19 Farragut, TN | Rail | September 15, 2002 | | | |
| 20 Jamaica, NY (Transit - Airtrain) | Rail | September 27, 2002 | | | |
| 21 Desplains, IL | Rail | October 21, 2002 | | | |
| **RPH ACCIDENT LAUNCHES - 2003** | **MODE** | **ACCIDENT DATE** | **RPH REPORTS COMPLETED - 2003** | **MODE** | **COMPLETION DATE** |
| 1 Burbank, CA (Passenger - Metrolink) | Rail | January 6, 2003 | 1 Carlsbad, NM | Pipeline | February 1, 2003 |
| 2 Tamaroa, IL | Rail | February 9, 2003 | 2 Baltimore, MD (Amtrak/MARC) | Rail | May 12, 2003 |
| 3 Scotts Bluff, NE | Rail | February 13, 2003 | 3 Clarendon, TX | Rail | June 3, 2003 |
| 4 Staten Island, NY | Haz/Marine | February 21, 2003 | 4 Atlanta, GA (Transit - MARTA) | Rail | July 21, 2003 |
| 5 San Juan Capistrano, CA (Amtrak) | Rail | April 1, 2003 | 5 Atlanta, GA (Transit - MARTA) | Rail | August 5, 2003 |
| 6 Glenpool, OK | Pipeline | April 7, 2003 | 6 Crescent City, FL (Amtrak, CSX Track) | Rail | August 5, 2003 |
| 7 Calamus, IA | HazMat | April 15, 2003 | 7 Los Angeles, CA (Transit-Angels Flight) | Rail | August 8, 2003 |
| 8 City of Commerce, CA | Rail | June 20, 2003 | 8 Farragut, TN | Rail | August 8, 2003 |
| 9 Wilmington, DE | Pipeline | July 2, 2003 | 9 S. Charleston, WV | HazMat | August 21, 2003 |
| 10 Dunsmuir, CA | Rail | July 31, 2003 | 10 Jamaica, NY (Transit - Airtrain) | Rail | September 17, 2003 |
| 11 Middleton, OH | HazMat | August 22, 2003 | 11 Placentia, CA (Passenger - Metrolink) | Rail | October 7, 2003 |
| 12 Chicago, IL (METRA -Westbound at Switch) | Rail | October 12, 2003 | 12 Port Hudson, CA | Rail | October 16, 2003 |
| 13 Chicago, IL (Bedford Hills) | Rail | November 3, 2003 | 13 Aurora, IL (Transit - METRA ) | Rail | November 24, 2003 |
| 14 Kelso, WA | Rail | November 15, 2003 | | | |
| 15 San Antonio, TX (Yard/Switching) | Rail• | December 7, 2003 | | | |

