1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

----------------X
MARJORIE MURTAGH COOKE, :
Plaintiff, :
vs. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION SAFETY :
BOARD, :
Defendant. :
----------------X

Videotaped Deposition of DANIEL CAMPBELL
Washington, D.C.
Thursday, November 15, 2007
9:59 a.m.

Job No.: 1-115036
Pages: 1 - 200
Reported by: Dana C. Ryan, RPR, CRR

2

Videotaped Deposition of DANIEL CAMPBELL, held at the law offices of:

The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

Pursuant to agreement, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia.

3

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
R. SCOTT OSWALD, Esquire
DAVID SCHER, Esquire
BRIAN M. LOWINGER, Esquire
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

ON BEHALF OF THE DEFENDANT THE UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, Esquire
United States Department of Justice
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7978

4

APPEARANCES CONTINUED

ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
ANDREA MCBARNETTE, Esquire
U.S. Attorney's Office
501 3rd Street, Northwest, Rm 4218
Washington, D.C. 20530
(202) 514-7153

ALSO PRESENT:
Denise M. D'Avella, Esquire, NTSB Office of General Counsel
Marjorie Murtagh Cooke, Plaintiff
Scott Forman, Videographer

93

having read it, and that would be my role.
BY MR. OSWALD:
Q In its entirety?
A I have no recollection of having done anything else.
Q I understand.
A Well, apparently --
Q Now, when did you -- who was responsible for the decision to rescind the vacancy announcement for the director of the Office of Marine Safety, a position that was announced the first time in late 2004, for the director of marine safety at the National Transportation Safety Board?
A I was.
Q And why did you rescind the first vacancy announcement?
A Well, that's a complicated question, but there were two principal things that were on my mind. One was I wasn't ready to have a selection made at that moment, and, two, I thought that the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an

94

internal candidate.
Q Now, what factors made up your decision to rescind the vacancy announcement for the director of marine safety at the NTSB -- this is the 2004 first vacancy announcement -- apart from your unwillingness or not being ready to make a selection and your belief that the pool of candidates was artificially narrowed based upon a preconceived notion that there was a preselection for the position; what other factors other than those?
A Well, I called -- when I got a list of who was -- who the panel had recommended, I put the list on the back of my desk and I didn't touch it very much for a period of time because, as I say, I wasn't really interested in seeing the selection process go forward at that point in time.
I can't remember why I finally decided I had to do something with it, but when I did, the first name on the list was a captain from the Coast Guard who I knew, and I called him and he told me that he was now employed by Johns Hopkins and was no longer a candidate, and I told him that I was kind of surprised

95

that there -- he was the only guy that was interested. Captain Brusseau was the guy who told me that it was understood it was kind of wired for the plaintiff and that that may have limited it, and, so, that conversation with one of the applicants would have been the only additional factor that I -- that went into it.
Q Who were the other four candidates on the list that was provided to you by the panel after the first vacancy announcement --
A I don't remember them by name, but there was a -- there was a Coast Guard guy from the operational side of the Coast Guard, and then there were two people from the private sector, and I don't remember their names. I do remember that I was not impressed.
Q And who else?
A The plaintiff.
Q Marjorie Murtagh was?
A Yes.
Q Why did you -- so what was it about the -- the five candidates that were sent to you by the first panel of the selection committee that led you to

96

believe that it was -- it was artificially narrowed? This is the same group that include, what, Captain Prudo (sic), a Coast Guard captain and two private sector folks and Marjorie Murtagh Cooke; how is it --
A Could you repeat the -- I lost your question and -- could you rephrase it?
Q Well, what was it about the list that the panel had supplied you, the list of five candidates, which included Captain Prudo (sic), two private sector employees, another captain in the Coast Guard and Marjorie Murtagh Cooke, the incumbent in the position, that led you to believe that the list was too narrow?
A Well, it wasn't the list that led me to believe that -- that -- that the -- it was too narrow. I mean, the list -- the list didn't have any good candidates in it except the first guy that I -- well, I don't want to say it didn't have any good candidates. The two private sector guys I found deficiencies with just looking at the -- the applications. I don't know that I -- if I had met with them and talked to them that they might not have been able to explain a lot of that, but I looked at it

and I thought to myself, well, there's a couple of glaring probabilities -- possibilities here that I'm not -- I'm not very happy with.

The one guy that was on the top, the first name there who I -- was somebody that I had dealt with in Coast Guard and thought was an -- an estimable person, I gave him a call and he was no longer a candidate. So now I was left with an operational guy, with Marjorie Murtagh and with the two private sector types who -- who had credentials that both didn't really speak to the job, but also had holes in them that made me very -- very nervous; periods of time where people had gone from a senior vice president, 170,000 or $180,000 a year to a GS-12. That's not the kind of career advancement that -- that makes you comfortable when you're thinking of turning someone into an SES. So it wasn't -- it wasn't a very -- it wasn't a pool that I was particularly delighted with.

Q And why wasn't Marjorie Murtagh Cooke a good candidate for the position?

A Well, she might have been a good candidate, but I would have had to take it to the chairman, and



she would not probably have been selected, and that's one of the reasons I was not in a hurry to do this. When I say I procrastinated, I procrastinated because I believed that I was going to lose the office director that was there; that was going to be the outcome.

Q What led you to believe that?

A Well, I knew who the chairman was. I knew what the -- what the -- the -- the -- as I say, I allowed the modal directors to make their own impressions on a chairman. I -- I gave them every opportunity to prove themselves. If I had made a suggestion that Marjorie Murtagh ought to be the office director during the period of time that the Barberi was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, Dan, have you lost your mind. I think -- I think that that would not have been a sensible thing for me to do.

Q Why not?

A Well, because to make somebody -- to pay



somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible. It's just -- it's not a sensible thing to do.

Q All right. Well, what were the other factors that led you not to believe that Marjorie Murtagh Cooke would be a good candidate for the position other than the fact that you believe that if the -- you went and took her name to the chairman that -- that she would ask you whether or not you were crazy?

A Marjorie Murtagh and I have been known to one another since probably 1995. So I've had a long history to develop my view of whether or not she would be the right candidate to run the office at the SES level. And I could, if you like, spend all the time from now to lunch describing to you the difficulties that I have encountered over that period of time that suggest to me that -- that it's not a good idea to make somebody an SES for doing something that they're only accomplishing, in my view, marginally at the



GS-15 level.

Q What was your view about whether or not Marjorie Murtagh Cooke would be a good candidate for the director of marine safety at the NTSB?

A I didn't think that that was sensible. I didn't think that she should be made an SES.

Q And therefore selected for the director of marine safety position?

A Yes, I had -- I had serious, serious difficulties with Marjorie's performance as the director over her -- her office, both in terms of the way she managed the office and in the quality of the product that came out of it.

Q I understand. Now, in 1995 what was -- what was your exposure to Marjorie Murtagh Cooke in 1995?

A Well, I'm not really sure when it -- when it first -- it might have been '97. The first time that -- that -- that I had a direct role to play in a Coast Guard matter was, I think, shortly after the Office of the Secretary of Transportation had been changed into the four modal offices, so I think it would be very early in Marjorie's leadership in the

129

might be or there's a draft report that's brought to a managing director's meeting for consideration by the peer-review process.

The difficulty with the Barberi was that apparently there had been some scheduling and some -- some -- some issues about when it was to go forward, and the chairman had to ask for a briefing from the plaintiff as to the status of it. And I, again, think this is sometime around August, but I can't -- I can't be more -- August or September. I'm not really sure.

But, in any event, there had -- there was a briefing about it, and as a result of the briefing the chairman was of the opinion that things were -- were not proceeding as they were supposed to proceed, and I -- it was -- it was a -- a fairly unpleasant meeting from the standpoint of -- of, I think, the plaintiff and -- and the chairman. There was -- there were disagreements about things, and -- and I think it was -- in fact, I think it was at the close of that meeting that Marjorie came to me one day -- the plaintiff came to me in the kitchen that is

130

located right next to the chairman's office and told me that I should fire her if that's the way that this was going to go. I assured the plaintiff that I had no intention of firing her, but apparently she had taken the -- the consequences of the meet -- the outcome of the meeting as a fairly significant event in her career.

As it were to turn out, the issues that seemed to be precluding the finishing of it turned out to be disputes at the staff level, and the chairman asked me if I would intervene, and I did and actually hosted a -- a progress meeting and -- the kind of thing that would normally be done by an office director -- hosted a progress meeting, found out what the problems were. We reached agreement on how some of them might be resolved.

I actually took some of them under -- in -- in -- in my own hand and wrote some portions of a -- a draft accident report, and we had another meeting or maybe another two meetings and produced a report, but it involved activity on my part far beyond what I would normally be involved in from any other

131

mode in accident investigation. And I think the report was produced in the early spring of 2005, about two or three months later, after -- well, late -- beyond what the original target had been, but I'm not -- I'm not sure, because I -- I may not even have been the one who gave the original target. I just know that the chairman was upset that it was not proceeding very rapidly.

