**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MARJORIE MURTAGH COOKE,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Case No. 06-748C** |
| | ) | **Judge Thomas C. Wheeler** |
| **THE UNITED STATES OF AMERICA,** | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Marjorie Murtagh Cooke ("Plaintiff" or "Mrs. Murtagh Cooke") files this memorandum of points and authorities in opposition to Defendant's motion for summary judgment filed by Defendant, United States of America, in the persons of the National Transportation Safety Board ("NTSB") and NTSB Chairman Mark Rosenker ("Rosenker") (collectively, "Defendant"). Plaintiff claims that Defendant has violated the Equal Pay Act, 29 U.S.C. § 206 ("EPA"). Defendant has raised the affirmative defenses that the unequal pay offered Plaintiff was based on a merit system and/or a factor other than sex. As this Court noted in the most recent case status conference for this case, both Plaintiff's *prima facie* case and Defendant's affirmative defenses are highly fact-intensive inquiries, and, in this case, there are numerous material issues of fact seriously in dispute. Therefore, Defendant's motion for summary judgment should be denied in its entirety.

**TABLE OF CONTENTS**

TABLE OF CONTENTS....2

TABLE OF AUTHORITIES....3

FACTUAL BACKGROUND....4

STANDARD OF REVIEW....13

ARGUMENT....14

I. NUMEROUS MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON PLAINTIFF'S *PRIMA FACIE* CASE UNDER THE EQUAL PAY ACT....14

II. NUMEROUS MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSES....19

A. Defendant's "Merit System" Defense Is Baseless....20

B. Defendant's "Factor Other Than Sex" Defense Is Redundant And Misses The Point....25

III. PLAINTIFF SEEKS ONLY BACK PAY, RETROACTIVE PROMOTION, LIQUIDATED DAMAGES AND ATTORNEYS' FEES....26

CONCLUSION....26

CERTIFICATE OF SERVICE....27

# TABLE OF AUTHORITIES

## CASES

*Allison v. U.S.*, 39 Fed. Cl. 471 (1997) .......... 13
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .......... 13
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .......... 13
*Corning Glass Works v. Brennan*, 417 U.S. 188 (1974) .......... 14, 19-20
*County of Wash. v. Gunther*, 452 U.S. 161 (1981) .......... 19
*Ellison v. United States*, 25 Cl. Ct. 481 (1992) .......... 15, 19
*Goodrich v. Int'l Bhd. of Elec. Workers*, 815 F.2d 1519 (D.C. Cir.1987) .......... 15
*Hauschild v. U.S.*, 53 Fed. Cl. 134 (2002) .......... 13-14, 19-20
*Lissak v. United States*, 49 Fed. Cl. 281 (2001) .......... 14
*Mansfield v. U.S.*, 71 Fed. Cl. 687 (2006) .......... 14, 19
*Molden v. United States*, 11 Cl. Ct. 604 (1987) .......... 14, 26
*Pearce v. Wichita County, etc., Hosp. Bd.*, 590 F.2d 128 (5th Cir.1979) .......... 15
*Pleasant Country, Ltd. v. U.S.*, 37 Fed. Cl. 321, 325 (Fed. CL. 1997) .......... 13
*Niagara Mohawk Power Corp. v. U.S.*, 525 F.2d 1380, 1385 (Ct. Cl. 1975) .......... 13
*Raymond v. United States*, 31 Fed. Cl. 514 (1994) .......... 14

## RULES

RCFC 56(c) .......... 13

## STATUTES

29 C.F.R. § 1620.14(a) .......... 14
29 C.F.R. § 1620.15(a) (2001) .......... 15
29 U.S.C. § 206 .......... 1, 14
29 U.S.C. § 206(d) .......... 11, 14, 19
29 U.S.C. § 215(a)(3) .......... 11
49 C.F.R. § 800.2 .......... 15
49 C.F.R. § 800.25 .......... 15

**FACTUAL BACKGROUND**

Mrs. Murtagh Cooke adopts, by reference, her Statement of Material Facts in Dispute ("SMFD") attached hereto.

Defendant is the United States of America, in the persons of the NTSB and Rosenker. *SMFD* at ¶ 48.

In 1994, Plaintiff was the Chief of the Marine Division, a unit under the NTSB's Office of Surface Transportation Safety. *See id*. at ¶ 4. Beginning in 1997, and ending in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: Highway Safety ("OHS"); Railroad Safety ("ORS"); Marine Safety ("OMS"); and Pipeline and Hazardous Materials Safety ("OPHMS"). *See id*. at ¶ 3.

Each surface office had a director who was paid at a GS-15 level and who reported to the Managing Director. The Managing Director had Senior Executive Service ("SES") status. The Director of the Office of Aviation Safety ("OAS"), Dr. B. Loeb, also had SES status. The Director and Deputy Director of the Office of Surface Transportation Safety also had SES status. *See id*. at ¶ 7-9. The core functions required for the Director of OMS, OHS, OAS and ORPH were all the same. *See id*. at ¶ I.D.1.

