**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| **MARJORIE MURTAGH COOKE,**<br>**Plaintiff,**<br>**v.**<br>**THE UNITED STATES OF AMERICA,**<br>**Defendant.** | **Case No. 06-748C**<br>**Judge Thomas C. Wheeler** |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC") Plaintiff Marjorie Murtagh Cooke ("Plaintiff" or "Mrs. Murtagh Cooke") submits this Statement of Material Facts in Dispute in opposition to Defendant's Motion for Summary Judgment and Proposed Findings of Uncontroverted Fact filed by Defendant the United States ("Defendant") As demonstrated below, there are numerous material facts in dispute between the Parties such that summary judgment is improper. Accordingly, Defendant's Motion for Summary Judgment should be denied.

## Proper Names

- **Battocchi:** Ron Battocchi, General Counsel of the NTSB
- **Campbell:** Dan Campbell, Managing Director of NTSB during Mrs. Murtagh Cooke's teenier as Director of OMS
- **Carroll:** Emily Carroll, Personnel Management Specialist within the NTSB
- **Chipkevich:** Robert J. Chipkevich, Director of ORPH, SES position holder and comparator to Mrs. Murtagh Cooke
- **Clark:** John C. Clark, Director of OAS, SES position holder and comparator to Mrs. Murtagh Cooke
- **Conners:** Ellen Engleman Conners, former Chairman of the NTSB
- **Mrs. Murtagh Cooke:** Marjorie Murtagh Cooke, Plaintiff
- **Ellingstad:** Dr. Vernon Ellingstad, Director of ORE
- **Haueter:** Tom Haueter, Deputy Director of OAS
- **Osterman:** Joseph Osterman, former Director of OHS, SES position holder and comparator to Mrs. Murtagh Cooke, current Managing Director of the NTSB
- **Magwood:** Collette Magwood, former Deputy Director of Human Resources at NTSB
- **Rosenker:** Mark Rosenker, Acting Chairman of the NTSB
- **Spencer:** John Spencer, current Director of OMS
- **Weinstein:** Elaine Weinstein, Director of OSRA
- **CFC:** United States Court of Federal Claims
- **DDC:** United States District Court for the District of Columbia
- **EEO:** Equal Employment Opportunity
- **FAA:** United States Federal Aviation Administration
- **NTSB/Board:** National Transportation Safety Board, Defendant
- **OAS:** Office of Aviation Safety, modal office within the NTSB
- **OHS:** Office of Highway Safety, modal office within the NTSB
- **OMD:** Office of Managing Director, within the NTSB
- **OMS:** Office of Marine Safety, modal office within the NTSB
- **OPM:** Office of Personnel Management
- **ORE:** Office of Research and Engineering, within the NTSB
- **ORPH:** Office of Railroad, Pipeline & Hazardous Materials Investigations, modal office within the NTSB
- **OSRA:** Office of Safety Recommendation & Accomplishments, within the NTSB
- **SES:** Senior Executive Service, government position above General Schedule (GS) levels
- **SL:** Senior Level
- **USCG:** United States Coast Guard

## Glossary

- **ad hoc review panel:** refers to one of the three review panels that reviewed applicants for the 2004 and 2005 advertisements for the Director of OMS SES position (2004 Panel: Weinstein, Chipkevich, Battocchi; First 2005 Panel: Osterman, Weinstein, Clark, Ellingstad, Chipkevich; Second 2005 Panel: Weinstein, Clark, Ellingstad, Chipkevich, Hauter)

- **modal:** refers to any of the four Directors of the four means of transportation within the NTSB: OAS, OHS, ORPH, and OMS

## Undisputed Facts

Pursuant to RCFC 56(h)(2), Mrs. Murtagh Cooke admits only the below facts listed in Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF"). Mrs. Murtagh Cooke disputes and denies all other facts asserted by Defendant as true:

1. The National Transportation Safety Board ("NTSB") is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. *DPFUF* ¶ 1.

2. Between 2003 and 2005, the NTSB had approximately 400 to 450 employees. *DPFUF* ¶ 2.

3. As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS"). *DPFUF* ¶ 3.

4. From 1994 until 1997, plaintiff, Mrs. Murtagh Cooke, served as the Chief of the Marine Division, an office within the NTSB's Office of Surface Transportation Safety. *DPFUF* ¶ 4.

5. In 1997, as a result of the restructuring, Mrs. Murtagh Cooke's title changed to Director of OMS. *DPFUF* ¶ 5.

6. The individuals who occupied the Director positions for each of the other three offices immediately following the restructuring were Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS). *DPFUF* ¶ 6.

7. The Directors of OHS, ORS, OPHS, and OMS (collectively the "surface modal offices") reported directly to the Managing Director ("MD"). *DPFUF* ¶ 7.

8. Thus, for a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale. *DPFUF* ¶ 15.

9. During all relevant time periods, NTSB's Office of Aviation Safety ("OAS") existed as a separate unit, and its director was paid at the SES level. During all relevant time periods, John Clark was the Director of OAS. *DPFUF* ¶ 16.

10. During all relevant time periods, OAS had a Deputy Director who was paid at the SES level. From November 2000 to March 2007, the individual occupying that position was Thomas Haueter. *DPFUF* ¶ 17.

11. From July 2001 to the present, OAS had a Chief Advisor for International Aviation Safety Affairs who was paid at the Senior Level ("SL"). During the entire existence of the position, it has been occupied by Robert MacIntosh, Jr. *DPFUF* ¶ 18.

12. Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became the Acting Director of ORPH. *DPFUF* ¶ 19.

13. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES. *DPFUF* ¶ 27.

14. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. *DPFUF* ¶ 34.

15. Following the selection process, Mr. Campbell informed Ms. Engleman Conners that the panel had recommended Mr. Osterman as the best person for the position. *DPFUF* ¶ 35.

16. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES. Mr. Osterman has been paid at the SES level since early 2004. *DPFUF* ¶ 36.

