# EXHIBIT NO. 7

**No. 06-748C**
**(JUDGE WHEELER)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**MARJORIE MURTAGH COOKE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

**JEFFREY S. BUCHOLTZ**
**Acting Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**MEREDYTH D. COHEN**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 353-7978**
**Fax: (202) 514-8624**

**Attorneys for Defendant**

**Of Counsel:**

**DENISE D'AVELLA**
**Office of General Counsel**
**National Transportation Safety Board**

**December 3, 2007**

TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

B. SES Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

C. Differences Between The Modal Offices . . . . . . . . . . . . . . . . . . . . . . . . 7

D. Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. Female SES Employees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

I. The Standard of Review For Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . 26

II. The Standard Of Review For The Equal Pay Act . . . . . . . . . . . . . . . . . . . . . . . 27

III. Ms. Cooke Cannot Establish Her Prima Facie Case . . . . . . . . . . . . . . . . . . . . . 28

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

B. The Effort Required For The Director Of OMS And The Alleged Comparators Was Not Equal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C. The Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

D. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

IV. Assuming That Ms. Cooke Has Established Her Prima Facie Case, The Pay Differential Was Not Based Upon Gender . . . . . 41

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System . . . . . 41

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level . . . . . 42

2. Ms. Cooke Could Not Have Been Given Overtime Pay . 43

3. Ms. Cooke Could Not Have Been Given A Retention Allowance . . . . . 44

4. Ms. Cooke Could Not Have Been Given Any Additional Performance Awards . . . . . 45

5. Ms. Cooke Could Not Have Been Given A Senior Level Position . . . . . 45

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex . . . . . 45

CONCLUSION . . . . . 50

Case 1:06-cv-00748-TCW Document 43 Filed 12/05/2007 Page 4 of 57

TABLE OF AUTHORITIES

**CASES**


Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) .......... 26, 27

Behm v. United States,
68 Fed. Cl. 395 (2005) .......... 46

Belfi v. Prendergast,
191 F.3d 129 (2nd Cir. 1999) .......... 28

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) .......... 26

Corning Glass Works v. Brennan,
417 U.S. 188 (1974) .......... 28

Epstein v. Sec'y, United States Dep't of Treasury,
739 F.2d 274 (7th Cir. 1984) .......... 29

Equal Employment Opportunity Commission v. Aetna Ins. Co.,
616 F.2d 719 (4th Cir. 1980) .......... 44, 46

Lissak v. United States,
49 Fed. Cl. 281 (2001) .......... 28, 46

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) .......... 26

Molden v. United States,
11 Cl. Ct. 604 (1987) .......... 25, 27, 28

Ratts v. Business Sys., Inc.,
686 F. Supp. 546 (D.S.C. 1987) .......... 30

Raymond v. United States,
31 Fed. Cl. 514 (1994) .......... 41

Sweats Fashions, Inc. v. Pannill Knitting Company, Inc.,
833 F.2d 1560 (Fed. Cir. 1987) .......... 26

Case 1:06-cv-00748-TCW Document 49 Filed 10/25/2007 Page 5 of 57

Wollenburg v. Comtech Manufacturing Co.,
201 F.3d 973 (7th Cir. 2000) ..... 45

**STATUTES**

5 U.S.C. § 5547(a) ..... 43

5 U.S.C. § 5754 ..... 23, 44

29 U.S.C. § 201 ..... 27

29 U.S.C. § 203(e)(2) ..... 27

29 U.S.C. § 206(d) ..... 1, 2, 25, 27, 41

29 U.S.C. § 215(a)(3) ..... 25

49 U.S.C. § 1131 ..... 8, 9

49 U.S.C. § 1132 ..... 8

**REGULATIONS**

5 C.F.R. § 550.105 ..... 43

5 C.F.R. § 575.301 ..... 23, 44

29 C.F.R. § 1620.13(a) ..... 28

29 C.F.R §1620.15(a) ..... 30

29 C.F.R. § 1620.16(a) ..... 32

29 C.F.R. §1620.17(a) ..... 35

29 C.F.R. § 1629.18 ..... 39

49 C.F.R. § 800.2 ..... 29

49 C.F.R. § 800.25 ..... 29

49 C.F.R. §850.10 ..... 9

49 C.F.R. §850.15 ..... 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant , the United States, respectfully requests that the Court grant summary judgment for defendant upon the grounds that there are no genuine issues of material fact and defendant is entitled to judgment as a matter of law. Defendant also respectfully requests that this Court deny plaintiff's motion for summary judgment, filed on October 9, 2007. The uncontroverted facts demonstrate that at all times relevant to plaintiff Marjorie Murtagh Cooke's complaint, the National Transportation Safety Board ("NTSB") properly paid Ms. Cooke at the General Schedule ("GS")-15 pay grade. Ms. Cooke's job did not require equal skill, effort, and responsibility and was not performed under similar working conditions as her alleged comparators. Furthermore, the NTSB's decision to pay Ms. Cooke at the GS-15 level was based upon a merit system and other gender-neutral considerations. Accordingly, because Ms. Cooke's job was not equal to the jobs of her comparators, the NTSB did not violate the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying Ms. Cooke at the GS-15 level. Even assuming that Ms. Cooke's job was equal to the jobs of her comparators, the NTSB did not violate the EPA by paying Ms. Cooke at the GS-15 level because it had gender-neutral reasons for doing so.

Case 1:06-cv-00748-TCW Document 43 Filed 12/05/2007 Page 7 of 57

In support of its motion, defendant relies upon the pleadings, the appended declarations, defendant's appendix ("DA"), and the following brief.

STATEMENT OF THE ISSUES

1. Whether Ms. Cooke's job required equal skill, effort, and responsibility and was performed under similar working conditions as the jobs of her alleged comparators.

2. Whether the NTSB paid Ms. Cooke at the GS-15 level pursuant to "a merit system . . . or a differential based on any other factor other than sex." 29 U.S.C. § 206(d).

STATEMENT OF THE CASE

I. Nature Of The Case

From 1997 to 2005, Ms. Cooke served as the Director of the Office of Marine Safety ("OMS") at the NTSB. First Am. Compl. ¶¶ 9, 44. Ms. Cooke alleges that, during her tenure as Director of OMS, she was paid less than "other similarly situated NTSB male directors . . . for similar work performed."[1] First Am. Compl. ¶ 1. Accordingly, Ms. Cooke alleges that the NTSB violated the Equal Pay Act, 29 U.S.C. § 206(d). First Am. Compl. ¶ 1. Ms. Cooke seeks reinstatement, promotion, economic damages including front and back pay, reasonable attorney's fees and costs, liquidated damages, and any other relief that this Court deems just and equitable. First Am. Compl. ¶ 50.

[1] The alleged comparators are Robert Chipkevich, Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations; Joseph Osterman, former Director of the Office of Highway Safety; John Clark, former Director of the Office of Aviation Safety; John Spencer, current Director of the Office of Marine Safety; Thomas Haueter, former Deputy Director of the Office of Aviation Safety; and Robert MacIntosh, Chief Advisor for International Aviation Safety Affairs. See DA 130.

## II. Statement of Facts

### A. Background

The NTSB is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. Defendant's Proposed Findings of Uncontroverted Fact ("PFUF") ¶ 1. Between 2003 and 2005, the NTSB had approximately 400 to 450 employees. PFUF ¶ 2.

As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS"). First Am. Compl. ¶ 6; PFUF ¶ 3. From 1994 until 1997, plaintiff, Marjorie Murtagh Cooke, served as the Chief of the Marine Division, an office within the NTSB's Office of Surface Transportation Safety. First Am. Compl. ¶ 5-6; PFUF ¶ 4. In 1997, as a result of the restructuring, Ms. Cooke's title changed to Director of OMS. First Am. Compl. ¶ 9; PFUF ¶ 5. The individuals who occupied the Director positions for each of the other three offices immediately following the restructuring were Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS). PFUF ¶ 6. The Directors of OHS, ORS, OPHS and OMS (collectively the "surface modal offices") reported directly to the Managing Director ("MD"). PFUF ¶ 7. Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became the Acting Director of ORPH. PFUF ¶ 15.

B. SES Allocations

Following the restructuring, it was the NTSB's intent that each of the four surface modal office directors be classified and paid at the Senior Executive Service ("SES") level. However, at the time of the restructuring, there were no available SES slots to allocate to the surface modal office directors. PFUF ¶ 8. There are two ways for a Federal agency, such as the NTSB, to elevate a position to the SES level. The NTSB can request and receive an allocation of an SES slot from the Office of Personnel Management ("OPM"). Once the agency receives this allocation, it can use it as it deems necessary. Alternatively, when a vacancy occurs in one of the allotted slots that the agency has, the agency can reassign that slot to another position in the agency. The agency is then authorized to fill that position by reassignment of a current SES employee to that position or through a competitive recruitment process. The NTSB cannot create a new SES position without OPM authorization. See PFUF ¶ 9. In June 1999, the NTSB submitted a request to OPM for additional SES slots so that each of the surface modal office directors could be classified and paid at the SES level. OPM denied the NTSB's request. PFUF ¶ 10. Thus, for a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the GS scale. PFUF ¶ 11; see also First Am. Compl. ¶ 7.

