# EXHIBIT NO. 11

# NATIONAL TRANSPORTATION SAFETY BOARD

---

## REPORT OF INVESTIGATION

---

## I. DESCRIPTION OF COMPLAINT

| | |
|---|---|
| Name of Complainant: | Marjorie M. Murtagh<br>Case Number NTSB-2005-02 |
| Title and Grade of Complainant's Position: | Director, Office of Marine Safety<br>GS-1801-15/10 |
| Name and Location of Agency and Unit Involved in Complaint: | Office of Marine Safety<br>National Transportation Safety Board |
| Date of Alleged Discrimination: | January 28, 2005 |
| Kind of Discrimination Alleged: | Sex |
| Nature of Action, Decision, or Condition Giving Rise to Complaint: | Pay discrimination; unequal employment conditions |

## II. DESCRIPTION OF INVESTIGATION

| | |
|---|---|
| Identity of Investigator: | Paul Greenberg<br>DSZ<br>1730 N. Lynn Street, Suite 601<br>Arlington, Virginia 22209 |
| Date Report of Investigation Submitted to Agency: | December 6, 2005 |
| Place of Investigation: | Washington, DC |
| Dates of Investigation: | August 26, 2005 to December 1, 2005 |
| Method of Investigation: | On-site Interviews |

## III. DESCRIPTION OF BASES AND ISSUES IN COMPLAINT

Complainant alleges she was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she has received less compensation than the compensation received by similarly situated male Office Directors. Corning Glass Works v. Brennan, 417 U.S. 188 (1974); Goodrich v. International Brotherhood of Electrical Workers, 815 F.2d 1519 (D.C. Cir. 1987).

Complainant also alleges she was treated disparately based upon sex when on January 3, 2005, she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated Office Directors. St. Mary's Honor Center v. Hicks, 113 S.Ct. 2742 (1993); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981); McDonnell Douglas v. Green, 411 U.S. 792 (1973).

## IV. SUMMARY

*The pay disparity issue*

From 1994 until 2005, Complainant (female) served as the head of the NTSB's Office of Marine Safety (OMS). The position was classified and paid as a GS-15 job throughout this period (Exhibit F2).

Between 1994 and 1997/98, OMS was a unit within NTSB's Office of Surface Transportation Safety, and Complainant's title was Chief. As part of a restructuring in 1997/98, the Office of Surface Transportation Safety was divided into four separate Offices: Highway Safety (OHS), Railroad Safety, Marine Safety, and Pipeline and Hazardous Materials Safety. Each Modal Office had a Director, initially paid at the GS-15 level (Exhibits F2, F3). Throughout this period, NTSB's Office of Aviation Safety existed as a separate unit (Exhibit F3).

Dan Campbell (male) served as NTSB's Managing Director (an SES position) from 2000 until 2005, and was Complainant's immediate superior during this period. According to Mr. Campbell, the position of Director of the pre-1998 Office of Surface Transportation Safety was classified as an SES job, and there may have been one other SES slot within the OST structure. When OST was divided – initially into four surface Modal Offices – NTSB made a request to the Office of Personnel Management (OPM) for additional SES slots so that each of the surface Modal Office Directors could be classified and paid at the SES level. However, OPM denied NTSB's request. As a result, the Agency did not have SES positions available to classify the surface Modal Office Directors at the SES level, and each of the four Directors were classified and paid at the GS-15 level. The persons filling these four positions were Joe Osterman (Highway Safety)(male), Bob Lauby (Railroad Safety)(male), Bob Chipkevich (Pipeline and Hazardous Materials Safety)(male), and Complainant Marjorie Murtagh (Marine Safety)(female). Later, the Railroad Safety and Pipeline and Hazardous Materials

Safety Offices were merged to form the Office of Railroad, Pipeline and Hazardous Materials Safety (RPH) (Exhibit F3).

Sometime after 2000, an SES employee at the NTSB retired and an SES slot therefore became available to the Agency. Mr. Campbell recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of Director, Office of Railroad, Pipeline and Hazardous Materials Safety (RPH). This position was occupied by Bob Chipkevich. Mr. Campbell explains he made this recommendation because Mr. Chipkevich was the most senior of the surface Modal Office Directors and because RPH was the most complex of the three surface Modal Offices. Although Chairman Hall initially was inclined to assign the SES slot to the Director of Highway Safety position because of its greater visibility, Mr. Campbell explains Chairman Hall ultimately accepted the recommendation and the RPH position became an SES job (Exhibit F3).

Around 2003, an SES position was eliminated at the NTSB Academy after the then-office holder voluntarily left the Agency, which made an additional SES slot available. NTSB leadership assigned this SES slot to the position of Director, Office of Highway Safety, which was encumbered by Joe Osterman. In 2004, NTSB received authorization from OPM for an addition Senior Executive Service position, which was assigned to the Director, Office of Marine Safety job. Mr. Campbell notes it always was the Agency's goal to elevate all the surface Modal Office Directors to the SES level, and if OPM had authorized enough SES slots when requested after the 1997/98 reorganization, all the positions would have been reclassified and the Director positions advertised at the SES level. However, because OPM did not authorize the requested SES slots, the process took place gradually both by gaining new slots from OPM and by reassigning slots from elsewhere within the NTSB (Exhibit F3).

Complainant states the authority, responsibilities and functions of the Modal Office Directors are all very similar and are described in the Code of Federal Regulations. Position Descriptions for the various Director jobs are included as attachments to Complainant's affidavit, Exhibit F2. In Complainant's view, the responsibilities for the Marine Safety and Aviation Safety Directors are most similar because both Offices have duties related to international accident investigations as well as investigations of both public and non-public accidents. As the Director of OMS, Complainant was responsible for initiating and overseeing the investigations of marine accidents, major and non-major (field investigations and incidents), domestic and international, those involving public and non-public vessels, as well as those involving claims of government malfeasance and Special Investigation reports. It was also her responsibility to oversee the factual documentation, analysis, development and preparation of detailed reports, including the drafting of conclusions, probable cause and recommendations. She notes that while the Board itself has ultimate authority to determine probable cause in transportation accidents, since 1998 the Board has delegated this authority to the Modal Office Directors when they issue the accident report as a "Brief Report of Accident." Complainant states that as OMS Director she also was responsible for preparing responses to proposed marine safety rulemakings and requests for technical support,

both internal and external, including the technical details for development of contracts issued by the NTSB (Exhibit F2).

Complainant believes pay classifications, pay rates and awards for Office Directors are determined by the NTSB Chairman, in consultation with the Managing Director. Between March 2003 and March 2005 the NTSB Chairman was Ellen Engleman Conners (female). Dan Campbell was the Managing Director during this period. *Id.*

Complainant states she met with Chairman Engleman Conners in April 2004 to discuss concerns about her compensation. She reminded Chairman Engleman Conners that she (Complainant) was being paid as a GS-15, and therefore was not receiving pay and awards comparable to her male counterparts who were NTSB Office Directors, all of whom were male. In addition, Complainant noted there even were some Deputy Directors at the NTSB who were classified and paid as SES members. Complainant indicated she wanted to find an equitable way to resolve this issue of pay disparity. According to Complainant, Chairman Engleman Conners emphasized the Agency was working hard to get an additional SES slot approved, which would be assigned to the OMS Director position; however, if the slot was granted, Chairman Engleman Conners noted the position would need to advertised and competed at the SES level. *Id.*

Complainant indicates she made it clear to Chairman Engleman Conners that her primary concern was to be compensated at the same level as the other Office Directors, rather than receive the SES classification *per se*. Complainant suggested that greater parity would be achieved if the Agency paid her (Complainant) overtime. Complainant noted the overtime payment would help close the pay gap between herself and the male Office Directors, and also would be helpful toward achieving her "high three" salary levels for calculating pension benefits. According to Complainant, Chairman Engleman Conners expressed doubts that overtime pay was possible, but committed to exploring the issue with Human Resources and she would consider it. Complainant states she had no further meetings about compensation with Chairman Engleman Conners after April 2004, and that she was not granted overtime pay nor did she receive bonuses comparable to the male Office Directors. Further, Chairman Engleman Conners did not respond to further attempts by Complainant to meet for further discussions about pay parity. *Id.*

