# EXHIBIT NO. 12

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------------X

MARJORIE MURTAGH COOKE :

Plaintiff :

v. : Case No.:

MARK ROSENKER, Chairman, : 1:06CV01928

NATIONAL TRANSPORTATION :

SAFETY BOARD :

Defendant :

--------------------------------------X

Videotaped Deposition of

ELLEN ENGLEMAN CONNERS

Washington, D.C.

Thursday, October 25, 2007

9:30 a.m.

Job No.: 1-115016
Pages 1 - 170
Reported by: Ellen L. Ford, RPR

Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006

Pursuant to agreement, before Ellen L. Ford, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
R. SCOTT OSWALD, ESQUIRE
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
1100 L Street, Northwest
Washington, D.C. 20005
(202) 353-7978



A P P E A R A N C E S (Continued)

ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
DENISE M. D'AVELLA, ESQUIRE
NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6086

ALSO PRESENT: Scott Forman, Videographer
Marjorie Murtagh Cooke, Plaintiff
Quan Luong, Esquire, US Dept. of Justice



C O N T E N T S


| EXAMINATION OF ELLEN ENGLEMAN CONNERS | PAGE |
|---|---|
| By Mr. Oswald | 7 - 164 |
| By Mr. Luong | 164 - 165 |


- - -

E X H I B I T S

(Exhibits retained by counsel.)


| ENGLEMAN CONNERS EXHIBITS | PAGE |
|---|---|
| No. 1 - Performance Appraisal Form | 86 |
| No. 2 - Affidavit | 143 |
| No. 3 - signed document | 144 |
| No. 4 - Performance Evaluation Form | 145 |
| No. 5A and B - e-mails | 146 |

understand.
Q My question is, when if ever did you become aware that any of the Directors of the four investigative modes at the NTSB were paid differently?
MR. LUONG: I'm just going to object to the term "differently" as vague.
COURT REPORTER: As what?
MR. LUONG: Vague.
COURT REPORTER: Thank you.
A I'm sorry. I really don't understand your question.
Q All right. When if ever did you become aware that any of the Directors at the NTSB -- Highway, Marine, Aviation or Rail -- were concerned about the fact that he or she was paid differently from other Directors at the NTSB?
MS. COHEN: Objection; assumes facts not in evidence.
Q You may answer the question.
A It's the way you're phrasing it, I'm having a hard time understanding exactly what you're asking.
When we did -- when I was presented with the



first, what you would call the annual performance review, the recommendation of bonuses, there was an SES pool, and so I could see from the listing who was an SES and who was not an SES.
So at that point, I guess you could say I was aware that people were paid that had different -- they were in different grade levels.
Paid differently is confusing to me because everyone is paid under the Federal Civil Service System, and that has grade levels, and it has time, and it has all these other things.
So, I mean, just sundry, everybody is paid differently even within the same grade level. You can have two people who are in the same grade level, but because they have different years, then one is a Level 2 and one is a Level 8. They're technically paid differently, but they're paid legally according to the pay schedule.
Q I understand.I?
A So I'm just struggling with your paid differently statement because --
Q I understand. When if ever did you become



aware that any of the Directors of the four investigative functions, the modes at the NTSB, were paid a different amount of money over the course of an annual basis?
MS. COHEN: Objection; assumes facts not in evidence.
A I can't answer your question other than the way I just answered it. Everyone was paid differently. Everyone was paid according to the Civil Service schedule of their grade level, and where they came in at, and years experience, and all of this stuff. So everybody was paid differently. Everyone was paid according to where they were on the schedule.
Q And what concerns did you have that there was -- there were individuals who were different places on the schedule and, therefore, paid differently?
MS. COHEN: Objection; assumes facts not in evidence.
A I had -- I mean, I don't understand. What concerns could I have? I don't control the Civil Service pay scale.



