# EXHIBIT NO. 13

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

MARJORIE MURTAGH COOKE :

Plaintiff :

vs. : Civil Action No.:

MARK ROSENKER, CHAIRMAN : 06-7480
NATIONAL TRANSPORTATION
SAFETY BOARD :

Defendant :

- - - - - - - - - - - - - - - - x

Washington, D.C.

Wednesday, November 28, 2007

Deposition of:

MARJORIE M. COOKE

the Deponent, called for examination by counsel for the Defendant, pursuant to notice and agreement as to time and place, at 501 3rd Street, N.W., Washington, D.C., before Sean Williams, a Notary Public in and for the State of Maryland.

APPEARANCES:
On Behalf of the Plaintiff:
DAVE SCHER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006-3307
(202) 331-2883
On Behalf of the Defendant:
ANDREA McBARNETTE, ESQUIRE
Assistant United States Attorney
U.S. Department of Justice
555 4th Street, N.W.
Washington, D.C. 20530
(202) 514-7153
On Behalf of the Agency:
DENISE M. D'AVELLA, ESQUIRE
National Transportation Safety Board
Office of General Counsel
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594-2000
(202) 314-6086



INDEX

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Marjorie Cooke | Direct - Ms. McBarnette | 4 |

EXHIBITS

| EXHIBIT NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Notes of meeting with Mr. Osterman | 147 |
| 2 | Request for Personnel Action and Unclassified Duties | 154 |
| 3 | Request for Personnel Action | 157 |
| 4 | Answers to Interrogatories | 170 |



PROCEEDINGS

(10:00 a.m.)

BY MS. McBARNETTE:

Q. This is U.S. Attorney Andrea McBarnette for the Defendant, so today I'll be asking you some questions. Have you had a deposition before?
A. Yes.
Q. All right. So I'm going to go over the ground rules. They might be familiar to you.
First of all, when I ask questions, if you don't understand something that I said, certainly stop me. I'll be happy to rephrase it for you or explain it to you.
A. Okay.
Q. If at any time you want to take a break, want to get more water or just take a break, that's fine. We'll stop and we'll accommodate you for that. And you have an attorney. If he chooses to object, we'll pause and let him do his objections and then you can answer after that.
So those are the basic ground rules. And my preliminary question for you today is have you taken any medication or anything that would affect your ability to answer or understand today?



A. No.
Q. All right. So let's start. Can you tell me about your educational background briefly after high school?
A. I went to the Bellevue School of Nursing in New York for a year and decided then to not pursue nursing, went to the -- I went to two community colleges in New York, one at Orange County and the other at Rockland County. Rockland County Community College, I finished my associates degree in -- I think it was science and engineering. And then I graduated -- I went to the State University of New York Maritime College and graduated from there with a bachelor of engineering degree in 1974.
Q. Any other degrees?
A. Other than the associates degree, no.
Q. And did you have a field of special admission?
A. At Maritime College?
Q. Um-hum.
A. Yes, marine engineering and Naval architecture.
Q. Let's talk about your employment. After you graduated from the Maritime Academy, can you tell me about your work history?
A. Yes.
Q. Okay. I know that goes back to, what is it, the 1970s, but if you can keep it brief.

anything.
I think I've covered it all. No awards. I wasn't given any opportunity even to even review how well I was doing, how well I was not doing, if that were the case, in the latter two positions, as well as the latter part of -- after April of 2004, after I had spoken to the Chairman, from that point on I was treated very, very poorly.
Q. Okay. You have listed now a number of actions. Specifically, who do you claim retaliated against you?
A. The Chairman of the Safety Board.
Q. Who would be?
A. Ellen Engleman-Connors. The Managing Director, Daniel Campbell, the new Managing Director, Joseph Osterman, the members of the panel for the 2005 readvertised SES position, the now Chairman, Mark Rosenker, the former General Counsel, Ron Batachi (phonetic sp.). Would you like me to -- you held up your hand. Do you want me to stop or --
A. I'm writing as fast as I can. I was just hoping you'd slightly slow down so I can get the names.
Q. Oh, certainly. If you'd asked me to slow down, I'd be happy to do that. I just didn't understand your signal.
A. Sure. I didn't want to completely interrupt



