# EXHIBIT NO. 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, )
Plaintiff )
vs. )No. 06-748C
THE UNITED STATES, )(Judge Wheeler)
Defendant )

Deposition of Marjorie Murtagh Cooke

Washington, D.C.

October 23, 2007

Reported by: Bonnie L. Russo

JOB NO. 183364

October 23, 2007
9:53 a.m.

Deposition of Marjorie Murtagh Cooke held at:

United States Department of Justice
Civil Division
1100 L Street, N.W.
Washington, D.C.

Pursuant to notice, before Bonnie L. Russo, Notary Public



APPEARANCES:

For the Plaintiff
BRIAN M. LOWINGER, Esq.
DAVID SCHER, Esq.
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, N.W., Suite 900
Washington, D.C. 20006
202-261-2806

For the Defendant
MEREDYTH D. COHEN, Esq.
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, N.W.
Washington, D.C. 20530
202-353-7978

For the Agency
DENISE M. D'AVELLA, Esq.
NATIONAL TRANSPORTATION Safety Board
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
202-314-6086



C O N T E N T S

EXAMINATION OF MARJORIE MURTAGH COOKE PAGE
BY MS. COHEN 5

EXHIBITS
1 Marine Launches 67
2 Recommendations and Controlled Documents Processed 111
3 Memorandum of Understanding Between the National Transportation Safety Board and the United States Coast Guard Regarding Marine Accident Investigation 117
4 Handwritten Note dated 5-24-05 246
5 E-Mail dated 5-26-05 252
6 Performance Agreement: Office of Marine Safety August 2001 through July 2002 269
7 Memorandum dated 8-2-02 275

(Exhibits included with transcript.)



P-R-O-C-E-E-D-I-N-G-S

MAJORIE MURTAGH COOKE,
was called for examination by counsel and,
after having been duly sworn by the Notary, was
examined and testified as follows:

EXAMINATION BY COUNSEL FOR DEFENDANT

BY MS. COHEN:

Q. Ms. Cooke, we have met before. As you know, I'm the attorney representing the United States in the court of federal claims case, Cooke v. United States.
Do you prefer to be called Ms. Cooke or Ms. Murtagh Cooke?
A. Ms. Cooke is fine.
Q. Can you please state your full name for the record.
A. It's Marjorie Murtagh Cooke.
Q. Ms. Cooke, have you ever taken a deposition before -- had your deposition taken?
A. Yes.
Q. How many times?
A. I think three.

Q. What was the position title prior to that?
A. Chief of the Marine division.
Q. When did you become chief of the Marine division?
A. In 1994.
Q. What was your position prior to that?
A. I was chief of the fire protection section at the United States Coast Guard prior to that.
Q. From what date to what date?
A. I joined the Coast Guard in 1984, I believe, until -- well, I became chief of the fire protection section in 1986 and I was in that position until 1994.
Q. Where did you attend college, Ms. Cooke?
A. At the state university of the New York Maritime College.
Q. What year did you graduate?
A. 1974.



Q. Have you ever filed a lawsuit before, Ms. Cooke?
A. No.
MR. LOWINGER: Objection. Vague. What do you mean by lawsuit?
BY MS. COHEN:
Q. Can you answer the question again, please?
A. Perhaps, you could ask it a different way to make sure I understand what you're asking.
Q. Have you ever filed a complaint in court, a civil complaint?
A. Sorry. I'm glad you asked that question again and I'm glad that it was raised again. Yes, I did. In the early '70s.
Q. What was the subject matter of the complaint?
A. It was entrance to an all male institution.
Q. Can you be a little bit more specific and what the circumstances were,



please?
A. I filed a lawsuit to gain entrance to the state university of New York Maritime College. At that time it was an all male institution, and when I applied to the college they told me my credentials were wonderful but I was a woman and they would not accept women, so I sued the state of New York.
Q. What was the outcome of that lawsuit?
A. I gained entrance to Suny Maritime College.
Q. Have you ever filed any other lawsuits, meaning civil complaints in court?
A. Not that I know of, no.
Q. I will turn now to your position as the director of the Office of Marine Safety. What were your duties and responsibilities in that position from 2000 to 2005?
MR. LOWINGER: Objection. Compound question.
Which duties or responsibilities?



