# EXHIBIT NO. 15

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - X

MARJORIE MURTAGH COOKE, :

Plaintiff, :

vs. : Case No.:

MARK ROSENKER, Chairman, : 1:06CV01928

NATIONAL TRANSPORTATION SAFETY :

BOARD, :

Defendant. :

- - - - - - - - - - - - - - - - X

Videotaped Deposition of DANIEL CAMPBELL

Washington, D.C.

Thursday, November 15, 2007

9:59 a.m.

Job No.: 1-115036

Pages: 1 - 200

Reported by: Dana C. Ryan, RPR, CRR

Videotaped Deposition of DANIEL CAMPBELL, held at the law offices of:

The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

Pursuant to agreement, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
R. SCOTT OSWALD, Esquire
DAVID SCHER, Esquire
BRIAN M. LOWINGER, Esquire
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

ON BEHALF OF THE DEFENDANT THE UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, Esquire
United States Department of Justice
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7978



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
ANDREA MCBARNETTE, Esquire
U.S. Attorney's Office
501 3rd Street, Northwest, Rm 4218
Washington, D.C. 20530
(202) 514-7153

ALSO PRESENT:
Denise M. D'Avella, Esquire, NTSB Office of General Counsel
Marjorie Murtagh Cooke, Plaintiff
Scott Forman, Videographer



C O N T E N T S


| EXAMINATION OF DANIEL CAMPBELL: | PAGE: |
|---|---|
| By Mr. Oswald | 7 |
| By Ms. McBarnette | 127 |
| By Ms. Cohen | 190 |
| By Mr. Oswald | 195 |


E X H I B I T S

(None)

abilities that were necessary to perform the director of the Office of Marine Safety position when the first vacancy announcement was issued in late 2004?

MS. COHEN: Objection, asked and answered.

THE WITNESS: The Office of Marine Safety already existed; it already had an office director. So the announcement for the position would have been largely drawn from an existing position description. And the knowledge, skills and abilities and such, since there had been other offices, for instance, the highway office, that had been converted, if you will, from 15 to SES, there would all -- have been a format for that, which suggests to me that human resources would have been able to do 99 percent of it.

On anything that they might have had some question with, they might have asked me or somebody else in my office, what should I do with this. That would have been the level of that input. I don't -- I don't recall being directly involved at all, but it's not unlikely that if Collette Magwood or



Lisa Love had a question about something that they might have picked the phone up and said, Dan, how do you want me to handle this. But unlike some, as I mentioned earlier, that I might actually sit down and have to write something on because there wasn't any format to work from, this one, there would have been a format and I probably was not involved very much at all.

BY MR. OSWALD:

Q So I just want to understand precisely, what role did you play in the preparation of the vacancy announcement, which included the job description and the knowledge, skills and abilities, for the position of director of Office of Mine (sic) Safety at the National Transportation Safety Board when the vacancy announcement -- the first vacancy announcement was published in late 2004?

MS. COHEN: Objection, asked and answered.

THE WITNESS: Very little. I would have answered the phone if somebody asked me a question, and that would be about all I would remember



of it. I probably am the person who signs off on it before it goes out, but in the creation of it, which I believe is your question, very little.

BY MR. OSWALD:

Q So other than -- just so I'm clear, other than signing off on the vacancy announcement and possibly answering a question over the telephone from human resources, what other role did you play in the preparation of a vacancy announcement, which included the job description and knowledge, skills and abilities, for the position of director of marine safety for the National Transportation Safety Board for the first vacancy announcement in 2004, late 2004?

MS. MCBARNETTE: Objection, asked and answered.

THE WITNESS: I'm repeating myself now. There was a format to work from. That would mean that human resources would be able to do 99 percent of the work. If there was a question they needed asked -- answered, they may very well have asked me. I have no recollection of that. So they probably presented me a document, and I would have signed the document after



having read it, and that would be my role.

BY MR. OSWALD:

Q In its entirety?

A I have no recollection of having done anything else.

Q I understand.

A Well, apparently --

Q Now, when did you -- who was responsible for the decision to rescind the vacancy announcement for the director of the Office of Marine Safety, a position that was announced the first time in late 2004, for the director of marine safety at the National Transportation Safety Board?

A I was.

Q And why did you rescind the first vacancy announcement?

