# EXHIBIT NO. 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x

MARJORIE MURTAGH COOKE, :

Plaintiff : Case No. 06-748C

vs. : (Judge Thomas C. Wheeler)

THE UNITED STATES, :

Defendants : PAGES 1 - 261

- - - - - - - - - - - - - - -x

Deposition of JOSEPH G. OSTERMAN, held at the offices of The Employment Law Group, 888 17th Street, N.W., Suite 900, Washington, D.C., commencing at 10:05 a.m., Thursday, May 24, 2007, before Elizabeth Mingione, Notary Public.

A P P E A R A N C E S O F C O U N S E L:

ON BEHALF OF THE PLAINTIFF:

THE EMPLOYMENT LAW GROUP, P.C.
BY: BRIAN M. LOWINGER, ESQUIRE
888 17th Street, Suite 900
Washington, D.C. 20006
(202) 261-2806

ON BEHALF OF THE DEFENDANT:

DEPARTMENT OF JUSTICE, COMMERCIAL
LITIGATION BRANCH
BY: MEREDYTH D. COHEN, ESQUIRE
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 353-7978

AND

NATIONAL TRANSPORTATION SAFETY BOARD
BY: KATHLEEN SILBAUGH, ESQUIRE
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202) 314-6084



C O N T E N T S

WITNESS: JOSEPH G. OSTERMAN


EXAMINATION BY: PAGE

Mr. Lowinger ................................ 6




DEPOSITION EXHIBITS
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | NTSB Position Description, Director, Office of Marine Safety | 221 |
| 2 | Position Description beginning with Bates 00753 | 224 |
| 3 | Position Description beginning with Bates 000759 | 226 |
| 4 | Position Description beginning with Bates 000766 | 229 |
| 5 | Memorandum of Understanding, NTSB and Coast Guard | 232 |
| 6 | Position Description beginning with Bates 000772 | 233 |
| 7 | Position Description of Robert Macintosh, Jr., 11/29/05 | 235 |
| 8 | Letter Dated July 18, 2003 to Delores Everett | 236 |
| 9 | Attachment F, Comparison of Average Compensation | 239 |
| 10 | NTSB Order 50, Marine Safety Program, Dated 11/25/96 | 241 |
| 11 | NTSB Order 20, Highway Safety Program, Dated 4/18/96 | 243 |
| 12 | NTSB Order 20A, Highway Safety Program, 5/17/02 | 244 |
| 13 | NTSB Order 40, Railroad Safety | 245 |




DEPOSITION EXHIBITS (Continued)
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 14 | NTSB Order 30, Hazardous Materials and Pipeline Safety Program, 4/18/96 | 247 |
| 15 | Notification of Personnel Action | 248 |
| 16 | Position Description, Office of Railroad, Pipeline and Hazardous Materials | 250 |
| 17 | Position Description, Director, Office of Aviation Safety | 252 |
| 18 | NTSB Performance Appraisal Form, Bates 233-240 | 252 |
| 19 | NTSB Performance Appraisal Form, Bates 231 and 232 | 253 |
| 20 | NTSB Organizational Chart, Bates 001008 | 256 |
| 21 | NTSB Draft Position Description, Director, Office of Marine Safety | 258 |


- - -

A. You have to have the report.
Q. Okay. You have to have to report. What would be second of the list of her primary duties that would follow that?
A. After investigations and report development, it would be the general management of the office, I think.
Q. Okay. And after general management of the office, what would follow as third?
A. Her coordination with the other internal offices of the agency. And then fourth would be her coordination with outside organizations.
Q. And fifth?
A. Those four pretty much cover most of the broader categories, I think.
Q. Those are the primary, those are the most significant?
A. Those are the primary. Right.
Q. So investigation of accidents and reports, general management of the office, coordination with other offices within the agency and coordination with outside groups?



A. Right.
Q. Are the most significant of the responsibilities of the director, of Ms. Murtagh Cooke as the Director of Office of Marine Safety between 1997 -- between 1997 and 2005?
A. Right. I think that I would put those in those four categories.
Q. And, therefore, would you say that meeting with congressional staff would be insignificant to --
A. I put that in the outside organization.
Q. Okay. Meeting with congressional staff is outside. Okay. Now, aside from those four, what would you say additional responsibilities are insignificant related to Miss Murtagh's Cooke's responsibilities as the Director of Office of Marine Safety?
A. I think that those four categories covered the majority of her responsibilities.
Q. Okay. Now, can you also tell me what skills are necessary, are required for Miss Murtagh Cooke to perform her primary duties as the Director of Office of Marine Safety between 1997 and 2005?



A. I think the skills required for Miss Murtagh, the Director of Marine Safety would be, one, leadership and supervisory skills; two, logic and analytical process skills. Miss Murtagh needed to also have fundamental knowledge of the marine industry. And, finally, her ability to communicate both written and orally were fundamental skills necessary for that position.
Q. Okay. Aside from leadership and supervision, logic and analytical process skills, fundamental knowledge of the marine industry and written and oral communications, what other skills were required for Miss Murtagh Cooke to perform her position as Director of Office of Marine Safety?
A. Well, she needed to be able to coordinate and collaborate with other professionals, both internally within the NTSB and externally as part of the investigations or other advocacy work of the marine office. So coordination and collaboration with others is a highly useful skill.
Q. Okay. What about -- is there anything else other than leadership and supervision, logic and



analytical process skills, fundamental knowledge of the marine industry, written and oral communications and coordination and collaboration with other offices and outside offices of NTSB?
A. That covers the broad aspects of what she needed to have to -- the skills she needed to have to be effective in that position.
Q. Okay. And how would you rank those in importance?
A. I would rank them based on the mission needs of the agency. The analytical skills would rank Number 1. Supervisory skills primarily because Miss Murtagh's an individual could not perform the mission of the marine safety function of the NTSB. It was the staff working that office that had to conduct the mission. So her supervisory skills were paramount.
Collaboration and coordination with others for exactly the same reason. The nature of the NTSB is such that we are a small organization and must work with others. We in fact have a built-in collaborative arrangement called the party system in our legislative

Page 42

authority that requires us at times and enables us at other times to work with outside agencies to get our work done, our investigative work done.

