# EXHIBIT NO. 17

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

\- - - - - - - - - - - - - - x
MARJORIE MURTAGH COOKE, :
Plaintiff, :
vs. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION :
SAFETY BOARD, :
Defendant. :
\- - - - - - - - - - - - - - x

Deposition of JOSEPH OSTERMAN

Washington, D.C.

Monday, October 1, 2007

9:47 a.m.

Job No.: 1-112710

Pages: 1 - 104

Reported by: Sarah M. Bickel

Deposition of JOSEPH OSTERMAN, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Sarah M. Bickel, Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
Employment Law Group
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF THE DEFENDANT:
QUAN LUONG, ESQUIRE
United States Department of Justice
555 4th Street, Northwest
Room 4417
Washington, D.C. 20001
(202) 514-9150

ALSO PRESENT: Marjorie Murtagh Cooke
Meredyth D. Cohen, Esquire
Denise M. D'Avella, Esquire



C O N T E N T S


EXAMINATION OF JOSEPH OSTERMAN PAGE
By Mr. Lowinger 5


E X H I B I T S
(Attached to the Transcript)


OSTERMAN DEPOSITION EXHIBIT PAGE
No. 1 Comparison of Average Compensation of Modal Office Directors 1/03 - 12/04 35
No. 2 Documents 41




P R O C E E D I N G S

JOSEPH OSTERMAN

having been first duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:

Q Can you please state your name for the record.

A Joseph Osterman.

Q And Mr. Osterman, we've deposed you before in an alternative capacity. Before we start, could you tell me your title?

A I am the managing director of the National Transportation Safety Board.

Q And how long have you been the managing director?

A Since March of 2005.

Q Okay. Mr. Osterman, can you tell me how you prepared for today's deposition?

A I didn't prepare very much for today's deposition.

Q Okay.

A I reviewed a few documents from our board

Page 58

receive a special acts service small monetary award?
A They are for discrete events, level of performance. An office director or supervisor would recommend to the chain of command for these awards. The monetary amount -- when it says small monetary amount, it's generally under a thousand dollars and the amount is usually established by the office director.
Q Have you ever -- other than the performance and the special acts service award that we mentioned earlier, have you ever received any of these -- any of the awards listed here?
A During what time frame?
Q Between 2000 and 2005?
A Other than the special act award that you mentioned earlier of 2500, no.
Q During your employment at NTSB, have you ever received the chairman's award?
A No.
Q Have you ever received the managing directors award?
A Yes.

Page 59

Q What year did you receive that?
A 1995.
Q Were you a GS-15 at that time?
A I was.
Q I see. What's the Joseph Trippe Nall Memorial Award?
A This is an award -- there is a description of the requirements for candidates but it is an annual award given to an employee of the agency who demonstrates essentially the characteristics represented by Joseph Trippe Nall, a former board member who passed away.
Q I see. And who awards the Joseph Tripple Nall Memorial Award?
A The Joseph Trippe Nall Award, the John K. Lauber Award, special recognition award, regional field award are recommended by a panel of the office directors, the candidates.
There are -- office directors are solicited for candidates and then the office directors as a group review those candidates and make a recommendation to the managing director on who

Page 60

should receive each of those awards.
The managing directors award and the chairman's award, the same process exists, however the chairman and the managing directors make the final call for each of those.
Q Did you ever receive any of these awards as a GS-15, sir?
A Only the managing directors award.
Q What is the other special recognition award at the bottom?
A That is generally an award with not very much cash value but for particular discrete events that occurred during the year. Occasionally it will be for a group effort. We've had over the -- my term at the NTSB a couple of staff members who have in their private lives saved a life, so the agency recognizes them with an award, generally some kind of display piece with a very small monetary award.
Q I see. And what about the special act -- I'm sorry, the special act/service moderate or high monetary award, what happens when you receive that?

Page 61

A It is similar to the special acts small monetary award. It is for discrete activity or event in which the employee performed above and beyond, and the value given to that activity is over a thousand dollars.
Q And are you aware of ever -- as the managing director have you ever awarded it to a GS-15 employee?
A The special acts service award?
Q Yes.
A Yes.
Q And have you ever given it to a director of a modal office?
A As the managing director?
Q Yes.
A I don't believe so.
Q When you were the -- while you were the director of OHS, did you ever oversee the -- or were you ever -- did you ever have knowledge of the award -- this special acts/service moderate or high monetary award for another GS-15 employee?
A Yes.

