# EXHIBIT NO. 18

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE, ) | Case No. 06-748C |
| Plaintiff, ) | Judge Thomas C. Wheeler |
| vs. ) | |
| THE UNITED STATES, ) | |
| Defendant. ) | |

DEPOSITION OF

JOHN C. CLARK

Washington, D.C.

Friday, June 29, 2007

9:08 a.m.

Job No.: 1-106677
Pages 1 through 270
Reported by: John L. Harmonson, RPR

Deposition of
JOHN C. CLARK

Held at the offices of:
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202)331-2883

Taken pursuant to the Federal Rules of Civil Procedure, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.



APPEARANCES

ON BEHALF OF PLAINTIFF:
BRIAN M. LOWINGER, ESQ.
The Employment Law Group, PC
888 17th Street
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT:
MEREDYTH D. COHEN, ESQ.
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
8th Floor
Washington, D.C. 20530
(202)353-7978
KATHLEEN SILBAUGH, ESQ.
National Transportation Safety Board
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202)314-6084

ALSO PRESENT:
JONATHAN DUNN, Intern
MARLA DUNN, Intern



EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. LOWINGER | 7 |
| EXAMINATION BY MS. COHEN | 259 |
| EXAMINATION BY MR. LOWINGER | 266 |


* * * * *

EXHIBIT INDEX

(Exhibits attached to transcript.)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Various "Notification of Personnel Action" | 237 |
| 2 | Performance Appraisal Form for period 9/1/2000 to 8/31/2001 | 245 |
| 3 | Performance Appraisal Form for period 9/1/2002 to 8/31/2003 | 246 |
| 4 | SES Performance Plan and Appraisal, 11/22/06 | 246 |
| 5 | Progress Review, 11/20/06 | 247 |
| 6 | Performance Appraisal Form for period 9/1/2003 to 8/31/2004 | 247 |




EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Organizational Listing, October 1, 2002 | 248 |
| 8 | Organizational Listing, October 1, 2003 | 250 |
| 9 | Organizational Listing, October 1, 2005 | 250 |
| 10 | Weekly Reports | 251 |
| 11 | Memo from B. Strauch to B. Loeb; September 29, 1997 | 253 |
| 12 | Memo from B. Strauch to B. Loeb; July 2, 1999 | 253 |
| 13 | Incentive Award Recommendation Form, 11/23/99 | 254 |
| 14 | Memo from B. Strauch to B. Loeb; January 12, 2000 | 254 |
| 15 | Memo from B. Strauch to B. Loeb; June 28, 2000 | 254 |
| 16 | Memo from B. Strauch to D. Dampbell; December 19, 2001 | 256 |

Page 58

those investigations conducted by regional investigators, and there's a wide range of those. There are a few incidents, but most are accidents. And then there's a number of fatal accidents that the deputy director of regional operations is responsible for.

Then we have major investigations, the crash that makes the news, an airline crash with a lot of people and things like that. That's the deputy director at headquarters, the deputy director in OAS. He's the deputy director for major investigations. Those can be the big investigations and all of those technical -- complicated technical investigations that didn't involve an accident. But that's the deputy director of major investigations.

That's the way it's structured right now. And then there's a deputy director of regional investigations that has all those investigators out scattered around the country.

MR. LOWINGER: Does anyone need a break? We've been at it for a little while. Would you like a break?

Page 59

THE WITNESS: Go ahead. I'm fine.

MR. LOWINGER: I'm fine as well.

BY MR. LOWINGER:

Q. Let's talk about -- I think we're getting ahead of ourselves a little bit, and I think we're kind of talking about the present right now, and I want to make sure we're all in the right time period.

You became the director of OAS in 2000 or 2001?

A. Yes.

Q. And you were an SES at the time?

A. Yes.

Q. From the beginning of the time that you were the director of OAS, can you describe to me your principal duties and responsibilities as the director of OAS?

A. The principal duties were to conduct aircraft accident investigations.

Q. Okay.

A. Have safety recommendations written that would improve the safety of aviation. The director is responsible for the overall maintenance of the

Page 60

regional investigative offices. Or not the maintenance, but the existence of those offices. The director is responsible for determining which slots should be filled in which order, for example.

