# EXHIBIT NO. 19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-748C<br>(Judge Thomas C. Wheeler) |

**DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES TO DEFENDANT UNITES STATES OF AMERICA**

Pursuant to Rules 26 and 33 of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, provides the following supplemental response to Plaintiff's Third Set of Interrogatories to Defendant, served by hand on or about December 12, 2007. Defendant provided its initial response on or about February 7, 2008. The following response is based upon defendant's current knowledge, information, and belief after making reasonable inquiry. Defendant expressly reserves the right to modify or supplement its response as it discovers additional information relevant to these interrogatories.

GENERAL OBJECTIONS

Defendant asserts and incorporates by reference the following general objections to plaintiff's interrogatories as though they were set forth in full in each response to each interrogatory:

1. Defendant objects to each interrogatory to the extent that it seeks information or documents protected from disclosure by the attorney-client privilege, the attorney work product doctrine, the deliberative process privilege, or any other applicable

privilege or immunity, or any statutory or regulatory restriction upon disclosure, including the Privacy Act of 1974, 5 U.S.C. § 552a. In objecting to and responding to an interrogatory, the fact that the United States provides certain information should not be construed as a waiver of its objection with respect to other information requested.

Furthermore, defendant objects to each interrogatory that seeks the identification and/or the disclosure of "all documents" to the extent that it seeks the disclosure or identification of documents written by defendant's counsel.

2. Defendant objects to each interrogatory to the extent that it seeks documents prepared in anticipation of or in connection with litigation.

3. Defendant objects to plaintiff's interrogatories, definitions, and instructions to the extent that they would require defendant to take actions and/or provide information not required by RCFC 26 and 33 and to the extent that they are overbroad, not reasonably calculated to lead to the discovery of admissible evidence, oppressive, and unduly burdensome.

4. To the extent these interrogatories seek documents or other information that need not be produced until a later date pursuant to the Rules of the United States Court of Federal Claims, any scheduling order, or by agreement of the parties in the Joint Preliminary Status Report or elsewhere, they will be produced by the date or dates specified in the applicable Rule, scheduling order, or agreement, unless otherwise agreed in writing by counsel for the United States.

5. The United States will screen all materials and information to be released to plaintiff to remove privileged materials; however, there is a possibility that privileged

documents or information may be inadvertently disclosed. The United States reserves the right to object to the introduction into evidence before the Court at any time before or at trial of information that is privileged under law and that has been revealed or produced inadvertently. The United States does not, by responding to these interrogatories, waive any claim of privilege or the protection of any doctrine.

6. The United States objects to these interrogatories to the extent they require the United States to draw legal conclusions or otherwise seek to impose upon the United States any requirements beyond those established by the Federal Rules of Civil Procedure or the RCFC.

7. Documents are being produced, information is being provided, and objections are being made for purposes of discovery. By producing documents or other information, the United States is not thereby admitting to their accuracy, authenticity, or admissibility at trial, and the United States reserves the right to make additional objections at a later date, including but not limited to at trial.

8. Defendant objects to definition "l," defining "director" and "directors" because it is unclear. Without waiving this objection, for the purposes of responding to plaintiff's interrogatories, defendant will define "director" and "directors" to mean the four office directors of the four modal offices (the Office of Aviation Safety ("OAS"); the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"); the Office of Highway Safety ("OHS"); and the Office of Marine Safety ("OMS")).

9. Defendant objects to definition "m," defining "job description" because it is vague, overbroad, and unduly burdensome. Defendant further objects because the

definition does not define the terms "exceptional authority granted," "level of supervisory authority," and "otherwise affect the terms and conditions."

10. Defendant objects to definition "n," defining "compensation," because it is unclear. For example, it is unclear what a "bonus scheduled or unscheduled" or "retirement package" might be. Furthermore, some of the items listed in this definition are options offered by the National Transportation Safety Board ("NTSB" or "agency") that an employee may or may not choose to utilize. For example, an employee may or may not contribute to a Thrift Savings Plan ("TSP") account.

EXPLANATION OF SUPPLEMENTAL RESPONSES

In its initial response to interrogatories 1 and 10, defendant referenced its December 3, 2007 motion for summary judgment and appendix and accompanying proposed findings of uncontroverted fact. Defendant is now supplementing those responses with information from the summary judgment motion that it deems to be responsive. Defendant's responses to all other interrogatories remain the same.

