# EXHIBIT NO. 26

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

-------------------------
MARJORIE MURTAGH COOKE, :
:
Plaintiff, :
:
-vs- : Case No. 06-748C
: Judge Thomas C. Wheeler
THE UNITED STATES, :
:
Defendant. :
-------------------------

CORPORATE DEPOSITION OF

NATIONAL TRANSPORTATION SAFETY BOARD

by and through JOSEPH G. OSTERMAN

Washington, D.C.

Friday, July 6, 2007

9:48 a.m.

Job No.: 1 - 107102

Pages: 1 - 265

Reported by: Paula M. Flint

Corporate Deposition of NATIONAL TRANSPORTATION SAFETY BOARD, by and through JOSEPH G. OSTERMAN, held at the law offices of:

THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Paula M. Flint, Notary Public of the District of Columbia.



APPEARANCES

On behalf of the Plaintiff:
BY: BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

On behalf of the Defendant:
BY: QUAN K. LUONG, ESQUIRE
U.S. Attorney's Office, Civil Division
501 Third Street, Northwest
Room 4218
Washington, D.C. 20530
(202) 514-9150
and
BY: KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
Office of the General Counsel
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6084



CONTENTS


| EXAMINATION OF JOSEPH G. OSTERMAN | PAGE: |
|---|---|
| Mr. Lowinger | 6, 257 |
| Mr. Luong | 251 |


EXHIBITS


OSTERMAN DEPOSITION EXHIBIT NO. PAGE:
(Exhibits subsequently attached to the deposition.)

| No. | Exhibit | Page |
|---|---|---|
| 1 | Position Vacancy Announcement | 88 |
| 2 | Memorandum | 91 |
| 3 | Position Vacancy Announcement | 92 |
| 4 | Memorandum | 93 |
| 5 | Operations Bulletin | 226 |
| 6 | Operations Bulletin | 227 |
| 7 | Operations Bulletin | 229 |
| 8 | Order | 232 |
| 9 | Performance Appraisal Form | 234 |
| 10 | Performance Appraisal Form | 234 |
| 11 | Position Description | 235 |
| 12 | Position Description | 237 |
| 13 | Application | 238 |
| 14 | Qualifications Brief | 238 |




EXHIBITS CONTINUED


OSTERMAN DEPOSITION EXHIBIT NO. PAGE
(Exhibits subsequently attached to the deposition.)

| No. | Exhibit | Page |
|---|---|---|
| 15 | Rating and Evaluation Plan | 240 |
| 16 | SES Rating Sheet | 243 |
| 17 | Briefing for Panel Members | 245 |
| 18 | Organizational Structure | 246 |
| 19 | Position Description | 248 |
| 20 | Unclassified Set of Duties | 249 |


* * *

may fall into those four categories.
MR. LOWINGER: Fine.
BY MR. LOWINGER:
Q. Are you aware, sir, whether Colette Magwood is still employed by NTSB?
A. She is not.
Q. Do you know when her career at NTSB ended?
A. I believe early 2006.
Q. Do you know where she's currently employed, sir?
A. I'm not certain, but I think it is the National Oceanic & Atmospheric Administration.
Q. Did she leave under good terms or not, less than good terms?
MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.
A. She left under favorable terms.
Q. What changes were made in 2005 to the advertisement that was not posted in -- that was posted in 2005 as opposed to the 2004? Do you understand the question? Maybe I can say it a little differently.



A. No, I understand the question. Was there a difference between the 2004 advertisement and the one readvertised in 2005?
Q. That's right.
A. Without looking at the documents I can't give you an answer to that specifically.
Q. Are you aware of whether or not Mr. Campbell suggested edits to the 2005 advertisement?
A. I'm not aware. I would have to look and compare the documents.
Q. Could it be that there were edits considered but not finally adopted in 2005?
A. It could be. I'm not aware of it.
Q. Did you have any conversations with Mr. Campbell regarding his editing of the vacancy announcement in 2004 and 2005?
A. No.
Q. Did Mr. Campbell discuss his role with regard to the -- his duties as the selecting official in 2004 and 2005 when you spoke with him?
A. He did.



