IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**JOINT STIPULATIONS OF FACT**

For the sole purpose of simplifying the issues to be resolved at trial of this matter and for no other reason, the parties stipulate as follows. Please note the terms "accident," "incident," "launch," "major," "notification," "report" and "serious" may mean different things in different contexts.

1. The National Transportation Safety Board ("NTSB") is an independent agency charged with determining the probable cause of transportation accidents and promoting transportation safety. The Board investigates accidents, conducts safety studies, evaluates the effectiveness of other Government agencies' programs for preventing transportation accidents, and reviews the appeals of enforcement actions involving airman and seaman certificates issued by the Federal Aviation Administration ("FAA") and the U.S. Coast Guard ("USCG") and civil penalty actions taken by the FAA.

2. Between 2003 and 2005, the NTSB had approximately 400 to 450 employees.

3. As part of a restructuring that began in 1997 and ended in 1998, the NTSB's Office of Surface Transportation Safety was divided into four separate offices: the Office of Highway Safety ("OHS"); the Office of Railroad Safety ("ORS"); the Office of Pipeline and Hazardous Materials Safety ("OPHS"); and the Office of Marine Safety ("OMS").

4. From 1994 until 1997, plaintiff, Marjorie Murtagh Cooke, served as the Chief of the Marine Division, an office within the NTSB's Office of Surface Transportation Safety.

5. In 1997, as a result of the restructuring, Mrs. Murtagh Cooke's title changed to Director of OMS.

6. The individuals who occupied the Director positions for each of the other three offices immediately following the restructuring were Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS).

7. The Directors of OHS, ORS, OPHS, and OMS (collectively the "surface modal offices") reported directly to the Managing Director ("MD").

8. SES slots are allocated to the NTSB from the Office of Personnel Management ("OPM"). The NTSB cannot create new SES slots without OPM authorization.

9. Once the NTSB is allocated an SES slot by OPM, it can be used to create a new SES-level position or to change an existing non-SES-level position to an SES-level position.

10. When a vacancy occurs on one of the already allocated SES slots, the NTSB can fill that slot or reallocate that slot to another position within the agency, then fill it.

11. An SES-level position can be filled by reassignment of a current SES-level employee to the position, or by a competitive recruitment process.

12. For a period of time immediately following the restructuring, each of the surface modal office directors were classified at the GS-15 level and paid in accordance with the General Schedule ("GS") scale.

13. During all relevant time periods, NTSB's Office of Aviation Safety ("OAS") existed as a separate unit, and its director was paid at the SES level. During all relevant time periods, John Clark was the Director of OAS.

14. During all relevant time periods, OAS had a Deputy Director who was paid at the SES level. From November 2000 to March 2007, the individual occupying that position was Thomas Haueter.

15. From July 2001 to the present, OAS had a Chief Advisor for International Aviation Safety Affairs who was paid at the Senior Level ("SL"). During the entire existence of the position, it has been occupied by Robert MacIntosh, Jr.

16. Effective November 5, 2000, ORS and OPHS were merged to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"). Mr. Chipkevich became the Acting Director of ORPH.

17. Pursuant to OPM regulations, the NTSB is required to advertise and compete all SES positions that will be filled by initial career appointment. An employee who encumbers a GS-level position that is reclassified to the SES level may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. Mrs. Murtagh Cooke has never held a career SES appointment.

18. Once the decision was made to allocate an available SES slot to the Director of ORPH, the position was advertised as an SES position, and applications for the position were accepted.

19. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. The NTSB recommended Mr. Chipkevich for this SES position to OPM, and he was approved for an appointment to the SES.

20. In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In that request, the NTSB stated that its planned

prioritization of new SES positions was as follows: (1) Director, Office of Highway Safety; and (2) Director, Office of Marine Safety. Again, OPM denied those requests.

21. Once the decision was made to allocate an available SES slot to the Director of OHS position, the position was advertised as an SES position, and applications for the position were accepted.

22. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level.

23. Following the selection process, Mr. Campbell informed Ms. Engleman Conners that the panel had recommended Mr. Osterman as the best person for the position.

24. The NTSB recommended Mr. Osterman for this SES position to OPM, and he was approved for an appointment to the SES. Mr. Osterman has been paid at the SES level since early 2004.

25. In July 2003, the NTSB requested two additional SES slots from OPM. In May 2004, OPM authorized only one additional SES slot. The NTSB allocated that slot to the position of Director of OMS.

