**No. 06-748C**
**(JUDGE WHEELER)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

---

**MARJORIE MURTAGH COOKE,**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

**GREGORY G. KATSAS**
**Assistant Attorney General**

**JEANNE E. DAVIDSON**
**Director**

**HAROLD D. LESTER, JR.**
**Assistant Director**

**MEREDYTH D. COHEN**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20530**
**Tel: (202) 353-7978**
**Fax: (202) 514-8624**

**Of Counsel:**

**KATHLEEN SILBAUGH**
**Office of General Counsel**
**National Transportation Safety Board**

**July 17, 2008**

**Attorneys for Defendant**

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

CONTESTED FACTS THAT DEFENDANT WILL PROVE AT TRIAL . . . . . . . . . . . . . . . . . . 3

I. SES Allocations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II. Differences Between The Modal Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

III. Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

IV. Damages Calculation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

RELEVANT LAWS AND REGULATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I. The Equal Pay Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

II. Personnel Laws And Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Laws And Regulations Governing NTSB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CONTENTIONS OF LAW DEFENDANT WILL PROVE AT TRIAL . . . . . . . . . . . . . . . . . . 13

I. The Equal Pay Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II. Ms. Cooke Cannot Establish Her *Prima Facie* Case . . . . . . . . . . . . . . . . . . . . . . 14

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

B. The Efforts And Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal . . . . . . . . . . . . . . . . . . . . . . . . . . 17

C. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV. Assuming That Ms. Cooke Has Established Her *Prima Facie* Case, The Pay Differential Was Not Based Upon Gender . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2. Ms. Cooke Could Not Have Been Given Overtime Pay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

3. Ms. Cooke Could Not Have Been Given A Retention Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

4. Ms. Cooke Could Not Have Been Given Any Additional Performance Awards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

5. Ms. Cooke Could Not Have Been Given A Senior Level Position . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex . . . . . . . . . . . . . . . . . . . . . . 29

V. Even Assuming That The NTSB Violated the Equal Pay Act, The Facts At Trial Will Demonstrate That The NTSB's Violation Was Not Willful For Determining The Statute Of Limitations Or Awarding Liquidated Damages . . . . . . . . . . . . . 34

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

TABLE OF AUTHORITIES

**CASES**

Adams v. United States,
350 F.3d 1216 (Fed. Cir. 2003) .......... 34, 35

Allison v. United States,
39 Fed. Cl. 471 (1997) .......... 34

Alvarez v. IBP, Inc.,
339 F.3d 894 (9th Cir. 2003) .......... 34

Angelo v. United States,
57 Fed. Cl. 100 (2003) .......... 35

Beebe v. United States,
226 Ct. Cl. 308 (1981) .......... 35

Behm v. United States,
68 Fed. Cl. 395 (2005) .......... 29

Belfi v. Prendergast,
191 F.3d 129 (2nd Cir. 1999) .......... 14

Corning Glass Works v. Brennan,
417 U.S. 188 (1974) .......... 13, 14

Epstein v. Sec'y, United States Dep't of Treasury,
739 F.2d 274 (7th Cir 1984) .......... 14

Equal Employment Opportunity Commission v. Aetna Ins. Co.,
616 F.2d 719 (4th Cir. 1980) .......... 27, 29

Hodgson v. Brookhaven Gen. Hosp.,
346 F.2d 719 (5th Cir. 1970) .......... 17

Lissak v. United States,
49 Fed. Cl. 281 (2001) .......... 13, 29

Molden v. United States,
11 Cl. Ct. 604 (1987) .......... 13, 14

Pabst v. Oklahoma Gas & Elec. Co.,
228 F.3d 1128 (10th Cir. 2000) .......... 34, 35

Pearce v. Wichita County,
590 F.2d 128 (5th Cir. 1991) .......... 17

Ratts v. Business Sys., Inc.,
686 F. Supp. 546 (D.S.C. 1987) .......... 15

Raymond v. United States,
31 Fed. Cl. 514 (1994) .......... 24

Rothman v. Publicker Indus. Inc.,
201 F.2d 618 (3d Cir. 1953) .......... 35

Warren v. Solo Cup. Co.,
516 F.3d 627 (7th Cir. 2008) .......... 29

Wollenburg v. Comtech Manufacturing Co.,
201 F.3d 973 (7th Cir. 2000) .......... 29

**STATUTES**

5 U.S.C. § 3133 .......... 12, 25

5 U.S.C. § 5336 .......... 12, 24

5 U.S.C. § 5547 .......... 12, 26

5 U.S.C. § 5754 .......... 12, 27

29 U.S.C. § 201 .......... 13

29 U.S.C. § 203(e)(2) .......... 13

29 U.S.C. § 206(d) .......... 1, 2, 12, 24

29 U.S.C. § 216(b) .......... 35

29 U.S.C. § 255(a) .......... 34

49 U.S.C. Chapter 11 .......... 12

## REGULATIONS

5 C.F.R § 1.1 ........ 12, 24

5 C.F.R § 1.2 ........ 12, 24

5 C.F.R. § 317.51 ........ 26

5 C.F.R. § 317.501 ........ 12, 26, 31, 33

5 C.F.R. § 317.701 ........ 12, 26

5 C.F.R. § 317.702 ........ 12, 26

5 C.F.R. §317.903(a) ........ 12, 25

5 C.F.R. Part 531 ........ 24

5 C.F.R. §§ 531.502-531.505 ........ 12, 24

5 C.F.R. § 550.105 ........ 12, 26

5 C.F.R. § 575.301 ........ 10, 12, 27

29 C.F.R. § 1620.13 ........ 12, 14

29 C.F.R. § 1620.15(a) ........ 12, 15

29 C.F.R. § 1620.16(a) ........ 12, 17

29 C.F.R. § 1620.17(a) ........ 12, 17

29 C.F.R. § 1629.18 ........ 12, 23

49 C.F.R. §§ 800.2 ........ 14

49 C.F.R. §§ 800.25 ........ 14

49 C.F.R. part 850 ........ 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-748C |
| | ) | (Judge Wheeler) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to paragraph 14(b) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), as modified by this Court's Order of April 2, 2008, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the claims of plaintiff, Marjorie Murtagh Cooke.

STATEMENT OF THE CASE

From 1997 to 2005, Ms. Cooke served as the Director of the Office of Marine Safety ("OMS") at the National Transportation Safety Board ("NTSB"). First Am. Compl. ¶¶ 9, 44. Ms. Cooke alleges that, during her tenure as Director of OMS, she was paid less than "other similarly situated NTSB male directors . . . for similar work performed."[1] First Am. Compl. ¶ 1. Accordingly, Ms. Cooke alleges that the NTSB violated the Equal Pay Act, 29 U.S.C. § 206(d). First Am. Compl. ¶ 1. Ms. Cooke seeks back pay, liquidated damages, reasonable attorney's fees and costs, and any other relief that this Court deems just and equitable. First Am. Compl.

[1] The alleged comparators are Robert Chipkevich, Director of the Office of Railroad, Pipeline, and Hazardous Materials Investigations; Joseph Osterman, former Director of the Office of Highway Safety; John Clark, former Director of the Office of Aviation Safety; John Spencer, current Director of the Office of Marine Safety; Thomas Haueter, former Deputy Director of the Office of Aviation Safety; and Robert MacIntosh, Chief Advisor for International Aviation Safety Affairs.

