# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

\- - - - - - - - - - - - - - - - X

MARJORIE MURTAGH COOKE, :

Plaintiff, :

vs. : Case No.:

MARK ROSENKER, Chairman, : 1:06CV01928

NATIONAL TRANSPORTATION SAFETY :

BOARD, :

Defendant. :

\- - - - - - - - - - - - - - - - X

Videotaped Deposition of DANIEL CAMPBELL

Washington, D.C.

Thursday, November 15, 2007

9:59 a.m.

Job No.: 1-115036

Pages: 1 - 200

Reported by: Dana C. Ryan, RPR, CRR

Videotaped Deposition of DANIEL CAMPBELL, held at the law offices of:

The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

Pursuant to agreement, before Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
R. SCOTT OSWALD, Esquire
DAVID SCHER, Esquire
BRIAN M. LOWINGER, Esquire
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-3911

ON BEHALF OF THE DEFENDANT THE UNITED STATES OF AMERICA:
MEREDYTH D. COHEN, Esquire
United States Department of Justice
Commercial Litigation Branch
1100 L Street, Northwest
Washington, D.C. 20530
(202) 353-7978



A P P E A R A N C E S C O N T I N U E D

ON BEHALF OF THE DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:
ANDREA MCBARNETTE, Esquire
U.S. Attorney's Office
501 3rd Street, Northwest, Rm 4218
Washington, D.C. 20530
(202) 514-7153

ALSO PRESENT:
Denise M. D'Avella, Esquire, NTSB Office of General Counsel
Marjorie Murtagh Cooke, Plaintiff
Scott Forman, Videographer



C O N T E N T S


| EXAMINATION OF DANIEL CAMPBELL: | PAGE: |
| --- | --- |
| By Mr. Oswald | 7 |
| By Ms. McBarnette | 127 |
| By Ms. Cohen | 190 |
| By Mr. Oswald | 195 |


E X H I B I T S

(None)

P R O C E E D I N G S

THE VIDEOGRAPHER: Here begins tape number 1 in the deposition of Daniel Campbell in the matter of Marjorie Murtagh Cooke versus Mark Rosenker, Chairman, National Transportation Safety Board, pending in the U.S. District Court for the District of Columbia, Case Number 1:06CV1928 and all related cases. Today's date is November 15th, 2007. The time is 9:59 a.m.

The video operator is Scott Forman of L.A.D. Reporting. This deposition is taking place at The Employment Law Group, 888 17th Street, Northwest, Washington, D.C.

Would counsel identify themselves and state whom they represent?

MR. OSWALD: Scott Oswald and David Scher on behalf of the plaintiff Marjorie Murtagh Cooke. In the room is Brian Lowinger and Ms. Murtagh Cooke.

MS. MCBARNETTE: Andrea McBarnette with the U.S. Attorney's Office for the district court case, and I represent the defendant.



MS. COHEN: Meredyth Cohen, I represent the defendant United States in the court of federal claims case.

MS. D'AVELLA: Denise D'Avella, I represent the National Transportation Safety Board defendant.

THE VIDEOGRAPHER: Thank you very much. The court reporter today is Dana Ryan of L.A.D. Reporting. Will the reporter please swear in the witness?

DANIEL CAMPBELL,

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. OSWALD:

Q Mr. Campbell, my name is Scott Oswald and we're going to be spending the day together. I briefly introduced myself before. Before we begin, I want to go through just a few ground rules with you and -- and then we'll begin by me asking you a few questions. First the ground rules, I'm going to be asking you a series of questions today. If there's ever a point at which you do not understand a



question, please let me know and I'll reformat it in a manner that you do understand.

I understand you're a lawyer; is that correct, sir?

A I was.

Q All right. And if at any point you would like to take a break at all, you let me know. I'll be happy to take a break. All I'll ask you to do is if there's a question pending at the time that you'd like to take a break, that you answer the question first and then we'll go ahead and take a break.

If at any time we have an objection -- you have two, really three fine counsel sitting to your right here -- we'll listen to the objection, and then once the objection is made, I'll ask you to go ahead and give your answer unless you are instructed not to answer a question by one of your counsel. Do you understand, sir?

A Certainly.

Q All right. Now, we have water, juice, sodas; we can get you almost anything, so if there's any point at which that you'd like something else,



please let me know.

Now, during a deposition there may be a point at which I ask you to verbalize an answer. We're on the Record today, and the court reporter sitting to your left cannot take down nonverbal cues, nods of the head, shakes, things of that nature, and if that happens, what I will ask you to do is to verbalize your answer, and the reason I'm doing that is -- is simply for our court reporter to take down. Do you understand, sir?

A I do.

Q All right. Now, are you taking any medication at all that would in any way interfere with your ability to listen and understand a question that I give you --

A No.

Q -- today?

Are you under any kind of disability at all that would prevent you from --

A No.

Q -- understanding and answering my questions today truthfully and completely?

A No.
Q With that, Mr. Campbell, just a -- I would like to know whether or not you've ever been deposed before today.
A I don't think so, no.
Q All right. Okay. Now, you said that you were a lawyer at one time. What was that period of time that you were a lawyer?
A 1971 to about 1999.
Q All right. And in what jurisdictions were you barred, sir?
A The District.
Q Other than the District of Columbia, where else were you barred to practice law?
A Nowhere.
Q What was it that led you to no longer be a lawyer in the District of Columbia as of 1999?
A I moved into management and didn't seem to be important to maintain a legal status.
Q All right. And, so, in 1999 what did you do to evidence the fact that you would no longer be practicing law with the D.C. bar?



A Nothing. Nothing. I don't pay bar dues, so I don't think I'm a member of the bar, but I didn't undertake any formal renunciation. I didn't think that was necessary either.
Q I understand. All right. Now, there was a period of time when you were -- you were employed with the NTSB; is that correct?
A That's correct.
Q What was that period of time?
A I think it began in 1990, about 1990, and lasted until 2005. It might have been 1989.
Q And prior to working for the -- the NTSB, where did you work?
A The Interstate Commerce Commission.
Q And for what period --
A That lasted probably about ten years.
Q 1980 through 1990?
A Around that.
Q Okay.
A And the previous ten years at the -- what was then the Civil Aeronautics Board.
Q Okay. All right. And you -- you have an



undergraduate degree, and where is that from?
A Princeton University.
Q And you have a law degree, and where is that from?
A New York University.
Q And when did you graduate with your law degree from New York University?
A That would be 1971.
Q Okay. So I just want to make sure I'm clear. The reason that the D.C. bar suspended you from the practice of law was for only the nonpayment of dues; is that correct?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: Yeah, I don't know if they suspended me. I have -- I'm -- I'm not in touch with the D.C. bar.
BY MR. OSWALD:
Q Okay. Do you have any reason to doubt that -- that the D.C. bar currently indicates that your membership status is suspended?
A I would suspect that that's what they do



since I don't pay dues.
Q I understand. My point simply is, you are not under any kind of disciplinary threat or --
A Oh, no.
Q -- or other proceedings --
A No, absolutely not.
Q -- against you by bar counsel; is that correct?
A No.
Q Okay. All right. Let's focus on your NTSB career from 1990 through 2005. What was the first position that you held at NTSB?
A The general counsel.
Q And you were general counsel from what year to --
A 1990 to 1999. I think that that's the -- when it was, yeah.
Q Okay. And then what was your next position with the NTSB?
A Managing director.
Q You served as managing director from what period to what period?

Page 14

A From whenever I took it, either in '99 or 2000, until, I believe, January of 2005. Somewhere around January of 2005, we named another managing director, and I took the position of executive director.
Q And for how long were you in the position of executive director?
A I -- I retired from federal service on September -- the last day of September -- last day of the fiscal year in 2005.
Q I understand. What was the -- let's talk about your job duties for a moment as the managing director. This is the position that you held from in or about 2000 through 2005. What were your job duties?
A The chairman of the agency by statute has the authority to distribute work, to pay employees and to undertake virtually all the administrative operations of the agency. And by federal delegation, rule delegation, that authority is vested in the managing director, so you would exercise whatever authorities the chairman was inclined to have you do.

Page 15

Q And --
A And --
Q -- what --
A -- they would, for me, have principally been production control.
Q What authority did you have over personnel?
A I had the authority of the chairman over personnel, which would be to hire and -- and pay.
Q All of the personnel at NTSB?
A Well, you actually end up with subsequent delegations, and office directors handle their offices, but -- but it -- it -- it has to work its way up to a pyramid, and at the top of the pyramid is the chairman, and the managing director, by delegation, exercises the chairman's authority.
Q Over personnel matters?
A Yes.
Q All right. The -- who were your direct reports from 2000 through 2005, and I'm -- I'm interested in right now not the individuals but rather the positions that directly reported to you?
A Well, the simple ones, the easy ones to

Page 16

answer are the modal directors, that is to say, the directors of the offices that were engaged in investigations of various modes of transportation, and the two principal support offices for those, the Office of Research and Engineering and the Office of Safety Recommendations. There were from time to time various different alignments of some of the offices when they would be direct reports to me and sometimes when they weren't. For instance, public affairs was for a period of time a -- I think a direct report to the managing director, and then it was put in another office, and so it would not have been.
I had a deputy for a period of time and two assistant directors, which obviously would have been direct reports to me. Human resources was a direct report to me. I can't think of any more at the moment.
Q Between 2000 and 2005, how many employees did the NTSB on average employ during that period of time?
A 400 is probably a good number. It's -- it -- it varied, but that's about the size of the

Page 17

agency.
Q The layout of NTSB, where was -- on what floor was your office as the managing --
A Sixth --
Q -- director?
A -- floor.
Q Okay. And how close was your office to -- to the chairman's office during that period of time, Eng -- Ellen Engleman Conners?
A Do you want that in feet, in --
Q Sure.
A It's probably 200 feet maybe. The office -- the managing director's office is a separate suite from the chairman's office, but it is adjacent to the suite. There is a door between the two suites. My office was at the far end of the managing director's suite. The chairman's office was at the far end of her suite. I could yell loud enough that she could hear me and vice versa, but --
Q I -- I understand. I understand. How often did you meet with, on average, Ellen Engleman Conners, the chairman, during the period of time that she was

the chairman and you were the managing director?

A Well, if she was in the office, it would be unlikely that I would not see her.

Q On any given day?

A Yeah.

Q And when you say you would see her on a daily basis when she was in the office, to what extent would you have a substantive conversation with her on days that you would see her in the office?

A Well, it would not be uncommon, but it's -- it wasn't a daily event, but it would not be uncommon. The chairman has a lot of the -- the chairman handles the public side of the agency. The managing director handles a lot of the -- the matter that is not yet public, that's in process and so forth, and, so, my day and hers would be very different.

Q When you would meet with Engleman -- Ellen Engleman Conners, where would those meetings take place?

A Well, one of three places. She would not infrequently come to my office if she had something that she wanted to talk to me about. If there were to



be other people involved in the meeting, it was more likely to be in her office. And there was a conference room in between us, and if there were a lot of people involved, it would probably have been in the conference room.

Q And how often would the -- these meetings be impromptu as opposed to scheduled meetings on a daily basis?

A They would be more likely to be impromptu by a large margin.

Q And this is when Engleman -- Ellen Engleman Conners would come down to your office to talk to you about various things that were going on?

A Or tell me that there was a -- an office -- I mean, meeting in her office that she would like me to attend, yes. There -- there -- and I had a managing director's meeting that the chairman might attend, and it was infrequently scheduled, so -- and I -- I don't believe that she had any scheduled meetings that would routinely have been scheduled, so they were in that sense almost always impromptu.

Q I understand. The -- the modal directors



and the other directors over whom you had direct supervision, how often would you evaluate their -- these individuals' performance, how regularly?

A What do you mean by "evaluate"?

Q Well, what -- what do you mean -- when I say the word "evaluate," what does that mean to you?

A Well, I evaluated them every time we had a conversation about anything of substance. I mean, that's what you have to do.

Q Let's use the -- the more formal term "evaluate," meaning an evaluation process. How often would you evaluate employees over whom you had direct supervisory authority when you were at NTSB both as a general counsel, managing director and then a -- finally executive director from on or about 1990 through 2005?

A Well, it would be -- it would be an ongoing thing. The -- in the general counsel's office there were very few people, and we all worked very closely together, so there wasn't any -- any sense in which there was a need to sit down and -- and -- and talk to one another about how we were thinking about one



another. It was pretty -- a pretty tight-knit group, so you had an annual appraisal at the end of the year that you had to do for civil service rules, and that would have been undertaken.

If a problem arose, it was probably going to be in the context of a -- of a proceeding or a case and you'd work it out in that manner, so that's pretty much the way I did it in the general counsel's office.

As a managing director, as I mentioned before, the principal -- my principal responsibility from the standpoint of what a chairman would expect of me was quality product. The agency works by way of presentation of accident reports to a board, and the managing director is the person who signs those reports and presents them to the board as a nearly finished product. The board obviously is going to meet on them and make determinations.

It would be in the context of the development of a report that the analysis of an office director and indeed the analysis of an office is undertaken. That would culminate in what was known as a director's review in which an office director would

Page 22

present a report to the managing director and to the other directors that were involved in it, and it was a -- a process in which you were -- you -- you -- you're basically peer reviewing a matter, and that's how you determined, evaluated the work of an office.
Q Let's talk about the annual performance appraisal that you just mentioned. Is it fair to say that you would perform that annual per -- performance appraisal on an annual basis?
A Yes.
Q All right. And how -- how would you go about that as the managing director over those individuals over whom you had direct supervisory authority?
A I'd ask them to -- the office directors to provide me with some information about what they believed to have been the accomplishments that they had for that year, and I think -- I don't know whether my assistants or -- or human resources or -- or who would present me pieces of paper that -- that would look to be the basic framework of an evaluation sheet, and then I would work a little bit on that.

Page 23

Q And then once you had worked a little bit on the evaluation sheet, what would you do?
A Are we talking now about the modal office directors?
Q Yes.
A Okay. Because it will make a difference. The people who were direct reports to me that were on my staff I might handle in a different fashion than I would handle a modal office director. Modal office directors really, in essence, were the heart of the agency and not employees of mine, and as such the chairman would be more interested in the way in which a modal office performed. And, so, that was a -- a -- a mutual undertaking.
As I say, my authority over personnel is a delegated authority from the chairman, so the chairman and I would reach some agreement about how modal directors were to be rated and then the ratings would be made.
Q So you have the -- the sheet from HR that has the general structure of what the evaluation would be, and you've said you'd work on that some.

Page 24

A Uh-huh.
Q Then what would you do when you are evaluating those over whom you have direct supervisory authority as part of the annual performance appraisal process?
A I would talk to the chairman and then tell the chairman that we had to go through the annual appraisal process, and we would work out some understanding of how we wanted to handle it. Then I would sign the documents and process the -- I think it's important to understand that to some extent the annual appraisal process is directly related to the end-of-the-year bonus process, and that's a lot of what was under consideration here.
Q So once you had completed the form, you had put in any of your comments and all as part of the annual performance appraisal process, then what would you do with that form?
A Well, human resources would take the form. I -- I can't really honestly say. This is not something that I spent a great deal of time thinking about in terms of how pa -- pieces of paper move

Page 25

around the agency in personnel, but -- but after we're done with the form, the form is going to end up in somebody's file, and it's going to end up being processed by whatever clerks process those sorts of things.
Q I understand. Before it ends up in the file, to what extent, if at all, would you meet with a person over whom you are -- you were evaluating to review the content of the performance evaluation?
A It would be unlikely that I would meet with anyone.
Q When, if ever, did you meet with any of your direct reports from 2000 through 2005 to review the content of their performance appraisal?
A As I say, performance appraisals were done in the -- performance was evaluated in the context of the way in which reports were brought to me. My direct reports had really little doubt about whether or not they were doing a good job. In fact, they were probably mostly self-regulating people. They understood what their jobs were and they would do a good job about it, and -- and -- and I don't think

that my evaluation of them would have been a productive undertaking, so I didn't do it.

Q You didn't evaluate any of the modal --

A No.

Q -- directors?

A At -- at one point we had -- we had some issues about how -- how people ought to be managed, and I brought into the agency some outside assistance in that regard. We -- we got all our managers together, and it was a -- a group that had had -- that taught this sort of stuff at Harvard University, and we brought them all in and said, okay, well, this is the real -- the way you really want to manage people if you're interested in creativity and if you're interested in production. And -- and the core teaching of that was that annual appraisals and annual bonuses are anti-productive and that what you need to do with people is you need to tell people what it is you want from them. And when they perform well, you need to say, that's good and -- and that's what I expected of you, and reward it right then.

But annual appraisals and annual bonuses, as



I say, are likely to be anti-productive. Most of my managers agreed that that was a sensible sort of thing. Most of my managers were of the view that the -- the civil service process as it stood now wasn't doing anything for anybody except perhaps creating a bit of antagonism and envy at the end of the year, and I might add that the plaintiff was one of the managers who came to me.

We had -- we had offered pilot programs in this, and the plaintiff was one of the managers that came to me and said that she was very much interested in having brought -- having a pilot program like that done in her office, and -- and I supported that and supported it for the other managers that came to me, but unfortunately it's very expensive to bring in outside consultants to do that, and I wasn't given the money to do it.

Q When you say Ms. Murtagh Cooke wanted a pilot program in her -- in her office --

A Uh-huh.

Q -- what do you mean by that?

A Well, at the end of -- Aubrey Daniels is the



fellow that actually teaches I think out of the University of Kentuck -- Kentucky but in coordination with Harvard.

At the end of it we -- we asked the managers, because we were -- really wanted to bring in a pilot program so that we could get this adopted as a -- kind of a -- an environment for the agency, and we asked the managers who -- who might be interested in having such a program initiated within their office, and the plaintiff was the first one through my door to say that she would like that, and I -- I -- I thought that was probably a good idea.

I couldn't get the money for it. We're -- we're talking here just a little under a million dol -- dollars in consulting fees. That's a lot of money, and -- and, so, it didn't come to pass.

