# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

----------------------------------x

MARJORIE MURTAGH COOKE, :

Plaintiff : No. 06-748C

v. : (Judge Wheeler)

THE UNITED STATES, :

Defendant :

----------------------------------x

Deposition of EMILY CARROLL

Washington, D.C.

Tuesday, February 12, 2008

10:05 a.m.

Job No.: 1-122456

Pages 1 - 76

Reported by: Alda Mandell, RPR

Deposition of EMILY CARROLL, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202)331-2883

Pursuant to agreement, before Alda Mandell, Registered Professional Reporter and Notary Public of the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
DAVE SCHER, ESQUIRE
THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT
MEREDYTH D. COHEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
CIVIL DIVISION
1100 L Street, Northwest
Washington, D.C. 20530
(202)305-2061

and



A P P E A R A N C E S (Continued)

KATHLEEN SILBAUGH, ESQUIRE
NATIONAL TRANSPORTATION SAFETY BOARD
490 L'Enfant Plaza East, Southwest
Washington, D.C. 20594
(202)314-6084

Also Present: MARJORIE MURTAGH COOKE

C O N T E N T S


EXAMINATION OF EMILY CARROLL PAGE
By Mr. Scher 5
By Ms. Cohen 67


E X H I B I T S

(None)



P R O C E E D I N G S

EMILY CARROLL

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. SCHER:

Q Good morning, Ms. Carroll. My name is Dave Scher. How are you?

A I'm doing good.

Q Good. I'm an attorney for Ms. Murtagh Cooke here in this case and I'm just going to be asking you a series of questions today. Have you ever had your deposition taken before?

A No.

Q Okay. All right. I'm just going to go over a few ground rules and sort of how things work and just to kind of give you some background information. All right. So basically I'm going to ask you a series of questions. I ask that you answer them completely, fully and accurately. Every once in a while -- hopefully just every once in a while -- Ms. Cohen may make an objection. If she does, please allow her to make the objection and when she's done, then you can

answer the question. Unless of course she directs you not to answer the question. Okay? Oh. That reminds me. You do need to actually answer fully verbally because this wonderful court reporter here cannot write head nods.
A Okay.
Q So you need to actually stay yes and say no. Do you understand?
A Yes.
Q Great. All right. Have you taken any medications or drugs that would impair your ability to answer truthfully today?
A No.
Q Okay. Do you have any physical, mental or other disability that would impair your ability to answer truthfully today?
A No.
Q All right. Great. Ms. Carroll, I'd like to go over your employment history. I can ask you question by question but it would be real helpful if you start with your first job after college and then go forward to the present time.



A My first job after college was actually my job that I had during college. I was a student employment at NTSB as a clerk typist.
Q When was that?
A In the 70's.
Q Okay.
A I moved into the HR division in the later 70's. And I've been a Personnel Assistant. And then I was a Personnel Management Specialist and that's where I am today, a Personnel Management Specialist with NTSB.
Q When you say NTSB, you mean the National Transportation Safety Board, correct?
A Correct.
Q So have you been employed at anyplace other than the NTSB?
A Prior to -- after college, no.
Q Okay. And where did you go to college?
A Here in the District at -- I graduated from UDC.
Q Okay.
A University of the District of Columbia.



Q Thank you. What was your college degree in?
A I was a bachelor's in English for teaching. Primary focus on teaching elementary and high school children.
Q Okay. Do you have any other after-college degrees?
A No, I do not.
Q Do you have any other training in development such as -- could be human resources curriculum type of class or any other training?
A I've taken functional training in human resources which means I've taken the classes or courses that I need to do my day-to-day job in staffing, classification.
Q Okay. Got it. Can you please describe your current job today, what you do today?
A Today I am a Personnel Management Specialist in the Human Resources Division of HR.
Q What does that mean?
A Basically I am currently assigned responsibility for what we call the pay processing team. Making sure the personnel actions get



processed, the liaison with our service provider for personnel payroll services, and working a team of people for the orientation of new employees. And answering and dealing with questions related to time and attendance and pay.
Q And how long have you been in that specific job role?
A This job role I've been in for about one year.
Q I just realized a forgot a couple of ground rules that are important. You may want to take a break --
A Okay.
Q -- and that's completely fine. Just let us know. We'll probably take a break every hour or so anyway.
A Okay.
Q If you need anything, water, juice, soda, just let me know.
A Okay.
Q If we do take a break and we happen to be in the middle of the question, I just ask you to answer

Page 10

that question first before we go on a break.
A Okay.
Q All right. Okay. Do you know Mrs. Marjorie Murtagh Cooke?
A Yes, I do.
Q And how do you know her?
A She was an employee with the NTSB.
Q How long have you known her?
A I'm not sure. Ms. Cooke was an employee and I've known her since her employment but I can't determine -- I can't remember who got to the agency first. So if she was there in the 70's, I've known her since the 70's, if she was there in the 80's, I've known her since the 80's, because I've been with the agency since the late 70's, 80's.
Q So are you saying you've known her as long as she's been an employee there?
A If that's when she started with the Board, yes. But for the most part, yes.
Q Okay. Okay. What if anything are you aware of concerning this particular case?
MS. COHEN: Objection. Vague.

