# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| MARJORIE MURTAGH COOKE, Plaintiff, vs. THE UNITED STATES, Defendant. | Case No. 06-748C<br>Judge Thomas C. Wheeler |

DEPOSITION OF

JOHN C. CLARK

Washington, D.C.

Friday, June 29, 2007

9:08 a.m.

Job No.: 1-106677
Pages 1 through 270
Reported by: John L. Harmonson, RPR

Deposition of
JOHN C. CLARK

Held at the offices of:
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202)331-2883

Taken pursuant to the Federal Rules of Civil Procedure, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.



APPEARANCES

ON BEHALF OF PLAINTIFF:
BRIAN M. LOWINGER, ESQ.
The Employment Law Group, PC
888 17th Street
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT:
MEREDYTH D. COHEN, ESQ.
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
8th Floor
Washington, D.C. 20530
(202)353-7978
KATHLEEN SILBAUGH, ESQ.
National Transportation Safety Board
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202)314-6084

ALSO PRESENT:
JONATHAN DUNN, Intern
MARLA DUNN, Intern



EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. LOWINGER | 7 |
| EXAMINATION BY MS. COHEN | 259 |
| EXAMINATION BY MR. LOWINGER | 266 |


* * * * *

EXHIBIT INDEX

(Exhibits attached to transcript.)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Various "Notification of Personnel Action" | 237 |
| 2 | Performance Appraisal Form for period 9/1/2000 to 8/31/2001 | 245 |
| 3 | Performance Appraisal Form for period 9/1/2002 to 8/31/2003 | 246 |
| 4 | SES Performance Plan and Appraisal, 11/22/06 | 246 |
| 5 | Progress Review, 11/20/06 | 247 |
| 6 | Performance Appraisal Form for period 9/1/2003 to 8/31/2004 | 247 |




EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 7 | Organizational Listing, October 1, 2002 | 248 |
| 8 | Organizational Listing, October 1, 2003 | 250 |
| 9 | Organizational Listing, October 1, 2005 | 250 |
| 10 | Weekly Reports | 251 |
| 11 | Memo from B. Strauch to B. Loeb; September 29, 1997 | 253 |
| 12 | Memo from B. Strauch to B. Loeb; July 2, 1999 | 253 |
| 13 | Incentive Award Recommendation Form, 11/23/99 | 254 |
| 14 | Memo from B. Strauch to B. Loeb; January 12, 2000 | 254 |
| 15 | Memo from B. Strauch to B. Loeb; June 28, 2000 | 254 |
| 16 | Memo from B. Strauch to D. Dampbell; December 19, 2001 | 256 |

EXHIBIT INDEX (Cont.'d)


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Incentive Award Recommendation Form, 2/27 | 257 |
| 18 | Incentive Award Recommendation Form, 12/15/04 | 258 |
| 19 | Incentive Award Recommendation Form, 10/15/03 | 258 |




PROCEEDINGS

JOHN C. CLARK,

after having been first duly sworn, was examined and did testify under oath as follows:

EXAMINATION

BY MR. LOWINGER:

Q. Good morning.
A. Good morning.
Q. My name is Brian Lowinger. I'm an attorney at the Employment Law Group here to take your deposition today.
Could you just state your name for the record, sir.
A. John Clark.
Q. And could you spell your last name, sir.
A. C-l-a-r-k.
Q. And could you give your date of birth?
A. 9/6/47.
Q. That's 1947?
A. Right.
Q. Just a few ground rules about the



deposition today. We're going to ask you a series of questions. It's really like a question-and-answer period except that it's extended. It's all being taken stenographically, so only what you say orally appears on the record. Nodding of your head to answer a question doesn't really appear on the record, so I'm going to ask that you respond to all questions with a verbal answer. If it's a yes or no answer, say "yes" or "no" rather than "uh-huh," because "uh-huh" always comes out with somebody thinking that means no or maybe later on down the road. So sometimes it doesn't really translate.
A. Okay.
Q. Thank you.
Have you ever been deposed before?
A. Oh, yeah.
Q. Can you tell me when you were last deposed?
A. It's probably been in the last 10 or 15 years, but most of it was right after I came to the Board or right before I came to the Board.
Q. In what context?
A. Always in aircraft accident litigation.



Q. I see.
Is there any reason why we can't take your deposition today? Are you under any medication that would affect your ability to hear, understand and respond to the questions?
A. No.
Q. And have you been convicted of a crime in any way?
A. No.
Q. Okay. And if you don't understand a question, I ask that you ask me to just repeat it or rephrase it, because if you do answer the question, I'm going to assume that you understood it. Similarly, if you don't hear me, I ask that you just ask me to rephrase it or to repeat it and we'll either have the court reporter repeat it or I'll say it again to the best of my ability.
A. Okay.
Q. So let's see. How did you prepare for your deposition today, sir?
A. I met with counsel, Meredyth and Kathy.
Q. I see.

Page 10

As long as we're talking about counsel, let me just say this. Your counsel are here today to represent you, and Ms. Cohen may interject some objections throughout the deposition. That's normal. I'm going to ask that you answer the question, because the judge will decide whether the objection stands or not. In the meantime, in order for this to be as efficient as possible, the writers of the rules have determined that it's best the questions be answered even though there is an objection.
A. Okay.
Q. It's a little strange and takes a little getting used to, but you'll see as it moves on it just becomes kind of common.
So you met with your counsel, Meredyth Cohen and Kathy Silbaugh. Did you speak with anyone else?
A. No.
Q. Did you review any documents?
A. Yes.
Q. Can you tell me all the documents you reviewed, sir?

Page 11

A. There was a folder that had some job descriptions. The document that I guess Marjorie listed her complaints or whatever, and I guess the Safety Board response to that document. I don't know the names of those.
That's all I can think of.
Q. All right. So you looked at job descriptions, Ms. Murtagh-Cooke's complaints, and would that be her grievance to the EO office at the NTSB?
A. I don't know. I don't know what it is. There were complaints. There was a whole list of complaints, and the Safety Board agreed or denied in the second document.
Q. I see.
Besides the job description and the complaint and the answer, is there anything else you reviewed in preparation for today's deposition?
A. Everything was in a little folder, so if I haven't described it, it was in there. I can't remember what there would have been other than that.
Q. Were there other court documents?

Page 12

A. I don't recall. I don't recall any. I don't think so.
Q. Okay. Do you remember seeing any -- do you remember seeing any NTSB documents other than job descriptions?
A. PD descriptions. Let's see, what else? I think there was a whole stack of performance ratings or salaries I had. So there was a list of over the years. They're not position descriptions. I can't think what they're called, but they were a list of job actions, promotions, salaries, changes in job status.
Q. For you or for Ms. Murtagh-Cooke?
A. For me.
Q. Okay. And were they human resources documents?
A. Yes.
Q. Okay. So aside from job descriptions, the complaint, the answer, PD descriptions, position descriptions, the salary chart and information related to your employment status, was there anything else that you remember in that pile?
A. I didn't say salary chart. There was a

Page 13

number of documents that were a progression that had like my salary on it, my job position, changes in job status. So there were a number of pages, all the same type of format.
Q. Oh, so was it a form?
A. It was a form, uh-huh. It was a form, and there were numerous pages in it.
Q. Sure. Like a human resources form?
A. Right.
Q. So aside from those documents that we just mentioned, the job descriptions, the complaint, the answer to the complaint, the position descriptions, the salary forms, is there anything else that you remember seeing in that stack?
A. That's all I can think of right now.
Q. Okay. Did you see anything with regard to Ms. Murtagh-Cooke's salary?
A. I don't recall seeing anything like that.
Q. Did you see anything with regard to Ms. Murtagh-Cooke's position descriptions?
A. No, I don't recall anything like that in there.

Q. Did you happen to review any evaluations of yourself or Ms. Murtagh-Cooke in preparing for today's deposition?
A. No.
Q. Just a little background. When did you start working --
A. When you say evaluations, there were some pages in there that talked about salary performance awards. But I think a lot of those were in reference to all those pages I was talking about.
Q. So there would be a description of a bonus or something like that?
A. Yes.
Q. Sure. And you didn't see any of those for Marjorie Murtagh-Cooke?
A. No.
Q. The entire pile was just solely limited to you?
A. Well, the HR-type papers, yeah.
Q. And the position description was yours as well?
A. Yes. A series of position descriptions.



Q. When did you start working at the National Transportation Safety Board?
A. 1981.
Q. 1981? And we're going to -- If it's okay with you, I won't say National Transportation Safety Board 45 times over the deposition. I'll just say NTSB.
A. That's fine.
Q. You're comfortable with that?
A. You bet.
Q. What was your first position at NTSB?
A. I was an aircraft performance engineer. Or no, I guess my first position was I was an investigator investigating general aviation crashworthiness-type accidents.
Q. What's a crashworthiness accident, sir?
A. The ones I was focused on were small airplanes and looking at survivability issues, the crashworthiness of the airplanes.
Q. You said smaller airplanes. Did you start working in the D.C. office?
A. Yes.



Q. And how long were you in that position as an investigator?
A. Oh, it's so long ago it's hard to remember. Two or three years.
Q. Okay. Do you remember what your next position was, sir?
A. I moved into the labs and was an aircraft performance investigator.
Q. Before we go any further, I have a sense that you have a technical background from crashworthiness determinations and performance investigations.
A. Yes.
Q. Can you tell me about your background a little bit, your educational background that led you to working at NTSB?
A. Let's see. I have a Bachelor of Science in aeronautical engineering from Wichita state in 1970. I started to work at Beech Aircraft in 1966. And then I left Beech in '79, I believe, somewhere around 1979, and went to work at Flight Safety International designing simulators. I worked there several years,



and then in 1981 I came to the Board.
Q. I see.
So from 1983 through 1984 you were an aircraft performance investigator. What does that job entail? Your second job at NTSB, what did you say it was?
A. It's not '83 or '84. Somewhere about that time. We can look at the record and get the specific dates. I moved into Aircraft Performance and did that for a number of years, and then at some point I became Chief of the Vehicle Performance Division. I don't remember those dates.
Q. What does the Chief of the Vehicle Performance Division do, sir?
A. The Vehicle Performance Division has a number of engineers, investigators, that work on airplane performance issues. We look at basically trying to reconstruct how an airplane moves. There's a lot of information we can use to determine that, for example, radar data, flight data recorder data, wreckage ground scars to see how an airplane is hitting the ground, for example. We use photographs,

video, whatever is available to try to piece together the motion of an airplane.

Q. What kind of -- Now that I know the topical area, what type of work did that involve? I mean, determining how an airplane moves, did your office produce reports? Did it contribute to crash analysis? Did it --

A. Oh, I see. There's a myriad of tools or information out there to draw upon. We would usually write a report. There would be any number of reports called studies. And after you would produce a study of some particular -- I'll give you a couple of examples in a second. Then we would also -- that would be an engineering evaluation to determine the motion, and then we would write an analysis report sometimes to analyze all the facts and the studies and the figures to try to draw a conclusion about what caused that motion, what could be done to fix that, an error or a problem.

So the studies could be something like a radar study, taking recorded radar data and determining motion. It could be a simulator study



where you've taken radar data, flight data recorder data and go to the simulator to look at performance. So it's quite a wide-ranging, and in a sense quite sophisticated, compilation of information.

Part of the other thing the performance engineering would do is take the cockpit voice recorder data, which is simply a recording, which can be laid out versus time. Each comment has a timestamp, and then take those comments and embed that with the flight recorder data or charts or graphs to try to show people, Board members, other investigators, and of course, to be made available to the public to give them a better time history of the airplane.

Q. What type of airplanes were you doing research on in the Aircraft Performance Investigation Group?

A. Oh, everything.

Q. Large and small?

A. Yeah, big airplanes, small airplanes, helicopters, balloons, blimps, ships. About anything that moves where there is some data that we could get



our nose into it and try to extract information about the motion.

Q. So it wasn't just limited to airplanes?

A. No. Mostly. It was 95 percent, 98 percent airplanes, but we would pick up different -- We worked on a couple of train accidents, a couple of marine accidents, a couple -- I never did anything in pipeline or hazardous materials. Highway guys do a lot of that themselves, so I never got involved in the highway side of it.

Q. Sure. When we talk about aircraft, were they all civil aircraft, or were they military aircraft as well?

A. I did a lot of work on military just to assist the military in some investigations. A lot of that came through the Armed Forces Institute of Pathology, some of the doctors in town who would go out and do some of the forensic things with the pilots. They knew what we did at the Board, so they would bring in some information or cases. I worked on a number of military investigations, and we would provide them the information.



But our purview is civil and public use. Back then it was just simply civil aircraft.

Q. Okay. Does "public" now refer to military and just governmental?

A. No. Public use is -- are those type of airplanes used by perhaps the local police department. It doesn't necessarily follow the civil rules that the FAA requires. They can -- they're pretty independent; they can do pretty much what they want regulation-wise, FAR-wise. So there's a certain amount of independence for state or local civil police departments. So that would typically be the public use type aircraft we would look at.

And from when we started to now, we now have the authority to investigate public use aircraft. Back then we didn't, but we would investigate those on request.

Q. And there's no difference in the type of aircraft, but the term now is just "public use aircraft"?

A. Now?

Q. In general.

A. No, no. Our No. 1 mandate is civil aircraft accidents.
Q. Uh-huh.
A. And the civil fleet is anything other than military and those aircraft that are involved in intelligence operations. And there's something else; it's in the FARs. If there were intelligence operations involved, we may or may not investigate those.
Q. Sure.
A. So right now the civil aircraft are all the airliners, the privately owned airplanes. Aircraft, not just airplanes.
Q. What's the difference between an aircraft and an airplane, sir?
A. Well, airplanes have wings and are powered by a motor. Then there's gliders that don't have an engine. There's helicopters that are aircraft. Airships are aircraft.
Q. What's an airship?
A. A blimp, a dirigible. Hot air balloons would be aircraft.



Q. When you were talking about public use aircraft, were you referring to your work back in 1983 as well? I mean, was that the term used back then?
A. Yeah. The term has always meant the same thing, it's just that what changed over the years is that back then we didn't have the authority to investigate. We could investigate upon request. And now we have the authority to investigate. So public use has always been the same throughout the years.
Q. And you were an investigator at that stage; am I correct?
A. Uh-huh.
Q. And from the aircraft performance investigator position, where did you move to next at NTSB?
A. I became deputy director of the Office of Research and Engineering.
Q. Do you remember when that was?
A. No. I'm going to guess '96, '97, somewhere in there. That's just a guess. It's in the records somewhere. If that's very far off, you might keep a note and I'll fix it.



Q. You'll have a chance. The system gives you a chance.
A. Okay.
Q. Can you tell me about your position as the deputy director at the Office of Research and Engineering?
A. Sure. The Office of Research and Engineering had a number of functions. They had a Public Inquiries Branch that made all the accident reports available to the public. They had a Safety Studies Group, special investigative studies for all modes. Back then we had all of the computer facilities in charge of all the computers at the Board and in the labs.
We had the Aircraft Performance Division, the Metallurgy Division. At one point -- Let's see.
That's all I can remember back then. It was kind of diverse so -- Oh, the Flight Data Recorder and Cockpit Recorder Divisions.
Q. Sure.
A. So when I became deputy, I focused primarily on the accident investigation and



engineering side, like the Airplane Performance, Metallurgy, the Recorders Division. And Dr. Ellingstad focused more on the computer side, the safety study side.
Q. Dr. Ellingstad, is that Vern Ellingstad?
A. Yes.
Q. And how did you find the job in Research and Engineering? How did you land yourself in that position?
A. Well, somewhere in there I bid on it. The deputy slot became available. My memory is I bid on it and was selected to be deputy. And at one point it was at a GS-15 level, and then it moved into an SES slot when that became available. Various slots became available throughout the years.
That's the best I can remember now.
Q. Sure.
Did you divide the work with Vern Ellingstad? Was he deputy director as well, or was he the director at the time?
A. He was the director.
Q. Okay. And did you have to divide your work

with other deputies? Was there another deputy anywhere?

A. No, I was the only deputy. Vern was responsible for everything, and then I could spend a lot of time and resources and take some of the load off him on the investigation side and some of the technical side. But when he wasn't around, I had to keep track of the safety studies, the computer things.

Q. Sure.

A. But he was more day to day involved in that than I was. But we sat right next to each other, so I pretty well knew everything that was going on.

Q. How many people did you oversee as the deputy director of Research and Engineering?

A. Oh, I'd have to go back and look. Off the top of my head, I would say it was something like 70 people.

Q. And you oversaw their work no matter what division they were in? You oversaw all the separate divisions or sub-offices within Research and Engineering?

A. Like I say, I paid more attention to the



day-to-day things going on in the met lab, in airplane performance, and certainly in the recorders areas. I was more involved in that on a day-to-day operation basis, and I know Dr. Ellingstad was, for example, more involved in the day-to-day operations of the computers, which I know very little about. And on the safety studies, he was more involved on those. I would read the reports and try to contribute to the reports or some of the work planning sessions on the safety studies.

Q. Did you have any budgetary authority as the deputy director?

A. Not really, in the sense that everything went through Vern. We would make suggestions, or when we would need equipment or a list of things, and we would get that in the pool of list of requisitions that the Board would have to make. And there was always a shortage of money, so there were always decisions to be made. So we would make known what would help us.

And then there were always the issues of needing more personnel. And the same thing, money



shortage or FTE shortage. It's just typical government.

Q. What does FTE stand for, sir?

A. Full-time employee.

Q. Okay. And so with regard to the budgeting, you weren't exactly -- you weren't given a budget and a certain amount of money to make sure that, for example, the met lab or airplane performance or the recorder work was done in a certain way, but you knew there was money, and if you needed more or there was a shortage, you would go to Vernon and you would talk to him about needing more money. But you didn't really have --

A. It was never in terms of money from my viewpoint. We had a budget officer in there to keep track of expenditures. We were given money for things like -- The met lab would always need supplies or replenishment of chemicals or film or new camera equipment as they would wear out. And there was kind of a capital improvement budget for things like better microscopes, scanning electron scanning microscopes. There were a lot of little items and a lot of big



items. Sometimes at the end of the year there would be extra money for that kind of equipment. Since the lab supported the entire agency, we often got a lot of the equipment we needed.

Q. Okay.

A. And then if there was a major investigation where we needed the equipment, then we would always get it.

Q. But there was a budgetary officer to make sure there was money and the money was being tracked, and that wasn't under your purview?

A. Well, at the time Eedie Francis was the person doing that, and she kept the books. I never paid attention to it; it was never much of a problem.

It's the same thing right now. NAS, we have a budget person and she keeps track. When we start getting low in investigative funds, she lets us know. They're not going to let us not go and investigate, so we usually get the funds to investigate or travel. But sometimes funds for new furniture, new cameras, stuff like that, maybe it's put off to the end of the year or the next year. But

I don't worry about that.
Q. Sure.
Just for the record, what does "met lab" mean?
A. Metallurgical lab.
Q. Okay. And what about hiring and firing of employees, et cetera? Can you tell me, did you have any human resources type of authority or delegated authority as the deputy director?
A. I wouldn't say it was delegated authority. We always dealt with Human Resources to follow the government rules to put out bids and try to hire people. The process was we would identify investigative needs to replace a person that left or to continue expanding because of workload, to get another performance investigator for example, or another metallurgist. We would make those needs known up to the Managing director. And often they would have to sit down and decide for the entire agency where available slots would go.
And sometimes we would get people, sometimes other offices would get people. Or it would



go to the MD's office, or it would go to our regional investigators. Or when I was in R&E, Research and Engineering, they would go to the Office of Aviation Safety.
So as slots became available, based on money and FTEs we were allowed, people knew where we could use resources, and it was for the office directors to get together and have a good discussion. Sometimes we could all agree that, you know, somebody was in dire straits and it seemed to make sense to everybody. But then sometimes the Managing director had to simply sit down and make a decision, which is his job, and we would move on.
Q. Did you have any responsibility for reviewing applications once a decision was made to hire an FTE?
A. Oh, yeah. Yes, I did.
Q. And did you interview candidates?
A. Yes.
Q. And whom had the ultimate decision on whether to hire an individual?
A. It depended. When I was Division Chief, we



would make recommendations and get the agreement of the directors. When I was deputy director, between Vern and I, those decisions for investigative staff, sometimes we would interview the individuals, several of them or all of them, separately from the investigative or whoever is doing the hiring, the division chief and whoever was there to conduct interviews.
We would either agree or disagree. Most often we would agree with their choices, that this person sounded like they would be added value and would work out, so we would forward the paperwork on to Personnel.
Q. Was there any report-writing done by the division, the Division of Research and Engineering that you were involved with or that you had responsibility to during your tenure there?
A. Oh, yeah. Yes. All the investigators write reports, and they varied a little bit. We have several types of reports. A factual report, an investigator goes on scene, grabs factual information, photographs, documentation, appendices, and they would



create a factual report of some part of an investigation.
The metallurgy lab does it a little bit different. They do more of a metallurgical report of a part or piece to describe something that melted, something that fractured, how it fractured or the type of fracture, or look at the granular structure of a fan disk, which is really cosmic-type stuff. I'm glad there were metallurgists there.
The airplane performance engineers typically would conduct an airplane performance study. It's not only all the facts that came in, but they would conduct simulations or write their own simulation code to simulate an airplane and then to better understand the motion of the airplane, for example. So we call those studies.
And then depending on the type of accident, the investigators often were asked to write an analysis. That's in R&E. It's a little different than OAS. But in R&E they would write an analysis. And that's not like engineering analysis, it was an analysis of all the studies, the facts, everything

that was known, to try to provide their insight into the nature of the accident, to analyze all those facts and figures. And those reports are not made public.
Q. Okay.
A. So we were involved in all of that.
And then I was also involved -- R&E put out an annual review of aircraft accidents for big airplanes, for little airplanes. So we would always look at those, and there was always some discussion in those reports about some subject matter of interest. We would review all of those.
Q. And with regard to the factual analysis -- I mean the factual report, the studies on types of accidents, the analysis for -- I guess it would be a probably cause determination?
A. In the analysis, our investigators are pretty much at liberty to say anything they want. They can opine on their version of probable cause, what they think it should include. It's a nice way to get everybody's thought downs.
Then all of those reports, if it's an aviation accident report, it's really the job in the



Office of Aviation Safety to pull all of those reports from their investigators and the lab investigators, to pull all of those together and compile it into a report. And there may be any number of suggested probable causes, which are good starting points to have a good discussion to make sure that we understand everybody, why they would say that, how they would come to that conclusion, and then perhaps somebody had a better idea. So it gets distilled down to, for aviation, a thing called a blue cover report. That's a major investigative report.
Q. Okay. So for the factual studies -- for the factual reports, the safety studies, the analysis and the annual report, did you have -- I mean, were you involved in the report-writing at all, or were you involved in the review of it? Any critique?
A. At various times I wrote reports like that. Sometimes I would be in the middle of making sure that various parts of an investigation were covered for the investigators. I assume as deputy director is what you're talking about.
Q. Yes.



A. We would know the investigations. That's the beauty of a very small agency. It's very thin from top to bottom, so you go from director to Chief to investigators. So everybody knows everybody. There's a lot of knowledge for the people that have been around for a long time, so it's always good to get in there early and make sure the investigations are on track. You can see where investigators are going and always offer suggestions to make sure that all the facets have been properly covered.
Q. Sure.
A. So it's very much an interactive process top to bottom. And also with R&E and OAS.
Q. It would seem in a sense you had an editorial role.
A. No, I'm not an editor. I'm not an English major.
Q. Well, not editing for commas and semicolons, but I mean as far as scope or --
A. That's not editorial. It's a technical role. It's a pretty hard core technical role. You can write technical writing that certainly wouldn't



meet the standard of a writer/editor, perhaps even lawyers. But there is a very functional level that engineers or investigators can get their thoughts down and progress it through to a logical conclusion. So it's much more technical.
Q. I've read plenty of scientific journals and enjoyed the love of passive voice.
Well, excuse me. I didn't mean to suggest, sir, that you are an editor. I guess what I was trying to say was more of an oversight --
A. Oh, yeah, I agree with that. I understand your comment.
Q. Okay. And you were the deputy director in Research and Engineering. Then did you move from there to another position before you arrived at the director of Aviation Safety?
A. Uh-huh.
Q. What was your next step?
A. I was deputy director in the Office of Aviation Safety.
Q. And when did you take that position, sir?
A. If I could get them all laid out, maybe I

can remember the dates. It was before 2000. Let me go through the list real quick.

