# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

--------------------------------------X

MARJORIE MURTAGH COOKE :
Plaintiff :
v. : Case No.:
MARK ROSENKER, Chairman, : 1:06CV01928
NATIONAL TRANSPORTATION :
SAFETY BOARD :
Defendant :

--------------------------------------X

Videotaped Deposition of

ELLEN ENGLEMAN CONNERS

Washington, D.C.

Thursday, October 25, 2007

9:30 a.m.

Job No.: 1-115016
Pages 1 - 170
Reported by: Ellen L. Ford, RPR

Videotaped Deposition of ELLEN ENGLEMAN CONNERS, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006

Pursuant to agreement, before Ellen L. Ford, Registered Professional Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

R. SCOTT OSWALD, ESQUIRE
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF DEFENDANT UNITED STATES OF AMERICA:

MEREDYTH D. COHEN, ESQUIRE
UNITED STATES DEPARTMENT OF JUSTICE
COMMERCIAL LITIGATION BRANCH
1100 L Street, Northwest
Washington, D.C. 20005
(202) 353-7978



A P P E A R A N C E S (Continued)

ON BEHALF OF DEFENDANT NATIONAL TRANSPORTATION SAFETY BOARD:

DENISE M. D'AVELLA, ESQUIRE
NATIONAL TRANSPORTATION SAFETY BOARD
OFFICE OF GENERAL COUNSEL
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6086

ALSO PRESENT: Scott Forman, Videographer
Marjorie Murtagh Cooke, Plaintiff
Quan Luong, Esquire, US Dept. of Justice



C O N T E N T S


| EXAMINATION OF ELLEN ENGLEMAN CONNERS | PAGE |
| --- | --- |
| By Mr. Oswald | 7 - 164 |
| By Mr. Luong | 164 - 165 |


- - -

E X H I B I T S

(Exhibits retained by counsel.)


| ENGLEMAN CONNERS EXHIBITS | PAGE |
| --- | --- |
| No. 1 - Performance Appraisal Form | 86 |
| No. 2 - Affidavit | 143 |
| No. 3 - signed document | 144 |
| No. 4 - Performance Evaluation Form | 145 |
| No. 5A and B - e-mails | 146 |

Page 6

P R O C E E D I N G S

VIDEOGRAPHER: Here begins Tape No. 1 in the deposition of Ellen Engleman Conners in the matter of Marjorie Murtagh Cooke versus the United States, pending in the U.S. Court of Federal Claims, Case No. 6-748C and the related claim.

Today's date is October 25th, 2007. The time is 9:54 a.m.

The Video Operator is Scott Forman of LAD Reporting.

This deposition is taking place at the Employment Law Group, 888 17th Street, Northwest, Washington, D.C.

Would counsel please identify themselves and state whom they represent?

MR. OSWALD: Scott Oswald on behalf of the Plaintiff, Marjorie Murtagh Cooke. And in the room is Brian Lowinger and David Scher and Ms. Murtagh Cooke.

MR. LUONG: Quan Luong for the Defendant in the matter before the District Court. Just point of clarification that this deposition is

Page 7

also for purposes of the District Court matter.

MR. OSWALD: Correct.

MS. COHEN: Meredyth Cohen for the United States in the Court of Federal Claims matter.

MS. D'AVELLA: Denise D'Avella representing National Transportation Safety Board.

VIDEOGRAPHER: Thank you, very much. The Court Reporter today is Ellen Ford of LAD Reporting. Would the Reporter please swear in the witness?

Whereupon,

ELLEN ENGLEMAN CONNERS,

being first duly sworn to testify to the truth, the whole truth, and nothing but the truth, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

Q Ms. Engleman Conners, my name is Scott Oswald, and we've introduced ourselves briefly before we began today.

I'm going to ask you a series of questions today, and we'll be spending some time together.

But before we do, I want to go over a few items

Page 8

before just as kind of a prelude.

Before I do, though, I want to know, how many times have you ever been in a deposition like this before?

A None that I'm aware of.

Q All right. And then what we're going to do today is I'm going ask you a series of questions, and I'll ask you to give me your true and complete answer.

If there is ever a point at which you don't understand a question that I have for you, please let me know --

A Okay.

Q -- and I will reformat it in a way that you do understand. If you answer a question, I'll assume you understand it.

To your right you have two very fine counsel, and there may be a point at which they interpose an objection. And we'll listen to that objection, and then I'll ask you to answer the question itself. If -- unless they instruct you not to answer.

If there's any point at which you'd like to take a break, you let me know and --

Page 9

A I'll let you know.

Q -- we'll do so. All I'll ask is that if there's a question pending at the time, that you answer the question first, and then we'll go ahead and take a break at your discretion.

A Okay.

Q We are -- in addition to the video, we also have a Court Reporter to your left.

A Right.

Q She'll be taking down what you and I say. She can't take down nonverbal cues. So there may be a point at which I ask you to verbalize an answer.

You may nod or shake your head. And the reason I will ask you is that a yes or something of that nature is because of the fact that we've got our Court Reporter here and she has to write the answer.

If you need any water, juice --

A I'm good.

Q -- I know you have your Diet Coke here.

A Thank you.

Q We've got more Diet Cokes if you need another.

A As long as it's not Pepsi, that would be great.
Q I understand. I think we're a Coke office.
A That's good.
Q We'll be -- we'll see if we can get you taken care of in that regard.
A Okay.
Q All right. With that, I'd like to ask you just a few preliminary questions.
A Mm-hmm.
Q Are you taking any kind of medication that would prevent you from understanding my questions today and answering truthfully and completely today?
A No.
Q Are you under any kind of disability at all that would prevent you from understanding my questions and answering truthfully and completely today?
A No.
Q All right. Now, I understand that two counsel to your right are representing the NTSB. Are they also representing you in your individual capacity?



A The Department of Justice is -- I'm not sure exactly how to explain it.
The Department of Justice was, for the purposes of preliminary discussions, I have an agreement with them, but I don't have a private attorney representing me on a personal level, but in the capacity of my former role as the Chairman of the National Transportation Safety Board.
Q I understand. And let's begin there.
A Okay.
Q What was your period when you were the Chairman of the National Transportation Safety Board?
A It was March -- it was either 22nd or 23rd -- I forget if it starts at midnight or when -- of 2003 through the same day, March of 2005.
Q Okay. And before we get to that, prior to your employment at the NTSB, where were you before that?
A I was the Administrator of Research and Special Programs Administration at the U.S. Department of Transportation.
Q How long were you there?



A I was brought in as the consultant in June of 2001. My Senate Confirmation Hearing was on September 21st, which was my birthday, that's why I remember that. So -- and then through my time at the NTSB.
I resigned from that position to take the new position at NTSB.
Q So that would have been on or about the 21st of March of 2003?
A It was about 15 minutes in between jobs. Because we were still very involved with post 9/11 activities, and so I was actually on duty through -- with DOT through the weekend till that Monday morning. And then that same Monday morning I started at the NTSB. So it was not a very long time period.
Q I understand. The period of time between June and September of 2000 then, what was your official title with the DOT?
A Well, let's see. I was the Nominee to be the Administrator, or a Designee I guess is what they call it. But you're brought in as a consultant.
So you're working within the Agency getting to



know folks pending your Confirmation Hearing, but you don't have signature authority. You're kind of in a learning mode and that type of thing.
Q All right. And then the exact title from the 21st of September of '01 --
A Well, the vote was on the 21 -- I mean, the hearing was on -- by the time the vote and everything it was a few days later, maybe a couple of weeks. But then it would be Administrator, Research and Special Programs, which is RSPA at DOT.
Q Okay. All right. And what job duties did you have as the Administrator of Research and -- say that last --
A Research and Special Programs.
Q Special Programs. What were your job duties.
A The Administrators are a Modal Administrator. The Department of Transportation is divided up into departments or divisions if you will.
Many people are familiar with the FAA, which is the Federal Aviation Administration. People are familiar with Federal Highways or Federal Railroad

Administration.

Well, RSPA had several offices. We had the Office of Pipeline Safety, which are responsible for safety regulation of the 2.2-million miles of our nation's oil and natural gas and aviation for pipeline.

The Office of Hazardous Material Safety, which is regulatory authority over 800,000 shipments of HAZMAT every day.

The Office the Emergency Transportation Coordination which involved our 9/11 activities in the Crisis Management System.

We are also involved with coordinating all the research for the University Transportation Centers. There were ten university programs that were involved with DOT, the Volpi Transportation Center in Boston, and also the Transportation Safety Institute in Oklahoma.

Q How many employees were underneath your supervision?

A I had approximately 1,000 employees and almost the same number of contractors.



Q And how many under your direct supervision?

A The direct supervision of a Modal Administrator would have been about a dozen or so. It would have been the Associate Administrators, which would have been Head of each of the individual divisions, but it also included things like administration, the General Counsel for the mode, the EEO officer, things like that.

So it's -- it's a self-contained unit within the larger DOT unit. So we had our own Press Office, our own ledge affairs person, et cetera and so forth, that then also mirrored the larger DOT structure, as well.

Q And over how many of the -- of the 12th individuals over whom you had --

A 12 or so. I mean, I would have to --

Q Approximately.

A Right.

Q Right. Of the approximately 12 individuals over whom you had regular supervisory authority, direct supervisory authority --

A Mm-hmm.

Q -- how often did you perform performance



evaluations for those individuals?

A Oh, on an annual basis.

Q All right. And so between September of 2001 and late March of 2003, how many cycles of performance evaluations, approximately, did you oversee for the 12 direct reports over whom you had supervisory power?

A Once again, I can't say it's exactly 12. It was approximately 12. I think it might have been 12 to 15. I have to think of every office and every person.

And I think we went through two cycles, I guess. Two years, two cycles.

Q All right. So would it be fair to say, approximately then, at least 24 performance evaluations that you conducted during your time at RSPA?

A Well, that's the arithmetic, yes.

Q All right. Now, let's talk about the -- your duties between March of 2003 and March of 2005.

A Mm-hmm.

Q What was your title and your responsibility at the NTSB?



A My title was Chairman of the National Transportation Safety Board, and I was also a member at the same time. It was a dual role.

As the Chairman, I was the Chief Executive Officer of the Agency and the official spokesperson of the Agency. And then I had the additional role as member, as well.

Q Okay. All right. Going back to your position as the Administrator of RSPA for a moment. How many of the positions, the -- of your direct reports, what was the grade level for those individuals during your two-year tenure?

A The majority of them would have been SES. I think a couple were 15s, GS15s. I would have to go through each individual to remember, but the majority were SES, and the Head of TSI, Transportation Safety Institute in Oklahoma, I think Frank was a -- I think he was a 15. So there were a couple 15s and the rest would have been SES.

Q All right. So of the approximately 12 then, approximately 2 were Grade 15, and 10 were SES during your tenure as the Administrator of RSPA between

September of '01 and March of '03.
A I wish I could remember exactly. I would have to really -- but I would say -- rather than saying 2 out of 10, I would say maybe 20 percent versus 80 percent, something like that ratio.
Q All right. Now let's move back to NTSB for a moment. How many direct reports did you have as the Chairman and the CEO of the NTSB?
A I had only three or four. The General Counsel, the Managing Director, the Chief Financial Officer and the EE0 person. Those were it.
Q And then underneath the Managing Director, who were the employees that reported directly to the Managing Director?
A Those would be the Division Heads, if you will.
Q And what Division Heads were there?
A Well, we had the Aviation Division -- they were based on modes, modes of transportation, somewhat similar to DOT. They were -- they mirrored it at the time.
So you had Highway, you had Marine, you had



Aviation, you had kind of a conglomeration which was Pipeline and HAZMAT and Rail put together; sea, air and surface.
Then you had -- we had Research and Engineering, we had -- that wasn't an investigation unit, but it supported the investigators.
And then you would have all your administrative offices; HR and Budget and Supply Ordering and Facilities and -- oh, and then we had the Academy, also, which was a new start, so to speak.
Q All right. And of the ones that were the primary investigative function for the NTSB, of the six that you've just named, which were the four that had the primary investigative function?
A Oh, well, Aviation, Pipeline/Rail, and Marine and -- who am I forgetting? I have to think of it. Marine, Aviation -- Highway, right.
Q Thank you. Now, during your tenure as the Chairman and CEO of the NTSB, either as first- or second-line reviewing authority over performance evaluations, which group of employees did you have that authority?



A I don't know -- I don't understand what you're asking me.
Q On the yearly evaluations that we talked about before that you gave, my question to you is, over which employees did you have either first-line evaluation authority or second-line supervisory evaluation authority?
A I had first-line authority over the four that were my direct reports.
Q And that would be the General Counsel, Managing Director, the Chief Financial Officer and the EEO Officer.
A Correct.
Q All right.
A Correct. Though I haven't heard it phrased that way of second-line authority, the direct reports to the Managing Director, or the Department heads, if you will, I would be the last signature on the appraisals. So if that's what you're asking, that would be -- that would have been me.
Q All right. And when you say the last signature on the appraisal, what are they?



A Well, I'm not an expert, but it -- basically you -- there were three signatures, if memory serves; the employee's signature, the supervisor's signature and then kind of a counterbalance to that one, which would have been the third signature.
And that was more for bonuses than determining -- because I had to sign the checks, basically. I mean, it was for signature authority for authorizing the bonuses than it was going through the actual minutia of the individual items on an annual appraisal.
Q So when would you sign the performance evaluation for this second-line --
A When it was --
Q -- reports?
A When it was presented to me. And that would have been after it was all done.
Q And whose signatures would already be on the form, if any?
A I think the other two, but I don't remember -- I can't -- I can't pull up a page in my mind. But I think they were both --

I don't remember the exact process. I don't know if I signed and then it went back to the employee, or they had both signed and it came to me. I'm sorry. I don't remember which way it was.

Q Okay. And when you say that they both signed, I'm just wondering who "both" is, though. Who is -- when you say "both", what does that refer to?

A I thought I stated it. I believe it's the employee and their supervisor.

Q And then once the employee and the supervisor sign it, then what happens to the form?

A Once again, I don't remember the exact sequence. I do remember three signatures, and I believe it's the employee -- the supervisor, the employee, and then mine was the last signature. I think it was the last signature to -- again, that was because of authorization for bonus or something like that.

Q I understand. And once you had given the last signature, let's say, for the bonus on the performance evaluation, what would happen to the form at that point, the evaluation form?



A I don't know.

Q When if ever would you retain a copy of the performance evaluations after you put your last signature on it and sent it off for check cutting?

A I did not retain any copies.

Q All right. I want to just talk about the -- you talked before about the employees. At least some of the employees underneath you at NTSB were also SES; is that correct?

A Mm-hmm.

Q And how many employees were SES employees?

A Let's see. Managing Director was SES, General Counsel was SES, I'm not sure if the CFO was or was not, the EEO I don't think was, but I'm not sure, the -- so of those that my direct reports, I'm sure two of them were, but I'm not sure actually the other two.

