# EXHIBIT F

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MARJORIE MURTAGH COOKE, | ) | Case No. 06-748C |
| Plaintiff, | ) | Judge Thomas C. Wheeler |
| vs. | ) | |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

Volume 1

DEPOSITION OF

THOMAS E. HAUETER

Washington, D.C.

Monday, June 25, 2007

9:45 a.m.

Job No.: 1-106488
Pages 1 through 227
Reported by: John L. Harmonson, RPR

Deposition of
THOMAS E. HAUETER

Held at the offices of:
THE EMPLOYMENT LAW GROUP, PC
888 17th Street, N.W.
Suite 900
Washington, D.C. 20006
(202)331-2883

Taken pursuant to the Federal Rules of Civil Procedure, before John L. Harmonson, Registered Professional Reporter, Notary Public in and for the District of Columbia, who officiated in administering the oath to the witness.



APPEARANCES

ON BEHALF OF PLAINTIFF:
BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, PC
888 17th Street
Suite 900
Washington, D.C. 20006
(202)331-2883

ON BEHALF OF DEFENDANT:
MEREDYTH D. COHEN, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
8th Floor
Washington, D.C. 20530
(202)353-7978
KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202)314-6084

ALSO PRESENT:
LINDSAY BREEDLOVE, Intern



EXAMINATION INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MR. LOWINGER | 5 |


* * * * *

EXHIBIT INDEX
(No exhibits identified.)



P R O C E E D I N G S

THOMAS E. HAUETER,
after having been first duly sworn, was examined and did testify under oath as follows:

EXAMINATION

BY MR. LOWINGER:
Q. Good morning.
A. Good morning.
Q. My name is Brian Lowinger. I'm an attorney at the Employment Law Group, and we represent Marjorie Murtagh-Cooke in a litigation against the United States government for claims related to the Equal Pay Act, and I'm here to take your deposition today.
Could you please state your name for the record.
A. It's Thomas E. Haueter, H-a-u-e-t-e-r.
Q. And, Mr. Haueter, can you tell me what your position is?
A. I'm director of the Office of Aviation Safety for the National Transportation Safety Board.
Q. Okay. And can you give me your date of

Page 6

birth, sir?
A. 12/21/51.
Q. Mr. Haueter, just some ground rules for the deposition today. This is only going to be taken stenographically, so I ask that any time you respond to a question, that you respond verbally, "yes" or "no," not a nod of the head.
A. Okay.
Q. And because we're going to be doing this for a little bit of time, you may become inclined to nod your head. If that's the case, then I'm just going to ask you to restate your answer so that the stenographer can record it properly.
At the same time, certain verbal responses don't necessarily translate well on the record. For example, "uh-huh" can be yes or no depending on the circumstances, however you're looking at it. If that happens, I'll have to ask you to just respond "yes" or "no." It's nothing personal, but it's just part of the process.
At the same time, there are a couple of questions that I have to ask that are just part of the

Page 7

deposition process that are somewhat personal and not always my favorite to ask.
Have you ever been convicted of a crime?
A. No, I have not.
Q. Are you under any sort of medication in any way that affects your ability to hear, understand or respond to my questions?
A. No, I'm not.
Q. And you're not under the influence of any sort of alcohol or any other type of stimulant that would affect your ability to hear, understand or respond?
A. No, I'm not.
Q. Okay. And we'll be here for a while. I understand you need to take a break at a certain period. I think it's at 12:00 o'clock.
A. Yeah. Or 12:30. I have a meeting with our chairman to get to.
Q. Okay. We're going to take a break for that. If you need to take a break during the interim, please just ask. The only thing I ask is that you let me finish the question and you respond to the question

Page 8

before we move on, before we move to a break or do anything else. Okay?
A. Okay.
Q. At the same time, your attorney may interject -- may state for the record that she has an opposition to a certain question, et cetera. It will be an objection of sorts. The objections are part of the process. You're to just answer the question, and then we'll let the court decide whether the question should stand or not. Okay?
A. Okay.
Q. And I think that's pretty much all for the ground rules.
Oh, the other thing is this, actually. If you don't understand the question, or if you didn't hear it, or if you want it restated, just please ask me. Otherwise I'll assume you heard it and you understood it. Is that okay?
A. Yes.
Q. Very good.
Can you please tell me when you began working at -- and we're going to call it NTSB, and

Page 9

that's going to be National Transportation Safety Board. When did you begin working at NTSB?
A. In December of 1982.
Q. Okay. And --
A. '83, I'm sorry.
Q. December of 1983. And what was your first position there?
A. I was an analyst in what was then the Safety Recommendations Group.
Q. Okay. And what type of analyst?
A. Basically reviewing our recommendation process, responses back from Federal Aviation Administration, and coming up with whether the proposed response was acceptable to the recommendation we provided.
Q. Okay. How did you ever end up at NTSB? Can you tell me your background that led you to NTSB?
A. Going back, I was working for a company called Tracor, Inc. out of Tysons Corner. They went Chapter 11, I was looking for a job, and a friend recommended that I apply to the NTSB based on my background.

Page 10

Q. I see.
And what is your background, sir?
A. I have a degree in aeronautical engineering. I also have a commercial pilot's license. And I have an MBA in operations research.
Q. So your degree is a Bachelor of Science or a Bachelor of Arts?
A. Bachelor of Science.
Q. From which university?
A. Purdue.
Q. So you have a Bachelor of Science in aeronautical engineering --
A. Aeronautical and astronautical engineering.
Q. So you have two --
A. It's one degree.
Q. It's one degree. And you have an MBA in --
A. Operations research. That was from George Mason University.
Q. Okay. And was there a third one, you said?
A. No. I also have a pilot license to go along with that.
Q. Have you ever flown commercially?

Page 11

A. I flew a 135 briefly many years ago.
Q. What's a 135?
A. A 135 is basically a charter air carrier.
Q. I see.
So your first position was as an analyst in the Safety --
A. Safety Recommendations Group.
Q. And how long were you an analyst for the Safety Recommendations Group?
A. Oh, about two years.
Q. Okay. Can you tell me what you did as an analyst in the Safety Recommendations Group?
A. Well, basically it was looking at recommendations being proposed to the Board to see if they're in a format that's worthwhile, understandable and could be acted upon by one of the regulatory agencies. Secondly, to look at incoming correspondence, mostly from the FAA, in response to a recommendation to see if that met the intent and then whether that action was acceptable or unacceptable to the Board.
During the course of that I would have to

Page 12

work a lot with the investigators in charge and the technical people in whether or not this was meeting their intent when they wrote the recommendation.
Q. Okay. And when you say you were an analyst, were you an analyst only for aviation issues, or was it for other issues as well?
A. Primarily aviation. Occasionally they would get into a bit of a crunch and I helped out in a couple of other modes. That was kind of rare. A couple of highway cases I can remember. But it wasn't very many.
Q. I see.
And for two years you were an analyst, and that was beginning in '82?
A. '83.
Q. '83, I'm sorry. And after that, what was your next position?
A. I was moved over to become a structures investigator.
Q. Can you describe to me what a structures investigator is?
A. Basically, going on scene to major

Page 13

accidents, documenting the wreckage, documenting the wreckage path, writing a factual report on the structures phase, the investigation, and writing an analysis report pertaining to the structures investigation. I also did maintenance records examinations back then, too.
Q. Okay. And what type of accidents were you investigating?
A. Basically air carrier. For instance, the 737 where the top peeled off in Hawaii, I did that. I did several accidents in Alaska, commuter accidents in Colorado. It just covered the Board of air carrier-type accidents.
Q. I see.
So you would go to the investigation, you would go to the wreckage site, and you would document the wreckage and what was on the ground or what was left over?
A. Well, you document the wreckage as it came to rest, document; all the ground scars, all the marks that came in there; examining components, whether there was structural failure before impact, looking

for fatigue, overload. Kind of a typical structures examination.
Q. What is fatigue overload?
A. Well, there's fatigue failures, which is a long-term buildup of stresses that cause cracking. And overload is just instantaneous, that for whatever reason the part was loaded beyond its capability and just broke.
Q. Okay. And then you do an analysis --
A. Uh-huh.
Q. -- after you've documented what you saw, the scars on the ground, looking at the components, the structure failures, the structural overloads. You would actually start drafting an analysis. Can you describe to me what you did as part of that?
A. Basically, all of our investigators do two reports. One is a factual report of the on-scene and any additional efforts that happen after that, and then they also do an analysis of what they believe is the documentation they found that could be pertinent to the investigation.
So the analysis is basically built on the



factual but how that could have been, you know, part of what happened in the accident sequence.
Q. Okay. And then you said as part of that, the next thing is I think you said you did a manual --
A. I also did maintenance records.
Q. Maintenance records. But those aren't necessarily part of the wreckage investigation for the structure investigator; is that correct?
A. That's correct. It's not a typical structures investigator job, but occasionally I would jump in and do that.
Q. Okay. So as a structure investigator, you went out into the field, you did your investigation, you did a factual analysis, and then -- a factual report and then an analysis. And what else is involved in the job?
A. Also involved in the job would be, say, going to the manufacturer, taking a look at the drawings, the engineering analysis of how the part was created, doing teardown examinations of different components, doing an analysis of whether the structure was adequately designed. It really depends on each



investigation as to what to go look into.
But there's a fair amount of travel to manufacturers, to operators, to how the part was installed, how it had been maintained over the years, looking at the background of the piece, whether it had been on a previous airplane before.
Q. Okay. So you go to the manufacturer, you go to the operator, and you do a teardown of the part to determine whether or not it's been installed and maintained properly.
A. Uh-huh.
Q. What else is involved in the factual report and the analysis?
A. It can also involve doing a structural examination and doing detailed calculations of the strength of the component.
Q. Okay. How long were you a structures investigator?
A. About two years.
Q. And what was your grade at that time?
A. I'm trying to remember. 13, 14.
Q. Okay. And so now you did two years as an



analyst, and then you did another two years as a structures investigator. And then what was your next position?
A. I became an investigator in charge.
Q. Can you tell me how long you were an investigator in charge?
A. Boy. I'm trying to think. From late 1988 until about '96.
Q. Okay. And which offices were you an investigator in charge for at NTSB?
A. Just the Office of Aviation Safety, OAS.
Q. When was the Office of Aviation Safety created?
A. There were -- I'm trying to remember. There were two offices before that. There was the Bureau of Technology and the Bureau of Investigation, and approximately '89, '90, the Office of Aviation Safety was created.
Q. Okay. And were you in the Bureau of Technology or the Bureau of Investigation?
A. Well, I was in both. Originally, as a structures person, I was in the Bureau of Technology,

and then when I became an investigator in charge, I was in the Bureau of Investigation.
Q. Okay. What happened that there was a Bureau of Investigation that was eventually created into an Office of Aviation Safety?
A. Prior to that, the Board had a matrix management approach where people could be moved around between modes; you know, whether it was aviation, pipeline, railroad, whatever. And when they created the different offices, they broke it out to people would be dedicated to aviation and people would be dedicated to the other modes.
Q. I see.
And so can you tell me what an investigator in charge -- the duties and responsibilities of an investigator in charge?
A. An investigator in charge is basically responsible for the overall accident investigation; in this case all major air carrier events, air carrier being the large commercial air carriers and then also regional airlines back then, corporate aircraft. Basically the larger airplanes.



And in that, he's responsible for the investigation and all the different specialists. Structure, systems, operations, meteorology, cockpit voice recorder, flight data recorder, and it goes on from there, reports to the investigator in charge.
Q. Okay. Now, I want to make sure I understand the terminology here, because every case is different and every case involves different terminology.
You said all major air carriers.
A. Right.
Q. What is major?
A. Major air carriers would be what is referred to as 14 CFR Part 121. That would be your United, your American Airlines, things like that, the larger air carriers. It also includes foreign airlines, the larger ones. They would get into what are regional airlines, which are now in Part 121 but were 135 way back then, and these are what now you see as the Comairs, the ASAs. They have now grown to be fairly substantial airlines of their own.
Q. Okay. Let's make sure we understand what a



major air carrier is, because I'm going to ask the question for the period 1988 through 1996 and then from 1997 through 2005.
A. Uh-huh.
Q. So has there been any change in the definition of "major" between 1988 and 2005?
A. Major in what term?
Q. As far as major air carriers for accident investigation purposes.
A. Only slightly in that there was a -- the FAA moved most of what used to be the commuter airlines into 121, and therefore a lot of the commuters, by definition, became major air carriers, and some of them have even since grown to be major air carriers. And some of the bigger air carriers have gotten smaller over the time also. But for the most, we're talking operators of jets with fleets more than eight.
Q. Okay. So as an investigator in charge, your responsibility is to -- you're in charge of the investigation team for all major air carrier accident investigations, and that's large air carriers, certain



regional carriers, corporate jets and --
A. Also foreign-operated airlines. Our IICs, investigators in charge, also are accredited reps in overseas travel, which is a fair amount, and will go overseas to support a U.S.-operated aircraft, a U.S.-manufactured aircraft, a U.S.-registered aircraft, and in a few cases we have gone overseas to support foreign countries upon request. And our investigator in charge then kind of changes hats slightly and becomes a U.S. accredited representative.
Q. Okay. So we have large air carriers, regional air carriers, corporate jets, certain foreign investigations, being those operated, manufactured or registered in the United States or those where the United States, upon request of a foreign country, goes to the foreign country and investigates an accident, at which time you become an investigator representative?
A. U.S. accredited representative.
Q. And are there any other types of aircraft accidents that you investigated from 1988 through 1996 as an investigator in charge?

A. There's occasionally also smaller aircraft, depending on personnel involved. I did the accident involving Senator Hines when he was killed up in Pennsylvania. It was a midair collision between two small aircraft. Because of the visibility, they decided to send an investigator in charge to do that one rather than one of our regional investigators.

So occasionally an investigator in charge can do other cases, depending on visibility.

Q. When you say "visibility," you're not talking about visibility in the air. You mean visibility in the press?

A. Visibility in the media, who was on board, yes.

Q. Okay. So a senator. What other type of people or individuals would normally take --

A. Oh, if you get -- obviously a senator. People from the entertainment industry; they're very well-known. It just depends on who may be on the aircraft. We did a Learjet at Dulles where the people on board were connected to the president of Mexico at the time.



Q. I see.

Now, when you say corporate jets, I'm not sure I understand that. Corporate jets, to me, there is a whole world of corporate jets, a whole industry of corporate jets these days. I know, for example, certain people have timeshares in corporate jets, certain people have their own corporate jets, certain people rent a jet for a day, et cetera. It's a whole industry that is reported all the time.

Can you explain to me what type of corporate jet accidents the investigator in charge would investigate?

A. Well, we wouldn't necessarily care who the owner was or how the aircraft was -- whether it was timeshare or outrightly owned, whatever. We would investigate it. If we have an accident with an aircraft that is a jet airplane, usually more than six fatalities, we'll do it out of headquarters with an IIC and the ownership really wouldn't matter to us.

Q. All right. So how many fatalities -- With regard to corporate jets, it's just a matter -- Is this a fair characterization? It's a privately owned



jet that's not associated with a major carrier, not associated with a foreign government, and it's not associated with a famous person but it's a privately owned jet that has an accident and has a certain number of fatalities or --

A. It could be corporate owned also. But the old rule we had was that if it was a jet operation with six or more fatalities, it was handled from headquarters. With less than six, it was handled by our regional offices. That number has varied over time. Once again, like with Senator Hines, that wasn't a jet. It was a piston-propelled aircraft. There were only three on board. It did impact a helicopter with two on board it. So it didn't meet that rule, but because it was a U.S. senator, we handled it out of headquarters.

Q. Okay. So the issue isn't necessarily -- Okay, let's see if I can ask it a different way.

Assuming there is no one famous on board this privately owned jet, from late 1988 through 1996 what was the standard for investigating a corporate accident?



A. It wasn't really a standard. It was more of a policy of the six fatal. If it were more than six -- six or more fatals, it would be handled out of headquarters. Less than six, it would be out of the regional offices.

Q. So the standard is basically six or more?

A. For a headquarters launch, right.

Q. Is that only for corporate jets, or is that for everything? For example, if Northwest Airlines has an entire plane full of people and there is an accident but you have five people -- only five people die, does that mean headquarters isn't involved?

A. No, if it was an air carrier, it's definitely headquarters.

Q. Okay. So the standard of six is really for non-air carrier, non-foreign government, non-regional --

A. For the most part. And like I said, it's not really a standard. It's kind of a policy we use. And we've varied that a lot depending on workload and what might be going on.

Q. Okay. And from 1988 through 1996, what was

your rank? What was your grade?
A. 14 and then 15.
Q. When were you a 14 and when did you become a 15?
A. Oh, boy. Certainly in '88 I was a 14. And probably in '91, '92, I became a 15. I really don't remember.
Q. Okay. And did you -- did you -- when you became a 15, or even as a 14, were you moved up by step each year, or did you -- How did you rise to the rank through 14 and 15? How does that work?
A. Basically, of the 14s, with the investigators in charge, they had investigators in charge and senior investigator in charge, basically based on merit. And in fact, at that time all the investigators in charge were made 15s.
Q. Okay. At what point in time were all the investigators in charge made 15s?
A. About the '91, '92 time frame.
Q. Okay. So in 1991 or 1992 time frame when all the investigators in charge became 15s, was there an abolishment of the senior investigator in charge status?
A. Not quite. There was still a potential for having 14s becoming part of what is the Major Investigations Group, and they would be assigned to some of the lesser cases until, you know, they had enough time and experience that they could move up and be a senior investigator in charge. We haven't done that in a while, but the potential still exists.
Q. And for the investigators in charge from that period, from 1988 through 1996, how often were you -- Can you describe to me what's involved in being the investigator in charge?
MS. COHEN: Objection; asked and answered.
BY MR. LOWINGER:
Q. So we talked about the type of work that you investigate, the type of accidents. Tell me what the investigator in charge -- the scope of responsibilities of the investigator in charge with regard to putting together a team for investigating an accident.
A. Well, the investigator in charge, they're on duty 24 hours a day, seven days a week for whatever period of time, usually a week or two. During that time frame they would take calls regarding events that may have happened. Once they heard about a major event, they would immediately contact the chief of the Major Investigations Division, the director of Office of Aviation Safety, the managing director and the chairman, informing them of the accident and what plans were being made to launch a team.
Back at the time frame we're talking about, the investigator in charge would put together a team to respond. Also make hotel reservations and sometimes airline reservations to get everyone there. But the first part was sorting out how many people needed to go depending on the disciplines, the size of the accident, and then getting them heading to the accident site as quickly as possible. Also coordinating with the airline, the manufacturer, the unions, the local police, our regional office that may be able to respond quickly.
So there's a huge amount of activity that happens in those first three or four hours.
Q. Okay. And this is what I don't understand. Maybe you can clarify for me. Who gets the call about an accident, an airline accident? Who gets the initial call that there is an airline accident that involves NTSB?
A. Usually the investigator in charge. Nowadays our com center may get called first.
Q. How do people know to call the investigator in charge? How does that work? Explain that process.
A. Well, basically there's two ways. Nowadays with our communications center it's fairly easy. The communications center --
Q. Wait, hold on a second. From 1988 through 1996, how did you know?
A. Back in those days we were using the FAA's communications center.
Q. I see.
A. And so the FAA, because of their towers, aircraft control towers and their people. Also CNN, radio, whatever, would hear there is an accident and they would call the investigator in charge and inform him.
Q. Okay. So the investigator in charge gets

this call. Who is the first person the investigator in charge calls afterwards?