A256

| | RPH ACCIDENT LAUNCHES - 2004 | MODE | ACCIDENT DATE | | RPH REPORTS COMPLETED - 2004 | MODE | COMPLETION DATE |
|---|---|---|---|---|---|---|---|
| 1 | Elkridge, MD | Haz/Highway | January 14, 2004 | 1 | Chicago, IL (Transit - CTA,'02) | Rail | February 6, 2004 |
| 2 | Chicago, IL (Transit - CTA, '04) | Rail | February 3, 2004 | 2 | San Juan Capistrano, CA (Amtrak) | Rail | February 13, 2004 |
| 3 | Carrizozo, NM | Rail | February 21, 2004 | 3 | Scotts Bluff, NE | Rail | February 13, 2004 |
| 4 | Queens, NY | Rail | March 10, 2004 | 4 | Minot, ND | Rail | March 9, 2004 |
| 5 | Flora, MS (Amtrak, CN Track) | Rail | April 6, 2004 | 5 | Wilmington, DE | Pipeline | April 6, 2004 |
| 6 | Gunter, TX | Rail | May 19, 2004 | 6 | City of Commerce, CA | Rail | April 7, 2004 |
| 7 | Macdona, TX | Rail | June 28, 2004 | 7 | Desplains, IL | Rail | May 27, 2004 |
| 8 | Memphis, TN | HazMat | August 7, 2004 | 8 | Kensington, MD (Amtrak, CSX Track) | Rail | May 28, 2004 |
| 9 | Dubois, PA | Pipeline | August 21, 2004 | 9 | Pacific, MO | Rail | June 17, 2004 |
| 10 | Clovis, NM | Rail | September 9, 2004 | 10 | Calamus, IA | HazMat | June 22, 2004 |
| 11 | East St. Louis, IL | Rail | September 21, 2004 | 11 | Cohasset, MN | Pipeline | June 24, 2004 |
| 12 | Harrisburg, PA | Rail | October 10, 2004 | 12 | Chicago, IL (Transit - CTA,'04) | Rail | July 4, 2004 |
| 13 | Pico Rivera, CA | Rail | October 16, 2004 | 13 | Middleton, OH | HazMat | July 4, 2004 |
| 14 | Kingman, KS | Pipeline | October 27, 2004 | 14 | Glenpool, OK | Pipeline | October 13, 2004 |
| 15 | Wash, DC Woodley Park (Transit-WMATA) | Rail | November 3, 2004 | 15 | Freeport, TX | HazMat | December 1, 2004 |
| 16 | San Antonio, TX (Building Collision) | Rail | November 10, 2004 | 16 | Baltimore, MD | Rail | December 16, 2004 |
| 17 | Washington, DC (Langdon) | Rail | November 15, 2004 | | | | |
| 18 | Zephyrhills, FL | Rail | November 29, 2004 | | | | |
| | RPH ACCIDENT LAUNCHES - 2005 | MODE | ACCIDENT DATE | | RPH REPORTS COMPLETED - 2005 | MODE | COMPLETION DATE |
| 1 | Glencoe, KY | Rail | January 5, 2005 | 1 | Tamaroa, IL | Rail | January 25, 2005 |
| 2 | Graniteville, SC | Rail/Haz | January 6, 2005 | 2 | Queens, NY | Rail | April 18, 2005 |
| 3 | Glendale, CA (Passenger - Metrolink) | Rail | January 26, 2005 | 3 | Pico Rivera, CA | Rail | May 31, 2005 |
| 4 | Home Valley, WA (Amtrak-BNSF Track) | Rail | April 3, 2005 | 4 | Kelso, WA | Rail | June 6, 2005 |
| 5 | Anding, MS | Rail | July 10, 2005 | 5 | East St. Louis, IL | Rail | June 27, 2005 |
| 6 | Shepherd, TX | Rail | September 15, 2005 | 6 | Flora, MS (Amtrak, CN Track) | Rail | July 26, 2005 |
| 7 | Chicago, IL (METRA -Eastbound at Switch) | Rail | September 17, 2005 | 7 | San Antonio, TX (Building Collision) | Rail | August 31, 2005 |
| 8 | Wilmer, TX | Haz/Highway | September 23, 2005 | 8 | Memphis, TN | Haz/Aviation | September 26, 2005 |
| 9 | Laramie, WY | Rail | October 5, 2005 | 9 | Chicago, IL (METRA -Westbound at Switch) | Rail | November 16, 2005 |
| 10 | Texarkana, AR | Rail | October 15, 2005 | 10 | Graniteville, SC | Rail | November 29, 2005 |
| 11 | Elmwood Park, IL (METRA Xing - R/Hwy) | Rail/Hwy | November 23, 2005 | 11 | SCADA Safety Study | Pipeline/RE | November 29, 2005 |
| 12 | Bergenfield, NJ | Pipeline | December 13, 2005 | | | | |
| | RPH ACCIDENT LAUNCHES - 2006 | MODE | ACCIDENT DATE | | RPH REPORTS COMPLETED - 2006 | MODE | COMPLETION DATE |
| 1 | Quantico, VA (Passenger - VRE) | Rail | January 5, 2006 | 1 | Wash, DC Woodley Park (Transit-WMATA) | Rail | March 23, 2006 |
| 2 | Lincoln, AL | Rail | January 18, 2006 | 2 | Shepherd, TX | Rail | May 22, 2006 |
| 3 | Philadelphia, PA | Haz/Aviation | February 8, 2006 | 3 | San Antonio, TX (Yard/Switching) | Rail | May 23, 2006 |
| 4 | Wash, DC Dupont Cir. (Transit-WMATA) | Rail | May 14, 2006 | 4 | Dubois, PA | Pipeline | May 31, 2006 |
| 5 | Arcola, LA (Amtrak-CN Track) | Rail | June 26, 2006 | 5 | Gunter, TX | Rail | June 13, 2006 |
| 6 | Abington, PA (Passenger - SEPTA) | Rail | July 1, 2006 | 6 | Macdona, TX | Rail | July 6, 2006 |
| 7 | Chicago, IL (Transit Tunnel - CTA) | Rail | July 11, 2006 | 8 | Texarkana, AR | Rail | October 17, 2006 |
| 8 | Queens, NY (Passenger - LIRR) | Rail | August 5, 2006 | 7 | Home Valley, WA (Amtrak-BNSF Track) | Rail | October 18, 2006 |
| 9 | Franklin, LA | Pipe/Marine | October 12, 2006 | 9 | Carrizozo, NM | Rail | October 31, 2006 |
| 10 | Pajaro, CA | Rail | October 13, 2006 | 10 | Quantico, VA (Passenger - VRE) | Rail | November 20, 2006 |
| 11 | New Brighton, PA | Rail | October 20, 2006 | 11 | Chicago, IL (METRA -Eastbound at Switch) | Rail | December 21, 2006 |
| 12 | Baxter, CA | Rail | November 9, 2006 | 12 | Arcola, LA (Amtrak-CN Track) | Rail | December 21, 2006 |
| 13 | Alexandria,VA Eisenh. Ave (Transit-WMATA) | Rail | November 30, 2006 | | | | |
| | RPH ACCIDENT LAUNCHES - 2007 | MODE | ACCIDENT DATE | | RPH REPORTS COMPLETED - 2007 | MODE | COMPLETION DATE |
| 1 | Wash, DC Mt Vernon Sq. (Transit-WMATA) | Rail | January 7, 2007 | 1 | Anding, MS | Rail | March 20, 2007 |
| 2 | Woburn, MA (Passenger - MBCR) | Rail | January 9, 2007 | 2 | | | |
| 3 | Sheperdsville, KY | Rail | January 16, 2007 | 3 | | | |
| 4 | Chicago, IL (CN-Metra) | Rail | March 7, 2007 | 4 | | | |
| 5 | Oneida, NY | Rail | March 12, 2007 | 5 | | | |
| 6 | | | | 6 | | | |