BY MS. MCBARNETTE:

Q Were you asked to take on duties that you considered were, in fact, Ms. Cooke's duties in this accident -- regarding this accident?

MR. OSWALD: Objection, ambiguous.

THE WITNESS: Yes.

BY MS. MCBARNETTE:

Q What duties were you asked to take on?

A Well, as I -- I just mentioned, we -- we had at least one or two, and maybe as many as three, what I would refer to as -- as progress or production meetings that I chaired to see who had an issue that was unresolved at the director's level that we needed to resolve.

132

And my recollection was the principal issue was between our resident human resources -- I mean human performance investigator, who was a Ph.D. on the psychology side, and our medical officer, who was an M.D., and how to describe some of the behaviors and some of the activities of the operator of the vessel, and I managed to reach some accord between those folks on that. And I think that's actually the section that I ended up writing up myself. So for the managing director who hopes that a -- when an -- when an accident report is presented at a managing director's meeting, I'm hoping it's a two-hour meeting, and I'm hoping at the end that I can sign a document sending it to the board, but instead of that I'm actually involved in the nitty-gritty of the process and even one of the -- the authors in the process, and that's -- that's unique.

Q Okay. You said you chaired three meetings regarding --

A Two or three.

Q -- this accident?

A Yeah.

BY MS. MCBARNETTE:
Q He was an applicant?
A Yes.
Q Okay. Please continue.
MR. OSWALD: Can we -- we're going to run out of tape here. You have seconds.
MS. MCBARNETTE: Okay. So --
MR. OSWALD: Can we take a break here? Let's go off the Record and change the tape.
THE VIDEOGRAPHER: This marks the end of tape 2 in the deposition of Mr. Campbell. We're going off the Record. The time is 2:54 p.m.
(Recess -- 2:54 p.m.)
(After recess -- 2:56 p.m.)
THE VIDEOGRAPHER: This marks the beginning of tape 3 in the deposition of Mr. Campbell. We're back on the Record. The time is 2:56 p.m.
BY MS. MCBARNETTE:
Q Okay. Let's back up a little bit. You mentioned that you had procrastinated. What did you mean by that?
A I think that the first group was brought to



me and that it might have been a month, it might have been two months, it might have been three months before I actually turned my attention to it full-time and said, all right, I need to -- I need to move forward on this. So I'm not sure what the elapse was, but -- but like a lot of people, I procrastinate and I also know when I'm procrastinating, so at some point I said, you can't do this and you need to move forward.
Q Why did you choose to procrastinate?
A I wasn't anxious to -- to proceed to the selection of an SES that I didn't necessarily think was going to work satisfactorily. I didn't think that Marjorie Murtagh Cooke, the plaintiff here, was going to be selected. I would not have recommended her selection, but I also didn't think that the pool that -- that I looked at when I initially went through was attractive.
Q After the position was readvertised, did you select a panel to review the incoming applications?
A Yes.
Q Do you know if that panel is -- was the final panel that actually selected the person who was



selected?
A Panels themselves don't select --
Q Right.
A -- so the panel wouldn't have selected. I believe that the panel that I suggested was the panel that made the review of the applications, so that's a yes. Were they a selector, I think that that's probably going to be a no.
Q Were you the selecting official for that particular position?
A No, for two reasons. One, I think I was no longer the managing director; and, two, as a matter of reality, the selection of any SES is going to be the chairman. As I mentioned earlier, the managing director works on a delegation with the chairman's authority, but only on a delegation. And at the level of SES, a chairman will be the determining call.
Q Did you have any input on who was ultimately selected?
A No.
Q Did you tell the panel members for the second panel who they should select or review?



A No, I didn't communicate with them on the merits of the panel at all.
Q Did -- did you give your opinion about who should be selected to the chairperson or to any other officer who had input into sel -- selecting?
A No.
Q Are you aware if Ms. Cooke was ranked within the top five for the second panel's selection in the applicant pool?
MR. OSWALD: Objection as to form, misleading.
THE WITNESS: I -- I'm not sure how many people the panel actually considered at the top. I'm not sure what they went forward with. I did hear at some point that Marjorie was not to be offered an interview; so she was not in their top group, but that's -- that's what I know about it. I was told -- I've forgotten who told me that the panel was making a -- a recommendation -- I don't know whether it was a recommendation of one person or five people, but they were making a recommendation -- and that Marjorie was not included in the group that would be interviewed.

24
080048

# National Transportation Safety Board
## ORDER
**Office of the Managing Director**
**Washington, D.C.**

**NTSB 1000**

**8/21/96**

**SUBJECT:** PERFORMANCE MANAGEMENT SYSTEM

TABLE OF CONTENTS

PART I
GENERAL


| | Title | Page |
|---|---|---|
| 1. | PURPOSE | 1 |
| 2. | CANCELLATION | 1 |
| 3. | REFERENCES | 1 |
| 4. | DESCRIPTION OF PERFORMANCE MANAGEMENT | 1 |
| 5. | SCOPE | 2 |
| 6. | DEFINITIONS | 2 |
| 7. | RESPONSIBILITIES | 4 |

PART II
RATING PERIODS

| | | |
|---|---|---|
| 8. | RATING PERIOD DATES | 7 |
| 9. | EXCEPTIONS | 7 |

PART III
APPRAISING PERFORMANCE

| | | |
|---|---|---|
| 10. | THE PERFORMANCE APPRAISAL PROCESS | 8 |

PART IV
EMPLOYEE RECOGNITION

| | | |
|---|---|---|
| 11. | QUALITY STEP INCREASES (QSIs) | 11 |
| 12. | PERFORMANCE AWARDS | 11 |
| 13. | SPECIAL ACT/SERVICE AWARDS | 12 |
| 14. | SES AWARDS | 12 |


DISTRIBUTION: Chairman
Vice Chairman
Members
All Employees

OPI: AD

15. WITHIN-GRADE INCREASES (WGIs) ..... 12

PART V
ACTIONS BASED ON PERFORMANCE BELOW FULLY SUCCESSFUL

16. APPLICATION ..... 12
17. ASSISTING EMPLOYEES IN IMPROVING PERFORMANCE ..... 12
18. PERFORMANCE IMPROVEMENT PLAN NOTIFICATION AND EMPLOYEE COUNSELING ..... 13
19. MONITORING PERFORMANCE ..... 13
20. PROVIDING FEEDBACK ..... 13
21. ADDRESSING UNACCEPTABLE PERFORMANCE ..... 14
22. PROPOSING AND TAKING ACTION BASED ON UNACCEPTABLE PERFORMANCE ..... 14
23. GENERAL ..... 14
24. ADVANCE WRITTEN NOTICE ..... 15
25. DECIDING OFFICIAL'S FUNCTIONS ..... 16
26. FINAL WRITTEN DECISION ..... 17
27. CONCURRING OFFICIAL'S FUNCTIONS ..... 18
28. ALLEGATIONS OF DISCRIMINATION ..... 18
29. REMOVAL/REASSIGNMENT FROM SES POSITIONS ..... 18
30. DENYING A WITHIN-GRADE INCREASE (WGI) BASED ON PERFORMANCE ..... 18
31. REASONABLE ACCOMMODATION ..... 18
32. ALCOHOL AND/OR DRUG ABUSE ..... 18
33. PHYSICAL AND MENTAL CONDITIONS ..... 19
34. DISABILITY RETIREMENT ..... 19

PART VI
DISAGREEMENTS, APPEALS, AND RECORDS

35. PERFORMANCE DISAGREEMENTS ..... 20
36. CANCELING A DISAGREEMENT ..... 20
37. MATTERS THAT MAY NOT BE DISPUTED OR APPEALED ..... 20
38. APPEALS ..... 20
39. OFFICIAL RECORDS ..... 21

PART I
GENERAL

1. PURPOSE. This Order describes the performance management system (PMS) at the National Transportation Safety Board (NTSB).

2. CANCELLATION. This Order cancels NTSB Order 10-A, dated 11/9/88.

3. REFERENCES.

   a. 5 C.F.R. Parts 293, 339, 351, 359, 430, 432, 451, 531, and 792.

   b. Board Order Nos. 1220, Disciplinary and Adverse Actions, and Grievances and Appeals, and 1230, Equal Employment Opportunity and Complaints of Discrimination in Safety Board Employment Practices.

4. DESCRIPTION OF PERFORMANCE MANAGEMENT.

   a. Performance management is the systematic process by which the NTSB involves its employees, as individuals and members of a group, in improving organizational effectiveness in the accomplishment of its mission and goals.

   b. Performance management should:

      (1) Communicate and clarify organizational goals to employees;

      (2) Identify individual and, where applicable, team accountability for accomplishing organizational goals;

      (3) Identify and address developmental needs for individuals and, where applicable, teams;

      (4) Assess and improve individual, team, and organizational performance;

      (5) Use appropriate measures of performance as the basis for recognizing and rewarding accomplishments; and

      (6) Use the results of performance appraisal as a basis for appropriate personnel actions.