Each modal office director was responsible for ordering an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate. *See id*. at ¶ I.D.2. Each modal office director was responsible to disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch. VIII. *See id*. Each modal office director was responsible to determine the probable causes of accidents. *See id*. Each modal office director was responsible to investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). *See id.*

In 1997, as the result of a restructuring, Plaintiff was named the Director of OMS. *See id*. at ¶ 5. After the restructuring, ORS and OPHMS merged to become the Office of Railroad, Pipeline and Hazardous Materials Safety ("ORPH"). Bob Chipkevich ("Chipkevich") became the Director of ORPH. *See id*. at ¶ 12. In early 2003, the NTSB was once again reviewing an available SES slot. This SES slot went to Joe Osterman ("Osterman"), the Director of OHS. After Osterman was awarded the SES slot, Plaintiff became the only Director of the four modal safety offices without SES status. *See id*. at ¶ 14-16.

Plaintiff was paid significantly less than her male counterparts, John Clark ("Clark"), who was the new Director of OAS, Osterman and Chipkevich. *See id*. at ¶ I.A.1.

Specifically, in 2003, while Clark received a salary of $142,022, Osterman received a salary of $136,872 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $121,583. Currently John Spencer ("Spencer"), the new OMS Director, who replaced Plaintiff, is paid at the SES level for performing equal work to that of Plaintiff. *See id*. at ¶ I.A.2.

In addition, in 2004, while Clark received a salary of $142,022, Osterman received a salary of $140,797 and Chipkevich received a salary of $142,022, Plaintiff received a salary of $126,963. *See id*. at ¶ I.A.3.

Plaintiff received lower monetary awards than her male counterparts, Clark, Osterman and Chipkevich. Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Plaintiff received an award of $5,400. And in 2004, while Clark received an award of $17, 000, Osterman received an award of $9,500, and Chipkevich received an award of $16,000, Plaintiff received an award of $3,400. *See id*. at ¶ I.A.4.

As the Director of the Office of Highway Safety, Osterman had virtually the same duties and responsibilities as Plaintiff when she was the director of OMS. *See id*. at ¶ I.D.6.

Osterman's position at OHS and Plaintiff's position at OMS had virtually the same job description as follows:

- Planned, managed and evaluated the work of the OHS.
- Exercised important policy making and policy determining decision that impacted highway safety at international organizations, federal agencies, and international and domestic industries.
- Provided for overall direction and technical accuracy of the investigation and reporting process for major highway safety accidents.
- Developed overall requirements and schedules to accomplish the highway safety program.
- Reviewed, approved and promulgated schedules and milestones for assigned activities.
- Reviewed, evaluated and approved, disapproved or modified requests for changes to milestones in schedules.
- Developed overall program review documentation and provided status reports on a regular basis.
- Determined the level of response and resources allocation for the NTSB highway safety program.
- Notified NTSB's chairman and managing director, federal and international agencies and managing director of the accident.
- Notified foreign embassies and/or flag representatives as appropriate.
- Coordinated the allocation of staff resources with other office directors involved in the investigation.
- Resolved differences between modal and support staff views regarding accident investigation, scope, required resources and analysis.
- Ensured through the completed and comprehensive review of the draft report that essential issues were adequately addressed.

- Ensured reviewed of the draft report that all findings and recommendations are supported by analysis and that the board and that the draft sent forward is of the best quality.
- Ensured the proper presentation of the draft report before the board at board hearings.
- Reviewed work product of other modal and support offices.
- Ensured that the quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program, including investigations, reports, safety recommendations and highway safety advocacy.
- Established and maintained liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, and Federal regulators.
- Provided authoritative advice and expertise to these groups in the development of industry standards and regulations and new applications of existing technology.
- Provided Congressional testimony.
- Participated in international meetings on highway safety issues as a representative of the NTSB.
- Developed and justified estimates for staff resources requirements including personnel funding, equipment, and office, space.
- Justified and defended budgets on all levels of management.
- Implemented concepts to get results through people and make selections assign work, train and reward employees.
- Corrected poor performance in a manner that maximizes the use of staff skills and achieving organizational skills.
- Monitored work status through formal and informal means and procedures.
- Ensured appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated.
- Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors.
- Ensure that employees are given real and continuing opportunity to influence their work environment and ensure that employees are given a real and continuing

opportunity to be able to participate in discussions related to methods of work accomplishments.