17. Once the decision was made to allocate the SES slot to the Director of OMS, the position was advertised in July 2004 as an SES position, and applications for the position were accepted. Mrs. Murtagh Cooke submitted an application for the position. *DPFUF* ¶ 38.

18. The Director of OMS position was readvertised as an SES position in early 2005. Mrs. Murtagh Cooke again submitted an application for the position. *DPFUF* ¶ 40.

19. The NTSB recommended John Spencer for this SES position to OPM, and he was approved for an appointment to the SES. *DPFUF* ¶ 41

20. In June 2005, Mrs. Murtagh Cooke was transferred to the Office of Safety Recommendations. *DPFUF* ¶ 42.

21. Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the board. *DPFUF* ¶ 43.

22. Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB is required to investigate and establish the facts, circumstances, and cause or probable cause of all accidents involving civil

aircraft and, with the participation of appropriate military authorities, all accidents involving both military and civil aircraft. This includes all general aviation accidents. *DPFUF* ¶ 58.

23. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a highway accident, including a railroad grade crossing accident, that the NTSB selects in cooperation with a state. *DPFUF* ¶ 59.

24. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a railroad accident in which there is a fatality or substantial property damage, or that involves a passenger train. *DPFUF* ¶ 60.

25. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a pipeline accident in which there is a fatality, substantial property damage, or significant injury to the environment. *DPFUF* ¶ 61.

26. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a major marine casualty (except a casualty involving only public vessels) occurring on the navigable waters or territorial seas of the United States or involving a vessel of the United States, under regulations prescribed jointly by the NTSB and the head of the department in which the Coast Guard is operating. *DPFUF* ¶ 62.

27. Pursuant to 49 C.F.R. § 850.10, the Coast Guard conducts the preliminary investigation of a marine casualty and notifies the NTSB of any marine casualties fitting the criteria set forth in 49 C.F.R. § 850.10(b). *DPFUF* ¶ 65.

28. Pursuant to 49 C.F.R. § 850.15, the NTSB may conduct an investigation of any major marine casualty or any casualty involving public and nonpublic vessels. *DPFUF* ¶ 66.

29. Pursuant to 49 C.F.R. § 850.15, the NTSB is only required to conduct a marine casualty investigation when:

(1) The casualty involves a Coast Guard and a nonpublic vessel and at least one fatality or $75,000 in property damage; or

(2) The Commandant [of the Coast Guard] and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty involves a public and a nonpublic vessel and at least one fatality or $75,000 in property damage; or

(3) The Commandant and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty is a major marine casualty which involves significant safety issues relating to Coast Guard safety functions. 49 C.F.R. § 850.15. *DPFUF* ¶ 67.

30. Additional criteria governing decisions about whether the NTSB will lead a specific major marine casualty investigation have been established by an NTSB-Coast Guard memorandum of understanding ("MOU"), the most recent of which was signed in 2002. *DPFUF* ¶ 68.

31. The modal office directors receive notifications of accidents in all transportation modes. *DPFUF* ¶ 81.

32. OMS decides whether to investigate a marine accident using the bright-line score set forth in the NTSB's Memorandum of Understanding ("MOU") with the Coast Guard. *DPFUF* ¶ 89.

33. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner. *DPFUF* ¶ 112.

34. Each modal office is responsible for preparing reports setting forth the factual findings of an investigation, analyzing the probable cause of an investigation, and usually making safety recommendations based upon those findings. Once the modal office has prepared its draft of the report, that draft goes through a process called a directors' review. During the directors' review meeting, the modal office presents the report to the other modal office directors, the Managing Director, the Director of the Office of Research and Engineering ("RE"), the Director of the Office of Safety Recommendations, and the General Counsel. Based upon the outcome of the meeting and the review process, the Managing Director may require that changes be made to the report. After the office directors sign off on the report, the notation process occurs. In the notation process, the report is sent to all five members of the Board simultaneously for them to consider it prior to the report being presented to them formally in public in a Sunshine Meeting. At the Sunshine Meeting, the appropriate office director and investigators officially present the report to the Board. The Board may adopt the report as is, or may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report. *DPFUF* ¶ 125.

35. Pursuant to the International Maritime Organization ("IMO") code for the investigation of marine casualties and incidents, the United States may investigate any international marine accidents involving United States flagged vessels or in which the United States has a substantial interest. The investigation may be conducted by the Coast Guard, the NTSB, or both. *DPFUF* ¶ 144.

36. GS-15 employees are eligible for overtime within the Federal system. *DPFUF* ¶ 230.

37. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. *DPFUF* ¶ 241.

38. A GS-level employee may receive a quality step increase if he or she receives an outstanding performance rating and had not received a quality step increase within the last 52 weeks. *DPFUF* ¶ 242.

39. From 2003 to 2005, Mrs. Murtagh Cooke received all within-grade step increases when she met the necessary criteria. *DPFUF* ¶ 243.

40. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment, are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase. *DPFUF* ¶ 244.

41. During Mr. Campbell's tenure as General Counsel, four of his seven professional hires were female. These selections included individuals who were to become the Agency's Ethics Officer, a Deputy Managing Director (selected by him), and an Associate Managing Director (selected by his successor). *DPFUF* ¶ 253.

42. Between 2002 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beale, and Elaine Weinstein. *DPFUF* ¶ 254.

43. Between 2001 and 2005, Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES. These were approximately half of the SES appointments made during that time. *DPFUF* ¶ 255.

44. Lola Ward, Julie Beale, and Elaine Weinstein were all required to compete for their positions. All of them competed against male applicants. *DPFUF* ¶ 256.

45. On April 28, 2006, Mrs. Murtagh Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). Cooke v. United States, 77 Fed. Cl. 173, 175 (2007). *DPFUF* ¶ 275.

46. On October 26, 2006, the district court transferred the Equal Pay Act claim to this Court. Cooke, 77 Fed. Cl. at 175-76. *DPFUF* ¶ 258.