Historically and during all relevant time periods, the NTSB's Office of Aviation Safety ("OAS") existed as a separate unit and its Director and Deputy Director were paid at the SES level. PFUF ¶ 12-13; see First Am. Compl. ¶ 7. From November 2000 to March 2007, the individual occupying the OAS Deputy Director position was Thomas Haueter. PFUF ¶ 13. From July 2001 to the present, OAS had a Chief Advisor for International Aviation Safety

Affairs ("OAS Chief Advisor") who was paid at the Senior Level ("SL"). During the entire existence of the position, it has been occupied by Robert MacIntosh, Jr. PFUF ¶ 14.[2]

In 2001, an SES employee retired, and, therefore, an SES slot became available. This SES slot was allocated to the position of Director of ORPH. PFUF ¶ 16. The slot was allocated to ORPH because Mr. Chipkevich was the most senior of the modal office directors and ran the most complex of the three surface modal offices (OHS, ORPH, and OMS). PFUF ¶ 16. In addition, ORPH was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. PFUF ¶ 16.

Pursuant to OPM regulations, all SES positions must be advertised and competed. PFUF ¶ 17. An employee who encumbers a GS-15 level position that is reclassified to the SES level may not be noncompetitively promoted to the SES unless that employee has previously held a career SES appointment. PFUF ¶ 17. Accordingly, once the decision was made to allocate the SES slot to the Director of ORPH, the position was advertised as an SES position, and applications for the position were accepted. PFUF ¶ 18. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level. At the conclusion of the competitive process, Mr. Chipkevich was selected for the position. The NTSB then recommended him for the position to OPM, and he was approved for appointment to the SES. PFUF ¶ 19.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In the request, the NTSB stated that its planned

---

[2] John Clark was the Director of OAS during all relevant time periods. PFUF ¶ 12.

prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, OPM denied those requests. PFUF ¶ 20.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy after the incumbent voluntarily left the agency. The NTSB determined that an SES position was not required at the Academy, but that SES positions were needed in the operating system. PFUF ¶ 21. That slot was allocated to the position of Director of OHS because OHS was a larger office than OMS, and, as there are approximately 43,000 highway deaths each year, in contrast to several hundred marine deaths per year, it was determined that OHS could have a greater effect on transportation safety than OMS. PFUF ¶ 21. In addition, the scope of responsibilities of OHS was much larger that the scope of responsibilities of OMS, including investigatory responsibilities, supervision, and responsibilities for regional offices.[3] PFUF ¶ 21. Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position, and applications for the position were accepted. PFUF ¶ 22. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level. At the conclusion of the competitive process, Mr. Osterman was selected for the position. The NTSB then recommended him for this position to OPM, and he was approved for appointment to the SES. PFUF ¶ 23. Mr. Osterman has been paid at the SES level since early 2004. PFUF ¶ 23.

In 2004, NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS. PFUF ¶ 24. Once the decision was made to

[3] OHS had five regional offices, while OMS did not have any. PFUF ¶¶ 37, 39.

allocate the SES slot to the Director of OMS, the position was advertised in July 2004 as an SES position and applications for the position were accepted. See First Am. Compl. ¶ 34. Ms. Cooke submitted an application for the position. See First Am. Compl. ¶ 35. The advertisement was cancelled because the NTSB believed that the pool of qualified applicants was too narrow and insufficiently robust. PFUF ¶ 26. The position was readvertised as an SES position in early 2005, and Ms. Cooke again submitted an application. PFUF ¶ 27; see also First Am. Compl. ¶¶ 36-37. The NTSB recommended John Spencer for this position to OPM, and he was approved for appointment to the SES. PFUF ¶ 28. In June 2005, Ms. Cooke was transferred to the Office of Safety Recommendations. First Am. Compl. ¶ 44; PFUF ¶ 29.

C. Differences Between The Modal Offices

There are numerous significant differences between the modal offices and, therefore, numerous significant differences between the work of the directors of those offices. Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the board. PFUF ¶ 30. However, the specifics of each modal office's conduct of these duties are significantly different.

The size of OMS is not comparable to the size of the other modal offices. Between 2003 and 2005, OMS had the fewest number of employees. During that period of time, OAS had

Case 1:06-cv-00748-TCW Document 39 Filed 06/25/2007 Page 13 of 57

approximately 120 to 140 employees, ORPH had approximately 40 to 50 employees, OHS had approximately 30 to 40 employees, and OMS had approximately 14 to 15 employees. PFUF ¶¶ 31-35. Between 2003 and 2005, OMS had the smallest budget of any of the modal offices. The majority of the NTSB's budget is composed of fixed overhead costs, such as labor, benefits, and facilities; the remaining portion of the budget is discretionary and divided among NTSB offices. PFUF ¶ 40. Of the discretionary portion of the budget for fiscal year 2003, OAS received 28.04 percent, OHS received 7.61 percent, ORPH received 4.67 percent, and OMS received 2.09 percent. PFUF ¶ 41. Of the discretionary portion of the budget for fiscal year 2004, OAS received 33.45 percent, OHS received 11.78 percent, ORPH received 7.52 percent, and OMS received 3.00 percent. PFUF ¶ 42. Of the discretionary portion of the budget for fiscal year 2005, OAS received 45.04 percent, OHS received 7.81 percent, ORPH received 6.84 percent, and OMS received 1.84 percent. PFUF ¶ 43. Between 2003 and 2005, OMS was the only modal office without any regional offices. During that time frame, OAS had ten regional offices, OHS had five regional offices, and ORPH had three regional offices. PFUF ¶¶ 36-39.

Marine is the only transportation mode in which NTSB is not the primary investigative authority for major transportation accidents. PFUF ¶ 44. Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB is required to investigate all civil aviation accidents, including all general aviation accidents. See PFUF ¶ 45. 49 U.S.C. § 1131 also requires the NTSB to investigate highway, railroad, and pipeline accidents which meet certain criteria. See PFUF ¶¶ 46-48. In contrast, the United States Coast Guard ("Coast Guard") has concurrent jurisdiction over any major marine casualties that also fall within the NTSB's jurisdiction (i.e., major marine casualties that occur in United States territorial waters or involve United States-flagged vessels,

and marine accidents that involve a public United States vessel). See 49 U.S.C. §§ 1131(a)(1)(E) and 1131(b). Moreover, unlike the Coast Guard, the NTSB's jurisdiction beyond United States territorial waters is strictly limited to United States flagged or public United States vessels, and, within United States territorial waters, does not include lesser accidents that do not qualify as major marine casualties. Id. In accordance with 49 U.S.C. § 1131(a)(1)(A), the NTSB investigates major marine casualties within its jurisdiction pursuant to regulations jointly prescribed by the NTSB and Coast Guard. Pursuant to 49 C.F.R. §850.10, the Coast Guard conducts the preliminary investigation of a marine casualty and notifies the NTSB of any marine casualties fitting the criteria set forth in 49 C.F.R. §850.10(b). PFUF ¶ 52. Pursuant to 49 C.F.R. §850.15, the NTSB may conduct an investigation of any major marine casualty or any casualty involving public and nonpublic vessels. PFUF ¶ 53. The NTSB is only required to conduct a marine casualty investigation when:

> (1) The casualty involves a Coast Guard and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (2) The Commandant [of the Coast Guard] and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty involves a public and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (3) The Commandant and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty is a major marine casualty which involves significant safety issues relating to Coast Guard safety functions.

49 C.F.R. §850.15; PFUF ¶ 54. Additional criteria governing decisions about whether the NTSB will lead a specific major marine casualty investigation has been established by a NTSB-Coast Guard memorandum of understanding ("MOU"), the most recent of which was signed in 2002. PFUF ¶ 55.

There are far fewer marine accidents than accidents in any other transportation mode. From 2003 to 2005, there were, on average, approximately 40 aviation accidents per week and

approximately 10 aviation accident fatalities per week. PFUF ¶ 57. There are approximately seven million highway accidents, three million injuries, and 43,000 deaths per year. PFUF ¶ 58. On average, 3,215 railroad accidents occur per year, resulting in 442 injuries and 17 deaths. In addition, on average, 355 fatalities per year occur at highway-rail crossings, and an average of 480 fatalities per year occur that involve trespassers around railways. PFUF ¶ 59. In 2003, there were 370 pipeline incidents, 71 injuries, and 12 fatalities reported. PFUF ¶ 60. In 2004, there were 443 pipeline incidents, 60 injuries, and 23 fatalities reported. PFUF ¶ 61. In 2005, there were 490 pipeline incidents, 47 injuries, and 16 fatalities reported PFUF ¶ 62. In 2003, there were 15,156 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 119 injuries and 15 fatalities. PFUF ¶ 63. In 2004, there were 14,846 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 288 injuries and 16 fatalities. PFUF ¶ 64. In 2005, there were 15,928 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 945 injuries and 34 fatalities. PFUF ¶ 65. In contrast, there are between 40 and 60 major marine accidents per year and 700 deaths. PFUF ¶ 66.

Each of the modal office directors received notification of accidents in all transportation modes. PFUF ¶ 68. Between 2003 and 2005, there were fewer notifications of marine accidents than accidents in any other mode. During that time period, there were approximately 38 notifications of aviation accidents, 18 notifications of highway accidents, 53 notifications of railroad accidents, 33 notifications of pipeline accidents, and 119 notifications of hazardous materials accidents per week. PFUF ¶¶ 69-73. In contrast, OMS received approximately 44 notifications of marine accidents or incidents in fiscal year 2003, 28 notifications in fiscal year

2004, and 23 notifications in fiscal year 2005. PFUF ¶ 74. The frequency of notifications of accidents outside normal business hours, from most to least, was: aviation, highway, rail, marine, and pipeline. PFUF ¶ 75.