Separately, Complainant states she spoke with Human Resources Director Lisa Love (female) about the overtime question. Complainant states Ms. Love advised her there were no OPM barriers to paying Complainant overtime, but the Chairman would need to approve such overtime. *Id.*

Complainant notes the substantial disparities between her compensation and that of the other [male] Office Directors, and alleges the pay disparities extend back at least seven years. She notes the Director, Office of Aviation Safety (the position she alleges is most comparable to her own) and the Director, Office of Railroad, Pipeline and Hazardous Materials Safety received annual pay more than $20,000 greater than she received, and triple the amount of bonus pay given her. In addition, even the Office of Highway Safety

000005

Director – also a GS-15 position until 2004 – was paid $12,000 more than a GS-15 in 2003. The OHS Director received about $14,000 more pay in 2003 than Complainant. *Id.*

Complainant states she has received exceptional performance evaluations throughout her tenure with the Agency, and most recently received an Outstanding rating from Managing Director Campbell and the reviewing official, Chairman Engleman Conners. In Complainant's view, the positions of the Modal Office Directors are comparable and she (Complainant) has successfully performed her work as the OMS Director. In Complainant's view, the only explanation for the lower level of compensation she has received is her gender. *Id.*

Complainant disputes the Agency's claim that Complainant's classification and pay were not elevated to the SES level because of a lack of SES slots. She notes that even without changing the classification of the OMS position, greater pay parity could have been achieved through overtime or bonuses. Complainant believes the Agency deliberately chose not to use these tools. Further, she asserts the Agency has received additional SES slots since 1998 but simply chose not to assign one of them to the OMS Director job. She notes the position of Deputy Director of the Office of Research and Engineering – an SES position – was advertised and filled at least three times since 1998. The persons hired into the position were all male. When the Deputy Directors were reassigned to new positions, they retained their pay in accordance with federal requirements. *Id.*

Complainant concedes that OMS was a smaller office than the other Modal Offices, but asserts her job function was equal to that of the other Modal Directors and merited equal pay. Further, she argues her Office had fewer staff members in part because the Agency was depriving her of staff resources needed to do her job (*see "denial of authority to fill vacant positions issue"* discussion, *infra*). Moreover, she notes that the classification of a position as eligible for SES pay is based on duties, level of responsibility and function, not on the number of staff supervised. *Id.*

The OMS Director position was advertised as an SES position early in 2005. Complainant applied for the position but was not among the candidates interviewed. Another candidate, John Spencer (male) was hired into the OMS Director position at the SES level. *Id.*

The statements of three management witnesses – Chairman Engleman Conners, Managing Director Campbell, and then-OHS Director Joseph Osterman[1] (male) – generally concur with the facts provided by Complainant regarding pay classification history and compensation. However, they uniformly deny Complainant's lower compensation (compared with other [male] Office Directors) was the result of gender-based pay discrimination, asserting the order for elevating the surface Modal Office Directors to the SES level – RPH first, OHS second, and OMS third – was justifiable

[1] Joe Osterman succeeded Dan Campbell as NTSB Managing Director in March 2005.

based on the size and responsibilities of the respective organization units. *See* Exhibits F3, F4 & F5.

While these Agency managers acknowledge there are similarities in the overall duties of the different Office Directors, each suggest there also are significant differences that justified the decision to make the OMS job the last Office Director position to be upgraded to SES classification and pay. Mr. Campbell notes that the RPH Director runs a larger organization than OMS and must be conversant in multiple disciplines. Similarly, the OHS Director runs a larger unit and has a much higher-profile job because of the great public interest in highway safety. He notes by comparison that NTSB shares jurisdiction for investigating commercial maritime activities with the U.S. Coast Guard, and that marine accidents are the one transportation mode where the NTSB is not the primary federal investigative authority. As a consequence, NTSB has a reduced ability to have significant effect on marine safety except for promoting better safety practices in the recreational boating area (Exhibit F3).

Mr. Campbell also disputes Complainant's claim that the OMS Director job is closely comparable to the Director, Office of Aviation Safety. He states Aviation Safety is at the core of the NTSB's mission, both from a budgetary standpoint as well as public recognition. Further, the number of times the Aviation Safety Office is called upon to perform an investigation is dramatically higher than OMS. He states OMS warranted a Director at the SES level, but that SES slots are a scarce resource and it made sense for OMS to be the last Modal Office to be upgraded. He does not recall Complainant complaining to him about when the OMS Director job would be reclassified as SES, nor did Complainant raise compensation issues with him. *Id.*

Although Mr. Campbell acknowledges OMS was the last of the Modal Office Director jobs to be upgraded to SES, he notes there are other SES positions at the NTSB that have been occupied by females. He notes there were at one time two female SES employees working at the NTSB Academy, although that number has been reduced to one, Director Julie Beal. The Director of the Office of Safety Recommendations and Communications, Elaine Weinstein, is female, as well as the Director of the Office of Administration, Lola Ward. These are both SES positions. *Id.*

Further, Mr. Campbell observes there were chronic problems with the pace and quality of work generated by OMS under Complainant's leadership. Attached to Mr. Campbell's affidavit is a copy of an employee exit interview conducted with a departing OMS employee in 2002. The departing employee had worked for NTSB for about one year in a cooperative program, but left for the private sector. The employee commented she was leaving because the progress of work in OMS was too slow and she was afraid it would affect her work ethic. *Id.*

Mr. Campbell confirms there are two offices with Deputy Directors paid at the SES level – the Office of Aviation Safety, and the Office of Research and Engineering. He states this practice goes back decades. He asserts the high-level Deputy positions are justifiable. With regard to OAS, this unit is central to the NTSB's work and has about

140 staff members, while the other Offices have only 20 to 40 staffers. Having an SES-level Deputy in Research and Engineering is justifiable because the Office is staffed with a relatively large number of higher-level engineers who have advanced degrees, and the unit performs sophisticated, technical work. *Id.*

Chairman Engleman Conners states she arrived at the NTSB after all Office Director positions had been raised to the SES level except OMS and Highway Safety. She defends the decision to convert the OHS position first, noting there are 43,000 highway deaths each year in contrast to several hundred marine deaths (Exhibit F4).

Chairman Engleman Conners confirms she was approached by Complainant about being paid overtime, but comments she felt Complainant's proposal was "slightly bizarre." Chairman Engleman Conners states she advised Complainant that the OMS Director position would be elevated to an SES position as soon as a slot became available, at which point Complainant could apply for the job. She states she made an inquiry about ways to raise Complainant's pay, speaking either with Managing Director Campbell or HR Director Lisa Love. *Id.*

Joe Osterman was Director of the Office of Highway Safety until early 2005, and is now the NTSB Managing Director. Mr. Osterman became a member of the SES early in 2003. Prior to 2005, he served on the NTSB's Executive Performance Review Board (EPRB), which is responsible for reviewing the ratings and awards for SES employees. As the Managing Director, he now chairs the EPRB (Exhibit F5).