Q I understand.
A This isn't the private sector where the CEO can change people with, you know, whatever decision they make. There's a set of rules, and everyone is paid according to where they are within the Civil Service schedule. I don't know how else to explain it.
Q I understand. All right. Let's now focus on April of 2004.
When if ever did Marjorie Murtagh Cooke come to your office and notify you that she believed that she was being paid differently than other Directors at her same level of the various modes in the investigative function at NTSB?
A We had a meeting, but I don't remember that that's the phrase that she used.
Q Okay. What do you remember?
A Marjorie came to my office -- and I don't remember exact words as in it's been years -- but it was -- she stated that she wasn't an SES, her office wasn't an SES, and she didn't make as much money as the folks who had an SES. So --

Page 54

Q What else?
A And she wanted me to fix that, and she said -- she requested overtime.
Q What else?
A That was pretty much it.
Q Now, the meeting that you had with Marjorie Murtagh Cooke, was it scheduled or was it impromptu?
A Scheduled, I believe.
Q Okay. And how did Marjorie Murtagh Cooke go about scheduling the meeting with you?
A I don't remember.
Q How would anyone of your -- in the NTSB that had either first or second-line reporting schedule a meeting with you?
A Two ways, or three ways or four ways, actually.
You could check with my Chief of Staff who would schedule; you could grab me in the hallway; you could see me after a meeting or after a hearing; or we had open office hours like every Wednesday or ever other Wednesday, as often as -- unless I was out on an accident or something like that. But I kept like an

Page 55

open office hour at least once a month where you just kind of walked in; and then the fifth way was people would just show up at my doorway.
Q Okay. And if one wanted to schedule a meeting with you, when if ever would be appropriate to send you an e-mail and ask you to schedule a meeting?
A Anytime.
Q That was appropriate to do that?
A Mm-hmm.
Q Is that -- I'm sorry. Is that a yes?
A Yes. I'm sorry. Yes. Mm-hmm is a yes.
Q Thank you. All right. So the meeting takes place in your office; is that right?
A Yes.
Q All right. And where were you seated?
A (non-verbal response.)
Q Behind your desk? Did you have the meeting at a conference table in your office?
A I don't remember specifically. I usually sat at a conference table rather than behind my desk. It would depend on the day. I mean if it was one of those -- if someone was just kind of coming in and

Page 56

out, I might stay behind my desk, sometimes I would sit at the conference; it was kind of 50/50. I don't remember specifically.
Q All right. And then who spoke first at the meeting with Marjorie Murtagh Cooke?
A I have -- whoever said hello first.
Q What knowledge did you have that the topic that Marjorie Murtagh Cooke wanted to raise with you?
A I don't remember having any --
Q Any foreknowledge.
A No.
Q I understand. And what was -- after the general greeting of hello, what was the first thing you remember Marjorie Murtagh Cooke saying to you?
A I don't. I mean, I don't remember very much about the meeting other than the request for overtime, which I thought was bizarre.
Q Why was it bizarre?
A Because it was -- it was out of context. It was -- it was bizarre. It was just out of the blue.
Q Why was it out of the blue?
A Well, I remember -- one of the things I

Page 57

remember of the meeting is it wasn't a very long meeting. This wasn't a long meeting or discussion or anything like that, it was just kind of out of the blue. And it was kind of like, "I'm here. I'm not an SES so you need to fix that by paying me overtime."
There was no justification, no rationale, no, "I've been working 60 hours a week and here are my hours," or anything.
It was just like, "You need to fix this, and here's what you need to do and." I felt like it was just a bizarre request. There was no -- I didn't understand where it was coming from.
Q Okay. And when if ever did you ask Marjorie Murtagh Cooke where her request was coming from, in your words?
A Well, I mean, during the -- I think I said something like, "Oh," or, "Whatever." But there was nothing else forthcoming. It was just kind of like, "I'm here. I want you to give me overtime." And there was nothing else behind it.
It was just out of the blue. It was kind of bizarre. My feeling was this is bizarre. That's all.