your flow. I'm sorry. You said Mark Rosenker and then you said --
A. The former General Counsel, Ron Batachi.
Q. Okay.
A. My supervisors, Elaine Weinstein when I was in the Office of Safety Recommendations and Accomplishments, and my -- it's still not clear to me who my supervisor was when I was in the Office of the Managing Director, so it was either Joseph Osterman or, by default, one of his deputies, whoever it was that was responsible for giving me and making sure that I had them. I assume it's Joe Osterman actually who was responsible to make sure that I had performing standards and give me an opportunity to not just to perform, but to -- and, of course, Mr. Osterman in particular because he denied me the opportunity to continue to pursue my marine career.
Q. Okay. Anyone else?
A. I think that's everybody.
Q. Let's start with Ms. Connors. Can you tell me what she did that you claim was retaliatory?
MR. SCHER: Well, just one second, okay? I'm going to let her answer. I'm objecting to this line of questioning as misleading and possibly a mischaracterization, so the -- Ms. Murtagh Cooke's obviously not a lawyer. The details of her allegations



of discrimination are as outlined in her complaint and various motion practice and discovery that's already been submitted. Having said that, she can answer all the questions you want to ask. I just don't want it to be interpreted that her testimony is in any way limiting those claims. Go ahead.
WITNESS: Thank you.
MS. McBARNETTE: Okay. In general objections shouldn't be speaking objections, so any grounds for objections, I'd prefer if we could keep them short. But, in any event --
MR. SCHER: Okay.
BY MS. McBARNETTE:
Q. -- I was asking you about your retaliation claim and you said earlier that you believe that Ms. Connors retaliated against you. Could you please tell me what she did that you believe was retaliatory?
A. When I spoke with Ms. Connors in 2004 I was asking her for some way to make my pay comparable to my male counterparts, the other modal directors, and after that meeting Ms. Connors refused to meet with me again and I believe retaliated in her role with regard to the advertisement and decision to readvertise the position in 2004.
Q. Are you saying that she had a role in



advertising that position again?
A. Yes, she did. She had a role in advertising and in the readvertisement of that position. The lack of equal pay, of course, is a separate issue, I think. Again, I'm not the lawyer. So she, along with Dan Campbell, denied me the opportunity even to be interviewed for that position.
She denied me an evaluation. The evaluation that I received for 2004 -- 2003/2004 was signed by Ms. Engleman-Connors, but it was never given to me by Ms. Engleman-Connors. She had given me my evaluation in 2003 for the 2002/2003 evaluation. I had had a personal meeting with her. She told me how wonderful a job I was doing. It was absolutely outstanding. And she had me sign the paperwork and she signed the paperwork at the same time.
Q. What year was this?
A. This was in November, I believe, of 2003. Yes, November of 2003, so that was my 2002/2003 evaluation. Okay.
Q. Do you recall when Ms. Connors became or entered her position?
A. In 2002, I believe.
Q. Could you give me the beginning of the year, the middle of the year, the end of the year?

but by saying to her I'm not being paid the same as my male counterparts in the modal offices, I felt it was enough information for her to be able to understand that. She's a lawyer or she was a lawyer. I don't know if she is or not, but I felt she was certainly intelligent enough to be able to understand.
Q. Did she say anything to you to indicate that she believed that yes, in fact, you were being discriminated against?
A. Other than the remark about tell me about it, there are deputies who are SES. She was the first one to raise the SES issue. I was not.
Q. And what does tell me about it, there are deputies that are SES mean to you? I know I asked you this before, but if you could clarify what that statement signifies to you.
A. If signified to me that she understood that there were deputies, male deputies, who were being paid more than I was.
Q. Did she say that there were male deputies or did she just say that there were deputies that are SES?
A. She said there were deputies.
Q. But you took it to mean that there were male deputies?
A. There were only male deputies in the other



modal offices.
Q. And you took it to mean that she was only referring to the modal offices?
A. She could have also have meant RE. They also had male deputies in RE who were SES, but you'd have to ask her. She just made the comment. I just moved on from there. It was not the SES that I was specifically focusing on.
Q. Well, this comment you take -- you seem to be taking it as significant. I'm trying to figure out why. On its face it doesn't seem to pertain to gender, so how is it that you took the statement to mean something in regards to gender?
MR. SCHER: Objection, mischaracterization, argumentative. Go ahead.
WITNESS: Yeah. I think I've already answered your questions.
BY MS. McBARNETTE:
Q. Yes. Could you please explain?
A. Please explain?
Q. How is it that you took this statement to mean something regarding gender?
A. Because the Deputy SESers in the other offices were all male.
Q. Did you have a conversation regarding unequal