BY MS. COHEN:
Q. Please answer the question.
A. Duties and responsibilities were to manage a major Marine transportation safety program for the agency, to investigate accidents, to analyze the accidents, to prepare everything from notification of the accidents all the way through to completion of the report, present that report to the Safety Board. Analyzing the accidents included developing conclusions, probable cause, and recommendations.
I also had the responsibilities, as I said, of presenting the report to the board in some cases. In some cases I determined probable cause myself and approved reports. To shepherd that report all the way through from notation through adoption, through completion of the document in preparation for it being publicly issued as a final report.
I managed personnel. I managed a budget. I developed, prepared, and implemented

policy. Managed the daily activities of the office. Communicated with internal entities such as -- all the way from the chairman, the other members of the board, the managing director, the general counsel, the other modal offices, the Office of Safety Recommendations and Accomplishments, Office of Human Resources, external organizations such as the communication with external organizations such as the Coast Guard, the Maritime Administration, the Department of State, Department of Defense, other government agencies, the private industries that were involved in operating in both -- from the construction through the operation of ships; preparing testimony for Congress dealing with the Hill; responding to questions from the Hill; preparing agency wide documents such as -- like providing the input to agency wide documents such as the reauthorization requests for the National Transportation Safety Board, the budget requests for the National



Transportation Safety Board, entered into outside agreements with other organizations and agencies.

I was responsible for assuring that every detail of a -- an accident investigation was thorough and complete; making sure we got it right. The same for the report.

Following up on recommendations, preparing and giving speeches, teaching accident investigation courses.

I think I have covered most of the issues that I had as duties and responsibilities and every other activity as requested by either the chairman or the managing director. All other duties as assigned is the term that's used.

Q. You said one of your duties was accident investigation. I would like to walk through with you the steps of the investigation.

What happens -- let's say a Marine accident occurs. What happens first?



A. The accident notification -- and it can come in from several different sources, but the notification when it arrives -- and, of course, it can happen at any time at, any day. You can't predict it.

MR. LOWINGER: Actually, you know, we're just going to object. Maybe, perhaps, we should ask Ms. Murtagh Cooke to step out because of regulations about a former employee talking about any specific accident investigations. If you want to -- why don't we have Ms. Murtagh Cooke step out for a second. We'll figure out how you want to deal with that because she is not allowed to actually testify as to specific accident investigations.

MS. COHEN: She can step out for a minute. We'll take a break.

(Whereupon, the witness exited the conference room.)

(A short recess was taken.)

(Discussion off the record.)

MR. LOWINGER: Meredyth, it's your



depo. So...

MS. COHEN: You raised an objection, Mr. Lowinger.

MR. LOWINGER: The objection was that deponent would not -- would not violate 49 C.F.R. 835345. That whole section regarding -- I think also .7 as well, regarding testimony of former employees and with regard to accident investigations. And the agreement that the parties reached is -- Meredyth, why don't you...

MS. COHEN: We do not believe that 49 C.F.R. Part 835 is applicable to testimony in this type of case. That is an employment case. It's mainly intended to protect the NTSB in cases involving accident investigations and suits, either civil or criminal concerning those accidents, not necessarily to an employee testifying in an employment personnel type case. And in consultation with the NTSB general counsel's office, we do not intend to pursue plaintiff for any of her testimony

view?

A. Well, one is the organization and the other one are the members of the board.

I had delegated authority to adopt reports. So for those that I have adopted, as the director of the office, I would consider them to be adopted by the National Transportation Safety Board. So I just want to be sure, again, I'm answering your question. And again, I believe that there is, in fact, a document that has that. I provided that information when I was at the board. So there is a document that I believe has that information on it.

Q. How many of the accidents listed in this document were adopted by the board, meaning the National Transportation Safety Board, during your tenure as the director of OMS?

A. Okay. Let's see. I don't remember the exact dates for these things.

I would say probably 18 or 19. It



depends upon how you count it, but I think that's an accurate number.

Q. Which accident are you not sure would be considered in the count. You said 18 or 19?

A. Yeah. The Taki Tooo, which was -- it was adopted -- I got it to notation during my tenure as director of OMS, but it was presented to the board after that, a couple of weeks after that. So I would consider the notated document as an adopted report that I completed, although I was no longer in that position at that time.

Q. So all of the accidents below the Taki Tooo starting with the May 25th and the Columbia to the end of the document, all of those were adopted by the NTSB during your tenure?