A Well, that's a complicated question, but there were two principal things that were on my mind. One was I wasn't ready to have a selection made at that moment, and, two, I thought that the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an

Page 94

internal candidate.
Q Now, what factors made up your decision to rescind the vacancy announcement for the director of marine safety at the NTSB -- this is the 2004 first vacancy announcement -- apart from your unwillingness or not being ready to make a selection and your belief that the pool of candidates was artificially narrowed based upon a preconceived notion that there was a preselection for the position; what other factors other than those?
A Well, I called -- when I got a list of who was -- who the panel had recommended, I put the list on the back of my desk and I didn't touch it very much for a period of time because, as I say, I wasn't really interested in seeing the selection process go forward at that point in time.
I can't remember why I finally decided I had to do something with it, but when I did, the first name on the list was a captain from the Coast Guard who I knew, and I called him and he told me that he was now employed by Johns Hopkins and was no longer a candidate, and I told him that I was kind of surprised

Page 95

that there -- he was the only guy that was interested. Captain Brusseau was the guy who told me that it was understood it was kind of wired for the plaintiff and that that may have limited it, and, so, that conversation with one of the applicants would have been the only additional factor that I -- that went into it.
Q Who were the other four candidates on the list that was provided to you by the panel after the first vacancy announcement --
A I don't remember them by name, but there was a -- there was a Coast Guard guy from the operational side of the Coast Guard, and then there were two people from the private sector, and I don't remember their names. I do remember that I was not impressed.
Q And who else?
A The plaintiff.
Q Marjorie Murtagh was?
A Yes.
Q Why did you -- so what was it about the -- the five candidates that were sent to you by the first panel of the selection committee that led you to

Page 96

believe that it was -- it was artificially narrowed? This is the same group that include, what, Captain Prudo (sic), a Coast Guard captain and two private sector folks and Marjorie Murtagh Cooke; how is it --
A Could you repeat the -- I lost your question and -- could you rephrase it?
Q Well, what was it about the list that the panel had supplied you, the list of five candidates, which included Captain Prudo (sic), two private sector employees, another captain in the Coast Guard and Marjorie Murtagh Cooke, the incumbent in the position, that led you to believe that the list was too narrow?
A Well, it wasn't the list that led me to believe that -- that -- that the -- it was too narrow. I mean, the list -- the list didn't have any good candidates in it except the first guy that I -- well, I don't want to say it didn't have any good candidates. The two private sector guys I found deficiencies with just looking at the -- the applications. I don't know that I -- if I had met with them and talked to them that they might not have been able to explain a lot of that, but I looked at it

Page 97

and I thought to myself, well, there's a couple of glaring probabilities -- possibilities here that I'm not -- I'm not very happy with.
The one guy that was on the top, the first name there who I -- was somebody that I had dealt with in Coast Guard and thought was an -- an estimable person, I gave him a call and he was no longer a candidate. So now I was left with an operational guy, with Marjorie Murtagh and with the two private sector types who -- who had credentials that both didn't really speak to the job, but also had holes in them that made me very -- very nervous; periods of time where people had gone from a senior vice president, 170,000 or $180,000 a year to a GS-12. That's not the kind of career advancement that -- that makes you comfortable when you're thinking of turning someone into an SES. So it wasn't -- it wasn't a very -- it wasn't a pool that I was particularly delighted with.
Q And why wasn't Marjorie Murtagh Cooke a good candidate for the position?
A Well, she might have been a good candidate, but I would have had to take it to the chairman, and

Page 98

she would not probably have been selected, and that's one of the reasons I was not in a hurry to do this. When I say I procrastinated, I procrastinated because I believed that I was going to lose the office director that was there; that was going to be the outcome.

Q What led you to believe that?

A Well, I knew who the chairman was. I knew what the -- what the -- the -- the -- as I say, I allowed the modal directors to make their own impressions on a chairman. I -- I gave them every opportunity to prove themselves. If I had made a suggestion that Marjorie Murtagh ought to be the office director during the period of time that the Barberi was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, Dan, have you lost your mind. I think -- I think that that would not have been a sensible thing for me to do.

Q Why not?

A Well, because to make somebody -- to pay

Page 99

somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible. It's just -- it's not a sensible thing to do.

Q All right. Well, what were the other factors that led you not to believe that Marjorie Murtagh Cooke would be a good candidate for the position other than the fact that you believe that if the -- you went and took her name to the chairman that -- that she would ask you whether or not you were crazy?