And what were the other categories that I gave you?

Q. Written and oral communications, and fundamental knowledge of the marine industry.

A. Fundamental knowledge of the marine industry probably would rank last, but it's not -- it's difficult to rank these. They are all equally important. The oral and written communications is sequentially critical, but you have to have cooperation and collaboration before you can get to the written communication product.

Without the written product, the work of the agency is -- it doesn't impact the safety of the transportation system. If we can't communicate the results of our investigation, we have failed to conduct our mission.

So it's very difficult to rank those in priority. Analytical skills would be Number 1 because for the agency we need to be right first. We need to

Page 43

be accurate and relevant first. The other ones are all very close to each other in their priority.

Q. Okay. Are there any other efforts outside of the ones that you just mentioned, analytical skills, supervisory skills, collaboration, knowledge of the industry and oral and written communications that are significant requirements for the position of Director of Office of Marine Safety between 1997 and 2005?

A. No. If you consider those categories as a little broad to incorporate other relatively insignificant activities, I mean, there's -- for example, under supervisory skills, there's a long list of what you would expect to be very standard activities from disciplining employees, performance of employees, budget execution, process development, internal planning. Those are all very subsets of that supervisory.

Q. Okay?

A. Relationship.

Q. Let's talk about those substantive supervisory. It includes personnel issues, hiring?

Page 44

A. Um-hmm.

Q. Evaluating, promoting?

A. Hiring, evaluating, promoting, attending to the normal personnel needs of the staff with that office. We could probably come up with a list of 20 or so fairly, you know, from creating position descriptions, to providing performance evaluations, to ensuring travel vouchers are executed properly, to ensuring that travel is done within the parameters of the rules. There's a very long list of fundamental supervisory activities that go on.

Q. Okay. So that's -- and then you said process. Can you describe to me what you meant by process?

A. I segregate the written communication and the development of investigation and reports kind of into two different categories. It is one thing to develop a process for the efficient work flow from an investigation into a report and the ultimate production of that report. It is a different thing to have the content of that report be relevant and accurate.

Page 45

There are two different skills, process flow, industrial engineering, if you will, how do you get from A to Z, and the steps necessary, and designing those kinds of steps based on the general rules or the parameters of the organization, and the development of the content of the reports and the impact of those reports.

Q. I see. So as far as process, we are talking about the actual production of the report, the investigation and the report or just the production of the report?

A. Both.

Q. Both. Okay. So when we say processes as far as supervisory skills, what we are talking about is designing a means for investigating an accident, a marine accident?

A. Yes.

Q. And how to generate -- and the steps necessary -- the steps necessary along the way to conduct this investigation, as well as the steps necessary to prepare and obtain approval of -- or obtain approval of a report related to the

investigation of the accident?
A. Correct.
Q. Is there anything else related to process?
A. For the investigation report, that pretty much sums it up.
Q. Okay. What other processes or processes are involved in the supervisory skills necessary to or required to perform the position of director of OMS between 1997 and 2005?
A. The processes for the supervisory component of that.
Q. Right.
A. Well, supervisory also transcends into everything else that's going on. But if we are talking about personnel and dealing with personnel, it is the identification of positions, necessary positions within the confinements of budget parameters. It is the recruitment and hiring of personnel to fill those positions. It is the development of personnel within those positions that either hold those positions or are new to the positions, which is training and counseling and



performance.
It is the oversight of their work and also the oversight of their personnel activity. I'm talking about, you know, payroll and that kind of activity, travel and things like that. And it is also the, in a broader sense, the management of the office, ensuring that the staff have tools to do their job within budget parameters, computers, furniture, other tools in addition to things like training.
Q. I see. And then you mentioned as far as the supervisory, well, let me just go back to this, actually. With regard to the processes for personnel issue, you said recruitment and hiring, development of personnel and positions, training and counseling personnel, oversight of their work, oversight of their personal activity including, for example, travel and payroll, identification of positions and within the budgetary parameters, and the overall management of the office.
Other than those, are there anything else related to the processes for the personnel issues related to the requirements for the position of



Director of Office of Marine Safety?
A. No. I may not have included every fine detail of personnel management, but it is the general supervision of the staff.
Q. I see. What about budgeting? Describe to me what processes are required for budgeting as part of the supervisory skills for the Director of Office of Marine Safety between 1997 and 2005?
A. During that period the budget execution and budget development, start with budget development and the budget execution requirements for the offices changed slightly. But in general terms the offices were responsible for providing a request for budget, for money.
And that money -- each fiscal year, fiscal year process in the federal government, and that money request included money for personnel, for overtime, for training, for mission execution, for equipment, for uniforms, for supplies, all of what you would expect in a normal budget category. The budget was in the NTSB during that time for the most part translated down to the offices. It was not for the most part



centralized, translated down to the offices to design and submit a request.
Those requests were then collected by the chief financial officer and the managing director's offices. And based on the allocation provided by Congress, the appropriation provided by Congress to the agency, managing director's office and CFO's office allocated back to the offices the amounts that the agency could afford for the offices to execute their mission.
It was almost never heard of that, I don't know of any circumstances where an office's budget request was completely filled when the allocation was returned to the office, simply because the agency did not have the level of appropriations that equaled the net sum of the budget requests.
Q. Sure. You said during your -- during that recent -- during the most recent answer you said that the offices were required. So is it correct to say that each of the offices, Office of Marine Safety, Office of Aviation Safety, Office of Highway Safety, Office of Railroad, Pipeline and Hazardous Material

Page 50

Safety all have the same requirement of their directors that they have skills and budget tear processes?
A. Yes.
Q. And those, were those budgetary processes the same for all the offices?
A. Yes.
Q. Okay. What skills are involved in the collaboration with -- well, let me ask this. Let's strike the earlier part of the question.
You mentioned as far as collaboration that NTSB has a party system. Is that what you said it was a party system?
A. Yes.
Q. Can you describe the party system as it applies to the Office of Aviation Safety, the Office of Highway Safety, the Office of Railroad, Pipeline and Hazardous Materials Safety and Office of Marine Safety?
A. Again, I'll need to take them one at a time.
Q. Okay.