Q Which employee was that?
A Mr. Magladry who was then my deputy. I recommended him for a special act award. I could only recommend it, it took the managing director's approval.
Q Back to Exhibit No. 1, sir, this document right here (indicating). Mr. Osterman, the salaries all here are salaries that are higher than Ms. Murtagh Cooke's salary. When did you first learn that Ms. Murtagh Cooke received a salary lower than the other modal office directors?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: I think that I only became aware of what Ms. Murtagh's actual salary was when I became managing director in March of '05.
BY MR. LOWINGER:
Q Other than knowing what her actual salary was, did you ever know that she was receiving a salary lower than the other modal directors?
A I do. I do.
Q And when did you learn that?



A I don't know exactly. Maybe a couple of years before that or longer.
Q And how did you learn that, sir?
A Through discussions with Ms. Murtagh.
Q And was there ever anyone else present during those conversations?
A I don't recall. There may have been.
Q Do you remember Ms. Murtagh -- do you ever remember a conversation with Dan Campbell about the fact that Ms. Murtagh Cooke received a salary lower than the other modal directors?
A Did I have a conversation with Mr. Campbell or --
Q Were you ever a party to a conversation?
A I don't recall that.
Q Were you ever a party to a conversation with Dan Campbell during which he discussed the -- when individuals would receive an appointment to SES level or when their offices would?
A Yes, I was.
Q Can you describe that conversation, sir?
A Mr. Campbell had a conversation with



office directors in 2000 or so where he described what the agency was attempting to do as far as acquiring new SES billets from the Office of Personnel Management, and he also indicated that the intention was to cascade those billets.
And as we received them from OPM at the time, the expectation was to receive new billets from OPM and cascade them out in sequence based on the size and function of the organizations.
Q What's the importance of size? What did Mr. Campbell say was the importance of size as it applied to an SES billet?
A He indicated that the belief of the chairman and he was that all of the office directors should be SES if all those positions should be SES. But we did not have the billets, the necessary billets from OPM to do that. And as we acquired those billets, he would distribute those based on the complexity and the size of the office. And he identified those as rail first, highway, marine, in that sequence.
Q Rail, highway, marine?



A Right.
Q And what about aviation?
A Aviation was already SES.
Q I see. Other than the 2000 meeting, were there any other occasions during which Mr. Campbell discussed salaries and modal directors?
A Not salaries.
Q What about positions or, I guess, status?
A There were some changes between 2000 and 2005 that permitted the agency or allowed the agency to open up more SES. The SES slots were not forthcoming from the Office of Personnel Management, but through retirements and reassignments of existing SES employees, reassignment from the SES to the SL. In Mr. Arena's case, Mr. Campbell was able to make available a new SES billets.
Q Is that the only time that a new SES billet was made available?
A No. There was more -- there was several occasions. The director of the NTSB academy position was made an SES at some point and that position was identified as an SES, the office director for highway

Page 66

safety was identified as an SES. Prior to, that, the office director of rail, pipeline, hazardous materials, and then after the Office of Highway Safety, the director position for marine safety was identified for SES advertisement.

Q Who is Mr. Arena, sir?

A Mr. Arena was the former director of the Office of Surface Transportation. When that office was dissolved, he became the associate managing director at an SES level and then sometime in 2003 or 2004 he was reassigned to an SL billet. The agency was able to obtain SL billets from OPM but not SES billets.

Q What was Mr. Arena's specialty for an SL slot?

A Interagency coordination, strategic management, safety and security.

Q With regards to what issues?

A The agency, broad issues of the agency.

Q Was he a specialist?

MS. COHEN: Objection, lack of personal knowledge.

Page 67

THE WITNESS: He was -- he was assigned specialty duties in the safety and security area, yes.

BY MR. LOWINGER:

Q And safety and security for what modes of transportation, sir?

A For the agency at large.

Q So he was a generalist?

A No, no, not a generalist. This is not a modal specific billet. His assignment in the SEL is -- or SL is the safety and security of the staff and the facilities, to continuous operation planning for the agency, badge and identification control, that kind of activity.

Q I see.

A Internal investigations.

Q Do you remember him ever interviewing for the SL slot?

A I don't have any knowledge of that. That happened before I became managing director.

Q Do you remember there being a notice of a vacancy for the SL slot that Mr. Arena eventually

Page 68

obtained?

A I don't recall.