Q. For FTEs?

A. For FTEs, yes.

The director had that delegated authority to sign off on a lot of the regional investigations that wouldn't go to the Board.

The director is responsible for making sure that the reports on major investigations are completed in a timely manner, that the various aspects of an investigation are properly covered and properly investigated, and that the report is compiled and presented to the Board, and then to get those reports accepted by the Board members and get their endorsement of those reports.

Q. Okay. So as the director of OAS, your responsibilities, or your primarily responsibilities were accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, filling slots for human

Page 61

resources or for individuals for employees, delegated authority for investigations that don't go to the Board, major investigation reports completed in a timely manner, proper investigation of major investigations, a report completed to the Board and accepted by the Board.

Would you say that's the complete list of your primarily responsibilities as the director of OAS?

A. Well --

Q. You can add to it, sir. We've got time.

A. And I will. I think that's kind of a top end. One thing I did forget is we have a major responsibility in participating in and coordinating foreign investigations.

Q. Okay.

A. That's a big operation in the sense of our responsibilities for U.S. products, U.S.-operated equipment, U.S.-manufactured equipment that are involved in accidents around the world.

Q. Right.

A. So there's a huge amount of our resources

that go to investigating foreign accidents. And fortunately, in the last number of years, we've had not too many major accidents in the United States, but it's never-ending overseas.

Q. Okay. So in addition to the list that we just said before, and participating in and coordinating foreign investigations for accidents occurring abroad that contain U.S. products, what other principal or primary responsibilities did you have as the director of OAS?

A. Well, one aspect of the job was to keep the managing director and the chairman informed, keep the Board members informed of what was going on in our world, provide testimony for the Hill, meet with Congressional staffers on a relatively routine basis.

Q. Okay.

A. I mean, things keep popping in my head, but that's all I can think of right now.

Q. All right. Well, let's go through the list again. So now it's accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, human



resources, delegated authority for regional investigations not going to the Board, major investigation reports completed in a timely manner, proper investigation for major investigations, reports completed to the Board and accepted by the Board, participating in investigations of accidents occurring abroad that involve U.S. products, keeping the managing director and the members of the Board informed of what's going on in the Office of Aviation Safety, testifying on Capitol Hill, and meeting with staffers on a routine basis.

MS. COHEN: Objection. Mischaracterization of testimony.

You can answer.

BY MR. LOWINGER:

Q. Is there anything else, sir, other than what I've just mentioned? And if I'm wrong, if any of what I just said is wrong, feel free to --

A. If it's wrong, I didn't pick up on it. And I wouldn't characterize that as everything. That's all I can remember at this time. There's a multitude of things.



Q. Let me throw some other things out there and see if any of it jars your memory a little bit.

A. Okay.

Q. Budget authority.

A. We have some budget authority in the sense that we're allocated some funds that go to the offices. We're allocated some funds to buy equipment. We have investigative funds that we can use either for headquarters or regional offices to help in the investigations.

Most of our authority is -- The budget is very limited in the sense that we don't control salary, wages. We have some control over overtime expenditures. The actual leasing and renting of facilities are handled separately.

So the budget authority is kind of -- I would say it's limited in a lot of ways. If there is a major investigation, we're going to get the funds to do the investigation.

Q. I see.

A. Our limitation, primarily, is we have more things we can do than we have people, so we



investigate as many things as much as we can, and there's very little budget authority in the sense of trying to do program plans or budgeting that you would see at a typical federal office. I guess the attitude is we could be absolutely flat broke and if there is a major crash, we're going. You know, somebody will find the way to get the money to us.

So the budget issue is pretty minor in a way. We just have to be careful that we don't exceed overtime. Or if we're getting short on travel money, for example, if we have a need for the travel, the agency always supports us. We're just careful with it.

Q. I see.

Who is responsible for the budgeting work?

A. Well, the office director would be, but primarily in our office, Annette Willis keeps track of all of that. If there's not a major launch or a major flurry of investigations going overseas, she'll keep track of overtime and -- We have a training budget. They give us so much money. So we kind of divvy up the training of people at their request or what we

require of them and then parse out that money and get as much training as we can. Basically, Annette Willis watches all of that.