DEFENDANT'S SUPPLEMENTAL RESPONSES AND OBJECTIONS

1. Describe in detail the factual basis for each and every affirmative defense, specifically naming all individuals and each act, occurrence and conversation.

SUPPLEMENTAL RESPONSE: Defendant objects based upon the general objections noted above, and specifically because the interrogatory is vague, overbroad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Without waiving these objections, defendant incorporates by reference its December 3, 2007 motion for summary judgment

and appendix and accompanying proposed findings of uncontroverted fact. Without waiving these objections, defendant also provides the following response:

Assuming that the Court were to find that Ms. Cooke has established her prima facie case, any pay disparity between Ms. Cooke and her alleged comparators falls within two of the four exceptions to the EPA, a merit system and differential based upon factors other than sex. See 29 U.S.C. § 206(d)(1).

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System

In order to qualify under the merit system defense, an employer must show that the merit system was "an organized and structured procedure by which employees were evaluated systematically and in accordance with predetermined criteria." Raymond v. United States, 31 Fed. Cl. 514, 518 (1994). In this case, Ms. Cooke's pay, as well as the pay of her alleged comparators, was determined by numerous statutes and regulations governing the Federal employee pay system. The NTSB was required to work within the confines of these statutes and regulations when determining Ms. Cooke's pay, as well as the pay of her alleged comparators. Within the Federal pay system, there was no way that Ms. Cooke could have been compensated at a rate equal to that of her alleged comparators. Ms. Cooke was paid at the GS-15 rate, as determined by OPM. Each GS pay grade has 10 incremental steps from step 1 to step 10, through

which employees progress based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. Ms. Cooke alleges that she could have received a within-grade step increase sooner than she did. However, during the period in question, Ms. Cooke received all step increases to which she was entitled.

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service

When Ms. Cooke became the Director of OMS, it was the NTSB's intention to classify and pay her and the other modal directors at the SES level. However, at the time, there were no available SES slots to allocate to the modal office directors. There are only two ways for the NTSB to obtain SES slots and thereby promote an employee to the SES level. One way is to request and receive slots from OPM and the other is to reassign slots within the agency. The NTSB cannot create a new SES position without authorization from OPM. In June 1999, the NTSB requested SES slots for the modal office directors from OPM, but that request was denied. When slots eventually became available, they were properly allocated first to the Director of ORPH position, then to the Director of OHS position. Even assuming that the first available SES slot had been allocated to the Director of OMS position, OPM regulations require that SES positions be advertised and competed. Thus, the NTSB could not have simply promoted Ms. Cooke to the

SES level; because she had not previously held a career SES position, she would have had to compete and be selected for the position. Any assumption made by Ms. Cooke that she would have been the most qualified applicant and therefore would have been selected for the position is purely speculative. Thus, the NTSB could not have promoted Ms. Cooke to the SES level because of the unavailability of slots and the requirement to advertise and compete SES positions.

2. Ms. Cooke Could Not Have Been Given Overtime Pay

While General Schedule employees are eligible for overtime pay within the Federal pay system, there is a limit on the amount of overtime pay that can be provided to GS employees. See 5 U.S.C. § 5547(a); 5 C.F.R. § 550.105. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10, or level V of the Executive Schedule. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, any overtime compensation would have been minimal and would not have provided her with compensation equal to that of her alleged comparators. Additionally, overtime pay must be ordered or approved in advance by one's supervisor, regardless of grade. Ms. Cooke arguably requested overtime from Ellen Engleman Conners in April 2004, but provided no justification or rationale for her

request. Finally, there was an unwritten policy that individuals in management positions, including modal office directors, would not receive overtime pay. A merit system may be based upon unwritten policies if those policies are made clear to employees. See Equal Employment Opportunity Commission v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir. 1980). It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present.

3. Ms. Cooke Could Not Have Been Given A Retention Allowance

Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301, an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301. The NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. There is no evidence that Ms. Cooke had unusually high or unique qualifications for her position. The fact that, when the position became SES and was competed, another individual was selected for the position strongly suggests that Ms. Cooke was not uniquely qualified. Of significance, there is no evidence that Ms. Cooke ever received an

offer of outside employment during her tenure as the Director of OMS. Therefore, Ms. Cooke was ineligible to receive a retention allowance.