Q. Can you tell me what he mentioned regarding his duties and responsibilities as the selecting official?
A. Well, his duties and responsibilities as selecting official were fairly standard. He would take the applicants provided by the ranking -- provided by the panel and determine which to interview. And he would conduct those interviews and make a selection from those interviews and the rating and ranking from the panel and the applications themselves.
Mr. Campbell in 2004 decided to readvertise the position. And his stated reason was that he learned from his discussions with leadership at the Coast Guard that there was a belief by many potential applicants who chose not to apply that the position was preselected for Ms. Murtagh. And he, in deciding to make sure that the NTSB had the broadest pool of qualified applicants, decided to reannounce the application -- or reannounce the advertisement.
Q. When you say the broadest pool, broadest



pool of what types of characteristics, sir?
A. Qualified applicants.
Q. When you say qualified applicants, I mean the -- are we talking about -- what qualifications was Mr. Campbell looking for that led him to believe that he needed to readvertise the position in 2004?
A. He was looking for a broader selection pool. He wasn't looking, from my understanding, for different qualifications.
I don't believe in the first advertisement, in 2004, there were many applicants. And his concern for that led him to readvertise the position so that there would be more applicants to choose from.
Q. So in doing so, how did the advertisement change so that there would be more applicants who would not think that it was preselected for Ms. Murtagh Cooke?
A. I don't believe that the advertisement changed. The nature of federal hiring, for those who watch senior executive positions, there is -- it is not permissible to preselect a candidate. The

rules prohibit that.
If an application is offered and there's a belief by the community that there is a preselection afoot, that an agency has a particular applicant in mind and then the agency readvertises the position, it essentially tells the reader, the audience who's looking at these advertisements, that there is no such preselection, because had there been there would not have been a readvertisement. Are you following?
Q. I --
A. So it's not necessary if you're trying to tell the audience of applicants that there is no air apparent necessarily, which is not permissible in the federal hiring service. It's not necessary to overtly say that. By readvertising it you're essentially doing that.
Q. What happens to the applications that were submitted prior to, in 2004, when there was -- when the position was readvertised?
A. In a readvertisement the human resources division will notify the applicants that it is going



to be readvertised, and there's two choices. I'm not sure which one was chosen here. Choice one is to forward those existing applications into the new announcement, or choice number two is, to notify the applicants that they must reapply.
Q. I see. And you don't know which one it was this time?
A. I don't. I suspect it was a notice that the applicants reapply.
Q. Who did Mr. Campbell speak with at Coast Guard regarding the thought that there was a preselection going on?
A. I don't know. It was the senior leadership at the time.
Q. Do you know if that was a telephone conversation?
A. I don't know.
Q. And why did he call the Coast Guard?
A. I believe that Mr. Campbell was actively engaged in discussions with the Coast Guard regarding the continuing memorandum of understanding that we had. I don't believe that there was a



specific phone call for this advertisement. My understanding from Mr. Campbell is that he learned of this belief during other conversation.
Q. So Mr. Campbell was speaking with the Coast Guard about a memorandum of understanding issue and it just so happened it came up that there was a concern that there was a preselection going on?
A. Yes, that's my understanding.
Q. I see. And how many candidates were there in 2004?
A. I think we can give you the record for that. I'm not certain.
Q. How many more were there in 2005, sir?
A. I know that there were more by volume. And we can -- I think we can give you that number.
MR. LOWINGER: May we have that information, please?
MS. SILBAUGH: You have it.
MR. LUONG: Yeah, we provided that to you.
BY MR. LOWINGER:
Q. And how was it determined that there was a



better set of qualified applicants in 2005 than there were in 2004?
A. There were more applicants in 2005 than 2004, determining their qualifications, the relative ranking by the panel.
Q. I see. Do you know when Mr. Campbell had the conversation with the Coast Guard official?
A. It was in November or December of 2004.
Q. And did Mr. Campbell encourage others to apply at the Coast Guard during this conversation?
A. I'm not aware that he spoke to anybody specifically about applying.
Q. Well, during his conversation regarding the OMS and learning about the concern of a preselection, what did he say about readvertising the position then?
A. I don't believe he spoke to the Coast Guard about it.
Q. What was Mr. Campbell's decision-making process with regard to readvertising the position after his conversation?
A. I think it is fairly simply in that