26. Once the decision was made to allocate the SES slot to the Director of OMS, the position was advertised in July 2004 as an SES position, and applications for the position were accepted. Mrs. Murtagh Cooke submitted an application for the position.

27. The 2004 OMS position advertisement was subsequently cancelled prior to a selection being made.

28. The Director of OMS position was readvertised as an SES position in early 2005. Mrs. Murtagh Cooke again submitted an application for the position.

29. The NTSB recommended John Spencer for this SES position to OPM, and he was approved for an appointment to the SES.

30. In June 2005, Mrs. Murtagh Cooke was transferred to the Office of Safety Recommendations.

31. Each of the modal offices conducts investigations of accidents within the NTSB's jurisdiction; prepares reports for submission to the board and release to the public setting forth the facts and circumstances of such accidents, including a recommendation as to the probable cause(s); determines the probable cause(s) of accidents when delegated authority to do so by the board; initiates safety recommendations to prevent future accidents; and conducts investigations into selected accidents involving safety issues of concern to the board.

32. From 2003 to 2005, OAS had approximately 120 to 140 employees.

33. Thus, from 2003 to 2005, 20 to 25 percent of the workforce of the NTSB reported to the Director of OAS.

34. From 2003 to 2005, ORPH had approximately 40 to 50 employees.

35. From 2003 to 2005, OHS had approximately 30 to 40 employees.

36. From 2003 to 2005, OMS had approximately 14 to 15 employees. During that time period, OMS never had more than 15 employees.

37. During all relevant time periods, OAS had ten regional offices.

38. During all relevant time periods, OHS had five regional offices.

39. During all relevant time periods, ORPH had three regional offices.

40. During all relevant time periods, OMS did not have any regional offices.

41. The majority of the NTSB's budget is composed of fixed overhead costs, such as labor, benefits, and facilities; the remaining portion of the budget is discretionary and divided among NTSB offices.

42. Of the discretionary portion of the budget for Fiscal Year 2003, OAS received 28.04 percent, OHS received 7.61 percent, ORPH received 4.67 percent, and OMS received 2.09 percent.

43. Of the discretionary portion of the budget for Fiscal Year 2004, OAS received 33.45 percent, OHS received 11.78 percent, ORPH received 7.52 percent, and OMS received 3.00 percent.

44. Of the discretionary portion of the budget for Fiscal Year 2005, OAS received 45.04 percent, OHS received 7.81 percent, ORPH received 6.84 percent, and OMS received 1.84 percent.

45. Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of all accidents involving civil aircraft and, with the participation of appropriate military authorities, all accidents involving both military and civil aircraft. This includes all general aviation accidents.

46. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a highway accident, including a railroad grade crossing accident, that the NTSB selects in cooperation with a state.

47. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a railroad accident in which there is a fatality or substantial property damage, or that involves a passenger train.

48. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a pipeline accident in which there is a fatality, substantial property damage, or significant injury to the environment.

49. Pursuant to 49 U.S.C. § 1131, the NTSB shall investigate or have investigated and establish the facts, circumstances, and cause or probable cause of a major marine casualty (except a casualty involving only public vessels) occurring on the navigable waters or territorial seas of the United States or involving a vessel of the United States, under regulations prescribed jointly by the NTSB and the head of the department in which the Coast Guard is operating.

50. Pursuant to 49 U.S.C. § 1131(b), the NTSB or the head of the department in which the Coast Guard is operating shall investigate and establish the facts, circumstances, and cause or probable cause of a marine accident involving a public vessel and any other vessel. The results of the investigation shall be made available to the public.

51. Pursuant to 49 U.S.C. § 1131(c), when asked by the NTSB, the Secretary of Transportation or the Secretary of the department in which the Coast Guard is operating may investigate an accident described under subsection (a) or (b) of § 1131 in which misfeasance or non-feasance by the Government has not been alleged.

52. Regulations prescribed jointly by the NTSB and the Coast Guard for the investigation of marine casualties are contained in 46 C.F.R. § 4.40 and 49 C.F.R. § 850. Marine investigations are also conducted pursuant to an NTSB-Coast Guard memorandum of understanding (“MOU”), the most recent of which was signed in 2002.

53. Pursuant to 49 C.F.R. § 850.10, the Coast Guard conducts the preliminary investigation of a marine casualty and notifies the NTSB of any marine casualties fitting the criteria set forth in 49 C.F.R. § 850.10(b).

54. Pursuant to 49 C.F.R. § 850.15, the NTSB may conduct an investigation of any major marine casualty or any casualty involving public and nonpublic vessels.