¶ 50; Pl. Opp. at 27.[2]

Ms. Cooke's contentions are unfounded and the uncontroverted evidence at trial will show that, at all times relevant to Ms. Cooke's complaint, the NTSB properly paid Ms. Cooke at the General Schedule ("GS")-15 pay grade. The NTSB will show that Ms. Cooke's job did not require equal skill, effort, and responsibility and was not performed under similar working conditions as her alleged comparators. Because Ms. Cooke's job was not equal to the jobs of her comparators, the NTSB did not violate the Equal Pay Act ("EPA"), 29 U.S.C. § 206(d), by paying Ms. Cooke at the GS-15 level. Furthermore, the NTSB will show that its decision to pay Ms. Cooke at the GS-15 level was based upon a merit system and other gender-neutral considerations. Thus, even assuming that Ms. Cooke's job was equal to the jobs of her comparators, the NTSB did not violate the EPA by paying Ms. Cooke at the GS-15 level because it had gender-neutral reasons for doing so.

## STATEMENT OF THE ISSUES

1. Whether Ms. Cooke's job required equal skill, effort, and responsibility and was performed under similar working conditions as the jobs of her alleged comparators.

2. Whether the NTSB paid Ms. Cooke at the GS-15 level pursuant to "a merit system . . . or a differential based on any other factor other than sex." 29 U.S.C. § 206(d).

3. Assuming the Court were to find that the NTSB violated the Equal Pay Act, whether that violation was willful.

4. Assuming the Court were to find that the NTSB violated the Equal Pay Act, the

[2] "Pl. Opp." refers to Plaintiff's Memorandum of Points and Authorities in Opposition to Defendant's Motion for Summary Judgment, filed on June 25, 2008.

amount of damages to which Ms. Cooke would be entitled.

## CONTESTED FACTS THAT DEFENDANT WILL PROVE AT TRIAL

We incorporate by reference the parties' joint stipulation of facts, filed on July 17, 2008, and we address only contested facts below.

### I. SES Allocations

Following the 1997-1998 restructuring of the NTSB's Office of Surface Transportation Safety, it was the NTSB's intent that each of the four surface modal office director positions be classified and paid at the Senior Executive Service ("SES") level. At the time of the restructuring, however, there were no available SES slots to allocate to the surface modal office director positions.

In June 1999, the NTSB submitted a request to the Office of Personnel Management ("OPM") for additional SES slots so that each of the surface modal office director positions could be classified and paid at the SES level. OPM denied this request.

The decision of where to allocate an available SES slot is made by the Chairman of the NTSB, usually with input from his or her advisors, including the Managing Director, General Counsel, other office directors, and his or her Chief of Staff. In deciding where to allocate an available SES slot, Chairman Ellen Engleman Conners considered these recommendations in accordance with the NTSB's long-term staffing plan involving allocation of resources within the agency.

Because of the retirement of an SES-level employee, an SES slot became available. In 2001, Daniel Campbell, the Managing Director at the time, recommended to then-NTSB Chairman James Hall that the SES slot be assigned to the position of the Director of the Office of

Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH") because ORPH was the most complicated and variegated of the three surface modal offices (OPRH, the Office of Highway Safety ("OHS"), and OMS) in terms of subject matter and Robert Chipkevich, then Director of ORPH at the GS-15 level, was the most accomplished and senior of the modal office directors.[3] The administrative tasks facing the Director of ORPH were among the most daunting in the agency, given the dispersed work force and the need to combine and coordinate the differing cultures of several modes. Additionally, as the Director responsible for hazardous materials, the Director of ORPH had trans-modal responsibilities, involving aviation, highway and marine accidents, as well as rail and pipeline. Finally, the Director of ORPH would frequently be the agency's principal public spokesman due to the intricacy of the field. Mr. Campbell's recommendation had nothing to do with gender. Chairman Hall initially believed that the SES slot should be allocated to the position of the Director of OHS because of the large highway death toll, but ultimately agreed with Mr. Campbell's recommendation. Thus, the SES slot was allocated to the position of Director of ORPH. Mr. Campbell understood that, should another SES slot become available during Chairman Hall's tenure as Chairman, that slot would go to the Director of OHS position.

In addition to the reasons raised by Mr. Campbell, the SES slot was allocated to the position of the Director of ORPH because of ORPH's multi-modal functions. That is, ORPH was responsible for three very different and distinct transportation modes (railroad, pipeline, and

[3] Though Mr. Campbell partially recommended that the SES slot be allocated to the Director of ORPH position because of Mr. Chipkevich's seniority and accomplishments, Mr. Campbell knew that, because Mr. Chipkevich was a GS-15 employee, the position would have to be advertised and competed at the SES level.

hazardous materials), whereas the other modal offices were each responsible for only one transportation mode.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy after the incumbent voluntarily left the agency. Because the Academy was just getting started, the NTSB believed that it did not need an SES position, but that SES positions were needed in the operating portion, rather than the training portion, of the agency. Though Chairman Hall was no longer in office, Mr. Campbell recommended following his plan of allocating the next available SES slot to the Director of OHS position. He did so because of the enormity of OHS's task, the size and dispersion of its workforce, and the constant need for public outreach and visible leadership. Because there are approximately 44,000 highway deaths per year, highway is the area in which the NTSB can have the most impact upon transportation safety. Comparatively, there are about 700 boating fatalities annually. Mr. Campbell's recommendation had nothing to do with gender.

Ms. Engleman Conners agreed that the SES slot should go to the Director of OHS position because the scope of OHS's investigatory responsibilities was larger than that of OMS, OHS had a greater number of employees than OMS, and OHS had regional offices, whereas OMS did not. Further, because of the approximately 44,000 highway deaths per year, in contrast to several hundred marine deaths per year, OHS had a much larger impact upon the agency's safety mission than OMS. Ms. Engleman Conners's decision had nothing to do with gender. Thus, the SES slot was allocated to the position of the Director of OHS. Ms. Engleman Conners had no role in the selection for the position. She never saw a list of candidates or interviewed anyone for this, or any other, SES-level position.

When the NTSB received an additional SES slot from the Office of Personnel Management ("OPM") in 2004 and allocated that slot to the position of the Director of OMS, that position was advertised and applications were accepted. The advertisement was subsequently cancelled prior to a selection being made because the NTSB believed that the pool of qualified applicants was too narrow and insufficiently robust. According to Mr. Campbell, there was a rumor that the position had been wired for Ms. Cooke.

Following the readvertisement of the position in early 2005, the NTSB selected who it believed to be the best-qualified candidate, John Spencer.

II. Differences Between The Modal Offices

Marine is the only mode in which NTSB is not the primary Federal investigative authority for major transportation accidents. The NTSB and United States Coast Guard ("Coast Guard") have concurrent jurisdiction over any marine accident that takes place in the United States' navigable waters, but the Coast Guard has primary responsibility in the United States for the investigation of marine accidents.