One of the offices did adopt it internally based on -- on -- on what they had seen, and -- and they got some -- some assistance that you could find textually and seemed to have some success with it, and -- and I don't know that -- the plaintiff's office was -- was also interested in that as well, I think.



Q So I just want to make sure I understand. With the modal directors, the -- those that were in charge of the highway --

A Uh-huh.

Q -- office, the marine office, the air safety office and the rail office, you did not perform annual performance appraisals on any of those modal directors between 2000 and 2005?

A I think what you said was did I speak to them after, and your question just now is did I perform an appraisal. I performed an appraisal. Did I talk to them about it afterwards? Virtually everyone is going to be rated outstanding, and they didn't really need to be told that.

Q And when you say, "virtually everyone is going to be rated outstanding," you mean the -- the modal --

A The --

Q -- officers --

A -- modal officers, yeah.

Q -- between --

A Uh-huh.

Page 30

Q -- 2000 and --
A Uh-huh.
Q -- 2005 --
A Yeah.
Q -- is that correct?
A Yeah, I think that's pretty much the way it was.
Q All right. Now, turning to --
A I don't want to leave you with the impression that if I had a difficulty with somebody's performance that I couldn't express to them what it was that they needed to do to -- to -- to bring that particular function back into play, so I don't -- I don't -- I'm pretty sure that everybody knew when there were difficulties, but to do it annually wouldn't make any sense. Sit down the day before Christmas and talk about things that happened in -- in October or April, senseless.
Q I understand. All right. The -- the performance appraisals that -- that you did conduct that -- the forms themselves, after you -- it came from HR and it was filled out and you then put in your

Page 31

comments about the person's performance, would you sign the form?
A I think I had to.
Q Okay. And who else would sign the form?
A Well, if we're talking about modal directors again, there have to be two signatures on the form, because, as I mentioned, there are -- there are -- it's connected with the bonus process, and you can't spend money and the government -- well, this recent thing in the D.C. government, I'm not sure, but theoretically you -- it -- you -- you have to have two signatures, so the chairman would be the -- the signing official since that's the official above me. If I take an action, I have to have a reviewing official. My report is to the chairman, so it would be the chairman.
Q And who else would sign the annual performance appraisal that would lead to bonuses and -- other than you and the -- and the chairman of the NTSB?
A The employee signs an appraisal form, I believe.

Page 32

Q And when does the employee sign the appraisal form in -- in the sequence of this process?
A Well, obviously after the other two signatures.
Q All right. And, so, who would -- once you had completed your comments on the form, then what would you do with the annual performance appraisal after you had inserted your comments, you had signed; what would you do next?
A I probably would give it to somebody to have it distributed to wherever it needed to be distributed.
Q You would give it to whom?
A Well, either to Lisa Love or Towanna Price or whoever it -- these were likely to be a stack of things, and I'd say to somebody that I'm done with them and then they would be gone.
Q And at what point would you have this conversation with the chairman about what her comments or -- or input was on the performance appraisal, if ever?
A Well, early on in the process to figure out

Page 33

how she wanted to do it or how he wanted to do it. With the modal office directors, I -- again, I'm -- I'm working under the delegation of the chairman, so I'm going to make sure that the chairman and I are on the same page about how someone is going to be rated.
Q Would you talk with the chairman before or after you signed the performance --
A I don't --
Q -- appraisal --
A -- know.
Q -- form?
A I don't know. I -- I -- the signature is not that critical a -- a thing that I am spending a lot of time on it. I doubt very much that the conversation with the chairman would have been -- revolve around the signature page. I probably would go in and -- you know, a chairman is a busy person. You don't spend a lot of time with a chairman. I would probably go in with a summary sheet and say, you know, this is -- this is -- this is what we did. I mean, I know exactly what I would say to -- to all the chairmen that I had to deal with because I had six

chairmen in six years, so I would go in with -- with -- with a -- a profile of what we had done the year before and a -- and a suggestion that here's -- you know, here's your opportunity to put your first imprint on the agency; do you want to do it immediately; would you like to wait for the -- you know, until you've been here for a while so that you can evaluate these people independently.

So this was a conversation that -- that -- I mean, it was -- in a sense it was irritating because you didn't have a -- you didn't have a chairman who was sitting, evaluating people for any great length of time from 19 -- from -- I think from 2000 to 2005. When I left I think there were six different people who were chairmen of the agency.

Q And during that 2003 to 2005 term -- time period when Ellen Engleman Conners was the chairman, when you would come in, you'd bring the forms to her and say, do you want to comment on any of the modal directors, how did she -- do you remember her responding?

A Well, I think we were -- we were pretty much



in agreement on -- the -- the first time that she came in, I think that she probably -- I -- I -- I -- not even probably. I said to Ellen that -- that she's not the first person I'd had the conversation with; that -- that -- that Marion Blakely, her predecessor, the first time through had simply said, okay, I don't need a year to evaluate people. Let's go with where we were last year, and as I think I mentioned, everybody was pretty much an outstanding, so that was a way of a chairman saying to people, okay, I think you're all great; I'll give you a chance to prove that, and let's go forward with that way, and people could make or break themselves during the course of that year.

I probably had that same conversation -- I can't honestly remember it, but I probably had that same conversation with Ellen, and that would have been the first conversation. The second conversation she would have had an opportunity to evaluate people, and she would have had more of an input in it.

Q And that would have been for the 2004 annual performance year?



A Well, I'll take your word for it. I'm -- I'm not that good on dates, but it would have been her second one. I think she was -- she was there for quite a period of time, but -- but her chairmanship ran out. We had an acting chairman, and then for some period of time she was under nomination. So she was the chairman designee and that didn't happen, so it -- it's -- unfortunately without a calendar and seeing all those events in front of me, I can't tell you who did what, but I believe that Ellen did two and not three, but -- but two evolutions of this.

Q So during the -- her second year, in 2004, when she played a more active role in the performance annual appraisal process for the modal directors --

A Uh-huh.

Q -- how -- what -- what -- how -- to what extent -- describe if you would for me the way she played a -- a more robust role in the evaluation process.

A I don't remember the conversation that well, so I'm not going to be that helpful, but -- but she clearly would have had her opinions about things,



and -- and we would have discussed the bonus structure for the offices, and I think that she made some changes in that. I don't really remember, but I believe that she made changes in that. And I can't honestly tell you that I remember the discussion precisely. With respect to the plaintiff, I remember that we had a discussion, if that's the one you're interested in.

Q (Indicated affirmative.)

A We had a discussion on that in which Ellen and I agreed that we needed to rate the plaintiff excellent, which in the context of NTSB ratings means that there were things that we found that needed to be corrected.

Q Okay. That -- that was a downgrade from -- from --

A Yes.

Q -- the way that Marjorie --

A Yes.

Q -- Marjorie Murtagh Cooke had been -- had been rated on an annual basis the previous year in 2003 --

A Yes.
Q -- is that correct?
A Yes.
Q Okay. Now, the -- that conversation about Marjorie Murtagh Cooke and downgrading her from outstanding to excellent, where did it occur?
A I don't know.
Q Okay. What did Engle -- what -- what were the reasons why you and Ellen Engleman Conners decided to downgrade Marjorie Murtagh Cooke's performance evaluation from outstanding to excellent late in 2004 for the -- for the year 2004?
A Well, my approach to the way in which modal directors correspond with the chairman was to stay out of the picture as much as possible. I didn't ask to be told either of the fact of a meeting between the modal director and the chairman or the substance of a meeting before the modal -- between the chairman and a modal director so that modal directors would feel quite free to establish themselves in one fashion or another. And I thought that that was very important, because actually the -- the -- the -- the modal



directors hold the key to the success of the agency in one fashion or another.
The agency is really evaluated on the nature of the kinds of reports and recommendations it makes, and no one person, no one managing director is likely to be knowledgeable about everything there is to know, and no one opinion should be the only opinion heard. I was in the minority on some of that viewpoint, I might add, but that was my viewpoint.
So every office director had the opportunity to -- to -- to prove themselves in one fashion or another with the chairman. Chairman Engleman Conners had an opportunity to -- to deal with the plaintiff over -- over the course of a year, and that year was a very important year from the standpoint of marine activity because there was a very high profile case in -- in New York, which is an enormously powerful media market, and -- and it was a very sad case, and -- and I believe that there was a good deal of dissatisfaction on the chairman's part about the progress of that that would have affected her feeling about it, and -- and it affected my feeling about it,



too, but -- but by this time I was somewhat accustomed to the difficulties of getting reports out, particularly of getting reports in the marine division that were difficult, so it wasn't a surprise to me. It might have been more of a surprise to Ellen and -- Ellen Engleman Conners, and -- and I'm certain that that had a great deal to do with her view of it.
Q And -- and what else were the reasons that you and Ellen -- Ellen Engleman Conners discussed for downgrading Marjorie Murtagh Cooke's performance for the performance year 2004 apart from this -- the handling of the report for the marine accident in New York?
A I don't think there were any others. Ellen was deeply dissatisfied with the way that that had gone and the -- and the fact that she had had to ask me to -- to step in and see to it that it was done. That was a -- that was a deep disappointment.
Q All right. What other factors?
A I'm not sure there were any other factors.
Q All right. This conversation with Ellen Engleman Conners about Marjorie Murtagh Cooke's



performance in the context of the annual performance evaluation, did that occur -- when did it occur in relation to when you had received the form from HR --
A I'm not --
Q -- for the annual performance evaluation --
A I am not going --
Q -- to put in --
A -- to help you --
Q -- your --
A -- on that.
Q -- comments?
A I'm not going to be able --
(The Reporter asks for clarification.)
THE WITNESS: I -- I can't give any kind of date on that or -- or -- it's not -- I'm not going to be helpful there.
BY MR. OSWALD:
Q All right. Had you completed the form by that point?
A I -- I wouldn't know. Chances are that I had not. Chances are I would have gone in, as I said, to the chairman with a summary of how I thought that

the offices ought to go. The reason for that is that on the -- on the -- the way in which the NTSB grades people is that there's a -- on the front of the form there's a grouping of what are known as the critical elements, and if you're going to be outstanding, you're going to be outstanding in I think 75 percent of the critical elements. So you're not going to mark that until you know the way in which the chairman wants somebody done, so in that sense I probably do not have that marked. I'm probably going to go in and ask the chairman, all right, this is -- this is where we were last year; what do you think about this year.

Q And in 2004 when you went in with the summary of how you felt the offices should go, what was that summary that you gave to Ellen Engleman Conners?

A Well, I can't remember all the details of the summary, but pertinent to this case, I would have recommended an excellent for Marjorie Murtagh, so I would have been recommending that, but it wouldn't have taken -- it would have been a brief conversation, because Ellen had been in my office on occasion over



the course of the year about the Barberi and her doubts and dissatisfaction was -- was fairly obvious. It -- this wouldn't have had -- have been a particularly long conversation.

Q All right. What was the reason why your summary of how you believed NTSB should rate Marjorie Murtagh Cooke was -- included a downgrade for Marjorie Murtagh Cooke from outstanding to excellent --

A Well --

Q -- in 2004?

A -- Marjorie's office -- Ms. Murtagh's office or Ms. Murtagh Cooke's office had always had difficulties. You need to understand that. And -- and those difficulties had always been -- I think that we -- we typically noted them in that form by putting an excellent in the use of resources and -- I'd have to see one of the forms, but there's one in there that -- that says how you manage your resources and how you deal with the other offices, and Marjorie was probably rated excellent in that particular critical element frequently because there was a difficulty that -- that -- both within her office and with the



way in which her office might relate to, say, the safety recommendations process that was manifest over -- over time, and, so, we had that.

So all you're talking about in terms of going from a -- from an outstanding to an excellent rating is a change in one other critical element, and one of those criti -- critical elements is the production of reports, and in that particular year there was no question that -- that Ellen was going to have a -- a heartache over making that an outstanding and that I would have had a heartache over making that outstanding because the critical report that was in the office was -- was not only not forthcoming, but what -- but almost foundered as what -- as -- as if it was a boat itself.

The -- the investigator in charge threatened to quit in the middle of the report. There had been dates that had been promised as to when the report would -- would be coming forward. They were slipping. Ellen had a briefing with -- with the plaintiff that I attended in which Ellen was asking for a status and a -- and a -- and an outline as to when things would



happen, and -- and that briefing was -- was very unsatisfactory from the chairman's standpoint.

So, as I say, the conversation when I finally get to the end of the year and say, how do you want to handle it, it's going to be very brief because you have lived through an entire process. There's -- there's nothing in that meeting that hasn't already taken place, and it would have been very surprising to me if Ellen had said, oh, I think that that should be outstanding, Dan, don't you; didn't you enjoy sitting at home writing parts of the report for the marine office because the marine office couldn't accomplish it. That -- that was going to be a very brief conversation.

Q When did the briefing occur with -- with Ellen Engleman Conners and Marjorie Murtagh about the Barberi?

A Well, I think the accident is early 19 -- earl -- early 2004, and I have a feeling that the -- that the -- this is -- I think that the report had been promised for December of 2004 at some point, and, so, this briefing is probably taking place in

September or August, and I -- I can't remember when.
Q And who attended the briefing meeting?
A The plaintiff, myself, David Clark, the chairman and anyone else that the plaintiff might have brought. I don't -- I -- I can't -- I don't remember it that well.
Q Okay. And how many times did Ellen Engleman Conners meet with Marjorie Murtagh Cooke from -- about the status of the report between January of '04 and December of '04?
A I have no way of knowing that.
Q How many times did she meet with Marjorie Murtagh Cooke with you present?
A Maybe twice.
Q And what were those dates?
A I don't -- I can't recall that.
Q Were they early in the year? One was -- you said was in August or September. When was the other one?
A It would have been before then, but that -- that's the best I can do for you. It would have been before then.



Q Okay.
A There may have also been group meetings in -- in that -- as I say, I had a managing director's meeting that the chairman would attend, and during those meetings there would be discussions of progress on reports and so forth, so it may also have happened in that context, but I don't remember any meetings with Ellen and -- and the plaintiff and myself other than I think one that was earlier than that and then -- then a sit-down meeting.
Q All right. And the one that was earlier than that, who attended the earlier meeting?
A I don't remember, but it was probably more in the context of kind of an operational meeting rather than a report-processing meeting, so there could have been -- there could have been a number of people there. The investigator in charge may have been there. I don't -- I don't remember.
Q Okay. And what's the difference between an operational meeting and a report-processing meeting?
A Well, when you first have an accident, you have to decide how you're going to investigate the



accident, and I would call that the operational side of it, and then when you -- when you've moved further along in that process, you're then -- you -- you -- you may want to talk about where you want the accident to go in terms of what kind of recommendations you're going to seek from it and -- and how you want to present it and when you want to present it, and I would -- I would -- this is a term that the agen -- the agency doesn't use, but I would say you're now -- you've moved into the production as opposed to -- to the operational side of accident investigation, and it's not uncommon for there to be both types of meetings and -- in major accidents that -- that are difficult to understand. You may stay on the operational or the investigative side for a long period of time because there's a lot of stuff that you have to -- you have to work on to figure it out.
On an -- on an accident like the Barberi that's not going to be the case. There's not that many issues in terms of understanding the accident.
Q So in two -- late 2004 when you come into Ellen Engleman Conner's office where you discuss the



summary of how you believe each of the performance evaluations should go for the modal directors, other than Marjorie Murtagh Cooke, what other modal directors did you recommend should be downgraded from outstanding to excellent, if any?
A I don't remember. I don't remember.
Q You don't remember how many you -- you --
A No, I don't remember --
Q -- recommended --
A -- if there were any others.
Q -- other than Marjorie Murtagh Cooke?
A Yeah, I don't remember if there were any others.
Q Okay. So after this meeting with -- with Engle -- Ellen Engleman Conners, what was the next time you talked to Ellen Engleman Conners about Marjorie Murtagh Cooke's performance evaluation in 2004?
A I don't recall any subsequent conversations.
Q The -- between 2000 and 2005, how many times were you involved in a selection process where there was a employee selection board that was impanelled?

MS. COHEN: Objection, assumes facts not in evidence.

BY MR. OSWALD:

Q You can answer the question.

A An employee selection board?

Q Uh-huh.

A That's a term that I don't know.

Q Well, it's called the employee resource board.

A You're losing me.

Q Okay. What familiarity, if any, do you have at NTSB of impanelling a group of employees --

A Uh-huh.

Q -- to comment on and to recommend --

A The panel?

Q -- potential selectees for positions at NTSB?

A The panel?

Q Yes.

A All right. We use a panel when we do an SES selection, and I don't know that some others don't use a panel for other selections. I can't -- I didn't



involve myself much in the way in which employees were hired, but for an SES selection, there was a panel, if that's what you mean by employee selection board.

Q All right. Well, let's assume -- it's -- it -- the official title is executive resource board. Does that help you at all?

A Yes, that's an SES group.

Q All right. Now, how many executive resource boards were impanelled between the time that you were -- from 2000 through 2005 when you were the managing director or executive director?

A I don't know.

Q Approximately?

A Oh, it's going to be way less than ten. NTSB doesn't have a lot of SES, and we don't hire a lot of SES.

Q All right. Was each of the -- the -- was it more than five?

A I would only be guessing. If you want me to guess on camera --

Q Yes.

A -- I'll guess on camera. Was it more than



five? Five sounds like a good number. Let's --

Q Okay.

A Let's stay with five.

Q All right. So of the approximately five, let -- let's talk about that process -- the approximately five executive resource boards that were impanelled, why were they impanelled and what was the process by which they would go about their work?

A Can -- I have to stop you here because the executive resource board is something that I think we even have like a board order on. It -- it's not created. It's there. There's an executive resource board. The executive resource board would not be the panel that would be used for an SES selection as such. It could be as a matter of coincidence that it would be the same, but -- but not likely.

Q Well, let's use our -- let's use, then, your verbiage.

A The panel.

Q The panel, right.

A So -- so if human resources told me that we were making an SES selection, they would say what we



would do at human -- at the human resources level --

Q When we're talking about an SES selection, now we're talking about the panel process; is that --

A Right.

Q -- right?