Page 11

MR. SCHER: You can answer.
THE WITNESS: I'm not really sure. Are you asking do I know the specifics of the case or what are you asking me?
BY MR. SCHER:
Q Yes. I'm asking you what you know about this particular case that we're here about.
A Oh. I know that Ms. Murtagh Cooke has a claim against the agency.
Q Okay.
A I know that it involves some vacancies. I know that there are some pay issues.
Q Anything else?
A No.
Q Did you have any conversations with Ms. Murtagh Cooke specifically about this case?
A No, I have not.
Q Did you have any conversations with her at anytime about her concerns regarding equal pay?
A No. I don't remember any discussions with her on that topic.
Q Okay. All right. Are you aware of whether

Page 12

at some point in time the NTSB's Office of Surface Transportation Safety divided into four separate modal offices?
A Yes. At some point in time there was a reorganization.
Q Do you know when that happened?
A The specific dates, no, I'm not.
Q Do you have an approximate date, like the year?
A It would have to have been maybe -- maybe in the late 80's, 90's. Somewhere in that time frame.
Q Okay. How many offices did the -- I'm going to use the acronym OSTS -- divide into?
A OSTS divided into railroad, hazardous materials and pipeline, highway, and marine four. There are four offices that it broke into.
Q Do you know what those offices are now called?
A Office of Marine Safety. Office of Highway Safety. Office of Railroad Pipeline Hazardous Materials Safety. And -- railroad, highway, marine safety. Office of Marine Safety and rail hazardous

Page 13

materials.
Q Okay. And do you know why NTSB divided into four modal offices?
A No.
Q How did you become aware that it did in fact divide into four offices?
A I work in the Human Resources Division. I process the personnel actions to make that happen.
Q Okay. What is the difference in the four offices?
MS. COHEN: Objection. Outside the scope of our limited discovery. Please don't answer.
MR. SCHER: Let's go off the record.
(Discussion off the record)
BY MR. SCHER: Go on the record.
Q All right. Prior to the division of the NTSB's OSTS into four modal offices, who occupied the position of Director of the OSTS and Deputy Director of the OSTS?
A Oh. I don't remember.
Q Okay. Do you know whether those positions were SES positions? When I say SES, I mean Senior

Executive Service positions.
A Yes, it is an SES.
Q Do you know what happened to those people after the division into four modal offices?
A Which persons?
Q The Director of OSTS and the Deputy Director.
A They would have been realigned somehow or moved to other positions. So, yeah, in a breakup of a division, all of the persons would have been assigned to one of the organizations or somewhere else in the organization.
Q Okay. Do you know specifically where they went?
A The persons with railroad expertise -- I'm sorry. Are you speaking of the staff people or are you --
Q I'm speaking of the Director and the Deputy Director.
A Yeah. Without being able to identify who that was, it's hard for me to say where they went.
Q Okay.



A And I'm not sure because this spans a long period of time. Yeah. I'm not sure. I'd have to give it a bit of a thought for a minute. I believe that the head of that organization at the time was Jim Arena I think.
Q Okay.
A And his deputy -- I am thinking that it was Ralph Johnson. I am not sure.
Q Okay.
A I think those are the two names that I have in that place at that time.
Q Do you know whether those people are still employed at NTSB?
A The people that I've named? One of them.
Q Who is that?
A James Arena.
Q And can you speak Arena?
A A-R-E-N-A.
Q And what is James Arena's role right now?
A He has a different position. He is responsible for -- his title is Chief Technical Adviser. He's a Chief Technical Adviser.



Q Is that an SES position?
A No, it is not.
Q Do you know what happened with the SES allocation from that position?
A No.
Q Okay. Now I'm going to ask you some questions about SES slots and how they are allocated.
A Okay.
Q All right. So could you explain to me how the NTSB goes about requesting SES slots and how that process works?
A The Office of Personnel Management puts out correspondence to agencies indicating to them that there's sort of a time frame for requesting or justifying positions that they would want in the Senior Executive Service. And if in fact they want positions, they would apply during this process.
Q Who's they?
A The agency. OPM says agencies, you can now -- you know, this is what you have. If that's what you want, keep it or you can request slots at this time.



Q So you're saying there's a certain number of slots that already exist within NTSB?
A Uh-huh.
Q And they can keep those?
A Uh-huh.
Q I need you to answer yes or no.
A Oh. I'm sorry. Yes.
Q That's okay. So the slots they already have they can keep, correct?
A Correct.
Q OPM is what?
A The Office Of Personnel Management.
Q So OPM then says if you want more, you can ask for them?
A Yes.
Q Okay. And why does OPM do that?
A It's a biannual review.
Q Biannual meaning twice per year?
A No. I meant --
Q Once every two years?
A Once every two years.
Q So once every two years OPM does a review

Page 18

and they say if you want more slots, you can ask for them?
A They allow agencies to take stock of what they have and make assessments and make a request if they need it.
Q So how does OPM decide what to give or not to give?
MS. COHEN: Objection.
A I do not --
MS. COHEN: Lack of knowledge.
MR. SCHER: I'm sorry. Can you answer the question?
A I don't know how they make their decisions.
BY MR. SCHER:
Q And who would know?
A The Office of Personnel Management.
Q Are there specific people within the Office of Personnel Management?
A They have a specific office that deals with that. Executive Resources.
Q Okay. The office is called Executive Resources?

Page 19

A Yes.
Q Okay. Thank you. All right. So how does the NTSB decide where its SES slots go?
A I can't answer the how.
Q Okay. You don't know how?
A I don't know how.
Q Okay. Are you familiar with something called the competitive recruitment process?
A Yes.
Q Could you explain that to me?
A That means that an agency would announce a position, vacancy, and persons would be eligible to compete for that job, make application and be considered.
Q Okay. And are you familiar with the process called reassignment?
A Yes.
Q Could you explain that process to me?
A It is the movement of an employee from a position to another or it could be the change in a position description of an employee.
Q And how specifically does that relate to SES

Page 20

slots?
A Senior Executive Service is a little bit different but a lot the same. It would mean that someone was moved from one position to another.
Q In other words, they would keep their SES position -- sorry -- their SES slot but they would move from one position to another within the agency?
A Yes. In reassignment there's generally no other change to the pay or grade of an employee on a reassignment.
Q I see. Okay. When if ever did the NTSB request SES slots for the four modal offices?
A The way -- I can't be definitive about that because I don't know what a particular request is and what position was for what slot.
Q Okay. Well, do you know whether at some point in time NTSB made a request to have SES slots for all four modal offices?
A Yes.
Q Okay. Do you know when that was?
A No. I'm not sure of the specific time frame.