I was deputy director in R&E, got into the SES in R&E. I went down and was deputy director in OAS for a period of time. Came back and was deputy director in R&E again. The guy that came in behind me didn't work out. And then I went back as deputy director of OAS and then director of OAS.

Q. Did you always stay an SES during that time?

A. Yes.

Q. So when you went from Aviation Safety back to Research and Engineering, or from Research and Engineering back to Aviation Safety, you never had to give up your SES?

A. No.

Q. Do you remember when you first obtained SES status?

A. Oh, boy. What did I say earlier? I think it was like '96, '97, something like that.

Q. Do you think it was halfway through your time in Research and Engineering as the deputy



director? Was it near the end of your time, your first run through?

A. I was deputy director, and I came in as a GS-15. And then some short period after that they bid the job -- or they bid the job to come in as a 15, so I had the job as 15. And then I can't remember whether we bid that into SES or not, but I know I had to go through the application process to be accepted into the SES.

So I think the job, I went in as a 15, and I don't remember whether we bid it at that point or not. There is certainly a record of that somewhere. What I do remember is filling out the huge amount of paperwork that seemed somewhat obscure to me. But you fill it out and it goes off somewhere.

Q. It's like 40 pages long.

A. I know. And for whatever, it was accepted as adequate, and then I was in the SES in that position.

Q. Did you have to interview for the SES position?

A. I don't remember. What I do remember is



interviewing for the deputy, the GS-15 position. And that had been an SES position. Dr. Loeb Haueter was head of R&E and Dr. Ellingstad was deputy, and for several years he was in the SES position as deputy. And Dr. Loeb moved down to AS and Dr. Ellingstad moved to be director. Then I moved up as a GS-15, and then that process started to see if it could be converted into an SES.

Q. I see.

A. So whether there was an interview for that back then, I just don't remember.

Q. Do you remember where you saw the advertisement for the SES position?

A. I don't know that I saw an advertisement for an SES. I don't know what you mean, advertisement.

Q. A posting, maybe an internal posting.

A. Well, I don't know. No, I don't remember. I remember there was a -- What I vaguely remember is that I turned in my application for the SES, and I understand that there were other people that did also. There were a number of people that bid on the SES



position, and I was selected. That's about all I remember at the time.

Q. Sure.

I'm sorry to have to ask this question again, but it's just piquing my interest. You don't remember a review panel or a group of people having to sit down -- having to sit down and talk to a group of people or a review panel or a panel of your peers regarding your qualifications for the SES position?

A. There could have been. I don't remember.

Q. Do you remember interviewing for the GS-15 position?

A. I don't remember those kind of things. You go in for an interview, you do it, it's done, and I don't remember now what the process was then.

Q. Maybe it wasn't an interview. Could it have been just an informal meeting that led to your selection?

A. I don't remember. I frankly don't remember what the process was back then for that.

Q. Do you think there's any piece of information I could give you that would help you

remember?
A. If you have it, it might.
Q. Would it be in, for example, your personnel file?
A. I suppose.
Q. Have you seen your personnel file ever, sir?
A. I went and looked in it something like the first year I got here at the Board. After that, I never looked. I know it exists and I know you can go look at it. I never have.
Q. Why look in that closet, right?
A. I don't know. It might be fascinating.
Q. Okay. The next thing is then you went -- There was a back and forth, I guess, between Research and Engineering and OAS. Is it OAS?
A. Office of Aviation Safety, yes.
Q. And let's see. You say you didn't remember the date, the year that you took that position?
A. No. The year I became director was like, I'm going to say, 2000, 2001, something like that.
Q. Okay.



A. It's all down in a bio somewhere, I imagine. I assume the personnel records are accurate.
Q. Let me ask a question, sir. When you became the director, do you remember seeing Bill Clinton's face on every wall, or do you remember seeing George Bush's face on every wall?
A. No, I don't remember that. Oh, you mean the first time -- When I became director?
Q. Yes.
A. That was 2000 or 2001, so whoever was president then.
Q. It wasn't 2002 at all?
A. I don't think so. Jim Hall was the chairman again. He's a Democrat, so probably Bill Clinton. I don't get involved in the political side of it.
Q. I understand, sir. I'm just trying to place dates.
A. That's not something I associate a date with.
Q. Can you tell me about your time as a deputy director in OAS? What position did you hold there? I



know there's a few deputy director positions in OAS. I think there's an international position, there's a general management type of position, and I think there may be a few others.
A. Well, the deputy position then, if I remember correctly, was the only deputy position at that time.
Q. Oh, okay.
A. Somewhere the deputy director position in regional was created. It could have existed at that time; I don't remember.
Q. Can you tell me what your responsibilities were as the deputy in OAS?
A. Well, tracking investigations, trying to keep the reports moving. We do a lot of investigations down there on parts and systems that aren't involved in accidents. We do a lot of engine investigations, systems failures that are, in a sense, more of an incident but they're very dangerous, could have easily resulted in a major accident.
Q. Sure.
A. So there's a lot of systems, structures,



power plants, those types of investigations going on all the time. So I was involved in a lot of those.
And then we had our major investigations also. And also had a number of investigations called field majors where the regional investigators were handling a pretty big accident, not a big airline-type accident, but we were trying to keep all those moving, keep track of it, working down through the regional directors and the division chiefs.
Q. Okay. I just want to make sure that I understand the investigations, because I understand -- I guess I want to understand the types of investigations.
There's parts and systems not involved in accidents, those types of investigations.
A. Uh-huh.
Q. That's just in the course of improving aviation.
A. Uh-huh, yes.
Q. Do you find out about this through a crash, or do you find out about this through an accident, or do you find out about it through someone saying, "I

don't know about that rotor, it's not the world's best, you guys ought to take a look at this"?

A. Those I would call incidents. We find out about a lot of those through any number of sources. You may read or hear about something in the news clips.

The FAA puts out a daily brief, so they get informed of a number of unusual occurrences out there. So we look at those and talk to them.

We get direct reports from the manufacturers such as Boeing or General Electric. If there is something going on that they know about and they know we would be interested in, they let us know.

The airlines may call us. We may get a call from a mechanic on the floor who just picks up the phone and says, "They aren't taking care of this correctly; you guys need to get your nose into this."

So it can come to us any number of ways. Most importantly, there are a lot of those incidents that go right into the FAA process and the FAA provides the oversight because they're in charge of the certification. So FAA handles a huge number of



those types of events, and they'll come out with an airworthiness directive or something to fix it and we perhaps won't have heard about it until it comes out from FAA.

Q. What's the relationship between FAA and NTSB OAS with regard to incidents and airworthy -- airworthy what?

A. Airworthiness directive.

Q. An airworthiness directive. Would you receive notice, for example, from FAA saying, "Come take a look at this. We want you to look at this and see what you think of it"? Or is there some sort of jurisdictional overlap?

A. Well, FAA is often one of the sources -- If it's something that's been going on or some type of investigation and there is a second or third one and the FAA knows about it, often they'll give us notice because they know we're interested in it. We're investigative, not enforcement. We have no regulatory authority.

So what we can do is be in the investigation, the ones that we choose. We can't



cover the gamut of what FAA covers, but we can -- if there's certain critical issues where we have an interest and we're looking into it, we can be talking to FAA all the time and make sure that they're moving towards a solution that seems reasonable to us, such as issuing an airworthiness directive.

Q. I see.

A. If they're not and it seems that we think they should do something different, then we can sit down and write a safety recommendation letter. And we would write about the facts and circumstances, what is wrong, what we believe would take to correct it. Or the fact that FAA has issued an AD and maybe the compliance time is two years and we think it should be 60 days; we don't want an issue out there for that long.

Q. Sure.

A. So it's a myriad. Every one is different. I mean, there is a similarity in all of these, but each one that comes in the door may play out distinctively differently. Sometimes we see the FAA is after it, they jump on it, there are service



bulletins from the manufacturer coming out, airworthiness directives from the FAA coming out, and we just back out because it's being taken care of.

If we need to write a safety recommendation, our investigator will bundle that together, it will go through a review process, and then our five Board members have to adopt that safety recommendation. So it's all of staff's job to get that through the writers, the editors, the Managing director, to the Board members and get them to adopt the safety recommendation.

Q. I guess what I don't understand, sir, is who decides whether you're going to do an incident report at NTSB? For example, do you have subpoena authority to demand that, for example, that a manufacturer turn over a pierce for review? Or is it just some part of a working relationship with FAA that they turn things over for your review?

I understand that you find out about things through the news, et cetera, but how do you actually go about deciding that an incident report is going to be undertaken, and what authority is exercised to do

that?

A. There's a lot of questions there.

Q. Do you want me to split it up?

A. Let me just give you a general, and if I didn't catch all your questions, you can ask.

There's incidents that come in the door that we're aware of that are kind of all shapes and sizes. Some need to be fixed and aren't real high priority. Others are very urgent. They come in through the systems. Power Plants group are more on the technical side. Operations are more pilots, if there is an operational deficiency out there.

And we sit down. They usually have -- the individual investigator and their division chief usually have a pretty good idea of what they need to do.

At the director level or deputy director in AS, we would size up and with the other division chiefs decide what we would need to have done to further clarify the situation, clarify the picture.

We have a morning standup where we meet every single morning for 5, 10, 15 minutes just to let



everybody hear and get everybody on Board on those particular issues. We also discuss the pending job changes, but that's our opportunity to discuss some developing issue.

Sometimes other people will have a better insight or more knowledge or prior history. We bring it all together, and then the investigator is usually by this time on the phone with the airline, the manufacturer or the FAA, or all three, getting an idea of what situation is, it's under control, it isn't under control.

And we may request that the parts come to the lab. We have the authority on any investigation -- we have a broad authority, and we certainly have subpoena authority, but we almost never ever use it. We usually get what we ask for. Most of the aircraft industry out there recognize the authority, and I think we have a lot of respect. So sometimes if it's going to be a hardship on them, we'll get an investigator into their facility and deal with it right there firsthand. Engine parts are very complex. Sometimes we do insist they come to our



metallurgy labs. Sometimes we'll go to the General Electric facility, for example, directly and work with them. But it's always our choice. We're looking for efficiency. We want to get in, get it done, fixed, stabilized, whatever.

So the questions you're asking are kind of -- not the way we operate. If we're aware of an issue, we have a lot of authority. We pick up the phone, and the individual person can reach out and touch two or three people throughout the day or the next day, and parts may be headed this way, or recorders may be headed in even though there wasn't a crash. We'll listen and review the data on those, get the parts in. Or we may understand that parts were tested at a certain facility, either here or abroad, so we pack the parts up and head to those facilities anywhere around the world.

Q. Does the Office of Aviation Safety continue to do incident reports?

A. Well, they're not incident reports as such. We do accident investigations, and then there are incident investigations. What you're describing as an



incident report, there are incidents, and then of those parts and pieces that we're doing an investigation on, we'll write about a certain part of an investigation of that incident.

A lot of incidents are not an accident, they're an incident, and we kind of -- we don't carry those to probable cause. We don't come to write a whole report on an incident. Some we do if it requires it, but most often it's an incident. A guy had an upset because an engine failed. Well, the real issue is the engine failure, so there will be reports about the engine, the metallurgy, why the fan blades failed, what part of the world the fan blades were examined, for example. They'll write a report about that, and then if it's being fixed, we're pretty much out of it. It's in our records; it may go in the docket.

And then if we do need to write a safety recommendation because of that, then there will be a safety recommendation letter that, as I described earlier, gets through the Board. And we do that to kind of put a stake in the ground of what we want,

when we want it, why we want it. And then that's out there very public. That's something that needs to be resolved either by the manufacturer or the FAA to rectify that.

Often they do what we say, or we may give some pretty direct advice. We may not tell them what to do, we just tell them what needs to be fixed by a certain time. They're very smart people and know what to do. Those recs then are eventually closed out, either acceptable or unacceptable. Or there may be alternate action; somebody found a better way to do it than we talked about. The problem may go away. All the parts may have been removed from the field.

So it's kind of no one set answer for anything.

Q. Sure.

You mentioned major regionals as well.

A. Uh-huh.

Q. What's a major regional?

A. It's easier to describe. There's a lot of accidents of small airplanes; for example, a student pilot's airplane gets away from him, runs in a ditch,



wrecks the airplane, he's not hurt. If he damages the airplane, it's an accident, but it's very limited in nature. We won't send an investigator on scene. Often the FAA will show up, so we'll use FAA photographs. They can cover that stuff very nicely. So we use the information they provide.

Then there are some pretty serious accidents that may kill four or five people in a Beech Baron, for example, a small twin-engine airplane. Our investigator will go out. The manufacturer will show up; the engine manufacturer will show up; air traffic may. FAA always shows up, and he'll have this small team.

So that's pretty much the bread and butter type accident investigations that our investigators are very much involved in.

Q. The regional investigators?

A. The regional investigators, yes.

And then there are the ones that are a corporate jet, big jet, a high profile person, more complex equipment. Big helicopters are complex. Jet airplanes in their operation are quite complex, a lot



of systems to work on. And so a regional investigator will pick up that. That's kind of a major regional investigation. It's more complex, more people involved.

We may send specialists from headquarters such as power plant guy or structures guy. So the regional investigator is in charge of a lot more assets than typical, and the issues are more complex than, I'm going to say, the typical general aviation accident out there. It's not quite to the point of complexity where we think we need to send an investigator in charge out of headquarters and a team of investigators out of headquarters to handle all the separate issues. The guy in the region has got to handle it all himself. But it's a tougher accident.

Q. Who is responsible for the report, regional or national, the national office?

A. It's all Office of Aviation Safety, so it's the director's responsibility. And it's delegated down through the deputy director of regional operations, the way we're structured right now. And then the deputy director at headquarters is



responsible for all the major investigations and also all of those, I'm going to say critical incident investigations, ones where an engine has failed or a piece of structure has failed that could have led to a catastrophic accident.

Q. Okay. I want to make sure I understand this. Through delegated authority, the regional deputy director can be responsible for the critical incident investigations and the major regional investigations through the delegated authority. Is that right?

A. I don't know what you're talking about, delegated authority. "Delegated authority" is a term that, as a director, the Board has given the director delegated authority to personally sign -- approve the probable cause of a lot of accidents. And when I was deputy or director, it may be 200 accidents at a time that don't go to the Board.

So it's the board's job to determine probable cause, but under delegated authority the director can sign for those. Now, the deputy director of the regional operations is responsible for all of

those investigations conducted by regional investigators, and there's a wide range of those. There are a few incidents, but most are accidents. And then there's a number of fatal accidents that the deputy director of regional operations is responsible for.

Then we have major investigations, the crash that makes the news, an airline crash with a lot of people and things like that. That's the deputy director at headquarters, the deputy director in OAS. He's the deputy director for major investigations. Those can be the big investigations and all of those technical -- complicated technical investigations that didn't involve an accident. But that's the deputy director of major investigations.

That's the way it's structured right now. And then there's a deputy director of regional investigations that has all those investigators out scattered around the country.

MR. LOWINGER: Does anyone need a break? We've been at it for a little while. Would you like a break?



THE WITNESS: Go ahead. I'm fine.

MR. LOWINGER: I'm fine as well.

BY MR. LOWINGER:

Q. Let's talk about -- I think we're getting ahead of ourselves a little bit, and I think we're kind of talking about the present right now, and I want to make sure we're all in the right time period.

You became the director of OAS in 2000 or 2001?

A. Yes.

Q. And you were an SES at the time?

A. Yes.

Q. From the beginning of the time that you were the director of OAS, can you describe to me your principal duties and responsibilities as the director of OAS?

A. The principal duties were to conduct aircraft accident investigations.

Q. Okay.

A. Have safety recommendations written that would improve the safety of aviation. The director is responsible for the overall maintenance of the



regional investigative offices. Or not the maintenance, but the existence of those offices. The director is responsible for determining which slots should be filled in which order, for example.

Q. For FTEs?

A. For FTEs, yes.

The director had that delegated authority to sign off on a lot of the regional investigations that wouldn't go to the Board.

The director is responsible for making sure that the reports on major investigations are completed in a timely manner, that the various aspects of an investigation are properly covered and properly investigated, and that the report is compiled and presented to the Board, and then to get those reports accepted by the Board members and get their endorsement of those reports.

Q. Okay. So as the director of OAS, your responsibilities, or your primarily responsibilities were accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, filling slots for human



resources or for individuals for employees, delegated authority for investigations that don't go to the Board, major investigation reports completed in a timely manner, proper investigation of major investigations, a report completed to the Board and accepted by the Board.

Would you say that's the complete list of your primarily responsibilities as the director of OAS?

A. Well --

Q. You can add to it, sir. We've got time.

A. And I will. I think that's kind of a top end. One thing I did forget is we have a major responsibility in participating in and coordinating foreign investigations.

Q. Okay.

A. That's a big operation in the sense of our responsibilities for U.S. products, U.S.-operated equipment, U.S.-manufactured equipment that are involved in accidents around the world.

Q. Right.

A. So there's a huge amount of our resources

Page 62

that go to investigating foreign accidents. And fortunately, in the last number of years, we've had not too many major accidents in the United States, but it's never-ending overseas.

Q. Okay. So in addition to the list that we just said before, and participating in and coordinating foreign investigations for accidents occurring abroad that contain U.S. products, what other principal or primary responsibilities did you have as the director of OAS?

A. Well, one aspect of the job was to keep the managing director and the chairman informed, keep the Board members informed of what was going on in our world, provide testimony for the Hill, meet with Congressional staffers on a relatively routine basis.

Q. Okay.

A. I mean, things keep popping in my head, but that's all I can think of right now.

Q. All right. Well, let's go through the list again. So now it's accident investigations, safety recommendations written to improve the safety of aviation, maintenance of the regional offices, human

Page 63

resources, delegated authority for regional investigations not going to the Board, major investigation reports completed in a timely manner, proper investigation for major investigations, reports completed to the Board and accepted by the Board, participating in investigations of accidents occurring abroad that involve U.S. products, keeping the managing director and the members of the Board informed of what's going on in the Office of Aviation Safety, testifying on Capitol Hill, and meeting with staffers on a routine basis.

MS. COHEN: Objection. Mischaracterization of testimony.

You can answer.

BY MR. LOWINGER:

Q. Is there anything else, sir, other than what I've just mentioned? And if I'm wrong, if any of what I just said is wrong, feel free to --

A. If it's wrong, I didn't pick up on it. And I wouldn't characterize that as everything. That's all I can remember at this time. There's a multitude of things.

Page 64

Q. Let me throw some other things out there and see if any of it jars your memory a little bit.

A. Okay.

Q. Budget authority.

A. We have some budget authority in the sense that we're allocated some funds that go to the offices. We're allocated some funds to buy equipment. We have investigative funds that we can use either for headquarters or regional offices to help in the investigations.

Most of our authority is -- The budget is very limited in the sense that we don't control salary, wages. We have some control over overtime expenditures. The actual leasing and renting of facilities are handled separately.

So the budget authority is kind of -- I would say it's limited in a lot of ways. If there is a major investigation, we're going to get the funds to do the investigation.

Q. I see.

A. Our limitation, primarily, is we have more things we can do than we have people, so we

Page 65

investigate as many things as much as we can, and there's very little budget authority in the sense of trying to do program plans or budgeting that you would see at a typical federal office. I guess the attitude is we could be absolutely flat broke and if there is a major crash, we're going. You know, somebody will find the way to get the money to us.

So the budget issue is pretty minor in a way. We just have to be careful that we don't exceed overtime. Or if we're getting short on travel money, for example, if we have a need for the travel, the agency always supports us. We're just careful with it.

Q. I see.

Who is responsible for the budgeting work?

A. Well, the office director would be, but primarily in our office, Annette Willis keeps track of all of that. If there's not a major launch or a major flurry of investigations going overseas, she'll keep track of overtime and -- We have a training budget. They give us so much money. So we kind of divvy up the training of people at their request or what we

require of them and then parse out that money and get as much training as we can. Basically, Annette Willis watches all of that.

Q. I see.

A. It would be the director's responsibility, but she takes care of it and it doesn't take a lot of time of the office director.

Q. When you say it doesn't take a lot of time, would you say it takes five minutes a week? Does it take ten minutes a week? Are we talking about --

A. Good weeks, zero, because Annette takes care of it. Several times a year you meet with the managing director and discuss budget issues and FTEs and what we may expect for the year. Those meetings may last a half a day or a day a couple of times a year. It's minimal.

Q. Okay. Was there anything else that you would consider your primary responsibilities that you had to expend your efforts on as the director of OAS?

A. I don't recall any right now. If it comes up, I'll mention them.

Q. Do you remember any that were not primary,



just little ones? Sometimes the little ones kind of stick out the most.

A. I didn't distinguish between -- No.

Q. Okay.

A. I can't think of anything other than that right now.

Q. All right. Of this list we just mentioned, which are the most important? If you were to rate them, which are the most important, all the way from top to bottom, that you would spend your time and efforts and expend your work time on it? Which of these are the most important?

A. Oh, the accident investigations and safety recommendations.

Q. Which is more important, accident investigations or safety recommendations?

A. You have to do the first to have the second.

Q. Okay. And then what about the maintaining of the regional offices? Is that a primary important responsibility?

A. Well, it's important, but it takes very



little effort on my part, or did.

Q. When you say "little effort," sir, can you tell me, would you say it takes an hour a week max? Does it take less than that?

A. Probably less. It's between the deputy director of the regional operations and the budget person. That's usually taken care of.

Q. With regard to maintaining the regional offices, which was a responsibility of yours but not necessarily -- I guess when you said maintaining of the regional offices, were you only referring to budgetary issues to make sure that they're still up and running, or were you referring to their investigation work in their regional office investigations, the regional offices -- I don't know -- their employees or --

A. I'm not sure of the distinction you're making there. I thought we were talking about budget. So in that sense there is not a lot of budgetary things under our control. The salaries and benefits and all of that are taken care of separately. If we get an FTE, he's going to be paid. We have overtime;



that's the budgetary.

There's a certain amount of the offices, equipment, office rental space, leases coming due, and our budget person keeps track of that and the deputy director of regional operations are aware of when each one of those -- It all gets taken care of, and very seldom would the director have to weigh in and spend a lot of time worrying about that. It's part of his responsibility, but we're so nicely structured that a lot of that takes care of itself and doesn't require a lot of time from the director.

Q. Sure. Let me just ask a question. I want to make sure we're 100 percent clear. When you just gave this entire list of primary responsibilities, were you under the impression that we were only talking about it as far as financial operations, or were you thinking -- When you said accident investigations are the most important, you weren't referring to any budgetary issue with regard to that, you were just talking about accident investigations in general are the most important?

A. Out of that whole list, there's some

budgetary things that come into it. But it's like I just described the regional offices, it's the director's responsibility, but the director doesn't have to spend a lot of time worrying about it. It's important that the offices are taken care of, and people take care of it.

So there's a mix and a match. There's some budgetary. And like I said, kind of the budgetary side is not a lot of -- it doesn't create a lot of work for the director.