Q And how about your second-line reports, those that reported directly to the Managing Director?

A It was a mix. Public Affairs was a 15 -- I forgot to mention them earlier. Public Affairs was a big part of what we do, too. I'm sorry, Ted.



Public Affairs was a 15, Marine was a 15, Marjorie was a 15, Highways was initially a 15, the Academy was an SES, and the other investigative -- let's see, Aviation, Rail -- Aviation, Rail -- who am I forgetting again? They were SES.

Q And how many of those converted from General Schedule to SES during your period of time as the Administrator, the CEO and Chairman of the NTSB?

MS. COHEN: Objection; assumes facts not in evidence.

Q You may answer the question.

A Could you repeat it?

Q Certainly. How many of the positions that were either directly under you or second line under you became SES, converted from General Schedule to SES during your tenure?

A Perhaps I'm not understanding the question, but I'm not aware of any that converted. We didn't convert a 15 to an SES. We were able to gain SES positions.

SES positions are separate. There are not a lot of them. And so we were able to gain some through a



couple of variety of measures. There were a couple of things that were able to happen so that we gained SESs, and then they were allocated to a division.

Q Who made the decision to allocate them to a division?

A I made the decision with the advice and counsel of the Managing Director and the General Counsel.

Q Once you made the decision to allocate an SES slot to a particular division, what was the process that would occur once you made that decision?

A Well, when -- and perhaps I need to clarify when I made a decision. My decisions were based on recommendations. I didn't come up with them and then seek advice and counsel as to whether I should or shouldn't. This was a collegial environment, A, and B, the majority of these were a combination of conversation with Dan, who was the Managing Director --

Q Is that Dan Campbell?

A Dan Campbell, yes, the Managing Director. So I can't tell you who thunk of it first. I mean, it

wasn't a question of I've got this great idea, I'm going to go tell Dan, because I didn't have -- political appointees don't have that kind of authority.

If you're in the private sector, you might have, and you can have that kind of I'll just make the decision authority as the CEO.

But the CEO term is not really accurate when you're in the public sector because it is a check and balance. And you have signature authority for the organization, but you do not have CEO authority in the way that you do in the private sector.

So it's a little misleading to say -- say it. Even though it's described that way, the reality is it's not that way. So I don't know how else to explain it.

So we and I were looking to do everything we could to improve the NTSB. And that meant gaining whatever assets that we could for the organization, improving the organization as it was and leading it to a better place.

And so part of that would -- was the looking for



SES allocations as part of the larger management review. Not a reorganization in a formal sense, but resource allocation perhaps would be a way to describe it.

Q So once you made the decision to allocate an SES position with the advice and counsel of Dan Campbell, how did the process work from there?

A It was a big sheet of paper. Before I came on board, I can't speak definitively, but my interpretation and what I saw was that positions were -- all positions, all the hiring was kind of scattered. It wasn't in a plan. There was no succession planning, which is part of the President's Management Agenda and requirement, and I was trying to implement PMA across the board. That was part of my responsibility. So that meant fiscal responsibility, budgetary review, all aspects of human capital investment, which would include making sure the right people were in the right place and having the right opportunities and the right resources, and that's everything from pencils and pens to training. So it's everything. So it's part of a much broader picture.



I can't remember exactly when came from what. But we had an SES come open from the Academy when the person left who was holding that position. It was called President of the Academy I think was the position. That person left and so that was open.

And once you had an open SES you could -- you could move it around. It didn't have to stay at the Academy.

That's one of the advantages of an SES is that it's -- I guess it's a little bit like a marble. You can put it on a different place on the board.

So I can't tell you which marble was from which, but I think we had two, and we were trying for two more, if memory serves. We were had -- we were able to get two and then we were trying for two more, something along those lines.

Q And once -- when you say, "moving it around the board like a marble," when did the Academy SES position become available?

A I don't remember the exact time. It was fairly early on. In my memory it was fairly early on. I can't -- I would have to find out from a calendar



when exactly it was. My memory it was fairly early on when I was Chairman, but I don't remember the exact date. I don't remember the exact date.

Q In or about 2003, 2000 --

A Again, my memory tells me it was the first year, but -- I mean, I'm thinking it was the first year, but I don't know exactly.

Q I understand. All right. And where did you assign that -- where did you place the marble, assign the SES slot when it became available because the incumbent at the Academy had left and left the SES slot available for reassignment?

A Well, we didn't want to keep it at the Academy because we didn't think we needed an SES at the Academy at the time. It was just starting.

We had a lot of issues that we had to do for business development and just figuring out what the Academy was or wasn't going to be.

At the moment it was a building that was still being constructed, and so -- and we really needed SESs more in the operating system.

So my goal was to get all the modes, the way I

would say it in speech is, to the same level of attention that Aviation had. Because the NTSB is very Aviation centric. By mission, by tradition, by reson detra.

So the goal was to have, what I would say is, the bar of safety be raised in all the modes, because I was a multi-modal person, not an Aviation person. I came from the surface world, not the Aviation world -- one of the few Chairman who wasn't Aviation centric -- to bring all the modes up to the same level.

Because, as I would say, if someone dies in a transportation accident, their family's grief isn't changed by whether it's an aviation accident or car accident; the grief and the loss is the same.

So we needed to move away from the Aviation centric view and try to include all the modes and all transportation safety. So --

Q So why did you want to bring the Highway, the Pipeline as one mode up to the Aviation mode and the Marine Division up to the Aviation mode, and the Pipeline, HAZMAT and Rail up to the Aviation level?

A For the reasons I just said. When someone



dies in a transportation accident, the loss to society, the loss to their family isn't mitigated by whether it's an aviation accident or rail accident or pipeline accident or a boating accident, the loss is the same, and yet the attention given, the ability to -- the amount of accidents that were investigated, the resources that were allocated within the Agency, the majority were aviation.

Now, there was a reason for that. Because if you look at the NTSB legislation, which created the Agency, if you look at the code, by law we were required to investigate every civil aviation accident in the United States. By law, required. That's the one thing we had to do. There was no we won't do that one. We had to investigate or cause to be investigated every civil aviation accident in the United States.

And that didn't require death. That could have been just an accident. So that was about 1700 a year. So it wasn't a small number by any means, but mostly those were general aviation.

When there would be a very large, if you will,



accident, a major airline accident, TWA 800 or American 587, which is -- people usually recognize because of all the media attention and, of course, the great trauma and horrible loss of life that accompanies those, those would take a lot of resources and many years, et cetera and so forth.

So there's nothing wrong about the NTSB being aviation centric because that's what it is by its very reason to exist.

But that being said, because we have responsibility for the other modes, and because my personal and professional belief was that all safety mattered in all modes, I wanted to raise the attention, raise the bar, raise the resources on all the other modes.

It would never be the same, but just to that awareness itself was a major change for the Agency.

Q And how did you feel that the -- was the most appropriate way to go about doing that, raising the bar for each one of the modes?

A Well, it was a combination of a desire to raise the bar, implement the President's Management



Agenda, which included human capital development and support, and what I considered just good business sense.

We looked at the entire Agency, not one office or one department, and said what do we need to do here? We had approximately 435 employees when I came on board, our budget was about 75 million, if memory serves; not a lot of money and not a lot of people for being the independent safety agency for the entire United States in all modes of travel and transportation.

So I tried to fill -- figure out where do we need people versus what I considered in the past people kind of raised their hand and said oh, me, me, me.

I want to hire somebody, and whoever was the squeakiest wheel would get the person. It seemed in the past that whoever had the squeakiest wheel would get the allocation versus a planned allocation of where we were going to put the resources.

So the Managing Director and I and with the team, which was the larger team, heads of all the departments, we basically said what are your needs?

Everybody tell us your needs.

And we came up with, I think it was about 93 positions, if memory serves. I want to say 93 because I used it in speeches, so I'm hoping it's 93. But it was a significant number, it was a little less than 100, but it was a significant number of positions.

And what we said to everybody is don't tell me you need six more people. That doesn't help me to go to Congress and sell that for you. Because obviously we couldn't do anything about an appropriation.

Tell me what you need and why. So it was by title, kind of a mini job description, and by grade. You know.

I need a -- I need a materials expert. I need a Navy architect. I need a pipeline specialist in flow design XYZ. That would be GS14 probably. And this would be, you know, probably the title -- you know, kind of a job description and title versus just I need the blank check.

So we put that together. And along with that was my desire to ensure that each of the divisions -- my goal was to have each of the department heads be an



SES, which is not what it was when I came in.

Q And why was that your goal?

A I thought that by raising the bar to having an SES, which is the highest level of Civil Service, it's a statement. An SES is a higher level of professionalism, abilities, et cetera and so forth.

When you put an SES in charge of a division or department or office or whatever that unit is called, it's making a statement about its importance. It's making a statement that -- about the qualifications and requirements. And this allows you to build a larger team.

And it also means that that person has a very significant level of skills that accompanies the ability to be an SES. Because an SES requires more than just having skills, there's a whole level of other skills that are attached. They are the Embassadors of Civil Service.

Q And to what extent were the Directors of each of the investigative modes Embassadors of their organizations?

A I'm sorry. I don't know what you mean by



that.

Q Well, to what extent -- when you say the SES were Embassadors for the responsibilities under their job, let's say, title and duties, to what extent was that the case with each of the Directors, if at all?

A Well, I would say Aviation definite -- I mean, again, I'm not -- when I say Embassador of Civil Service, that's how it's been described to me. And when I talk to people --

The concept behind an SES is that they could be placed in any government agency and be effective, which is different than a technical line operator who only knows accounting or law or something like that.

An SES is meant to be multi-facetted in their abilities and have a level of expertise so that you could --

The idea, when the SESs were created, if my understanding is correct, is that an SES at the Department of State could be taken over and become an SES at Department of Transportation and be equally effective because they had a greater skill set than just the technical knowledge or operational knowledge



or something like that.

That they are essentially like a -- I don't want to say mini CEO -- but that capability that they could be moved anywhere. And the original idea, if I understand the Senior Executive Service, was that they would ultimately be moved around various agencies being able to take expertise from one agency to another and kind of be Embassadors, roving Embassadors, if you will, like our Embassy staff is.

So that's why I say Embassador of, not within only the NTSB, but that is my understanding and my respect for the role of the SES.

Q And to what extent was that indeed your intention to put individuals in each one of the SES positions, let's say the Directors of each of the four -- the investigative divisions and the two other divisions that would be and have that executive expertise as opposed to any kind of line expertise?

A That was my -- that was my hope is that, if we went that route -- now, we looked at a lot of different things, though.

So one thing was looking at is to whether -- we

were looking to how can we achieve the goal of NTSB? How can we make the NTSB better? How can we make it more efficient? How can we make it -- it was a lot of stove piping.

Each of the individual -- we call the modes, but that's the world I came from -- they kind of worked internally. There were no real shared resources, shared expertise. They tend to be very linear. And yet there were some elements that I thought could be shared.

For instance, setting aside the technical expertise of understanding an air foil versus a pipeline, or the engineer aspect of it or something like that, the process of being an investigator was similar in their training. Okay? Interviewing is similar. Okay? Whether you're interviewing a pilot or you're interviewing a pipeline operator, the process of interviewing, which is you're interviewing me today. Writing. You either can write well or you can't write well, but writing skills, et cetera and so forth.

So we were looking at a lot of possibilities.



One possibility was to do away with the modes and not have the individual little divisions and go back -- actually it would have gone back and time -- and I don't know when this occurred -- but at one time I think it was Aviation and everything else. And then at some point it was delineated into Pipeline, Rail, dah dah dah, et cetera and so forth. But that was another consideration we were having to -- should it be Aviation and then put everything else in like surface. So we would have two main divisions and be able to hopefully consolidate some sharing and maybe have a pool of writers, for instance. Do cross-training. So -- because accidents are never planned. So perhaps we could have some cross-training on investigators because we always seemed to have feast or famine when it came to accidents, you know.

Q Mm-hmm.

A So there were just a lot of ideas. And as I said, part of that is to bring -- you know, how we could get the best folks in to do that. So it was a combination of how we could do that.

Q Once you had the SES slot, let's say either



internally --

A From the Academy.

Q From -- let's say, from the Academy, or it came from OPM because you requested it.

A Right. It was a constant process.

Q I understand. At that point, once it was assigned to a particular division, what would happen next to filling the -- with regard to filling the SES position?

A Standard announcement and -- I mean, they were competed.

Q And what is your understanding of that process, being the Chairman of the NTSB and CEO?

A The process is that a position description is written, responsibilities. I'm not sure of the exact forms, et cetera so forth, or the requirements for how long they are or are not advertised.

I believe one makes a decision of internal only or internal and external, only Federal or internal external plus all open in your ability to hire.

In other words, open would be people outside of Civil Service, Civil Service only, or I don't know if



you can do Agency only or it's only all Civil Service. I forget the exact things.

But you have to make a decision on that. You attach the PD. Obviously, there are forms and filing dates and such that are required. There's an announcement period, people apply, and standard operating procedure. I mean, it's --

Q What happens after people apply?

A There is usually a review. There's -- it's changed over time. I grew up in a -- my mother worked fork the Federal Government for 47 years. So part of my brain remembers what it was like as a little girl, but that's changed over time.

Q What I'm interested in is your period of time as the CEO of NTSB.

A Right. I understand. But I'm just trying to get my brain in check. It was like what was it like when my mom did it. It was like this best three list.

But I think they bring it down. It's my understanding that you create an interview list.

See, I've never sat in on SES hiring, so I don't

Page 42

know exactly. I know of it, but there's -- SESs are different than General Schedule, so I'm more familiar with the General Schedule.
Q What happens after the interview list is created?
A I know on a General Schedule list you can choose without interviewing. I'm not sure if you're required to interview or not with the SES.
It goes to something I believe is called an ERM Board or something. It's a group of others within the organization. And the final recommendation comes from that. And then it would have been, from that, the selection made.
Q Now, when an SES was assigned, let's say from the Academy to another director slot --
A Mm-hmm.
Q -- or one that came directly from OPM --
A Mm-hmm.
Q -- who was it that was responsible for creating the position description for the position?
A That would have been through Dan Campbell probably, but I don't know that he wrote it himself.

Page 43

I think he probably worked with HR.
Q And what role did you play in either preparing or reviewing the position description --
A None.
Q -- that Dan Campbell would prepare for the Directors of each of the modes, the investigative modes?
A I didn't have a role in that.
Q What conversations if any did you have with Dan Campbell about the preparation of the job descriptions for any of the Director positions that were being competed for the four investigative modes?
A I think we had some general, you know, discussion, but it was basically let's find the best person. I mean, it wasn't any detailed -- there wasn't a laundry list or anything like that.
Q So other than Dan Campbell, who else made the decision -- was involved in making the actual decision of what the position description would be for each of the Directors of the four investigative modes; Highway, Aviation, Marine and Rail?
A I don't know who he talked with. I would

Page 44

assume -- I mean, I don't know who he consulted with. I would assume it would be HR because that's what they did. They were responsible for position descriptions. So --
Q Who had the ultimate authority to sign off on the position description that was -- NTSB had set upon for each of the Director positions; Highway, Marine, Aviation and Rail?
A I believe as Managing Director Dan had that authority.
Q All right.
A I don't remember one way or another whether I also had to sign off or not. I don't remember doing it, I don't remember not doing it. I think that fell under Managing Director's office, though.
Q I understand. The decision on -- once the managing -- once Dan Campbell received the individuals, the final interview list from the ERM Board, what authority did he have then to make the selection for the Director of any of the investigative modes; Highway, Marine, Aviation and Rail?
A I don't know.