A. Almost simultaneously trying to get ahold of the chief of Major Investigations and our chairman of the Safety Board. Our structure has changed a bit with our com center nowadays.

Q. When was the com center created, sir?

A. Gee. '97, '98.

Q. Okay. So you get a call. In the first three to four hours you call the chief of Major Investigations. Is that someone who is only in Aviation Safety, or is that a general position?

A. It's only Aviation Safety.

Q. So there is a chief of Major Investigations. Then you call the chairman of the Safety Board. When did the investigator in charge actually call the person in charge of Aviation Safety, the person you are now?

A. Well, back then, the chief of Major Investigations would contact the director of the Office of Aviation Safety. We were somewhat phone-limited back in the old days, so we would -- you



know, making that call, he would also be responsible for calling the managing director, the chairman, getting them involved, while the investigator in charge was trying to round up the team to go to the scene.

Q. Okay. So the investigator in charge calls the person in charge of Aviation Safety, and then the director of Aviation Safety would start making calls to the chief of Major Investigations, the chairman of the Safety Board and other high-ranking officials while the investigator in charge would be making calls to assemble the team and figuring out what's actually happening on the ground?

A. Usually the investigator in charge will call the chairman. He could call the chief of Major Investigations and the chairman to let them know right then. And then the chief of Major Investigations would get ahold of the managing director and the director of the Office of Aviation Safety. But we were just trying to get everyone informed as fast as we could.

Q. Was there a policy in place at that time?



A. Yes, we had an investigation manual.

Q. And that would tell everyone who to call first and the chain of command for calls?

A. Uh-huh.

Q. Okay. Is there an investigation manual in effect these days for Aviation Safety?

A. Yes. It's available off our website.

Q. And are you aware of whether or not there are investigation manuals for the other modal offices as well?

A. I have no idea.

Q. And then you assemble a team --

A. Uh-huh.

Q. -- in the next three to four hours. And you mentioned you called the unions?

A. Right.

Q. You call the police?

A. Uh-huh.

Q. Did the investigator in charge have any special training with regard to labor issues and unions in order to get the team assembled, or was it just call the union and get as many people out there



as possible?

A. There no was special training. We just knew to call -- For instance, with most airlines, you have just the APA, the Airline Pilot Association. We kind of know who the unions are; the Teamsters, the machinists union. So we know who these folks are. We obviously have the manufacturer, Boeing, Douglas, Airbus. So we sort of know who the main players are.

Q. Okay. So you call them. What's the purpose of calling them?

A. The Safety Board works on a party system. We have parties to the investigation. We're a very small agency, and therefore we allow outside parties to provide technical assistants to participate in the investigation. And certainly we need the manufacturer, the airline, people that maintain the aircraft, people who flew the airplane to be part of our team.

Q. Let's get a list of everyone involved from the party system in an aviation accident, a major aviation accident.

A. Uh-huh.

Q. The machinists?
A. It can be. It can be the manufacturer.
Q. Manufacturer of what?
A. The airplane.
It can also break down into manufacturer of components. We can get into engines, systems, avionics. So whatever group we may have there. We have had manufacturers of hydraulic fluids, manufacturers of grease.
We then get into, say, the operator of the aircraft. We may have a different company that's maintaining the aircraft. That happens occasionally.
We then have the union representing the pilots, the union representing the flight attendants, the machinists union, and then other experts or people we believe should participate.
Q. From 1988 through 1996, was the Federal Aviation Administration involved as part of the party system?
A. They're always involved, yes.
Q. How is the Federal Aviation Administration -- We'll call that the FAA from now on,



if that's okay with everyone at the table.
How is the FAA, from 1988 through 1996, how were they involved in the party system once there was a major aviation accident?
A. The same as it's always been, is that they're automatically a party to the investigation. That's by statute. So they'll send people to the scene to also participate in the investigation.
Q. What I don't understand is, what is their role in the party system?
A. Their role is twofold. One, they are responsible for the certification and regulation of the airline, the operation and everything else. Two, and most importantly, if we find something wrong in the process, they're the organization that can effect a change immediately. They can issue directives; they can suspend licenses. So if we find something awry in the investigation, the FAA can take immediate action to correct the issue and improve safety.
Q. How does NTSB -- Describe the working relationship, I guess the hierarchy for NTSB and FAA from 1988 through 1996 as part of the party system for



a major airline investigation.
A. We have basically -- The FAA has an office, a safety office, that is sort of our counterpart. We work directly with them on a regular basis. So when we're notified of an accident, we tell them and they'll assign one of their investigators to participate in the team. They'll also make available specialists from certification or other parts of the FAA. It could be in terms of fire, aircraft response, fire fighting. Different areas of the FAA will provide experts to be on the team.
Q. Okay, so these experts are on the team. Who is in charge of the FAA experts? Is the FAA in charge of the FAA experts or is the NTSB in charge of the FAA experts?
A. The NTSB is in charge of the investigation. Each party to the investigation provides a party coordinator. So the FAA would have a party coordinator who works directly for the investigator in charge, who is an NTSB person. And there will then be specialists assigned to the group, and some of the specialists may be with the FAA.



Q. Okay. At what stage does the jurisdiction of the two differ that involves a different scope of responsibilities as part of the party system?
A. It doesn't. When they're part of our investigation process, the people assigned have no regulatory authority. That's part of the agreement we have with them. So they work for the Safety Board. They're participating; they're helping us in terms of they're on the teams. We put together factual reports. They're reviewing the factual reports. So basically, they work for us for all intents and purposes.
Q. You mentioned an agreement as, you said, "part of our agreement with them." Is there a written agreement between NTSB and FAA?
A. There is an MOU, yes.
Q. There is an MOU. And when was the MOU entered into?
A. Oh, gee. There's been several updates of it. There's one from '92 that was updated again in '97. We're in the process right now of going through it again.

Q. And is that on the web?
A. Not that I'm aware of, but I don't know.
Q. Who negotiated the MOU?
A. Oh, gee. The managing director and the chairman. It was way back when.
Q. So the managing director of --
A. National Transportation Safety Board.
Q. And the director of?
A. Well, it would be the director of Office of Aviation Safety, the managing director, the chairman of the Safety Board. In terms of the FAA, the last one was assigned by the administrator. That's been a while.
Q. Who is the administrator? What do you mean by that?
A. The head of the FAA.
Q. So the head of the FAA.
So the MOU is negotiated by the chairman of the Board for NTSB, director of the Office of Aviation Safety, and the administrator of the FAA?
A. Well, I'm not sure; it's changed over time. There were several MOUs. Some were signed by the



chairman and the administrator. Some were signed by the director of the Office of Aviation Safety. And I can't remember the FAA. There's various pieces of them.
Q. I'm not necessarily concerned about who signed them. I'm concerned about who negotiates.
A. That I'm not sure of. The actual negotiation, I'm not sure who was involved.
Q. At any time between 1997 and 2005, were you involved in negotiating an MOU with FAA?
A. No. What was the end date?
Q. 2005, June 2005.
A. No.
Q. So we talked about the party system and who is involved in the party system. Is there anyone else other than the manufacturers of the airplane, the components, the engine, the systems, the avionics, the hydraulics, any other fuels involved, the operator of the aircraft, the maintenance group of the aircraft, the unions representing all the employees involved with the aircraft. Who else is involved in the party system?



A. Whoever else we believe can provide us technical expertise for the investigation.
Q. Would that include -- For example, who else could that include for your average investigation?
A. It depends greatly. It's hard to say average. We could bring in specialists from universities. We've brought in specialists from other corporations. Whatever we believe we need for the investigation. So we could expand the parties as broad as necessary. We could bring in technical expertise as we need.
Q. What about the local police? How are the local police involved?
A. The local police and, say, national guard, state police mainly are providing security services on scene. When you're on the scene of the investigation, they're keeping out the crowd control and providing the security. After we leave the scene, they basically are no longer part of the investigation.
Q. Once you leave the scene. I'm not sure what you mean by that.
A. Well, you're at the accident scene where



the accident happens. At some point you've collected all the available information there and the wreckage is removed and taken elsewhere.
Q. Uh-huh.
A. At that point it's either locked in a secure facility or at that point the Safety Board says we no longer need it. But until that time there is local security to keep people from wandering in and picking up parts or just hanging around.
Q. Okay. So does that require constant coordination with the local police?
A. Oh, yes.
Q. I would assume the local police needs the staff, and that has to take time as well?
A. It depends on the accident. It can be a few people, it can be a large amount. We've done accidents where we've had the national guard, the local police. We've had a huge amount of fire department show up. They put together a combined command center to control all this. It can be a large amount of local responders assisting us at a distance.
Also, in wreckage recovery, sometimes

they'll provide assistance there, actually picking up the parts and putting them in a truck to be hauled off.

Q. What is wreckage recovery?

A. It's actually picking up the pieces. After we're done examining them, we'll take out the parts we want to do additional examination with. Then you'll have the remainder of the structure that we no longer need. And it may be moved to a hangar somewhere, and we'll work with usually an insurance company or local authorities to have the wreckage picked up, put on a truck or flatbed, and moved to wherever we want to put it.

Q. Who does wreckage recovery work for?

A. It depends. If we've released the wreckage, they work for the insurance company. If we still maintain the wreckage under the control of NTSB, they work for us, in which case we're controlling the movement of the wreckage to a hangar or some other facility for examination.

Q. Is wreckage recovery just a general term for a private group that picks up these pieces of --



A. It can be a private group. It can be a government agency. It depends on each case. Sometimes at that point when we're talking to the insurance company, the insurance company will hire somebody who is equipped to come in and pick up the wreckage under our control and take it elsewhere.

Q. All right. Once you're off the scene, you know, you've left the scene of this accident, from 1988 through 1996, what are the next steps for the accident investigator in charge?

A. The on-scene depends. It can last a week, two or three weeks, in some cases go on for months. That's really the tip of the iceberg. There is a huge amount of activity that happens after we leave the scene of the accident, after it's picked up and the site cleaned.

We'll go to manufacturers and use their flight simulators to do reconstructions of the flight. We'll bring components in for teardown. We'll do desktop simulations of the flight. There is a huge engineering analysis that goes on. It just depends on what we need for the investigation.



Q. So you go to manufacturers.

A. Uh-huh.

Q. You do simulations. You do desktop work. I'm not sure what that means.

A. Desktop work is doing computer analysis nowadays. You can take the flight data recorder and examine it. We can do a finite element analysis of the structure. We can do just regular energy analysis of the structure. We can take a look at the engine performance characteristics. Whatever is required. The engines will go to the manufacturer for teardown. Various hydraulic systems will go to those manufacturers for teardown. Other parts will go back to the main manufacturer for examination. Nowadays in a global environment a lot of these parts are made overseas, so our guys will have to go overseas to the manufacturers for examination.

Q. Okay. How does -- From 1988 through 1996, how did the reports get created?

A. Well, basically, each group chairman would create a factual report and an analysis of their specific area. Up until, oh, about '97 or '98, the



investigator in charge would write the final report, would draft it for the Board. So he would take the factual reports and convert those into one factual report, and then create an analysis report to provide to the Safety Board.

Q. What happened in 1997 through 1998?

A. We created the Report Writers and Editing Division. So we have a group of people now who are dedicated to writing reports.

Q. Is that the Report Writers and -- What is it called?

A. Report Writing and Editing Division. That's within the Office of Aviation Safety.

Q. Is that only for major accidents?

A. No, it can be for anything. They also do pure recommendation letters. Any report going to the Board goes through them, even our regional reports, which can be one or two pages. Notice of proposed rule-making. Anything that happens to go to the Board will go through the Writing and Editing Division. The biggest product, obviously, are reports.

Q. You say notice of proposed rule-making.

What is the Office of Aviation Safety's rule with regard to notices of proposed rule-making?

A. If we've issued a safety recommendation and the FAA has put it out for comment, we'll then comment on those.

Q. And the commenting is done by the Report Writing and Editing Division?

A. The comment itself is first created by an investigator or an investigator in charge, and then the report writers will clean it up and make it a little easier to read.

Q. So from the period 1988 through 1996, you wrote all of these factual reports for all these -- you wrote the factual and analytical report for the Board?

A. As the investigator in charge, I would create reports for the Board, yes.

Q. Okay. So you put it all together. Did anyone review it?

A. Oh, yes.

Q. Who would review it?

A. It would be reviewed by the -- All the



group members would review it, certainly; all the group chairmen. It would be reviewed by the chief of Major Investigations. It would be reviewed by the deputy director of Aviation Safety and the director of the Office of Aviation Safety. Then eventually it would be reviewed by the managing director, the director of Research Engineering, the director of Safety Recommendations and our general counsel before it was then cleaned up and went to the Board.

Q. So at each of those steps that you just mentioned -- I think there was like ten steps. I want to make sure I get it all.

A. Uh-huh.

Q. The chief of Major Investigations, the managing director, the Office of General Counsel, the Office of Safety and Recommendations. Who else is involved?

A. It's not really steps. The director of Research Engineering, director of Safety Recommendations, managing director and general counsel would get it at the same time. That would be the latest version that they would take a look at.



Prior to that it would be reviewed within the Office of Aviation Safety by the director, deputy director, the division chiefs within the office, and then also by the group chairmen that were assigned.

So it's only like about three steps in the process, maybe four.

Q. Okay. So the directors of Research and Safety and Engineering, the managing director and the general counsel is one step. Then there's steps within OAS, which is the director, the deputy director, the division chiefs and group chairmen. What is the third step?

A. I'll go back. The first step is the investigator in charge creates a draft. He then puts it out to his people that worked on the investigation, which would have been the group chairmen and the division chiefs of Aviation.

The next step from that after changes or whatever, the report would go on to the director and deputy director of the Office of Aviation Safety. Once they reviewed it, the next step would be to go to the other directors, which is the director of Research



Engineering, director of Safety Recommendations, general counsel and our managing director for their review before it went to the Board.

Q. A lot of changes along the way?

A. It can be. It depends.

Q. Is it a burdensome process?

A. It is, but it gets good results.

Q. When you say it's burdensome, how is it burdensome?

A. It's just time consuming. There's a lot of -- you know, a lot of meetings, a lot of going through all the review process. It can be challenging at times.

Q. When you say "challenging at times," you mean because people want changes that -- I guess there would be politics involved because people want to make sure that their agency's recommendations are well represented and --

A. No, not politics involved. It's all internal to the Safety Board. But certainly the general counsel may see things that the investigators didn't, because we're all engineers. Safety

Recommendations may see things from a different point of view than the managing director may just in terms of the flow of the analysis.
So it's difficult to create a document and then have people make changes to it and then go back and try to mold it in. But it does turn out in the end a very good product.
Q. I see.
And you said it's a time-consuming process before it gets to the Board. How long?
A. The report-writing process can take five months.
Q. Five months?
A. Yeah.
Q. Is that an average?
A. Yeah, that's about the number. For a major report, that seems to be about the number we're hitting.
Q. And is that average applicable from 1986 through 1996, or is it applicable from 1988 through 2005?
A. It's been pretty much stagnant over the



years for a major report. Some go longer than that depending on the complexity. When you get into a report that's 400 or 500 pages, that can draw it out a bit.
Q. Sure.
As the investigator in charge, was there any other type of accident that you would investigate; for example, any sort of an aviation accident on a public aircraft?
A. Only occasionally as an investigator in charge did we do public use. Most of those are handled by the regional office.
Q. Okay. So just in general, not talking about a time frame now, what is a regional office, for the record?
A. We have eight regional offices. They primarily handle the general aviation accidents, the Pipers, the Cessnas, things like that.
Q. What's a Piper? I don't --
A. Oh, excuse me. These are the small single engine aircraft, piston engine, small twin engine aircraft, privately owned. So our eight offices



respond to those.
They also respond to air carrier events where there are no major injuries or damage; an aircraft goes off the end of the runway and folds the landing gear. If there's not a lot of damage, our regional office will respond to that. They respond to some of the commuter accidents that are of a lesser nature. Occasionally they'll handle an air carrier event depending on what the issues may be. But for the most part, they're seeing all of the privately owned single-engine aircraft and multi-engine piston aircraft.
Q. Is there an overlap between the regional and the national office with regard to corporate jets that are privately owned?
A. Yes, sir, there certainly can be. On the corporate owned jets, there can be an overlap between the regional offices and headquarters.
Q. How is it determined who takes the investigation?
A. It's on a case-by-case basis. Most of the time in a situation of a corporate aircraft, the



regional office will take it unless it turns out to be somebody of stature on board that needs a little more attention from headquarters. Also, if it's a brand-new aircraft, recently certified and it's the first accident of that type, we would probably take it from headquarters. It's really a case-by-case basis.
Q. Would you say just in general, not from the period of 1998 through June of 2005, what percentage of corporate privately owned jets did regional investigate -- accidents did regional investigate and what percentage did national investigate?
A. Probably, I would say even today, the regions probably do about 90 percent of the corporate aircraft, the corporate jets.
Q. I see.
And those two categories, you said before, are new aircraft and famous people aircraft are pretty much the two criteria for national to investigate?
A. It depends. It depends on the circumstances. Certainly those are the most obvious. But once again, it's really case by case depending on what we may have. If it's an issue where we see the

accident appears to be heavily weighted towards an involvement with air traffic control, we'll do it from headquarters.
Q. What do you mean by that?
A. If we see an event where it appears that air traffic control vectored two airplanes together or put an airplane on the wrong runway, we'll take that from headquarters.
Q. As an aside, I have to tell you as an attorney, when you do a construction law dispute, you think, you know, I'm so scared to sit in my house; look at what these people do. And now that we're sitting here doing a deposition over airline traffic, I'm not sure I'm going anywhere this summer.
A. It's quite safe.
Q. Now, you did mention commuters also are handled by the regional offices as well.
A. Uh-huh.
Q. How do you break down from 1997 through 2005, June of 2005, what the regional office would take for a commuter investigation and what the national office would investigate?



A. It's changed greatly, as I mentioned before, in terms of the fact that there aren't as many commuters. They got folded into Part 121 air carrier rules some time ago. So that changed matters a bit.
Basically the regions were handling mostly if it was an unscheduled commuter operation, Part 135. The regions are doing most of those. Once it became a scheduled operation, especially if there's more than six fatalities, then that became a headquarters.
Q. I apologize, sir. I didn't hear you. A scheduled, and what's the other criteria?
A. Well, there's scheduled computer operations and there's unscheduled.
Q. What's the difference?
A. Basically, the scheduled operation is every day at certain hours it takes a flight to wherever. There are other unscheduled flights where you show up and say, "I want to go to Albany" and you pay for that flight. It's an unscheduled commuter or charter operation. And there were, back in the old days, a fair number of these unscheduled commuters. They went to the same city every day, but it wasn't scheduled



per se.
That's changed a bit. But sort of the line we had for quite a while, if it was an unscheduled Part 135, the regions got those unless there was some other mitigating circumstance. If it was scheduled, it went to headquarters.
But once again, there is no solid line here. It depends on circumstances.
Q. From 1997 through 2005, what percentage of commuter accidents did the regional offices take and what percentage did the national office take?
A. Boy, it depends. It depends on how you count the accidents or incidents.
In terms of accidents, it's probably about 50/50.
Q. You say it depends on how you break it out. What do you mean by that?
A. There are events where an airplane is in an incident. There is damage or injury but it's not too high. And then there are other ones that are clearly accidents where the airplane is destroyed and people are killed. And there's lots of variation in between.