A257

ORGANIZATIONAL LISTING
NUMBER OF EMPLOYEES
October 1, 2003

| Org | Org Desc | Count | |
|---|---|---|---|
| 2001 | OFFICE OF THE DIRECTOR | 7 | -1 |
| 2100 | MAJOR INVESTIGATIONS DIVISION | 6 | |
| 2201 | REGIONAL OPERATIONS/GENERAL AVIATIO | 6 | ✓ |
| 2210 | NORTH CENTRAL REGIONAL OFFICE (CHI) | 10 | ✓ |
| 2220 | SOUTH CENTRAL REGIONAL OFFICE (FTW) | 6 | ← I have 5 |
| 2221 | SOUTH CENTRAL FIELD OFFICE (DEN) | 4 | ← I have 5 |
| 2230 | SOUTHWEST REGIONAL OFFICE (LAX) | 9 | ← I have 11 |
| 2240 | SOUTHEAST REGIONAL OFFICE (MIA) | 5 | |
| 2241 | SOUTHEAST FIELD OFFICE (ATL) | 6 | ← I have 11 |
| 2250 | NORTHEAST REGIONAL OFFICE (NJ) | 8 | |
| 2251 | NORTHEAST FIELD OFFICE (DCA) | 3 | I have 12 |
| 2260 | NORTHWEST REGIONAL OFFICE (SEA) | 7 | |
| 2261 | NORTHWEST FIELD OFFICE (ANC) | 6 | ← I have 5 |
| 2300 | OPERATIONAL FACTORS DIVISION | 14 | |
| 2400 | AVIATION ENGINEERING DIVISION | 20 | |
| 2500 | HUMAN PERFORMANCES DIVISION | 3 | |
| 2600 | SURVIVAL FACTORS DIVISION | 7 | |
| 2700 | WRITING AND EDITING DIVISION | 6 | |
| | Grand Total | 133 | |

**Headquarters =** ~~69~~ 62
**Region =** ~~64~~ 71