5. SCOPE.

a. The provisions of this Order do not apply to performance-based actions taken under Order 1220, Disciplinary and Adverse Actions, and Grievances and Appeals.

b. The performance management system includes senior executives (employees in the Senior Executive Service (SES)), supervisory, and nonsupervisory employees. The appraisal systems for these employees are used to recognize differences in the quality of performance, and as a basis for adjusting base pay, training, rewarding, reassigning, promoting, demoting, removing, or retaining employees.

c. The provisions of this Order do not apply to Presidential appointees, Administrative Law Judges, or non-SES positions in the excepted service in which employment is not reasonably expected to exceed 120 calendar days in a consecutive 12-month period.

6. DEFINITIONS.

a. Acceptable Performance. Performance that meets the written performance requirement(s) or standard(s) above the Unacceptable (PMS) or Unsatisfactory (SES) level for the critical element(s) at issue.

b. Appraisal. The act or process of reviewing and evaluating the performance of an employee against the described performance standard(s).

c. Critical Element. A written component of a position consisting of one or more duties and responsibilities that contributes toward accomplishing organizational goals and objectives, and that is of such importance that Unacceptable or Unsatisfactory performance on the element results in Unacceptable or Unsatisfactory performance in the position.

d. Executive Resources Board (ERB). A panel chaired by the Managing Director and including the Deputy Managing Director, all SES career office directors, and advisors (non-members) responsible for various SES and supervisory management policy and planning. Three members are required for a quorum.

e. Non-critical element. A component of an employee's position that does not meet the definition of a critical element, but is of sufficient importance to warrant written appraisal.

f. Performance Review Boards (PRB). Panels composed of at least three employees that are established by an office director, the Deputy Managing Director, Managing Director, or Chairman to review performance-related matters, and make

recommendations to the office director, Deputy Managing Director, Managing Director, or Chairman. Three members are required for a quorum.

g. Performance Standards. The expressed measure of level of achievement, including quantity, quality, and timeliness, established for the duties and responsibilities of a position or a group of positions.

h. Progress Review(s). Interim review(s) of the employee's progress towards achieving the performance standards. In accordance with OPM regulations, at a minimum, these reviews should take place at least once during the rating period. (The Human Resources Division annually issues a memorandum to rating and reviewing officials to remind them to prepare progress reviews at least 90 days prior to the end of the rating period.) Progress reviews are not summary ratings.

i. Rating Levels. The levels of performance for critical elements: Outstanding, Excellent, Fully Successful, Minimally Satisfactory, and Unacceptable (for SES, Unsatisfactory). These levels may also be used for non-critical elements.

j. Rating Official. Establishes critical elements and noncritical elements and performance standards at the beginning of the appraisal period, determining and communicating to the employee the performance requirements for the position. Assigns work, assists in developing employees' capabilities in the job, and evaluates the employee's performance (interim and final). Prepares Performance Improvement Plans (PIPs). Recommends rating/award determinations and other performance-based actions.

k. Rating of Record. The summary rating required at the end of the appraisal period or at such other times for special circumstances, i.e., an employee's rating has fallen since the last rating period, and the rating official must prepare a rating of record in making a determination of within-grade increase eligibility.

l. Reviewing Official. Reviews, revises, and approves the rating official's assessment of the employee's performance, and reviews and approves rating elements and performance standards at the beginning of the rating period, and when they change. Reviews PIPs, rating/award determinations, and other performance-based actions. Determines and provides appropriate assistance in improving performance for senior executives rated Unsatisfactory.

m. Summary Rating. The written record of the appraisal of each critical and non-critical element and the assignment of an overall summary rating, normally given at the end of the rating period. (All elements should be defined as critical). It may also be given throughout the rating period after completion of the minimum 90-day appraisal period. An employee may receive a summary rating for a 90-day period served on a detail, temporary promotion, or for work accomplished in a position from which the employee

is being reassigned. Interim summary rating(s) will be considered when deriving the annual rating of record, i.e., at the end of the rating period.

n. Unacceptable/Unsatisfactory Performance. Performance that fails to meet established performance standards in one or more critical elements of the employee's position.

7. RESPONSIBILITIES.

a. Chairman. In addition to serving as the rating official for employees directly supervised and as the reviewing official for certain other employees, approves SES ranks and bonuses, SES awards, and SES performance pay decisions to assure overall agency performance appraisal consistency, and to assure that SES performance-related awards are within funding availability. Final approved actions are forwarded to the servicing human resources representative for processing.

b. Managing Director.

(1) Prepares progress reviews and performance appraisals of employees directly supervised and serves as reviewing official for other employees. Reviews each organization's listing of progress reviews and performance appraisals for all employees to ensure equity and compliance with agency and administration goals.

(2) Directs revisions of ratings for supervisory and nonsupervisory employees, when necessary, providing the rationale for any revisions in writing. For SES members, provides higher level review of an initial rating, documents conclusions and recommendations without altering the initial rating, and forwards to the SES Performance Review Board (SES PRB) for review and comment.

(3) Approves non-SES supervisory and nonsupervisory employees' performance appraisals, awards, promotions, pay decisions, etc., based on performance.

(4) Ensures that organizational objectives are included in each SES member's rating elements and performance standards.

c. Chief, Human Resources Division, and Staff. Provide guidance to managers, supervisors, employees, and members of PRBs on all aspects of the performance management system. Monitor and evaluate the systems, as appropriate.

d. Employees. Review, evaluate, and discuss position descriptions, rating elements, performance standards, progress reviews, and final ratings and provide feedback for corrections, at least annually. Provide written comments whenever applicable. Communicate to the rating official resources and managerial support needed to meet performance expectations. Recommend changes to or propose potential critical

elements for the upcoming performance appraisal period. Should assist in establishing or revising standards, elements, and element weights. Initiate progress reviews, as appropriate.

e. Executive Resources Board (ERB). The Chief, Human Resources Division, and the EEO Director, or their designees, are advisors to the ERB. The ERB's responsibilities are:

(1) Merit staffing for career appointment to the SES.

(2) Advising the Managing Director, who advises the Chairman, as to the number of SES and non-SES positions needed, distribution of allocated authorities, development of executive staffing plans, forecasting of executive requirements, determination of how these needs will be met, and determination of executive development program objectives.

(3) Staffing of supervisory General Schedule positions, including conduct of the merit staffing process, selections, promotions, reassignments, and details.

(4) Career SES executive development, including selection of candidates for programs to develop executive qualifications, the planning and conduct of development programs, programs for the continuing development of senior executives, and evaluation of performance during development programs.

(5) Position management, including proper use of SES and other positions, and redistribution of functions to maximize the effectiveness of NTSB SESers.

(6) Pay management, including advising on the most effective use of pay flexibility provided by the SES.

(7) Development of policy on performance awards for the SES and their use to enhance employee effectiveness, and agency-wide coordination of performance awards with statutory requirements and central oversight of performance awards.

(8) Development of policy on discipline and removal of SESers for cause.

(9) Development of policy on removal from SES based on performance or during probation, and oversight of removal and fallback procedures.

(10) Nominations for the awarding of honorary rank to senior executives.

f. Performance Review Boards (PRBs).

(1) SES Career PRB. A panel composed of the Deputy Managing Director as SES PRB Chair, SES career office directors, with the Chief, Human Resources Division, and EEO Director as advisors. The SES career PRB's responsibilities are to:

(a) Monitor the SES performance review process, and recommend ways to improve and strengthen the SES performance appraisal system.

(b) Review and approve or recommend to the Chairman changes to the critical and non-critical elements, weights, and performance standards for all SES employees.

(c) Make written recommendations to the Chairman concerning the performance of each senior executive and the level of basic pay and bonuses to be granted to Fully Successful or above senior executives. The Chairman approves or revises appraisals only after considering the recommendations of the SES PRB.

(d) When recommending a less than Fully Successful rating, refer the senior executive's appraisal to the ERB for additional recommendation or action prior to the Chairman's final review and decision.

The Chairman may not be a member of the PRB. Notices of appointment are published in the Federal Register. In reaching a decision, the PRB may obtain additional information, either orally or in writing. Members shall have at least Fully Successful, or equivalent, performance ratings, consistently have applied NTSB appraisal systems effectively in their own organization, be objective and possess a thorough knowledge and understanding of the NTSB appraisal system gained through experience and training, will not be an executive whose performance appraisal was initially prepared by the incumbent under review, and will not be the supervisory official who made the initial appraisal of the employee. SES supervisory officials may be asked to appear before the PRB, and the SESer whose evaluation is being discussed will not participate in the discussions.

(2) SES Non-Career PRB. A panel composed of the Vice Chairman as PRB Chair, the Special Assistant to the Chairman, and the Chief, Human Resources Division. The SES-non-career PRB's responsibilities are to:

(a) Review and approve or recommend changes to the Chairman regarding any non-career executive's critical and non-critical elements, element weights, and performance standards.