- Ensured reasonable equity within OHS of performance standards and rating techniques developed by subordinates and ensure equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work.
- Evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory employees rated by subordinate supervisors.
- Evaluated program accomplishments and their overall effectiveness.
- Identified program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed.
- Worked closely with human resources in approving their recruitment, placement and retention of a high quality OHS work force.
- Ensured that crucial training courses needed to keep pace with today's technological improvements in highway transportation safety are provided to staff for their technical and operational currency.
- Ensured crucial training sessions needed to keep pace with today's technological improvements in highway transportation safety are provided to the staff for their technical and operational currency.
- Provide effective management training to maintain a highway motivated and cohesive force.
- Relate equal employment opportunity concepts to overall responsibilities.
- Support affirmative action plan while performing assigned responsibilities.
- Available 24 hours a day 7 days a week.
- Support board members, agency initiatives, and meetings with regard to agency staff awards.

*See id.*

The skills required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those skills included, essentially, technical expertise in their transportation mode; knowledge of, and expertise in, accident investigation processes and procedures from the

investigation stage through report completion, leadership and supervisory skills; logic and analytical process skills; a fundamental knowledge of their respective modal industries; the ability to communicate both written and orally and to coordinate and collaborate with other professionals both internally within the NTSB and externally as part of the investigations or other advocacy work for each respective office. *See id*. at ¶ I.B.1.

The efforts required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those efforts included: effectively managing large volumes of information related to accident investigation; assessing and evaluating issues; evaluating resources necessary and available; juggling multiple priorities; dealing with contingencies and uniqueness of each investigation; decision making; supervising and evaluating staff both in the office and in the field; providing support and essential information for internal personnel including Board members, the Managing Director and other executives and managerial staff, supervisors, investigators, report writers, and administrative personnel and external personnel including the transportation mode regulator (e.g. FAA and USCG), party representatives (e.g. Cruise ship owners), Congressional staff, and, in the case of international/foreign investigations, State Department and foreign government officials, and in the case of public/non public investigations, Department of Defense officials; developing, establishing, and assuring fulfillment through supervision and oversight of multiple processes for accident investigation from accident/incident notification through report development; reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission, communication of results, collaboration with internal and external professionals; complying with all rules, regulations, and guidelines that apply to human and monetary resource management; and conducting business on a year round 24 hour/ 7 day schedule. *See id*. at ¶ I.C.1.

The responsibilities required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those skills include but are not limited to managing a major modal program for the agency which included: conducting accident investigations to determine their cause and preparing justifications for safety recommendations to prevent accident repetition in the future; overseeing the analysis, development and preparation of detailed reports and proposing probable cause determinations of major and field accidents and incidents; preparing accident investigation reports in a timely manner; preparing Special Investigations, responses to proposed rulemakings, responses to requests for technical support, and Public Hearings. *See id*. at ¶¶ I.D.2-3.

Additionally, the list of responsibilities included management responsibilities related to internal and external communications (e.g. keeping the Chairman, other Board members, the Managing Director, other agency executives and managers, party representatives and Congressional members and staff, informed either verbally and/or in writing), human resources (e.g. managing modal professionals, recruiting and hiring personnel, supervising, training and tracking career goals and progression, developing performance standards and evaluating personnel; tracking leave and overtime); budget management (e.g. exercising budget authority, using funds for training, travel, overtime, and on-scene investigation support); project tracking and quality control of all Modal Office products. *See id*. at ¶ I.D.4.

Plaintiff performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of ORPH and Osterman performed his work as Director of OHS. Each worked primarily in an office environment using electronic devices, computers and telephones for communication. The critical nature of each Director's work requires him/her to be available 24 hours a day/ seven days a week (24/7) in case of an accident that requires an investigation. Each Office Director

was expected to deal effectively with the pressure of accident launches, the on-scene investigation phase including coordination and collaboration with internal and external staff, subsequent analysis and report preparation stage, preparation of written and oral communications and presentation to the Board and to the public. Each director reported directly to the Managing Director, their second level supervisor was the Chairman. Each of the Office Directors was relatively independent to do their work. *See id*. at ¶ I.E.1.

Though Defendant had many options available to increase Mrs. Murtagh Cooke's salary to meet those of her male comparators, it refused to do so. *See id.* at ¶¶ I.A.5-8, II.B.4-6. Defendant's own Personnel Management Specialist has been unable to provide clear, uncontroverted testimony regarding Mrs. Murtagh Cooke's compensation and the NTSB's appointment of SES positions. *See SMFD* at ¶¶ II.B.2. and II.B.6.

In July 2004, and in early 2005, NTSB advertised Plaintiff's position for SES status. Each time, Plaintiff submitted an application for the position. In May 2005, NTSB's Managing Director notified Plaintiff of her non-selection for the same position that she performed since 1997. Shortly thereafter, in June 2005, NTSB transferred Plaintiff to the Office of Safety Recommendation and Communication. Plaintiff later retired. *See id*. at ¶ 17-20.