47. Mrs. Murtagh Cooke filed her complaint in this Court on November 14, 2006. *DPFUF* ¶ 259.

Insofar as any of the proposed facts offered by Defendant not listed above but included in DPFUF can be deemed true, Mrs. Murtagh Cooke disputes any inferences or assumptions Defendant draws from those facts. Mrs. Murtagh Cooke further asserts that the facts described in ¶¶ 22 and 25 of DPFUF speak to individual intent and mental impressions and cannot be properly presented as fact. The facts described in ¶¶ 45 and 53-56 assumes facts not presented or unknown to Mrs. Murtagh Cooke. As such, Mrs. Murtagh Cooke denies said proposed facts.

Furthermore, Mrs. Murtagh Cooke asserts the following facts to be undisputed but not proposed by Defendant:

48. Defendant is the United States of America, in the persons of the NTSB and Rosenker. *See* Ex. 1, Amended Complaint, ¶ 3; *see also* Ex. 2, Answer, ¶ 3.

49. On January 8, 2007, Defendant filed an Answer to the Complaint, which contained no affirmative defenses. *See* Ex. 2.

50. On October 9, 2007, Mrs. Murtagh Cooke filed a motion for summary judgment before this Court, asserting, partly, that Defendant proffered no affirmative defenses. *See* Ex. 3, Plaintiff's Memorandum of Points and Authorities in Support of her Motion for Summary Judgment.

51. On October 19, 2007, Defendant filed a motion to amend its answer and assert its affirmative defenses. *See* Ex. 4, Defendant's Motion for Leave to File Amended Answer and Affirmative Defense.

52. Mrs. Murtagh Cooke opposed Defendant's motion to amend its answer on November 15, 2007, and Defendant replied on November 26, 2007. *See* Ex. 5, Plaintiff's Opposition to Defendant's Motion for leave to File Amended Answer and Affirmative Defense; *see also* Ex. 6, Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Leave to File Amended Answer and Affirmative Defense.

53. On December 3, 2007, Defendant filed its cross motion and response to Mrs. Murtagh Cooke's October 9, 2007, motion for summary judgment. *See* Ex. 7, Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment.

54. On December 5, 2007, Judge Thomas Wheeler held a hearing regarding Defendant motion to amend is answer, ruling that the amended answer be allowed, the pending motions for summary judgment denied, and discovery extended with regard to Defendant's affirmative defenses. *See* Ex. 8, Opinion on Motion to Amend Answer; *see also* Ex. 9, Order; *see also* Ex. 10, Defendant's Amended Answer and Affirmative Defense.

55. On April 2, 2008, the Court held a scheduling conference with counsel for both parties, scheduling the trial to begin on August 18, 2008 at 9:30 AM at the National Courts Building and allotting five (5) days, through August 22, 2008, for trial. *See* Ex. 33, Pretrial Order.

## Disputed Facts and Genuine Issues

Pursuant to RCFC 56(h)(2), Mrs. Murtagh Cooke concisely illustrates below both the material facts she asserts are true, supporting her claim, and how there are numerous genuine issues and disputed facts with those proposed by Defendant in Defendant's Motion for Summary Judgment ("Defendant's Memorandum") and DPFUF. As such, Defendant's motion must be denied.

<table>
<tr><td colspan="2"><u>I. PLAINTIFF HAS ESTABLISHED A PRIMA FACE CASE UNDER THE EQUAL PAY AS A MATTER OF LAW</u><br><br><u>Summary</u>: Mrs. Murtagh Cooke establishes as a matter of law that all of her comparators, all men, received substantially higher compensation than her over a period of several years. All of her comparators possessed equal job duties, and their work required virtually identical skills, effort and responsibility under virtually identical working conditions. Satisfying the requisite elements of the Equal Pay Act, 29 U.S.C. § 206, Mrs. Murtagh Cooke has met her burden to establish a prima face case before this Court.</td></tr>
<tr><td>Mrs. Murtagh Cooke's Disputed Facts</td><td>Defendant's Assertions</td></tr>
<tr><td colspan="2">A. Defendant Paid A Different Wage to Plaintiff, Who Is Not Of The Same Sex As Her Comparators.</td></tr>
<tr><td>1. Mrs. Murtagh Cooke was <u>paid significantly less than her male counterparts</u>, John Clark ("Clark"), Director of OAS, Osterman, Director of and Chipkevich. (See Ex. 11, Excerpts from EEO Investigative Report, Exhibit F2i)</td><td>Mrs. Murtagh Cooke was paid in accordance with Federal statutes. DPFUF ¶¶ 228-229.</td></tr>
<tr><td>2. In 2003, while Clark received a salary of <u>$142,022</u>, Osterman received a salary of <u>$136,872</u> and Chipkevich received a salary of <u>$142,022</u>, Mrs. Murtagh Cooke received a salary of <u>$121,583</u>. Currently, <u>Spencer</u>, the new OMS Director who replaced Mrs. Murtagh Cooke, is <u>paid at the SES</u> level for performing <u>equal work to that of Mrs. Murtagh Cooke</u>. (See Ex. 11 at Exhibit F2i; see also Ex. 1 at ¶ 17; see also Ex. 2 at ¶ 17)</td><td>Mrs. Murtagh Cooke was paid in accordance with Federal statutes. DPFUF ¶¶ 228-229.</td></tr>
<tr><td>3. In 2004, while Clark received a salary of <u>$142,022</u>, Osterman received a salary of <u>$140,797</u> and Chipkevich received a salary of $<u>142,022</u>, Mrs. Murtagh Cooke received a salary of <u>$126,963</u>. (See Ex. 1 at ¶ 18; see also Ex. 2 at ¶ 18)</td><td>Mrs. Murtagh Cooke was paid in accordance with Federal statutes. DPFUF ¶¶ 228-229.</td></tr>
</table>