OMS does not have as much discretion as OHS and ORPH in deciding whether to investigate a particular accident. In deciding whether to investigate, OMS uses the bright-line score set forth in NTSB's MOU with the Coast Guard. PFUF ¶ 76. On the other hand, because of its legislative mandate, OHS has enormous discretion in deciding whether to investigate. Highway accidents must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation. PFUF ¶ 77. The Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 78. In general, ORPH evaluates the circumstances and safety issues of each accident, and the Director of ORPH makes a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident prevention issue. Overall, the Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 78.

Between 2003 and 2005, OMS conducted the fewest number of accident investigations of all the modal offices. In 2003, OAS launched on four major domestic accidents and five foreign accident investigations. PFUF ¶ 79. In 2004, OAS launched on seven major domestic accidents and 10 foreign accident investigations. PFUF ¶ 80. In 2005, OAS launched on 16 major domestic and 17 foreign accident investigations. PFUF ¶ 81. In 2003, OAS regional offices initiated 1,915 accident investigations and 50 serious incident investigations and completed

1,707 investigations. PFUF ¶ 82. In 2004, OAS regional offices initiated 1,865 accident investigations and 116 serious incident and accident investigations and completed 2,361 investigations. PFUF ¶ 83. In 2005, OAS regional offices initiated 1,927 accident investigations and 128 serious incident and accident investigations and completed 2,335 investigations. PFUF ¶ 84. In 2003, OHS initiated 49 investigations and launched on 34 accidents.[4] PFUF ¶ 85. In 2004, OHS initiated 45 investigations and launched on 45 accidents. PFUF ¶ 86. In 2005, OHS initiated 33 investigations and launched on 28 accidents. PFUF ¶ 87. In 2003, ORPH launched on 10 railroad accidents, two pipeline accidents, and three hazardous materials accidents. Of the hazardous materials accidents in 2003, one of these accidents was also a marine accident. PFUF ¶ 88. In 2004, ORPH launched on 14 railroad accidents, two pipeline accidents, and two hazardous materials accidents. Of the hazardous materials accidents in 2004, one of these accidents was also a highway accident. PFUF ¶ 89. In 2005, ORPH launched on eight railroad accidents, one pipeline accident, and two hazardous materials accidents, one of which was a railroad accident, and the other of which was a highway accident. PFUF ¶ 90. In 2003, OMS investigated eight accidents and launched on three accidents. PFUF ¶ 92. In 2004, OMS investigated seven new accidents and launched on four accidents. PFUF ¶ 93. In 2005, OMS investigated three new accidents and launched on three accidents. PFUF ¶ 94.

Investigations of accidents in transportation modes other than marine, particularly investigations of aviation accidents, are far more complex than investigations of marine

[4] "Launching" on an accident involves traveling to the accident site immediately after the appropriate senior official has made the determination to launch. "Initiating an investigation" involves commencing an investigation on a particular accident, but may not always involve immediate travel. PFUF ¶ 85.

Case 1:06-cv-00748-TCW Document 53-10 Filed 10/25/2007 Page 19 of 58

accidents. The workload of a major aviation investigation is much larger than the workload of a major marine investigation. PFUF ¶ 95. Aviation investigations involve far more people, far more press, and far more interest than investigations in the other modes. PFUF ¶ 96. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough and complete manner. PFUF ¶ 98. An investigation of a major aviation accident may involve up to 100 to150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. See 49 C.F.R. part 831. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals. PFUF ¶ 99. In general, approximately 10 to 12 NTSB employees launch on major aviation accident investigations. PFUF ¶ 101. In contrast, the investigation of a major marine accident may involve three to seven NTSB representatives and approximately 20 individuals as party representatives. PFUF ¶ 102.

Highway accident investigations are more complex than marine accident investigations, in part because the parties to a highway investigation are typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, OHS is required to educate and provide information to the parties each time. PFUF ¶ 103. In ORPH, the parties to an investigation also vary considerably. PFUF ¶ 105. In contrast, the Coast Guard is almost always a party to an investigation undertaken by OMS and is already well aware of the rules and regulations that pertain to accident investigation. See PFUF ¶ 104.

In general, there typically is much greater press and public interest in aviation and highway accidents than there is in marine accidents. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function on the NTSB. PFUF ¶ 107. Typically, hundreds of thousands of people are interested in aviation accidents, an interest which is not comparable to other transportation accidents.[5] PFUF ¶ 108. The sheer volume and persistence of political officials, the industry, the press, and public in a major aviation accident is not comparable to other modes. PFUF ¶ 109. Similarly, OHS has a much higher public profile than OMS because highway safety is a very visible matter of public concern. PFUF ¶ 106. In comparison, very little of the Director of OMS's time is spent dealing with the press. PFUF ¶ 110.

Each modal office is responsible for preparing reports setting forth the factual findings of an investigation, analyzing the probable cause of an investigation, and usually containing safety recommendations based upon those findings. Once the modal office has prepared its draft of the report, that draft goes through a process called a directors' review. During the directors' review meeting, the modal office presents the report to the other modal office directors, the Managing Director, the Director of the Office of Research and Engineering ("RE"), the Director of the Office of Safety Recommendations, and the General Counsel. Based upon the outcome of the meeting and the review process, the Managing Director may require that changes be made to the report. After the office directors sign off on the report, the notation process occurs. In the notation process the report is sent to all five members of the Board simultaneously for them to

---

[5] For example, in the year that TWA 800 crashed off Long Island, New York, it was the biggest news story during the year, even though it was a presidential election year. PFUF ¶ 108.

consider it prior to the report being presented to them formally in public in a Sunshine Meeting. At the Sunshine Meeting, the appropriate office director and investigators officially present the report to the Board. The Board may adopt the report as is or may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report. PFUF ¶ 111.

Between 2003 and 2005, OMS completed fewer reports than any other modal office. During that time period, OAS completed 12 major reports, OHS completed 111 dockets[6] and issued 17 major reports, and ORPH completed 39 reports. PFUF ¶¶ 112-14, 117-19, 121-23. Between 2003 and 2005, OAS completed a total of approximately 5,560 reports. PFUF ¶ 115. During the same time period, OMS only completed 11 reports. PFUF ¶¶ 125-27. In addition, major aviation accident reports are larger and more complex than reports in any other mode. PFUF ¶¶ 126.

Between 2003 and 2005, OMS issued fewer safety recommendations than any of the other modal offices. From 2003 to 2005, OAS developed 185 safety recommendations, OHS developed 113 safety recommendations, and ORPH developed 82 safety recommendations that were adopted by the Safety Board. PFUF ¶ 116, 120, 124. In contrast, during the same time period, OMS developed 20 safety recommendations that were adopted by the Safety Board. PFUF ¶ 128.

OMS's international work is not comparable to the international work done by OAS. OMS's role in international accident investigation is vastly different from OAS's role. Pursuant

---

[6] "Completion of a docket" refers to the completion of the fact-finding and analytical components of an investigation, which is a considerable undertaking that is critical to the NTSB's subsequent analysis of the accident during its investigation. PFUF ¶ 117.

to the International Maritime Organization ("IMO") treaty, the Coast Guard has responsibility and primacy to investigate any international marine accidents involving United States flagged or Unites States manufactured vessels. PFUF ¶ 130. Unlike OMS, pursuant to the International Civil Aviation Organization ("ICAO") treaty, the NTSB, specifically OAS, has primary responsibility to investigate international aviation accidents involving United States registered, manufactured, or operated aircraft. PFUF ¶ 134. Many major international aviation accidents involve one or more of these, so the NTSB is involved in many major international aviation accidents. PFUF ¶ 134. In addition, OAS is responsible for participating in accident investigations conducted by other nations per the entitlements conveyed in the ICAO treaty Annex 13. PFUF ¶ 135.

Furthermore, OAS participates in a much greater number of international accident investigations than OMS. Between 1999 and 2005, OMS launched to approximately one international accident per year. PFUF ¶ 133. Between 2000 and 2005, the NTSB never took the lead on a marine investigation outside of the territorial seas of the United States and not involving a United States flagged vessel. PFUF ¶ 131. In 2005, OMS did not investigate any overseas marine accidents. PFUF ¶ 132. In contrast, between 2003 and 2005, OAS participated in 34 foreign accident investigations. PFUF ¶¶ 136-38.

Not only does OAS have a larger role than OMS in international accident investigation, but OAS also has a much larger role than OMS in the United States' representation at their respective international organizations, ICAO and IMO. The Coast Guard, not OMS, is primarily responsible for United States representation at IMO. PFUF ¶ 140. The NTSB's interest in IMO has to flow through the Coast Guard. PFUF ¶ 147. For marine accident investigations, the Coast

Guard serves as the head of the United States delegation to IMO. PFUF ¶ 142. The head of the delegation for the Coast Guard is the person who sits in the United States' seat at the plenary session of IMO. PFUF ¶ 143. The NTSB does not have an official role at IMO. The NTSB attends IMO meetings as part of the United States delegation and advises the head of the delegation about NTSB's position on issues before IMO. PFUF ¶ 141, 144. The NTSB does not have a seat at the plenary session of IMO. PFUF ¶ 145. If the NTSB wanted an issue to be presented at the plenary session of IMO, that recommendation would have to be made through the Coast Guard. PFUF ¶ 146.

Unlike OMS, OAS is primarily responsible for United States representation at ICAO on matters pertaining to the investigation of accidents and incidents in civil aviation. PFUF ¶ 148. Mr. MacIntosh is responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to <u>Aircraft Accident and Incident Investigation</u>, Annex 13 to ICAO. OAS is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO. PFUF ¶ 149. In addition to ICAO activities, OAS (specifically Mr. MacIntosh) represents the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators. PFUF ¶ 150.