Mr. Osterman reports that in 2004 then-Managing Director Campbell convened the EPRB to discuss the distribution of additional SES and SL slots within the Agency. The EPRB recommended the next SES assignment should be for the OMS Director position because OPM had allocated NTSB additional SES slots. The actual assignment of the SES position was done by the NTSB Chairman. *Id.*

Mr. Osterman's account of the history of the elevating the Modal Office Director positions to the SES – and the rationale for their order – is consistent with the accounts of the other management witnesses, *supra*. Although Mr .Osterman agrees with Complainant that the Office Director positions require similar skill and effort, and their core mission is similar, he states the Offices have differing levels of responsibility. For example, RPH has responsibility for two modes of transportation (railroads and pipelines), and also provides support for the other Offices for accidents involving hazardous materials. Additionally, RPH maintains regional offices, while some Offices do not. *Id.*

Mr. Osterman asserts that like RPH, the Office of Highway Safety maintains regional offices. Although OHS does not have similar support functions for the other Offices, it generates the majority of recommendations to Congress or to state legislatures for regulatory changes. Highway accidents account for more than 43,000 deaths per year, while all the other modes of transportation combined account for fewer than 3,000 deaths per year. He notes the Office of Marine Safety is smaller than the other Offices,

and does not have regional offices. OMS provides few support functions for the other Offices. Although OMS has a limited international responsibility, this work largely involves conferences. *Id.*

With regard to the question of gender bias in deciding the order in which the Director jobs would be raised to the SES level, Mr. Osterman notes that the RPH Office Director, Bob Chipkevich, became an SES member three years before his position (OHS Director) was raised to the SES. Mr. Osterman observes that he would have liked his job at Highway Safety elevated earlier, but he knew the rationale for the order of SES assignments. In his view, Complainant understood this rationale fully as well. *Id.*

Lisa Love, Director, Human Resources Division, Office of Administration (female) states responsibility within NTSB for setting pay for SES classifications is handled by the Managing Director, with guidance from SES Program Manager Colette Magwood. She describes the process through which agencies are allocated SES slots. Each year, OPM invites agencies to request SES allocations for the upcoming fiscal year. NTSB does not always receive the number of SES positions requested (Exhibit F6).

Ms. Love is aware that some Office Directors have been paid as SES employees, while others have been paid as GS-15s. She believes the reason for the disparity in classification was due to program complexity, scope and impact of the work, and the qualifications required to perform the job. In addition, the number of SES slots allocated by OPM is a factor. She does not view it as an anomaly that some Deputy Director positions might be classified as SES while there were still Office Director positions paid on the GS scale. *Id.*

With regard to Complainant's interest in receiving overtime compensation, Ms. Love states she is advised by HR Specialist Emily Carroll that the personnel regulations do not prevent payment of overtime based on grade, but there is an overall premium pay limitation based on the amount of salary received. The applicable premium pay/overtime limitation is the biweekly salary of a GS-15 step 10 or Level V of the Executive Schedule, whichever is higher. As long as an employee's salary is below the limitation, the employee is eligible to earn premium pay/overtime. It therefore is probable Complainant could be paid some overtime compensation. However, she would need to make arrangements for overtime with her supervisor. *Id.*

A table comparing the compensation among Office Directors is found at Exhibit F1.

*The "denial of authority to fill vacancies" issue*

Although the letter accepting Complainant's EEO charge focuses on a "denial of authority to fill vacancies in the Office of Marine Safety" that occurred January 3, 2005, Complainant states the January 2005 event was simply the latest in a series of similar experiences that has been on-going since 1998. Complainant asserts this pattern made it extremely difficult for OMS to apply necessary resources to its investigations and required her to work excessively long hours (Exhibit F2).

The January 2005 incident related to Complainant's effort to fill the position Marine Accident Investigator. The position was advertised, interviews were conducted and a selection was made in 2004. Complainant states that at the end of the process, Managing Director Campbell advised her she could not hire the selectee because he had applied for more than one job at the Agency. Specifically, in addition to applying for the Marine Accident Investigator position, the selectee also had applied for the OMS Director position that finally had been advertised as an SES job. According to Complainant, Campbell questioned the judgment of an applicant who had applied both for an investigator position in an Office while also applying for the most senior management position in the unit. Complainant states she was not concerned by this issue, and believes Mr. Campbell's explanation was implausible. *Id.*

In 2001, the Chief, Report Development Division, OMS, retired. Complainant states this was position was the head of a major division within OMS. The vacant position was advertised within NTSB, applicants were interviewed and Complainant made a selection. She forwarded the name of the selectee to Mr. Campbell, who then spoke directly with the selectee and decided she was unsuitable for the position. Complainant states she was prohibited from hiring a person into the position, and instead had to "make do" with the staff within her office. *Id.*

Also in 2001, Complainant reports Mr. Campbell placed a Human Performance Investigator from OMS on detail to OHS. This later became a permanent transfer. Complainant states she was prohibited from recruiting a replacement employee. *Id.*

In 2000, Complainant's Deputy Director left NTSB for a position at another agency. Although Complainant made numerous requests to fill the vacant Deputy Director position, she was not permitted to do so. As a result, OMS was the only Modal Office to operate without a Deputy. Complainant states her successor, current OMS Director Spencer, was assigned an Acting Deputy Director and has been given permission to hire a permanent Deputy Director. *Id.*

Complainant notes that in his statement to the EEO Counselor, Mr. Campbell suggested all the Office Directors were treated badly and cited the Agency's budget as prompting an overall drop in the number of positions at the NTSB. However, she attaches budget materials which she asserts support her claim that OMS was singled out for unfavorable treatment regarding staffing. Complainant states other male Office Directors were allowed to fill key slots and to increase the overall number of staff in their offices. She also states then-OHS Director Osterman would comment at meetings that his unit did not need more people and that OMS had a greater need for additional staff. *Id.*

Complainant asserts the repeated denial of opportunities for her to fill positions in her unit was discriminatory because Agency officials felt that if OMS was very small in size, the small size of the Office would in some way justify limiting the pay of its Director, who was female. She sees no reason other than sex discrimination that would explain why she was treated differently from her male counterparts in the other Modal Offices. *Id.*

Former Managing Director Campbell admits Complainant was refused opportunities to fill some positions, but denies this was discriminatory behavior motivated by Complainant's sex. With regard to the Marine Accident Investigator position, Mr. Campbell confirms Complainant's statement that he (Campbell) felt it was strange to hire a mid-level Investigator into OMS who simultaneously was seeking to become the Director of the Office. He notes also that the OMS Director position was being competed, and he thought it would be fair to delay the hire so that if a new person was hired as Director, the Director would have a chance to hire his or her own person into the job (Exhibit F3).

Mr. Campbell also confirms he stopped the hire of a new OMS Chief of Report Development. He explains Complainant wanted to fill the position with a person already working within OMS. The selectee informed Campbell that she had applied for the position because she wanted to block another co-worker from getting the job because they were incompatible. Campbell states he knew the selectee, and while he viewed her as a good editor he did not believe she would be able to manage the investigators who are a key part of the report-generating process. Mr. Campbell states he already had bad experiences with OMS' report generating abilities, citing problems with the accident report into the Staten Island Ferry crash. Mr. Campbell states he had to plead with an investigator to stay with the project rather than quit, and ultimately Campbell lifted the investigation out of OMS and personally supervised the project from the Managing Director's office. *Id.*

Mr. Campbell did not have a specific recollection with regard to the OMS Deputy Director position. *Id.*

Mr. Campbell states he normally did not view it as his role to intervene when Office Directors such as Complainant wanted to make a hire. However, he felt Complainant did not demonstrate good judgment in her selections. He recalls he once received a visit from the NTSB ethics office concerning an applicant for an OMS position. The applicant had a background with cruise ships. He was hired, and subsequently quit under a cloud. Mr. Campbell feels this experience vindicated his doubts concerning Complainant's hiring judgment. *Id.*

Mr. Campbell denies Complainant was singled out in her ability to hire staff for her Office. He states Complainant was allowed to fill many vacancies in her unit. Further, he states staffing levels generally are down at the Agency. He believes Complainant probably was allowed to hire more employees than other Directors because her Office had a relatively high turnover rate. *Id.*

Chairman Engleman Conners states she probably had some role in limiting some of the hiring. After she arrived at the Agency in 2003, she asked all senior managers to consider prioritizing the filling of positions based on the vision for the Agency, rather than simply backfilling open positions. NTSB identified 73 positions in the Agency and began a prioritizing process. Early in 2004, it was decided that the first positions to be

filled would be openings on the regional aviation investigation teams. At that time, the Agency had about 426 employee and was expecting to drop to about 415 positions, then 411. To avoid a RIF situation, many open positions at the Agency were not being filled. Jobs that were being filled were priority slots that had been mandated by Congress. *Id.*

Chairman Engleman Conners notes other Office Directors also were unhappy they were denied authorization to fill vacant positions, citing specifically the Director of the Office of Research and Engineering, Verne Ellenstad. She denies Complainant's being denied opportunities to fill vacancies related to her gender. *Id.*

Joe Osterman moved from the Director, OHS, position to the Managing Director job around the period when Complainant was attempting to fill the Marine Accident Investigator position in early 2005. He states the candidate selected by Complainant for the position was mediocre, and that he (Osterman) was the person who denied Complainant authority to complete the hire. This action was taken with Mr. Campbell's concurrence (Exhibit F5).