Page 58

Q Why was it bizarre for Marjorie Murtagh Cooke to ask you to pay her overtime to equalize her wage with the other Directors of the divisions?
A Well --
MR. LUONG: Objection; I think that mischaracterizes the earlier testimony.
Q You can answer the question.
A First of all, she didn't say to equalize. She didn't suggest that. It's just like, "I'm not an SES so you have to make up for it." I mean, that was the context.
It was -- there was no anything like that. It was like a small child is upset that you didn't buy them the toy -- that their father didn't buy them the toy in the window, and you're the aunt, so therefore, you have to buy the toy.
I mean, it was just out of the blue. I didn't understand it. She was a manager. I didn't know if it was possible to pay a manager overtime.
There were a lot of things about it I didn't understand, so it was just a bizarre request.
I had never had a department head in government,

Page 59

in my experience in government, make a request like that at either of the agencies that I had worked for. So it was not something I had experienced before, and it was, as I said, kind of out of the blue.
So bizarre is the only word -- I mean, bizarre meaning not bad, not good, but out of the blue, different than what normally one has as a conversation.
Q Well, why was it in your mind inappropriate for her to ask you to make up the differential between what she was being paid and what the other Directors were being paid?
MS. COHEN: Objection; mischaracterizes evidence.
MR. LUONG: Objection.
Q You may answer the question.
A I didn't say it was inappropriate, I said it was bizarre and I hadn't experienced it before.
I didn't know the answer, and I said I would look into it.
So I didn't judge it one way or another other than its uniqueness in the request. When I say

Page 60

bizarre, I'm not saying negative, I'm saying unusual, different, something I hadn't experienced and I didn't completely understand.
And normally, when -- my experience has been if someone comes and says I want a raise or I want a new job or this or that, they kind of lay out their case. They pitch it to you. Not a declaratory sentence. So it was a unique -- it was just unique. I said I would look into it and, I mean, that's all I could do at the time.
I'm not in charge of the pay schedule for the Civil Service. I didn't hire her. I didn't know all the circumstances. There was no justification on her part when she met with me to explain what was her concerns. It was just kind of, as I said, like a declaratory sentence. "You need to do this." Okay.
Q Well, when Marjorie Murtagh Cooke said to you that she was entitled to be paid at the same level as the other Directors, what did you understand her to mean by that?
MR. LUONG: Objection; assumes facts not in evidence.

Page 61

A She didn't say that. She didn't say she was entitled to be paid what the other Directors were. That's not the words that she used. She did not say that.
Q You're certain.
A Yeah.
Q Okay. Now, the -- okay. When you told her that you would look into it --
A Mm-hmm.
Q -- how did you tell her that you were going to look into equalizing her pay with the other Directors?
A I never said I would equalize --
MR. LUONG: Objection.
A I did not say I would look into equalizing her pay with the other Directors, I said I would look into her request for overtime. That was the request that she made to me. She did not say, "equalize my pay," she said, "you should give me overtime because I'm not an SES and they are." That's what I heard and what I understood her request to be.
Somehow I was supposed to bend the rules, or make

the rules be that way, or implement rules if they already existed, or find the rules or what. I wasn't sure exactly what I was supposed to do, but I knew I needed to find out more because she had made the request and I understood it to be that.

But my understanding was confused because, again, there was no justification, there was no pitch, there was no demonstration of this is the issue and dah dah dah dah and all that kind of stuff. It's just here are the facts.

I knew that she was not an SES, and she knew she was not an SES. Okay? She was a 15, they were an SES.

I was working in the larger whole to try to create SESs -- more SESs in the organization, but they're not something you can just pull out of your pocket, nor do I have signature authority to just make someone's pay change just because someone says they're not happy with the fact that the position that they hold is a 15.

Well, that's what it was, and I -- that's just what we all had at that time. It was the way it was.



So that being said, I was trying to figure out, do managers get overtime? Do department heads get overtime?

In the private sector, a department head did not get overtime. You would have a salaried position and you would be -- have the good luck to be on board 90 hours a week no matter what because that's the way it is if you're in a salaried position.

So it was unique from that perspective because, as a department head, I though well, I don't even know if you even can qualify for overtime as a department head.

So I couldn't say yes, Marjorie, I will give you overtime because I didn't know if by law I was allowed to give overtime. Because it's Civil Service. And the one thing I know is you have to check the rules because they're different.

So I couldn't answer her one way or another at that time anyway until I found out more. So all I could do was say, "All right, I will look into it." There were a lot of other questions, but I couldn't just -- and I couldn't just say, "Okay, here's your



overtime slip."

Q When if ever did she suggest that one of the things you could do was also give her a bonus to equalize her pay?

A I don't remember bonus, I just remember the overtime. I don't remember her asking for a bonus.

Q Okay.