pay with any other person in the executive branch executives, any other executives?
A. Dan Campbell.
Q. When did you discuss with Dan Campbell that you weren't getting paid the same amount as your male counterparts?
A. There were at least two occasions. The first one came sometime about Bob Chipkevitch had been given the SES in Railroad, and Joe Osterman and I had a meeting with Dan Campbell. We were talking about work and the issue was raised about when were Joe and I going to get SES positions. We weren't being paid the same as -- in fact, it was not when were we going to get SES positions, it was when were we going to get paid the said as Chipkevitch, now Aviation and Mail were being paid at this level, and Dan Campbell we've submitted paperwork. We're consistently submitting paperwork for SES positions, and Joe immediately responded even faster than I did that it was not the SES position specifically that he was interested in, he was interested in the pay and I responded, as I say, virtually at the same time to say the same thing, it was the issue of pay.
Q. Any other time?
A. Yes. When the advertisement was put out for the Director of the Office of Highway Safety, I went in



to see Dan Campbell and asked him again. He said I don't know when I'm going to take care of you. I know right now I have to do this for Joe.
Q. Who was the Director of Highway Safety?
A. When?
Q. At this time? You said that there was an SES advertised, so at the time who was the Director?
A. Joe Osterman.
Q. And when you went in to see Dan Campbell when this position was advertised --
A. Yes.
Q. -- what exactly was your complaint?
A. What was my complaint?
Q. Yeah.
A. It was my request for pay essentially, to ask what about me getting paid. He said I don't know when I'm going to -- I don't know about you. All I know is right now I've got to do this for Joe.
Q. Okay.
A. And that's -- you know, we could put it in quotes, but it was -- that was the general statement that he made.
Q. And this was the second time then that you had asked Dan Campbell about getting paid higher than what you were receiving, equal to that of other modal heads,

Page 58

is that correct?
A. Well, when you say the second time, it was another time that I had said it to him because there was another occasion in which I had asked him about being paid for overtime, and he had said I'll for you what I would do -- what I did when I was General Counsel, and that was I would tell my attorneys that if they worked overtime, they could take a day off now and again and I would look the other way.
Q. So did he tell you that you could get overtime pay?
A. No. He said it was -- my working overtime was one of the privileges of working in the office as a manager.
Q. So you have just described three conversations regarding pay.
A. Correct.
Q. Do you recall any other conversations that you may have had with Dan Campbell regarding pay?
A. Regarding pay or regarding equal pay?
Q. Pay equal to other modal heads.
A. That would be -- those are the three that I recall.
Q. The first conversation that you mentioned, you and Mr. Osterman met with Dan Campbell. Did you convey

Page 59

to Mr. Campbell that you believed that there was some sort of gender discrimination going on and that was why you weren't getting the same pay as the other modal heads?
A. No.
Q. The second time that you mentioned -- this is when the SES position was advertised for Highway Safety -- did you mention or convey to Dan Campbell that you believed that you were being discriminated against and not getting the pay because you were a woman?
A. No.
Q. The third conversation that you discussed regarding overtime, did you convey during that conversation that you believed you weren't getting paid equal to the other modal heads because there was some sort of gender discrimination going on?
A. I did not mention gender discrimination, no.
Q. The first time that you had a conversation with Dan Campbell, at least the first conversation that you mentioned -- this is when you and Mr. Osterman met with Dan Campbell -- you mentioned that Mr. Chipkevitch had gotten his SES. Can you tell me what time frame we're talking about?
A. That would have been, I believe, in the 2000 time frame, is when Mr. Chipkevitch got his SES. Now