A. Say that again. I'm sorry. Repeat that, please.

Q. All of the accidents listed on this document starting with the MV Columbia to the



end of the document, all of those were adopted by the NTSB during your tenure as director; is that correct?

A. You said the MV Columbia. It actually starts, I believe, with the MV Carnival Destiny --

Q. Okay.

A. -- on the document that I have.

Did I -- am I looking at a different document?

Q. You had said 18 or 19. If it starts with the Carnival Destiny that would not be 18.

A. Maybe -- let's see. Oh, you're counting up from the bottom and counting 18 or 19. Is that what you're doing? Sorry. I just want to make sure I understand.

You're doing one, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17; is that correct? Is that the way you were counting?

Q. You had said 18. Why don't we just do it this way. Please tell me which of these



accidents specifically were ones that were adopted by the NTSB during your tenure, not how many, but the actual names.

A. Okay.

MR. LOWINGER: Objection. Vague and mischaracterization. Form just in general.

But go ahead.

THE WITNESS: Okay. There are a couple on -- I might actually fair better if I were to tell you the ones that I know were not during my tenure, because if you were counting from the bottom and you were counting 18 or 19 up, you would have missed some that were adopted --

BY MS. COHEN:

Q. Okay.

A. -- above that. So --

Q. Which ones were not adopted by the board during your tenure?

A. Okay. And again, I think there's a document to -- so if I misspeak I want to be sure that I don't misspeak and set myself up

Page 78

for a problem later on where -- so without the actual dates I'm going to say -- let's see. The Greeneville, Ehime Maru, so these were not adopted rather than the ones that were adopted. How about we do it that way.

Yeah, the Greeneville, Ehime Maru, the Norway, the Lady D, small passenger vessel Lady, D and the Selendang Ayu for certain.

I apologize because I just -- my memory isn't good enough to be able to say that I definitely know of others.

Q. You said the USS Greeneville, Ehime Maru was one that was not adopted by the board during your tenure?

A. As the director, that's correct.

Q. Is it accurate that the accident occurred on February 9, 2001?

A. That's correct.

Q. Why did it take so long for this particular report to be finalized?

MR. LOWINGER: Objection. Vague and argumentative.

Page 79

But go ahead.

THE WITNESS: The U.S.S. Greeneville was -- and the Ehime Maru was a U.S. Navy submarine that hit a -- a fishing vessel, a Japanese fishing vessel. And the issues that were involved in this case were extremely complex, highly political, it was an international investigation. It involved the Department of Defense, the Department of State, Japanese Embassy. It was very complex. We had to arrange for the Ehime Maru to be brought up from the -- we had to get a -- the Navy involved in the salvage of the Ehime Maru. It was a -- just a very complex accident.

BY MS. COHEN:

Q. Did the Navy have do its own investigation of that accident?

A. Yes.

Q. And when did the Navy issue their report?

A. I don't know.

Q. Was it during your tenure as a

Page 80

director of OMS?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: I don't know when they issued their report.

BY MS. COHEN:

Q. You don't know at all whether it was during your tenure as director of OMS?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: I don't know.

BY MS. COHEN:

Q. Do you know that they issued a report at all?

A. They had public hearings, so I don't know specifically about the report that they may or may not have issued, whether it was a public report, whether it was an internal report. I just don't know.

Q. The Andrew Barberi in calendar year 2004, how many investigators were sent to that accident?

Page 81

MR. LOWINGER: Objection. The document speaks for itself.

THE WITNESS: Let's see. It was -- could you repeat the question, please?

(The record was read as requested.)

THE WITNESS: How many investigators?

I think eight or nine.

BY MS. COHEN:

Q. Eight or nine investigators from the Office of Marine Safety?

A. No.

Q. Who were the -- how many investigators were there from the Office of Marine Safety?

MR. LOWINGER: Objection. The document speaks for itself.

Go ahead.

THE WITNESS: I believe there were six.