A Marjorie Murtagh and I have been known to one another since probably 1995. So I've had a long history to develop my view of whether or not she would be the right candidate to run the office at the SES level. And I could, if you like, spend all the time from now to lunch describing to you the difficulties that I have encountered over that period of time that suggest to me that -- that it's not a good idea to make somebody an SES for doing something that they're only accomplishing, in my view, marginally at the

Page 100

GS-15 level.

Q What was your view about whether or not Marjorie Murtagh Cooke would be a good candidate for the director of marine safety at the NTSB?

A I didn't think that that was sensible. I didn't think that she should be made an SES.

Q And therefore selected for the director of marine safety position?

A Yes, I had -- I had serious, serious difficulties with Marjorie's performance as the director over her -- her office, both in terms of the way she managed the office and in the quality of the product that came out of it.

Q I understand. Now, in 1995 what was -- what was your exposure to Marjorie Murtagh Cooke in 1995?

A Well, I'm not really sure when it -- when it first -- it might have been '97. The first time that -- that -- that I had a direct role to play in a Coast Guard matter was, I think, shortly after the Office of the Secretary of Transportation had been changed into the four modal offices, so I think it would be very early in Marjorie's leadership in the

Page 101

Office of Marine Safety.

Q And -- and during that --

A When that is, I can't say, but I think it's maybe 1997 or '95 or something like that, and I am the general counsel at the time.

Q In 1997 or '95 did you -- do you have a significant -- did you liaise significantly with the Coast Guard during that period of time as general counsel?

A No. This wasn't Coast Guard that I'm talking about. This is the Office of Marine Council.

Q Well, I understand that. No, my question is different. Did you have occasion to liaise with the -- with the Coast Guard between 1995 and 1997?

A No, I -- "liaise" would not be the -- not be the right word for the relationship that I ever had with the Coast Guard. No, that was always an adversarial relationship.

Q Why was it adversarial?

A Well, because, one, they're one of the agencies of government that come under our purview when we do an accident investigation. They are the

regulator of marine safety. They are the -- the -- the -- the -- the group within the federal government that's responsible for not only the waterways but the inspection of vessels and for manning requirements and such. So we're investigating them at the time of an accident, so there's that arm's -- to begin with, there's arm's length, but secondly, and unlike the other modes, we also have a shared jurisdiction there, and we are sharing a jurisdiction with -- to do accident investigations with an agency that is hundreds of times our size, has boats and guns. So we're put at a -- something of a disadvantage in that.

And, indeed, the very first relationship I had involved -- the very first opportunity I had to become involved with the Coast Guard as such was a legislative fight early in my career about whether or not the United States would assume the authority to do off-shore accident investigation with passenger vessels -- of cruise vessels that were ported in our own -- in our ports but -- but theoretically flagged by foreign states. And that was a -- a -- I would consider a -- a fairly robust struggle between NTSB



and Coast Guard, so I -- I'm not sure that I would ever say that the way that I related to Coast Guard was -- was to liaise with them. Long answer to a short question, but I didn't liaise with Coast Guard.

Q All right. The -- give me just a moment. When was the first time that you and En -- Ellen Engleman Conners ever discussed the fact that -- that Marjorie Murtagh Cooke believed that she should be paid more money than she was being paid at NTSB?

MS. MCBARNETTE: Objection.

THE WITNESS: I don't -- I don't know that we ever had that discussion.

MS. MCBARNETTE: My objection is that it's assuming facts not in evidence.

THE WITNESS: I don't -- I don't recall any such discussion.

BY MR. OSWALD:

Q All right. So, just so I'm clear, there was no conversation between you and Ellen Engleman Conners ever about the fact that Marjorie Murtagh Cooke believed that she was not being paid sufficiently as the director of marine safety at NTSB?



MS. COHEN: Objection, asked and answered.

THE WITNESS: I don't have recollection of a conversation with Ellen about Marjorie's inadequate compensation.

BY MR. OSWALD:

Q When, if ever, did you have a discussion with Ellen Engleman Conners about the fact that Marjorie Murtagh Cooke wanted to be paid overtime?

A I don't know that I had a discussion with Ellen about overtime. I know that at some point I -- I learned that Marjorie might have asked somebody for overtime. Whether that -- I learned that while I was the executive director and Joe told me that, Joe Osterman, the managing director, or whether Ellen mentioned it to me when I was still the managing director, I can't say, but it was a very brief conversation, and I don't recall who it was with.

Q When, if ever, did Ellen Engleman Conners ask you to investigate, research the circumstances under which NTSB could pay a managing -- a modal director like Marjorie Murtagh Cooke, indeed,



including Marjorie Murtagh Cooke, overtime pay?