Page 51

A. Because it is slightly different.
Q. Okay.
A. In general terms the NTSB operates its investigations with parties. What that means is that we select organizations to work with us on the investigation. That can be federal agencies. It can be in the industry. It can be other organizational groups that are not part of manufacturing.
It can be the carriers in an accident. And they are responsible under this arrangement to provide work force to the investigation to assist us in the development of the factual information that we need to gather during each investigation.
The exchange is that they work for us essentially on the investigation. And we provide in return an open book on the factual information that we are gathering during the investigation. It does not include -- the party system does not include the analytical aspects of our investigation.
So it is really a work force of -- work force multiplier for us.
Q. So, I apologize for interrupting you, sir.

Page 52

So each office is involved in this party system. Has each office director is -- has a skill requirement that he be able to engage in this party system that he or she actually the -- be able to engage in this party system and to actually execute that party system?
A. Correct.
Q. Concept?
A. Correct. With some variables between offices.
Q. Okay.
A. Okay.
Q. Can you describe the variables between the offices?
A. For aviation safety, the FAA is the only agency or entity that is automatically granted party status by the NTSB. It is in the statute. No other organizational entity or agency is automatically granted this statute.
Additionally, in aviation the parties to the investigation are generally well-known individuals and organizations to our aviation group. They are from Boeing or they are from Airbus or they are from

Page 53

General Electric or United Airlines, et cetera. They are the same groups. And we make a concerted effort to train those individuals in advance of the accident investigations.
We have the basic accident investigation school that we provide to these folks so that they can work on our investigation when the time comes to do that. So the industry, the aviation industry is rather large, but the individuals that we see as parties are people that we've seen before. And so there's familiarity there.
Q. Sure.
A. In the other modes, it is somewhat different.
Q. Okay. Let me just go back to aviation real quickly. What is the -- can you just describe to me a plane falls out of the sky or there's an aviation accident. Describe to me how the party system works between the FAA, NTSB and the private groups, Boeing and other groups that you train?
A. Certainly. A plane crashes. A commercial airliner crashes. And the NTSB arrives on the scene

Q. Yes. Explain that part of it.
A. It is Railroad Pipeline and Hazardous Materials is the most complicated office in the agency, I believe because it is a mixture of three different similar and wholly dissimilar disciplines.

For railroad accident investigations it is analogous to aviation. We know there are not that many railroads in the United States, but they are relatively large. We have working relationships and familiarity with the majority of the major railroads in the United States. And that includes the majority of the major Metropolitan Transit Authorities in the United States.

In the pipeline area, it is more analogous to probably the highway area. There is lots of miles of pipeline in the U.S. and lots of pipeline companies. And frequently our pipeline investigators are introducing themselves to the pipeline parties when they go to their investigations.

And then there is the third component of the rail pipeline hazardous materials, and that is the exclusive hazardous material part of that. Our



parties in hazardous material are generally new to the NTSB on each investigation, but the hazardous material function is as much a support role as it is a primary modal role.

Hazardous materials don't get there on their own. They go by truck or train or pipeline or ship or plane. So hazardous material is generally support activity for the agency.

We have occasionally issued hazardous material reports, but for the most part our hazardous material work and party system falls within the purview of another modal activity.
Q. I see. What type of education is required to perform the requirements of the Director of Office of Marine Safety between 1997 and 2005?
A. Well, the required education for the GS level employees that are not technical employees, not engineers, they are in federal government requires as you probably know degreed personnel for engineering positions, for lawyers, for some other billets. But for the Director of Marine Safety, there is no formal education requirement, but there is a practical



educational requirement and understanding of the marine industry within the United States and also internationally.
Q. And --
A. I think it would be difficult for a nonmariner -- it wouldn't be impossible but it would be difficult for a nonmariner to run the Office of Marine Safety. It would be difficult for a non-aviator or avionics engineer to run the Office of Aviation Safety. It would be difficult for a non-highway engineer or highway accident investigator to run the Office of Highway Safety.
Q. I see.
A. Not impossible but it's better with that background.
Q. Are there any specific educational requirements for the requirements of office of -- Director of the Office of Railroad, Pipeline and Hazardous Materials between 1997 and 2005?
A. There are no specific educational requirements required, but that is a relatively unique position in that you have to -- the gentleman who



holds that position now has a background and an understanding in all three disciplines that are contained within that organizational unit.
Q. Who's that individual?
A. Robert Chipkevich.
Q. I see.
A. C-H-I-P-K-E-V-I-C-H.
Q. And that's applicable, your statement that there's no educational requirement per se to fulfill the requirements of the position of Director of Office of Railroad, Pipeline and Hazardous Materials; Office of Marine Safety; Office of Aviation Safety and Office of Highway Safety; that's correct?
A. That's correct.
Q. Okay. Can you describe the abilities that are required for the position of Director of Office and Marine Safety between 1997 and 2005?
A. The abilities fall within the categories that we previously discussed, leadership, the ability to supervise employees and lead a -- the practical functional application of an office, process development skills, coordination, communication, oral

and written, analytical skills and an understanding of the marine industry.

Q. Anything else apart from those?

A. No. I think that we covered those in the previous answer.

Q. Sure. And can you describe the efforts that are required to perform the position of office -- Director of Office of Marine Safety between 1997 and 2005, what specific efforts or I guess efforts in general are required to perform that position?

A. The Director of the Office of Marine Safety needed to evaluate accidents, notifications, select accidents to recommend that the agency investigate, supervise and oversee the investigation of the accidents, supervise and oversee the development of the report and recommendations from those accidents, develop and put in place agreements and processes for all of those activities, collaborate and coordinate with other offices within the agency and outside of the agency to conduct those activities, and then represent with some organizational unit outside the agency and congressional staff essentially the results



of those investigations.

Q. So aside from evaluating accidents and selecting accidents and recommending accidents for investigation, supervising staff in the field, development of processes, collaboration and communication of results, is there any other -- are there any other efforts that are required in order to perform the position of Director of Office of Marine Safety between 1997 and 2005?