Q You're not saying it didn't happen, you're just saying you don't remember?

A I don't know. I don't know.

Q When you became SES, did you have an interview for the position?

A Yes.

Q And was there an announcement for the position?

A Yes.

Q And were there other candidates besides yourself?

A Yes.

Q Do you remember how many interviews you went on for that position, sir?

A How many -- I had a single interview.

Q Okay. And did you have to submit an application as well?

A I did.

Q When were the academy SES positions awarded?

Page 69

MS. COHEN: Objection, lack of personal knowledge.

THE WITNESS: I don't know and there's only -- there was only one. There was one position -- I don't know. I don't know. Some time ago, maybe before 2000.

BY MR. LOWINGER:

Q Are you aware of any other discussion or communications related to Ms. Murtagh Cooke's status between 2000 and 2005 as a GS-15 employee?

A In what context?

Q As not being an SES position.

A Ms. Murtagh Cooke and I and Mr. Chipkevich had maybe one or two conversations about what the agency was doing to get SES billets made available for those positions, for the office director position.

Q At the time was Mr. Chipkevich an SES employee?

A He may have -- he may have been both. Before he was an SES and after. I'm not sure.

Q I see. Did Dan Campbell ever speak to the

Page 70

employees about the other -- I am sorry, did Dan Campbell ever speak to the other directors about your retention allowance?
MS. COHEN: Objection, lack of personal knowledge.
THE WITNESS: I have no idea.
BY MR. LOWINGER:
Q Did the chief financial officer of NTSB ever prepare a chart of all the modal office directors, salaries and bonuses that they received for Dan Campbell that they discussed with the other modal directors?
MS. COHEN: Objection, lack of personal knowledge.
THE WITNESS: For Dan Campbell?
BY MR. LOWINGER:
Q Yes.
A I don't know.
Q Have you ever seen a document detailing all the modal office directors' salaries and bonuses prepared by the chief financial officer?
A For what time frame?

Page 71

Q Any time frame, sir.
A I have since I've been managing director, yes.
Q Okay. And prior to that?
A I believe that I saw the 2004 chart in the 2005 deliberation for bonuses. If you can follow when determining the 2005 SES bonuses, the human resources department also displayed for me what the bonuses had been the previous year.
Q I see. Is it understood at NTSB that if you have an SES, if you have a higher salary than a GS-15 level employee?
A Is it understood?
Q Is it known?
A Generally, that's correct.
Q Are you aware of any SES employees that have a lower salary than a GS-15 employee?
A Not today.
Q At any time in the past?
A Yes, there had been. In 2005 there were three, I believe, employees.
Q Were they modal directors, sir?

Page 72

A No.
MS. COHEN: Brian, I'd like a short break here.
MR. LOWINGER: That's fine.
(Recess.)
BY MR. LOWINGER:
Q Mr. Osterman, for the years 2000 through 2005 we didn't have your annual salary or the other information related to your bonuses. Do you happen to know at this point, are you able to remember it?
A At this meeting right now?
Q Yes.
A No.
Q Could you provide it to me at some point?
MS. COHEN: Objection. If you have a document request, please ask me or Quan, not the witness.
MR. LOWINGER: Could you just get back to us on that? It's just a matter of his preparation for the deposition or the Equal Pay Act case so --
MS. COHEN: There was no need to for him to prepare. This is based on his personal knowledge

Page 73

only. If he doesn't remember, he doesn't remember.
MR. SCHER: Off the record for a second.
(Discussion off the record.)
BY MR. LOWINGER:
Q Mr. Osterman, with regard to your duties and responsibilities as the director of the Office of Highway Safety, did you plan, manage, direct and evaluate the work for the Office of Highway Safety and exercise important policy making and policy determining decisions impacting highway safety at the Board at international organizations, other federal agencies and international domestic industry?
MS. COHEN: Objection, compound question. Can you split those up, please.
THE WITNESS: What time frame?
BY MR. LOWINGER:
Q Between 2000 and 2005.
A Do you have a document that I can refer to? That was a long question.
Q Actually, I don't. Do you need me to get you one? I'll go through it again.
A Ask it again.