Q. I see.

A. It would be the director's responsibility, but she takes care of it and it doesn't take a lot of time of the office director.

Q. When you say it doesn't take a lot of time, would you say it takes five minutes a week? Does it take ten minutes a week? Are we talking about --

A. Good weeks, zero, because Annette takes care of it. Several times a year you meet with the managing director and discuss budget issues and FTEs and what we may expect for the year. Those meetings may last a half a day or a day a couple of times a year. It's minimal.

Q. Okay. Was there anything else that you would consider your primary responsibilities that you had to expend your efforts on as the director of OAS?

A. I don't recall any right now. If it comes up, I'll mention them.

Q. Do you remember any that were not primary,



just little ones? Sometimes the little ones kind of stick out the most.

A. I didn't distinguish between -- No.

Q. Okay.

A. I can't think of anything other than that right now.

Q. All right. Of this list we just mentioned, which are the most important? If you were to rate them, which are the most important, all the way from top to bottom, that you would spend your time and efforts and expend your work time on it? Which of these are the most important?

A. Oh, the accident investigations and safety recommendations.

Q. Which is more important, accident investigations or safety recommendations?

A. You have to do the first to have the second.

Q. Okay. And then what about the maintaining of the regional offices? Is that a primary important responsibility?

A. Well, it's important, but it takes very



little effort on my part, or did.

Q. When you say "little effort," sir, can you tell me, would you say it takes an hour a week max? Does it take less than that?

A. Probably less. It's between the deputy director of the regional operations and the budget person. That's usually taken care of.

Q. With regard to maintaining the regional offices, which was a responsibility of yours but not necessarily -- I guess when you said maintaining of the regional offices, were you only referring to budgetary issues to make sure that they're still up and running, or were you referring to their investigation work in their regional office investigations, the regional offices -- I don't know -- their employees or --

A. I'm not sure of the distinction you're making there. I thought we were talking about budget. So in that sense there is not a lot of budgetary things under our control. The salaries and benefits and all of that are taken care of separately. If we get an FTE, he's going to be paid. We have overtime;



that's the budgetary.

There's a certain amount of the offices, equipment, office rental space, leases coming due, and our budget person keeps track of that and the deputy director of regional operations are aware of when each one of those -- It all gets taken care of, and very seldom would the director have to weigh in and spend a lot of time worrying about that. It's part of his responsibility, but we're so nicely structured that a lot of that takes care of itself and doesn't require a lot of time from the director.

Q. Sure. Let me just ask a question. I want to make sure we're 100 percent clear. When you just gave this entire list of primary responsibilities, were you under the impression that we were only talking about it as far as financial operations, or were you thinking -- When you said accident investigations are the most important, you weren't referring to any budgetary issue with regard to that, you were just talking about accident investigations in general are the most important?

A. Out of that whole list, there's some

Page 70

budgetary things that come into it. But it's like I just described the regional offices, it's the director's responsibility, but the director doesn't have to spend a lot of time worrying about it. It's important that the offices are taken care of, and people take care of it.

So there's a mix and a match. There's some budgetary. And like I said, kind of the budgetary side is not a lot of -- it doesn't create a lot of work for the director.

Q. Okay.

A. We either get FTEs, we're going to get investigators. We're careful with our money. We're careful in when we travel, why we travel on lesser accidents. So we always seem to have the money for that. You know, we get that.

Our big issue is we need big chunks of money for persons, and that's not a budgetary issue that is in my control, or was in my control.

Q. All right. So we've dealt with accident investigations, safety recommendations, maintaining the regional offices. The next one was -- What would

Page 71

be next? What would be the primary responsibility that we discussed?

A. If you want to look at your list, we can go down it.

Q. Next on the list is filling slots. Was that a primary responsibility? Was that a low amount of work for you?

A. It's a low amount of work. It's very important, but if we were authorized to hire one or two investigators a year, it doesn't take a lot of time.