### 4. Ms. Cooke Could Not Have Been Given Any Additional Performance Awards

While Ms. Cooke was eligible for a number of the types of performance awards available at the NTSB, performance awards are based upon performance and are not meant as a tool to augment an employee's salary. Ms. Cooke never received a special act award because, between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award.

### 5. Ms. Cooke Could Not Have Been Given A Senior Level Position

SL positions are intended for technical positions with little to no supervisory responsibilities. There is no evidence to suggest that Ms. Cooke qualified for an SL slot when she was the Director of OMS. In addition, SL employees may not perform supervisory duties more than 25 percent of the time. Ms. Cooke's position as Director of OMS involved routine supervisory responsibilities of 14 to 15 employees, on average, and it is clear that Ms. Cooke performed these supervisory responsibilities more than 25 percent of the time. Thus, Ms. Cooke was ineligible for an SL position.

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex

Pursuant to the fourth exception of the EPA, even if a male comparator and Ms. Cooke performed the same work, the EPA is not violated if the differential stems from a factor other than gender. See Wollenburg v. Comtech Manufacturing Co., 201 F.3d 973, 976 (7th Cir. 2000). Federal courts do not agree on whether any factor is sufficient or whether the factor must be a product of a legitimate business reason, although a majority of Federal courts of appeals espouse the legitimate business reason view. Lissak, 49 Fed. Cl. at 285. While the Federal Circuit has not spoken on this matter, the Court of Federal Claims has determined that the "rational basis" standard is appropriate for this analysis, in that it is enough that the factor be gender neutral on its face and used in good faith and not in a discriminatory manner. Behm v. United States, 68 Fed. Cl. 395, 399-400 (2005). Additionally, non-gender-based pay differences, which are the result of separate pay and classification systems, are permissible under the Equal Pay Act. See EEOC v. Aetna Ins. Co., 616 F.2d 719, 723-26 (4th Cir. 1980). In this case, the reason for the pay differential between Ms. Cooke and her alleged comparators was the gender-neutral allocation of available SES positions. The NTSB both had a rational basis for its actions and possessed legitimate business reasons for allocating available SES positions to

the Director of ORPH and the Director of OHS positions prior to the Director of OMS position. Ms. Cooke's pay was the result of the non-gender-based classification of her position as a GS position, and the classification of her alleged comparators' positions as SES or SL positions.

The OAS Director and Deputy Director positions have always been SES-level positions for legitimate business reasons. Aviation safety is the reason for NTSB's existence. Thus, the work of OAS is central to the agency's mission. In addition, OAS is much larger; handles many more accident investigations; handles more complex accident investigations; garners much more press, public, and congressional interest; and does more international work than any of the surface modal offices. Furthermore, OAS is the only modal office required by statute to investigate all civil accidents in its mode. For these reasons, OAS had the highest potential for impact in the area of transportation safety, has an extremely high profile with Congress as well as the general public, and, thus, its Director and Deputy Director were properly designated SES-level positions.

Following the dividing of NTSB's Office of Surface Transportation into four separate surface modal offices, it was NTSB's intention that each of the four surface modal offices directors, including OMS, be headed by a member of the SES. However, there were no available slots to allocate to the surface

modal office directors. In June 1999, NTSB requested additional SES slots from OPM for all of the surface modal office directors, but OPM denied that request. Thus, there was no way for NTSB to make any of the surface modal office director positions SES-level positions, and each of the surface modal office directors were initially paid at the GS-15 level.

In 2001, an SES employee retired, and, therefore, an SES slot became available. This SES slot was allocated to the position of Director of ORPH based upon legitimate business reasons and in accordance with a rational plan. ORPH was the most complex of the three surface modal offices (OHS, ORPH, and OMS) and was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode.