framework around the maritime industry. Knowledge of that is important for that position.
Q. So international and domestic regulatory knowledge?
A. Yes.
Q. What else?
A. The basic aspects of navigation, ship building, how the maritime industry works, as far as cruise ships, passenger ships, cargo vessels. I'm certain that I'm not covering all the areas here.
Q. I'm sure it's a lot.
A. It is.
Q. So aside from naval architecture, shipping, boating, international -- regulatory knowledge of both domestic and international navigation, shipping building, how the industry works, cargo and vessels, is there anything else that just comes to your mind in defining what maritime means?
A. It's a very large industry with a long history and many tentacles, lots of aspects to the industry.



Q. What are the factors in determining what an experienced maritime -- let me -- please strike that. Let me just rephrase the question.
Did Mr. Campbell speak to any factors that he considered were especially relevant when he drafted the quality ranking factors or the KSAs?
A. The KSAs are exactly the elements that he believed were relevant to selecting a director of marine safety. That is why KSAs are developed, to specifically identify those skill sets, knowledge, skills and ability, that the applicants need to have to successfully execute that job.
Q. So the KSAs for 2004 and 2005 reflect Mr. Campbell's belief of what an experienced -- an individual with experience in maritime should have?
A. Yes. Qualify that comment. Yes, as it relates to the director of the marine safety office, the director of OMS position.
Q. Let's make sure we just get this right.
A. The KSAs do not say, this in makes you an experienced mariner. It is the knowledge, skills and abilities that NTSB believes should -- that the



applicant should have to be considered for the position.
Q. So the KSAs and the quality ranking factors reflect Mr. Campbell's belief, personal belief as to what the individual with maritime experience should have for experience in order to serve as the director of OMS at the SES level for NTSB?
A. Yes.
Q. Are you aware of whether or not -- let me rephrase that. Excuse me.
With whom else besides Colette Magwood did Mr. Campbell develop the KSAs and the quality ranking factors?
A. I don't know if he developed them in concert with anyone else or not.
Q. What other resources did Mr. Campbell use in order to determine the KSAs and quality ranking factors?
A. I don't know.
Q. Other than an experienced maritime individual that we just discussed, what other topics



did Mr. Campbell tell you were essential to his development of the KSAs and the quality ranking factors for the -- for the SES position for OMS?
A. I'm not certain of where you're going with -- I'm not certain of the question.
Q. I'll rephrase it. Other than -- did Mr. Campbell express any other factors that he felt were essential to the position of the director of OMS at the SES level other than maritime experience?
A. Those and the core competencies.
Q. Do you know when he completed -- when Mr. Campbell completed the KSAs and quality ranking factors in 2004 for the advertisement?
A. Not specifically. It would have been prior to the public advertisement of the position and shortly before the advertisement.
Q. I see. So if it was advertised in July of 2004 --
A. It would have likely been June.
Q. I see. Can you tell me or describe to me what qualifications Marjorie Murtagh Cooke had as a -- in order to perform the position of director of

OMS at the GS-15 level?
A. What I know about Ms. Cooke's background is that she had come to the safety board in the early '90s from the Coast Guard as the chief of the marine accident investigation division, I believe that was 1993, and functioned in that capacity through '97.
In '97 the title of her position was changed to director of the Office of Marine Safety, and she functioned in that capacity until 2005. Prior to her arrival -- and in that time -- let me back up. In that time frame she would have managed the accident investigation, the marine accident investigation activity and report development activity for the NTSB.
Q. I just didn't hear the word. You said marine accident, and then what was the other one?
A. Report development activity. Also recommendation development and some of the advocacy and public presentation activities on marine safety.
Prior to 1993, I know that she had worked at the Coast Guard for a number of years,