55. Pursuant to 49 C.F.R. § 850.15, the NTSB shall conduct a marine casualty investigation when:

> (1) The casualty involves a Coast Guard and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (2) The Commandant [of the Coast Guard] and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty involves a public and a nonpublic vessel and at least one fatality or $75,000 in property damage; or
> (3) The Commandant and the [NTSB] agree that the [NTSB] shall conduct the investigation, and the casualty is a major marine casualty which involves significant safety issues relating to Coast Guard safety functions.

49 C.F.R. § 850.15.

56. The NTSB investigates aviation accidents most frequently, followed by highway, railroad, and marine. The least frequently-investigated accidents are pipeline accidents.

57. From 2003 to 2005, there were, on average, approximately 40 aviation accidents per week and approximately 10 aviation accident fatalities per week.

58. There are approximately seven million highway accidents per year, three million injuries, and 43,000 deaths.

59. On average, 3,215 railroad accidents occur per year, resulting in 442 injuries and 17 deaths. In addition, on average, 355 fatalities per year occur at highway-rail crossings, and an average of 480 fatalities per year occur that involve trespassers around railways.

60. In 2003, there were 370 pipeline accidents, 71 injuries, and 12 fatalities reported.

61. In 2004, there were 443 pipeline accidents, 60 injuries, and 23 fatalities reported.

62. In 2005, there were 490 pipeline accidents, 47 injuries, and 16 fatalities reported.

63. In 2003, there were 15,156 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 119 injuries and 15 fatalities.

64. In 2004, there were 14,846 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 288 injuries and 16 fatalities.

65. In 2005, there were 15,928 incidents reported involving the release of hazardous materials in all transportation modes, resulting in 945 injuries and 34 fatalities.

66. There were between 16 and 31 major marine accidents that occurred each year between 2003 and 2005. Of these, OMS launched on approximately 15 percent.

67. There are approximately 4,000 marine accidents, 4,150 injuries, and 850 marine accident fatalities per year reportable under the United States Coast Guard regulations, specifically 33 C.F.R. Part 173 and 46 C.F.R. § 4.05-1(a). The majority of injuries and fatalities in marine accidents are attributable to recreational, not commercial, boating.

68. Between 2003 and 2005, there were approximately 38 notifications of aviation accidents per week.

69. Between 2003 and 2005, there were approximately 18 notifications of highway accidents per week.

70. Between 2003 and 2005, ORPH received, on average, approximately 53 notifications of railroad incidents and accidents per week.

71. Between 2003 and 2005, ORPH received, on average, approximately 33 notifications of pipeline incidents and accidents per week.

72. Between 2003 and 2005, ORPH received, on average, approximately 119 notifications of hazardous materials incidents and accidents per week.

73. Between 2003 and 2005, OMS received approximately 84 notifications of marine accidents.

74. The order of frequency for notifications of accidents outside of normal business hours was: aviation, highway, rail, marine, pipeline.

75. The bright-line score set forth in the NTSB's MOU with the Coast Guard is a factor in OMS's decision whether to investigate a marine accident.

76. OMS must evaluate the circumstances and safety issues of each accident.

77. Because of its broad legislative mandate, OHS has an enormous amount of discretion in deciding whether to investigate a highway accident. In OHS, each accident must be evaluated to determine whether the relevant safety issues and level of impact on public confidence prompt an investigation.

78. The NTSB exercises considerable discretion in determining whether to launch an investigation on certain rail, pipeline, and hazardous materials accidents. In general, ORPH evaluates the circumstances and safety issues of each accident, and the Director of ORPH makes a decision on whether to launch investigators to the site of the accident. The NTSB may also investigate selected accidents that highlight safety issues of national importance or that involve a selected accident prevention issue. Overall, the Director of ORPH maintains broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation.

79. In 2003, OAS launched to four major domestic accidents and five foreign accident investigations.

80. In 2004, OAS launched to seven major domestic accidents and 10 foreign accident investigations.

81. In 2005, OAS launched to 16 major domestic and 17 foreign accident investigations.

82. In 2003, OAS regional offices initiated 1,915 accident investigations and 50 serious incident investigations and completed 1,707 investigations.

83. In 2004, OAS regional offices initiated 1,865 accident investigations and 116 serious incident and accident investigations and completed 2,361 investigations.

84. In 2005, OAS regional offices initiated 1,927 accident investigations and 128 serious incident and accident investigations and completed 2,335 investigations.