The workload of a major aviation accident investigation is much larger than the workload of a major marine accident investigation. Aviation investigations involve far more people, far more press, and far more interest that investigations in the other modes and the process flow for aviation accident investigations is much more complicated than for other transportation modes. Major aviation accidents, such as TWA 800 and AA 587, take many resources and many years to complete.

While accident investigations in all modes usually involve the participation of parties other than the NTSB, in OHS, as opposed to OMS, the parties to an accident investigation are

typically different for each investigation. That is, the parties to an investigation have likely never been involved with a previous OHS investigation. Thus, there is an educational and informational component to the party system in OHS that does not exist in some of the other investigative modal offices.

In general, there typically is much greater press and public interest in aviation and highway accidents than there is in marine accidents. OHS has a much higher public profile than OMS because highway safety is a very visible matter of public concern. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB. The NTSB is aviation-centric because aviation safety is the core reason for the NTSB's existence as the successor to the Civil Aeronautics Board. Typically, hundreds of thousands of individuals are interested in major aviation accidents, an interest that is not comparable to other transportation modes. The sheer volume and persistence of political officials, the industry, the press, and the public in a major aviation accident is not comparable to other modes. For example, in the year that TWA 800 crashed off Long Island, New York, it was the biggest news story during the year, even though it was a presidential election year. In comparison, less than one percent of the Director of OMS's time is spent interacting with the press.

Major aviation accident reports are larger and more complex than reports in any other mode.

The Coast Guard, not the NTSB, is the agency that represents the United States at the International Maritime Organization ("IMO"). Between 2003 and 2005, the NTSB did not have an official role at IMO; the NTSB's interest in IMO had to flow through the Coast Guard.

It is undisputed that, as Director of OMS between 2003 and 2005, Ms. Cooke traveled

less frequently than any of her alleged comparators, both to accident sites and to events and gatherings not involving accident investigation. In fact, Ms, Cooke never traveled to the site of an accident during that time. The working conditions at the site of an accident, including detailed examination of wreckage and interviews with survivors or associated personnel are different from, and more hazardous than, working conditions of any office environment. In his capacity as the Chief Advisor for International Aviation Safety Affairs at the NTSB, Mr. MacIntosh travels frequently. It is undisputed that his position requires more travel than the positions of the modal office directors. Mr. MacIntosh's frequent travel and the associated long hours present a source of stress, and physical and mental fatigue that exceed that of any office environment.

It is undisputed that all of the SES-level modal office directors, including Mr. Spencer, were members of the Executive Resources Board ("ERB"), whereas Ms. Cooke was not a member. The SES-level modal office directors spent up to 15 percent of their time on work related to the ERB. Ms. Cooke was not involved in any of the ERB's duties during her tenure as Director of OMS. Specifically, Ms. Cooke had no official role in staffing and career appointments to the SES, advising the MD regarding the number of SES positions within the NTSB, the selection of SES candidates, decisions to redistribute SES positions within the NTSB, development of policy for performance awards for SES employees, or the development of policy in discipline and removal of SES employees. As Director of OMS, Ms. Cooke was not responsible for broader agency-wide planning and program development activity.

There are a number of other areas in which the work of OMS and, accordingly, the work of the Director of OMS differs substantially from the work of the other modal offices and their

directors. For example, the Director of OHS has greater responsibility in establishing public hearings, public forums, and safety studies than other modal directors. Because of the differences in the work of the modal offices, different skills are required for each of the modal office directors, for the Deputy Director of OAS, and for OAS Chief Advisor. The position of Deputy Director of OAS requires a more technical background than the modal office director positions because of the Deputy Director's involvement in the technical aspects of major investigations. The Deputy Director of OAS has greater responsibility for the day-to-day conduct of accident investigations than any of the modal office directors.

In addition to being a member of the ERB, there are other areas in which Mr. Spencer's work differed from that of Ms. Cooke. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman. Specifically, Mr. Spencer was asked to reduce the backlog in the office, restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities.

III. Compensation

It is undisputed that the NTSB is required to work within the confines of Federal statutes and regulations when determining the pay of its employees.

Within the Federal system, overtime is defined as hours of work outside the employee's normal tour of duty that are officially ordered or approved in advance by a supervisor. While Ms. Cooke, as a GS employee, was technically eligible to receive overtime pay, there was an unwritten policy that individuals in management positions at the NTSB, including modal office directors, would not receive overtime pay. It is clear that Ms. Cooke was aware of this policy, as

it was discussed at several meetings at which she was present.

During the April 2004 meeting with Ms. Engleman Conners, Ms. Cooke asked to be paid overtime to compensate for her GS-15 status. She did not say anything suggesting that her request for overtime pay had to do with "equalizing" her pay to that of the other modal office directors. She did not state that she was filing a complaint or alleging a violation of the Equal Pay Act. She also did not say anything suggesting that she believed her pay was different from that of the other modal office directors because of her gender. She did not provide any justification or rationale to support receipt of overtime pay. She did not ask about any type of compensation other than overtime pay. Ms. Engleman Conners did not know whether managers were eligible for overtime pay pursuant to the civil service regulations, so she told Ms. Cooke that she would look into it and get back to her. Later that day, she relayed the conversation to Mr. Campbell and asked him to look into it. Ms. Engleman Conners did not follow up with Mr. Campbell because she assumed he had taken care of it. To this day, Ms. Engleman Conners does not know if overtime pay is available to managers at the NTSB. Ms. Engleman Conners does not recall receiving any documentation requiring or requesting her approval of Ms. Cooke's request for overtime pay. Ms. Cooke never approached Mr. Campbell about receiving overtime pay, even though, because he was her first-line supervisor, that would have been the normal course.

In addition to the retention allowance requirements set forth in 5 C.F.R. § 575.301, the NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the NTSB. It is undisputed that Ms, Cooke never received an offer of outside employment during her tenure as Director of OMS.

Thus, she was ineligible for a retention allowance.

Performance awards are based upon performance and are not meant to augment one's salary. Though they are taxed as compensation, they are not considered to be part of one's salary. Between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award. It was tradition for office directors to decline to participate in the end-of-year agency-wide awards.

It is undisputed that Senior Level ("SL") employees may not perform supervisory duties more than 25 percent of the time. The Director of OMS performs supervisory duties more than 25 percent of the time.

IV. Damages Calculation

The difference between Ms. Cooke's compensation and the compensation of her alleged comparators between April 28, 2004 (two years prior to the filing of her complaint) and June 6, 2005 (her last day as the Director of OMS) was $15,142. The difference between Ms. Cooke's compensation and the compensation of her alleged comparators between April 28, 2003 (three years prior to the filing of her complaint) and June 6, 2005 was $40,278. These calculations are based upon the actual salary and monetary awards received by Ms. Cooke, Mr. Osterman, Mr. Clark, Mr. Chipkevich, and Mr. Haueter during those time periods, with a 7% reduction for contributions to their respective retirement funds.[4]

[4] Assuming the Court were to find that the NTSB violated the Equal Pay Act only as to some of the alleged comparators, we reserve the right to submit a revised calculation of the difference in compensation between Ms. Cooke and the remaining comparators.