Between 2000 and 2005?

A Yes.

Q I understand.

A If -- if -- if that's the process we were in, the human resources people would look at applications when they first come in and they would take out of that -- that group the ones that clearly have no business being in there. You know, you'll get people who apply for jobs that -- that are way -- they're almost humorous to read some of them, and -- and, so, a group of staff from human resources will take those out and they will then present them to a panel, and the panel would review and determine who might be -- not really qualified, because that's sort of been determined below them, but who ought to be interviewed and who ought to be considered, maybe even rank them, maybe even suggest who they think is the --

Page 54

you know, and -- and -- and, so, you've got a -- a group of peers, if you will, SES peers that are looking at that sort of thing.
Q And what would be the first step in that process that -- the process by which individuals would know that there was a -- a vacancy to begin with?
A Oh, there's an announcement that goes out.
Q And what role did you play in preparing the vacancy announcements that -- the content of the vacancy announcements for the SES selections at NTSB between 2000 and 2005 when you were the managing and executive director?
A Well, that would vary dramatically depending upon whether or not the position had been established before. No offense to human resources types, but if there's something that you can copy, they copy it, and then they can come fairly close to getting a -- a document that will work. If it's a brand-new position, they're going to need to go to somebody else and say, what is it you're actually looking at and what is it that you want.
So we, during this period of time that you

Page 55

have in consideration, had an academy established, and that would have required additional work for someone to do it, so that would have been done outside of maybe human resources. We had a director of administration created again, and on that one in particular I was asked to do some thinking, structuring about which components of administration should be under that SES and what the skill sets we were looking for. So I had a lot of -- a lot of input in that.
For the Office of Marine Safety, since that was -- basically what we were trying to do there was put an SES pay scale on top of an existing position. I probably had very little input into it. I don't remember any at all, because --
Q All right.
A -- because they're working from a document. They're just changing a -- a GS-15 to a -- to an SES, and they probably have some magic that they will put in there to -- so that it passes OPM approval for SES independence of thought and independence of action and such, and I'm not going to do that.

Page 56

Q When you say, "they," you mean human resources?
A Human resources.
Q All right. Now -- but my question is a little broader, though. My -- my question is -- is -- so between 2000 and 2005 for the modal directors that went to SES, what role did you play in preparing the knowledge, skills and abilities and the job description for the vacancy announcement for those positions during the period of time that you were the managing and executive director?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: I think I've just said that when we were working from a given GS-15 position to go to SES, my role would have been very little or none, and I don't remember any.
BY MR. OSWALD:
Q All right. During that period of time, once the -- how many -- once the vacancy announcement was -- was published, how many of the -- of the approximately five announcements were rescinded and

Page 57

reannounced, if any, from 2000 and 2005 for the -- for the --
A One.
Q -- positions that were -- were -- where there was a -- converted from something else to SES during the period of time that you were the managing and executive director of NTSB?
A One.
Q And what position was that?
A The director of the Office of Marine Safety.
Q I understand.
A The plaintiff's office.
Q All right. The -- the -- the panels that -- ones that were impanelled to review the suitability of the candidates that had been prescreened by HR to be minimally qualified to perform the duties of the SES positions that had been established at NTSB, who would choose those panels?
A Usually me.
Q This is between 2000 and 2005 when you were the managing director and executive director of --
A Uh-huh.

Q -- NTSB?
A Uh-huh.
Q Is that -- is that a yes?
A Yes, that's a yes.
Q Thank you.
A Yes.
Q All right. Now, between 2000 and 2005, of the approximately five positions that were converted from -- from a GS schedule or some other position to SES, how many of those were -- in how many of those instances was the incumbent in the position at the time that the position was converted to SES not selected for the position of SES director, including modal director?
A How many times was an incumbent not selected for the SES position?
Q Yes.
A I think the plaintiff was not selected. I don't think there were any other occasions.
Q Where do you live now?
A Oakton, Virginia.
Q I understand. How long have you been there?



A Thirty-one years.
Q In -- in Oakton, Virginia?
A Uh-huh, I think so.
Q I understand. All right. Now, what -- when, if ever, did you have a conversation with Ellen Engleman Conners about converting a position from a general schedule position to an SL position?
A I don't remember any. I think at one point I -- I can't remember. I -- I don't -- I'd have to see the documents to figure out when the time came. At one point we got approval from OPM that included new SLs. I don't know whether that was in Marion Blakely's tenure or in Ellen's tenure. I had a meeting with my office directors, and when we -- when we announced that we got the additional authority from OPM, they were not hesitant to produce a list of -- of their scientists, if you will, that they wanted to encumber those.
Q Uh-huh.
A And, so, I would have had a discussion with somebody about them, but I can't remember with whom that discussion took place. If that -- if that was



during Ellen's tenure, that would have been a discussion with Ellen.
I want to say, again, that the chairman's seat was a -- was a -- was a revolving chair, so it's very difficult for me to do this. There were six different people sitting there from 2000 to 2005, so it's kind of hard for me to figure out who -- who I'm talking to at any given point when you're asking me a cold date like that, a cold question like that. I'd like to help you, but I can't.
Q All right. And what is an SL position?
A It's a scientific position and -- that, without management responsibility, has a pay scale that -- that is somewhat equivalent to the SES position. I don't think it has the same bonus opportunity that the SES has, but it is higher than a GS-15 scale, and I think that the NTSB has three or four of them. I'm not sure what the "S" stands for or I might -- I might tell you what it is.
Q And when, if ever, did you -- did you have a conversation with Ellen Engleman Conners about who would be an appropriate -- excuse me, the -- the kind



of position that would be an appropriate position for an SL position?
A As I just said, I don't know that I ever had that conversation with Ellen.
Q All right. When was the first time you had a conversation with Ellen Engleman Conners about how the agency should allocate SES positions within the agency?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: I don't know that I had that conversation.
BY MR. OSWALD:
Q Is it possible you had that conversation?
A Well, it would have been more than possible that we had a conversation about particular office arrangements. Let me say -- let me put this -- there were two SES at one point out at our academy. I was not in favor of that and probably would have made that point to the chairman.
Ellen Engleman Conners was in favor of having an administrative office back at the level of

SES, and NTSB had had one. When we moved to having an independent controller, chief financial officer, that SES was allocated to the chief financial officer, so now human resources and contracting and acquisitions and so forth was headed up by a series of GS-15s reporting directly to the managing director, which was not fun for the managing director, but -- but made sense in -- in the sense that it avoided using an SES in that area.

And until we had all the modal offices at the SES level, I would have been opposed to putting an SES back there. But we got to the point where we had the SES for that position, so Ellen and I would have had a conversation about that. I don't know that Ellen and I would ever have had a conversation about SES in modal offices because that was presumed.

I had written -- one of the first things I did when I became managing director was written -- I -- I authored a letter to OPM indicating that the modal offices, now that they were independent, ought to be staffed at the SES level. And we requested SES to do that, and OPM denied it, and we -- I think



annual -- I think that was an annual -- you know, it was sort of -- it was almost like a ritual. I'll ask OPM, and they'll say no. And eventually they said yes to one or two; I can't remember what, but we eventually got it done by pulling an SES from here and pulling an SES from there. Sometimes the chairmen were agreeable to that. Other times the chairmen would expend those SESs in ways that -- that I would not have preferred, but --

Q And why did you believe that all of the modal offices, this would be the -- the highway office, the marine office, the air office and the rail and pipeline office, all should have SES designation?

A Well, if you look at the federal pay scale, you'll see that it's fairly well compacted, and it's not uncommon for us to have highly graded investigators because it's a -- it's a -- you know, we're a skill-intensive agency, and, so, you can have GS-15 investigators or GS-14 -- high step GS-14 investigators, and their compensation can be very, very close to the compensation of their office director, and if that makes sense to you, then you



look at business differently than I do.

So to me it was simply an issue of money. It was simply an issue of, if you're going to run the office, if you're going to take the responsibility for it, if -- if -- if you're going to be at the top, I want to put in an incentive. I want to put a pyramid there. I want the right people to crawl up there.

It was not uncommon at NTSB for people to -- to -- to refuse to take, for instance, a division chief job on the grounds that they were already doing the work and they didn't need the hassle of management and there wasn't another nickel in it for them. That's government service.

So for me it was basically, all right, we had gone from an office that had been run by two SES; we were going to four offices. I was not in favor of that, but if that's what was going to happen, I -- I was definitely in favor of going -- of putting in the SES. I've been in the SES myself since the day it was created in 1978, so I'm -- I'm not going to -- I'm not going to look at an office director and say, you shouldn't be an SES. I think that -- I think they



should, so that was -- that was a no-brainer for me.

Q I understand. When the SES came free from the academy, who was it who made the decision to allocate that SES position to the highway modal office director position?

A It would have been the chairman. Which chairman, I -- I'm going to be at a loss for again, because there were -- I probably would not have allowed -- let me -- let me back up a little bit. I probably would not have allowed that decision to go forward too quickly if I had an acting chairman who I knew was about to be replaced, and I was in that position not infrequently where the -- the -- a nomination had been sent up and I knew that an acting chairman was, you know, months away from -- from going back to board member status and I'd have a new chairman in. That's not sensible for a lot of reasons, including the interpersonal relationships that may then occur between a board member and a chairman about who -- who decided what was going to be an SES and who made the selection. Presidential appointees can be jealous about those kind of

prerogatives.

But it -- so assuming that it was the academy that went to highway -- and I think you're correct on that, but I'm not sure -- a chairman will have made that decision; although, I will have presented that as a -- as a given. If -- if I -- if the -- if the chairman is sitting in front of me and said, well, what do we do with this, I would have said, oh, we need to move this into the modes.

Q And -- and who was it who made the decision to assign the -- recommendation to assign the academy SES position to highway as opposed to any other modal office?

A Well, I've been 100 percent behind that, so if we're looking for a recommendation -- I'm not sure there was a recommendation because I'm not sure that there was ever any -- any -- any debate or consideration about it, but if there -- if -- if you want someone to have recommended it, I'll recommend it, because it's -- from the institutional standpoint, it's pretty much a no-brainer.

Q Why is that?



A Unfortunately there's 44,000 people who die every year on the highways. The -- as an institution, NTSB is dependent upon aviation. It -- it -- it began in aviation. It was actually part of the Civil Aeronautics Board that I was a part of back in the '70s. Our budget is predicated on aviation. I think, in fact, when we do reauthorization, we go before the aviation subcommittees of the -- of the commerce committees on both sides. I don't even think the full committee is here. I think it's all done in aviation.

And of course aviation have their -- there are very important parts of the aviation that NTSB needs to be involved in. I don't want to downplay that. But if you were to ask yourself where NTSB can have an impact, there's less than -- less than a thousand people probably dying in aviation every year, and most of that not in commercial aviation. There's less than just -- I think in an -- marine it's around 700 people a year. In highway it's 44,000. It's -- it's almost a million worldwide, and that's the -- that's the area, and we're -- and we're -- as a -- as a result of that, we're sort of organized in that



fashion. We have regional offices in highway. It's -- it's -- it's a no-brainer from our standpoint that that's where we can have the impact. That's where you want to do most of your business that is discretion -- that is a discretionary call.

Q And who was the incumbent at that time?

A A fellow named Joe Osterman.

Q And prior to your recommendation and Ellen Engleman Conner's transfer of the SES slot from the academy over to highway --

A Again --

Q -- to this --

A -- you're --

Q -- position --

A -- assuming it's Ellen. I -- I'm not sure it is, but -- but I'll take your word for it for the purposes of the discussion.

Q All right. In light of highway's -- the modal directors importance to NTSB, how had you gone about making sure that -- that Joe Osterman had received more money in that position given all the responsibilities that he had had?



MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: Yeah, I -- I didn't do that. I don't -- the answer to that is I'm not involved in that.

BY MR. OSWALD:

Q Okay. So I just want to make sure I'm clear. You had no role at all in -- in approving bonuses and other premium payments for Joe Osterman during the period of time prior to the --

A Joe Osterman had --

Q -- the SES -- wait a minute. If I could finish.

-- the SES being assigned to him as the director of the highway division?

A Well, I reviewed and signed the performance appraisals every year. He was outstanding, as were the rest of the office directors, and there was a reason for doing that. Well, like Lake Wobegone, all the children are above average, but the reason that they're above average is that the way in which NTSB structured its bonus proposals -- I mean, its bonus

undertaking was that an excellent could only get X amount of dollars and a -- and an outstanding got an additional amount of dollars. And it was the difference between about, roughly speaking, a 3,000 and $5,000 bonus at the end of the year. So if that's what you mean, yes, I signed Joe's papers and he got the $5,000 bonus, as would have any GS-15 office director.

Q And what role did you play in -- in awarding him retention bonuses --

MS. COHEN: Objection --

BY MR. OSWALD:

Q -- if any?

MS. COHEN: -- assumes facts --

THE WITNESS: I don't --

MS. COHEN: -- not in evidence.

THE WITNESS: -- recall any role in that. I know that -- I know that it had occurred, but I don't -- I'm -- I'm not sure that that happened while I was managing director, but I don't recall any role.

BY MR. OSWALD:



Q Okay. So if your signature is on a retention bonus approval form, you just --

A Well --

Q -- you signed it?

A Well, once you get a retention bonus, you -- it will be renewed annually unless -- unless somebody makes a determination that things have changed, and I may have signed those. We probably had four employees who had them to get a retention bonus, and I need to back up because your question is sort of inaccurate about this. To see to -- to it that Joe gets extra money because he's an office director is not what a retention bonus is about. A retention bonus is only given as a matter of law when you have somebody in the government that you will lose to the private sector, and in order to demonstrate that, people have to go through a series of -- of -- of hoops, if you will.

The one that I remember being involved in, a woman named Karen Bury, who was our chief writer in aviation. I remember reviewing the offer she had from a law firm; it might have been you folks. She's -- she's a very talented lawyer, and -- and we were going



to lose her to a law firm that was going to pay her more money, and that's the reason for that retention bonus, so that's the way that works.

It's -- it, you know, would be very nice if you could simply sit there and say, we really need X, so why don't we pay her more money, but you do not have that option. A retention bonus is a -- we -- we argued with OPM about giving us the right to pay retention bonuses to people who are not leaving government service but were leaving NTSB for other government agencies, because when 9/11 hit the wall there and all these new people -- we -- we lost a lot of GS-14s that became GS-15s elsewhere, and we couldn't put them in a GS-15 slot, but we would have paid them retention if we could have, but OPM was -- eventually just said -- and OPM actually made that as a suggestion to Congress, but either Congress or OPM was ult -- ultimately decide no. The only time you can offer a retention allowance is when someone is going to leave government service, and that's either because they are retirement eligible or they have an offer.



Q I understand. It -- Karen Bury -- I'm sorry, what's her name?

THE WITNESS: Denise, you might want to help me with her last name now. Is it -- it may be Karen Bury, but I -- I -- it's --

BY MR. OSWALD:

Q Okay. So, other than Joe Osterman and Karen Bury, who are the other of -- the other two of the four that NTSP -- NTSB paid retention bonuses during the period of time that you --

A I --

Q -- were --

A -- can --

Q -- managing director?

A -- only remember one. Well, no, I -- I think I have them both. I don't want to misspeak. The senior aviation investigator who actually was an aviation investigator before there was even an NTSB was -- is a fellow named Dick Rodriguez, and I believe that Dick Rodriguez, who was eligible for retirement twice over -- I think he had been with the agency nearly 45 years -- was paid a retention allowance, if

he's still there or at least he was, and I think that there's also a retention allowance paid to one of the division chiefs for a period of time, but I think he ultimately then did take the private sector job and left us.
Q I understand. And what was the offer that Joe Osterman provided to you to --
A He didn't provide --
Q -- substantiate --
A -- (inaudible) --
Q -- his --
(The Reporter asks for clarification.)
BY MR. OSWALD:
Q -- to substantiate his requests for a retention bonus?
A I -- I don't recall, and I don't recall that it was provided to me.
Q The -- the offer?
A Yes.
Q This is the outside private sector offer of alternate employment --
A Yeah.



Q -- is that right? I understand.
Joe Osterman, is he still working at NTSB?
A He is the managing director now.
Q I understand. What do you remember about bringing Joe Osterman's retention bonus request to Ellen Engleman Conners?
MS. COHEN: Objection, assumes facts not in evidence.
BY MR. OSWALD:
Q If anything?
A Yeah, nothing.
Q Did you bring Joe Osterman's retention bonus request to Ellen Engleman Conners?
A Not that I recall. I'm pretty sure that I didn't discuss retention bonuses with the chairmen, any of them; not just Joe's, but any of them.
Q Okay. So if Ellen Engleman Conners were to testify that you did bring her Joe Osterman's retention bonus request, that would be inaccurate; is that correct?
A No, as I said, I have no recollection. If she says I did, then maybe I did, but I have no



recollection of it, of -- because what we would be talking about here is a renewal, and I don't have any recollection of that.
Q But it's possible that it happened?
A Well, it's certainly within the realm of possibility. I don't know why it would have happened, so I -- I -- I don't have any rec -- recollection, as I say.
MR. OSWALD: Let's go off the Record.
THE VIDEOGRAPHER: This marks the end of tape 1 in the deposition of Mr. Campbell. We're going off the Record. The time is 11:21 a.m.
(Recess -- 11:21 a.m.)
(After recess -- 11:43 a.m.)
THE VIDEOGRAPHER: This marks the beginning of tape 2 in the deposition of Mr. Campbell. We're back on the Record. The time is 11:43 a.m.
BY MR. OSWALD:
Q During your period as the managing or executive director, when, if ever, did you grant a directors -- managing director's bonus to any of the modal directors? This is highway, marine, air --



A I'm not certain what you mean, "managing director's bonus."
Q What do you understand the managing director's bonus was?
A I have no understanding of that.
Q Okay. You've never heard of a manager's director's -- managing director's bonus?
A I'm searching my mind for the circumstances in which I might have given a bonus to an office director outside of the end-of-the-year performance appraisal and nothing is coming to mind.
Q All right. So -- just so I'm clear, you -- there is -- there was no pool of money at all that was available either to the chairman or the managing director to grant bonuses -- discretionary bonuses to individuals within NTSB during your tenure as the -- as the general counsel, managing director or executive director; is that correct?
A Well, that's a different question. I think your first question was a managing director's bonus to a modal director. There is a fund of money that bonuses can be made to -- made from during the course

of the year. I may have made one or two of those, and it would be not significant bonuses, but you would make what were referred to as on-the-spot bonuses for somebody who -- who did something that you thought you wanted to see repeated, and you would -- you would reward it immediately.