Page 21

Q Okay. Do you have an idea of what year?
A No.
Q Okay. All right. Do you know whether this request was made for all four modal offices all at the same time?
A Without looking at the specific request, that would be hard for me to answer. I know at given points in time requests were made and those type of positions were included in the requests.
Q Okay. So are you saying that at some point in time NTSB made its biannual request, if you will, for SES slots and in that request they included SES slots for the four modal offices? Is that what you're saying? I'm just trying to understand.
A I'm backing into the answer --
Q Okay.
A -- because I know that those positions have been filled within SES so we had to have a slot in order to advertise.
Q Okay.
A So I'm kind of backing into it without being on the inside of the process. I wouldn't have known

Page 22

the specifics.
Q Right.
A But having known that we recruited to fill slots --
Q Right.
A -- we had to have a position or used another position in the agency. So it could have been one of the two ways.
Q Okay. I understand.
A Okay.
Q I'm asking a very specific question. I apologize. I'm not being clear so I'm going to try to be really clear. Okay?
A Uh-huh.
Q I'm asking whether you know at some point in time NTSB made a single request for four SES slots for all modal directors all at the same time.
A I can't definitively answer that. I don't remember.
Q Okay. That's fine. I really am only interested in what you know.
A Uh-huh.

Page 23

Q But I guess you do know that at some point in time NTSB made requests for SES slots for these modal directors. At some point in time.
A At some point in time. Yes.
Q Okay. Do you know why the NTSB did that?
A No.
Q Do you know who made the requests?
A The request is signed by the Chairman so it would have been -- for NTSB that would have been the Managing Director and the Chairman.
Q And who was the Managing Director? I guess it depends on the point in time.
A It depends on the point in time. Our Managing Directors have changed.
Q Okay. That's fine. Do you know whether at any point in time that NTSB made a request for an SES position for a modal director and that request was denied by OPM?
A What I know of that process is that you make a request identifying positions. They respond with a number.
Q Okay.

Page 24

A So I can't definitively say that X was approved and X was given.
Q I see.
A I know that NTSB advertised certain positions that they had to have a slot for.
Q I see. So I understand how this works, NTSB would say I want -- I'm making up this number now -- 10 SES slots and then OPM says you get eight or whatever they say. And then NTSB decides what to do with them. Is that how this process works?
A Correct.
Q So OPM does not say you must use it for this or you must use it for that?
A No. OPM does not say that.
Q How does the NTSB determine where to allocate those specific slots?
A That decision would be made by the Managing Director in consultation with the Chairman. I don't know what things they consider in that discussion.
Q Okay. All right. When the four offices were created or when OSTS was split into four offices, do you know what pay levels those modal directors were

Page 25

paid initially?
A No.
Q Do you know whether they were all classified at the same pay level?
A SES positions by classification are SES positions. Their pay is separate and not necessarily aligned with that. They have a range. And so without knowing specific people, I don't remember it at that level of detail.
Q Understood. Okay. What I'm asking is when the four modal offices were originally created, they were not SES positions, correct?
A Correct.
Q Okay. Do you know what they were?
A More than likely they were GS-15's.
Q Okay. What does GS-15 mean by the way?
A It is a general scheduled position at Grade 15.
Q Is there a level higher than 15?
A On the general schedule, no.
Q All right. Now, were all of the four modal directors paid at the level of GS-15 before they

became SES?
A Yes.
Q Okay. I want to turn your attention to the Office of Airline Safety or OAS. When if ever was the Director of OAS paid at the SES level?
A When if ever?
Q Yes.
A The Director of OAS is an SES position.
Q It is now?
A It is now.
Q Okay. Do you know when it became an SES position?
A I've always remembered it to be an SES position.
Q As long as you --
A As long as I can remember, it has been an SES position.
Q Okay. Do you know when if ever the Deputy Director of OAS was ever paid at the SES level?
A The Deputy Director in OAS has been in SES for as long as I remember --
Q Also for as long as you remember?



A Also for as long as I remember. I am pausing because that -- by deputy position, I mean the person second to the Director.
Q Correct. Yes. So the answer to that --
A The answer to the question is as long as I've known it to be, it's an SES.
Q Okay. Do you know why the Director and Deputy Director of OAS were, as long as you remember, paid at the SES level?
A That's how those positions were classified.
Q Do you know why they were classified that way?
A No.
MR. SCHER: Off the record.
(Discussion off the record)
MR. SCHER: Go on the record.
BY MR. SCHER:
Q Do you know whether at some point an SES slot became available for the Director of the Office of Railway -- Pipeline and Hazardous Materials, which I'm going to use ORPH because I can't seem to say this correctly.



A That's fine. Yes. The Director of RPH?
Q Yes.
A Yes.
Q Do you know when that happened?
A Without having the approximate dates -- I don't have approximate dates. Somewhere around 2004. 2003, 2004. Somewhere in that area.
Q And do you know how that slot became available?
A No. No, I do not.
Q Okay. Do you know why the NTSB gave the SES slot to ORPH?
A No, I do not.
Q When if ever, to your knowledge, okay, has an NTSB employee been non competitively promoted to do an SES position?
A Non competitively promoted?
Q Yes.
A By noncompetitive promotion do you mean that they were moved in there without announcement and bidding on the job?
Q Yes. That's what I'm asking.



A Okay. For me that's not a promotion.
Q Okay. What is that?
A It's just a movement. It's back to reassignment. The reassignment question.
Q Okay. So --
A I just wanted to make sure I understand --
Q Okay.
A -- how you mean the person was put in the job.
Q Okay. Well, other than reassignment, is it possible for an NTSB employee to be promoted to an SES position in a noncompetitive manner?
MS. COHEN: Objection to the term promoted.
A No.
BY MR. SCHER:
Q Just to cover all bases. Other than through reassignment, is it possible for an NTSB employee to be awarded an SES position in a noncompetitive manner?
MS. COHEN: Objection to the term awarded.
A By NTSB employee -- no.
MR. SCHER: Okay. Can we go off the record a second.