Q. Okay.

A. We either get FTEs, we're going to get investigators. We're careful with our money. We're careful in when we travel, why we travel on lesser accidents. So we always seem to have the money for that. You know, we get that.

Our big issue is we need big chunks of money for persons, and that's not a budgetary issue that is in my control, or was in my control.

Q. All right. So we've dealt with accident investigations, safety recommendations, maintaining the regional offices. The next one was -- What would



be next? What would be the primary responsibility that we discussed?

A. If you want to look at your list, we can go down it.

Q. Next on the list is filling slots. Was that a primary responsibility? Was that a low amount of work for you?

A. It's a low amount of work. It's very important, but if we were authorized to hire one or two investigators a year, it doesn't take a lot of time.

Q. Is that, on the average, how many you were authorized to hire?

A. Sometimes one or two, sometimes three or four. Very few.

Q. Very few? So not a big chunk of your time?

A. No, it didn't require a lot of time.

Q. All right. What about delegated authority for regional investigations not going to the Board?

A. That's minimum time.

Q. Minimum? Less than budget and less than filling slots?



A. They're all down there pretty small.

Q. Near the bottom?

A. Yeah.

Q. Major investigation reports completed in a timely manner?

A. That's pretty big.

Q. Is that near the top?

A. Yeah. I would say that's No. 3.

Q. No. 3?

A. Uh-huh.

Q. Okay. Making sure investigations are conducted in a proper manner?

A. Those would be the three. I would combine those two. You can't do one without the other, but they're somewhat distinct.

Q. Completing the report for delivery to the Board and accepted by the Board. Are those separate?

A. I would say that's probably 4.

Q. So both of those together is 4, or separate?

A. I don't know what both you're talking about.



Q. Completing a report for delivery to the Board, is that No. 4?

A. Yeah.

Q. Making sure the report gets accepted by the Board?

A. That would be the same thing.

Q. Okay. Participating and coordinating foreign investigations of accidents that involve U.S. products?

A. Right now, I would say that's 5. It might change depending on what year.

Q. Keeping the managing director and the Board informed of what's going on.

A. It's down below those, but I'll have to see what the rest are.

Q. Testimony for Capitol Hill?

A. That's minimal. I group that down there as a minimum effort.

Q. Meeting with staffers on a routine basis, I think you said.

A. I'd say that's a minimum. Those you said that are all at the bottom, I would say all of those

Page 74

in a group, it depends from week to week, but they're all a minimum effort from the director.
Q. I think we're actually at the end. So what about --
A. Where was foreign? Is that the fifth one there?
Q. Yes.
A. Okay.
Q. Let's start going through these lists, okay? Do you want to talk about some other topic first?
A. I'm just thinking, on the foreign, the workload effort at the director's level, it's kind of hard to sort out because it's part of the investigations we do. I mean, it can be grouped right up there with 1 and 2. We don't write reports on foreign investigations, but it's a huge resource. It's a lot of coordination of manpower. There's all of that that goes on with an investigation except for writing the report.
Q. So participating in and coordinating foreign investigations is really, while it's listed as

Page 75

5, it can go all the way to 1 because once you have an accident --
A. An accident is an accident.
Q. An accident is an accident no matter if it happens in Geneva, Switzerland, or --
A. There is a difference. If it's in the United States, there's a lot of volatility. The investigations in the United States can be huge. We may have 100 to 200 investigators working for us out of our whole staff. Foreign investigations are typically smaller and they're a little more streamlined because of the complexity.
In the United States, we may launch -- We have 50 investigators in the regions, or we should. Sometimes we're way down. We would like to have 50 at headquarters. We would like to have 50 in the regions, but we may have 40.
Q. Together, or in each region?
A. No, that's total.
And at headquarters, we would like to have 50 and we may have 35. So if we have a major launch here, we may launch about half of those people in that

Page 76

first wave. But with all the parties coming in and the people participating in our investigation, there may be 100 or more people that we're managing out on the scene.
Q. Okay.
A. I mean, it's just a huge operation. It's very intense. So the foreign ones, we may launch three or four investigators, or one or two, and then we will get some -- it will be a lesser number -- qualified people from the manufacturer or the pilots union, for example. But the investigation is conducted by the foreign government typically, and we will participate with them.
But it's critically important. It's not like a major investigation here, but the importance is just as great.
Q. So you mentioned that you work with foreign governments.
A. Uh-huh.
Q. Do you work in a supporting role when there is a foreign accident? Is it limited to just a supporting role?

Page 77

A. It's very defined. We will provide an accredited representative under the rules of IKO Annex 13, and our accredited representative that we send is essentially one of our investigators in charge.
Q. Uh-huh.
A. And our accredited representative will have advisors. For example, Boeing and FAA will be advisors to our accredited representative. That's the U.S. team, and that team is provided the opportunity to participate in the investigation. And each foreign country has different rules, as we handle foreign investigative teams coming into our investigations in the United States.
Q. So under IKO, you don't take over investigation for a government?
A. No, no. If it's in the United States, it's our investigation. If it's in international waters, it's our operation if it's U.S.-operated.
In a foreign country, we can participate if that accident involves a U.S.-manufactured airplane, is U.S.-operated. There's a limited participation if it's a number of U.S. citizens on board.

But since the United States is the No. 1 player in aviation in the world, we participate -- Well, let me back up.

The U.S. manufacturers, the only equivalent out there is Airbus for France. So there's either Airbus or a lot of U.S.-built airplanes. The FAA is internationally recognized as the premier certification authority. And so all of that entity that's in the United States, there's some thread back to that if there is an aviation accident overseas. Unless it's a Russian aircraft. But if it's a Boeing or McDonnell Douglas, or even an Airbus with perhaps General Electric engines, we're going to be involved in that investigation.

Q. Okay. So let me make sure I understand this. If I'm wrong, it's only because it's my first time trying this.

Anything in the territorial United States, any time an airplane falls out of the sky in the territorial United States, whether it be a U.S.-created airplane, a foreign-created airplane with U.S. parts, anything like that, the NTSB has primary



authority?

A. No. Close. Generally, you're correct. That captures most of it except for military and whatever may be considered intelligence operations.

Q. Okay.

A. There are some really odd situations where aircraft are operating in the United States under the purview of a foreign country embassy, for example. Those are really odd; they don't happen often. If it's a civil aircraft or public use in the United States or its territories, it's our investigation if it's considered an accident.

And then there are incidents, and we evaluate each one of those.

Q. Accident means there is a death involved?

A. Or substantial damage to the airplane.

Q. Okay, accident equals death.

Incident means --

A. Anything that's not an accident.

Q. Anything underneath it, right?

A. Yeah. And that can be a wide range of things.



Q. Okay. All right. Now, what happens if you get out into the middle of the sea? If you're in the middle of the Atlantic and you're between -- you're in the middle of the pond and it's a U.S. plane --

A. Well, I have to be careful. Because we go to the book. We go to Bob Macintosh, who is our IKO expert. If it's a U.S. operator and it's in international waters, it would be our investigation. We would take the investigation.

Q. When you say U.S. operator, do you mean like TWA?

A. Yes, or United.

Q. A U.S. carrier?

A. A U.S. carrier. Or a private individual of the United States that flew off the coast into international waters.

Q. Then you would take the primary investigation?

A. Yes.

Q. If the plane falls in the middle of Europe or another country, you contribute?

A. Yes. Well, we might.



Q. You may decide to contribute?

A. No. If we have the opportunity, we almost always will. If it's an air carrier-type airplane somewhere in Europe, if it crashes in some territory, that's the state of occurrence. They have the first shot at being the primary state lead on the investigation. It's their investigation, and we would participate with an accredited representative and the advisors.

If it involved U.S. product, U.S. equipment -- for example, an Airbus crashed in Europe, we may or may not go. It may be a U.S. operator flying an Airbus. It may be a foreign country flying an Airbus; we wouldn't look at that. If it looked like American-made engines were at the heart of it, we would be involved at least for that. There's always decisions.

Q. I see.

What about the regional accidents? How do you decide whether you're going to become involved in a regional accident?

A. Well, if it's classified as an accident,

we're required to investigate. What that means is we will either actively participate in the investigation or the FAA almost always is involved in the investigation or on scene. They have a lot more people than we do, and we would often talk to them on the telephone and get a synopsis. They would write a short report or a long report, provide statements, and they would provide that to us. And then we would write the final report, sometimes in a very abbreviated format, and we would determine the probable cause of that accident.

Q. Okay. As the director of OAS, how much time was spent on these regional accidents, what percentage of your time?

A. That's hard to -- There's always an ebb and flow going on. You may find one day you spend your whole day doing that. If we launch on a major investigation, that's three weeks right there.

Q. That's full time for three weeks?

A. Director, deputy director. It's just full time.

Q. All right. So let's break this down.



A. So maybe if we get the whole list down, I can kind of size it up.

A lot of the regional investigations, they'll be pulled in and a report will be created, so there's a lot of effort trying to coordinate that.

I'm having a hard time trying to think how to parse it out. But we can try.

Q. All right. It almost doesn't matter what type of accident it is; what really matters is the investigation and the report. Am I correct?

A. We have to do that, yeah, and determine probable cause.

Q. Let's think about it in that sense then.

A. Okay.

Q. Accident investigations and safety recommendations and -- Let's just deal with those. Describe to me what your work was, how you were involved with it, what type of responsibility you had, how much work was involved in the accident investigation, from your view as the director.

A. Well, it's distinctly different for various levels of investigation. A major investigation --



Q. Let's start with majors.

A. The first three weeks just absorbs all your time.

Q. Okay. Let me ask this question. How many major investigations, on average, was the OAS involved with per year from 2000 through -- When did you finish your tenure, sir? Late 2006, I believe. Right?

A. Yeah, September or October, somewhere in there.

Q. Okay. How many per year was OAS involved with?

A. I want to say two or three.

Q. Two or three a year?

A. Uh-huh.

Q. Okay. Walk me through the steps of a major investigation. Your duties, your responsibilities, your efforts, how you contributed to it, walk me through a major investigation from the moment you get a phone call all the way through to the Board.

A. Okay. You pick up through the news or the com center picks watching television or CNN reports that an airplane has crashed somewhere. Let's kind of



step through 587, for example. That's the one where the whole fin came off and the airplane crashed at Belle Harbor, New York, coming out of Kennedy.

Q. This is after 9/11, right?

A. Yeah, a couple of weeks after.

Q. Is this a good general example of all the majors that you normally do?

A. Well, there's two things that are somewhat different about that one for the on-scene phase. New York City is always a pain, and right after 9/11 there was a great amount of interest or worry. The logistics in New York City are tough, so that's a heightened interest.

Lexington, Kentucky, is much more laid back. Even though it's very volatile, it's a very dynamic situation at Lexington when an airplane went off the end of the wrong runway at Lexington. Lexington may cost us two weeks total time. Belle Harbor, four weeks. So the three weeks is kind of an average of a major accident near a major city.

Q. So you get a phone call. There's been a major accident; in other words, there is an airliner,

there's a corporate jet with someone important on it or a lot of people --

A. Those are pretty easy. What we're talking about is a major airliner.

Q. And that includes commuter; am I correct?

A. Uh-huh.

Q. And does it include a cargo plane?

A. It can, yeah. Cargo are less volatile because there aren't a lot of people on board, or less intense in public scrutiny because there's not usually a large loss of life; there may be three or four. But the investigation is just as important because we want to find out why that airplane crashed because it could just as easily be one full of passengers.

Q. Would you still launch 100 people for a cargo?

A. No, we don't launch a hundred people. Sometimes the team gets like 20 or 30 or 40. Not the team. The Board will launch that many. The investigative team may be 10 or 15 investigators, and we'll have our investigators in the labs ready to lead out the recorders, the CVR. But out of those 10 or



15 -- like at Belle Harbor, we launched two structures people, and there could end up being 20 or 30 people in the structures group that those two structures investigators have to manage out there documenting the wreckage, doing it on-scene. New York City wanted it done in a hurry to clean up the streets in the neighborhood, which is certainly understandable.

The power plants may be somewhat smaller. You send one or two power plants people. In a situation where you've got the engines, they can look in the engines. One power plants guy may come home. He may be left with a team of seven, eight, nine power plant specialists. You get an investigator launched in from the regional office. We have a regional office in New York City to start coordinating with the police and getting witness statements and answering the telephones.

Q. What about your role?

A. My role at that time would be to make sure all of that is going well; if they need any support, make sure we get equipment out of headquarters or getting parts or pieces or things contracted out if we



needed a contractor up there to do something. I would try to make sure, you know, of what's coming out of flight data recorders; what's coming out of cockpit voice recorders; what we're seeing on-scene; who's looking at maintenance records back at the operator; starting to look at design issues, making sure -- In this case we had foreign participation because it was an Airbus, so the French or the BEA is heavily involved with us making sure that they're integrated into the investigation and that we afford them the opportunity to listen to the CVR.

There's lots of questions, comments coming into our Board members. They have concerns, so we spend a lot of time talking to them, bringing them up to speed on what's going on in the investigation and trying to absorb what's coming to them, because they'll have concerns forever because somebody may call in with an idea.

So we're making sure that what we're putting out for press statements is acceptable and providing quality information without tilting the investigation, which is easy to do.



So it's a very dynamic process. Our focal point for the investigation is our investigator in charge out on the scene. He's to keep all of that operating. And then each one of these separate investigators work for division chiefs. They're keeping them advised.

So it's a lot of flow of information, and all of that is geared to making sure that we're looking at parts and pieces, making sure that they have the support they need on scene. It's a big-time operation. It's unlike any of the other investigative offices at the Board. They're just simply not that kind of magnitude. They're different.

Q. Okay. You as the director, how much time is finding out -- is spent during that two- to three-week period or two- to four-week period after an initial is spent in finding out if there is a need for more support on the scene, whether it be equipment or individuals or contractors? Is that a major part of what you would do?

A. I don't know how to break it out. There's a big operation going, and we try to let the

investigator in charge keep it going on-scene if there's something he needs. I would say that's a relatively small part of it, unless it becomes a problem. Then it becomes a major time-consumer, but not often.

Q. When it becomes major, how much time does it take?

A. Oh, I don't know. Half a day for an issue, perhaps. It's not much in the sense of -- A lot of it is knowing it, a lot of it is picking up on it, and a lot of things can be handled seamlessly. It's there and always a part of it.

Q. Gotcha.

A. It's not something where you break it down and say, "For the next 30 minutes I'm going to be getting in parts and pieces." It's just part of the whole process.

Q. What about the flight recorders, the voice recorders from the cockpit that you mentioned? As the director, what type of work would you be doing with regard to the flight recorders and the voice recorders?



A. Getting the recorders off-scene. Making sure things stay coordinated with the labs when the recorders are coming in. Just, you know, making sure that we know the recorders are coming into D.C., who's going to be out there picking them up, how they're going to get them into the building. Often it's there, we're aware of it. You kind of keep tracking it. It doesn't take a lot of extra time. Most of it is handled pretty seamlessly.

Specifically for the recorders, I would typically, if I'm available, or the deputy if I'm not, would be in the labs when they start getting flight data recorder information out so we would be looking at graphs and charts immediately so we can decide if there's things of an urgent nature right there that need to be addressed immediately, we'll know them immediately. That's why we have a sense of urgency on the flight data recorders.

Cockpit voice recorders are very tightly controlled. When it comes into the lab, the CVR specialist gets it prepped, and then the office director either for R&E and AS do the first listen to



the cockpit voice recorder and from that makes an immediate decision. If there is something that needs to happen out in the regions, if we're hearing something that our investigators need to look at or do something to kind of gain some inference or insight, if there is something unusual that either of the directors pick up, we can immediately get some subject matter expert in such as a senior CVR person who knows a bunch about all kinds of things, or get our operations person in to listen to it to see if something is happening.

If there is an appearance of criminal activity, which is very rare, but if there is an appearance of criminal activity -- It's kind of like 9/11. We knew that, so the FBI was involved right from the start. But the presumption is it's an accident until there's credible evidence there's been a criminal act, so we want to be very careful to see if there is any kind of criminal activity and try to size it up and then coordinate with Justice or FBI to get their take on it. And if there's criminal activity, then it would roll into a criminal



investigation. We're prepared for that, but it happens very seldom.

Q. Does NTSB have any role in a criminal investigation?

A. We often do. It's to provide support for FBI agents, because we know parts and pieces. We had investigators in all the sites, all the 9/11 sites, and our investigators would recognize a black box as they're digging it out of the wreckage, which sometimes it's burned and beat up. So we can get that, and the FBI agents know we've got one of the recorders coming out, parts and pieces.

We know what airplanes look like when they hit the ground hard. We also know explosive witness marks would look like. The FBI knows that, but they don't know what the aircraft looked like when it hit the ground.

So our investigators would participate in the FBI investigation like 9/11 just to help them, if we can, on the parts and pieces. We did all the recorders, got those in, read those out, got the data processed for FBI agents. So we provide a service to

them so that they can have all of that data in a quick and timely manner, because we do it fast.

So we participate sometimes, but we don't participate to be an expert witness or a criminal investigator. It's just to help them know about the airplane issues.

Q. And during your tenure as the director of OAS, how many criminal investigations -- how many accidents were actually criminal besides 9/11?

A. Oh, gee. I don't know. I can think of several. There's some fires started in lavatories, and we get out there -- The FBI is out there a lot of times. They want to get in and take care of making sure their data is -- the forensic data for what they need is well protected, which if it's an accident, it's distinctly different than what we would want protected. But we can get in and get mechanics to help them take panels off, you know, and get into the inside of an airplane, or look at wiring or look under the structures. Because the agent doesn't want to get in there and tear things apart and structurally damage an airplane.



There was an example where a FedEx employee got into the cockpit and started beating on the flight crew. That was a criminal act, so we provided the flight data recorder and cockpit voice recorder data to them.

So they happen once a while. Not often, but they happen.

Q. But when they happen, it seems like it's more of a support role for OAS.

A. Yeah. Now, 9/11 was different. We spent a lot of resources out on those scenes, especially in New York where we never got any of the recorders back. So we had a lot of presence up there for a period of time.

But if it rolls into the criminal, it's very minimal compared to an accident investigation.

MS. COHEN: Would this be a good point for a short break?

MR. LOWINGER: Sure. Come back in five minutes?

MS. COHEN: Sure.

(A recess was then taken.)



BY MR. LOWINGER:

Q. Can you tell me your role, what work -- Let me start the question all over.

Tell me what your responsibilities are in launching a team and picking the team that goes out there, determining who from industry or the FAA also goes out there to investigate once you get the call. What does the director of OAS -- what did you do as the director of OAS? What was your role, what was your responsibility, what kind of effort did you have to put into determining how many people launched for -- not only launching for NTSB, but launching for the entire investigation? Can you describe that process for me, sir?

A. Sure. When we have a major launch, there is a lot of the entities out there who already know what their role is. For example, FAA, Boeing, General Electric, Pratt Whitney, United Airlines for example, the pilots union. The whole operation is pretty well-known.

Q. Uh-huh.

A. And when we pick up a major launch, the



first thing is trying to size it up and see what we have. Is it a major crash, a major loss of life? Is it a severely damaged airplane? Because in those first few moments we really don't know.

We'll start getting our team together on the telephone, getting manned up with 20 people on the telephone, for example. We'll get the division chiefs on, because as the minutes play out we learn more and more about an accident. We know the workload of all the investigators. They're all multitasking. They're all multitasking, working multiple investigations, and trying to size up who best to send from any particular group, or send several.

For example, like the New York City accident, we sent several structures people just because there was going to be a big operation on the ground in recovering the wreckage.

The deputy would be involved in those. The director would be. The chief of the Major Investigations Division, he has all the investigators in charge. Usually the managing director is on, the chairman is on. Whoever the Board member is that's

going to be picking up the accident, they get on so they're aware of what's happening.

Somebody in that process is making sure that the FAA is getting their airplane ready for us or we're going commercial.

The com center is -- I would say they're very good at reading the tea leaves to find a motel and getting a number of rooms blocked, get the cars ready at the airport.

And we try to determine when the airplane is going to be available, how many people we can get on that airplane. If it's a short flight on some of the FAA airplanes, it's a lot of people. If it's a long flight, they have to carry so much fuel we can't get as many people on that airplane. So it's quite an interesting, very dynamic process. And that may go on for, oh, the first hour and a half of just getting things in place.

And by that time it should be settling down that we know who's going to be on that first airplane. We'll have a Board member who's the press person.

People in the labs are getting ready to



figure out what kind of recorders are going to be coming back in. The recorders may be coming in within hours, it may be days.

And by that time we've got that first wave out and people are supposed to meet at National Airport at 7:30 that evening, for example. We may pick up an accident at 5:00 in the evening and so we're going to have people on that first launch headed out of town on that airplane at 7:30.

So we've got people coming into the airport. We're trying to make sure the Board members are accommodated, that they're on, and we get that first wave of people headed out.

We're also trying to coordinate our regional investigators. We'll pull several from an office, or two or three or four perhaps; for example, in New York City, to get out and make contact with the first responders there, to make contact with the incident commander to let them know we're coming. A lot of big cities know somewhat what to expect out of us, but if we can, we'll get the regional guys in place. And then by that time, three or four hours



into it, we may be learning more and more of the story. We may start adding people to the investigation. We may start diverting people to the maintenance facilities.

So every one is different. It's just a very dynamic, interesting process.

Q. Now, what I heard through the answer was certainly interesting, but I also heard a lot of first person plural, "we."

A. Uh-huh.

Q. When you say "we," are you saying "we" because that represents your coordination efforts as the director, or are you saying "we" because that process is such that the first hour and a half is so fluid that you're a part of the process and even though you're the director and you have this responsibility, you're not giving orders to everyone? Everyone is contributing. There's 20 people on the phone and you are not -- not saying you're just a player, but you're a player in the scene, it's just that you're not the only person giving all the instructions?



A. Well, there's just a huge amount of things going on, and if it's all going perfectly, then the director can sit there and never say word. But there's always contingencies, there's always differences, and there's just any number of decisions that you can make to help clarify or, you know, remove dilemmas out there and just make a decision so everybody gets on the same page or everybody's on the same course of action. And sometimes you have to --

And when I say "we," there's the division chief of the Major Investigations Division, deputy directors. The managing director may have some thought. The chairman -- I work for both of them, or did, in that position. They have their needs coming out. They need to be briefing people, either on the Hill or wherever.

So a lot of it is very interactive. A lot of it is absorbing everything that's going on. It doesn't take a lot of action; you just have to be paying attention. If there are things that aren't coming together correctly, you quickly make a decision who gets on the airplane, for example, and just try to

size it up and, if somebody needs a decision, make a decision.

In this kind of thing, a lot of that can get sorted out. The investigator in charge can be doing a lot of that, except he may be en route to the airport. He may not want to get into turf battles of who all from FAA can get on the airplane or if somebody shows up from DOT that we're not going to let on. It's a lot easier for me to let them know rather than the IIC having to deal with that.

So it's a very kind of synergistic operation, so when I say "we," there's a lot of stuff going on, but it's still the director's responsibility to step in and redirect or give some clarity to a situation.

Q. I see. So it's kind of like a coordinator and mediator-type of role that you would play during that initial conversation?

A. Well, that's part of it. That's one aspect of it. One aspect is sizing up the intelligence coming in, what kind of investigation we've got, trying to make sure in the director's mind that we've



got the right assets going. And, of course, the division chiefs are very smart investigators in their own rights, so they have their views. It's not a -- it's not an autocratic operation where one guy is just barking out instructions and giving rules. Everyone knows their job.

In a perfect launch, the director could sit there and never say a word and everything would flow very nicely and naturally. Of course, that's just not the real world. There are always unusual things cropping up, or usual things that create a conflict, so...

Q. Okay. Now, once everyone is launched and everyone is in the field --

A. They're headed there, yeah.

Q. Tell me your responsibilities, what you do once everyone is on their way, or once they even arrive there. What type of efforts are you putting in? Does it slow down for you a bit?