Page 45

Q What role did you play in that process, if any?
A I mean, I don't know -- I believe the process was that Dan would -- that the ERM would make the selection and make it as a recommendation, and then Dan and I would both sign off on that recommendation is the way I remember the process.
Q But when they send over a list of names, when ERM send you a list of names to interview --
A I don't remember -- no, no, no.
Q -- what role did you play in interviewing any of those individuals?
A No, no, no. I never saw a list of any names. I never knew anyone who was applying to any of those jobs. I never saw a list of names and I wasn't on the ERM.
Q I understand. What role did you play in interviewing any of the individuals that came as a recommendation from the ERM?
A Zero. Zero. Because I did not interview anyone, I never saw the list of names, I wasn't a member of the ERM, so none would be the answer.

Q I understand. The layout in the NTSB, the proximity of Dan Campbell and the Directors of each of the investigative modes, where were they in relation to where your office was?
A My office was on the sixth floor. Everyone was everywhere. The Chairman and Vice Chairman were on the sixth floor. The other three members were on the fourth floor. Public Affairs --
Q The other three members, you mean of the Board.
A Other three members of the Board were on the fourth floor. Managing Director was on the sixth floor. Public Affairs was on the sixth floor. General Counsel was on the sixth floor.
Everybody was spread everywhere. I mean, we have odd space over there. It's not --
Q When you say, "the Managing Director," you mean Dan Campbell.
A Right.
Q So you and Dan Campbell were on the same floor of the NTSB.
A Yes, yes.



Q How close were your offices?
A He was in the middle of the building and I was at kind of the end of the building, two-thirds down.
Q I understand. And what other Directors, either Highway, Marine, Aviation or Rail, were also on the sixth floor, if any?
A I don't -- we moved offices several times. People were constantly changing offices, so I really -- I don't remember where each individual's office was.
We had the labs, we had a variety of things. So I can't tell you specifically offices.
Quite honestly, people met with me in my office, I didn't go to their offices, so I didn't worry about office numbers.
Q During which period of time was Marjorie Murtagh Cooke, as Director of Marine Safety, on your floor?
MR. LUONG: Objection; assumes facts not in evidence.
Q You may answer the question.



A I don't know.
Q You don't know?
A No, I don't know.
Q Do you know, was she on the sixth floor?
A I never paid -- as I said, people always met in my office, I never met in other people's offices, so I really don't remember what floor anybody was on as far as the modes.
Q Okay. It's possible that Marjorie Murtagh Cooke was on the sixth floor during your tenure --
MR. LUONG: Objection; asked and answered.
Q -- as the Chairman and CEO of the NTSB; is that not correct?
A It's possible. I, again, did not visit the modal offices. All the meetings that I held were usually in my office or in the Chairman's conference room, or we would have the NTSB hearing room, which is where I usually would interact, or the Managing Director's conference room. So it was generally in conferences and meetings not in their personal office space.



Q I understand. When did you first -- strike that.
All right. When did you first become aware that some of the Directors of the four investigative modes were paid differently?
A Were paid differently.
Q Mm-hmm. Different levels.
A Meaning they all weren't SESs? Or what -- I don't --
Q When if ever did you become aware that the individuals who were in the Director positions of any of the four investigative modes at the NTSB -- Highway, Marine, Rail or Aviation -- were paid at a different base salary?
A I don't know what their base salaries were, so I can't answer that. I can -- I mean, I don't know what anyone was paid. I didn't sign their checks. So I don't actually know the salary of any one person other than myself.
Q My question is just a little bit different, though.
A Right. That's what I'm trying to

understand.
Q My question is, when if ever did you become aware that any of the Directors of the four investigative modes at the NTSB were paid differently?
MR. LUONG: I'm just going to object to the term "differently" as vague.
COURT REPORTER: As what?
MR. LUONG: Vague.
COURT REPORTER: Thank you.
A I'm sorry. I really don't understand your question.
Q All right. When if ever did you become aware that any of the Directors at the NTSB -- Highway, Marine, Aviation or Rail -- were concerned about the fact that he or she was paid differently from other Directors at the NTSB?
MS. COHEN: Objection; assumes facts not in evidence.
Q You may answer the question.
A It's the way you're phrasing it, I'm having a hard time understanding exactly what you're asking.
When we did -- when I was presented with the



first, what you would call the annual performance review, the recommendation of bonuses, there was an SES pool, and so I could see from the listing who was an SES and who was not an SES.
So at that point, I guess you could say I was aware that people were paid that had different -- they were in different grade levels.
Paid differently is confusing to me because everyone is paid under the Federal Civil Service System, and that has grade levels, and it has time, and it has all these other things.
So, I mean, just sundry, everybody is paid differently even within the same grade level. You can have two people who are in the same grade level, but because they have different years, then one is a Level 2 and one is a Level 8. They're technically paid differently, but they're paid legally according to the pay schedule.
Q I understand.l?
A So I'm just struggling with your paid differently statement because --
Q I understand. When if ever did you become



aware that any of the Directors of the four investigative functions, the modes at the NTSB, were paid a different amount of money over the course of an annual basis?
MS. COHEN: Objection; assumes facts not in evidence.
A I can't answer your question other than the way I just answered it. Everyone was paid differently. Everyone was paid according to the Civil Service schedule of their grade level, and where they came in at, and years experience, and all of this stuff. So everybody was paid differently. Everyone was paid according to where they were on the schedule.
Q And what concerns did you have that there was -- there were individuals who were different places on the schedule and, therefore, paid differently?
MS. COHEN: Objection; assumes facts not in evidence.
A I had -- I mean, I don't understand. What concerns could I have? I don't control the Civil Service pay scale.



Q I understand.
A This isn't the private sector where the CEO can change people with, you know, whatever decision they make. There's a set of rules, and everyone is paid according to where they are within the Civil Service schedule. I don't know how else to explain it.
Q I understand. All right. Let's now focus on April of 2004.
When if ever did Marjorie Murtagh Cooke come to your office and notify you that she believed that she was being paid differently than other Directors at her same level of the various modes in the investigative function at NTSB?
A We had a meeting, but I don't remember that that's the phrase that she used.
Q Okay. What do you remember?
A Marjorie came to my office -- and I don't remember exact words as in it's been years -- but it was -- she stated that she wasn't an SES, her office wasn't an SES, and she didn't make as much money as the folks who had an SES. So --

Q What else?
A And she wanted me to fix that, and she said -- she requested overtime.
Q What else?
A That was pretty much it.
Q Now, the meeting that you had with Marjorie Murtagh Cooke, was it scheduled or was it impromptu?
A Scheduled, I believe.
Q Okay. And how did Marjorie Murtagh Cooke go about scheduling the meeting with you?
A I don't remember.
Q How would anyone of your -- in the NTSB that had either first or second-line reporting schedule a meeting with you?
A Two ways, or three ways or four ways, actually.
You could check with my Chief of Staff who would schedule; you could grab me in the hallway; you could see me after a meeting or after a hearing; or we had open office hours like every Wednesday or ever other Wednesday, as often as -- unless I was out on an accident or something like that. But I kept like an



open office hour at least once a month where you just kind of walked in; and then the fifth way was people would just show up at my doorway.
Q Okay. And if one wanted to schedule a meeting with you, when if ever would be appropriate to send you an e-mail and ask you to schedule a meeting?
A Anytime.
Q That was appropriate to do that?
A Mm-hmm.
Q Is that -- I'm sorry. Is that a yes?
A Yes. I'm sorry. Yes. Mm-hmm is a yes.
Q Thank you. All right. So the meeting takes place in your office; is that right?
A Yes.
Q All right. And where were you seated?
A (non-verbal response.)
Q Behind your desk? Did you have the meeting at a conference table in your office?
A I don't remember specifically. I usually sat at a conference table rather than behind my desk. It would depend on the day. I mean if it was one of those -- if someone was just kind of coming in and



out, I might stay behind my desk, sometimes I would sit at the conference; it was kind of 50/50. I don't remember specifically.
Q All right. And then who spoke first at the meeting with Marjorie Murtagh Cooke?
A I have -- whoever said hello first.
Q What knowledge did you have that the topic that Marjorie Murtagh Cooke wanted to raise with you?
A I don't remember having any --
Q Any foreknowledge.
A No.
Q I understand. And what was -- after the general greeting of hello, what was the first thing you remember Marjorie Murtagh Cooke saying to you?
A I don't. I mean, I don't remember very much about the meeting other than the request for overtime, which I thought was bizarre.
Q Why was it bizarre?
A Because it was -- it was out of context. It was -- it was bizarre. It was just out of the blue.
Q Why was it out of the blue?
A Well, I remember -- one of the things I



remember of the meeting is it wasn't a very long meeting. This wasn't a long meeting or discussion or anything like that, it was just kind of out of the blue. And it was kind of like, "I'm here. I'm not an SES so you need to fix that by paying me overtime."
There was no justification, no rationale, no, "I've been working 60 hours a week and here are my hours," or anything.
It was just like, "You need to fix this, and here's what you need to do and." I felt like it was just a bizarre request. There was no -- I didn't understand where it was coming from.
Q Okay. And when if ever did you ask Marjorie Murtagh Cooke where her request was coming from, in your words?
A Well, I mean, during the -- I think I said something like, "Oh," or, "Whatever." But there was nothing else forthcoming. It was just kind of like, "I'm here. I want you to give me overtime." And there was nothing else behind it.
It was just out of the blue. It was kind of bizarre. My feeling was this is bizarre. That's all.

Q Why was it bizarre for Marjorie Murtagh Cooke to ask you to pay her overtime to equalize her wage with the other Directors of the divisions?
A Well --
MR. LUONG: Objection; I think that mischaracterizes the earlier testimony.
Q You can answer the question.
A First of all, she didn't say to equalize. She didn't suggest that. It's just like, "I'm not an SES so you have to make up for it." I mean, that was the context.
It was -- there was no anything like that. It was like a small child is upset that you didn't buy them the toy -- that their father didn't buy them the toy in the window, and you're the aunt, so therefore, you have to buy the toy.
I mean, it was just out of the blue. I didn't understand it. She was a manager. I didn't know if it was possible to pay a manager overtime.
There were a lot of things about it I didn't understand, so it was just a bizarre request.
I had never had a department head in government,



in my experience in government, make a request like that at either of the agencies that I had worked for. So it was not something I had experienced before, and it was, as I said, kind of out of the blue.
So bizarre is the only word -- I mean, bizarre meaning not bad, not good, but out of the blue, different than what normally one has as a conversation.
Q Well, why was it in your mind inappropriate for her to ask you to make up the differential between what she was being paid and what the other Directors were being paid?
MS. COHEN: Objection; mischaracterizes evidence.
MR. LUONG: Objection.
Q You may answer the question.
A I didn't say it was inappropriate, I said it was bizarre and I hadn't experienced it before.
I didn't know the answer, and I said I would look into it.
So I didn't judge it one way or another other than its uniqueness in the request. When I say



bizarre, I'm not saying negative, I'm saying unusual, different, something I hadn't experienced and I didn't completely understand.
And normally, when -- my experience has been if someone comes and says I want a raise or I want a new job or this or that, they kind of lay out their case. They pitch it to you. Not a declaratory sentence. So it was a unique -- it was just unique. I said I would look into it and, I mean, that's all I could do at the time.
I'm not in charge of the pay schedule for the Civil Service. I didn't hire her. I didn't know all the circumstances. There was no justification on her part when she met with me to explain what was her concerns. It was just kind of, as I said, like a declaratory sentence. "You need to do this." Okay.
Q Well, when Marjorie Murtagh Cooke said to you that she was entitled to be paid at the same level as the other Directors, what did you understand her to mean by that?
MR. LUONG: Objection; assumes facts not in evidence.



A She didn't say that. She didn't say she was entitled to be paid what the other Directors were. That's not the words that she used. She did not say that.
Q You're certain.
A Yeah.
Q Okay. Now, the -- okay. When you told her that you would look into it --
A Mm-hmm.
Q -- how did you tell her that you were going to look into equalizing her pay with the other Directors?
A I never said I would equalize --
MR. LUONG: Objection.
A I did not say I would look into equalizing her pay with the other Directors, I said I would look into her request for overtime. That was the request that she made to me. She did not say, "equalize my pay," she said, "you should give me overtime because I'm not an SES and they are." That's what I heard and what I understood her request to be.
Somehow I was supposed to bend the rules, or make

the rules be that way, or implement rules if they already existed, or find the rules or what. I wasn't sure exactly what I was supposed to do, but I knew I needed to find out more because she had made the request and I understood it to be that.

But my understanding was confused because, again, there was no justification, there was no pitch, there was no demonstration of this is the issue and dah dah dah dah and all that kind of stuff. It's just here are the facts.

I knew that she was not an SES, and she knew she was not an SES. Okay? She was a 15, they were an SES.

I was working in the larger whole to try to create SESs -- more SESs in the organization, but they're not something you can just pull out of your pocket, nor do I have signature authority to just make someone's pay change just because someone says they're not happy with the fact that the position that they hold is a 15.

Well, that's what it was, and I -- that's just what we all had at that time. It was the way it was.



So that being said, I was trying to figure out, do managers get overtime? Do department heads get overtime?

In the private sector, a department head did not get overtime. You would have a salaried position and you would be -- have the good luck to be on board 90 hours a week no matter what because that's the way it is if you're in a salaried position.

So it was unique from that perspective because, as a department head, I though well, I don't even know if you even can qualify for overtime as a department head.

So I couldn't say yes, Marjorie, I will give you overtime because I didn't know if by law I was allowed to give overtime. Because it's Civil Service. And the one thing I know is you have to check the rules because they're different.

So I couldn't answer her one way or another at that time anyway until I found out more. So all I could do was say, "All right, I will look into it." There were a lot of other questions, but I couldn't just -- and I couldn't just say, "Okay, here's your



overtime slip."

Q When if ever did she suggest that one of the things you could do was also give her a bonus to equalize her pay?

A I don't remember bonus, I just remember the overtime. I don't remember her asking for a bonus.

Q Okay.

A And in fact, she had received a bonus in the prior performance review, so I knew -- I mean, she -- that's why I don't remember her asking for a bonus because I would have said, "Well, you just -- you did get one," or something like that. But that part of the conversation didn't occur because -- that I remember, because she received a bonus the prior year, I do know that.