Q. What are some of the factors that would lead the national headquarters to take the commuter investigation over?
A. Once again, if it's a newly designed and certified airplane, it's got new technology, definitely that would come more under headquarters. Again, depending who may be on board, the circumstances, if there was air traffic involvement or something else unusual going on, it would come to headquarters. It just depends.
Q. If there was more than six fatalities, was there ever circumstances where the national headquarters would not investigate?
A. It depends. There could be, but it varies. We've had, you know, charter jets crash at Aspen where there weren't that many fatalities on board. We were interested in what was going on with that approach. We've had college basketball team accidents that we've launched headquarters people on that were not jets, that were turbo props. So it varies.
Q. So sometimes between regional and national, it seems like one of the driving forces is the profile

of the investigation.
A. Not totally. It could also be workload. We'll take a look at what workload is going on at the moment. If the regional office is absolutely just buried in cases and doesn't have somebody to put on it, we may say, "Okay, we'll send somebody from headquarters." We don't have to send a full team. We could send two people from headquarters; we don't have to send 15. So everything we can juggle a bit.
Q. I see.
MR. LOWINGER: I'm about to go into another whole line of questions from 1997 on. If you want to take a break right now, we've been at it for about an hour.
THE WITNESS: Okay.
MR. LOWINGER: So let's take a quick five-minute break and then we'll come back to it.
MS. COHEN: Okay.
(A recess was then taken.)
BY MR. LOWINGER:
Q. Mr. Haueter, just quickly, a question going back. What did you do to prepare for your deposition



today?
A. I met with Kathy briefly, about an hour, and they gave some general information about how it went, what to be expected.
Q. Who is Kathy?
A. I'm sorry. Kathy Silbaugh.
Q. Okay. Anything else? Did you review any documents?
A. Yeah. I had some of my old performance evaluations and things like that. Yeah.
Q. How many performance evaluations did you review, sir?
A. Oh, I don't remember.
Q. Do you remember which years the performance evaluations covered?
A. I think from the beginning until recent, but I don't remember the exact number.
MR. LOWINGER: I believe we've requested those performance evaluations, and we haven't received them. If we could receive copies of them, please.
MS. SILBAUGH: You have them.
MR. LOWINGER: We've only received one



performance evaluation; one or two. We have one SES and a couple of undated ones.
MS. SILBAUGH: Then that's all there would be.
MS. COHEN: You received everything from the personnel file.
BY MR. LOWINGER:
Q. Mr. Haueter, do you keep a record of your own evaluations elsewhere?
A. No.
Q. It would only be from your personnel file?
A. Yeah.
Q. Just to wrap up what we talked about in the prior hour, sir. When you say "yeah," you mean yes, right?
A. Yes. Sorry.
Q. With regard to being an investigator in charge, it's an on-call position?
A. Yes, it is.
Q. It's kind of like a firefighter, I guess, in the sense that you're on call for a certain period of time each month. If you get a call of an airline



accident, you are to report it along a certain channel of individuals. Generally there is an investigation manual that dictates who you call first. I believe you told me that the first person you call would be either an individual who ends up calling the chairman of the Board, and then there is a whole process where the higher-ups make calls to each other, and you're assigned to assemble a team, and then you assemble a team through the party system.
A. Uh-huh.
Q. The party system goes out to this accident area. As part of the party system, you're in charge of making sure that the NTSB officials who were designated to the team had travel arrangements made for them and lodging arrangements made for them. And you worked with local public safety officials to make sure that the area was quarantined. And you worked with industry officials and the FAA officials to make sure it's investigated a certain way.
And then the wreckage people took the wreckage away from the site, and everyone went back to their respective offices where an investigation report

and analysis was prepared, and the teams all drafted their own -- the team members all drafted their own reports, a factual report and analysis report that was given to you, which you then turned into a larger product, which then eventually went through four steps along the way, which would have been the directors of Research and Safety, the managing director, the general counsel, and then the director and deputy director of OAS, the division chiefs and the group chairmen. And then eventually it got up to the Board members for final review. The reports took about five months.

A. For larger reports.

Q. And you investigated major aircraft crashes during that time, and those are commercial jets, certain corporate jets, certain commuters, certain international investigations as well.

Was there anything else as part of your duties as investigator in charge that we didn't cover?

MS. COHEN: Objection. Mischaracterization of testimony.

BY MR. LOWINGER:



Q. Please answer the question, sir.

A. Well, I think there's a lot there I covered. For instance, an investigator in charge on scene would also be doing the media briefings or briefing a Board member for media briefings, which is a fair amount. There's a lot of coordination with each of the groups each evening in terms of what's the status of the investigation, giving them direction, making sure resources are applied correctly.

Q. Okay.

A. There's a fair amount also just in terms of occasionally we get involved in security issues. We have the cockpit voice recorder that is highly controlled and only the investigator in charge will know of for quite a while.

So there are a lot of other aspects of this that go beyond what you mentioned.

Q. Let's talk about those. I know right before the break I said I would like to move on, but I want to make sure I understand what you did as the investigator in charge.

You said media briefings and briefing Board



members. Describe that to me, sir.

A. Every evening there will be a process meeting where all the group chairmen come in, all the teams, and they report on what they did today and what their plans are for tomorrow. And the investigator in charge runs that meeting and also provides guidance as to what they should be doing the next few days, what's going on with the wreckage, even what the weather is going to be. If there's a storm front moving in, then there's things that have to happen sooner because evidence could be washed away.

Also coordination in terms of if there is a water recovery, we would be working with the Navy supervisor of salvage in how to get pieces out of the water. So that's happening.

Anyway, we have this progress meeting. At the end of the progress meeting the Board member on scene or the investigator in charge will then brief the media on the findings at that time of the investigation. That happens about twice a day, definitely in the evening after the progress meeting and possibly again in the morning for the new



segments.

So the investigator in charge would brief the Board member, stand by him during the press conference in case there are any technical questions. If the Board member is not there, the investigator in charge would provide the briefings himself.

Q. So media briefings. Coordination with the group. You said security and resources. Can you describe the security issues that you mentioned?

A. Well, working with the state and local police, sometimes the national guard, on any issues with security of parts, any issues in terms of the accident scene itself in terms of haz-mat. There is fuel on board. There's other components that could be very dangerous. How those are handled. We occasionally have to bring in other people to help control some of the haz-mat functions.

Local coroners, we have to work with them in terms of body recovery. Sometimes the Armed Forces Institute of Pathology will show up. We'll work with them on recovery of remains.

So there is a lot more going on here. If

we have a public hearing, the investigator in charge becomes the hearing officer controlling the public hearing and putting that together.
Q. A public hearing, does that take place during the initial investigation?
A. No, that's later in the investigation.
Q. Okay. So media briefings. So everything regarding getting the report of the accident, launching a team, getting the report, getting everyone to investigate their part of the team-oriented report, the media briefings, and then getting -- I'm sorry. Let me start again.
Getting the report of the accident, launching a team, getting the team to investigate, media briefings, coordination within the group, security issues including state and local police, the local or national guard, haz-mat issues, local coroners, Armed Forces Pathology, public hearings.
What else did the investigator in charge do?
MS. COHEN: Objection. Mischaracterization of testimony.



BY MR. LOWINGER:
Q. What did I say that was wrong, sir?
A. It's hard to go through it all. It's there and it's not all there. In terms of everything that happens on scene, there is no -- The launch aspect of it, there's what is going on in terms of each case, working with each of the manufacturers. There's so much that can possibly pop up.
Q. I see.
In 1997 you were appointed the deputy director of the Office of Aviation Safety; is that correct?
A. I'm trying to remember. I was first chief of Major Investigations, and then I can't remember the date when I became acting deputy director of the Office of Aviation Safety. I think it was later than '97.
Q. Okay. So from 1997 until when were you the chief of Major Investigations?
A. Chief of Major Investigations -- boy, I have to go back. I believe that was from '96 until -- I'm trying to think when I became deputy director.



Well, actually, from '96 until December of 2000 I was chief of Major Investigations.
Q. Okay.
A. And then for a period of time I was also deputy director -- acting deputy director.
Q. When did you become the deputy director?
A. That was actually January of 2001.
Q. Briefly, could you tell me as the chief of Major Investigations what you did?
A. As chief of Major Investigations you're responsible for all the investigators in charge and responsible for all of the major investigations.
Q. Is that a 24/7 job?
A. Yes.
Q. And did you launch the sites during that time?
A. Only on a few cases. Basically, if it was a large accident, I would go out and sort of quality control and monitor what was going on.
Q. I see.
But it was largely from D.C.?
A. Yes.



Q. And were you involved with the regional offices at all during that time?
A. As chief of Major Investigations, I coordinated activities with them, yes.
Q. Okay. And in 2000, you became the acting deputy Director of OAS? When I say OAS, I mean the Office of Aviation Safety, not the Organization of American States.
A. In 2000 I became deputy director. January 2001, excuse me.
Q. At what level did you become the deputy director of OAS in January of 2001?
A. I don't understand the question.
Q. At what pay level, what GS level?
A. SES. Deputy director is SES.
Q. Were you SES as the acting deputy director of OAS?
A. No, I was not.
Q. When you were the acting deputy director of OAS, what GS level were you?
A. I was a 15.
Q. What step?

A. Oh, I don't remember.
Q. Tell me about the process of becoming an SES for the deputy director of OAS.
A. The position was bid, and I applied for it.
Q. And when you applied for it, did you have to interview for it?
A. I had an interview, yes.
Q. Do you remember how many interviews you had?
A. Just one.
Q. Okay. And was there anything else involved in the SES appointment process other than submitting an application and interviewing before you took the position?
A. In terms of the process, that's all I recall.
Q. Okay. Do you remember your starting pay as the director of -- as the deputy director of OAS in 2001, January 2001?
A. No, I don't.
Q. Do you remember if you received any bonuses for 2001 as the deputy director of OAS?



A. I received a couple of performance bonuses, if you will.
Q. Okay. Do you remember what those were?
A. It's for teaching at our training center, and they were in the $500 to $1,000 range.
Q. And you were the deputy director of OAS from January 2001 until when?
A. I was deputy director from January of 2001 until February 2007.
Q. In February 2007 you became the director of OAS?
A. That's correct.
Q. Is that also an SES job?
A. Yes, it is.
Q. From January 2001 through February 2007, you were an SES for the deputy director of OAS. Can you tell me -- can you describe to me what the deputy director of OAS -- the responsibilities of the deputy director of OAS?
A. Basically, once again, it was a 24/7 job, but now not just having major investigations, the regional investigations also come under the deputy



director's purview, too.
Q. Okay. So there's major and regional. What else?
A. That's essentially the case. I mean, major and regional is how it's broken out. So all of the investigative activities of the Office of Aviation Safety, there's the director and then there's the deputy. We kind of worked a combined group, the director and myself, so each could replace the other at any given moment. But all the major investigations, all the regional investigations, all the foreign investigations, they more or less funneled through the deputy director.
Q. Okay. So we have three types of investigations. We just talked about your role as an investigator in charge for major investigations. How did the whole investigation process, starting with the notification of an accident, change once you became the deputy director of OAS?
A. Well, things also changed because of our communications center being created. Now what happens still is that when there is an accident, as deputy



director I would be called immediately, too. So we were no longer phone-limited. So we would get all the management on the phone within a few moments of being notified.
Q. Who calls the communications center first? How is the communications center involved?
A. The communications center learns of the accident either by media, which is extremely good nowadays, or sometimes the FAA, or occasionally the airlines. From their sources they learn there is an accident or may have been an accident, and they will immediately contact the investigator in charge who is on duty. If it's clearly an accident, they don't bother with that; they just bring everybody up at once.
Q. Okay. So sometimes an investigator in charge is called and sometimes everybody is called at once?
A. Uh-huh.
Q. How is that determined?
A. It depends on the size. If the com center takes a look and they see on their TV monitors there's

an airplane burning and it's clearly a large case, they just know to contact all the director levels and get everybody going now.

If it's a case where they have spotty information or it's a foreign airline and they don't have complete information on what may have happened, they'll call the investigator in charge first and notify him, and then he'll make the decision as to whether or not he needs to call myself or someone else.

Q. Okay. Walk me through the process of your new job. Walk me through the process of the deputy director's responsibilities once the communications center calls with --

A. Once we've determined there is an accident, we'll then decide, you know, what level response we need.

Q. How is that determined?

A. Basically taking a look at what circumstances of the accident were, the size of the aircraft involved, the number of fatalities and other issues that may be there. We'll determine from the



deputy director -- make a recommendation to the director, here's the level of response we need. We also take a look at the people we should send, whether we have the right specialists going to the case.

From there on we would contact the Board member who may be launching to the scene, certainly the chairman, the managing director.

Q. Okay. So what is your role in making the recommendations? Or describe to me what your role is as the deputy director once the call is made. Not what happens in general with everyone involved, but tell me what your role is and your responsibilities once the call is placed to you.

A. One would be helping to decide what the level of response should be.

Q. Okay.

A. Also, it would be contacting Board members to tell them we've had an accident, tell them who is launching when, get that firmed up. Also contacting the Federal Aviation Administration to make arrangements sometimes to take the team to the site. Contacting the manufacturers. Just part of the launch



process. And generally doing whatever has to be done at the moment sometimes.

Q. Sure.

With regard to the -- You said it was the level of responsibility --

A. Level of response.

Q. Level of response. What is required of you in order to determine the level of response as the deputy director?

A. I don't understand your question.

Q. What factors do you use? For example, what information do you need? How do you go about determining the level of response as the deputy director?

A. Once again, it depends on the circumstances of the accident, what kind of airplane it was, what may have been involved, whether it's a collision between two airplanes, an airplane goes off the end of the runway. There is a whole list of factors. It's based on experience, quite frankly, in determining what we should respond to this with.

Q. Okay. When you say it's based on



experience, what experiences do you use in determining the level of response?

A. The experience of being an investigator in charge and chief of Major Investigations. And also basic engineering background, too.

Q. Okay. And do you determine that you're going to make a launch before you call a Board director, or do you have to consult with a Board director before you make a determination to do the launch?

A. I have made launches without consulting a Board director, yes.

Q. Okay. What percentage of the decision-making process do you decide to make a launch without consulting a Board director?

A. Back in the old job as deputy, that happened probably -- John was usually there. John Clark was the director. Probably the number of times that occurred without me talking to John in some fashion was maybe like 20 percent of the time.

Q. The other 80 percent, John was always on the phone?

Page 78

A. Phone-available, yes.
Q. Okay. And then you said a Board member is contacted. Who had the responsibility of contacting the Board member?
A. It would depend, but usually I would call the Board members. We have one Board member that would be launching to the scene. The chairman always knows too. So I would call the other three just to inform them of the circumstances and what was going on so they were aware of the launch and what was happening.
Q. Okay. Who called the Board member launching to the scene?
A. That was usually done on the conference call we had regarding the whole launch.
Q. But who had the responsibility for making that call? Or is there always a designated Board member on call?
A. There's a designated Board member for that week.
Q. Oh, there is?
A. Yeah. So we would pull up that person and

Page 79

inform them.
Q. Okay. And then you said all the aspects of launching a team, including calling the FAA, making sure there's an airplane to take people, calling the manufacturers and putting together the party system team approach.
A. Uh-huh.
Q. How many of those calls are you responsible for making and that you would make as the deputy director?
A. Oh, gee, I never counted them up. I mean, quite frankly, from the time of a first call until finally hanging up the phone at night, these calls go three or four hours.
Q. Would you be making the calls, or would an assistant be making the calls?
A. I would be making calls. Everybody is involved, yeah.
Q. Okay. So forgetting the whole -- I guess what I'm getting at, did you have an assistant helping you making all these calls?
A. Usually not, because it would usually

Page 80

happen at 2:00 o'clock in the morning. But no.
Q. Really?
A. Yeah.
Q. So you figure out that there's going to be a launch. Are there any other issues in determining a launch? For example, are there any human resource issues that you're responsible for as the deputy director?
A. Not in terms of the launch. I mean, if we have an accident regarding an air carrier, we have to respond to it. That's our mission. So we don't look at the finances of should we send five or should we send eight. We send what we need. So we don't get into the financial aspects of that part of it. We'll leave that up to our managing director and chief financial officer if we have financial issues. We just know we have to respond.
Q. Okay. Was the team ever limited by the managing director or the chief financial officer because of the amount of people that you would want to launch or the amount of people that could be lunched?
A. Not that I've experienced.

Page 81

Q. Okay. And what about Human Resources issues as the deputy director? When you put together a launch team, can you tell me what's involved in that?
A. Only that we look at the best person for the job. Occasionally we have somebody on the team who, because of physical limitations, may not be the appropriate person to send to a certain accident. We would take a look also at technical capabilities, if somebody would be more technically qualified for a specific accident than somebody else. And we also look if there are haz-mat or other issues going on that we know of.
Q. How are haz-mat issues related to human resource issues?
A. Well, in terms of how close people can get to the site. If we know that there are chemicals on board, radioactive compounds, something like that, we may tell our people that they have to stay back until the local people can control that. We don't want to get our people in danger.
Q. Okay. So the best person available, the

best person with certain technical background, any physical capacity issues and haz-mat issues. What other human resource matters do you have --
A. What do you mean by human resource issues?
Q. Picking the people for the team.
A. The people are more or less already picked. Every week they're on call for their specialty for that week, but sometimes we make adjustments within that depending on the accident and the circumstances.
Q. Can you explain that to me? There's always a list of people for each week?
A. We have a "Go Team" list every week. It starts Monday afternoon, and people on that list are on call for that specialty for that whole time period. And so for 24/7 for that period, if there is an accident that requires a person, say in power plants, he would be expected to respond to that accident.
Q. What if the person is already launched on a different investigation? Is that possible?
A. We try to avoid having him on two accidents at the same time. We have done that occasionally where we're very short on personnel and someone will



be out on, say, a teardown examination where, because we're short, we've had to put him on the Go Team list for the week and hope nothing happened. We have had to do that.
Q. I understand.
Is there ever a decision not to launch a team because of lack of people available, lack of NTSB employees available for the team?
A. Not that I've experienced.
Q. So you've always felt as the deputy director that there's enough individuals to launch a team for each investigation?
A. We've been thin sometimes where we haven't sent as many people as we would like just because we didn't have the employees.
Q. I see.
A. But we've always launched an adequate team. Sometimes we have had people who are overworked.
Q. I see.
You said there's times where you've been thin. What do you mean, there are times where you've been thin?