(b) Make written recommendations to the Chairman concerning the performance of any non-career executive and the level of basic pay and award to be granted.

(3) Supervisory and Nonsupervisory Employees' PRB. An ad hoc panel composed of three members appointed by the Office Director or Deputy Managing Director to review performance disagreements.

PART II
RATING PERIODS

8. RATING PERIOD DATES. The annual appraisal period for SES senior executives begins on September 1 and ends August 31; for supervisory employees it begins on August 1 and ends on July 31; for nonsupervisory employees it begins on June 1 and ends on May 31.

9. EXCEPTIONS.

a. The Minimum Appraisal Period for All Employees. All employees must have been given rating elements and performance standards 90 calendar days before an actual performance rating can be given. If an employee has less than 90 calendar days total service in the NTSB appraisal system, the rating period must be extended until the minimum appraisal period is met.

b. Minimum Appraisal Period Under New Supervisor. No performance rating will be given by a rating official until he/she has directly supervised an employee for 90 calendar days. Examples of options:

(1) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The Deputy Office Director, or any other next higher official in the chain of command, may complete division employees' annual ratings.

(2) Division chief is newly appointed to position at the time the annual ratings are due and has not supervised employees for 90 calendar days. The division chief may extend the rating due date until she/he has supervised employees for 90 calendar days.

(3) Division chief leaves position 5 months into the rating period. New division chief may complete annual ratings. (Departing division chief should complete summary ratings for incorporation in the final ratings.)

c. Rating Period Procedures for All Employees Who Have Completed a Minimum Appraisal Period and Change Positions. If an employee has served in a position for the minimum appraisal period and changes positions during that rating period, his/her

performance shall be evaluated and an element rating assigned to each performance element on which the employee had an opportunity to demonstrate performance prior to his/her departure and a summary rating shall be given. This summary rating must be taken into consideration in deriving the next rating of record.

d. Rating Period Procedures for All Employees While on Detail or Temporary Promotion. Employees who are detailed or temporarily promoted within the NTSB for more than 90 days will receive written elements and standards no later than 30 calendar days after the detail/temporary promotion begins. Critical elements are established by the rating official in consultation with the employee. Ratings on the elements must be prepared for these details and temporary assignments and must be considered in deriving a final rating at the end of the performance appraisal period. When an NTSB employee is detailed outside NTSB at any time during the rating period, NTSB will make a reasonable effort to obtain appraisal information from the borrowing organization and consider that information in deriving the employee's next rating of record. If such an employee has served in NTSB for the minimum appraisal period, the employee must be rated at the end of the appraisal period. If the employee has served 90 calendar days or more outside the NTSB, but has not met the minimum appraisal period within the NTSB, NTSB will make a reasonable effort to prepare a rating using appraisal information obtained form the borrowing organization. A rating of record will then be derived following the normal NTSB appraisal procedures.

e. Rating Period Procedures for Employees Transferring to Another Federal Agency During the Rating Period. All employees who have served at least the 90-day appraisal period will be evaluated and given a summary rating when they transfer to another agency. This rating, along with the performance appraisal, will be transferred with the employee's Official Personnel Folder (OPF).

## PART III
## APPRAISING PERFORMANCE

### 10. THE PERFORMANCE APPRAISAL PROCESS.

a. A Step-by-Step Approach to Performance Determinations for Rating Officials.

(1) Establish/review/define position descriptions, elements, element weights, and performance standards, using employee input.

(2) Conduct progress review(s).

(3) Obtain employee feedback.

(4) Appraise end-of-year performance, and make a performance rating determination. (Do not release rating to employee until authorized.)

(5) Obtain employee feedback.

(6) Make personnel decisions based on the appraisal.

b. Beginning of the Appraisal Process. Rating officials are required to inform new employees of performance expectations in writing, and ensure that performance expectations for current employees are updated annually, as needed. Rating officials should have completed the following steps normally within 30 days after the appraisal period begins.

(1) Review the position description, and elements and standards in performance plans for employees.

(2) Make necessary corrections to position descriptions, and to elements, element weights, and performance standards.

(3) Ask for input from employees.

(4) Finalize elements/standards and provide them to employees.

Note: If the review determines that changes are not necessary, standards should still be given in writing to an employee at the beginning of each appraisal process.

c. Progress Reviews. By law, a progress review shall be held for each employee at least once during the appraisal period. Reviewing officials and employees are all involved in the performance review process with the rating officials being responsible for initiating and conducting the reviews. Progress reviews are important to let employees know how they are performing in relation to their performance appraisal so they are not surprised by their end-of-year rating. If deficiencies are prevalent, it also satisfies the legal requirement to inform the employee of below Fully Successful performance. Also, the Human Resources Division will provide additional progress review guidance annually. Rating officials should take the following steps to ensure that a proper progress review is completed.

(1) Ask employee for a list of accomplishments to date.

(2) Ask reviewing official for feedback.

(3) Determine performance to date of each element, and assign an overall summary rating.

(4) If performance is below Fully Successful on any element, contact the human resources representative for guidance on completing a Performance Improvement Plan (PIP). (See Part V for a discussion on PIPs.)

(5) Discuss performance to date with employee, and if a PIP is required, indicate any significant accomplishments or areas in which improvement is needed.

(6) Sign the form, get the reviewing official's signature and then the employee's signature. (If employee refuses to sign, so indicate on the form and notify employee that he/she may attach any comments.)

(7) Give a copy of the progress review to the employee, retain a copy, and forward the originals of the reviews for all your employees through supervisory channels to your servicing human resources representative.

d. <u>End of the Appraisal Process for Non-SES Employees</u>. End-of-year appraisal information is important to employees because they need to know their performance levels. Awards, bonuses, promotions, training and career development, and performance-based actions are based on this information. Rating officials should take the following steps within the timeframes established in the Human Resources Division's annual end of the appraisal process guidance.

(1) Ask employees for a list of accomplishments that have occurred since the progress review.

(2) Ask reviewing official for feedback.

(3) Determine performance of each element, and assign an overall summary rating.

(4) Prepare a tentative ratings/awards list for all employees and forward through supervisory channels to the Human Resources Division.

(5) If performance is below Fully Successful on any element, contact the servicing human resources representative for guidance on completing a Performance Improvement Plan (PIP).

(6) Once the Managing Director has approved the tentative ratings/awards list, finalize the performance appraisal, and the PIP, if applicable.

(7) Discuss performance with employee, and the PIP, if required, indicating any significant accomplishments or areas in which improvement is needed.

(8) Sign the form, get the reviewing official's signature and then the employee's signature. (If employee refuses to sign, so indicate on the form and notify employee that he/she may attach any comments.)

(9) Inform the employee of the assistance and counseling to be provided throughout the PIP, if one is required.

(10) Forward the appraisal, the PIP, if one was accomplished, and any applicable awards through the Office Director to the human resources representative for processing and retention. Give the employee a copy.

Note: If performance is at Minimally Satisfactory or Unacceptable level, contact the servicing human resources representative for guidance.

e. End of the Appraisal Process for SES Employees. For SES employees, rating officials discuss the proposed rating of record (initial rating) with the executive and give the executive an opportunity to respond in writing and an opportunity for review by someone other than the rating official who is in a higher executive level, unless there is no higher level executive. Forward the initial rating and any comments from the executive to the reviewing official. The reviewing official does not give prior approval to or revise an initial rating, but provides comments and recommendations on the completed initial rating to the SES PRB, the initial rater, and the SES member. (Most of the same steps under d. above should be followed for SES employees, as appropriate.)

f. The Upcoming Rating Period for All Employees. If needed, hold a separate meeting about a week after the appraisal conference to review the elements, element weights, performance standards and employee training needs for the upcoming rating period. (See paragraph 10.b. above.) Even if the elements and standards don't change frequently or significantly, a separate discussion is still suggested to allow for employee communication and update.

## PART IV
## EMPLOYEE RECOGNITION

11. QUALITY STEP INCREASES (QSIs). Initiated by rating officials with the reviewing official's concurrence for employees who have received an overall summary rating of record of Outstanding. QSI's may not be granted to an employee who has received an overall summary rating of record below Outstanding. QSIs may not be granted to an employee who has received a QSI within the preceding 52 consecutive calendar weeks.

12. PERFORMANCE AWARDS. A performance award shall be based on the employee's rating of record for the current appraisal period for which performance awards are being

paid. Each decision to grant a performance award must be approved by a higher level supervisor, except in cases where the employee reports directly to the Chairman. These reviewing officials should be the same ones as those responsible for making the performance appraisal decisions. The Human Resources Division will issue guidance on performance award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

13. <u>SPECIAL ACT/SERVICE AWARDS</u>. These awards are described in Order 1002, Incentive Awards. The Human Resources Division will issue guidance on Special Act/Service award criteria and amounts annually in conjunction with the provision of instructions on completing end-of-year ratings.