On April 28, 2006, Plaintiff filed a complaint in the United States District Court for the District of Columbia against Defendant, asserting claims for violations of the Equal Pay Act, 29 U.S.C. § 206(d) and the retaliation provision contained in the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). *See id*. at ¶ 45. On October 26, 2006, the District Court transferred the Equal Pay Act claim to this Court. *See id*. at ¶ 46. On November 14, 2006, Mrs. Murtagh Cooke filed her complaint in this Court. *See id*. at ¶ 47.

On January 8, 2007, Defendant filed an Answer to the Complaint, which contained no affirmative defenses. *See id*. at ¶ 49.

On October 9, 2007, Mrs. Murtagh Cooke filed a motion for summary judgment before this Court, asserting, partly, that Defendant proffered no affirmative defenses. *See id*. at ¶ 50.

On October 19, 2007, Defendant filed a motion to amend its answer and assert its affirmative defenses. *See id*. at ¶ 51. Mrs. Murtagh Cooke opposed Defendant's motion to amend its answer on November 15, 2007, and Defendant replied on November 26, 2007. *See id*. at ¶ 52.

On December 3, 2007, Defendant filed its cross motion and response to Mrs. Murtagh Cooke's October 9, 2007, motion for summary judgment. *See id*. at ¶ 53.

On December 5, 2007, Judge Thomas Wheeler held a hearing regarding Defendant motion to amend is answer, ruling that the amended answer be allowed, the pending motions for summary judgment denied, and discovery extended with regard to Defendant's affirmative defenses. *See id*. at ¶ 54.

Trial is now scheduled for August 18, 2007. *See id*. at ¶ 55.

**STANDARD OF REVIEW**

Summary judgment is only appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *See Allison v. U.S.*, 39 Fed. Cl. 471, 474 (1997); RCFC 56(c). "The moving party has the burden of establishing that there are no genuine material issues in dispute and that it is entitled to judgment as a matter of law." *Id. See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986). *See also, Hauschild v. U.S.*, 53 Fed. Cl. 134, 137 (2002) (Summary judgment appropriate only where there can be but one conclusion as to the verdict). All inferences and presumptions are drawn in favor of the non-moving party – the Plaintiff in this case. *See Pleasant Country, Ltd. V. U.S.*, 37 Fed. Cl. 321, 325 (Fed. CL. 1997); *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2502, 2510, 91 L.Ed.2d 202 (1986).

Summary judgment is highly disfavored when there are evidentiary conflicts or disputed issues of fact. *See Allison*, 39 Fed. Cl. at 475 ("[O]n a motion for summary judgment, it would constitute reversible error for the court to resolve evidentiary conflicts that might affect the outcome of the suit. A trial court may deny summary judgment if 'there is reason to believe that the better course would be to proceed to a full trial.' "), *quoting*, *Anderson v. Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513-14; *Pleasant Country, Ltd. V. U.S.*, 37 Fed. Cl. at 325 ("Summary judgment is not appropriate if there are disputes over material facts that might significantly affect the outcome of the suit."); *Niagara Mohawk Power Corp. v. U.S.*, 525 F.2d 1380, 1385 (Ct. Cl. 1975) ("If there are disputed material factual issues which must first be resolved on the merits, then we cannot grant defendant's motion for summary judgment.").

## ARGUMENT

### I. NUMEROUS MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON PLAINTIFF'S *PRIMA FACIE* CASE UNDER THE EQUAL PAY ACT

The Equal Pay Act, 29 U.S.C. § 206 ("EPA") provides as follows:

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.

29 U.S.C. § 206(d)(1).

Mrs. Murtagh Cooke establishes a *prima facie* case under the EPA by showing that Defendant paid different wages to employees of opposite sexes "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Mansfield v. U.S.***,** 71 Fed. Cl. 687, 692-93 (2006), quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). See also, *Hauschild*, 53 Fed. Cl. at 138; *Lissak v. United States*, 49 Fed. Cl. 281, 284 (2001); Alison, 39 Fed. Cl. at 475; *Raymond v. United States*, 31 Fed. Cl. 514, 518 (1994); *Molden v. United States*, 11 Cl. Ct. 604, 610 (1987).

To establish a prima facie case, it is not necessary to prove that the work of plaintiff's comparator(s) is identical in every aspect, but only that it requires equal skill, effort, and responsibility, and that it is performed under similar working conditions. *See Corning Glass Works*, 417 U.S. 188, 94 S.Ct. 2223, 41 L.E. 2d 1 (1974); *Hauthschild*, 53 Fed. Cl. at 138 ("In the context of the Equal Pay Act, "equal" work does not mean "identical" work. 29 C.F.R. § 1620.14(a). 'Insubstantial or minor differences in the degree or amount of skill, or effort, or

responsibility required for the performance of jobs will not render the equal pay standard inapplicable.' *Ellison v. United States*, 25 Cl. Ct. 481, 487 (1992)").