<table>
<tr><td colspan="2">4. Mrs. Murtagh Cooke received lower monetary awards than her male counterparts, Clark, Osterman and Chipkevich. Specifically, in 2003, while Clark received an award of $16,080, Osterman received an award of $5,900, and Chipkevich received an award of $16,056, Mrs. Murtagh Cooke received an award of $5,400. And in 2004, while Clark received an award of $17, 000, Osterman received an award of $9,500, and Chipkevich received an award of $16,000, Mrs. Murtagh Cooke received an award of $3,400. (See Ex. 1 at ¶ 20 and ¶ 21; see also Ex. 2 at ¶ 20 and ¶ 21)</td><td>Mrs. Murtagh Cooke was paid in accordance with Federal statutes. DPFUF ¶¶ 228-229.</td></tr>
<tr><td colspan="2">5. In April 2004, Mrs. Murtagh Cooke complained to Conners, Chairman of the NTSB, that her pay was not equal to that of her male counterparts. (See Ex. 12, Excerpts of Conners Deposition in DDC, at 53; see also Ex. 1 at ¶¶ 24-29; see also Ex. 2 at ¶¶ 24-29; see also Ex. 13[1], Excerpts of Mrs. Murtagh Cooke Deposition in DDC, at 20; see also Ex. 14, Excerpts of Mrs. Murtagh Cooke Deposition in CFC, at 259)</td><td>In April 2004, Conners had a brief meeting with Mrs. Murtagh Cooke regarding Mrs. Murtagh Cooke's request for overtime, but Mrs. Murtagh Cooke did not say anything suggesting that the request was to equalize her pay or that she was filing an EPA or sexual discrimination complaint. DPFUF ¶ 233.</td></tr>
<tr><td colspan="2">6. Conners characterized Mrs. Murtagh Cooke's request as that of a "small child...upset that you didn't buy them the toy." Conners refused to meet with Mrs. Murtagh Cooke again regarding her unequal pay and did not follow up on Mrs. Murtagh Cooke's complaint. (See Ex. 12 at 58-59, 74-76; see also Ex. 11 at F4 at 4)</td><td>Conners never received documentation or other justification from Mrs. Murtagh Cooke for her request for overtime. DPFUF ¶ 235.</td></tr>
<tr><td colspan="2">7. Though Conners testified that she met with Campbell to discuss her meeting with Mrs. Murtagh Cooke in April 2004, Campbell denied having any conversation with Conners regarding Mrs. Murtagh Cooke's pay or overtime.</td><td>Conners relayed to Campbell the content of her meeting with Mrs. Murtagh Cooke. DPFUF ¶ 234.</td></tr>
<tr><td>a. Conners relayed her conversation with Mrs. Murtagh Cooke regarding not being paid the same as the other modal directors to Campbell on the same day the conversation took place.</td><td>b. Campbell denied ever discussing Mrs. Murtagh Cooke's request for equal pay or overtime with Conners. (See Ex. 15, Excerpts of Campbell Deposition in DDC, at 103-</td><td></td></tr>
</table>

[1] Please note, there was an error with counsel's copy of Mrs. Murtagh Cooke's deposition in the DDC, creating unnecessary blank pages. However, no testimony was lost and the excerpts include the full text of the intended sections.

| | | |
|---|---|---|
| (*See* Ex. 12 at 66-68) | 105) | |
| 8. In addition to meeting with Conners, Mrs. Murtagh Cooke addressed her concerns regarding her unequal pay directly with Campbell himself. (*See* Ex. 13 at 56-58; *see also* Ex. 14 at 255-256) | | Mrs. Murtagh Cooke never approached Campbell about receiving overtime pay. *DPFUF* ¶ 236. |
| 9. Mrs. Murtagh Cooke could not submit documentation regarding overtime because none of her requests for overtime were approved. (*See* Ex. 14 at 255) | | Conners never received documentation or other justification from Mrs. Murtagh Cooke regarding her request for overtime. *DPFUF* ¶ 235. |
| **B. The Skills Required For The Director Of OMS And Comparators Were Equal.** | | |
| 1. The skills required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those skills included (a) technical expertise in their transportation mode; (b) knowledge of, and expertise in, accident investigation processes and procedures from the investigation stage through report completion, leadership and supervisory skills; (c) logic and analytical process skills; a fundamental knowledge of their respective modal industries; and (d) the ability to communicate both written and orally and to coordinate and collaborate with other professionals both internally within the NTSB and externally as part of the investigations or other advocacy work for each respective office. (*See* Ex. 16, Excerpts of Deposition of Osterman in CFC, at 39-50) | | ORPH and OHS entail more complicated and variegated, larger and more dispersed, than that of OMS. OAS, ORPH, and OHS are larger in size, have larger budgets, investigate more frequent accidents, have higher public profiles, produce a larger number of reports, are more internationally active, interact more regularly with Congress, require more travel and more hazardous environments, entail greater executive responsibility, and contain other differences from that of OMS. The Director of OMS performs supervisory duties that do not make the position eligible for an SL position. *DPFUF* ¶¶ 21-23, 30-31, 44-56, 57, 63-64, 69-80, 82-88, 90-111, 113-124, 126-143, 145-222, 226-227, 248-251 (referenced |

| | |
|---|---|
| | hereinafter as "Differences Between The Modal Offices"). The skills required for the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 29-31. |
| 2. Conners, former Chairman of the NTSB, and ultimately responsible for all modal directors, responded under oath that she admitted that the skills required of the modal office directors were identical. (*See* Ex. 11 at Exhibit F4 at 2.) | Differences Between The Modal Offices. The skills required for the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 29-31. |
| **C. The Effort Required For The Director Of OMS And Comparators Were Equal.** | |
| 1. The efforts required for the Director of OAS, OMS, ORPH and OHS were all virtually identical. Those efforts included: (a) effectively managing large volumes of information related to accident investigation; (b) assessing and evaluating issues; (c) evaluating resources necessary and available; (d) juggling multiple priorities; (e) dealing with contingencies and uniqueness of each investigation; decision making; (f) supervising and evaluating staff both in the office and in the field; (g) providing support and essential information for internal personnel including Board members, the Managing Director and other executives and managerial staff, supervisors, investigators, report writers, and administrative personnel and external personnel including the transportation mode regulator (e.g. FAA and USCG), party representatives (e.g. Cruise ship owners) Congressional staff, and, in the case of international/foreign investigations, State Department and foreign government officials, and in the case of public/non public investigations, Department of Defense officials; (h) developing, establishing, and assuring fulfillment through supervision and oversight of multiple processes for accident investigation from accident/incident notification through report development; (i) reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission, communication of results, collaboration with internal and external professionals; (j) complying with all rules, regulations, and guidelines that apply to human and monetary resource management; and (k) conducting business on a year round 24 hour/ 7 day schedule. (*See* Ex. 17, Excerpts of Osterman individual Deposition in | Differences Between The Modal Offices. The effort required for the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 31-32. |