As OAS's Chief Advisor, Mr. MacIntosh's responsibilities involve both the international accident investigation and international representation aspects of OAS's international work. Mr. MacIntosh is responsible for coordinating technical matters and interface for each international

launch with the host country and any other countries involved in the investigation. PFUF ¶ 204. Mr. MacIntosh also provides counsel to NTSB aviation safety investigators with regard to Annex 13 during the course of foreign aviation accident investigations. PFUF ¶ 151.

ORPH also does a significant amount of international work. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and 2005, the Director of ORPH communicated with officials in foreign countries approximately four to six times per year on various matters. PFUF ¶ 139.

Each modal office director, and Mr. Haueter and Mr. MacIntosh, were required to testify before Congress on issues related to their transportation modes, prepare NTSB Board members or other NTSB staff to testify before Congress, and brief Congressional staff members. Between 2003 and 2005, the Director of ORPH testified before Congress twice, and the Director of OHS testified before Congress three times. PFUF ¶¶ 152, 154. Since 2001, the Director of ORPH has testified before Congress 10 times. PFUF ¶ 152. Ms. Cooke, however, never testified before Congress between 2003 and 2005. PFUF ¶ 155. Moreover, between 2003 and 2005, Ms. Cooke prepared a Board member or other NTSB staff member to testify before Congress less frequently than the Director of OAS, the Director of OHS, Mr. Haueter, and Mr. MacIntosh. On average, Ms. Cooke prepared a board member or other NTSB staff member to testify before Congress

Case 1:06-cv-00748-TCW Document 49 Filed 06/25/2008 Page 24 of 57

once per year between 2003 and 2005. PFUF ¶ 156. On average, the Director of OHS prepared a Board member or other NTSB staff member to testify before Congress six times per year between 2003 and 2005. PFUF ¶ 158. The Director of OAS did so, on average, twice per year; Mr. Haueter twice per year; and Mr. MacIntosh twice per year. PFUF ¶¶ 159-61. Between 2003 and 2005, the Director of ORPH prepared the Chairman or a Board member to testify before Congress twice. PFUF ¶ 157. Since 2002, the Director of ORPH has prepared the Chairman or a Board member to testify before Congress 14 times. PFUF ¶ 157.

As Director of OMS between 2003 and 2005, Ms. Cooke traveled less frequently than any of her alleged comparators. Between 2003 and 2005, the Director of OHS traveled to the site of an accident approximately twice per year. PFUF ¶ 162. Between 2003 and 2005, the Director of OAS traveled to the site of an accident four times and the Deputy Director of OAS traveled to the site of an accident seven times. PFUF ¶¶ 165-66. Between 2003 and 2005, the Director of OHS traveled approximately eight times per year and the Deputy Director of OAS three to four times per year in order to represent the NTSB at events or gatherings not involving accident investigation. PFUF ¶¶ 163, 166. Between 2003 and 2005, the Director of ORPH traveled three times during 2003, four times during 2004, and one time during 2005 for the same purpose. PFUF ¶ 167. In his capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, Mr. MacIntosh travels frequently, primarily to diplomatic meetings. On average, he travels eight to nine times per year, for at least one week to two weeks per trip. His position requires much more travel than any of the modal office directors. His frequent travel and the associated long hours present a source of stress and mental fatigue that exceed that of any office environment. PFUF ¶ 168. Between 2003 and 2005, Ms. Cooke traveled

Case 1:06-cv-00748-TCW Document 43 Filed 06/25/2007 Page 25 of 57

approximately two times per year, with each trip lasting approximately one week. PFUF ¶ 170. Ms. Cooke never traveled to the site of an accident between 2003 and 2005. PFUF ¶ 169. The working conditions at the site of an accident, including detailed examination of wreckage, and interviews with survivors or associated personnel are different from, and more hazardous than, working conditions of any office environment. PFUF ¶ 171.

All of the SES-level modal office directors, including Mr. Spencer, were members of the Executive Resources Board ("ERB"), whereas Ms. Cooke was not a member. PFUF ¶ 172, 175. The SES-level directors spent approximately 10 to 15 percent of their time on work for the ERB. PFUF ¶ 173. Ms. Cooke was not involved in any of the ERB duties during her tenure as Director of OMS. PFUF ¶ 176. The members of the ERB were responsible for staffing and career appointments to the SES; advising the MD regarding the number of SES positions needed by the agency; selecting SES candidates in the NTSB; redistributing SES positions within the NTSB; development of policy for performance awards for SES employees at the NTSB; and development of policy in discipline and removal of SES employees. PFUF ¶¶ 177, 179, 181, 183, 185, 187. Between 2003 and 2005, Ms. Cooke did not possess any of these responsibilities. PFUF ¶¶ 178, 180, 182, 184, 186, 188. Unlike the SES-level modal office directors (including Ms. Cooke's successor, Mr. Spencer), Ms. Cooke had no responsibility for broader agency-wide planning, that is, decision making for agency activity outside of OMS. PFUF ¶¶ 189-90.

There are a number of other areas in which the work of OMS and ,accordingly ,the work of the Director of OMS differs substantially from the work of the other modal offices and their directors. For example, the Director of OHS had significant responsibility for state recommendation advocacy. The other modal office directors did not have the same level of

responsibility because regulation of those modes is primarily federal. PFUF ¶ 191. The Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than OMS or ORPH. PFUF ¶ 192. OHS handles more mutli-modal investigations than the other modal offices. The primacy for investigating accidents involving highways and waterways or highways and railroads falls to OHS, as opposed to OMS or ORPH. PFUF ¶ 193. The Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. In this regard, the division of ORPH that conducts hazardous materials investigations is unique, and it requires ORPH to interact closely with other offices, either as the primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation. PFUF ¶ 195.

In addition to the ERB, there are other areas in which Mr. Spencer's work differed from that of Ms. Cooke. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman. Specifically, Mr. Spencer was asked to reduce the backlog in the office, restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities. PFUF ¶ 207-210.

Because of the differences in the work of the modal offices, different skills are required for each of the modal office directors, for the Deputy Director of OAS, and for OAS Chief Advisor. As acknowledged by Ms. Cooke, the technical expertise required of the Director of OHS and ORPH differed from the technical expertise that she possessed. PFUF ¶ 196. Because of the fact that ORPH is responsible for multiple transportation modes, the Director of ORPH

must maintain a considerable amount of expertise in all three areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transportation of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of accident investigations. PFUF ¶¶ 197-98. In contrast, in order to be the Director of OMS, it is not necessary to be educated in any transportation mode other than marine. PFUF ¶ 199. The position of Deputy Director of OAS requires a more technical background than the modal office director positions, including OMS, because of the Deputy Director's involvement in the technical aspects of major investigations. PFUF ¶¶ 200. The position of OAS Chief Advisor requires unique international relations abilities not required by any of the modal office director positions. See PFUF ¶ 205. Mr. MacIntosh works with the State Department in a variety of different capacities and speaks several languages. PFUF ¶ 206.

Additionally, all SES employees throughout the Federal Government are required to possess certain skills that are not required for GS employees. There are five mandatory Executive Core qualifications common to all SES positions. They are leading change, leading people, results driven, business acumen, and building coalitions/communication. PFUF ¶ 211.

D. Compensation

The NTSB is required to work within the confines of Federal statutes and regulations when determining the pay of its employees. See PFUF ¶ 212. GS employees are eligible for overtime pay within the Federal system. PFUF ¶ 214. However, there is a limit on the amount of overtime pay that GS employees may receive. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10 or level V of the Executive Schedule. PFUF ¶ 215. As Ms. Cooke was being paid at the GS-15, step 9 or 10

Case 1:06-cv-00748-TCW Document 54-10 Filed 06/25/2008 Page 29 of 58

level throughout her tenure as Director of OMS,[7] she was only eligible to receive in overtime an amount equal to the difference between here salary and the premium pay limitation. PFUF ¶ 215. Overtime is defined as hours of work that are officially ordered or approved by a supervisor before the hours are worked. PFUF ¶ 216. Furthermore, there was an unwritten policy that individuals in management positions at the NTSB, including modal office directors, would not receive overtime pay. PFUF ¶ 218. It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present. PFUF ¶ 219.

Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301, an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301; PFUF ¶ 220. The NTSB further requires that an employee have an offer in writing for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. PFUF ¶ 220. During her tenure as Director of OMS, Ms. Cooke never received an offer of outside employment. Thus, Ms. Cooke was ineligible for a retention allowance. PFUF ¶ 221.

Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service

---

[7] Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke was paid at the GS-15, step 10 level from January 23, 2005, until the date of her retirement, on July 3, 2006. PFUF ¶ 215.

requirements established by OPM for each intervening step. PFUF ¶ 222. From 2003 to 2005, Ms. Cooke received all step increases to which she was entitled. PFUF ¶ 223.

Employees may be eligible for "performance awards" based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, in the form of "special act awards," often concerning a specific project or the fulfillment of a specific goal. See PFUF ¶ 224. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment are given at the end of the appraisal period, based upon performance ratings. If the employee receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase. PFUF ¶ 224. Performance awards are paid based upon performance and are not meant to augment an employee's salary. PFUF ¶ 225. Between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. PFUF ¶ 226. Further, it was tradition for the office directors to decline to participate in the third category of awards, the end-of-year agency-wide awards. See PFUF ¶ 227.

NTSB employees who hold SL positions must demonstrate technical competencies. PFUF ¶ 228. Additionally, SL employees may not perform supervisory duties more than 25 percent of the time. PFUF ¶ 229. Ms. Cooke's position as Director of OMS involved routine supervisory responsibilities for a staff of 14 to 15 people. PFUF ¶ 230.