In Mr. Osterman's view, the restrictions on Complainant's ability to hire were not unique, and she was not singled out because of her gender. He states that other Office Directors also were prohibited from making hires at various times. He states his own unit, the Office of Highway Safety, lost about six positions between 200 and 2005 when he was denied authorization to hire against vacancies. This was happening throughout the Agency. *Id.*

In specific response to Complainant's assertion that he (Osterman) made several comments suggesting that OMS had a greater need for staff than OHS, Mr. Osterman states the comment was not made quite the way Complainant suggests. He states all the Offices were short-handed in some manner.

*Additional materials*

Position descriptions for the Modal Director jobs are found as Exhibit F8. Performance ratings for Complainant and the employees to whom she compares herself are found as Exhibit F9. Tabulations showing positions filled in the Modal Offices are found as Exhibit F10.

## V. SURVEY OF THE GENERAL ENVIRONMENT

Position descriptions for the Office Director positions are found at Exhibit F8. As both the Complainant and Agency Managers acknowledge, there are significant similarities among the Office Director positions, as described. As discussed above, Agency Managers contend the differences between the jobs relate to a number of factors including the size of the Office's staff, number of investigations conducted, public visibility, support for investigations performed by other NTSB units, etc.

A comparison of compensation of the Modal Office Directors for 2003 and 2004 is found at Exhibit F1. The comparison shows that Modal Office Directors Clark, Osterman and Chipkevich (all male) received greater compensation (salary and bonus) than Complainant during both years. During 2003, each of the male Office Directors received at least $13,000 more in compensation than Complainant. During 2004, each of the male Office Directors received at least $14,000 more in compensation than Complainant.

A listing of positions filled by each of the Offices between January 2003 and January 2005 is round at Exhibit F10. During this period, four positions were filled in the Office of Marine Safety, two positions were filled in the Office of Railroad, Pipeline and Hazardous Materials Investigations, nine positions were filled in the Office of Research and Engineering, twenty-five positions were filled in the Office of Aviation Safety, and two positions were filled in the Office of Highway Safety.

# INDEX

TAB A: **FORMAL COMPLAINT DATA**

Exhibit A1: Formal Complaint of Discrimination of Majorie Murtagh, dated April 16, 2005

TAB B: **COUNSELING DATA**

Exhibit B1: EEO Counselor's Report of Chester Fisher, dated April 7, 2005, with attachments:

a) Initial Interview Data Sheet.
b) Memorandum from EEO Counselor to Complainant re: Rights and Responsibilities of Aggrieved Parties (March 1, 2005).
c) Summary of Interview with Daniel Campbell.
d) Position Description, Director, Office of Marine Safety.
e) Position Description, Director, Office of Aviation Safety.
f) Comparison of Average Compensation of Modal Office Directors (1/1/2003 - 12/31/2004).
g) List of NTSB Senior Executive Service positions and employees, 2002 through FY04.
h) 49 C.F.R. Part 800, Organization and Functions of the Board and Delegations of Authority.
i) Comparison of Core Functions of Office Director Positions.
j) NTSB Organization Chart.

Exhibit B2: Notice of Right to File a Discrimination Complaint, dated April 1, 2005.

TAB C: **DELINEATION OF THE ISSUES**

Exhibit C1: Letter of Acceptance of the Complaint of Discrimination to Marjorie Murtagh from Fara D. Guest, dated July 21, 2005.

Exhibit C2: Investigator's Letter of Authority, dated August 17, 2005.

TAB D: **DOCUMENTATION OF ATTEMPTS AT INFORMAL RESOLUTION**

TAB E: **DOCUMENTATION OF APPELLATE ACTIVITY**

**TAB F: DOCUMENTATION AND EXHIBITS**

Exhibit F1: Organizational Charts & Data:

a)

a) Relationship of Affiants, National Transportation Safety Board, as of January 3, 2005 (Source: EEO Investigator).
b) Organization Chart, National Transportation Safety Board, dated September 15, 2004 (Source: EEO Counselor's Report).
c) Workforce profiles, dated September 9, 2004 (Source: Marquee' Holmes, Human Resources Division):
Office of Aviation Safety
Office of Highway Safety
Office of Marine Safety
Office of Railroad, Pipeline and Hazardous Materials
Office of Research and Engineering
d) Comparison of Average Compensation of Modal Office Directors (01/01/2003 - 12/31/2004) (Source: EEO Counselor's Report)

Exhibit F2: Affidavit of Marjorie Murtagh (female), Complainant, former Director, Office of Marine Safety, NTSB, GS-15, dated October 18, 2005, with attachments:

a) 49 C.F.R. §800.2, Organization [of the NTSB].
b) 49 C.F.R. §800.25, Delegation to the Directors of the Office of Aviation Safety, Office of Railroad Safety, Office of Highway Safety, Office of Marine Safety, and Office of Pipeline and Hazardous Materials Safety.
c) Excerpt, NTSB FY2003 OMB Budget, pp. 11-13.
d) Position description, Director, Office of Marine Safety.
e) Position description, Director, Office of Aviation Safety.
f) Comparison of Core Functions of Office Director Positions.
g) Excerpt, Independent Safety Board Act of 1974.
h) Summary of interview of Daniel Campbell dated March 14, 2005, performed by EEO Counselor Chester Fisher.
i) Comparison of Average Compensation of Modal Office Directors, 1/1/2003 - 12/31/2004.
j) GS Salary Table 2003-DCB for the Washington-Baltimore area, effective January 2003.
Locality Pay Rates for Members of the Senior Executive Service, effective January 2003.
k) NTSB Performance Appraisal for Marjorie Murtagh for the period from August 1, 2002 to July 31, 2003.
l) Excerpt (p.3), response to written questions by Chairman Rogers in follow up to the testimony of the Chairman, NTSB, before the Subcommittee on Transportation and Related

Agencies Committee on Appropriations, House of Representatives, regarding FY2003 Budget Request (April 2002).

m) Same, p. 5.

n) NTSB 2001 Personnel Report, excerpt relating to the Office of Marine Safety, prepared by the Office of the Chief Financial Officer

o) Same, excerpts relating to the Office of Aviation Safety; Office of Railroad, Pipeline and Hazardous Materials Investigations; Office of Highway Safety.

p) Investigator's file memorandum reporting that Complainant declined to submit a rebuttal statement for the ROI (November 11, 2005).

Exhibit F3: Affidavit of Dan Campbell (male), Executive Director, NTSB, SES, dated October 19, 2005, with attachment.

Exhibit F4: Affidavit of Ellen Engleman Conners (female), former Chairman, NTSB, dated October 17, 2005.

Exhibit F5: Affidavit of Joseph Osterman (male), Managing Director, NTSB, SES, dated October 24, 2005.

Exhibit F6: Affidavit of Lisa Love (female), Director, Human Resources Division, NTSB, GS-15, dated October 21, 2005.