A And in fact, she had received a bonus in the prior performance review, so I knew -- I mean, she -- that's why I don't remember her asking for a bonus because I would have said, "Well, you just -- you did get one," or something like that. But that part of the conversation didn't occur because -- that I remember, because she received a bonus the prior year, I do know that.

Q Okay. So I just want to make sure I understand this. Marjorie Murtagh Cooke did or did not ask you to use either overtime, bonus or other supplemental pay to equalize the pay that -- to make up the pay differential between herself and the other office directors?

MR. LUONG: Objection; asked and



answered.

MS. COHEN: Objection; compound question.

MR. LUONG: Asked and answered, as well.

A That is not how she phrased it. That is not the conversation I remember.

Q I understand. And when did you say that you would get back to Marjorie Murtagh Cooke after she met with you in April of 2004 --

MS. COHEN: Objection; assumes facts not in evidence.

Q -- and requested that you pay her overtime or additional monies to equalize her pay with the other Directors?

A Again, that's not what she asked. She asked for me to pay her -- she asked for me to pay her overtime. That's what I remember. I don't remember her using those other words, as I've already answered several times.

I did not give her a time certain. I said I would look into it. I did not say, "I will get back

to you by noon tomorrow."
Q All right. And how did you go about looking into it?
A That same day I went and saw Dan Campbell and relayed the conversation to him.
Q All right. Where did that meeting occur?
A Pardon?
Q Where did that meeting occur with Dan Campbell?
A I think I walked over to his office. It was -- I mean, we tried to touch base at least once a day, so it was probably, you know, towards the end of the day, it was kind of like here's a list of things that -- kind of touch base how the day went, that type of thing. So it was one of several items.
Q All right. And what did you say?
A "I had this really bizarre conversation with Marjorie."
Q And how did he respond?
A He said, "What happened?"
Q What how did you reply?
A I told him.



Q What did you say?
A She came in, she said that she wasn't -- you know, she was a 15, the others were SESs, and she wanted -- she made a request for me to pay her overtime. It was like two sentences, basically what happened.
Q And how did he respond to what -- to that?
A He said, "Really," or something to that effect.
Q What did you say in reply?
A I said, "Yeah. So can we do this? I mean, I don't know," and I just started explaining all my questions. I said, can -- I mean, I just started saying, you know, I said, "I didn't know how to answer her. I have no idea. Do department heads get overtime? I haven't run into that before. I mean, how does it work? I'm not really sure," you know, "What are the rules?" You know, just explaining all the things I didn't understand about it, because I was looking to get an education, too.
Q And how did Dan Campbell respond?
A He said, I don't know, something like he



would get into HR. I mean, we didn't -- it was towards the end of the day. It wasn't that we had a long time period. It was one of several items that we were chatting about so it was like, "Well, I'll take care of it."
Q And after he said that he would take care of it and get it to HR, then what did you say?
A "Great, thanks," and just moved on. We had a list of stuff so --
Q All right. And when was the next time that you talked to Dan Campbell or anybody else about Marjorie Murtagh Cooke's request that the NTSB pay her more in light of the fact that she was not the same pay level as the other Directors?
MS. COHEN: Objection; assumes facts not in evidence.
A That wasn't her request. Her request was for overtime. So I can't respond to your question because I don't agree with it.
I don't remember ever talking about it again. I mean, I delegated it -- I delegated it on. So it wasn't something I remember having another



conversation about.
Q With anybody else.
A I don't remember if I talked to -- I don't remember talking to anyone else. I can't say I didn't, but I don't remember -- I mean, it was -- quite honestly, it was a weird day. It was just part of a -- kind of a weird request. I remember it because it was unusual, it was unique, it was bizarre is the word I've said, because I had never had a request like that. I passed it on to Dan, and that was it. It was not a big deal.
Q Other than Dan Campbell on the day that Marjorie Murtagh Cooke came to your office in April of 2004 and requested that the NTSB pay her overtime --
A Mm-hmm.
Q -- what other NTSB official, if any, did you have a discussion about Marjorie Murtagh Cooke's request or the NTSB's ability to pay her more, overtime or otherwise, between April of 2004 and the time you left the Department in March of 2005?
MR. LUONG: Objection; asked and answered.