Page 60

when the conversation took place, I can't give you -- it would be sometime between when Bob Chipkevitch was given the SES and when the advertisement came out for the Director of the Office of Highway Safety.
Q. Which was when?
A. I believe that was in 2003.
Q. So when the SES was advertised for the Director of Highway Safety, you had a conversation with Dan Campbell. When about did you have this conversation with Mr. Campbell?
A. When the advertisement came out.
Q. So sometime in 2003?
A. Yes. That probably would have been -- yes. It was yeah, sometime in 2003.
Q. The third conversation that you mentioned where you asked for overtime pay, do you recall about when you had this conversation?
A. That conversation was linked to a recruitment. It was a recruitment for the Chief of the Report Development Division. I believe that was in 2003. It may have been 2002, but somewhere in that time period.
Q. You said that it was linked to the Chief of the Report Development Division or an advertisement for that position.
A. It was linked to his -- it was linked to the

Page 61

outcome of that advertisement.
Q. Was there a person who was selected for that position?
A. Yes.
Q. Who was it?
A. Patricia Barnes.
Q. Were you asked for overtime because you believed Patricia Barnes was getting overtime?
A. I asked for overtime because Mr. Campbell refused to agree to promoting to Patricia Barnes, and he then refused to let me -- since he would not agree to who I had selected, he had -- he had asked me to consider for the position a personal friend of his, Charlie Pierra (phonetic sp)., and when I did not select Mr. Pierra, he called me into his office and he asked me several questions because when I had sent forward the advertisement with my selection, Patricia Barnes, I had sent it forward with a memo telling him that I wanted to thank the panel as well, and I wanted him to thank the panel for doing such a nice job on it.
Q. So I'm not sure I understand what the connection is between your asking for overtime and Mrs. Barnes' promotion or non-promotion.
A. Because Mr. Campbell also said he would not let me readvertise for the position, so I was not going to

Q. Can you guess?
A. I can't guess.
MR. SCHER: Objection, speculation, misleading.
WITNESS: Yeah, I can't guess.
BY MS. McBARNETTE:
Q. Why can't you guess?
A. I can't guess. I don't know the exact dates of people leaving, so I can't guess.
Q. Is it a number greater than five?
A. I don't believe so.
Q. Possible from zero to five?
A. From zero -- well, I don't think five ever left but, again, I don't know. Without looking at the names and the dates that they departed, I would not honestly be able to tell you, and it would be totally inappropriate for me to guess. I just don't feel comfortable guessing.
Q. The question is what is a ballpark figure on how many people left in 2003? I am asking you to guess. It doesn't have to be exact. My question for you right now is do you believe that zero people left in 2003?
A. I don't recall.
Q. Is it possible that no one left in 2003?
A. I probably had one person at least leave. I'll guess at least one person left in 2003.
Q. And likely no more than five, is that correct?



A. Probably, yeah.
Q. Okay. I'm asking you the same question for 2004. How many people do you believe left your staff?
A. 2004? Possibly one. Let me see. When did -- let me see if I can come up with even a -- yeah, possibly one left in 2003, again in 2004.
Q. Before you stopped becoming -- sorry. Before you stopped being the Director for OMS in 2005, how many people left your staff?
A. From what date?
Q. In 2005.
A. In 2005.
Q. Before you stopped being the Director of OMS.
A. I don't think any.
Q. How many people total were on your staff in 2003?
A. Somewhere between -- probably in the vicinity -- ballpark I'd say was 15 throughout -- 13 to 15 maybe. Yeah, 13 to 15, something like that.
Q. Do you know if your attrition rate was higher than the other modal offices?
A. Do I know?
Q. Um-hum.
A. I believe it was not.
Q. And when you staff or when employees that



worked for you left, would you ask them why they were leaving?
A. Yes, sometimes. Sometimes I knew I didn't need to ask.
Q. Did Ms. Connors ever express a concern about your work performance?
A. Never.
Q. Did Dan Campbell ever express any discontentment with your work performance?
A. With my work performance? No.
Q. Are you aware if any Chairmen asked anyone to take work from you?
A. Repeat that question. Sorry.
Q. Are you aware if any Chairmen or women ever asked that someone take work away from you?
A. No.
Q. Do you recall the Barberi incident?
A. The Barberi accident? Yes.
Q. Can you tell me what that is?
A. The Andrew J. Barberi is a Staten Island ferry. It had an elision with a dock in New York I believe the fall of 2003.
Q. Was that a high profile accident?
A. Yes.
Q. Was it your responsibility to investigate the