BY MS. COHEN:

Q. And where were the other two or

Page 82

three from?
A. One was from Aviation Safety, I think one was from Research and Engineering. I think we actually had -- we may have had two from aviation. I'm not positive. Without looking at the launch team I couldn't tell you precisely.
Q. How many parties were there to the Barberi accident?
A. Let's see. Again, I don't know precisely, but I can tell you who some of them were. We had the city of New York. We had the -- I believe the state of New York. We had the U.S. Coast Guard. We had, I believe, the fire department from New York City. We had the manufacturer of the propulsion system, I believe was a party to the investigation. Those would have been -- those are the ones that come to mind immediately.
Q. For the Lady D, how many OMS investigators were sent to the accident?
MR. LOWINGER: Objection. The

Page 83

document speaks for itself.
THE WITNESS: I didn't hear you that time. Could you speak up?
BY MS. COHEN:
Q. I'm sorry. For the Lady D accident how many investigators from OMS were sent to the accident?
MR. LOWINGER: Objection. The document speaks for itself. Same objection.
Go ahead.
THE WITNESS: From the Office of Marine Safety, I believe -- let's see. Maybe four or five.
BY MS. COHEN:
Q. Any from other offices within NTSB?
A. Yes, from the Office of Research and Engineering.
Q. How long were the investigators on site?
A. They were on scene at different times. I think the initial investigation they were on scene for about two weeks, but that was

Page 84

an investigation where they returned several times because the -- there were two children who were two of the fatalities from that accident. It was a vessel that overturned in the harbor in Baltimore and they could not immediately retrieve the bodies and our investigators were involved in trying to determine where the vessel was when it overturned and that, of course, was being used to determine where potentially the bodies would be. So they returned a few times to that accident scene. So I don't have a specific number of days.
Q. The S.S. Norway you said that that was one of the reports that was not approved by the board during your tenure?
A. That's correct.
MR. LOWINGER: Objection. Asked and answered.
Go ahead.
THE WITNESS: Sorry.
BY MS. COHEN:

Page 85

Q. That accident, according to this document, occurred on May 25th, 2003; is that correct?
A. That's correct.
MR. LOWINGER: Objection.
BY MS. COHEN:
Q. Why did it take so long for a board approval of that report?
MR. LOWINGER: Objection. Argumentative.
Go ahead.
THE WITNESS: The long portion of that is -- probably the part that is questionable. But aside from that, the Norway, if you look at the number of accidents that we had at that -- in that time period we had the -- every major accident that occurred that year was a Marine accident and that extended over to the following calendar year. So it was -- we just had launch after launch of investigators and the Norway was an extremely -- again, another very extremely

complex accident.

It was an explosion of the boiler on the vessel which meant that the accident scene was literally in pieces. The team had to go in wearing fully protected gear because it had so much asbestos in the engine room. They could only go in for 30-minute intervals at a time. It happened in May in Miami, extremely hot. So it was -- and they had to try and reconstruct an exploded engine room.

We -- it was a very complex accident. Took a long time for them to gather all the information. There was, in fact, I believe, an entire room filled with boxes of factual information from that accident.

BY MS. COHEN:

Q. Looking at all of the accidents on these documents, the ones specifically that were approved by the board during your tenure as director --

A. Okay. Specifically approved by?

Q. The NTSB.



A. The National Transportation Safety Board?

Q. Yes, during your time as director?

A. Okay. So that's -- right, that's the organization. Okay.

Q. Yes.

A. So it includes me, the ones that I have adopted.

Q. Yes, that's correct.

A. Right. Okay.

Q. What was the average length of time from the date of the accident to approval of the board?

MR. LOWINGER: Objection. Vague.

Go ahead.

THE WITNESS: The average time for completion of accident reports was about 18 months.

BY MS. COHEN:

Q. How long was it specifically from the date of the accident to the date that it was approved by the board in this time? I



mean, the board members, the five board members. What was the average amount of time for these accidents listed here?

A. So the ones that were adopted by the board?

Q. (Witness nodding head.)

A. Okay. Between 2000 and 2005?

Q. All of the accidents reflected on this document which would be 2000 to 2005, yes.

A. 2000 to 2005. Well, that wouldn't necessarily reflect all the ones that were adopted. So, in other words, there would have been accidents that were from previous years that would have been adopted in 2000 or adopted in 2001 so this document doesn't reflect all the reports that would have been adopted during that time period.

Q. Okay.

A. So I will answer your question -- sorry. Go ahead.

Q. All reports that were adopted by the five-member board during the time period of



2000 to 2005.

A. Okay. I believe the time period between 2000 and 2005, the average time period was about 18 months.

Q. And the time period from the accident date to the date that it was adopted by the board meeting of the NTSB?

MR. LOWINGER: Objection. Asked and answered.