A I -- I don't have a recollection of having been asked that.

Q By Ellen Engleman Conners?

A By anyone.

Q If Ellen Engleman Conners were to testify that she had a specific conversation with you in which she not only told you that Marjorie Murtagh Cooke had asked her whether or not NTSB could pay her overtime, and, indeed, Ellen Engleman Conners asked you to research this and investigate it with HR, would that be correct or incorrect?

A I have no recollection of the conversation.

Q What investigation or other research did you do in 2004 to determine whether or not Marjorie Murtagh Cooke or, indeed, any of the managing -- any of the modal directors could receive overtime?

MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: I wouldn't have done any research. I didn't have a -- I didn't have a live issue on my table from any of my office directors

about overtime. If Marjorie Murtagh had been looking for overtime, since I was her supervisor, she could have come to me and said, Dan, you should be paying me overtime. We would have had a discussion about why. There are rules about overtime. There are rules about a GS-15 cap on overtime. There are rules about getting it preauthorized and so forth. It would have been natural for Marjorie to have come to me and ask me if we were going to consider doing that for her. I never had that conversation with Marjorie, and I don't recall having a conversation with anyone else.

BY MR. OSWALD:

Q I understand. What are the rules as you understand them about the cap for overtime for GS-15 employees?

A Well, I'm going to mess this up big time because I -- the way I know it was in the context of overtime for non-GS-15s. The agency was fortunate enough in, I think, 2002 to receive an exemption from Congress from the rules that -- that provide what we refer to as undertime; that is to say, when a GS-14 would work overtime, they would actually be paid at



the GS-10 rate. We got the right to pay time and a half, which was a substantial gain for our employees, but as a consequence of that, it meant that the higher rated GS-14s and the GS-15s might, as an accumulated matter or a monthly matter -- and I can't even remember which was the thing, whether it was within a -- a -- a pay period or within an annual accumulation -- that there was some cap that said you couldn't go over the level of GS-15, 10, and I knew it because there were people who got close to it and the CFO or the -- the payroll person would come to me and say, we got somebody close to it, and, you know, you'd have to give some kind of warning to an office director that, all right, that person is no longer going to get the time and a half and maybe even no longer get overtime because they're close to the cap. That's what I know about the cap.

I had -- don't think ever considered what happens to the cap, for instance, if you try and pay hour-one overtime to somebody already being paid GS-15, step 10. I don't know that it's even lawful to do that. I never asked that question of anyone



because that wasn't the way in which the question had presented itself to me.

Q What was the way the question was presented --

A Whether --

Q -- to you?

A -- or not a G -- what happens to a GS-14 or a GS-15 lower when they get close to the cap, and I didn't research the answer, but people told me that we couldn't go over the cap, and, so, you know, if the CFO saw somebody that was close to that, he would come down to my office and say, we need to -- we need to see to it that this person doesn't exceed the cap.

Q Who asked you to research that?

A Nobody asked me to research it.

Q You just said someone had come -- when it came to you, how did it come to you?

A The CFO would have a -- the CFO has a printout of how much he is paying people. That's -- you know, we're -- we're not that loose with our finance, and if it looked as if somebody was going to pay more than the GS-15, step 10, the payroll people



and the CFO would tell me that, so apparently they knew these rules. I didn't know them. That's how I learned about them.

Q Now, other than the August meeting on the Barberi incident and then your meeting with Ellen Engleman Conners in or about December of '04 when you discussed downgrading Marjorie Murtagh Cooke's performance from outstanding to excellent, what other conversations did you have with Ellen Engleman Conners about Marjorie Murtagh Cooke's performance in 2004?

A In answering that question, I don't want to suggest that I think you have the dates right. You're probably within the ballpark, but I'm not sure August and December is anything that I would have said or that I certainly wouldn't feel comfortable about. I think I did say August to September for one of those meetings, but -- but I really want you to understand, I don't -- I don't keep a calendar. I never kept a calendar, so I -- I'm not going to be in any way, shape or form able to get you closer than -- than a relative period of time.

Conversations with Ellen would occur from

time to time, as they would about any office director, about the way that things were proceeding and the difficulties that might have come up. For instance, I'm sure that I had a conversation with Ellen when it came to pass that the chief investigator of the Barberi accident had threatened to quit and -- and -- an interoffice dispute, and we would have talked about that and why that was so. And I know that -- that she was of the view that I should go down and see to it that that didn't happen. It wasn't going to -- it wasn't going to be good for the agency to have a chief investigator quit in the middle of what was then our highest profile accident, and so I did speak to the gentleman and did convince him to at least stay through that accident.