A. Well, broad categories cover the majority of the work, yes.

Q. We discussed a lot of these already; am I correct?

A. We did.

Q. We didn't discuss evaluating and selecting accidents to investigate. Can you describe the requirements in order to evaluate and select and recommend an accident to investigate?

A. Each of the office directors in the modes have the responsibility of ensuring that a robust notification system exists, not only through our communications center but through the organizations



that we generally work with, that our office directors work with, and Office of Marine Safety would be for example the Coast Guard as the primary and then potentially department of natural resource units within the states and the international community for notification.

Once the -- because that's the key, learning about the accidents that exist, that occur. Once that knowledge comes in, and once that system's been established, the office director would assess the nature of the accident, the number of deaths, location, issues involved, and based on their specific criteria, and each criteria is different for each mode, make a recommendation to the chairman, essentially to investigate a major accident.

Q. The criteria are different but all the directors between 1997 and 2005, all had the same I guess requirements that they obtain -- that once they obtain communication that they evaluate and determine whether it's an accident that should be investigated, determining to investigate it and then recommending the investigation. Is that correct?



A. Basically. It -- the office directors would need to evaluate the circumstances of the accident, then also look at their specific mandatory criteria or thresholds, evaluate resources, consider implications for other investigations and then make a recommendation.

Q. I see. And can you describe to me the working conditions under which Miss Murtagh Cooke was required to -- was required to perform her job between 1997 and 2005 as Director of Marine Safety?

A. The Managing Director between -- between 2000, 2005?

Q. I'm sorry, 1997 and 2005. I apologize.

A. In '97 and 2005 the managing directors were different during that time. The supervisors were different. And the chairman of the board were different. We had several different chairman and at least two, maybe three managing directors, both in a supervisory chain for Ms. Murtagh.

So the particular nuances of each of those individuals changed somewhat regarding notification and the process for notification. But the same

Page 82

general parameters existed. And those were that the offices were relatively independent to do their work, expected to conduct the work assigned to them and the mission of the office, and to report upward through the Managing Director to the chairman the decisions and the progress and the developmental aspects of their work.

Q. So every time a Managing Director or a chairman changed or someone higher than the modal office director changed, the working conditions would be changed in the same manner for each of the office directors?

A. More so for the Managing Director and chairman. I am not sure, you mean, if the change in the office director?

Q. No, not officer.

A. Okay. With nuances for different chairmen, some chairmen wanted immediate contact on accidents and notifications. Some wanted to wait for the office director to gather more information and make a recommendation. Some managing directors wanted immediate contact first before the chairman was

Page 83

notified. Others did not.

Those are the kinds of nuances. But the basic parameters of the office and running the office were left up to the office director.

Q. Okay. Can you describe to me the duties, the primary duties of the Office of Highway Safety between the requirements of the director of the Office of Highway Safety between 1997 and 2005?

A. Duties of the office of -- director of the Office of Highway Safety were to evaluate accident notifications, set up the accident notification process, evaluate accident notifications, make recommendations on those accidents that the office believed -- the office director believed should be investigated, then supervise and oversee the investigation of those accidents and the development of reports and recommendations.

The Office of Highway Safety director had an additional responsibility in the development of advocacy programs for state recommendation advocacy which the other modes do not have. And because there are 50 states, it is a different organizational

Page 84

requirement. Everything else is federal for the most part, and the other modes from the investigative and from a regulatory perspective.

However, highway safety is regulated mostly at the state level. So that organizational and advocacy activity was required of the Office Director for Highway Safety. Additionally, the nature of highway safety issues lend themselves to the development of safety studies and public forums and hearings more conveniently than maybe some other modes.

And, therefore, the Director of Highway Safety had the responsibility of establishing and developing and deploying public hearings, public forums and safety studies more frequently than the other office directors.

MS. COHEN: I'd like to take a break here, if you don't mind.

MR. LOWINGER: Are you done, sir?

THE WITNESS: I am done. Yeah.

MS. COHEN: Can we take a ten-minute break please.

Page 85

MR. LOWINGER: Sure.

\- - -

(Recessed at 11:53 a.m.)

(Reconvened at 12:05 p.m.)

\- - -

BY MR. LOWINGER:

Q. It's 12:05, 12:06. We are just coming back from a break. Mr. Osterman, during the break I understand that I was asked to come back because you were speaking with counsel. Can you tell me what you spoke about with your counsel during the break?

MS. COHEN: Objection. Attorney-client privilege. Don't answer the question.

MR. LOWINGER: There's no attorney-client privilege during a break, a recess in a deposition. Can you please tell me?

THE WITNESS: I am not going to answer it if my attorney tells me not to.

MR. LOWINGER: All right. We are going to go off the record.

\- - -

(Recessed at 12:06 p.m.)

Page 98

Q. Can you describe to me the work that's involved in the Annex 13?

A. It involves representational duties at ICAO meetings and representational duties in the development and modification of any clauses of Annex 13. Every three years ICAO holds -- ICAO is a subset of the United Nations. And they hold a general assembly in which they consider changes and alterations to the treaty essentially.

And ICAO also conducts audits of member states. And they do a number of other functions. And our responsibility when it comes to the United States is the accident investigation part of that.

Q. I see.

A. So that office director has that responsibility.

Q. Is there any similar sort of responsibility for international treaty-based work for the Office of Marine Safety?

A. There is, but it resides with the Coast Guard. There is an international maritime organization. I think we spoke about this earlier.

Page 99

It is a equivalent organization to ICAO. It is part of the UN.

They do the same kind of work. And there is marine accident investigation components to the IMO Treaty. However, the NTSB is not the responsible party for the United States government on that. It is the U.S. Coast Guard.

Q. But would the -- would the director between 1997 and 2005 have responsibilities to IMO even though it's not primary responsibility?

A. We have an interest in being involved in the International Maritime Organization. And we have an interest, a very significant interest in being involved in the development of changes or modifications to the Marine Accident Investigation Treaty. And our interest has to flow through the Coast Guard.

Q. So the agency is still represented with regard to international matters, and there's still a requirement of performance of duties related to international matters, it's just that it's not -- it's just that it's through the Coast Guard?