Page 74

Q As the director of Office of Highway Safety did you plan, manage, and evaluate the work of the Office of Highway Safety?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacted highway safety at the Board?
A Yes.
Q Did you exercise important policy making and policy determining decisions at international organizations?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other federal agencies?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other international domestic industry?
A Yes.
Q Okay. Did you provide for the overall direction and technical accuracy of the investigation

Page 75

and reporting process for major highway safety accidents?
A I did.
Q Did you develop the overall requirements and schedules to accomplish the highway safety program?
A Yes.
Q Did you review, approve and promulgate schedules and milestones for assigned activities?
A Yes.
Q Did you review, evaluate and approve, disapprove or modify requests for changes to milestones in schedules?
A Yes.
Q Did you develop overall program review documentation and provide status reports on a regular basis?
A Yes.
Q Did you determine the level of response and resource allocation for NTSB highway safety program?
A Yes.

Page 76

Q Upon notification of a highway accident that warrants NTSB response, did you notify NTSB's chairman and managing director, another federal agency -- did you notify NTSB's chairman and managing director of the accident?
A Yes.
Q Did you notify another federal agency?
A Yes.
Q Which agency?
A Depends on the accident.
Q But you would notify another agency depending on the accident?
A I would notify the Federal Highway Administration, the Federal Motor Carrier Safety Administration, the Research and Special Programs Administration. It depends on the nature of the accident.
Q I understand. Did you notify any international agencies as well?
A Yes.
Q Did you notify other federal agencies regarding international aspects of an accident,

Page 77

including, for example, the State Department?
A Yes.
Q Okay. Did you ever notify foreign embassies and/or flag state representatives as appropriate?
A Yes.
Q As a director of highway safety, do you serve as a hearing officer for public hearings?
A As the director of highway safety I did not. I served as hearing officer prior to my appointment as director of highway safety.
Q Thank you. Did you coordinate the allocation of staff resources with other office directors involved in the investigation?
A Yes.
Q Did you resolve differences between modal and support staff views regarding accident investigation, scope, required resources and analysis?
A Yes.
Q Did you ensure through complete and comprehensive review of the draft report that

Page 78

essential issues are adequately addressed?
A Yes.
Q Did you ensure that through the review of the draft report that all findings and recommendations are supported by analysis and that the board -- and that the draft sent forward is best of quality?
A Yes.
Q And did you ensure, as the director of highway safety, the proper presentation of the draft report before the board at board hearings?
A Yes.
Q As the director of highway safety, did you review work product of other modal and support offices?
A Yes.
Q As the director of highway safety, did you ensure that quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program -- of NTSB's highway safety program?

Page 79

A Yes.
Q Including investigations, reports, safety recommendations and the marine safe -- and marine -- highway safety advocacy?
A Yes.
Q As the director of highway safety, did you establish and maintain liaison with international and domestic industry?
A Yes.
Q And did you establish an maintain liaison with international -- I'm sorry, with safety groups?
A Yes.
Q Did you establish and maintain liaison with labor organizations?
A Yes.
Q With associations?
A Yes.
Q Did you establish and maintain liaison with societies?
A Yes.
Q Did you establish and maintain liaison with Congress?

Page 80

A Yes.
Q Did you establish and maintenance liaison with federal regulators?
A Yes.
Q Did you provide authoritative advice and expertise to these groups in the development of industry standards and regulations?
A Yes.
Q Did you provide authoritative advice and expertise in the development of industry standards and regulations?
A Yes.
Q Did you provide authoritative advice and expertise to these groups with regard to technology and new applications of existing technology?
A Yes.
Q As the director of highway safety were you called upon to provide congressional testimony?
A Yes.
Q As the director of highway safety did you represent NTSB and serve as a member of the United States delegation at any international meetings

Page 81

regarding highway safety accident investigation issues?
A I participated in many international meetings on highway safety issues. The phrase you used there is part of the delegation, delegation in an official capacity, no; delegation as U.S. representative -- as a representative of the NTSB, yes.
Q I see. Thank you. Did you develop and justify estimates for staff resource requirements including personnel funding, equipment, and office space?
A Yes.
Q Did you present, justify and defend budgets on all levels of management?
A Yes.
Q Did you implement concepts to get results through people?
A Yes.
Q And did you make selections, assign work, train and reward employees?
A Yes.

Q And did you correct poor performance in a manner that maximizes the use of staff skills and achieving organizational skills?
A Yes.
Q Did you monitor work status through formal and informal means and procedures?
A Yes.
Q Did you ensure the appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated?
A OHS, yes.
Q I'll ask it again. Did you ensure that appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated?
A Yes.
Q Were you as director of highway safety, were you responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors?
A Yes.