Q. Is that, on the average, how many you were authorized to hire?

A. Sometimes one or two, sometimes three or four. Very few.

Q. Very few? So not a big chunk of your time?

A. No, it didn't require a lot of time.

Q. All right. What about delegated authority for regional investigations not going to the Board?

A. That's minimum time.

Q. Minimum? Less than budget and less than filling slots?

Page 72

A. They're all down there pretty small.

Q. Near the bottom?

A. Yeah.

Q. Major investigation reports completed in a timely manner?

A. That's pretty big.

Q. Is that near the top?

A. Yeah. I would say that's No. 3.

Q. No. 3?

A. Uh-huh.

Q. Okay. Making sure investigations are conducted in a proper manner?

A. Those would be the three. I would combine those two. You can't do one without the other, but they're somewhat distinct.

Q. Completing the report for delivery to the Board and accepted by the Board. Are those separate?

A. I would say that's probably 4.

Q. So both of those together is 4, or separate?

A. I don't know what both you're talking about.

Page 73

Q. Completing a report for delivery to the Board, is that No. 4?

A. Yeah.

Q. Making sure the report gets accepted by the Board?

A. That would be the same thing.

Q. Okay. Participating and coordinating foreign investigations of accidents that involve U.S. products?

A. Right now, I would say that's 5. It might change depending on what year.

Q. Keeping the managing director and the Board informed of what's going on.

A. It's down below those, but I'll have to see what the rest are.

Q. Testimony for Capitol Hill?

A. That's minimal. I group that down there as a minimum effort.

Q. Meeting with staffers on a routine basis, I think you said.

A. I'd say that's a minimum. Those you said that are all at the bottom, I would say all of those

in a group, it depends from week to week, but they're all a minimum effort from the director.
Q. I think we're actually at the end. So what about --
A. Where was foreign? Is that the fifth one there?
Q. Yes.
A. Okay.
Q. Let's start going through these lists, okay? Do you want to talk about some other topic first?
A. I'm just thinking, on the foreign, the workload effort at the director's level, it's kind of hard to sort out because it's part of the investigations we do. I mean, it can be grouped right up there with 1 and 2. We don't write reports on foreign investigations, but it's a huge resource. It's a lot of coordination of manpower. There's all of that that goes on with an investigation except for writing the report.
Q. So participating in and coordinating foreign investigations is really, while it's listed as



5, it can go all the way to 1 because once you have an accident --
A. An accident is an accident.
Q. An accident is an accident no matter if it happens in Geneva, Switzerland, or --
A. There is a difference. If it's in the United States, there's a lot of volatility. The investigations in the United States can be huge. We may have 100 to 200 investigators working for us out of our whole staff. Foreign investigations are typically smaller and they're a little more streamlined because of the complexity.
In the United States, we may launch -- We have 50 investigators in the regions, or we should. Sometimes we're way down. We would like to have 50 at headquarters. We would like to have 50 in the regions, but we may have 40.
Q. Together, or in each region?
A. No, that's total.
And at headquarters, we would like to have 50 and we may have 35. So if we have a major launch here, we may launch about half of those people in that



first wave. But with all the parties coming in and the people participating in our investigation, there may be 100 or more people that we're managing out on the scene.
Q. Okay.
A. I mean, it's just a huge operation. It's very intense. So the foreign ones, we may launch three or four investigators, or one or two, and then we will get some -- it will be a lesser number -- qualified people from the manufacturer or the pilots union, for example. But the investigation is conducted by the foreign government typically, and we will participate with them.
But it's critically important. It's not like a major investigation here, but the importance is just as great.
Q. So you mentioned that you work with foreign governments.
A. Uh-huh.
Q. Do you work in a supporting role when there is a foreign accident? Is it limited to just a supporting role?



A. It's very defined. We will provide an accredited representative under the rules of IKO Annex 13, and our accredited representative that we send is essentially one of our investigators in charge.
Q. Uh-huh.
A. And our accredited representative will have advisors. For example, Boeing and FAA will be advisors to our accredited representative. That's the U.S. team, and that team is provided the opportunity to participate in the investigation. And each foreign country has different rules, as we handle foreign investigative teams coming into our investigations in the United States.
Q. So under IKO, you don't take over investigation for a government?
A. No, no. If it's in the United States, it's our investigation. If it's in international waters, it's our operation if it's U.S.-operated.
In a foreign country, we can participate if that accident involves a U.S.-manufactured airplane, is U.S.-operated. There's a limited participation if it's a number of U.S. citizens on board.