Pursuant to OPM regulations, all SES positions must be advertised and competed. Accordingly, once the decision was made to allocate the SES slot to the position of Director of ORPH, the position was advertised as an SES position and applications for the position were accepted. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. The advertisement and selection process was conducted

pursuant to OPM regulations. Mr. Chipkevich was selected because he was the best candidate for the position, not for any gender-biased reasons.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In its request, NTSB stated that its prioritization of these requests was first OHS, then OMS, indicating that the order of SES allocations proceeded according to a plan set forth long before another SES position became available. Again, those requests were denied by OPM. Thus, the NTSB had a legitimate business reason for not making the Director of OMS position an SES-level position at that time.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. That slot was allocated to the position of Director of OHS for legitimate business reasons, namely that OHS was a larger office than OMS and because there are approximately 43,000 highway deaths each year, in contrast to several hundred marine deaths per year. It was determined that OHS could have the greater positive impact on transportation safety. In addition, the scope of responsibilities of OHS was much larger than the scope of responsibilities of OMS, including investigatory responsibilities, supervision, and responsibilities for regional offices. Once the

decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position and applications for the position were accepted. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level and was eventually selected for the position. Again, the advertisement and selection processes were conducted pursuant to OPM regulations. Mr. Osterman was selected because he was the best candidate for the position, not for any gender-biased reasons.

In 2004, NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS.

In sum, the reason that Ms. Cooke was not paid at the SES-level was because the NTSB did not have enough available SES slots to assign to all of the surface modal office directors simultaneously. The order in which the available slots were assigned was dictated by legitimate business reasons – namely, they were prioritized based upon the complexity of the offices and the potential for positive effect upon transportation safety. OMS was smaller in size, conducted fewer investigations, had shared jurisdiction with the Coast Guard, and had fewer regional offices. Furthermore, there were comparatively fewer marine deaths than highway deaths per year. Thus, OMS had the least potential for impact in the area of

transportation safety. Given that NTSB's mission is to promote transportation safety, it was legitimate to consider which modal office would have the greatest impact upon transportation safety when allocating SES slots.

Additionally, even if the Director of OMS position had been the first surface modal office director position to be given an SES slot, the NTSB could not have simply promoted Ms. Cooke to the SES-level. In accordance with Federal Government-wide OPM policies, the NTSB would have had to advertise and compete the position and select the best candidate from the pool of applicants. If Ms. Cooke had not been the best candidate for the position, the NTSB would have had a legitimate business reason for not selecting her. The NTSB clearly has a business interest in hiring the best candidate possible for each position.

Finally, it is clear that the disparity in pay between Ms. Cooke and her alleged comparators was based upon factors other than sex because the NTSB had three female SES-level employees during the relevant time period: Lola Ward, Julie Beale, and Elaine Weinstein. All three of these women were required to apply and compete for their positions, and all three competed against male applicants. Thus, the NTSB did not pay Ms. Cooke at the GS-15 level because of her gender, but because it was complying with Federal pay

requirements and making legitimate business choices in its pay and SES allocation decisions.

10. Identify and describe in detail all reasons Plaintiff was not given the SES position that was created for her former position of Director of OMS.

SUPPLEMENTAL RESPONSE: Defendant objects based upon the general objections noted above, and specifically because the interrogatory is vague and not reasonably calculated to lead to the discovery of admissible evidence related to the agency's affirmative defenses. Defendant objects because no time frame is given. Defendant further objects because "given" is not defined. Without waiving these objections, defendant states that SES positions are not "given"; they are competed. Ms. Cooke applied for the Director of OMS position at the SES level, and she was found to be qualified for the position. She was not, however, among the candidates who were recommended to the selecting official by the panel. Defendant incorporates by reference its December 3, 2007 motion for summary judgment and appendix and accompanying proposed findings of uncontroverted fact. Defendant further incorporates by reference its response to interrogatory 1, above, particularly subsections A1 and B.

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

HAROLD D. LESTER, JR.
Assistant Director

MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

March 18, 2008

Attorneys for Defendant

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 06-748C<br>(Judge Thomas C. Wheeler) |

**CERTIFICATION**

Pursuant to Title 28 United States Codes Section 1746, I declare under penalty of perjury that the foregoing is true and correct.

Date: 3-14-08

Joseph G. Osterman, for the supplemental responses to interrogatories 1 and 10 in Plaintiff's Third Set of Interrogatories to the United States.

CERTIFICATE OF SERVICE

I hereby certify that on this 18 day of March 2008, I caused to be sent by messenger a copy of the foregoing "DEFENDANT'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S THIRD SET OF INTERROGATORIES TO DEFENDANT UNITED STATES OF AMERICA" addressed as follows:

David M. Scher
The Employment Law Group, PC
888 17th Street, NW, Suite 900
Washington, DC 20006
(202) 261-2802

Jean M. Swanson