specifically in a fire science field, fires aboard ships. She had experience with the international maritime organization. And she had graduated, I believe, from New York Maritime with a maritime-related degree. I think it was marine engineering, but I'm not certain.
Q. What is involved in -- what was involved between -- what was involved in the position other than maritime accidents -- responding to maritime accidents, development of reports, recommendation development, the advocacy piece you mentioned, what else was involved in the position of director of OMS as performed by Marjorie Murtagh Cooke?
A. In addition to what you mentioned, there was basic supervision duties for the staff of the Office of Maritime Safety -- or Marine Safety. There was some coordination activity that she was responsible for between the offices and among the offices within the NTSB when it related to maritime issues. And she would occasionally prepare, or her staff would prepare under her direction, speeches, congressional testimony for board members and



others.
Q. What about human resources, anything -- did she have duties with regard to that?
A. Supervision of the personnel and all of the human resources aspects that come with supervision.
Q. What are the aspects that come with --
A. Performance management, discipline, time and attendance, training, workload management, basic supervision duties.
Q. What about -- does she have any budgetary authority?
A. Prior to 1997 her budgetary authority was limited as a division chief. The organizational structure was such that she, along with the other modal divisions in surface, reported to a director of Surface Transportation Safety. After 1997 that layer of management was eliminated and she reported directly to the managing director.
In 1997, she had broader -- she began with broader budget responsibilities, as far as the application of funds necessary to do the functions



I've mentioned of the position. So training funds, travel funds, equipment funds for the staff and activities of the Office of Marine Safety were within her control.
Q. What documentation outside of her -- what documentation exists with regard to Marjorie Murtagh Cooke's performance of her duties and responsibilities as the director of OMS from 1997 through 2005?
A. I think that there's a performance evaluation that we have provided to you for 2003 and 2002. There should be performance evaluations -- performance appraisals for the years you mentioned prior to that.
Q. Where would we find those -- other than 2002 and 2003, where would we find those performance appraisals?
A. They should be in her personnel file, if they exist.
Q. What's the difference between a performance evaluation and performance appraisal, sir?

A. None. The form will say "performance appraisal."
Q. I apologize.
A. The form will say "performance appraisal." That's why I corrected it.
Q. Oh, I see.
A. There is no difference. They're identical.
Q. Does NTSB keep all performance appraisals of an employee in the personnel -- official personnel file of its employees?
MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.
MR. LOWINGER: That's a standing one, isn't it?
MR. LUONG: Not when it's --
MR. LOWINGER: Regarding her performance appraisals.
MR. LUONG: You're asking about the performance appraisal system within NTSB.
MR. LOWINGER: Okay.
A. Performance appraisals once given to the



employee and signed should be maintained in their personnel file.
I will tell you that the NTSB personnel files are not complete. They're not always placed in the individual OPF, official personnel file.
Q. How is that?
A. Performance decrements on the part of either supervisors or the human resources office.
Q. So if an individual wants to see their official personnel file and they notice that it's lacking, what happens then?
A. They can do one of two things. They can request that a copy be placed in their personnel file. They should have a copy and their supervisor should have a copy. And that's -- once that request is made human resources will do that.
And there may be circumstances where a performance appraisal was not completed and therefore there is no copy.
Q. The supervisor should have a copy as well?
A. Yes.
MR. LUONG: Brian, just so I don't



continue to interrupt you, just a continuing objection to this whole line of questioning about the performance appraisals as outside the scope of the 30(b)(6) deposition.
BY MR. LOWINGER:
Q. Where does the supervisor keep copies of performance appraisals?
A. Let me clarify that. Not all supervisors keep copies of the performance appraisals. Some do and some do not. There is no requirement that the supervisor maintain a copy.
Once a performance appraisal is completed for an individual, that completed appraisal is submitted to human resources with the intention that it go into the official personnel file. Some supervisors do not keep their own copies of past performance appraisals.
Q. Did Dan Campbell keep copies of past performance appraisals for the directors?
A. He did not that I'm aware of.
Q. Other than performance appraisals, what other documentation exists regarding Marjorie