85. In 2003, OHS initiated 49 investigations and launched on 34 accidents.

86. In 2004, OHS initiated 45 investigations and launched on 45 accidents.

87. In 2005, OHS initiated 33 investigations and launched on 28 accidents.

88. During the calendar year of 2003, ORPH launched on 10 railroad accidents, two pipeline accidents, and three hazardous materials accidents. Of the hazardous materials accidents in 2003, one of these accidents was also a marine accident.

89. During the calendar year of 2004, ORPH launched on 14 railroad accidents, two pipeline accidents, and two hazardous materials accidents. Of the hazardous materials accidents in 2004, one of these accidents was also a highway accident.

90. During the calendar year of 2005, ORPH launched to eight railroad accidents, one pipeline accident, and two hazardous materials accidents, one of which was a railroad accident, and the other of which was a highway accident.

91. Between 2003 and 2005, OMS launched to approximately five to seven marine accidents per year.

92. In 2003, OMS investigated eight accidents and launched on three accidents.

93. In 2004, OMS investigated seven new accidents and launched on four accidents.

94. In 2005, OMS investigated three new accidents and launched on three accidents.

95. NTSB investigations involve party participants, who supply information and technical expertise at the direction of the NTSB, in order for the NTSB to conduct its fact-finding regarding each accident in the most thorough, complete manner.

96. An investigation of a major aviation accident may involve up to 100 to 150 people, or more in some cases, which includes multiple investigative parties that participate at the direction of the NTSB. For major aviation accident investigations, it is not uncommon for the NTSB to utilize and direct the participation of six or more parties, each of which may be represented by numerous individuals.

97. In OAS, the FAA is permitted to be a party to any aviation accident investigation, and should be aware of the rules and regulations that pertain to accident investigations.

98. In OAS, aviation companies, manufacturers, and operators can participate as parties to aviation accident investigations and are sometimes aware of the rules and regulations pertaining to accident investigation.

99. In general, one or more NTSB employees launch on foreign aviation major accident investigations.

100. NTSB does not always write reports on foreign aviation accident investigations.

101. In general, approximately 10 to 12 NTSB employees, some of who may not be OAS employees, launch on major aviation accident investigations.

102. The investigation of a major marine accident may involve three to seven NTSB investigators and approximately four parties represented by approximately 20 individuals.

103. In OMS, Coast Guard investigators frequently are parties to marine accident investigations, and they should be aware of the rules and regulations that pertain to accident investigation.

104. In OMS, non-government parties to an accident investigation may vary considerably; some parties may have previously been involved in NTSB investigations, while others require the NTSB to take extra steps to ensure that they are familiar with the structure, processes, and general conduct that an investigation will entail.

105. In ORPH, the parties to an accident investigation often vary considerably; some parties are frequently involved in NTSB investigations, while others require the NTSB to take extra steps to ensure that they are familiar with the structure, process, and general conduct that an investigation will entail.

106. The NTSB is a successor agency to the Civil Aeronautics Board. The CAB, unlike the NTSB, was not an independent agency.

107. Each modal office is responsible for preparing reports setting forth the factual findings of an investigation, analyzing the probable cause of an investigation, and usually making safety recommendations based upon those findings. When a modal office prepares a draft of a major report, that draft goes through a process called a directors' review. During the directors' review meeting, the modal office presents the report to the Managing Director, the Director of the Office of Research and Engineering ("RE"), the Director of the Office of Safety Recommendations, and the General Counsel. As required by the facts of the investigation, other modal office directors may participate in the directors' review. Based upon the outcome of the meeting and the review process, the Managing Director may require that changes be made to the report. After the office directors sign off on the report, the notation process occurs. In the

notation process, the report is sent to all five members of the Board simultaneously for them to consider it prior to the report being presented to them formally in public in a Sunshine Meeting. At the Sunshine Meeting, the appropriate office director and investigators officially present the report to the Board. The Board may adopt the report as is, or may make changes to it. The appropriate office is then responsible to get final changes of the Board incorporated into the final report.

108. In 2003, OAS completed four major reports and continued work on four other major investigations.

109. In 2004, OAS completed four major reports and continued work on six other major investigations.

110. In 2005, OAS completed four major reports and continued work on seven other major investigations.

111. Between 2003 and 2005, OAS completed a total of approximately 5,560 reports, 12 of which were for major accident investigations.