# RELEVANT LAWS AND REGULATIONS

I. The Equal Pay Act

A. 29 U.S.C. § 206(d)

B. 29 C.F.R. § 1620.13(a)

C. 29 C.F.R. § 1620.15(a)

D. 29 C.F.R. § 1620.16(a)

E. 29 C.F.R. § 1620.17(a)

F. 29 C.F.R. § 1629.18

II. Personnel Laws And Regulations

A. 5 U.S.C. § 3133

B. 5 U.S.C. § 5336

C. 5 U.S.C. § 5547(a)

D. 5 U.S.C. § 5754

E. 5 C.F.R §§ 1.1 and 1.2

F. 5 C.F.R. § 317.501

G. 5 C.F.R. §§ 317.701 and 317.702

H. 5 C.F.R. §317.903(a)

I. 5 C.F.R. §§ 531.502-531.505

J. 5 C.F.R. § 550.105

K. 5 C.F.R. § 575.301

III. Laws And Regulations Governing NTSB

A. 49 U.S.C. Chapter 11

B. 49 C.F.R. part 850

CONTENTIONS OF LAW DEFENDANT WILL PROVE AT TRIAL

I. The Equal Pay Act

The Equal Pay Act ("EPA") was enacted in 1963 as an amendment to the Fair Labor Standards Act ("FLSA") and was extended from private industry to the Federal Government in 1974. 29 U.S.C. § 201, 203(e)(2). The EPA's purpose was to eradicate society's traditional belief in the inferiority of women and to alleviate the consequences stemming from that belief. See Molden v. United States, 11 Cl. Ct. 604, 608 (1987). The EPA provides that an employer may not discriminate between employees on the basis of sex by paying different wages to employees of the opposite sex who are performing jobs that require the same level of skill, effort, and responsibility and which are performed under similar working conditions, unless the differential falls into one of the EPA's four exceptions:

1. a seniority system;
2. a merit system;
3. a system which measures earnings by quantity or quality of production;
4. a differential based upon any factor other than sex.

29 U.S.C. § 206(d)(1).

Pursuant to the EPA, Ms. Cooke first has the burden of proving that she performed work similar to those of the opposite sex (that is, the "male comparators") involving equal skill, effort, and responsibility; that she and her male comparators performed the work under similar conditions; and the NTSB compensated Ms. Cooke and her male comparators differently for that work. See Lissak v. United States, 49 Fed. Cl. 281, 284 (2001); Corning Glass Works v.

Brennan, 417 U.S. 188, 195 (1974); Belfi v. Prendergast, 191 F.3d 129, 135 (2nd Cir. 1999). Once Ms. Cooke establishes a prima facie case, the burden shifts to the NTSB to prove the disparity can be accounted for by one of the four exceptions to the EPA. See Corning Glass Works, 417 U.S. at 196.

II. Ms. Cooke Cannot Establish Her *Prima Facie* Case

Pursuant to the EPA, Ms. Cooke has the burden of showing that her employer, the United States, paid a male employee higher wages than Ms. Cooke for work requiring equal skill, effort, and responsibility and performed under similar working conditions. Molden, 11 Cl. Ct. at 610. Although Ms. Cooke need not prove that her job was identical to that of her alleged comparators, she is required to demonstrate that the jobs were "substantially equal." 29 C.F.R. § 1620.13(a). Ms. Cooke has failed to establish that her job was substantially equal to the jobs of her alleged comparators and, therefore, cannot establish her prima facie case.

To the extent that Ms. Cooke relies upon the description of the modal offices and their Directors contained in the Code of Federal Regulations at 49 C.F.R. §§ 800.2 and 800.25 and the NTSB position descriptions for each of the alleged comparators, those descriptions do not establish Ms. Cooke's prima facie case because "[a]pplication of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance." 29 C.F.R. § 1620.13(e); see also Epstein v. Sec'y, United States Dep't of Treasury, 739 F.2d 274, 277 (7th Cir 1984). Furthermore, even though two jobs may have identical job descriptions, a court is not required to find a prima facie equal pay violation. Epstein, 739 F. 2d at 277.

Though some of the very general skills, efforts, responsibilities, and working conditions of Ms. Cooke and her alleged comparators may have been similar, a close examination of the skills, efforts, responsibilities, and working conditions of the modal office directors, and of Mr. Haueter and Mr. MacIntosh, reveals that the job requirements and performance of the alleged comparators were substantially different from those of Ms. Cooke and that, therefore, Ms. Cooke has not established her prima facie case.

A. The Skills Required For The Director Of OMS And The Alleged Comparators Were Not Equal

"Skill includes such factors as experience, training, education, and ability." 29 C.F.R. § 1620.15(a). It is undisputed that, on a very general level, some of the same skills were required for each of the modal office director positions. Many of these skills, however, are requirements for almost any position in any organization, especially any management or executive position.[5] These include leadership and supervisory skills and the ability to communicate orally and in writing with professionals both within and outside of the organization.

Furthermore, there are differences in the degree of each of these skills required for each of the modal office directors. Because, as detailed above and in the joint stipulation of facts, the size and scope of the work of OAS, OHS, and ORPH are much larger than those of OMS, the directors of those three offices must have greater or, at the very least, different leadership and supervisory skills. For example, it is undisputed that the Director of OAS must lead an office

[5] Courts have found the comparison of executive/management positions for purposes of the Equal Pay Act to be difficult. In fact, "[a]llegations of Equal Pay Act violations have routinely been rejected by courts applying the equal work standard to jobs involving executive and management positions." Ratts v. Business Sys., Inc., 686 F. Supp. 546, 550 (D.S.C. 1987).

that has almost ten times as many employees than OMS and ten regional offices. The Directors of OHS and ORPH must also supervise more employees and more regional offices than the Director of OMS. Moreover, the Director of OAS must lead and supervise a much greater number of participants in aviation accident investigations than those in marine accident investigations. Additionally, because of the greater public, press, and congressional interest in aviation and highway accidents, the Directors of OAS and OHS must have different communication skills than the Director of OMS. Because OAS has a much larger international role, the Director of OAS must be conversant with a wide variety of issues that affect the international aviation community. The Director of ORPH must communicate knowledgeably regarding three transportation modes (rail, pipeline, and hazardous materials), a skill not required for the Director of OMS.

While technical expertise in the transportation mode is necessary for all modal office directors, that expertise is vastly different for each mode; the modal office director positions are not interchangeable. For example, the Director of ORPH must have technical expertise in three transportation modes (railroad, pipeline, and hazardous materials), whereas the Director of OMS need only have technical expertise in one mode. Acquiring knowledge in three transportation modes requires much more and different experience, training, and education than acquiring knowledge in one mode. While both the Director of OMS and the Deputy Director of OAS require technical expertise in their fields, the Deputy Director requires a more technical background than the Director of OMS because of the Deputy Director’s greater involvement in the technical aspects of accident investigations, particularly major investigations. Finally, the skills required for OAS Chief Advisor are different from those required for Director of OMS

because the OAS Chief Advisor must have unique international relations skills, including education and training, in order to perform his or her duties.

While each of the modal office directors must have knowledge of and expertise in accident investigation, that knowledge and expertise is significantly different for each mode because the nature of accident investigation in each mode is significantly different. For example, because there is much greater press and public interest in aviation accidents than in any other mode, the Director of OAS must have greater expertise in handling the press as part of an accident investigation. Unlike the other modal office directors, the Director of ORPH must have knowledge and expertise in investigating accidents in three different modes of transportation, rather than just one. Mr. MacIntosh's role in foreign aviation accident investigations also requires different skills than those of the modal office directors.