Q And you had the discretion to award bonus monies out of that pool of discretionary money as the managing director of the NTSB?

A I think if I did it I'd have to get it signed off on. I -- I think there's always a -- a second signature involved in granting money. I probably would have seen most of the ones that I saw in terms of my being the sign-off on somebody else's granting a bonus.

As I mentioned before, we had one office that went to the -- to the structure that I think is the reasonable structure, that is to say, awarding bonuses as work is accomplished according to the way you would want it accomplished. That was the highway office. When they awarded those on-the-spot bonuses, I probably was for most -- for at least some of the



bonuses the second signature.

The lower the -- the lower an individual is in the hierarchy, the more likely that there's somebody else that can be the second signature, because an office director can sign off on one of these.

Q And just so I understand, the -- the on the -- as you call them, the on-the-spot bonuses, those were at the discretion of the -- the managing director and the chairman; is that correct?

A And the office directors.

Q And office directors. I see.

A Yes.

Q All right.

A And -- and they're largely granted by the office directors. I don't know that the chairman and -- and the managing director did much of that.

Q What were the factors that were -- that you considered in deciding to award on-the-spot or discretionary bonuses to Joe Osterman when he was the director of highway safety during the period of time that you were the managing director of the N --



National Transportation Safety Board?

MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: Yeah, I don't know that that -- that that would have occurred. If it occurred, it might have occurred during this period of time where he had a different bonus process in place. If he was still a GS-15 -- because if he was a GS-15, he wouldn't have been under the SES program.

And as I say, Mr. Osterman had changed the way in which bonuses in his office as a general matter worked. There was kind of a netting out; that is to say, you did work during the course of the year, you work -- did the work according to the way in which you had promised it or in which it was asked and so forth and so on, and if that was accomplished, you received a bonus for that.

As a result of that, however, the end-of-the-year bonus for that office was no longer in place, so it was a -- it was a swapping out of the way you went about it, and -- and I think that at one point we did a sort of informal audit to make sure



that it was working that way, that the -- basically the office was receiving a sum of money over a 12-month period that was relatively equivalent to the sum that would have come out if it had been done at the end-of-the-year period, and I think everybody was satisfied that that was the way it was working, and -- and I think their office was satisfied that that was a more sensible way for them to go about it because they knew what they were being rewarded for and they knew what they had to do to get the rewards, which is dramatically not so for a lot of the end-of-the-year proposal -- end-of-the-year bonus work in the federal government.

BY MR. OSWALD:

Q So what were the factors that you considered in awarding Joe Osterman the discretionary bonuses during the period that he was a GS-15 as the director of highway safety?

MS. COHEN: Objection --

THE WITNESS: I'm still --

MS. COHEN: -- assumes --

THE WITNESS: -- sitting --

MS. COHEN: -- facts --
THE WITNESS: -- here --
MS. COHEN: -- not in --
THE WITNESS: -- not --
MS. COHEN: -- evidence --
THE WITNESS: -- knowing that I did that --
(The Reporter asks for clarification.)
MS. COHEN: Objection, assumes facts not in evidence and asked and answered.
THE WITNESS: So, in other words, I'm like the low man on the totem pole?
THE COURT REPORTER: No, it's just important I --
THE WITNESS: I --
THE COURT REPORTER: -- hear what you say.
THE WITNESS: I -- I have no recollection of it, so I don't know that it happened, but if it happened, it happened in the context of -- of an accident investigation in which they had a schedule; they met the schedule.



My recollection of it, though, is that that was at the -- at the level of -- of division chief and accident investigator, so I'm sitting here drawing a blank on your question.
BY MR. OSWALD:
Q At the -- what role did you have in -- in either recommending or in issuing the chairman's award bonus?
A I would convene a meeting of the office directors to consider the proposals that office directors had for who would receive the various bonuses that were given out at the end of the year, and -- and there is a -- one of those that is called a managing director's bonus, if that's what you had earlier referenced to.
I would convene the meeting and listen to the modal directors and we would vote on it. I did not vote in that meeting. So what the other office directors decided at the end of that meeting would be the chairman's award, and -- and I think we had a John Lauber award and a managing director's award, if that's what you meant. I did not vote in that



meeting. I convened the meeting. I listened to the arguments and so forth, but I wouldn't cast a vote.
Q And the modal directors were deciding amongst themselves who would -- who were the potential recipients of the managing director and chairman --
A Yes.
Q -- awards?
Amongst them -- of themselves?
A Yes. And then they would make a presentation to the chairman of that, or I would make the presentation to the chairman, and I can't think of any offhand in which there were any changes made. There probably were over the years, but maybe -- I can't remember any.
Q What were the factors that went into your recommendation that Joe Osterman receive managing director and chairman awards during his time as the director of the Office of Highway Safety?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: Yeah, I -- I -- as I say, I -- to convene a meeting -- if this occurred while I



was a managing director, I would convene a meeting, and that would be a determination made by the office directors. If -- if -- if you were an office director in that meeting and somebody had put your name up for that award, you would be asked to excuse yourself from the meeting; all your peers would say what they really thought about you, and then ultimately there would be a vote on it, but I didn't vote in it, and -- and -- and I would simply be passing on what that group had determined.
BY MR. OSWALD:
Q And when, if ever, did you present a recommendation to the office directors prior to their vote about whether or not you -- what you believe would be the appropriate recipient of a manager director -- managing director's or chairman's award?
A Oh, I did it on a couple of occasions. I had people I thought needed some recommendation, some -- some recognition. There was a fellow named Teddy Brown that I put in a -- a good word for. I can't remember whether that was when I was the general counsel or the managing director.

There was one whose name escapes me who was our -- our resident artist who did all of our graphics and such, and it's kind of a -- it's a part of the universe you don't see much, and -- and I -- I supported her for the managing director's award, and I happened to run into her yesterday, and she is still -- still smiles at me.

I don't think I did as much of that -- I mean, I -- all the SES would come in and -- and they would sit around a table, and, so, it was -- it was somewhat of a horse trade. And it wasn't just the SES. The -- the plaintiff had a proposal one year for a chairman's award, a -- a person in her office, and that was successfully accepted. So that's the way it was done, and this -- this was not something that was done in the chairman's discretion or managing director's discretion. It was done by a group of senior executives in the agency.

Q And when you recommended Joe Osterman for a manager's director award, what were the factors that went into that recommendation?

MS. COHEN: Objection, assumes --



THE WITNESS: I --

MS. COHEN: -- facts --

THE WITNESS: -- don't --

MS. COHEN: -- not in evidence.

THE WITNESS: -- remember recommending Joe. If you mean did I ever carry a recommendation from the group to -- to the chairman, I don't remember that either. But I -- I have no recollection, none.

BY MR. OSWALD:

Q So if Joe Osterman testified that you recommended him for a manager's director's award during the period of time that he was a GS-15, would that be correct or incorrect?

A I have no recollection of having done that.

Q What reco -- recollection do you have of carrying a recommendation for his award of a manager's directive (sic) or chairman's award --

A I --

Q -- to the chairman for signature?

MS. COHEN: Objection, asked --

THE WITNESS: I --

MS. COHEN: -- and answered.



THE WITNESS: I don't mean to disappoint you about how carefully I may or may not have looked at these, but I don't have any recollection of Joe Osterman's even receiving a managing director's award. If he did, he did.

BY MR. OSWALD:

Q And assuming that Joe Osterman received a manager's -- managing director's award, what would that signify?

A Well, the chairman's award and the managing director's award are given to the -- they're -- they're the two last awards we give out in the awards ceremony. They're considered to be the two top awards.

The managing director's award is normally given for people who have contributed to the agency on the management side, which I should say is like the administrative side or the financial side or the organizational side as opposed to the accident investigation side. So if Joe Osterman were to have received the managing director's award, it would have been in terms of the organization and efficiency of



his office.

As I -- as I mentioned before, he had adopted a different plan for financing, for -- for rewarding people, and he did run an efficient office. If he got it, it was for those efficiencies, not for the substantive work.

If he received a chairman's award, it would have been for the substantive work for the agency, for the actual outcome in terms of accident investigation and recommendations, because that's the nature of those two awards.

Q I understand. Let's talk now about the conversion of the Office of Marine Safety director position from a GS-15 to an SES position. When did that -- when did that occur?

A I believe the announcement to do it went out in 2004, and I think that the actual selection was made sometime in 2005, very close to the time that I was leaving the agency.

Q And what role, if any, did you play in preparing the vacancy announcement, which included the job description and the knowledge, skills and

Page 90

abilities that were necessary to perform the director of the Office of Marine Safety position when the first vacancy announcement was issued in late 2004?

MS. COHEN: Objection, asked and answered.

THE WITNESS: The Office of Marine Safety already existed; it already had an office director. So the announcement for the position would have been largely drawn from an existing position description. And the knowledge, skills and abilities and such, since there had been other offices, for instance, the highway office, that had been converted, if you will, from 15 to SES, there would all -- have been a format for that, which suggests to me that human resources would have been able to do 99 percent of it.

On anything that they might have had some question with, they might have asked me or somebody else in my office, what should I do with this. That would have been the level of that input. I don't -- I don't recall being directly involved at all, but it's not unlikely that if Collette Magwood or

Page 91

Lisa Love had a question about something that they might have picked the phone up and said, Dan, how do you want me to handle this. But unlike some, as I mentioned earlier, that I might actually sit down and have to write something on because there wasn't any format to work from, this one, there would have been a format and I probably was not involved very much at all.

BY MR. OSWALD:

Q So I just want to understand precisely, what role did you play in the preparation of the vacancy announcement, which included the job description and the knowledge, skills and abilities, for the position of director of Office of Mine (sic) Safety at the National Transportation Safety Board when the vacancy announcement -- the first vacancy announcement was published in late 2004?

MS. COHEN: Objection, asked and answered.

THE WITNESS: Very little. I would have answered the phone if somebody asked me a question, and that would be about all I would remember

Page 92

of it. I probably am the person who signs off on it before it goes out, but in the creation of it, which I believe is your question, very little.

BY MR. OSWALD:

Q So other than -- just so I'm clear, other than signing off on the vacancy announcement and possibly answering a question over the telephone from human resources, what other role did you play in the preparation of a vacancy announcement, which included the job description and knowledge, skills and abilities, for the position of director of marine safety for the National Transportation Safety Board for the first vacancy announcement in 2004, late 2004?

MS. MCBARNETTE: Objection, asked and answered.

THE WITNESS: I'm repeating myself now. There was a format to work from. That would mean that human resources would be able to do 99 percent of the work. If there was a question they needed asked -- answered, they may very well have asked me. I have no recollection of that. So they probably presented me a document, and I would have signed the document after

Page 93

having read it, and that would be my role.

BY MR. OSWALD:

Q In its entirety?

A I have no recollection of having done anything else.

Q I understand.

A Well, apparently --

Q Now, when did you -- who was responsible for the decision to rescind the vacancy announcement for the director of the Office of Marine Safety, a position that was announced the first time in late 2004, for the director of marine safety at the National Transportation Safety Board?

A I was.

Q And why did you rescind the first vacancy announcement?

A Well, that's a complicated question, but there were two principal things that were on my mind. One was I wasn't ready to have a selection made at that moment, and, two, I thought that the pool of candidates had been artificially narrowed by rumor that the first announcement had been wired for an

internal candidate.
Q Now, what factors made up your decision to rescind the vacancy announcement for the director of marine safety at the NTSB -- this is the 2004 first vacancy announcement -- apart from your unwillingness or not being ready to make a selection and your belief that the pool of candidates was artificially narrowed based upon a preconceived notion that there was a preselection for the position; what other factors other than those?
A Well, I called -- when I got a list of who was -- who the panel had recommended, I put the list on the back of my desk and I didn't touch it very much for a period of time because, as I say, I wasn't really interested in seeing the selection process go forward at that point in time.
I can't remember why I finally decided I had to do something with it, but when I did, the first name on the list was a captain from the Coast Guard who I knew, and I called him and he told me that he was now employed by Johns Hopkins and was no longer a candidate, and I told him that I was kind of surprised



that there -- he was the only guy that was interested. Captain Brusseau was the guy who told me that it was understood it was kind of wired for the plaintiff and that that may have limited it, and, so, that conversation with one of the applicants would have been the only additional factor that I -- that went into it.
Q Who were the other four candidates on the list that was provided to you by the panel after the first vacancy announcement --
A I don't remember them by name, but there was a -- there was a Coast Guard guy from the operational side of the Coast Guard, and then there were two people from the private sector, and I don't remember their names. I do remember that I was not impressed.
Q And who else?
A The plaintiff.
Q Marjorie Murtagh was?
A Yes.
Q Why did you -- so what was it about the -- the five candidates that were sent to you by the first panel of the selection committee that led you to



believe that it was -- it was artificially narrowed? This is the same group that include, what, Captain Prudo (sic), a Coast Guard captain and two private sector folks and Marjorie Murtagh Cooke; how is it --
A Could you repeat the -- I lost your question and -- could you rephrase it?
Q Well, what was it about the list that the panel had supplied you, the list of five candidates, which included Captain Prudo (sic), two private sector employees, another captain in the Coast Guard and Marjorie Murtagh Cooke, the incumbent in the position, that led you to believe that the list was too narrow?
A Well, it wasn't the list that led me to believe that -- that -- that the -- it was too narrow. I mean, the list -- the list didn't have any good candidates in it except the first guy that I -- well, I don't want to say it didn't have any good candidates. The two private sector guys I found deficiencies with just looking at the -- the applications. I don't know that I -- if I had met with them and talked to them that they might not have been able to explain a lot of that, but I looked at it



and I thought to myself, well, there's a couple of glaring probabilities -- possibilities here that I'm not -- I'm not very happy with.
The one guy that was on the top, the first name there who I -- was somebody that I had dealt with in Coast Guard and thought was an -- an estimable person, I gave him a call and he was no longer a candidate. So now I was left with an operational guy, with Marjorie Murtagh and with the two private sector types who -- who had credentials that both didn't really speak to the job, but also had holes in them that made me very -- very nervous; periods of time where people had gone from a senior vice president, 170,000 or $180,000 a year to a GS-12. That's not the kind of career advancement that -- that makes you comfortable when you're thinking of turning someone into an SES. So it wasn't -- it wasn't a very -- it wasn't a pool that I was particularly delighted with.
Q And why wasn't Marjorie Murtagh Cooke a good candidate for the position?
A Well, she might have been a good candidate, but I would have had to take it to the chairman, and

she would not probably have been selected, and that's one of the reasons I was not in a hurry to do this. When I say I procrastinated, I procrastinated because I believed that I was going to lose the office director that was there; that was going to be the outcome.

Q What led you to believe that?

A Well, I knew who the chairman was. I knew what the -- what the -- the -- the -- as I say, I allowed the modal directors to make their own impressions on a chairman. I -- I gave them every opportunity to prove themselves. If I had made a suggestion that Marjorie Murtagh ought to be the office director during the period of time that the Barberi was in play -- that's the accident that -- that I have now been asked to undertake by the chairman -- I believe the chairman would have looked at me and said, Dan, have you lost your mind. I think -- I think that that would not have been a sensible thing for me to do.

Q Why not?

A Well, because to make somebody -- to pay



somebody at the SES level to do something that they don't -- they are not necessarily doing to your satisfaction at the GS-15 level is not -- just not sensible. It's just -- it's not a sensible thing to do.

Q All right. Well, what were the other factors that led you not to believe that Marjorie Murtagh Cooke would be a good candidate for the position other than the fact that you believe that if the -- you went and took her name to the chairman that -- that she would ask you whether or not you were crazy?

A Marjorie Murtagh and I have been known to one another since probably 1995. So I've had a long history to develop my view of whether or not she would be the right candidate to run the office at the SES level. And I could, if you like, spend all the time from now to lunch describing to you the difficulties that I have encountered over that period of time that suggest to me that -- that it's not a good idea to make somebody an SES for doing something that they're only accomplishing, in my view, marginally at the



GS-15 level.

Q What was your view about whether or not Marjorie Murtagh Cooke would be a good candidate for the director of marine safety at the NTSB?

A I didn't think that that was sensible. I didn't think that she should be made an SES.

Q And therefore selected for the director of marine safety position?

A Yes, I had -- I had serious, serious difficulties with Marjorie's performance as the director over her -- her office, both in terms of the way she managed the office and in the quality of the product that came out of it.

Q I understand. Now, in 1995 what was -- what was your exposure to Marjorie Murtagh Cooke in 1995?

A Well, I'm not really sure when it -- when it first -- it might have been '97. The first time that -- that -- that I had a direct role to play in a Coast Guard matter was, I think, shortly after the Office of the Secretary of Transportation had been changed into the four modal offices, so I think it would be very early in Marjorie's leadership in the



Office of Marine Safety.

Q And -- and during that --

A When that is, I can't say, but I think it's maybe 1997 or '95 or something like that, and I am the general counsel at the time.

Q In 1997 or '95 did you -- do you have a significant -- did you liaise significantly with the Coast Guard during that period of time as general counsel?

A No. This wasn't Coast Guard that I'm talking about. This is the Office of Marine Council.

Q Well, I understand that. No, my question is different. Did you have occasion to liaise with the -- with the Coast Guard between 1995 and 1997?

A No, I -- "liaise" would not be the -- not be the right word for the relationship that I ever had with the Coast Guard. No, that was always an adversarial relationship.

Q Why was it adversarial?