(Discussion off the record)
BY MR. SCHER:
Q What is the correct terminology for an employee moving from a non SES position level to an SES level position? What is the correct term?
A If an employee moves from a non SES position to an SES position, they have to compete for it.
Q Okay.
A So it would be a competitive selection.
Q Okay. Would you call them then promoted to that position?
A I generally don't say promoted. I say appointed.
Q Appointed?
A Yes.
Q Okay. Would you say awarded ever?
A No. I would not use awarded with that type of process.
Q Okay. So you would not use the word promoted and you would not use the word awarded, correct?
A Correct.



Q But you would use the word appointed. Okay. All right. When if ever has an NTSB employee been appointed to an SES position in a noncompetitive manner?
MS. COHEN: Objection. Vague.
MR. SCHER: You can answer.
THE WITNESS: Is the question that you're asking me again about a GS employee going to an SES position or an SES employee going to an SES position?
MR. SCHER: A GS employee going to an SES position.
THE WITNESS: I'm sorry. Can you repeat that one more time?
MR. SCHER: Absolutely. Okay.
BY MR. SCHER:
Q Let's do this in a hypothetical. It will be easier. I have an NTS employee. That NTS employee's a GS-15. I want to appoint that NTS employee to an SES position. Is there any I can do that without competing him?
A No.
Q Thank you.



A You're welcome.
Q To your knowledge, has every single SES position appointed within NTSB been advertised and completed?
A Can you repeat that?
Q Absolutely. To your knowledge, has every single SES position appointed within NTSB been advertised and competed?
A No.
Q Okay. When has it not been advertised and competed?
A When NTSB moves an SES incumbent, current SES person, from one position to another.
Q Okay. All right. So to your knowledge, has every single SES position appointed from a GS-15 or lower to an SES position been -- within NTSB been advertised and competed?
A Yes.
Q Okay. Do you know whether NTSB allocated SES slots to the different modal offices in a particular priority order?
A Oh. No, I do not.



Q Do you know whether at some point NTSB requested an SES slot for the Director of the Office of Marine Safety?
A Yes.
Q And I'm going to use OMS now for Office of Marine Safety, okay?
A Okay.
Q Do you know when that was?
A I don't have a specific time frame for that.
Q Okay. Do you know the year?
A I know that the position was advertised in '05 and I believe '06 but I don't know whether or not -- what the time frame was between the allocation to when we advertised it. I know we advertised a position, SES, in OMS.
Q Do you know what happened when it was initially advertised?
A When it was initially advertised, it was readvertised.
Q Okay. Do you know why it was readvertised?
A No.
Q When if ever has NTSB advertised and then

readvertised a position other than this one?
A Are you talking outside of the SES or any position?
Q Any position.
A We have readvertised positions.
Q Okay. All right. Let's speak specifically about SES.
A Okay.
Q Are you aware of whether -- except for this particular instance -- of the OMS being advertised and then readvertised, that position, whether an SES allocated position within NTSB was advertised and then readvertised a second time?
A I don't remember. I don't remember.
Q Okay. Is there any specific instance that you recall?
A No.
Q Okay. All right. Under circumstances is an NTSB employee eligible to receive overtime pay?
A When the overtime is ordered and approved by a supervisor.
Q And how is overtime pay ordered and approved



by a supervisor?
A You mean by what mechanism?
Q Yes.
A I think each supervisor would handle that differently.
Q Okay.
A They have an assignment that they make.
Q Okay. Could they make that approval verbally?
A Yes.
Q Okay. Are GS-15 employees eligible for overtime pay?
A Yes.
Q Now, how much overtime pay could a GS-15 employee receive?
A The regulations give a limit to not just GS-15's but all employees receiving premium pay and there's a premium pay limit.
Q Okay. And what is that limit?
A Generally it's the salary of a GS-15, Step 10. They cannot receive overtime in a manner that their pay would exceed 1510 or Executive Level 5 and I



don't know the dollar figures that go with that.
Q Is there a differential between GS-15, Step 10 and Executive Level 5?
A Sometimes yes.
Q What do you mean by sometimes?
A It depends on what is approved as the pay for Executive Level 5 and what is approved for the pay of the general schedule.
Q Who makes that approval?
A Congress.
Q Okay. I want to specifically direct you to the position of the Directors of the modal offices. Okay?
A Okay.
Q Is there a difference between GS-15, Step 10 and Executive Level 5 in those positions?
A There could be depending on the -- I'm going to say generally speaking, yes.
Q All right.
A But in any given year, depending on how pay is approved and the increases in pay of the Executive Level, the 15-10 could be higher than the Exec Level 5



and therefore there would not be a difference.
Q So it depends on what Congress decides in this regard?
A Yes.
Q And when does Congress do that?
A Generally in November or December of the year. You know, the government cost-of-living adjustment end of year, it's that whole process.
Q Are you aware of whether a GS-15, Step 10 employee anywhere in NTSB has received overtime pay?
A In a year where there would be a difference between 15-10 and Exec Level 5, the employee could receive overtime.
Q But are you aware whether that ever actually happened?
A I think it could -- it's possible. I don't know specifically that it did.
Q All right. Now, with respect to the modal office directors, do you know whether overtime could include hours of work that an employee incurs in connection with an accident investigation?
THE WITNESS: I'm sorry. Can you repeat

Page 38

that?

MR. SCHER: Sure. Actually could you just read back the question?

THE COURT REPORTER: "Now, with respect to the modal office directors, do you know whether overtime could include hours of work that an employee incurs in connection with an accident investigation?"

A It's possible.

BY MR. SCHER:

Q And when would it be possible?

A When the 15-10 salary is less than the Exec 5.