A. It can. It depends. Sometimes once a decision is made and it's the middle of the night, you can go back to bed for a couple of hours. You're



going to get up a couple hours early and get back to headquarters because by that time there's going to be more and more information coming from the television news. FAA has a lot of people out there. We may be talking to FBI agents on scene that are already there. So it's kind of a whole new wave of intelligence coming in, and we'll get all the key players either in the conference room or on the phone and try to keep the Board members apprised of what's happening.

A lot of Congressional staffers are vitally interested. Our aviation staffers really understand what we do, so we can give them very succinct briefings. But there will be a lot of Congressional staffers, for example, that aren't on any of our committees. For example, out of Lexington, they were very interested because it occurred in their state, but they're wanting some update in intelligence.

Or when Chalks Airline crashed in Miami Harbor, Miami wanted that channel open. The governor of Florida wanted the channel open.

So there's just a lot of people with a lot of needs. And the FBI, if it were to turn criminal,



we don't want to be doing something that would sour their criminal investigation if it were to turn criminal. But like on Chalks, they wanted that channel open, so we were coordinating with the Coast Guard who closed the channel so their divers could get down.

So there's a lot of activity of importance in trying to meet everybody's needs. We do the best we can as long as we're going to get our investigation done correctly.

The mayor of Chicago may be wanting Midway open. He wants those runways open because there's a huge number of airplanes that aren't being able to land because we have the airport shut down until we sort out which runways need to be cleared.

Q. So are you the person speaking with the FBI as the director? Are you speaking with the mayors? Are you --

A. It can be. We usually try to keep it coordinated on scene, but they'll come back with questions. It's happened when, oh, Tom Ridge was just starting at Homeland Security; he picked up the phone

and called. It was before Homeland Security was really big. So he was very concerned on criminal details. So we would try to tell him what we knew and try to read the tea leaves and say everything we're seeing looks like an airplane crash, for example. So a lot of those conversations go on.

Or we may get a call from the chairman that somebody has contacted him. So we'll be on the phone with whomever to give them a quick update.

And a lot of it is we're a very wide-open agency, so we really don't have any secrets, but there are times and places to get information out so it doesn't sour an investigation, so it doesn't unbalance an investigation where someone feels like they're being unfairly picked upon. You have to be careful what you say because all of a sudden the pilots unions think you're unfairly bashing their pilot. You can't be doing that up front. So in the process of this stuff going out, it's a very concerted effort to get that first -- not press statement, but when our Board member arrives on scene, they like to have a few talking points. So we'll give them a quick rundown of



the talking points, and they can give a credible opening statement.

And then a lot of this is just we're incredibly small, so we don't have layers and layers of people that handle all these jobs. It's all right there.

Q. Now, I'm not necessarily saying -- Let me just ask the question.

With regard to speaking with the press or getting the initial press statement out or preparing talking points for the Board member or making sure that Congressional staffers are dealt with, as the director, do you delegate that authority ever? Or do you absorb it all yourself?

A. It's between the director and deputy director, the chief of the Major Investigations Division. We'll be looking at what we deem pertinent as part of the investigation, what we can release, what we should hold firm for a moment. Somebody from the press office will be down because they'll have a press person with the Board member on scene. So we're coordinating with our press people very closely.



It's not -- If I went home and went to bed early in the morning or something, people there can take care of it. We've got enough people that, you know, know the business that if any one of us was not there, the other people can step in and take care of it. So if I'm out for a period, the deputy can sit there and make all the decisions and keep it going, brief me. Maybe sometimes I would have done it differently, but that's not important as long as somebody is making the decisions and getting the actions completed or protecting the investigation or the sense of fairness in the investigation, that we're not making statements that kind of unbalance everything and get the parties fighting early.

Q. What about now that the press releases are going out and Congressional staffers are dealt with, who speaks with the people in the field for -- I don't know -- regarding what's going on with the accident?

A. It can take on several forms. When the recorders come in and we listen to the CVR, the two directors sit down and see what we want to say about those. It's illegal to provide direct quotes off the



CVR and publicly present those, but we sometimes characterize what's on the CVR. Early in the game we keep that to a minimum.

We're looking at the FDR data coming out, and if it looks like a systems issue, we'll have systems people looking at the FDR. Or if we have a systems guy in the field, we're trying to provide information to them of what to look for or be careful of; not to disturb something, for example.

Q. Is there anyone responsible for documenting all this information, writing it down? Or is it everyone knows from experience what's going on? It's not that there is no need to, but because everyone knows their job and has been trained a certain way, you don't need a secretary taking notes on this all?

A. Most often we don't need it. Perhaps sometimes we wish we had had a scribe keeping a running order of things. But most often that's not necessary. Things get done. It's just dealing with issues, dealing with contingencies, keeping things going.

When the team gets on scene they have to

start setting up a command post, get a presence out on scene, keep the Board member ready for a couple of press conferences throughout the day. The important thing by that time is to get the investigators out on the scene and start looking. The first night, get the major investigative coordination meeting going. Usually it's the first night, but it can happen any time.

Q. One thing that wasn't clear and seems kind of interesting to me, this is just something that -- I just want to know, when you find out a plane goes down, how do you know to call Boeing? How do you know to call a certain engine maker? How do you know to call a certain equipment manufacturer? How is that all determined right off the bat? I mean, is there a list of who made this plane?

A. And sometimes you're wrong. Sometimes you'll hear that it's American Airlines and one of their smaller airplanes crashed. Well, that's going to be an MD-80. They're getting other airplanes now, but that was all they had. It it's one of their big airplanes it could be an Airbus or a DC-10, so we have



to sort it out. But you can pull out the OAG, and it will tell you the typical --

Q. What's an OAG, sir?

A. Official Airline Guide. I don't think they have them anymore, but you can go online and check the flight and it will tell you what kind of equipment is involved. That's one way.

And then the airline absolutely knows what kind of airplane was on the flight, unless there is some unusual thing that they've switched equipment at the last minute for some reason; if they've had an equipment malfunction and roll a different airplane in. That's unusual.

Q. What about on Day 2, starting on Day 2? How do things normalize? Describe your role.

A. Just keeping track of the briefing and kind of the turmoil that continues on scene and people wanting to know what's happening, the Board members and Congressional staffers. Perhaps by that time we're getting the recorders in, so there's a lot of information flowing in.

Q. When you say there's information flowing



in, you mean information flowing in to your people on the launch team, and your taking this information and --

A. It can be from the launch team, or it can be that perhaps another airline may call and say, "You know, we've had a couple of incidents that might have developed into something like this."

So there's a lot of information coming in, and it's coming in through a lot of different channels. It may be coming in to our investigators on scene. People may be calling the union guy that's with the mechanics union that's part of the systems group. So there's quite a bit of -- I don't want to say turmoil. There's a lot of activity of information flowing back and forth.

A lot of times by that time we're getting some pretty good charts and graphs. Things are starting to settle down. So we can be talking to people at Boeing, for example, or McDonnell Douglas. They're out on scene and have their hands full to keep digging through all the systems and looking for problems.



And we're careful with the FDR data because it may give us an indication there is a real problem somewhere but the problem may be somewhere else, so we still have to handle the hands-on stuff out in the regions very carefully.

Q. What about the Board member on scene? How long does the Board member on scene stay out there?

A. A day or two, three, four. As long as there is a camera interest, a press interest, they often like to stay on scene. Sometimes they'll leave early. They kind of do a rotation of duty, so they may end up out on scene on one of our investigations and then there's a train wreck somewhere. If things are winding down on the airplane scene, they'll go off to a train investigation if they choose.

Q. And do you have -- I guess you serve the Board member. So the Board member says, "I'm leaving," and there is no more to it?

A. When I was in that position, I worked for the chairman and the managing director. The Board members on scene were spokesmen. They don't run the investigation, but their job is to be the public

interface to speak, to provide briefings on the investigation. And sometimes that's difficult because they're not technical persons or they're not oriented to the transportation mode, so it's difficult for them. But that's fundamentally their job, is to be the public spokesman. And there will be a press person to help them with that and us providing talking points and trying to educate them on the talking points, which is easier for us to do at headquarters because the people out on scene have their hands full.

Q. Sure.

A. And it works pretty well.

Q. Who takes primary responsibility for educating the Board member, the press corps on scene or your office?

A. The press corps on scene, sometimes they're pretty knowledgeable because they've been around a long time. But it's really the responsibility of the chief of the Major Investigations Division, the deputy director and director to kind of QC and try to be that conduit. But anybody who is knowledgeable can get in touch with the Board member to provide them some



information.

Q. Excuse my lack of knowledge, sir, but what does QC stand for?

A. Quality control.

Q. Okay. When do you start bringing people back from the field? Describe what you do, you as the director do, to bring people back from the field. Tell me what kind of efforts go into that, what kind of decisions, what kind of experience you need to exercise or utilize to do that.

A. By the time the field is up, two or three days perhaps, and really running well -- and it depends on the magnitude of the investigation. Power plants, for example, may say, "Yeah, it's clear the engines were running when it hit the ground but we may want to take the engines back and do a teardown somewhere." So they can in a day write a very good description about the physical evidence they see that would indicate that the engines were under power and operating properly, essentially. So in a day or two they may be able to finish their field notes, get it cleared through the investigator in charge, and they



believe they're ready to go. And we listen to that, and most often they use good judgment.

Once in a while it may be that the systems people say, "Well, we're just going to have a close-out. We're finishing in the field after three or four days, there's really no systems we're seeing in the investigation, but we'll go tear down a couple of boxes, and we're planning on doing that a month from now."

We may say, "No, get the boxes out of there, get them somewhere. You've got your whole team together. Go to the manufacturer who is a couple of hours away, have a component and get it done."

And so it varies.

Q. Let me ask a question, sir. Power plants are the people who deal with the engines and the motors?

A. Right.

Q. What is the next group of people?

A. Systems.

Q. The systems people are the ones who deal with the electronics on Board?



A. There's all kinds of systems. There's hydraulic systems, there's mechanical systems, electronic systems, an intermix and match of both. Systems can be all your flight displays and your data system, the onboard computer. The systems guys do everything inside the airplane. And then there's structures guys and power plants.

Q. What is structure?

A. Structure of the airplane.

Q. So they're the ones --

A. The cabin, the fuselage, the metal components of the wings, the rivets, the skins.

Q. So they're the guys who actually deal with the -- when you say the structure guys, that's the actual airplane itself?

A. Uh-huh. The airframe.

Q. Okay. So those are the three primary groups that go out from NTSB, power plant, systems, and structure?

A. No. We may launch as many as -- not launch, but there may be 18 different groups, for example.

Q. From NTSB? From within NTSB?
A. Yeah. And we squeeze those out of our 35 people at headquarters, a couple of guys from the region, or three or four different disciplines out of R&E. We have operations go out there; that's the pilots. We have meteorology who may or may not travel. Air traffic control. Systems, structures, power plants, recorders, flight data recorders, CVRs, airplane performance. And then sometimes there's a group that pulls all that together for the animation-type stuff.
We have survival factors that deal with people being able to egress the airplane, the slides, the seatbelts, post-crash fire.
We have people who deal with -- Oh, flight attendants, flight safety. A lot of times airports.
Q. Those are all divisions within NTSB?
A. No. We have seven divisions in OAS, and I can go down those. Some of them are like the writers, so they're not necessarily launch. They may be out on scene because getting the writer involved early is sometimes really helpful.



Then we will add on special groups as things come up. We will create a group. We'll find the best expert we have. For example, tribology. Something exciting is grease, like when the jack screw eroded on Alaska Airlines.
We had a special group on fuel tank explosions after TWA 800. We pulled in experts that we would hire and experts from the companies on fuel volatility.
So you never know which direction an investigation is going to take or what special niche you may be getting into in something.
Q. Right.
A. But part of the aviation side is quite different from a lot of the other modes. We get into kind of cutting edge research and even something as boring as grease. Or fuel tanks explosion was a big-time research effort on our part. So it can end up pretty complicated.
Q. Let me just ask a question; actually two questions. Do you ever go to the launch yourself?
A. Not anymore.



Q. Did you as the director?
A. No, I never launched. Sometimes I would go out a day or two later just to see how things were going and get a sense. What we started doing is the deputy director -- back then it was Tom Haueter -- would launch out there, or our most senior investigator in charge, Bob Benzon, would go. Each person has their own different personality, and a lot of different personalities can really do a good investigation, but we wanted to make sure under that wide range of individuality there was at least some common ground that people knew what to expect when we got out there no matter what the personality of the investigator in charge.
So we started that for deputy director, one of our senior investigators or the division chief, all the major investigation teams, to get out and be careful not to try to intrude, because the investigator in charge really needs to get ahold of all these people and it doesn't help to have somebody second-guessing you every step of the way, but try to size it up and make sure they were all kind of on the



same page from investigation to investigation.
Q. You said you would go out there sometimes after one or two days. How many times during your tenure as director did you go out this after one or two days?
A. Did I say one or two days? Sometimes 30 days. Oh, a couple of times a year, I suppose.
Q. Did you --
A. A lot of that was because I could take care of things right at headquarters and the deputy was out there handling the day-to-day operation. And those visits were generally pretty brief.
Q. You said something before. You had said -- You were talking about the uniqueness of an aviation investigation as opposed to the other modal offices.
A. Uh-huh.
Q. What is unique about an aviation investigation that isn't unique about, say, a marine investigation?
A. Well, I think the complexity, the data we get, the amount of destruction you can have with an airplane compared to a ship. Large loss of life

Page 122

creates a lot of -- what's the right word? -- turmoil out there just because of the large loss of life.

There's a lot of complex systems involved in airplanes. Complex structures. Power plants. The operation of an airplane is very complex. The training you have to have for pilots is very rigorous training year after year, several times a year.

I think because of the nature of airplanes, you design it as light as you can to hold the biggest load. We push the pilots to have to perform at a very high level. And when that stuff starts breaking down and you end up with a big crash, it's hard to get back in and sort through all of the remains to make sure we're really getting to the cause of the accident. The complexity of the systems are just hugely complex that can go wrong on an airplane compared to a vessel.

Q. So, for example, like the power plant, I would assume that a ship has a power plant?

A. Uh-huh.

Q. An airplane has a power plant?

A. Uh-huh.

Q. And if a ship goes down, you would want to

Page 123

look at the power plant to make sure that that's not a basis for the crash, and you do that with an airplane?

A. Kind of the analogy is if a ship goes down, if it sinks and you want to recover it or send divers down to look at stuff, it's there to be looked at. If an engine quits on a ship, it's going to quit moving through the water but it's still going to be sitting there floating most likely, unless it wanders off and runs aground. So it's entirely different.

If an engine quits on an airplane, it's going to hit the ground at 500 miles an hour. And the turbine engines are really complexes; they're really complex beasts, both for the aerodynamics as well as the type of structure that goes on in the big fan disk or the turbine blade.

The fuel controls are very complex, and if one of those things hits the ground going 500 miles an hour, it's tough to dig through that wreckage and try to see what's going on.

We're getting more and more parameters on recorders. We may have 1,200 recorded parameters. Back when we were limited on recording capability, you

Page 124

may have had 17 or 18 parameters that were required to be recorded, but 40 or 50 that were recorded. Typical voice recorders and stuff like that simply don't have that kind of information. And it's not necessary. You have a speed and a heading and a rudder position. The complexity just isn't there.

Kind of one of the most complex things on a ship accident was Her Royal Majesty where their GPS navigation system conked out. But it was one of our performance guys from Aviation that's out there. We deal with autopilots and navigation systems and GPS systems, and he's the one that really started sorting out that they had pulled the plug on the GPS antenna and they didn't get good warnings. So it was a human performance issue on the ship. It was an important investigation, but the ship chugged along for three or four days and ran aground. They thought they knew where they were and didn't know where they were.

In a sense, that's an important marine investigation, but that's kind of on a par with one of our regional investigations. They just don't compare to the complexity of a major aircraft investigation.

Page 125

Not too many that the Marine Office go out on is there a large loss of life.

Trains are pretty straightforward.

Q. Can I ask a question, though?

A. Sure.

Q. When you have a tube in the middle of the air going 500 miles an hour that drops out of the air, there's just going to be a loss of life; am I correct? There is no investigation of how people died?

A. Well, for non-survivable accidents, not much, no.

Q. Okay. What about the structure of an airplane? Is that uniform, generally? For example, you said -- did you say a DC-10?

A. Uh-huh.

Q. Are all the DC-10s manufactured in a plant?

A. The DC-10 has -- you know, there is a structural design, and all DC-10s should be similar or the same.

Q. Okay.

A. And there are mods that go on, but that's usually inconsequential.

Q. When you say "mods," you mean modifications, sir?
A. Right.
Q. Thank you. I just needed that little bit of clarification.
And then you have to start preparing a report at some point, I would assume?
A. Yes.
Q. You mentioned that was No. 2, actually. The safety recommendations to improve the safety of aviation, that's No. 2. That's the accident investigation we just talked about?
A. Well, the major, we kind of went through that. There's all levels of accident investigation. On a major investigation, the report process starts almost immediately. There is a lot of information that's out there and being captured and gathered. Within the first three or four days -- The report just kind of goes hand in hand with what's required to be investigated on a major. And it's a little more, oh, standardized. The whole report process, parts of that are standardized, but what we're going to talk about



or write about in an investigation is whatever the investigation brings to us.
There's a lot of GA accidents out there that the reports are fairly standardized and the investigators have to make certain determinations on whatever is going on in that particular investigation and get that captured quickly. The more simple investigations can be essentially handled over the telephone and information that comes in can get embedded into the report and you can move those pretty quickly; within 30 days, for example.
So there's all different levels. The level of the report or the complexity of the report kind of goes with the investigation, what's happening.
Q. So if you have two major accidents on average per year, over the course of the year, what percentage of time is the director involved in that major investigation and the report?
A. It depends. When I was director, I could devote a lot more of my time because the deputy handed a lot of the coordination with the offices. But for just raw time on issues dealing with major



investigations and report processes -- Let's keep book here. Let me start out with 30 percent, and then whatever else is out there, I'll see if that still makes sense. I don't think of it in those terms. Right now, I would say 30 or 40 percent, something like that.
Q. Okay. Now, after those initial few days after the accident -- and I'm just trying to get a glimpse here. It seems like the first few days are quite pressing timewise.
A. Oh, yeah.
Q. How much time of the day in those first few days, how many hours in the day are spent on a major investigation?
A. Whatever it takes. Before I got old, I could go in there and be going 48 hours straight. You know, you can't do that, so you go in the office and conk out on the floor for a few hours and get up and go again. And sometimes it isn't like that. If you get everybody put together and they're headed out and everything is settling down on scene, you don't have to work those kind of hours. But it's always -- I



want to say 10 to 16 hours regardless, in those first two or three days.
Q. Okay. And then thereafter, after the first two or three days, do things settle into a less time intense regimen where you're working less hours than 10 to 16?
A. I would say less time. The intensity, as long as we have people out there and the press is following it and the Board members are following it and things haven't really settled down on all the investigative objectives at that time, I would say the intensity is there, but it just takes less time to keep track of it. That's part of the business we're in. You know, it's intense. It's volatile.
But if everything is going well and there is nothing unusual out there, then you sit and keep track of it, but it may not require a lot of effort on my part to intercede. But you're watching it; you're looking at it.
Q. Okay. And then once the press leaves and the Board member either comes back or goes to the next accident --

Page 130

A. It's usually they come back.
Q. Okay. What's the pressure like then? What's the time commitment? There's the time commitment and then you said it's also intense. But once the press stops following it 24/7 like the modern press does now and the Board member is back, does the intensity calm down a bit?
A. Yeah, it can. The investigative roles of each one of the entities out there may become more clear. It may not be a power plants issue and those guys are rolling off the issue. It may not be an air traffic issue or a meteorology issue, it may not be a severe weather event. A lot of that starts peeling off and those guys write their reports and are pretty much done. And then it really starts distilling down to the core issues of any investigation.
Sometimes, like the investigation in 587, it stayed very intense, very active, for any number of weeks. That's where that big fin came off, and there were people making all sorts of unfounded assertions about composite structure rather than aluminum structure and how the thing was attached. And that

Page 131

volatility stayed for, oh, several months, and it would rear up all the time because that was a very contentious issue.
Then as we moved further in that investigation, the issue of pilots mishandling or overhandling the airplane boiled up into a major issue.
So that's what we do. It's not unusual. Just staying on top of it takes a lot of time.
Q. Okay. So after all the teams go to the field, shortly thereafter certain teams can determine that they're not going to have a big role because their issued aren't involved?
A. Right.
Q. And then it starts narrowing down and narrowing down until you realize what's the cause of the crash.
A. Uh-huh.
Q. Once you determine the cause, are you down to just one or two groups doing their reports?
A. No, it doesn't work that way. Well, sort of. Once it really starts getting into an area -- for

Page 132

example, if it really looks like the pilots made a mistake, or maybe they were behaving very egregiously -- then the pilots union is going to come in with strawman proposals of why they behaved that way or why they were misled into making a mistake. So there will be a second wave where the pilots union will be very protective of their pilot even though at face value it looks like the guy just made a mistake.
So then there's -- so it kind of comes in layers of trying to -- they raise issues, they raise scenarios. Some of them we try to size up and say it's kind of ridiculous, we're not even going to mess with it. Sometimes we have to because of public pressure, Congressional pressure and you still have to go look at that.
Sometimes they raise a point and we pretty well know it's not a valid point, but we need to do more work to really settle that issue down, and sometimes we'll find out that there is an issue there.
So that's part of the process after kind of that first wave and we're kind of getting focused into a certain area. There's still a lot of people with a

Page 133

lot of ideas of things we should be looking at and investigating. And we do. We try to resolve as many of those issues as we can.
Q. During the second wave, sir, explain to me your role. And we're just going to use the pilots for the example, but it could be anything, right?
A. Yeah.
Q. During that second wave where the pilots come to you and say, "No, no, no. It was A, B and C, it wasn't the pilot," how do you go about doing that part of the work in dealing with that second wave? Tell me what you as the director did, how you went about it, what type of experience you relied on in dealing with that second wave. Because if seems like you have all of this experience in investigating crashes and determining how an airplane moves, and then all of a sudden you're dealing with politics, or not necessarily politics but dealing with the -- where the fallout might be.
A. Uh-huh.
Q. Explain to me how you went about it and how much work you did in dealing with that second wave.

A. I'm not sure what you're asking. Your characterization is like one time I'm working on airplane performance and the next time I'm looking at politics. It's all there all the time. When you start out as an investigator, you're really focused on airplane performance, but as you get further along in the investigation, or being the chief or whatever, you're either sitting there trying to support the office directors with good information that we know to be true. It's always going up and down depending whether you're at the working level or the management level. It's kind of part of the culture we live in. So it's not just one over the other, like you described.

And I've kind of lost track of the question you had.

Q. Let me ask it differently, then.

Explain to me -- explain your work in dealing with the second wave when the pilots come to you, start raising issues, and how you deal with that, or how you dealt with that.

A. It comes in several ways. The particular



group, like the operations group, pilots, say, "We're hearing that --" or within the group the ALPA group members raise issues. So that will come to either the division chiefs or the investigator in charge or we become aware of it, or it comes up in work planning meetings, or we'll have investigator meetings where we'll sit in for the major investigation. So however these come up, these are issues, and it doesn't take long to size up particular issues and how we're going to look at it, take it on, deal with it.

My background is airplane performance, like you noted, so if it's really human performance or airline operations, I would go to those guys or go to the chief, and we get the investigator and/or the chief or the human performance people in and have a good discussion of what the issues are and how we would try to resolve that issue somebody has raised if somebody is having an issue with the way they think the direction of the report is going.