Q Okay. So I just want to make sure I understand this. Marjorie Murtagh Cooke did or did not ask you to use either overtime, bonus or other supplemental pay to equalize the pay that -- to make up the pay differential between herself and the other office directors?

MR. LUONG: Objection; asked and



answered.

MS. COHEN: Objection; compound question.

MR. LUONG: Asked and answered, as well.

A That is not how she phrased it. That is not the conversation I remember.

Q I understand. And when did you say that you would get back to Marjorie Murtagh Cooke after she met with you in April of 2004 --

MS. COHEN: Objection; assumes facts not in evidence.

Q -- and requested that you pay her overtime or additional monies to equalize her pay with the other Directors?

A Again, that's not what she asked. She asked for me to pay her -- she asked for me to pay her overtime. That's what I remember. I don't remember her using those other words, as I've already answered several times.

I did not give her a time certain. I said I would look into it. I did not say, "I will get back

Page 66

to you by noon tomorrow."
Q All right. And how did you go about looking into it?
A That same day I went and saw Dan Campbell and relayed the conversation to him.
Q All right. Where did that meeting occur?
A Pardon?
Q Where did that meeting occur with Dan Campbell?
A I think I walked over to his office. It was -- I mean, we tried to touch base at least once a day, so it was probably, you know, towards the end of the day, it was kind of like here's a list of things that -- kind of touch base how the day went, that type of thing. So it was one of several items.
Q All right. And what did you say?
A "I had this really bizarre conversation with Marjorie."
Q And how did he respond?
A He said, "What happened?"
Q What how did you reply?
A I told him.

Page 67

Q What did you say?
A She came in, she said that she wasn't -- you know, she was a 15, the others were SESs, and she wanted -- she made a request for me to pay her overtime. It was like two sentences, basically what happened.
Q And how did he respond to what -- to that?
A He said, "Really," or something to that effect.
Q What did you say in reply?
A I said, "Yeah. So can we do this? I mean, I don't know," and I just started explaining all my questions. I said, can -- I mean, I just started saying, you know, I said, "I didn't know how to answer her. I have no idea. Do department heads get overtime? I haven't run into that before. I mean, how does it work? I'm not really sure," you know, "What are the rules?" You know, just explaining all the things I didn't understand about it, because I was looking to get an education, too.
Q And how did Dan Campbell respond?
A He said, I don't know, something like he

Page 68

would get into HR. I mean, we didn't -- it was towards the end of the day. It wasn't that we had a long time period. It was one of several items that we were chatting about so it was like, "Well, I'll take care of it."
Q And after he said that he would take care of it and get it to HR, then what did you say?
A "Great, thanks," and just moved on. We had a list of stuff so --
Q All right. And when was the next time that you talked to Dan Campbell or anybody else about Marjorie Murtagh Cooke's request that the NTSB pay her more in light of the fact that she was not the same pay level as the other Directors?
MS. COHEN: Objection; assumes facts not in evidence.
A That wasn't her request. Her request was for overtime. So I can't respond to your question because I don't agree with it.
I don't remember ever talking about it again. I mean, I delegated it -- I delegated it on. So it wasn't something I remember having another

Page 69

conversation about.
Q With anybody else.
A I don't remember if I talked to -- I don't remember talking to anyone else. I can't say I didn't, but I don't remember -- I mean, it was -- quite honestly, it was a weird day. It was just part of a -- kind of a weird request. I remember it because it was unusual, it was unique, it was bizarre is the word I've said, because I had never had a request like that. I passed it on to Dan, and that was it. It was not a big deal.
Q Other than Dan Campbell on the day that Marjorie Murtagh Cooke came to your office in April of 2004 and requested that the NTSB pay her overtime --
A Mm-hmm.
Q -- what other NTSB official, if any, did you have a discussion about Marjorie Murtagh Cooke's request or the NTSB's ability to pay her more, overtime or otherwise, between April of 2004 and the time you left the Department in March of 2005?
MR. LUONG: Objection; asked and answered.

A I don't remember specifically talking to anyone else about that.

Q I understand. If it had been your decision to pay Marjorie Murtagh Cooke overtime, more money, why would you have denied her request?

A Well, I would neither deny nor agree without justification. So I would need more than I want overtime. I would need justification, I would need proof that she worked more than 40 hours a week.

If you're paying overtime, I'm assuming that means you're paying beyond a 40-hour week work schedule, so there would have to be documentation, things like that. It couldn't just be pay me overtime, I need to know that she was actually working overtime.

Q If she was working overtime, would you have paid her more money?

A If someone was working overtime, if it was within the rules, I mean, it was allowable, which I don't know, and it was appropriate for them to be paid overtime, then I would follow the rules, wherever the rules would lead me.



But I do know you have to have a paper trail. I mean, you would have to have time cards and stuff like this. None of this was part of Marjorie's and my discussion. There was no statement, you know, Ellen I worked 72 hours last week. There was not that kind of a statement.

So, yeah, I mean, I wouldn't have without justification, appropriateness, make sure it was following the rules, et cetera. And then I would only -- if it's within all those boxes are checked, I don't know that there's really a decision, you're just following the rules.

Q Why did you never ask Marjorie Murtagh Cooke to provide you with the documentation that you just described to, as you say, justify her request that she be paid overtime during the April, 2004 meeting.

A Well, first, we never talked about it again. And second, why would I ask somebody to give me paperwork and everything if I didn't even know if it was allowable or not.

I mean, when she made the request, I didn't even know if it was possible. So I'm not going to start



someone down that kind of a path -- I mean, that's a big homework assignment -- if I can't do it.

Q And when did you first learn whether it was or was not allowable?

A Do you know, I still don't know. I don't know if it is or is not allowable.

Q How many times did Marjorie Murtagh Cooke after the April, 2004 meeting ask you for follow-up meetings relating to her request for overtime or more pay?

MS. COHEN: Objection; assumes facts not in evidence.

MR. LUONG: Objection; assumes --

A I know that Marjorie at a much later date scheduled something with me, but I don't know that it related to this meeting. She didn't phrase it that way.

There was some kind of an e-mail, I vaguely remember. I don't remember what the e-mail said. Something about wanting to talk to me, and I thought she said -- I thought the e-mail said something like for a personal issue, but I really don't remember. I



don't remember exactly what the e-mail said, but I think she made the meeting request by an e-mail, and I think David set it up.

Q How did you respond?

A David set up the meeting. I mean, David scheduled a meeting.

Q All right. When was that meeting?

A I don't think it happened.

Q Why not?

A First time we either went out of town or an accident or something. I mean, it was just -- it was like can we reschedule? Life happens, especially at the NTSB.

I don't remember why, but that wasn't uncommon, either. My schedule got pretty hectic at times and we would reschedule meetings all the time.

But the advantage was that when I was in the building, I was always accessible, so I never really worried that much because people usually didn't try to have formal meetings with me because they would just grab me in the hall. That's usually when I had most of my discussions with folks. People would just grab

me after a hearing or in the hallway or, when we had the larger meetings, people would just stay after.

So I didn't really worry about rescheduling a formal meeting because we always ended up usually talking, I mean, whoever it was.

Q Okay. So when Marjorie Murtagh Cooke made the --

A And I don't remember if it was to me or to David -- it might have been to David and to me or me to David. I forget, but I remember there was an e-mail.

Q All right. How many times did she request meetings with you -- follow-up meetings as a result of her meeting in April of 2004 requesting overtime or more pay?

MR. LUONG: Again, objection; I think it mischaracterizes testimony and assumes facts not in evidence.

Q You can answer the question.

A I don't know that she ever did. I know that there was another time she requested a meeting via an e-mail, it was either to me or David or both, and I



don't remember that it referenced the previous meeting at all or said what it was about. I don't remember that as it. I remember that Marjorie wanted to meet with me and we were trying to schedule it.

Q Okay. So when if ever did you ask Dan Campbell whether or not he had -- since you had delegated this to Marjorie and you had committed to Marjorie that you would look into it and get back to her, when if ever did you ask Dan Campbell, "Have you gotten back to Marjorie Murtagh Cooke? Have you looked into it, investigated it, and gotten back to Marjorie Murtagh Cooke about the request for overtime or more pay?"

MR. LUONG: Objection; mischaracterizes her testimony.

A I didn't follow up with Dan because I assumed it was taken care of. I delegated it to Dan, Dan was a great Managing Director, he always got everything done. So, I mean, it was not an issue.

Q When if ever did you tell Marjorie Murtagh Cooke that you would not be responding to her, you would not be following up with her, but rather that



you had delegated it to Dan Campbell and that he would follow up?

A I don't think I ever had that conversation with Marjorie. It wasn't -- she reported to Dan, so I didn't feel I was reporting to her. I heard her request, I passed it on to Dan, figured it was in the works and whatever was, was.

Q Okay. And your expectations of Dan Campbell was that he would look into whether or not this was possible. What did you tell him you wanted him to do?

MR. LUONG: Objection; asked and answered.

A Exactly what I said. I said, "Marjorie made this request. Can we do it? Will you look into it? Handle it?" "Yes, ma'am." That was it. I mean, just --

Q When if ever did you tell -- ask Dan Campbell to check with HR about whether or not it was possible?

A I didn't micromanage Dan Campbell. You don't micromanage someone and say that I want you to call by 10:15.



This man is the Managing Director of an Agency and been there years, and prior to that he had been the General Counsel for the organization. I had no doubt that everything would be looked at and taken care of and moved on.

My job was not to be the HR Director, my job was to be the Chairman of the NTSB. And then in that case, I was trying to do things like get money from Congress and Appropriations to support the entire Agency, be the spokesperson where you had major accidents to make sure the traveling public felt safe, do my best to respond in my role as a member, as well, when we were taken out on accidents and do my job.

So this was a small -- were we not here today, I would have forgotten the incident. It was not a milestone in my time at the NTSB.

Q When did you first learn that Dan Campbell hadn't taken care of and that it hadn't been resolved?

MR. LUONG: Objection; assumes facts not in evidence.

A I assumed everything -- I assumed that it was followed up and whatever the answer was, was and

Page 78

move on.
Q When did you first learn that it was not resolved?
A I don't know that --
MR. LUONG: Same objection.
A I don't know that I learned one way or another.
Q Okay. Well, you know today it wasn't resolved; is that right?
A I don't know. Are you telling me it wasn't resolved? I mean, I don't know.
Q You have no idea.
A No. I don't know what Marjorie has or hasn't been paid, or whether she got overtime or -- no, I don't know.
Q Okay. So as we sit here today, you have no idea whether or not Marjorie Murtagh Cooke received any supplemental pay, or overtime, or her pay was changed as a result of her inquiry to you in April of 2004 --
A No.
Q -- is that correct?

Page 79

A That's correct.
MR. OSWALD: Let's go off the record.
VIDEOGRAPHER: This marks the end of Tape 1 in the deposition of Miss Conners. We're going off the record. The time is 11:19 a.m.
(Recess taken.)
VIDEOGRAPHER: This marks the beginning of Tape 2 in the deposition of Miss Conners. We are back on the record. The time is 11:39 a.m.
BY MR. OSWALD:
Q Between April of 2004 and when you left the NTSB in March of '05, between the time that you had the meeting with Marjorie Murtagh Cooke and when she had come to your office and asked you for overtime and March of '05 when you left the NTSB.
A I didn't leave the NTSB in March of '05.
Q I'm sorry. When was it?
A My Chairmanship ended in March of '05. I didn't leave the NTSB in '05.
Q I understand. Okay. All right. Well, let's take that first.
A Okay.

Page 80

Q Between April of 2004 when you met with Marjorie Murtagh Cooke and March of 2005 when your Chairmanship of the NTSB ended --
A Okay.
Q -- when if ever did you meet again with Marjorie Murtagh Cooke in a one-on-one meeting about anything?
A I don't believe I did.
Q Between April of 2004, when Marjorie Murtagh Cooke came to you in your office and asked you about overtime, and March of 2005, when you left your Chairmanship of the NTSB, when if ever did you meet with Marjorie Murtagh Cooke and Dan Campbell?
A I don't remember such a meeting.
Q All right. During your tenure as the Chairman and CEO of the NTSB, when if ever did you meet with Marjorie Murtagh Cooke about her performance evaluation?
A I didn't have individual meetings with performance evaluations with people who didn't report to me. Marjorie did not report to me.
Q I understand. But my question is just a

Page 81

little bit different.
When if ever between March of 2003 and March of 2005 when you were the Chairman and CEO of the NTSB did you ever meet with Marjorie Murtagh Cooke about her performance evaluation?
A I don't remember meeting about performance evaluations.
Q With Marjorie Murtagh Cooke.
A I don't remember meeting with Marjorie on a performance evaluation.
Q Between March of 2003 and March of 2005 when you were the Chairman and CEO of the NTSB; is that correct?
A That's correct. My title was Chairman, it wasn't Chairman and CEO. So the title was Chairman of the NTSB, just so you know.
Q I understand.
A Okay.
Q But the point is that you never had a meeting about Marjorie Murtagh Cooke's performance evaluation between -- with her between March of 2003 and March of 2005; is that correct?

A Not that I remember.
Q I just want to make sure I understand this. When if ever during your tenure with the NTSB would you describe the assignment of an SES position to what was once a General Schedule position as a conversion?
A I'm sorry. Will you repeat the question?
Q Mm-hmm. When if ever did you describe during your tenure at the NTSB an assignment of an SES position to a position that had heretofore been a General Schedule position to an SES position as a conversion to an SES position?
A I don't know that I ever used the phrase conversion. I don't know that -- I guess I still don't understand what you're asking.
Q Okay. I just want to understand the verbiage that you used. Did you ever describe a conversion of a Director position from a General Schedule to an SES position using that word?
A I don't know if I did or not. I mean, I don't know if I ever used the word conversion or not.
Q All right. Well, if you did use the word, what would you mean by conversion?