A. We're a small agency. I only have about 40 investigators, and usually only three in a given specialty. Sometimes, especially if we're between, somebody has retired and we're trying to hire, we're down to two, and therefore I can't cover as well as I would like.
Q. Okay. Are there any types of aviation accidents that, as the deputy director, you are not involved in because of your background? For example, there was a type of -- this is a certain type of accident and you wouldn't have a background in it and wouldn't become involved in that type of investigation and there was another person who made decisions regarding the launch?
A. No. No.
Q. Okay.
A. I think maybe always in aviation we have to respond to accidents. That's our mandate by Congress.
Q. Okay. So as the deputy director, you get a call for each and every accident that took place, whether it be regional or major.
A. Not for all the regionals, because there's



about 2,000 of those. Usually only the ones that have risen to a level I will get called on that looks like we may have to launch a team on.
Q. Is that based on the criteria that we discussed before, the profile -- ones that have a higher profile, someone of notoriety or public interest on board, or new aircraft or a new type of componentry? I think those were the three criteria.
A. For the most part. We have a pager system. I get paged on a lot more accidents than I get called on, and some of those we'll take a look at and decide maybe we should up the interest level on this one because there have been a series of these accidents and we need to take a closer look at it. Our regional investigators may not be aware of that.
So there's various ways of me taking a look at accidents, either by physically a phone call, by pager messages, by e-mails, also from just my contacts through the industry, finding out about an event that maybe we should take a bigger look at that than initially indicated.
Q. Do regional offices have an obligation to

contact you regarding an accident?
A. It depends on what level. The regional directors are generally aware of certain accidents that they should call headquarters on, yes.
Q. So is there a written policy for the types of accidents that a regional director is supposed to call the deputy director on?
A. I can't think of a policy. It's our practice and a working knowledge we've had over the years.
Q. So it's just more tradition?
A. I think experience, capabilities. Certainly in discussions we know of events. For a while we were tracking rudders on a certain group of aircraft, and they knew if something happened with that type of airplane, to give me a call.
Q. Okay. So you said there are about 2,000 regional accidents. Is that on a daily basis? A monthly --
A. Annual.
Q. What percentage of the 2,000 regional accidents do you become involved in launching a team



for?
A. Launching a team, that's only a handful. That's pretty small. But we do some as regional major investigations, and that's maybe five, six a year.
Q. What's the difference between a launch and a regional major investigation?
A. A headquarters launch would be an investigator in charge from headquarters with a group of specialists. A major regional response can be one or two, three regional investigators, or it can be also a regional investigator with assistance from a specialist from headquarters.
Q. Does the FAA become involved in that?
A. Usually, yes.
Q. What are your responsibilities with regard to coordinating a major regional response?
A. Usually most of the coordination is handled by the deputy director for regional operations or the regional director himself. They'll keep me informed, especially if they need support from headquarters. I would be involved with providing initial support.
Q. What percentage of your work as deputy



director involved major regional responses?
A. It was a small amount. It had to be in the 15 percent rage.
Q. Okay. Why don't I take this back a little bit. I hope I don't confuse you. Could you just tell me briefly and generally what the components of the position of deputy director of OAS are?
A. Well, there's various things. Obviously in terms of accident response, that's the major. Whether it's domestic air carrier, foreign accidents -- we do a lot of those. So a lot of the activities of the deputy is responding to foreign events. And then also another component is the regional majors and some of the other regional activities.
Q. Is there any management involvement regarding staff, budget or anything like that?
A. That's also involved. The director basically provided me all the budgeting for the office. I did most of that in terms of working on that. I did the performance evaluations. And I'm trying to think what else.
Q. So there's the accident responses, and



that's domestic, foreign and regional majors, most of the budgeting, and performance evaluations.
A. Also reviewing all the reports for technical accuracy. All the reports went through the deputy. They go through the director, too. Everybody takes a cut at it.
Q. Okay. So it's accident responses for domestic, foreign and regional majors; most of the budget; performance evaluations; and reviewing all the reports for technical accuracy. What else is involved, in general, for the deputy director?
A. It's handling a lot of HR issues that may crop up.
Q. Can you describe those for me?
A. Oh, anything from, you know, pay issues to, you know, hiring-type events. Occasionally a grievance issue. There's a whole variety of various HR functions.
Q. Sure.
In addition to HR, what other types of --
A. Working with our Transportation Disaster Assistance Group.

Q. What is that?
A. They provide assistance to victims' family members. We coordinate with them. We do a lot of testimony for the Hill; I've testified on the Hill several times as deputy. Working with our government affairs people. Working with our media people. Coordinating with Board members. The list kind of goes on and on.
Q. Keep going.
A. Let's see. Working with the airlines, the manufacturers. Working with our foreign counterparts. Every country has an investigation group similar to our NTSB, so talking to them. Some international travel going to conferences and coordinating with our foreign counterparts.
Also, under the International Convention on Civil Aviation, working with the various U.S. groups on changes to the language that we believe is necessary for safety.
Q. Okay. Anything else?
A. Not that I can think of at the moment.
Q. I'm going to go down the list. Maybe it



will spark something else.
Accident responses from domestic, foreign and regional majors. Most of the budgeting for OAS performance evaluations for employees of OAS. Reviewing all reports for technical accuracy. HR issues, including pay issues, hiring, grievances from time to time. The Transportation Disaster Group, which is the Family Assistance Group. And then there's preparation of testimony for Congress on Capitol Hill. Government affairs. Media relations. Coordination with Board members. Working with industry. Foreign public agency coordination or relations. International travel for conferences. And working with IKO, which is the International --
A. Civil Aviation Organization.
I also taught training courses for our training center. I did a fair amount of that.
A lot of time spent just going through reports and ensuring, you know, what's the status of the investigation.
Also as deputy I traveled to accident sites to do quality control.



Q. So going through reports and going on site for quality control. What did you say about going through reports?
A. Well, just taking a look at the group chairmen factual reports and the group chairmen analysis reports to make sure everything was covered and there wasn't anything additional that needed to be researched and developed before the report went to the Board.
Q. Anything specific to being an SES member, sir?
A. What do you mean?
Q. Was there anything incumbent upon you as an SES member, any additional responsibilities because you are an SES member? "Congratulations, here's the key to the corporate restroom, and you have to do this as well."
A. There's an Executive Review Board. I've only participated in a few of those prior, back when I was deputy.
Q. Okay, sir. Here's the list so far. I'm surprised they didn't give you a little sheet for you



to remember it all. But here we go.
Accident responses for domestic and foreign and regional majors. Most of the budgeting. Performance evaluations. Reviewing all reports for technical accuracy. Human resources issues. Transportation for disaster, the Family Assistance Group. Preparation of testimony for Capitol Hill. Testifying on Capitol Hill. Government affairs relations. Media relations. Coordinating with Board members. Working with industry. Working with foreign public agencies. Traveling to international conferences, IKO. Teaching courses at the training center. Going through reports -- we kind of mentioned that before. Quality control on site. And the Executive Review Board.
Anything else?
A. There's probably more to it, but I can't think of it now. There's probably lots of little things.
Q. We're talking about broad categories right now.
A. Broad, I would have to think about it for a

Page 94

minute or two.
Q. Take your time. If something comes up, please let me know.
A. Okay.
Q. Now, which of these are the most important functions that require -- Which are the most important functions in your job as the deputy director? How would you rate them?
A. Well, I think the most important function of the Board is quality investigations.
Q. Actually, sir, as the deputy director, not the Board.
A. But that comes down to all of us. The most important function for the deputy director is still a quality investigation and whatever it takes to do that, from the time of the launch through all of the reports. That's the most important function of the deputy, is to ensure that we have done absolutely everything we can for an investigation.
Now, part of that that comes in is the HR requirements, budgeting, reporting to Congress, and everything else. But the most important thing we have

Page 95

as a deputy, especially a technical person like myself, is to make sure there's a quality investigation.
Q. Okay, quality investigation. What percentage of your time was dedicated to quality investigation?
A. That was 24 hours a day. I mean, that's the key thing that we do. Certainly, a lot of time is spent in all the other functions. Writing testimony for the Hill and everything else, they eat up a lot of time. But of the important things, the investigation is the most critical.
Q. I understand that's the most important thing. Now, if we had to break it into percentages --
A. I have no idea. I've never even tried.
Q. I'm going to ask you to try.
A. I wouldn't want to.
Q. I understand, sir. But I'm going to ask you to try.
A. Then I can't respond to it. I really don't know. I haven't thought about how many times I have sat and written a report to Congress or worked on the

Page 96

budget or anything else. I've never even tried.
Q. Let's try it a different way, then.
As the deputy director, did you have any staff helping you with all the general responsibilities that we've discussed?
A. Well, I had two immediate staff members, one for budgeting purposes that kept control of dollars coming in and dollars going out, and another one who would be responsible for hiring, more the HR functions.
Q. Okay. So --
A. And there's also an administrative secretary.
Q. Okay. So you had a person helping you with budgeting during your period as deputy director from January 2001 through 2007 when you became the actual director.
A. Uh-huh.
Q. What was the person's duties and responsibilities for budgeting?
A. Primarily it was expenditures in terms of keeping track of what was spent, where, and that we

Page 97

stayed within our budget.
Q. Okay. What kind of budget constraints did you have as the deputy director?
A. We have basically mission money for accident investigations. Then we have training money. And then we have some money for support of other areas.
Q. So every year you got mission money, training money and --
A. Support money.
Q. -- and support money.
What is mission money?
A. Mission is accident investigation. That's responding to doing our mission.
Q. All right. Explain to me how you get mission money. When do you get mission money?
A. Basically, each year the managing director and the chief financial officer will basically, on historical purposes, allocate us money for each year.
Q. Okay. So let's say in any given year from 2001 through 2007, you got mission money.
A. Uh-huh.

Page 98

Q. Hypothetically -- or not even hypothetically. How much would you receive for mission money? What percentage of your budget was mission money?
A. That was the majority. Boy, I'm trying to think. Probably about 80 percent of our funds are mission.
Q. Okay. Now, was there a separate budget for the deputy director as opposed to the rest of the organization?
A. No.
Q. So it's just the overall agency.
A. The overall Office of Aviation Safety.
Q. So about 80 percent is mission money?
A. Uh-huh.
Q. What percentage is training money?
A. Training would probably be about 10 percent.
Q. Is it safe to assume that the last 10 percent --
A. The last 10 percent would be support.
Q. Training. How did you spend the money for

Page 99

training? What was that spent on?
A. Well, each individual person would take a look at what skill sets they had, what they needed, and we would try to make sure everybody got supplemental training each year, all the investigators.
Q. Only investigators, or anyone else?
A. Well, basically all the staff, admin, investigators. Each person we try to give some training to if we can.
Q. What's support money?
A. Support money is basically to go out to industry, to conferences, things that are not training, that are not mission.
Q. Okay. So the 100 percent of the budget for OAS is 80 percent for mission money; that's launching teams and creating reports.
A. Right.
Q. I assume that's also getting it passed through the Board. Or is it just launching a team and generating a report?
A. Adopted by the Board, that's the goal.

Page 100

Q. Did that cost anything extra?
A. No.
Q. 10 percent for investigators and staff to be trained.
A. Right.
Q. And 10 percent for travel and other industry events.
A. Right.
Q. Okay. So someone helps you track all that money?
A. Right.
Q. What percentage of your work -- To what extent did you rely on that person to do those responsibilities?
A. Quite a bit. In terms of the accounting of it, almost completely. What I would do is kind of do an overall review every couple of weeks to make sure that we were still within budget, if it looked like we were making our goals. Mission I wasn't really that concerned about. But in terms of making sure that we spent all of our training money and making sure everyone was appropriately trained and making sure

Page 101

support money was being used correctly.
Q. You said that the mission money you weren't too concerned about. What do you mean, you weren't concerned about the mission money?
A. We have to launch. We can't turn down an accident.
Q. All right. So at the beginning of the year you get -- we're going to call it, I don't know -- How much money would you get at the beginning of the year? Let's say 2004. 2003, 2004, 2005, those three years. Do you remember the budget?
A. No, I don't remember the dollars.
Q. What happens between 2003, 2004, 2005, if you went over budget during the year?
A. If it's a mission, we would have to go to Congress and use our emergency fund to cover the investigations.
Q. Tell me what's involved --
From 2003, 2004, 2005, did you go to Congress for emergency funds?
A. No, we didn't.
Q. Okay. In the other years, from 2001

through 2003, did you have to go to Congress for emergency funds?
A. We discussed it, but we didn't have to.
Q. From 2005 through 2007, did you ever have to go to Congress for emergency funds?
A. No.
Q. Did you spend all your money from 2003 through 2005 on training?
A. Darn close to it.
Q. And did you spend all your money on support for 2003 to 2005?
A. That was very close to.
Q. When you say very close for training and support, what do you mean?
A. Well, we try to spend it all, buying some equipment and training. But people's training programs, especially in the summer, will get canceled due to an accident or something else. So despite our best intentions, every now and then somebody doesn't get training so the money doesn't get spent.
Q. From 2003 to 2005, you never had to go for any emergency funds to Congress. Why did you not have



to go to Congress for emergency funds? How much surplus was there, in general, from 2003 to 2005?
A. I'm not sure what the surplus was. But the reason is that we had fewer accidents during this time frame in terms of major events where we needed a huge amount of resources.
Q. I see.
So was -- Let's try to characterize the surplus. Small, medium and big. 2003, is the surplus small, medium or big?
A. Oh, it's always small. Because 90 percent of our budget is salary. I mean, that's where it all goes to. The Safety Board's budget is almost all salary. So our surplus there is usually really small.
Where we get into trouble is additional travel or additional costs in wreckage recovery or having to hire consultants. But most of our budget goes into salary, which is well understood.
Q. So when you say "salary," are you saying annual salary?
A. Yeah. Annual compensation, whatever it might be. There's a certain amount of salary,



bonuses, whatever.
Q. What about overtime?
A. That's part of it, too.
Q. So bonuses, salary and overtime. Is there anything else that eats up the majority of mission? You said 90 percent --
A. Most of our money goes into compensation for our employees.
Q. When you say most, I just want to make sure I can conceptualize the pie chart here.
A. It's like 90 percent.
Q. And you said about every couple of weeks you check in with your accounting person to see how you're doing.
A. In terms of support and training money, yes.
Q. So every couple of weeks you checked in on support and training money. How often did you check in on mission money?
A. Not that much.
Q. When you say "not that much," you mean --
A. Just in general. But once again, we have



to do our mission. So, quite frankly, if we got into trouble, we would go to the managing director and say, "We need more money."
Q. You also had a person for hiring?
A. Doing most of the HR work, yeah. For any -- Doing hiring announcements, working with the HR Department, normal personnel-type things. Making sure people got their cost-of-living adjustments and things like that.
Q. You had one person for budgeting and one person for hiring?
A. Yes. And actually the person for hiring is only part time.
Q. Is the person for budgeting from 2001 through 2007 full time?
A. Yes.
Q. From 2001 through 2007, is the person for hiring part time?
A. Yes.
Q. What's the name of the person who did budgeting work for you from 2001 through 2007?
A. Annette Willis.

Page 106

Q. Who was the person who did the hiring for you on a part-time basis from 2001 through 2007?
A. Amy Jacky.
Q. Annette Willis, how do you spell her name?
A. The last name is W-i-l-l-i-s.
Q. And hiring, what's the name of that person?
A. Amy Jacky, J-a-c-k-y.
Q. And you also have an administrative secretary?
A. Right.
Q. Let's talk about hiring. How often -- Describe Ms. Jacky's responsibilities to you.
A. One is if we do have an opportunity to hire someone, is to work with Human Resources to put together the paperwork, the bid for hiring, making sure it gets all coordinated with whether we need announcements with the press, anything else.
We also have any personnel issues that might come up through the year in terms of quality step increases, the normal things that just happen with HR.
Q. Was she involved in any grievances?

Page 107

A. Not that I'm aware of.
Q. You had all responsibility for the grievances?
A. Yeah. I handled a few grievances, yes.
Q. How many grievances from 2003 through 2005 were you involved with?
A. Three.
Q. Describe what grievances you were involved with.
A. What do you mean, describe? The allegation or --
Q. Describe what you were required to do to deal with --
A. What we had was an employee who wrote a grievance. His immediate supervisor did a response. I would then do the evaluation, the second line after that, and provide my comment to HR.
Q. Okay. And what else -- what other aspect of the grievance process were you involved with those three times from 2003 to 2005?
A. Basically, I wrote up my evaluation of the employee and the supervisor's characterizations and

Page 108

made my comments of whether I thought the grievance was supportable or not and provided it to HR. That was more or less the end of it from my point.
Q. Was it a big, long work --
A. They take three or four days each to review and write.
Q. Your time?
A. My time, yeah.
Q. Do you remember what types of grievances you had between 2003 and 2005?
A. Oh, they were all basically on pay issues.
Q. Okay. What kind of pay issues?
A. People thought they weren't getting the compensation they deserved for what they were doing.
Q. Was any of it based on a discriminatory basis or alleged discriminatory basis?
A. No.
Q. Just to be clear, none of it is related to the Equal Pay Act or Title VII or --
A. I don't know those terms.
Q. I understand.
No one was asserting they weren't being

Page 109

paid enough because of their gender or nationality or race or any other inherent characteristic?
A. No.
Q. It was all because, "I'm busting my butt here and I'm not getting paid enough"?
A. Or "Somebody is getting paid more than I am and I'm better than he is." That kind of deal.
Q. Okay. Was anyone ever saying, "I'm not getting paid as much as someone else and I'm better than he is and I'm not getting paid enough because I'm a woman"?
A. No.
Q. Okay. Who was involved in the staffing -- Describe the division of responsibilities between you and Ms. Jacky with regard to the staffing of the office from 2003 to June of 2005.
A. Basically, the director, myself as deputy director, we would talk to the division chiefs, determine where we needed people, and then we would make a decision as to what areas we should hire. And then based on that, Ms. Jacky would move forward in working with HR in trying to recruit and hire an

Page 110

individual or two.
Q. Sure.
How often did you and -- You said the managing director?
A. No, director.
Q. The director. From 2003 to 2005, that's John Clark?
A. Yes.
Q. From 2003 to 2005, how often did you meet with Mr. Clark to discuss hiring issues?
A. Boy, I don't know. Several times a month.
Q. Several times a month?
A. Yeah.
Q. And would you sit down with the division chiefs as well each time you sat down with Mr. Clark to discuss hiring?
A. Sometimes. It just depended. Occasionally we would get all the chiefs together to try to get an idea of who had the most need, where the critical aspects are coming, who would have somebody retiring that we didn't know about. So yeah, we would get together maybe quarterly with the chiefs and try to

Page 111

see what was going on with their issues.
Q. So you met with the chiefs on a quarterly basis. And you met with Mr. Clark on what sort was basis?
A. Well, at least several times a month, depending on what was going on at the moment.
Q. Let me ask a question about this. How long would you spend with Mr. Clark in these meetings discussing hiring needs?
A. Oh, sometimes it was, you know, 30 minutes and sometimes it was several hours.
Q. Okay. And how long were the quarterly meetings with the division chiefs?
A. Some of those were several hours. It could be four or five hours of discussions.
Q. Okay. Now, when we talk about hiring and human resources meetings, you said hiring. Is that only limited to hiring, or doe it include hiring, firing, spending?
A. It's mostly hiring. Fortunately, we haven't fired anybody in a long, long time, or suspended anybody. So mostly it's just hiring and

Page 112

retirements.
Q. Okay. What's the attrition rate for retirements, sir?
A. Oh, gee. It's changed over the years. We have 125 employees, and we would lose a couple a year.
Q. So you would have all these meetings for hiring and a couple of retirements a year. How many people would you hire per year?
A. In the last few years we've hired very few because we've been down on people. So the last year we got in two -- we've tried this year to hire two more. We've had several turn-downs. So because of the process, you go through six people and you may get one. That's just the nature of the animal.
Q. I understand.
From 2003 through 2005, how many people were in the division?
A. It's been pretty steady around the 125 mark.
Q. Okay. From 2003 through 2005, how many people did you publish notice for for hiring?
A. Boy. Three or four a year, if that. Some

Page 113

years it's been lower. That includes the regional offices, everything.
Q. That includes regional offices?
A. That's everything.
Q. So whenever we talk about hiring --
A. That's across the Board. That's everything in Aviation Safety.
Q. And when we say 125 --
A. That's all of Aviation Safety.
Q. So there's 125 people in all of Aviation Safety nationwide?
A. Right.
Q. And from 2003 through 2005 you published approximately two to three announcements for new hires per year?
A. About that, yeah.
Q. And from 2003 to 2005 you had a couple or three retirements per year?
A. Thereabouts, yeah.
Q. Okay. Is there a link between retirements and hiring?
A. Well, basically, you know, almost all of

our fills right now are from retirements, and occasionally people leave. We've had a couple of areas where we've been allowed to increase staff. There's been a few in the last few years that we've been given FTE to increase our staff.