14. <u>SES AWARDS</u>. SES employees are eligible for SES Performance and Rank awards in accordance with OPM policies. They are also eligible for Special Act Awards in accordance with Order 1002.

15. <u>WITHIN-GRADE INCREASES (WGIs)</u>. WGIs recognize employees in the General Schedule who are performing at an acceptable level of competence. WGIs are effective the first pay period following completion of the WGI waiting period. WGIs are an increase to basic pay equivalent to the next higher step in the grade. A waiting period must have been completed and the employee may not have received an equivalent increase during the waiting period. Employees already at the maximum step of their grade may not receive a WGI. WGIs are processed automatically by the Human Resources Division once the human resources representative has received a supervisory certification that the employee is performing at an acceptable level of competence.

## PART V
## ACTIONS BASED ON PERFORMANCE BELOW FULLY SUCCESSFUL LEVEL

16. <u>APPLICATION</u>. This part applies to supervisory and nonsupervisory employees (non-Schedule "C" positions) who are being rated under the performance appraisal system.

17. <u>ASSISTING EMPLOYEES IN IMPROVING PERFORMANCE</u>. Performance evaluation is more than the process of assigning performance ratings. When a supervisor determines that an employee has a performance deficiency at any point during the rating period, the supervisor should initiate appropriate corrective action. The supervisor should not wait until the end of the rating period to address the problem. Corrective action includes identifying the critical element(s) for which performance is less than Fully Successful, and structuring assignments that will provide the employee with an opportunity to improve performance to a Fully Successful level. Paragraphs 18, 19, and 20 below are the recommended approaches for the supervisor to take when performance has fallen below Fully Successful, but has not been determined to be at the Unacceptable level.

080062



18. PERFORMANCE IMPROVEMENT PLAN NOTIFICATION AND EMPLOYEE COUNSELING. At any time during the performance appraisal cycle that an employee's performance is determined to be Unacceptable in one or more critical elements, the supervisor shall notify the employee of the element(s) for which performance is Unacceptable. Additionally, the supervisor shall inform the employee of the performance standard(s) that must be attained in order to demonstrate acceptable performance, and provide a reasonable opportunity to improve performance. The notification shall be in the form of a memorandum or letter to the employee and a PIP that identifies the element(s) and performance standard(s) for which the employee has failed to meet the Fully Successful level. The PIP shall be discussed with the employee and the instances of less than Fully Successful performance relevant to each element and performance standard. Additionally, the supervisor shall describe what steps the employee must take to improve performance to the Fully Successful level for each element, and the specific assistance that will be offered to improve performance. Assistance may include, to the extent appropriate, structured job assignments, training, scheduled meetings with the supervisor for guidance and advice on how to improve work performance, and referral to the Employee Assistance Program Coordinator for assistance with resolving personal problems.

19. MONITORING PERFORMANCE. After the employee has been made aware of the performance problems and necessary correction action, the supervisor should continue to monitor the employee's work performance to ensure that the necessary corrective action has been taken. Monitoring performance means observing and gathering evidence of progress or lack of progress. It enables the supervisor to reinforce positive performance and to deal promptly with any instances of negative performance as soon as they occur. While it is at the supervisor's discretion to decide how closely to monitor the employee's performance, the supervisor should not limit monitoring to sporadic incidents of exceptionally good or poor performance.

20. PROVIDING FEEDBACK. The supervisor should keep the employee informed orally and/or in writing of progress toward correcting the performance problem. If the employee's performance is deficient after a reasonable amount of time, the supervisor must determine if the employee is performing at the Unacceptable level based on consultation with the servicing human resources representative. If so, the employee must be given a formal opportunity to demonstrate at least Minimally Satisfactory performance. Reasonable time means an amount of time commensurate with the employee's duties and responsibilities which is sufficient to allow the employee to show whether he or she can meet minimum performance standards. If the employee alleges or the supervisor suspects that a handicapping condition (including drugs and/or alcohol use) is causing performance deficiencies, the supervisor shall follow the guidance provided in paragraphs 30 and 31 below. If the employee fails to improve to at least a Minimally Satisfactory level, a performance-based personnel action may be taken. See paragraph 22.

21. ADDRESSING UNACCEPTABLE PERFORMANCE. At any time during the performance appraisal period that an employee's performance is determined to be Unacceptable in one or more elements (and a PIP has already been attempted), the supervisor shall notify the employee of the element(s) for which performance is Unacceptable, and inform the employee of the performance standards that must be met in order to demonstrate acceptable performance. The supervisor shall also inform the employee that unless his or her performance in the critical element(s) improves to **and is sustained at an acceptable level, the employee may be reduced in grade or removed.** For each element in which the employee's performance is Unacceptable, the supervisor shall afford the employee a reasonable opportunity to demonstrate acceptable performance, commensurate with the employee's duties and responsibilities. As part of the employee's opportunity to demonstrate acceptable performance, the supervisor shall offer assistance to the employee in improving Unacceptable performance. (See paragraphs 17 - 20 above.)

22. PROPOSING AND TAKING ACTION BASED ON UNACCEPTABLE PERFORMANCE.

a. Once an employee has been afforded a reasonable opportunity to demonstrate acceptable performance but fails to do so, the supervisor may propose a reduction in grade or removal action. The action may only be proposed if the employee's performance during or following the opportunity to demonstrate acceptable performance is Unacceptable in one or more of the critical elements for which the employee was afforded an opportunity to demonstrate acceptable performance.

b. If an employee has performed acceptably for 1 year from the beginning of an opportunity to demonstrate acceptable performance, and the performance again becomes Unacceptable, the supervisor shall afford the employee an additional opportunity to demonstrate acceptable performance (by again beginning the paragraph 17 - 20 procedures) before determining whether to propose a reduction in grade or removal action.

c. A proposed action may be based on instances of Unacceptable performance that occur within a 1 year period ending on the date of advance written notice of proposed action.

23. GENERAL. An employee against whom a reduction in grade or removal action is proposed is entitled to:

a. A 30-day advance written notice of the proposed action. This time may be extended for a period not to exceed 30 days for the following reasons:

(1) Obtain and/or evaluate medical information when the employee has raised a medical issue in the answer to a proposed reduction in grade or removal;

(2) Arrange for the employee's travel to make an oral reply to the deciding official, or the travel of the deciding official to hear the employee's oral reply;

(3) Consider the employee's answer, if an extension to the period for answer has been granted (e.g., because of the employee's illness or incapacitation);

(4) Consider reasonable accommodation of a handicapping condition;

(5) Consider positions to which the employee might be reassigned or reduced in grade; or

(6) Comply with a stay ordered by the Merit Systems Protection Board (MSPB).

If the supervisor believes that an extension of the advance written notice is necessary for other than a reason described above, he/she may request prior approval for extension from OPM through the human resources representative.

b. Time to answer, but not less than 24 hours, orally and in writing and to furnish affidavits and other documentary evidence in support of the answer.

c. Representation by an attorney or other representative.

d. A written decision and the specific reasons for the action at the earliest practicable date.

24. <u>ADVANCE WRITTEN NOTICE</u>. The notice must:

a. Identify both the specific instances of Unacceptable performance and the critical element(s) involved in each instance of Unacceptable performance.

b. State that the employee has a right to respond to the action within 15 calendar days, and that no decision will be made until after the response has been received and considered, or until the response time has passed, and that any action to be taken, if adverse to the employee, shall be taken usually within 60 calendar days from delivery of the notice. The notice shall indicate that, if an extension of time is needed, a written request should be made by the employee to the deciding official specifying the need for the extension.

c. Advise the employee of the right to answer orally and/or in writing, and to furnish affidavits and other documentary evidence in support of an answer within 15 calendar days from receipt of the advance written notice. If the employee wishes the NTSB to consider any medical condition which may contribute to the problem, the employee shall be given a reasonable additional time, if needed, to furnish medical documentation of the condition. Whenever possible, the employee shall supply such documentation

within the time limits allowed for an answer. The deciding official will summarize an oral response of the employee, if one is provided, and will include it in the file.

e. Advise the employee of the right to representation by an attorney or another representative. The General Counsel may disallow as the employee's representative an individual whose activities as a representative could cause a conflict of interest or position, an NTSB employee whose release from his or her position could give rise to unreasonable costs to the Government, or an employee whose priority work assignment precludes his or her release.

f. Advise the employee of the right and the right of his/her representative to review the material relied on to support the reasons for the proposed action. Material that may not be disclosed to the employee, the employee's representative, or a designated physician, may not be used.

g. Advise the employee and his/her representative of their right to have up to 8 hours of official time to prepare the answer.

h. Identify the management official who will receive the written and/or oral answer (usually the management official at the next higher level than the official who proposed the action) and how to make contact.

i. Identify the name of the person to be contacted for information about the notice.

j. **Be reviewed by the Human Resources Division and Office of the General Counsel before issuance.**

k. If the employee is in a duty status, the notice shall be hand delivered at least 30 calendar days before the proposed action becomes effective, and documented by management that it was received. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address -- Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on the method used to mail the advance notice, it is presumed that it was received by the employee.)