Defendant does not dispute that Mrs. Murtagh Cooke was paid less than every other modal director at NTSB, Clark, Osterman and Chipkevich during the relevant time period – all of whom are male, and all of whom are comparators in this case. *See SMFD* at ¶¶ I.A.2-4. In fact, on average, Mrs. Murtagh Cooke's salary was approximately $14,000 lower per year than any other comparator, and her monetary awards were also lower than any other comparator. *See id*.

The legal issue germane to Plaintiff's *prima facie* case, therefore, is whether Mrs. Murtagh Cooke and her comparators performed equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions. "*The focus of this inquiry is on the primary duties of each job*." *Hauthschild*, 53 Fed. Cl. at 138 (emphasis added), citing 29 C.F.R. § 1620.15(a) (2001), *Goodrich v. Int'l Bhd. of Elec. Workers,* 815 F.2d 1519, 1524 (D.C. Cir. 1987), *Pearce v. Wichita County, etc., Hosp. Bd.,* 590 F.2d 128, 133 (5th Cir.1979) ("[T]he controlling factor under the Equal Pay Act is job content - the actual duties that the respective employees are called upon to perform.").

In this case, as described in detail above, Mrs. Murtagh Cooke's duties were not just similar – they were *completely identical* – to the duties of her comparators. *See SMFD* at ¶¶ I.D.1-7. In fact, under the Code of Federal Regulations implementing the modal director positions for NTSB, the positions held by Mrs. Murtagh Cooke and her comparators (Clark, Osterman and Chipkevich) are all described as having virtually identical job duties and descriptions. *See* 49 C.F.R. § 800.2; 49 C.F.R. § 800.25.

Mr. Osterman acknowledged in his deposition that his job duties exactly matched, with almost no exception, Mrs. Murtagh Cooke's job duties as modal directors. *See SMFD* at ¶¶ I.D.5-7. As Defendant's own witnesses, including the 30(b)(6) deponent and Ellen Engleman Conners, former Chairman of the NTSB, who was ultimately responsible for all modal directors testified, the skills, effort, and responsibility required of all of Mrs. Murtagh Cooke's comparators were virtually identical, and their work was performed under virtually identical working conditions. *See SMFD* at ¶¶ I.B.2, I.C.2, I.D.7, I.E.2. In fact, when asked if the duties of the modal office directors are identical, and require the same skill, effort and responsibility under the same working conditions, Mrs. Conners responded under oath stating "I agree". *See id.*

However, notwithstanding these pure admissions of identicality by the two top NTSB officials, Defendant contends somehow it has proven, beyond any issue of fact, that Plaintiff "cannot establish her *prima facie* case." *Defendant's Memorandum* at p. 29.

First, Defendant attempts to argue that the skills of the modal offices are different because the Director of OAS has more employees, and OAS and the other modal offices have more press accountability and more international activity. *See Defendant's Memorandum at* pp. 29-31. These factors are of minimal import in the context of four modal offices derived from the same original source with virtually identical skills descriptions. *See SMFD* at ¶¶ 21, 34, I.B.1-2, I.C.1-2, I.D.1-7, I.E.1-2. Further, Plaintiff contests these assertions and in fact testified that her position involved substantial visibility in the press and in the international community and required skills to manage both domains and supervise the investigation of major global incidents. *See SMFD* at I.F.1.

Next, Defendant contends that the efforts required were not the same because the Director of OMS had "far fewer accident investigations and prepared fewer reports than any other modal office." *Defendant's Memorandum* at p. 31. Defendant completely side-steps the massive nature of marine accidents and investigations. Whereas a highway accident in the United States may involve a handful of people and make local press (and, on rare occasion, national press), a marine accident is a national, and often international, disaster, affecting hundreds and perhaps thousands of victims and, frequently, global attention. *See SMFD* at I.F.1. The efforts required by the Director of OMS are at least akin to those of the Director of OAS which also involves many fewer accidents but of a much more massive and wide-reaching effect. *See SMFD* at I.F.1. For Defendant to suggest otherwise is preposterous.

Defendant then argues that the responsibilities of the modal office directors were different, but really merely states exceptions that prove the rule. For example:

- "Each of the modal office directors was responsible for overseeing accident investigations and the preparation of reports, including safety recommendations and probable cause determinations. See PFUF (*Defendant's Proposed Findings of Uncontroverted Fact*) ¶ 43. However, the Directors of OHS and ORPH had much greater responsibility in deciding whether to investigate a particular accident than the Director of OMS."

- "While all of the modal office directors were responsible for internal and external communication, the scope of responsibility for communications was very different for each modal office director."