| | | |
|---|---|---|
| | DDC, at 74-86; *see also* Ex. 16 at 77-80) | |
| 2. | Conners, former Chairman of the NTSB, and ultimately responsible for all modal directors, responded under oath that she admitted that <u>the effort required of the modal office directors were identical</u>. (*See* Ex. 11 at Exhibit F4 at 2.) | Differences Between The Modal Offices. The effort required for the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 31-32. |
| | **D. The Responsibilities Of The Director Of OMS And Comparators Were Equal.** | |
| 1. | The <u>core functions</u> required for the Director of OMS, OHS, OAS and ORPH were <u>identical</u>. (*See* Ex. 11 at Exhibit F2f at 1.) | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| 2. | Each modal office director was responsible (a) for ordering an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate; (b) to disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch. VIII; (c) to determine the probable causes of accidents; and (d) to investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). (*See* Ex. 11 at Exhibit F2f at 1) | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| 3. | The <u>responsibilities required</u> for the Director of OAS, OMS, ORPH and OHS were <u>identical</u>. Those responsibilities included but were not limited to managing a major modal program for the agency which included: conducting accident investigations to determine their cause and preparing justifications for safety recommendations to prevent accident repetition in the future; overseeing the analysis, development and preparation of detailed reports and proposing probable cause determinations of major and field accidents and incidents; preparing accident investigation reports in a timely manner; preparing Special Investigations, responses to proposed rulemakings, responses to requests for technical support, and Public Hearings. (*See* Ex. 18, Excerpts of Clark Deposition in CFC (Part I), at 60-75; *see also* Ex. 17 at 74-86; *see also* Ex. 16 at 77-81, 98-100 and 114-119) | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| 4. | The list of <u>responsibilities required</u> for the Director of OAS, OMS, ORPH and OHS included management responsibilities related to internal and external communications (e.g. keeping the Chairman, other Board members, the Managing Director, other agency executives and managers, party representatives and | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were |

| | |
|---|---|
| Congressional members and staff, informed either verbally and/or in writing.) human resources (e.g. managing modal professionals, recruiting and hiring personnel, supervising, training and tracking career goals and progression, developing performance standards and evaluating personnel; tracking leave and overtime); budget management (e.g. exercising budget authority, using funds for training, travel, overtime, and on-scene investigation support); project tracking and quality control of all Modal Office products. (*See* Ex. 17 at 60-75; *See also* Ex. 16 at 77-80) | not equal. *Defendant's Memorandum* at 32-36. |
| 5. As the Director of the OHS, Osterman had virtually the same duties and responsibilities as Mrs. Murtagh Cooke when she was the director of OMS. (*See* Ex. 17 at 74-86; *see also* Ex. 11 at Exhibit F2d at 1-4) | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| 6. Both Osterman's position at OHS and Plaintiff's position at OMS had the virtually the same job description as follows:<br><br>1) Planned, managed and evaluated the work of the OHS;<br>2) Exercised important policy making and policy determining decision that impacted highway safety at international organizations, federal agencies, and international and domestic industries.<br>3) Provided for overall direction and technical accuracy of the investigation and reporting process for major highway safety accidents;<br>4) Developed overall requirements and schedules to accomplish the highway safety program;<br>5) Reviewed, approved and promulgated schedules and milestones for assigned activities;<br>6) Reviewed, evaluated and approved, disapproved or modified requests for changes to milestones in schedules;<br>7) Developed overall program review documentation and provided status reports on a regular basis;<br>8) Determined the level of response and resources allocation for the NTSB highway safety program;<br>9) Notified NTSB's chairman and managing director, federal and international agencies and managing director of the accident;<br>10) Notified foreign embassies and/or flag representatives as appropriate;<br>11) Coordinated the allocation of staff resources with other office directors involved in the investigation;<br>12) Resolved differences between modal and support staff views | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |

| | |
|---|---|
| regarding accident investigation, scope, required resources and analysis;<br>13) Ensured through the completed and comprehensive review of the draft report that essential issues were adequately addressed;<br>14) Ensured reviewed of the draft report that all findings and recommendations are supported by analysis and that the board and that the draft sent forward is of the best quality;<br>15) Ensured the proper presentation of the draft report before the board at board hearings;<br>16) Reviewed work product of other modal and support offices;<br>17) Ensured that the quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program, including investigations, reports, safety recommendations and highway safety advocacy;<br>18) Established and maintained liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, and Federal regulators;<br>19) Provided authoritative advice and expertise to these groups in the development of industry standards and regulations and new applications of existing technology;<br>20) Provided Congressional testimony;<br>21) Participated in international meetings on highway safety issues as a representative of the NTSB;<br>22) Developed and justified estimates for staff resources requirements including personnel funding, equipment, and office, space;<br>23) Justified and defended budgets on all levels of management;<br>24) Implemented concepts to get results through people and make selections assign work, train and reward employees;<br>25) Corrected poor performance in a manner that maximizes the use of staff skills and achieving organizational skills;<br>26) Monitored work status through formal and informal means and procedures;<br>27) Ensured appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated;<br>28) Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors;<br>29) Ensure that employees are given real and continuing opportunity to influence their work environment and ensure that employees are given a real and continuing opportunity to be able to participate in discussions related to methods of work accomplishments; | |