E. Female SES Employees

Between 2003 and 2005, the following female employees occupies SES positions at the NTSB: Lola Ward, Julie Beale, and Elaine Weinstein. PFUF ¶ 231. Between 2001 and 2005,

Lola Ward, Julie Beale, and Elaine Weinstein were each approved for appointments to the SES. PFUF ¶ 232. All three were all required to compete for their positions and all three competed against male applicants. PFUF ¶ 233.

On April 28, 2006, Ms. Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. § 206(d) and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). On October 26, 2006, the district court transferred the Equal Pay Act claim to this Court. Ms. Cooke filed her First Amended Complaint in this Court on November 14, 2006. PFUF ¶¶ 234-38.

SUMMARY OF ARGUMENT

The Equal Pay Act prohibits gender discrimination in the payment of wages and requires equal pay for equal work. See Molden v. United States, 11 Cl. Ct. 604, 608 (1987). The NTSB did not violate the Equal Pay Act in this case because Ms. Cooke's job did not require equal skill, effort, and responsibility and was not performed under similar working conditions as her alleged comparators. Furthermore, even assuming Ms. Cooke's job was equal to the jobs of her alleged comparators, any pay differential[8] between Ms. Cooke's pay and that of her alleged comparators was based upon a merit system. Any pay differential was also based upon the NTSB's gender-neutral allocation of available SES positions. In addition, Ms. Cooke's position could not have been upgraded to SES, nor could Ms. Cooke have been given a retention allowance, given additional performance awards or additional within-grade step increases, or been upgraded to an SL position. Ms. Cooke could not have been authorized to receive overtime

[8] For purposes of this motion only, we assume that all of the alleged comparators were compensated at a higher rate than Ms. Cooke at some point during the relevant time period - that is, 2003 to 2005.

Case 1:06-cv-00748-TCW Document 43 Filed 06/25/2007 Page 31 of 57

pay for the purpose of remedying alleged unequal pay. Further, even if she were authorized to work overtime and receive overtime pay, she could only have been eligible to receive a minimal amount of overtime pay, consistent with the statutory and regulatory cap. All of the factors governing Ms. Cooke's pay applied equally to men and women. Accordingly, because there is no evidence to support Ms. Cooke's claim that her job was equal to that of her alleged comparators or that gender bias accounts for any of the pay differentials that she alleges, the NTSB did not violate the Equal Pay Act. Therefore, Ms. Cooke's complaint should be dismissed.

## ARGUMENT

### I. The Standard of Review For Summary Judgment

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); Mingus Constructors, Inc. v. United States , 812 F.2d 1387, 1390 (Fed. Cir. 1987); RCFC 56(c). Summary judgment is "a salutary method of disposition 'designed to secure the just, speedy and inexpensive determination of every action.'" Sweats Fashions, Inc. v. Pannill Knitting Company, Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). As the court of appeals emphasized in Sweats, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather, "the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the [Court of Federal Claims] -- that there is an absence of evidence to support the non-moving party's case." Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325).

A “material fact” is one “that might affect the outcome of the suit under the governing law.” Anderson v. Liberty Lobby, 477 U.S. at 248. “[S]ummary judgment will not lie if the dispute about a material fact is ‘genuine,’ that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.” Id. As discussed below, there is no dispute over any fact that could affect the outcome of this case. Accordingly, disposition of Ms. Cooke’s case through summary judgment is appropriate.

II. The Standard Of Review For The Equal Pay Act

The Equal Pay Act (“EPA”) was enacted in 1963 as an amendment to the Fair Labor Standards Act and was extended from private industry to the Federal Government in 1974. 29 U.S.C. § 201, 203(e)(2). The EPA’s purpose was to eradicate society’s traditional belief in the inferiority of women and to alleviate the consequences stemming from that belief. See Molden, 11 Cl. Ct. at 608. The EPA provides that an employer may not discriminate between employees on the basis of sex by paying different wages to employees of the opposite sex who are performing jobs that require the same level of skill, effort and responsibility, and which are performed under similar working conditions, unless the differential falls into one of the EPA’s four exceptions:

1. a seniority system;
2. a merit system;
3. a system which measures earnings by quantity or quality of production;
4. a differential based upon any factor other than sex.

29 U.S.C. § 206(d)(1).

Pursuant to the EPA, Ms. Cooke first has the burden of proving that she performed work similar to those of the opposite sex (i.e., the "male comparators") involving equal skill, effort and responsibility; that she and her male comparators performed the work under similar conditions; and that the NTSB compensated Ms. Cooke and her male comparators differently for that work. See Lissak v. United States, 49 Fed. Cl. 281, 284 (2001); Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974); Belfi v. Prendergast, 191 F.3d 129, 135 (2nd Cir. 1999). Once Ms. Cooke establishes a prima facie case, the burden shifts to the NTSB to prove the disparity can be accounted for by one of the four exceptions to the EPA. See Corning Glass Works, 417 U.S. at 196.

III. Ms. Cooke Cannot Establish Her *Prima Facie* Case

Pursuant to the EPA, Ms. Cooke has the burden of showing that her employer, the United States, paid a male employee higher wages than Ms. Cooke for work requiring equal skill, effort, and responsibility, and performed under similar working conditions. Molden, 11 Cl. Ct. at 610. Although Ms. Cooke need not prove that her job was identical to that of her alleged comparators, she is required to demonstrate that the jobs were "substantially equal." 29 C.F.R. § 1620.13(a). Ms. Cooke has failed to establish that her job was substantially equal to the jobs of her alleged comparators, and therefore cannot establish her prima facie case.

In her motion for summary judgment, Ms. Cooke alleges that she has established her prima facie case by showing that, "under the Code of Federal Regulations implementing the modal director positions for the NTSB, the positions held by Ms. Murtagh Cooke and her comparators (Clark, Osterman and Chipkevich) are all described as having virtually identical job

Case 1:06-cv-00748-TCW Document 43 Filed 12/5/2007 Page 34 of 57

duties and descriptions." Pl. Br. at 18 (citing 49 C.F.R. §§ 800.2 and 800.25).[9] However, "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e); see also Epstein v. Sec'y, United States Dep't of Treasury, 739 F.2d 274, 277 (7th Cir 1984). Even though two jobs may have identical job descriptions, a court is not required to find a prima facie equal pay violation. Epstein, 739 F. 2d at 277. Thus, Ms. Cooke's citation to the Code of Federal Regulations' descriptions of the modal offices does not establish her prima facie case.

In addition to citing the Code of Federal Regulations, Ms. Cooke also cites Mr. Osterman's deposition testimony to show that the modal office director positions, specifically the OMS and OHS director positions, were exactly the same. See Pl. Br. at 7-11, 18. Ms. Cooke alleges that Mr. Osterman's job duties "exactly matched" those of Ms. Cooke. Pl. Br. at 18. However, both the Code of Federal Regulations and Mr. Osterman's testimony are very general descriptions of the modal offices and of the work of the modal office directors.[10] A closer examination of the skills, efforts, responsibilities, and working conditions of the modal

---

[9] "Pl. Br." refers to Plaintiff's Memorandum of Points and Authorities in Support of Her Motion for Summary Judgment, filed on October 9, 2007.

[10] 49 C.F.R. § 800.2 describes the organization of the NTSB and the functions of each of the modal offices. Section 800.2 states that each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the board. See 49 C.F.R. § 800.2. 49 C.F.R. § 800.25 states that each of the modal office directors possesses delegated authority to investigate accidents, disclose factual information related to accidents, and determine the probable cause(s) of accidents under certain circumstances.

office directors, and of Mr. Haueter and Mr. MacIntosh, reveals that the actual job requirements and performance of the alleged comparators were substantially different from those of Ms. Cooke and that ,therefore, Ms. Cooke has not established her prima facie case.

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal

"Skill includes such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a). Ms. Cooke alleges that the skills required for all of the modal office directors were virtually identical. Pl. Br. at 11. We do not dispute that, on a general level, each of the skills listed by Ms. Cooke were required for each of the modal office director positions. However, many of the skills listed are requirements for almost any position in any organization, especially any management or executive position.[11] These include leadership and supervisory skills; logic and analytical process skills; the ability to communicate both in writing and orally; and the ability to collaborate with other professionals both within the NTSB and externally. The fact that such general management-type skills are required for all modal office director positions does not mean that the positions were equal for purposes of the EPA.

Furthermore, there are differences in the degree of each of these skills required for each of the modal office directors. Because, as detailed above, the size and scope of the work of OAS, OHS, and ORPH are much larger than those of OMS, the directors of those three offices must have greater, or at the very least, different, leadership and supervisory skills. For example, the Director of OAS must lead an office that has almost ten times as many employees than OMS

[11] Courts have found the comparison of executive/management positions for purposes of the Equal Pay Act to be difficult. In fact, "[a]llegations of Equal Pay Act violations have routinely been rejected by courts applying the equal work standard to jobs involving executive and management positions." Ratts v. Business Sys., Inc., 686 F. Supp. 546, 550 (D.S.C. 1987).

Case 1:06-cv-00748-TCW Document 43 Filed 12/05/2007 Page 36 of 57

and ten regional offices. See PFUF ¶¶ 31, 35, 36. The Directors of OHS and ORPH must also supervise more employees and more regional offices than the Director of OMS. PFUF ¶¶ 33-34. In addition, the Director of OAS must lead and supervise a much greater number of participants in aviation accident investigations than those in marine accident investigations. PFUF ¶¶ 99, 102. Additionally, because of the greater public, press, and congressional interest in aviation and highway accidents, the Directors of OAS and OHS must have different communication and collaboration skills than the Director of OMS. PFUF ¶¶ 106, 108-110. Because OAS has a much larger international role, the Director of OAS be conversant with a wide variety of issues that affect the international aviation community. See PFUF ¶¶ 130-138, 139-151. The Director of ORPH must communicate knowledgeably regarding three transportation modes (rail, pipeline, and hazardous materials), a skill not required for the Director of OMS. PFUF ¶¶ 197, 199.