Exhibit F7: Classification Standards, General Schedule Supervisory Guide; Memorandum from EEO Investigator regarding SES classification standards (Source: Fara D. Guest, EEO Director).

Exhibit F8: Position Descriptions (Source: Fara D. Guest, EEO Director):

a) Director, Office of Marine Safety.

b) Director, Office of Aviation Safety.

c) Director, Office of Research and Engineering.

d) Director, Office of Highway Safety.

e) Director, Office of Railroad, Pipeline and Hazardous Materials Safety.

Exhibit F9: Performance Ratings and Standards for Complainant and the employees to who Complainant compares herself for the two year period prior to the denial of equal pay at issue (Source: Fara D. Guest, EEO Director):

a) Marjorie Murtagh, Director, Office of Marine Safety.

b) Vernon Ellingstad (male), Director, Office of Research & Engineering.

c) John C. Clark (male), Director, Office of Aviation Safety.
d) Robert Chipkevich (male), Director, Office of Rail, Pipeline and Hazardous Material Safety.
e) Joseph Osterman (male), Director, Office of Highway Safety.

Exhibit F10: List of positions filled, Office of Marine Safety, Office of Rail, Pipeline and Hazardous Materials Investigations; Office of Research and Engineering; Office of Aviation Safety; Office of Highway Safety 2003-2005 (Source: Marquee' Holmes, Human Resources Division).

**TAB G: MISCELLANEOUS MATERIAL**

Exhibit G1: EEO Investigator's initial document request.

Exhibit G2: Email correspondence on documentation requested but not provided.

ATTACHME EXHIBIT F2d

000098

Draft for Review

Position Description Number MS-321519
Page 1 of 4

~~ATTACHMENT D~~

# National Transportation Safety Board

POSITION DESCRIPTION

Organizational Title: Director, Office of Marine Safety
Organization: Office of Marine Safety
Pay Plan Series and Grade: TBD
Incumbent: Marjorie M. Murtagh

**INTRODUCTION**

This position is located in the Office of Marine Safety, National Transportation Safety Board (NTSB). The Office manages major marine transportation investigations for which go-teams are sent to the accident site. The Office investigates selected accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation regulations, requirements, policies, practices and systems in government and industry.

The incumbent serves as the Director, Office of Marine Safety (OMS), responsible for providing staff supervision and resource management, as well as overall management and direction of international and domestic marine accident investigations and reporting processes, recommendation development and marine safety program advocacy and oversight.

**MAJOR DUTIES**

Plans, manages, directs and evaluates the work of the Office of Marine Safety and exercises important policy-making and policy-determining decisions impacting marine safety at the Board, at international maritime organizations, other Federal agencies and the international and domestic industry. Provides for the overall direction and technical accuracy of the investigation and reporting processes for major marine accidents.

Develops the overall requirements and schedules to accomplish the marine safety program. Reviews, approves and promulgates schedules and milestones for assigned activities. Reviews, evaluates and approves, disapproves or modifies requests for changes to milestones and schedules. Develops overall program review documentation and provides status reports on a regular basis.

Determines level of response and resource allocation for NTSB marine safety program. Upon notification of marine accident that warrants NTSB response, notifies NTSB's Chairman and Managing Director, U.S. Coast Guard, international or domestic federal agencies, e.g., State Department, foreign embassy and/or flag state representatives, as appropriate. Serves as hearing officer for public hearings. Coordinates the allocation of staff resources with other Office Directors involved in the investigation. Resolves differences between modal and support staff views regarding accident investigation scope, required resources, and analysis. Ensures, through complete and comprehensive review of the draft report, that essential issues are adequately addressed, all findings and recommendations are supported by analysis and that the draft sent forward is of the best quality. Ensures the proper presentation of the draft report before

the Board at Board meetings.

Reviews work product of other modal and support offices. Ensures quality is commensurate with NTSB standards to promote success of NTSB marine safety program, including investigations, reports, safety recommendations and the marine safety advocacy.

Establishes and maintains liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, Federal regulators, etc. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. May be called upon to provide Congressional testimony.

Represents NTSB and serves as a member of the United States delegation at all International Maritime Organization (IMO) meetings regarding marine accident investigation issues.

Develops and justifies estimates for staff resource requirements, including personnel, funding, equipment and office space. Presents, justifies, and defends budget to all levels of management.

Implements concepts to get results through people. Makes selections, assigns work, trains and rewards employees, and corrects poor performance in a manner which maximizes the use of staff skills in achieving organizational goals. Monitors work status through formal and informal means and procedures. Ensures that appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated. Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communication between employees and their supervisors. Ensures that employees are given a real and continuing opportunity to influence their work environment and are able to participate in discussions related to methods of work accomplishment.

Essures reasonable equity within OMS of performance standards and rating techniques developed by subordinates. Ensures equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work. Evaluates subordinate supervisors and senior non-supervisory managers and serves as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors.

Evaluates program accomplishments and their overall effectiveness. Identifies program problem areas and solicits from Division Chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions, as needed.

Works closely with HR in improving the recruitment, placement and retention of a high-quality OMS workforce. Ensures that crucial training courses needed to keep pace with today's technological improvements in marine transportation safety are provided to the staff for their technical and operational currency, as well as their development in non-technological areas. Provides effective management training to maintain a highly motivated and cohesive workforce.

Relates Equal Employment Opportunity concepts to overall responsibilities. Supports Affirmative Action Plan items while performing assigned responsibilities.

The critical nature of the work of this position requires the incumbent to be available 24 hours per day, seven days a week.

**PROGRAM SCOPE AND EFFECT** Factor Level 1-x (xxx pts.)

The Director, Office of Marine Safety heads a major operating program which investigates marine transportation accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation policies, practices and systems in government and industry. The program directly involves the Agency's national mission, has nationwide and international impact on public safety issues within the marine manufacturing and transportation industry, and receives frequent congressional and media attention.

ORGANIZATIONAL SETTING Factor Level 2-x (xxx pts)

The incumbent reports directly to the Managing Director, National Transportation Safety Board.

SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED Factor Level 3-x (xxx pts)

The incumbent operates under the general supervision and policy direction of the Managing Director. The Director, Office of Marine Safety, oversees the overall planning, direction and timely execution of the marine safety program which is carried out by approximately 22 employees in the Office of the Director, the Major Investigations Division, and the Report Development Division. The incumbent has the full range of supervisory and management authority for subordinate supervisors and employees in development, assignment, and clearance of long range goals and objectives for the program. Exercises discretionary authority for the allocation and expenditure of funds in the MS investigations and safety program. Exercises final authority for the full range of personnel actions recommended by subordinate supervisors.

Manages the development of policy changes and organizational changes in the OMS investigations and safety program in response to changing priorities and unanticipated needs.

PERSONAL CONTACTS Factor Level 4-x (xxx pts)

The incumbent represents the Safety Board and serves as a spokesperson for the Board with regard to marine safety activities in dealing with other domestic and international Federal, state and other government agencies, military services, Congress, marine industry groups, labor organizations, foreign governments, and public, civic and private safety groups, as appropriate. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. Often, the incumbent is placed in the position of defending agency actions or of persuading other interests to cooperate with approaches that have broad and controversial impact. Incumbent may be called upon to provide Congressional testimony.

DIFFICULTY OF TYPICAL WORK DIRECTED Factor Level 5-x (xxx pts)

The highest level of basic nonsupervisory work directed which constitutes 25 percent or more of the workload is GS-15.

OTHER CONDITIONS Factor Level 6-x (xxx pts)

Supervision exercised by the incumbent involves exceptional integration and coordination through subordinate supervisors who each direct substantial investigative workloads at the GS-14 or higher level. The incumbent's supervision and resource decisions have a direct and substantial impact on the organizations and programs managed. Decisions by the incumbent involve significant internal and external policy issues, major resource decisions to maximize the effectiveness of accident investigation

and prevention, and the need for changes in program goals, organizational structure or delegated authorities to optimize OMS operations. Ensures that all administrative and technical programs are carried out with full conformance with the standards, policies and procedures of the Board.