Barberi?
A. It was the responsibility of my office, sure.
Q. And did you do that?
A. Yes.
Q. Did you receive help from Dan Campbell?
A. What do you mean by help?
Q. Did Dan Campbell perform any tasks regarding the Barberi incident?
A. Yes.
Q. What did he do?
A. He took on the part of the Chief of Report Development Division in the fall of 2004 or the early part of 2005. I don't recall exactly when he became involved in it.
Q. What is the Chief of -- what did you say, Chief Report Division?
A. Chief of the Report Development Division.
Q. What is that?
A. We've actually talked about it almost all day. It is a supervisory position, and that supervisory position is a -- the person who works with the report writers to make sure that the report writers are keeping their -- it's a supervisory position, so it's actually all of the work that would be involved with -- dealing with the report writers on an accident report. And he

Page 98

took on that portion of the position that dealt with the Barberi accident only.
Q. Did he do anything else?
A. Not that I know of.
Q. Did he testify in front of a New York City Council?
A. He -- actually because I was an observer at his deposition and he said that he did, yes.
Q. Do you know if he drafted portions of the accident report?
A. I don't know that he did. He said he did, but I don't know that he did.
Q. Your office would have been responsible for drafting the accident report?
A. Correct.
Q. But you are not aware if Dan Campbell actually drafted portions of it?
A. That's correct.
Q. Why is that?
A. He was the Managing Director, so I certainly wasn't looking over his shoulder to see what he was doing with regard to that work. I had other duties and responsibilities, so since he had offered to do that, he was getting ready to retire, he wanted experience with that writing, he said, I let him do that.

Page 99

Q. You let him write that whole report or part of it?
A. I didn't let him write anything. He said that he wanted to work with the report writers and that he would learn from the experience --
Q. Did you write --
A. -- so I don't know what he wrote or what he didn't write.
Q. Did you write any portion of that accident investigation report?
A. Probably.
Q. But you don't recall?
A. No, I don't recall. I mean I was usually involved with the report. By the time Dan got involved with it, it was almost complete, so there would have been so many other steps in that process up to that point that I would have given comments back as we were developing an office draft, that kind of thing, so there were probably things that I had written.
Q. Did Dan ever chair any meetings for you?
A. Dan Campbell ever chair any meetings for me? Not that I know of.
Q. Could he have done so without you knowing it?
A. I'm sorry because I don't know what you're talking about.

Page 100

Page 101

Q. Excuse me. Do you recall if one of the accident investigators threatened to quit during the investigation of the Barberi incident?
A. Yes.
Q. Do you know how that came about?
A. Yes.
Q. Okay. Could you explain, please?
A. That was Bob Forth (phonetic sp.). He was the investigator in charge, and Bob had threatened to quit several times over the years. Bob was a very, I felt, emotional person and stress would build up and he would -- you know, over the years I'm leaving, I've had it, I can't handle the stress, whatever, and we learned to deal with that. He would tell his supervisor. We learned to deal with it, talked to him, he would get through it.

The pressure that was on Bob -- but also happened to be a very capable investigator in charge, so I don't mean to imply that he was not a capable individual. He was. But the pressure that was on Bob during the Barberi incident or accident was extreme. Everybody in New York City was interested in the outcome of that accident, and he had not just that accident on his plate. He had others because we were short of personnel.

He was constantly dealing with lawyers, which

we normally do not deal with at the Safety Board. No offense, but they're not allowed to participate in our accident investigations. He was dealing with lawyers. He was dealing with the pressure of trying to get that report done, and Bob said he was quitting, just as he had many times before that. So you were asking me how he got to that point. And may we take just a two minute break please before you ask me the next question?

MS. McBARNETTE: Off the record.

(OFF THE RECORD)

(ON THE RECORD)

BY MS. McBARNETTE:

Q. Going back to Dan Campbell's contributions to the Barberi incident, was he responsible in the end for the report that your office put out?

A. Was he responsible for it?

Q. Right.

A. No.

Q. All right. Do you recall if Dan Campbell ever wrote other reports for other modal offices?

A. I don't know.

Q. Was it unusual for a Managing Director to write a report or to contribute to writing a report in your office?

A. It was unusual for him to offer to do that,



yes, but he was getting ready to retire, so it seemed reasonable certainly from my perspective to use any resources I could get.

Q. Did he tell you why he wanted to contribute to this particular accident?

A. He said he was getting ready to retire and -- he said it on several occasions. He was getting ready to retire and he'd always thought about what it would be like to work on a report. That was my understanding of it.