THE WITNESS: In some cases it was substantially less than that. Could have been some that were more. I will say it's probably about the same time period. 18 months, I'll say is an average, but I will stand corrected if I actually had the dates in front of me.

BY MS. COHEN:

Q. Can you describe the process for preparation and approval of Marine accident reports?

MR. LOWINGER: Objection. Asked and answered.

Go ahead.

experience in accident investigation and report of production, and for the director of the Office of Marine Safety clearly education associated with operating the ship.

BY MS. COHEN:

Q. Would you say that knowledge about any transportation modes other than Marine is required?

A. Knowledge of any other transportation mode is required?

Q. Is a skill that's required for the OMS director?

A. So I understand, is it necessary -- you're asking me is it necessary to have education in any other mode of transportation in order to be able to do the job as the director of the Office of Marine Safety, other than Marine?

Q. Yes.

A. Necessary, no.

Q. Would you say that the director of the Office of Railroad, Pipeline & Hazardous



Materials needs to have knowledge of more than one transportation mode to be director of that office?

A. Knowledge or education?

Q. Knowledge.

A. Prior to becoming or after becoming?

Q. Both.

A. Both? Then the answer would -- the answer would not necessarily be that that's necessary if -- I want to make sure I'm answering the right question. So let me go back and ask what was the -- what was the question again?

(The record was read as requested.)

THE WITNESS: You said it would be knowledge before as well as after?

BY MS. COHEN:

Q. Let's take it one at a time. Knowledge before?

A. In my opinion, the answer is it should be.

Q. And after?



A. It should be.

Q. How many hours did you work per week?

MR. LOWINGER: Objection. Vague. Are we still talking about 2000, 2005?

MS. COHEN: Yes.

THE WITNESS: Between 2000 and 2005? It would depend. And it would --

BY MS. COHEN:

Q. Let's do it year by year then. 2000?

A. Well, no, it's not by year that the determination is made. It's really more a matter of if you have an accident investigation, a major accident investigation that you're dealing with and under those conditions you can work almost 24 hours a day for days on end. You may take a few hours sleep and then get back up ans start again.

So if it were a major accident, as I said, it could be almost around the clock



except for a few hours of sleep now and again. If it were a time period when you have people, as I say, even investigations where you have people in the field and you're juggling those priorities it can be at least 60 hours.

Q. How many hours would you say you worked per week on average, you personally, not a director in general, worked per week on average between 2000 and 2005?

A. How many hours did I personally work? You said not as director?

Q. As a director?

A. Oh, as the director?

Q. Yes.

A. Yeah. I would say an average of 60.

Q. Did you ever travel to the site of Marine accidents as director in 2000 to 2005?

A. From 2000 to 2005, no.

Q. Did you ever travel for any other reasons as director of OMS from 2000 to 2005?

A. Yes.

Q. What were those reasons?

Page 238

offices?
A. Yes.
Q. Does the Office of Highway Safety have regional offices?
A. Yes.
Q. How many modes are encompassed by ORPH?
A. Railroad and pipeline.
Q. Are there any other modes?
A. Modes, no.
Q. Are there any other areas of investigation encompassed within that office?
A. Other than modes?
Q. Yes.
A. Do you mean hazardous materials?
Q. Yes.
A. Yes.
Q. How many employees were there in the RPH office between 2000 and 2005?
A. Maybe 30 to 40.
Q. How many employees were there in the highway safety office between 2000 and 2005?

Page 239

A. About the same.
Q. Other than being promoted to SES, how do you believe your pay could have been made equal to the male employees who you alleged did substantially the same work as you?
A. The agency has used the SL positions in the past to pay employees above the GS-15 level so they could have used a senior level position, for one.
Q. Were there any other possibilities?
A. They could have used within the -- within the civil service system, they could have supplemented my salary the same as they did Mr. Osterman's salary.
Q. What way was that?
A. They did it with a retention bonus between 2000 and 2005.
Q. Anything else?
A. They could have paid me for -- between 2000 and 2005 they could have given me a quality step increase to provide for my step as a 15. I didn't receive that 1510 until