And -- and -- and that would have been the kind of conversation we would have had, and Ellen would have asked me during the context of that, well, how does that happen, and we probably would have had something of a discussion about personnel within the Office of -- of Marine Safety and what my understanding of their morale and their turnover



issues were, so I'm sure that happened.

Q Uh-huh. What other conversations?

A None come to mind.

Q So when you had the conversation with Ellen Engleman Conners when the investigator in the Barberi accident wanted to quit, what did you discuss with Ellen Engleman Conners about morale and turnover in the marine safety department?

A Well, I would have told her that this was not a -- a kind -- a novel development and that I had had some difficulties with -- with morale and -- and dissension down there over the past, and that I had made a con -- a -- a habit of informally doing, and sometimes not so informally doing exit interviews with people as they left the office, because very frequently Marjorie would tell me that she had somebody that was a good employee and then that good employee would leave.

And it was not unusual for Office of Marine employees to come to my office and volunteer that they were unhappy. That had happened on more than one occasion. And, so, I -- I'm certain that I described



what my understanding of the situation down there was.

Again, because I had so many different chairmen in such a short period of time, I can't really remember all of the discussions I might have had with any given one of them. I had discussions, I'm sure, with Marion Blakely about the same sorts of subjects while she was there, so that's all I can do for you.

Q I understand. So other than the Barberi incident, what were the other reasons why, in your opinion, Ellen Engleman Conners, if you had brought her the name of Marjorie Murtagh Cooke as the new director of marine safety with the SES designation, 2005 -- what other factors would have led Ellen Engleman Conners to say to you, are you crazy?

A Well, the -- that would have been the factor -- Barberi would have been her factor, but the -- she would not, I think, have -- have wanted to make a move on that without having heard me out. So the other factor would have been my views, and my views were that this was not -- this was not worth doing. This was not a good idea.



Q What was not a good idea?

A Promoting Marjorie to SES to continue to run an office at the SES level that there was sig -- significant difficulty with as a GS-15. It's not a sensible decision, and I would have told her that, so I'm sure that that would have weighed heavily on it if I had brought it, and -- and that would have meant that we would be in the position, one, to have to select from a panel that had -- from a group that I didn't think really had a -- a good choice in, and, two, it would have meant that that would be the point in time when we made a selection that Marjorie would no longer be the head of the office, that the plaintiff would no longer be the head of the office, and I wasn't in a hurry to have that happen, notwithstanding that I had difficulties with Marjorie. You know, we're all human, and I was just not interested in seeing it, so I procrastinated.

Q Procrastinated in doing what?

A In bringing to -- to a head the issue of a selection for SES in marine.

Q How did you bring it to a head finally?

A I don't honestly know whether somebody finally said to me, Dan, you've got to do something here. I -- I was getting close to the end of being the managing director, and I was trying to get things that were my problems off the desk for the next guy. And, so, at that point I decided to readvertise; that that would -- that would be the best course for it. And in the readvertisement, I thought that my -- my role in it would be finished and we would just let it -- let -- let it happen whatever way it was going to happen, but my role in it was going to be finished.

Q And how would that help you get the problem off your desk?

A Well, I had a -- I had a selection that needed to be made, and if it wasn't going to be made from -- from the first advertisement, you had to put out a second one, so I put out the second one.

Q I want to make sure I understand this. When, if ever, did Marjorie Murtagh Cooke herself come to you and tell you that she was unhappy with the way -- the disparity in pay, either that she wasn't being paid enough or wasn't being paid enough in



relation to the other modal directors, during the period of time that she was the director of marine safety at NTSB?

A Never.

Q When the EEO counselor came to you and notified you that Marjorie Murtagh Cooke had filed an EEO complaint, what was your reaction?

MS. COHEN: Objection --

THE WITNESS: I don't know --

MS. COHEN: -- assumes --

THE WITNESS: I don't know --

MS. COHEN: -- facts --

THE WITNESS: -- who --

MS. COHEN: -- not in evidence.

THE WITNESS: I don't know how I learned of her complaint. My first recollection of anything was that our EEO specialist told me that he needed to interview me. I don't have a recollection of our EEO officer talking to me about it, but I do know that at some point the EEO specialist who worked for her said he needed to talk to me, and then subsequently an investigator talked to me, but I can't



date it. I think that they probably have notes from it that were dated, but I can't date it.