Page 100

A. The Coast Guard, the Coast Guard has a responsibility for representing the United States at IMO. The NTSB does not. But the NTSB has an interest in the outcome of the work done there.

So we attempt to influence the Coast Guard to include us and consider our concerns in their discussions with IMO. Whereas in the aviation side, we are the representatives for the accident investigation part. We do represent the U.S. government on that part.

Q. I understand. With regard to unique duties between regional and general investigations and regional reports and the maintaining the database and producing the report and working with ICAO, are there any other unique duties of the office of direct -- the director of the Office of Aviation Safety between 1997 and 2005?

A. We talked about, I know you covered -- I don't know that you covered everything we talked about, but it is in the testimony, the regional -- overseeing the regional activities. And we mentioned earlier that the international work of the Office of

Page 101

Aviation Safety is significant because of our responsibilities in the treaty. So we do a lot of international work in aviation and safety.

We are responsible for supplying investigators to accidents worldwide that involve U.S. carriers, U.S. manufactured aircraft or components. And it's pretty difficult nowadays to find a major aviation accident that doesn't involve a U.S. manufactured air craft or component. Airbus puts Pratt and Whitney and GE engines on their aircraft. So we are involved in most international major events.

And we also have a responsibility to assist other nations at their request. And they have done that frequently, especially South America and Africa where they don't have the capacity to do it themselves.

Q. And that's all?

A. That's pretty much it for aviation. You had asked about railway.

Q. Right. Other than the general duties that we had discussed, the supervision of investigation of reports and production of reports, staffing of

prescribed steps that the modes use in producing a report. Several drafts are reviewed by staff and ultimately will -- we get to the director's review that I mentioned previously and then ultimately is delivered to the board for their deliberation.

In highway safety area, the office director is also responsible for as I said previously safety studies, more often than other modal directors. And they are also responsible because of the nature of highway accidents for providing safety reports in addition to accident reports. Accident reports are generally discrete reports on a particular accident event.

Safety reports are generally a collection of a number of different accidents with the common issue in which the issue is thoroughly examined, for example, bus crash worthiness. I don't remember how many investigations were included in that safety report, but maybe a dozen in which we did a number of analytical activities to produce a report on the issue of bus crash worthiness.

Q. And did the Office of Marine Safety between



1997 and 2005 produce safety reports?

A. I don't believe they did. I believe they produced accident investigation reports.

Q. And to what extent would -- to what extent is it -- is marine safety -- let me see if I can rephrase that. Okay. So let's just go back to this.

You said before that there are a few prescribed steps in producing a report that's common to all the offices. What are those prescribed steps that are common?

A. Well, I can give you the basic steps. There are more finite detailed steps within the production of a report, but once the investigators are finished with their on-scene investigation, and that is a relatively fluid statement because on-scene investigations can sometimes be wrapped up in several weeks, and sometimes it will take much longer period. Like a TWA 800 that's at the bottom of the ocean, it may take months or even years to get all the data.

They will have a work planning meeting or series of work planning meetings in which the investigative staff and the office heads, not all of



them but the office heads that are involved in the investigation, namely the modal office director and frequently the director of research and engineering, if it's a technical problem, will evaluate the progress of the investigation and do two things. One is to evaluate what additional work needs to be done; and, two, what general time line and what general production flow should occur as far as when they think the investigation will be complete and assignment of resources and things like that.

Following the completion of the investigation, a writer will begin to take from a public document which is all of the factual information we compiled from the investigation, take that data and begin to craft it into a comprehensive report for the agency. Our data for TWA 800, for example, filled up an entire room full of file boxes, but the report is only several hundred pages long.

We talk the pertinent information from the investigation and write a report based on established format guidelines for the agency for the report. That report then once in draft goes through a series of



reviews, beginning at the investigative team review, then a review through the office, that is the originating office, marine safety or aviation safety.

It then goes to a technical review which is where the parties to the investigation, and sometimes we will hire experts from the outside to review our reports if they are very complicated, get an opportunity to look at the factual information only to make sure that what we've got is accurate; that we are representing it correctly, but only the factual part. Once that is all done, it goes through a series of editing and formatting cleansing operations and then comes to the director's review that I mentioned early on in the deposition.

Following the conclusion of the director's review, the report is modified based on the direction from the directors, Managing Director and the director of RE and SR, and then presented to the board for deliberation. Many of the reports, most of the major reports go to a sunshine meeting, a board meeting, public meeting where the board deliberates the report and the recommendation and votes on adoption or

changes, the content of the recommendations. And some are sent to the board for only a review without a public meeting. And they still vote on it.

Q. When it leaves editing and goes to the director review, you said other entities or other parties are involved in the director's review. Am I correct?

A. No. I said technical review.

Q. Okay. It goes from --

A. Technical review where we involve the parties in a review of the factual information to make sure one last time that it's correct.

Q. Okay. And who does this technical review for in general?

A. The parties who are involved in the investigation. And if we don't have -- in our opinion if we don't have satisfactory technical skill from the parties to ensure accuracy, we will occasionally enlist non-aligned technical experts to review some reports.

Q. I see. With regard to --

A. I think I have to pull one more piece of



that puzzle in for you because especially in aviation, but also in highway and rail, the office directors also have the responsibility of producing and approving reports on accidents that do not have recommendations associated with the reports without the process of going to the board. They have delegated authority to approve a report that is not -- does not contain recommendations.

Q. You said each office director has that authority?

A. The Office of Aviation, Rail, and, yeah, I think the Office of Marine Safety has it as well. It's mostly the majority of those cases come out of aviation, all the general aviation cases. Next would be highway and then rail and then marine, but I am not sure that marine frequently uses their delegated authority.

This is a report that does not have -- of an investigation we may have conducted where we do not have recommendations to present to the board. And it does not have other national implications.

I know that our current marine safety



director has signed one or two investigation reports as a delegated authority. I'm not sure. I would have to look for those episodes between '97 and 2005 for the former marine safety director. I just don't know.

Q. Is there any information anywhere that you are aware of that would list all the delegated reports produced between 1997 and 2005?

A. We can gather that. It's a brief extrapolation. If it was not adopted by the board through a vote, it was a delegated report to the office director.