Q As the director of highway safety, did you ensure that employees are given real and continuing opportunity to influence their work environment?
A Yes.
Q Did you ensure that employees are given a real and continuing opportunity to be able to participate in discussions related to methods of work accomplishment?
A Yes.
Q As the director of highway safety, sir, did you ensure reasonable equity within the Office of Highway Safety of performance standards and rating techniques developed by subordinates?
A Yes.
Q As the director of highway safety, did you ensure equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work?
A Yes.
Q Did you evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory



employees rated by subordinate supervisors?
A Yes.
Q As the director of highway safety, did you evaluate program accomplishments and their overall effectiveness?
A Yes.
Q Did you identify program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed?
A Yes.
Q Did you work closely with human resources in approving their recruitment, placement and retention of a high quality Office of Highway Safety work force?
A Yes.
Q Did you ensure that crucial training courses needed to keep pace with today's technological improvements in marine -- in highway transportation safety are provided to the staff for their technical and operational currency?
A Within budget limitations, yes.



Q Okay. As well as with their development and nontechnological areas?
A Yes.
Q Do you provide effective management training to maintain a highly motivated and cohesive force?
A Yes.
Q As the director of highway safety, did you relate equal employment opportunity concepts to overall responsibilities?
A Yes.
Q Did you support an affirmative action plan while performing assigned responsibilities?
A Yes.
Q As the director of highway safety, were you available 24 hours a day, 7 days a week?
A Unfortunately, yes.
Q Is there any part of your job description as the director of highway safety that I did not discuss right here in regards to your responsibilities?
A That generally covers most of the duties.

Page 86

Q What else is there that you're aware of, sir?
A Support for board members and the broader agency initiatives such as planning, participation and discussions on awards, the larger awards for agency staff. Broader agency-wide responsibility.
Q Your support for board members, can you describe that to me, sir?
A Board members are an advocacy tool for the agency. They frequently speak and discuss -- speak about and discuss issues with various groups internationally and nationally and they require support, modal support specifically, on the issues and information, both personal knowledge that I would have and the preparation of support material for their activities.
Q Was that a regular part of your responsibilities, sir?
A It was.
Q You also said supporting agency initiatives. Can you describe that work to me, sir?
A Agency initiatives, when necessary. For a

Page 87

time, I was responsible for the supervision of the human resources office. Because of a change in management in that office, I had temporary management oversight of that particular function. I also had the EEO function through a subordinate employee for what was originally supposed to be a three month period. I had it for almost a year.
Q Is that it?
A Typical other duties as assigned.
Q And when were you involved in the human resources function?
A I am not sure this is correct, but 2001 maybe.
Q Okay. And when were you responsible for the EEO function through your subordinate for a one year period?
A Maybe 2000.
Q You've mentioned also that you had responsibility with regard to awards for staff?
A This is an office director-wide contribution to the discussion on agency-wide awards.
Q And describe that work for me, sir.

Page 88

A That is essentially a meeting where candidates for the agency-wide awards are evaluated by the office directors and determined to be, made recommendation for a particular candidate as suggested by the group.
Q And you did that from 2000 to 2005?
A Yes.
Q Other than support for board members, supporting agency initiatives and meetings with regard to agency staff awards, what other than the responsibilities that I mentioned in there did you perform as the director of highway safety?
A In 2004 when I became an SES, I also was -- participated in the executive resource board meetings that were convened by the managing director to discuss a variety of issues. Usually, issues having to do with the acquisition of SES billets from OPM, SES and SL billets from OPM, the agency strategic planning and strategies for appropriations and authorization activity on the Hill. That's primarily what the executive resource board did at that time.

Page 89

Q And how much time did you spend discussing with the managing director with regard to the acquisition of billets for SES and SL slots from OPM?
A Well, I was SES in 2004 and I did not participate in the ERB meetings prior to that. I don't know what happened in those meetings. At least two or three meetings, in 2004 ERB meetings, and at one meeting it was discussed the next year's request of OPM.
Q Did you attend meetings in 2005 as well?
A I did.
Q How much time between 2004 and 2005 would you say you spent attending ERB meetings discussing acquisition of billets for SES and SL slots?
A Maybe an hour and a half.
Q Altogether?
A Just that particular -- just that discreet topic, yes.
Q But altogether?
A Altogether.
Q And what about agency strategic planning? Can you describe that to me, please, sir?