Murtagh Cooke's performance of her duties?
A. I believe that's all. I have not reviewed Ms. Murtagh's official personnel file, therefore I do not know if there was any disciplinary action or anything else that may have occurred. I just want to clarify. When I say I don't know, I'm not aware of any.
Q. I see. Did Ms. Murtagh Cooke submit an application, a separate application in 2004 and 2005?
A. I'm not certain. I'm not certain. We can find out, but I'm not certain if it was a different application or whether -- I think I have stated before I wasn't sure how HR handled the 2004 applicants, whether they transferred over the applications to the 2005 announcement or whether they asked the applicants to reapply.
If you are at a convenient place, can we take five minutes?
Q. Of course.
(A recess was taken.)
BY MR. LOWINGER:

Q. You mentioned that there's a few performance appraisals in the documents submitted -- submitted as by NTSB related to Marjorie Murtagh Cooke?
A. Yes.
Q. Are you aware of how Ms. Murtagh Cooke rated in those performance appraisals?
A. I believe one was outstanding and one was excellent.
Q. What does outstanding convey, sir?
A. There are five levels of performance rating in the GS schedule at the NTSB, and it is outstanding, excellent, fully successful, minimally successful and unsuccessful. And so outstanding would be the highest rating.
Q. And you said her other one was an excellent?
A. I believe so.
Q. What does that communicate or convey?
A. Also excellent performance.
Q. It conveyed that she's just a stellar performer in her duties. Is that correct, sir?



A. I would not -- fully successful should be doing the job at the level you're being paid, not a great deal more, but doing an adequate job. Excellent is doing better than adequate. And outstanding is superior, above most others.
Q. Are you aware of what other levels of evaluation Ms. Murtagh Cooke received in -- in her other performance appraisals?
A. I'm not specifically aware. I can't give you a year and a rating, but my understanding is that they were generally favorable, excellents or outstandings.
Q. And in 2004, there wasn't a performance appraisal for 2004. Are you aware of how she performed in 2004, sir?
A. I believe that her performance was adequate. It was -- she was doing an adequate job. My understanding of her performance was based on my interview with Mr. Campbell, who believed that he had to assist Ms. Murtagh in some of the duties within her position too often for her position, and that he had to assist the Office of Marine Safety in



crafting reports and completing investigations more than he should have, and that is a negative comment on her performance during that time frame.
Q. Is that reflected in a performance appraisal anywhere?
A. No.
Q. I see. Are those -- his efforts related to the reports authored by the Office of Marine Safety, are those kept anywhere?
A. Clarify the question.
Q. Are Mr. Campbell's edits to the reports, indication of his help on those reports, is that reflected anywhere?
A. Not generally, other than in the memories of the individuals who participated in the meetings. Most draft reports, regardless of the mode leading up to the final board's report, are generally thrown out.
Q. They're not subject to a record retention policy of any sort?
A. No. The draft reports are not forwardable or they're internal communications. And when the



final board report is submitted to the board and voted on by the board, it becomes the final product of the board and the drafts leading up to that are almost always destroyed.
Q. How many reports in 2004 did Mr. Campbell have to help Ms. Murtagh Cooke on?
A. I know that there were several underway that he was working on with her, several that were high-profile investigations. I would say five to six.
Q. So her office, the Office of Marine Safety, was working on five to six high-profile reports in 2004?
A. They were working on more than five or six, but five or six high-profile ones, or ones that required Mr. Campbell's attention.
Q. Did the managing director, is he involved in reviewing reports of other modal offices at NTSB?
A. The managing director is the final review stage before the report is submitted to the board for their consideration of every report that is submitted to the board.

recipients reply. We reply back to them. They reply again. It is keeping track of where the recommendation is in its evolution through its life, and then identifying that and making it easy to capture that information.
Q. So basically it's finding out in whose court the ball resides?
A. Whose court the ball resides and what's the status of the work against the recommendation.
For example, if we recommended to the FAA that they promulgate a regulation, they would respond back to us, we'd write back with comments, they write back again. Knowing where they were in the regulatory processes is a necessary item that we need to know as we continue to investigate new accidents.
Q. How would you characterize this assignment?
A. As a temporary assignment for someone who had demonstrable planning skill.
Q. What do you know about what she actually did?