112. From 2003 to 2005, OAS developed 185 safety recommendations that were adopted by the Safety Board.

113. In 2003, OHS completed 44 dockets, issued seven reports, and continued work on 22 investigations. The "completion of a docket" refers to the completion of the fact-finding and analytical components of an investigation.

114. In 2004, OHS completed 36 dockets, issued 6 major reports, and continued work on 26 investigations.

115. In 2005, OHS completed 31 dockets, issued four major reports, and continued work on 29 investigations.

116. From 2003 to 2005, OHS developed 113 safety recommendations that were adopted by the Safety Board.

117. During the calendar year of 2003, ORPH completed a total of 13 investigation reports, which included 11 railroad accident reports, one pipeline accident report, and one hazardous materials report. At any given time during 2003, ORPH was working on approximately 15 to 20 continuing investigations.

118. During the calendar year of 2004, ORPH completed a total of 16 investigation reports, which included 10 railroad accident reports, three pipeline reports, and two hazardous materials reports. At any given time during 2004, ORPH was working on approximately 15 to 20 continuing investigations.

119. During the calendar year of 2005, ORPH completed a total of 10 investigation reports and one pipeline report that was a safety study. These investigation reports included nine railroad accident reports and one hazardous materials report. At any given time during 2005, ORPH was working on approximately 15-20 continuing investigations.

120. From 2003 to 2005, ORPH developed 82 safety recommendations that were adopted by the Safety Board.

121. In 2003, OMS completed one report and continued work on 10 investigations.

122. In 2004, OMS completed four reports and continued work on 18 accident investigations.

123. In 2005, OMS completed six reports and continued work on seven accident investigations.

124. From 2003 to 2005, OMS developed 20 safety recommendations that were adopted by the Safety Board.

125. Pursuant to the International Maritime Organization ("IMO") code for the investigation of marine casualties and incidents, the United States may investigate any international marine accidents involving United States flagged vessels or in which the United States has a substantial interest. The investigation may be conducted by the Coast Guard, the NTSB, or both.

126. Between 2003 and 2005, the NTSB never took the lead on a marine investigation that (1) was both outside of the territorial seas of the United States and (2) did not involve a United States flagged vessel.

127. Between 2003 and 2005, OMS launched to approximately one international accident per year.

128. In 2005, the NTSB did not investigate any major overseas marine accidents.

129. Pursuant to the International Civil Aviation Organization ("ICAO") treaty, the NTSB, specifically OAS, is the accredited United States representative for international accident investigations.

130. OAS has a responsibility to participate in accident investigations conducted by other nations per the entitlements conveyed in the ICAO treaty Annex 13.

131. In 2003, OAS participated in seven foreign accident investigations.

132. In 2004, OAS participated in seven foreign accident investigations.

133. In 2005, OAS participated in 20 foreign accident investigations.

134. ORPH's involvement in railroad and pipeline investigations is not limited to domestic investigations and inquiries. ORPH is frequently involved in international work concerning pipeline activity between the United States and Canada. In addition, between 2003 and 2005, ORPH investigated two accidents involving foreign railroads. Similarly, the hazardous

materials division of ORPH may also conduct investigations involving the shipment and receipt of hazardous materials to and from Europe and Asia. Overall, between 2003 and 2005, the Director of ORPH communicated with officials in foreign countries approximately four to six times per year on various matters.

135. IMO and ICAO are specialized United Nations organizations. To represent the United States as a member of the United States delegation at subject-specific meetings, clearance must be obtained through the United States State Department.

136. Between 2003 and 2005, Ms. Cooke, as Director of OMS, was a member of the United States delegation to IMO and her role was as an advisor to the head of the United States delegation. The head of the United States delegation was a member of the Coast Guard.

137. If the NTSB wanted an issue to be presented at the plenary session of IMO, that recommendation would have to be made through the Coast Guard.

138. During all relevant times, Mrs. Murtagh Cooke represented the NTSB at the Working Group on Accident Investigations at the IMO Subcommittee on Flag State Implementation.

139. The NTSB is the agency primarily responsible for United States representation at ICAO on matters pertaining to the investigation of accidents and incidents in civil aviation.

140. Mr. MacIntosh is responsible for crafting language and monitoring the working group activity on behalf of the agency that is related to Aircraft Accident and Incident Investigation, Annex 13 to ICAO. OAS is responsible for representing the United States in technical aviation safety matters before ICAO; as such, OAS is responsible for representation of the United States at ICAO meetings and in the development and modification of any clauses to Annex 13 of ICAO.