### B. The Efforts And Responsibilities Of The Director Of OMS And The Alleged Comparators Were Not Equal

"Effort is concerned with the measurement of the physical or mental exertion needed for performance of a job. Job factors which cause mental fatigue and stress, as well as those which alleviate fatigue, are to be considered." 29 C.F.R. § 1620.16(a). "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." 29 C.F.R. § 1620.17(a). "Although job titles are entitled to some weight in the assessment of comparative responsibility, '[t]he controlling factor under the Equal Pay Act is job content - the actual duties that the respective employees are called upon to perform." Pearce v. Wichita County, 590 F.2d 128, 133 (5th Cir. 1991) (quoting Hodgson v. Brookhaven Gen. Hosp., 346 F.2d 719, 725 (5th Cir. 1970).

The Director of OMS required a different effort to perform her job than her alleged comparators and the scope of responsibility was much greater for the Directors of OAS, OHS, and ORPH than for the Director of OMS. Again, while it is undisputed that some of the very general efforts and responsibilities required of the modal office directors were similar, these efforts and responsibilities would be required of any manager or executive in any organization - effectively managing information; evaluating available and necessary resources; managing multiple priorities; decision-making; supervising and evaluating staff; providing support and information to internal and external personnel; and complying with all rules, regulations, and guidelines that apply to human and monetary resource management. The fact that such general management-type efforts and responsibilities are required for all modal office director positions does not mean that the positions were equal for purposes of the EPA. If that were the standard, Ms. Cooke's position would be equal to virtually any other office director in any organization.

The management efforts and responsibilities of each of the modal office directors were also very different. While all of the modal office directors were responsible for internal and external communication, the scope of responsibility for communications was very different for each modal office director. Aviation safety has always been viewed as central to the NTSB's work and is a highly visible function of the NTSB. The NTSB is aviation-centric because aviation safety is the core reason for the NTSB's existence, as it is a successor agency of the Civil Aeronautics Board. Thus, the Director of OAS had a central role in communicating the agency's mission to the public. Because of the great public interest in aviation accidents, the Director of OAS had a much greater responsibility in communicating with the press than the Director of OMS. The same was true for the Director of OHS, given the public's interest in

highway safety. The Director of OMS spends less than one percent of the time communicating with the press. Because of the greater number of participants in aviation accident investigations, the Director of OAS had a greater responsibility in communicating with parties than the Director of OMS. The Directors of OHS and ORPH were called upon to testify before Congress and to prepare NTSB board members or staff to testify before Congress more frequently than the Director of OMS. Accordingly, each of those directors had greater responsibility for communications with Congress than the Director of OMS.

Additionally, while generally efforts and responsibilities related to accident investigation and preparation of reports were required of all of modal office directors, the efforts and responsibilities of each modal director varied widely because the nature, scope, and frequency of accidents varied considerably. As set forth in in the joint stipulation of facts, there were more accidents investigated by OAS, OHS, and ORPH than by OMS. Therefore, the Directors of OAS, OHS, and ORPH had greater responsibility and required a different degree of effort for accident investigation and report writing. The mental fatigue and stress related to accident investigations was not at the same level for the Director of OMS as for the other modal office directors.

Furthermore, aviation accidents investigations involved many more participants than marine accident investigations. The investigation of a major marine accident may have involved three to seven NTSB investigators and approximately four parties represented by 20 individuals, while the investigation of a major aviation accident may have involved 150 to 200 people, or more, including multiple investigative parties that participate at the direction of the NTSB. Because so many more participants are involved in aviation accident investigations, the Director

of OAS has much greater responsibility in overseeing investigations than the Director of OMS. Additionally, the Director of OMS also did not have as many obligations in working with parties to an investigation as the Director of OHS. In OHS, the parties to each investigation tend to be different, and therefore the Director of OHS and his or her staff are responsible for educating parties about the investigation process for each accident. In OMS, the Coast Guard is frequently a party to investigations, and thus the Director of OMS and his or her staff do not have the same responsibility to educate.

Because OHS and ORPH had much greater discretion than OMS in deciding whether to investigate a particular accident, the Directors of OHS and ORPH had more responsibility and were required to exert much greater effort in deciding whether to investigate than the Director of OMS. The Director of OHS had an enormous amount of discretion in deciding whether to investigate an accident and had to evaluate each accident to determine whether the relevant safety issues and level of impact on public confidence warranted an investigation. The Director of ORPH also maintained broad discretion in deciding whether the NTSB should conduct any rail, pipeline, or hazardous materials investigation. The Director of OMS followed the bright-line rule set forth in NTSB's MOU with the Coast Guard and, therefore, did not have as much accountability in the decision to investigate as the other modal office directors.

While all of the modal office directors technically had to be available to respond to accident notifications 24 hours per day, seven days per week, the fact that there were fewer marine accidents than accidents in any other mode meant that the Director of OMS was called upon to respond to accident notifications less frequently than other modal office directors outside of normal business hours. Thus, the stress of being required to work outside of normal business

hours did not occur to the same degree for the Director of OMS as for the other modal office directors.

Further, the Director of OMS required less effort and had fewer responsibilities related to human resources and personnel issues because OMS had a much smaller staff than the other modal offices and no regional offices. Handling human resources for 140 employees, as the Director of OAS did, is a much greater responsibility than handling human resources for 15 employees, as the Director of OMS did. While all office directors were responsible for their office's budget, as set forth in detail in our joint statement of facts, the OMS budget was much smaller than the budget of the other modal offices. Thus, the responsibilities of the other office directors with respect to budget were greater. Furthermore, because the size of OAS, OHS, and ORPH was larger than the size of OMS, the budgeting for each of these offices was necessarily more complex than budgeting for OMS and required less effort related to monetary resource management.

Because OMS had a much smaller international role than OAS, the Director of OMS did not require as much effort as the Director of OAS (and as the Deputy Director and OAS Chief Advisor) in relation to international accidents or representation of the United States in the international community. Because of the fact that marine accidents garner much less public, press, and congressional interest than highway or aviation accidents, the Director of OMS did not require as much effort as the Directors of OAS and OMS in handling inquiries from the public, press, and Congress.

There were efforts required by the OAS Chief Advisor that were not required for the Director of OMS. Mr. MacIntosh traveled much more frequently than Ms. Cooke, and that

additional travel and associated long hours were sources of stress and mental fatigue that Ms. Cooke did not have. Mr. MacIntosh also interacted with the international community more frequently than Ms. Cooke, which meant greater efforts in terms of collaboration with individuals outside of the NTSB.