A Well, because, one, they're one of the agencies of government that come under our purview when we do an accident investigation. They are the

regulator of marine safety. They are the -- the -- the -- the -- the group within the federal government that's responsible for not only the waterways but the inspection of vessels and for manning requirements and such. So we're investigating them at the time of an accident, so there's that arm's -- to begin with, there's arm's length, but secondly, and unlike the other modes, we also have a shared jurisdiction there, and we are sharing a jurisdiction with -- to do accident investigations with an agency that is hundreds of times our size, has boats and guns. So we're put at a -- something of a disadvantage in that.

And, indeed, the very first relationship I had involved -- the very first opportunity I had to become involved with the Coast Guard as such was a legislative fight early in my career about whether or not the United States would assume the authority to do off-shore accident investigation with passenger vessels -- of cruise vessels that were ported in our own -- in our ports but -- but theoretically flagged by foreign states. And that was a -- a -- I would consider a -- a fairly robust struggle between NTSB



and Coast Guard, so I -- I'm not sure that I would ever say that the way that I related to Coast Guard was -- was to liaise with them. Long answer to a short question, but I didn't liaise with Coast Guard.

Q All right. The -- give me just a moment. When was the first time that you and En -- Ellen Engleman Conners ever discussed the fact that -- that Marjorie Murtagh Cooke believed that she should be paid more money than she was being paid at NTSB?

MS. MCBARNETTE: Objection.

THE WITNESS: I don't -- I don't know that we ever had that discussion.

MS. MCBARNETTE: My objection is that it's assuming facts not in evidence.

THE WITNESS: I don't -- I don't recall any such discussion.

BY MR. OSWALD:

Q All right. So, just so I'm clear, there was no conversation between you and Ellen Engleman Conners ever about the fact that Marjorie Murtagh Cooke believed that she was not being paid sufficiently as the director of marine safety at NTSB?



MS. COHEN: Objection, asked and answered.

THE WITNESS: I don't have recollection of a conversation with Ellen about Marjorie's inadequate compensation.

BY MR. OSWALD:

Q When, if ever, did you have a discussion with Ellen Engleman Conners about the fact that Marjorie Murtagh Cooke wanted to be paid overtime?

A I don't know that I had a discussion with Ellen about overtime. I know that at some point I -- I learned that Marjorie might have asked somebody for overtime. Whether that -- I learned that while I was the executive director and Joe told me that, Joe Osterman, the managing director, or whether Ellen mentioned it to me when I was still the managing director, I can't say, but it was a very brief conversation, and I don't recall who it was with.

Q When, if ever, did Ellen Engleman Conners ask you to investigate, research the circumstances under which NTSB could pay a managing -- a modal director like Marjorie Murtagh Cooke, indeed,



including Marjorie Murtagh Cooke, overtime pay?

A I -- I don't have a recollection of having been asked that.

Q By Ellen Engleman Conners?

A By anyone.

Q If Ellen Engleman Conners were to testify that she had a specific conversation with you in which she not only told you that Marjorie Murtagh Cooke had asked her whether or not NTSB could pay her overtime, and, indeed, Ellen Engleman Conners asked you to research this and investigate it with HR, would that be correct or incorrect?

A I have no recollection of the conversation.

Q What investigation or other research did you do in 2004 to determine whether or not Marjorie Murtagh Cooke or, indeed, any of the managing -- any of the modal directors could receive overtime?

MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: I wouldn't have done any research. I didn't have a -- I didn't have a live issue on my table from any of my office directors

Page 106

about overtime. If Marjorie Murtagh had been looking for overtime, since I was her supervisor, she could have come to me and said, Dan, you should be paying me overtime. We would have had a discussion about why. There are rules about overtime. There are rules about a GS-15 cap on overtime. There are rules about getting it preauthorized and so forth. It would have been natural for Marjorie to have come to me and ask me if we were going to consider doing that for her. I never had that conversation with Marjorie, and I don't recall having a conversation with anyone else.

BY MR. OSWALD:

Q I understand. What are the rules as you understand them about the cap for overtime for GS-15 employees?

A Well, I'm going to mess this up big time because I -- the way I know it was in the context of overtime for non-GS-15s. The agency was fortunate enough in, I think, 2002 to receive an exemption from Congress from the rules that -- that provide what we refer to as undertime; that is to say, when a GS-14 would work overtime, they would actually be paid at

Page 107

the GS-10 rate. We got the right to pay time and a half, which was a substantial gain for our employees, but as a consequence of that, it meant that the higher rated GS-14s and the GS-15s might, as an accumulated matter or a monthly matter -- and I can't even remember which was the thing, whether it was within a -- a -- a pay period or within an annual accumulation -- that there was some cap that said you couldn't go over the level of GS-15, 10, and I knew it because there were people who got close to it and the CFO or the -- the payroll person would come to me and say, we got somebody close to it, and, you know, you'd have to give some kind of warning to an office director that, all right, that person is no longer going to get the time and a half and maybe even no longer get overtime because they're close to the cap. That's what I know about the cap.

I had -- don't think ever considered what happens to the cap, for instance, if you try and pay hour-one overtime to somebody already being paid GS-15, step 10. I don't know that it's even lawful to do that. I never asked that question of anyone

Page 108

because that wasn't the way in which the question had presented itself to me.

Q What was the way the question was presented --

A Whether --

Q -- to you?

A -- or not a G -- what happens to a GS-14 or a GS-15 lower when they get close to the cap, and I didn't research the answer, but people told me that we couldn't go over the cap, and, so, you know, if the CFO saw somebody that was close to that, he would come down to my office and say, we need to -- we need to see to it that this person doesn't exceed the cap.

Q Who asked you to research that?

A Nobody asked me to research it.

Q You just said someone had come -- when it came to you, how did it come to you?

A The CFO would have a -- the CFO has a printout of how much he is paying people. That's -- you know, we're -- we're not that loose with our finance, and if it looked as if somebody was going to pay more than the GS-15, step 10, the payroll people

Page 109

and the CFO would tell me that, so apparently they knew these rules. I didn't know them. That's how I learned about them.

Q Now, other than the August meeting on the Barberi incident and then your meeting with Ellen Engleman Conners in or about December of '04 when you discussed downgrading Marjorie Murtagh Cooke's performance from outstanding to excellent, what other conversations did you have with Ellen Engleman Conners about Marjorie Murtagh Cooke's performance in 2004?

A In answering that question, I don't want to suggest that I think you have the dates right. You're probably within the ballpark, but I'm not sure August and December is anything that I would have said or that I certainly wouldn't feel comfortable about. I think I did say August to September for one of those meetings, but -- but I really want you to understand, I don't -- I don't keep a calendar. I never kept a calendar, so I -- I'm not going to be in any way, shape or form able to get you closer than -- than a relative period of time.

Conversations with Ellen would occur from

Page 110

time to time, as they would about any office director, about the way that things were proceeding and the difficulties that might have come up. For instance, I'm sure that I had a conversation with Ellen when it came to pass that the chief investigator of the Barberi accident had threatened to quit and -- and -- an interoffice dispute, and we would have talked about that and why that was so. And I know that -- that she was of the view that I should go down and see to it that that didn't happen. It wasn't going to -- it wasn't going to be good for the agency to have a chief investigator quit in the middle of what was then our highest profile accident, and so I did speak to the gentleman and did convince him to at least stay through that accident.

And -- and -- and that would have been the kind of conversation we would have had, and Ellen would have asked me during the context of that, well, how does that happen, and we probably would have had something of a discussion about personnel within the Office of -- of Marine Safety and what my understanding of their morale and their turnover

Page 111

issues were, so I'm sure that happened.

Q Uh-huh. What other conversations?

A None come to mind.

Q So when you had the conversation with Ellen Engleman Conners when the investigator in the Barberi accident wanted to quit, what did you discuss with Ellen Engleman Conners about morale and turnover in the marine safety department?

A Well, I would have told her that this was not a -- a kind -- a novel development and that I had had some difficulties with -- with morale and -- and dissension down there over the past, and that I had made a con -- a -- a habit of informally doing, and sometimes not so informally doing exit interviews with people as they left the office, because very frequently Marjorie would tell me that she had somebody that was a good employee and then that good employee would leave.

And it was not unusual for Office of Marine employees to come to my office and volunteer that they were unhappy. That had happened on more than one occasion. And, so, I -- I'm certain that I described

Page 112

what my understanding of the situation down there was.

Again, because I had so many different chairmen in such a short period of time, I can't really remember all of the discussions I might have had with any given one of them. I had discussions, I'm sure, with Marion Blakely about the same sorts of subjects while she was there, so that's all I can do for you.

Q I understand. So other than the Barberi incident, what were the other reasons why, in your opinion, Ellen Engleman Conners, if you had brought her the name of Marjorie Murtagh Cooke as the new director of marine safety with the SES designation, 2005 -- what other factors would have led Ellen Engleman Conners to say to you, are you crazy?

A Well, the -- that would have been the factor -- Barberi would have been her factor, but the -- she would not, I think, have -- have wanted to make a move on that without having heard me out. So the other factor would have been my views, and my views were that this was not -- this was not worth doing. This was not a good idea.

Page 113

Q What was not a good idea?

A Promoting Marjorie to SES to continue to run an office at the SES level that there was sig -- significant difficulty with as a GS-15. It's not a sensible decision, and I would have told her that, so I'm sure that that would have weighed heavily on it if I had brought it, and -- and that would have meant that we would be in the position, one, to have to select from a panel that had -- from a group that I didn't think really had a -- a good choice in, and, two, it would have meant that that would be the point in time when we made a selection that Marjorie would no longer be the head of the office, that the plaintiff would no longer be the head of the office, and I wasn't in a hurry to have that happen, notwithstanding that I had difficulties with Marjorie. You know, we're all human, and I was just not interested in seeing it, so I procrastinated.

Q Procrastinated in doing what?

A In bringing to -- to a head the issue of a selection for SES in marine.

Q How did you bring it to a head finally?

A I don't honestly know whether somebody finally said to me, Dan, you've got to do something here. I -- I was getting close to the end of being the managing director, and I was trying to get things that were my problems off the desk for the next guy. And, so, at that point I decided to readvertise; that that would -- that would be the best course for it. And in the readvertisement, I thought that my -- my role in it would be finished and we would just let it -- let -- let it happen whatever way it was going to happen, but my role in it was going to be finished.

Q And how would that help you get the problem off your desk?

A Well, I had a -- I had a selection that needed to be made, and if it wasn't going to be made from -- from the first advertisement, you had to put out a second one, so I put out the second one.

Q I want to make sure I understand this. When, if ever, did Marjorie Murtagh Cooke herself come to you and tell you that she was unhappy with the way -- the disparity in pay, either that she wasn't being paid enough or wasn't being paid enough in



relation to the other modal directors, during the period of time that she was the director of marine safety at NTSB?

A Never.

Q When the EEO counselor came to you and notified you that Marjorie Murtagh Cooke had filed an EEO complaint, what was your reaction?

MS. COHEN: Objection --

THE WITNESS: I don't know --

MS. COHEN: -- assumes --

THE WITNESS: I don't know --

MS. COHEN: -- facts --

THE WITNESS: -- who --

MS. COHEN: -- not in evidence.

THE WITNESS: I don't know how I learned of her complaint. My first recollection of anything was that our EEO specialist told me that he needed to interview me. I don't have a recollection of our EEO officer talking to me about it, but I do know that at some point the EEO specialist who worked for her said he needed to talk to me, and then subsequently an investigator talked to me, but I can't



date it. I think that they probably have notes from it that were dated, but I can't date it.

BY MR. OSWALD:

Q And what did the EEO specialist say to you?

A I think he asked me a whole bunch of questions. I -- I don't -- beyond that, I don't remember, but I think that the -- I -- I -- I -- I'm sure that he has a record of it, whether it was part of a process that they go through.

Q When was the first time that you met Mr. Spencer?

A Who is Mr. Spencer?

Q The selectee for the --

A Oh.

Q -- director of the Office of Marine Safety.

A I thought he might be referring to the --

Q The person that you selected.

A I didn't select Mr. Spencer.

Q When -- when's the first time you -- you met Mr. Spencer?

MS. MCBARNETTE: Objection --

THE WITNESS: After --



MS. MCBARNETTE: -- assumes facts not in evidence.

THE WITNESS: After Mr. Spencer was selected, he was in the hall one day and I was introduced to him.

BY MR. OSWALD:

Q When was that?

A Probably just before I left. I think we only overlapped for a period of a few weeks.

MR. OSWALD: I understand. Let's go off the Record.

THE VIDEOGRAPHER: We are going off the Record. The time is 12:34 p.m.

(Recess -- 12:34 p.m.)

(After recess -- 12:43 p.m.)

THE VIDEOGRAPHER: We are back on the Record. The time is 12:43 p.m.

BY MR. OSWALD:

Q After you decided to rescind the vacancy announcement for the director of marine safety position at NTSB, what conversations did you have with Joe Osterman or -- in particular, but anybody else for

that matter, about your decision to rescind the vacancy announcement?

MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: I don't remember any conversations with Joe Osterman about that. I remember a conversation with Ron Battocchi, and that would be the only conversation I remember.

BY MR. OSWALD:

Q And what did you and Ron Battocchi talk about in relation to your decision to rescind the first vacancy announcement for the position of director of marine safety in or about late 2004?

MS. COHEN: Objection. Can we just have a minute off the Record?

THE COURT REPORTER: And --

BY MR. OSWALD:

Q You --

THE COURT REPORTER: -- I'm going to want --

BY MR. OSWALD:

Q -- may answer -- you may answer the



question.

MS. COHEN: Before answering the question, I would like to consult with the witness, please, concerning privilege.

BY MR. OSWALD:

Q Was Ron -- was Ron Battocchi counsel for the NTSB?

A Yes. So should I answer the question? I'm hap -- perfectly happy to answer the question.

MS. COHEN: No.

MS. MCBARNETTE: No.

BY MR. OSWALD:

Q Where was the -- where -- where did you have the conversation with Ron Battocchi?

A It might even have been in the hall.

Q Okay. And --

A May I say to my attorneys here, this was not a legal conversation. It had nothing to do with the law. He had been on the earlier panel, and I was going to tell him that he wasn't going to be on the new panel. That was the conv -- that was the A to Z of that conversation.



Q And how did he -- how did he respond?

A He thought I had a good idea. You know, he's -- he's a lawyer, and I -- I basically said, Ron, I'm going to -- I'm going to readvertise it again and I think what I'll do is I'll have all of the office directors that are involved in accident investigation or accident investigation support be the panel so that the person that they decide ought to be the office director for marine is someone that they believe works at their level and -- and is acceptable to them, because they will live with the person. I'm out of here. I don't -- you know, it's not like it -- people are going to be able to say, well, it was Dan's fault or it was Dan's success. It will be their choice, and that was the right way to go.

I think in the first panel that Ron Battocchi, as the -- as the general counsel, sat on the panel. The general counsel is only peripherally involved in accident investigation, so I thought he wouldn't sit on the panel. If he had said he wanted to sit on the panel, I probably would have said, yes, but my view was, I will get my office directors who do



accident investigation work; they will be the panel, and they will select their peer.

Q But -- but since the -- his panel had already -- had already given you their five sel -- selections for the position, including Marjorie Murtagh Cooke, what was the reason that you told Ron Battocchi was the rationale for your decision to -- to readvertise the position and -- and convene a second panel?

MS. MCBARNETTE: Objection, assuming facts not in evidence.

THE WITNESS: I don't have any recollection of having explained my decision to him at all. I just told him that it was going to happen and that he wouldn't be on the panel. That was -- and as I say, I think this was a hallway conversation. I think we were walking down the hall together.

BY MR. OSWALD:

Q And -- and when he responds, well, why is this happening, using your --

A He didn't --

Q -- words --

A -- respond --
MS. MCBARNETTE: Objection --
THE WITNESS: -- that way.
MS. MCBARNETTE: -- assuming facts not in evidence.
BY MR. OSWALD:
Q When, if ever, did he ask for your rationale?
A I don't recall him asking for rationale.
Q So other than Ron Battocchi, who else did you -- did you talk about your decision to rescind the vacancy announcement for the director of marine safety position? This is the first vacancy announcement in or about late 2004.
A I don't have any recollection of any other conversations. I would suppose that I would have told either David Clark or Ellen Engleman Conners that I was going to reannounce, but I don't recall which of them it was that I relayed that to.
Q And what was the reason that you gave to David Clark or Engle -- Ellen Engleman Conners about why you were rescinding the vacancy announcement for



the director of marine safety position in or about --
MS. MCBARNETTE: Objection.
BY MR. OSWALD:
Q -- late 2004?
MS. MCBARNETTE: Objection. Again, assuming facts not in evidence.
THE WITNESS: If a reason was given, that is to say, if anybody asked me why I was doing it, I would have told them that I was unhappy with the pool of candidates that I had and had been made known -- aware of the fact that a potential pool of candidates, that is to say, senior Coast Guard officials approaching retirement, had been of the view that the job was wired for an internal candidate and would not have applied. That's what I would have said. Do I have a recollection of having said it? No, I don't. I don't know that anybody would have questioned the decision to readvertise.
BY MR. OSWALD:
Q Why not?
A Well, fish don't question the water they're in. I think there would have been an assumption that



we were looking for a better candidate than we had in the pool.
Q Including Marjorie Murtagh Cooke?
A That's correct.
MR. OSWALD: Your witness.
MS. MCBARNETTE: I beg your pardon? Are you done with your deposition?
MR. OSWALD: I'm done.
MS. MCBARNETTE: Well, then, what I would like to do is take a lunch break and then come back and ask --
MR. OSWALD: I'm happy to do that --
MS. MCBARNETTE: -- Mr. Campbell --
MR. OSWALD: -- but Mr. -- Mr. Campbell wants to get out of here before lunch; we're ready to go, so it's up to you. I'm happy to stay.
MS. MCBARNETTE: Right, so my decision is we're going to have lunch first and then we'll come back.
MR. OSWALD: Okay. We'll --
THE WITNESS: You buying? I don't eat lunch, so --



MS. MCBARNETTE: You better gather up that money.
MR. OSWALD: Let me, just on the Record, just say a couple things. We're in a deposition right now. It's as if you were on the stand.
THE WITNESS: Yes.
MR. OSWALD: Therefore I'm going to caution you, consistent with the rules of civil procedure and the standing order in this case, you are not to talk to counsel about anything substantive relating to your testimony at all. It would be a violation of court rules. Certainly you can talk about peripheral things like the weather and things of that nature, but nothing substantive at all about your testimony during this break. Do you understand my admonition to you?
THE WITNESS: I would like to say on the Record that I am represented here by the Justice Department, and they know the rules --
MR. OSWALD: I'm sure that --
THE WITNESS: -- and --

Page 126

MR. OSWALD: -- they do --
THE WITNESS: -- we don't break them.
MR. OSWALD: -- and I want to make sure you understand them as --
THE WITNESS: Yes.
MR. OSWALD: -- well.
THE WITNESS: So --
MR. OSWALD: Do you understand them?
THE WITNESS: -- I'm glad that's both on the Record.
MR. OSWALD: It is -- it is --
THE WITNESS: Yes.
MR. OSWALD: -- very much on the Record. Do you understand the --
THE WITNESS: Yes --
MR. OSWALD: -- admonition --
THE WITNESS: -- I do.
MR. OSWALD: -- that I've given you?
THE WITNESS: Yes, I do.
MR. OSWALD: Thanks so much.
THE WITNESS: You're welcome.
THE VIDEOGRAPHER: We're going off the

Page 127

Record. The time is 12:50 p.m.
(Lunch recess -- 12:50 p.m.)
(After lunch recess -- 1:54 p.m.)
THE VIDEOGRAPHER: We're back on the Record. The time is 1:54 p.m. Go ahead.