Q Okay. What I'm saying is so suppose I'm a GS-10 -- I'm sorry. Suppose I'm a GS-15, Step 5 and I go do an accident investigation. I'm part of the Office of Marine Safety. And I go to a boat and I do an accident investigation. If my manager authorizes overtime, can I include those hours as part of my overtime pay?

A If the manager approves it, yes, you can make your claim and if it's approved, the timekeeper can put it on the time sheet.

Page 39

Q Okay. All right. And how would I make that claim?

A Submitting an overtime request form, or now we have an automated system so they would submit a request in the system.

Q Right.

A And the supervisor would approve it.

Q But do I need the supervisor's approval in advance to get overtime pay in the first place?

A For accident investigation?

Q Yes.

A Is that the scenario we're dealing with?

Q Yes.

A In accident investigation, if the employee is assigned to the accident, the supervisor generally knows that there is possibly overtime involved.

Q Okay.

A And there is direct communication between the employee and the supervisor while the employee is engaged in the investigation so there's opportunity to have dialogue about that.

Q And that dialogue can happen verbally?

Page 40

A Yes. It has to be followed up with the documentation to get it paid.

Q Yes. So I could obtain a verbal approval but then I need to follow up with the documentation to actually get the overtime, is that correct?

A Yes.

Q All right. Are you aware of a retention allowance, the term retention allowance?

A Yes, I am.

Q What is a retention allowance?

A The regulations provide that a retention allowance can be paid to an employee when the agency has a special need for the skills and it is known that the employee would most likely leave the federal government.

Q Okay. How would somebody know that the employee is likely to leave the federal government?

A The employee would tell them.

Q Okay. And you keep referencing regulations. What regulations are you referring to?

A Federal regulations that would be found in the Code of Federal Regulations, 5 CFR.

Page 41

Q All right. Do you know whether anyone at NTSB at anytime was paid a retention allowance?

A Yes. We've paid a retention allowance.

Q Okay. Do you know you how many times that occurred?

A Currently we have six.

Q Okay. Do you know who those six are?

A Yes.

Q Okay. Would you tell me who they are?

A By name or by position?

Q Both actually.

A First name and last name?

Q Yes.

A Okay. Bob Benzon, B-E-N-Z-O-N, Air Safety Investigator; Kenneth Egge, E-G-G-E, Investigator. I don't know his title. Paul Misencik, Investigator; James Wildey, Investigator; Henderson, James Henderson, Investigator; Karen Lanier, L-A-N-I-E-R.

Q Is that it?

A Yeah. I think I left somebody out but I can't remember the other name.

Q Okay. That's fine. Okay. Suppose I want

to pay somebody a retention allowance? I'm not sure whether or not they're going to leave but I want to give them a retention allowance. Could I do that?
A Suppose -- say that again?
Q Yeah. I come to you. I say I want to give somebody a retention allowance. I want to give them some money. I'm going to do it by giving them a retention allowance. They may or may not leave if I don't give it to them but I really want to give it to them. Could I do that?
A If you do not have -- if you don't have the likelihood of believing that the person's going to leave the federal service, that would not be the appropriate means.
Q Okay. Well, how could I establish that they were likely to leave, by just them telling me?
A They have an offer of a job outside of government.
Q Okay.
A Or they have announced their intention to retire and they're eligible.
Q Okay. All right. Are you aware of whether



at any point in time within NTSB an employee was going to leave because their pay was insufficient and a retention allowance was given to them to make them stay?
A Not with those conditions alone.
Q Okay. What other conditions were present?
A Somebody had a job offer.
Q Okay. They actually said I can make more money somewhere else in the private government?
A Yes.
Q But just coming to you and saying or coming to their manager and saying I need more money or I'm going to leave, would that be considered insufficient to give a retention allowance?
A Yes. They don't have a job offer.
Q Okay.
A That -- yeah. The likely to leave has to be kind of confirmed.
Q Got it. Other than a job offer, is there any other way to confirm that?
A An employee who's eligible to retire who says that they're going to retire and they're



eligible.
Q I see. Okay. All right. Good. Are you familiar with senior level positions within NTSB?
A Yes.
Q I'm going to use the acronym SL. Okay. Under what circumstances can the NTSB award SL positions?
MS. COHEN: Objection to awarding.
A SL positions are like SES positions. We have to have an allocation.
BY MR. SCHER:
Q Okay. And how does NTSB obtain an allocation?
A The process for obtaining an allocation is the same for SES. They have to go to OPM to request an allocation.
Q I see. Okay. And what are the requirements for appointing an SL position?
A I'm not sure I understand your question.
Q Well, are there any specific competencies that are required?
A It depends on the position.



Q Okay. Let's take a modal director, for example, of the four modal offices. Suppose I am a manager and I want to appoint an SL position to a modal director. Are there any specific requirements I must meet?
A As a manager you would have to work with HR to determine the qualifications for that particular job depending on what type of job it is.
Q Okay. All right. But what makes that different from promotion from GS-15, Step 9 to GS-15, Step 10 for example?
A GS-15, Step 9 to GS-15, Step 10 is not a promotion.
Q Okay.
A It's an -- yeah. It's not a promotion.
Q Is an SL appointment a promotion?
A Yes. It could be.
Q Okay. What else could it be?
A It could be a reassignment if it's an SL to an SL.
Q I see. All right. But are there any regulations or anything that qualify what I need to

put in the qualifications for an SL position?
A In the Code of Federal Regulations that I referred to earlier, it kind of defines a single level or SL position as a position that's classified higher than a GS-15.
Q Okay.
A And so it would have to be higher than a GS-15.
Q Well, other than money, what differences could there be?
A Depending upon the specialization of the position.
Q Okay. Well, let's talk about the Director of the Office of Marine Safety for example.
A Uh-huh.
Q What differences between GS-15, Step 10 and SL would I need to state in my qualifications to be able to appoint that position as an SL position?
A You would have to work with HR to determine the specifics. I mean that's not something I can tell you off the top of my head because it's not so concrete. They could use -- depending on the