Another way it comes in is a more formal process. We request that all the parties provide submissions. And what that is is we're kind of



finishing all the factual. We'll have meetings, kind of closeout meetings, if you will, that bring in all the investigative parties or their representatives and say, "Do you have issues with our factuals as they exist?" And they want things deleted or things added. We go through that process, and when all the factuals are settled down they will raise -- they will provide a submission, and that is kind of their accident report of what they think we should be saying in ours. And they should raise their theories, try to support them.

And I'll sit and read all of those, and most of our people do, and we'll go down through and try to size those up, and things that look promising, if something looks like a red herring, we want to have good answers to resolve that. So it's just a matter of staying coordinated, staying involved in the investigation so everybody is satisfied we have good answers for everything that's raised in a submission or we need to answer it.

The other place where information comes in is our public hearings. We may or may not have a



public hearing on a major investigation. That's part of the investigative process where we will bring in experts or people with firsthand knowledge to testify about certain things. It's a public arena out there. But the parties have an opportunity to question those witnesses.

So there's lots of ways information flows back and forth, and as director, you keep track of the major parts of the issue. You don't have to be involved in the day-to-day, but if there are problem areas coming up, you need to be aware of it and make sure we're getting those issues resolved.

Q. What about actually getting the drafts of the report up and running? Describe to me what you would do to get the draft of the actual analysis report up and running.

A. Well, the analysis -- There is a factual, and a lot of our investigators will come off-scene with field notes, and so they'll try to formalize those with their group describing the facts they see, and they may add attachments, like a piece out of the pilot's operating handbook, or a design document on a

part or piece. They'll build up their factual.

And then they'll in turn write their analysis about what they believe about how their part fit into this whole investigation. So that's kind of their opportunity to take all the facts and things that they know and come to a conclusion of how that accident happened.

Then all of those reports are coming in, the submissions are coming in, and so there is a lot of information coming in. And then the investigator in charge with his group, and us, try to outline how that report should look, what we're going to cover, how we're going to cover it. If there are safety recs in this process, they should be getting those done and out the door and not wait for the report.

And then the investigator in charge and the report writer sit down and start pulling all of that together. They're involved right from the very start, but this is where the paperwork really starts coming together. And then it's for the report writer to grab those parts. In a factual and an analysis there may be some extensive discussion to prove a point. So the



report writer's job is not to build a complete watch in the accident report but grab the pertinent parts out. So there is a good discussion, because you can always go back to the factual. So the IIC and the report writer are very actively involved in starting to pull all that together.

And investigators aren't particularly good writers in the sense of writing prose, so that's where the writer can take a lot of the thoughts and make it a much more readable report.

Q. What about the director at that stage? It seems to me that now we're at a stage where all the private party groups have submitted their factuals, all the NTSB participants have submitted their factuals, and now we're going to start deciding -- It seems like someone has to decide which facts are going to make it into the fact section of the report.

A. A lot of time that's the IIC and the report writer. The whole kind of management side and the IIC and the report writer have a pretty good idea of the scope of this investigation, where it's going. They have a pretty good idea of the points we're going to



want to make in the report.

And I can only imagine it's kind of like the legal profession. Everybody has their bright ideas, but when you put it down on paper is where it really stands the test or it doesn't. And as we're writing or developing, there may be questions that arise that cause us to go back and do further investigation. There may be things that we thought were a good idea, but by the time you get it all down on paper or we learn more about some particular subject, we decide we don't need to really go into that kind of depth. So that's an interwoven process.

Q. What's the director's role during that process?

A. A lot of that can go on. A lot of it gets developed. As sections are finished or the factual is finished or the analysis of the blue cover is finished, the director needs to be aware of it, read it. It may not be well developed or whatever, but just to make sure that it's all making sense to the director, all the division chiefs, deputy. So there's kind of a screening there.



And then the report really gets to the point that a draft goes out to all the division chiefs, and it's even more developed and everybody has their comments. Most often the director tries to get all the investigators in the room with everybody's comments and basically just go through page by page and look and try to make decisions, "Are you okay with this?" The investigator may think that the writer just butchered everything he was trying to say, so he's trying to make sure that the concept he thinks is missing is in the report. And often director will be involved in that. That's what our big product is, so we're involved in it every step of the way.

Then it gets to the directors draft, so it goes to a number of directors in the agency, like GC, R&E. We have a division draft and the directors are involved in that. Then we have the AS-1 draft, and key players and key persons get that draft and anybody has an opportunity to still comment, correct, enhance, fix, whatever.

And a lot of the issues are resolved, but if there is somebody still out there that it's nagging

at them that they think it's just not correct, then often as director I would step in and try to get those things resolved. And a lot of it is just a difference of opinion, and you have to make a decision and tell everyone why you're making the decision and move on.

Then there is a directors draft. When we're finally satisfied in the office, it goes to the directors of like R&E, general counsel, managing director, Safety Recommendations Division. So we look at all of those. And if we answer all of their questions satisfactorily and a few key offices are willing to sign off, then it's ready to go on notation. That's the process where it now becomes official and is officially distributed to the Board members.

Q. Did we talk about the division chief draft yet?

A. I mentioned it.

Q. Is that when everyone gets together, all the people who submitted a factual? Or does that happen before?

A. It certainly can happen then. It can



happen before. It depends.

Q. There is a division chief draft and then there's an AS-1 draft?

A. Uh-huh.

Q. And then there's a directors draft?

A. And sometimes there's a first draft and second draft and then it gets bumped up to the directors. It's flexible based on the needs of the report.

Q. Okay. But the first step is everyone comes in with their facts?

A. Uh-huh.

Q. And we discussed that.

The next step is what?

A. They need to start developing their analysis. We may have a public hearing which generates a lot of testimony that can be used in the report. Sometime after the public hearing we try to get all of our factuals in place and distribute it to all the group members.

We have a tech review meeting where all the parties come together and agree or don't agree or



suggest changes to the factual reports. And typically we've told them to be writing their report all along. But after the tech review meeting we'll agree or not agree to those changes. And if it needs to be resolved, that's the director's decision to agree or not agree. And there's always a lot of discussion; it's not an autocratic thing.

And then typically 30 days, or sometimes 60 days, after that the parties have to have their submissions in, and that's where we see in writing for the first time what they have probably been talking about all along. So we almost know what to expect. But it's their good faith effort to make their points known to us and to support them. And often there is a lot of really good information in those that make our report-writing process easier because it's a good description and a good way to present a point of view.

And then once the submissions are in, a lot of times by that time the factual part of our blue cover is pretty well written because we've had our factuals in. Tech review usually doesn't result in a lot of changes to the factuals. If new issues arise



in the submissions, there may be some changes. So we'll have a pretty good draft of the factual.

Q. Then we have the party submission. And then after the party submission, how do we get to -- What's next?

A. Various drafts go out. And it may be a draft of a section of the report. The writers always like to have everything done and finished before they give it to the director. They like it well written, but they may be off target or whatever. So you get the copies of the draft. They may say, "We've really finished the factual." So we get copies of that and quickly scan it, not for being well written but the substance is there, all the issues are there and we've got a factual basis. And that gets distributed to key players.

You know, if it's not an air traffic accident, air traffic people don't necessarily spend a lot of time on it. But people in the labs and the airplane performance side are looking at it.

And then somewhere it gets to a division chief draft, a division draft and it goes to the

division chiefs and the investigators. That's kind of the first big one out there that everyone can really get in and really comment on. And then if all the disagreements can be resolved, fine. If they can't, you get everyone in a room and discuss the issues, try to resolve those issues and make decisions.

Then when that's done, a lot of comments are kind of maybe more editorial. A lot of them are quite substantive. Then it's for the writer to start incorporating all of those. If the changes are extensive, we may go back with another division draft. If it's not too extensive it may go directly to -- I can't think. It's not the directors draft.

Q. The AS-1?

A. AS-1, yeah.

Q. What does AS-1 stand for, sir?

A. Office of Aviation Safety No. 1.

Q. Tell me about the public hearing. What's your role, and what kind of work is involved in conducting a public hearing?

A. Often in a public hearing the director will sit on the board of inquiry. The Board member becomes



the chairman of that public hearing.

Q. Uh-huh.

A. Which is different than being chairman of the Board. But often the office director or deputy director or somebody who's got kind of a breadth of knowledge will be on the board of inquiry. Safety Recs may be there. R&E, Research and Engineering, Dr. Ellingstad may be on that board of inquiry, or another selected person who really has some insight into what the issues are.

We'll have a tech panel, usually our investigators that -- maybe our systems investigator, power plants investigator, human performance will be on a tech panel. Then we'll call witnesses. We'll have all the parties out there, FAA, Boeing, an engine manufacturer, pilots union, Association of Airports, like the city, like Midway or City of Chicago or Lexington, Kentucky. The city maybe has representatives there because it's their airport.

And then we'll bring in experts one at a time or as a panel and get public testimony from them. That often really speeds up the process of getting the



information available in transcript, a PowerPoint presentation perhaps, that we can get them to talk. And it's in the public, so the public gets an idea of what's going on. It's a good source to get a lot of information out and for everybody to see. So the investigator asks the questions, and then it goes to the parties to the investigation, and then it goes to the board of inquiry, and then the chairman gets to ask the last questions.

Q. Who decides when to conduct a public hearing?

A. The Board. They do it on recommendation of the office. We'll send up a recommendation whether we think it's going to be helpful or not.

Q. What are the factors that the director has to apply in determining whether or not a public hearing is necessary?

A. Well, if the issues of the investigation are pretty clear-cut -- They're labor intensive, so it takes a lot of effort. It's several months in the report-writing process that just can't be recovered. If a lot of the information is available and we don't



have to go through that process, we would send up a recommendation not to.

If there's some really good technical stuff where you would just like to get somebody up there and make a good technical presentation, or if there's some things there where we really want to probe around in kind of a public nature and everybody can ask questions, that might be a reason.

If there's a lot of public interest -- the public is very interested in why the tail came off of an Airbus, for example -- and if there are a lot of rumors flying around, sometimes that's a good reason to have a public hearing, so we can just sit there and we get all of our docket material out, a lot of those factual reports are done, a lot of presentations are done, and people can sit and watch us talk to the experts about what those issues are.

So that's certainly worthwhile. And a lot of it comes down to the Board members size it up and think it worthwhile from a public policy type of viewpoint.

Q. Sure.

During your tenure as the director, were there a lot of public hearings conducted?

A. No. We were coming off of just this -- just these huge numbers of high profile accidents. And then kind of by the time I became director we had the 587 accident; that was a big one. But we were cleaning up a lot of the old reports. And we had a few accidents that weren't so big. We had a number of accidents of -- you know, helicopter operations in the Gulf, EMS helicopters.

So the nature changed that we weren't getting a lot of high profile. We had one where only the flight crew were out screwing around on an airplane and we had a public hearing on that.

And then we -- I can't remember.

THE WITNESS: Do you remember if we had a hearing on Kirksville?

MS. SILBAUGH: I can't help you.

THE WITNESS: There was a period in there where I was out sick and so there were things happening that I wasn't even around for a couple months period.



There was a Pentacle hearing; we had one on that. But we opted not to have a hearing on the Lexington accident because a lot of those issues were really straightforward. They were issues that we knew exactly what the airplane did. We had very good coverage of what the controller could have seen out of the tower, so we didn't have a hearing on that.

BY MR. LOWINGER:

Q. Do you ever conduct public hearings on foreign or regional accidents?

A. Not on foreign. That's not our purview. Well, if it's our investigation and it's a foreign carrier we could, like Egypt Air, for example. But if it's a foreign investigation in Indonesia, for example, we would not.

Q. What about investigations by the regional offices?

A. Often not. We have a few once in a while. For example, we had an airplane takeoff accident in Montrose, Colorado, that killed the son of Dick Ebersol; it was certainly high visibility. But we launched a regional team up there because of the



snowstorm. Those guys are on the road driving up in the middle of a blizzard, and they're very capable. So it was going to be several days before we could get a flight in close to Montrose and then on into Montrose, and so we elected not to. It was a takeoff accident with ice on the upper wings. And we did have a hearing on that.

Q. That's unusual, would you say?

A. Yeah.

Q. What's involved in -- You said there's the tech review meeting and then 30 to 60 days later they submit their facts --

A. Their submission.

Q. Does that include facts and analysis?

A. It can take any form that they want. It's the parties' opportunity to provide information to us the way they would like to see our report go. It can be very directed to a subject and say, "Here are our facts. Here's how we would conclude. We think the FAA needs to do something to fix this problem."

It can be something -- At one point American Airlines would give us a submission that it



looked exactly like one of our reports. They were saying our report ought to look start to finish exactly like that. So it can take on any form. We don't care. We just want to know what they want us to consider.

Q. And then it eventually gets -- And then once you get done with that tech review meeting and the 30 to 60 days later and the parties do their submission, then you said there was a substance step? What was that? I guess you review the substance of all these reports? Is that what you said, sir?

A. Say that again.

Q. After the parties do their submissions after that 30- or 60-day period, then there is a substance --

A. I'm not sure I said "substance." I very well could have. What we do there is we review the submissions to -- If I said "substance" it would be in the context of the substance of their submission. Some of the things they say isn't worthy of a response. Some of it, they're complaining about something. Then we get into the issues of the facts

Page 154

that they are presenting, the conclusions they would draw or their analysis. They're coming to some conclusion, and we have to say, "Well, we have that covered; it's going to be covered in our report," or "Wait a minute, they're off base but we're going to have to do a little bit of work to make sure we've got the information to support saying they're off base."

So we review the submissions at that point. Sometimes it's page by page, line by line. Sometimes we can look at somebody's submission, perhaps from the air traffic control union, and we can read down the whole thing and say, "That's cool. We've got it all covered."

Q. Is that a meeting or is that just through interoffice mail and e-mail?

A. It's people reviewing it individually, unless there is no comment or something. Often what I'll do is sit down with the investigator in charge and find out -- I'll go through it. If I have questions, then we may get a lot of people together, a few pertinent people, and try to resolve whatever the issues are in the submission.

Page 155

Q. Do you draft an analysis of the submissions?

A. No. We come to an agreement on it, and out of all of that, often what I would have is perhaps some notes in each individual submission. Because the Board members like to, you know, scrutinize our report, and then they may raise issues about the submission. And part of it is sometimes they may want to argue with us. Sometimes they just want to show that there are a lot of things being considered to the public, and so I like to have at least memory joggers down there to know how to answer that in a Board meeting.

Q. You eventually get to the division draft --

A. Uh-huh.

Q. -- and then to the AS-1. When do you get to the directors draft?

A. By the time the office director or the NAS have really read the report, the division chiefs and everybody's happy, or people that are still disagreeing, we've really resolved it with them and sat down and made a decision -- sometimes you have to

Page 156

make a decision and say, "Well, I have to go this way."

But when the report seems well written and it's very clear and a lot of the loose ends have been tied up -- there can be a few loose ends of non-pertinent things. But once we're really comfortable that that's the report we want to take forward, then we're ready to distribute it to the directors draft.

Q. Tell me about the directors meeting regarding the directors draft. During your tenure, what was the atmosphere during those meetings?

A. Oh, it varied. And, you know, each personality is different. Peter Goelz had a personality. Ken Jordan was director. Dan Campbell, Joe Osterman. They're all different personalities. So there would a different atmosphere in some.

Sometimes we were arguing among the offices about what the report should say. But a typical one is it goes out and a lot of the office directors had comments. A lot of those we could resolve. Some we chose not to. Sometimes we disagreed with them, but

Page 157

often just walked down the hall and sat and hashed it out and would come to an agreement. If you ended up having pretty good agreement with everybody, there was no need to have a directors review.

Sometimes we would have to go in and really defend our position. Some of the office directors saw things differently. And sometimes, you know, they started inviting the press offices in, or the Office of Safety Recommendations, and they would argue about our safety recommendations. They wanted them nice and neat and sweet so they could close them easily without a lot of headache.

Q. Sure.

A. So that stuff went on. You get into the directors review and start going through that, and sometimes -- I mean, they're smart people, so they would raise issues. And you would say, "Boy, that's a good point, we haven't thought about it from that perspective. We can write around that and make it a better product."

Fundamentally, the managing director then became the arbitrator. Now, we could always go argue

Page 158

to the Board members or whatever, but very seldom did it come down to that. We knew their concerns, and we knew what we believed the report should be, and we could take that report and get it cleaned up and it reads well and capture as many issues as we can from the other office directors, and they would either be satisfied or not. And one way or another they always signed off that they believed the report was ready to go to the Board members.

Q. You had said before that the managing director at times would send the work back to be revised.

A. No, I never said that.

Q. Okay. You had said that the managing director would want changes made and you would have to argue your point and there were times you had to actually go to the Board to --

A. No. I said in the directors review we always had that opportunity. All of my experience is that we always got it resolved.

Q. Let me ask a question, sir. Did it ever get contentious with the managing director? Did it

Page 159

ever become a contentious process with Dan Campbell to get the report the way he wanted it to read or the way he thought the report should be?

A. I wouldn't say contentious. He would review the reports. A lot of the managing directors really wouldn't get into the type of report; they would review the report, want changes or not, we would discuss it, and we would usually come to a pretty good agreement. Once in a while Dan would find something that he just thought should be in the report, so we would be scrambling to take his thought, his process, and try to get the facts and figures and write appropriate text to make a point or to set the stage for part of a safety rec that he believed necessary.

So he was more active in doing that. Osterman does it some, but not so much as Dan.

Q. Was there a lot of back and forth with Dan Campbell when he wanted some of that added information to be included into the report? I mean, it wasn't just he said, "I want this in there," and you would say, "Fine." I mean, I'm sure there was a back and forth where you had to defend your position why it

Page 160

wasn't in there. Can you describe that whole process with Dan Campbell regarding the report?

A. Well, a couple of times it happened that we were in directors review and he raised issues that had been discussed earlier, and we told investigators, "If you want to make the point, go do your work and come back." So he would sometimes raise the same issue. And I'm sure the investigator was giving him information, and it sounded good to him, so he thought it was important to put in.

So we would end up scrambling up doing the investigator's work that should have been done in the first place. These were usually relatively minor points, but we would have to end up in a two- or three-day period having to find information and craft a rec. Sometimes it wouldn't take the form he initially saw, but we would have to sit down and explain, "We think we've found a better way to describe it or request it," and he was usually happy with that. Sooner or later he always signed off on the reports and sent them forward, so I think he ended up happy with it.

Page 161

Q. So it sounds like there was a back and forth.

A. Not much. A little bit. Just like with Joe Osterman now. He sees things that he wants. Things are changing. Board members are a lot more active now. The managing director now knows there are some things that the Board members are going to want discussed in the report and we haven't, or haven't discussed it in great length, so he may ask us to go back and enhance certain areas or more carefully develop something because of talking to the Board members.

Q. You know, you mentioned issues related to Dan Campbell and Joe Osterman and their management style. How did the director's job change when Dan Campbell left the position and Joe Osterman took over?

A. Oh, I don't think it did. All those things, the accident investigations, reports, safety recs still had to get out the door.

Q. What about the management of Aviation Safety from the Managing Director's Office? Were there any changes?

A. Not in the investigations. Osterman seems to be a much more structured person that wants a lot more process and forms in place. For a lot of the things that happen in an investigation, he wants specific bulletins formalizing how we do things. For example, getting the FAA airplane, pick up the phone and call. They know we're going to be calling on a launch and they're already in the process of getting it. He just wanted that formalized on a piece of paper.

For years and years we've always worked with the FBI on the scene. He has a fellow that's supposed to be our FBI liaison for the forensic-type work.

Q. Does that make the whole process clearer for you, sir?

A. No. We're going to do what we're going to do. If we've got an FBI coordinator -- On a major investigation, it's being handled right there. On a regional investigation where a regional investigator may be working with a regional FBI office or a local FBI investigator, there were some requests going back



for some forensic work; for example, hunting for a beacon right in the middle of Katrina. Well, the FBI didn't have access, so he thought it would be better if we had a coordinator to discuss those. And the coordinator is good.

Q. Has this process made the report writing more clear, do you think -- the report process more clear and therefore made the whole completion of a report --

A. No. That's more management. It's kind of the bureaucracy of the agency. The actual investigation and getting the report process down pretty much hasn't changed. There's -- Osterman introduced a senior writer, Karen Lanier, who used to be a writer for us and very good, an attorney also. So she is now providing scrutiny, helping him scrutinize the reports as they get up to director's level.

But the effect on our process, on aviation, has been pretty minimal. It has an impact. It's one more person to deal with or whatever. But for the most part, her comments are helpful; they improve it.



But that's really person specific. She's very good at helpful comments.

Q. Do you think that since Joe Osterman has taken over, that the process has become more transparent?

A. What process? You mean the report writing?

Q. The report approval process. Yeah, I would say the report approval process. Has it become more transparent?

A. It hasn't changed much in that sense. It's pretty transparent among the offices. The distribution is the same. We get the same comments coming back in. I would say it's about the same.

Q. Okay.

A. I guess transparency of our report writing process --

Q. I guess the edits come back so you know what kind of information beforehand that he's going to want to be added or edited out of the report so that you have a better sense so you don't have to scramble or you don't have to make changes so late in the game.

A. Oh, I don't know that it's better or worse.



I think it's just different personalities. Dan saw things that he wanted and we would deal with them, and Joe doesn't do that that much. I mean, Peter Goelz never did. He didn't care. I mean, you get in there and he would let the office directors argue about it. We're usually working very closely with Research and Engineering because it's a lot of their assets involved in investigations, so by the time that report gets out of our two offices, we're in lockstep. I mean, we resolve the differences between our two offices. Those are always done before you ever get to a managing director's office.

Q. Okay.

A. I guess the impact one way or the other for either one, it's no big difference.

Q. I see.

MS. COHEN: Brian, can you wrap up this line of questioning so we can take a break shortly?

MR. LOWINGER: We'll take a break now, and I'll think about what I need, and if I need to bring it back, I will.

(A recess was then taken.)

BY MR. LOWINGER:
Q. Are there lots of edits? Can you describe to me whether or not there are lots of edits in the director review process now that Mr. Osterman is the managing director?
A. Generally, in the context of the other office directors, bringing everything together, they're about the same. Campbell had his own views of what needed to be in a report, so he was more involved in the construct of the report. So for what he believed needed be in there, he does that more often than Mr. Osterman does, or did that more often than Mr. Osterman does.
Q. Sure.
The next stage in the process seems to be that the directors all have to sign off. Is that the director of the Office of Managing Director, the Office of Research and Engineering, and the Office of Safety and Recommendations and the Office of Aviation Safety all have to sign off on the report before it gets sent for notation to the Board? Is that correct, sir?