MR. LUONG: Objection; calls for speculation.
Q Do you understand the question?
A Right. I'm trying to think. If I used -- I'm just trying to think if I -- see, I don't think I would have used that word or, if I did, I mean, I -- I don't remember using the word. I can tell you the process, but I don't -- as I understood it and what we were doing and what my intentions were, but I don't remember saying we were converting a 15 to an SES. We were gaining SESs.
Q What's the difference?
A I mean, I can only answer in the hypothetical. If you converted something, you would be changing it. If you added something, you would be adding it.
So if you change something, the former would never -- would not continue to exist. If you added -- so, you know --
I mean, I don't remember using the word conversion in that process. I don't remember not using the word conversion. I mean, it wasn't --



Q Is it possible you used the word conversion?
A Could be.
Q And what would you have meant if you used the word conversion?
MS. COHEN: Objection; calls for speculation.
Q You can answer the question.
A I can only tell you what my intent was. My intent was to, what I called, professionalize the NTSB. I know I used that phrase before. Professionalizing the NTSB to be able to gain the ability to have each of the major departments, not just the investigative departments but all the major departments to be headed by an SES so that we could align the skill set and the requirements and the expertise accordingly under an SES led unit. Safety recommendations, Research and Engineering, Aviation, as much as possible and as broadly as we could. That's the direction -- I mean, we looked at a lot of things as possibilities, but that's the direction that we ultimately went towards.
Q And why convert all of the Director



positions to SES positions? Why was that your ultimate goal?
A Well, again, it wasn't convert as much as -- I mean, I don't think the word convert is appropriately used. And if I used it, then I was probably inappropriately using it.
I mean, it wasn't converting in my -- it was assigning. It was being able to having an SES. You can't -- I don't think you can even convert a 15 to an SES. You have to gain an SES. They're a separate bucket of jobs. Okay?
I don't know that you can -- I don't even think you can convert, that's why I'm confused by that word.
You can get an SES position and assign it to that division, but that's not converting a 15 to an SES. I don't think that's even possible.
You gain an SES. It's a separate pool of jobs. So I don't think I ever said it, but if I did, I either misspoke or taken out of context. I just don't -- it's a separate pool of jobs is what I'm trying to say, so I don't think that would have even been possible.

Page 86

Q I understand.
(Engleman Conners Exhibit No. 1 - NTSB Performance Appraisal Form - marked for identification.)
BY MR. OSWALD:
Q I'm showing you what's been marked as Exhibit No. 1. What is that document?
A It's entitled NTSB Performance Appraisal Form.
Q And when if ever during your term at the NTSB have you seen such a form?
A I think they may have been attached to the bonus recommendations after the -- at the end of the year.
Q All right. And to what extent is this similar to the form that we've talked about earlier today relating to performance evaluations?
A Oh, gosh. It's -- I can't answer. That's been so long since I've seen things like this. I --
Q Do you have any reason to doubt that is an NTSB Performance Appraisal Form that was used in the performance appraisal process we talked about earlier?
A It says NTSB Performance Appraisal Form, so

Page 87

I accept it on its face that that's what it is.
Q All right.
A I don't have a cognitive memory of what the forms looked like.
Q But you have no reason to doubt that that's a Performance Appraisal Form similar to the kind we talked about earlier today; is that right?
MR. LUONG: Objection; asked and answered.
A I have no reason to doubt one way or another. I accept it on its face.
Q I understand. All right. After August of 2004 --
A August?
Q I'm sorry. April -- thank you. April, 2004.
A Okay.
Q Let's begin again. After April of 2004, when was the next time that you talked to anybody at NTSB about Marjorie Murtagh Cooke's performance in her job?
A I don't know that I did.

Page 88

Q All right. So between April of 2004 through March of 2005, when if ever did you have discussions with any NTSB employee about Marjorie Murtagh Cooke's performance in her job?
A I don't have contextual memory of having conversations or not having conversations.
Q Okay. You don't recall any specific conversation between April of 2004 when -- we're taking when Marjorie Murtagh Cooke came into your office and asked you for overtime -- and March of 2005 when you were no longer the Chairman of the NTSB, you don't have any specific recollection of any particular meeting or conversation or other communication with any NTSB employee about Marjorie Murtagh Cooke's performance --
MR. LUONG: Objection.
Q -- is that correct?
MR. LUONG: Objection; asked and answered.
A Nothing comes to my memory.
Q So is that correct?
A It's correct in that nothing comes to my

Page 89

memory of a specific conversation, no.
Q I understand.
A No.
Q Now, there were -- who was the NTSB Director of the Highway Mod when the Director position was slotted or assigned a slot of an SES position?
MS. COHEN: Objection; assumes facts not in evidence.
Q You may answer the question.
A Joe Osterman.
Q Okay. And for Aviation?
A John Clark.
Q And for Rail?
A Bob Chetkovich (phonetic). He was the Director. I mean, are you asking when they got SESs or are you asking who the Head of the departments were.
Q I'm asking who the Head of the department was at the time that an SES slot came from somewhere -- either it was reassigned from another position and assigned to their Director position or OPM assigned it -- and then you made the decision

Page 90

to --
A Okay.
Q -- assign the position.
A I don't know about when SESs went to Pipeline/Rail or Aviation. I know when we put one to Highway, and these were the people that were in the offices at the time.
I don't know when John Clark -- I mean, I don't know when Aviation got SESs. Is that what you're asking or --
Q Okay. So Highway was either slotted for SES or converted to SES during your tenure at NTSB.
A I would not say it was converted to SES. That when we got an SES, we put it towards Highway.
Q I understand. And who was the incumbent in the position at the time that that SES was put to the Director position of Highway?
MR. LUONG: Objection to the term "incumbent".
A The person who was the Director of the office at the time was Joe Osterman.
Q All right. And who was selected for the SES

Page 91

position at Highway?
A Joe Osterman.
Q What role did you have in preparing the job description for Joe Osterman's Director of Highway Safety position, if any?
A None. No specific role.
Q How many times was the Highway position which Joe Osterman was the incumbent advertised?
MR. LUONG: Again, objection to the term "incumbent".
A I think it was advertised once.
Q And what role did you play in the selection process, if any?
A No specific role. Recommendation was given to me after the whole process played through.
Q And who gave the recommendation to you?
A I don't remember if it was Dan Campbell or Ron Battocchi. It was whoever chaired the ERM. And I think it was -- it was either Ron or Dan. I don't remember specifically. I think it was -- it was probably Dan.
Q And what was Dan Campbell's recommendation

Page 92

to you about who should be -- NTSB, you, should select for the Director of Highway Safety position?
A It wasn't Dan's recommendation, it was the ERM's recommendation after the review process. It wasn't his sole recommendation.
Q Who was the person?
A Who was the person recommended? It was Joe Osterman.
Q How many other people were recommended?
A It wasn't a slate. It was -- this was the best candidate was how it was presented.
Q All right. And how did you respond when Dan Campbell presented you with Dan Osterman as the best candidate for the Director of Highway Safety position?
A Something to the effect of, "Is he the best guy for it?" And he said, "Yes," and I said, "Fine." I mean, it was just, "Thank you," and, "Next."
Q Okay. Now, for other positions that where they were SES slots during your tenure, Assistant Directors, et cetera, how many of those were either slotted or -- well, let's just use your word slotted for SES?

Page 93

MS. COHEN: Objection; vague.
A In the grand scheme of things, if we could have gone trick-or-treating and gotten all of our SESs at once, my ultimate goal, long-term goal, perhaps not in my lifetime or term as Chairman, but the long-term goal that I was setting the NTSB on is that every Director and Deputy Director, the goal would be to have an SES in every major office. Not only the investigative offices, but every major office.
Q And how many individuals were -- individual positions were slotted -- using your word -- for SES during your tenure --
A I don't --
Q -- other than -- other than Director of Highway?
A Let's see. Again, the goal was every major office would have a Deputy and a Director. So the answer would be every office -- major office times two would be the total -- the desired total. We just had to do them one at a time.
I mean, I'm trying to think. If you want me to list every office -- I'm just --

Q Yes. I want you to tell me how many positions during your tenure were --
A Officially slotted?
Q -- converted, slotted, changed to from a General Scheduled position to an SES position.
A There is a difference between the goal and the ability.
Q I understand.
A So are you asking me the goal or the ability?
Q The latter.
A The ability.
Q Yes.
A I think we had three.
Q Okay. And which positions were those?
A Marine, Deputy of Engineering and Research, Highway, Administration -- so that would be four.
Those are the four I remember I think that we filled. And there might have been a fifth one. Kept bouncing around what we were going to do with the Academy. I think I remember those four.
Q Okay. And the Director -- the Deputy of



engineering, what was that full title for that position?
A Deputy Director of Research and Engineering, I think.
Q Okay. And then the Administration position, what was the full title of the Administration position?
A Director of Administration.
Q Thank you.
A I'm not sure. Director of Administration and Management, Director of Administration, something along those lines.
Q I understand. Now, the Deputy Director of Engineering, when his or her position was changed from the General Schedule to SES, who was the -- at that moment, who was the incumbent in that position?
A See, I don't remember on Engineering whether it was already an SES or we applied an SES there. I don't remember which. I think it is an SES position, but I don't remember if we were able to apply one there or it was already an open SES. That one I don't remember which way it was.



Q Who was the person in the position?
A Who was the Deputy -- I don't remember his name. Vern Elinstat (phonetic) was the Director, but I don't remember the Deputy's name. I can see his -- I don't remember his name. Sorry.
Q All right. And then the Director of Administration and Management, who was that person?
A That person is Lola Ward.
Q Lola Ward. Okay. Now, when Lola Ward -- was she -- did she compete for the position when it was changed to SES?
A That position -- yes, it was compete. It wasn't changed, it was -- that was not changed. There wasn't an Office of Administration before, that was created.
Q And was she in the position at the time prior to the fact that it was changed or it was slotted for SES?
A It didn't exist before.
Q What was her title before that?
A I'm not sure.
Q Was she working at NTSB?



A She was working at NTSB.
Q All right.
A I think. Was she working or was she not working at NTSB? I don't remember whether she was working at NTSB or not working at NTSB at the time it happened. I'm sorry.
Q All right. I understand.
A I don't remember the time line on that one.
Q All right. The Deputy Director of Engineering, was that position competed when it was changed from a General Schedule to an SES?
A Again, I don't know if it was changed to a General Schedule or not or already -- as I stated earlier, I don't remember if that was already an SES or not so I can't answer -- I can't say it was changed because I don't remember if it was already an SES and it had to be filled or whether we put an SES there.
Q Okay. Let me refine my question. What I'm interested in are positions similar to Joe Osterman's position at Highway and the position at Marine that were General Schedule and, during your tenure, were converted, changed, slotted, whatever word you want to

use, to an SES position.
What other positions were assigned an SES that were not an SES at the time during your tenure other than Highway -- Director of Highway and Director of Marine?
A Administration didn't exist before, so that was new, and I don't remember about Research and Engineering.
Q All right. When was the -- did you make the decision to assign an SES position to the Administration position?
A I don't remember when.
Q It was during your tenure, though?
A Mm-hmm.
Q Okay. And then the Deputy Director of Engineering, when was that that you assigned an SES slot for that position?
MR. LUONG: Objection; asked and answered.
A I don't remember when. It was --
Q During your tenure?
A -- during that time period, right.



Q Why did you decide to assign the SES moniker to the Deputy Director of Engineering position before you decided to assign the SES moniker to the Director of Marine position?
MS. COHEN: Objection; assumes facts not in evidence.
MR. LUONG: I'm also going to object to the term "moniker".
Q Do you understand my question?
A You're talking about the priority of the assignments.
Q Yes.
A Yes. That was based on the much larger scope of the organization, the scope of the work, the level of responsibility, the need for the expertise; there were a lot of different elements that went into it.
Mostly it was scope of work and impact on the organization. Those would be the two primary reasons which led to need. So --
Q Okay. What other reasons other than scope of work and impact on the organization?



A Those are pretty good ones.
Q All right. I just want to understand this.
A I mean, they were level of responsibility, overall impact on the organization and the growth of the organization, supporting our mission for transportation safety --
Q Okay.
A -- direct relationship to the safety mission.
Q Okay.
A Those were all reasons.
Q All right. I just want to understand -- make sure I understand.
So other than the scope of work, the impact on the organization, furthering the safety mission, and the need, what were the other reasons that you decided to assign the SES tag to the Deputy Director for Research and Engineering, the Director of Highway, and the Director of Administration before you assigned the SES tag to the Director of Marine position, if any?
MS. COHEN: Objection; mischaracterization of earlier testimony and assumes



facts not in evidence.
Q You may answer the question.
A I don't remember the order, so I can't speak to whether that was the order or not. I don't remember the order of assignment.
You suggested to me that it was Highway, Research and Engineering, Administration, Marine. So I don't remember the order. If that was the order, fine. I don't remember it.
I remember Highway was first. That I do remember, but I don't remember the rest of the order.
There was also the issue of how many employees were in that department or division. So when you were talking about scope, it's the scope of the investigatory responsibilities as well as the scope of supervision, the existence of regional offices. Highway had regional offices. So again, the scope of the responsibility was much larger and more employees, and there are over 45,000 highway deaths a year in the United States. So the impact on the safety mission is pretty darn big.
Q All right.

A So that's why Highway was chosen first. The rest, following that same type of analysis would have been utilized with the goal of being able to bring in more SESs throughout the Agency.
Q And you made that decision --
A Yes.
Q -- of the order in which you were going to assign the SES tags to the various positions.
A Yes and no. It was pretty clear that Highway should be next. Again, for all the reasons I already stated.
The others, it came as part of a larger process. If you remember earlier I talked about the organizational review that we conducted and the requests that we made to all the Directors for the openings that they were proposing, et cetera and so forth. We looked at that in context of our mission, in context of all the items I just listed, scope of responsibility, amount of supervision, et cetera, and just trying to align it so that there was a little bit of equity to try to fill all the pots to some degree, knowing that we wouldn't ever have a perfect world



where we could have 100 percent where we wanted one of the departments to the detriment of the others. We were going to have to fill every pot a little bit as we could. And it wasn't just for SESs, it was for staff, it was everything from investigators to writers to admin to clerical.
So none of these decisions was a single point decision. They were part of a much larger deliberation over allocation of resources in the organization with the end goals as previously stated, and at the same time a nonstatic environment.
Q Who was the decision-maker other than you?
A It was the discussion with myself, it was debated, discussed, Dan Campbell, probably Ron Battocchi, we got input from other Office Directors, from my Chief of Staff.
Q Who had the authority to make the decision other than you?
A The authority for the SES assignment?
Q Yes.
A Well, I believe that ultimately was my determination, again, with recommendation and



discussion with the General Manager -- or Managing Director rather, I'm sorry, Dan Campbell. And Ron Battocchi would have been part of the discussion.
Q They couldn't overrule your determination, could they?
A Ron Battocchi could if I was doing something illegal. I would expect that he would.
Q Other than if you were doing something illegal. To the extent that you had that was not illegal to do, who else had the discretion to make the decision on which position would receive the SES --
A Where the SES would be allocated?
Q -- where it would be allocated other than you?
A I believe it was my decision.
Q Where do you work now?
A Federal Communication Commission.
Q What is your job title?
A It's a long one. Senior Deputy Bureau Chief of the Enforcement Bureau of the FCC.
Q How long have you been in that position?
A Since March of this year.



Q Is that an appointed position?
A No.
Q Are you Civil Service? Is it a Civil Service position?
A No.
Q SES?
A I'm a non-career SES political appointee.
Q I understand.
A I said no appointed, I thought you meant confirmed. I'm sorry. It is appointed. It's a political appointment, but it's not a con --
Q But you weren't confirmed I'm saying.
A It's not a confirmed, no, it's not a PAS.
Q I understand. When did you first become aware that Dan Campbell decided to readvertise for the Director of Marine Safety position?
MR. LUONG: Objection; assumes facts not in evidence.
A When did I first learn -- I don't know exactly. It was sometime after it was advertised, I believe. I was no longer Chairman, so I believe it was sometime after I was no longer Chairman.