Q. What is FTE?

A. Full-time employee.

Q. From 2001 to 2007, how many increases in staff were you permitted?

A. Boy, it's been probably four or less.

Q. That entire time?

A. Yeah.

Q. How many requests did you make for an increase?

A. Oh, requests. I've had request for 35.

Q. 35 individuals in total for those six years, or 35 per year?

A. Well, about 35 per year that I would like to fill. We've been down that many. And we can't do it.

Q. How about if people leave for industry? What happens then?



A. Well, if someone left for industry, it's the same as retirement; we would hire. We have had only a few of those. Most of the people who come to the Board stay with us until they retire. In that time frame, maybe two people that I can think of that went back to industry.

Q. Okay. So you had meetings regarding hiring. You didn't fire many people.

A. I can't think of firing anybody.

Q. Did you suspend anyone?

A. No.

Q. What percentage of your time with regard to the hiring and the putting out of notices, what percentage of the work was done by Ms. Jacky?

A. In terms of the actual paperwork, most of it was done by her.

Q. When you say most, what percentage?

A. Well, essentially filling out the forms, that was all done by her.

Q. The review of the applications?

A. The review of the applications was -- The first review is done by our HR group, and then once



they've brought it down to a smaller number than applied, those would come up and I would review those of the applicants.

Q. Are you finished with your answer?

A. Yeah.

MR. LOWINGER: It's noon. I think you have to --

MS. COHEN: 12:30.

MR. LOWINGER: I want to make sure we keep everyone who's supposed to be in the air in the air, and everyone who's supposed to be on the ground is on the ground.

Can you repeat the last answer. I just want to make sure. Actually, now I remember.

BY MR. LOWINGER:

Q. So for those couple times a year, how many applicants would you actually have to review?

A. Oh, gee. I'm trying to think. We usually get about eight to ten qualified people to look at and hire. One application, we'll get 800 people apply, and HR knocks it down to people who are actually qualified, and that gets down to the eight to ten



range.

Q. Okay. So you get a stack of eight to ten applications.

A. Uh-huh.

Q. Tell me what you would do with regard to reviewing the applications.

A. I read through the application, see what the background and qualifications are, make a bit of a judgment whether this person, based on his experience, would be a good fit. And then occasionally we would have people come in to interview.

Q. What is involved in determining whether a person is a good fit or not?

A. Basically experience level, what projects they've worked on in the past, where they were in their career development, whether they've been a project manager, an engineer, what kind of programs they've worked on. If we're looking for somebody, say, in composite materials, whether they've done finite analysis, whether they've been involved in certification of materials. If they worked for an engine manufacturer, what programs they've worked on

and in what capacity.
Q. So once you get eight to ten applications, how much time would you spend before narrowing down the field?
A. Whatever the time it takes to read the applications. Usually make a few phone calls, people who I know in industry, if they knew the person, what their thoughts of them were. I've never tracked hours on it.
Q. I see.
What percentage of the -- Well, that's okay.
And then you have interviews?
A. Uh-huh.
Q. Who set up the interviews and who conducted the interviews?
A. HR would call the applicant and schedule a time for them to come in.
Q. Okay.
A. And then we would usually interview in a group, have a panel interview of an applicant.
Q. And who had ultimate hiring authority?



A. The director.
Q. And what was your role in determining who to hire?
A. Basically providing the director with my assessment of the candidates and who I thought would be a good fit.
Q. Did the director also review the applications?
A. Yes.
Q. Did anyone else review the applications?
A. Certainly the chief of the division the person would be hired into.
Q. Anyone else?
A. HR, the chief, sometimes the deputy chief when we had them in certain areas. Occasionally they would ask some of the other investigators to look over the application to see if this guy's background and experience seemed to match up with reality.
Q. So it's the director, the deputy director, the division chief, sometimes if there was a deputy division chief, and an investigator in charge?
A. It just depends. Investigators in charge



occasionally; that doesn't happen a lot. But if somebody says, "Hey, this person worked the same you worked. Do you know him, and does this background make sense to you?"
Q. And how many of those people in that group were involved in the interview?
A. Oh, the actual interview? Oh, that would be knocked down to usually division chiefs and myself.
Q. Okay. Did John Clark ever conduct interviews?
A. Not in the panels. He interviewed them separately.
Q. Okay. So you would do an interview, and then if you thought he should be brought back and you were going to make a recommendation, John Clark would interview the person?
A. John would definitely interview every candidate and meet with them before they're actually hired, yes.
Q. And was that a rigorous interview for John Clark, or by that point he just wanted to make sure the person -- that he was comfortable with the person?



A. A little bit of both. Make sure he was comfortable and making sure he was a good personality fit, but it was a rigorous interview, too, to see if his technical background would match up with what we were looking for.
Q. Okay. We just discussed all the work with regard to budgeting and hiring. What percentage of your time would you say -- So that's budgeting and hiring. We did grievances. And now let's look at -- You said you did performance evaluations as well.
A. Uh-huh.
Q. Describe to me all your work related to performance evaluations. Can we call that part of hiring as well?
A. It's not part of hiring. It's just part of annual appraisals. So I would actually physically write the performance evaluations for all the division chiefs, for the deputy regional directors, for the budget analyst and for the HR person, Amy Jacky. I wrote those myself. I would be the reviewing official and John would be the approving official.
I did also in terms of everyone else in the

organization, I would see all 125 evaluations to review those every year.
Q. Okay. Did you just do annual evaluations?
A. Also a midpoint.
Q. So twice a year you would review 125 evaluations?
A. Right.
Q. And twice a year you would write -- Well, Let me ask the question. How many division chiefs are there?
A. Seven division chiefs plus the deputy for regional investigations. So that's eight. So I did nine I wrote myself. And there was a period of time I was also writing them for major investigations, but that was early on.
Q. That wasn't between 2003 and 2005?
A. No.
Q. Okay. So twice a year you wrote nine evaluations and reviewed 125? You reviewed the other 125?
A. Right.
Q. How much time does that take each year?



A. Oh, gee. The writing of the evaluations -- well, I'm trying to think. That's a good two or three weeks off and on. But I don't concentrate and do them for two or three weeks. It's as I find time.
Q. Sure.
Well, you said before that you did your analysis for a grievance over a four-day period. Was that a full-time four-day period, or was that --
A. That was pretty much -- I would say during that four-day period, that was 50 or 60 percent of my effort.
Q. And the writing of the evaluations for the two to three weeks, what percentage of your time for that two to three weeks was writing the evaluations?
A. 30 or 40 percent.
Q. And what percentage of your time was reviewing applications? Reviewing evaluations, excuse me.
A. That probably would cover, over a period of time, probably about two or three days.
Q. Full time?
A. Yeah.



Q. Tell me what's involved in reviewing applications. What would you do, just read them?
A. Basically read them and decide whether I thought the evaluation was fair, was honest, was the person doing the evaluation being too generous or too hard. I would take a look at the perceived rating, whether it was going to be satisfactory, excellent, outstanding. And then for the excellents and outstandings there would be a nomination for an award amount, and whether I thought the award amount was within guidelines and reasonable. If not, I would call up the person who did the evaluation and we would chat about it.
Q. Were evaluations ever changed based on your review?
A. Yes.
Q. Describe to me how much time you spent going over evaluations and making sure that they got revised and the circumstances under which they would get revised.
A. Once again, I'm going to say two or three days was spent on the majority of them, just reading



through them. Once again, there would be a handful where I would call the person doing the evaluation and say, "Do you really think this fellow deserves it?" Or "You put him in for outstanding but your evaluation reads like an excellent. Do you want to take it back and try to beef up what you've provided?"
Q. Okay. So when you say handful, you mean five?
A. No. I mean -- Probably, I would say, there's about 10 or 12 a year.
Q. Where you would call the supervisor?
A. Where I would call the supervisor and ask him, "Is there more to this?"
Q. Did you ever have to actually speak with the individuals about their evaluations or --
A. I have had employees contact me to talk about it.
Q. So it's only based on what they contact you? You never had a responsibility or duty or time requirement to call them and --
A. Usually I would talk to their supervisor asking -- In some cases I thought they evaluated too

Page 126

low, and in some cases I just thought, "You need to take a look at your evaluation. If you want to put the person in for an outstanding, you need to provide the words to show what he did that was outstanding." And they would take it back and realize they made an error. Or sometimes they put in for an award, and I said it really should be higher or something less than that.

Q. What experience do you have in -- yeah, what experience do you have in giving advice on evaluations in human resource issues like that?

A. Basically, it's just the experience of being a manager myself, reviewing evaluations, receiving evaluation, taking a look at what is kind of a reasonable review.

Q. Of course. Do you have any training in conducting evaluations?

A. Oh, I've attended a few classes. But whether it's specific or not, nothing in terms of a specific how to write one or anything else. And the Safety Board's way of doing evaluations is different than what I experienced in private industry.

Page 127

Q. Were the training classes during the time you were the deputy director?

A. No, it was before then.

Q. Pay issues. Describe to me if there's any pay issues in human resources other than the evaluation process and appointing amounts for bonuses and salary bumps.

A. What do you mean by "pay issues"?

Q. You had mentioned that as part of your human resources responsibilities you spent time on pay issues.

A. Only in terms of people getting step increases, performance awards, things like that.

Q. But was that part of the evaluation process?

A. It can be. Part of doing the annual evaluation process in terms of whether somebody gets a quality step increase. We also have bonuses you can get throughout the year. And then, of course, the annual bonus that we provide.

Q. What percentage of your time is spent on bonuses?

Page 128

A. It depends what happens that year. If we have a major investigation where certain people have done a really outstanding job and have gone beyond, I would write up or have somebody else write up a bonus proposal for a person.

Q. Did you do the write-up yourself?

A. Some I did and some were done by others.

Q. How many bonus proposals as deputy director were you involved in recommending?

A. Oh, gee. Involved in recommending?

Q. Yeah.

A. Wow. I'm trying to think. On a yearly basis, probably ten or so.

Q. Okay. How much time does it take to determine whether to recommend someone for a bonus?

A. Oh, not much time at all. When you take a look at the performance someone has done, you've read the reports and you've looked at the work they've done, they stand out.

Q. I see.

Of those ten, how many of those did you write yourself?

Page 129

A. Of the ten, probably recently I've only written one or two myself. Lately I've been delegating more of that to other people and just doing the reviewing process.

Q. As deputy director?

A. As deputy director, I do one or so a year, maybe.

Q. How long does it take to do a write-up for a bonus?

A. It depends what you have to work with. It depends on the bonus. If it's a relatively low amount, it takes no effort at all. It's basically just a one-line justification. For an amount that needs approval by the MD, that takes a little more write up. It doesn't take a huge amount of time; an hour or two.

Q. Describe your work with the individuals of the Transportation Disaster Assistance.

A. There's several levels. One is their job is to keep family members informed of the investigations. We get a lot of letters, e-mails from family members regarding the status of an

Page 130

investigation, and so I would work with them on providing a response.

Occasionally they would come down and ask questions about what's going on. They also work a lot with other government organizations and ask me to provide briefings to other organizations of how we function, how we work, so people like armed forces, pathology, FBI, other places understand the Safety Board's practices and procedures for accident investigation.

Q. For 2003 through 2005, what percentage of your time was spent working with TDA?

A. Oh, I don't know.

Q. Was it 10 percent?

A. You know, I don't know. It happens, you know, here and there. Sometimes it's, you know, a couple of minutes a day. Sometimes it can be a couple of hours. I went to New York for two days one time. It's just all over the board.

Q. When did you go to New York with them?

A. That was about three years ago.

Q. 2004?

Page 131

A. Yeah. Let's see. We went up there -- No. It was longer ago. I'm trying to think. Probably 2002.

Q. And did you do any other trips with TDA?

A. That's the only one I've done with them. We've had meetings here in town.

Q. Okay. So what kind of work is involved -- What are your responsibilities, or what kind of actions do you actually have to perform in order to keep TDA working on keeping family members informed?

A. Well, sometimes it's actually drafting a letter that they could provide to the family member. The family member may have some direct questions, and I would draft a response. We also get a lot of letters from Congress along those lines. So I would draft the response for them.

Q. You would draft the response? You wouldn't assign it to someone else?

A. No, I would draft the response for them.

Q. And what about working with other organizations?

A. We've met with the FBI sever times, other

Page 132

government organizations that support them. We've had some local responders come in that I've met with for 30 or 40 minutes just discussing about how we do investigations and our process.

Q. Okay. So working with other organizations, that's not necessarily part of working with TDA?

A. Well, it is with TDA because they come in because TDA works with them, and TDA prefers us technical people to explain our practices and procedures rather than TDA trying to explain what we do.

Q. I understand.

And TDA is affiliated with which agency?

A. NTSB. They're a very small group. There's only three of them.

Q. I see.

And those meetings with other organizations, how much time would that take up?

A. Sometimes, like I said, they'll come by for just an introduction that took 15 or 20 minutes, and sometimes we would do more of, "Here is how the Safety Board works."

Page 133

Q. And were you involved in teaching other organizations how the Safety Board works?

A. Only in terms of a course that we give, our industry training course. And I teach two days of that a couple times a year, and many times other organizations would attend that one.

Q. And that's somehow related to your work with TDA?

A. Well, it's broader than that. The industry training course goes beyond TDA, but TDA uses that as an opportunity to bring in other responders to attend.

Q. Describe to me what the industry training course is.

A. It's a three-and-a-half-day course the Board provides to kind of walk groups through the investigative process so they have a better understanding of how the Safety Board works.

Q. Who is involved in teaching the course?

A. Myself. Several people from the Office of Aviation Safety. Bob Macintosh. Bob Benzon teaches a section of it. Jeff Guzzetti teaches a section of it. We also have TDA come in at different points and talk

about it. Our media comes in. General counsel. And also Research Engineering and do a tour of the lab.

Q. Other modal offices, are they involved in the industry training course?

A. No. They've attended it. The one I've attended, it's just been all-round aviation. They may do one for their modes; I don't know. Mine is just geared to the aviation side of the house.

Q. I see.

And how often each year is there an industry training course?

A. Two or three times.

Q. And how long is each training course?

A. Two and a half, three days.

Q. And how much time do you spend in organizing and actually making a presentation at the industry training course?

A. Making the presentation is about a day and a half for me.

Q. A day and a half?

A. Yes.

Q. Is it the same presentation year after



year?

A. Yeah, it's the same thing.

Q. It's just actually doing it?

A. Right.

Q. Like my evidence teacher, he didn't really have to prepare anything.

A. Yeah, it's the same thing.

Q. I understand.

A. I also do a course for NASA every year that takes about four days.

Q. Tell me about that course.

A. They have a course on accident investigation practice and procedures, so we teach that for them, and I'm involved there for about four days. That's once a year.

Q. And you do that as a deputy director?

A. And director now, too. I've continued on with that one.

Q. You did the industry training courses as deputy director?

A. Yeah.

Q. And the NASA one from year to year, has



that changed, your presentation?

A. No. That one we've kept the same.

Q. Does anyone help you prepare these presentations?

A. The first one, the industry training course, was prepared by someone else, Julie Beal, who doesn't work for us anymore. I'm modified it since, but it's essentially the same course each time.

Q. How much modification have you done since Julie Beal?

A. Not a lot. Just fine-tuning it to make it more updated slightly.

Q. Okay. And what about NASA? Who actually drafted the NASA --

A. I drafted that myself.

Q. And when did you draft it?

A. Four years ago.

Q. So you drafted it in 2003?

A. That sounds about right, yeah.

Q. How long did it take to draft?

A. That took about two weeks to put together.

Q. But you used it again for 2004 and 2005?



A. Yeah. I'll be using it again here shortly in 2007.

Q. I see.

As long as we're talking about making presentations, in the last five minute -- and if you have to cut out, just let me know. Describe for me all the presentations that you've done for Capitol Hill, where you've actually gone to the Hill and made a presentation as deputy director.

A. As deputy director, I was up there last November and testified on our most wanted recommendations.

Q. That's November 2006?

A. Yeah, November 2006. That was the last time I was up there.

I've been up there several times with the chairman in terms of providing technical support to the chairman, not testifying personally.

Q. Did you do that between 2003 and 2005, sir?

A. Oh, yeah.

Q. How many times?

A. Two or three times a year.

Q. Tell me about the testimony that you provided technical assistance.
A. Well, basically the Board will be presenting on one accident case. Usually it's our most wanted safety recommendations. I've gone to the Hill numerous times as deputy just to brief the Senate and Congressional staff on the status of investigations.
Q. Would that be investigations in their districts or their states?
A. Or their interest area. Yeah.
Q. So the most wanted safety recommendations, how much work is involved year to year in preparing the technical aspects and the most wanted safety recommendations?
A. Well, there's a different aspect. We do an annual report to the Safety Board also, and that one takes me a couple of hours to prep on that one. Creating the testimony for the Hill and to get ready for that, I probably put a week into that.
Q. But aside from the one in November 2006, the most wanted list, the technical work that you



would do for 2003, 2004 and 2005 would be a couple of hours each year?
A. Yeah. That's just part of the normal job.
Q. Okay. You said about two times a year in 2003, 2004 and 2005 for the actual accident hearings. How many accident hearings did you provide technical assistance?
A. Oh, up on the Hill? Probably about two or three a year.
Q. Describe for me the work that's involved in doing that.
A. Not too much work in prep because it's ongoing investigations. I'm just providing information I already know. There's not much preparation work involved because I already know it.
Q. Do you have to write anything?
A. No. I go up there, they ask a question, and I provide a technical answer.
Q. So you're at the panel and John Clark says, "I'll refer this to --"
A. No. Usually what it is is the chairman or Board member will be there and there will be a



question, and I'll either go to the table and respond or I'll provide the information for the Board member or chairman to respond.
Q. So there's really no prep time to prepare, it's just the time it takes to be at the Hill that day?
A. I know what the issue is going to be. But once again, usually it's an ongoing investigation that I know thoroughly.
Q. I understand.
And then you said you meet with Congressional staffers.
A. Just a briefing.
Q. Can you describe that to me, sir?
A. Oh, usually --
Q. This is as the deputy director?
A. Right. I would say every other month I would go up there with our Congressional affairs person to brief either a member of Congress or their staff on an ongoing investigation.
Q. Okay. What was your role? How did you and the Congressional affairs person divvy up the



responsibilities for the meeting with the Congressional staffers?
A. Essentially, I would answer all technical questions. I would brief on the status of the investigation and determining what we found and what our plans are for the future.
Q. I see.
And would that take any time to prepare for?
A. Not much. It's an ongoing investigation, so I knew it. It's just briefing the facts we have.
Q. Do you have to write anything for these?
A. No.
Q. So it was just really your time on the Hill?
A. Right.
Q. And aside from providing technical assistance to either the Board member or the director, working on the most wanted list, and meeting with Congressional staffers or members of Congress, what other work did you do on Capitol Hill between 2003 and 2005?

A. That's essentially it on the Hill.

I responded a lot to Congressional letters, too. Congress would send a letter to the Board on an accident investigation, and we responded. I drafted most of those myself.

MR. LOWINGER: We'll cut here because it's 12:30.

I want to make a note that you're going to repeat the answer when we come back.

(A recess was then taken.)

BY MR. LOWINGER:

Q. Between 2003 and 2005 -- and when I say 2005, we all understand that I'm talking about the year 2005, not just January 2005.