25. <u>DECIDING OFFICIAL'S FUNCTIONS</u>. The deciding official:

a. Has the option to affirm the action as proposed, reduce it to a lesser action, or cancel it, if he or she believes the proposed action is not fully supported.

b. May grant an extension of time.

c. Makes a final decision within 30 days after expiration of the advance notice period. (A decision to reduce in grade or remove an employee for Unacceptable performance may be based only on those instances of Unacceptable performance that occurred during the 1 year period ending on the date of issuance of the advance notice of proposed action.)

26. FINAL WRITTEN DECISION. The management official who has been designated to receive the written and/or oral response will serve as the deciding official. The deciding official will consider only those reasons stated in the advance written notice, and will consider any answer of the employee or his or her representative in making a decision. If the employee provides an oral response, the deciding official will prepare a summary of the oral response and include it in the file and provide the employee with a copy. The decision must:

a. Be in writing and addressed to the employee.

b. State the nature of action to be taken against the employee and its effective date. **(The day the notice was issued does not count towards the 30-day requirement.)**

c. Refer to the advance notice by date and any amendments or additions.

d. State that the notice is withdrawn (along with amendments and additions) and the reason(s) for withdrawing the notice, if no action is to be taken against the employee.

e. Specify the instances of Unacceptable performance on which the action is based.

f. Indicate that the decision is supported by substantial evidence.

g. State that the employee and/or his or her representative's oral and/or written answer, if one was provided, was given full consideration in making the decision.

h. Inform the employee of any applicable appeal and/or grievance rights.

j. **Be reviewed by the Human Resources Division and Office of General Counsel before issuance.**

k. Be signed by the deciding official.

l. If the employee is in a duty status, the notice shall be hand delivered at least 3 calendar days before the proposed action becomes effective. If the employee is in a non-duty status, the notice may be hand delivered and witnessed, or sent by registered mail to the employee's home address -- Return Receipt Requested, and it is presumed that the employee received the notice. (Management will document for the file that, based on

080067



the method used to mail the written decision, it is presumed that it was received by the employee.)

27. CONCURRING OFFICIAL'S FUNCTIONS. The written decision shall be concurred in by the Managing Director, except in those cases where the Managing Director is the deciding or proposing official (in which case the Chairman will serve as the concurring official). The action may not be effected without the concurring official's signature.

28. ALLEGATIONS OF DISCRIMINATION. When an allegation of discrimination is made in connection with a performance management system action, any information or evidence submitted by the employee or the employee's representative orally or in writing shall be made part of the employee's answer to the advance notice. Such information shall be given consideration, by the deciding official, along with other supporting and rebuttal information in the file, in reaching a decision. If the decision is to reduce in grade or remove the employee, no action is to be taken without prior consultation with the EEO Director or designee.

29. REMOVAL/REASSIGNMENT FROM SES POSITIONS. Any career SES employee will be removed/reassigned from a position in the following instances: (1) reassignment or transfer within SES or removal from SES for an Unsatisfactory rating; (2) removal from SES for two Unsatisfactory ratings in a consecutive 5-year period; and (3) removal from SES for two less than Fully Successful ratings in a consecutive 3-year period.

30. DENYING A WITHIN-GRADE INCREASE (WGI) BASED ON PERFORMANCE. Performance below Fully Successful can result in a denial of a Within-Grade-Increase. A human resources representative must be contacted before actions to deny or withhold a WGI are initiated.

31. REASONABLE ACCOMMODATION. The Vocational Rehabilitation Act places an obligation on Federal employers to accommodate handicapping conditions of their employees. Accommodation refers to the alteration of the work environment and/or job in order to meet the individual needs of the employee. Generally, the balance between an accommodation that is reasonable as compared to one that imposes an undue hardship on the agency depends on the resources available to the agency.

32. ALCOHOL AND/OR DRUG ABUSE. If the supervisor suspects that an employee's misconduct and/or performance problem is caused by alcohol or drug abuse, he/she shall:

a. Consult a human resources representative.

b. Together with the servicing human resources representative, meet with a staff member of the Office of General Counsel to discuss the legal aspects of the case.

c. Meet with the Employee Assistance Program Coordinator (designated by the Chief, Human Resources Division) who will provide guidance on how to confront/refer the employee for assistance.

d. Meet with the employee to discuss misconduct and/or performance deficiencies and the possibility of a future disciplinary or adverse action if the action(s) persists.

e. Refer the employee to a specific counseling program as identified by the representative.

f. Inform the employee that information that he or she provides during sessions with the counselor is confidential. If the employee claims that alcoholism and/or drug abuse caused the misconduct and/or performance deficiency, the supervisor must allow the employee the opportunity to enter a program and the opportunity to demonstrate successful rehabilitation.

If there is an alcohol and/or drug problem, an employee should admit the problem, accept any offer of rehabilitative assistance or elect to participate in a program of choice. If such is the case, the employee should provide to the supervisor a report from the treatment facility. The report should outline the nature of the program and its expected duration. If no report is provided or the employee refuses to go for treatment, the supervisor may proceed with appropriate action against the employee.

33. PHYSICAL AND MENTAL CONDITIONS. When an employee alleges that a physical or mental handicap is causing a misconduct and/or performance problem, the supervisor should request that the employee submit medical documentation from a licensed medical practitioner to substantiate the existence of the condition and its effect on job conduct. The medical documentation will be used by the supervisor in consultation with the servicing human resources representative to determine whether the employee is handicapped, if reasonable accommodation is warranted, and what accommodations are appropriate. The supervisor must allow the employee a reasonable amount of time to submit the medical documentation. If the employee requests an accommodation not indicated by his or her practitioner, the supervisor, in consultation with the human resources representative, should determine whether the type of accommodation requested is appropriate and feasible.

34. DISABILITY RETIREMENT. If the employee has at least 5 years of Federal civilian service and a misconduct and/or performance problem may have been caused by a medical condition, the supervisor should inform the employee of his or her possible eligibility for disability retirement and refer the employee to the servicing human resources representative for retirement counseling. In most cases, the employee is responsible for filing the retirement application.

# PART VI
# DISAGREEMENTS, APPEALS, AND RECORDS

35. PERFORMANCE DISAGREEMENTS.

a. PIPs, position descriptions, performance standards, rating elements, ratings of record, and summary ratings, are all performance-related items that may be disputed at the NTSB.

b. Supervisory and nonsupervisory employees are encouraged to resolve matters of disagreement concerning appraisals and ratings with the rating official and the reviewing official. Failing resolution of the matter, employees may file a performance disagreement with their office director, who will convene a PRB to review the matter. Supervisory and nonsupervisory employees should also consult their servicing human resources representative to discuss appeal procedures, especially for personnel actions based on Unacceptable performance. The PRBs review the appraisal and any relevant supporting documentation, and make recommendations to the management official above the reviewing official, who shall make the final decision. If the performance disagreement is filed by a supervisory employee, the Managing Director or Chairman will be the deciding official. Suggested times for the disagreement process are: 10 working days for presentation to a PRB; 10 working days for the PRB to make a recommendation; and 10 working days for a final decision.

c. An SES executive who disagrees with the critical elements or the rating of record is encouraged to resolve the matter with the rating official and the reviewing official. Failing resolution, any relevant supporting documentation should be forwarded to the SES PRB or the Chairman within a reasonable time (usually 10 working days). The Chairman will make the final decision on all disagreements.

d. Performance disagreements are internal Board procedures and do not give rise to appeals outside the Board. See paragraph 38 below.

36. CANCELING A DISAGREEMENT. An employee may cancel a performance disagreement at any time. Once canceled, the disagreement may not be reactivated.

37. MATTERS THAT MAY NOT BE DISPUTED OR APPEALED. Progress reviews may not be disputed. Assessments of performance at the time of progress reviews can change before the end of the rating period and disputes filed before that time would be premature. However, employees may attach descriptions of matters of concern. Performance appraisal and summary performance ratings of SES members' performance are not appealable.

38. APPEALS. Eligible employees (consult with the servicing human resources representative) may appeal a reduction in grade or removal to the MSPB within 30

calendar days after the effective date of the action. The servicing human resources representative is available to advise any employee about the appeal process.

39. OFFICIAL RECORDS. When a performance-based action is effected, all relevant documentation concerning a reduction in grade or removal shall be available for review by the employee or his/her representative. At a minimum, the record shall consist of a copy of the notice of proposed action, the answer of the employee when it is in writing, a summary when the employee makes an oral reply, the written notice of decision and the reasons, and any supporting material including documentation regarding the opportunity afforded the employee to demonstrate acceptable performance. If an action ultimately is not effected, all documents should be destroyed after 1 year, unless they are a part of a negotiated settlement. See paragraph 22(c).

Kenneth U. Jordan
Managing Director

# National Transportation Safety Board

**Office of the Managing Director**
**Washington, D.C.**

**ORDER**

**NTSB 1001**

**1/24/96**

**SUBJECT:** MERIT STAFFING PLAN

1. PURPOSE. This Order describes the policies and procedures governing the administration of the Merit Staffing Plan at the National Transportation Safety Board (NTSB).