- "While Mrs. Murtagh Cooke and the other modal office directors each had human resources responsibilities, the amount of human resources responsibilities was greater for

the other modal offices because of the fact that each of the modal offices employed significantly more employees than OMS."

- "OAS had greater responsibility for international accident investigation than OMS."

*Defendant's Memorandum at* pp. 33-35

Essentially, Defendant argues that other modal offices had more quantity of accidents, human resources personnel, and international presence – not unlike its argument regarding skills and effort. Again, Mrs. Murtagh Cooke contests these alleged differences. *See SMFD* at ¶¶ I.B.1-I.F.1. However, even if true, Defendant misses the critical factor – that is, the *quality* of the responsibilities. For example, as noted above, a marine accident is often a massive international incident involving hundreds of victims, whereas a highway traffic accident is more often than not of far less magnitude. *See id.* at I.F.1. When considered in the context of quality as well as quantity, the responsibilities of the Director of OMS are at least equal to, if not greater than, the responsibilities of the other modal offices.

Last, and really least, Defendant makes the rather weak argument that the working conditions of the modal offices were different because one of her comparators, Mr. MacIntosh, traveled more frequently and because Mrs. Murtagh Cooke did not travel to accident sites between 2003-2005. *Defendant's Memorandum* at p. 37. Again, Mrs. Murtagh Cooke contests this allegation and asserts that she in fact did travel to accident cites throughout her tenure. *See SMFD* at ¶ I.E.2. Further, all modal offices worked in the same building, close to each other, in the same exact size offices, under the exact same working conditions, for many years. *See SMFD* at ¶ I.E.1-3. With the possible exception of occasional brief travel of one modal office director or another, their working conditions were identical. This argument is meritless.

In sum, Defendant's own witnesses and documentation, and Mrs. Murtagh Cooke, dispute the veracity of these purported differences asserted by Defendant. *See SMFD* I.B.1-I.F.1.[1] Even if true, these assertions are of minimal importance. At least, they raise many many many material fact questions as to whether these differences matter or are simply distinctions without a material difference.

Further, none of Defendant's contentions can diffuse the basic critical fact that the overall job duties of each modal office are virtually identical, and Defendant admits as much. *See Hauthschild*, *supra*, 53 Fed. Cl. at 138. *See SMFD* at ¶¶ 21, 34, I.D.1-8.

If anything, Mrs. Murtagh Cooke has established a *prima facie* case that Defendant has violated the EPA as a matter of law. At a bare minimum, numerous material issues of fact exist and Defendant's motion for summary judgment should be denied.

## II. NUMEROUS MATERIAL ISSUES OF FACT EXIST PRECLUDING SUMMARY JUDGMENT ON DEFENDANT'S AFFIRMATIVE DEFENSES

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to prove, as a matter of law, one of four affirmative defenses under 29 U.S.C. § 206(d)(1). *See Hauschild v. U.S.*, 53 Fed. Cl. 134, 138 (2002), citing *Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. 2223, *County of Wash. v. Gunther*, 452 U.S. 161, 170, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Mansfield*, 71 Fed. Cl. at 693; *Alison*, 39 Fed. Cl. at 475-76.

As stated by this Court in *Hauschild*,

> The burden of proving that a factor other than sex underlies the wage differential is a heavy one. *Ellison*, 25 Cl.Ct. at 487 (citing *Brennan v. Owensboro-Daviess Co. Hosp.*, 523 F.2d 1013, 1031 (6th Cir.1975)). "Merely asserting a plausible, non-gender based explanation is not sufficient." *Id.* An employer's liability under the Equal Pay Act is exempted only if it can show that the differential is attributable to one of the four

[1] Mrs. Murtagh Cooke also directs this Court to her testimony regarding her numerous duties as Director of OMS. *See SMFD* at ¶ I.D.7.

> presumptively sex-neutral reasons enumerated in the statute. *Corning*, 417 U.S. at 196, 94 S.Ct. 2223. These exemptions are to be narrowly construed. *Grumbine v. United States*, 586 F.Supp. 1144, 1150 & n. 27 (D.D.C.1984).

*Hauschild*, 53 Fed. Cl. at 139.

Here Defendant argues that, as a matter of law, it has met its burden of proving that Mrs. Murtagh Cooke's disparity in pay was based on: a) a merit system, and/or b) a factor other than sex. *See Defendant's Memorandum* at p. 38. Defendant has come nowhere near meeting its burden. A multitude of issues of fact preclude summary judgment on both defenses.

**A. Defendant's "Merit System" Defense Is Baseless**

Notwithstanding the several options available to Defendant to equalize her pay, Defendant bases its "merit system" argument on the assertion that "there was no way that Mrs. Murtagh Cooke could have been compensated at a rate equal to that of her alleged comparators." *Defendant's Memorandum* at p. 38. This is simply untrue.