| | |
|---|---|
| 30) Ensured reasonable equity within OHS of performance standards and rating techniques developed by subordinates and ensure equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work;<br>31) Evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory employees rated by subordinate supervisors;<br>32) Evaluated program accomplishments and their overall effectiveness;<br>33) Identified program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed;<br>34) Worked closely with human resources in approving their recruitment, placement and retention of a high quality OHS work force;<br>35) Ensured that crucial training courses needed to keep pace with today's technological improvements in highway transportation safety are provided to staff for their technical and operational currency;<br>36) Ensured crucial training sessions needed to keep pace with today's technological improvements in highway transportation safety are provided to the staff for their technical and operational currency;<br>37) Provide effective management training to maintain a highway motivated and cohesive force;<br>38) Relate equal employment opportunity concepts to overall responsibilities;<br>39) Support affirmative action plan while performing assigned responsibilities;<br>40) Available 24 hours a day 7 days a week; and<br>41) Support board members, agency initiatives, and meetings with regard to agency staff awards.<br><br>(*See* Ex. 17 at 74-86; *see also* Ex. 11 at Exhibit F2d at 1-4) | |
| 7. Mrs. Murtagh Cooke's <u>position</u> as Director of OMS included <u>all of the same duties and responsibilities</u> as those of the other modal directors. (*See* Ex. 14 at 21-23) | Differences Between The Modal Offices. The responsibilities of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| 8. Conners, former Chairman of the NTSB, and ultimately responsible for all modal directors, responded under oath that she admitted that the <u>responsibilities required of the modal office</u> | Differences Between The Modal Offices. The responsibilities of the |

| | | |
|---|---|---|
| | directors were identical. (*See* Ex. 11 at Exhibit F4 at 2.) | Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 32-36. |
| **E. The Working Conditions Of The Director Of OMS And Comparators Were Equal.** | | |
| 1. | Mrs. Murtagh Cooke performed her work as Director of OMS under similar conditions as Clark performed his work as Director of OAS, Chipkevich performed his work as Director of ORPH and Osterman performed his work as Director of OHS. Each worked primarily in an office environment using electronic devices, computers and telephones for communication. The critical nature of each Director's work requires him/her to be available 24 hours a day/ seven days a week (24/7) in case of an accident that requires an investigation. Each Office Director was expected to deal effectively with the pressure of accident launches, the on-scene investigation phase including coordination and collaboration with internal and external staff, subsequent analysis and report preparation stage, preparation of written and oral communications and presentation to the Board and to the public. Each director reported directly to the Managing Director, their second level supervisor was the Chairman. Each of the Office Directors was relatively independent to do their work. (*See* Ex. 17 at 74-86; *see also* Ex. 16 at 80-82 and 130-131; *see also* Ex. 13 at 207; *see also* Ex. 14 at 188-189; *see also* Ex. 34, Excerpts of Conners Deposition in CFC, at 45-47) | Differences Between The Modal Offices. The working conditions of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 37-38. |
| 2. | Mrs. Murtagh Cooke did travel off site to investigate marine incidents. (*See* Ex. 13 at 237) | Differences Between The Modal Offices. The working conditions of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 37-38. |
| 3. | Conners, former Chairman of the NTSB, and ultimately responsible for all modal directors, responded under oath that she admitted that the working conditions of the modal office directors were identical. (*See* Ex. 11 at F4 at 2.) | Differences Between The Modal Offices. The working conditions of the Director of OMS and the alleged comparators were not equal. *Defendant's Memorandum* at 37-38. |

| **F. The OMS Investigated Publicly Visible and Major Incidents, Just As The Other Modal Offices** | |
|---|---|
| 1. OMS was responsible for the investigation of high profile national and international marine incidents, such as the *Andre J, Barberi* Staten Island Ferry accident and other incidents involving the *Miss Majestic*, the *Ehime Maru*, the *Scandia*, the *Lady D*, the *S.S. Norway*, a cruise ship explosion, a passenger vessel overturning, among others (Ex. 13 at 96-103, 105-125; *see also* Ex. 14 at 77-86, 279-281). | Differences Between The Modal Offices. OAS, ORPH, and OHS have higher public profiles than that of OMS. *DPFUF* ¶¶ 120-124. |

**II. THE DISPARITY IN PAY BETWEEN PLAINTIFF AND HER COMPARATORS WAS BASED UPON SEX AND ANY DEFENSES WITHOUT MERIT**

**Summary:** The NSTB's proffered legitimate business reasons and affirmative defenses, namely the existence of a merit system and other determinative factors other than sex, are without merit and do not cure the NTSB's violation of the Equal Pay Act, 29 U.S.C. § 206. Initially, the NTSB is unable to clearly name or support its defenses before Mrs. Murtagh Cooke. Furthermore, the NTSB's assertion that a promotion to an SES position is the primary means by which Mrs. Murtagh Cooke could receive equal pay ignores other avenues admitted by NTSB employees. The improper method by which the NTSB created the SES positions within the agency and ultimately denied Mrs. Murtagh Cooke's application for the OMS SES position, despite being qualified, clearly demonstrate the NTSB's dedication to refuse equal pay to Mrs. Murtagh Cooke.