Moreover, within each of the very broad categories listed by Ms. Cooke that are specific to the NTSB, the skills required for each office director were very different. While technical expertise in the transportation mode is necessary for all modal office directors, that expertise is vastly different for each mode; the modal office director positions are not interchangeable. PFUF ¶ 196. For example, the Director of ORPH must have technical expertise in three transportation modes (railroad, pipeline, and hazardous materials), whereas the Director of OMS need only have technical expertise in one mode. PFUF ¶¶ 198-99. Acquiring knowledge in three transportation modes requires much more and different experience, training, and education than acquiring knowledge in one mode. The same is true for knowledge of accident investigation processes and knowledge of modal industries - each of these requires greater and varied skill for the Director of ORPH because he or she must be knowledgeable about three very

different transportation modes. PFUF ¶ 198. While both the Director of OMS and the Deputy Director of OAS require technical expertise in their fields, the Deputy Director requires a more technical background than the Director of OMS because of the Deputy Director's greater involvement in the technical aspects of accident investigations, particularly major investigations. PFUF ¶ 200. Finally, the skills required for OAS Chief Advisor are different from those required for Director of OMS because the OAS Chief Advisor must have unique international relations skills, including education and training, in order to perform his or her duties. PFUF ¶ 205.

### B. The Effort Required For The Director Of OMS And The Alleged Comparators Was Not Equal

"Effort is concerned with the measurement of the physical or mental exertion needed for performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered." 29 C.F.R. § 1620.16(a). Ms. Cooke alleges that the efforts required for all of the modal office director positions were virtually identical. Pl. Br. at 11-12. Again, Ms. Cooke characterizes the efforts required for each position in very general terms, but the specific efforts required of the modal office directors, the Deputy Director of OAS and the OAS Chief Advisor were all different. As in Ms. Cooke's description of necessary skills, Ms. Cooke lists efforts that would be required of any manager or executive in any organization - effectively managing large volumes of information; assessing and evaluating issues; evaluating resources necessary and available; decision-making; supervising and evaluating staff; collaboration with internal and external professionals; and complying with rules, regulations, and guidelines regarding human and monetary resources. We do not dispute

that most of these efforts were required of all of the modal office directors.[12] However, the fact that such general management-type efforts are required for all modal office director positions does not mean that the positions were equal. If that were the standard, Ms. Cooke's position would be equal to virtually any office director in any organization.

Moreover, within each of the broad categories of efforts listed by Ms. Cooke, the actual efforts required by each of the modal office directors was very different. Because OMS handled fewer accident investigations than any other modal office, the Director of OMS required a different degree of effort related to accident investigations. PFUF ¶¶ 79-94. That is, the mental fatigue and stress related to accident investigations was not the same level for the Director of OMS as for the other modal office directors. As Director of OMS, Ms. Cooke did not manage as much information regarding accidents, circulate that information internally and externally as frequently, deal with as many contingencies of accidents, juggle as many multiple accidents at once, or handle the accident investigation process through report development as frequently. See PFUF ¶¶ 79-94, 112-28. Additionally, while all of the modal office directors technically had to be available to respond to accident notifications 24 hours per day, seven days per week, the fact that there were fewer marine accidents than accidents in any other mode meant that the Director of OMS was called upon to respond to accident notifications less frequently than other modal office directors outside of normal business hours. See PFUF ¶68-75. Thus, the stress of being required to work outside of normal business hours did not occur to the same degree for the

[12] We do dispute that "reviewing, assessing, and writing justifications for the agency's plans, goals and objectives to fulfill its mission" was one of Ms. Cooke's efforts. Pl. Br. at 12. Agency-wide planning and development was a responsibility of the ERB, of which Ms. Cooke was not a member. Nor did Ms. Cooke have any responsibility for the agency's plans, goals, or objectives outside of those directly related to OMS. See PFUF ¶¶ 172-190.

Case 1:06-cv-00748-TCW Document 53 Filed 06/25/2007 Page 39 of 57

Director of OMS as for the other modal office directors. Further, OMS had a much smaller staff than the other modal offices and no regional offices. See PFUF ¶¶ 31-39. Therefore, the Director of OMS required less effort related to human resources and personnel issues. That is, supervising and evaluating staff, evaluating available personnel, and complying with regulations related to human resource management all required less mental fatigue and stress for the Director of OMS than for the directors of the other modal offices. Finally, because OMS had a much smaller budget than the other modal offices, the Director of OMS required less effort related to monetary resource management than the other modal office directors. PFUF ¶¶ 40-43.

In addition to the efforts listed by Ms. Cooke, there were other efforts required that were different for each modal office director. Because OMS had a much smaller international role than OAS, the Director of OMS did not require as much effort as the Director of OAS (and as the Deputy Director and OAS Chief Advisor) in relation to international accidents or representation of the United States in the international community. See PFUF ¶¶ 130-138, 139-151. Because of the fact that marine accidents garner much less public, press, and Congressional interest than highway or aviation accidents, the Director of OMS did not require as much effort as the Directors of OAS and OMS in handling inquiries from the public, press, and Congress. PFUF ¶¶ 106, 108-110. Because OHS and ORPH had much greater discretion than OMS in deciding whether to investigate a particular accident, the Directors of OHS and ORPH were required to exert much greater effort in deciding whether to investigate than the Director of OMS, who followed the bright-line rule set forth in NTSB's MOU with the Coast Guard. PFUF ¶¶ 76-78.

Finally, there were efforts required by the OAS Chief Advisor that were not required for the Director of OMS. Mr. MacIntosh traveled much more frequently than Ms. Cooke, and that additional travel and associated long hours were sources of stress and mental fatigue that Ms. Cooke did not have. PFUF ¶¶ 168, 170. Mr. MacIntosh also interacted with the international community more frequently than Ms. Cooke, which meant greater efforts in terms of collaboration with individuals outside of the NTSB. See PFUF ¶¶ 130-51, 168.

C. The Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal

"Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). Ms. Cooke alleges that the responsibilities of each of the modal office directors were virtually identical. Pl. Br. 12-13. As with skills and efforts, we do not dispute that, at a very general level, the responsibilities of each of the modal office directors were similar. However, within each of the broad categories listed by Ms. Cooke, the scope of responsibility was much greater for the Directors of OAS, OHS, and ORPH than for the Director of OMS.

Each of the modal office directors was responsible for overseeing accident investigations and the preparation of reports, including safety recommendations and probable cause determinations. See PFUF ¶ 30. However, the Directors of OHS and ORPH had much greater responsibility in deciding whether or not to investigate a particular accident than the Director of OMS. The Director of OHS had an enormous amount of discretion in deciding whether or not to investigate an accident and had to evaluate each accident to determine whether the relevant safety issues and level of impact on public confidence warranted an investigation. PFUF ¶ 77. The Director of ORPH also maintained broad discretion in deciding whether the NTSB should

conduct any rail, pipeline, or hazardous materials investigation. PFUF ¶ 78. The Director of OMS followed the bright-line rule set forth in NTSB's MOU with the Coast Guard and, therefore, did not have as much accountability in the decision to investigate as the other modal office directors. PFUF ¶ 76. In addition, as set forth in detail above, there were more accidents investigated by OAS, OHS, and ORPH than by OMS. See PFUF ¶¶ 79-94. Therefore, the Directors of OAS, OHS, and ORPH had greater responsibility for accident investigation and report writing. Furthermore, aviation accidents investigations involved many more participants than marine accident investigations. The investigation of a major marine accident may have involved three to seven NTSB investigators and approximately 20 party representatives, while the investigation of a major aviation accident may involve 150 to 200 people, or more, including multiple investigative parties that participate at the direction of the NTSB. PFUF ¶ 99, 102. Because so many more participants are involved in aviation accident investigations, the Director of OAS has much greater responsibility in overseeing investigations than the Director of OMS. The Director of OMS also did not have as many obligations in working with parties to an investigation as the Director of OHS. In OHS, the parties to each investigation tend to be different, and therefore the Director of OHS and his or her staff are responsible for educating parties about the investigation process for each accident. PFUF ¶ 103. In OMS, the Coast Guard is a party to almost all investigations, and thus the Director of OMS and his or her staff do not have the same responsibility to educate. See PFUF ¶ 104.

Ms. Cooke also alleges that the management responsibilities for each of the modal office directors were the same. Pl. Br. 12-13. As in Ms. Cooke's description of necessary skills and efforts, Ms. Cooke lists responsibilities that would be required of any manager or executive in

any organization. The fact that these were required of the modal office directors does not indicate that their positions were equal for purposes of the EPA. Moreover, there are significant differences in responsibilities within each of the categories listed by Ms. Cooke. First, Ms. Cooke alleges that each modal office director was responsible for internal and external communications. While true, the scope of responsibility for communications was very different for each modal office director. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB. The NTSB is aviation-centric because aviation safety is the reason the NTSB exists. PFUF ¶ 104. Thus, the Director of OAS had a central role in communicating the agency's mission to the public. Because of the great public interest in aviation accidents, the Director of OAS had a much greater responsibility in communicating with the press than the Director of OMS. See PFUF ¶¶ 108-09. The same was true for the Director of OHS, given the public's interest in highway safety. PFUF ¶ 106. Because of the greater number of participants in aviation accident investigations, the Director of OAS had a greater responsibility in communicating with parties than the Director of OMS. See PFUF ¶¶ 99, 102. The Directors of OHS and ORPH were called upon to testify before Congress and to prepare NTSB board members or staff to testify before Congress more frequently than the Director of OMS. PFUF ¶¶ 152, 154-58. Accordingly, each of those directors had greater responsibility for communications with Congress than the Director of OMS.