**EVALUATION**

Total Points:
Point Range
Grade Level:

**FINAL CLASSIFICATION:**

000105

~~ATTACHMENT I~~

# COMPARISON OF CORE FUNCTIONS OF OFFICE DIRECTOR POSITIONS

(By Delegation of Authority)[1]

| Director, OMS[2] | Director, OHS[3] | Director, OAS[4] | Director, RPH[5] |
|---|---|---|---|
| 1. Order an investigation into the facts, conditions, and circumstances of accidents that the Board has the authority to investigate | Same as OMS | Same As OMS | Same as OMS |
| 2. Disclose factual information pertinent to all accidents or incidents as provided for in part 801 of 49 CFR Ch VIII. | | | |
| 3. Determine the probable causes of accidents. | | | |
| 4. Investigate accidents as provided under Sec. 304(a) of the Independent Safety Board Act of 1974 as amended (49 U.S.C. 1131(a)). | | | |
| | | | |

[1] As provided in 49 Code of Federal Regulation ("CFR") Volume 5, Chapter VIII (National Transportation Safety Board) Part 800, Subpart B – Delegation of Authority to Staff Members.

[2] Per 49 CFR 800.2 (h), the **Office of Marine Safety** ("OMS") conducts investigations of marine accidents with the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; determines the probable cause(s) of accidents when



ATTACH EXHIBIT F2f

delegated authority to do so by the Board; initiates safety recommendations to prevent future marine accidents; participates in the investigation of accidents that occur in foreign countries and that involve U.S. registered vessels; and conducts special investigations into selected marine accidents involving safety issues of concern to the Board.

[3]Per 49 CFR 800.2 (g), the **Office of Highway Safety** ("OHS") conducts investigations of highway accidents, including railroad grade-crossing accidents, within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future highway accidents; and conducts special investigations into selected highway accidents involving safety issues of concern to the Board.

[4]Per 49 CFR 800.2(e), the **Office of Aviation Safety** ("OAS") conducts investigations of all aviation accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the Board; initiates safety recommendations to prevent future aviation accidents; participates in the investigation of accidents that occur in foreign countries and involve U.S. registered and/or U.S. manufactured aircraft; and conducts special investigations into selected aviation accidents involving safety issues of concern to the Board.

[5] Per 49 CFR 800.2(f) and (i), the **Office of Railroad, Pipeline, and Hazardous Materials Investigations** conducts investigations of railroad, pipeline, and hazardous materials accidents within the Board's jurisdiction; prepares reports for submission to the Board and release to the public setting forth the facts and circumstances of such accidents; including a recommendation as to the probable cause(s); determine the probable cause(s) of accidents when delegated authority to do so by the Board, initiates safety recommendations to prevent future railroad, pipeline, and hazardous materials accidents; and conducts special investigations into selected railroad, pipeline, and hazardous materials accidents involving safety issues of concern to the Board.

~~ATTACHMENT I, PAGE2~~

000110

ATTACH EXHIBIT F2i

~~ATTACHMENT F~~

# COMPARISON OF AVERAGE COMPENSATION
## OF
## MODAL OFFICE DIRECTORS

(01/01/2003 – 12/31/2004)

| Name | 2003 Salary | 2003 SES Award | 2004 Salary | 2004 SES Award | Total Comp | Average annual Compensation |
|---|---|---|---|---|---|---|
| Clark | $142,022 | $16,080 | $142,022 | $17,000 | $317,124 | $158,562 |
| Osterman | $136,872 | $0 | $140,797 | $9,500 | $287,169 | $143,585 |
| Chipkevich | $142,022 | $16,056 | $142,022 | $16,000 | $316,100 | $158,050 |
| | | | | | $920,393 | $153,399 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Murtagh[1] | $121,583 | $5,400 | $126,963 | $3,400 | $257,346 | $128,673 |

DISCUSSION

This chart depicts the average compensation received by the Directors of the Offices of Aviation Safety ("OAS"), Highway Safety ("OHS"), Railroad, Pipeline, and Hazardous Materials Investigations ("RPH"), and Marine Safety ("OMS") during calendar years 2003 and 2004. Actual yearly salary was determined by dividing the annual salary by 2087[2] and multiplying the result by 80[3] x 26[4]. Total compensation includes salary and cash awards received by each individual during this period. Average annual compensation for the Directors of OAS, OHS, and RPH[5] was computed by dividing the total amount of compensation they received ($920,393) during the two years by six (6). Average annual compensation for the Director OMS was computed by dividing the total amount of compensation she received during the two years by two (2).

[1] Complainant
[2] To convert the annual salary to an hourly salary.
[3] The number of hours in a pay period.
[4] The number of pay periods in a calendar year.
[5] The Directors of OAS, OHS, and RPH are male.

AFFIDAVIT OF ELLEN ENGLEMAN CONNERS

City: Washington

State: District of Columbia

I, **Ellen Engleman Conners**, make the following statement freely and voluntarily to Paul Greenberg, who has identified himself to me as an EEO Contract Investigator investigating a formal complaint of discrimination filed by Marjorie M. Murtagh against the National Transportation Safety Board (NTSB) on April 18, 2005, Agency Number NTSB-2005-02. I am advised the issues accepted for investigation are:

1. Whether Complainant was discriminated against on the basis of sex in violation of the Equal Pay Act and Title VII, Civil Rights Act of 1964, in that she received less compensation than that received by similarly situated male Office Directors.

2. Whether Complainant was treated disparately based upon sex when on January 3, 2005 she was denied the same authority to fill vacancies in the Office of Marine Safety as afforded similarly situated male Office Directors.

Knowing this statement is not confidential and may be shown to any interested party, I solemnly affirm the following:

**1. Please identify your position with the NTSB?**

I am a Board member, and I am the Chairman-designate.

**2. How long have you held this position?**

I became a Board member in March 2003, and served as Board member and Chairman. My term as Chairman ended in March 2005. I have been re-nominated to serve as Chairman, and am serving as a Board member while awaiting confirmation.

**3. Please identify your gender.**

Female.

**4. Describe your role in setting pay classifications and rates for Office Directors at NTSB. If you did not play a role in setting pay rates for Office Directors, please identify who did.**

I do not have a role. With regard to the number of SES positions that we have, this is handled through Human Resources through a request process to the Office of Personnel

 Initials [signature]

Management.

The agency is allocated a certain number of SES positions, and we have the ability to request additional slots. The NTSB has made such requests, and OPM's responses come back to Human Resources, the Managing Director and the Chairman. When a new SES position is available, we have discussions about where it should be assigned. The Chairman's office has a role in this, but it is a relatively rare event. I believe we have had SES positions to assign only twice since 2003: once when we were allocated an additional SES position by OPM and once when a position which previously had been designated as an SES was shifted to an SL position.

The Chairman is designated by statute as the chief executive officer of the agency, so technically I have been involved in making these assignments. However, this is done with the advice of Human Resources and the Managing Director.

5. **Are you aware of disparities in pay classifications among the Office Directors? If so, what is your understanding of the reasons for these disparities?**

I was aware that not all Office Directors were SES employees, particularly the Directors of the Office of Highway Safety and the Office of Marine Safety. The reason they were not classified as SES positions is very simple: we did not have enough SES positions within the agency. This was the situation when I came to the NTSB in 2003.

6. **The Complainant has asserted the duties of the Modal Office Directors are similar, and that the jobs call for similar skill, effort and responsibility. Please respond.**

I agree, although the differentiating factor is the workload.