Q. Who was the Chairperson at this time?

A. Ellen Engleman-Connors was the Chairperson up through the presentation of the report, I believe. I think her term ended in March of 2005 and the report was presented in March of 2005.

Q. Do you -- is that it?

A. Yes.

Q. Do you recall if Ms. Connors expressed interest in this particular accident investigation?

A. She -- yes.

Q. Do you know if she asked Mr. Campbell to play a role in drafting the accident investigation report?

A. She and I and he and David Clark had a meeting in the fall of 2004 in which she said that Congress was putting a lot of pressure on her to get this report

Page 106

Page 108

Page 107

completed as quickly as possible, what could we do to get it done as quickly as possible, and I said to her that we were certainly working on that. We had a draft at that point. There were some medical issues that we had to resolve, but the chief drawback was I did not have a Chief of the Report Development Division, and she said there's no I in team, what can we do as a team, and Dan Campbell offered that he could assist since he was getting ready to retire with the Chief of the Report Development Division tasks on that report.

Q. When was this meeting?
A. In the fall of 2004.
Q. And you said it had been Campbell, Ms. Connors --
A. Um-hum.
Q. -- yourself.
A. Um-hum.
Q. Who was the fourth person?
A. David Clark.
Q. Also earlier you mentioned Bob Ford. I think he was the main investigator for the accident, is that correct?
A. He was the investigator in charge, correct.
Q. Do you know if he testified in front of the New York City Council?

Page 109

A. I don't recall.
Q. Did most accidents end up with testimony in front of a City Council?
A. No.
Q. Why is it that you didn't testify in front of the Council?
A. Dan Campbell was the Managing Director. If that request was made to the Agency -- I'm trying to recall. Because we had a lot of testimony at different times and I think that -- I honestly don't remember the dates and the things that were occurring. I mean I was involved in subpoenaing witnesses and the captain. It had lots of legal aspects to it. It was a very controversial and -- so I don't recall who testified when, to be honest with you, so I can't answer your question honestly.
Q. Was this the highest profile accident that year?
A. I'm sorry. I didn't hear your last word.
Q. This incident, was it the highest profile accident that year?
A. What year?
Q. Well, what year was the accident?
A. What time did the accident occur or what time was the accident under scrutiny?

Q. Let's start with during the time that the accident was under scrutiny did you have any other case that was higher profile?

A. There were, I believe, five high profile accidents that occurred in 2003. As I say, we had the -- and the Chairman commented on it repeatedly. There were no other modal accidents that even approximated the high profile accidents that we had in that year.

We had a cruise ship accident, an explosion in the engine room, that resulted in fatalities, a cruise ship carrying thousands of Americans. It was very high profile. We had a passenger vessel out on the west coast that was extremely high profile that overturned. I believe it was on Father's Day and that there was high loss of life. We had a passenger vessel accident in Baltimore in which it overturned and we had high loss of life. We had the Andrew J. Barberi which was the Staten Island Ferry. So they were all very high profile. Yeah, I could say they were all very high profile.

Q. You spoke of a Report Development Division in OMS. When did that division come into being?

A. The reorganization to have a Report Development Division and an Accident Investigation Division was -- I'm going to say about 2000, maybe 1999, 2000, somewhere in that time period.



Q. What was the time frame that the Barberi incident was being investigated?

A. As I said, I believe it happened in the latter part of 2003 and that went through 2004, and the report was presented early in 2005.

Q. Did you testify in any other city or anywhere during this time frame, testify?

A. I believe that the -- yes. I believe that the request for the captain to testify was a process in which my written statement was used in a court of law in New York. So testify --

Q. Um-hum. Did you have --

A. Did I personally travel to New York? No.

Q. Not necessarily just for New York, but did you -- do you recall traveling anywhere to personally testify in front of a City Council, in front of a courtroom, in front of any public body regarding any of your accidents during 2003 through 2005?

A. 2003. We may have done the Morning Dew in that time period, but I'm not sure, and that would have been -- I went up on the hill with Jim Hall, so it could not have been 2003. I just don't recall.