Page 240

2005. They could have supplemented my income, in part, by giving me overtime for the number of overtime hours that I had to work. That's all that comes to mind at the moment.
Q. Did you ever request a senior level or SL position?
A. Request?
Q. Yes.
A. No.
Q. Did you meet the administrative criteria required for an SL position in your job as director of OMS?
A. Yes.
Q. How did you do that?
A. I had technical expertise as a marine safety expert. I had technical expertise as a fire protection expert, a marine fire protection expert, in particular.
Q. Are there any or reasons you believe you met the criteria for an SL position?
A. Other than my technical expertise, certainly. I would say my technical expertise

Page 241

would be the basis for an SL position.
Q. Does your job as director of OMS involve any supervisory responsibilities?
A. I'm going to go back and correct what I just said because the issue of an SL position was held by the Office of Aviation Safety and they used that for their international -- I believe at one point it was Ron Schleet who was deputy director for International Relations and then they changed that to the senior adviser for international within the Office of Aviation Safety. And so certainly the international experience and expertise that I had would have qualified me for an SL position.
So I apologize for interrupting your next question, and I don't recall what it was, but I wanted to make sure that I covered those things.
MS. COHEN: Can you please read back the previous question?
THE WITNESS: Did my position as

Page 254

it would have been the first week in June between May 31st and June 4th -- 3rd, sorry. May 31st and June 3rd.
Q. You also said that you could have been compensated by being paid overtime.
Do you believe you were eligible to receive overtime as an office director?
A. I could have been partially compensated. I could not have been compensated completely.
So the rest of your question was, do I believe I was eligible?
Q. Yes.
A. Yes.
Q. Based upon what?
A. Based upon the fact that I was less than a 15 step 10 and I was performing the duties and responsibilities of the director of the Office of Marine Safety which was comparable to the director of the Office of Aviation Safety and railroad, Pipeline & Hazardous materials and highway safety.

Page 255

Q. Did you ever submit a request for overtime pay?
A. I asked for it verbally.
Q. Did you ever submit any documentation supporting -- let me go back.
Did you work hours -- did you actually work overtime hours between 2000 and 2005?
A. Oh, yes.
Q. Did you ever submit any documentation in support of your request for overtime showing the overtime hours that you worked?
A. Did I ever submit documentation documenting the hours that I had worked, no.
Q. Why not?
A. You have to get approval in advance for overtime.
Q. Did you ever request advance approval for overtime?
A. Yes.
Q. From whom did you request that?

Page 256

A. I requested it from Dan Campbell as managing director and I requested it from the chairman of the Safety Board, Ellen Engleman-Conners.
Q. When did you make the request of Mr. Campbell?
A. I believe in 2003.
Q. Do you remember what month in 2003?
A. It was -- no, I don't remember what month.
Q. What was his response?
A. No, I won't pay you overtime. If you would like, I will let you do what I used to do when I was the general counsel of the agency and I would tell my attorneys that if they wanted to take a day now and again I would look the other way.
Q. What was your response?
A. That wouldn't solve the problem because the reason I had so much overtime was I was not being granted the authority to hire and without that authority to hire to fill the

Page 257

positions that had been vacated, the deputy director, the chief of the report development division, for example, I was -- I still had to fulfill those duties and responsibilities and all that it would serve to do if I were to take a day off now and again would be to delay my work.
Q. Did Mr. Campbell give you a reason as to why he rejected your request for overtime pay?
A. Yes.
Q. What was that reason?
A. That overtime was -- one of the benefits that I derived from being a manager.
Q. Did any of your employees ever request overtime from you?
A. Yes.
Q. How were those requests typically made?
A. They were made in advance of the overtime.
Q. Was there any specific documentation

submitted requesting overtime?
A. No.
Q. Employees simply made verbal requests for overtime?
A. They made a request if they could be paid for overtime and I said -- I granted an agreement with them so when they worked overtime they would submit the paperwork.
Q. When you say they made a request for -- to be paid overtime, was that a written request?
A. No, verbal.
Q. Did you make the same --
A. In advance it was made. It was a verbal request in advance of their working the overtime.
Q. Did you make the same sort of verbal request for overtime in advance to Mr. Campbell?
A. I just explained to you I said to Mr. Campbell I have -- I have to put in an excessive number of hours to make up for the



lack of resources, can I get paid for overtime, and he said no.
Q. You said you also made a request for overtime to Ms. Engleman-Conners. When was that request made?
A. That was made in April of 2004.
Q. What specifically did you say?
A. With regard to overtime?
Q. Yes.
A. The conversation is not just bracketed by overtime, but with regard to overtime I suggested that Ms. Engleman-Conners could approve me in advance for all of the overtime hours that I was putting in as a partial compensation for the inequity in pay between myself and the other modal directors.
Q. What was Ms. Engleman-Conners's response?
A. She didn't believe that supervisors could be paid overtime. She would check with HR.
Q. What was your response?