BY MR. OSWALD:

Q And what did the EEO specialist say to you?

A I think he asked me a whole bunch of questions. I -- I don't -- beyond that, I don't remember, but I think that the -- I -- I -- I -- I'm sure that he has a record of it, whether it was part of a process that they go through.

Q When was the first time that you met Mr. Spencer?

A Who is Mr. Spencer?

Q The selectee for the --

A Oh.

Q -- director of the Office of Marine Safety.

A I thought he might be referring to the --

Q The person that you selected.

A I didn't select Mr. Spencer.

Q When -- when's the first time you -- you met Mr. Spencer?

MS. MCBARNETTE: Objection --

THE WITNESS: After --



MS. MCBARNETTE: -- assumes facts not in evidence.

THE WITNESS: After Mr. Spencer was selected, he was in the hall one day and I was introduced to him.

BY MR. OSWALD:

Q When was that?

A Probably just before I left. I think we only overlapped for a period of a few weeks.

MR. OSWALD: I understand. Let's go off the Record.

THE VIDEOGRAPHER: We are going off the Record. The time is 12:34 p.m.

(Recess -- 12:34 p.m.)

(After recess -- 12:43 p.m.)

THE VIDEOGRAPHER: We are back on the Record. The time is 12:43 p.m.

BY MR. OSWALD:

Q After you decided to rescind the vacancy announcement for the director of marine safety position at NTSB, what conversations did you have with Joe Osterman or -- in particular, but anybody else for

me and that it might have been a month, it might have been two months, it might have been three months before I actually turned my attention to it full-time and said, all right, I need to -- I need to move forward on this. So I'm not sure what the elapse was, but -- but like a lot of people, I procrastinate and I also know when I'm procrastinating, so at some point I said, you can't do this and you need to move forward.

Q Why did you choose to procrastinate?

A I wasn't anxious to -- to proceed to the selection of an SES that I didn't necessarily think was going to work satisfactorily. I didn't think that Marjorie Murtagh Cooke, the plaintiff here, was going to be selected. I would not have recommended her selection, but I also didn't think that the pool that -- that I looked at when I initially went through was attractive.

Q After the position was readvertised, did you select a panel to review the incoming applications?

A Yes.

Q Do you know if that panel is -- was the final panel that actually selected the person who was



selected?

A Panels themselves don't select --

Q Right.

A -- so the panel wouldn't have selected. I believe that the panel that I suggested was the panel that made the review of the applications, so that's a yes. Were they a selector, I think that that's probably going to be a no.

Q Were you the selecting official for that particular position?

A No, for two reasons. One, I think I was no longer the managing director; and, two, as a matter of reality, the selection of any SES is going to be the chairman. As I mentioned earlier, the managing director works on a delegation with the chairman's authority, but only on a delegation. And at the level of SES, a chairman will be the determining call.

Q Did you have any input on who was ultimately selected?

A No.

Q Did you tell the panel members for the second panel who they should select or review?



A No, I didn't communicate with them on the merits of the panel at all.

Q Did -- did you give your opinion about who should be selected to the chairperson or to any other officer who had input into sel -- selecting?

A No.

Q Are you aware if Ms. Cooke was ranked within the top five for the second panel's selection in the applicant pool?

MR. OSWALD: Objection as to form, misleading.

THE WITNESS: I -- I'm not sure how many people the panel actually considered at the top. I'm not sure what they went forward with. I did hear at some point that Marjorie was not to be offered an interview, so she was not in their top group, but that's -- that's what I know about it. I was told -- I've forgotten who told me that the panel was making a -- a recommendation -- I don't know whether it was a recommendation of one person or five people, but they were making a recommendation -- and that Marjorie was not included in the group that would be interviewed.



BY MS. MCBARNETTE:

Q Do you find that surprising?

A Yes.

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: Yes, I found that surprising.

BY MS. MCBARNETTE:

Q Why?

A I believed out of courtesy -- if nothing else, out of courtesy to an individual that held the office for that long that he or she should be considered and given an opportunity to explain to his or her peers why that individual would have been the best choice. That's just -- I mean, that to me was -- that to me would have been common decency if -- if -- even if the person were clearly not qualified for the position. By technical background, Marjorie's qualified for the position, so if it had been me, I certainly would have had the interview, so I was surprised.

Q After the selection was made, did you have