Q. Are the delegated reports still published?

A. Yes.

Q. Back to Deputy Haueter, I just wanted to get back to this for a quick second. I apologize. But does Deputy Haueter have any budgetary responsibilities?

A. His budgetary responsibilities would be executed through authority delegated to him by the director. So if the aviation director wanted him to manage part of the budget, he could do that or would do that.



Q. Are you aware whether or not, well, describe to me the instances in which Deputy Haueter actually did do budgeting work for the Office of Aviation Safety during his tenure?

A. I do know that the Deputy of Aviation Safety managed a number of our contracts involved in major aviation investigation and activity. We frequently will contract with outside vendors to conduct technical work and sometimes recovery work.

747, for example, dropped an engine in Lake Michigan, and we contracted with a vendor to recover that engine. And he managed that contract.

Q. I see.

A. I know that he did that function while he was the deputy.

Q. What about, for example, coordination with outside organizations?

A. The deputy of Office of Aviation Safety had some activity and some responsibility for coordinating with outside organizations, specifically with the investigations that he was overseeing, but in a more general sense for the Office of Aviation Safety, that

authorship of the report?
A. I think each director to different levels was involved in modifying draft reports. Writing a report from a blank piece of paper, there were staff in each of the offices that conducted that activity. The office directors reviewed reports. And before those reports left the office, they had a hand in modifying the report.
Q. Okay. And what type of prior experience and training and education is required to be the Deputy Director, Mr. Haueter, to fill Mr. Haueter's role?
A. For aviation safety?
Q. Um-hmm.
A. Again it is not an engineering or professional GS position. Therefore, there's not a mandatory educational component. But the practical requirements are that the deputy of AS has a very specific understanding of aviation, why planes fly and why they don't, sometimes.
Q. I see. Would you say that Ms. Murtagh Cooke's job was a 24-hour 7-day-a-week job like the



other directors' jobs?
A. I would say that it was 24/7 but it was not like the other directors' jobs. As I mentioned with the office of aviation safety, the level of notification and deployment of resources is constant and regular and always. Every weekend the NTSB is deploying aviation investigators to an accident somewhere, and frequently many accidents.
In highway safety, that is probably the next most cumbersome 24/7 job. All of the directors need to be available or have someone available 24/7 to take these responsibilities of evaluating accidents and deploying resources. But by volume, aviation certainly is -- happens all the time. Highway accident notifications are very frequent because of the nature of the sheer volume of accidents that occur nationally.
Railroad accident investigations are next. I would put marine in the fourth position and probably pipeline last.
Q. I see.
A. So you don't have to always -- you are not



always taking calls on the weekend. You are not always taking calls at night in some of these modes. Aviation always is doing it; highway, mostly; rail, frequently; marine, not so frequently; and pipeline infrequently.
Q. I see. Do you need a break?
MS. COHEN: Yes. We'd like to take our lunch break now.
\- - -
(Recessed for lunch at 1:13 p.m.)
(Reconvened at 2:04 p.m.)
\- - -
BY MR. LOWINGER:
Q. Mr. Osterman, we are back on the record. It's 2:05. During the break did you have any communications about your testimony with your counsel?
MS. COHEN: Objection. Attorney-client privilege. Don't answer that.
Q. I am not asking what your communication is, sir. I'm just asking whether you had any communications about your testimony?
A. No.



Q. Thank you. Could you please tell me, sir, whether Mr. Haueter during his tenure had the authority to hire and fire personnel?
A. Mr. Haueter as a supervisor.
Q. Yes.
A. Did have the authority to, within the parameters of the federal rules, to hire and attend to personnel matters.
Q. Okay. And what about -- how did the job of director of office of -- how did the requirements of the job of Director of Office and Marine Safety change in May 2005?
A. The requirements of the position in May of 2005, I am not sure that -- the requirements of the position didn't particularly change in May of 2005. They were relatively the same.
The requirements of the position changed with the advertisement of the position as an SES. And that happened earlier than May 2005. May 2005 was a selection of someone to fill that advertisement.
Q. I understand. Did the requirements of the actual job of Director of OMS change after

Miss Murtagh Cooke left the position?
A. Yes.
Q. Well, how did the requirements of the job change?
A. The nature of the fundamental job that we spoke about earlier, the accident investigation, supervision of the office and the other functions remained the same. But as an SES-level employee, the position was now responsible for broader agency-wide planning and program development activity.
Q. Can you --
A. The position became part of the executive resource board.
Q. What is the implication of you said a broader responsibility planning and what?
A. Process development for the agency.
Q. Can you explain how the responsibilities changed as far as planning and process development?
The senior executive service member, the position, the person who holds that now is responsible for participating in agency-wide planning, program development and decision-making for agency activities



that may or may not impact the Office of Marine Safety.
Q. Can you give me an example of a program development that may or may not affect --
A. The development of a new philosophy regarding the NTSB training center and the development of a business plan for that training center was an activity that was executed by staff with the review of the executive resource board and under the direction of the executive resource board, which are the senior executives in the agency, the SES members of the agency.
Q. During Miss Murtagh Cooke's tenure did she have any involvement in any of the planning with regard to the academy?
A. She had involvement in development of specific courses dealing with marine issues, but not in the overall direction of the academy plan. It was the academy until 2006, so we've changed the name to the training center.
Q. I see. What actually is more time intensive, determining the philosophy of the academy



or planning classes?
A. In this particular circumstance, developing the philosophy of the training center.
Q. How so?
A. How so, because the training center in this particular example that I gave you is very heavily overseen by the congressional committees. And its development based on the direction we have been given by Congress is being done as a business model, which is not a common practice for the federal executives, especially at the NTSB. And we have had to heavily engage in developing a business model approach with a contracted vendor for this training center. So it has been very labor intensive.
Q. Okay. And how does that -- and is that one of its primary responsibilities? Is that -- if you were to rate that among Mr. Spencer's -- John Spencer's primary responsibilities, how does that fall, rank?
A. Well, the business plan for the training center was an example. You asked for an example, so I gave you that as an example. One of his primary