A. I didn't evaluate her, and I didn't monitor her daily activities. So I'm not actually sure.
Q. Overall do you know what she did -- do you have a sense of what she did while she was in the Office of Safety Recommendations and Communications?
A. My understanding is she did essentially what the original design was for, assisted Ms. Weinstein, who also continued her detail for a short period of time to finish the project.
Q. What type of -- what type of guidance did Ms. Murtagh Cooke receive in performing her work in determining how she was doing in performing her work?
A. She would have received it from Ms. Weinstein.
Q. Would it have been a position description?
A. Position description and then personal direction from the supervisor.
Q. What about performance standards, should she have received performance standards?
A. Not for a temporary assignment. For a



detail she should have received a position description for the detail, but the performance standards go back to the originating office. In this case it's the Office of Management.
Q. I see. Do you know who she worked with while she was doing this work?
A. In Safety Recommendations? I presume Ms. Weinstein and others, but I'm not sure who.
Q. What rule is there that doesn't require a performance standard for Ms. Murtagh Cooke's transfer in the Office of Safety Recommendations and Communications?
MR. LUONG: Objection to the term "transfer."
A. As a detail you maintain your position of record, although you may be doing other duties in another assignment. The rater should consult with the manager in that detailed assignment to see how well they did against the position description.
Q. And who would that have been? Who would have been rating her work?
A. It would have been Ms. Czech.



Q. And was there a rating of Ms. Murtagh Cooke's work while she was working in the Office of Safety Recommendations and Communications?
A. No.
Q. And was -- has there ever been any follow-up as to why there wasn't any rating of Ms. Murtagh Cooke's work?
A. Ms. Murtagh Cooke left before the end of the rating cycle and the rating wasn't completed. She retired before the end of the rating cycle.
Q. When we say "ratings," are we talking performance appraisals?
A. Performance appraisals.
Q. And on an annual basis how many performance appraisals are given to an employee at NTSB?
A. Generally you get one performance appraisal annually, and you get a short written midterm performance appraisal.
Q. And --
A. It's actually called a progress review.
Q. And did Ms. Murtagh Cooke receive a

Page 190

progress review?
A. I don't believe she did.
Q. And whose responsibility was it to give her a progress review?
A. Ms. Czech's.
Q. Who is Ms. Czech and where does she work?
A. At the time Ms. Czech was the associate managing director. We've changed the titles, but she worked directly for me as an associate managing director.
Q. And was there any follow-up as to what happened to her -- to Ms. Murtagh Cooke's rating -- what was the term of art, sir?
A. The appraisal.
Q. Midterm appraisal.
A. Oh, the midterm appraisal. No, I don't know why it wasn't completed.
Q. And what -- are you aware of how well Ms. Murtagh Cooke performed while she was in the Office of Safety Communication -- Safety Recommendations and Communications?
A. My understanding is she did fine.

Page 191

Ms. Weinstein was fine with what she was doing.
Q. And when did the -- when was she transferred back to the office of managing director?
A. I know that her detail was continued in October. And I think she was transferred back January of '06, thereabouts. There should be -- it's getting late in the day -- a personnel action.
Q. And at the end of '06 -- at the end of '05, did Ms. Murtagh Cooke receive a performance bonus of any sort related to her work in either OMS or the Office of Safety Recommendations and Communications?
A. No.
Q. Would a midterm performance appraisal have helped her obtain a performance bonus of sort?
A. Not necessarily.
Q. If she was doing fine would she have likely received a bonus at the end of the year, sir?
A. If she was performing on a fully successful level the likelihood is she would not have received a bonus. Our candidates who are working at their level who do not receive excellents