141. In addition to ICAO activities, OAS (specifically Mr. MacIntosh) represents the United States on other international bodies and professional organizations such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators.

142. Mr. MacIntosh provides counsel to NTSB aviation safety investigators with regard to the application and interpretation of Annex 13 of ICAO during the course of foreign aviation accident investigations.

143. Between 2003 and 2005, the Director of ORPH testified before Congress twice. To date, the Director of ORPH has testified before Congress 10 times since 2001.

144. In preparing for his testimony before Congress, the Director of ORPH was required to brief and interact with Congressional aides and members of Congress on several occasions between 2003 and 2005. The purpose of such briefings was to help staff and members of Congress understand railroad, pipeline, and hazardous materials safety investigations or issues.

145. Between 2003 and 2005, the Director of OHS testified before Congress three times.

146. Between 2003 and 2005, Mrs. Murtagh Cooke never testified before Congress.

147. On average, Mrs. Murtagh Cooke prepared a board member or other NTSB employee to testify before Congress once per year between 2003 and 2005.

148. The Director of ORPH prepared the Chairman or a Board member to testify before Congress two times between 2003 and 2005. To date, the Director of ORPH has prepared the Chairman or a Board Member to testify before Congress 14 times since 2002.

149. On average, the Director of OHS prepared a board member or other NTSB employee to testify before Congress six times per year between 2003 and 2005.

150. On average, the Director of OAS prepared a Board member to testify before Congress twice per year between 2003 and 2005.

151. On average, the Deputy Director of OAS prepared a Board member to testify before Congress twice per year between 2003 and 2005.

152. On average, the OAS Chief Advisor prepared a board member or other NTSB employee to testify before Congress three times per year between 2003 and 2005.

153. Between 2003 and 2005, the Director of OHS traveled to the site of a highway accident approximately twice per year, on average.

154. Between 2003 and 2005, the Director of OHS traveled approximately eight times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

155. Between 2003 and 2005, the Director of OAS traveled to aviation accident sites four times.

156. Between 2003 and 2005, the Deputy Director of OAS traveled to the site of an aviation accident seven times.

157. Between 2003 and 2005, the Director of OAS traveled approximately four to five times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

158. Between 2003 and 2005, the Deputy Director of OAS traveled approximately three to four times per year, on average, in order to represent the NTSB at events or gatherings that did not involve accident investigations.

159. The Director of ORPH traveled three times during 2003, four times during 2004, and one time during 2005, in order to represent the NTSB at events or gatherings that did not involve accident investigations. Such events included providing presentations, participating in briefings, or representing the NTSB at conferences.

160. In his capacity as Chief Advisor for International Aviation Safety Affairs at the NTSB, Mr. MacIntosh travels primarily to diplomatic meetings. On average, he travels eight to nine times per year, for at least one week to two weeks per trip. His position requires much more travel than any of the modal office directors.

161. Mrs. Murtagh Cooke never traveled to the site of an accident between 2003 and 2005.

162. Mrs. Murtagh Cooke traveled approximately twice per year between 2003 and 2005. Each trip lasted approximately one week.

163. The SES-level modal office directors were members of the Executive Resources Board ("ERB").

164. The Director of ORPH has participated in numerous ERB meetings and decisions affecting the management of the NTSB since assuming the position at the SES level.

165. As Director of OMS, Mrs. Murtagh Cooke was not a member of the ERB.

166. The members of the ERB were responsible for staffing and career appointments to the SES.

167. The members of the ERB advised the MD regarding the number of SES positions needed by the agency.

168. The members of the ERB had a role in the selection of SES candidates in the NTSB.

169. The ERB had a role in decisions to redistribute SES positions within the NTSB.

170. The ERB had a role in the development of policy for performance awards for SES employees at the NTSB.

171. The ERB had a role in the development of policy in discipline and removal of SES employees.

172. As an SES-level position, the Director of OMS was responsible for broad agency-wide planning and program development activity. That is, the SES-level OMS director was responsible for decision-making for agency activity outside of OMS.

173. The Director of OHS had responsibility for significant state recommendation advocacy. The other modal office directors did not have the same level of responsibility for state recommendation advocacy.

174. OHS handles more multi-modal investigations than the other modal offices.

175. OHS is responsible for completing more safety reports than any other modal office. These safety reports examine a number of different accidents with a common issue.