Ms. Cooke's alleged comparators also had other responsibilities that she did not have. OAS, specifically the Director of OAS and the OAS Chief Advisor, had international responsibilities that Ms. Cooke did not have. As set forth in detail above, OAS had greater responsibility for international accident investigation than OMS. OAS also had a greater responsibility in representing the United States in the international aviation community than OMS had in representing the United States in the international marine community. As set forth in detail above, all of the SES-level modal office directors (including Mr. Spencer) had responsibilities with respect to the ERB that Ms. Cooke did not have. These included responsibilities for the agency's plans, goals, or objectives outside of those directly related to OMS, which Ms. Cooke did not have. These ERB responsibilities were significant, taking up to fifteen percent of each SES-level director's time. In addition, as Deputy Director of OAS, Mr. Haueter had a significant responsibility for the day-to-day conduct of accident investigations; a responsibility greater than Ms. Cooke's for marine investigations. When Mr. Spencer began his tenure as Director of OMS, he was assigned numerous responsibilities by the Managing Director, Mr. Osterman, none of which were responsibilities assigned to Ms. Cooke when she was the Director of OMS. Specifically, Mr. Spencer was asked to restore a good working relationship with the Coast Guard, give NTSB a greater presence in the marine industry, and become more active in international activities.

C. The Working Conditions Of The Director Of OMS And The Alleged Comparators Were Not Similar

A comparison of working conditions requires a practical judgment of whether the differences in working conditions are the kind customarily taken into account when setting wage levels. See 29 C.F.R. § 1629.18. Working conditions include surroundings, meaning elements commonly encountered by workers, and hazards, including the frequency and severity of injuries that they can cause. See id. Working conditions do not encompass shift differentials. Id. Each of the alleged comparators generally worked in an office environment. However, each of the alleged comparators, especially Mr. MacIntosh, traveled more frequently than Ms. Cooke. Working conditions during travel are different from working conditions in the office. Furthermore, while Ms. Cooke never traveled to the site of an accident between 2003 and 2005, almost all of her alleged comparators did. The working conditions at the site of an accident are different from and more hazardous than conditions in the office.

In sum, the evidence at trial will show that none of the alleged comparators performs work requiring equal skill, effort, and responsibility under similar working conditions as Ms. Cooke. Accordingly, Ms. Cooke has failed to establish her prima facie case. Thus, this Court should find in favor of defendant.

IV. Assuming That Ms. Cooke Has Established Her *Prima Facie* Case, The Pay Differential Was Not Based Upon Gender

Assuming that this Court were to find that Ms. Cooke has established her prima facie case, this Court should nonetheless find in favor of defendant because any pay disparity between Ms. Cooke and her alleged comparators was not based upon gender. Specifically, the pay

disparity falls within two of the four exceptions to the EPA, a merit system and differential based upon factors other than sex. See 29 U.S.C. § 206(d)(1).

A. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Merit System

In order to qualify under the merit system defense, an employer must show that the merit system was "an organized and structured procedure by which employees were evaluated systematically and in accordance with predetermined criteria." Raymond v. United States, 31 Fed. Cl. 514, 518 (1994). In this case, Ms. Cooke's pay, as well as the pay of her alleged comparators, was determined by numerous statutes and regulations governing the Federal employee pay system. The NTSB was required to work within the confines of these statutes and regulations when determining Ms. Cooke's pay, as well as the pay of her alleged comparators. See 5 C.F.R §§ 1.1 and 1.2. Within the Federal pay system, there was no way that Ms. Cooke could have been compensated at a rate equal to that of her alleged comparators. Ms. Cooke was paid at the GS-15 rate, as determined by OPM. Each GS pay grade has 10 incremental steps from step 1 to step 10, through which employees progress based upon attaining satisfactory performance and meeting length of service requirements established by OPM for each intervening step. See 5 C.F.R. Part 531. Ms. Cooke alleges that she could have received a within-grade quality step increase sooner than she did. A GS-level employee may receive a quality step increase if he or she receives an outstanding performance rating and had not received a quality step increase within the last 52 weeks. See 5 U.S.C. § 5336; 5 C.F.R. §§ 531.502-531.505. During the period in question, Ms. Cooke received all quality step increases

when which she met the necessary criteria.[6] While Ms. Cooke theoretically could have been detailed to an SES-level position (assuming one was available), such details are typically used only to meet emergency or short-term needs. Furthermore, if Ms. Cooke had been given a limited term appointment or detailed to an SES-level position, she would have continued to be compensated at the GS-15 level. See 5 C.F.R. §317.903(a).

1. Ms. Cooke Could Not Have Been Promoted To The Senior Executive Service Level

Ms. Cooke suggests that one way she could have been provided compensation in an amount equal to that of her alleged comparators was to have been promoted to the SES level. When Ms. Cooke became the Director of OMS,[7] it was the NTSB's intention to classify and pay her and the other modal directors at the SES level. At the time, however, there were no available SES slots to allocate to the modal office directors. A GS-level position can only become an SES-level position in two ways. Either the NTSB can obtain an additional SES slot from OPM, or a vacant SES slot can be reallocated to the GS-level position. The NTSB cannot create a new SES position without authorization from OPM. See U.S.C. § 3133. In June 1999, the NTSB requested SES slots for the modal office directors from OPM, but that request was denied. When slots eventually became available, they were properly allocated first to the Director of ORPH position, then to the Director of OHS position.[8] Even assuming that the first available

[6] Ms. Cooke was paid at the GS-15, step 9 level from January 27, 2002 until January 22, 2005. Ms. Cooke received a step increase effective January 2005 and was paid at the GS-15, step 10 level from January 23, 2005 until the date of her retirement, on July 3, 2006.

[7] That is, when her title changed to Director of OMS following the restructuring described above.

[8] The details of these allocation decisions and their propriety are addressed below.

SES slot had been allocated to the Director of OMS position, OPM regulations require the NTSB to advertise and compete all SES positions that will be filled by initial career appointment. 5 C.F.R. § 317.501. Thus, the NTSB could not have simply promoted Ms. Cooke to the SES level. Because she had not previously held a career SES position, she would have had to compete and be selected for the position. See 5 C.F.R. §§ 317.51, 317.701 and 317.702. Any assumption made by Ms. Cooke that she would have been the most qualified applicant and, therefore, would have been selected for the position is purely speculative.[9] Thus, the NTSB could not have promoted Ms. Cooke to the SES level because of the unavailability of slots and the requirement to advertise and compete SES positions.

When an SES slot became available and was allocated to the Director of OMS position, the NTSB properly advertised and competed the position, and selected who it believed to be the best candidate, John Spencer.

2. Ms. Cooke Could Not Have Been Given Overtime Pay

Ms. Cooke also alleges that she could have been given overtime pay to "equalize" her pay with that of her alleged comparators. While GS employees are eligible for overtime pay within the Federal pay system, there is a limit on the amount of overtime pay that can be provided to GS employees. See 5 U.S.C. § 5547(a); 5 C.F.R. § 550.105. Ms. Cooke was not eligible to receive overtime pay to the extent that her total salary would exceed the greater of GS-15, step 10, or level V of the Executive Schedule. 5 U.S.C. § 5547. As Ms. Cooke was being paid at the GS-15, step 9 or 10 level throughout her tenure as Director of OMS, any

---

[9] In fact, history belies this assumption. When the Director of OMS position eventually became an SES-level position, Ms. Cooke applied for it and was not selected.

overtime compensation between 2003 and 2005 could not have been more than approximately $3,800 per year, and would not have provided her with compensation equal to that of her alleged comparators. Additionally, overtime pay must be ordered or approved in advance by an employee's supervisor, regardless of grade. Ms. Cooke spoke to Ms. Engleman Conners about overtime in April 2004, but provided no justification or rationale for her request, and that request was never approved. Ms. Cooke never approached Mr. Campbell about overtime, even though, since he was her first-line supervisor, that would have been the normal course. Finally, there was an unwritten policy that individuals in management positions, including modal office directors, would not receive overtime pay. A merit system may be based upon unwritten policies if those policies are made clear to employees. See Equal Employment Opportunity Commission v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir. 1980). It is clear that Ms. Cooke was aware of this policy, as it was discussed at several meetings at which she was present.