EXAMINATION BY COUNSEL FOR THE DEFENDANT
NATIONAL TRANSPORTATION SAFETY BOARD
BY MS. MCBARNETTE:

Q Mr. Campbell, you were discussing an incident you called the Barberi incident. What is that?
A Barberi.
Q Barberi.
A The Barberi is a Staten Island ferry that slammed into the Staten Island dockage side that hit the bow, and -- and there were a number of fatalities and it was a -- a very high profile accident. Occurred, I believe, in the winter of 2004 -- I'm -- the early winter of 2004. I'm not positive about the date.
In many ways it was a relatively simple accident. In many ways it was a relatively complex

Page 128

context that the accident occurs in, and the agency was very interested in bringing the accident to a closure in a rapid and timely fashion because it was one that Congress was interested in, and we are a creature of commerce, our budget issues and appropriations issues and so forth, and, so, we were interested in -- in doing a good job and doing it in a fair time frame.
Q Now, which modal head had responsibility into looking into that incident?
A That would be the plaintiff. That would have been the Office of Marine Safety.
Q And what problems did you find with Ms. Cooke's performance regarding that incident?
MR. OSWALD: Objection --
THE WITNESS: Well --
MR. OSWALD: Objection, misleading.
THE WITNESS: -- the managing director's office is typically not involved in -- in -- in too much of the operational aspects of an accident investigation up to the point in time where there is discussion about what the recommendations

Page 129

might be or there's a draft report that's brought to a managing director's meeting for consideration by the peer-review process.
The difficulty with the Barberi was that apparently there had been some scheduling and some -- some -- some issues about when it was to go forward, and the chairman had to ask for a briefing from the plaintiff as to the status of it. And I, again, think this is sometime around August, but I can't -- I can't be more -- August or September. I'm not really sure.
But, in any event, there had -- there was a briefing about it, and as a result of the briefing the chairman was of the opinion that things were -- were not proceeding as they were supposed to proceed, and I -- it was -- it was a -- a fairly unpleasant meeting from the standpoint of -- of, I think, the plaintiff and -- and the chairman. There was -- there were disagreements about things, and -- and I think it was -- in fact, I think it was at the close of that meeting that Marjorie came to me one day -- the plaintiff came to me in the kitchen that is

located right next to the chairman's office and told me that I should fire her if that's the way that this was going to go. I assured the plaintiff that I had no intention of firing her, but apparently she had taken the -- the consequences of the meet -- the outcome of the meeting as a fairly significant event in her career.

As it were to turn out, the issues that seemed to be precluding the finishing of it turned out to be disputes at the staff level, and the chairman asked me if I would intervene, and I did and actually hosted a -- a progress meeting and -- the kind of thing that would normally be done by an office director -- hosted a progress meeting, found out what the problems were. We reached agreement on how some of them might be resolved.

I actually took some of them under -- in -- in -- in my own hand and wrote some portions of a -- a draft accident report, and we had another meeting or maybe another two meetings and produced a report, but it involved activity on my part far beyond what I would normally be involved in from any other



mode in accident investigation. And I think the report was produced in the early spring of 2005, about two or three months later, after -- well, late -- beyond what the original target had been, but I'm not -- I'm not sure, because I -- I may not even have been the one who gave the original target. I just know that the chairman was upset that it was not proceeding very rapidly.

BY MS. MCBARNETTE:

Q Were you asked to take on duties that you considered were, in fact, Ms. Cooke's duties in this accident -- regarding this accident?

MR. OSWALD: Objection, ambiguous.

THE WITNESS: Yes.

BY MS. MCBARNETTE:

Q What duties were you asked to take on?

A Well, as I -- I just mentioned, we -- we had at least one or two, and maybe as many as three, what I would refer to as -- as progress or production meetings that I chaired to see who had an issue that was unresolved at the director's level that we needed to resolve.



And my recollection was the principal issue was between our resident human resources -- I mean human performance investigator, who was a Ph.D. on the psychology side, and our medical officer, who was an M.D., and how to describe some of the behaviors and some of the activities of the operator of the vessel, and I managed to reach some accord between those folks on that. And I think that's actually the section that I ended up writing up myself. So for the managing director who hopes that a -- when an -- when an accident report is presented at a managing director's meeting, I'm hoping it's a two-hour meeting, and I'm hoping at the end that I can sign a document sending it to the board, but instead of that I'm actually involved in the nitty-gritty of the process and even one of the -- the authors in the process, and that's -- that's unique.

Q Okay. You said you chaired three meetings regarding --

A Two or three.

Q -- this accident?

A Yeah.



Q Did you normally chair meetings for your modal heads?

A No, never.

Q You also mentioned that you authored a document. Do you -- do you normally author documents for your modal heads?

A No. No.

Q What else, if anything else, did you do regarding this accident that you didn't normally do for your modal heads?

A Well, I don't recall ever having been put into a position where we had an investigator in charge of a -- of a high-profile accident threaten to quit over a performance appraisal. As you've heard already today, I'm not a big fan of those end-of-the-year performance appraisals, but that's what was -- the upshot of one of these was. They had a performance appraisal in -- in marine and -- I've even forgotten who told me that the chief investigator was now upset and -- and -- and was going to quit, and that would not have been a good development from the standpoint of the production of the report and from the

Page 134

standpoint of the acceptance of the report in the public eye, so I was asked to see what I could do about that.

Q An investigator quitting, how does that relate to Ms. Cooke's duties?

A Well, I'm not sure how every office handles their personnel, but it's every office director's responsibility to maintain morale and -- and a sense of purpose within the office, and when that disappears, when that disintegrates, you're going to have higher turnover. And if you've got higher turnover, it's going to be more and more difficult for the office to -- to be productive.

Q So you had to step in in terms of personnel for Ms. Cooke; is that --

MR. OSWALD: Objection.

BY MS. MCBARNETTE:

Q -- correct?

MR. OSWALD: Objection, ambiguous and misleading.

BY MS. MCBARNETTE:

Q In regards to this accident and the

Page 135

investigator who was threatening to quit, did you have to step in regarding personnel matters --

MR. OSWALD: Objection --

BY MS. MCBARNETTE:

Q -- for Ms. Cooke?

MR. OSWALD: Objection --

THE WITNESS: Yes --

MR. OSWALD: -- ambiguous --

THE WITNESS: -- I did.

MR. OSWALD: -- misleading.

BY MS. MCBARNETTE:

Q And is that usual for you to step in for a modal head to handle their personnel issues?

MR. OSWALD: Objection, same -- same objection.

THE WITNESS: No. Is that usual? It's the only time I've ever had an accident investigator, a chief accident -- the IIC, as we like to refer to them, in the middle of an accident attempt to do this -- to attempt to leave or be dissatisfied, so that -- this was a very unusual occasion.

Are there other occasions where there

Page 136

are disputes within an office that the managing director might become involved in? Yes, because if you've got a dispute between an office director and somebody within the office, you have to go the next step up to get it resolved. So I would occasionally be involved in such a thing, but nothing ever of this type or quality.

BY MS. MCBARNETTE:

Q All right. Were you ever asked to take the lead in what you considered to be Ms. Cooke's duties before?

MR. OSWALD: Objection, form, ambiguous.

THE WITNESS: Yes, I'd have to say that that's happened at least once or twice. Yes.

BY MS. MCBARNETTE:

Q Were you ever asked to negotiate a memorandum of understanding between your agency and the Coast Guard?

A At some point during the process of negotiating an understanding -- let -- let me back up on what this is. We -- as I said once before, we have

Page 137

a joint jurisdiction between Coast Guard and NTSB as to who investigates major accidents. The issue that was -- the agency was confronted with was who's going to do which one. And the chairmen, going back from the time that I first came there, were concerned that the -- that we didn't want to resolve that question in the context of an accident. You didn't want to get the phone calls in the middle of the night and have to debate whose accident it was going to be, yours or ours, since the Coast Guard was very likely to be on scene with their assets, and -- and they'd have a jump on us. So we needed to have an understanding between the two agencies of who went to what.

Now, my first understanding that we were involved in the negotiation of it was when the plaintiff approached me with a potential resolution that she was about to offer. It was not a resolution that I thought was at all sensible, and it came to pass as a result of that, although I can't really tell you who said what to whom when, that the lead in those negotiations ended up in my hands. And it may -- I may even have been the general counsel during some of

Page 138

that time, but much of the position papers taken by NTSB and even the correspondence that was exchanged between NTSB and Coast Guard were my doing. I wrote them. I thought them through.
It was, by the way, not something that I was unhappy about doing. A lot of things the managing director might have to do were finance, administration, personnel and so forth and so on. And accident work is what the agency is about, and -- and you want to participate in it if you're given the opportunity to, but this is not the kind of thing that I would have expected to have been asked to do. We have memorandum of understanding with other individuals -- other agencies or institutions. They would normally be brought to the MD as a fait accompli.
Q So, just to be clear, who would you have expected to have negotiated a memorandum of understanding with the Coast Guard?
MR. OSWALD: Objection, ambiguous.
THE WITNESS: It appeared that Marjorie had been -- the plaintiff had been en -- engaged in

Page 139

that, and I would have expected that -- that it -- it would have been largely presented to the board from the modal office as an accomplishment of the modal office.
BY MS. MCBARNETTE:
Q Which modal office are we talking about?
A Marine.
Q And who, if anyone, asked you to step in and help out with the memorandum of understanding?
A Well, it's going to be the chairman, but, again, I don't remember whether it was Jim Hall, Carol Carmody, Marion Blakely. We had so many chairmen so quickly during this period of time, I can't remember who it -- was asking me to do what.
Q Now, why did a chairman -- you may not remember the name, but why did a chairman ask you to step in and negotiate this memorandum of understanding?
MR. OSWALD: Objection, misleading --
THE WITNESS: I'm not --
MR. OSWALD: -- (inaudible) --
THE WITNESS: -- sure that I could put

Page 140

myself entirely in -- in their shoes, but I -- I believe they wanted it done and it hadn't been done, and -- and I had had some success with this kind of thing and -- you'd have to actually ask them why they said, we'll get Dan to do it. But it wasn't being done, so somebody had to do it.
BY MS. MCBARNETTE:
Q Have you ever testified in front of the New York City Council?
A Yes.
Q And can you explain to me how that came about and why?
A That goes back to the -- the Barberi accident that we were discussing, and after the NTSB had issued its report, some -- the New York City Council or some subdivision of the New York City Council wished to have a hearing on it. They invited the chairman. The chairman, I believe, had a conflict, as did the vice chairman, and they came to me and asked me if I would do the testimony, and -- and you don't say no in circumstances like that.
Q Now, who would you have expected to have

Page 141

testified in front of the council?
A Well, if it wasn't the chairman, it would have been the -- the -- the -- it would have been an opportunity as well as an obligation of the modal office.
Q And which modal office are we --
A That --
Q -- talking --
A -- would --
Q -- about?
A -- have been the marine -- marine office; that would have been plaintiff.
Q The plaintiff's office?
A Uh-huh.
Q Did Ms. Cooke ever indicate to you that she knew that there were problems with her work?
MR. OSWALD: Objection, form, ambiguous.
THE WITNESS: Well, I -- I -- I think I mentioned that at one point she came to me and said that I should fire her if that's what I wanted to. I assume that that means that she understood that --

that there was some very considerable difficulty with the way in which things were proceeding in her office. So -- and I -- there were other occasions in which we would have a discussion or two, and I'm -- I have no doubt that -- that the plaintiff understood that there were difficulties in the way in which the Office of Marine Safety would produce things. And it was typically that the difficulties were -- were very frequently directly associated with the more important cases that were there. So it wasn't just that there was a production difficulty; it was where there was stress that was involved in it that the production was most likely to be deficient.

BY MS. MCBARNETTE:

Q You talked earlier about director reviews. What is that?

A The managing director will host a meeting when an office director believes that they have a report that is ready to go to the board for consideration in a sunshine meeting. They are presented to the managing director and to the other office directors. We'll hold a meeting that is



basically a peer-review type meeting. We'll go over the different parts of the report to see the degree to which there is agreement on them. And, as I say, we're hoping that it's a two- to three-hour affair and that at the end of it you have a report that goes to the board, so --

Q So would you let your modal heads know if there were -- was a problem with their work during such a review process?

A Yes, that's -- that's exactly what would happen. They'll -- at the end of a -- a director's review, they'll know what went well and what didn't go well. And -- and if the report has difficulties, that process could be an all-day process. It could be at least as long as this deposition. We would stay at it until we thought we had some understanding of how to move forward.

Q Would you let the plaintiff know if there were problems with her work during a direct review?

MR. OSWALD: Objection as to form, prospective, ambiguous.

THE WITNESS: Well, it's a public



grouping, so you don't select out somebody and speak to them directly and say, I think you -- you've failed me here, you know. You praise in public and you criticize in -- in private. But there's no way that an office director coming out of a meeting when there have been substantial changes required of a report, either in a -- in -- in the writing of the report or even in some of the investigative activity that was undertaken in the report that an office director doesn't know that you've got a problem.

So, yes, it's a -- it -- it is a critical -- in the sense of criticism, it is a critical meeting. Everybody is in there; everybody exchanges their points of view, and an office director will see how well he or she succeeded.

BY MS. MCBARNETTE:

Q Let me be specific. Did you let Ms. Cooke know that there were problems with her work during a director review?

A Well, yes --

MR. OSWALD: Objection --

THE WITNESS: -- I'm sure --



MR. OSWALD: Objection --

THE WITNESS: -- that came --

MR. OSWALD: Objection --

THE WITNESS: -- out.

MR. OSWALD: Objection as to form, ambiguous, misleading.

THE WITNESS: Yes.

BY MS. MCBARNETTE:

Q In general, were you satisfied with the speed in which the plaintiff completed her work?

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: No.

BY MS. MCBARNETTE:

Q And how so?

MR. OSWALD: Same objection.

THE WITNESS: Well, let me go back to what I said a moment ago. There will be, in every office, very significant accidents, key accidents in the way in which the life of the office and in which the life of the board will be affected in terms of our safety recommendations, in terms of our ability to be

Page 146

heard within the communities that we needed to affect, and there were not infrequent occasions where in precisely those kind of accident investigations the Office of Marine would have a great deal of difficulty in -- in producing a timely accident report on accidents that would not -- not really be that complicated. So that would be frustrating, and I think -- and I think it would be perfectly obvious to the office head that there was a deficiency there.

I'll give you an example if you'd like an example. Going back to the dispute we have with the Coast Guard about who's going to investigate what, there was an -- there was an accident called the Miss Majestic. It was a -- a duck, one of these amphibious vessels that travels the roads and then goes on the water. Now, this one was out in Arkansas and -- and it sunk and there were some fatalities, and the Coast Guard's initial approach to it was overly aggressive, if you will.

They -- I think they thought they were going to do the investigation. I think they impounded the sunken vessel, and -- and as a result of that --

Page 147

and we were critical of that obviously. We thought that -- that since they had done an inspection on the vessel, since they had cleared the vessel that -- that they needed to be a little bit more arm's length on it, and it became the focus of some of the discussion at the congressional level about whether or not NTSB had to have independent authority to investigate a marine accident. It had always been argument -- our argument that we shouldn't have joint authority. We should have independent authority and we should be able to do what we needed to do with respect to marine, the same as we could do with respect to aviation.

Having made that particular accident investigation the centerpiece of this part of the dispute, you would have hoped that we could have, when we did the accident, come forward with it in a timely fashion.

BY MS. MCBARNETTE:

Q Who did the report, did you say?

A The Office of Marine would have done the report. We would have hoped it could come forward in

Page 148

a timely fashion. I think it was three or four years in the making.

Q A report was three or four years in the making. Is that a long time; is that a normal length of time to do a report?

A Reports are reports of accidents of different complexity. There can be an accident that would take three or four years. The Miss Majestic was a relatively simple accident in which a -- a maintenance error had occurred in the way in which you rehook up the boot that goes between the drive shaft and the water, so it was not a difficult accident. It should have been done in nine months.

Q But it took three years; is --

A Three --

Q -- that what --

A Three --

Q -- you're saying?

A I think it was three years.

Q Okay. Do you recall an accident called the Ehime Maru?

A Ehime Maru. Yes, of course I recall that

Page 149

accident. And I don't exactly remember when it was. It might have been 2001; it might have been 2002. It was an American submarine that sunk a Japanese vessel. We weren't at -- we weren't at war. It was an accident and it --

Q Whose office was responsible for doing --

A That would have been --

MR. OSWALD: Excuse me, Counsel. If you would let him finish his answer. I don't think he's -- that's the second time you truncated him. So if you would let him finish. You can go ahead and finish your ques -- your answer, sir.