specialties that would be looked at and what could be in classification guides, they would have to determine that for that specific position.
Q I see. Now, are SL and SES slots interchangeable?
A I'm not really sure about that piece. You have to clarify for me what you mean by interchangeable.
Q Well, can a person who is an SL be moved into an SES slot?
A Oh. That kind of interchangeability --
Q Yes.
A -- between people? No. Not to my knowledge. No.
Q Okay. Can that be done through reassignment?
A No.
Q No. Okay. All right. Do you know whether an SL position has a limit of the amount of supervisory duties it can engage in?
A My understanding is that an SL position can have no more than 25 percent of the duties



supervisory.
Q Do you know why that is?
A No, I do not.
Q What is the SL employee supposed to do with the other 75 percent of their time?
A It would depend upon the job but it's the technical specialty of the position.
Q Okay. I see. All right. Do you know whether at any point in time any of the four office modal directors were appointed as an SL position?
A We had a vacancy announcement for an SL position. We had a member of the SES compete and they were selected for that position.
Q Okay. And what position was that?
A The chief technical adviser intergovernmental relations. I don't remember the specific title.
Q All right. When was that?
A Around 2005.
Q Okay. Does an SL position -- is it required to be competed?
A I'm not remembering that specifically.



Q You don't know?
A I don't know.
Q Okay. I just need to clarify something.
A Uh-huh.
Q Correct me if I'm incorrect, okay?
A Okay.
Q An SES appointment, unless it's a reassignment at the same level, SES to SES, it has to be competed, correct?
A Yes.
Q Is the same thing true for SL?
A Most of the positions for SL I've seen have been competed. I'm not really sure whether or not it can be done another way.
Q Okay. Thank you. Are you familiar with performance awards within NTSB?
A Yes.
Q Okay. And how are performance awards granted?
A Performance awards are based upon -- are granted based upon the performance appraisal rating that an employee receives.

Page 50

Q Okay. And when does the employee receive a performance appraisal rating?
A We have an annual cycle for each category of groups of employees and they receive them on a cycle, an annual cycle.
Q Okay. So is every employee required to have a performance appraisal on an annual basis?
A Most employees are required to have that on an annual basis.
Q Okay. What employees are not required to have it on an annual basis?
A Employees who could have not been in their jobs for 90 days because they've moved or change jobs.
Q I see.
A Or new to the agency cycle.
Q Okay.
A They would miss -- they would sometimes miss SL.
Q So is it correct that every NTSB employee who has been there, been employed for more than a year, is required to have an annual performance appraisal?

Page 51

A Yes.
Q Is that performance appraisal done in person?
A The employee and supervisor discuss it --
Q Okay.
A -- in person. But the supervisor does the rating before that meeting.
Q Okay. All right. Then once the supervisor does that rating, what happens next?
A The ratings go from the immediate supervisor to office directors and are reviewed and then HR receives them to do an overall agency assessment and the managers at the same time they do ratings make recommendations for awards and that package goes forward and is reviewed by the Managing Director.
Q Okay. All right. Now, is the manager required to review the performance rating with the employee?
A Once it has -- not before they release it from their office.
Q Okay. After they release it from their office, they're required to review the performance

Page 52

appraisal and rating with the employee?
A Yes. At the end of the cycle, after HR has reviewed it, after the MD has reviewed it then it goes back for the managers to have their discussions with the employees.
Q But is it possible or permitted -- excuse me -- is it permitted for a manager to do the entire review, issue the performance rating and never discuss it with the employee?
A The guidelines say that they're supposed to have the discussion.
Q All right. What is the consequence if they don't?
A I don't know of a consequence.
Q All right. So what performance ratings then justify the grant of a performance award?
A Outstanding and excellent.
Q Okay. And is that an automatic thing? If I receive an outstanding, do I automatically get a performance award?
A I've seen instances where it's not an automatic.

Page 53

Q Okay. Why would that be the case?
A I don't know the causes. It's supervisor to supervisor. There are various situations.
Q Okay. I got it. Now, what type of compensation is a performance award?
A A performance award is a cash award, a lump sum cash award.
Q Is it considered salary?
A It's considered part of compensation package but not salary.
Q But is it included on the employee's income?
A Yes.
Q Is it taxed --
A Yes.
Q -- as income?
A It is taxed as income.
Q All right. And are you familiar with the term quality step increase?
A Yes. I'm familiar with that.
Q All right. What is that?
A A quality step increase is a within-grade increase -- a quality step increase is an incremental

step in pay that an employee can receive.
Q Okay. When you say incremental step, do you mean from say, GS-15, Step 5 to GS-15, Step 6?
A Yes.
Q Now, is that an increase in salary?
A Yes, it is.
Q Now, how is it determined to issue a quality step increase?
A I don't know how it is determined but there are certain eligibility requirements.
Q What are those requirements?
A The employee would have to have received an outstanding performance rating.
Q Okay.
A And they would -- they could not have received a quality step increase within 52 weeks.
Q Okay. I got it.
MR. SCHER: I think we're -- off the record.
(Discussion off the record)
MR. SCHER: We're on the record.
BY MR. SCHER:
Q One of your jobs is to manage payroll, is



that correct?
A Yes.
Q Okay. What does that job entail?
A At NTSB what that means is I am the direct contact with our service representative because our payroll is not handled by NTSB. It's handled by the National Business Center. We have an agreement with them to process our pay.
Q What is the National Business Center?
A The National Business Center?
Q Uh-huh.
A It's a franchise of the Department of Interior and they are a center who provides services to government agencies and they are one of the government payroll offices. So they are essentially our payroll office.
Q Is this a private company?
A No. It is a government franchise.
Q A government franchise?
A They're part of the -- the parent organization is the Department of Interior.
Q I see. And where are payroll records kept?