A. Normally. And then the Office of General Counsel is in there, too. Almost always everybody gets a signature. My attitude was that it didn't have to be the lowest common denominator of all those offices. The managing director needs to sign it off and it can go to the Board. Part of the thing is you have the review and the consensus of the other offices, but I always believed that if the managing director were willing to take it to the Board, he could take it without any signatures. That's his authority to do.
Q. The managing director could take it to the Board without anyone else's signatures?
A. Yeah. He's the boss.
Q. Did that ever happen?
A. No.
Q. It's just a possibility?
A. It's a possibility. But if any particular office director wanted to stand firm on an issue, the thing that was in place was that the managing director could authorize the report to go to the Board and the other office that may have a complaint could certainly



make their complaints known, and that disagreement in whatever appropriate form would go to the Board also so that the Board would be aware there wasn't consensus from all the office directors.
Q. Describe to me what happens once there is a notation on the report. Describe to me your role as the director and what you had to do to get the report approved.
A. Well, two things were going to happen. Certainly on the big reports, there was going to be a public meeting, a sunshine meeting, with the Board members publicly discussing the report or asking staff questions and staff supporting the report.
In the process, in typically the next two or three weeks or the month before the Board meeting, the Board members would be having questions. We would try to answer those. Some of those questions, we would sit in on briefings with those Board members.
They may put formal requests for changes in writing. We run that through the executive secretary. It came back to us and we would officially have to have a response to those questions, whether we agreed



or disagreed.
We would be visiting with the Board -- not visiting with the Board members. The Board members would be entertaining visitors that wanted to lobby the Board members about the accident investigation. The Board members would either choose to listen to them, such as the pilots union or Boeing or whoever would want to come in and explain personally to each one of the Board members their views about the accident, and we would often be invited by the Board member to sit with them while they were being advised or lobbied by those entities or parties.
Q. When you say that the Board had questions and there were meetings and then there was the ex parte meetings with the visitors, did you participate as the director of OAS during that process?
A. I don't know what "ex parte" is in that sense.
Q. It's a meeting with, I guess -- I guess the meetings with the directors by outside groups. I'll change the whole wording of it.
During that period before the sunshine

meeting when the Board asked questions and you had meetings with members of the Board and the Board submitted questions and the Board met with third parties, non-agency employees, regarding their concerns about the report, can you describe to me what your role was as the director of OAS during that period?

A. Well, it was to manage that process. Often the staff or the division chief, deputy director or the IIC, the investigator in charge of investigation, could discuss it with the Board members and answer their questions. And sometimes there would be several of us that would meet with the Board member and discuss issues with the report or discuss their concerns that perhaps we hadn't discussed outside the report. And sometimes the director could be there, sometimes not.

The issue was to find out what was on the Board member's mind, what their concern was, and then sit down separately and see if we could resolve those issues to make changes to the report or discuss with them and perhaps convince them that what they were



asking for didn't need to be implemented into a report.

So it's an informal process. Some of the Board members you never hear from until the Board meeting. Some we do.

And then there are times when the parties or entities would be coming in to lobby the Board members about issues on a report, and sometimes a Board member would ask us to sit in. Sometimes it would be the IIC, sometimes the office director. Again, that type of participation was informal and often at the Board member's request. Often they wanted us to be hearing what these parties were saying so we could better discuss with them afterwards any concerns they had from those discussions and we would have heard it firsthand, which was a nice way to resolve those issues.

Some of the Board members would meet with different parties without staff there. Some of the Board members would -- And it was kind of a mix and match from investigation to investigation. A lot of Board members would have us sit in.



Q. How much time would you have to put into the meetings with the Board members and attending ex parte -- attending third-party meetings and coordinating staff to meet with the Board members and getting responses coordinated? Was that a significant part of your time as a director?

A. No. It could be a significant part of your time over a two- or three-day period when a lot of people were coming in to talk to the Board members. These people may stay an hour, and you go to three of the Board member meetings and not two, and then the next group are coming in. So there may be a couple, two or three hours. It's more of a scheduling issue, an hour here and there.

In a sense, in the grand scheme of things, it wasn't a lot of time, but right in the middle of a busy time of moving reports towards the Board, it could use up a better part of your day when you could perhaps spend it elsewhere. But it was always good to hear what these people had to say --

Q. Did you --

A. -- and discuss it with the Board member.



Q. Excuse me. I apologize for interrupting you.

Would you ever delegate that work to someone?

A. Yeah. If I were tied up, I would see if the deputy or the division chief or the IIC could sit in. A lot of times I would like to sit in on at least one of the meetings. Because these parties would come in and kind of tell the same story to all the Board members, and so if I heard that, then after they left, if there were lingering issues with the Board member that could be brought back, you know, you walk in their office and discuss it with them or see how to best resolve it.

And delegate, a lot of times you're just so busy that we would get a call from one of the Board member's offices and the deputy or secretary finds somebody to go. But whoever is going up, you know, the director, the deputy, we all kind of knew who was coming in, when they're coming in, and we knew who on our staff -- whether we had been invited to sit in or not. Sometimes there were a lot of meetings where we

weren't invited to sit in and we simply wouldn't know about them. We would see some of these people out in the hall and knew what they were doing, they were visiting Board members, but we weren't privy to that.

Q. And describe to me what your role was in preparing for the sunshine meeting, for the actual Board meeting.

A. One thing is getting the report done. And then if there is a flurry of requested changes to the report, how were we going to handle that, seeing if we could get it resolved. Sometimes that took a bit of time on various reports, sometimes not.

We spent a lot of time getting our presentations ready for each investigator. When we go to the sunshine meeting, sometimes the office director would have an opening statement. Most often it was the investigator in charge. The Board members would have our report, and the whole purpose of the meeting is for them to adopt that report.

They see that sometimes they need to be asking questions so the public really understands there were a lot of things going on in the



investigation, so they ask nicely probing questions so we could describe what was going on. And sometimes they just disagreed with what we said and they wanted to argue about it.

But to start off the meeting, the chairman goes through an opening statement about the accident and where all the Xs are and things like that. Then the IIC, the investigator in charge, would give an opening statement, give a summary of the investigation at various levels. Sometimes they would pretty much give the whole presentation.

And then sometimes there would be a round of questions. Then perhaps the systems person would give their presentation of how a system failed. And then the next person may be the human performance person who has two roles: what was the human performance role in the system that failed because it was put together improperly, and then what was the human performance role in the process that the pilot couldn't handle the situation. So they may have several presentations embedded into one.

But we go down through all those



presentations and basically lay out the staff's position so the public could clearly see, and then that would give the Board members something to probe and ask questions. And if they had concerns, hopefully we could answer the questions and make them feel comfortable that they should adopt the report.

Q. Did you ever have the Board members asking you -- Describe to me occasions as the director when the Board came to you and asked you to make changes to the reports that you had submitted as part of the notation.

A. You mean some types of examples?

Q. Well, first of all, had it ever occurred?

A. Oh, sure.

Q. Was that a common experience?

A. Yeah. It happened virtually every accident -- every report we were taking to the Board.

Q. I see.

And what does the word "reconsideration" mean?

A. That comes later. The investigation process isn't like a criminal process at all, but



there is an adversarial nature to it. The pilots may think Boeing or the engineers designed a poor product, and the engineers or Boeing may think the pilots didn't know how to fly an airplane. So by the time we take the report, we'll try to size everything up. We'll have findings and a probable cause and safety recommendations embedded in that report. Sometimes a Board member will adopt it. Sometimes a Board member will append their own thoughts to the report, sometimes not.

Then that report is adopted by the Board, and they may have some Board member thoughts appended to it, and that report determines the probable causes, the findings, safety recs, and then that report is out there on the street.

The findings and all of that are available immediately, and then the report has to go to a printer, publisher to get it bundled. Now it's available very soon in an electronic form.

And then if one of those parties out there are still miffed we didn't take their side or he ignored their argument, there's a set of rules by

Page 178

which they can file a petition of reconsideration. What that is is they are petitioning the Board to reconsider that report, and they will say what they want changed about that report.

Q. Has that ever happened with an aviation report during your period as director?

A. Oh, yeah. Not only on big ones. Even on a very small accident in general aviation with a minimum of effort. We get a pilot's statement, put it in, draw a conclusion, and after he sees what we took from his statement he may file a petition for reconsideration even on the brief-type formats, the smallest of reports. When we write a report and determine probable cause, interested parties, whoever that may be in that investigation, can file a petition for reconsideration.

Q. And did the Board ever require reconsideration of a report as a result of a petition?

A. Uh-huh. They've modified or made substantive changes. A lot of the changes that come in on reconsiderations -- There's two sitting on my desk right now from general aviation accidents. So

Page 179

there's a lot that come in on that.

On the major investigations, there's a third one sitting out there on an accident that occurred in Afghanistan, and because it was a U.S. operator flying for the military, it's kind of a screwed-up mess.

So there's petitions that come in all the time.

Q. Okay. So if a petition comes in, just because someone files a petition, that doesn't mean the report has to be amended?

A. No, no. What happens with a petition -- the smaller ones are easier to describe, but some major reports have been changed.

The ATR accident at Roselawn, Indiana, the French took great exception to the way we handled that report, the conclusions we drew and kind of some of the strident language that we had in the report. And they petitioned for changes, and they made some very strong arguments. And by this time we had new Board members that weren't there for the whole history of the old report, so they're hearing for the first time

Page 180

what a lot of the issues are, so they believed they could in good faith agree with the changes that the French government and French manufacturer wanted. So there were some substantive changes made to that report because the Board members believed that those were appropriate.

Q. Other than the ATR for Roselawn and the French comments, were there other reports during your tenure as director which resulted in -- Let me rephrase the question.

Were there any other petitions for reconsideration during your period as director of OAS that resulted in changes to the report?

A. On a major investigation like that, I don't recall any. I don't recall any.

Q. What about minors?

A. The regional-type investigations? Sure, we change those all the time.

Q. I see.

How long does the whole process take between the accident, the launch for the accident, and getting Board approval, on average?

Page 181

A. Oh, it varies. A number of years ago, it was, on average, three years. Right now we're ready to produce the Lexington report in what, eight or nine months. There were a bunch of really complex investigations doing the engineering work and all of that took a lot of time. And there were a lot of them; we were just in overload. One of them, the 427, was like five years to get it out the door. But it was just constant work on a very complex thing. We had a whole string of really complex investigations.

Right now we're seeing investigations that just simply aren't nearly as complex, so we're turning some of those in a year and a half to two years. Some of them will stretch out simply because we've put them on the back burner and aren't moving them because we're moving other products. Right now, off the top of my head, we should be in the two-year range, on average.

Q. Right now in 2007, or during your tenure as director of OAS?

A. It's about the same. Actually, it may be getting a little quicker now, because in the seven

months, Lexington fits in there. A lot of those are in the pipeline and kind of in that range. It may even be getting a little bit shorter now.

We've picked up a couple of accidents that should move more quickly. They're just not the monstrous accidents like getting into fuel tank inerting and rudder hard-overs on 737s.

Q. What are the factors other than technical complexity, what other factors affected the ability to have a report approved within a certain period of time?

A. Staffing and writing resources. All of our investigators are multitasking, and an investigator may be involved in a really substantive issue on an incident, and then we launch him out on a major investigation. So we're always juggling whether to get them back and keep the investigation going or get the safety recs out on the incidents. They may pick up two or three. Investigators in charge are usually handling two or three -- these aren't major. We have the big majors, but there's substantive investigations that our investigators in charge are carrying along at



the same time.

So the big thing is trying to juggle it and the mix and match of how we mix our systems and power plants and our IICs on one investigation and it's a different mix on another. It's just a constant evaluation of how that's going on. Just like today, if there were a major accident today, all of that planning, all of our great plans would just be put in abeyance until that new one settled down, and then we would figure out where we were and have to reshuffle everything else to see how that schedule would play out.

Q. Were the national staff members, were they involved in preparing regional reports as well?

A. You mean headquarters?

Q. Yes.

A. Sure, they can be.

Q. Did the regional reports ever preclude or slow down a national report?

A. What I'm hearing you say is a headquarters investigator, who is typically a specialist, providing assistance to a regional investigator, who is kind of



a generalist, and they're on a pretty substantial investigation, and the headquarters investigator, the specialist, will that divert time away from preparing a major report at headquarters?

Q. Right.

A. Yes.

Q. What would happen if that circumstance? Wouldn't the national report take precedence over the regional?

A. It depends. It's just a judgment. We just sit down and try to size it up. Normally what we do is we try to carry both at the same time.

Q. Are those regional reports significant factors in delaying a major report?

A. No, I don't think so.

Q. Can you talk to me about testifying -- What is a green page or a green leaf? Is that what it's called?

A. A green sheet.

Q. Green sheet. What is a green sheet, sir?

A. A safety recommendation letter.

Q. What's a safety recommendation letter?



A. That is a -- We talked about safety recommendations. Typically the Office of Aviation Safety will make those to FAA, because FAA is the entity in aviation that can make things happen. In all facets of operations, design, with airports with the whole aviation infrastructure, they're the ones that have the authority to mandate.

So we make our recommendations pretty much universally to them. The green sheets are printed on green paper. If you printed one out, it would be to the administrator, and it says on this day at this time something happened, and it would give the description of an accident or an incident or a piece of equipment failure, not necessarily a major accident, that a little piece broke off of a small airplane and they crashed, or they could have.

And there would be a history about that type of event. If we know about it, we try to bring that. We try to describe the engineering phenomenon and the potential fixes, or that the manufacturer already has an appropriate fix. We go through what the event was, what the prior history is we can draw

to bear to find the magnitude or the criticality or the danger and say where the problem is and what needs to be fixed. And sometimes we will actually write pretty specifically what needs to be fixed. Sometimes we don't. Sometimes we don't know and the FAA needs to get out and study the problem and find the fix.

And then there will be a series of recommendations, "The NTSB recommends the FAA..." and there will be three or four specific items, or 25 in a major report. And then that will be adopted by the five Board members, and that's a stand-alone safety recommendation that may come from one small incident out in the regions that we didn't believe was getting proper attention, or it may be coming right out of a major accident investigation report and may be very substantial, cover a lot of subject areas and cover 10 or 20 safety recommendations.

Q. So these safety recommendations, do they have to go through the entire process that we discussed before with regard to the division chiefs and the investigators and then the division chiefs and the AS-1 and the director meetings and --



A. I'll just describe it. It depends. In a certain subject area, if it's air traffic, the air traffic investigator will say, there are some problems with air traffic control; here's what the history is; we've had a couple other accidents or incidents, and FAA needs to change something.

In air traffic, the human performance people would typically look at it because it involves humans doing something. Our operations people would look at it because it involves air traffic effects, how pilots fly airplanes through the air traffic system.

Then the office director -- the deputy and the office director would be involved in that process. They would get it written, usually take a look at it, have meetings on it, and say, "Yeah, that makes sense. You get it down written well on paper." And then when it finally comes out, it makes sense, they've got substantial information.

And then, "Well, we need to enhance it," or "We need to get more information in certain areas." And then once the office directors, once we're



satisfied, then we would sign off for that to go and right there be distributed to the -- it's -- I can't remember what it's called. It's not the directors draft but it's -- I can't think of the term right now. It goes to the office directors, but it may only go to certain ones. If it's air traffic, it may not go to Research and Engineering. It always goes to general counsel.

Q. And does the Board have to sign off on it?

A. Oh, yeah, they adopt it.

Q. And does that have to go through a sunshine period?

A. No. One thing, both for reports and safety recommendations, when the managing director signs off and the executive secretary helps review for him that it's ready for notation, it's ready for the Board members to vote on it, it will go to the Board members and the paperwork will move around, and they get a certain amount of time to voice their complaints or ask questions or request changes in the safety recommendations.

If we can get all of them to agree and sign



off on it, or get a majority, in this case three out of five Board members, if we get those signatures, then that rec is adopted and it's out the door. And it's the same for reports. We send reports to the board that don't go to sunshine meetings, and those reports are adopted without going to a sunshine meeting.

Q. Earlier you said that major reports take 30 to 40 percent of your time. What percentage of your time would you say the safety recs take?

A. It's hard to tell when they're buried right in a major report and are part of that. I'm going to say 20 percent, maybe.

Q. You mean 20 percent of the 30 to 40?

A. No, no. 20 percent on its own. We write a hundred safety recs a year. Not a hundred safety recommendation letters, but there's roughly a hundred safety recommendations a year.

Q. And how many of those are approved by the Board?

A. Oh, they all are. Well, let me put it this way. The ones they approve are adopted and put out

the door. But virtually 100 percent of what we send up is adopted. By the time it gets to the Board member level, virtually 100 percent of those are adopted.

Q. What happens with the regional reports? Who signs off on the regional reports?

A. Well, that comes up through the deputy director of the regional operation and either one of the headquarters writers or there's a couple of regional writers that will help craft those reports. They do a lot of work and then it still comes up to the director and deputy director to read those. Because it's a report that -- if it's a report that's going to the Board, then we'll look at the whole investigation and read the entire report and go through our process very similar to a major investigation, and we'll be somewhat selective on which division chiefs come in to help. It's meant to be an inclusive process, but sometimes particular division chiefs don't need to waste their time on it.

And once that report gets fairly well through all of that process, then it's ready to go to



a directors draft which goes out to all the directors, and then it's got to go to the managing director. And on the notation process, at any time on majors or these regional-type reports, if a Board member calendars that's report, then it's headed for a sunshine meeting.

Q. How many regional reports end up on a sunshine meeting? How many ended up on sunshine when you were the director of OAS, sir?

A. I don't know. It's a couple, two or three a year. There's kind of an ebb and flow. Sometimes we'll have a grouping of Board members that pay a lot of attention to it or like to bring them to the Board. And then sometimes they'll sign off on the reports and get them out the door or adopt the reports without going to a sunshine. It's whatever those numbers are, those reports sitting out there. I don't recall.

Q. I want to make sure I understand the regional report. A regional division chief or regional deputy director or another person writes up this report and it eventually makes it to national where it goes through the appropriate division, let's



say it's a safety recommendation issue or a research and engineering issue, and it gets reviewed at that level.

A. Uh-huh.

Q. It also gets reviewed at the level of your office as well, the director?

A. Oh, yeah.

Q. And who else reviews it?

A. Well, it depends who may have some expertise to provide some -- you know, a good review of the report. It varies. It depends. If it's a report coming in that deals, for example, with EMS helicopter stuff, we've got some pretty savvy helicopter people in the regions. They may review the report. And since it's EMS with survivability issues or survival factors, persons may review the report from their perspective. So it depends what the nature of the report is and who has the expertise. It's variable.

Q. But I was under the impression based on our earlier conversation that the majority of the regional reports are nothing more than one-sentence reports;



you know, they adopt a recommendation. They're very short, actually.

A. That's true. I thought we were talking about reports coming into headquarters and going to the Board. In round numbers, I don't remember the breakdown anymore. We have several different types of investigations that go on out there. There is a C Form investigation, and that is one which is pretty simple, pretty straightforward. The pilot survives the accident, calls in, says, "Here's what I was doing, here's how I screwed up, here's what happened," and talks to the FAA. That's the same story we get from the FAA guy.

So we may get a pilot's statement in and some limited information, where it was, what time, the airplane, pilot's name and number. We'll put than in, and if it's pretty simple and straightforward, that report can be adopted within 30 days. It's processed in electronic form and sent to headquarters.

And then there are limited investigations in which we don't travel but it requires more effort on our investigator other than just getting

information in and bundling it and sending it out the door. So there are limited investigations, and they will end up in a brief format, but our investigator will have to do a little more work, a little more typing to write about the facts and circumstances of the investigation. A lot of limiteds don't involve fatalities, but it's still an accident.

And then we have our -- there's incidents out there that are investigated also, a few.

And then there are fatal accidents or really substantial accidents of high complexity, and that will require a lot more time of our investigator. It may take six or eight months for him to get everything done and pulled together. He may need some reports out of our lab or a radar study or something from a flight data recorder, for example. So those are brief formats, and those are presented in a narrative format. There is a factual format and a probable cause format.

And then behind that there is always the docket of individual reports, the investigator in charge's report with forms filled out, and



specialist-type reports, like a metallurgy report. So there is a whole docket there that gets pulled together.

And then with all that, the regional investigator in charge will write a factual narrative about all the facts, and then he will write a probable cause portion of that which may be very substantive if it goes into a lot of description and analysis to come to a conclusion, or it may be just simply a relatively brief statement that probable cause may be something like the pilot lost control on the landing in a crosswind, and that's all that's necessary for that report.

Q. Okay.

A. So that's one style of reports that come through. Those are the ones that we sign off about 200 at a time, for example. There's roughly 2,000 a year of those.

Q. So 2,000 of C Form limited incidents.

A. And the fatal accidents, for example, there would be about 400 of those. Or no, that's too many. About 400 fatal accidents a year.



Q. So all together from the regional offices, national headquarters signs off on 2,000 reports?

A. Uh-huh. We've use that number over the years of 2,000. I think it may now be down to 1,800. The price of gas is up this year, so the number this year is going to be -- you know, it kind of rises and falls with economic times or whatever. There was a big dip, of course, when nobody was flying after 9/11.

Q. What percentage of your time gets taken up with these regional reports?

A. For those type of reports, a minimum.

Q. When you say "minimum," can you put a percentage on it? Is it as small as testifying in front of Congress?

A. No, it's more than that. It's hard to say. It's just going on all the time, and a lot of it you can just kind of know of an issue. Like in the morning, we'll brief that there's been a Beech Baron crash in Utah. Well, what are the details? We'll get a good briefing. So that adds up over a year's time.

Once in a while there will be something of substance and we'll spend a little more time on it; an



icing incident, for example, where the engines quit on a Beech jet, a small private jet but the engines flame out. So we'll have a power plants guy looking at it, and when it's all said and done, there's been three or four of them and people have been able to dead stick the airplane down or get the engine restarted. That may take a couple hours total of my time over a couple week period.

And then, of course, if there is a safety rec coming out of that, then we've learned a lot over two or three hours of being kept up to speed over a period of time, and then we're better prepared. When our safety rec comes forward, we can scrutinize it much more quickly.

Q. So the C Form, the incident, the limited and the fatal. Do they all have to get Board approval?

A. No. At those levels of those reports coming up, the office director, I guess, has delegated authority to approve any accident that's coming through. We just know -- I mean, if it's a major, I wouldn't do that. That's the Board's prerogative.

Page 198

But for these other, let's say, 1,800 briefs, some of them are very simple, a lot of C Forms, a lot of limiteds. The Board members aren't going to sit down with 1,800 reports and go through page by page and scrutinize it, so they have delegated the office director the authority to sign on their behalf to determine probable cause.

So those would come through in batches of 200 at a time, and as office director, I would spend not very much time at all on that whole package. Often the deputy director would flag certain ones that were unusual or that were going to be contentious or that were involving some notoriety, either the people involved or the circumstances. So I could review those and refresh my memory on those events that were up, and then just kind of give a quick look that we were all comfortable with the probable cause going out, and then I would sign the entire package 200 at a time.

And every once in a while there would be some we would look at and say we're going to generate a lot of interest in this and we haven't really fully

Page 199

explained. So sometimes we would pull one or two out -- not very many -- and go at it again to add more information, and we can release them separately or in the next batch of 200.

Q. My question, sir, it seems every morning during the standup there is a discussion about some sort of an accident, these smaller accidents at regional.

A. There can be, yeah.

Q. And a little bit later down the road -- 30, 60, 90 days -- there is a report coming from the regional offices.

A. On the C Forms.

Q. On the C Forms.

A. Yeah. The C Forms almost never get discussed at the morning briefing. There's accidents of substance out there, small airplanes that may involve a new model, multiple fatalities or hit a building and generate a lot of news or somebody important on board. We hear about those. We also hear about all the reports coming in that we're going to be trying to look at or track, systems on big

Page 200

airplanes or little airplanes, like engines flaming out, for example.

Now, some of those field investigations, because of workload out there, may not show up for six months. If they're really complex, they may not show up for two years because the investigator out there is carrying a full investigative workload and then he's also trying to push a complex report through the process.

Q. So even when you see it, unless it's flagged for you by the deputy director, it's not really something that you put a lot of substantive time into?

A. Not compared to all the other stuff.

Q. And unless it's flagged by the deputy director, it's not something that you spend even much more than a minimum amount of time on?

A. I think that's accurate. Or I flag them myself. You know, we hear about it, so I just make a note that I would like to see that one when it's ready to come through just out of curiosity. But it's minimum. It's not a burdensome thing.

Page 201

And I guess the nice thing about that is it's kind of a testament of what comes up through the regions and out of the regional offices and takes care of itself pretty well.

Q. Are there any other types of reports produced by the Office of Aviation Safety? We talked about majors, safety recommendations, regionals.

A. With the regionals, sometimes we put together coming out of the regions, or sometimes headquarters, kind of a compendium. It's an investigative report or study of something like -- Well, I'll give you an example of where I spend time on regional stuff.