Q Which would have been when?
A I was no longer Chairman March of '05. It was either the 22nd or 23rd again, that time period.
Q Who told you that the position had been readvertised?
MR. LUONG: Objection; assumes facts not in evidence.
A I don't remember anyone telling me.
Q How did you learn that Dan Campbell had readvertised the position?
A I don't know that I learned that Dan Campbell had readvertised the position. I remember at some point being aware that the position was advertised. It may or may not have -- I don't remember.
Q Through what medium did you become aware that the position had become readvertised?
A I don't remember.
Q What was your reaction?
A I don't remember having one.
Q During your entire tenure at the NTSB, what other positions are you aware of were readvertised



after there was initial advertisement for the position?
A I think we had -- I don't remember specifically. I don't remember a specific position.
Q Other than the Marine -- Director of Marine Safety position.
A That's correct. But I also did not track the advertising of the positions at any level, really. So once they were out there, the process was to go forward. I did not track the positions at any level, so I can't say that I knew or I didn't know unless it came up or --
Q I understand. When the EEO counselor contacted you in January of '05 about Marjorie Murtagh Cooke's discrimination complaint, where were you?
MR. LUONG: Objection; assumes facts not in evidence.
A I don't think I understand your question. Who are you referring to?
Q What do you not understand about my question?
A Who are you referring to?



Q The EEO counselor from the EEO office.
A Identify who you're referring to, please.
Q Any EEO counselor.
A I don't remember an EEO counselor ever contacting me.
Q Ever?
A I don't remember an EEO counselor contacting me so --
Q All right. When an employee of the EEO office contacted you in January of 2005, or someone who was acting on behalf of the EEO office in January of 2005, where were you?
MR. LUONG: Objection; assumes facts not in evidence.
A I don't remember being contacted in January, 2005 by an employee of the EEO office.
Q When is the first time that an employee of the EEO office or anybody else investigating or conciliating an EEO complaint that Marjorie Murtagh Cooke had filed contacted you?
MR. LUONG: Objection; compound, and objection to the term conciliating.



MS. COHEN: And assumes facts not in evidence.
Q You may answer the question.
A I don't remember being formally contacted by an EEO officer or employee of an EEO complaint. I do not remember a formal contact happening --
Q At any time.
A -- in January. You asked me in January.
Q My question -- okay.
A I don't remember being contacted by the EEO office about a complaint.
Q I'll ask it again. When if ever did an employee, agent or any other person either conciliating, investigating, looking into a complaint or a contact that Marjorie Murtagh Cooke had made with the EEO office contact you?
A The only thing I remember as a formal contact was the gentleman who called and said that they wanted to schedule a statement, and then I subsequently met with them and gave my statement. That's the first corporate memory I have of it. But I cannot tell you the date. I'm not --

Q So it is your position that an EEO counselor or an officer in the EEO office at NTSB never contacted you during the informal process that led up to Marjorie Murtagh Cooke's formal complaint under the EEO system; is that correct?
MS. COHEN: Objection; mischaracterization of testimony.
A I'm very confused. You just asked about a formal complaint, and now you're asking about an informal process.
I don't remember being contacted in a formal context, you know -- I don't remember a contact by the EEO office. It just doesn't -- I just don't remember having that discussion.
Q When did you first learn that Marjorie Murtagh Cooke had filed an EEO complaint?
A I just answered that. When -- my corporate memory is when the guy called me and asked to set up the statement.
Q Okay. I'm not interested in your corporate memory, I'm interested in when it happened.
A I can only give you my best memory. My best



memory is, when this person called me -- and I don't remember his name or her name -- came and scheduled for a statement. I was no longer Chairman. We scheduled it, and that's when they said this is going to be -- and I said, "What's this about?" I remember saying, "What is this about?" And they said Marjorie had filed a complaint. That's the first memory I have.
Q Okay. When Dan Campbell came to meet with you about Marjorie Murtagh Cooke's complaint that she filed, where did that occur?
A I don't remember --
MR. LUONG: Objection; assumes facts not in evidence.
A I don't ever remember Dan Campbell coming to me and having such a meeting.
Q Never happened?
A I don't remember, no.
MR. LUONG: Objection; asked and answered.
Q I understand. During your tenure at the NTSB from March of 2003 as the Chairman to March of



2005, for what positions are you aware if any multiple panels of reviewers were impaneled to provide their input? This is the Employee Review Board.
MR. LUONG: Objection to the term "multiple panels".
A I don't know when the -- I was calling it ERM earlier. It's ERB. I knew it was ER something. I was thinking ER meeting, not ER board.
I don't know when they specifically met. I'm not aware of a schedule. There was no schedule that was posted or brought to my attention.
It was part of the HR process within the Agency, so they occurred when they needed to occur. I don't know the dates or when specifically they occurred or -- I mean, I can't tell you more than that.
I know that they occurred when they were required to occur, but I don't know that there was any statement to me -- it wasn't part of an active discussion of oh, the ERB is going to meet next week, or oh, the ERB met last week. That kind of discussion never occurred.
Q I understand. My question is a little



different. My question is between March of 2003 and March of 2005, for what positions are you aware that there were multiple Employee Review Board panels impaneled, one being dissolved, another then being impaneled before there was a selection for a position?
A I don't know if that occurred or not occurred. I wasn't privy to the ERB meetings.
Q You're not aware of any instance between your -- March of 2003 through March of 2005 where there were multiple ERB panels impaneled, one being dissolved, another being impaneled to review the credentials of applicants for any particular position --
MS. COHEN: Objection; asked and answered.
Q -- is that correct?
A Right. I'm not -- I don't know.
Q You're not aware of any.
A I'm not aware if it happened or it didn't happen. I wasn't briefed on such things.
Q You're not aware of any particular instance when that occurred; is that correct?

A No, no.
MR. OSWALD: Let's go off the record.
VIDEOGRAPHER: We're going off the record. The time is 12:22 p.m.
(Recess taken.)
VIDEOGRAPHER: We are back on the record. The time is 1:20 p.m.
BY MR. OSWALD:
Q Okay. Ms. Engleman Conners, before we were talking about your four direct reports, and I just want to understand that. There is the Associate Administrator, General Counsel, there is the Director of Administration and the EEO officer; is that right?
A No.
Q I'm sorry. Tell me who they are again.
A Managing Director, General Counsel, the EEO person, and the CFO.
Q Okay. And how often per week would you meet with the CFO on average during your tenure as the Chairperson between March of '03 and March of '05?
A We did not have standing meetings.
Q How often on average would you meet with the



CFO?
A On a weekly basis?
Q How about on a monthly basis?
A It would ebb and flow with the budget process. So around appropriations time we would meet more. End of the fiscal year we would meet more. Then probably as-needed.
Q On average, how often would you meet with your Chief Financial Officer between March of 2003 and March of 2005 on a monthly basis?
A We did not have standing meetings so it would depend on which month. So if it was the appropriations month, we would be meeting more. If it was the end of the fiscal year in September, we would be meeting more. But we didn't have a standing meeting so I can't speculate. I don't know how many meetings we had.
Q On an annual basis.
A I don't want to speculate on how many meetings I had. I just want to say that.
Q Was it more than 100?
A Did we meet twice a week? No.



Q More than 50?
A Did we meet once a week? No.
Q More than 25?
A Did we meet once every two weeks? During budget times we would meet more often, and the end of the fiscal year we would, but otherwise, no.
So there could be several weeks or a month that would pass I would not meet, and then there could be a week I might have three meetings in the same week.
Q On average per year, did you meet with your Chief Financial Officer more than 20 times?
A I don't think we've met more than 20. Perhaps we met 20 times in a year, including all the budget meetings and the like. I don't think there would have been more.
Q I understand. How about your Management Director? On an annual basis, on average, how many meetings would you have with your Management Director?
A Exclusive meetings one-on-one? What -- or group meetings?
Q Exclusive meetings one-on-one.
A I probably talked to Dan almost -- probably



once a day. Whether I met with him -- I would say -- I mean, we operated very casually. We didn't have a lot of -- we didn't have a standing meeting, so I probably was in some kind of contact with him possibly on a once every day or every other day.
Q And from March of '03 through March of '05, the Management Director was Dan Campbell; is that correct?
A The majority of the time he was, but -- my memory. Before I ended my term as Chairman, he was no longer the Managing Director. And we had a new Managing Director, and he became -- I'm trying to remember the title. I don't remember the title.
It was like -- what was his title? I think Executive Advisor or something, but I don't remember the specific title. But I believe that happened before the end of my formal Chairman's term.
Q It was in or about March of '05; is that right?
A My Chairman's term, I know when that ended. That was March of '05, right. I don't know when the switchover was, but I'm pretty sure it was before

then.
Q I just want to make sure I'm clear. On -- between March of '03 and in or about March of '05 when Dan Campbell moved from the Management Director to a different position --
A Yes.
Q -- you communicated with Dan Campbell on average pretty much every day.
A Probably at least one once a day on average, yeah.
Q I understand. How about with the EEO officer? On an annual basis, how often did you meet with your EEO officer or communicate with the EEO officer?
A Once. Again, there were no formal scheduled meetings so -- as in every other Tuesday anything. Once every quarter maybe.
Q And what were the topics of your meetings with your EEO officer?
A Whatever she wanted to bring up.
Q During your tenure as the Chairperson of the NTSB for March of '03 through March of '05 your EEO



officer was Farah Guest (phonetic); is that correct?
A Yes.
Q What were some of the things that Farah Guest brought up in the meetings that she had with you every quarter or --
A See, I don't even remember if it was every quarter. It was -- it was now and then. I'm trying to remember what she even brought up. I don't remember any specific situation or --
Q What were the purpose of any of the meetings?
A We had very few meetings. The purpose would be to brief me on anything that I would need to be briefed on, but I don't remember the content of specific examples or anything like that.
Q The meetings that you had -- well, so just so I'm clear, you can't remember anything that you talked about with Farah Guest, communicated with her on any subject during your tenure with the NTSB from March of '03 through March of '05?
A I really don't.
Q Nothing.



A No.
Q Complete blank --
MS. COHEN: Objection; argumentative.
MR. LUONG: Objection.
Q -- is that right?
A That's correct.
Q I understand. It's correct, is it not, that Miss Guest would review with you any complaints that were pending with the Agency under the No Fear Act, isn't that correct, during her tenure as your EEO officer and direct reporter?
A I don't remember the need -- I don't remember content of meetings that I had with Farah. We didn't have a lot of them. And, I mean, we're talking over two years ago, and I don't remember the content of the meetings.
Q My question is different. I'm not asking for the specific content, I'm saying that one of the purposes of your quarterly meetings or more with Farah Guest was so that she could update you on any EEO complaints that were pending against the Agency under the No Fear Act; isn't that correct?



MR. LUONG: Objection; asked and answered.
A I don't remember that being delineated as the specific purpose. If that was -- if that was -- the purposes were -- how can I say this?
If that was the correct -- if that's what her job was do then it was to do.
I don't remember saying, oh, I'm going to meet with Farah today and hear about any claims under the No Fear Act.
It wasn't in my mind what was going to happen. I didn't set the agenda for these meetings. So Farah, in her role, would set the itinerary, agenda, content of the meeting. So since I didn't set the agenda, I don't remember agenda items, and so I can't verify that that's what she was or wasn't briefing me on.
Q But when you got the agenda from Farah Guest in advance, how often would you review it before the meeting as opposed to at the meeting?
MS. COHEN: Objection; assumes facts not in evidence.
A I didn't say she gave me an agenda. I meant

as a meeting topic area. I did not mean to say there was a written agenda. I don't remember a written agenda being presented.

I meant during the meeting, the items that she brought forth would be items that she chose to bring forth. I do not remember a structure set around them.

Q And what were some of the things that Miss Farah Guest chose to bring forth during the meetings that she had with you?

MR. LUONG: Objection; asked and answered.

A I really don't remember the content of the meetings with Farah.

Q Did you keep an Outlook calendar while you were at the NTSB?

A A bit. Not a formal -- I used Outlook, but not for everything.

Q Where would you keep a copy of your calendar?

A My calendar was mostly kept by my Executive Assistant or by our Receptionist, Stephanie.

Q How would they keep it, in what form?



A It was probably on the Outlook thing. I mean, we would look, but some of it was verbal, too.

Q Did they give you a schedule of your meetings for the day in advance?

A Not really.

Q So I just want to understand. You would show up at the NTSB having no idea what was on your schedule every day. You would just showed up and see what came --

MR. LUONG: Objection; argumentative.

Q -- is that right?

A No.

Q Okay. What I'm asking you is, what advanced notice did you have of what was on your calendar and in what form?

A There would be calendar items on my calendar, there would be meetings that occurred as required.

Q Okay. This was --

A It would be a combination of both. There would be --

Q The calendar items were on your Outlook



calendar, is that correct --

A Right.

Q -- at the NTSB?

A Right.

MR. OSWALD: Counsel, none of those have been provided to us. You'll of course get those to us expeditiously, correct?

MS. COHEN: If you send us a written response, we'll then consider it.

MR. OSWALD: Consider -- it's within the content for the request for production of documents. Nothing of that nature has been provided to us. May I have your commitment that you'll provide it?

MS. COHEN: If you send us a written request, we'll consider it.

MR. LUONG: I would agree with that. I mean, to the extent that you've made that request already in a document production, I assume that we've addressed that. And if we haven't addressed that, then we'll resolve that dispute. But if you're making a new request then I would ask you to submit it in a



written request.

MR. OSWALD: It's not a new request. We asked for that in a document request.

MR. LUONG: Again, if that's something that you did, then I'm sure that's something that was either responded to or we're in the process of trying to resolve at the moment.

MR. OSWALD: You'll resolve it expeditiously for me?

MR. LUONG: To the extent that that's a discovery request that you've already made, we will work with Plaintiff's counsel in resolving it, if there is a dispute as to this.

MR. OSWALD: I understand.

Q All right. Let's move to -- prior to April of 2004, when if ever did you communicate with Marjorie Murtagh Cooke about her performance or about any awards that NTSB was giving her, if ever?

A I don't remember one way or another. I tried to, the first year, meet with those who got bonuses, the Direct -- the Department Heads that got bonuses after the first appraisal -- I don't know if I

was able to meet with all of them or not due to scheduling -- just to say a personal thank you and, you know, you'll be receiving a bonus.

That was really all it was, just a way to say a personal thank you and that.

I don't remember if I met with Marjorie or not. That was the -- I guess that would have been the '03 appraisals? And I wasn't able to meet with everyone, so I don't remember specifically, but it would have been that time period.

Q Thus, when if ever did you meet or communicate with Marjorie Murtagh Cooke about her performance, including but not limited prior to April of 2004, including but not limited to any communications that you might have had about a year-end bonus in 2003?