A. Okay.

Q. Tell me about what goes into answering a Congressional inquiry letter.

A. It depends. Usually it will be a letter from Congress regarding an accident investigation, either specific questions or general scope. Sometime it's passing on a letter from a constituent to respond to. So I would try to draft these.



I do them all myself because you have to be fairly careful in that you can't tell too much about the investigation that's ongoing, but by the same token you want the person to know that we're actively pursuing certain areas. So the Board has not determined probable cause or has released no analysis or anything else, so you have to be sensitive on how you respond to these. That's why I choose to handle them. I'm kind of better at finding the fine line at that than maybe some other people.

Q. I see.

How many Congressional inquiry letters did you do in 2003?

A. I've never kept track. They come in in spurts depending on what investigations are going on. We had the Lexington accident last year, 2006. Quite a few came in following that. It just depends. We get quite a few from the general aviation side of the house where someone has asked their Congressman, "Where is the investigation report on the accident that killed my relative?" We get that type of stuff.

So there's kind of -- It's hard to say



anything is normal. If you get a major accident, there's a huge flood of them that comes in afterwards, and then there is a kind of a normal group that comes in just occasionally throughout the year on the other accidents.

Q. With the major accident, the big flood of inquiries --

A. Uh-huh.

Q. -- can you tell me how much the letter changes from response to response?

A. It depends. Each letter is different because the issues they bring up are very different. Some, a constituent will provide the same inquiry to every Congressman and every Senator they have so we get the same letter four or five different times. You have to be careful because sometimes there is a little nuance. Sometimes you can do the same letter, and sometimes they have to be tweaked a little bit.

Q. So with the major floods, there's repeats and then there's tweaks?

A. Usually in the flood, those are all different. I mean, it's brand-new and no one knows



much of what is going on with the investigation. It's later on that you get the repeats and tweaks.

Q. All right. So when there is a major accident and you get the flood of what's going on with the investigation from people nationwide, are you responding to each one of those separately with a completely different content?

A. Sometimes. It just depends on what the question may be.

Q. And later on, do you get to use that content?

A. If we can. If we get the same question, yes, we'll try it that way, if for nothing else because it's much easier if you have the same answer rather than someone getting two different responses to the same question. That gets embarrassing.

Q. So we have a flood with the major accident, and that eventually that turns into a trickle of sporadic questions. What other types of inquiries do you get?

A. Then we get what I call the onesies and twosies from the smaller accidents, the general

aviation accidents that you'll get a letter every now and then regarding a specific accident.

Q. In 2003 through 2005, how many sporadic onesies and twosies do you remember receiving?

A. Oh, gee. It really changes. Some months you'll get none and some months you'll get six or eight. It's really hard to judge because of how they come in. A couple a month on average, maybe.

Q. So with the onesies and twosies, how long does it take to respond?

A. Boy, I don't know. Some can take a couple of hours to put together. Part of it is researching to find out all -- to contact the investigator in charge, talk to the group chairman to make sure I have all the facts correct. If it's a major investigation we're working on at headquarters, I'm usually pretty up on it, but if it's a regional activity, it takes a little work to cover all the bases and make sure I know what all the issues are.

Q. Is it an immediate project that requires full attention all the time, or is it something you're working on?



A. Usually you have 30 days to respond, so you have a little time to play with it. Occasionally we get one in that demands a fast turnaround, but usually there's a little bit of time to work on it and get it out the door.

Q. Now, you said you handle them all. Why don't you use the Congressional affairs office?

A. They come to me because they're not the technical experts.

Q. I see.

And there was no one else on your staff during 2003 through 2005 that would have been able to provide that kind of assistance?

A. I give some of them out for initial drafting to provide certain information, but I always take a look at it. It does require a certain degree of sensitivity.

MR. LOWINGER: Could we go off the record a quick second? I apologize to everyone. Excuse me.

(Off-the-record discussion.)

BY MR. LOWINGER:

Q. So you normally have 30 days to respond.



A. Sometimes shorter, but most are in that neighborhood.

Q. Okay. And what percentage of your time do the letters take up in general?

A. I don't really know. They're several hours each. You know, it's hard to say. In a month, it might be a day or so.

Q. Did that change over the years during your period as the deputy director, sir?

A. No, not really. I was doing them as deputy. It just really changes most depending on which accidents are happening at the time. That's kind of the driving factor behind it.

Q. I see.

A. After 9/11, we got a lot of letters in even though we weren't responsible for the investigation.

Q. Who was responsible for the investigation related to 9/11?

A. FBI. We provided technical assistance.

Q. What about -- There's Congressional letters, Congressional testimony, there's meetings with Congressional staffers. Anything else related to



Capitol Hill?

A. That's about all I can think of.

Q. Okay. What about private industry? How many types of meetings or conversations would you have with private industry?

A. That's a fair amount. Talking to -- Well, not just private. There's my counterparts at the FAA; I talk to them almost on a daily basis. There's also my counterparts overseas, Australia, France, England, Germany, Canada, Singapore. Those are the primary ones, and then to a lesser extent Latin America. Then there's also talking to manufacturers, Airbus, Boeing; some of the sub-manufacturers, Pratt Whitney, General Electric, Parker Hannifin, Monsanto.

Then we get into some of the union groups, ALPA in particular. ALPA represents the pilots. NATCA, the National Air Traffic Controllers Association. Teamsters a little bit, and the machinists union.

Q. What is GAMA?

A. GAMA is the General Aviation Manufacturers Association. I don't have that much contact with

Page 150

them. That's handled mainly by the deputy for regional investigations.

Q. Okay. Other than ALPA, NATCA, Teamsters, GAMA you said isn't much of a factor, who else? Anyone else?

A. It depends on what's going on at the moment. Like right now, we have Comair from the accident in Lexington that's going on. We have a variety of people associated with that one. It was a Canadian CRJ, so we're talking more to the Canadians and also Bombardier, the manufacturer of the aircraft.

So it changes depending on what might be going on. There are certain groups we deal with on pretty much a steady basis, and it changes depending on what accident may actually have happened. If we have an Airbus accident investigation going on, we talk more to Airbus. We have a 737 in Cameroon and a couple in Indonesia, so we've been chatting a lot with Boeing lately.

Q. Let me maybe understand this a little better. With regard to the industry groups, the ALPA, NATCA and the Teamsters, describe your work with them.

Page 151

A. Well, basically it's several levels. Calling to basically keep me informed. They'll call me to keep me informed of issues they believe are pertinent to the investigation, or developing issues they have on a different issue regarding air safety. They will often come up with concerns they see out there, other issues going on they want to tell me about. If they have an issue with an individual investigator or group chairman, they'll inform me that they're having some difficulties and why. There could be a variety of reasons why they contact me.

Q. During your period as the deputy director, were you the primary person with whom they communicated, or were there others in your office with whom they communicated?

A. It depends. They would talk to the investigator in charge, certainly. They would also contact the chief of Major Investigations. But many of these people I've known for a long time, so they tend to call me first.

Q. Okay. And describe to me again the circumstances on why they would call you.

Page 152

A. For instance, once again, if they had an issue in the investigation, if they thought something wasn't being treated to the extent it should be, or they wanted to pass along information they thought was more pertinent, maybe they didn't believe it was getting attention, they'll bring up issues regarding what's going on with legislation before the Hill, what's the Safety Board's interest in that, bounce ideas off me a little bit. And as we mentioned before, also if they have an issue with one of our group chairmen, if things aren't working out or if he's not doing what they think he should be doing, they'll inform me of that.

Q. What is group chairman and what's the impact?

A. Each of our investigators will be chairman of a particular group, structures, systems, power plants. So that would be a group chair but he's a Safety Board employee and he's head of that group. And he may have anywhere from two to ten parties on that group, and so he's the chief NTSB person leading that piece of the investigation.

Page 153

Q. Let me just ask a question about this that I want to make sure I understand. To what extent are these calls anything more than just routine day-to-day calls of your job and to what extent do they really take up a significant part of your time?

A. It's hard to say. Some routine calls take a significant part of time. It just depends. Some are, you know, very informative of breaking information, new developments they perceive, or what may be new developments. It goes across the board. If it involves a manufacturer, they'll provide information on testing and research they may have done.

Q. So what do you do with this information?

A. Well, it depends on the case. If it's information in terms of an employee and some scope of the investigation hasn't been covered adequately, I'll go talk to the division chief and the employee and say, "Hey, what's going on in this area." So I'll research it to find out, do we need to look into this further, is this something we haven't considered, or is this not realistic.

Q. What about legislation? Describe your work with them when they call about legislation.
A. Normally it's just to inform me there is some issue going to the Hill they're interested in. Usually it's just informational, because we're not involved in the legislation part of it. But it's helpful for me to know what they're pursuing and what their interests are. Occasionally, if we have a recommendation out there that they're also interested in, they can help push that through the Hill.
Q. What happens with regard to the investigations? Is there ever any written follow-up as a result?
A. Not usually a written follow-up, no.
Q. And what about the legislative work? The information related to legislative work, is there anything written?
A. No, usually not.
Q. And what about wanting to pass information along to you? Is there anything --
A. I usually don't write it down per se. We use it a great deal sometimes.



Q. What's that?
A. We'll use it a great deal sometimes.
Q. What about information related to staff on investigations and investigations in general? Is there anything ever written or required to be written as a result?
A. No.
Q. What about do you ever do a follow-up with regard to it?
A. It's just part of the investigation process. If it turns out that we need to pursue an area, we'll just have the investigator go pursue the area. If it turns out that it's strictly a dead-end that is helpful to one organization but not necessary for the investigation, we may not do anything with it.
Q. Regarding your counterparts, your foreign counterparts, describe to me your responsibilities with regard to your foreign counterparts.
A. Partly inform them of investigations that may involve products or operators from their countries, investigation information regarding our investigations that could impact operations in their



countries. With Airbus, we talk to a lot to our counterpart BEA in France because they're responsible for the Airbus products, so we'll coordinate with them. We'll have teardowns going on in Germany or France. We inform our counterparts our fellow is going to be over there. In some cases we ask them to do the teardown for us and provide us the information.
Q. What's a teardown?
A. Taking a component and ripping it apart, open it up completely and examine it.
Q. So you sometimes inform them about investigations and products from manufacturers in their countries. Sometimes it's with regards to an actual piece of machinery that either NTSB is responsible for tearing down or that you request that the foreign government tear down and do the work for NTSB.
A. Right. And we'll do that for them also. Occasionally they'll ship a part over here to the States to Boeing, and so we'll do the examination over here for them and send the results back. We do that.
Also, just share information of common



interest in safety. If we're pursuing runway incursions, for instance, and they've come up with an idea that they believe is interesting, they'll want to inform us about it.
Q. Okay. So with regard to all this, the information regarding the investigation of products and manufacturing in other countries, the teardowns and the areas of common interest, other than those three areas, is there anything else related to your position as the deputy director?
A. There's ongoing investigations, of course. There's a lot of those. There's a certain amount of meetings. IKO, the changes to like Annex 13, we'll discuss changes we would like to make, that they would like to make. There is another group that meets that I can't think of the acronym to. We'll meet with them on mutual areas of aviation safety. There's a conference up there for a week with those fellows.
Q. There was IKO and another --
A. It's called ITSA, I-T-S-A. It's like the International Transportation Safety Association.
Q. And there's a one-week conference?

A. Yeah, there's a one-week conference. It happens every year. This year it was up in Canada. Next year it's in Moscow.
Q. What about during the time you were the deputy director, did you go to the ITSA conference?
A. I attended it when it was here in Washington two years ago as deputy. That's the first one I've been to.
Q. Did you have any role other than attending with regard to ITSA?
A. Providing technical expertise during the meetings when people recommended changes, accident investigation procedures, how we handle cockpit voice recorders, flight data recorders.
Q. But if you didn't attend, did you participate otherwise in the organization?
A. NTSB participates.
Q. What about you, sir?
A. When I attend, I participate as necessary. Whether I was deputy or not.
Q. I see.
So the years that you didn't attend --



A. It meets every two years. So it was two years ago, and this year was the first time I had a chance to attend.
Q. What about IKO? Can you describe your work with IKO?
A. Meeting a lot with the State Department, the FAA reps. We do have a fellow for international coordination, Bob Macintosh. We do a lot of work with them, with Bob. And also there's the aircraft investigation group part of IKO working with the ambassador to pursue areas that are of interest. How information is handled in the States is different, and so we do a lot of activities with them.
Q. What about while you were the deputy director? Can you tell me the scope of your involvement in IKO?
A. About the same. John Clark wasn't that interested in that aspect of it. He's more technical, so he kind of gave all that to me.
Q. Okay.
A. So that didn't really change between being deputy and being director.



Q. When you say he wasn't all that interested in it, what did that require that you do?
A. Well, it's a lot of diplomatic functions. John's more technical. A lot of it is in terms of putting together issue papers, coordinating with the various State Department people, IKO and the FAA. Most of that I would handle. I kept John informed, obviously, both myself and Bob Macintosh.
Q. So how did you and Bob Macintosh split up the duties with regard to the IKO?
A. Bob would take kind of the lead in terms of making the arrangements and working within the organization. I provided more of the technical and also NTSB policy side of the discussions.
Q. What percentage of the work at IKO is technical and policy work on behalf of NTSB and what percentage was work that Bob Macintosh would do?
A. It beats me. I've never even thought about it that way. We just do it.
Q. Well, from year to year while you were deputy director, can you tell me the type of activities that you were involved with with IKO?



A. Well, it depends. We would get in just normally a group of issue papers to review. We would get in policy changes. We would get in proposals to get reviewed. There's a variety of different meetings with State Department and other groups here in town. It just changes.
Q. On a weekly basis, how much of your time would be spent working on IKO issues?
A. Boy, it's hard to say. Some weeks it's almost none, and coming up now on the 36th IKO assembly meeting it's going to get very hectic over the next couple of months. Two months ago there was hardly anything at all.
Q. So it seems to center on an organizational meeting?
A. Correct.
Q. How many organizational meetings does IKO have per year, or did it have when you were deputy director?
A. The different meetings in town, wow. There's some I didn't attend, didn't have time for, and Bob took care of. They must have an IKO event

once or twice a month of some variety working with State or FAA or some other group.
Q. And were you a regular participant, or would you say it was just something you did as you could?
A. I did as I could. Investigations get in the way.
Q. I see.
Did you ever submit any technical documents to IKO?
A. Not personally.
Q. So it's merely you had an advisory or --
A. You also have to understand how the Safety Board works. The Safety Board staff does not exist. Only the Board members exist. So a Safety Board staff could create the paper, but it's presented by the paper, so the staff name never appears on it.
Q. Okay. Were there papers that you wrote for IKO?
A. There are papers I wrote for the Board.
Q. Describe the papers you wrote for the Board for IKO.



A. They would be position papers that Bob Macintosh and I would work on. They would be provided -- Recently we're taking a look into our exclusions to disclosure information.
Q. What about while you were deputy director?
A. There were some there over time, too. I don't remember them.
Q. How many would you guesstimate there were?
A. I don't know.
Q. Maybe like five over that six-year period?
A. I don't know. Probably more than that, but I don't know.
Q. Would every paper to IKO by the Board, policy paper to IKO by the Board from 2001 through 2007 be something that you assisted in writing with Bob Macintosh?
A. Not necessarily. Bob could handle it by himself.
Q. Okay. What percentage of the papers did Bob write and which ones did you share with him?
A. Boy, I have no idea right now. I never added them up.



Q. When you say you don't have any idea, that means you just don't know, or you just don't remember?
A. Kind of both. I mean, it's something we just do, and I never wrote them down or particularly cared about it. Once they were done, they were gone.
Q. Sure. But if you were to characterize your IKO work, it would not be a significant part of your duties, would it?
A. Not significant, no. Not compared to other things, no.
Q. Would it be a small part of your duties?
A. I wouldn't call it small. It's important. I really wouldn't know how to characterize it compared to all the other things.
Q. It's never a front-burner project is it?
A. It depends. Like when the 31st Congress -- I mean the 31st Assembly gets going, it will be a front-burner project. I've got a meeting tomorrow with the chairman for about four hours getting all prepped for that.
Q. But it's never like a constant part of your job?



A. It's always there. It's not necessarily constant, but it's always there.
Q. It's on the back burner?
A. Sometimes. Sometimes it comes to the front burner.
Q. Right. And that's generally around meeting time?
A. It depends on what's going on. Some issue might pop up, so you never --
Q. When there's not a meeting, when does it become a front-burner project?
A. Well, one country could bring up an issue they want to deal with, or we're having a problem coordinating with a particular country, and we'll work with IKO trying to get them to move and provide recorders or provide technical assistance or something else. So we use IKO for that.
Q. Is it urgent work?
A. Sometimes it can be. It depends on if we want the recorders back, or if we're not getting the cooperation of the country we believe we deserve under the treaty, then it becomes urgent work.

Q. Do you ever have people help you with your IKO work?
A. Basically, Bob. Bob Macintosh is the key person for it. Occasionally we may go to somebody else, like an investigator in charge, for some technical piece to help in it. But, you know --
Q. So for 2003, do you remember how much work you did with IKO?
A. Not offhand, no.
Q. Is there any way to help you remember that? Is there any kind of way to reconstruct that information?
A. No, not offhand. I don't keep a log.
Q. What about in 2004 and 2005?
A. I remember doing things, but nothing specific. It's just one of these kind of semi-continuing efforts.
Q. I see.
And during the rest of the period of your deputy directorship, it would be the same?
A. Yeah. It's just one of those things that's always been there. Back when I was chief of Major



Investigations we did things with IKO that just always have been part of the job.
Q. I see.
Let's talk about -- Let's switch topics a little bit. It seems to me that there is a current theme throughout our discussions today, and that is that the most important thing are the investigations.
A. Absolutely.
Q. How did your work change with regard to investigations and reports when you became deputy director?
A. Basically a little bit broader in scope as deputy from going from chief of Major Investigations. I certainly still was concentrating on major investigations but now I also had to take a look at the regional investigations and all the resources we had. So the scope broadened out a little bit.
Q. Okay.
A. And there was a period of time I did both jobs; I was both chief of Major Investigations and deputy.
Q. And when was that period, sir?