2. CANCELLATION. This Order cancels NTSB Order 3315.1A dated 10/6/82.

3. REFERENCES. 5 CFR Parts 212, 330, and 335.

4. SCOPE. The provisions of this Order apply to all NTSB competitive staffing actions, not excepted from competition by this Order, in the competitive service and Senior Executive Service (SES) career service.

## PART I
## NON-SES POSITIONS

5. POLICY.

   a. Vacancies will be filled with the best qualified available candidates, promoting from within whenever possible. This policy does not prohibit the filling of positions by other appropriate merit staffing processes and procedures (i.e., reinstatements, transfers, reassignments, Office of Personnel Management (OPM) certificates of eligibles, displaced employee placement programs, etc).

   b. Supervisory positions may be filled with persons without prior supervisory experience, if they meet the specific requirements established for supervisory positions.

   c. The administration of the merit staffing program will be in compliance with applicable laws and regulations, including those related to equal employment opportunity, political activity and conflicts of interest. There will also be a mechanism in place that ensures candidates opportunities for appeal or administrative review.

   d. All merit staffing actions shall be made solely on the basis of merit, fitness and qualifications, without regard to race, color, national origin, sex, non-disqualifying

DISTRIBUTION: Chairman
Vice Chairman
Members
All Employees

OPI: AD

physical handicap, marital status, age, and other non-merit criteria, including favoritism based on personal relationship or patronage.

6. DEFINITIONS.

a. Area of Consideration. The designated areas (Status or All Sources -- Nonstatus) in which NTSB, using competitive procedures, makes an intensive search for eligible candidates in filling a specific vacancy.

b. Delegated Examining Unit. The OPM has delegated to the NTSB the authority to examine and hire status and nonstatus candidates without further examination under OPM's competitive procedures. This authority is evaluated by OPM to ensure that NTSB's merit staffing procedures are in accordance with law.

c. Status. Career and career-conditional employees, current or former Federal employees who have reinstatement eligibility, and individuals with non-competitive eligibility are considered as having "status" eligibility.

d. All Sources (Nonstatus). Individuals who have never held a competitive career-type position with the Federal Government or who no longer have reinstatement eligibility have no "status" eligibility.

e. Job Analysis. A systematic review of a position to determine the knowledge, skills, and abilities an individual must have for successful performance in the position.

f. Selective Factors. Mandatory job-related knowledge, skills and abilities essential for the performance of the duties of the position, i.e., knowledge of aerodynamics for an aerospace engineer.

g. Quality Ranking Factors. Desirable, but not mandatory skills, knowledge, and abilities that are important but not essential for successful performance in a position and permit making distinctions among qualified candidates.

h. Rating Schedule. A point-rated system containing the criteria by which a candidate's experience, education/training and self-development, awards, performance appraisal, and other significant job-related skills, knowledge, abilities, and personal characteristics are rated and ranked.

i. Merit Promotion Panel (Evaluation Panel). A group of employees convened for the purpose of evaluating, comparing, and ranking qualified candidates using a rating schedule.

j. Qualified Candidates. Those candidates who meet the minimum established OPM qualification standards, including appropriate selective factors established by the NTSB for the position.

k. Best Qualified Candidates. Those eligible candidates who rank at the top of the list of qualified candidates, and who are referred to the selecting official on a Referral and Selection Register. A reasonable number of best qualified candidates are referred for selection consideration.

l. Selecting Official. The person with the authority to select a candidate, or recommend a selection.

m. Priority Consideration. Individuals who by law, regulation, or other entitlement must be considered for vacancies before other candidates are considered.

n. Career or Career Ladder Promotions. There are two types:

(1) Promotion without competition when at an earlier stage an employee was either selected from an OPM list of eligibles or was chosen under competitive promotion procedures for an assignment intended as a matter of record to prepare the employee for the position being filled. Includes promotions within an established career ladder, promotions in a position filled below the established or anticipated grade, and promotions of a trainee.

(2) Promotion as a result of an employee's position being reclassified at a higher grade because of new or accretion of duties and responsibilities (see paragraph 8.b.5 for definition).

o. Detail. The temporary assignment of an employee to a different position for a specific and reasonable length of time. The employee returns to regular duties at the end of the detail.

7. RESPONSIBILITIES.

a. Managers, Supervisors, and Selecting Officials.

(1) Comply with the provisions of this order, including the principles of equal opportunity.

(2) Anticipate personnel needs and initiate actions to fill vacancies.

(3) Coordinate with human resources representatives in identifying skills, knowledge, abilities, ranking factors, and selective factors essential to successful job performance, and in developing rating schedules by which candidates will be rated and ranked.

(4) Make timely selections.

(5) Encourage employees to seek advancement in their careers, develop themselves, and contribute effectively to the workforce.

(6) Serve as members of evaluation panels or designate subordinates to do so.

(7) Provide constructive feedback, comments and suggestions for improvements to the merit staffing plan.

b. Chief, Human Resources Division, and Staff.

(1) Develop, modify and administer the merit staffing plan to ensure that it is carried out in principle and practice throughout the NTSB.

(2) Ensure that procedural aspects of the plan are observed in all actions, and that the provisions are in accordance with appropriate delegated examination unit procedures as authorized by OPM.

(3) Apply appropriate affirmative action requirements and outreach techniques to locate candidates from all segments of society.

(4) Determine when competitive or non-competitive procedures are to be used.

(5) Assist selecting officials in determining the areas of consideration and vacancy announcement criteria when vacancies are announced, in determining the methods of locating candidates, and in developing rating schedules.

(6) Screen and evaluate qualifications of candidates against OPM qualification standards.

(7) Convene and advise members of evaluation panels.

(8) Establish and maintain required records.

(9) Answer inquiries concerning vacancies and notify candidates on the status of their applications.

(10) Ensure proper handling of applications from individuals entitled to automatic and priority consideration.

(11) Make official job offers in writing.

c. Employees.

(1) Continuously develop themselves for advancement to more responsible positions.

(2) Keep both their supervisor's and official personnel folders (OPFs) current with respect to newly acquired skills, completed training, and records of additional work experience.

(3) Serve as members of evaluation panels, when requested.

(4) Provide constructive feedback, comments, and suggestions for improvements to this Order.

8. USE OF COMPETITIVE AND NON-COMPETITIVE PROCEDURES FOR NON-SES POSITIONS.

a. Competition is required for the following non-SES actions:

(1) Temporary Promotions that exceed 120 days. Prior service during the preceding 12 months under all details or temporary promotions to higher graded positions is included in the 120-day calculation;

(2) Details for more than 120 days to a higher grade position or to a position with higher promotion potential;

(3) Training that is part of an authorized training agreement, part of a promotion program, or required before an employee may be considered for a promotion;

(4) Reassignment or Demotion to a position with more promotion potential than a position previously held on a permanent basis in the competitive service (except as permitted by reduction-in-force regulations);

(5) Transfer to a position at a higher grade or with more promotion potential than a position previously held on a permanent basis in the competitive service; and

(6) Reinstatement to a permanent or temporary position at a higher grade or with more promotion potential than a position previously held on a permanent basis in the competitive service.

b. Competition is not required for the following actions:

(1) Career or career ladder promotions;

(2) Reassignments, transfers, or reinstatements to positions with no greater promotion potential;

(3) Temporary promotions or details of 120 days or less;

(4) Promotions due to issuance of a new classification standard, or due to correction of a previous classification error;

(5) Promotions due to an accretion in duties. (The additional duties and responsibilities must not be as a result of a planned management action to promote the employee);

(6) Promotions to a grade or position from which the employee was demoted or separated within the NTSB for other than performance, or conduct reasons, or at his/her own request;

(7) Promotions after failure to receive proper consideration for a competitive promotion action in which the original promotion is allowed to stand;

(8) Conversion of Cooperative Education students or appointees in other such authorized programs to permanent status;

(9) Position changes effected by reduction-in-force;

(10) Promotions of employees upon exercise of reemployment rights when the record shows selection for promotion in absentia or where the former position was reclassified during the employee's absence;

(11) Competitive appointments from OPM's certificate of eligibles or under direct hire authority;

(12) Noncompetitive appointments under a special authority such as appointment under the Veterans Readjustment Authority;

(13) Temporary/term promotions and details provided they were originally made under competitive procedures. Additionally, the fact that it might lead to a permanent promotion was made known to all competitors and the area of consideration provided an adequate number of well qualified candidates; and

(14) Promotions resulting from successful completion of a training program for which the employee was selected competitively in accordance with the provisions of this Order.