Defendant had the following options to available to it:

1. Appoint Mrs. Murtagh Cooke to a Senior Executive Service (SES) position as was done with all other modal office directors – all of whom were competed and then appointed to SES positions.

2. Provide Mrs. Murtagh Cooke overtime pay.

3. Provide Mrs. Murtagh Cooke a retention allowance.

4. Give Mrs. Murtagh Cooke a performance award.

5. Offer Mrs. Murtagh Cooke a Senior Level (SL) position.

*See SMFD* at ¶¶ II.B.4-6.

None of these five options were even attempted or considered by Defendant. *See id.* at ¶¶ I.A.5-8, II.B.4-6.

Juxtaposed here are Defendant's arguments for why it took no action with respect to any of the five options available to it, and Plaintiff's response, to highlight the inaccuracies and misleading statements made by Defendant. At a minimum, it is very evident that material issues of fact exist regarding all five options:

| | DEFENDANT'S ARGUMENT | PLAINTIFF'S RESPONSE |
|---|---|---|
| SES Slots | "[A]t the time, there were no available to SES slots to allocate to the modal office directors." Further, states Defendant, even if there were SES slots, Plaintiff would have to compete for it. | There were several SES slots available – and they were used for other positions unnecessarily and could easily have been used for the Director of OMS position as would have been consistent with Defendant's own stated plan. Further, although the position would have to be competed, every single other modal office SES appointment was given to the incumbent director. When the Director of OMS position finally was competed, Plaintiff was deemed qualified but the position was withdrawn and re-competed twice. During the third re-compete, Plaintiff was suddenly deemed "unqualified" for unknown reasons and lost the appointment. |
| Overtime Pay | Plaintiff's overtime pay could not have been more than $3,800 per year. Plaintiff requested overtime but provided "no justification". | Plaintiff agrees that she could have been paid an extra $3,800 per year! Notably, she received nothing. Plaintiff agrees that she requested overtime and states that she specifically argued the basis for overtime to Engleman Conners and Dan Campbell on several occasions. |

| | | |
|---|---|---|
| Retention Allowance | "There is no evidence that Mrs. Murtagh Cooke had unusually high or unique qualifications for her position." "[T]here is no evidence that Mrs. Murtagh Cooke ever received an offer of outside employment." | Defendant's own witnesses have testified to the unusual qualifications of the modal office positions, including the Director of OMS. Other individuals received retention bonuses without proving "outside employment" offers. |
| Performance Awards | While Mrs. Murtagh Cooke was eligible for a number of the types of performance awards available at the NTSB, performance awards are based upon performance and are not meant as a tool to augment an employee's salary. Mrs. Murtagh Cooke never received a special act award because, between 2003 and 2005, Mrs. Murtagh Cooke never had a discrete success or project that warranted a special act award. | Plaintiff agrees that she was eligible for a number of types of performance awards. She contests that they were not "meant to augment an employee's salary". Indeed, Defendant's own witness described a performance award as a component of salary. Mrs. Murtagh Cooke takes offense at the allegation that she never had a discrete success or project warranting an award and pointed in her deposition to several high visibility extraordinary results she achieved and that are now being discounted or minimized by Defendant. |
| SL Position | "SL positions are intended for technical positions with little to no supervisory responsibilities. There is no evidence to suggest that Mrs. Murtagh Cooke qualified for an SL slot when she was the Director of OMS." "SL employees may not perform supervisory duties more than 25 percent of the time." | This argument is plainly ridiculous. Mrs. Murtagh Cooke was incredibly highly qualified as a Director of OMS and was even ranked qualified by the NSTB Review Board for an SES slot – a position much higher than the SL position. While Mrs. Murtagh Cooke did have supervisory responsibilities, the exact percentage of time is in dispute, and the job role could have easily been defined to fit within SL parameters. |

*See Defendant's Memorandum* at pp. 38-43; *See SMFD* at ¶ II.B.2.k.

The repeatedly conflicting testimony of Defendant's key witness on this topic, Emily Carroll, drives home the fruitless effort of Defendant to assert this defense, let alone argue it has established it as a matter of law. Again for purposes of clarity, juxtaposed here are conflicting excerpts from Emily Carroll's declaration in support of Defendant's original motion for summary judgment, her deposition testimony, and her declaration in support of Defendant's current motion for summary judgment:

| FIRST DECLARATION<br><br>(November 29, 2007) | DEPOSITION<br><br>(February 12, 2008) | SECOND DECLARATION<br>(May 14, 2008) |
|---|---|---|
| "In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied this request." | "Q: I'm asking whether you know at some point in time NTSB made a single request for four SES slots for all modal directors all at the same time.<br>A: I can't definitively answer that. I don't remember." | "In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be at the SES level. OPM denied this request." |
| "Some time after 2000, an SES employee retired and an SES slot became available. Senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned an available SES slot." | "Q: Do you know whether at some point an SES slot became available for the Director of the Office of Railway -- Pipeline and Hazardous Materials, which I'm going to use ORPH because I can't seem to say this correctly.<br>A: That's fine. Yes. The Director of RPH?<br>Q: Yes.<br>A: Yes.<br>Q: Do you know when that happened?<br>A: Without having the approximate dates – I don't have approximate dates. Somewhere around 2004. 2003, 2004. Somewhere in that area.<br>Q: And do you know how that slot became available?<br>A: No. No, I do not." | "Due to the retirement of a SES-level employee, a SES slot became available. In 2001, senior officials at the NTSB determined that the position of Director of the newly created Office of Railroad, Pipeline, and Hazardous Materials Safety ("ORPH") would be assigned the available SES slot." |

| | | |
|---|---|---|
| "In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM." | "Q: Okay. Do you know whether NTSB allocated SES slots to the different modal offices in a particular priority order?<br>A: Oh. No, I do not." | "In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, those requests were denied by OPM. |
| "Performance awards are based upon performance and are not intended meant to augment one's salary." | "Q: Okay. I got it. Now, what type of compensation is a performance award?<br>A: A performance award is a cash award, a lump sum cash award.<br>Q: Is it considered salary?<br>A: It's considered part of compensation package but not salary.<br>Q: But is it included on the employee's income?<br>A: Yes.<br>Q: Is it taxed --<br>A: Yes.<br>Q -- as income?<br>A: It is taxed as income." | "Performance awards are based upon performance and are not intended to augment one's salary." |

*See SMFD* at ¶ II.B.2.

Defendant's proposition that it has met its burden and is entitled to summary judgment on its merit system defense as a matter of law is baseless.

**B. Defendant's "Factor Other Than Sex" Defense Is Redundant And Misses The Point**

Defendant repeats its "sorry we had no SES slots available" argument again as a purported factor "other than sex" as a basis for refusing to equalize Mrs. Murtagh Cooke's pay with her comparators. *See Defendant's Memorandum* at pp. 43-48. Again, Defendant argues that, although its own plan was to render all modal office positions SES level positions, "the NTSB did not have enough available SES slots to assign to all of the surface modal office directors simultaneously." *Defendant's Memorandum* at p. 47. Again, as stated above this statement is just untrue.

Defendant passed up several available SES slots, refused to allocate them to the Director of OMS, and instead assigned them to unnecessary positions. Then, when Defendant finally did compete for the position for an SES slot, even though Mrs. Murtagh Cooke was initially deemed qualified, Defendant withdrew the competed position and re-advertised it twice. The third time around, Mrs. Murtagh Cooke was mysteriously deemed "unqualified" and lost the appointment. If anything, the SES process followed here illustrates Defendant's animus towards Mrs. Murtagh Cooke and its underhanded avoidance of its obligation to equalize her pay. *See SMFD* at ¶¶ 18-20, II.C.

In any event, this argument misses the point. Mrs. Murtagh Cooke was not demanding an SES position – she was asking for equalized pay. There were five different ways this could have been accomplished – and none of them Defendant even considered. *See id.* at ¶¶ I.A.5-8, II.B.4-6.

## III. PLAINTIFF SEEKS ONLY BACK PAY, RETROACTIVE PROMOTION, LIQUIDATED DAMAGES AND ATTORNEYS' FEES

Defendant reminds us that promotion, reinstatement and front pay are not available as remedies for violations of the Equal Pay Act. *See Defendant's Memorandum* at pp. 48-49. Mrs. Murtagh Cooke is not seeking these damages, except to the extent that she seeks back pay based on retroactive promotion, a remedy which is plainly available to her. *See, Molden v. U.S.*, 11 Cl. Ct. 604, 614 (Cl. Ct. 1987) (awarding retroactive promotion).

Mrs. Murtagh Cooke seeks only back pay, back pay based on retroactive promotion, liquidated damages and attorneys' fees, and will enter into a joint stipulation with Defendant accordingly.

## CONCLUSION

In sum, virtually every fact material to Plaintiff's *prima facie* case and Defendant's affirmative defenses is hotly in dispute and contested by the parties. Based on the foregoing, Defendant's Motion for Summary Judgment should be DENIED in its entirety.

Marjorie Murtagh Cooke

By Counsel

/s/

R. Scott Oswald
David Scher
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.net
*Counsel for Plaintiff Marjorie Murtagh Cooke*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment was served via the Court's electronic filing service this 25th day of June, 2008, upon:

Meredyth D. Cohen, Esq.
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
1100 L St., N.W., Room 12016
Washington, D.C. 20530
Phone: (202) 353-7978
Fax: (202) 514-8624
meredyth.cohen@usdoj.gov

/s/
R. Scott Oswald