| ***Mrs. Murtagh Cooke's Disputed Facts*** | | ***Defendant's Assertions*** |
|---|---|---|
| **A. The NTSB Is Not Aware Of The Basis For Or Of Facts The Support Any Affirmative Defenses.** | | |
| 1. After the NTSB amended its Answer to assert its affirmative defenses after Mrs. Murtagh Cooke filed for Summary Judgment, the NTSB could not state what those defenses were or specifically identify those documents that support such defenses. | | The pay differential was not based upon gender. *Defendant's Memorandum* at 37-48. |
| a. Osterman, on behalf of the NTSB, affirmed the truth and correctness of the NTSB's affirmative defenses and supporting documentation. (*See* Ex. 19, Defendant's Supplemental Responses to Plaintiff's Third Set of Interrogatories to Defendant United States of America in CFC, at 18) | b. Osterman, on behalf of the NTSB, testified that he was not aware of any affirmative defenses or supporting documentation. (*See* Ex. 20, Excerpts of Second NTSB 30(b)(6) Deposition in CFC, at 10-11, 13) | |
| **B. Mrs. Murtagh Cooke's Unequal Pay Was Not Legitimately Based Upon Any Merit System Within The NTSB.** | | |
| 1. The skills, effort, responsibilities, and conditions between the GS-15 Director of OMS and SES OMS directorship were substantially the same. (*See* Ex. 21, Director of OMS SES Position Description; *see also* Ex. 11, Exhibit F8a; *see also* Ex. | | Mrs. Cooke could not have been promoted to the SES level. *Defendant's* |

| | | | |
|---|---|---|---|
| 16 at 137-138) | | | *Memorandum* at 39. |
| 2. Though the NTSB argued that it sought to make all four modal directorships SES positions, it cannot confirm any actual plan to do so nor recall how or when such positions came into being. | | | It was NTSB's intent that each of the four modal office directors be classified and paid at the SES level; the NTSB requested to OPM for additional SES slots for the modal directors and followed established protocol in classifying the modal office directors as SES employees. *DPFUF* ¶¶ 8-14, 20-21, 28-29, 37; *Defendant's Memorandum* at 39-40. |
| a. Carroll stated that in June of 1999, the NTSB requested from OPM SES positions for the modal directorships (OAS, OHS, ORPH, and OMS). (*See* Ex. 22, November 29, 2007, Declaration of Carroll, at ¶ 5) | b. Carroll later admitted that she is not aware of a request by NTSB for SES positions for the modal office directors from OPM. (*See* Ex. 23, Excerpts of Carroll Deposition in CFC, at 22) | c. Carroll once again changed her testimony and stated that in June 1999, the NTSB submitted a request to OPM for additional SES slots for the modal directorships. (*See Appendix to Defendant's Motion for Summary Judgment ("DA")* at 7, ¶ 8) | |
| d. Carroll stated that the Director of ORPH became an SES position in or around the year 2000 due to the retirement of a former SES position holder. (*See* Ex. 22 at ¶ 8) | e. Carroll later testified that the Director of ORPH became an SES position in either 2003 or 2004 and admitted that she is not aware as to how the position became available. (*See* Ex. 23 at 27-28) | f. Carroll once again changed her testimony and stated that the Director of ORPH became an SES position in 2001 due to the retirement of a former SES position holder. (*See DA* 7, ¶ 11) | |

| | | | |
|---|---|---|---|
| g. Carroll stated that the NTSB's planned prioritization of new SES positions, after appointing the ORPH SES position, was (1) Director of OHS, then (2) Director of OMS. (*See* Ex. 22 at ¶ 12) | h. Carroll later testified that she was not aware of any particular priority order in which NTSB allocated SES slots to the modal offices. (*See* Ex. 23 at 32) | i. Carroll once again changed her testimony and stated that, after the appointment of the ORPH SES position, NTSB prioritized OHS before OMS. (*See DA* 8, ¶ 15) | |
| j. Carroll stated that performance awards are not meant to augment one's salary. (*See* Ex. 22 at ¶ 27) | k. Carroll later testified that performance awards are considered and taxed as compensation (*See* Ex. 23 at 53) | l. Carroll once again changed her testimony and stated that performance awards are not salary. (*See DA* 10, ¶ 32) | |
| 3. While Mrs. Murtagh Cooke refutes any claim that the Director of OMS was smaller size or scope than any other NTSB modal directorship, the truth was the NTSB did not follow its own stated plan to establish SES positions for the modal directors sequentially. The Deputy Director of OAS, Deputy Director of ORE, Dean of the NTSB Academy, and Director of the NTSB Academy became SES positions prior to the Director of OMS. (*See* Ex. 24, Chart of SES Positions within the NTSB) | | | It was NTSB's intent that each of the four modal office directors be classified and paid at the SES level; the NTSB requested to OPM for additional SES slots for the modal directors and followed established protocol in classifying the modal office directors as SES employees. *DPFUF* ¶¶ 8-14, 20-21, 28-29, 37; *Defendant's Memorandum* at 39-40, 47. |
| 4. Though the NTSB argued that Mrs. Murtagh Cooke was not eligible for any permitted mechanisms for pay equalization, other than through an SES position or retention allowance, Osterman contradicted his own testimony and admitted other mechanisms do exist. | | | Mrs. Murtagh Cooke was ineligible for a retention allowance or performance awards. Performance awards are not meant to augment one's salary. *DPFUF* ¶¶ 239-240, 245, 252; |

| | |
|---|---|
| | *Defendant's Memorandum* at 41-42. |
| a. Osterman claimed, at first, that SES classification or retention allowances were the only methods for Mrs. Murtagh Cooke to receive equal pay. (*See* Ex. 16 at 188-189)<br>b. Osterman later admitted that awards or bonuses were available as mechanisms for earning increased pay. (*See* Ex. 16 at 191-192) | |
| 5. The NTSB prevented Mrs. Murtagh Cooke from earning performance awards by not providing her with a performance evaluation. (*See* Ex. 25, Excerpts of Chipkevich Deposition in DDC, at 133-135; *see also* Ex. 26, Excerpts of First NTSB 30(b)(6) Deposition in CFC, at 187-191, 210-211) | Between 2003 and 2005, Mrs. Murtagh Cooke never had a discrete success or project that warranted a special act award. It was tradition for office directors to decline to participate in the end-of-year agency-wide awards. *DPFUF* ¶¶ 246-247; *Defendant's Memorandum* at 42. |
| 6. Though the NTSB argues that overtime was not an option to Mrs. Murtagh Cooke, Carroll, a Personnel Specialist for NTSB, and Defendant's own DPFUF contradict Defendant's own statements and testimony that overtime was available to Mrs. Murtagh Cooke. | There is a limit to the amount of overtime pay a GS-level employee can receive. *DPFUF* ¶¶ 231-232; *Defendant's Memorandum* at 40-41. |
| a. Conners testified that NTSB managers should not get and are not entitled to overtime, denying overtime as a means to equalize Mrs. Murtagh Cooke's pay with that of her comparators. (*See* Ex. 11 at Exhibit F4 at 4)<br>b. Carroll confirmed that overtime was not permitted for hours in connection with an accident investigation. (*See* Ex. 22 at ¶ 20)<br>c. Carroll testified that overtime was available to GS-15 NTSB employees, such as Mrs. Murtagh Cooke. (*See* Ex. 23 at 34-35, 37) | |
| 7. The NTSB was required to work within the confines of Federal statutes, which allowed overtime pay. Mrs. Murtagh asserts that the NTSB could have supplemented her income with overtime for the number of overtime hours she worked. (*See DPFUF* ¶¶ 228, 230-231; *see also* Ex. 14 at 239-240, 254) | There unwritten policy that individuals in management positions at the NTSB, including modal officer directors, |