Ms. Cooke next alleges that the modal office directors had similar human resources responsibilities. While the types of responsibilities were similar, the amount of human resources responsibilities was greater for the other modal offices due to the fact that each of the modal offices employed more employees than OMS. PFUF ¶¶ 31-35. Handling human resources for

140 employees, as the Director of OAS did, is a much greater responsibility than handling human resources for 15 employees, as the Director of OMS did. PFUF ¶¶ 32, 35. Ms. Cooke alleges that the modal office directors had similar budgeting responsibilities. While all office directors were responsible for their office's budget, as set forth in detail above, the OMS budget was much smaller than the budget of the other modal offices. PFUF ¶¶ 40-43. Thus, the responsibilities of the other office directors with respect to budget were greater. Furthermore, because the size of OAS, OHS, and ORPH was larger than the size of OMS, the budgeting for each of these offices was necessarily more complex than budgeting for OMS. See PFUF ¶¶ 32-35. Finally, Ms. Cooke cites "project tracking and quality control of . . . products" as a responsibility common to all modal office directors. Pl. Br. at 13. It is unclear what specifically Ms. Cooke means, but as with all of the other responsibilities, due to the larger size of the other modal offices and the larger scope of their work, the Directors of OAS, OHS, and ORPH would have had a greater number of projects and products in their offices, and therefore greater responsibility for tracking and quality control.

Ms. Cooke's alleged comparators also had other responsibilities that she did not have. OAS, specifically the Director of OAS and the OAS Chief Advisor, had international responsibilities that Ms. Cooke did not have. As set forth in detail above, OAS had greater responsibility for international accident investigation than OMS. PFUF ¶¶ 130-38, 151. OAS also had a greater responsibility in representing the United States in the international aviation community than OMS had in representing the United States in the international marine community. PFUF ¶¶ 140-50. Most notably, OAS was the United States' primary representative to ICAO, whereas the Coast Guard, not OMS, was the United States' primary

representative to IMO. PFUF ¶¶ 140, 148. As set forth in detail above, all of the SES-level modal office directors (including Mr. Spencer) had responsibilities with respect to the ERB that Ms. Cooke did not have. PFUF ¶¶ 172-190. These ERB responsibilities were significant, taking approximately ten to fifteen percent of each SES-level director's time. PFUF ¶ 173. In addition, as Deputy Director of OAS, Mr. Haueter had a significant responsibility for the day-to-day conduct of accident investigations; a responsibility greater than Ms. Cooke's for marine investigations. PFUF ¶ 202. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman, none of which were responsibilities assigned to Ms. Cooke when she was the Director of OMS. Specifically, Mr. Spencer was asked to restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities. PFUF ¶ 207-210.

D. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar

A comparison of working conditions requires a practical judgment of whether the differences in working conditions are the kind customarily taken into account when setting wage levels. See 29 C.F.R. § 1629.18. Working conditions include surroundings, meaning elements commonly encountered by workers, and hazards, including the frequency and severity of injuries they can cause. See id. Working conditions does not encompass shift differentials. Id. As Ms. Cooke stated, each of the alleged comparators generally worked in an office environment. Pl. Br. at 13. However, all of the alleged comparators, especially Mr. MacIntosh, traveled more frequently than Ms. Cooke. PFUF ¶¶ 162-170. Working conditions during travel are different from working conditions in the office. See PFUF ¶ 171. Furthermore, while Ms. Cooke never

traveled to the site of an accident between 2003 and 2005, almost all of her alleged comparators did. PFUF ¶¶ 162, 164, 165, 169. The working conditions at the site of an accident are different from and more hazardous than conditions in the office. PFUF ¶ 171. Ms. Cooke also alleges that working conditions were the same for all modal directors because they all were required to be available 24 hours per day, 7 days per week. Pl. Br. at 13. This factor, however, does not seem to fall within the EPA's definition of "working conditions." Nonetheless, even if it is considered a working condition, it was not the same for Ms. Cooke and her alleged comparators because she did not have to respond to after-hours accident notifications as frequently as the other modal office directors. PFUF ¶ 75. All of the other working conditions cited by Ms. Cooke involve accident investigation procedures and the preparation of reports. Pl. Br. at 13. Again, it is doubtful that these factors fall within the EPA's definition of working conditions. Even assuming that they do, as detailed above, the duties, responsibilities, and efforts related to accident investigation and report preparation were much greater and more numerous for the other modal office directors than for Ms. Cooke, and therefore their working conditions related to these duties and responsibilities were different.

In sum, none of the alleged comparators performs work requiring equal skill, effort, and responsibility, under similar working conditions as Ms. Cooke. Accordingly, Ms. Cooke has failed to establish her prima facie case. Thus, this Court should deny Ms. Cooke's motion for summary judgment, grant defendant's motion for summary judgment, and dismiss the complaint.

Case 1:06-cv-00748-TCW Document 53 Filed 12/05/2007 Page 46 of 57

IV. Assuming That Ms. Cooke Has Established Her Prima Facie Case, The Pay Differential Was Not Based Upon Gender

Assuming that this Court were to find that Ms. Cooke has established her prima facie case, this Court should nonetheless grant our motion for summary judgment because any pay disparity between Ms. Cooke and her alleged comparators was not based upon gender. Specifically, the pay disparity falls within two of the four exceptions to the EPA, a merit system and differential based upon factors other than sex. See 29 U.S.C. § 206(d)(1).

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System

In order to qualify under the merit system defense, an employer must show that the merit system was "an organized and structured procedure by which employees were evaluated systematically and in accordance with predetermined criteria." Raymond v. United States, 31 Fed. Cl. 514, 518 (1994). In this case, Ms. Cooke's pay, as well as the pay of her alleged comparators, was determined by numerous statutes and regulations governing the federal employee pay system. The NTSB was required to work within the confines of these statutes and regulations when determining Ms. Cooke's pay, as well as the pay of her alleged comparators. PFUF ¶ 212. Within the federal pay system, there was no way that Ms. Cooke could have been compensated at a rate equal to that of her alleged comparators. Ms. Cooke was paid at the GS-15 rate, as determined by OPM. See PFUF ¶ 213. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. PFUF ¶ 222. Ms. Cooke alleges that she could have received a within-grade

step increase sooner than she did. However, during the period in question, Ms. Cooke received all step increases to which she was entitled.[13] PFUF ¶ 223.

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level

Ms. Cooke suggests that one way she could have been provided compensation in an amount equal to that of her alleged comparators was to have been promoted to the SES level. When Ms. Cooke became the Director of OMS,[14] it was the NTSB's intention to classify and pay her and the other modal directors at the SES level. PFUF ¶ 8. However, at the time, there were no available SES slots to allocate to the modal office directors. PFUF ¶ 8. There are only two ways for the NTSB to obtain SES slots and thereby promote an employee to the SES level. One way is to request and receive slots from OPM and the other is to reassign slots within the agency. The NTSB cannot create a new SES position without authorization from OPM. See PFUF ¶ 9. In June 1999, the NTSB requested SES slots for the modal office directors from OPM, but that request was denied. PFUF ¶ 10. When slots eventually became available, they were properly allocated first to the Director of ORPH position, then to the Director of OHS position.[15] Even assuming that the first available SES slot had been allocated to the Director of OMS position, OPM regulations require that SES positions be advertised and competed. PFUF ¶ 17. Thus, the NTSB could not have simply promoted Ms. Cooke to the SES level; because she had not

[13] Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke received a step increase effectove January 2005 and was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006. PFUF ¶ 213.

[14] That is, when her title changed to Director of OMS following the restructuring described above.

[15] The details of these allocation decisions and their propriety are addressed below.

previously held a career SES position, she would have had to compete and be selected for the position. See PFUF ¶ 9. Any assumption made by Ms. Cooke that she would have been the most qualified applicant and therefore would have been selected for the position is purely speculative.[16] Thus, the NTSB could not have promoted Ms. Cooke to the SES level because of the unavailability of slots and the requirement to advertise and compete SES positions.

2. Ms. Cooke Could Not Have Been Given Overtime Pay

Ms. Cooke also alleges that she could have been given overtime pay to "equalize" her pay with that of her alleged comparators. While General Schedule employees are eligible for overtime pay within the Federal pay system, there is a limit on the amount of overtime pay that can be provided to GS employees. See 5 U.S.C. § 5547(a); 5 C.F.R. § 550.105. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10 or level V of the Executive Schedule. PFUF ¶ 215. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, any overtime compensation would have been minimal and would not have provided her with compensation equal to that of her alleged comparators. Additionally, overtime pay must be ordered or approved in advance by one's supervisor, regardless of grade. See PFUF ¶ 216. Ms. Cooke arguably requested overtime from Ellen Engleman Conners in April 2004, but provided no justification or rationale for her request. PFUF ¶ 217. Finally, there was an unwritten policy that individuals in management positions, including modal office directors, would not receive overtime pay. PFUF ¶ 218. A merit system may be based upon unwritten policies if those

[16] In fact, history belies this assumption. When the Director of OMS position eventually became an SES-level position, Ms. Cooke did apply and was not selected. PFUF ¶¶ 25, 27-28.

policies are made clear to employees. See Equal Employment Opportunity Commission v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir. 1980). It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present. PFUF ¶ 219.