Of course, we cannot forecast when there will be accidents. By law, all civil aviation accidents must be investigated, and there are more than 1700 such accidents each year, so the Office of Aviation Safety always has a large workload. But the situation with the other modes is different, because investigations are performed at the discretion of the agency. As a result, the number of investigations is variable. Generally, we determine whether to conduct an investigation based upon the number of deaths or the amount of property damage involved and the safety issues involved.

So the workload in the other modes varies, and is largely controlled by the Office Directors. The Directors make preliminary recommendations whether to investigate to the Managing Director and NTS Board member on duty, and a decision to proceed is made based on the established criteria and the availability of agency resources.

7. **When were the other Office Director positions converted to SES positions? Did the Complainant ever speak with you about her classification or compensation level? Please describe the conversation.**



Initials ____

The position of Director, Office of Highway Safety, was converted to an SES position during my tenure as Chairman when an SES slot became available. I do not know when the other Office Director positions were converted.

When I came to the NTSB as Chairman, it was my goal to make all the Office Directors SES positions either through requesting new slots from OPM or by shifting existing slots within the agency. We converted the OHS Director position first, before the OMS Director job. There are 43,000 highway deaths each year, in contrast to several hundred marine deaths. OHS is a bigger office, so we moved first with OHS and then planned to elevate the OMS position when an SES slot was available. In both situations, however, it was always understood that when the job classification was changed the incumbent Director would have to apply competitively for the new SES position.

Ms. Murtagh did speak with me once about being paid overtime. Frankly, I thought the conversation was slightly bizarre. She asked me whether I was aware she was not a member of the SES, and suggested that because she was not in an SES position the agency should pay her overtime to make up for that. I explained that the agency was looking for an additional SES slot so that the status of the OMS Director position could be raised, at which point she could apply for the job.

Ms. Murtagh was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors. I promised I would look into the situation. I discussed this with someone within the agency, either Dan Campbell or Lisa Love.

I thought the request was very bizarre. Ms. Murtagh knew we were looking for the additional SES slot, and I was encouraging her to apply for the position at the SES level when it became available.

I worked as a CEO in the private sector before coming to the NTSB, and I am accustomed to the proposition that an employee might argue for more pay based on additional performance. But Ms. Murtagh's argument was devoid of such reasoning, it was simply "Even though I am not classified as an SES employee, I'm entitled to the same pay."

8. **Are there Deputy Director positions within the other Offices that are paid at the SES level? Why would these positions be classified as SES, while the OMS Director position would not be?**

I know there are Deputy Directors at the SES level, for example, in the Office of Aviation Safety.

The reason the OMS Director position was not classified as an SES position was that we did not have an available slot, and OMS is the smallest of the Modal Offices. Ironically,



Initials ____

during my first two years at the NTSB there were about six major marine accidents, but this is atypical. The work of the other Offices is simply greater. Aviation Safety is huge by comparison. Railway, Pipeline and Hazardous Materials is responsible for three modes of transport. And there are 43,000 highway deaths each year.

No one was isolating the Office of Marine Safety, but it logically was last in the queue. Actually, it is my hope ultimately to make all the Deputy Directors SES positions, also.

9. **Did the Complainant talk to you about being paid overtime as a means for bringing her compensation closer to that of the male Office Directors? Did you discuss this with the Managing Director, Dan Campbell, or with Human Resources? What was your decision and response.**

Yes, this is the method she proposed for raising her compensation. I thought it was bizarre for a manager to suggest being paid overtime.

Can it be done? I do not believe managers are entitled to overtime, unlike the investigators, for instance. I do not recall whether I made a specific decision to deny Ms. Murtagh overtime, but I would have. I do not even recall whether it would have been possible to pay her overtime.

10. **After the discussion about possible overtime, did you evade further requests by Ms. Murtagh to discuss her compensation request? Was Ms. Murtagh ever told she would not be paid overtime?**

On several occasions, Ms. Murtagh asked me for follow up meetings. On the initial occasions, I was genuinely busy and did not have the time to meet with her. Later, I knew the SES slot for the OMS Director job was being processed, so I felt it was not appropriate to meet.

I am not sure whether Ms. Murtagh ever was contacted to be told she would not be paid overtime, no.

11. **Was the decision to pay the OMS Director as a GS-15, rather than at the SES level, related to the fact that the OMS Director was female?**

Absolutely not.

12. **Complainant describes several situations in which she had advertised, interviewed and selected a candidate for various positions, only to be told that she could not fill the job with the selectee. For example, earlier in 2005 she states she was denied an opportunity to hire a Marine Accident Investigator. Do you have any information about this?**

I probably had a role in this. I had asked all senior managers to get together and consider

 Initials

filling positions based upon our vision for the agency, rather than just backfilling open positions.

We identified 73 positions in the agency and began a process of prioritizing which would be filled. Early in 2004, we decided as a team that the first positions to be filled would be openings on the regional aviation investigation teams.

The agency had about 426 employees, and we were expecting to drop to about 415 positions, then 411. We were trying to avoid creating a situation where we would need to implement a reduction in force (RIF). Therefore, a lot of positions in each Office were not being filled to avoid having a RIF. We were very focused on filling just the priority slots, some of which had been mandated by Congress.

With regard to the Marine Accident Investigator position, I have no specific recollection.

13. **Complainant describes a situation several years ago in which she had advertised, interviewed and selected a candidate for the position of Chief, Report Development, only to be instructed she could not fill the job. Do you have any information about this position?**

I have no recollection of this.

14. **Around 2000, the then-Deputy Director of OMS left the NTSB. Complainant has claimed she was prohibited from hiring a new Deputy Director, making OMS the only Office without a Deputy. Do you have any information about this?**

I have a vague recollection that OMS was not allowed to fill the Deputy Director position, but I do not recall the circumstances.

15. **Were other Office Directors allowed to fill vacancies in their units during this time frame? If so, please identify by name, gender and division. Which positions were they allowed to fill?**

Some Office Directors were allowed to fill positions, and others were not allowed. It was all based on the needs of the agency and funding. For example, the Director of the Office of Research and Engineering, Verne Ellenstad, was very unhappy during this period that he was not allowed to fill some vacant positions in his unit.

16. **Was Ms. Murtagh's being denied opportunities to fill vacant positions related to her gender?**

Absolutely not. As an executive and as a woman, I find it insulting that she would even suggest this.

17. **What other witnesses do you believe have information that would be relevant to**



Initials *[initials]*

000165

**your discrimination claim?**

Dan Campbell and Lisa Love

18. **Do you have any documents that are relevant to your claim of sex and pay discrimination? If so, please provide them.**

None.

19. **Is there anything else you would like to add?**

No.

I have read the above statement consisting of 6 pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

10-17-05
Date

Ellen Engleman Conners

Witness



Initials

0001bb

# *PRIVACY ACT NOTICE TO EEO COMPLAINT INTERVIEW WITNESSES (OTHER THAN COMPLAINANT) FOR DISCRIMINATION COMPLAINT INVESTIGATION INTERVIEW*

## GENERAL

This information is provided pursuant to Public Law 93-579 (Privacy Act of 1974), December 31, 1974, for individuals supplying information for inclusion in a system of records.

## AUTHORITY

The authority to collect the information requested by affidavit, statement or other type of testimony is derived from one or more of the following:

Title 5, Code of Federal Regulations, Sections 5.2 and 5.3; Title 29, Code of Federal Regulations, Section 1613/1614; Title 5, United States Code, Sections 1303 and 1304; Title 42, United States Code, Section 2000e-16; and Executive Order 11478, as amended.

## PURPOSES AND USES

The information you supply will be used along with data developed to resolve or otherwise determine the merits of the equal employment opportunity (EEO) complaint of discrimination and/or reprisal. This information may be furnished to designated officers and employees of agencies and departments of the Federal Government in order to resolve or otherwise determine the merits of the EEO complaint of discrimination and/or reprisal. The information may also be disclosed to any agency of the Federal Government having a working relationship with regard to Equal Employment Opportunity Commission activities, or to others for uses as published in the Federal Register.