Q. During this time frame of the Barberi accident and its investigation and the producing of the accident investigation report, did you ever tell Mr. Campbell that

Page 114

Page 116

Page 115

you thought he wanted to fire you?
A. No.
Q. Did you ever make reference to his terminating his services at the Agency?
A. No.
Q. Did you think that he wanted to fire you?
A. Mr. Campbell -- I'm going to use that as open-ended question. Mr. Campbell, when he talked to me within the first year of my arrival at the Safety Board, told me that he had recommended I not be hired. He did not believe me to be capable of doing the job. And so no matter -- did I believe Mr. Campbell wanted to not have me? I knew it from the first year I was there.
Q. Did you ever get the impression that due to your performance while Director at OMS that Mr. Campbell wanted to terminate your services?
A. No.
Q. Did you have a good working relationship with Mr. Campbell?
A. It was challenging.
Q. Did your office have a problem in getting out accident investigation reports in a timely manner?
A. No.
Q. Did you have a problem with the speed in which your office got out accident investigation reports?

Page 117

A. Could you repeat that? Sorry.
Q. Did you have a problem with the speed in which your office got out accident investigation reports?
A. No.
Q. Were you ever criticized for not getting out a report in a timely manner?
A. Not that I recall.
Q. Miss Majestic. Was there an accident involved a Miss Majestic?
A. Yes.
Q. Can you tell me what that accident was?
A. The accident occurred in the late '90s, I believe. It was an accident that was -- that involved a vessel called a DUKW, D-U-K-W. You see them operating in different cities, but they were -- the vessel itself was a World War II Army vehicle that had been converted to a passenger vessel, and it was operating on a lake out of Hot Springs, Arkansas when it went down taking, I believe 13 people with it.
Q. Did your office do an accident investigation report?
A. Yes.
Q. How long did it take for you to get that report out?
A. I don't recall.

Page 118

Page 120

Page 119

Q. Do you recall if it took more than one year?
A. It took more than a year.
Q. More than two years?
A. It may have.
Q. More than three years?
A. I don't think so, but it may have. It was a very complex accident, number one. It was an accident that Jim Hall wanted to use as an example of the difference between how NTSB did an accident and the Coast Guard did an accident, and it was highly controversial.
Q. The Hemimaro. There was an accident involving the Hemimaro. Can you tell me what that accident involved?
A. It was a collision between a U.S. nuclear submarine and a Japanese fishing vessel off the coast of Hawaii.
Q. When was this?
A. About 2002, I think.
Q. Was this a high profile case?
A. Yes, very.
Q. And when was the report issued for this?
A. The -- I don't know.
Q. Was an accident investigation report actually issued for this?
A. I believe so.

Page 121

Q. If you weren't going to do an accident investigation report, is there something that you can do instead of a report?
A. If I were not going to do an accident investigation report. If a decision were made to do that, you can do a -- what's called a closeout memo, yes.
Q. A closeout memo. Is it possible that an accident investigation report was not produced for the Hemimaro but perhaps something else?
A. When you say an accident investigation report, there was a complete accident investigation report including conclusions and recommendations that was prepared during my tenure. What actually went out I do not know nor do I know when it went out.
Q. So do you recall then when the accident investigation report was prepared?
A. Yes. It was prepared between the time that the accident occurred and -- I want to say the draft that I'm talking about was, I believe, issued to the directors about 2004.
Q. Issued to the directors. Did you issue it to the directors?
A. Correct.
Q. The Scandia accident, can you tell me about that?

Page 122

Page 124

Page 123

A. I can. The Scandia accident occurred in 1995 maybe, 1996, somewhere in that time period. It was -- so I'm really going back quite a ways in terms of my memory. But the accident was an ocean tow that was pushing an oil-filled barge off the coast of Rhode Island when they had a fire in the engine room and they lost control of the vessel as well as the barges. And the personnel were rescued off the vessel, brought ashore, but the vessel itself was drifting, and the concern was for pollution.

The Coast Guard officer at the station decided to go out and try and take some action with regard to the barges, and so he took the crew from the vessel that had had the fire, brought them back out to the scene, put them aboard the barges to take some action, again, to keep it from running ashore, from hitting up on the rocks.

It turned out they couldn't then get the people off the barges. The weather by then had turned extremely poor, so they were out in heavy weather. It was an extremely dangerous situation. The Coast Guard had then to send helicopters out into that situation to try and rescue the personnel who were now at risk at sea. Ultimately, they did at great risk to themselves.