A. She would check. I thought she said check with HR.
Q. What was your response to that?
A. My response to -- I wasn't just bracketed by the overtime issue, so...
Q. What other issues were discussed during this conversation?
A. The conversations specifically was about my -- the fact that I was not paid the same as my counterparts in the other modal offices, and that I did not have the resources that I needed to be able to do my work effectively.
Q. Were there any other topics discussed during this conversation?
A. The chairman mentioned that it wasn't -- she understood it wasn't fair, but -- and that tell me about it. There are deputy directors that are being paid as SES employees, that she was doing what she could to get additional SES slots, that she had -- when she had the opportunities she had decided to give



the SES slot to highway and I told her that it was not specifically the SES that I was interested in. It was in equal pay. And that I wanted to work with her to solve this problem, that -- in fact, I used the terms getting to yes. I would like to get to yes on this. That I was interested in the pay and if there was some way within the -- some way within the civil service regulations that I could be equitably paid, I would like that to occur, and she said she didn't know, but she would check.

The other issue was because of the lack of resources, in particular, I had been -- I had asked for approval to hire a chief of the report development division. I had been denied that opportunity by Mr. Campbell and I asked her if I could do that. I was desperate for resources, and she agreed that I could.
Q. Did any of the other modal directors ever request overtime between 2000 and 2005?
A. I have no idea.

Page 278

schedule between 2000 and 2002?
A. I don't know. However, the second sentence and the third sentence does provide for the participation by Jack Orlando in our office to help because I was missing resources and Vice Chairman Carmody was kind enough to provide Mr. Orlando as a -- an additional resource in the office.
Q. As the director of OMS between 2000 and 2005, did you interact with the press at all?
A. Yes.
Q. Under what circumstances?
A. There would be questions that would come in from the press about accident investigations that were underway and I would interact, as you say. If you mean do I -- did I directly deal with the press or -- well, interact, I'm interpreting to mean that I may have talked to them directly or I may have provided the information for a spokesperson to deal with them. So, yes, I would interact.

Page 279

Q. How frequently did you receive requests for information from the press between 2000 and 2005?
A. For every major investigation that was of public interest we would have the questions that would come in from the press.
Q. How many major investigations were there that were of public interest between 2000 and 2005?
A. I would have to go back and look at the dates for each of those accidents to be able to tell you that.
Q. Can you give me an estimate of how many?
A. There were probably an average of -- I will say four or five majors a year and if they were -- you know, probably on most of those there would be questions from the press. Some would have very high interest. There would be lots of queries from the press. For example, on the Andrew J. Barberi, which was the Staten Island ferry, because it was --

Page 280

everybody knew about it around the world, so there were questions that came in on it.
The questions that came in on the Greeneville, Ehime Maru, there were -- it was very high public interest and there were lots of questions that came in on that. So I'm afraid that if I give you an average it won't necessarily reflect the -- accurately the number of times that I interacted with the press.
Q. Out of the four to five major accidents that you say there were per year between 2000 and 2005, approximately how many of those received questions from the press?
A. I don't know.
Q. Would it be more than one?
A. You're really asking me to guess at something, and I would prefer to be able to provide the information accurately. I -- as I said, the number of majors that we had in 2003 we had more majors in 2003 than any other mode of transportation. So throughout 2003

Page 281

virtually every week we had queries from the press.
So, again, giving you an average is not necessarily reflecting the work. You can't predict accidents and you can't predict when those responses are going to come in.
Q. How frequently did you receive queries from the press in 2005 during your tenure as OMS director?
A. I don't know.
Q. Would it be once a week, more frequently than that?
A. I don't know.
Q. Was there any press interest in OMS activities other than accident investigations between 2000 and 2005?
A. Yes.
Q. What activities?
A. What comes to mind is the MOU between the Coast Guard and the NTSB. That was written up international as well as domestically. The press was interested in