responsibilities is the overall leadership and management decisions for the agency at large. Yes.
Q. So he's become a quasi-chairperson?
A. No. No. The chairman of the agency is the chief executive officer.
Q. Okay.
A. I would be, for example, the chief operating officer as the Managing Director.
Q. Okay.
A. But the senior executives in the agency at the senior executive service level convene as the executive resource board to evaluate and make decisions on planning and programming development and process development for the agency at large.
Q. Is that the only change in the requirements of the job since Mr. Spencer's taken the position?
A. That is the primary difference between that job as an SES level and that job as a 15 level. That's the primary difference. Mr. Spencer was given some direction by me about what to focus on in the position when he came on board. But their focus -- their issues are focusing on the primary

responsibilities of the office.
Q. Those would be the same requirements of the job that Miss Murtagh Cooke got?
A. Yes.
Q. I see. What percentage of Mr. Spencer's work is evaluating planning and program development for the agency?
A. I would think probably ten to fifteen percent maybe.
Q. When you say maybe?
A. Roughly.
Q. Could it be less?
A. No. It's about 10 to 15 percent. The Executive Resources Board, executive committee meets every week. The Executive Resources Board meets every quarter.
We have over the last year put in play a comprehensive strategic plan, and the guidelines for operating the plans, the guidelines for performance management. We have established a number of policies and operational bulletins from the committee on performance management, so, 10 to 15 percent.



Q. And was Miss Murtagh Cooke ever involved in any of those duties or requirements during her tenure?
A. No.
Q. She was never consulted as to planning and program development for the agency?
A. She may have been asked for input, but not as a comprehensive part of a executive resource board. There are a number of organizational units, some at the 15 level leadership and some subordinate to that that are requested for input into different products and activities of the board.
Q. I see. And was Miss Murtagh Cooke's -- was her input sought during her tenure as director of OMS?
A. I believe so. I believe that she was requested to provide input for a number of things, the agency's annual report, as were all the officers. A strategic plan that was developed I think in 2000 asked for some input specific to her.
When we go through our reauthorization every several years, each of the modal office directors are asked for their input and ideas on authorization language, and same thing for



appropriations and budgets, very standard.
Q. I see. Who is Bob Macintosh?
A. Bob Macintosh is the senior level employee in the Office of Aviation Safety responsible primarily for international activity within that office.
Q. And when was his tenure as a senior level international person?
A. I'm not going to give you exact dates because I can't recite them, but he has been involved in the international activity for over a decade in the office. And he moved from a GS-15 position to an SL position somewhere around 2000, thereabouts.
Q. Okay.
A. I am not sure that's exactly right. It may be 2001, it maybe 1999.
Q. And what about Mr. Haueter, what was his grade?
A. Mr. Macintosh or Mr. Haueter prior to becoming Deputy Director of the Office of Aviation Safety was the division chief for major investigations at the 15 level. When he assumed the duties of Deputy Director, I am not exactly certain.



He's had -- he's been the Deputy Director for some time.
Q. Is he still?
A. No. Now he is the director of the Office of Aviation and Safety.
Q. When he was the Deputy Director was he a senior executive or was he a GS-15?
A. No. He was a senior executive.
Q. I see. Between 1997 and 2005, do you know how much Mr. Haueter and Mr. Macintosh were paid as a senior executive for Mr. Haueter and senior level for Mr. Macintosh?
A. I would have to refer to the pay tables to give you the answer to that, what their salaries were on any given year. They were different each year between '97 and 2005. And I don't know the specific values of those differences.
Q. Where are the pay tables? Can you describe those documents for me, sir?
A. Well, I believe that we have provided you with some of that information as far as pay for those individuals. But there are no pay tables that I can

excellent and outstanding.
And the supervisors can choose within that range for bonuses or occasionally alternatives. Occasionally office supervisors can award a GS employee a step increase in lieu of a bonus. It's called a -- it's getting late in the day -- a -- it's a step increase in between the time that the normal cycle would happen.
Q. I see. Was Miss Murtagh Cooke ever considered for a step increase in that scenario in between during the interim period of the normal cycle?
A. During what time frame?
Q. Between 2003 and 2005?
A. No. I don't believe so.
Q. At any time while she was the director of OMS was she considered for an interim step increase?
A. She did receive several interim step increases. I believe that they were the byproduct of the cyclical increase that I mentioned.
GS employees have ten steps, regardless of the grade. For the first four steps, one through four, there's a one-year waiting period, five through



seven, a two-year waiting period, eight through ten, a three-year waiting period between steps. And when that waiting period expires, there's an automatic form that is generated for the supervisor that says this employee is now eligible. Do you want to approve a step increase for them.
And more often than not, supervisors have endorsed that step increase and the employee receives a step increase.
Q. Are you aware of any instances where Miss Murtagh Cooke was not granted the step increase?
A. No, I am not.
Q. Are you saying that she was always granted the step increase?
A. As far as I know.
Q. Is that because she was considered a good employee?
A. Step increases are generally denied for unsatisfactory performance.
Q. So --
A. So if your performance is satisfactory or greater, the step increase is almost always granted in



the cyclical way that they are produced.
Q. I see. Are you aware of -- I want to make sure I understand this, because it seems like the only way Miss Murtagh Cooke could have ever obtained pay equal to her male counterparts is by obtaining SES status. Is that your position, sir?
MS. COHEN: Objection. Asks for a legal conclusion.
A. The movement into the SES pay system was one of two ways that I know of to reach a higher grade than the GS schedule. The other way is to a retention allowance. And a retention allowance is only granted when the employee is going to leave the agency, leave the federal government, not the agency. And you must pay them more to retain them, or they have such a unique skill that it cannot be found -- it cannot be easily replaced.
Q. So the only other way of -- aside from SES, the only other way of Ms. Murtagh Cooke obtaining equal pay would have been through the retention allowance?
A. Yes. And Miss Murtagh would have had to



have come forward and said -- and demonstrate that I am being given a job offer at a higher salary outside of the government. And the agency would then have had to decide that it was absolutely necessary for the government to retain her and, therefore, try to keep her by giving her a retention allowance.
Or, and this would not have applied to Miss Cooke, the skill for the position was so necessary to the government that we could not easily replace the person if they left. That does not happen very often, the second.
Q. What is it about Miss Murtagh Cooke's skills that are not unique enough to receive the retention bonus?
A. Generally the test is that if you can put out a job announcement and receive candidates that are equally qualified and equally capable of doing the position, then it is not so unique a skill that the government can't replace the person.
Q. And what about -- is that the only standard?
A. No, that plus leaving the government. If,

as I said, Miss Cooke -- or anyone would have to demonstrate that, one, they had a legitimate credible job offer from outside the government for a much higher salary than they were able to make at that time, and then the agency would have to make a determination that it was critical to the function of the agency -- critical to the government to hold on to this individual and offer them a higher salary. But the salary can't go past I think -- I think, I'm not sure but I think it's 20 percent of the salary. It may be 25.