Page 192

or outstandings generally do not receive performance bonuses.
Q. I see. So when you said that it's your understanding that she was performing at a level --
A. Satisfactory level.
Q. And is that a term of art?
A. I'm trying to give you a different phrase from fully successful. She was performing at a fully successful level.
Q. And that's below excellent?
A. That's below excellent.
Q. I see. And what documentation is there with regard to the basis for an assessment that Ms. Murtagh Cooke's work was fully successful?
A. I don't believe there's any.
Q. Did you have any communications with Ms. Weinstein?
A. I did.
Q. And what did she say about the quality of the work?
A. She thought that Ms. Murtagh was working out fine, doing what she was asked to do and doing

Page 193

it in a satisfactory manner.
Q. When people are put on, as you say, a detail, is it possible to receive a bonus at the end of the year?
A. It is. It's possible.
Q. Is it likely?
A. It's possible. It depends on the nature of the detail. Details are very unique. And it depends on what the work involved and what the nature of the detail was.
Q. Describe how this -- how the work performed by Ms. Murtagh Cooke, the actual assignment, fits within the scope of the bonus, an end-of-the year bonus.
A. The bonus -- it's not a bonus, it's a performance award that is provided to staff who receive an outstanding or an excellent and varies in percentage. A higher percentage for outstanding, a lower percentage for excellent. Generally no performance award for fully successful. And not all excellent candidates receive a performance award either.

strategic management times 10.
Q. What was written between you and Ms. Murtagh Cooke about the chief strategic planning position?
A. I don't believe there are any written documents.
Q. Did she receive any -- did Ms. Murtagh Cooke receive any performance standards for her work in her archival position that she was -- that she performed for the Office of Management -- Office of Managing Director?
A. I think our records are that she did not.
Q. And did she receive a position description?
A. I believe she did not.
Q. And did she receive any sort of feedback about the type of job she was doing in --
A. She received -- she talked to Ms. Czech on a regular basis and she talked to me several times during that period in a review of the work that she was doing. And she received feedback from me, progress reviews as she was moving along. All very



good, all very cordial conversations. And as the progress -- as the project was progressing, more thorough and more detailed feedback each time.
Q. I see. What type of interpersonal work did the position require, the archival position when you would go to other offices and ask about their audits that they haven't reported on or that are outstanding that haven't been accumulated by the NTSB?
A. It was mostly information gathering. The exercises and information gathering exercise. There was very little negotiation or coordination, it was gathering facts and status.
Q. And how was the quality assurance position different?
A. The quality assurance position can be a very critical position to the production line. People are producing products. The quality assurance associate managing director is responsible for kicking back those products if the quality is not sufficient, if the investigations and the reports are incomplete or not thorough or processed



improperly or format incorrect.
Q. When did Ms. Murtagh Cooke retire?
A. July 3 of '06.
Q. Why do you think she retired?
A. I'm not certain. It was -- I did not expect it. She announced it to Ms. Czech one day and several weeks later she was gone.
Q. Did she appear happy while she was working in the Office of Managing Director?
A. She appeared content.
Q. Did the work seem -- do you think the work seemed interesting to her?
MR. LUONG: I'm just going to object to the extent you're asking him to testify about the perception of her work.
A. I don't know how she perceived the work. She seemed content in doing the work.
Q. Did she seem more or less content than she did while she was the director of Marine Safety?
A. More content.
Q. She seemed more content working in the Office of Managing Director?



A. She was frequently unhappy, as the director of Marine Safety unhappy with the management and unhappy with the process and unhappy with board members and other activities. I didn't notice any of that when she was working in the Office of Management.
Q. Were there other positions available to her while she was in the Office of Managing Director that she could have taken?
A. There are some positions that were offered by the agency for competitive -- offered as a competitive bid. But to the best of my knowledge she did not apply for any of those.
Q. Do you know what positions those were?
A. Well, after she left the Office of Marine Safety, we advertized for a chief information officer at the SES level and a director of Highway Safety at the SES level, my former position, and deputy managing director at the SES level. There were then a number of 15-level positions, none of which I thought she was particularly well-suited for. Deputy CIO, deputy chief information officer,