176. The Pipeline and Hazardous Materials Division of ORPH typically becomes involved in accident investigations involving other modes, because the transportation of hazardous materials can occur via aviation, marine, rail, or highway transportation. Thus, the division of ORPH that conducts hazardous materials investigations requires ORPH to interact closely with other offices, either as a primary investigative office, or as a supporting investigative office that oversees a specific portion of the investigation.

177. The technical expertise required of the Director of OHS and ORPH differed from the technical expertise possessed by Mrs. Murtagh Cooke.

178. The Director of ORPH should be conversant in multiple transportation modes.

179. The Director of ORPH must maintain a considerable amount of expertise in three distinct areas of transportation: railways (including freight trains, intercity passenger trains, and transit trains), pipelines, and the transport of hazardous materials. Each of these areas involves its own unique inquiries and considerations during the course of these different types of accident investigations.

180. It is not necessary to be educated in any transportation modes other than marine to be the Director of OMS.

181. The Deputy Director is the chief advisor to the Director and is the operational manager for the Office Director. The Deputy Director of OAS was responsible for the general oversight and conduct of all major aviation investigations. This responsibility included supervising the scope of accident investigations and making decisions regarding the course, direction, duration, and general breadth of inquiry concerning certain aspects of investigations.

182. The OAS Chief Advisor's responsibilities involve the coordination of NTSB's role and activity involving international aviation investigation.

183. Mr. MacIntosh is responsible for coordinating technical matters and interface for each international launch with the host country and any other countries involved in the investigation.

184. The OAS Chief Advisor must possess unique international relations abilities, including education and training on geopolitical subjects.

185. Mr. MacIntosh works with the Department of State in a variety of different capacities and is conversant in two different languages.

186. There are five mandatory Executive Core qualifications common to all SES positions. They are leading change, leading people, results driven, business acumen, and building coalitions/communication.

187. SES-level positions, because they are at the highest level of civil service, require a certain level of professionalism, abilities, qualifications, and skills not necessary for GS-level positions.

188. The NTSB was required to work within the confines of Federal statutes and regulations when determining Mrs. Murtagh Cooke's pay, as well as the pay of her alleged comparators.

189. Mrs. Murtagh Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Mrs. Murtagh Cooke was paid at the GS-15, step 10 level from January 23, 2005, until the date of her retirement, on July 3, 2006.

190. GS-15 employees are eligible for overtime within the Federal system.

191. However, there is a limit on the amount of overtime pay that GS employees may receive. Mrs. Murtagh Cooke was eligible to receive overtime pay to the extent that her total salary did not exceed the greater of GS-15, step 10, or level V of the Executive Schedule, as set by Congress. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, she was only eligible to receive in overtime an amount equal to the difference between her salary and the pay limitation. Between 2003 and 2005, this difference was no more than approximately $3,800 per year.

192. In April 2004, Ms. Engleman Conners had a meeting with Mrs. Murtagh Cooke. During that meeting, Mrs. Murtagh Cooke asked to be paid overtime.

193. Ms. Engleman Conners never received documentation from Mrs. Murtagh Cooke for her request for overtime.

194. Pursuant to 5 C.F.R. § 575.301, an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

195. During her tenure as Director of OMS, Mrs. Murtagh Cooke never received an offer of outside employment.

196. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress, based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step.

197. A GS-level employee may receive a quality step increase if he or she receives an outstanding performance rating and had not received a quality step increase within the last 52 weeks.

198. From 2003 to 2005, Mrs. Murtagh Cooke received all within-grade step increases when she met the necessary criteria.

199. Employees may be eligible for performance awards based upon the most recent rating of record. Employees may also receive recognition for outstanding achievement, often concerning a specific project or the fulfillment of a specific goal. NTSB employees are eligible to receive recognition for special acts in the form of certificates and lump sum cash awards throughout the year; however, performance awards, in the form of lump sum cash payment, are given at the end of the appraisal period, based upon performance ratings. If the employee

receives an outstanding rating, he or she is eligible to receive a lump sum cash award or a quality step increase.

200. NTSB employees who hold SL positions must demonstrate technical competencies.

201. SL employees may not perform supervisory duties more than 25 percent of the time.

202. Mrs. Murtagh Cooke's position as Director of OMS involved routine supervisory responsibilities for a staff of 14 to 15 people.

203. A GS-level employee may be given a limited term appointment to an SES-level position or may be detailed to an SES-level position to meet emergency or short-term needs. Typically, the NTSB has used the detail authority to accomplish assignments of an SES position during staff shortages and transition. Pursuant to 5 C.F.R. § 317.903, "[f]or purposes of pay and benefits, the employee [who is detailed] continues to encumber the position from which detailed."