3. Ms. Cooke Could Not Have Been Given A Retention Allowance

Ms. Cooke alleges that she could have been paid a retention allowance to "equalize" her pay. Pursuant to 5 U.S.C. § 5754 and 5 C.F.R. § 575.301,[10] an agency may pay a retention allowance

> when an agency determines that the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee would be likely to leave the Federal service in the absence of an incentive.

5 C.F.R. § 575.301 (2006). The NTSB further requires that an employee have an offer for a position outside of the Federal Government for a salary larger than he or she was making at the

[10] A recent amendment to 5 C.F.R. § 575.301 removed "Federal service" from the last sentence. That amendment went into effect in December 2007 and, therefore, is inapplicable to this case.

NTSB. There is no evidence that Ms. Cooke had unusually high or unique qualifications for her position. The fact that, when the position became SES and was competed, another individual was selected for the position strongly suggests that Ms. Cooke was not uniquely qualified. Of significance, there is no evidence that Ms. Cooke ever received an offer of outside employment during her tenure as the Director of OMS. Therefore, Ms. Cooke was ineligible to receive a retention allowance.

4. Ms. Cooke Could Not Have Been <u>Given Any Additional Performance Awards</u>

Ms. Cooke asserts that her compensation could have been "equalized" by the NTSB giving her additional performance awards. While Ms. Cooke was eligible for a number of the types of performance awards available at the NTSB, performance awards are based upon performance and are not meant as a tool to augment an employee's salary. Ms. Cooke never received a special act award because, between 2003 and 2005, Ms. Cooke never had a discrete success or project that warranted a special act award.

5. <u>Ms. Cooke Could Not Have Been Given A Senior Level Position</u>

Ms. Cooke further alleges that she could have been given an SL position to "equalize" her pay. SL positions are intended for technical positions with little to no supervisory responsibilities. There is no evidence to suggest that Ms. Cooke qualified for an SL slot when she was the Director of OMS. In addition, SL employees may not perform supervisory duties more than 25 percent of the time, and the Director of OMS performs supervisory duties more than 25 percent of the time. Thus, Ms. Cooke was ineligible for an SL position.

B. The Disparity In Pay Between Ms. Cooke And Her Alleged Comparators Was Based Upon A Factor Other Than Sex

Pursuant to the fourth exception of the EPA, even if a male comparator and Ms. Cooke performed the exact same work, the EPA is not violated if the differential stems from any factor other than gender. See Wollenburg v. Comtech Manufacturing Co., 201 F.3d 973, 976 (7th Cir. 2000). Federal courts do not agree on whether any factor is sufficient, or whether the factor must be a product of a legitimate business reason, although a majority of Federal courts of appeals espouse the legitimate business reason view. Lissak, 49 Fed. Cl. at 285. While the Federal Circuit has not spoken on this matter, the Court of Federal Claims has determined that the "rational basis" standard is appropriate for this analysis, in that it is enough that the factor be gender neutral on its face and used in good faith and not in a discriminatory manner. Behm v. United States, 68 Fed. Cl. 395, 399-400 (2005).[11] "The justification need not be a 'good reason,' but merely a gender-neutral one." Warren v. Solo Cup. Co., 516 F.3d 627, 630 (7th Cir. 2008). Additionally, non-gender-based pay differences, which are the result of separate pay and classification systems, are permissible under the Equal Pay Act. See EEOC v. Aetna Ins. Co., 616 F.2d 719, 723-26 (4th Cir. 1980).

In this case, the reason for the pay differential between Ms. Cooke and her alleged comparators was the gender-neutral allocation of available SES positions. The NTSB both had a rational basis for its actions and possessed legitimate business reasons for allocating available

---

[11] "Under rational basis review, the classifications made by the plan and rules are valid unless they bear no rational relationship to the Government's objectives. . . . All that the Government must show is that the plan and rules rationally relate to a legitimate interest, under any conceivable set of facts." Behm, 68 Fed. Cl. at 402 (internal quotation marks and citations omitted).

SES positions to the Director of ORPH and the Director of OHS positions prior to the Director of OMS position. Ms. Cooke's pay was the result of the non-gender-based classification of her position as a GS-level position, and the classification of her alleged comparators' positions as SES or SL positions.

The OAS Director and Deputy Director positions have always been SES-level positions for legitimate business reasons. Aviation safety is the core reason for the NTSB's existence. Thus, the work of OAS is central to the agency's mission. In addition, as detailed above, OAS is much larger; handles many more accident investigations; handles more complex accident investigations; garners much more press, public, and congressional interest; and performs more international work than any of the surface modal offices. Furthermore, OAS is the only modal office required by statute to investigate all civil accidents in its mode. For these reasons, OAS had the highest potential for impact in the area of transportation safety and has an extremely high profile with Congress as well as the general public. Thus, its Director and Deputy Director were properly designated SES-level positions.

Following the dividing of the NTSB's Office of Surface Transportation into four separate surface modal offices, it was the NTSB's intention that each of the four surface modal offices directors, including OMS, be headed by a member of the SES. However, there were no available slots to allocate to the surface modal office directors. In June 1999, the NTSB requested additional SES slots from OPM for all of the surface modal office directors, but OPM denied that request. Thus, there was no way for the NTSB to make any of the surface modal office director positions SES-level positions, and each of the surface modal office directors were initially paid at the GS-15 level.

An SES employee retired, and, therefore, an SES slot became available. This SES slot was allocated to the position of Director of ORPH in 2001 based upon legitimate business reasons and in accordance with a rational plan. ORPH was the most complex of the three surface modal offices (OHS, ORPH, and OMS) and was responsible for three very different and distinct transportation modes (railroad, pipeline, and hazardous materials), whereas the other modal offices were each responsible for only one transportation mode. Additionally, as the Director responsible for hazardous materials, the Director of ORPH had trans-modal responsibilities involving aviation, highway, marine, rail, and pipeline accidents. Finally, because of the intricacy of the field, the Director of ORPH was frequently that agency's principal spokesperson.

Pursuant to OPM regulations, the NTSB is required to advertise and compete all SES positions that will be filled by initial career appointment. See 5 C.F.R. § 317.501. An employee who encumbers a GS-level position that is reclassified to the SES level may not be noncompetitively promoted to the SES level unless that employee has previously held a career SES appointment. Id. Accordingly, once the decision was made to allocate the SES slot to the position of Director of ORPH, the position was advertised as an SES position and applications for the position were accepted. Mr. Chipkevich, who at the time was the Director of ORPH at the GS-15 level, applied for the Director of ORPH position at the SES level and was eventually selected for that position. The advertisement and selection process was conducted pursuant to OPM regulations. Mr. Chipkevich was selected because he was the best candidate for the position, not for any gender-biased reasons.

In July 2001, the NTSB again requested SES slots from OPM for the positions of Director of OHS and Director of OMS. In its request, the NTSB stated that its prioritization of these requests was first OHS, then OMS, indicating that the order of SES allocations proceeded according to a plan set forth long before another SES position became available. Again, those requests were denied by OPM. Thus, the NTSB had a legitimate business reason for not making the Director of OMS position an SES-level position at that time.

In 2003, an SES position was eliminated from the personnel structure of the NTSB Academy by abolishing the office of the President of the Academy. That slot was allocated to the position of Director of OHS for legitimate business reasons: namely, that OHS was a larger office than OMS, had regional offices, and had a constant need for public outreach and visible leadership, and because there are approximately 44,000 highway deaths each year, in contrast to several hundred marine deaths per year. It was determined that OHS could have the greater positive impact upon transportation safety. The allocation had nothing to do with gender. Once the decision was made to allocate the SES slot to the Director of OHS, the position was advertised as an SES position, and applications for the position were accepted. Ms. Engleman Conners had no role in the selection for the position. She never saw a list of candidates or interviewed anyone for this, or any other, SES-level position. Mr. Osterman, who at the time was the Director of OHS at the GS-15 level, applied for the Director of OHS position at the SES level and was eventually selected for the position. Again, the advertisement and selection processes were conducted pursuant to OPM regulations. Mr. Osterman was selected because he was the best candidate for the position, not for any gender-biased reasons.

In 2004, the NTSB requested and received an additional SES slot from OPM. That slot was allocated to the position of Director of OMS and advertised and competed according to OPM regulations. Mr. Spencer was selected for the position because he was the best candidate, not for any gender-biased reasons.

In sum, the reason that Ms. Cooke was not paid at the SES-level was because the NTSB did not have enough available SES slots to assign to all of the surface modal office directors simultaneously. The order in which the available slots were assigned was dictated by legitimate business reasons - namely, they were prioritized based upon the complexity of the offices and the potential for positive effect upon transportation safety. OMS was smaller in size, conducted fewer investigations, had shared jurisdiction with the Coast Guard, and had no regional offices. Furthermore, there were comparatively fewer marine deaths than highway deaths per year. Thus, OMS had the least potential for impact in the area of transportation safety. Given that the NTSB's mission is to promote transportation safety, it was legitimate to consider which modal office would have the greatest effect upon transportation safety when allocating SES slots.

Additionally, as set forth above, even if the Director of OMS position had been the first surface modal office director position to be given an SES slot, the NTSB could not have simply promoted Ms. Cooke to the SES-level. In accordance with Federal Government-wide OPM policies, the NTSB would have had to advertise and compete the position and select the best candidate from the pool of applicants. <u>See</u> 5 C.F.R. § 317.501. If Ms. Cooke had not been the best candidate for the position, the NTSB would have had a legitimate business reason for not selecting her. The NTSB clearly has a business interest in hiring the best candidate possible for each position.

Finally, it is clear that the disparity in pay between Ms. Cooke and her alleged comparators was based upon factors other than sex because the NTSB had three female SES-level employees during the relevant time period: Lola Ward, Julie Beal, and Elaine Weinstein. These were approximately half of the SES appointments made during that time. All three of these women were required to apply and compete for their positions, and all three competed against male applicants. Thus, the NTSB did not pay Ms. Cooke at the GS-15 level because of her gender, but because it was complying with Federal pay requirements and making legitimate business choices in its pay and SES allocation decisions.

V. Even Assuming That The NTSB Violated the Equal Pay Act, The Facts At Trial Will Demonstrate That The NTSB's Violation Was Not Willful For Determining The Statute Of Limitations Or Awarding Liquidated Damages

The applicable statute of limitations for filing suit in a Federal court for an EPA claim is no more than two years after the cause of action accrued, or if there was willful failure to pay, no more than three years after the action accrued:

> . . . every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C. § 255(a); Allison v. United States, 39 Fed. Cl. 471, 478 (1997).

Ms. Cooke bears the burden of proving a willful violation of FLSA. Adams v. United States, 350 F.3d 1216, 1229 (Fed. Cir. 2003). The standard for willfulness is that the "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Id. (internal quotation marks omitted). Whether an employer's violation of the FLSA was willful is a mixed question of fact and law. Alvarez v. IBP, Inc., 339 F.3d 894, 908 (9th Cir. 2003), aff'd in non-relevant part, 126 S. Ct. 514 (2005); Pabst v.

Oklahoma Gas & Elec. Co., 228 F.3d 1128, 1137 (10th Cir. 2000). Willfulness, however, is more consistent with deliberate conduct on the part of the employer. Angelo v. United States, 57 Fed. Cl. 100, 108-09 (2003).

The evidence at trial will show that the NTSB did not act in willful disregard of the law. As established above, the NTSB paid Ms. Cooke in accordance with Federal statutes and regulations governing pay and followed its long-standing plan concerning the allocation of SES slots. Thus, if the Court finds the NTSB violated the Equal Pay Act in this matter, it should only allow Ms. Cooke to claim back pay for the two years that preceded her complaint.

If Ms. Cooke carries her burden of proving that the NTSB violated the Equal Pay Act, she would be entitled to back pay, and the Court may award her "an additional equal amount as liquidated damages," 29 U.S.C. § 216(b). However, a determination "that the plaintiff[] [is] entitled to recover overtime pay . . . do[es] not automatically entitle plaintiff[] to liquidated damages." Beebe v. United States, 226 Ct. Cl. 308, 640 F.2d 1283, 1295 (1981). The employer may show that its "failure to obey the [Fair Labor Standards Act] was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon [it] more than a compensatory verdict." Ellison v. United States, 25 Cl. Ct. 481, 489 (1992) (citing Rothman v. Publicker Indus. Inc., 201 F.2d 618, 620 (3d Cir. 1953)). The evidence at trial will show that the NTSB's decisions to pay Ms. Cooke the way that it did were made "in good faith" and that the NTSB certainly had reasonable grounds to believe its decisions were not in violation of the FLSA. Accordingly, "the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title." Adams, 350 F.3d at 1226.

CONCLUSION

The evidence at trial will show that Ms. Cooke's job did not require equal skill, effort, and responsibility and was not performed under similar working conditions as her alleged comparators. The evidence at trial will also show that the pay differential between Ms. Cooke and her alleged comparators was the result of factors other than gender. Ms. Cooke will not be able to produce any evidence at trial that her gender was the reason for any pay differential or that the NTSB violated the Equal Pay Act, and we respectfully request that her claim be dismissed.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ HAROLD D. LESTER, JR.
HAROLD D. LESTER, JR.
Assistant Director

/s/ MEREDYTH D. COHEN
MEREDYTH D. COHEN
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tel: (202) 353-7978
Fax: (202) 514-8624

Of Counsel:
KATHLEEN SILBAUGH
Office of General Counsel
National Transportation Safety Board

July 17, 2008

Attorneys for Defendant

CERTIFICATE OF SERVICE

I certify under that on this 17th day of July, 2008 a copy of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ MEREDYTH D. COHEN