THE WITNESS: It would have been the marine office that did that. I don't remember what the earlier question was, but I appreciate your assistance.

BY MS. MCBARNETTE:

Q I'm asking you about the length of time that it would take for the plaintiff to complete --

A Right.

Q -- her investigation reports, and regarding the Ehime Maru --

A Right.

Q -- and correct me if I'm saying that improperly, were you satisfied with the length of time it took for her to complete that report?

A No, that report was probably -- probably two years, a little longer in -- in duration before it came out than it needed to have been. In fact, it came out as a brief without any recommendations, and I think I had a discussion with the plaintiff saying, Marjorie, if you can't bring it to the board, just bring it out as a brief.

Because of the international aspect of it with the Japanese waiting to see what the Americans would say about an American military vessel that had sunk one of their civilian vessels, it was somewhat embarrassing for the agency not to be able to move forward on that and I think it ultimately was brought out as an accident brief, which means there would be no recommendations attached to it and it's not going to be presented to the board and -- and . . .

Q So was this a high-profile case?

A Yes.



Q And would you have -- have expected that the report or the brief, excuse me, should have come out earlier than it did?

A Well, I would have expected it to come out as a report. And, yes, yes, earlier than it did, probably by at least a year, maybe longer. I mean, it -- it -- the Navy undertook to do a court marshal, and a court marshal probably occurred within a month or two or three or four, but within months of the accident, and the court -- the court marshal laid out a very detailed record of the events of the accident.

We had done our own factual investigation, but now we had a detailed factual investigation done by the Navy as well as cross-examination of the principal operators of the vessel, which gave us a wealth of information to work from. And, so, having that kind of data set, it shouldn't have been an impossible project to bring it forward to the board, but --

Q So given that amount of information that was already out there, you certainly would have expected the brief or report to have been issued earlier; is



that what you're --

A Yes.

Q -- saying?

MR. OSWALD: Objection as to the form, misleading.

BY MS. MCBARNETTE:

Q And you also seem to suggest that there was some sort of criticism that the plaintiff produced a brief instead of a report.

MR. OSWALD: Objection.

BY MS. MCBARNETTE:

Q Could you explain -- if that is the case, could you explain why you believe a report should have been made versus a brief; what's the significance?

MR. OSWALD: Objection as to form --

THE WITNESS: Well --

MR. OSWALD: -- ambiguous, misleading.

THE WITNESS: -- a marine accident brief, like most briefs from the offices, is signed off by the office director and -- and not by the board. Normally they are done for accidents that are not initially believed to be what we would refer to



in-house as majors; accidents that may have some significance to them, but not enough significance to be presented to the board.

It would not have been my judgment in the -- in the early years of the Ehime Maru, that the Ehime Maru, that the sinking of a civilian Japanese vessel with significant loss of life by an American military vessel would have gone to a brief.

BY MS. MCBARNETTE:

Q Why not?

A Because it's a significant accident. One would have expected the board to -- to sign off on that accident. But a brief at least would put us in the position of having closed the matter, and that was better than nothing, but it wasn't timely.

Q Do you recall the name of the submarine that was at issue in the Ehime Maru?

A Greenville.

Q Did you have problems with Ms. Cooke's leadership style?

MR. OSWALD: Objection as to form, ambiguous.

Page 154

THE WITNESS: Well, I wouldn't use the word "style." One of the things an office director has to do, one of the things any manager has to do is motivate the people that work for him or her, and did I believe that the people working for Marjorie were well managed, well motivated, that they were -- that they were as productive as they might have been, and the -- the answer to that would be, no, not at all.

BY MS. MCBARNETTE:

Q Were you satisfied with her ability to make decisions?

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: No.

BY MS. MCBARNETTE:

Q Why not?

MR. OSWALD: Same objection.

THE WITNESS: Well, very frequently there would be a reluctance to make a decision, and that had a lot to do with some of the timeliness issues in her office, and -- and -- and I think that I'd also say that some of the decisions that Marjorie

Page 155

would make were decisions that I would find myself in -- in -- in -- in deep and profound disagreement with.

BY MS. MCBARNETTE:

Q How so? Can you elaborate, please?

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: Well, I guess the best way to elaborate would be in the context of examples. There was an accident early on in which a tug pulling a tow of some 4 million gallons of heating oil lost its tow north of Block Island. Either the tug or the tow is called the Scandia, and I can't remember which, but the -- the -- the tow went ashore and spilled about a quarter of its cargo on a -- an ecologically fragile beach called the Moonstone or Moonrock. I can't remember that.

And in the -- during the investigative stage of that, in -- in what I would have considered to be a very unique opportunity for the board, we were offered a tape-recording of the master of that vessel who had a conversation with the owner of the vessel

Page 156

which I would characterize as a shakedown conversation. The Office of Marine Safety declined to hear that tape, and I only learned about it from the U.S. attorney who had decided to bring a -- a criminal procedure because the -- the tape indicated that not only was there negligence, but it was more of a malfeasance; that there was deferred maintenance that had put everybody at risk, and there was some -- some very, very serious poor decision-making about even going to sea because it was a -- the sea state was -- was terrible for this particular tow.

So the U.S. attorney and the Rhode Island attorney decided that they would proceed against the company. And while we typically think of accidents as something you don't want to proceed with criminally, there are cases in which the criminal prosecution is better suited to bring about the public purpose of safe transportation than a -- a calm, civil inquiry, if you will. And usually that has to do with foreknowledge and -- and -- and gross negligence.

And, so, this proceeding is going forward. They came to me to tell me of the tape. I

Page 157

listened to the tape, and when I heard the tape, I told the marine office that what I would like them to do is to simply finish their factual inquiry, close up their -- their -- their factual reports, not open a docket and not proceed to go to a report until the criminal process had played itself at least to the point of a grand jury indictment or no indictment.

I subsequently received from the marine division a draft report, much to my surprise. And when I opened the draft, the first line on the analysis was that there were no seaworthy issues with this vessel, and I was stupefied. And I told -- went to the marine -- marine office and told them that they -- that they should withdraw that draft and that would be the end of it until, again, the criminal process played itself out.

The plaintiff apparently didn't think that I was making any sense, took the matter to the chairman. I believe that the chairman at the time would have been Jim Hall, and that was the first time the chairman had learned that there was a tape-recording of a shakedown in which the master of

the vessel had alleged that there was an awful lot of maintenance that he had been asking for that had not been done on the tug which had caught fire. And some of that maintenance might have been directly related to a fire and had to do with -- with fuel that was spilling on hot exhaust. And when the chairman learned of the tape, the chairman's reaction was pretty much the same with mine, is -- well, one, why wouldn't you have listened to it, and, two, why would you now bring forward a report that says there's no seaworthy issues with -- when -- when you have it, but -- so when I say I'm, you know, profoundly disturbed by some of the decisions that were taken, that would be -- that would be an example of one.

BY MS. MCBARNETTE:

Q Was the chairperson also disturbed?

A Oh, yeah, yeah, and -- and insisted that all kinds of additional investigative work to document the -- the actual maintenance status of that boat, the -- the seaworthiness status of that boat be undertaken, and the fellow who finally did that came to my office about six or seven months later in tears



and apologized for the -- the -- the poor quality of his work.

Q Did the plaintiff apologize for the poor quality of her work?

A Not to my recollection.

Q Now, you talked about her judgment, and I'd like to know something slightly different, which is were you satisfied with her ability to actually make a decision?

A Well, no. It would be a noninfrequent occasion in a director's review when I would actually direct a question to the plaintiff and say, Marjorie, what's your take on this, because, as I say, you -- you may have different people around the table who will have different ideas about things, and as the managing director, you're going to have to weigh everything. And one of the things that you're going to weigh and weigh more seriously than perhaps some of the other things is what that particular modal director believes. And it would be very difficult to elicit a straightforward statement from Marjorie as to what her beliefs were. I would be told that -- "the



team had concluded" was a -- what -- I mean, that would be a quote/unquote, or "the team is of the belief," and -- and I would more than -- more often than not say, Marjorie, I was kind of interested in what your belief is, and it would be very difficult to -- to get that answer.

So in my position sitting at the head of the table, I'm, you know, left with some -- some doubt about the -- the way in which decisions had been arrived at in the office and whether or not there was a -- an established chain of command, an established leadership. And -- and a number of the occasions that I had to talk to people in the office or that people who worked for me had to talk to people in the office --

Q Which office are you talking about?

A The marine office.

-- it was confirmed that decision-making within the office was a -- was difficult and that it retarded the process of the work flow within the office. That was confirmed many times.

Q You mentioned earlier that you would speak



to employees that had decided to leave the agency upon their departure. And did you find out anything from these employees about Ms. Cooke's performance?

MR. OSWALD: Objection, ambiguous, misleading.

THE WITNESS: Well, I would speak to employees that were leaving the marine division, but sometimes it was not my doing. Sometimes they -- they would volunteer to come to my office on their way out the door to tell me what they thought of what was going on in marine. As a result of some of those early encounters, I also had some additional post-employment interviews with people who -- who I valued. That is to say, some of the people who would volunteer a point of view were people who I -- I might -- I might have had less than full confidence in, would be a polite way of saying it. But -- but they would tell me the way the office looked to them, and -- and some of them weren't even leaving.

I had people come into my office to sit down just to -- just to give me complaints about the -- about the -- the office. So I did informally

adopt a program of doing exit interviews with employees from the marine office because there was a high turnover there, and I spoke to several.

And I did not ever write out what they were telling me, but I believe that I provided for you folks one of the exit interviews that was done by one of my subordinates, because in order to report it to me, Barbara Czech did write it out, and it was an exit interview from one of the folks from the marine office that Marjorie had told me was one of her better employees, so I was very interested to see why she would leave, and she left because of a variety of things and decision-making was very high on her list. She --

BY MS. MCBARNETTE:

Q What does that mean, decision-making was high --

A She didn't think decisions were being taken in a timely fashion, that the work product was so slow that -- I believe as she said it she thought it was going to ruin her work ethic.

Q And your opinion was that Ms. Czech -- is



that her last name?

A That's not the name -- that's the -- my assistant who did the interview. That's not the name of the employee.

Q Do you recall what the name of the employee was?

A No, but I think it's on the document that I may have provided.

Q Okay.

A But that's not the only -- that -- that -- I only provided that one because it's the only one I have in writing, but that is consistent with other employee exit interviews that I've done.

Q So, excuse me, it was your impression that these employees were criticizing Ms. Cooke's ability to make a decision?

A Yes.

Q Okay.

A And to lead the office. I had a -- I did an exit interview with a fellow that she had selected as deputy, who I think is a -- a -- a very competent individual. He had been in the -- on the finance side



of the house, and I know that -- that Marjorie relied on him and that -- that he was a -- a friend, and -- and, so, I did an exit interview with him to see if -- if somebody who I thought was -- you know, would -- would -- would give me a different point of view would give me a different point of view, and, again, while he was a friend of -- of Marjorie's or at least he liked -- as he would put it, you know, I like Marjorie and so forth and so on, but if asked was she going to be able to lead the office effectively, his answer was no.

Q Going back to the Ehime Maru incident, do you recall who the chairperson was during that incident?

A Well, that incident is probably two years long, so there's going to be more than one chair involved in it.

Q Do you --

A I think at the time that the accident -- the time the accident occurred that it was acting chairman Carol Carmody. I think Carol Carmody was acting chairman twice, once before Marion Blakely and once



after Marion Blakely. I'd have to see all the dates to put it back together, but I think that this is after Marion Blakely, so I believe the chairs sitting during the course of the Ehime Maru process would have been Carol Carmody, John Hammerschmidt, Ellen Engleman Conners and maybe even Mark Rosenker when it finally goes out. But, I -- I -- I mean, this is just -- they just came and went too fast for me to keep a -- keep track of them.

Q Did any of those chairpeople tell you that the report on the Ehime Maru was taking too long?

A I don't remember any specific conversation with a chairman on that, but there -- there may very well have been one with the chairman. I remember on a couple of occasions where the people who do our congressional outreach and maybe our public outreach would indicate that the Japanese have once again asked what the status of our report is, and I just can't remember the context in which those come up and whether the chairman is involved in it or not. But there was -- it -- you know, the -- it was not like the report was just going to disappear. People from

Page 166

the outside wanted to know what NTSB was doing since we were investigating the accident.

Q Okay. We just talked about your opinion of Ms. Cooke's performance. In light of your opinion of her performance, do you believe that the personal -- personnel evaluations that you prepared for her match your opinion of her performance?

A No. No.

Q And why don't they match your opinion of her performance?

A Well, with each successive change in the seat of chairman, what I would do when I approached the chairman was say, this is -- this is where we were last year; how would you like to proceed vis-a-vis your modal office directors and your other -- your other principal directors. I mean, the chairman also reviews the CFO who doesn't even report to the managing director, but nevertheless in this kind of process we've got to get the paper done, and, so, I'd be saying, how do you want to -- how do you want to go forward with this. And one of the options that a chairman would always have was, well, let's keep it

Page 167

pretty much where it was last year; give me the opportunity to observe people, and after I've observed them, then I'll put my stamp on it.

Q I'm not sure I clear -- it's clear what you're talking about. Keep what the same as last year?

A The profile of the ratings for the principal office directors. That is to say, if everybody was outstanding in 1999 when Jim Hall left, and that may very well have been the case or close to the case, when you have the acting chairman sitting there for the next year you say, well, do you want to depart from the way in which it's been done in the past. And the chairman may have only been sitting there for about six months or so, and -- and they would say, well, no, and then even if you had a -- not an acting chairman but a confirmed chairman, they might very well, as they all -- as they uniformly did, say, all right, we'll do this for this year; I'll get an opportunity to look at it in some detail; people will be reporting to me for a year; I'll get to -- a read on them, and then I -- I'll decide a little bit more

Page 168

fulsomely how I want people rated. And, so, as it turned out, we kept the ratings in pretty much the same form for several years.

Q What do you mean kept the ratings in the same --

A I --

Q -- form?

A -- mean everyone was outstanding for several years.

Q So you kept giving people outstanding evaluations every year?

A Yes.

Q Okay. Did Ms. Conners ask you to keep a performance evaluation the same when she came on board --

A We --

Q -- and you --

A We had --

Q -- did the first annual --

A -- that discussion, and, yes, that was her initial approach was -- and one, by the way, that I would support was -- I want to put a, you know,

Page 169

positive foot forward. I don't -- I don't want to start right off here with some kind of negative inference for one individual or another individual; I'd like to go forward and -- and after it -- after I've got a year under my belt and a, you know, full -- a -- a better look at who's who, then maybe I will have something to say about it.

Q When you say, "I," are you talking about yourself or --

A The chairman.

Q -- are you talking about -- okay.

A The chairman.

Q So other than a chairperson's wish to keep a performance evaluation as outstanding or whatever it was the year before, is there any other reason on why you would give an outstanding to -- to your direct reportees, like the modal heads?

A Well, generally speaking, no, but in the context of -- of those modal heads that remain GS-15s and any other GS-15 that the chairman is involved with, because there are some GS-15s that are more or less direct reports to a chairman; for instance, the

public relations officer, the chairman will want to know how that person is -- is rated, because that person has got a lot of the chairman's public perception within their purview, so he'll -- there's a lot of different issues.

Well, with the GS-15, it is not simply a rating, but by -- I think I explained this before -- by the way in which NTSB approached the bonus system, if you rate somebody excellent, you cannot give them an award above about $3,000. Outstanding is about $5,000. A $5,000 award to an office director at the end of the year is a -- is a much more significant statement of -- of you're part of the team here and -- and I want, you know, you to help us, than a $3,000 award is because most of the GS-14s who are outstanding would have a higher award. So you have this kind of perverse structure.

The federal pay system is compacted in a way in which recognizing the difference between a manager who's got the headaches of managing and probably also is responsible for substantive input -- it's a small agency; everybody's a laboring oar -- that person you



want to be able to reward, so you -- you -- you don't want to give somebody an excellent. You don't want to -- you certainly don't want to give somebody a fully satisfactory. A fully satisfactory in the context of -- of NTSB, it is -- is a -- a black ball in -- at -- at least at the overall level for an office director. Even an excellent at the office director level is a -- is a very significant statement of dissatisfaction.

Q So is it correct to say that you took into account the possible bonus a modal head would get when you did performance evaluations?

A I certainly did, yes.

Q Okay. Did you tend to give all your modal heads outstanding?

A Yes.

Q Do you recall what you gave Ms. Cooke when Ms. Conners was chairperson?

A There was one outstanding and one excellent. I think that that's correct, but you -- you have --

Q You're --

A -- paperwork.



Q -- saying one outstanding performance review.

A We had --

Q Was that the first --

A The first one was an outstanding; the second one was an excellent.

Q Even though the bonus might be different with an excellent, you recommended giving Ms. Cooke an excellent?

A I can't remember whether it was my recommendation or whether it was something that we mutually agreed on. I certainly would not have recommended an outstanding, but -- but by the time that this occurs, there's -- you know, there -- it would not have taken a long discussion of why or so forth or so on because you're living this on a day-to-day basis; you know -- you know how you feel about people. I'm sure the chairman thought that there were some office directors who I didn't have a high enough opinion of, and she may have thought there were some that I had too high an opinion of.

Q But --



A But I would not have recommended Marjorie for an outstanding in the context of that -- that year, so I may not have recommended it, but I don't think that Ellen Engleman Conners would have recommended it either -- would -- would have been interested in it either.

Q Okay. I'm going to ask you about Ms. Conners, and I'm also going to ask you about your opinion.

A Uh-huh.

Q But starting with your opinion, why did you give Ms. Cooke an excellent in the -- I suppose in the second performance evaluation that was signed off on by Ms. Conners?

A I would have given the plaintiff, Ms. Murtagh, an excellent recommendation from as far back as when Marion Blakely first took office. I even had a discussion with Marion Blakely's chief of staff, as it turned out, as they were leaving in which he indicated to me he was now in agreement that there was a -- a difficulty there and he would entertain whatever suggestion I might have as to how to remedy

it.

So for at least four or five years, I would have been in a position to endorse an excellent. I was not going to offer an excellent to a brand-new, incoming chairman as a must-take because that chairman doesn't know me and the chairman doesn't know the plaintiff. So I would tell the -- a chairman, this is how it was done last year. I might or might not have said, and I can't honestly remember, what some of my thinking was on the plaintiff or on anybody else, but -- but the first year it would have been in the context of, this is how it was last year.

The second year there would have been more discussion since the office head would have had an opportunity to establish him or herself with the chairman, and I would have had an opportunity to either get the chairman's trust or to be considered by the chairman to be someone who didn't know what he was talking about. But at that point we would have had a more full discussion.

Q Okay. So let me be specific. Ms. Conners -- and correct me if I'm wrong -- signed



off and you signed off on the two performance evaluations for Ms. Cooke.

A Yes.

Q The first one was outstanding and the second was excellent; is that correct?

A That's correct.

Q Now, during the time frame that you worked with Ms. Conners, I'd like to know why you chose to give Ms. Cooke an excellent the second time around? What went on during that year for you to decide this is time now to give her an excellent?

A And the reason I gave you a lengthy answer to the question that you asked before is you're asking me as if from my perspective it all happened within this year, and what I'm saying is, no, it didn't all happen within this year, but within this year we were having, once again, a very significant problem with a very high profile case.

Q And what case was that?

A That was the Barberi case that we have talked about, and -- and -- and there may have been other things that were -- that were happening, too.



I -- I really can't remember everything that goes on. I think if -- if -- if you've been listening to the way this discussion proceeds, I remember a whole lot more about accidents than I do about the administra -- the administrative side of the house.

That's what animates the people who work at NTSB. We want to get the accidents done right. The rest of this is the nuisance and the bother you have to put forward in order to run an investigative agency. But there's no one that's really animated by the finance, by the human resources, by the administration, by the contracting and so forth and so on. You're animated by trying to save somebody's life. And the way in which an office director establishes or fails to establish a reputation within the building is how well they do that in the context of accident report and recommendation.

My opinion about whether or not that was being done at the outstanding level in the Office of Marine Safety goes back years, and it would have been, no, it is not. Why Ellen Engleman Conners decided the second year probably had much more to do with what



happened in that year because that's what she would have observed, and she was observing the Barberi and whatever else it was that was going on during the context of that.

I had almost no discussions during that period of time that were -- where we would have said -- sat down and said, what do you think of this office director, either that -- the plaintiff, marine or anyone else outside of the context of accident reports, because that's where it all came to pass. That was the name of the game.

Q Do you recall what, if anything, Ms. Conners asked you to do regarding the Barberi incident -- Barberi incident?

A Well, I think that it would just simply be that she told me to get it done; that she wanted it done. I don't know that she knew how I would approach that. I think that she was confident that I could get it done because by this time she and I had a history, and I think that she had concluded during the course of the history that I was capable of doing this sort of thing; that I would be able to accomplish getting

an accident report done in a timely fashion in a way in which the board would -- would sign off on it if I put my mind to that, and, so, that's -- she made this a priority of mine.

Q Do you believe she was confident that Ms. Cooke could get that investigation report done?

A No, I don't think she was. I'm sure she wasn't, and -- and I -- as I say, I think it was after a meeting such as this that -- that Marjorie said to me that I should fire her, so I assume that the -- there was a dis -- a subsequent discussion between Marjorie and the chairman in which Marjorie's sense of her prospects had -- had -- had dissipated. I told Marjorie that I was not interested in firing her, that I wouldn't fire her, and -- and told her that if she was interested in a position outside of management, I'd -- I'd consider to see if we could work to structure a national resource specialist arrangement in which we could continue to use her technical resource for the agency and take her out of the stress of management, but that's as far as I would have been willing to go.



Q Were you confident that she could work on the Barberi incident?

A Was I confident that --

MR. OSWALD: Objection.

THE WITNESS: -- Marjorie could work --

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: -- was -- that Marjorie could work on the Barberi incident?

BY MS. MCBARNETTE:

Q Yes, up to your satisfaction.

A No, the other -- it would have been directly otherwise.

Q Did you have sit-down discussions about your annual performance evaluations with your modal heads?

A No.

Q Did you ever have a sit-down discussion with Ms. Conners about her performance, her annual performance?

A You said, "Ms. Conners."

Q I beg your pardon. Ms. Cooke's?

A Not that I recall.



Q Okay. I'd like to talk about the readvertising of the marine position. Could you tell us again why you decided to readvertise that position?

MR. OSWALD: Objection as to form.

THE WITNESS: When I finally turned to it after procrastinating for a while -- I'll confess to that -- I made a phone call to one of the candidates that was there that I had known to see what his status on it was. He told me that he had taken a job, and he is also the fellow that told me that the pool was very likely to be smaller than it might otherwise have been because of the understanding at Coast Guard that there was an internal candidate who was going to get the job.

BY MS. MCBARNETTE:

Q Who are you talking about?

A The Coast Guard individual was captain -- now retired Captain Joseph Brusseau, I think is his last name.

THE VIDEOGRAPHER: You have one more minute on the tape.

MS. MCBARNETTE: That's okay.



BY MS. MCBARNETTE:

Q He was an applicant?

A Yes.

Q Okay. Please continue.

MR. OSWALD: Can we -- we're going to run out of tape here. You have seconds.

MS. MCBARNETTE: Okay. So --

MR. OSWALD: Can we take a break here? Let's go off the Record and change the tape.

THE VIDEOGRAPHER: This marks the end of tape 2 in the deposition of Mr. Campbell. We're going off the Record. The time is 2:54 p.m.

(Recess -- 2:54 p.m.)

(After recess -- 2:56 p.m.)

THE VIDEOGRAPHER: This marks the beginning of tape 3 in the deposition of Mr. Campbell. We're back on the Record. The time is 2:56 p.m.

BY MS. MCBARNETTE:

Q Okay. Let's back up a little bit. You mentioned that you had procrastinated. What did you mean by that?

A I think that the first group was brought to

me and that it might have been a month, it might have been two months, it might have been three months before I actually turned my attention to it full-time and said, all right, I need to -- I need to move forward on this. So I'm not sure what the elapse was, but -- but like a lot of people, I procrastinate and I also know when I'm procrastinating, so at some point I said, you can't do this and you need to move forward.

Q Why did you choose to procrastinate?

A I wasn't anxious to -- to proceed to the selection of an SES that I didn't necessarily think was going to work satisfactorily. I didn't think that Marjorie Murtagh Cooke, the plaintiff here, was going to be selected. I would not have recommended her selection, but I also didn't think that the pool that -- that I looked at when I initially went through was attractive.

Q After the position was readvertised, did you select a panel to review the incoming applications?

A Yes.

Q Do you know if that panel is -- was the final panel that actually selected the person who was



selected?

A Panels themselves don't select --

Q Right.

A -- so the panel wouldn't have selected. I believe that the panel that I suggested was the panel that made the review of the applications, so that's a yes. Were they a selector, I think that that's probably going to be a no.

Q Were you the selecting official for that particular position?

A No, for two reasons. One, I think I was no longer the managing director; and, two, as a matter of reality, the selection of any SES is going to be the chairman. As I mentioned earlier, the managing director works on a delegation with the chairman's authority, but only on a delegation. And at the level of SES, a chairman will be the determining call.

Q Did you have any input on who was ultimately selected?

A No.

Q Did you tell the panel members for the second panel who they should select or review?



A No, I didn't communicate with them on the merits of the panel at all.

Q Did -- did you give your opinion about who should be selected to the chairperson or to any other officer who had input into sel -- selecting?

A No.

Q Are you aware if Ms. Cooke was ranked within the top five for the second panel's selection in the applicant pool?

MR. OSWALD: Objection as to form, misleading.

THE WITNESS: I -- I'm not sure how many people the panel actually considered at the top. I'm not sure what they went forward with. I did hear at some point that Marjorie was not to be offered an interview, so she was not in their top group, but that's -- that's what I know about it. I was told -- I've forgotten who told me that the panel was making a -- a recommendation -- I don't know whether it was a recommendation of one person or five people, but they were making a recommendation -- and that Marjorie was not included in the group that would be interviewed.



BY MS. MCBARNETTE:

Q Do you find that surprising?

A Yes.

MR. OSWALD: Objection as to form, ambiguous.

THE WITNESS: Yes, I found that surprising.

BY MS. MCBARNETTE:

Q Why?

A I believed out of courtesy -- if nothing else, out of courtesy to an individual that held the office for that long that he or she should be considered and given an opportunity to explain to his or her peers why that individual would have been the best choice. That's just -- I mean, that to me was -- that to me would have been common decency if -- if -- even if the person were clearly not qualified for the position. By technical background, Marjorie's qualified for the position, so if it had been me, I certainly would have had the interview, so I was surprised.

Q After the selection was made, did you have

any input on where Ms. Cooke would be placed within the agency?

A I don't think I had what you would call input. I may have -- some people may have talked to me about different options. I think I'm now the executive director. They may have talked to me about different options.

The only conversation that I remember was somebody said something about the academy. I told you we had a -- an academy located out in -- in Loudoun County, and that was one of the things that I had been asked to take a very intensive look at during the course of my -- of the last two years, and -- and I would not have thought that that would have been a useful fit, but if somebody said it was going to happen, then it would have happened because I was not in a position to -- to either say or do much about any of that. I didn't want to. I was -- I was delighted to be out from under this side of the agency's business.

Q What is the "this side" that you are referring to?



A Personnel, contracting, administration. You have to understand, I became the managing director because the chairman knew that he was leaving, and I was also leaving, and he said, Dan, while we're looking for a new chairman who will establish a new administration in the agency, you should be the managing director. You should be the guy that -- that basically represents the institution to the incoming political appointees and --

Q You said, "managing director." Do you mean managing or executive director?

A It will take a little bit of -- of time to really describe all that. At the time the conversation was happening, there was a senior career civil servant position that was called the deputy managing director. There is also a noncareer position that's called the managing director. This is in 1999. The managing director -- it is a noncareer position -- typically comes in with the chairman at the time of the chairman's appointment and is the chairman's principal chief of staff, if you will, and will execute the chairman's will.



It is to that person that the delegation of the chairman in the CFR is -- is made. It is to the managing director. So there were two things that were going to happen when Mr. Hall left. One is there would no longer be a managing director who was a noncareer who would sign in place of the chairman. The second was that someone who had the exalted title, if you will, of general counsel was now being asked to be an office deputy.

So I said what we should do is rename the positions. I'll become a managing director. The -- the noncareer position will become the executive director. I will temporarily have the ability to sign papers that need to be signed, but as soon as we can get someone else to do that by way of executive director, I will go back to quality controlling reports for the agency, which is what I wanted to do, the production side, the accident investigation side, and I'll get out from underneath all of the administrative stuff. And that was the way we looked forward to being able to do it.

I believe that there's counsel at the table



who could back me up on that because I asked to have redrafted, as I took the office, that delegation. So as soon as there was an executive director, we could change the CFR and someone else would do all the paperwork, and that was drafted for me and I was ready to hand it off at any moment. That moment never came because of the way in which the White House and Congress made appointments.

We -- as I've said many, many times, I think between the year 2000 and the year 2005 when I left, that five different people were -- seven different people in five years were the chairman. So that never came to pass, and I sat as the managing director during this period -- during this interim period. We now have -- have had the same individual as chairman for two years, and I believe that I've been told that he has a -- a potential for nomination for another two years, so I assume that there is some greater stability in the way in which things are run now, and that would be good for the agency.

That was a long answer, but I -- I don't know any other way of saying it, so --

Page 190

MS. MCBARNETTE: Okay. I have no further questions.

MS. COHEN: I have a couple of questions before you start.

EXAMINATION BY COUNSEL FOR THE DEFENDANT UNITED STATES OF AMERICA

BY MS. COHEN:

Q You had mentioned earlier a time-and-a-half overtime; are --

A Yes.

Q -- all NTSB employees eligible for that?

A Time-and-a-half overtime was limited to employees in accident investigation work. It was the understanding at the time -- I should back up and say that there was an enormous congressional resistance to the notion that a federal employee will get time-and-a-half overtime, and we were -- we had -- were confronted by people from the civil service committees who told us that was a -- a nonstarter because if we put the nose in the door that every -- every civil servant would get time and a half eventually and that this was a budget-buster, and, so,

Page 191

that we couldn't have it.

We had some very significant arguments on our side, and I -- I was the principal congressional affairs officer also at this time for -- I -- I mean, I wore a lot -- I did a lot of things, so I did most of the negotiation, most of the Hill work on this. And the commerce committee on -- on both the Senate and the House side would eventually agree that there would be a limited -- a limited and temporary time and a half that would be reviewed again to see how we used it, and it would be limited to accident investigation.

Some thought that meant actually on site. We made a slightly broader interpretation of that when we got it home, because we would ask an on-site person to work around the clock, but we had people that backed them up in-house that would work around the clock, too, that -- the people in research and engineering, for instance, who do vehicle performance readouts on data recorders and so forth, they don't work a clock.

When there's an accident, you just keep going until you've got what you've got, and those are

Page 192

early hours of an accident, so that's where that time and a half was intended to be spent, and closely mon -- monitored by Congress. Reports had to be filed on an annual basis, and I believe they still have it. I was proud to have gotten it for them, and I believe they still have it.

Q You mentioned earlier that there was low morale in the Office of Marine Safety during Ms. Cooke's tenure as director. Was there low morale in any of the other modal office --

MR. OSWALD: Objection.

BY MS. COHEN:

Q -- modal offices during that time?

MR. OSWALD: Objection as to form, misleading.

THE WITNESS: Some, yes, but if I were to qualitatively say it, I'd say that the one office that I looked at as a group that -- that that was a problem in would have been marine. There were some difficulties in -- in different divisions elsewhere, but that's not really that uncommon. Where it clearly affected productivity was in the Office of Marine

Page 193

Safety.

BY MS. COHEN:

Q You said there was a high turnover rate for employees in the Office of Marine Safety during Ms. Cooke's tenure as director. Was there also a high turnover rate in any of the other modal offices during that time?

MR. OSWALD: Objection as to form, misleading.

THE WITNESS: No. Some of the offices had too low a turnover rate for my satisfaction, I'll say. You would hope that people would up and move on every once in a while, create the opportunity for some new intelligence. The transportation community itself evolves rapidly. It's a technologically driven group, and you need new skill sets, and if you have civil servants that -- that stay too long, you can't get those new skill sets. And we were limited in -- from a budgetary standpoint most of my tenure as managing director and, indeed, most of my tenure as the general counsel, we were -- we were struggling to find ways to hire new people.

Page 194

Q You said that you conducted exit interviews with several individuals that left the Office of Marine Safety?
A Yes.
Q Did you conduct any exit interviews with individuals that left other offices?
A No.
Q Why not?
A I wasn't having a problem of that nature.
Q A problem of what nature?
A A lot of people leaving for -- as I say, I started it not because I thought it would -- because it -- it was a brainstorm. It was because people came to me on their way out the door to tell me how dissatisfied they were. And the first one or two who did that would not have been people whose word I would have taken without some -- without double-checking it. They were not the -- the -- the most productive employees themselves. And, so, I -- I wasn't necessarily unhappy to see them go, but some of the things that they told me I thought maybe I needed to know the -- the truth of, whether there was any truth

Page 195

there or not.
Q Such as what things that they told you?
A That they were leaving because decisions were hard to come by; that there was contradiction; that, you know, you'd start working -- they -- they would tell me, yeah, I'd start working on one thing and then I'd have to -- I'd have to abandon that and that -- that there doesn't seem to be any direction, and it was an issue of direction and -- and a sense of -- of -- a -- a sense of that there was purpose to the office.
I had -- I had a group come to me one -- I think a group of either two or three people who were not leaving the office to sit down and tell me that, so it wasn't -- it wasn't that uncommon for -- in the Office of Marine Safety. It never occurred elsewhere.
MS. COHEN: No further questions.

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. OSWALD:
Q Mr. Campbell --
A Yes.
Q -- from 2000 through 2005, during the period

Page 196

of time that you were the managing director or executive director, when, if ever, did you issue Marjorie Murtagh Cooke a formal written warning for her profound underperformance, as you said?
A Never.
MR. OSWALD: Let's go off the Record.
THE VIDEOGRAPHER: We are going off the Record. The time is 3:13 p.m.
(Recess -- 3:13 p.m.)
(After recess -- 3:18 p.m.)
THE VIDEOGRAPHER: We're back on the Record. The time is 3:18 p.m.
MR. OSWALD: Nothing further. We're done.
THE VIDEOGRAPHER: This marks the end of the deposition of Mr. Campbell. The number of tapes used was three. We're going off the Record. The time is 3:18 p.m.

(Signature having not been waived, the Videotaped Deposition of DANIEL CAMPBELL was concluded at 3:18 p.m.)

Page 197

ACKNOWLEDGMENT OF DEPONENT

I, Daniel Campbell, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

____________________ ________________________
(DATE) (SIGNATURE)

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Dana C. Ryan, Registered Professional Reporter, Certified Realtime Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 26th day of November 2007.

My Commission expires:
July 14, 2010

________________________________
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA



E R R A T A S H E E T

IN RE: MARJORIE MURTAGH COOKE v. MARK ROSENKER,
CHAIRMAN, NATIONAL TRANSPORTATION SAFETY BOARD
RETURN BY: ____________________________________________
PAGE LINE CORRECTION AND REASON

________________ ____________________________
(DATE) (SIGNATURE)



E R R A T A S H E E T C O N T I N U E D

IN RE: MARJORIE MURTAGH COOKE v. MARK ROSENKER,
CHAIRMAN, NATIONAL TRANSPORTATION SAFETY BOARD
RETURN BY: ____________________________________________
PAGE LINE CORRECTION AND REASON

________________ ____________________________
(DATE) (SIGNATURE)