A In Denver.
Q Denver?
A Yes. But that's where the National Business Center payroll office is.
Q I see.
A We have an automated payroll system --
Q Okay.
A -- posted by the National Business Center.
Q Okay. This is an online thing?
A Yes.
Q On the internet?
A Uh-huh.
Q Okay. So suppose I wanted to search the payroll records.
A Uh-huh.
Q Not to be -- suppose I wanted to put your name in. I put your name in. I want to see all of your payroll records. How would I go about doing that?
A No. You wouldn't be able to do that. There's -- how can I explain this to you? It's not a query system. It's a payroll operation. So we would



on their behalf -- we could look at payroll records or call up a particular pay period to look at.
Q Suppose I wanted to see all your payroll records. How would I go about doing that?
A Make a request.
Q Of who?
A National Business Center.
Q And how would they do that?
A They would draw a report off of their system.
Q How long would it take them to do that?
A I don't know. I deal with it request by request.
Q All right. Well, the average time it takes for a request.
A I've had -- depending on the timing of the request, it could take anywhere from three days to one week. It depends.
Q All right. Now, suppose I wanted to obtain 50 payroll records. Could I do that?
A They could run -- by payroll records you mean payroll information?

Page 58

Q Correct.
A Okay. They would run a query for me to get that type of information.
Q Okay. In what form do they produce that to you?
A Generally I have received payroll information in an Excel spreadsheet format.
Q Okay. So they email this to you?
A No. Depending on the type of data that I'm asking for, it can't be emailed. They would put it on a CD and mail it to me.
Q Why can't they mail it to you?
A The sensitivity of the information.
Q Suppose I wanted the records of every person who's ever been an SES at the NTSB -- NTS level position? Could I obtain that from the National Business Center?
A What type of record? What type of information?
Q The fact that they were an SES and when they were an SES.
A That's personnel information.

Page 59

Q Okay.
A So it will come through HR.
Q Okay.
A And HR would provide that information.
Q How would HR go about getting that information?
A We would review official personnel folders or we would query our database depending on what information you were asking for.
Q Well, what's the difference between querying the database and looking at the folders?
A I query the database sometimes to validate what I have in the folders. The other is is that my automated system goes back to 2002 and my records on the automated system don't go that far. So if I have to give information prior to 2002, then I have to do a combination thereof.
Q Okay. So suppose what I want to find out is between 2002 and today, I want to know every SES appointment that has been made within NTSB.
A Okay.
Q How would I go about doing that or

Page 60

how would -- I request this of you. But how would you go about doing that?
A Just query the database and ask for employees who had pay plans of ES for that period of time.
Q How would it take you to do that?
A It depends. I mean it could take -- we haven't had that many. It wouldn't take that long. So it would take one day, two days.
Q And what form would that answer come in?
A A report form.
Q Okay.
A It would be a report depending on what you asked.
Q And if you were going to give that report to me, how would you do that?
A Create an Excel spreadsheet depending on how much information you ask for.
Q Okay. And then you could print that Excel spreadsheet or --
A Yes.
Q You could print it? Could you email it to

Page 61

me?
A Depending upon what information you are requesting.
Q All right. All right. I got it. Now, I have the same question regarding SL positions.
A Uh-huh.
Q I come to you and I want to know every SL position that's been awarded within NTSB between 2002 and the present. Would you again query the database?
A Yes.
Q And how long would that take?
A Probably about a day to two days.
Q And then what form would you take when you got the result?
A We choose the form -- depending on how much data you asked for, it would probably be an Excel spreadsheet or sheet of paper with columns of information, or by employee. It just depends on the information that's requested.
Q Okay. All right. Now, let's go back from 2000 to 2002, before the database existed. How would you obtain that information for, say, SES positions?

A Look at the official personnel folders, what we have queried the database. And look through other records of the agency --
Q Okay.
A -- and reference OPM records to see if the information is complete.
Q All right. And how long would that take you?
A Depending on how many sources I would have to use to do that, it could take me longer. So it could take me like maybe five days, three to five days, depending on the sources.
Q Now the same question regarding SL positions between 2000 and 2002.
A Uh-huh.
Q Would that also take you about five days to come up with the answers?
A Depending on how many sources I had to use, yes.
Q Okay. All right. Do you know who Dan Campbell is?
A Former Managing Director for the agency.



Q How long have you known him?
A Probably about as long as I've been at the agency. Probably not. I've known Dan Campbell for a very long time in the position of Managing Director and the position of General Counsel. So for however long he was at the agency that I was at the agency.
Q Okay. Is it fair to say it's at least five years?
A Yes.
Q Okay. All right. What conversations if any did you have with Dan Campbell regarding Julie Beale?
A None that -- I mean none specifically that I can remember.
Q Okay. And what conversations if any did you have with Dan Campbell regarding Marjorie Murtagh Cooke?
A None that I can specifically say. Can you tell me -- when you say conversations --
Q Yes.
A -- what are you referring to?
Q Okay. When I say conversation, I mean an email communication, a written communication, or



talking.
A Okay.
Q Go ahead.
A In HR I am subject to communicate with the Managing Director on a lot of topics but specifically, having a specific topic that I actually engaged with him on, I can't remember a specific.
Q Okay. Well, did you talk with Dan Campbell about Marjorie Murtagh Cooke at all?
A Not that I know of. She was an employee of his so if I -- if a manager comes and asks for information, say, I need the names and grades of all of people, that's when we talk. When we facilitate a process with a manager at the end of a performance cycle and we have to provide a list of employees in that organization, we go back to that manager and say your reports are due on this date, you have to provide us this information. That type of generic. Just standard HR conversations.
Q Okay. All right. I just have one more question. The question is what forms or types of compensation could NTSB award an employee of any kind?



A When you say award, are you --
Q I'm sorry.
A -- talking about --
Q Award being grant, promote, give to.
A Okay.
Q Yeah.
A We have basic salary.
Q Uh-huh.
A We have premium pay or various forms of -- can I back up for a second?
Q Yes.
A By forms of compensation and NTSB employee, you mean any NTSB employee, what available means do we have of --
Q Yes.
A Oh, okay. Salary.
Q Uh-huh. Yes.
A Awards.
Q Okay.
A Allowances.
Q Okay. What about overtime?
A Premium pay. Yes. Overtime.

Q Premium pay includes overtime?
A Yes.
Q What else is included within premium pay?
A Premium pay includes overtime, compensatory time, compensatory time off for travel, call-back overtime, holiday pay, danger pay, hazardous and environmental pay. There are all kinds of different pay categories.
Q Okay.
A But it's all included under the umbrella of premium pay. And all of them have different eligibility requirements. It's not -- like every employee can't get all of those categories. It's case specific.
Q Of course. And then you said allowances. What types of allowances are there?
A Retention incentives and allowances in some areas. Like Alaska, there's a cost of living allowance that's required for the persons who are there.
Q Okay.
A That's it.



Q And then there's -- did you say performance?
A I said awards or -- instead of awards, which would include performance awards and other awards.
Q What other awards are there?
A Special act in service.
Q What is that?
A It's an award given to an employee based on a specific task that they've done or accomplishment that they've made.
Q Okay. Got it. Is there anything else?
A In the awards category I've talked about quality step increases and that's included in that.
Q All right.
MR. SCHER: Nothing further at this time. Thank you.
MS. COHEN: Can we go off the record, please?
MR. SCHER: Sure.
(A recess was taken.)
EXAMINATION BY COUNSEL FOR THE DEFENDANT
BY MS. COHEN:
Q I just have a couple of questions.



Mr. Scher earlier asked you about the different types of compensation available to NTSB employees.
A Uh-huh.
Q When you responded, were you talking about GS employees or SES employees?
A I used the term -- I took that as a term generically of what's available. There would be a distinction for an SES employee versus a GS employee.
Q Which of those types of compensation would be available for an SES employee?
A Salary, awards, and some of the incentives and allowances. They would not be eligible for overtime -- premium pay which would include overtime and comp time, comp time off.
Q Not eligible for any of the premium pay that you described?
A The only one that's -- no. They're not eligible for any of it.
Q Are they eligible for retention allowances?
A There would be an instance where an SES'er would be eligible for retention incentive.
Q What would that be?



A If an SES'er had a job offer or if an SES employees was eligible to retire, that would have been a mechanism by which they would have been able to get a retention incentive.
Q Are they eligible for the cost-of-living allowances?
A In the last couple of years the regulations have changed and they're not eligible for the cost of living. The way they changed the SES is it's not automatic for them. They can get adjustments but not necessarily the cost-of-living adjustments.
Q Mr. Scher also asked you about payroll records, how they're kept, how they can be queried. What did you take payroll record to mean?
A Information from the payroll system. I, in getting payroll records, get information from the payroll system about how people are paid. He went on to talk about records that were HR-related records. So it's what payroll information do we have access to.
Q He was talking about searching generally for everyone in, say, an SES position. Is that possible?
A Up to a certain time frame? From our

Page 70

payroll system, it is. Again when you talk about payroll, you're talking about how somebody is paid. But general pay information is available through the HR system.

Q What's the difference between payroll information and --

A Payroll information in my mind is tax information, salary information, benefit information, the withholdings from somebody's check. The allotments. Those types of things.

Q And that's what you were talking about from the National Business Center system?

A Uh-huh.

Q And anything else would be HR information?

A HR information.

Q Earlier on you were talking about making requests for SES slots to OPM. When those requests are made, does the agency name the particular positions that they want to become SES?

A As part of that process, the agency has to not only name, it has to describe the position.

Q So in any requests to OPM it would have,

Page 71

say, we would like the Director of OHS to become SES and a description of what that SES position would be?

A Yes. It would say -- it would identify the new positions that it's seeking and it would describe it. So it would say Director, Office of whatever, and it would give a description of those duties.

Q And when OPM responds, do they say which position can become SES?

A No. OPM has responded saying your new allocation is this and they give numbers.

Q And then that number of extra positions, assuming they give extra positions, can be allocated anywhere?

A Yes.

MS. COHEN: No further questions.

MR. SCHER: Okay. Last thing is I just have a document request. I'll memorialize this. We request that you have the HR and National Business Center records searched to provide a list to us of all SES appointments and SL appointments between 2000 and 2005 solely to the extent that they exist in one or the other computer system. I'm not asking you to make

Page 72

a manual search but only to do a computer search. I'll be happy to memorialize it for you.

MS. COHEN: We'll consider that once we receive the written request.

MR. SCHER: Of course you will. Thank you. Nothing further.

MS. COHEN: We'd like reading and signing.

THE COURT REPORTER: And you'd like a copy?

MS. COHEN: Yes.

MR. SCHER: Regular delivery is fine. Thank you.

MS. COHEN: Fine for me as well.

MS. SILBAUGH: We don't get a copy. It all goes to Justice.

(Signature having not been waived, the deposition was concluded at 11:39 a.m.)

Page 73

ACKNOWLEDGMENT OF DEPONENT

I, EMILY CARROLL, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

______________________ ________________________

(DATE) (SIGNATURE)

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Alda Mandell, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 23rd day of February 2008.

My commission expires:

July 31, 2012

____________________________

NOTARY PUBLIC IN AND FOR THE

DISTRICT OF COLUMBIA



E R R A T A S H E E T

IN RE: Cooke v. The United States

RETURN BY: ________________________________________

PAGE LINE CORRECTION AND REASON

_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________

_______________ ________________________________
(DATE) (SIGNATURE)



E R R A T A S H E E T C O N T I N U E D

IN RE: Cooke v. The United States

RETURN BY: ________________________________________

PAGE LINE CORRECTION AND REASON

_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________
_____ _____ ________________________________

_______________ ________________________________
(DATE) (SIGNATURE)