Like aging aircraft. The T-34 is an old military trainer. They're out there flying them for all kinds of fun and games and wings start breaking off. So we'll spend a lot of time. Our investigators will spend a lot of time, and I'll have a lot of attention put on those. But in the grand scheme of things of a major investigation versus this, those take time and we're spending a lot of investigative resources and I stay aware of those.

But then back to a regional investigation. We may start picking up a trend that we have a lot of helicopters crashing in oil operations in the Gulf of Mexico. So there will be a number of investigations. We'll start pulling a lot of those together, and the deputy director of regional operations will put together a team, and they will pull a lot of these investigations together or start looking at a lot of them. And there's current ones, and then another accident that happens right in the middle of this, and they will come up with a pretty substantial report that kind of is focused on a lot of Gulf of Mexico flights. And there will be the whole recommendation. But it will be a bunch of accidents that each one individually doesn't grab anyone's attention.

Q. So it's a safety report?

A. Another one would be, for example, coming out of the regions would be EMS helicopter operations or EMS airplane operations, and we would start picking up that there seems to be a lot of these accidents, and then we'll get -- We've got some pretty savvy helicopter people and a lot of really good



investigators, and they'll sit down and kind of size up all these reports and say there's kind of a thread here. There are some things that continue to happen the way they're switching operations from one FAR operating mode to another and they're getting themselves into situations where we're either crashing the helicopters and certainly losing the helicopters and the crews but maybe even the medical personnel on board or the patients.

So we kind of sit back and look at all of these, and we can write safety recommendations for the whole industry to put some more process in place or structure in place or something that should go a long way to prevent a series of accidents.

Q. How much of your time and effort do you as the director put into the safety recommendation reports?

A. Coming out of the regions?

Q. Yeah.

A. The ones coming out of the regions, it's -- When they're kind of coming together, we'll have meetings and spend an hour or two here and there of my



time trying to get a sense of what's going on. There will be a series of meetings as it's progressing. And then it really gets into the report process and the investigators pulling everything together and the writer. So that's where it ends up. Several hours of briefing; three or four hours or a couple of days of reading through reports, really giving them a good scrutiny and QC'ing it just like everybody else does. So those can end up using up a significant amount of time.

Q. How much?

A. Oh, I don't know.

Q. I'm sorry. You were speaking, sir. Go ahead.

A. I would say you end up spending two or three weeks to get each one of those out, stretched out over two or three months.

Q. How many of those safety reports were produced per year?

A. I would say one or two, depending. Probably more like, on average, one. There may be a year where we go and don't have one; some years we



have two.

Q. Any other type of reports produced by your office, sir?

A. I can't think of any right now.

Q. Is there a national database that you're involved with, that the Office of Aviation Safety maintained on aviation accidents?

A. You say a national database. You mean --

Q. Or a database.

A. You mean using national headquarters?

Q. I apologize. Is there a database maintained by Aviation Safety during the period that you were director?

A. There's several. There's the overall agency database that kind of tracks the accidents, and they use some of that for cost accounting. And then we had our ADMS database that's more oriented towards regional investigations so they can get the regional investigations coming in and get data. So there could be some information tracked on that.

Research and Engineering maintains kind of one part of the official accident database. You can

go to it and see which investigations are open, which ones have a probable cause. It's R&E where you can go to the website right now and look at accidents and query and look at thousands and thousands of accidents. Or you may look at an accident that occurred a couple of weeks ago and you'll see that there is a preliminary report for it.

We put the reports through that whole process, these small investigations, and as the reports are developed, they're embedded into that. You can go online and see the electronic versions of the factual report, the probable cause report, the narrative report. And then you still have to write in on most accidents to get the docket for each one of those reports.

Q. With regards to the databases you just mentioned, what portion of your time as the director was spent on issues related to them?

A. Very little. That's something that's pretty well developed. It's ongoing. As reports -- or as investigations are completed and we sign off on 200 at a time, then those appear. They get into the



NTSB database. They show up as a final. And a lot of that information, then, is kind of handled in a statistical manner through R&E. They put out an annual review of smaller general aviation accidents, annual review of air carrier accidents. They put out a couple of required reports that use that data.

Q. I see.

A. But in a sense, I'll review their reports. I don't QC it for the numbers or anything, but there is a lot of information that they glean out of it and want to discuss in the annual report. So I'll review that, but it's not much time.

Q. Tell me about testifying before -- We talked about testifying on the Hill. You say it really wasn't a significant part of your work.

A. Well, you say testify. I would say that's a very minimum part. During the six years I was there, the chairman -- If there was going to be testimony in front of committees, the chairman would always do that and I would be there with him. I wouldn't testify, but I would go up and brief staffers or go with a Board member to brief staffers on



whatever staffers wanted to know. But that's not a significant part of my time.

Q. Did you have to produce the work necessary to brief the Board member or the chairman when he actually was testifying at a Congressional hearing?

A. I would usually figure out what they wanted, know who the experts were, and they could bundle the testimony. Or find the data and get the data all bundled and get that up to the chairman.

Q. Would you bundle the data?

A. No. Sometimes you see the data coming in and you kind of have an idea of what the chairman is wanting and see the data and get it reorganized or more information put in or less and look at what was written and sometimes rewrite it. That wasn't a significant part.

Q. What about international organizations? Did you participate in any international organization while you were director of OAS?

A. No, not directly. Things like the IKO, the International Civil Aviation Association, we would send people who had subject matter expertise, or



Mr. Macintosh would handle most of that interface with IKO issues as they came up. That would not have taken much of my time at all.

Q. How about evaluations and human resources issues? We didn't really talk much about that. Did you draft evaluations for your employees while you were the director of OAS?

A. Not much. The only one that I really had to draft would be the deputy, and then he drafted the evaluations for the chiefs, and then the chiefs or regional directors would do it for their staffs.

Q. And did you review all those evaluations each year?

A. Yeah. We're a small agency, so I would go through the evaluations, like for the regional offices, and look at the evaluations for the chiefs. Since it's all so tightly integrated, you kind of know if someone is struggling out there. If something isn't working well, you're aware of it. So I would read the evaluations for the chiefs and then for each one of the regional investigators to see how the chiefs were rating them.

Some people I thought were very good performers and I would just see what their ratings were. And sometimes you would be surprised and see somebody had a lower rating than I perhaps thought they should. So I would talk about it, and they would usually have a real good reason to rate people the way they did. But I would review them.

And the same for headquarters. All the division chiefs were there, so I would look at those. We deal with them more on a day-to-day basis. At headquarters you kind of know what products they're putting out, whether it's good stuff or whether they're getting into some really substantive investigation.

Q. Who made decisions about bonuses?

A. The chiefs would recommend. They do their ratings and we would look at that. They would recommend various bonuses. And then the deputy would recommend bonuses for the chiefs, and the deputy director of the regional operations would recommend bonuses for the chiefs, and the chiefs would recommend bonuses all the way down. We would review those and



try to balance out. We would live within whatever the bonus budget was, so we would bump it up or down, or try to get everybody on an equal playing field and then divvy up the money fairly.

Q. With regard to evaluations and bonuses, how much of your time was spent each year doing that type of work?

A. Oh, not much. A lot of it was in the process. About the time the performance reviews are due and recommendations for bonuses, it's been two or three hours over three or four days; you know, two or three hours here, a couple of hours there, another hour here.

But the senior administrative person, the finance person, deputy directors and myself would go over all that. Not much. There's a lot of work that goes into it to write all those, but as it all comes together, you usually had a pretty good idea looking at the performance ratings. Then you look at the bonuses and there would be the highs and lows that were kind of prescripted. We would look at that.

And then we would also look at somebody who



had really done some outstanding work on a special project throughout the year. We would recommend extra money for them or a special act type of bonus. We were aware of it or the chiefs recommended it.

Q. And the whole evaluation process, would you call it minimum as well?

A. Well, in the grand scheme of things. I mean, in a sense, none of these are minimum when we're in kind of overload all the time anyway. I mean, they impacted right at those moments in time. I mean, you deal with them. They're due. It's appropriate to take care of the people, and you have to meet the schedules to get it in the process for the entire agency. So you just take the time and do it and try to do it properly and get it done, and then it would move off to Personnel or HR or whomever has the top-end review of all of that.

Q. Can I ask you a question, sir? What skills are necessary to succeed as the director of OAS? What skills were required to do the job properly?

A. Well, for me, I think the skills that I brought to that job were the technical knowledge, kind



of a broad-based knowledge of a lot of the facets of accident investigation, which goes to getting the investigations done, conducted, getting the safety recs out. So that was what I was better at.

The deputy, Mr. Haueter, he was a pretty hard core investigator or engineer, but he's better oriented when it comes to the business management side. So a lot of that, he could pay more attention to so I could get more into the technical side of it.

And then we had the admin and finance person sitting there taking care of a lot of whatever budget we could manage, which isn't a big part of the way the agency operates.

The way we were structured is between myself and the deputy, I told people we were pretty much interchangeable, that if I wasn't around and there was something happening or something that needed immediate attention, get with him and get it resolved. And when he wasn't around, I did it. So we could --

Q. Which deputy are you referring to, sir?

A. Mr. Haueter.

And then also Mr. Guzzetti on the regional

side, on the regional investigations. He had a lot of authority to make a lot of things happen and did it very well, did it without -- There were huge amounts of problems when he came in and took over, and there's a lot of those problems that have gone away; personnel issues, workload issues, backlogs, all that kind of stuff. He was taking care of a lot of that.

Q. Was Mr. Guzzetti paid at the SES level?

A. No. He's a GS-15.

Q. And when you say that you were interchangeable with Mr. Haueter, could you explain that?

A. Well, in the sense that any decision or anything like that, I always had the final authority. But on the day-to-day operations, we both had a good sense of what was going on and what needed to be done. If there was a major launch going on --

We used to laugh. There were two major launches overseas in one day and I was sitting in the dentist chair the whole time. He just handled it seamlessly and got it out, and by the time I got back to the office with a fat face, everything had settled



down and was taken care of.

So in that sense, people wouldn't hesitate in a minute to say, we just picked up one in Indonesia and we just picked up one in Africa. He was one busy fellow there for three or four hours and I wasn't around, but he took care of it.

Q. Those are launches on an international basis with U.S. parts in the aircraft?

A. Uh-huh. I think they were both Boeing products.

Q. We were talking about Human Resources before. Can you tell me what type of work you would do to ensure diversity of your workforce?

A. Well, we worked with Human Resources. We worked with our EO counselor. We worked with -- when we were putting out bids, there were a lot of -- we get a lot of applicants in, and we basically go right down the list of finding the best engineers or pilots or whatever. I think if you look at our mix out there now at headquarters, we have a lot of women there, three division chiefs out of seven divisions. So in a sense, the best people coming in the door, we grabbed



the best ones we could, and I guess in my mind, it kind of took care of itself. We have a wide range of minorities and women in the workplace.

Q. What about working with other agencies? Including working with the FAA or State Department, U.S. Navy, I guess Department of Defense, et cetera, or even with the embassies for international launches, can you describe for me the type of work you did with regard to those?

A. A lot of the work we did -- When we go overseas, we check in with the embassy, work with the local investigative authorities, usually debrief the embassy coming out. And in the process, Mr. Macintosh would be heavily involved talking to State and back to the embassy and keeping them informed when our teams are out in the field.

In a foreign country, Mr. Macintosh worked a lot and does a lot of work with State for State employees being deployed to embassies. So they bring a lot of those people in, and we brief them what we do overseas, how we do it, so they understand what it is when we're coming, or under the rules of Annex 13,



they have a better idea of what we're going to do, what we need. And it's very helpful that they know that. They're very supportive of us, almost universally. That's with State.

With Department of Defense, if we have investigations that involve a civil airplane, it's our investigation. But we deal with the Department of Defense a lot on using, for example, sup salv, supervisor salvage, to go recover wreckage or recorders from deep water. They've got the deep water drones, and they have the contracts in place to get that launched. Like recovering all the wreckage off of TWA 800. That was supervisor salvage of the Navy that really manned that entire operation for us. So we deal with military all the time.

State Department, mostly foreign or IKO issues. Sometimes we're heavily involved with State, for example, when Egypt Air crashed and the Egyptians delegated the accident to us and then wanted it back, and there were a lot of State Department issues with that. But we kept the investigation. But there is just a constant battle with some countries. National

Page 218

pride or whatever, or wanting to blame Boeing for everything. So we get involved with State for that.

Q. So dealing with the Department of State, dealing with the Department of the Navy or the Navy for deep sea recovery, and of course FAA, any other agencies that you work with on a regular basis?

A. Well, FAA we work with continuously because they are the ones that can get a lot of things fixed. They have a right to participate in our investigations as a party to our investigations. Unlike some of the other modes who conduct joint investigations or in cooperation with, we don't do joint investigations. They're ours. And we will have parties, which FAA is one. So it's a little bit different arrangements than with some of the modes. We don't have to negotiate with state police. We don't have to negotiate with -- The railroad people have to work with FRA. The haz-mat people, there's no telling who they may have to end up working with. Or the Marine Office coordinates with Coast Guard. But if it's an aircraft, it's our investigation. So we're distinctly different in that respect.

Page 219

Q. Any other agencies that you work with on a regular basis?

A. Sure. NASA. We work a lot with NASA on very technical issues. They know a whole lot about complex aircraft things, things that fly, and they've got lots of knowledge in all kinds of areas. They're the world's leading experts on composites. Boeing is no slouch; Airbus is no slouch. They're all very good. So when the composite tail came off the airplane in New York City, we used a tremendous amount of NASA's resources helping us both for the strength of materials, the composites, the aerodynamics of the loads on the tail. So we have a very good working relationship with them.

We launched a number of managers down to provide oversight -- or not to provide oversight but to help Admiral Gehman when Columbia crashed. So we had a lot of people down there when that operation was setting up and going. That was much, much bigger than any operation we've ever done. But we could offer good advice on the pitfalls we could see coming or the lessons we've always learned the hard way.

Page 220

We provided investigators out when the Mars thing came in and crashed because the parachutes wouldn't deploy. So we had some investigators out helping assist.

We work with the FBI. They many times will send their forensic teams in to help us out to capture data, or we send things down to the FBI labs. So they're always more than willing to help out. FBI does a lot of the victim identification issues for us.

We work some with ATF if there are fires or potential for incendiary devices.

That's all I can think of off the top of my head.

We work with national labs which are federal entities, like Sandia Labs or labs up at Brookhaven in New York. They have various labs that have very expert people in very specific areas. So if we need help, we go through and search labs, and sometimes they volunteer to pitch in and get in on our investigations because it helps them. Sometimes they want money.

So anyway, we reach out and touch a lot of

Page 221

federal agencies.

Q. While you were director of OAS, were you ever involved in the Executive Review Board?

A. Yes.

Q. Can you describe that to me?

A. The Executive Review Board could meet on any number of things. A lot of times the ERB would meet and look at performance ratings and awards and give the managing director ideas about how the awards should be distributed. The ERB, various people in that or groups would sit in on performance evaluations for new SES candidates coming in to evaluate them.

Q. And what portion of your time was spent on that?

A. Oh, not much. You know, a couple of hours for like the performance ratings, or maybe a big stack coming in on people coming in for interviews. You may take a day to read through all of the applications, a day sitting through the evaluations, and then if people were recommended to be interviewed, two or three hours per interview. So at those times it would take a lot of time in a short period, but we wouldn't

be involved in that for six months or a year.
Q. Sure.
I asked you a lot of questions today about everything from investigations, from accidents, through investigations, through the report writing process, through dealing with the Board, dealing with other types of reports, dealing with Congress, dealing with other agencies, et cetera.
Do any of your answers change for the period of 2003 through 2005, or would your answers today, could they be applied universally for that period 2003 to 2005?
A. Versus right up to 2006, last year, you mean?
Q. Right. From 2005 through 2006 or 2001 through 2003. Is there anything unique about 2003 through --
A. Oh, I see what you mean. No.
Q. There is nothing unique about 2003 to 2005 with regard to your responses today?
A. About all of that? No, not unique, other than there's different investigations that have



different needs. You know, that kind of stuff. But the general process I think would be the same from 2001 to 2006, all the time I was there.
Q. What's a quality step increase, sir?
A. People in the GS series, there's various grades all the way from GS-1 to GS-15, and then there's steps 1 through 10 within each one of those grades, and a quality step increase would be -- usually it's time-based to go from one step to the next. But for somebody that's an exceptional performer, they can get a quality step increase before the total time has expired.
Q. Did you ever receive a quality step increase?
A. Uh-huh. Yes.
Q. Do you remember when?
A. I got a lot of them. You mean over the years?
Q. Yes.
A. There were a lot of them in there. I don't remember when. I would have to go back and look.
Q. Does that apply to SES as well, or does it



only apply to general service?
A. I don't think it applies to SES, because there are various SES grades, and you're at whatever grade you're at. I don't think they're broken up into steps. In fact, I'm virtually certain.
So the QSIs, like I said, I thought they were at the GS level.
MR. LOWINGER: Could I take a quick two-minute break?
(A recess was then taken.)
BY MR. LOWINGER:
Q. You had said earlier that you and Mr. Haueter were interchangeable. Were you and Mr. Macintosh ever interchangeable?
A. Not in the day-to-day operations. If we had a major launch and Haueter and I weren't there, Mac could step in and get that going and chase the assets. At that time Mr. Robert Benzon was the chief of the Major Investigations Division. Right now John DeLisi is. So if we needed to get a launch going, they could step in and start getting people together and getting it organized and getting it out the door.



Q. What about the whole oversight, the whole supervision that you performed for the entire agency and the marshaling of troops that we discussed today, and the marshaling of assets and resources and correspondence with the Board members and Congress? Could Mr. Macintosh do that on your behalf or in your place?
A. Oh, he could. But there probably wouldn't be any need for him to do that.
Q. Did you ever have to communicate with the press other than outside of an accident?
A. Oh, yeah.
Q. And can you describe your work with the press, sir?
A. It could take on several different forms. I may get a call from the press on any number of issues. It comes in through our press office. If I could answer the questions or background, discuss it on the telephone, I'd help them out, clarify issues or whatever, I would do that. Sometimes they wanted interviews so they could show it in written print or on camera.

I could do that, but Haueter always did that stuff better, so I would usually get him to do it. Dealing with the press wasn't what I looked forward to doing, and he was good at it, so most of the time I would get him to do it.

Q. Is that a big part of your job? Was that a big part of your job?

A. No. It's an important part every once in a while. I think a lot of what Mr. Haueter and I would do is if there was a lot of major investigations or issues that may be coming up in aviation, there may be a lot of misconception out there or misinformation or whatever. And I think the press turned to the Safety Board because they know in most of this, or virtually all of it, we have no dog in the fight. We're an independent agency.

So the aviation reporters particularly would learn that when we could give them information, that was usually pretty solid. And then we could give them our own personal views on background about various issues. But we could almost always talk about both sides of an issue, the pros and cons as we see it



from the Safety Board.

Sometimes they would -- Well, you said outside of investigations. It wasn't much. It didn't take much time. We get requests in every two or three weeks and usually hand it off and let one of the subject matter experts provide the information.

Q. I see.

So it wasn't really something you would handle; it was more like something you would coordinate?

A. The coordination would be minimum. The press guy would call up and say, "Can you answer some questions, do you care?" I'd say, "No, any particular person who may be the expert, go ahead and talk to them." So that was minimum.

Q. One thing we haven't actually talked about is the agency's wish list. Can you describe your work with regard to the agency's wish list each year for safety items per year? Are you aware of what I'm talking about?

A. No.

Q. Okay, then.



A. Wish list?

Q. It's called a wish list. Each year the agency has a mission program. For example, for certain modal offices it would be like drive with seatbelt on, don't drink and drive.

A. I thought you were going to be referring to something like what kind of staff we needed for the year. They may have a wish list.

Q. What about staffing for the year? What kind of work was involved in obtaining a budgetary approval for the division for the office each year?

A. You could end up having meetings at various times throughout the year, and we would identify where we were having shortages or where we would like to expand our investigative capability, and we could list a number of people. And then if some investigative area, like our pilots, the airline pilot types, if we have a retirement or somebody quit and we're getting critically thin, we would have to replace somebody to keep going. We would give them an idea of how we would want to -- what types of investigators we would want to hire to get more product out of our operation.



Q. And who would you discuss that with?

A. Oh, inside, we would talk to our chiefs and listen to their discussions, our regional directors or up through the deputy director of regional operations. We would perhaps be getting critically short in the L.A. office and the backlog was piling up, so we would need to get investigators in there, regional investigators.

We wanted to expand into systems modeling, for example, and wanted to hire somebody skilled in that. Or systems safety, we did hire and that person worked out well, so we wanted to hire a second one. So that's the way the lists morphs around.

And then if they say, "Well, in the next three months you get to hire three people. What out of the three would you want?"

"Okay, two in the regions and get me an ops type."

So we would operate on that. And, of course, everybody else in the agency wanted different investigators or to be able to do different things, and for each one to get in and explain what we were

going to get out of it, what we weren't going to get if we didn't hire somebody, where we were going to be critically short or hurt pretty badly, or looking into the future, we may have one or two we can almost anticipate retiring and we better start getting some new people in there so they can be halfway functional if people that may retire do retire.

Q. Do you remember ever encountering issues in obtaining the personnel that you needed to fill your ranks?

A. It's easier to say did we ever not. I mean, that's a constant thing. It's always that way.

Q. And were you always given the hiring authority that you sought?

A. No. What I would say is we're chronically short of people. Our investigator numbers have actually gone down some over the years. It does have an impact.

I can't remember, but four or five years ago we were right on the cusp. We had a good number of investigators and had a number in the pipeline. Then the budget dried up or it took forever to hire



people through HR back then, and by the point we could be to the point where -- HR would cost us three, four, six months, and by the time we were through that process the budget scenario had changed, so we had missed an opportunity to get people on board. And had we been able to act fast, we could have gotten them on board. And then as the budget shrunk -- The budget's never shrunk to where we've had to lay off people or RIF people.

So it's always a struggle. You get the go-ahead to hire people, and then you have to go through the government bureaucracy to get a person hired and on board.

Q. Do you remember ever being denied authority to hire people?

A. What I would suggest right now is I don't have the authority to hire the ten people I want to hire. I mean, I don't know how you mean that. We've always had a need. All I know is that the managing director -- all the offices and entities can use more people, and the managing director -- All the offices put their needs out there, and the managing director



has to size it up. If the budget is going to allow hiring five people, he's got to decide which offices get which people.

If he were to turn to us and say, "You get three people," we would have a list of ten people, and at this moment in time these are the three people that are our most critical need. That whole list could change if one person quit or if we picked up a certain type of accident and a systems guy would be tied up for two years on a really complex issue. So it really changes all the time.

Or where it really was changing fast was with guard getting called up because of the war in Afghanistan or Iraq. In Aviation, we have a lot of Guard people or Air Force Reserve, and every one of them has been called up. We had four or five people in the Guard in our 40 or 35 total. At one point in time we were down five people just because they were in the Guard for a year. So at that time, if we could have hired an ASI, we would have hired that instead of hiring at headquarters. So it changes all time.

It's loosening up and getting better and



better. We're picking up a person here and a person there. We just brought on two air safety investigators out in the regions, and we're looking for an airline type in operations.

Q. Is it something that, I guess in your sense, the managing director was always receptive to hearing about your hiring needs?

A. Oh, yeah. You know, all the way back from Peter Goelz, Dan Campbell, Joe Osterman, they know we need people, and they sit down and listen. They've got to make some tough decisions. A lot of times we didn't get the people and they went to CFO. I thought, let the guy take a hit, let him go to jail for not balancing the budget; we need investigators. But they had to make those decisions. So in the overall goodness of the agency, they make their decisions. They made them as best they could for what we needed to accomplish.

Q. Who is Goelz?

A. Peter Goelz was the managing director a number of years ago under Jim Hall.

Q. In deciding whether to launch or contribute

Page 234

people for a regional investigation, do budgetary concerns ever affect your decision?

A. Budgetary? No. Just staff workload may. You know, there's requests out there, people that would like support, and we try to size it up. Or the division chiefs, if they can give them the support, they will.

Sometimes when we really pick up two or three investigations for, let's say, the ops guys to be out, they're going to be in overload and they just won't be able to spend a lot of attention at the regional investigations. But we have some regional investigators out there with operational experience in a certain mode, like a charter operation or something. And so we can kind of mix and match those. One regional investigator will support another.

So it's always a very interactive process. So in the sense you say budgetary constraints, we've always had the money to travel and move people. The budget constraint is we don't have the people. So that's kind of out of my -- I don't think of it in budget terms. I have people to apply to it and their

Page 235

workload is such that they can or they can't.

Q. Okay. How important are leadership and supervisory skills to your duties as the director of OAS?

A. Well, I think they're critical. You have to be able to stand up in front of your people and get them to do above and beyond in this agency. The supervisory skills I think are important in the sense of the interest of trying to treat people correctly and fairly. It's just paramount.

Q. What about knowledge of the aviation industry? Is that fundamental to the position?

A. Oh, yeah. It's just simply core. We're so tightly integrated from top to bottom and so small that you've just got to be -- And the whole staff is very airplane-oriented, aircraft-oriented, aviation-oriented. It's just absolutely critical.

Q. And what about coordinating and collaborating with others? How does that factor in as a skill?

A. With others?

Q. Yes. With either people within your

Page 236

department or people outside your department in doing a launch or doing an investigation.

A. Well, it's important. We do that all the time. Like I was describing, our investigations, we may only launch 15 investigators but there may be 100 people involved in the investigation around the countryside. So we coordinate with people.

There's a certain amount of misconception out there that we do investigations -- that these parties cooperate in investigations. It's still our investigation and they cooperate.

Q. Sure.

A. But by the same token, all of these parties that come in most often really understand their roles. But there's conflict. Not in a bad sense, but there's different needs from different entities out there. So it's important to try to resolve all those the best we can or explain where we aren't. That's a never-ending process in the middle of an investigation.

Q. And what about analytical skills?

A. You absolutely need those. It's an analytical operation.

Page 237

Q. And written and oral communications?

A. Both. You have to be able to get up and speak. And writing. You have to be able to, certainly, as an individual writer. I'm not a writer or editor, like I said earlier. But by the same token, you have to be able to get your thoughts down and get those communicated. And by the same token, everybody else's thoughts coming in the door, their ideas, you have to be able to assimilate all that and make sure it all fits within the investigation.

Q. Just some exhibits, sir. Okay?

MR. LOWINGER: This is going to be Clark Exhibit No. 1.

(Exhibit 1 marked for identification and attached hereto.)

BY MR. LOWINGER:

Q. Mr. Clark, the document that was just handed to you as Exhibit No. 1, the first page is Bates number 3625. It's actually in the bottom right.

A. I've got you.

Q. Those are called Bates numbers. I don't know who Mr. Bates was, but that's what we all refer

to them as, as lawyers. I'm going to ask you a series of questions about these, and you can just tell me yes or no.

Is Bates number 3625 the personnel action reflecting your salary for 2006?

A. It's my current salary.

Q. For 2006 or for 2007?

A. Well, the effective date was 12/24/06. I don't know whether there was a raise that went into effect in January or whatever. I would say the date is for 2006. If there's been subsequent raises or whatever -- It could be, but that's close to what it is.

Q. And for the next page, 3626, does that reflect your bonus for 2007?

A. Yes.

Q. Or for 2006? Do you know which one it is? Is it your bonus for the year coming forward for 2007, or was it a bonus for the prior year?

A. It would have been -- Well, it's in -- I think we received the bonus just after the first of the year in 2007. This is the bonus for the work in



the prior year.

Q. And on the next page, 3627, does that reflect your salary as the director of the Office of Aviation Safety?

A. Yes.

Q. And would that have been for 2007 or for 2006?

A. It was the salary at that time in 2006.

Q. And 3628, does that reflect your salary as the director of the Office of Aviation Safety for 2006?

A. Yes.

Q. And can you tell me what 3629 reflects, sir?

A. I think that's the performance award I received for work in 2005.

Q. And the next one is 3636.

A. Okay.

Q. And can you tell me, is this the salary you received for 2005 going forward? Or is this a bonus for the prior year? Do you know what this document reflects?



A. It's the bonus I received for the year -- Well, that must have been 2004. Yeah, the one previous, 3629, was a bonus for 2005 work. And then 3636, the 17,000 there, that's my bonus for work in 2004.

Q. And on 3635, is that your salary for the year 2004?

A. Something changes there. Let's see. That would essentially be my salary in the year 2004, I believe. Or that's what it was on 1/11/4.

Q. And 3636, does that reflect your salary for 2003?

A. Yeah. Effective date of this salary at the bottom would have -- Throughout 2003, I think it would be that salary.

Q. And 3645, is this your salary for 2003 as the Office of Aviation Safety director?

A. 3645?

Q. Yes, sir.

A. No, that's a performance award. So that would have been for 2002.

Q. What page are you on, sir? I have an



effective date of 1/12/03.

A. Yes.

Q. And that would have been for 2002, you're saying?

A. The performance award would have been for the prior year, which would have been in 2002.

Q. You don't get awards going forward?

A. No.

Q. Okay. And page 3646, does that reflect your salary going forward for 2002?

A. Yeah, I believe.

Q. And 3647, does that reflect your bonus in 2002, an individual cash award?

A. It's a cash award for something.

Q. You got a cash award, though, right?

A. I got a $250 cash award for something. It doesn't say here.

Q. And 3649, does that reflect your bonus for the year 2001?

A. Yes.

Q. Okay. And 3658, does that reflect your salary for the year 2001?

Page 242

A. Yes.
Q. And 3659, does that reflect your salary for 2001?
A. I think so, yeah.
Q. And then 3660, does that reflect your salary again for 2001?
A. Well, it's --
Q. How does this work, sir? You got a lot of raises within a short period of time. Do you remember what happened?
A. I don't think they're raises. This one looks like -- It says reassignment.
Q. Okay.
A. The pay plan changed, the occupational code changed. I don't know what that's about. It's a reassignment of some position. I don't know what that's about.
Q. Is 3661 your cash bonus for 2001?
A. No. It's a cash award for something. Those are for something -- Some of those in that time would be for instructing at the Basic Accident Investigation School. All the instructors get some

Page 243

sort of cash award, and so I think that's what that would be. Typically it's $150 or $250, something like that.
Q. Do you typically give speeches at schools, sir, outside of Congress?
A. I do. Not often, but I do some.
Q. And where would you normally give the speeches between 2000 and 2006?
A. Speeches? I'm trying to recall right now. I gave a speech at the Bombardier Safety Standdown out in Wichita one year. That's all I can think of right now.
Q. Do you ever give speeches at the NTSB's academy?
A. Oh, I give opening remarks often at the accident -- We have an industry training program where we bring all the industry in, and often I'll give the opening remarks, or would, to those groups coming in. Industry training is a class we put on for the airlines or the local police departments, airports, or whomever may be involved in one of our investigations if we launch. So we take all of those entities.

Page 244

Local police departments come in.
We take them through what we would be doing in the event of a major launch. And that one is more oriented to what happens when we show up on scene in Lexington or somewhere where there has been a major crash, and we tell airlines how we're going go to in and get set up and operate to get the investigation going and how we'll conduct the investigation. I gave the opening remarks for that.
And at the academy I always teach one day on basic accident investigation on airplane performance.
Q. Is it the same speech year after year, or is it the same type of presentation?
A. For those two. They're two different ones. One is real short and takes an hour or so, and the other one is an all-day class presentation.
Q. Do they change year to year?
A. No, I don't change it. Well, I mean, there are things that change a little bit here and there, but it's minimal changes.
Q. Sir, are you aware of any personnel actions

Page 245

for 2005? There's nothing in this pile. Were you paid in 2005, sir?
A. Oh, sure.
MS. SILBAUGH: This is the file. I would check your documents, though, just in case.
MR. LOWINGER: I have to ask. We do not have anything for 2005. Could you please check to see if you have those materials?
MS. COHEN: I will check. What are the pages that are missing from these Bates numbers?
MR. LOWINGER: Well, I can't track all the Bates numbers. But if you think it's based on Bates numbers, we notice that we went from 3649 to 3658, so it doesn't seem like the numbers track very well. We had to pull these from various sources through the production, so if you could please look for 2005.
MS. COHEN: We will.
MR. LOWINGER: Thank you very much.
This is Exhibit No. 2.
(Exhibit 2 marked for identification and attached hereto.)
BY MR. LOWINGER:

Q. Mr. Clark, is this your performance evaluation for 2001, from September 1, 2000, through August 31, 2001?
A. Yes.
Q. These are pages 3652 through 3657.
A. Okay.
MR. LOWINGER: This is No. 3.
(Exhibit 3 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Mr. Clark, is Bates numbers 3638 through 3644 your performance evaluation for September 1, 2002, through August 31, 2003?
A. Yes.
MR. LOWINGER: Here's No. 4.
(Exhibit 4 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit No. 4, Bates numbers 4091 -- Hold on a second.
MR. LOWINGER: Do we have a copying issue here?



MS. COHEN: Uh-huh.
MR. LOWINGER: I'm going to take 4091 and take it off. Just take that page off.
BY MR. LOWINGER:
Q. Exhibit No. 4, 4041 through 4062, is this your evaluation for 2006? It's dated November 22, 2006.
A. Yes.
MR. LOWINGER: No. 5.
(Exhibit 5 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit No. 5, Bates numbers 4063 through 4068, is this your evaluation for midterm progress?
A. Yes.
(Exhibit 6 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Bates numbers 3633 through 3634, is this your evaluation for September 2003 through August 2004, sir?
A. Yes.



Q. Is this complete? Do you know if there are any other pages to it? This one is two pages. Some of them are eight.
A. Oh, I wouldn't remember.
MR. LOWINGER: We don't have any for 2005, it appears. Would you please look for the performance evaluation or appraisal for 2005?
MS. COHEN: We'll look.
MR. LOWINGER: Please let me know the results.
MS. COHEN: Yes.
MR. LOWINGER: Thank you.
(Exhibit 7 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit No. 7, is this your staffing numbers for 2002 for the Office of Aviation Safety?
A. That's what it says. I suppose it's accurate.
Q. And is this your handwriting at the bottom? Does that reflect your handwriting?
A. No. I don't remember seeing anything like this.



Q. Does that exhibit reflect the number of employees you had in 2002, sir, in your division?
A. It's reasonably close. It's in the ballpark, but I don't know who put it together or who added it up.
Q. And the second page, sir, there is what appears to be a roster with names on it. At the bottom it says 1 of 4. Do you know what this page is?
A. It looks like a listing by division or region. The top one would be AS-1. The next one down would be investigators, IICs; that's AS-10. The next one down is AS-20. And then North Central Regional Office, that's the investigative team in Chicago.
Q. Are there more pages to this, sir?
A. Yeah, I would assume. There's a total of either nine or ten regional offices and seven headquarter offices.
MR. LOWINGER: Ms. Cohen, are you aware of where the other pages would be?
MS. COHEN: We've already produced all the pages to this. I know I've seen them.

(Exhibit 8 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Is Exhibit No. 8 the approximate number of employees you had in the Office of Aviation Safety?
A. It's up in that range.
Q. 133 is in the range?
A. Yeah. 130, 140. It varied a little bit.
Q. Is this your handwriting on this page, sir?
A. No, I don't think so.
Q. Do you know whose handwriting this is?
A. No, I can't say.
(Exhibit 9 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit No. 9, is this the organizational listing of the number of employees for the Office of Aviation Safety as of October 1, 2005?
A. I would assume it's accurate. I mean, I can't know whether it's accurate or not. It's in the ballpark.
Q. Whose handwriting is this? Do you know,



sir?
A. I don't know.
Q. It's not yours?
A. No.
Q. And you would say you had about 138 as of October 2005?
A. This says 128.
Q. Oh, I'm sorry, 128. I apologize.
A. I don't remember. If you go through the list, that's in the ballpark.
Q. I see.
MR. LOWINGER: We don't have one for 2004, one of these charts. Are you aware of whether there is one?
MS. SILBAUGH: May I speak?
MR. LOWINGER: Sure.
MS. SILBAUGH: I believe it has been produced to you.
MR. LOWINGER: Okay, we'll look.
(Exhibit 10 marked for identification and attached hereto.)
BY MR. LOWINGER:



Q. This is Exhibit No. 10, sir. Each week were you required to produce a weekly report for -- As the director of the Office of Aviation Safety, did you produce a weekly report?
A. Yes.
Q. And for what period of time were you producing the reports?
A. It started when Engleman Conners was chairman; I don't remember when. We produced the reports, sent them to her, and then somewhere it was somewhat a little more formalized and sent to the Board members and then to other offices. I don't remember the dates when those changes were made.
Q. Do you remember doing one every week for that entire period?
A. Normally we did. Sometimes we would be busy and pile everything in for the next week, or issue it on Monday or Tuesday instead of Friday. Sometimes we would just skip it and wait until the next week if we did. So it wasn't an absolute requirement.
Q. Are these the weekly reports that you



produced during that time period, sir?
A. I suspect they are. These were certainly the type of reports we produced, and I assume somebody pulled them together. Mr. Haueter would be -- Mr. Haueter was the one who usually distributed them. If he wasn't around, I may, or the chief -- or at one point the chief operator would distribute those if Haueter wasn't around. I very seldom got involved with dealing with those.
Q. I see.
(Exhibit 11 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. This is Exhibit No. 11, sir. Is this an indication of the bonus that you received for the basic aircraft accident investigation course?
A. Uh-huh. Yes, sir.
(Exhibit 12 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. And again, sir, Exhibit No. 12, is this the 1999 cash award notice for your basic aircraft

accident investigation course?
A. Yes.
(Exhibit 13 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Does Exhibit No. 13 reflect your pay and bonus for 1999?
A. Yes.
(Exhibit 14 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit No. 14, Bates number 3682, does this reflect your cash bonus in 2000 for teaching the course on basic aircraft accident investigation?
A. Yes. I expect the class was in '99. That's when the memo went forward.
(Exhibit 15 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Is Exhibit No. 15 the cash bonus you received for teaching the basic aircraft accident investigation course as of June 28, 2000?



A. Yes.
Q. Does this reflect the same course you told me that you give the introductory speech for each year?
A. No. The basic accident investigation class, my portion is a two-and-a-half-week class, and I have one day teaching investigation techniques that deal with airplane performance.
Q. I see. We haven't discussed that yet today?
A. Well, I said --
Q. Have we discussed this presentation yet today, when I asked if you give a presentation on airline safety?
A. Well, what I said was that we have a -- There's two classes, a basic aircraft accident investigation class that's two and a half weeks, and the one day of that that I do is directed at new investigators to teach them how to generate information on airplane performance in a field investigation.
The other is an industry training program



we have that runs for one and a half days where we bring in those people in industry or foreign governments who may be participating in our investigations, and we provide to them information -- well, we tell them what to expect from us when we show up on the scene on a major investigation.
Q. Okay. So the one that we're looking at now for the basic aircraft accident investigation that we've seen for the past few documents, that's the day-long talk that you give for the two-week training course?
A. Yes.
Q. Okay.
A. There is no award or anything on the industry training.
Q. Thank you.
(Exhibit 16 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Is Exhibit 16 the cash award that you received for teaching the basic aircraft accident investigation class as of December 19, 2001, that you



would have received again?
A. Yes. That's for my day in the class.
Q. How many times a year is the class taught, sir?
A. It depends. Some years we don't. Other years it's twice, depending on activity, budget. We've hired new investigators. It varies from year to year.
(Exhibit 17 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit 17 is Bates number 365 either 6 or 0. At the bottom it has a date of 2/27 and a recommended award of $15,084.
A. Okay.
Q. Is this the bonus that you received for that period, and do you know which year that would apply to, sir?
A. No. What I suspect is that for whatever year it is, it's the bonus that I had for the year prior to that, because this comes out in February, so it would be for whatever the year was prior. But I

Page 258

had no idea.
Q. Okay.
(Exhibit 18 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Does Exhibit 18, Bates numbers 3631 and 3632, reflect your salary for 2004 and your bonus for 2004?
A. Yes.
(Exhibit 19 marked for identification and attached hereto.)
BY MR. LOWINGER:
Q. Exhibit 19, Bates number 3637, does this reflect your salary and bonus for 2003?
A. Yes.
MR. LOWINGER: No further questions.
MS. COHEN: We need a break for a few minutes.
MR. LOWINGER: May I stay in the room?
MS. SILBAUGH: Sure.
THE WITNESS: Did you have no further questions?

Page 259

MR. LOWINGER: I have no further questions. They may ask some questions.
MS. SILBAUGH: We'll have a few follow-ups. But you're welcome to take a break, because it will take us a minute to get coordinated.
(A recess was then taken.)
EXAMINATION
BY MS. COHEN:
Q. You mentioned that the Board made changes to reports. Has a report ever been rejected by the Board in the past?
A. A long time ago there could be. Maybe like 20 years ago. In kind of the recent history, I don't remember the Board sitting there saying, "We're going to send it back." Now, the Board would ask for changes, and it would be adopted and we would make the changes and they would agree to it. But as far as actually sending a report back to start over or something, I don't remember any. It could be.
Q. How would you characterize the types of changes the Board made?
MR. LOWINGER: Objection. Vague, and it

Page 260

requires speculation. Objection as to form.
BY MS. COHEN:
Q. You can answer.
A. For the reports we worked on in aviation, I think relatively minor. Almost all of them come through with almost no changes. If there are changes, it may be something that a Board member would ask for where they say they want a safety recommendation in there that we hadn't put in. So it's an additive to the report where we would have to see the change they want, make sure we have the facts to support it, an analysis in the report to support it so we can support the safety recommendation. Sometimes it takes a lot of work in a short period of time, but it's relatively minor.
Q. Were any of the safety recommendations ever rejected by the Board?
A. Oh, they can be, yeah. Sometimes they would take them out. More often they'll suggest changes. They'll adopt changes to a safety recommendation, so we'll make those. Sometimes they add their own. Well, we talked about that. But

Page 261

sometimes they'll ask for changes.
And sometimes, by the time we get out of the Board meeting and then we really sit down and lay out what the issues are that seem to have prompted that change, from my perspective, they would mellow the safety recommendation or come back closer to where it started. But that's their prerogative. They make changes.
Q. I'm showing you Exhibit 18 again.
MR. LOWINGER: Which Bates number is that, please?
MS. COHEN: That is 3631, I believe. I can't read the last number.
THE WITNESS: 3631 and 3632.
BY MS. COHEN:
Q. Do you receive a copy of this yearly?
A. I suppose. There's a lot of personnel action paperwork that comes in, and I take it and throw it in the file and it piles up over the years. So I assume I do.
Q. What happens to this form after it's filled out and signed?

A. I have no idea. I get a copy of it. I assume I get all copies of it. I don't know if I do or don't. You mean after I get it?
Q. Yes.
A. Throw it in the drawer. Now, the original -- I'm getting a copy, so the original, where it goes in the agency, I have no idea.
Q. Do you know if it goes to Human Resources?
A. Oh, I assume it would, yes.
Q. Do you know if they produce a document based on this?
A. No, I don't. Well, they produce the personnel action report like that (indicating). The cause and effect I don't know. What I assume is this is the paperwork that's approving it and causes it to start to happen. I believe a lot of times you'll see a check in the mail or it shows up in the paycheck, and sometimes a couple of days later, or a couple of months later, or a long time later the personnel action report comes through. I don't know that they're particularly timely in the sense of when the award hits the paycheck, but I would assume that's



part of the basis for the official personnel action.
Q. If you look at Exhibit 1, page 3630, is that the personnel action that you were referring to?
A. I was saying that in general.
MR. LOWINGER: 3630?
MS. COHEN: Yes.
THE WITNESS: Just based on the date, this is at the end of the year. This is the paper where the managing director approved the award. It's just before the end of the year; this is just after the first of the year. I assume it's one and the same. It's the same value.
BY MS. COHEN:
Q. So these two documents, Exhibit 18, the award recommendation, and Exhibit 1, page 3630, do these reflect the same award?
MR. LOWINGER: Objection; vague. Form.
THE WITNESS: I believe they do.
BY MS. COHEN:
Q. I'm showing you Exhibit 5. Is that the complete progress review for that time period?
MR. LOWINGER: Can you give me the Bates



numbers, please?
MS. COHEN: 4063 to 4068.
MR. LOWINGER: Thank you.
THE WITNESS: This says it's a midterm progress review. Oh, wait a minute. This is for 11/7 and then 11/20. So this would be for the performance rating -- It says progress review, but it's almost like a midterm; somewhat brief. It's for the year '06.
BY MS. COHEN:
Q. Can you tell me what the last page of that document is, page number 4068?
A. It looks like the signatures is of the vice chairman and the chairman. That's Vice Chairman Robert Sumwalt and Chairman Mark Rosenker.
Q. I'd like you to look at Exhibit 4. It's Bates numbers 4041 through 4062. Is that a complete version of your performance appraisal for that year?
A. Yes, it looks like it.
Q. Does it have the same signature page as Exhibit 5?
A. You mean the back page? I don't see



anything like that here. Am I missing it? I don't see any other signature page other than the front page.
Q. Is it, then, a complete evaluation for that time period without the signature page?
A. I don't know. It is what it is. It doesn't have a back signature page. Joe Osterman as managing director signed the front. I don't know if it's required to have a signature page at the back or not. This is kind of a new form this year, so I don't know. If it's not required to have a back page, it's complete. If it is required to have one, it isn't. So I don't know.
Q. I want you to look at Exhibit 1 again, the last page, Bates number 3624. Is this page part of your personnel file?
A. No. It says Bob Chipkevich.
MS. COHEN: No further questions.
MR. LOWINGER: Would you agree to remove the last page of Exhibit 1, 3624, and strike it from the record?
MS. COHEN: Yes.

MR. LOWINGER: Thank you. I appreciate your courtesy.

EXAMINATION

BY MR. LOWINGER:

Q. When Attorney Cohen referred to reports being rejected, she just said "reports." Are you aware of which report she were referring to in general or specifically?

A. Well, I thought the conversation was about reports that went to the Board, went on notation and then were calendared to be presented for the Board to adopt in a public sunshine meeting.

Q. So that's what your understanding of the question was?

A. Yes.

MR. LOWINGER: No further questions.

MS. COHEN: We would like to reserve the reading and signing.

(Whereupon, the deposition was concluded at 4:29 p.m.)



WITNESS CERTIFICATE

I, JOHN C. CLARK, have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony with the exception of any attached corrections or changes.

______________________________
JOHN C. CLARK

[ ] No corrections

[ ] Correction sheet(s) enclosed

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by the witness, JOHN C. CLARK, on this the _____ day of ___________________, ________.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF __________________

My Commission Expires: __________



REPORTER'S CERTIFICATE

I, the undersigned Registered Professional Reporter and Notary Public, do hereby certify that JOHN C. CLARK, after having been first duly sworn by me to testify to the truth, did testify as set forth in the foregoing pages, that the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript.

I further certify that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

SUBSCRIBED AND SWORN TO under my hand and seal this 3rd day of July, 2007.

______________________________
JOHN L. HARMONSON, RPR
Notary Public in and for
the District of Columbia
My Commission Expires: 10/14/2010



CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

DATE SIGNATURE

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

______________________________________________

DATE SIGNATURE