A It would have been towards the end of 2003.

Q Where did this meeting communication take place?

A I don't remember it occurring, as I just stated. I tried to meet with as many of the Department Heads as scheduling would permit -- given



that it was the end of year, holidays, travel, accidents, et cetera -- to say the personal thank you rather than just have them have it in the check.

But I don't remember if I met with Marjorie then or not. I remember a couple of them, but I don't remember all of them.

Q Do you or do you not have a recollection of meeting with Marjorie Murtagh Cooke or communicating with her in any way about her performance prior to April of 2004?

MS. COHEN: Objection; asked and answered.

Q Yes or no?

A You would have to -- I mean, are you talking about a performance appraisal? I --

Q What is it you don't understand about my question?

A Well, I've tried to share with you that I don't remember if I was able to meet with her at the end of the 2003 appraisals or not.

I stated that I had tried to meet with the Department Heads. I tried to meet with all of them.



I don't know if I was able to do so, again, because of holiday scheduling, accidents and things like that.

So I'm trying to answer your question, but I don't know that I can go any further than that if I don't remember.

Q Well, my question is really broader --

A Okay.

Q -- than just the performance appraisals at the end of 2003.

A Okay.

Q My question is, when if ever did you meet or communicate with Marjorie Murtagh Cooke about her performance prior to April of 2004?

MR. LUONG: I'm going to object to the term "performance" as confusing and vague.

Q You may answer the question.

A I don't remember -- I'm having difficulty telling you what you're ask -- or responding to your question because I don't totally understand what you're saying.

Marjorie was in many meetings in which I was in with all the Department Heads. So it wasn't that I



didn't see her for a year or whatever you're trying to insinuate. And that's issue one.

There were discussions, at least one that I remember when we talked about accident report progress. I don't know if you want to -- how you define that.

I remember there was at least one meeting when we talked about how things were progressing on some accident reports. So, you know, so there were meetings with her, but I'm having trouble saying -- trouble responding to was there a performance meeting and I don't --

Q Okay. Well, let's define --

A -- recall specifically.

Q -- how do you define "performance meeting"?

A Well, I'm not -- I wasn't Marjorie's supervisor so, to a large degree, I wouldn't have a performance meeting with her because she didn't report to me, she reported to the Managing Director.

Q My question is, how do you define "performance meeting"?

A Well, from my perspective you're talking

about a formal appraisal or something like that. So I don't -- I didn't conduct a formal appraisal.
Q When if ever did you have a meeting with Marjorie Murtagh Cooke herself, just and you Marjorie Murtagh Cooke, prior to April of 2004, where you discussed or communicated with her about her performance?
MS. COHEN: Objection; asked and answered.
A I don't remember a performance meeting. As I stated twice, I remember -- at least, I remember meetings about progress on accident reports and where we were. Nothing is triggering --
Q I understand. In March of 2005 through March of 2006 when you left the NTSB, what was your title?
A I didn't leave in March of 2006, I left May 31st of 2006.
Q Of 2006? I understand.
A From March of 2005 until approximately December 7th of 2005 I was Chairman Designee. I had been renominated by the President to serve a second



term.
I withdrew my -- I requested my nomination be withdrawn in December of '05. I was a Board Member continuously through my Chairmanship, as well as I stated at the beginning it was a dual role, so my title was Chairman Designee from March through December of '05 and Member of the Board.
Q Between March of '05 and December of '05, how did your job duties change, if at all?
A Completely. The day I was no longer Chairman was the day I was no longer Chairman. I had no management responsibilities at all. It was only my Member -- Board Member responsibilities.
Q So it's your testimony today that your job duties between March of '05 and December of '06 when you were the Chairman Designee did not -- did change materially. You did not have any supervisory responsibility over the four -- Dan Campbell and others during that period of time, is that your --
A That's by law. The Vice Chairman became the acting Chairman and everything went to him.
Q And who was that?



A Mike Rosenberg.
Q All right. What were your job duties between March of '05 and December of '05?
A I was a Member of the Board.
Q And what were your job duties?
A The same as the other Board Members. My job was to be available for going to the accidents when required and necessary, job is to participate in the accident hearings, and your job was to participate in advocating safety, and going forward in working with our publics and constituents to forward the safety agenda for the organization.
Q Did you move out of your office?
A Yes.
Q Where did you move to?
A I moved to my former Chief of Staff's cubical outside my office.
Q And that was in March of '05?
A Mm-hmm.
Q So you were in a work station from March of '05 through May of --
A No.



Q -- '06?
A I was at a work station from March until December. While Chairman Designee, it's appropriate that you cannot use the Chairman's office nor the resources. But I wasn't a Member, I was a Chairman Designee.
The minute, or the day, that I withdrew my nomination -- requested my nomination be withdrawn, I moved to a Member's office. And I was in a Member's office from December until I left in the end of May.
Q I understand. Between March of '03 and March of '05, what conversations did you have with Dan Campbell, Joe Osterman or anybody else about retention pay for any of your subordinates, whether they be first-line or second-line subordinates?
MS. COHEN: Objection; assumes facts not in evidence.
A I think there was an investigator in Aviation, whose name I can't think of. I think there was a discussion about that. There --
Retention pay. I think that that's the only one -- I mean, I can't remember the name. It wasn't a

topic that occurred often and, in fact, it was a topic that was new to me. It wasn't a topic I had run into before.

Q And the investigator in the Aviation Safety, what was the contours of the conversation about retention pay for him or her?

A I just have a vague recollection. For some reason I won't even say it was a regional office person, but I don't remember one way or another. It was a person who was highly skilled, who they wanted to be able to retain. I mean, I don't remember that many other particulars about it and, again, that was a new topic to me.

Q And how did they propose to retain him?

A I don't remember whether it was an in-grade or a single payment or -- I'm not sure of the actual mechanism.

Q In-grade or single payment what?

A I mean, I don't know what the mechanism was. I don't know -- I don't remember exactly how a retention pay would be done.

I mean, I know that there are, you know,



mechanisms that one -- there are in-grades you can give, which means you move up a step in the pay, there's time-off awards and things -- I mean, there's a gambit of small, medium and large, I guess, ways you can offer it.

I'm not sure how the retention pay worked, but there was a single, like a bonus type of thing, or whether it would be like an in-grade or in-step in-grade or something where you would actually have a higher annual salary. I'm not sure.

Q All right. The -- when was this conversation relating to the investigator?

A Oh, I don't know. You asked within a two-year time period and I -- sometime in that two-year time period I do remember having one conversation, but that's the only one that really comes to mind about retention pay.

Q All right. Was it early in your tenure, late in your tenure?

A I don't remember.

Q With whom did you have that conversation?

A You asked me whether with Joe Osterman or



Dan Campbell, and I'm sure it was with one or both of them, but I don't remember specifics.

Q And did they bring it up or did you bring it up?

A I wouldn't have brought it up because how would I know about it?

Q And so why would they bring that up? Why did they tell you they were bringing that to you, Joe Osterman or Dan Campbell?

A I don't remember that they necessarily brought it up to me. I don't remember --

The Managing Director has an incredible amount of responsibility for the organization. The Chairman has a separate role for the organization. And there are places where the two worlds merge.

As I stated earlier, I would have informal conversations just kind of stand at the doorway, stop by hellos. I didn't have a lot of formal set meetings.

And so it would have been in the passing of a conversation if it was with Dan, which it was probably Dan but -- as I said, we would talk probably once a



day, but we didn't have a let's meet at 10:00 formal meeting with a formal agenda. Just whatever was in front of us we would deal with and then move on.

So I can't say that there was a request for a meeting on retention allowance for John Smith of the QXZ department, et cetera, so forth. I don't remember that type of event happening.

Q All right. When if ever did you have a conversation with Dan Campbell or anybody else about allocation of senior level positions?

A I had a couple conversations about that.

Q All right. The first conversation.

A I can't tell you exactly when it was. It was something that was a potential tool to utilize within the organization as we were trying to meet the goal of getting allocation of spots and this and that.

So that was a -- kind of something in your tool kit that we wanted to look into utilizing. It was easier to bureaucratically get an SL than it was an SES. And because the NTSB is a technical organization, and SLs are utilized usually for legal or technical positions without supervisory

Page 138

responsibility, it was a good tool that we thought that -- I was informed of -- I mean, again, learning through all this -- but it was something that we were looking at as something that we could utilize as we were trying to grow the organization and make it better.

Q Utilize for what?

A Utilize to get skilled people if we needed a skill set. Where we could do -- you know, we need a skill set. We could use this in order to lure someone who -- you know, be attractive to someone to either take on responsibilities, change their responsibilities, come to the organization for whatever reasons. It was a way of -- category of where we would have a high pay level and a way to get an SL.

Again, they were easier to bring into the organization to create the SL position than it was to get a new SES, because the SES, again, were that separate pool of positions that were difficult to achieve.

Q Beyond the higher pay level that you could

Page 139

offer with an SL, what were the other aspects of the SL that would lure someone -- that you could use it as a tool to lure someone to the NTSB?

A Well, I say lure. Attract I think is the better way. To make a position attractive is the way I would prefer to say.

The SLs were more technical based by criteria, and they could not be -- they were not supervisory positions. So there was -- in a government bureaucracy, there was an attractiveness to being able to have the higher pay and not have the day-to-day responsibilities of supervising a team and all the other stuff that goes with supervising a team or department or whatever. So it's more of a technical skill level type position.

Q So in either of the conversations that you had with Dan Campbell, what was the -- how were you and he or he to you suggesting to utilize this SL tool to attract potential individuals for with the higher pay associated with the SL?

A Well, we used it in one case to a current employee who was an SES to shift them from an SES

Page 140

position to an SL position, and then thus freeing up the SES. So that was one case where it was utilized.

Q And why did you do that?

A The individual in question was a highly talented individual who was not put in the best place for his skill set as a -- he wasn't a very good people person, but he was a very talented technical person. So with the concept of round peg in round hole versus round peg in square hole, the idea was good person, good skills, not a good place for him or the organization where he currently is and how it was working. But if this option was available, would they still be happy? Would they be better utilized? Would they be a happier camper? And would it also better the organization? And the answer was yes to both sides.

Q Where did you assign the S -- and you freed up the SES slot by offering this person an SL position.

A Mm-hmm.

Q Where did you then assign the SES slot as a result of being able to free it up?

Page 141

A I think it was Administration.

Q The Director of Administration position.

A Mm-hmm. I think that's where it went.

Q Other than Dan Campbell, who else did you have conversations about using the SL designation as a tool to attract potential candidates for positions and in some circumstances to free up SES positions --

A These conver --

Q -- for assignment elsewhere?

A These conversations probably occurred mostly between Dan Campbell, Ron Battocchi and myself, sometimes with David, sometimes not, who was my Chief of Staff.

Q David Clark?

A David Clark.

Q I understand. All right. Subsequent to April of '04 -- April, '04 through May of '06 when you left NTSB --

A Mm-hmm.

Q -- what conversations if any did you have with Joe Osterman about Marjorie Murtagh Cooke?

A Did I have with Joe. The only one that

comes to mind is when the Direct of Marine Safety was announced, and I asked Joe, "What's Marjorie going to do," or something to that effect. And he said she's going to be working in or is working in safety recommendations, I think is the conversation that occurred.
Q And that occurred at or about the time of the announcement?
A Yeah. It was after the person had been selected. So it wasn't -- it was more of a -- it was just conversation, it wasn't a meeting or anything. It was just a so --
Q I understand.
A Sorry. Hand gesture.
Q I understand. And how did you respond? How did he respond?
A What I just said. He said she's going to be or is working in safety recommendations, and I said, "Oh, good. That's with Elaine," or something to that effect.
Q What else did he say?
A That was really it.



(Engleman Conner Exhibit No. 2 - affidavit - marked for identification.)
BY MR. OSWALD:
Q Would you look at that and, in particular, turn to the last page for me?
A Mm-hmm.
Q Is that your signature on the last page?
A Yes.
Q Thank you. And this is Exhibit No. 2; is that right?
A Yes.
Q Okay. And what is that document?
A It's the Affidavit of Ellen Engleman Conners.
Q And when did you give that Affidavit?
A April 18th, 2005.
Q Okay. And in what context?
A This person called me up and requested the appointment, and we scheduled the appointment, and I gave the Affidavit at that time.
Q Thank you.



(Engleman Conners Exhibit No. 3 - signed document - marked for identification.)
BY MR. OSWALD:
Q All right. I'm showing you what's been marked as Exhibit No. 3. And I'm going to ask you to turn to page -- in the upper left-hand corner there's some numbers. The second to last page.
A Mm-hmm.
Q Is that your signature?
A Yes.
Q And this is Page 239; is that right?
A Mm-hmm.
Q And then the last page, 240 --
A Mm-hmm.
Q -- whose signature is that?
A Mine.
Q All right. Thank you.
A The signature is mine for Chairman.
Q I'm sorry. Say that again for me. The signature is yours but what?
A I scrawled the word Chairman. I'm saying the signature is mine, I mean, it's just -- it's



scrawled. I mean, I'm trying to figure out what the word was. So, it's Chairman.
Q All right. Is that your writing, as well, Chairman?
A I don't think that Chairman is my writing. I think the signature is mine. I can't tell because I have a big scrawl. So if I did, I just scrawled it but --
Q Okay.
A -- the signature is mine.
Q I understand. Do you have any reason to believe that you signed this at or about the same date that you signed here?
A Yeah, yeah.
Q November 13th?
A Yeah, I signed it, yeah, it just would have been scrawled.
Q You signed it the same day.
A I'm pretty sure.
Q Okay.
(Engleman Conners Exhibit No. 4 - Performance Appraisal Form - marked for identification.)

BY MR. OSWALD:
Q All right. I'm showing you what's been marked as Exhibit No. 4.
I'm showing you what's been mark as Exhibit No. 4. What is that document?
A NTSB Performance Appraisal Form.
Q All right. And let's look at the second page. Is that your signature?
A Yes.
(Engleman Conners Exhibit Nos. 5A and 5B - e-mails - marked for identification.)
BY MR. OSWALD:
Q I'm showing you what's been marked as Exhibit 5 A and B. Let's look at 5A for a moment. What is this document?
A It's a printout of an e-mail.
Q From whom to whom?
A Marjorie to myself.
Q All right. And what's the date?
A January 4th, '05.
Q And when if ever did you respond to this e-mail dated Tuesday, January 24th, '05? This is 5A.



A When did I respond? I don't remember when I responded.
Q Did you ever respond?
A I know we set up a meeting, the one we talked about earlier that I know I had to reschedule at least once. So yes, there was a response, but I don't know specifically. It would have been through David.
Q You set up a meeting to talk with Marjorie Murtagh Cooke as a result of her --
A David would have set up a meeting. I mean, he would have -- this would have been something I would have given to David.
Q Okay. And what did he tell you about setting up a meeting with Marjorie Murtagh Cooke as a result of the -- about the e-mail 5A sent by Marjorie to you on Tuesday, January 4th, 2005?
MS. COHEN: Objection; assumes facts not in evidence.
A I don't remember one thing or another. I mean --
Q Well, when you handed it off to him, did you



forward the e-mail to him? Did you print it out and give it to him? When you say handed off to him, what do you mean?
A I could have forwarded it, I might have said something verbally, I might have printed it and handed it to him and said handle this. This would have been one of 500 things we would have done in a day --
Q And what if ever --
A -- that I would have handed to David. So --
Q Okay. When if ever did David respond?
A I think it was David. I'm trying to think. When was -- did he go to Government Affairs?
I changed Chief of Staff at some point halfway through. So it would have been David or Patrick. It would have been one of the two. And I would have said, "set up a meeting," or, "handle this," or whatever. And they would have done it. I mean, they would have contacted or followed up or whatever.
Q All right. And when if ever did David or Patrick, your Chief of Staff, or whoever was your Chief of Staff in that position --
A He was my advisor, but yeah, that



position --
Q -- advisor.
A -- yeah, that position.
Q When if ever did they get back to you and tell you they had set up a meeting?
A I don't remember when. I remember that we had a subsequent meeting set, but I don't remember when they responded to me.
Q Okay. And then where was that meeting with Marjorie Murtagh Cooke?
A As I mentioned earlier --
MR. LUONG: Objection; asked and answered.
A -- we did not have that meeting. It was scheduled for my office. It would have been at my office, but we had to reschedule at least once. And again, as I said earlier, I don't remember if it was because of travel or something, but there was some reason I said, "Hey, we just need to reschedule."
Q Okay. But the only reason you rescheduled it other than -- what reason did you reschedule the meeting other than the fact that you had travel or

Page 150

there was some other conflict?
A That would have been why.
Q I understand. Let's look at 5B. And to whom did you refer Marjorie Murtagh Cooke's e-mail to? Tawanna Price was your Admin I understand; is that right?
A No, she was not my Admin.
Q Fine. Who was Tawanna Price?
A Tawanna Price was Admin for the Managing Director. I did not have an Admin at the time, so she filled in -- she did some things for me but not all.
Q I understand. To whom did you refer this e-mail that Marjorie Murtagh Cooke -- this is 5B -- sent on Friday, January 7th?
A I didn't. It wasn't sent to me, it was sent to Tawanna. I was CCed on this.
Q All right. So you did what? Did you follow up with Tawanna?
A No.
Q Why not?
A Because it was sent to Tawanna and Tawanna would have handled it. This was just a CC to me.

Page 151

This was to Tawanna so --
Q What did you understand Marjorie Murtagh Cooke wanted to talk to you about?
A Well, on which e-mail?
Q 5A.
A I didn't know. It says, "I believe I need to meet with you personally. Please let me know when you're available."
Q All right.
A So that doesn't give me any indication.
Q And on 5B?
A Well, I didn't receive 5B, I was copied on 5B. And it states, "Tawanna, I need to talk with the Chairman regarding my evaluation. Please let me know when she can fit me into her schedule. Thank you."
Q What did you understand Marjorie Murtagh Cooke wanted to meet with you about when she sent the e-mail Friday, January 7th?
MR. LUONG: Objection; I think that question mischaracterizes the document in Exhibit 5B.
Q You may answer the question.
A I don't remember what you asked. I didn't

Page 152

receive this, I was CCed on it. So I would not have made an opinion about the e-mail because it was not sent to me, it was CCed to me.
So I don't know when I would have even read the e-mail. I don't know if I read it the day it was sent or three weeks later.
I can't tell you what my state of mind was when I saw the e-mail because I don't remember when I would have reviewed the e-mail because, again, it was CCed to me, it wasn't sent to me.
So I don't have an opinion. I mean, I don't have an answer for you.
Q So how did you treat e-mails that were CCed to you differently than e-mails that were sent to you?
A If I was CCed then I was simply CCed, I was copied. It was not sent to me, and it was sent to Tawanna, and Tawanna would set the meeting up.
It was not rocket science here so --
Q When if ever did you ask Tawanna about when the meeting would be with Marjorie Murtagh Cooke?
A I did not supervise Tawanna. She reported and worked for the Managing Director. She was helping

Page 153

me out because I did not have Admin.
So I would not have been checking on her, or her assignments, or whether she had done something for me in the way that you're suggesting.
We have a very competent staff, things got done, I didn't need to micromanage or follow up on every one of the hundreds of e-mails that would come through my office every single day in order to follow up something as simple as a meeting request.
It would have been handled under normal operating procedures, and so I had great faith that what would need to be done would be done. This would not have been on my follow-up list.
Q Where did you keep your follow-up list?
A That was an illustrative statement. I do not keep a follow-up list. I was using that as an illustration of my comment or feelings at the time.
Q I see. Did you have a task list, To Do list?
A Occasionally I would keep an informal legal pad list of things. I didn't keep a formal To Do list.

Q Okay. When if ever did you follow up with Tawanna Price about Marjorie Murtagh Cooke's request to have a meeting with you that she sent by e-mail on Friday, January 7th at 5:14 p.m.?

MR. LUONG: Objection.

MS. COHEN: Objection.

MR. LUONG: Asked and answered.

A I do not believe I ever followed up with Tawanna Price on this request because I know a meeting was set. So I don't remember how the meeting was set, but I know the meeting had been scheduled.

Q I understand. When if ever, after you canceled the meeting with Marjorie Murtagh Cooke, did you ever follow up with Marjorie Murtagh Cooke to either reschedule the meeting or find out what about, either personally or her evaluation, it was that Marjorie Murtagh Cooke wanted to talk to you about?

MR. LUONG: Objection; compound. Are you asking about both exhibits now, Exhibits 5A and 5B? If you are, then we object. It's a compound and confusing question.

Q Do you understand my question?



A You're making assumptions in your question that are incorrect. So if I may say with respect, I did not follow up with Tawanna. I know a meeting was scheduled. I stated that I know that we had to reschedule it at least once, if not twice. I stated that had in my Affidavit.

It was a normal scheduling request. This was not a -- anything other than normal business procedure. The reason I was not concerned about it was because I saw Marjorie. I never -- I would see Marjorie. If it was such an urgent matter, there were many times when she could have said, "Hey, Ellen," or stay after a meeting, or approach me in the hallway, or in the ladies' room, or any number of times when we would share the same room or something like that.

I had a very informal opportunity. People would come to my doorway, walk right in, "Hey, Chairman. Can we chat?" "Sure."

There was so -- this was just standard. She was -- she sent in an e-mail, that's fine. But she could have just come right through the front door, that would have been fine, too.



Q And you would have been happy to meet with her under those circumstances.

A Yes.

Q Okay. I'm going to ask one more question here and then we'll take a break.

My question is, after you canceled the meeting with Marjorie Murtagh Cooke, and I understand --

A When I resched -- when I tried to reschedule the meeting. I mean, it wasn't canceled, there will be no meeting, it was can we reschedule. We need to reschedule.

Q All right. You canceled and then said we need to reschedule.

A Right.

Q All right. When if ever did you follow up with Marjorie Murtagh Cooke, with her personally, to reschedule the meeting that you had with Marjorie Murtagh Cooke sometime -- that you had scheduled with her sometime after January 7th of 2005?

A I did not personally contact her because I did not personally schedule the meetings. It was through either at -- this process would have been



through whoever was setting it up, whether it was Tawanna, or Patrick, or at the time I think -- or David.

I would not have stopped everything I was doing because I needed to reschedule a meeting. I would have had it rescheduled by someone who was supporting my scheduling meetings at the time.

So Tawanna -- again, I'm trying to remember if it was David or Patrick, it might have been Patrick at the time, would have just tried to find another time to reschedule.

Q I just want to make sure I'm clear. You didn't personally reach out to Marjorie Murtagh Cooke after the meeting was cancelled and attempt to reschedule; is that correct?

MR. LUONG: One second. I'm going to ob -- I think this line of questioning is confusing because I'm not sure what meeting you're talking about, whether the performance evaluation meeting or this meeting to discuss something personal. But I also think this question has been asked and answered.

Q Is that correct?

Page 158

A What's correct?
Q Okay.
A What is correct?
Q As I understand it, your testimony is that you did have a meeting scheduled with Marjorie Murtagh Cooke --
A Right.
Q -- sometime after the two e-mails that she sent you on January 4th and January 7th. My -- am I correct about that?
A There was a meeting that was scheduled, yes. I do not know if it was scheduled on January 5th, between the two e-mails, after the two e-mails.
Q But it was after the first.
A I would assume so because why else would we be scheduling a meeting?
Q Okay.
A So yes, deductively I'm going to say it would have occurred after the first meeting request, we would have scheduled a meeting.
Q All right. So sometime after June 4th --
A January.

Page 159

Q -- January 4th, 2005 --
A Right.
Q -- when you had a meeting scheduled with Marjorie Murtagh Cooke --
A Right.
Q -- when if ever did you personally reach out to Marjorie Murtagh Cooke and reschedule the meeting that you had canceled because of your schedule, conflict or otherwise?
MR. LUONG: Objection; asked and answered. I also think this is getting argumentative.
A I don't remember personally reaching out to her to reschedule what would have been normal meeting process. I believe it would have been someone on support staff, probably Patrick, or Tawanna in this case, or David -- and again, I just don't remember the names, this is over two years ago, I don't remember specifics of when the two switched off between David and Patrick.
Q I understand.
A I'll be happy for you to educate me accordingly to that time period. We had 435

Page 160

employees, and this was one meeting that -- it was a meeting.
Q I understand.
MR. OSWALD: Let's go off the record.
(Recess taken.)
VIDEOGRAPHER: This marks the end of Tape 2 in the deposition of Miss Conners. We're going off the record. The time it 2:15 p.m.
(Recess taken.)
VIDEOGRAPHER: This marks the beginning of Tape 3 in the deposition of Miss Conners. We are back on the record. The time is 2:35 p.m.
BY MR. OSWALD:
Q Beginning in March of 2005 then, what was it precisely that your role was -- other than your Board Member responsibilities -- between that point and December? As the Chairman Designate, who responsibilities did you have under that -- under that title, if any?
A Zero, none.
Q All right. Since you were also a Board Member, why is it that you didn't assume the office of

Page 161

a Board Member in -- as the other Board Members did between March of '05 and December?
A Because I was Chairman Designate.
Q So the responsibilities as the -- as a Board Member, what were your responsibilities, let's say in March of -- late March, early April of '05?
A As I stated earlier, we would be available for launching, for major accidents, there was a rotating weekly schedule, we would participate in the public hearings, in the safety symposium, we would do national advocacy for safety, specifically general speeches to the public upon request of associations and constituents, advocating pushing forward the safety recommendations that were -- we were pursuing, testifying in state legislatures, doing speeches, and general safety advocacy.
Q When if ever did your attitude towards Marjorie Murtagh Cooke change during your tenure of the Chairman of NTSB?
MS. COHEN: Objection; vague.
A I don't think my attitude changed towards Marjorie.

Page 162

Q What was your attitude?
A I mean, it was a positive, neutral -- I mean, it was -- I mean, I didn't have -- it was a positive, neutral attitude. Positive in that she was part of our professional staff, but I didn't have any outside a bell curve feelings one way or another.
Q Okay. When you say "positive, neutral," what was the neutral aspect of your attitude towards Marjorie Murtagh Cooke during the period of time that you were the Chairman from March of '03 through March of '05?
A I don't think I had any -- I mean, I don't believe I had any feelings -- my attitude was towards her professional role. So it -- you know, positive attitude towards her as a person, and positive neutral towards her and her -- her department was sometimes challenging. And so if you say from that perspective, there were some challenges within the department. The Marine Safety office, I guess you would call it.
Q I understand. My question relates to Marjorie Murtagh Cooke personally.
A I have positive neutral feeling towards her.

Page 163

I mean, I don't have any negative towards her. I didn't have any exemplary off the bell curve so --
Q All right. And your attitude towards Joe Osterman between March of '03 through March of '05. How would you describe your attitude towards him?
MS. COHEN: Objection; vague.
A Positive neutral. Positive is good person. He was probably our top -- or his office was probably -- he was our top performer. So maybe positive positive from that perspective.
But you said on a personal level. He's a good guy.
Q Okay. Did you think that Marjorie Murtagh Cooke was a good gal?
A No. I thought -- well, she was a good guy, too. I mean, I didn't see it as male versus female. He was a good person, she was a good person. Everybody at the NTSB was a pretty decent person.
Q All right.
MR. OSWALD: Nothing further.
MR. LUONG: Can we go off the record for a moment?

Page 164

MR. OSWALD: Sure.
VIDEOGRAPHER: We are going off the record. The time is 2:40 p.m.
(Recess taken.)
VIDEOGRAPHER: We are back on the record. The time is 2:49 p.m.
MR. LUONG: Ms. Engleman Conners, I just have a few questions for you.

EXAMINATION BY COUNSEL FOR THE DEFENDANT

BY MR. LUONG:
Q During your tenure as Chairman of the NTSB, did your duties and responsibilities involve any travel away from Headquarters?
A Constantly.
Q And what kind of things were you traveling for?
A Accidents, launch team accidents, safety advocacy, safety conferences, speeches.
Q During your tenure as Chairman of the NTSB, if you can quantify it, what percentage of your time do you think you were away from Headquarters on work-related travel?

Page 165

A A significant time. I also worked out of the -- we were trying to support the Academy, which is in Ashburn, Virginia. And I had kept an office there, too.
So I would work out of the office at the Academy a great deal of time, as well as the Headquarters office. That was to make a statement that the Academy mattered. And by having the Chairman have an office there, it was supporting the Academy.
So I was out of the office a great deal. So there would be official travel, accident launches, working at the Academy. I would say 50 percent.
Q Okay.
MR. LUONG: We have no further questions.
MR. OSWALD: We're done.
MR. LUONG: We'd like to read and sign, please.
MR. OSWALD: Sure.
MR. LUONG: Thank you.
VIDEOGRAPHER: This marks the end of deposition of Miss Connor. You number tapes used was

Page 166

three. We're going off the record. The time is 2:50 p.m.

(Proceedings concluded at 2:50 p.m.)

Page 167

ACKNOWLEDGMENT OF DEPONENT

I, ELLEN ENGLEMAN CONNERS, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

________________________ ________________________

(DATE) (SIGNATURE)

Page 168

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Ellen L. Ford, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of November, 2007.

My commission expires:
September 30, 2008

_________________________

NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA

Page 169

E R R A T A S H E E T

IN RE: Cooke -v- US/Cooke -v- NTSB

RETURN BY: ____________________________________

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

__________________ ______________________________

E R R A T A S H E E T C O N T I N U E D

IN RE: Cooke -v- US/Cooke -v- NTSB

RETURN BY: ______________________________

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |
| _____ | _____ | ______________________________ |

____________________ ______________________________