A. Oh, gee. It was right after I became -- probably 2001 until sometime in 2002.
Q. Okay. Do you remember when in 2002?
A. Not right offhand. But it's a -- Because I remember for a while I was -- I was still wearing two hats. I was chief of Major Investigations deputy, but I had a deputy in major investigations to help carry the load there.
Q. I see.
So what percentage of your time was spent on major investigations work as opposed to deputy director work?
A. Boy, that's hard to say. There's a good deal of overlap. Boy, I don't know. It was almost the same. It almost didn't change at all when I finally gave up the job, just a little bit different function. The only thing that really changed is I had performance evaluations for eight more people.
Q. I see.
So as the deputy director, you get a call from the communications office or you get a page or you get -- It would only be a call from communications



or a page?
A. Uh-huh.
Q. And you decide -- First of all, with regards to the regionals, whether or not the NTSB is even going to participate at the national level?
A. Right.
Q. And then the next question is whether regional is going to participate at the regional level based on staffing needs?
A. Some of those I don't see at all, depending on the case. I mean, if it's a large enough regional thing for them to call me, yes.
Q. Okay. And what was the likelihood they would be calling you for a regional?
A. It depends. If it's an air carrier event, they'll most likely call me. If it's getting a lot of national interest, a lot of local media attention, they usually call me.
Q. Okay. And as the deputy director, what percentage of the calls you got for launches was for regional work?
A. Boy, I don't know. For a regional major

launch, probably 15, 20 percent.
Q. And how many of those were actually launched as a result?
A. Just about all of them.
Q. Describe your duties and responsibilities and what was required to launch a regional.
A. For a regional launch, that was just mainly a little bit of coordination, deciding whether we need support from headquarters, who the investigator might be going out. You usually get a lot of the input from the deputy director for regional operations and regional directors, a lot of deciding whether they have sufficient resources to do this. Occasionally we can move things around a bit in terms of who we're going to launch out the door. But it's sort of like any other launch we do, just a lot smaller scale.
Q. Once it was launched, did you have any follow-up work?
A. Yeah. They keep me informed with what's going on, especially if the recorders are coming back. If a flight data recorder and cockpit voice recorder came in, most of the time there were three of us who



would listen to the cockpit voice recorder. I would definitely review the flight data recorder information. And we would try to keep the investigators informed.
Q. I see.
Did you have any duty or responsibility to tell anyone else in your chain of command regarding the regional investigation?
A. Certainly we kept the Board, the chairman absolutely, usually the Board members, the managing director. We would issue initial notifications, status reports, and then also verbally discuss things with them.
Q. Who had the ultimate responsibility for deciding whether or not to launch a regional investigation?
A. The ultimate would have been usually like the director, John Clark.
Q. Okay. And what was your role in recommending -- in helping John Clark make his decision?
A. We would discuss the issues involved,



whether this event was -- if there had been similar accidents on a different make and model, that would raise our interest. If there had been similar accidents with the airline or whatever background information we might have. So I provide kind of my experience and knowledge to help John in making a decision. Or if he wasn't there, I would make it without him.
Q. Okay. And once the information started coming in and the investigation reports were coming in, at what point was a report required, if at all?
A. Well, we would do reports and everything. And so your biggest thing to do is decide what level report we were going to do, whether this was going to be a large report, whether it's going to be a short report. So we take a look at the accident and issues and decide what level of report would be justified. Sometimes it's a very short report and a recommendation letter about issues that need to be corrected. Sometimes it could be fairly long report.
Q. How would you break up the short and long reports? Is it 50/50?



A. What do you mean, break up?
Q. What percentage of the regional launches resulted in a large report and which ones resulted in a short report?
A. Oh, gee, I have no idea. I've never looked at it that way.
Q. How did you look at it, sir?
A. I'm just trying to think. Because a lot of them turned into pure recommendation letters. Of the ones we launched on in terms of a regional major, as we called them, very few became major reports. That was something handled by headquarters. I would say probably around 30 percent became a short report of some variety. And then the rest were recommendations, or some just turned out to be nonevents once we got into it.
Q. So a very few were turned into large reports?
A. That's probably verging on none. If it was something that was that major, we would launch the team at headquarters on it.
Q. Okay.

Page 174

A. But down into the other reports, that's the 60-pages-and-less variety. And then quite a few are recommendations which are two pages to 12 pages.
Q. So the majority are recommendations?
A. Most all have recommendations. And then the size of the report varied.
Q. Do all the recommendations have reports attached to them?
A. Not necessarily. An accident report can be two pages or it can be up to 30 or 40 pages, depending on the kind of accident.
Q. The accident reports -- What was your involvement in the accident reports for regional investigations?
A. Well, one thing was reviewing them all for technical accuracy, content, making sure that all the issues had been covered and that they were in a format capable of being presented to the Board.
Q. Do the recommendation letters go to a Board meeting?
A. They go to the Board but they don't go to a Board meeting necessary.

Page 175

Q. What's the difference, sir?
A. Depending on whether the Board wants to meet or not. A recommendation letter can be signed off by the Board just by signature authority. They can choose to meet on a recommendation if they chose.
Reports for regional variety, they can also sign off on by just signature without meeting on it in terms of a public meeting, as we call it, a Board meeting.
Q. Sure.
A. But most of the ones that get to that level of any size, there's a Board meeting on.
Q. Okay. So are the majority of the regional reports that we've been discussing sign-off reports, or are they Board meeting reports?
A. The majority of those are probably being signed off on. We only take two or three to the Board a year.
Q. Describe your follow-up work with recommendations with a sign-off. Once it left your hands, did it go to John Clark to usher it through the sign-off, or did it go --

Page 176

A. No. Well, once we at my and John Clark's level have reviewed it and commented on it, it would then go to the other directors for review and comment and then to the Board.
Now, once the recommendation is adopted by the Board, the FAA will eventually comment and respond to what action they're going to take. That's reviewed first by Safety Recommendations, and then it comes down to our office. The technical specialists will look at it. And then I always look at each one going back out to make sure it hits the mark.
Q. So it goes to the Board, the Board signs off, and then it goes to the FAA?
A. The recommendations do, yeah. In Aviation, most all the recommendations go to the FAA.
Q. "Recommendations" is actually a term of art?
A. Right.
Q. It conveys a certain type of document and its purpose?
A. No. It's a specific recommendation. It says, "The FAA should require X."

Page 177

Q. Oh, I see.
A. So it's usually about a paragraph long and it says the specific safety action be taken. And some reports can have one or two recommendations and some have 22 recommendations.
Q. I see.
A. It's kind of the product of our investigations.
Q. So once it left yours and John Clark's hands and it went to the other directors, did they come back to you with questions?
A. Oh, sure. We have a directors' review meeting where they go through all their questions and comments. We may then have to make changes to the report based on the directors' review meeting. Once we've cleaned it up from that meeting, it's signed off by the directors once they've reviewed it again, and then it goes to the Board.
Q. Okay. So there's a report, then it goes to you and John Clark for technical review, and then it goes to the directors. The deputy directors or --
A. It goes to each of those offices of

directors, and sometimes the deputy reviews it and sometimes the director reviews it.
Q. When we say the directors, we mean Engineering and Safety and Recommendations?
A. Research Engineering, Safety Recommendations, general counsel and managing director. That's normal.
Q. And then you guys have a meeting, then there is a sign-off, and then if it gets approved -- Once it leaves, once the directors of those offices actually sign off on it and it goes to the Board, what was your involvement once there was a sign-off and it went to the Board?
A. Once it goes to the Board, let's say it goes on notation and there's going to be a Board meeting on it, then we have to get prepared for presentations to the Board.
Q. This is for regional reports?
A. For regional reports.
Q. Even for the recommendation letters?
A. Not for recommendation letters.
Q. Just for those major two or three a year?



A. Right.
Q. Let me ask a question, sir. Maybe I can shorten the process here, because I don't want to ask this whole series of questions again.
When we talk about these major reports for regional matters, is this whole process applicable also for the majors?
A. Yes. It's all the same.
Q. The regional majors is the same as -- the process for the regional majors is just as applicable?
A. It's identical. The process is the same.
Q. For a plane going into the ocean or a plane crashing into the Himalayas?
A. Right.
Q. It's all the same?
A. Yeah. If a general aviation accident goes to the Board, the process of getting it through looks the same as a 747 crash into the ocean.
Q. All right. And the difference with a recommendation letter is that -- We'll get to the whole sign-off process for the majors.
Were the directors of the other offices,



Engineering and Safety, managing director, general counsel, and Safety and Recommendations --
A. Research Engineering, Safety Recommendations, and general counsel.
Q. Did you have a directors meeting for sign-off for recommendations?
A. They sign off. We don't have a directors review meeting.
Q. So it just goes through interoffice mail?
A. Yeah, it's sent to them electronically, they review it and provide comments, it comes back, and we make the changes. So we don't have a big meeting for those.
Q. Okay. Does that make the process go quicker or shorter? Does it add more work for you by the fact that there's not a meeting?
A. Well, it's a much shorter document. For a recommendation letter, that's only a few pages. That's like two to maybe 20 pages for a recommendation letter. So it's a much shorter document.
Q. What's the average period of time while you were a deputy director for getting a recommendation



letter from the initial call all the way through sign-off by the Board?
A. Well, it's hard to put it that way. Some of our recommendation letters don't involve a specific accident per se. But it depends. I've had recommendation letters that we've drafted and gotten through in a few days because it's an urgent issue. We've had recommendation letters that have floundered for a while for a variety of reasons for quite some time, to the point they've had to go back and be updated because they've gotten so old, but they weren't a critical issue. So it depends.
Q. But the recommendation letters, though, are just 15 to 20 percent of your time as a deputy director with regard to reports?
A. With regard to reports? Well, it depends. Because, you know, there's recommendation letters that come out of every major reports.
Q. Just for the regional recommendations.
A. Oh, regionals? As deputy, yeah, I was lesser involved with the regional products like that. So probably there it's 15, 20 percent of the time.

Page 182

Q. All right. Now, with regard to the major reports, is the launch process that we talked about earlier today in the morning while you were the investigator in charge and then office of -- Was it Damage Management? Or what was it called?
A. Transportation Disaster Assistance?
Q. No, no. Your next position after investigator in charge.
A. Oh, chief of Major Investigations.
Q. Right. Is that whole investigation launch process the same for you for a major as deputy director as it was for those earlier positions?
A. It stayed about the same, yes. The only difference is I moved up -- that no longer being an on-scene investigator, if you will, I didn't travel as much. As investigator in charge I traveled a lot. As chief of Major Investigations I traveled less. And as deputy I only went a couple of times; it wasn't necessary for me to go out on every one.
Q. A couple of times during those six years or a couple times during the --
A. A couple times during those six years.

Page 183

Mainly I was going out on the major investigations for quality control as deputy. Like American 587. I went out on that one for a week. There was so much going on, I wanted to keep on top of it.
Q. Now, are those quality controls part of those two or three trips that you mentioned during the six years, or are those separate from?
A. It was part of that. Specifically what I was mentioning was going out on accident investigations on scene, either as part of the launch or following a day afterwards.
Q. So following the launch, going out on the scene or following the launch, does that include quality control trips or not?
A. That's what it was for. Because I wasn't an investigator. I'm not out there collecting information. There is an investigator in charge. My function there was actually several-fold. Quality control. We had a lot of Board member activity. So to make sure the whole thing went smoothly.
Q. Okay. Were you in charge of preparing the team, appointing the team in the party system as the

Page 184

deputy director? Or did you, once you announced, "Okay, we're going to launch on this project," did that get turned over to the investigator in charge and you kind of took a step back from that?
A. The investigator in charge would be responsible for who are the parties to his investigation.
Q. Did you have a role after that once the team launched?
A. It depends. Sometimes if there was a party that was added that shouldn't have been or a party that should have been, I would get involved there.
Q. How often did that happen where someone shouldn't have been or should have been?
A. Twice during the time I was deputy.
Q. Okay. What about making sure that all the resources needed, the investigatory materials, the equipment got there? Did you get involved in that once it was decided to launch?
A. Usually not at the time of the launch. However, after the team was on scene, as we got requests for equipment or supplies or something else,

Page 185

or more people, whatever, I would be involved there.
Q. Describe your involvement, please.
A. Everything from the fact that they need GPS units, they need more cameras, they need more of the biohazard suits, making arrangements to have them shipped. It varied. Or if we need a grease expert, or we need an expert in some other thing, or we need somebody to go to a manufacturer's facility. So it depends what popped up.
Q. Was there always a pop-up? I mean, how often was there a pop-up that required your involvement?
A. Pop-ups are just part of the investigation process. You send everybody you know, and then things happen afterwards.
Q. Sure. Sure.
But what percentage of the post-launch experience would that take? Would that take up a lot of your time, or would that take just a couple of phone calls?
A. It usually -- There's usually calls, almost always at night for some reason. And so during the

day it wasn't much, but it seems every evening like between 9:00 and 10:00 they would pop up. So it happened regularly.

Q. I see.

And were you involved in the daily meetings, coordination meetings, as the deputy director?

A. No. Obviously, if I had gone to the scene, yes. But back at headquarters, no. They would brief me later on, or they would brief me beforehand. So I stayed briefed on what was going on, but I wasn't attending the meetings. Those usually happened about 7:00 o'clock at night and would last for about two hours.

Q. So they would brief you at a later period to just give you an update?

A. Yeah. Usually every morning the investigator in charge would give me a call and let me know what was going on.

Q. Okay. Other than that, other than that briefing, did you have other communications with people on the scene?



A. Yeah, depending on what popped up. If they found something that needed to be researched or something that they encountered that looked like it may be a cause in the investigation or something we needed to talk to the FAA about or the manufacturer about, they would give me a call.

Q. Was that a regular occurrence?

A. It's pretty regular. It's a normal part of the investigation.

Q. And it's a normal part of your job?

A. Yeah.

Q. Did you have any role in press conferences as a deputy director?

A. Yes. Both preparing bullets for somebody giving the press conference, preparing bullets from the cockpit voice recorder or the flight data recorder, working with the government affairs office and media office to prep a Board member to do a press conference, yes.

Q. Okay. And what percentage of your work was involved in doing that?

A. It just depends on the investigation, how



big was it and what's going on. It's hard to get percentages on this because it happens, and sometimes it takes several hours to put something together for it. It just depends.

Q. Were there ever topics that were beyond your bailiwick and you had to assign out?

A. It was a group activity sometimes. Several of us would be putting together different points. As deputy, usually John Clark would review it before it went out. But myself and a few others might be the key ones that put it all together.

Q. I see.

What about in securing the wreckage and determining the status as deputy director?

A. That's handled by the investigator in charge.

Q. I see.

What about the black box investigation?

A. That would come to headquarters, and either myself or John Clark would do the initial audition of the cockpit voice recorder.

Q. And can you explain to me what's involved?



A. Just basically coming into the office and listening to the voice recorder; calling the investigator in charge and providing him in a briefing on what we hear, what may be pertinent to the investigation.

Q. Okay. And how long does it actually take to listen to one of those tapes?

A. Oh, gee. Some are 30 minutes long, some are two hours long. You listen to it multiple times. We usually came into the office for, you know, up to four hours occasionally to go through it all. Then we would have to brief people on it and make briefing points to provide to a Board member.

Q. I see.

When did black boxes begin to be required?

A. Back in the middle '60s.

Q. Okay. So there's always been a black box during the entire time you were --

A. Oh, yeah. They've just improved and gotten longer.

Q. I see.

Is there always a black box found?

A. Usually, for most air carriers. Even the corporate aircraft will have at least a cockpit voice recorder. Most of the larger airplanes have both, a cockpit voice recorder and a flight data recorder.
Are they always found? Sometimes not. We have foreign cases where we've lost one or two. We have one now in the ocean that we're trying to get them both back, but we're still waiting for the Indonesians to recover them.
Q. I see.
Did the type of investigations change when you became deputy director, or was it still major aircrafts, commuters and corporate jets?
A. It stayed basically within the major investigational.
Q. Did you ever review other government agencies in their investigation, for example, the FAA or the Department of the Army or something like that? Did you ever have to go behind their back or be called in and, say, look at what they've done?
A. We've never done that. We have provided technical assistance. I went to Croatia and was



providing technical assistance to the Air Force on the Ron Brown investigation. I was also an advisor to the Columbia accident investigation board for the Space Shuttle Columbia, and so I spent a lot of time in Houston as an advisor for them.
Q. Okay. For Ron Brown and the Space Shuttle Columbia, were you the deputy director at the time?
A. I was deputy director for the Space Shuttle Columbia. During Ron Brown I was chief of Major Investigations.
Q. I see.
Describe to me how many times other than Space Shuttle Columbia you've been involved in reviewing NASA's investigations.
A. Well, I did the Challenger years ago, but since then we've done the Ron Brown. And that's really my only involvement with them. The Board has done other things with NASA, but I didn't participate.
Q. Do you ever review crashes of government airplanes?
A. Occasionally we see a few. It depends on what you mean by "government." If it's, say, a Forest



Service, Customs Border Patrol, we would do those investigations that come under our purview under the Public Use Law. So the only ones we don't do are military operations and intelligence-gathering. All the rest are ours. That's state and local police, anything.
So like Ron Brown was really military, but they asked us to come in for technical assistance.
Q. I see.
What percentage of the crashes are non-military operations or non-intelligence operations crashes?
A. Boy, I don't know how to answer that question.
Q. Did you understand it?
A. Not quite.
Q. Let's make sure you understand the question.
As the deputy director, how many investigations of non-military operations and non -- other than military operations and intelligence operations crashes was Aviation Safety involved with



that required your involvement?
A. It depends. We had the one in Bagram that we did -- that was Afghanistan -- that was sort of military. We certainly had the air tankers breakups out in California and Colorado. Boy. Most of the Forest Service ones are handled by the regional offices directly; I didn't get involved in those.
Q. Were you involved in Bagram?
A. Only in reviewing the report, yes. The investigation was done by one of our regional investigators, but because of the nature of the investigation I was involved in it a lot.
Q. And what about the air tankers in Colorado and California?
A. That report, once again, through review process and comments and everything else.
Q. Were you involved in deciding to launch these investigations, or were you just involved in the review?
A. When it initially happened, in terms of the extra personnel that were assigned to them. And then we did a re-investigation and I was responsible for

having people reassigned to those cases.
Q. I'm not sure I understand, sir. Why would there be a re-investigation in those cases?
A. We took a look. There was a previous air tanker breakup that, because of findings from a later air tanker breakup, we thought we should go back and recover wreckage and investigate it again. And we found additional information.
Q. What happens when the team comes back? What do you do as a deputy director once the team comes back?
A. When the team comes back, we'll have a work planning meeting in terms of what are the facts we have and what do we have to do next. So part of that is determining what additional things we need to do for this investigation. Do we need to do a recommendation right now to the FAA to cure a problem? So we start developing, where is this investigation going and what do we have to do now.
Q. And you're involved in that?
A. Yes.
Q. Describe your involvement.



A. It's basically making decisions at the meeting in terms of assigning resources. We have people who are assigned to multiple tasks that are small, and it's like, okay, we're going to take somebody off of this task for two weeks to put him on one that's a higher priority, or we're going to say, "Okay, you need to leave this one on the back burner and finish off the one you were doing last week before you got launched." So a lot of those meetings are just setting priorities and schedules.
Q. So the meetings, everyone comes back, you have a coordination meeting. And then describe your involvement and the coordination meeting.
A. Well, after we have that then people go out again in terms of research and developing recommendations. We'll then have a follow-up and have a work planning meeting. We'll start setting schedules for when will their factual reports be completed, when do they think the analysis reports will be completed, so we can start working on when we'll have the final report put together and ready to go to the Board.



And that can take some time. It's just juggling resources in terms of we don't have a lot of people, so how are we going to put them to use.
Q. So you have a coordination meeting and then you have a work planning meeting?
A. Right. And there's several coordination meetings. Those sort of happen every month thereafter in terms of where are we going; have we accomplished last month what we promised to do and where are we going to be next month, and try to keep things moving.
Q. So coordination meetings where you describe not only the work from the most recent accident but other accidents as well so you can figure out who goes where and who does what?
A. Exactly.
Q. And then you have work planning meetings to determine the people who are assigned to a certain accident, how they're moving along?
A. And scope out when we're going to complete the investigation, as best we can.
Q. Okay. And then what other work are you involved in as the deputy director regarding the



report?
A. And then in terms of they'll start drafting the report, one of our -- We'll get together again and have a report-writing discussion about what are the key issues of the report, where should it go. Then once the report is started to be drafted, it's a matter of reading your report, reviewing it, making comments, getting back to them with, "We need to fill in these areas," or is some more information needed, do we need to do more investigation, or are we satisfied with everything we need.
Q. Were you directly involved in the strategy-planning meeting for key issues to focus on in the reports?
A. Yes.
Q. Were you the person assigning the issues of concern or to focus on, or was it kind of collaborative?
A. It's a collaborative effort. John Clark would be there, myself, and the whole group.
Q. Okay. And so then the collaboration meeting takes place, and then the reports kind of come

in? The drafts of the reports are coming in?
A. Right.
Q. And describe your role with regard to the drafts of the reports.
A. Well, basically, reading every one of them to take a look and make sure they're technically correct, technically accurate, whether all the issues have been covered, whether there are additional things we need to address, any holes that might be in the investigation, or perhaps we have too much here and we can take that piece out. So it's just kind of your normal report review process.
Q. Now, are you actively editing the work, or are you just making suggestions to it? Are you doing the rewrite as if you were the investigator in charge, or are you writing back and saying, "You missed these topics; you don't need this topic; and here's some additional suggestion"?
A. I do both. There's some areas where I just make the comment and there's other areas where I'll completely rewrite a section if I have to.
Q. Is it common that entire sections are



rewritten during this drafting session?
A. It's not uncommon.
Q. And who else does that ongoing review before all the team reports are finalized?
A. Certainly the directors are looking at it. The division chiefs will look at it. Even the group chairmen specialists are looking at it, and also the director will take a cut at it. Some reports, the director will wait until it gets through a couple iterations of the process before he spends time on it.
Q. Okay. And do you have any follow-up work once you've made your comments? What goes on next with regards to that?
A. Well, once we've included all our comments, we'll have several meetings on this, because sometimes it takes a few meetings to sort out which comments to accept and which ones not to. Once it gets to the directors review meeting, then as deputy I attend that also, there basically to support the report as written and to hear the comments and whether changes are necessary.
Q. Describe the directors review meetings.



A. We send out a copy of the report, a draft, to each of the directors once again, Research Engineering, Safety Recommendations, general counsel, the managing director. They review it, and then we have a meeting where we all get together and step through their comments. And whether their comments -- whether they found something that we didn't see or whether we believe we have something covered or why not, areas we can beef up to improve our analysis.
Q. Do you ever have the opportunity to bring in extra outside people to help out with the report, consultants or technical experts?
A. We could if necessary, yes.
Q. Did you?
A. We've brought in technical experts in various areas, yes.
Q. And that provided you an opportunity to make the report better. Was that also in your budget?
A. Well, we would have to put together a purchase request and go for somebody. It goes through a whole government contracting cycle. But we've had to bring in people, experts in grease, experts in



explosions and different things over the years. It just depends who we might need.
Q. Is that a regular part of the report process, or is that --
A. Not regular. Usually we're pretty self-contained. But if we need somebody, we can do it.
Q. Okay. What does the term "reconsideration" mean?
A. Petition for reconsideration. That is after the Board has issued a final report and signed off on it, a party or person of interest to the investigation can request the Board to reconsider the probable cause and findings. They'll write a letter to the Board requesting this. They have to provide new factual information or analysis that wasn't previously considered by the Board for it to be accepted. And we take a look at that and decide whether we're going to proceed with it or not.
Q. I see.
How often was there a petition for reconsideration while you were deputy director?

Page 202

A. On major reports, that's pretty rare. We don't get that many on big ones. On the ones that are regionals, we get, you know, six to ten a year.
Q. And what happens as a result?
A. As a result, we'll take a look at it, see if there is new information. We'll do a re-evaluation. A letter will be written back to the party saying that we deny the petition based on these reasons, we accept in part, or we accept totally.
Q. Did you ever accept them totally while you were deputy director?
A. Not on a major; we haven't had that. We did a couple in parts. The Board is re-investigating a couple of accidents itself.
In the regional offices, on some of their smaller reports, there's probably been a couple that have been accepted totally, but I can't remember which ones.
Q. I see.
When you get to the managers meeting --
A. The directors meeting.
Q. The directors meeting. Are there

Page 203

substantive changes coming from those meetings?
A. Usually not. There could be some very good changes. They may see things differently or have a different presentation. But yeah, it just depends. Most of the time for most reports that get to the Board at that level, there aren't huge changes, but there can be a different focus they want to put into it.
Q. While Dan Campbell was the managing director, was he involved in suggesting changes in the direction of the report?
A. Oh, yeah. Certainly Dan was. General counsel. I mean, they're all equally involved.
Q. Dan Campbell, what was his involvement in recommending changes and rewrites for Office of Aviation Safety reports?
A. Well, he ran the directors review meeting, and so some of the suggestions were his, some came from other sources and he endorsed them, or sometimes he didn't endorse them and shot them down.
Q. Okay. Did he regularly make suggestions that were incorporated into the reports?

Page 204

A. Probably. I can't remember how many. But he did make suggestions that were incorporated, certainly.
Q. Let me ask it a different way, sir.
When you went to the directors meeting, was it expected that Dan Campbell was going to have a comment or two that would require substantive changes to the report?
A. No.
Q. Was it expected that Dan Campbell would make changes that would be incorporated into the report?
A. It wasn't expected.
Q. Was it customary that he would make suggestions that got incorporated into the report?
A. I'm trying to think of the last meeting I had with him. He did make suggestions, certainly. Sometimes he would just say it was a great report and there would be no changes at all. It varied.
Q. Did Dan Campbell ever recommend that you adopt either the Research and Engineering officer's or Safety and Recommendations officer's or the general

Page 205

counsel's proposed changes in his role as the managing director?
A. Yeah, that happened occasionally where one of the other groups would come up with an idea that once we all heard and thought about it, yes, they were correct. It was an easy sell.
Q. Describe these meetings. Were they tense? Were they --
A. No, they're collegial. Sometimes they would get to arguing over fine points. We're much more technical, so we see things from a strictly technical point of view. Other people may see them slightly different. A lot of the discussions were along the lines of safety recommendations, like is this recommendation really going to get what you want? How is the person going to interpret this, going to respond to it? We had a few of those. Recommendations were usually the most discussed issue. And also probable cause; that became an issue.
Q. How did it all change -- how did the directors meetings change when Joe Osterman took over?
A. It smoothed out a bit. Even Dan changed.

We used to go page by page through the report. Dan then kind of changed over to, "Do you have any issues?" kind of yes or no. And Joe's got a style that's sort of halfway in between. It's basically we start by, "Does anyone have any questions on the factual section?" It goes smoother, quite frankly, but it's just a matter of style.

Q. Sure.

Let's talk about these types of changes. Were there changes to the probable cause section of a major report as a result of the directors meeting?

A. There could be some tweaks to it. Usually nothing major, but occasionally there would be some changes to probable cause, yes.

Q. When you say "tweaks," describe what you mean.

A. Oh, we would change something in contributing, or switch contributing factors. Occasionally something that we had put into part of the probable cause statement would get moved to a contributing factor as opposed to probable cause itself. Most of the changes were pretty minor.



Q. What about the recommendation section?

A. Those would get some changes occasionally. Sometimes we added a recommendation. Sometimes we modified a recommendation a bit. That happened.

Q. Did you ever remove recommendations?

A. We probably did. I can't remember. Either removed or replaced or came up with a better idea.

Q. Let me make sure I understand this. There are organizational or structural changes to the report. And with regard to probable cause, there would be tweaking type of changes to make the probable cause read differently or to attribute different factors to the probable cause.

A. Right.

Q. And as far as the recommendations, recommendations could be added, recommendations could be modified, and less frequently recommendations were removed?

A. It did happen. Occasionally a recommendation is removed. Somebody would take a look and say, "Hey, you can't really sell this," and it would come out.



Q. I understand.

And what about changes to the factual or the analytical section?

A. Rarely would we change the factual. I can't really think of anything. Occasionally the analysis is more editing changes than any real analysis change; the presentation of it, things to improve the readability or help people understand a little better what we were trying to get across.

Q. I see.

How many major reports did OAS present to the Board between 2001 and 2007?

A. Gee. Normally about five, six a year. So just multiply that time frame. That's been around our average, five to six.

Q. Okay, that's the average. Were there lesser during certain years?

A. A couple of years we did like two, especially back when we were really busy and couldn't get our head above water. This year I think we'll be up to nine.

Q. How do you describe the difference between



two and nine? What are the factors involved?

A. Well, it depends on what's going on. When we were doing accidents like TWA 800, US Air 427, we just got buried alive in work. And trying to get reports out, it was hard to get people to write because they were out on the road doing investigations. So we really got behind on reports for a period of years, and during that time frame we just couldn't catch up. So once things settled down a bit, we were able to start catching up with the backlog and moving reports out the door again.

Q. What was that time frame when you couldn't keep your head above water?

A. Oh, gee. It started in '96 and lasted until about 2002.

Q. Okay. And then from 2003 through, I guess, 2007, when you moved on and became the director, what was the average?

A. Well, there we're back down to -- like I said, during that time frame, from 2002 on, we're probably doing five to six a year.

Q. Okay. And so it's a function of the number

of accidents that you're investigating?
A. Well, it's a function of the complexity of the investigations, not necessarily number. But we did a group of accidents that were extraordinarily complex and just really used up our resources.
Q. Okay. What about staffing levels?
A. Staffing levels actually shrank a little bit. So we lost some budget, and so we have fewer people now than we did back in the 2001 time frame.
Q. But while you were deputy director, did staffing levels affect the division's ability to generate reports?
A. Yes. We've been low on staff.
Q. Do you think if you had more staff in any given year you would be able to produce more reports?
A. Absolutely.
Q. Did you ever talk to anyone about getting more staff so you could produce more reports?
A. Practically daily. It's just a function of the budget the Safety Board received at the time. But yeah, that was ongoing discussion.
Q. After the directors meeting, additional



changes are made and then there is a sign-off meeting?
A. After the directors meeting it goes to the Board, and usually there will be a Board meeting in a public forum. At that time the staff will formally present the report to the Board, it will be discussed in an open environment, and then the Board signs off on the report.
Q. I understand there is actually a whole process once it leaves the modal office and goes up to the Board. From doing my background research I understand there's meetings, and I understand this actually takes place in all the agencies where, for example, people go up to the floor where all the Board members are and have meetings and figure out what kind of questions the Board is going to have before the sunshine, et cetera. Describe your involvement in that process.
A. Certainly the Board wants to meet with staff before the Board meeting to discuss the report with them, discuss any issues they have to try to understand it better. I attended probably about half of those during the period I was deputy. I went to



them or John went to them. So we would meet with each of the Board members. They would discuss the report and any issues they had, any questions they had, and help get them prepared for the public meeting.
Q. Did you participate on behalf of the division at the sunshine meetings?
A. Yes. I would sit in on -- When John was director, he sat in on most of them, so I only did probably about 25 percent of those during the time I was deputy.
Q. Describe to me what's involved in representing the division or the modal office at a sunshine meeting.
A. Well, for the most part, staff will make a presentation of their findings in various areas of the Board. The Board will discuss it. Staff will provide the facts and their analysis.
For the director or deputy director, a lot of what we do there is policy or overall part of the investigation in terms of some bigger aspects of why we didn't do something, why we did, historical background on issues and things like that, and kind of



provide a broader perspective.
Q. Was there a lot of work involved in preparing for a sunshine meeting for you?
A. Meeting with the Board members, getting up to speed. There's a lot of activity that takes place in the two weeks prior to a Board meeting in terms of the Board may have additional questions. There's a process they can put their questions back into the system to see if any changes are made to the report or if they have suggested changes to consider during the report meeting.
So there is a lot of activity that happens. In fact, just about 100 percent of the deputy's and director's activities are wrapped around getting to that Board meeting in those last two weeks.
Q. So during that two-week period, 100 percent of your time is involved in making sure --
A. Just about. Between meetings of the Board and just getting all the presentations. Because we do have presentations. We'll have dry runs and making sure they all run smoothly, reviewing all the charts and graphs.

Q. Who was involved in that? Was John involved in that, or were you involved in that?
A. Both.
Q. When you say both, how did you divvy up the work?
A. We both would attend. For instance if they're doing a dry run of the presentation, we would both be there and both comment on the presentation, whether they needed to add something, take something back, change the presentation. We were both there.
Q. You mean the staff members' presentation?
A. Yes, the staff members' presentation.
Q. What about responding to questions from the Board members? Did you participate in that?
A. Yes. Usually a staff member may answer directly, or occasionally John or myself would respond.
Q. More frequently, who was asked the question, a staff member or you?
A. Most of the time it's the staff member. They're the person who did the on-scene investigation. They're the point person.



Q. Sure.
What about the meetings with the Board members, actually attending meetings with the Board members? How much time did that take?
A. As I said, that's like two weeks before. That took a lot of time. Some of those meetings would drag on for hours. Some Board members are not as technically savvy and we're trying to get them up to speed on the technology and what's going on. That can take a long time.
Q. During that period, that two-week prior to that sunshine period, how much were you involved in other investigations, or would you just write off your calendar --
A. No. That's where the evenings come into play. There's still other things going on, and so a lot of things happen after hours in terms of getting information out the door. But during the daytime, it's almost spent, you know, working getting a report ready.
Q. I see.
You yourself as the deputy director were



involved in doing that work and getting the report ready?
A. Yes.
Q. What other types of reports were there that the Office of Aviation Safety produced from 2001 through 2007?
A. We also produced special investigation reports which are not on specific accidents; they're on several accidents that are related. We did one on EMS helicopter services during that time frame. That was the biggest one we did. So that's one we did produce.
Q. How many did you do, sir?
A. I know the EMS one. I think there's another one, but I can't remember the name of the darn thing.
Q. It wasn't while you were deputy director?
A. It was as deputy, but I can't think of the name of it.
Q. So there were two special investigation reports?
A. Right.



Q. What other types of reports were produced?
A. Basically, that's all we produced. We have accident reports, special investigation reports. We have recommendation letters that go out. Those are our primary products.
Q. The special investigation reports, describe your involvement in those.
A. Everything from when we first proposed the idea to which resources are assigned to it. Once again, once it becomes a written draft, it goes through the review process and comment period.
Q. Did it track the same type of process as a major report?
A. Yeah. Once they start to do the writing process, they're identical. It's hard to tell the difference.
Q. Okay. So you were involved in shepherding the project through and the coordination. Did you have any of the analytical review as well?
A. Yeah. I review the analysis sections, yeah.
Q. And describe whether these reports are

taken as -- with the imperative of a major report. Are they timely?

A. We try to be timely, but we also understand that they have to take a back burner to a major report that's going out. So we're trying to push them through the system, but we understand that, you know, if something else comes up from an ongoing investigation, they're kind of a secondary approach until they get really close to going out the door. Then we have to speed them up. Once they're up to the draft stage and director's review, it's time to move them. We can't hold them up anymore.

Q. I see.

Describe that to me again. I want to make sure I understand this. Once it gets through the staff review --

A. Once we've got enough documented that we have kind of a critical mass of report going on, it's just easier to keep it moving and get it to the next level, get it to the director's review level. Because if it sits to go, we have to start almost all over again.



Q. I see.

What percentage of your time was spent on special investigative reports as deputy director?

A. It would be just like any other report. Like I said, there's two during that time frame, and they're quite long and well done, but it would be like any other long report.

Q. Describe to me the technical issues that you would get involved with in dealing with a major report, let's say for -- let's pick a report from 2001 through 2007. Describe to me what type of technical --

A. Well, it depends. Take, for instance, American 587.

Q. Which is what?

A. That was an airplane taking off from JFK and the vertical fin separated and it crashed into Jamaica, New York. Or actually Belle Harbor, New York. And that one heavily involved -- I was on-scene for a period up there because there was so much involvement by the media, the police, the FBI and everything else. As deputy director, I wanted to be up there to help make sure the coordination was going smoothly. It also happened just right after 9/11, so there was a lot of interest in terrorism and that possibility. So I was up there for that.



As it continued on, as we got into the systems aspect, I was involved closely in some of the systems research going on.

Q. Describe your systems research. What is that?

A. We were taking a look at the response of the rudder system, so how was the rudder system designed, what was the rate of response of the rudder system. I was involved in that.

We also hired NASA to assist us in the composite materials investigation. I attended a lot of meetings -- well, actually four meetings down at NASA Langley regarding their work on modeling the vertical fin, their loads analysis, and working with them. It changes.

Q. Is that common that you would go up to New York or go on site or go to meetings with model agencies or outside people who did modeling as the deputy director?



A. Yeah, that's fairly common. Because once again, when we had an accident -- There was actually an accident in Estonia where we were interested in the actuator system. I attended the actuator teardown and the examinations out in California on it.

So there are certain ones I'll take a look and want to be hands-on with.

Q. You said it was common for you to get involved. Which of the two, the on-site or the -- You already said you didn't really go on-site --

A. The on-site was only like a major investigation with a major launch. We haven't had that many lately.

Component teardowns, other examinations, it depends on when they occurred. 587 I was involved a lot more in because my background was in structures.

Q. Uh-huh.

A. I also, from previous investigations, knew a lot about aircraft flight control systems, so I was involved in that one from that point of view. It just depends on what's happening.

Page 222

Q. In a given year while you were deputy director, how many teardowns did you become personally involved in that required travel and you had to go somewhere?
A. Boy, I don't know. Several each year. Two or three.
Q. Two or three a year?
A. Yeah.
Q. And how long were the trips for that you would go on?
A. Some were a couple of days. Usually not more than a week.
Q. And that wasn't really a major part of your work, was it?
A. No, it wasn't. It just got in the way of everything else going on because you were out of the office for a period of time.
Q. Sure.
What's a green sheet?
A. A green sheet is a recommendation letter. They're printed on green paper; that's why they're called a green sheet. It's left over from something

Page 223

back in the '60s. But the recommendation letters are printed on green paper.
Q. I see.
MS. COHEN: If you're at a stopping point, can we take a five-minute break?
MR. LOWINGER: Sure.
(A recess was then taken.)
MR. LOWINGER: We're back on the record, and it's nine to 5:00 in the afternoon. We are going to stop the deposition with the understanding that the parties are going to bring the deponent back at a later date, and counsel for both parties have agreed tentatively with the deponent to continue on Friday, the 13th of July, to finish this up. If not, the parties agree to set a mutually convenient date so that we can wrap this deposition up.
Is that correct?
MS. SILBAUGH: Yes, we do.
MR. LOWINGER: No further questions.
(Whereupon, the deposition was recessed at 4:51 p.m.)

Page 224

WITNESS CERTIFICATE

I, THOMAS E. HAUETER, have read or have had the foregoing testimony read to me and hereby certify that it is a true and correct transcription of my testimony with the exception of any attached corrections or changes.

______________________________
THOMAS E. HAUETER

[ ] No corrections
[ ] Correction sheet(s) enclosed

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned authority, by the witness, THOMAS E. HAUETER, on this the _____ day of ___________________, _______.

______________________________
NOTARY PUBLIC IN AND FOR
THE STATE OF ________________

My Commission Expires: __________

Page 225

REPORTER'S CERTIFICATE

I, the undersigned Registered Professional Reporter and Notary Public, do hereby certify that THOMAS E. HAUETER, after having been first duly sworn by me to testify to the truth, did testify as set forth in the foregoing pages, that the testimony was reported by me in stenotype and transcribed under my personal direction and supervision, and is a true and correct transcript.

I further certify that I am not of counsel, not related to counsel or the parties hereto, and not in any way interested in the outcome of this matter.

SUBSCRIBED AND SWORN TO under my hand and seal this 3rd day of July, 2007.

______________________________
JOHN L. HARMONSON, RPR
Notary Public in and for
the District of Columbia
My Commission Expires: 10/14/2010

CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

DATE SIGNATURE



CHANGES AND SIGNATURE

PAGE LINE CHANGE REASON

DATE SIGNATURE