9. METHODS OF LOCATING CANDIDATES FOR NON-SES POSITIONS.

a. Priority Consideration. All persons entitled to priority consideration will be referred to the selecting official prior to consideration of other candidates. Priority consideration extends only to the next appropriate vacancy for which the priority candidate meets the qualification requirements. Additionally, the consideration must be for the same grade level, type of position, and the same area of consideration. Once priority consideration has been given, the candidate must compete for all subsequent vacancies through the procedures outlined in this Order, unless otherwise entitled to preference based on law, court order, or other regulation.

b. Automatic Consideration. The human resources representative will provide automatic consideration for a vacancy for which individuals are qualified, if vacancies arise when employees are absent on leave, detail, military furlough, at training courses, or serving on Intergovernmental Personnel Act assignments **provided the employee provides the human resources representative the following information in advance of departure:**

(1) Duration of the absence;

(2) The specific series and grade level(s) for which they wish to be considered;

(3) A current application form; and

(4) Latest performance appraisal.

c. Vacancy Announcements.

(1) Distribution.

(a) Internal vacancy announcements shall be distributed in the most efficient manner possible, i.e., via e-mail, handcarried, regular mail delivery, etc., and made available to all employees.

(b) External vacancy announcements shall be distributed in accordance with OPM regulations and as deemed appropriate by the human resources representatives, supervisors, and managers. Every effort will be made to produce an adequate supply of qualified applicants and meet affirmative action goals.

(2) Contents. As a minimum, they shall contain the following:

(a) Announcement number.

(b) Opening and closing dates. (The closing date represents the last date applications must be received or **postmarked** to receive consideration.)

(c) Number of vacancies to be filled. (More than the number of vacancies listed may be filled. The human resources representative, in consultation with the Chief, Human Resources Division, will determine what constitutes a reasonable time to fill additional identical vacancies.)

(d) Agency contact and telephone number.

(e) Title, series, and grade of the position.

(f) Organizational and geographic location.

(g) Statement of delegated authority, if applicable.

(h) Promotion potential, if any.

(i) Area of consideration (see Paragraph e. below).

(j) Special conditions of employment, i.e., temporary, part-time.

(k) Conflict of interest statement.

(l) Equal employment opportunity statement.

(m) Grade level(s) and salary range(s).

(n) If applicable, supervisory, managerial, and/or probationary period statement.

(o) If applicable, for temporary/term promotions and details, a statement to the effect that the promotion may become permanent.

(p) A statement as to whether relocation or moving expenses will be paid, as appropriate.

(q) A statement of veteran preference requirements and special authorities that may apply.

(r) How-to-apply procedures.

(s) Brief description of duties.

(t) Minimum qualifications, and selective and quality ranking factors.

(u) Required licenses, certificates, ratings, etc.

(v) Time-in-grade restrictions, if applicable.

(w) Other significant facts.

(3) Period of Advertisement. There must be sufficient time for all applicants within the designated area of consideration to receive and submit applications. All vacancy announcements will be open for a minimum of 10 working days. The period of announcement will be lengthened for those announcements: with an expanded area of consideration; being readvertised or hard to fill; or for other reasons deemed appropriate by the human resources representative.

(4) Amendments, Extensions, and Cancellations. Vacancy announcement advertisements may be amended to change or clarify the content of the announcement, to expand the area of consideration, to extend time limits to apply, etc. Advertisements may be canceled at any time. Distribution sources used for the prior advertisement must be used for the amendment, extension, or cancellation.

d. Other Methods of Locating Candidates. Candidates may also be identified through OPM lists of eligibles, reinstatement eligibles, job fairs, and other sources deemed appropriate by the human resources representative, supervisor, or manager.

e. Area of Consideration. If vacancy announcements are used, the area of consideration will be as broad as practical to uphold basic merit principles of open competition, provide equal employment opportunity, and provide a reasonable number of best qualified candidates. The areas of consideration at the NTSB will be: NTSB Employees Only, Applicants with competitive status, and Applicants from all sources.

(1) Minimum Area of Consideration. For all positions in NTSB, the minimum area of consideration will be agencywide, unless circumstances warrant a more limited area, as deemed appropriate by the human resources representative. Such limitations may be based on reasons of economy, timeliness in filling a vacancy, externally-imposed freezes, etc. However, such limitations shall not constitute a permanent reduction in the minimum area of consideration.

(2) Expanding the Area of Consideration. The human resources representative, in consultation with the Chief, Human Resources Division, retains the option of expanding the minimum area of consideration when experience has shown that few highly qualified applicants were available for a particular type of position or geographic location or to meet affirmative action goals.

10. DETERMINING ELIGIBILITY AND EVALUATING CANDIDATES FOR NON-SES POSITIONS.

a. General. All candidates will be evaluated to determine their minimum qualifications for the position. A review will be made initially to ensure that candidates: are within the designated area of consideration; meet legal and regulatory requirements; meet OPM qualification requirements; and meet selective factors established for the position.

b. Evaluating, Rating, and Ranking Candidates. When a position vacancy is announced, the human resources representative shall develop a rating schedule in consultation with the supervisor and/or office director of the position involved. They shall identify the job-related knowledge, skills, abilities (KSAs), and other characteristics necessary for successful performance on the job. The KSAs derived from this job analysis shall be evidenced in the position description and shall be ratable and reasonable. Each shall be assigned a point value or range of values indicative of its relative importance in performing the job. Applicants will be evaluated based on the degree to which the KSAs as evidenced in the application materials submitted or available in OPFs (for NTSB employees) as described below:

(1) Candidates with Competitive Civil Service Status. Each candidate will be evaluated on the factors below to ascertain the point values to be assigned. These factors will be made a matter of record in the merit promotion file. (The number in parentheses following each factor indicates the normal range of total points for the factor, on a basis of 100. These points are general guides only, and may be adjusted at the discretion of the human resources representative and the supervisor or manager concerned.)

(a) Experience. (50-80) Type and quality of experience in relation to the KSAs required in the position.

(b) Training/Education/Self-Development. (5-20) Evidence of job-related training, education, and self-development directly/indirectly related.

(c) Performance Appraisal. (5-25) Appraisals received during an annual rating cycle. Point values are assigned to the overall rating.

(d) Awards and Commendations. (5-10) Includes awards, honors, special achievements, special recognitions, etc., received, and outside relevant activities.

(e) Other. Any other job-related evaluation criteria, KSA, or personal characteristic necessary to perform the duties of the position.

(2) Candidates Without Competitive Civil Service Status (All Sources). Applications from all sources shall be evaluated separately from status candidates on the following basis: (The percentages are general guidance only.)

(a) Seventy percent (70 points) for meeting the minimum qualifications standard and any selective factors.

(b) A maximum thirty percent (30 points) for any applicable knowledge, skills and abilities.

(c) Appropriate additional points will be assigned if the applicant claims and submits the required proof for veteran preference determinations.

(3) Evaluation of Candidates for Supervisory Positions. OPM Handbook X-118 will be used to determine eligibility for supervisory positions.

(4) Evaluation Panels. If panels are used, candidates who are minimally qualified will be referred to an evaluation panel for evaluation. Panels shall be used for all investigative, technical, professional, or other positions deemed appropriate by the human resources representative, or at the request of the selecting official when there are more than five minimally qualified candidates. Secretarial, clerical, and para-professional positions may be paneled when there are more than five minimally qualified candidates. The following conditions apply to all panels:

(a) The panel shall consist of at least two evaluators familiar with the duties of the position, and a human resources representative and equal employment opportunity representative, as advisors.

(b) Panel members shall be at the same or higher grade than the position advertised, excluding the human resources and equal employment opportunity representatives.

(c) Neither the selecting official nor an applicant for a given position may serve as a panel member for the position being paneled.

(d) The human resources representative shall instruct the panel members on the rating procedures, explain the criteria in the rating schedule, as required, and review the ratings for consistency with Federal regulations.

(5) Ranking Eligible Candidates. The evaluation panel, or the human resources representative if a panel is not convened, will evaluate all eligible applications against the appropriate evaluation criteria to arrive at a numerical rating for each candidate. When all eligible applicants have been ranked, the highest-scoring candidates from each group (status and all sources), known as the best qualified candidates, will be referred to the selecting official.

c. Referring Candidates to the Selecting Official. Three to five best qualified candidates will usually be referred for a single vacancy. Up to 10 best qualified candidates may be referred, if meaningful distinctions cannot be made among the numerical scores. The best qualified candidates will be listed on a Referral and Selection Register with no numerical scores shown. Registers of status and all sources candidates will be separately prepared. The human resources representative may meet with the selecting official to explain the evaluation of the candidates, and any other relevant merit staffing procedures.

11. SELECTION PROCEDURES FOR NON-SES POSITIONS.

a. Selection Process. The selecting official may choose to:

(1) Make a selection based on the information contained in the application materials forwarded with the Referral and Selection Register (employment application, supplemental narratives, etc.);

(2) Request to review the OPFs of in-house best qualified candidates; and/or

(3) Interview any or all of the best qualified candidates.

b. Selection Timing. The selecting official shall make every effort to finalize a selection as expeditiously as possible, normally within 60 calendar days from the date the selection certificate is received. The human resources representative, in consultation