| | |
|---|---|
| | would not receive overtime pay; Mrs. Murtagh Cooke knew of this unwritten policy. *DPFUF* ¶¶ 237-238 |
| 8. Clark started as the Deputy Director of ORE at the GS-15 level. When the Deputy position became an SES position, the NTSB automatically appointed Clark to the new SES position without subjecting him to the same review process to which Mrs. Murtagh Cooke had to endure (e.g., posting the position for a competitive application review process and conducting interviews of qualified candidates). (*See* Ex. 27, Excerpts of Clark Deposition in CFC (Part II), at 25, 38-40) | According to OPM regulations, the NTSB must, and did, advertise and compete all SES positions that will be filled by initial career appointment. *DPFUF* ¶¶ 24-26; *Defendant's Memorandum* at 45. |
| **C. Mrs. Murtagh Cooke's Unequal Pay Was Not Legitimately Based Upon Any Other Factor Other Than Sex.** | |
| 1. The ad hoc review panel for the Director of OMS SES position offered in 2004 unanimously determined that Mrs. Murtagh Cooke was qualified for the SES position. (*See* Ex. 28, Excerpts of Battocchi Deposition in DDC, at 133; *see also* Ex. 25 at 38-39; *see also* Ex. 29, Memorandum Regarding 2004 Selected Candidates; *see also* Ex. 30, 2004 SES Rating Sheet for Mrs. Murtagh Cooke) | Spencer was tasked with improving upon the OMS's backlog and other issues within OMS that occurred during Mrs. Murtagh Cooke's tenure as Director. *DPFUF* ¶ 223-225 |
| 2. The NTSB considered Mrs. Murtagh Cooke as having sufficient background and education in marine accident investigation, developing reports, recommending development, advocacy, agency coordination, personnel management, and budgeting. NTSB appointed Mrs. Murtagh Cooke to Director of OMS in 1997. (*See* Ex. 26 at 69-73) | Mrs. Murtagh Cooke never had a discreet success or project that warranted a special act award. *DPFUF* ¶ 246; *Defendant's Memorandum* at 42. |
| 3. Mrs. Murtagh Cooke received "outstanding" and "excellent" performance appraisals as Director of OMS. (*See* Ex. 26 at 78; *see also* Ex. 31, 2003-2004 Performance Review) | Mrs. Murtagh Cooke never had a discreet success or project that warranted a special act award. *DPFUF* ¶ 246; *Defendant's Memorandum* at 42. |
| 4. Mrs. Murtagh Cooke performed so well, she received monetary performance awards. (*See* Ex. 16 at 195-196) | Mrs. Murtagh Cooke never had a discreet success or project that warranted a special act award. *DPFUF* ¶ 246; *Defendant's* |

| | |
|---|---|
| | *Memorandum* at 42. |
| **D. The Re-Advertisement Of The Director Of OMS SES Position Demonstrates That There Is No Legitimate Reason For Mrs. Murtagh Cooke's Unequal Pay.** | |
| 1. After the ad hoc review committee deemed Mrs. Murtagh Cooke qualified for the OMS SES position, Campbell decided to re-advertize the OMS SES position. (*See* Ex. 29; *see* also Ex. 15 at 114) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |
| 1. Campbell admitted, and it was known, that he re-advertized the Director of OMS SES position to ensure that Mrs. Murtagh Cooke would not receive the SES appointment; otherwise, he felt he would have been accused of losing his mind. (*See* Ex. 15 at 93-98, 182; *see also* Ex. 26 at 36) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |
| 2. Although Campbell re-advertised the Director of OMS SES position due to an alleged preselection of Mrs. Murtagh Cooke, the 2005 re-advertisement was exactly the same as that of the 2004 original, without any announcement of non-preselection. (*See* Ex. 26 at 37-38) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |
| 3. Although Campbell re-advertized the Director of OMS SES position because of an alleged impression by the Coast Guard that the position was preselected for Mrs. Murtagh Cooke, Campbell never confirmed to the Coast Guard that no preselection existed. (*See* Ex. 26 at 41) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |

| | |
|---|---|
| 4. Although Campbell re-advertized the Director of OMS SES position because of an alleged desire to increase the applicant pool, the NTSB received the same number of applicants (20) for both the original 2004 posting and subsequent 2005 posting of the position. (*See* Exs. 29 and 32, Memorandum Regarding March 28, 2005, Selected Candidates) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |
| 5. Campbell clearly does not have a problem with preferential treatment within the NTSB's recruiting processes. Although Campbell decided to re-advertise the OMS SES position due to a perceived preference for Mrs. Murtagh Cooke for the position, Campbell himself attempted to have a personal friend placed in a position within OMS. (*See* Ex. 13 at 60-62; *see also* Ex. 28 at 210) | The NTSB cancelled the 2004 OMS SES position advertisement because it felt the pool of applicants was too narrow and the rumor that the position was wired for Mrs. Murtagh Cooke. *DPFUF* ¶ 39; *Defendant's Memorandum* at 9. |