3. Ms. Cooke Could Not Have Been Given A Retention Allowance

Ms. Cooke alleges that she could have been paid a retention allowance to "equalize" her pay. Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301,[17] an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301. PFUF ¶ 220. The NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. PFUF ¶ 220. There is no evidence that Ms. Cooke had unusually high or unique qualifications for her position. The fact that, when the position became SES and was competed, another individual was selected for the position strongly suggests that Ms. Cooke was not uniquely qualified. Of significance, there is no evidence that Ms. Cooke ever received an offer of outside employment during her tenure as the Director of OMS. PFUF ¶ 221. Therefore, Ms. Cooke was ineligible to receive a retention allowance.

[17] An amendment to 5 C.F.R. § 575.301 was recently proposed, removing "Federal service" from the last sentence. That amendment would not go into effect until December 2007 and, therefore, is inapplicable to this case.

4. Ms. Cooke Could Not Have Been <u>Given Any Additional Performance Awards</u>

Ms. Cooke asserts that her compensation could have been "equalized" by NTSB giving her additional performance awards. While Ms. Cooke was eligible for a number of the types of performance awards available at the NTSB, performance awards are based upon performance and are not meant as a tool to augment an employee's salary. PFUF ¶ 225. Ms. Cooke never received a special act award because, between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. PFUF ¶ 226.

5. <u>Ms. Cooke Could Not Have Been Given A Senior Level Position</u>

Ms. Cooke further alleges that she could have been given an SL position to "equalize" her pay. SL positions are intended for technical positions with little to no supervisory responsibilities. There is no evidence to suggest that Ms. Cooke qualified for an SL slot when she was the Director of OMS. In addition, SL employees may not perform supervisory duties more than 25 percent of the time. PFUF ¶ 229. Ms. Cooke's position as Director of OMS involved routine supervisory responsibilities of 14 to 15 employees, on average, and it is clear that Ms. Cooke performed these supervisory responsibilities more than 25 percent of the time. PFUF ¶ 230. Thus, Ms. Cooke was ineligible for an SL position.

B. The Disparity In Pay Between Ms. Cooke And Her <u>Alleged Comparators Was Based Upon A Factor Other Than Sex</u>

Pursuant to the fourth exception of the EPA, even if a male comparator and Ms. Cooke performed the exact same work, the EPA is not violated if the differential stems from any factor other than gender. <u>See</u> <u>Wollenburg v. Comtech Manufacturing Co.</u>, 201 F.3d 973, 976 (7th Cir. 2000). Federal courts do not agree on whether any factor is sufficient, or whether the factor

must be a product of a legitimate business reason, although a majority of Federal courts of appeals espouse the legitimate business reason view. Lissak, 49 Fed.Cl. at 285. While the Federal Circuit has not spoken on this matter, the Court of Federal Claims has determined that the "rational basis" standard is appropriate for this analysis, in that it is enough that the factor be gender neutral on its face and used in good faith and not in a discriminatory manner. Behm v. United States, 68 Fed. Cl. 395, 399-400 (2005).[18] Additionally, non-gender-based pay differences, which are the result of separate pay and classification systems, are permissible under the Equal Pay Act. See EEOC v. Aetna Ins. Co., 616 F.2d 719, 723-26 (4th Cir. 1980). In this case, the reason for the pay differential between Ms. Cooke and her alleged comparators was the gender-neutral allocation of available SES positions. The NTSB both had a rational basis for its actions and possessed legitimate business reasons for allocating available SES positions to the Director of ORPH and the Director of OHS positions prior to the Director of OMS position. Ms. Cooke's pay was the result of the non-gender-based classification of her position as a GS position, and the classification of her alleged comparators' positions as SES or SL positions.

The OAS Director and Deputy Director positions have always been SES-level positions for legitimate business reasons. PFUF ¶¶ 12-13. Aviation safety is the reason for NTSB's existence. Thus, the work of OAS is central to the agency's mission. PFUF ¶ 107. In addition, as detailed above, OAS is much larger; handles many more accident investigations; handles more complex accident investigations; garners much more press, public, and congressional

[18] "Under rational basis review, the classifications made by the plan and rules are valid unless they bear no rational relationship to the Government's objectives. . . . All that the Government must show is that the plan and rules rationally relate to a legitimate interest, under any conceivable set of facts." Behm, 68 Fed. Cl. at 402 (internal quotation marks and citations omitted).

interest; and does more international work than any of the surface modal offices. Furthermore, OAS is the only modal office required by statute to investigate <u>all</u> civil accidents in its mode. PFUF ¶ 45. For these reasons, OAS had the highest potential for impact in the area of transportation safety, has an extremely high profile with Congress as well as the general public, and, thus, its Director and Deputy Director were properly designated SES-level positions.

Following the dividing of NTSB's Office of Surface Transportation into four separate surface modal offices, it was NTSB's intention that each of the four surface modal offices directors, including OMS, be headed by a member of the SES. However, there were no available slots to allocate to the surface modal office directors. PFUF ¶ 8. In June 1999, NTSB requested additional SES slots from OPM for all of the surface modal office directors, but OPM denied that request. PFUF ¶ 10. Thus, there was no way for NTSB to make any of the surface modal office director positions SES-level positions, and each of the surface modal office directors were initially paid at the GS-15 level.

In 2001, an SES employee retired, and. therefore, an SES slot became available. This SES slot was allocated to the position of Director of ORPH based upon legitimate business reasons and in accordance with a rational plan. PFUF ¶ 16. ORPH was the most complex of the three surface modal offices (OHS, ORPH, and OMS) and was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. PFUF ¶ 16.

Pursuant to OPM regulations, all SES positions must be advertised and competed. PFUF ¶ 17. Accordingly, once the decision was made to allocate the SES slot to the position of

Case 1:06-cv-00748-TCW Document 59 Filed 06/25/2008 Page 53 of 57

Director of ORPH, the position was advertised as an SES position and applications for the position were accepted. PFUF ¶ 18. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. PFUF ¶ 19. The advertisement and selection process was conducted pursuant to OPM regulations. Mr. Chipkevich was selected because he was the best candidate for the position, not for any gender-biased reasons.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In its request, NTSB stated that its prioritization of these requests was first OHS, then OMS, indicating that the order of SES allocations proceeded according to a plan set forth long before another SES position became available. Again, those requests were denied by OPM. PFUF ¶ 20. Thus, the NTSB had a legitimate business reason for not making the Director of OMS position an SES-level position at that time.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. PFUF ¶ 21. That slot was allocated to the position of Director of OHS for legitimate business reasons, namely that OHS was a larger office than OMS and because there are approximately 43,000 highway deaths each year, in contrast to several hundred marine deaths per year. PFUF ¶ 21. It was determined that OHS could have the greater positive impact on transportation safety. In addition, the scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS, including investigatory responsibilities, supervision, and responsibilities for regional offices. PFUF ¶ 21. Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position and applications for the position were accepted. PFUF ¶ 22. Mr.

Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level and was eventually selected for the position. PFUF ¶ 23. Again, the advertisement and selection processes were conducted pursuant to OPM regulations. Mr. Osterman was selected because he was the best candidate for the position, not for any gender-biased reasons.

In 2004, NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS. PFUF ¶ 24.

In sum, the reason that Ms. Cooke was not paid at the SES-level was because the NTSB did not have enough available SES slots to assign to all of the surface modal office directors simultaneously. The order in which the available slots were assigned was dictated by legitimate business reasons - namely they were prioritized based upon the complexity of the offices and the potential for positive effect upon transportation safety. OMS was smaller in size, conducted fewer investigations, had shared jurisdiction with the Coast Guard, and had fewer regional offices. Furthermore, there were comparatively fewer marine deaths than highway deaths per year. Thus, OMS had the least potential for impact in the area of transportation safety. Given that NTSB's mission is to promote transportation safety, PFUF ¶ 1, it was legitimate to consider which modal office would have the greatest impact upon transportation safety when allocating SES slots.

Additionally, as set forth above, even if the Director of OMS position had been the first surface modal office director position to be given an SES slot, the NTSB could not have simply promoted Ms. Cooke to the SES-level. In accordance with Federal Government-wide OPM policies, the NTSB would have had to advertise and compete the position and select the best

candidate from the pool of applicants. If Ms. Cooke had not been the best candidate for the position, the NTSB would have had a legitimate business reason for not selecting her. The NTSB clearly has a business interest in hiring the best candidate possible for each position.

Finally, it is clear that the disparity in pay between Ms. Cooke and her alleged comparators was based upon factors other than sex because the NTSB had three female SES-level employees during the relevant time period: Lola Ward, Julie Beale, and Elaine Weinstein. PFUF ¶¶ 231-32. All three of these women were required to apply and compete for their positions, and all three competed against male applicants. PFUF ¶ 233. Thus, the NTSB did not pay Ms. Cooke at the GS-15 level because of her gender, but because it was complying with Federal pay requirements and making legitimate business choices in its pay and SES allocation decisions.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment should be denied, and defendant's cross-motion for summary judgment should be granted.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
DENISE D'AVELLA
Office of General Counsel
National Transportation Safety Board

December 3, 2007

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this __ day of December, 2007 a copy of the foregoing "DEFENDANT’S CROSS-MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH APPENDIX” was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court’s electronic filing system. Parties may access this filing through the Court’s system.

/s/ MEREDYTH D. COHEN