## EFFECTS OF NON-DISCLOSURE

Disclosure of the information sought is voluntary; however, failure to furnish the information will result in a direction by the head of the agency, or his/her designated representative, to produce or provide such information as is available. Failure to provide the information at that time may result in the initiation of disciplinary proceedings against you up to and including removal. Applicants in such cases may be refused employment.

Disclosure of information by present or prospective Government contractors is also voluntary, although failure to furnish the above requested information where the contract so provides may result in administrative sanctions, including disqualification to enter into a contract or termination of an existing contract.

| | |
|---|---|
| [signature] | [signature] |
| Signature of Interviewer | Signature of Affiant |
| 9/30/05 | Washington DC |
| Date | Place |

# National Transportation Safety Board

## POSITION DESCRIPTION

Organizational Title: Director, Office of Marine Safety
Organization: Office of Marine Safety
Classification: Supervisory Accident Investigator, GS-1801-15

### INTRODUCTION

This position is located in the Office of Marine Safety, National Transportation Safety Board (NTSB). The Office manages major marine transportation investigations for which go-teams are sent to the accident site. The Office investigates selected accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation regulations, requirements, policies, practices and systems in government and industry.

The incumbent serves as the Director, Office of Marine Safety (OMS), responsible for providing staff supervision and resource management, as well as overall management and direction of international and domestic marine accident investigations and reporting processes, recommendation development and marine safety program advocacy and oversight.

### MAJOR DUTIES

Plans, manages, directs and evaluates the work of the Office of Marine Safety and exercises important policy-making and policy-determining decisions impacting marine safety at the Board, at international maritime organizations, other Federal agencies and the international and domestic industry. Provides for the overall direction and technical accuracy of the investigation and reporting processes for major marine accidents.

Develops the overall requirements and schedules to accomplish the marine safety program. Reviews, approves and promulgates schedules and milestones for assigned activities. Reviews, evaluates and approves, disapproves or modifies requests for changes to milestones and schedules. Develops overall program review documentation and provides status reports on a regular basis.

Determines level of response and resource allocation for NTSB's marine safety program. Upon notification of a marine accident that warrants NTSB response, notifies NTSB's Chairman and Managing Director, the U.S. Coast Guard, international or domestic Federal agencies (e.g., State Department), foreign embassies and/or flag state representatives, as appropriate. Serves as hearing officer for public hearings. Coordinates the allocation of staff resources with other Office Directors involved in the investigation. Resolves differences between modal and support staff views regarding accident investigation scope, required resources and analysis. Ensures, through complete and comprehensive review of the draft report, that essential issues are adequately addressed, all findings and recommendations are supported by analysis and that the draft sent forward is of the best quality. Ensures the proper presentation of the draft report before the Board at Board meetings.

Reviews work product of other modal and support offices. Ensures quality is commensurate with NTSB standards to promote success of NTSB marine safety program, including investigations, reports, safety recommendations and the marine safety advocacy.

Establishes and maintains liaison with international and domestic industry, safety groups, labor organizations, associations, societies, Congress, Federal regulators, etc. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. May be called upon to provide Congressional testimony.

Represents NTSB and serves as a member of the United States delegation at all International Maritime Organization (IMO) meetings regarding marine accident investigation issues.

Develops and justifies estimates for staff resource requirements, including personnel, funding, equipment and office space. Presents, justifies and defends budget to all levels of management.

Implements concepts to get results through people. Makes selections, assigns work, trains and rewards employees, and corrects poor performance in a manner which maximizes the use of staff skills in achieving organizational goals. Monitors work status through formal and informal means and procedures. Ensures that appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated. Responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communication between employees and their supervisors. Ensures that employees are given a real and continuing opportunity to influence their work environment and are able to participate in discussions related to methods of work accomplishment.

Ensures reasonable equity within OMS of performance standards and rating techniques developed by subordinates. Ensures equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work. Evaluates subordinate supervisors and senior non-supervisory managers and serves as the reviewing official on evaluations of non-supervisory employees rated by subordinate supervisors.

Evaluates program accomplishments and their overall effectiveness. Identifies program problem areas and solicits from Division Chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions, as needed.

Works closely with HR in improving the recruitment, placement and retention of a high-quality OMS workforce. Ensures that crucial training courses needed to keep pace with today's technological improvements in marine transportation safety are provided to the staff for their technical and operational currency, as well as their development in non-technological areas. Provides effective management training to maintain a highly motivated and cohesive workforce.

Relates Equal Employment Opportunity concepts to overall responsibilities. Supports Affirmative Action Plan items while performing assigned responsibilities.

The critical nature of the work of this position requires the incumbent to be available 24 hours per day, seven days a week.

**PROGRAM SCOPE AND EFFECT** Factor Level 1-5 (900 pts.)

The Director, Office of Marine Safety, heads a major operating program which investigates marine transportation accidents and incidents; develops proposed probable cause(s) of accidents; formulates recommendations to minimize recurrence of similar accidents; prepares detailed reports for use by other

000901



international and domestic government agencies, Congress, the transportation community and the traveling public; and improves public safety by advocating changes to international and domestic marine transportation policies, practices and systems in government and industry. The program directly involves the Agency's national mission, has nationwide and international impact on public safety issues within the marine manufacturing and transportation industry, and receives frequent Congressional and media attention.

**ORGANIZATIONAL SETTING** Factor Level 2-3 (350 pts)

The incumbent reports directly to the Managing Director, National Transportation Safety Board.

**SUPERVISORY AND MANAGERIAL AUTHORITY EXERCISED** Factor Level 3-4 (900 pts)

The incumbent operates under the general supervision and policy direction of the Managing Director. The Director, Office of Marine Safety, oversees the overall planning, direction and timely execution of the marine safety program, which is carried out by approximately 22 employees in the Office of the Director, the Major Investigations Division and the Report Development Division. The incumbent has the full range of supervisory and management authority for subordinate supervisors and employees in development, assignment and clearance of long range goals and objectives for the program. Exercises discretionary authority for the allocation and expenditure of funds in the MS investigations and safety program. Exercises final authority for the full range of personnel actions recommended by subordinate supervisors.

Manages the development of policy changes and organizational changes in the OMS investigations and safety program in response to changing priorities and unanticipated needs.

**PERSONAL CONTACTS** Factor Level 4-4 (225 pts)

The incumbent represents the Safety Board and serves as a spokesperson for the Board with regard to marine safety activities in dealing with other domestic and international Federal, state and other government agencies, military services, Congress, marine industry groups, labor organizations, foreign governments and public, civic and private safety groups, as appropriate. Provides authoritative advice and expertise to these groups in the development of industry standards and regulations, technology and new applications of existing technology. Often, the incumbent is placed in the position of defending agency actions or of persuading other interests to cooperate with approaches that have broad and controversial impact. Incumbent may be called upon to provide Congressional testimony.

**DIFFICULTY OF TYPICAL WORK DIRECTED** Factor Level 5-8 (1030 pts)

The highest level of basic nonsupervisory work directed which constitutes 25 percent or more of the workload is GS-15.

**OTHER CONDITIONS** Factor Level 6-6 (1325 pts)

Supervision exercised by the incumbent involves exceptional integration and coordination through subordinate supervisors who each direct substantial investigative workloads at the GS-14 or higher level. The incumbent's supervision and resource decisions have a direct and substantial impact on the organizations and programs managed. Decisions by the incumbent involve significant internal and external policy issues, major resource decisions to maximize the effectiveness of accident investigation and prevention, and the need for changes in program goals, organizational structure or delegated authorities to optimize OMS operations. Ensures that all administrative and technical programs are carried out with full conformance with the standards, policies and procedures of the Board.

000902



**EVALUATION**

Total Points: 4730
Point Range: 4055-up
Grade Level: GS-15

**FINAL CLASSIFICATION: Supervisory Accident Investigator, GS-1801-15**