The barges, however, did come ashore on the rocks, created one of the greatest pollution incidents in

Page 125

the area. I believe it was at Point Judith at the time. That's the accident. Is there's anything else you'd like to know?

MR. SCHER: Off the record. I'm sorry. My wife has just called three times in a row. I'll just make sure there's no emergency.

MS. McBARNETTE: Please.

MR. SCHER: Okay.

(OFF THE RECORD)

(ON THE RECORD)

BY MS. McBARNETTE:

Q. Going back to the Hemimaro, you mentioned that your office prepared an accident investigation report. Did you have a directors' review on that report?

A. No.

Q. Why not?

A. It had to be scheduled by the Managing Director.

Q. And there was never a review on that report?

A. I don't believe -- well, I don't know if there was a review on that report. I was not at any review of that report. It may have been after June of 2005, but I was not at one.

Q. About when was the report from your office finished?

Page 206

Page 208

Page 207

A. Did I discuss? When I went over to the Managing Director's office, Joe knew that I wanted to go back to OMS and he said something like you have terrific management skills. You can do this job which is whatever, but he was not going to transfer me back to OMS.

Q. Did you have any other complaints about your working conditions?

A. My working conditions? My working conditions were working in an office environment, so working in an office environment was still working in an office environment.

Q. Did you express any unhappiness with that?

A. Working in an office environment?

Q. Um-hum.

A. No.

Q. What about when you were working for Ms. Weinstein?

A. I beg your pardon. Could you repeat that?

Q. What about when you were working for Ms. Weinstein, did you complain about the working environment?

A. The working conditions -- I was in the same office when I was working for -- I didn't move my office around. Other than the initial move from OMS I stayed in

Page 209

the same office space.

Q. All right. Let me show you another exhibit.

MS. McBARNETTE: Can you mark this as Exhibit 2?

WITNESS: Do you want me to hold onto this one or pass this off or --

BY MS. McBARNETTE:

Q. You might as well just collect them there --

A. Okay.

Q. -- and then when we're all done we'll collect them.

A. Okay.

(Whereupon, the document that was referred to as Exhibit Number 2 was marked for identification.)

BY MS. McBARNETTE:

Q. This is Exhibit 2. Can you take a look at that and then tell me if you've seen it before.

A. It appears as if these are two separate documents, so are you asking me if I saw each of these three pages before?

Q. Yes.

A. Okay. I've seen the -- I think I've seen this first page before, but I'm not positive, so -- yeah, I'm

Page 234

Page 236

Page 235

A. Let's see, in 2006/2007 -- I'm speculating now because I don't remember the dates -- I investigated an accident which involved a collision between two vessels and -- but I don't know the dates. Certainly that information has been provided to you --
Q. Is that 2006 --
A. -- and I can provide it to you again if you need it, but I --
Q. You're not capable of providing the answers because you actually don't remember or you're unwilling to answer?
A. I really don't remember.
Q. So when you investigated a collision between two vessels, did it take you two hours to do the investigation, did it take you a week to do the investigation, how long did it take you to investigate?
MR. SCHER: Objection, relevance, badgering the witness, argumentative, irrelevant. I said that already. Go ahead.
WITNESS: Yeah. If you would really like me to provide this as accurate information, I would be happy to do that.
BY MS. McBARNETTE:
Q. No. I'm not asking you to provide it as accurate information. At this point I'm asking you to

Page 237

estimate. That's it. We are the Defendants and we have the right to ask you these questions, so I'm not quite sure I understand your reticence in answering.
A. Because I don't know the exact number. It's not something that I keep track of.
Q. I'm not asking you for the exact number.
A. It is really not something --
Q. I'm not asking you for the exact number, just to guess. At this point it could be that you worked five hours for -- between 2006 through 2007, and if you did that's fine, but I just need to know if that's how many hours you worked.
A. Okay. Between -- the accident investigation -- again, I don't get paid the hourly rate for travel, for off hours, et cetera, so that is not accurate for that, but it means time and travel and that would probably be oh, a week-and-a-half maybe or maybe two weeks of work on that particular accident.
Q. And that was last year, in 2006?
A. I don't know that it was in 2006 --
Q. Okay.
A. -- exclusively. It was over the time period from 2006 through 2007.
Q. Okay.
A. Oh, my gosh.