Q. Okay. Is there any written rule about this retention policy?

A. Yes. There are retention policy guidelines put out by OPM. And there is an agency policy on retention which is almost a mirror image of the OPM guidelines.

Q. And when was the agency policy promulgated?

A. Retention policy has been there throughout the '90s and exists today. And I don't know how far back it went.

Q. Other than --



A. Prior to the '90s.

Q. I apologize. And then the OPM guidance?

A. The OPM guidance has been with the personal management system of the federal government for decades.

Q. I see. And other than the retention allowance and bump to SES and overtime, what other mechanisms are there for obtaining more -- were there available for Ms. Murtagh Cooke to obtain additional money?

A. The only other mechanisms are bonuses and awards.

Q. What bonuses and awards were available to Miss Murtagh Cooke?

A. The agency has a menu of possible bonuses in the standard performance management system that we have. There are end-of-the-year bonuses. And I discussed that there are parameters, percentage parameters on the excellent and the outstanding rating.

And there are special act bonuses or awards. They are really not bonuses. Bonus is the



wrong term. These are awards. The federal government doesn't give out bonuses. They give out awards.

And there is a special act award for discrete and definable projects, programs, particular events. And then the agency also has a third method, and that is the end-of-the-year agency-wide awards. There are I think seven or eight awards that are in very specific categories.

There is a chairman's award, a managing director's award, a regional investigator or regional employee award and several other technical awards, several other categories of awards that are spelled out in a board order who is eligible, how the nomination process works. The Executive Resource Board determines the award recipients or makes a recommendation to chairman on the award recipients. And that happens every year.

Those are really the three mechanisms for awards.

Q. So there's the special management policy? Is that what you said?

A. Special act.



Q. Special act. There's the end-of-the-year agency-wide awards, and then what was the third?

A. And then the performance award. The end-of-the year performance awards.

Q. Are you aware whether Miss Murtagh Cooke ever received end-of-the-year performance awards?

A. Yes, she did.

Q. Are you aware whether she was ever considered for special act awards?

A. Specifically, I don't know. It would be in the records if she received a special act award.

Q. Would she have been eligible for one?

A. Yes.

Q. And who would have had to have nominated her for?

A. Her supervisor?

Q. And who would that have been between 2003 and 2005?

A. Between 2003 and '05 it would have been Dan Campbell.

Q. I see. And what are the standards for a special act award?

Page 194

A. A discrete activity and achievement that benefits the agency, the work in the agency. It is for a particular project activity, success, assignment.
Q. Are you aware of any other GS-15s who have ever received a special act award?
A. Yes.
Q. Is it common for a GS-15 to receive a special act award?
A. Special act awards are less common than performance awards. And they happen throughout the year rather than at the end of the rating cycle. They are not uncommon. They are not frequent but they are not uncommon.
Q. Why do you believe -- why would Dan Campbell have not granted Miss Murtagh Cooke any special act award?
A. She would need to have a discrete success or project that warranted consideration for award specific to that activity.
Q. I see. And is it the agency's position that she never performed such a discrete and

Page 195

meritorious act to warrant the special act award?
A. What time frame?
Q. Between 2003 and 2005?
A. Yes. She didn't -- as far as I know, she did not perform such a discrete success or act to warrant the recommendation for a special act award. Okay.
Q. Okay. And the performance awards are only based on the evaluations?
A. The performance awards are based on the end of the year evaluations. Yes.
Q. I see. Does a level of performance -- a series of performance awards indicate that the person is -- can you describe to me between 1997 and 2005 whether Miss Murtagh Cooke received a series of performance awards?
A. Miss Murtagh Cooke did receive performance awards during that time period. I think the specific amounts probably have been provided to you. I can't recite them for you.
She received end-of-the-year performance ratings. And with those ratings came commensurate

Page 196

awards, cash awards.
Q. So, and what about agency end-of-the-year awards, the agency-wide awards? Was Miss Murtagh Cooke eligible for those?
A. She was eligible for those, but again it was tradition that the office directors, if nominated for those awards, declined to participate.
Q. Where is this, when you say tradition?
A. It is -- I was nominated for the chairman's award one year. I asked that my name be withdrawn. Mr. Chipkevich was nominated for the award one year. He asked that his name be withdrawn. It was simply tradition.
I don't believe that Ms. Murtagh was nominated any year that I am aware of between 1997 and 2005, but traditionally the office directors would withdraw themselves from consideration.
Q. What year were you nominated, sir?
A. We have a record of it, but maybe 2001.
Q. And what year was Mr. Chipkevich nominated for?
A. 2003 maybe. I am not exactly sure of the

Page 197

dates.
Q. You said earlier that when a person goes from GS-15 to SES that that person obtains a new responsibility as member of the agency policy board?
A. Executive Resource Board.
Q. Executive Resource Board. Where is that requirement reflected?
A. In the operations bulletin that describes the Executive Resource Board responsibilities for the agency.
Q. I'm sorry. Could you repeat that again?
A. It's an operations bulletin that describes the Executive Resource Board responsibilities for the agency. Additionally, OPM has required agencies for at least the last ten years to maintain an Executive Resource Board comprised of senior-level executives.
Q. Is it only senior executives that participate in the executive board?
A. Yes. There's one advisor from our HR department who participates, but all of the members are the senior executive service directors.
Q. Are there any SL members?