204. During Mr. Campbell's tenure as General Counsel, four of his seven professional hires were female. These selections included individuals who were to become the Agency's Ethics Officer, a Deputy Managing Director (selected by him), and an Associate Managing Director (selected by his successor).

205. Between 2002 and 2005, the following female employees occupied SES positions at the NTSB: Lola Ward, Julie Beal, and Elaine Weinstein. Ms. Beal's position, Director of the NTSB Academy, was created in 2001. The Director of Administration position was reestablished as an SES-level position in 2005. Ms. Ward applied and was selected for the position.

206. Between 2001 and 2005, Lola Ward, Julie Beal, and Elaine Weinstein were each approved for appointments to the SES. These were approximately half of the SES appointments made during that time.

207. Lola Ward, Julie Beal, and Elaine Weinstein were all required to compete for their positions. All of them competed against male applicants.

208. On April 28, 2006, Mrs. Murtagh Cooke filed a complaint in the United States District Court for the District of Columbia asserting violations of the Equal Pay Act, 29 U.S.C. § 206(d), and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3). Cooke v. United States, 77 Fed. Cl. 173, 175 (2007).

209. On October 26, 2006, the district court transferred the Equal Pay Act claim to this Court. Cooke, 77 Fed. Cl. at 175-76.

210. Mrs. Murtagh Cooke filed her complaint in this Court on November 14, 2006.

211. Defendant is the United States of America.

212. On January 8, 2007, defendant filed an Answer to the Complaint, which contained no affirmative defenses.

213. On October 9, 2007, Mrs. Murtagh Cooke filed a motion for summary judgment before this Court, asserting, partly, that defendant proffered no affirmative defenses.

214. On October 19, 2007, defendant filed a motion to amend its answer and assert its affirmative defenses.

215. Mrs. Murtagh Cooke opposed defendant's motion to amend its answer on November 15, 2007, and Defendant replied on November 26, 2007.

216. On December 3, 2007, defendant filed its cross motion and response to Mrs. Murtagh Cooke's October 9, 2007, motion for summary judgment.

217. On December 5, 2007, the Court held a hearing regarding defendant motion to amend is answer. On December 6, 2007, the Court ruled that the amended answer be allowed, the pending motions for summary judgment be denied without prejudice, and discovery extended with regard to defendant's affirmative defenses.

218. On April 2, 2008, the Court held a scheduling conference with counsel for both parties, scheduling the trial to begin on August 18, 2008 at 9:30 AM at the National Courts Building and allotting five days, through August 22, 2008, for trial.

219. Some of the general skills required for the Director of OAS, ORPH, OHS, and OMS positions were: technical expertise in their respective transportation modes; knowledge of, and expertise in, accident investigation processes and procedures from investigation through report completion as related to their respective transportation modes; leadership and supervisory skills; knowledge of their respective modal industries; and the ability to communicate orally and in writing and to coordinate and collaborate with other professionals both within the NTSB and externally as part of investigations or other advocacy work.

220. Some of the general efforts and responsibilities required for the Director of OAS, ORPH, OHS, and OMS positions were: effectively managing information related to accident investigation; evaluating available and necessary resources; managing multiple priorities; responding to the contingencies of each investigation; conducting accident investigations to recommend to the Safety Board the cause or probable cause and drafting safety recommendations for review by the Safety Board to prevent similar accidents from occurring in the future; decision-making; supervising and evaluating staff; providing support and information to NTSB personnel, including Board members, the Managing Director, investigators, report writers, and administrative personnel; providing support and information to external personnel

including party representatives and congressional staff; developing and implementing accident investigation processes including overseeing the analysis, development, and preparation of reports, including draft probable cause findings; complying with all rules, regulations, and guidelines that apply to human and monetary resource management; and being available 24 hours a day, seven days a week.

221. Each modal office director, when not traveling, worked primarily in an office environment using electronic devices, computers, and telephones for communication. Each modal office director's work required him or her to be available 24 hours per day, seven days per week.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ R. SCOTT OSWALD
R. SCOTT OSWALD
Employment Law Group
888 17th Street, NW, Suite 900
Washington, DC 20006
Tel: (202) 331-2883

Attorney for Plaintiff

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:

KATHLEEN SILBAUGH
Office of General Counsel
National Transportation Safety Board

July 17, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 17th day of July, 2008 a copy of the foregoing "JOINT STIPULATIONS OF FACT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN