# EXHIBIT G

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

MARJORIE MURTAGH COOKE, Plaintiff,

-vs-

THE UNITED STATES, Defendant.

Case No. 06-748C
Judge Thomas C. Wheeler

CORPORATE DEPOSITION OF

NATIONAL TRANSPORTATION SAFETY BOARD

by and through JOSEPH G. OSTERMAN

Washington, D.C.

Friday, July 6, 2007

9:48 a.m.

Job No.: 1 - 107102

Pages: 1 - 265

Reported by: Paula M. Flint

Corporate Deposition of NATIONAL TRANSPORTATION SAFETY BOARD, by and through JOSEPH G. OSTERMAN, held at the law offices of:

THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Paula M. Flint, Notary Public of the District of Columbia.



A P P E A R A N C E S

On behalf of the Plaintiff:
BY: BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

On behalf of the Defendant:
BY: QUAN K. LUONG, ESQUIRE
U.S. Attorney's Office, Civil Division
501 Third Street, Northwest
Room 4218
Washington, D.C. 20530
(202) 514-9150
and
BY: KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
Office of the General Counsel
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6084



C O N T E N T S


| EXAMINATION OF JOSEPH G. OSTERMAN | PAGE: |
|---|---|
| Mr. Lowinger | 6, 257 |
| Mr. Luong | 251 |


E X H I B I T S


| OSTERMAN DEPOSITION EXHIBIT NO. | | PAGE: |
|---|---|---|
| (Exhibits subsequently attached to the deposition.) | | |
| 1 | Position Vacancy Announcement | 88 |
| 2 | Memorandum | 91 |
| 3 | Position Vacancy Announcement | 92 |
| 4 | Memorandum | 93 |
| 5 | Operations Bulletin | 226 |
| 6 | Operations Bulletin | 227 |
| 7 | Operations Bulletin | 229 |
| 8 | Order | 232 |
| 9 | Performance Appraisal Form | 234 |
| 10 | Performance Appraisal Form | 234 |
| 11 | Position Description | 235 |
| 12 | Position Description | 237 |
| 13 | Application | 238 |
| 14 | Qualifications Brief | 238 |




E X H I B I T S C O N T I N U E D


| OSTERMAN DEPOSITION EXHIBIT NO. | | PAGE |
|---|---|---|
| (Exhibits subsequently attached to the deposition.) | | |
| 15 | Rating and Evaluation Plan | 240 |
| 16 | SES Rating Sheet | 243 |
| 17 | Briefing for Panel Members | 245 |
| 18 | Organizational Structure | 246 |
| 19 | Position Description | 248 |
| 20 | Unclassified Set of Duties | 249 |


* * *

Thereupon,
JOSEPH G. OSTERMAN,
was called for examination by Counsel and, after having been duly sworn by the Notary, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:
Q. Good morning.
A. Good morning.
Q. How are you today?
A. Good.
Q. Can you please state your name for the record.
A. Joseph Osterman, O-S-T-E-R-M-A-N.
Q. And, Mr. Osterman, you are here today for the deposition of Marjorie Murtagh Cooke versus Mark Rosenker as the chairman of the National Transportation Safety Board. And you will be serving as the designated representative on behalf of the National Transportation Safety Board. Is that your understanding of why you're here today?
A. Yes.



Q. And could you please -- before we start let's just deal with some initial items.
Have you reviewed the topics for a deposition today that are -- that I will be questioning you on?
A. I have.
Q. And you feel comfortable discussing all of the topics in that -- in that series of questions except for questions 17 and 18, which deal with email and electronic discovery issues?
A. Correct. The IT ones I'm not prepared for, and I have some, but not complete, knowledge on some of the others.
MR. LOWINGER: Now's a good time that we're going to just -- counsel are going to just enter in just some general notes about the deposition for today.
Counsel for -- actually, counsel for National Transportation Safety Board -- we're just going to refer to it as NTSB. Is that okay with everyone today?
MR. LUONG: Yes.



MR. LOWINGER: We're going to enter in some objections on the record.
And, Mr. Luong, why don't you go ahead.
MR. LUONG: Great. Thank you, Mr. Lowinger.
We want to object on the grounds of relevance to topic 1, topic 9 and topic 20.
With regards to topic 1 of the 30(b)(6) notice, let me state that we don't object to the extent that questions are asked about the evaluation of Ms. Murtagh Cooke that was submitted along with her application for the SES on that position. To the extent that it asks questions related to her tenure or performance beyond that, we do object on the grounds of relevance.
With regards to topic 9, again we object on the grounds of relevance, with the exception of the performance evaluation that Ms. Murtagh Cooke submitted along with her application for the SES on that position.
Topic 20, we object on the grounds of relevance. It's also -- we also believe this is



overly broad as well.
We also object with regards to -- coming back to topic 1, to the extent that questions are asked prior to the 2000 time period, those topics or those questions exceed the scope of what this witness has been designated to speak to today as a 30(b)(6) witness.
With regards to topic 9, same objection as well, that to the extent that questions are asked about the time period prior to 2000, that it exceeds the scope of what this witness has been designated to testify to as a 30(b)(6) witness.
With regards to topic 10, we don't object on the grounds of relevance, but we do object to the extent that this witness has not been designated to speak to this topic. We also believe this topic is outside the scope of a 30(b)(6) deposition, to the extent that this information is not reasonably known or available to the agency.
And again with regards to topic 20, even though we object on the grounds of relevance, we have indicated to plaintiff's counsel that

Mr. Osterman can't speak to this topic dating back to the 2000/2001 time period. However, we do object, in addition to our objection, to the entire topic on the grounds of relevance. We object to the extent that any questions asked prior to 2000/2001 as outside the scope of what this witness has been designated to speak to as a 30(b)(6) witness.

And then just the other thing we wanted to address -- Brian, we talked about this -- is a protective order with regards to any testimony that Mr. Osterman gives to -- in response to topic 20. Do you recall that?

MR. LOWINGER: Sure.

MR. LUONG: Sure. And I guess what we had talked about is putting that testimony under a separate tape and under seal and then agreeing that subsequently we would file a joint protective order with the court.

MR. LOWINGER: And would that apply to publicly available proceedings or just internal EEOC?

MR. LUONG: Just internal EEOC. To the



extent that anything's publicly available. We would not on that, that is subject to the protective order.

MR. LOWINGER: Just a few questions about your objections. I think with regard to number 20 you said that you have an objection with regard to back to 2000/2001. Is it that you don't have an objection back to 2000/2001, but you do object to prior to 2000/2001?

MR. LUONG: We have an objection to the entire topic on the grounds of relevance. But again, in the interest of cooperating in discovery we are willing to produce a witness who can testify to topic 20 dating back to the 2000/2001 time period.

To the extent that questions go prior to that or outside the scope of that, we have checked that that exceeds the scope of what the witness has been designated to testify to. Is that clear?

MR. LOWINGER: Clear.

MR. LUONG: Okay.

MR. LOWINGER: And with regard to -- and



on behalf of plaintiff, with regard to any matters that the representative cannot testify as to, plaintiff reserves the right to keep the deposition open, to bring back another representative to testify as to those topics. And also that we will possibly follow-up on this deposition with regard to the IT topics, questions 17 and 18.

BY MR. LOWINGER:

Q. Just some introduction questions, sir. Okay?

A. (Indicating.)

Q. Have you ever been convicted of a crime?

A. No.

Q. And have you -- have you had any substance in the past 12 hours that would affect your ability to hear, understand or respond to the questions today?

A. No.

Q. And just some brief ground rules. I know that we've met before at another -- in another case, but it's a separate deposition so let me just go through them again for the record.



It's a deposition. It's really just a question-and-answer period. During the time your counsel may impose some objections. That's perfectly reasonable. It's part of the process. I ask that you respond to the question nonetheless. The court will decide whether or not to let the deposition -- let the question proceed or not at a later time.

I ask that you let me finish my question before you answer it and that I will also try not to interrupt you when you answer, but in case I do, I apologize in advance. And also please feel free to just restate your answer in case I threw you off or anything like that.

And of course, along that same line, if you don't understand the question, if the question is not clear, if you didn't hear it, just please let me know. Because otherwise, if you answer, I'll assume that you heard and understood it. Is that okay?

A. I understand.

Q. Thank you. Also, we request that all your

Page 14

responses be verbal, and that they be a "yes" or a "no" and not an uh-huh. Because uh-huh or a nod of the head doesn't translate onto the record and it leaves lots of confusion later down the road. Is that okay with you, sir?

A. It is.

Q. And is there any reason why you couldn't testify as to the topics today other than what's been discussed previously so far today?

A. No.

Q. I guess with no further -- why don't we just proceed.

Can you please tell me how you came to be the representative for today's deposition?

A. I'm currently the managing director of the National Transportation Safety Board and the senior career civil servant within the board.

Q. And you say you're currently the managing director. How long have you been the managing director?

A. I've been the managing director since March 17, 2005.

Page 15

Q. And prior to that -- can you describe to me what the duties of the managing director are, sir?

A. The managing director is essentially the chief operating officer for the agency. My responsibilities are for the execution of the agency mission, budget, personnel and all of the planning and activity that goes on with the career staff within the NTSB.

Q. What does career staff mean?

A. Nonpolitical staff career. Career federal employees.

Q. I see. And prior to that how -- what was your position at NTSB, if you had one?

A. Prior to that I was the director of the Office of Highway Safety from 1997 to 2005.

Q. Can you tell me what the duties of the director of Highway Safety entail?

A. A director of Highway Safety is responsible for the highway accident investigation activity, personnel involved with that activity, budget. Not only the investigations but the

Page 16

development and presentation of reports associated with those investigations. Also recommendations and representing the board on highway safety issues.

Q. And is that -- was that a GS-15 or SES level position, sir?

A. It was both. It was a GS-15 from 1997 to 2002 and -- I've seen so many numbers in my reviews I may get confused. And in 2003 I was promoted to the SES position.

Q. I see. I'm just going to stop this line of questioning just for a second because you mentioned something, that you've seen so many numbers during your reviews.

A. I think I got those numbers earlier.

Q. That's perfectly okay. I'm sure there's a document out there somewhere. But you did mention during your reviews -- just briefly, how did you prepare for today's deposition?

A. I looked over the submissions that we have provided to you and then agency policies and practices. Additionally, I previously interviewed the former managing director, Dan Campbell, and

Page 17

that's it. That constitutes the bulk of my review.

Q. You interviewed Dan Campbell. Did you speak with anyone else besides Mr. Dan Campbell regarding today's deposition?

A. Other than Ms. Silbaugh, no.

Q. And you said you reviewed your submissions to us, the plaintiffs. What submissions were those?

A. A variety of documents that include the CFR, operations bulletins for the agency, performance evaluations for Ms. Murtagh, position descriptions. Some -- for this particular deposition, some material associated with the advertisement and selection process for the office director for Marine Safety.

Q. You said some materials related to the advertisement and selection for the office -- for the SES position for director of Office of Marine Safety. Can we just refer to that as OMS for the rest of the day?

A. Certainly.

Q. Are there any other abbreviations that you would want to use throughout the day to keep this as

efficient as possible? Are there any others?
A. I don't think so. NTSB and OMS will -- and SES, senior executive service, will cover most of them, I think.
Q. You said you reviewed the CFR, the operations bulletins, performance reviews, position descriptions and the advertisement and selection information related to the OMS SES position.
Could you just tell me whether any of that information was electronic, whether you saw any of it in email format or on a computer?
A. No, I saw it all on paper.
Q. All of it was paper. And when you say you saw information related to those topics, with regard to the advertisement selection of OMS, were there any -- were there any handwritten notes that you saw on any of the documents?
A. There were. There were copies of handwritten notes on the selection panel forms that I looked at.
Q. And do you know which -- do you know which selection panel forms those were that you saw



handwritten notes on?
A. They were for the selection panel that occurred in early 2005.
Q. Were there any other handwritten notes along the way related to the 2004 selection panels?
A. No. The only handwritten notes were annotation on the selection sheet written by Mr. Campbell, referring the selection for readvertisement.
Q. I see.
A. Or for referring the job for advertisement.
Q. Going back to that prior line of questioning with regard to your duties as the director of the Office of Highway Safety, you became an SES in 2002. Were you at all involved in any of the review panels for the SES position as an SES member for the OMS position?
A. I was.
Q. Which panel were you involved in?
A. From my review of the documents there was a panel in 2004, a panel in early 2005, and then a



second panel in 2005. I was -- I participated in the middle of those, in the first panel in 2005.
Q. You did not participate in the panel in 2004?
A. No.
Q. And there's two panels, not one panel in 2005?
A. Correct.
Q. Could you describe the two panels in 2005, sir?
A. After the job was readvertised, the panel that was convened for the review of the applications occurred in, I believe, February of 2005 to review the applicants that had been provided and the applications that had been provided by our human resource office.
That panel reviewed the group, eliminated a few applicants as nonqualified and then ranked the remaining applicants and submitted that ranking to the then managing director, Mr. Campbell.
Q. And you were part of that panel?
A. I was part of that panel.



Q. And that's an ad hoc executive review panel. Review board panel, is that what it's called?
A. Yes. It's not a standing panel. They're convened -- these review panels are convened specifically for each SES job.
Q. I understand. And there was a second panel. Why was there a second panel, sir?
A. There was a second panel because in the interim, after the first panel, I became the managing director. And because I was involved in the first panel and then would also be the selecting official, that became a conflict in the OPM regulations, or at least an appearance of a conflict. So I reconvened the panel, a different panel, and had them look over all of the applications again as if it had not occurred previously and then resubmitted.
Q. When did this -- when was the second panel convened?
A. I believe February of 2005.
Q. And the first panel was convened when?

Page 22

A. In the fall or late fall of 2004.
Q. When was the first panel for the 2005 --
A. In February of 2005.
Q. So there were two panels in February 2005?
A. Correct.
Q. Did both panels review the -- all the applications that were submitted for the SES position?
A. Yes.
Q. And there was a full set of -- there was a completely separate review by the panel members?
A. Clarify the --
Q. Sure. Who was on the first panel in 2005?
A. The first panel was myself, Elaine Weinstein, the director of Safety Recommendations, John Clark, the director of Aviation Safety, Vern Ellingstad, the director of Research and Engineering, and Robert Chipkevich, the director of Rail, Pipeline and Hazardous Material Safety.
Q. Anyone else besides yourself, Elaine Weinstein, John Clark, Vern Ellingstad and Bob Chipkevich for the first panel in 2005?

Page 23

A. I don't believe so, but if I look at the documents there may be another. But my recollection is not.
Q. Sure. What I'm -- who was on the second panel in 2005, sir?
A. The second panel were the same panel members minus myself and the addition of Mr. Tom Haueter, H-A-U-T-E-R, who was the deputy director of the Office of Aviation Safety.
Q. Are there records, sir, with regard to the results of the first panel in 2005?
A. Yes.
Q. Are there records with regard to the second panel in 2005?
A. Yes.
Q. What were -- with regard to Marjorie Murtagh Cooke and the first panel, was she selected -- did she pass through and was she approved by human resources for the first panel as a qualified applicant?
A. Yes.
Q. And was she determined to be qualified

Page 24

for -- to proceed to the next level of consideration by the panel members for the first panel in 2005?
A. Yes.
Q. Was she determined to merit an interview by the panel members in the first set of panel members in 2005?
A. No.
Q. She was not. Are there records regarding the decision not to grant her an interview by the first panel in 2005?
A. There are records regarding the rating of the applicants.
Q. Okay.
MR. LUONG: I'm sorry, I'm just going to object.
MR. LOWINGER: Can we just let him finish?
MR. LUONG: I just want to state my objection to the characterization of the question. That's it.
BY MR. LOWINGER:
Q. Please proceed.
A. There are records as to the ranking of the

Page 25

applicants. And the panel submitted the first five members in the ranking as those that should be interviewed.
Q. And has NTSB produced a copy of the ranking by the first 2005 panel?
A. I don't believe so. I'm not certain.
MR. LOWINGER: Mr. Luong, could we please have a copy of the first panel's review of the candidates?
MR. LUONG: We already produced that, Mr. Lowinger.
MR. LOWINGER: You've already produced that?
MR. LUONG: That's correct.
MR. LOWINGER: Have you produced the second set of the second panel's review in 2005?
MR. LUONG: What do you mean, Mr. Lowinger, by the -- I think what we just produced to you earlier today was the rating and ranking sheets for Cooke and for his selectee for the 2005 second panel.
MR. LOWINGER: Okay. So previously --

MR. LUONG: We produced it for the first panel, and this morning we produced it for the second panel.
BY MR. LOWINGER:
Q. To whom did the first panel make its recommendation in 2005?
A. The first panel in 2005 made its recommendation to the managing director.
Q. And that was Mr. Campbell?
A. Mr. Campbell.
Q. And to whom did the second panel in 2005 make its recommendation?
A. To the managing director.
Q. And who was that?
A. That was me.
Q. Can you describe to me the process, from the beginning to the end, in general for how a -- how the executive -- the ad hoc executive review board panel reviews SES applications for the SES OMS position?
A. Certainly. Following the completion of a public advertisement for the position, the human



resources division will review all of the applicants received and extract from the applicants those that are -- do not meet basic qualifications. And that means they have not submitted the appropriate paperwork or they do not meet the core qualifications for an SES application. All other applicants are forwarded to the panel.
The panel is convened specifically of SES members that are only convened for that particular position for OMS or any other SES position.
SES members are selected for this panel based on their knowledge of the basic duties of the position and their interaction within the agency with the candidate who would potentially be selected for that position.
All of those applications are sent to the members for review, the panel members for review in advance of a meeting. Those members review the applications. There's also a very short procedural guidance provided by human resources on how the panel is to review the applications.
And then finally there is a -- I'm not



sure that I have the title correct, but it is a ranking sheet that is provided, in which the panel members decide whether the applicants are qualified, highly qualified, minimally qualified or not qualified in a series of different categories.
Q. Okay.
A. Let me complete the answer.
Q. Please, go ahead.
A. The panel then convenes, has -- reviews each of the applicants and, as a group, discusses the merits of each applicant and each panel members' individual assessment of their skill and qualifications. And then the panel agrees to a final rating and ranking of the applicants.
One additional step. If the panel finds that there are applicants that are not qualified, they will eliminate them from consideration.
Q. Just some questions about the process, sir.
A. Uh-huh.
Q. Who drafts the advertisement?
A. The advertisement for the position is



generally drafted by the human resources division personnel, and then the selecting official frequently, usually, has significant input into the advertisement.
Q. Who's the selecting official, sir?
A. The managing director.
Q. So in 2004, did Mr. Campbell have input on the content of the advertisement?
A. Yes.
Q. Did he participate in editing the advertisement?
A. I don't know specifically, but the general practice is for the selecting official to contribute by choosing KSAs, knowledge, skills and ability qualifications, and reviewing then the core requirements for the SES.
However in the federal service, general schedule jobs are frequently very unique in their advertisement descriptions. Within the SES the advertisement is relatively standard across the government in categories of business acumen, leadership, communications and so on. And it is

extracted from an OPM standard.
Q. I see.
A. So the primary contribution would be KSAs.
Q. I just want to make sure I understand, sir. The managing director's primary contribution in 2004 and in -- for the first panel, for the first advertisement -- or for the advertisement in 2005 was related to the KSAs?
A. Yes.
Q. When we say KSAs, what are KSAs, sir?
A. They are specific qualifications that are asked for in the advertisement for that specific position.
Q. I see.
A. Knowledge, skills and abilities that you need as an applicant to execute this particular job.
Q. Was there one advertisement in 2004 and only one advertisement in 2005?
A. Correct.
Q. And did Mr. Campbell contribute his editing or his -- did he contribute in his manner, however he did, on the KSAs in 2004 and 2005?



A. Yes.
Q. Are there drafts of the advertisement maintained by NTSB?
A. The only advertisement that I'm aware of is the final advertisement.
Q. Is the document actually prepared electronically?
A. Yes.
Q. And are the drafts that are exchanged between human resources and the managing director exchanged electronically?
A. Not when Mr. Campbell was there.
Q. Can we -- I think we're getting -- I think this leads me to the next question. What do you mean by that, sir?
A. Well, Mr. Campbell generally did not correspond edits or comments through the electronic media, through the email or attachment process.
Q. Why is that?
A. It was his standard practice.
Q. I see. Who was the human resources person who did drafting along with Mr. Campbell in 2004 and



2005?
A. I believe it was the deputy human resources division chief, Colette Magwood, M-A-G-W-O-O-D.
Q. And how long did it take Ms. Magwood and Mr. Campbell to prepare the advertisements in 2004?
A. That I don't know.
Q. Do you know how many versions of the draft there were?
A. I don't know that either.
Q. Do you have an understanding of whether there was more than one draft exchanged between them?
A. I don't. I don't know if there was or was not.
Q. Are the drafts -- is it that there's absolutely no electronic draft of the advertisement in 2004 and 2005?
A. The only electronic draft that I'm aware of is the final draft that went on the public Website.
Q. I see.



A. The final announcement.
Q. And where is the final draft maintained in NTSB's electronic record system?
A. This is going to be one where I'm not sure. I'm not an IT groundhog. I'm not exactly sure where the drafts go in the IT system. You'll need to ask the IT witness on that one.
MR. LUONG: Brian, one of the things I meant to make clear early on is that -- and this was our agreement, that the reason we were stating those objections is because they'll apply to any questions that arise within the context of those categories as we proceed throughout the deposition so that I won't have to renew those objections.
MR. LOWINGER: Well, if it was on a desktop, then we wouldn't be talking about servers and everything like that. I'm just trying to find out if it's a desktop issue or if it's a server issue.
MR. LUONG: And again, I'm just stating that we're not going to continue to make our objections to the extent that any of your questions

Page 34

may fall into those four categories.
MR. LOWINGER: Fine.
BY MR. LOWINGER:
Q. Are you aware, sir, whether Colette Magwood is still employed by NTSB?
A. She is not.
Q. Do you know when her career at NTSB ended?
A. I believe early 2006.
Q. Do you know where she's currently employed, sir?
A. I'm not certain, but I think it is the National Oceanic & Atmospheric Administration.
Q. Did she leave under good terms or not, less than good terms?
MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.
A. She left under favorable terms.
Q. What changes were made in 2005 to the advertisement that was not posted in -- that was posted in 2005 as opposed to the 2004? Do you understand the question? Maybe I can say it a little differently.

Page 35

A. No, I understand the question. Was there a difference between the 2004 advertisement and the one readvertised in 2005?
Q. That's right.
A. Without looking at the documents I can't give you an answer to that specifically.
Q. Are you aware of whether or not Mr. Campbell suggested edits to the 2005 advertisement?
A. I'm not aware. I would have to look and compare the documents.
Q. Could it be that there were edits considered but not finally adopted in 2005?
A. It could be. I'm not aware of it.
Q. Did you have any conversations with Mr. Campbell regarding his editing of the vacancy announcement in 2004 and 2005?
A. No.
Q. Did Mr. Campbell discuss his role with regard to the -- his duties as the selecting official in 2004 and 2005 when you spoke with him?
A. He did.

Page 36

Q. Can you tell me what he mentioned regarding his duties and responsibilities as the selecting official?
A. Well, his duties and responsibilities as selecting official were fairly standard. He would take the applicants provided by the ranking -- provided by the panel and determine which to interview. And he would conduct those interviews and make a selection from those interviews and the rating and ranking from the panel and the applications themselves.
Mr. Campbell in 2004 decided to readvertise the position. And his stated reason was that he learned from his discussions with leadership at the Coast Guard that there was a belief by many potential applicants who chose not to apply that the position was preselected for Ms. Murtagh. And he, in deciding to make sure that the NTSB had the broadest pool of qualified applicants, decided to reannounce the application -- or reannounce the advertisement.
Q. When you say the broadest pool, broadest

Page 37

pool of what types of characteristics, sir?
A. Qualified applicants.
Q. When you say qualified applicants, I mean the -- are we talking about -- what qualifications was Mr. Campbell looking for that led him to believe that he needed to readvertise the position in 2004?
A. He was looking for a broader selection pool. He wasn't looking, from my understanding, for different qualifications.
I don't believe in the first advertisement, in 2004, there were many applicants. And his concern for that led him to readvertise the position so that there would be more applicants to choose from.
Q. So in doing so, how did the advertisement change so that there would be more applicants who would not think that it was preselected for Ms. Murtagh Cooke?
A. I don't believe that the advertisement changed. The nature of federal hiring, for those who watch senior executive positions, there is -- it is not permissible to preselect a candidate. The

rules prohibit that.

If an application is offered and there's a belief by the community that there is a preselection afoot, that an agency has a particular applicant in mind and then the agency readvertises the position, it essentially tells the reader, the audience who's looking at these advertisements, that there is no such preselection, because had there been there would not have been a readvertisement. Are you following?

Q. I --

A. So it's not necessary if you're trying to tell the audience of applicants that there is no air apparent necessarily, which is not permissible in the federal hiring service. It's not necessary to overtly say that. By readvertising it you're essentially doing that.

Q. What happens to the applications that were submitted prior to, in 2004, when there was -- when the position was readvertised?

A. In a readvertisement the human resources division will notify the applicants that it is going



to be readvertised, and there's two choices. I'm not sure which one was chosen here. Choice one is to forward those existing applications into the new announcement, or choice number two is, to notify the applicants that they must reapply.

Q. I see. And you don't know which one it was this time?

A. I don't. I suspect it was a notice that the applicants reapply.

Q. Who did Mr. Campbell speak with at Coast Guard regarding the thought that there was a preselection going on?

A. I don't know. It was the senior leadership at the time.

Q. Do you know if that was a telephone conversation?

A. I don't know.

Q. And why did he call the Coast Guard?

A. I believe that Mr. Campbell was actively engaged in discussions with the Coast Guard regarding the continuing memorandum of understanding that we had. I don't believe that there was a



specific phone call for this advertisement. My understanding from Mr. Campbell is that he learned of this belief during other conversation.

Q. So Mr. Campbell was speaking with the Coast Guard about a memorandum of understanding issue and it just so happened it came up that there was a concern that there was a preselection going on?

A. Yes, that's my understanding.

Q. I see. And how many candidates were there in 2004?

A. I think we can give you the record for that. I'm not certain.

Q. How many more were there in 2005, sir?

A. I know that there were more by volume. And we can -- I think we can give you that number.

MR. LOWINGER: May we have that information, please?

MS. SILBAUGH: You have it.

MR. LUONG: Yeah, we provided that to you.

BY MR. LOWINGER:

Q. And how was it determined that there was a



better set of qualified applicants in 2005 than there were in 2004?

A. There were more applicants in 2005 than 2004, determining their qualifications, the relative ranking by the panel.

Q. I see. Do you know when Mr. Campbell had the conversation with the Coast Guard official?

A. It was in November or December of 2004.

Q. And did Mr. Campbell encourage others to apply at the Coast Guard during this conversation?

A. I'm not aware that he spoke to anybody specifically about applying.

Q. Well, during his conversation regarding the OMS and learning about the concern of a preselection, what did he say about readvertising the position then?

A. I don't believe he spoke to the Coast Guard about it.

Q. What was Mr. Campbell's decision-making process with regard to readvertising the position after his conversation?

A. I think it is fairly simply in that

believing that we had a small pool of applicants, and that small pool was the result of a belief within the industry that this was a preselected position, that in order to ensure a larger pool of qualified applicants, he readvertised the position. And that's, quite frankly, all he would need to do to announce to potential applicants that it was not preselected for any particular individual.

Q. You just mentioned that he had authority to make a determination to readvertise again based on his -- based on the criteria. What is that criteria, sir?

A. Clarify.

Q. What authority did Mr. Campbell have to make a determination to readvertise?

A. Mr. Campbell could make a variety of decisions based on the panel's -- once the panel completed its work, he could interview applicants, he could not interview applicants, he could make a selection in either of those two categories. He could readvertise the position or he could cancel the position altogether, cancel the announcement.



Those are essentially his choices.

Q. Was anyone interviewed in 2004?

A. I do not believe so.

Q. Was anyone considered for interview in 2004?

A. I know that the panel submitted -- completed their work in the 2004 application and submitted the best qualified list to Mr. Campbell.

Q. And was Marjorie Murtagh Cooke on the best qualified list?

A. She was in the top five, yes.

Q. Is there any requirement that there be a top five?

A. No. Five is a number selected by the panel as a manageable number for interviews. SES interviews are lengthy, involved, require some resources. And the panel's purpose is to identify the best applicants within the pool of applicants so that the selecting official can choose the top group to interview. Otherwise the panel doesn't really have any great utility.

Q. I see.



MR. LOWINGER: Can we just go off the record for a second?

(Discussion off the record.)

BY MR. LOWINGER:

Q. What are the expectations for the number of applicants for the SES position in 2004? Was there an expectation that there would be a lot of applicants, just a few? How does the agency determine that it has a qualified pool?

A. The expectations are somewhat subjective, but the belief -- the general belief is that we should, in an SES announcement, receive at least 25 to 30 applicants for a position. They are relatively coveted positions and infrequently available, especially in unique skill sets such as the OMS director where it is a marine industry type of position.

So there are some senior executive service positions in the government where there are a lot of these types of positions. Attorney is a good example of one, where there are a lot of SES attorneys, general counsels and the deputy general



counsels in one of the myriad of federal agencies that exist. But there are very few senior executive service positions relative to the pool of senior executive service positions in the unique industry of maritime safety.

Q. When was the position advertised then, sir, in 2004?

A. I would have to look at the document to tell you the exact dates.

Q. Was it open for a long period of time?

A. If I could -- it's on the face of the advertisement.

Q. Okay.

A. If I could look at that I could tell you how long it was open.

Q. Was the period of time in 2004 that the position was open the same period of time that it was open in 2005?

A. Again, I would have to compare the documents on how long it was open.

Q. If they are the same --

A. Yes.

Q. -- what is it that the second time generated more applicants?
A. It's what I explained before, that those individuals who are paying attention to available SES advertisements will look at the advertisement. And if they have a belief, if the individual has a belief that there is someone preordained or predisposed for that position, they may not apply.
If the agency, any agency readvertises that position it is essentially telegraphing to the audience that there is no such preselection -- now, preselection is not permitted and it doesn't happen at the NTSB. But if there's a belief that somebody's got that job locked up, many of the potential applicants will not apply. Applying for the SES is a time-consuming exercise.
Q. Aside from publishing the advertisement a second time, what other efforts did anyone at NTSB, including Mr. Campbell, do to increase the applicant pool?
A. I'm not aware of any. And it wouldn't, in my opinion, really be necessary to do anything else.



That simple act of readvertisement neutralizes a belief that there's a candidate preselected.
Q. Did Mr. Campbell -- are you aware of whether Mr. Campbell made calls to the Coast Guard again or anyone in private industry that he was readvertising the position?
A. I'm not aware that he did, no.
Q. Would there be records of that anywhere?
A. I doubt it.
Q. Is there a phone log kept by the managing director at NTSB?
A. No, not to the desk phones.
Q. Through which types of phones are there phone logs?
A. Well, there's a cell phone log available for employee-issued cell phones.
Q. So all those --
A. Agency-issued cell phones.
Q. I apologize for interrupting you, sir.
A. Sure.
Q. So on the agency-issued cell phones there's a phone log. Is it a manual phone log or is



it a --
A. It's a paper phone log.
MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.
BY MR. LOWINGER:
Q. What is the -- so is it only just one telephone call to the Coast Guard that drew this concern by Mr. Campbell to readvertise?
A. That's my understanding.
Q. Is there --
A. Well, that and the fact that there was not a large applicant pool.
Q. Other than the telephone call, what other documents exist that demonstrate that the decision-making process related to readvertising the position?
A. I think the only document that exists that demonstrates that is his annotation on the selection sheet that instructs the human resources division to readvertise the position.
Q. Who else was involved in deciding to readvertise that?



A. In the decision making it would have been Mr. Campbell.
Q. Who are the panel members in 2004?
A. 2004 the panel members were the then general counsel, Ron Battocchi, B-A-T-T-O-C-H-I. That's probably wrong. Robert Chipkevich and Elaine Weinstein.
Q. And did they go through the whole review process in 2004, reviewing all the applicants in 2004 and coming up with a recommendation for Mr. Campbell?
A. That's my understanding.
Q. And do they have -- are there rating sheets for 2004 other than the recommendation to Mr. Campbell?
A. As far as I know there's only the recommendation to Mr. Campbell, the best qualified, the top five.
Q. Wouldn't they have to do a rating sheet as part of the procedure?
A. They should do a ranking and rating sheet as part of the procedure. I'm not sure that I've

seen those.
Q. Is it likely that they did a rating and ranking sheet as part of the procedure?
A. It is.
Q. And are you aware of whether or not they actually did do a rating and ranking sheet as part of the procedure in 2004?
A. I'm not aware. I can't recall if that was in the packet of documents that I reviewed.
MR. LOWINGER: Mr. Luong, is there a rating and ranking sheet for the panel in 2004?
MS. SILBAUGH: I do not believe so.
MR. LUONG: We haven't seen that.
BY MR. LOWINGER:
Q. Is there a chairperson in charge of the panel of -- someone in charge of the ad hoc panel in 2004?
A. I don't know if Mr. Campbell designated a chair, but the senior member of the panel would have been Mr. Battocchi.
Q. And was there a procedural meeting prior to their sitting down and reviewing the applications



on their own and coming together and discussing the applications and then coming up with a decision and a recommendation from Mr. Campbell?
A. At the beginning of the panel meeting there would have been a procedural briefing by Ms. Magwood.
Q. And did anyone else participate in the procedural briefing in 2004?
A. I don't believe so.
Q. Did Mr. Campbell ever participate in the procedural briefings in 2004 or 2005?
A. No.
Q. I'm sorry, I didn't hear you, sir.
A. No, no.
Q. And what is -- what information, if any, was conveyed to the panel members in 2004 that the matter would be -- that the position would be readvertised?
A. At the executive resource board, which is a collection of the office directors, SES level office directors, Mr. Campbell just indicated to that group, which included the three panel members



from the 2004 panel, that he was going to readvertise the position.
Q. Can you tell me --
A. That is likely the only notice that they got.
Q. Can you tell me exactly what he said?
A. He indicated at that time that he was going to readvertise the position. He believed that there was a belief within at least the Coast Guard that the NTSB was going to select Ms. Murtagh and there was no -- and therefore the applicant pool was small, and he wanted to make sure that we had a sufficient pool of applicants to choose from.
Q. And were you at that meeting, sir?
A. I was.
Q. And did anyone say anything in response to Mr. Campbell's statement?
A. I don't believe so.
Q. Was there any reaction from the group?
A. I don't believe so. A relatively innocuous procedural activity.
Q. When you say "I don't believe so," are you



saying that -- is that a "yes" or a "no" or you just don't remember?
A. No, there were no substantive comments, disagreements or agreements related to those comments by Mr. Campbell.
Q. I see. Let's just kind of go back here for a second.
The advertisement, first there's an advertisement. And we said that Ms. Magwood would have done a draft and Mr. Campbell would have done a -- would have made edits.
What other documents are involved in the drafting of the, I guess, materials for the panel members to use or for the selecting official to use as part of the process?
A. The material for the panel members would constitute the advertisement, the applicants -- or the applications from the applicants, a brief procedural guide, generally a one-page process on how to conduct the panel, and then the rating and ranking sheets for each applicant.
Q. This is -- does each panel member do his

Page 54

or her own individual ranking sheet for each applicant as part of their review process?
A. The general behavior of the panels that occur at the NTSB is that the individual panel members will review each of the applications prior to the meeting and make some preliminary judgments on the quality of the applications. The panel will then convene, they will discuss each of the applicants and the qualifications against the rating and ranking sheet and then the panel will complete one rating and ranking sheet for each applicant signed by all panel members.
Q. Do the panel members come to the meeting with their own notes about each applicant?
A. Some do and some do not.
Q. I see.
A. Occasionally.
Q. And what happens to those notes?
A. I believe they're all collected by the HR office at the end. All of the applications at the end of the panel and all of the materials collected by -- in this case it would have been Colette

Page 55

Magwood, but it was collected by the human resource office.
Q. So it's collected. And then what happens to those documents?
A. I'm not certain.
Q. Are they stored somewhere?
A. I believe that the rating and ranking sheets are kept.
Q. What about the notes of the panel members?
A. If there are notes on the rating and ranking sheets that the panel members took, they're kept as well.
Q. I'm sorry?
A. There may be notes kept as well.
Q. Notes separate from the rating and ranking sheets?
A. There may be, yes.
Q. And those would be maintained also by human resources?
A. Yes.
Q. Are any of these -- are these notes generally handwritten notes or are they electronic

Page 56

notes?
A. They're -- I don't know of any instance when they were ever electronic notes. The ones that I'm aware of in this particular circumstance are handwritten notes.
Q. NTSB doesn't have a policy of handing out the applications in electronic format to all the panel members so that they can review it electronically in a paperless office type setting and let them make their notes electronically?
A. No. There's a privacy issue with the application so that the packets are delivered all in paper.
Q. And are the packets sealed in any way when they receive them?
A. Each of the panel members receive the entire packet in an envelope sealed by the -- in this particular circumstance, by Ms. Magwood.
Q. And it just comes through interoffice mail?
A. No, it's personally delivered.
Q. By Ms. Magwood?

Page 57

A. Yes.
Q. Did any of the other -- did any of the applicants other than Ms. Murtagh Cooke apply in 2005 as well?
A. Yes.
Q. And did any of them --
A. You mean from the 2004 application to the 2005?
Q. Right.
A. Yes.
Q. And were any of those listed as the top five selected for an interview?
A. I would need to refer to the documents, but I think the answer is no.
Q. I see. When Mr. Campbell decided to readvertise in 2004, was he looking for more -- was he looking for a certain type of qualification?
A. No, he was looking --
MR. LUONG: Objection, asked and answered.
A. Looking for volume. To increase the size of the applicant pool.
Q. But he could have ended up with just more

applicants without the qualifications?
MR. LUONG: Objection, argumentative.
A. That could have been a by-product.
Q. Are you aware whether or not that was a by-product?
A. My understanding is it was not. We had a -- in the 2005 advertisement a larger applicant pool of qualified applicants.
Q. I see.
A. Not just a larger pool.
Q. Let's just go back to this. We said before that there's the advertisement and then there's the rating and ranking sheet and the procedural issues. Who drafts the procedural issues?
A. The human resources division.
Q. Is the selecting official involved in that in any way?
A. The procedural issues for the panel?
Q. Yes.
A. No.
Q. And the rating and ranking sheet, who



prepares the rating and ranking sheet?
A. Also the human resources division.
Q. Does the selecting official, Mr. Campbell, did he have any role in preparing that?
A. Not in preparing that. It is prepared based on the advertisement.
Q. Do he do any of the editing of the rating and ranking sheet for the panels in 2004 and 2005?
A. No.
Q. Did he review it?
A. No.
Q. There's just no -- describe to me how you go from the advertisement to the rating and ranking sheet then, sir.
A. The rating and ranking sheet essentially transcribes two components directly from the advertisement. For the SES position there are the core qualifications, and they are transposed onto the rating and ranking sheet, and then there are the KSAs, the knowledge, skills and abilities, that are also transposed on the rating and ranking sheet, and a third quality factor from the advertisement. But



it's all transcribed essentially from the advertisement.
Q. When you say transcribed, do you mean just paste and cut?
A. Exactly.
Q. So it will be verbatim?
A. It will be nearly verbatim.
Q. What was that third topic? You said there's the core requirements, the KSAs, and what is the third one?
A. It's a quality ranking factor. And I'm not sure that I'm using the correct term. If I can look at the advertisement document I can make sure I give you the right term.
There are core -- for the SES, there are core qualifications. Core competencies is what OPM calls them, Office of Personnel Management. And there are KSAs, knowledge, skills and abilities. And then there's a quality ranking factor which says, for example, you must have this technical qualification or certification or some other issue or you're not qualified.



For example if we were looking for a licensed engineer, you would have to have a license in good standing. That would be a quality ranking factor.
Q. I'm just going to refer to it as the quality ranking factor.
A. I may have misnamed that, but that's what it is, yes.
MR. LOWINGER: Mr. Luong, you're okay with me just referring to it?
MR. LUONG: That's fine.
MR. LOWINGER: Thank you.
BY MR. LOWINGER:
Q. The five executive core qualifications, they don't -- are those subject to editing by NTSB?
A. No. They're directly from the OPM.
Q. The KSAs, are they subject to editing by NTSB?
A. Yes.
Q. Are the quality ranking factors subject to editing by NTSB?
A. Yes.

Q. Just identify for me, sir, all the individuals that are involved in the editing of the KSAs and the quality ranking factors for the 2004 and 2005 vacancy announcements and ranking sheets.
A. It would be Mr. Campbell, as the managing director and the selecting official, would have been involved in modifying or revising either the KSAs or quality ranking factor, and Ms. Magwood would have simply executed those changes.
Q. I see. Are you aware -- so essentially -- let me make sure -- let me start this all again. Excuse me, I started it off kind of funny. Excuse me.
So Mr. Campbell, as the selecting official, has the authority to basically create the position, the qualifications, the ultimate qualifications for the position?
A. Correct. Ms. Magwood in preparing the application would suggest likely preliminary KSAs, but Mr. Campbell would then have the opportunity to modify those, rewrite those, add, delete.
Q. Are the KSAs in the vacancy announcement



or just the ranking sheet?
A. No, it's all in the vacancy announcement.
Q. And the quality ranking factors, are those in the vacancy announcement or the ranking sheet?
A. I'm sorry. I misstated the last one. It is in both. And -- both the announcement and the ranking sheet.
Now, one thing that I need to -- without looking at the advertisement, I can't recall if there was a quality ranking factor for the director position OMS. I know there are KSAs and I know there were core competencies.
Q. Okay. And are you aware -- describe to me what factors Mr. Campbell applied in determining which KSAs and quality ranking factors would be applied for the OMS SES position in 2004 and 2005.
A. Mr. Campbell would have evaluated the needs and the position in the agency and determined the skill set that a director of the Office of Marine Safety should have to meet those needs.
Q. Did you speak to Mr. Campbell about the needs that he determined NTSB would need and the



skill set that would be needed to fulfill those?
A. I did not specifically speak about that.
Q. Generally did you speak to him about that, about the process of developing the KSAs and the quality ranking factors?
A. In a very general context I did.
Q. Can you tell me what he said, sir?
A. He indicated that he believed that it was necessary to have an experienced maritime knowledgeable individual fill that position. That's about the complete context of the conversation.
Q. I just want to make sure I understood you. I apologize, sir. He was looking for an experienced maritime individual?
A. Someone with experienced maritime -- maritime experience.
Q. What is your understanding of what maritime experience means, sir?
A. An intimate knowledge of the industry. The government aspects of maritime, of the maritime industry, which would be knowledge of the Coast Guard, knowledge of the maritime administration,



knowledge of the rules and regulations governing maritime, the maritime industry. And significant experience working within the maritime industry, either in the government or the private sector.
Q. Let me just excuse myself and my ignorance here. What is meant by maritime?
A. Shipping.
Q. Shipping?
A. Shipping, boating, vessels, boat design, naval architecture.
Q. So naval architecture, shipping. And when you say shipping, you mean delivery of cargo or something like that?
A. There's a long list of things that involve the maritime industry, from tug boats to 5,000-passenger cruise ships and everything in between, including private boating.
Q. So naval architecture, shipping, boating. What other factors are involved in maritime?
A. Well, there's -- the maritime industry around the world and in the United States is heavily regulated. So there is a lot of regulatory

Page 66

framework around the maritime industry. Knowledge of that is important for that position.
Q. So international and domestic regulatory knowledge?
A. Yes.
Q. What else?
A. The basic aspects of navigation, ship building, how the maritime industry works, as far as cruise ships, passenger ships, cargo vessels. I'm certain that I'm not covering all the areas here.
Q. I'm sure it's a lot.
A. It is.
Q. So aside from naval architecture, shipping, boating, international -- regulatory knowledge of both domestic and international navigation, shipping building, how the industry works, cargo and vessels, is there anything else that just comes to your mind in defining what maritime means?
A. It's a very large industry with a long history and many tentacles, lots of aspects to the industry.

Page 67

Q. What are the factors in determining what an experienced maritime -- let me -- please strike that. Let me just rephrase the question.
Did Mr. Campbell speak to any factors that he considered were especially relevant when he drafted the quality ranking factors or the KSAs?
A. The KSAs are exactly the elements that he believed were relevant to selecting a director of marine safety. That is why KSAs are developed, to specifically identify those skill sets, knowledge, skills and ability, that the applicants need to have to successfully execute that job.
Q. So the KSAs for 2004 and 2005 reflect Mr. Campbell's belief of what an experienced -- an individual with experience in maritime should have?
A. Yes. Qualify that comment. Yes, as it relates to the director of the marine safety office, the director of OMS position.
Q. Let's make sure we just get this right.
A. The KSAs do not say, this in makes you an experienced mariner. It is the knowledge, skills and abilities that NTSB believes should -- that the

Page 68

applicant should have to be considered for the position.
Q. So the KSAs and the quality ranking factors reflect Mr. Campbell's belief, personal belief as to what the individual with maritime experience should have for experience in order to serve as the director of OMS at the SES level for NTSB?
A. Yes.
Q. Are you aware of whether or not -- let me rephrase that. Excuse me.
With whom else besides Colette Magwood did Mr. Campbell develop the KSAs and the quality ranking factors?
A. I don't know if he developed them in concert with anyone else or not.
Q. What other resources did Mr. Campbell use in order to determine the KSAs and quality ranking factors?
A. I don't know.
Q. Other than an experienced maritime individual that we just discussed, what other topics

Page 69

did Mr. Campbell tell you were essential to his development of the KSAs and the quality ranking factors for the -- for the SES position for OMS?
A. I'm not certain of where you're going with -- I'm not certain of the question.
Q. I'll rephrase it. Other than -- did Mr. Campbell express any other factors that he felt were essential to the position of the director of OMS at the SES level other than maritime experience?
A. Those and the core competencies.
Q. Do you know when he completed -- when Mr. Campbell completed the KSAs and quality ranking factors in 2004 for the advertisement?
A. Not specifically. It would have been prior to the public advertisement of the position and shortly before the advertisement.
Q. I see. So if it was advertised in July of 2004 --
A. It would have likely been June.
Q. I see. Can you tell me or describe to me what qualifications Marjorie Murtagh Cooke had as a -- in order to perform the position of director of

Page 70

OMS at the GS-15 level?
A. What I know about Ms. Cooke's background is that she had come to the safety board in the early '90s from the Coast Guard as the chief of the marine accident investigation division, I believe that was 1993, and functioned in that capacity through '97.
In '97 the title of her position was changed to director of the Office of Marine Safety, and she functioned in that capacity until 2005. Prior to her arrival -- and in that time -- let me back up. In that time frame she would have managed the accident investigation, the marine accident investigation activity and report development activity for the NTSB.
Q. I just didn't hear the word. You said marine accident, and then what was the other one?
A. Report development activity. Also recommendation development and some of the advocacy and public presentation activities on marine safety.
Prior to 1993, I know that she had worked at the Coast Guard for a number of years,

Page 71

specifically in a fire science field, fires aboard ships. She had experience with the international maritime organization. And she had graduated, I believe, from New York Maritime with a maritime-related degree. I think it was marine engineering, but I'm not certain.
Q. What is involved in -- what was involved between -- what was involved in the position other than maritime accidents -- responding to maritime accidents, development of reports, recommendation development, the advocacy piece you mentioned, what else was involved in the position of director of OMS as performed by Marjorie Murtagh Cooke?
A. In addition to what you mentioned, there was basic supervision duties for the staff of the Office of Maritime Safety -- or Marine Safety. There was some coordination activity that she was responsible for between the offices and among the offices within the NTSB when it related to maritime issues. And she would occasionally prepare, or her staff would prepare under her direction, speeches, congressional testimony for board members and

Page 72

others.
Q. What about human resources, anything -- did she have duties with regard to that?
A. Supervision of the personnel and all of the human resources aspects that come with supervision.
Q. What are the aspects that come with --
A. Performance management, discipline, time and attendance, training, workload management, basic supervision duties.
Q. What about -- does she have any budgetary authority?
A. Prior to 1997 her budgetary authority was limited as a division chief. The organizational structure was such that she, along with the other modal divisions in surface, reported to a director of Surface Transportation Safety. After 1997 that layer of management was eliminated and she reported directly to the managing director.
In 1997, she had broader -- she began with broader budget responsibilities, as far as the application of funds necessary to do the functions

Page 73

I've mentioned of the position. So training funds, travel funds, equipment funds for the staff and activities of the Office of Marine Safety were within her control.
Q. What documentation outside of her -- what documentation exists with regard to Marjorie Murtagh Cooke's performance of her duties and responsibilities as the director of OMS from 1997 through 2005?
A. I think that there's a performance evaluation that we have provided to you for 2003 and 2002. There should be performance evaluations -- performance appraisals for the years you mentioned prior to that.
Q. Where would we find those -- other than 2002 and 2003, where would we find those performance appraisals?
A. They should be in her personnel file, if they exist.
Q. What's the difference between a performance evaluation and performance appraisal, sir?

Page 74

A. None. The form will say "performance appraisal."
Q. I apologize.
A. The form will say "performance appraisal." That's why I corrected it.
Q. Oh, I see.
A. There is no difference. They're identical.
Q. Does NTSB keep all performance appraisals of an employee in the personnel -- official personnel file of its employees?
MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.
MR. LOWINGER: That's a standing one, isn't it?
MR. LUONG: Not when it's --
MR. LOWINGER: Regarding her performance appraisals.
MR. LUONG: You're asking about the performance appraisal system within NTSB.
MR. LOWINGER: Okay.
A. Performance appraisals once given to the

Page 75

employee and signed should be maintained in their personnel file.
I will tell you that the NTSB personnel files are not complete. They're not always placed in the individual OPF, official personnel file.
Q. How is that?
A. Performance decrements on the part of either supervisors or the human resources office.
Q. So if an individual wants to see their official personnel file and they notice that it's lacking, what happens then?
A. They can do one of two things. They can request that a copy be placed in their personnel file. They should have a copy and their supervisor should have a copy. And that's -- once that request is made human resources will do that.
And there may be circumstances where a performance appraisal was not completed and therefore there is no copy.
Q. The supervisor should have a copy as well?
A. Yes.
MR. LUONG: Brian, just so I don't

Page 76

continue to interrupt you, just a continuing objection to this whole line of questioning about the performance appraisals as outside the scope of the 30(b)(6) deposition.
BY MR. LOWINGER:
Q. Where does the supervisor keep copies of performance appraisals?
A. Let me clarify that. Not all supervisors keep copies of the performance appraisals. Some do and some do not. There is no requirement that the supervisor maintain a copy.
Once a performance appraisal is completed for an individual, that completed appraisal is submitted to human resources with the intention that it go into the official personnel file. Some supervisors do not keep their own copies of past performance appraisals.
Q. Did Dan Campbell keep copies of past performance appraisals for the directors?
A. He did not that I'm aware of.
Q. Other than performance appraisals, what other documentation exists regarding Marjorie

Page 77

Murtagh Cooke's performance of her duties?
A. I believe that's all. I have not reviewed Ms. Murtagh's official personnel file, therefore I do not know if there was any disciplinary action or anything else that may have occurred. I just want to clarify. When I say I don't know, I'm not aware of any.
Q. I see. Did Ms. Murtagh Cooke submit an application, a separate application in 2004 and 2005?
A. I'm not certain. I'm not certain. We can find out, but I'm not certain if it was a different application or whether -- I think I have stated before I wasn't sure how HR handled the 2004 applicants, whether they transferred over the applications to the 2005 announcement or whether they asked the applicants to reapply.
If you are at a convenient place, can we take five minutes?
Q. Of course.
(A recess was taken.)
BY MR. LOWINGER:

Q. You mentioned that there's a few performance appraisals in the documents submitted -- submitted as by NTSB related to Marjorie Murtagh Cooke?
A. Yes.
Q. Are you aware of how Ms. Murtagh Cooke rated in those performance appraisals?
A. I believe one was outstanding and one was excellent.
Q. What does outstanding convey, sir?
A. There are five levels of performance rating in the GS schedule at the NTSB, and it is outstanding, excellent, fully successful, minimally successful and unsuccessful. And so outstanding would be the highest rating.
Q. And you said her other one was an excellent?
A. I believe so.
Q. What does that communicate or convey?
A. Also excellent performance.
Q. It conveyed that she's just a stellar performer in her duties. Is that correct, sir?



A. I would not -- fully successful should be doing the job at the level you're being paid, not a great deal more, but doing an adequate job. Excellent is doing better than adequate. And outstanding is superior, above most others.
Q. Are you aware of what other levels of evaluation Ms. Murtagh Cooke received in -- in her other performance appraisals?
A. I'm not specifically aware. I can't give you a year and a rating, but my understanding is that they were generally favorable, excellents or outstandings.
Q. And in 2004, there wasn't a performance appraisal for 2004. Are you aware of how she performed in 2004, sir?
A. I believe that her performance was adequate. It was -- she was doing an adequate job. My understanding of her performance was based on my interview with Mr. Campbell, who believed that he had to assist Ms. Murtagh in some of the duties within her position too often for her position, and that he had to assist the Office of Marine Safety in



crafting reports and completing investigations more than he should have, and that is a negative comment on her performance during that time frame.
Q. Is that reflected in a performance appraisal anywhere?
A. No.
Q. I see. Are those -- his efforts related to the reports authored by the Office of Marine Safety, are those kept anywhere?
A. Clarify the question.
Q. Are Mr. Campbell's edits to the reports, indication of his help on those reports, is that reflected anywhere?
A. Not generally, other than in the memories of the individuals who participated in the meetings. Most draft reports, regardless of the mode leading up to the final board's report, are generally thrown out.
Q. They're not subject to a record retention policy of any sort?
A. No. The draft reports are not forwardable or they're internal communications. And when the



final board report is submitted to the board and voted on by the board, it becomes the final product of the board and the drafts leading up to that are almost always destroyed.
Q. How many reports in 2004 did Mr. Campbell have to help Ms. Murtagh Cooke on?
A. I know that there were several underway that he was working on with her, several that were high-profile investigations. I would say five to six.
Q. So her office, the Office of Marine Safety, was working on five to six high-profile reports in 2004?
A. They were working on more than five or six, but five or six high-profile ones, or ones that required Mr. Campbell's attention.
Q. Did the managing director, is he involved in reviewing reports of other modal offices at NTSB?
A. The managing director is the final review stage before the report is submitted to the board for their consideration of every report that is submitted to the board.

Q. So the managing director reviews every report before it goes to the board?
A. Correct.
Q. And did Mr. Campbell exercise editing discretion with other reports outside of the Office of Marine Safety?
MR. LUONG: Objection to this line of questioning, it's outside the scope of the 30(b)(6) deposition.
MR. LOWINGER: I think it relates to her tenure and performance.
BY MR. LOWINGER:
Q. Go ahead.
A. He did.
Q. And were those edits in line with the types of edits he would make to or suggest to the Office of Marine Safety?
A. They were not. His description to me was that the edits necessary and the revisions necessary for the majority of other modal reports were not nearly as substantial as those that he needed to make to the Office of Marine Safety reports.



Q. And which of the modal offices has the smallest staff for preparing reports at NTSB?
A. The Office of Marine Safety.
Q. I see. What was Colette Magwood's role in reviewing applications in 2004?
A. Ms. Magwood, as the deputy division chief for the human resources division, was also the SES coordinator for the agency. And in such she would help with the advertisement, monitor the applications. And with all advertisements that the NTSB issues, the human resources division does an initial screen of all the applications to make sure they meet basic minimum qualifications.
Q. So she was the individual who determined -- who made the initial qualification review for OMS at the SES level in 2004?
A. It's more of eliminating those that are overtly unqualified.
Q. So it's pretty low bar?
A. Pretty low bar.
Q. And what kind of discretion -- is there discretion involved, or what are the factors that



Ms. Magwood would look for?
A. She doesn't have any discretion. Her issue is to match the applications against the federal requirements and standards.
For example, if a felon were to apply, a convicted felon, she would eliminate that application. Convicted felons are not eligible. That's the kind of screen she would conduct. She would not conduct a screen on the quality of the applicant's credentials, just the basic requirements.
Q. And she determined that Marjorie Murtagh Cooke passed the requirements for an approval from her office?
A. Yes.
Q. Describe to me what Elaine Weinstein's role was in reviewing applications in 2004.
A. She was a member of that three-member review panel. As we had discussed previously, she was given all of the qualified applicants, it was determined to be qualified by human resources, for review. She reviewed those and then met with



Mr. Battocchi and Mr. Chipkevich in a panel to discuss and rank all of the applicants.
Q. What was her position with regard to Marjorie Murtagh Cooke's application in 2004?
A. Well, the panel collectively put Ms. Murtagh in the top five of the applications that they reviewed. Ms. Murtagh's application.
Q. What was Ms. Weinstein's review of Ms. Murtagh Cooke's application in 2004, what did it reflect?
A. I'm not --
Q. As an individual member of the ad hoc review panel, review board, what was her determination of Ms. Murtagh Cooke's qualifications?
A. I don't know what her personal assessment was. I know the assessment of the panel as a group. And I presume that since she had signed the panel document, that her assessment agreed with -- her personal assessment agreed with the panel assessment.
Q. Okay. Do you know what Mr. Battocchi's position was with regard to Ms. Murtagh Cooke's

application?
A. Identical answer. The group, Mr. Battocchi was part of, placed Ms. Murtagh in the top five of the candidates reviewed.
Q. And what was Mr. Chipkevich's determination of Ms. Murtagh Cooke's qualifications in 2004?
A. Again, an identical answer. He signed as a panel member, placing Ms. Murtagh in the top five of the group reviewed.
Q. Are you aware whether there were -- well, let me ask this question.
You said before that there were some core qualifications, some KSAs and the quality ranking factors. In 2004, do you know what the core qualifications were?
A. The core qualifications are identical for any SES position, and there are five. I need to look at the application to give you the exact word. But they're prescribed by OPM. It's business acumen, communication, leadership, leading change, and there's another. If I can refer to the document



I can give you all of them. There are five.
Q. I don't have the documents here. So leading change, leading people, results driven?
A. This is the list.
Q. Results driven and building coalitions and communications?
A. Correct.
Q. So the list again is leading change, leading people, results driven, business acumen, building coalition and communications?
A. Correct.
Q. Do you remember what the KSAs and core ranking factors were in 2004?
A. Not specifically. I would need to look at the ranking factors or the application to tell you specifically what they were.
Q. But -- okay. They involved familiarity with maritime issues?
A. In general, yes.
Q. And you said knowledge of the regulatory matters?
A. I believe so. It's a relatively easy



thing for me to see. If I can see the application --
Q. I just don't have it with me.
A. -- or the ranking factor, I can tell you exactly what they are.
Q. Were any of the core qualifications or -- were any of the KSAs or quality ranking factors mandatory as opposed to desirable?
A. The quality ranking factor is generally a mandatory -- generally a mandatory one, as are the core competencies. But as I said earlier, I can't recall if there was a quality ranking factor in this particular application. If I could look at the rating sheets I could tell you.
Q. Okay.
MR. LOWINGER: Off the record.
(Discussion off the record.)
(Document marked Deposition Exhibit Number 1 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, is this the vacancy



announcement for the director of OMS in 2004? This is Exhibit Number 1.
A. Yes.
MR. LOWINGER: The exhibit is Bates numbered 81 through --
MS. SILBAUGH: 812.
MR. LOWINGER: It's 812 through 819.
BY MR. LOWINGER:
Q. Sir, can you tell me what the core qualifications are then for -- the mandatory core qualifications in 2004?
A. Mandatory executive core qualifications are leading change, leading people, results driven, business acumen and building coalitions and communication.
Q. Were there any -- are there any mandatory technical professional qualifications?
A. There are. There are two. These are what I previously referred to as quality ranking factors.
Q. Okay.
A. So that we're comparing them correctly.
The first one is, "Broad familiarity with water

safety and marine transportation, including principles and practices of navigation, marine engineering, marine regulation and accident investigation, naval architecture and watchstanding requirements sufficient to provide leadership in directing marine accident investigation and the formulation of improved safety practices."

And the second is, "Authoritative knowledge of marine transport and its regulation and demonstrated ability as spokesperson, advocate or instructor in this field sufficient to ensure the ability to represent NTSB's products and positions during legislative, executive and industry activities."

Q. And underneath that there's desirable technical professional qualifications, what are those, sir?

A. Those are additional qualifications that would be desirable, but if an applicant did not have those qualifications he would not eliminate them from consideration.

Q. I see. And did Mr. Campbell write the



mandatory technical professional qualifications and desirable technical professional qualifications?

A. He at least edited it.

Q. Would he be the person with the final approval of those?

A. Yes.

Q. So he had final authority?

A. Correct.

MR. LOWINGER: Exhibit Number 2.

(Document marked Deposition Exhibit Number 2 for identification and subsequently attached to the deposition.)

BY MR. LOWINGER:

Q. Mr. Osterman, is this -- this is Exhibit Number 2. Is this the rating about the things you mentioned before, the referral to Mr. Campbell that the people -- that certain individuals qualified for an interview?

A. This is the memorandum to Mr. Campbell from the executive resource board, the rating panel following their review of the 10 applications that they were given by Ms. Magwood. It reflects that



Ms. Magwood screened, for minimum qualifications, a total of 20 applicants, 10 were eliminated during that screen and 10 were considered by the panel, and that the panel forwarded five as qualified or highly qualified.

Q. And was Ms. Murtagh Cooke one of those as being highly qualified?

A. Yes.

MR. LOWINGER: Exhibit Number 3.

(Document marked Deposition Exhibit Number 3 for identification and subsequently attached to the deposition.)

MR. LOWINGER: Just for the record, Exhibit Number 2 are Bates numbers 820 through 821.

BY MR. LOWINGER:

Q. Exhibit Number 3. Mr. Osterman, is Exhibit Number 3 the vacancy announcement for 2005 as posted?

A. Yes.

Q. What are the mandatory executive core qualifications in 2005, sir?

A. They appear to be identical to the



mandatory technical qualifications in the 2004 announcement.

Q. And what are the mandatory technical professional qualifications for the 2005 --

A. Do you mean the desirable technical --

Q. No. First I did the mandatory core qualifications.

A. The core qualifications are the five that I mentioned previously. Would you like me to repeat them all?

Q. No. But they don't change?

A. It does not appear that they've changed.

Q. And are the mandatory technical professional qualifications and desirable professional qualifications the same in 2004 and 2005?

A. Yes.

MR. LOWINGER: Exhibit Number 3 is Bates numbers 825 through 832.

Exhibit Number 4.

(Document marked Deposition Exhibit Number 4 for identification and subsequently

attached to the deposition.)
BY MR. LOWINGER:
Q. Sir, this Exhibit Number 4, Bates numbers 833 and 834, is this the rating of applicants by the ad hoc rating panel for 2005?
A. This is the second panel in 2005, because it is directed to me as managing director.
Q. Are there -- are you aware if there's another rating of applicants for the first panel? Do you remember signing one?
A. I did sign -- as a panel member, I did sign the ranking and rating sheets. I can't recall whether I signed a memo directing the list -- the rating and ranking list to Mr. Campbell.
Q. Do you remember there being a recommendation from the panel to Mr. Campbell from the panel that you sat on?
A. The panel concluded. The first panel in 2005 concluded their work and ranked the top five of the 15 applicants.
Q. Now, sir, what about Marjorie Murtagh Cooke's qualifications in 2004 made her qualify for



an interview?
A. She had the requisite qualifications that are described in the position vacancy announcement, the core qualifications, the desirable qualifications and also the mandatory ones.
Q. And --
A. And in comparison with the other candidates at that time, she ranked in the top five.
Q. I see. In 2005 what are the factors that Marjorie Murtagh Cooke did not possess to make it to the interview round in comparison to 2004?
A. She had exactly the same qualifications as she did in 2004. The difference was that there were more qualified applicants in the 2005 ranking than there had been in the 2004 ranking. Therefore, based on a relative comparison with the other applicants, she placed lower on the ranking list.
Q. Did you -- did your panel determine that she did not qualify for an interview in 2005?
A. The panel determined that she did not rank in the top five candidates submitted to the managing director for probable interview.



Q. Could the managing director have taken the list and still determined that Marjorie Murtagh Cooke merited an interview?
A. Could have.
Q. Has that ever happened before?
A. The managing director, or the selecting official in this case, is not obligated to stay with five or three or seven. The number is completely up to the selecting official on how many individuals they wish to interview.
It is a time-consuming exercise, so the panel recommends the top five be interviewed, rating. It is possible but not advisable for the selecting official to reach beyond the list, to capture candidates further down on the list. If the selecting official is going to interview the number 10 candidate, for example, they should also interview one through nine, otherwise the work of the panel is not nearly as useful.
Q. What was the message that the selecting official or the managing director was trying to send to the review panel in readvertising the position?



A. Well, the managing director wasn't trying to send a message to the review panel. The managing director was readvertising the position because he believed there was an insufficient pool of applicants.
Q. What do you think the message is that's sent to the review panel when there is a second posting like that?
A. I think it is -- there's no hidden meaning in there, it's very straightforward. He believed there were insufficient applicants, qualified applicants for the position, and he wanted to cast a broader net to try to capture more qualified applicants so that the NTSB could consider a broader group.
Q. What does that say about the candidates from the prior posting?
A. It doesn't say anything specifically about the candidates from the prior posting, what it says is that the application process did not solicit enough applicants.
Q. So it's just a number of applicants?

A. Number of applicants, qualified applicants. Unqualified applicants are meaningless. If there is a significant amount of unqualified applicants for a job, there's also potentially something flawed with the process. We shouldn't be obtaining a whole host of applicants who are not qualified.

Q. In 2005, describe your views on Marjorie Murtagh Cooke's application for the SES position.

A. My personal view?

Q. Yes.

A. My --

MR. LUONG: Objection, outside the scope of the 30(b)(6) deposition.

A. My view was that she was qualified for the position along with -- I think that there were 15 applications that were forwarded to the panel. Several of those applicants, in my opinion and the panel's opinion, were unqualified and were eliminated from our consideration.

Marjorie Murtagh was qualified, as were 10 or 12 others. I think they even say so in here.



The relative ranking of credentials, of all of the applicants, my personal opinion was that she was -- she ranked about number seven on that list. The top five applicants had significant and more diverse experience.

Q. What was Elaine Weinstein's position with regard to Marjorie Murtagh Cooke's application in 2005?

A. It's going to be very similar to the 2004 answers, because the panel agreed, a consensus, on the ranking of the applicants. Her position on Ms. Murtagh Cooke was identical to mine.

Q. Describe to me in detail what happened at the meeting in 2005 that you were present at when it came time to discuss Marjorie Murtagh Cooke's application. Who spoke first?

A. At the meeting, first there was a briefing by Colette Magwood on the procedure.

Q. Anyone else? Did anyone else brief the group?

A. No, just Colette Magwood.

Q. Okay.



A. And just a procedural briefing and then she left. And the five panel members were left to conduct the review.

The first order of business was to ask the panel members if there were unqualified if there were applicants we believed not to be qualified, and there were several, and the panel discussed that group first.

Then the panel discussed, one at a time, each of the remaining applicants. Open discussion about qualifications, strengths, weaknesses with the applications. And we went through the remaining list of 12 or so applicants that we thought were highly qualified.

We then went back and rated the applicants based on a random selection of applications, starting with this one first and that one next and just completely random, and rated against each other the qualifications.

Q. What was discussed about Marjorie Murtagh Cooke when the group discussed her application?

A. She had significant NTSB experience. She



had fire science experience. I know that the group thought that her application was, in its preparation and its appearance, weak. But we had, quite frankly, more knowledge about Ms. Cooke because we'd been working with her for 12 years or so and knew more than the application displayed.

I also know that there was discussion about whether she had any real time at sea or on ships. And the general consensus was that if she had time it was very minimal, very little time, actually, on vessels.

Q. There's significant NTSB experience, fire science, the preparation and appearance of the application and any real time at sea or on ships. What other factors were discussed about Marjorie Murtagh Cooke?

A. Each of the core factors were discussed with each -- about each of the applicants. It's a very long process. Most-of-the-day process. Each of the mandatory core qualifications and each of the desired core qualifications were all discussed on each individual applicant.

Page 102

Q. You said that there's any real time at sea or on ships. When you say sea or on ships, does it have to be on one of the seven seas or can it be on any other type of body of water on a large ship -- or on a ship?
A. I don't think we confined it to that. We were looking, as a desirable qualification, for some experience, hands-on experience with boats, with ships.
Q. So hands-on experience on navigable waters?
A. Yeah. Navigable waters are all the seas and the Mississippi and elsewhere and -- yes.
Q. Great Lakes?
A. Yes.
Q. You said that the application, the preparation and appearance looked weak but you were able to look outside the application. What do you mean that you looked outside the application because you knew her?
A. Had we -- had the panel not -- and of course the panel knew Marjorie. Had the panel not

Page 103

known her I think the panel would have ranked her application lower than it did, further down the hierarchal. Because I thought -- the panel generally thought that the application was poorly prepared.
Q. What about it was poorly prepared, sir?
A. It was an appearance that was scribbled. It didn't have all the information. It didn't give as thorough descriptions of some of the qualifications as other applications within those that were being considered -- as the majority of other applications that were being considered. It wasn't as professionally prepared a piece as the other applications.
Q. When you say it was scribbled, how do you mean that it was scribbled?
A. It looked like it had been written hastily and it was done in pen, much of it, and not done on a computer or typed. It was -- it was complete, but not particularly thorough in some areas.
Q. Do you remember which areas the group determined weren't thorough enough?

Page 104

A. We don't think that she expanded enough on her experience prior to the NTSB. It was unclear, I think, to the group how much sea time she may or may not have had.
Q. When you say it was unclear, what was unclear about it, sir?
A. It was difficult to locate within the complete application the experience within the ship, how much had she really been on a ship.
Q. I see. What else was discussed about the application? You said it was not a -- not as professional. How was it not as professional?
A. I think I just described that. It was handwritten, not prepared. It was not as thorough as some of the others. Some of the other applications -- you need to write to each of the core competencies and you need to write each of the mandatory and the desirable qualifications. Her application was not as thorough in comparison to many of the other applications.
Q. What else was discussed about Marjorie Murtagh Cooke besides the core qualifications and

Page 105

the significant NTSB experience, the fire science experience, the preparation and appearance of the application and any -- and the time on ships, what else was discussed about her and her application?
A. At the end of the rating and ranking, at least for the panel that I participated in, it was obvious that Ms. Murtagh would not be in the top five. And the panel discussed whether we should recommend, that since she was in the position at the 15 level, that she be included regardless. And the panel decided that it was more important to stay true to the process and to recommend the top five no matter who those top five were and not reach around or reach down further regardless of where Ms. Murtagh ended up on the ranking. That was discussed.
Q. Who spoke about that issue?
A. All of the panel members spoke about that issue and the concern about whether we should reach to the person who holds the position at the 15 or not.
Q. So Elaine Weinstein discussed that issue?

A. All five of the panel members discussed that issue, I believe.
Q. Specifically what did Ms. Elaine Weinstein say about Ms. Murtagh Cooke's application?
A. I'm not going to be able to recall the specific comments from each of the panel. There was concern from all the panel members about whether we should, as a policy, as a panel, reach to the person who was the incumbent at the 15 level or not. And the panel decided collectively, and I agreed with this, as did all the other panel members, that we should not bend the process to do that. We should stay with the top five no matter who they were.
Q. What did Mr. Battocchi say about that issue?
A. I don't recall that Mr. Battocchi was involved in that issue. Mr. Battocchi was not in this panel. He was in the '04 panel.
Q. Oh, excuse me. I apologize, sir.
What did John Clark say about that issue?
A. Specifically all of the office directors who were there, the five who were there, had the



same concern, should we reach down to the incumbent at the 15 level or not. And by not doing that we were essentially bending the practice, to reach down and include the incumbent at the 15 level. And we decided it was better for the system and better for the agency not to bend those procedural rules but rather stay true to the process.
Q. Who introduced the topic?
A. I think I did. I believe I did.
Q. What was your position with regard to Ms. Murtagh Cooke's application and possibly making her higher than number seven?
MR. LUONG: Objection, asked and answered.
A. I wasn't interested in changing her relative ranking, I guess, to the other applicants. My concern was, as was -- the concerns were relatively similar from all the panel members, should we go beyond the five to suggest that the managing director interview seven. Of course knowing that it's a call that the managing director gets to make anyway.
If we recommended that he interview five,



he doesn't have to interview five, he can interview three. And the concern was do we, at the panel level, suggest that the incumbent at the 15 level not be interviewed.
And the panel, myself included, decided that we should stay true to the ranking. And the ranking was that she came out as number seven in -- number seven or eight in a list of 12 or so, and that the top five would be forwarded for interview.
Q. Did all the panel members speak or did just one or two of them speak?
A. No, it was an open discussion among all the panel members.
Q. Everyone spoke?
A. Yeah. I cannot give you a transcript of the conversation, but it was five members around the table talking about each applicant, each -- the ranking, and then finally this issue at the end.
Q. So everyone agreed that Ms. Murtagh Cooke was number seven and she should not be given an application because of the process -- because of the need to adhere to the procedure?



A. No, that we should forward the top five names, which was the charge of the panel, and that she did not bubble to the top.
Q. When did you receive the applications, sir?
A. I would say maybe a week before the meeting, thereabouts.
Q. And how did you receive the applications?
A. Ms. Magwood delivered them in a sealed envelope.
Q. And in the week during -- between the time of the delivery and the meeting of the panel -- the meeting of the panel, with whom did you speak about the applicant pool?
A. No one. I read the applications, looked at all of the material. There was a lot of material to read. Each of the applications is -- are fairly involved at the SES level, and I didn't have any premeeting discussion with anybody.
Q. Is there a rule at the agency that panel members cannot discuss applications in the time between receiving the application and the meeting?

Page 110

A. I don't know that there's a specific rule, there may be, but it is a practice. And it's also practical sense in that there simply isn't time or inclination to have that discussion, because the panel's going to meet the following week to have that discussion.
Q. Is there any rule prohibiting panel members from discussing the applications with anyone outside the panel?
A. There's privacy, the warning by, in this case, Colette Magwood to keep the information private.
Q. When does she tell you that?
A. When she delivered the package.
Q. And keeping the application package private or the contents of it private, the privacy extends to whom, to people outside of NTSB?
A. Most anybody. Don't leave the applications on your desk where somebody can walk in and look at them. Don't discuss them with, you know, other employees who are on part of the panel. It's a basic privacy warning.

Page 111

Q. Is Mr. Campbell deemed a member of the panel through his role as the selecting official?
A. No. He convenes the panel. He essentially would order that the panel be convened.
Q. Did Mr. Campbell have communications with any panel members regarding Ms. Murtagh Cooke's application in 2004 or 2005?
A. Prior to the panel -- prior to the panel convening?
Q. Yes.
A. No, I don't believe so.
Q. Do panel members have an obligation to disclose communications from people outside the panel regarding the application of an individual?
A. If there's something unusual I would imagine they would, but give me a context.
Q. Let's say there's a communication from Ms. Engleman Conners to one of the panel members regarding any of the applicants. For example, oh, yeah, I know that guy. I know him through some third party or some agency, some industry group or something like that.

Page 112

A. If that information was there, the panel members usually will bring it up. I don't know that there's an obligation that they disclose that. But there certainly isn't any hesitation on the part of panel members when they are aware of an applicant or have heard from someone else about an applicant.
Frequently we will be told that people have applied and that this person has applied, and they'll get occasional phone calls, almost always endorsements from someone. And the panel members will bring that up if they've heard that information.
Q. Is there ever circumstances where the panel members receive the opposite of an endorsement, a statement that this person's probably not qualified for the position?
A. I imagine there are, but not that I recall in this circumstance.
Q. What communications are you aware of by Mr. Campbell to the other panel members regarding Ms. Murtagh Cooke's application in 2004 or 2005?
A. I'm not aware of any prior to the panel.

Page 113

I mentioned previously that Mr. Campbell announced the ERB, that he was going to reannounce the position. And my request to be on the panel came through Ms. Magwood. From Mr. Campbell, I presume.
Q. Well, let's just clarify this. When Mr. Campbell announced that he was going to readvertise the position to the ER -- to the executive review board?
A. Resource board.
Q. Resource board, excuse me. Did he say anything about Marjorie Murtagh Cooke?
A. No, no. There was no more than a 30-second comment in the ERB meeting.
Q. What did he say specifically?
A. Specifically he said --
MR. LUONG: Objection. It's been asked and answered already.
A. Without being verbatim, he said essentially that he didn't think there was a sufficient pool of qualified applicants and he was going to reannounce it to see if he could enlarge

Page 114

the pool of applicants.
Q. And are you aware of whether or not Mr. Campbell actually reviewed the applications of the five people recommended in 2004?
A. I don't believe he did.
Q. And then you'd mentioned that people -- are people placed on the ad hoc review panel or do people volunteer for it?
A. No, it's not a volunteer, it's an assignment. Generally by the selecting official, depending on the availability of the individual.
Q. And how does the selecting official know who to appoint?
A. What they look for are people who are -- have the ability to make a judgment on the credentials and qualifications of the applicants.
So in this case, at least in the panel that I participated in and the second panel, like positions, the director of aviation safety, highway safety, rail safety, were included because the positions were similar. And the director of research and engineering and safety recommendations

Page 115

were included because these two offices work every day with the Office of Marine Safety. They are co-dependent offices.
Q. I see. Do the ranking sheets reflect the panel's discussion with regard to the individual's qualifications?
A. They do. They reflect the consensus at the conclusion of the discussion.
Q. So when the conversation's over, who's the person who prepares the ranking sheet?
A. In the circumstance of my panel, it's whoever in the group volunteers to do it, but all of the members review and sign it.
Q. What was discussed -- describe to me what conversations or what communications there were during your review panel with regard to Ms. Murtagh Cooke's meeting with Ellen Engleman Conners in April of 2004.
MR. LUONG: Objection, assumes facts not in evidence.
A. Well, there was no discussion about her -- any meeting that she had with Chairman Conners.

Page 116

Q. Was there a general knowledge of the meeting?
A. I didn't have a general knowledge of the meeting. I can't tell you what the other four panel members knew, but it wasn't discussed.
Q. And describe to me what was communicated with regard to Ms. Murtagh Cooke's complaint filed with the EEO office at NTSB when you reviewed her application.
MR. LUONG: Objection, assumes facts not in evidence.
A. I don't believe any of the panel members knew that there was an EEO claim or filing of any type. EEO filings are private. Our EEO director does not advertise that information.
Q. Okay.
A. Unless the individual tells you.
Q. Were any of the panel members that you were -- that you sat with, did the issue come up during the conversation?
A. No, the issue did not come up. And I wasn't aware of it in advance of the panel.

Page 117

Q. You're saying personally?
A. Personally.
Q. Who at NTSB was aware of the complaint filed with the EEO office? Who would have been made aware of that?
A. I'll give you a standard answer of who would be aware of any complaint filed with the EEO director. There's of course an informal and a formal process. But it starts with the informal process and the complaint would be made to the EEO director.
The EEO director would generally notify the general counsel and then, in the informal process, would look at the complaint and try to see first if it was in the EEO director's opinion legitimate and, secondly, if there was a resolution that could be had.
So there's a possibility that the EEO director could speak about circumstances with individuals involved if she were trying to resolve the issue.
I don't know what, if any, the EEO

director talked with any other individuals other than the general counsel and -- but she could have advised the managing director of the complaint.
As managing director today, I get a briefing every two months or so about all active complaints, grievances, EEO activity.
Q. How often did Mr. Campbell get reports about the EEO complaint process?
A. Less frequently and more sporadically. He did not have the standard meeting that I have. Every two months I review all the activity that's going on. He would get notified on an individual complaint basis and in a sporadic fashion.
Q. I see. And who would make him aware of the individual complaint?
A. It would be the EEO director.
Q. Would he be made aware of the informal complaint?
A. Most possibly. The informal -- the informal complaint in my briefing is included.
Q. I see. And would Mr. Campbell be made aware of the formal complaints as well?



A. Yes.
Q. When did you become -- when did -- is there any individual who's assigned an application during the review panel so that he or she presents the application to the group, or is it just everyone's reviewed it and you just discuss it?
A. You mean is there an advocate for each application?
Q. Or just someone who introduces the application.
A. No.
Q. There's no one responsible for introducing the applications?
A. No, it's an open discussion among the five panel members. All the panel members are supposed to review all the applications.
Q. Who aside from Mr. Campbell and the general counsel would be aware of the EEO complaint filed by Ms. Murtagh Cooke?
A. The only other one could be the labor relations officer, in that position. The person has changed over the years in that position. I think



the OR officer could be also aware. Today they're aware. Because the EEO director, the labor relations officer and our general counsel work in concert today to work on these issues.
Q. I see.
A. I'm not certain about 2004, which is when you mentioned.
Q. What about the chairman -- the chairman?
A. The chairman can be briefed on these issues. The EEO complaints, whether they're informal or formal, are protected from privacy, but the chain is the EEO director directly reports to the chairman, but practically also reports to the managing director in an organizational chart. Solid line to the chairman, a dashed line to the managing director.
Q. How is the information communicated?
A. About complaints?
Q. Yes.
A. In 2004, as I said, it was done verbally. It was done individually per complaint and it was done sporadically. So as a complaint appeared, the



EEO director would most likely come over and tell Mr. Campbell about it and potentially tell the chairman, but not necessarily. Today it's done in a very structured spreadsheet.
Q. Is this -- in 2004 and 2005, was any of the information communicated by email?
A. Not that I'm aware of. Generally the EEO director does not do that to protect the written documents.
Q. I see. What information's communicated to the managing director?
A. The nature of the complaint and the status of the work on the complaint.
Q. And does the managing director or chairman get a copy of the complaint?
A. No. I don't.
Q. In 2005 when Mr. Campbell was the managing director, did he get a copy of the complaint?
A. Not that I'm aware of.
Q. And Mr. Campbell did not do any work over the intranet, you said, over the -- I guess the intranet or through electronic means at NTSB?

A. That's not exactly what I had said. He would certainly communicate via email, but he did not edit documents in the electronic medium, he did it on paper. And most reading that he did was done on paper, it wasn't done electronically.
Q. Was Ms. Murtagh Cooke's complaint to the EEO discussed at any of the executive review board meetings?
A. The executive resource board is different than the panels. So let's make that clear.
Q. Sure.
A. It was not discussed and nor is any EEO complaint discussed at the executive resource board. And the reason is because many of the people on the executive resource board have no need to know that information.
(A lunch recess was taken.)
BY MR. LOWINGER:
Q. Can you describe to me what happened in April of 2004 when Marjorie Murtagh Cooke met with Ellen Engleman Conners regarding the dispira pay between her and her male counterparts?



A. I cannot. I don't have any information or knowledge about what went on in that meeting.
Q. Have you read any documentation regarding that meeting, sir?
A. No.
Q. When did you become aware of the meeting, sir?
A. The meeting between Marjorie Murtagh and Ellen Engleman Conners?
Q. Yes.
A. I think I became aware of that meeting as we were preparing for this -- for our previous deposition in this same general matter.
Q. I see. Are you aware of any documents, including any electronic documents related to the meeting?
A. I'm not. I'm not aware of any.
Q. Is it possible that any exist?
A. It's possible, but I'm not aware that there are any.
Q. When did Dan Campbell learn about the meeting between Ellen Engleman Conners and Marjorie



Murtagh in -- the April 2004 meeting? Let me repeat the question.
When did Dan Campbell learn about the meeting in April of 2004 between Ellen Engleman Conners and Marjorie Murtagh Cooke?
A. My understanding from Mr. Campbell is he didn't learn about it until after it had occurred. When exactly I'm not certain.
Q. When you spoke with Mr. Campbell, did he say he learned about it shortly after it occurred or did he --
A. No. My impression was that he learned about it sometime later, some significant time later.
Q. Did he say anything else about the meeting?
A. No. He didn't know the content of it either.
Q. When you say he didn't know the content of it, did he know the topic of it?
A. I don't believe he did.
Q. When did -- what was the agency's response



to the meeting between Ms. Engleman Conners and Ms. Murtagh Cooke in April of 2004?
A. I don't know that there was a response. I'm not sure of the context. But there was, to my knowledge, no written response or any action on the part of the managing director's office or the agency regarding that meeting.
Q. What about human resources, sir, and the possibility of making up the difference in pay one way over time or some other means?
A. I'm not aware of any action through human resources in response to that meeting.
Q. What's the impact of Ms. Murtagh Cooke's meeting with Ellen Engleman Conners on her career at NTSB?
A. I don't think there was any impact one way or the other. Through another deposition with you I learned that there was -- the content was talking about pay. I don't believe that her pay was impacted by that meeting. And I don't believe there was any negative consequences either.
Q. Did the meeting in any way impact her

standing with Ms. Ellen Engleman Conners?
A. Not that I'm aware of, but I wasn't privy to what went on in the meeting.
Q. Are you aware of any -- anyone other than David Clark, Ellen Engleman Conners or Marjorie Murtagh Cooke who was privy to what happened at the meeting?
A. No.
Q. There's no one -- there's no record of it kept anywhere by, like, for example, a secretary of Ellen Engleman Conners?
A. No. And I doubt that there would be. No, I'm not aware of any record by her secretary, and that wouldn't be a common practice.
Q. Of Ellen Engleman Conners?
A. Correct. It would not be a common practice for her to keep notes of a meeting like that.
Q. Would Dan Clark keep notes of a meeting like that?
A. I doubt it.
Q. I want to discuss with you what I asked



you about, the impact of the meeting on her career. Did it -- what affect, if at all any, did the meeting have in relationship between Marjorie Murtagh Cooke and Ellen Engleman Conners?
A. I can't speak to the relationship, but it didn't have any impact, that I can see or know about, to Ms. Murtagh and her career.
Q. Did it impact Ms. Engleman Conners' views of Ms. Murtagh Cooke?
A. I don't know the answer to that.
Q. Do you know what was discussed at the meeting, sir?
A. I do not.
Q. Do you know what the basis for the meeting was?
A. My only knowledge of the basis of the meeting is what you've suggested in the previous deposition, that it had to do with pay.
Q. And the lack of equal pay?
A. And overtime.
Q. And what about the methods of making up the difference that was discussed during the



meeting?
A. Again, I don't know what was discussed during the meeting.
MR. LUONG: Brian, so that there's no confusion on the record, as you know that entire line of questioning was -- relates to category 10, for which we already stated our objections.
MR. LOWINGER: That's right.
BY MR. LOWINGER:
Q. We were just talking about the creation of the topics -- well, let's just -- we discussed evaluations a little while ago, sir.
Do the other directors at modal offices in 2004, did they receive performance appraisals?
A. Not all of them.
Q. Which ones did?
A. There are 11 office directors, and I don't know which ones either did not pursue --
MR. LUONG: I'm going to object because I think this is outside the scope of the 30(b)(6) deposition.
BY MR. LOWINGER:



Q. How are the -- in what manner were the other applicants in 2005, as determined by the second panel, how were they better qualified than Marjorie Murtagh Cooke for the SES position?
A. The panel determined that they had all had significant experience in the maritime industry or in the regulatory area or significant experience aboard ship. And most of them had multiple tiers of experience, different experiences in different aspects of the industry, both private and government, and different technical aspects of the industry, from environmental protection, which is a big marine issue, to ship design to significant supervisory experience.
Q. What were the factors that were most important in determining that those individuals were better qualified than Marjorie Murtagh Cooke?
A. The breadth of the experience, not only the diversity of the experience among the applicants but also the level of experience and the level of supervision and interaction, both domestically and internationally.

Q. How would their international experience rate higher than Marjorie Murtagh Cooke's?

A. Some of them -- it depends on the applicants, but some of them were heavily engaged in international committees and chairpersons of such committees on marine safety and environment issues. Some were head -- the head of joint international programs. That's one aspect of the breadth of experience that I had mentioned.

Q. So environmental, supervisory, the breadth of experience, the level of experience, the supervision and the international domestic work, I guess regulatory work or work with outside organizations --

A. Right.

Q. -- were all factors that demonstrated that they were better qualified than Marjorie Murtagh Cooke?

A. Yes.

Q. Any others?

A. No. Each applicant, of course, was somewhat different, they're individuals, and their



experiences were different. But in a broad sense their breadth and level of experience was superior.

Q. What about Mr. Spencer's experience was superior to Ms. Murtagh Cooke's?

A. Mr. Spencer had not only the requisite marine Bachelor's degree, he also had a Master's and a doctorate.

Mr. Spencer had been through the Coast Guard in a variety of marine safety positions and had retired as a captain, Coast Guard captain. He then went on to manage the technical development program at the American Bureau of Shipping for a number of years. He has authored a number of papers. He has chaired a number of international committees on maritime safety. He was well-known in the industry and very well respected.

Q. So how does his -- how did his education rank higher than Marjorie Murtagh Cooke's?

A. Marjorie Murtagh Cooke has a Bachelor's degree in marine engineering, I believe, and that is essentially the end of her formal education. I believe. Without looking at her application. I



would need to look specifically at her application.

But Dr. Spencer's three formal education degrees are all in maritime. And his 40-odd-year career has been exclusively in the maritime industry and both in the regulatory side and at the industry side. And he has spent some time on ships as well.

Q. When you say some time, what kind of ships did he spend his time on?

A. For the most part Coast Guard vessels when he was with the Coast Guard.

Q. And did it matter to the board what type of vessels a person was actually on?

A. Not necessarily. Time at sea, time actually in command of different aspects of a ship were desirable.

Q. What type of ships were desirable, sir?

A. I don't think that one was necessarily more than the other, it was the experience of being at sea. A Coast Guard cutter is different than a cruise ship, but being at sea is still -- has the same basic principle as far as command of a vessel or aspects of a vessel.



Q. But it doesn't necessarily limit it to being at sea. You could be on a navigable water and it would be just as good as long as you have the applicable experience?

A. Sure.

Q. Who conducted the interviews?

A. The interviews for?

Q. The applicants in 2005.

A. For the applicants in 2005. It was myself, Elaine Weinstein, Vern Ellingstad and I think Robert Chipkevich.

Q. At what point did Dan Campbell say -- at what point did Dan Campbell learn that Marjorie Murtagh Cooke was not going to be interviewed?

A. When I received the memorandum from March 28 from the panel, the second panel in 2005. I believe I notified Mr. Campbell, who was then the executive director, that I was going to interview the five -- top five applicants and that Ms. Cooke was not one of them.

Q. Did he learn about it from the first 2005 panel?

A. He would have, yes. He would have learned it in that panel, she was not one of the top five applicants.
Q. What was his response from the first 2005 panel?
A. He never -- he never got to the point of actually conducting interviews from that panel.
Q. I see.
A. Because I was the managing director shortly after that panel concluded its work and before Mr. Campbell had the opportunity to interview anyone. So we reconstituted the panel to review the applications all over again.
Q. Did you discuss -- when you reconstituted the panel, did you discuss with Dan Campbell anything related to Marjorie Murtagh Cooke's candidacy?
A. No, not particularly. It was a very procedural matter. The panel needed to be reconstituted because I was a panel member originally and now I was the selecting official.
Q. Did the panel go through all the same steps as before?



A. Yes.
Q. Did it take as long the second time as it did the first time?
A. It took a substantial period of time, yes.
Q. And when you say substantial period of time, how much more or less time did it take for the second panel than it did the first panel?
A. I don't know that there was a significant difference. I know that the first panel took probably four hours, a rough estimate. And I believe the second panel, although I wasn't part of the second panel, I believe that took roughly the same period of time.
Q. And what communications did the panel members have with anyone outside of the panel in between the first and the second panel regarding the applicants?
A. With the exception of Ms. Magwood, none that I'm aware of.
Q. When you say with the exception of Ms. Magwood, can you describe what you mean by that?



A. Well, Ms. Magwood, as with the first panel and the panel in 2004, was the administrative organizer of the panel. So she delivered the applications, she briefed the panel in advance of -- at the beginning of the meeting, she received all the applications back and the final information and prepared essentially the memo for the panel members' signature.
Q. And how much time did the panel members have to review the applicants the second time around?
A. I think about a week.
Q. When you say about a week, was it a workweek?
A. A regular workweek. I don't know if there was a weekend involved in it, but I believe there was. Usually when we're provided a significant amount of reading material we usually were provided it in one week and conduct the meeting the following week.
Q. And do you remember which day the meeting took place?



A. Without referring to the document I can't tell you exactly the date.
Q. And what -- who gave the procedural discussion this time?
A. It would have been Ms. Magwood.
Q. And the second time around, what was the discussion with regard to Marjorie Murtagh Cooke's application? Can you describe the conversation?
A. I don't know the conversation that occurred within the panel. I wasn't part of that. And I don't know if they discussed -- had the same conversation that we had in the first panel of '05 regarding her position and whether she ought to be interviewed or not. I don't know.
Q. Was there a ranking sheet the second time around?
A. Yes.
Q. And how did Ms. Murtagh Cooke rank the second time around as opposed to the first time around in 2005?
A. I think in the same position. I think she was number 7 out of 12 or 13.

Q. The only distinction being that Tom Haueter was involved the second time around?
A. Tom Haueter took my place and otherwise the panel was the same.
Q. And what was Tom Haueter's position with regard to Marjorie Murtagh Cooke's application?
A. All I can tell you is that he signed, along with the other panel members, the recommendation to me, the managing director, for the top five people.
Q. Did you have any conversations with him about this?
A. Mr. Haueter, no.
Q. Did you have any conversations with any of the other members of the second 2005 panel?
A. I did not until the interviews. And during the interviews, as we interviewed the top five members, Mr. -- or Dr. Ellingstad and Ms. Weinstein and Mr. Chipkevich knew the applications from their review on the panel and had conversations about those five individuals during the interviews.



Q. But what about regarding Marjorie Murtagh Cooke?
A. No, I didn't have conversation with the panel members.
Q. What about -- the interviewers were basically the same. Was there any discussion amongst the interviewers that Marjorie Murtagh Cooke was not selected for an interview?
A. No, no. The interviews were specific to the applicant that was being interviewed at that time.
Q. Did you participate in that re-interview?
A. I did.
Q. After the interviews were completed, what -- were you going to say something, sir?
A. Yeah, I'm trying to -- no, never mind.
Q. Are you sure?
A. I'm trying to make sure that I give you the right people on the interview. And I think that I've done that.
Q. Who gave Marjorie Murtagh Cooke notice that she wasn't going to be granted an interview?



A. I did.
Q. Describe to me the conversation.
A. I brought her in and I told her that she was -- that we had conducted five interviews of five applicants and we're prepared to make a selection. I did not bring her in and say she was not going to be interviewed. And the reason for that is had the five top applicants not worked out during the interviews, I had the option of moving further down the list.
So I was not going to advertise that she wasn't in the top five until such a point that we had conducted those interviews and decided whether we could make a selection from that crew, which I could.
Q. So after you told her that you conducted interviews and that you were in the position to make a selection, what was the next thing said?
A. Well, I talked to her about the fact that she was going to no longer be the director of the Office of Marine Safety, that a new SES employee was going to come in sometime in the summer and take



that position. And we discussed briefly what she wanted to do, what we could do regarding her position and where she might like to be positioned next within the agency.
Q. And what did she say to you, sir?
A. It was a cordial meeting. She said that her concern was not necessarily the SES but it was pay. She was interested in pay and how could that -- how could she increase her salary within the NTSB.
So we had a discussion about what those options were. She proposed that -- she thought that -- and I asked her. I said, well, what do you think you would like to do. And she indicated that she would like to try to create a position for an international billet at the SL level, which at that time was a relatively equal pay category to the SES. And I told her to go and come up with a proposal for that and come back and see me.
Q. What else was discussed during the meeting?
A. She was appreciative that I was being

frank and communicative, talking to her about the issue. She thought it was not right that she was not selected. She believed she should have been selected. She understood the situation.

And we had also briefly discussed whether she wanted to remain within the Office of Marine Safety or not. And I can't recall whether at that meeting she indicated she did not or at a subsequent meeting she indicated she would rather not stay in the Office of Marine Safety with the new director.

Q. So at which point did Ms. Murtagh Cooke tell you that she did not want to stay in OMS with a new director?

A. I think that at that first meeting she said she would think about that situation. And at a second meeting that we had she indicated that she did not want to say in the Office of Marine Safety.

Q. When did she give you her bullet points for the SL position?

A. At the second meeting.

Q. And what was your response to the bullet points?



A. I took them and I told her I would consider them and review them with the executive director and the chairman, and I did just that. And I came back to her and I told her that our collective discussion was that there was not sufficient work to create this position within the agency for an international liaison, if you will, when such a position already occurred -- already existed for aviation in the aviation office.

Q. So walk me through the steps of the second meeting. I just want to make sure I understand it. When did the second meeting take place?

A. Maybe a week later.

Q. When did the first meeting take place, do you remember?

A. It was after the interviews when I was prepared to make a final selection and announce that selection. It must have been late April or early May 2005.

Q. And the second meeting was -- actually, with regard to the first meeting, what did Ms. Murtagh Cooke say about the fact that she



thought that she should have been selected and that it was not the right decision?

A. She indicated she thought that she should have been selected for the position. She didn't know any of the other candidates or their applications. She did not comment on those. Her position was that she believed that she should have been selected regardless.

Q. And what was your response?

A. And my response was that we went through the process. She did not rank in the top five. We interviewed the top five, and among that group there was at least one -- there were several. As a matter of fact, all five candidates were reasonable choices for the position.

Q. And then what did she say?

A. She then talked about the fact that her issue was not so much title or status of the SES, it was pay. She was interested in trying to find a way -- Ms. Murtagh understood that the decision had been made to select another candidate. Her interest now was -- turned to finding a way to get pay equal



to the SES.

Q. Okay. Was there any discussion after she said that -- after she said that, what was said next?

A. Well, then the discussion was about what kind of positions she would potentially want to do. In the agent one-on-one -- execute the agency, she brought forward this idea of the international liaison. We talked about it. It was a discussion. And I thought it was an interesting concept. And I told her to develop it further and come back with her thoughts on what she felt she could do with this position.

Q. What office would that SL international position, liaison position be in?

A. As we were discussing it we were discussing it in the Office of Managing Director, my office.

Q. I see. Why would it be in the Office of the Managing Director?

A. At the moment the agency has an SL position for international aviation functions, which

is the majority of the international work that goes on within the NTSB. But there are other international aspects of the agency that are not represented by that SL position.

The person that currently occupies it, that position, Mr. MacIntosh, deals almost exclusively with aviation issues, while there are some marine, a few highway and some rail and pipeline issues that are international issues, and there was no, at that time, liaison in the agency to manage that activity, that international activity.

Q. Is the international aviation SL position, is that in the Office of the Managing Director as well?

A. No, that's in the Office of Aviation Safety.

Q. After you discussed the aviation -- the international position and interest in equal pay, what else was discussed during that first meeting?

A. The only other topic that was discussed was she thanked me and thanked me for being frank and clear in the conversation with her and indicated



that she had not always understood or been -- in her opinion things had not been communicated well to her in the past. That pretty much covers the content of that meeting.

Q. Was there anything discussed with regard to the meeting with Ellen Engleman Conners?

A. I don't believe so.

Q. Did she mention communications with Ellen Engleman Conners regarding equal pay and her efforts to try to get equal pay?

A. At some point in one of the meetings Ms. Murtagh indicated that she had met with Member Conners -- Engleman Conners and had tried to meet with her again but could not.

Q. And what was -- was that the first or second meeting?

A. I don't recall. It was in one of those meetings.

Q. Either the first one or the second?

A. Where she mentioned -- and I suspect it was the first, because she was talking about communication, her concern about not --



communication flow not going very well for her.

Q. And what about -- what did she say about the meeting other than the communication? Did she mention the fact that she was seeking equal pay and had sought equal pay because she was the only woman doing equal work and was not being paid at the same level as the men?

A. Yeah, I believe she did. I believe she did. I think that I testified earlier that -- or at least I mentioned earlier that I learned of her concern about equal pay through the deposition, or maybe that was the EEO. I think that was the EEO. No, I think she did mention it. Much of that topic was about equal pay in that first meeting.

Q. I see. And what did you respond when you discussed equal pay besides the SL position?

A. Well, I told her that the SES position that she had applied for was a competitive position, that she was not selected. I could not legally just arbitrarily improve her salary. I don't have that ability and couldn't do it. That if she was interested in making more salary we would need to



find a rational and justifiable mechanism for doing that. And this is when we talked about the potential for her developing an SL position within the Office of Management.

Q. What was your understanding as to what would -- what Ms. Murtagh Cooke would need to do in order to obtain the SL position when you discussed that during your first meeting?

A. I did discuss it. I said first we would have to have a justifiable need. We would have to identify the position and craft a position description.

Secondly, we would have to obtain the billet from OPM. SES and SL billets are allocated from OPM. I just can't create a billet. I have to request it from the Office of Personnel Management with a justification and a rationale behind it.

Once granted that billet it then becomes a competitive billet, because it is a promotion. All promotions have to be done competitively. So there would be an announcement. She would have to compete. She would have to be selected and then --

that's the process. And we discussed that as well.
Q. And how long -- the duration of the process, did you discuss that at all?
A. How long that would take?
Q. Yes.
A. Not likely. I don't think that I discussed that, but I sent her off on the first step, which was to create essentially a concept.
Q. And a week later you had a meeting -- let me just ask this question.
Before the meeting ended, what else was discussed with regard to equal pay? Did you discuss the equal -- the EEO complaints at all during the first meeting?
A. No, I don't recall that.
Q. Were you aware of it at that point?
A. I don't think so. I don't think I was aware of the EEO complaint. I think I was aware that she had met with Chairman Engleman Conners, but I don't think I was aware of the EEO complaint.
Q. When you took over -- when you took over for Mr. Campbell, did you have any discussions with



regard to Marjorie Murtagh Cooke and her tenure given that she was at that point not likely to be selected for the SES position?
A. When the sheet came from the panel, after I reconstituted the panel, had them redo their work and the sheet came back to me, it was clear that she was not in the top five. And I mentioned to Mr. Campbell that she was not in the top five.
At that stage he wanted essentially to be an arm's length from the process because I was the selecting official.
Q. What did he say about Marjorie Murtagh Cooke, about her not being in the top five?
A. I don't believe he had any comment at all. I informed him and he made note of it and that was the end of the conversation.
Q. How did he make note of it?
A. He acknowledged that I gave him the information.
Q. And how did you give him the information?
A. Verbally. I told him that I was going to prepare for five interviews for the position, that



Marjorie was not in the top five and that he needed to be aware of that.
Q. Why would he need to be aware of that?
A. Because she was the incumbent at the 15th level.
Q. And how would that impact him?
A. It is -- as the executive director, he had overall direction at that time for the activities of the agency. The activities that go on with hiring and so on with staff concern not only the managing director but the executive director as well.
Q. Was he surprised that she wasn't selected for an interview?
A. I don't believe so because I believe that he knew from the previous panel that she had not made the top five as well.
Q. And did he speak to you about that, that he had not -- that she had not been selected the first time, in 2005?
A. I don't think so. I know that Mr. Campbell, through conversations with me, believed that if it was plausible that the incumbent



should be interviewed, but if she didn't make the top five she didn't make the top five.
Q. Did Mr. Campbell express an opinion about the other candidates and their qualifications being greater than Ms. Murtagh Cooke's?
A. As far as I know, he never looked at the applicants in any detail from either the second panel or the third panel, the 2005 panels.
Q. Was there ever any discussion with him about the scope and the breadth of the panel -- of the pool of candidates?
A. No. I know that his intention in December of 2004 was to get more qualified applicants. And I know that we had 15 applicants forwarded to the panel, for the first panel in 2005, wherein 2004 there had only been 10. That's all that I'm aware of as far as his comments about that.
Q. What did he specifically say about the fact that it is at all plausible that the incumbent be interviewed, that the incumbent should be interviewed? What specifically did he say about that?

Page 154

A. Well, I know that in his practice from those positions in the agency, and my recommendation and the panel's recommendation were concurrent, and that was that we should stay as close to the rules on all of the job applications that we are advertising, and whoever comes out in the top five comes out in the top five.

Q. It's always the top five at NTSB?

A. For SES it's usually the top five, because it's such a work force -- workload to interview and manage those applications.

Q. What did Mr. Campbell say about Ms. Murtagh Cooke other than her application with regard to her candidacy for the SES position?

A. Well, that's a broad question. In the interview that I conducted we talked about the sequencing of the SES billets, which we had spoken about in the previous deposition. And other than what I've mentioned here, I think that's probably it.

Q. Did Mr. Campbell ever express an opinion about Ms. Murtagh Cooke's claims that she deserved

Page 155

equal pay?

A. Yes.

Q. Describe those -- the conversation about that.

A. Well, he thought that, one, there was of course a procedural difficulty with that. You can't just promote people without the proper process. And two, he was not comfortable with her performance and did not believe that she was performing at the same level as the other office directors, and therefore he thought that a request for equal pay was bold on her part.

Q. When did you have this conversation with Mr. Campbell?

A. This is in my preparation for the first deposition in May of this year.

Q. For the Court of Federal Claims' action?

A. Yes.

Q. Did you have any conversations with Mr. Campbell about the issues that we've just discussed in the prior question while you were switching from the Office of Highway Safety to

Page 156

managing director and Mr. Campbell was switching from the Office of Managing Director to the Office of Executive Director?

A. No, very little. Mr. Campbell made it very clear that he wanted to stay at arm's length from these hiring activities for several reasons, and not just Ms. Murtagh's position or the director of OMS position, but all of them because he was assuming a different role as an executive director and liaison with the board members.

His focus was going to be, during his last six months with the board, attention to the board members and their issues. And so he immediately, the day of my assignment to the managing director, essentially said it's all yours, and other than information let me know what's going on in the end, it's yours to manage.

Q. And you said he said that he wasn't interested in hearing about Marjorie Murtagh Cooke or the application process. Specifically what did he say about Marjorie Murtagh Cooke?

A. I didn't say he wasn't interested.

Page 157

MR. LUONG: Yeah. Objection, I think that mischaracterizes his testimony.

A. Yeah, I didn't say he wasn't interested in hearing about it, he wasn't interested in being involved with it. Other than the final stage information that I would normally provide to my superior about the process.

And he was at that time fully engaged in the new assignments. Our chairman's term had ended. We had an acting chairman and a potential incumbent chairman who were two different people, and we had board members coming in and leaving, and there was lots of activity surrounding those board members. He was fully engaged with that.

Q. Tell me about the second meeting with Marjorie Murtagh Cooke when she came to you with the bullet points.

A. The second meeting was a transmittal of the information from her to me.

Q. How long did the meeting last?

A. It wasn't very long. Maybe 30 minutes, where she discussed the points of what she thought

the position could do. And I told her I would consider it and talk to the executive director and the chairman about it and I would get back with her.
Q. What else was discussed? Was the whole meeting just about the SL position?
A. Pretty much. She also, I think, restated her position about wanting to not be focused on status or title but rather pay. She was interested in increasing her salary and the pay.
Q. Going forward or for past actions?
A. No, going forward.
Q. What was discussed about her meeting with Ellen Engleman Conners at your second meeting?
MR. LUONG: Objection, assumes facts not in evidence.
A. I don't believe that was discussed at the second meeting.
Q. What was discussed about the EEO complaint at the second meeting?
MR. LUONG: Objection, assumes facts not in evidence.
A. I don't believe that was discussed at the



second meeting.
Q. Other than the SL position, what else was discussed during the second meeting?
MR. LUONG: Objection, that's been asked and answered already.
A. The SL position was really the only context of that second meeting.
Q. Tell me about your meeting or when you actually discussed the SL position with the executive director and the chairman.
A. Shortly after the second meeting with Ms. Murtagh, I brought to the executive director and both the acting chairman and the incumbent chairman the suggestion that an SL position -- her suggestion of an SL position. I was asked what I thought and my opinion was that there was not sufficient work to justify another SL position for international work.
Although there is international work at the agency that is not aviation, at least 80 percent of it is aviation. The majority of it is aviation. And we already had an SL billet handling that work, a person at the SL level. I did not believe that



there was justification for the SL grade for what was left in the international work.
Q. When did you form that opinion?
A. I formed that opinion after I reviewed Ms. Murtagh's proposal and after our second meeting.
Q. And do you remember what -- how long the proposal was?
A. It wasn't very extensive. Several pages maybe, maybe bullet points.
Q. And was there any -- was it that the presentation wasn't extensive enough or was it that there just wasn't enough space, enough international work other than aviation?
A. I just didn't think that there was sufficient -- and the executive director and both the chairmen agreed that I didn't think that there was sufficient work to justify that level of position.
Q. And the executive director was Dan Campbell?
A. Yes.
Q. And who was the chairman at that time?



A. The acting chairman was Mark Rosenker, and the incumbent chairman or chairman designee was Ellen Engleman Conners.
Q. Did you meet with both chairpersons?
A. I did.
Q. And both of them agreed, or was there any disagreement?
A. No, no disagreement.
Q. How long was the meeting with Mr. Rosenker and Ms. Ellen Engleman Conners?
A. They were not together, they were different. Probably no more than about 15 minutes.
Q. Which one actually had authority to grant the opening of a position for the SL position?
A. None of them. The authority has to come from OPM.
Q. Which one would have authority to let you seek authority from OPM?
A. At that time it would have been the acting chair, Rosenker.
Q. So what was Ellen Engleman Conners' input worth?

Page 162

A. She was the chairman designee, which meant that the president had already designated her to be the next chairman, although her term had expired. His intention was to nominate her to be the chairman again. And because of that there was, at a minimum, a courtesy factor to include her in the decision that affected the agency.
Q. And after meeting -- how long was your meeting with Mr. Campbell regarding the SL position?
A. Probably about 15 minutes.
Q. And was there any thought of a way by any of the people with whom you met, Mr. Campbell, Mr. Rosenker and Ms. Engleman Conners, as to a way that Ms. Murtagh Cooke could be accommodated with an SL position or a position -- some sort of position that she envisioned that would encompass the international aspect that she was seeking?
A. I'm a little confused by the question.
Q. Was there -- was it just a yes or no decision or was there any other discussion about a way to accommodate her -- her next step after being --

Page 163

A. All three meetings were nearly identical in which I presented the situation, that because we were selecting another candidate, she -- we would need to find a new role for her, and she had proposed an SL position for this international billet. And this was her ideas on that -- these were her ideas. And all three individually asked me what I thought about it and I told them exactly what I said here, that I did not think there was sufficient work to justify that level billet for that particular aspect of the work.
Q. Was there any other way to make a position available to her at the SL level or at a higher level than what she eventually was transferred into? For example, at the Office of Safety Recommendations.
A. The basic test that has to occur is that there has to be sufficient justification and need for the agency to request from OPM an additional SL billet. And then OPM has to agree with the agency and grant the billet.
Q. When did you discuss the issue with

Page 164

Ms. Murtagh Cooke that the agency was not in a position to create an SL position for her?
A. About a week or two later maybe.
Q. And describe the conversation for me.
A. I indicated that I had discussed it with the executive director and the chairman and we did not believe there was sufficient work to justify an SL billet for this international work that she had been seeking.
Q. And what was her response?
A. She was unhappy with that. She believed otherwise. And the conversation then moved into where would you like to work, what would you like to do.
We discussed several options. She could stay in the Office of Marine Safety, which she decided was not what she wanted to do. She didn't want to stay there. And I indicated that we had an immediate need for a 15-level manager, planning manager in the Office of Safety Recommendations for a specific duration of time. It was not an endless need, but it was a coincidental time need to go and

Page 165

help the Office of Safety Recommendations do some planning activity, and she agreed to do that. And then for us to consider what other position may be appropriate for her at the 15 level. And so we detailed her to the Office of Safety Recommendations.
Q. What was discussed with regard to her staying in OMS?
A. I asked her very clearly, what would you like to do. Would you like to stay in the Office of Marine Safety.
I told her that we could create a national resource billet for her there, which is a 15 level position. And I also told her my personal opinion was I didn't think it was necessarily the best idea coming from the director's billet to a lesser position and working for a new director, but that I would leave it up to her on how she wanted to do it. And she didn't want to stay in the Office of Marine Safety.
Q. What is the national resource?
A. Fifteen level employees at the NTSB for

the most part are supervisory employees. The supervisory billets in the Office of Marine Safety were filled already. So to keep her grade, I could give her -- create a national resource specialist billet in the Office of Marine Safety, which is a nonsupervisory technical 15. And we would provide -- we would essentially assign her marine engineering tasks for investigations.

Q. And what was her view on that position?

A. The position was not unattractive, but I think that she didn't want to stay in this -- the office structure, the Office of Marine Safety.

Q. What was her reason for not wanting to stay in the Office of Marine Safety?

A. Comfort or discomfort. A new director coming in, essentially taking her place at the SES level. She thought it would be awkward, and I agree it would have been awkward for her.

Q. Did she offer to stay and help acclimate Mr. Spencer?

A. She did not. She actually wanted to be out of it at that point. She made it very clear



that she'd wrap up some of the work that she was doing, but she wanted to be extracted as quickly as possible. She didn't want to be in place as the last marine director waiting for the new marine director to come in.

Q. So how much time was there between her leaving OMS and Mr. Spencer taking over?

A. There was -- Mr. Spencer took over in August. She left, I believe, in May or very early June. And in the interim I put in place another employee as the acting director.

Q. So what was discussed with regard to other options besides the national resource specialist in the Office of Safety Recommendations?

A. Well, I looked through the agency, what other billets were available, and I essentially told Marjorie that the two that were available that I had at the moment were this national resource specialist in the Office of Marine Safety or a detail to the Office of Safety Recommendations to help with advocacy planning and recommendation planning.

And those were the positions that I had at



that time. And that if she wanted -- in which she indicated she wanted to go to Safety Recommendations. If she did, I made it very clear that was a temporary position, it was a detail, and while she was on the detail I would work to create -- work for a pathway for her to another position within the agency.

At that time I'd only been in charge for a little less than two months and hadn't really put the whole plan of action in place yet of what I was going to do.

Q. Excuse me for interrupting. Did you finish? I didn't hear the last part of it. You said --

A. I hadn't had much opportunity to think through an organizational development process, wearability and debate.

Q. During that third meeting when you discussed the national resource specialist and the advocacy planning position at Office of National -- of Safety Recommendations, what was discussed with regard to dispira pay and/or the EEO complaint?



MR. LUONG: Objection, assumes facts not in evidence.

A. Well, I don't believe we discussed the EEO complaint at all. And at each meeting I talked with Ms. Murtagh, she would bring up the -- her belief that she should have equal pay. And at the 15 level she was, I think a 15-9 or a 15-10, there was very little that I could do.

Q. Who was the first person interviewed by the EEO for the complaint?

A. By who?

Q. By the EEO office at NTSB with regard to Marjorie Murtagh's complaint.

A. Well, it would have been Marjorie.

Q. Aside from Marjorie. Very well, sir. Aside from her.

A. Oh, the sequencing of who. Farah Guest is the EEO director. I don't know who she spoke with or in what order.

Q. What about --

MR. LUONG: Brian, I have a clarification. What stage of the EEO process are you referring to?

MR. LOWINGER: Okay.
BY MR. LOWINGER:
Q. Let's just go back to one thing quickly and then we'll go to the EEO.
When did Ms. Murtagh Cooke, when was she transferred to Office of Safety Recommendations and -- Office of Safety Recommendations and Communications?
A. There's paperwork, personnel action, that tells you specifically the date, but it would have been late May or early June 2005.
Q. When did the EEO start doing interviews with employees of NTSB with regard to Ms. Murtagh Cooke's complaint?
MR. LUONG: Same concern, Brian. Clarification. Are you referring to the informal process or the formal process?
BY MR. LOWINGER:
Q. Please -- whether it be the informal or the formal, sir.
A. I know that Ms. Murtagh made a complaint and there was an informal investigation. Ms. Guest



concluded that. I don't know if she interviewed people during that. And Ms. Murtagh was referred to -- by Ms. Guest to the formal process.
Q. Did you have any communication with Ms. Guest with regard to the informal complaint?
A. Ms. Guest advised me after I became managing director, sometime after I became managing director, maybe a couple of months, that there was a complaint process in place. In the same sporadic way that Mr. Campbell had received notifications, she gave me an update.
Q. Had you spoken about it with anyone else at that point?
A. No.
Q. Were there any communications between Mr. Campbell and Ms. Engleman Conners with regard to the complaint that you're aware of?
A. Not that I'm aware of.
Q. Let's talk about the efforts to remediate this complaint. Once the complaint was filed formally, what were the steps involved in trying to resolve the complaint within the agency?



MR. LUONG: I'm just going to object to the extent that the question implies requirement to resolve the complaint.
A. Once a complaint is transmitted to the EEO director, the EEO director needs to make an informal inquiry into the complaint to essentially assess whether the EEO director believes that the complaint has merit.
If the complaint has merit, the EEO director has the opportunity to try to resolve the issue among the parties, between the complainant and managers or others. If she does not believe that it has merit she will communicate that back to the original complainer.
Either way, the complainant can go to the formal process next. If the informal process does not resolve it or if the formal process determines that the EEO director makes a determination that there is no merit to the complaint, the employee has the option of going to the formal, the EEOC.
Q. I understand that. Let me ask this question. When the informal complaint has been



transferred to the director of the EEO office, what efforts were undertaken to resolve it or determine that it did or did not have merit?
A. I'm going to have to refer to the records from the EEO office. I cannot recall exactly what Ms. Guest did regarding resolution.
Q. And when it became a formal complaint, what steps were undertaken to resolve the matter?
A. Well, there's two -- there's one key, and that is request of the complainant, what will it take to resolve this problem for you. Or if the agency believes there's no merit to it, that that question will be asked of the complainant, but if the question is asked of the complainant, it's incumbent on the complainant to essentially say here's how I would like this resolved.
Q. What was the agency's response with regard to the merit issue?
A. I know that the -- in this particular case the resolution that Ms. Murtagh communicated to the EEO director was equal pay, would bring her salary up to the equivalent of the SES. That's what would

Page 174

have resolved her concerns in the EEO complaint. And I simply did not have the authority to do that. I could not have done that.

Q. I guess my question was, sir, what was the agency's response to the question of whether or not the complaints had merit?

A. The agency did not believe the complaint had merit.

Q. And where is that reflected?

A. Again, I'm going to have to go to the records from the EEO director to show where that is.

Q. Are there communications between your office and the EEO director with regard to the determination of merit or the complaint?

A. In the informal process?

Q. Informal or formal, sir.

A. I believe there is. I'm not sure. I believe there's a -- sorry, I'm a little fuzzy around the EEO structure here, but I believe that there's a submission to me about what would resolve the complaint, what would satisfy the complainant. And I recall that discussion in that the complainant

Page 175

wanted to have equal pay to the SES.

Q. Do you remember when you received that communication, sir?

A. I do not. It would have been in the summer of '05.

Q. Summer of '05?

A. Uh-huh.

Q. Was it a written document?

A. I believe so.

Q. Were there any conditions attached to the -- well, upon your receipt of the proposed solution or resolution, what was the agency's position?

A. The agency's position at the beginning was that there was no merit to the complaint because there had been competitive announcements for the positions. She competed, was not selected. The agency's position to the resolution of elevating her pay to that equal of the SES was that there again there was no merit to the claim and, two, there was no authority that the agency had to do that.

Q. I see. Upon its determination of the fact

Page 176

that Ms. Murtagh Cooke wouldn't be selected for the SES position, who else spoke with her about her next steps?

A. I think it was probably just me.

Q. Did Mr. Battocchi have any communications with --

A. Mr. Battocchi did speak with her, yes, he did talk to her.

Q. Describe all the meetings between Mr. Battocchi and Ms. Cooke with regard to her position at NTSB after she was not selected?

A. I know that Mr. Battocchi spoke with Ms. Cooke about whether she wanted to retire after her nonselection for this position, and that he discussed with her that it was possible to do --

MR. LUONG: I'm just going to object. Our concern is this communication may be subject to attorney/client privileges.

MR. LOWINGER: Well, he represents the agency.

MS. SILBAUGH: Who's the "he" you're referring to?

Page 177

MR. LOWINGER: Mr. Battocchi.

MR. LUONG: Can we go off the record for just a moment? I want to speak with agency counsel about this.

MR. LOWINGER: Okay.

(A recess was taken.)

BY MR. LOWINGER:

Q. Can you describe Mr. Ron Battocchi's efforts to resolve the EEO complaint on behalf of NTSB with Ms. Marjorie Murtagh Cooke?

MR. LUONG: I'm going to object to that question on the basis of attorney/client privilege and instruct the deponent not to answer that question.

BY MR. LOWINGER:

Q. Can you describe Gary Halbert's efforts to resolve the complaint, Ms. Murtagh Cooke's complaints -- EEO complaint?

MR. LUONG: I'm also going to object to that question on basis of attorney/client privilege and instruct the witness not to answer that question.

BY MR. LOWINGER:
Q. Mr. Osterman, I understand you're not going to answer the question?
A. Say it again.
Q. You're not going to answer the question?
A. No, I'm not going to answer the question.
Q. When you spoke with Ms. Murtagh Cooke with regard to the Office of Safety Recommendations and Communication and her work there, can you describe whether or not that was -- can you describe the -- describe to me the position that she was going to be transferred to?
A. Certainly. I told her the one was a temporary position, term appointment, detail if you will. It was not intended to be a permanent position. There was a need to assist the director of that office in planning activities. And I considered Ms. Murtagh a good planner and felt that that fit would be good for the agency and would give her the opportunity to move out of the Office of Marine Safety, as she wished, and also give me the opportunity to design a more permanent position for



Ms. Murtagh outside of the Office of Marine Safety.
Q. Describe to me your conversation with regard to the temporary nature of the position that you assert.
A. Oh, I told her that it was for -- probably through the summer and early fall and it was intended to work on planning activity within the Office of Safety Recommendations, and that once that was complete that she would return back to the Office of Management. And at that time I would have -- have the opportunity to create and design a job based on an organizational development model, a legitimate position with substantive work in the Office of Management for her.
Q. What did Ms. Murtagh Cooke -- what was her response to your statement with regard to the temporary nature of the transfer?
A. She understood it as a detail. She understood that she would be returning most likely to the Office of Management when the detail was complete.
Q. And describe the planning activities.



Actually, what was discussed with regard to the return to the Office of Management? I mean how did we ever get to a position at the Office of Management from Office of Marine Safety? How did we ever get that far in the process of planning her next stops?
A. Quite frankly, thinking a little bit ahead. At the time we had the discussion about her going to the detail in Safety Recommendations, there was not another 15 billet open and available to place her in that was appropriate for her -- for her background. And in taking over the Office of Management, I knew that there was an organizational development, a redesign of that office that was necessary. I knew that we needed to have a planning functionary within that office that didn't previously exist, and I thought that Ms. Murtagh would be a good candidate for such a position. However, I hadn't worked all that out yet. I had only been in the job a couple of months.
Q. Who did you all speak with in the Office of Safety Recommendations and Communications with



regard to placing Ms. Murtagh Cooke in that position?
A. The director, Elaine Weinstein.
Q. What was her response?
A. She was fine. She thought it would be helpful for her. She had the need for some higher level assistance at that time and she was perfectly willing. She has always had a favorable relationship with Marjorie and thought it would work out nicely.
Q. And when you discussed the position or you considered the position, what aspects of marine safety work was to be involved in the position?
A. It was mostly management and planning. There was not nearly as much marine safety aspect to the position in Safety Recommendations, but Marjorie was also a manager as well as a marine safety expert.
Q. What marine safety work was actually involved during her time at the Office of Safety Recommendations and Communications?
A. The details of what she did specifically

within that office --
Q. Yes.
A. -- I'm not that familiar with. I know that she assisted the director in planning advocacy activities for a variety of different recommendation initiatives, some of them marine.
Q. What is -- when we discuss planning, describe what kind of planning Ms. Murtagh Cooke was to be doing in the Office of Safety Recommendation and Communications?
A. My understanding is she was to be planning the execution of advocacy activities and the organization of recommendation tracking processes. I think that's basically it.
Q. What type of organization planning was to be involved?
A. It was recommendation planning, an advocacy planning. You mean from my office or in the Office of Safety Recommendations?
Q. Let's just be clear. Describe to me the plan that she was to be doing. I just want to make sure I've got this straight. I think I misconstrued



what you said. So can you just repeat it please, sir?
A. Well, the details of what she was doing while she was in the Office of Safety Recommendations, Ms. Weinstein can probably answer better than I. However, my understanding was that she was going to work on advocacy, strategic planning, planning against our most-wanted safety recommendations for advocacy, and also look at the recommendation tracking process.
Q. What does advocacy strategic planning mean?
A. Where we spend our resources and our time and our effort to promote open safety recommendations.
Q. And what would Marjorie Murtagh Cooke -- what was your understanding that Marjorie Murtagh Cooke would be doing in that work?
A. My understanding is that she would work on the basic structure of how to put that in an organized fashion.
Q. And is this a white paper, is this -- what



type of --
A. There is an advocacy plan for the agency today. I believe that Ms. Cooke had contributed to that plan in its beginning stages, its fundamental stages. And there's also an advocacy plan for the board members' activity.
Q. And with whom -- and other than the advocacy plan for the agency and the board, what other aspects are there to the advocacy strategic planning work that she was to be doing?
A. Linking the activity to recommendations.
Q. When you say linking to recommendations, what do you mean by that?
A. Identifying all of the open recommendations, where the advocacy activities of the agency could be most effectively used or the resources against those recommendations.
Q. Aside from advocacy planning and linking to recommendations and open recommendation and the -- how recommendation advocacy is actually used, what else is involved in advocacy strategic planning?



A. Prioritizing recommendations.
Q. What else, sir?
A. Making an assessment of available resources versus desired activity and doing a benefit analysis against that to determine, to make sure that the limited resources are applied to the most desirable activities.
Q. Is there anything else, sir?
A. That's basically it.
Q. And what about the clinic for the safety recommendations?
A. The safety recommendation, that one I'm not very knowledgeable of, what Ms. Weinstein had her working on, but it had to do with organizing and identifying within the agency the records management for safety recommendation and the tracking process.
Q. So record management and tracking?
A. Yes.
Q. What does that mean?
A. Well, there are a number of recommendations within the agency that the agency has issued. It's a correspondence exercise. The

recipients reply. We reply back to them. They reply again. It is keeping track of where the recommendation is in its evolution through its life, and then identifying that and making it easy to capture that information.

Q. So basically it's finding out in whose court the ball resides?

A. Whose court the ball resides and what's the status of the work against the recommendation.

For example, if we recommended to the FAA that they promulgate a regulation, they would respond back to us, we'd write back with comments, they write back again. Knowing where they were in the regulatory processes is a necessary item that we need to know as we continue to investigate new accidents.

Q. How would you characterize this assignment?

A. As a temporary assignment for someone who had demonstrable planning skill.

Q. What do you know about what she actually did?



A. I didn't evaluate her, and I didn't monitor her daily activities. So I'm not actually sure.

Q. Overall do you know what she did -- do you have a sense of what she did while she was in the Office of Safety Recommendations and Communications?

A. My understanding is she did essentially what the original design was for, assisted Ms. Weinstein, who also continued her detail for a short period of time to finish the project.

Q. What type of -- what type of guidance did Ms. Murtagh Cooke receive in performing her work in determining how she was doing in performing her work?

A. She would have received it from Ms. Weinstein.

Q. Would it have been a position description?

A. Position description and then personal direction from the supervisor.

Q. What about performance standards, should she have received performance standards?

A. Not for a temporary assignment. For a



detail she should have received a position description for the detail, but the performance standards go back to the originating office. In this case it's the Office of Management.

Q. I see. Do you know who she worked with while she was doing this work?

A. In Safety Recommendations? I presume Ms. Weinstein and others, but I'm not sure who.

Q. What rule is there that doesn't require a performance standard for Ms. Murtagh Cooke's transfer in the Office of Safety Recommendations and Communications?

MR. LUONG: Objection to the term "transfer."

A. As a detail you maintain your position of record, although you may be doing other duties in another assignment. The rater should consult with the manager in that detailed assignment to see how well they did against the position description.

Q. And who would that have been? Who would have been rating her work?

A. It would have been Ms. Czech.



Q. And was there a rating of Ms. Murtagh Cooke's work while she was working in the Office of Safety Recommendations and Communications?

A. No.

Q. And was -- has there ever been any follow-up as to why there wasn't any rating of Ms. Murtagh Cooke's work?

A. Ms. Murtagh Cooke left before the end of the rating cycle and the rating wasn't completed. She retired before the end of the rating cycle.

Q. When we say "ratings," are we talking performance appraisals?

A. Performance appraisals.

Q. And on an annual basis how many performance appraisals are given to an employee at NTSB?

A. Generally you get one performance appraisal annually, and you get a short written midterm performance appraisal.

Q. And --

A. It's actually called a progress review.

Q. And did Ms. Murtagh Cooke receive a

progress review?
A. I don't believe she did.
Q. And whose responsibility was it to give her a progress review?
A. Ms. Czech's.
Q. Who is Ms. Czech and where does she work?
A. At the time Ms. Czech was the associate managing director. We've changed the titles, but she worked directly for me as an associate managing director.
Q. And was there any follow-up as to what happened to her -- to Ms. Murtagh Cooke's rating -- what was the term of art, sir?
A. The appraisal.
Q. Midterm appraisal.
A. Oh, the midterm appraisal. No, I don't know why it wasn't completed.
Q. And what -- are you aware of how well Ms. Murtagh Cooke performed while she was in the Office of Safety Communication -- Safety Recommendations and Communications?
A. My understanding is she did fine.



Ms. Weinstein was fine with what she was doing.
Q. And when did the -- when was she transferred back to the office of managing director?
A. I know that her detail was continued in October. And I think she was transferred back January of '06, thereabouts. There should be -- it's getting late in the day -- a personnel action.
Q. And at the end of '06 -- at the end of '05, did Ms. Murtagh Cooke receive a performance bonus of any sort related to her work in either OMS or the Office of Safety Recommendations and Communications?
A. No.
Q. Would a midterm performance appraisal have helped her obtain a performance bonus of sort?
A. Not necessarily.
Q. If she was doing fine would she have likely received a bonus at the end of the year, sir?
A. If she was performing on a fully successful level the likelihood is she would not have received a bonus. Our candidates who are working at their level who do not receive excellents



or outstandings generally do not receive performance bonuses.
Q. I see. So when you said that it's your understanding that she was performing at a level --
A. Satisfactory level.
Q. And is that a term of art?
A. I'm trying to give you a different phrase from fully successful. She was performing at a fully successful level.
Q. And that's below excellent?
A. That's below excellent.
Q. I see. And what documentation is there with regard to the basis for an assessment that Ms. Murtagh Cooke's work was fully successful?
A. I don't believe there's any.
Q. Did you have any communications with Ms. Weinstein?
A. I did.
Q. And what did she say about the quality of the work?
A. She thought that Ms. Murtagh was working out fine, doing what she was asked to do and doing



it in a satisfactory manner.
Q. When people are put on, as you say, a detail, is it possible to receive a bonus at the end of the year?
A. It is. It's possible.
Q. Is it likely?
A. It's possible. It depends on the nature of the detail. Details are very unique. And it depends on what the work involved and what the nature of the detail was.
Q. Describe how this -- how the work performed by Ms. Murtagh Cooke, the actual assignment, fits within the scope of the bonus, an end-of-the year bonus.
A. The bonus -- it's not a bonus, it's a performance award that is provided to staff who receive an outstanding or an excellent and varies in percentage. A higher percentage for outstanding, a lower percentage for excellent. Generally no performance award for fully successful. And not all excellent candidates receive a performance award either.

Page 194

But generally all outstanding, people who are rated outstanding receive some form of performance award. And there are several different forms.

Additionally staff can be provided with a special act award for discrete activities that occur outside of the general performance level.

Q. Any other type of bonuses, sir?

A. There are large -- seven or eight large agency end-of-the-year awards that are granted, chairman's award, managing director's award, regional staff assistant awards, that are granted at the end of the year.

Q. How complex of an assignment was Ms. Murtagh Cooke assigned to in the Office of Safety Recommendations and Communications?

A. I don't think it was particularly complex. I think that it was needed and procedurally robust, but it wasn't particularly difficult.

Q. To what extent was Ms. Murtagh Cooke's skills as a GS-15, level 10, being utilized in that position?

Page 195

A. I think her skills as a manager and planner were being utilized. I don't believe that we utilized any of her marine safety skills much. But that wasn't the intention of the detail.

The detail was to put her into a position that was, one, available and, two, matched as closely as possible her skills. She was a good organizer and planner and that's what that basic assignment was.

Q. But if it wasn't particularly complex and the highest you can run as a government employee before you become an SES at a GS-15, level 10, isn't it likely that it would just be a very mundane task for Ms. Murtagh Cooke?

MR. LUONG: Objection, argumentative.

A. There weren't a lot of options. There were only two options I had. One was to keep her in the Office of Marine Safety as a national resource specialist for marine safety issues or this particular assignment. It was the assignment that was available. She did not wish to stay in the Office of Marine Safety, so it became the de facto

Page 196

only assignment available.

Q. Was she doing the work with anyone else, sir?

MR. LUONG: Objection, asked and answered.

A. In Safety Recommendations she was working under the direction of Ms. Weinstein, and I don't know who specifically she worked with.

Q. How was the planning work that was required for the job similar to or related to her work done in the Office of Marine Safety?

A. As a director of Office of Marine Safety at the 15 level, she was required to plan annually the activity of the office and the staff, to organize and oversee the development of different product and processes. And it is similar, not identical, but it's a similar basic planning function.

Q. And how was it planning for putting together an advocacy plan? What was she planning rather than just putting together a piece of -- it sounds like she was figuring out how to put together, I guess, a report on strategic -- on

Page 197

strategic planning, it wasn't really planning going forward, it was just a report on the status of it?

A. No, I don't think so. I think it was to take available resources and available -- not available, but the open recommendations, prioritize and dovetail these two together in such a way that we were using the most efficient process possible to determine where to spend our limited advocacy dollars.

Q. And what was the result? Was Ms. Murtagh Cooke asked to produce a result?

A. I know that I received from the director of that office an advocacy plan. And I believe Ms. Murtagh participated in the construction of that plan. But at what level and the specific deliverables, the office director would have to tell you.

Q. When did you receive the plan, sir?

A. The advocacy plan I received in the fall of '06. It was due to me in -- not the fall of '06. In the spring of '06. It was due to me in the fall of '05.

Q. And is it the type of project that someone new in the position would be able to just -- wouldn't it be something, the type of project that someone who's been performing in marine safety and organizing staff to take some time to learn the position, learn the scope of the work?
A. To a small degree but not in a broader sense, because the agency is so flat and so small that the office directors in the modal offices have to be involved in the development and life cycle of the open recommendations.
So she knew the process of recommendation, issuance and tracking probably as well as anyone situated in the Office of Safety Recommendations.
I knew when I was director of Highway Safety, I certainly knew the process intimately.
Q. I see. And what -- when was she transferred out of the Office of Safety Recommendations and Communications?
A. My recollection is January 2006, December, January, the holiday, right around there.
Q. Was there ever a -- did you ever speak



with her during this interim period?
A. I spoke with her maybe once or twice while she was detailed to the Office of Safety Recommendations. Casual conversation. How's it going, going fine, that kind of casual conversation, nothing specific and no great detail.
Q. Was there anything -- any steps taken to make sure that Ms. Murtagh Cooke would be, I don't know, monitored given the type of -- the type of transition she had encountered from going from the head of a modal office, which is a very prominent position, to someone just working on a planning report?
MR. LUONG: Objection, characterization, argumentative.
A. Monitored in what way?
Q. Making sure that -- frankly, that it was a job that was well suited to her.
A. It was not ideal. The position was not ideally suited to her, but it was the available position. And she was monitored by her supervisor, Ms. Weinstein.



Q. Did she ever express any desire to return to a different -- or to leave the Office of Safety Recommendations and Communications during the period that she worked there?
A. At the beginning of her detail it was clear to her, because I made it clear, that it was a detail. And the intention was to return her to the Office of Management with a different position designed for the needs of the agency.
Q. What about the -- had she expressed any interest in returning to marine safety during that time?
A. No, not to me.
Q. And to whom would she have requested the transfer?
A. What transfer?
Q. To whom should she have requested a return to marine safety or doing work more focused on marine safety issues?
A. Me.
Q. How would she have known to do that?
A. She could have come to me at any time and



asked to terminate the detail and go back to the Office of Marine Safety.
Q. Was there any communication between you and her that would let her know that she could get out of the detail, as you call it, the detail, and go back to Marine Safety?
A. It's sort of an awkward way of putting it. She was aware that it was a detail. She didn't want to return to Marine Safety, and she never indicated that, one, she was unhappy with the detail or, two, that she ever wanted to return to Marine Safety. If she had these thoughts she kept them to herself and didn't tell anybody.
Q. So how did the detail end?
A. The work was over. The work that Ms. Weinstein had needed to be done was substantially complete. And at that time I had an opportunity to design a new position within the Office of Management to essentially redesign the organizational structure of the Office of Management. And I brought her in and spoke to her and told her that I had a very credible GS-15 level

Page 202

position as the associate managing director for strategic management, and -- although I'm not sure I had titled it that at that time, but it was the chief planning officer for the agency, a position that did not previously exist in the administration that preceded my tenure. And I asked her if she would do it.

I told her that I wouldn't make her do it, she had the option of saying no, but that I thought that her planning and presentation, especially strategic planning skills, were good. I had seen, as the office director for Highway Safety, her planning activity as a counterpart, as a colleague when I was in that position, and she was good at process flow and strategic process and organizational development, and I thought she would be quite good for the position.

She thought about it and decided that she did not wish to embark on that kind of position. She didn't want to do it. And I asked her why. And she indicated that it was just too much work. She didn't want to get that heavily engaged again. And

Page 203

it was a lot of work. It was a new position, creating a new process and a new, essentially, function for the agency, one that maybe should have existed for a long time, it hadn't, and that is a permanent planning function. So I offered that to her and she declined.

So I told her that we would put her in a program management position, program analyst position until such time that we could determine what other positions became available at the 15 level. And we gave her the assignment of doing essentially an archeology task, which was to identify, one, all of the reviews and audits that the agency had incurred in the last 10 years and then archive the responses that the agency had against all of those reviews and audits, which we had not done previously. The agency hadn't done that previously. And to do that she had to go around and talk to all the office directors, find out all the information, collect it, collate it and put it into essentially an archive.

Q. What written documentation do you have

Page 204

with regard to the position of -- the associate strategic management position?

A. Associate managing director for strategic management is what it is titled now. I think at the time that I spoke to Ms. Murtagh about it, I'm not sure that that was exactly the title. It may have been chief strategic planning or -- we modified the title a couple of times.

I have a position description and a performance standard and I have a new employee in that position at the moment.

Q. Was there a position description provided to Ms. Murtagh Cooke to consider the position?

A. No, because -- and I recall this conversation. I had a draft and I wanted her to consider that. And part of the duty of the -- I was intending for her to do was to complete that position description by refining it and finalizing it as she came into it.

Q. What part of planning was Ms. Murtagh Cooke good at in the Office of Marine Safety?

A. Process flow.

Page 205

Q. What is process flow, sir?

A. How one identifying the elements of -- it's really an industrial engineering kind of aspect. Identifying all of the elements of a particular process, breaking them down, looking for weaknesses within the process and suggesting corrections for that. She is methodical in her assessment of -- especially process, and I thought that that was a good fit.

Q. At what level would she have served in the chief strategic planning position?

A. It's a 15 position, 15 billet. The current person, incumbent is a 15.

Q. Has it ever been higher?

A. It's never existed before and it's never been higher.

Q. Who did Ms. Murtagh Cooke work for doing this archival work with regard to audits and reviews?

A. Ms. Czech.

Q. And what did Ms. Czech -- did you speak with Ms. Czech about Ms. Murtagh Cooke's performance

in that position?
A. I did.
Q. And what was her statement?
A. She thought her performance was good. She was moving forward with little supervision, gathering the information she needed from the variety of sources that she needed to get it from and creating a matrix and an archive for all of this data. She also reviewed that with me two or three times between January and her ultimate retirement in June.
Q. Other than just good, what did Ms. Czech say about the quality of the work that Ms. Murtagh Cooke was providing?
A. It was thorough. I know that. That was my assessment as well, from what I was looking at. Her matrix that she was creating was a little confusing, but not something -- not anything that was a problem. And she had identified a few audits that we didn't even know about, that she had, through her resources, come up with. So she was doing a good job and she completed that before she



retired.
Q. And aside from the chief strategic planning position, what other positions were available to her besides this archival position?
A. At that time the only other position that was available in the Office of Management was a quality assurance position, also a new position, intended to ensure the credibility of -- or the thoroughness of the reports and organize the entire notation correspondence of flow among the board members and the office directors.
Q. And what level position would that be?
A. 15.
Q. And was that offered to Ms. Murtagh Cooke?
A. It was not.
Q. It was not. Why was it not?
A. My assessment?
Q. Yes.
A. My assessment alone is that position requires significant coordination and collaboration with board members and the officer directors and a variety of individuals. And Ms. Cooke's approach,



although methodical, is somewhat rough at times and directed. I did not think that was particularly a good blend.
Q. When you say it's rough at times, can you describe what you mean by that?
MR. LUONG: Brian, I'm going to object to this line of questioning regarding this quality assurance position to the extent it's outside the scope of the 30(b)(6) deposition.
A. I'm not quite sure how else to describe it. Ms. Cooke is an effective employee but sometimes does not always get along with everyone that she's working with, and doesn't always negotiate well or resolve problems well with counterparts.
Q. Is the quality assurance position, is it a more prominent position than the chief strategic planning position?
A. No, they're equal.
Q. And when you say that she doesn't get along with people at times, what do you mean by that?



A. It sounds more critical than it is. The quality assurance position needs to be able to coordinate with five different politically appointed board members every day and the nuances that come with those individuals, along with all of the office directors and the pressure that is involved in producing reports under an accelerated schedule, notation products, and also with the administrative law judges.
It is a position that requires some not only process background, which she had, but it also requires some legal background in the administrative law judges and also a healthy writing and correspondence knowledge.
There was a much better candidate that I moved into that position than Ms. Murtagh. Ms. Murtagh was, in my opinion, well poised to take the strategic management position, and she did not want that.
And if her stated reason for not wanting the strategic management position was because it was too much work, that quality assurance position is

strategic management times 10.
Q. What was written between you and Ms. Murtagh Cooke about the chief strategic planning position?
A. I don't believe there are any written documents.
Q. Did she receive any -- did Ms. Murtagh Cooke receive any performance standards for her work in her archival position that she was -- that she performed for the Office of Management -- Office of Managing Director?
A. I think our records are that she did not.
Q. And did she receive a position description?
A. I believe she did not.
Q. And did she receive any sort of feedback about the type of job she was doing in --
A. She received -- she talked to Ms. Czech on a regular basis and she talked to me several times during that period in a review of the work that she was doing. And she received feedback from me, progress reviews as she was moving along. All very



good, all very cordial conversations. And as the progress -- as the project was progressing, more thorough and more detailed feedback each time.
Q. I see. What type of interpersonal work did the position require, the archival position when you would go to other offices and ask about their audits that they haven't reported on or that are outstanding that haven't been accumulated by the NTSB?
A. It was mostly information gathering. The exercises and information gathering exercise. There was very little negotiation or coordination, it was gathering facts and status.
Q. And how was the quality assurance position different?
A. The quality assurance position can be a very critical position to the production line. People are producing products. The quality assurance associate managing director is responsible for kicking back those products if the quality is not sufficient, if the investigations and the reports are incomplete or not thorough or processed



improperly or format incorrect.
Q. When did Ms. Murtagh Cooke retire?
A. July 3 of '06.
Q. Why do you think she retired?
A. I'm not certain. It was -- I did not expect it. She announced it to Ms. Czech one day and several weeks later she was gone.
Q. Did she appear happy while she was working in the Office of Managing Director?
A. She appeared content.
Q. Did the work seem -- do you think the work seemed interesting to her?
MR. LUONG: I'm just going to object to the extent you're asking him to testify about the perception of her work.
A. I don't know how she perceived the work. She seemed content in doing the work.
Q. Did she seem more or less content than she did while she was the director of Marine Safety?
A. More content.
Q. She seemed more content working in the Office of Managing Director?



A. She was frequently unhappy, as the director of Marine Safety unhappy with the management and unhappy with the process and unhappy with board members and other activities. I didn't notice any of that when she was working in the Office of Management.
Q. Were there other positions available to her while she was in the Office of Managing Director that she could have taken?
A. There are some positions that were offered by the agency for competitive -- offered as a competitive bid. But to the best of my knowledge she did not apply for any of those.
Q. Do you know what positions those were?
A. Well, after she left the Office of Marine Safety, we advertized for a chief information officer at the SES level and a director of Highway Safety at the SES level, my former position, and deputy managing director at the SES level. There were then a number of 15-level positions, none of which I thought she was particularly well-suited for. Deputy CIO, deputy chief information officer,

Page 214

which is a very technology-laden computer billet. But there were several SES positions she could have competed for.
Q. Was the deputy managing director an SES position?
A. Yes.
Q. And did anyone speak with her about that position?
MR. LUONG: Objection to the extent this is outside the scope of the 30(b)(6) deposition.
A. I didn't speak to her about the position.
Q. How would she have learned about it?
A. Like everyone else, through the competitive advertisement.
Q. Where is the competitive advertisement posted?
A. It's posted on the intra and Internet site and then the USA jobs.
Q. Was Ms. Murtagh Cooke provided a computer at work?
A. Yes.
Q. Was that computer linked to the intranet?

Page 215

A. Say it again.
Q. Was the computer linked to the network, the intranet network?
A. Yes. All the computers border link to the intranet.
MR. LOWINGER: Can we take a break?
(A recess was taken.)
BY MR. LOWINGER:
Q. Sir, you've used the word "detail" any number of times today. Can you tell me what a detail is?
A. It is a temporary assignment to another activity or position.
Q. And outside of OMS, what other opportunities were available to Ms. Murtagh Cooke to work on marine safety issues after Mr. Spencer -- after she was removed from the position of director of OMS?
A. There's probably only four places that touch marine safety issues. The Office of Marine Safety, the Office of Research and Engineering, the Office of Safety Recommendations, and where they

Page 216

touch it is in the safety recommendation correspondence activity, and then occasionally with the board members.
Q. What steps were taken by the agency to put Ms. Murtagh Cooke in a position related to marine safety after her removal from the directorship position?
A. Ms. Cooke indicated she did not want to be in the Office of Marine Safety. I looked through the agency to determine where there was another acceptable position. The single billet, which was a 14-level billet in the Office of Safety Recommendations that dealt with marine safety recommendations, was already filled.
In the Office of Research and Engineering there were no specific marine positions available. And I mentioned the board members, but the board members' billet, the few that are there are political billets, not career positions. And it was unlikely that she would be eligible for one of those.
Q. Aside from OMS, Research and Engineering,

Page 217

Safety Recommendations and Communications and working with the board members, were there any other opportunities after she left the Office of Marine Safety for work within -- work in the field of marine safety?
A. Not substantial opportunity, but not where the position was substantial marine safety.
Q. What about that would have involved, for example, planning at marine safety or other combinations that involved marine safety?
A. I'm just going to answer no, because -- and I'll qualify that answer.
Every organizational unit within the agency touches each other to some degree. The general counsels office, for example, touches the Office of Marine Safety with their work, but their work is not substantially marine safety.
So no, those positions, those areas that I told you are where the substantial marine safety work resides in the organization.
Q. Could she have been transferred to another agency on a detail?

A. She could have.
Q. Was that an available option during the year?
A. It was possible.
Q. And how could she have gone about obtaining a position like that?
MR. LUONG: Objection to this line of questioning, outside the scope of the 30(b)(6) deposition.
A. She could have made a request. We didn't consider it. She could have requested it.
Q. What kind of feedback -- aside from Barbara Czech and Elaine Weinstein, what kind of feedback did you provide Ms. Murtagh Cooke in 2005 after she had been removed?
A. I think we went over the majority of discussions that I had with her. There are a series of discussions in May and June about where she could work within the agency. Once she was detailed to Safety Recommendations a few casual conversations.
In January or thereabouts in '06, a lengthy discussion about the strategic management



position within the Office of Management. And then when she didn't want to do that, doing the program analyst work. And then through that program analyst work, in the spring of '06, several meetings about that -- the nature of that work.
Q. What about Mr. Campbell before he -- before he moved on, did he provide any feedback in 2005?
A. To Ms. Murtagh?
Q. Yes.
A. I don't believe so.
Q. Are you aware of -- in your discussion with Mr. Campbell, did that issue come up at all?
A. No. But I'm almost certain that he did not have a conversation with Ms. Murtagh after I became managing director, at least not a substantive one.
Q. Is it safe to assume that the two -- that he just doesn't think highly of her?
A. That's a broad description. Probably not correct. I don't think that Mr. Campbell dislikes Ms. Murtagh, I think that he believed her



performance was lacking as director of the Office of Marine Safety, especially when it came to producing major reports.
Q. I see. What about the other -- what about the other elements of the position? Was he favorable of her performance in the other elements other than performing, turning in a completed --
A. Well, the investigations and the report is often processed -- or components of the position, director of Office of Marine Safety, are the key components. That was where he was most critical.
Her budget ability was fine, as far as I understand. I do know that Mr. Campbell was concerned about her ability to recruit and select qualified staff and questioned her judgment on some selections.
Q. Anything else?
A. No, those are the broad areas.
(The following testimony was marked confidential and bound separately.)



THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK



THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK



THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK



THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

Page 226

(This concludes the confidential testimony.)

(Document marked Deposition Exhibit Number 5 for identification and subsequently attached to the deposition.)

BY MR. LOWINGER:

Q. Mr. Osterman, can you identify this document, Exhibit Number 5, Bates numbers 1148 through 1162, as the merit staffing plan for NTSB in effect as of -- that was in effect in 2005?

A. This was the operations bulletin for the merit staffing plan that was in effect after I became managing director in 2005 and beyond. It has been updated since.

Q. Was there a merit staffing plan in effect prior to this?

A. There was a board order for a merit staffing plan, yes.

Q. There's a board order. And what are the effective dates of the board order?

A. I don't know exactly. The late 1990s.

Q. Is it any different than this document?

A. No, it's substantially the same. I'm sure

Page 227

that there are differences, but the merit staffing plan for -- that is now the operations bulletin has been in its basic configuration for a number of years.

MR. LOWINGER: May we have the board order?

MS. SILBAUGH: We'll try. I'm not sure if it still exists.

THE WITNESS: We'll try.

MR. LOWINGER: Number 6.

(Document marked Deposition Exhibit Number 6 for identification and subsequently attached to the deposition.)

BY MR. LOWINGER:

Q. Mr. Osterman, Bates numbers 1128 through 1147, is this the operations bulletin for performance management system for NTSB?

A. It is.

Q. And what is the effective date of this document?

A. This became effective on August 19, 2005.

Q. Is there a prior document that was in

Page 228

effect prior to this?

A. I believe there was a board order regarding performance management that predated this, but most of this material is -- comes directly from the Office of Personnel Management, as far as federal rules for performance management.

Q. And which -- what was the board order?

A. I don't recall off the top of my head.

MR. LOWINGER: May we have a copy of the board order, please?

MS. SILBAUGH: Again, to follow the testimony, I'm not sure it existed in this format.

A. There was performance management guidance prior to this. There were a number of board orders that provided guidance, and there was some policy guidance. After I took over I codified all these into these operational bulletins.

Q. Are they all reflected in this one document?

A. The performance management system is operations -- this number operations bulletin. So I'm not sure what you mean.

Page 229

Q. Are all the board orders that you referred to, the prior existing board orders, are they all codified in this one document?

A. No.

MR. LOWINGER: Number 7.

(Document marked Deposition Exhibit Number 7 for identification and subsequently attached to the deposition.)

BY MR. LOWINGER:

Q. Mr. Osterman --

A. If I can go back to this to help us --

Q. Yes.

A. -- a little bit. If you look on Exhibit Number 6, page two, the operational bulletin for performance management system cancels NTSB order 1000, dated August 21, 1996. So there is or there was a board order 1000 dated in 1996 that predated this operations bulletin.

Same thing on Exhibit Number 5, page two. The operations bulletin for the HR staffing plan cancels NTSB board order 3315.1A, dated 1982.

Q. Where would we get those documents, sir?

A. Hopefully we can provide those to you, but they are now obsolete. I don't know where they are archived.

MR. LUONG: We'll see if we can get that to you, Brian.

MR. LOWINGER: Thank you very much.

BY MR. LOWINGER:

Q. What exhibit is this?

A. 7.

Q. Can you identify this document, sir, Bates numbers 1168 through 1174?

MR. LUONG: Brian, we're going to object to any questioning dealing with this document to the extent that it's outside the scope of the 30(b)(6) deposition.

MR. LOWINGER: How would it be outside the scope of the 30(b)(6)? I've asked about performance appraisals over and over again. Here we're talking about --

MR. LUONG: This deals with record retention policies. So it's not one of the topics.

MR. LOWINGER: We've talked about



performance appraisals, we've talked about the board review -- executive review board, resource board documents, finding those. We've talked about electronic -- we're going to talk about electronic data soon. It's just a document you turned over. I'm just going to ask him as a 30(b)(6) to verify what it is.

MR. LUONG: Again, we're going to state our objection to this document and line of questioning related to this document to the extent that record retention policy was not identified as a topic for the 30(b)(6) deposition. With regards to the electronic information, we've already agreed that this witness will not be testifying to that anyhow.

So you can certainly ask, but we're going to state our objection. And to the extent that he gives any testimony, it is not in his capacity as a 30(b)(6) witness. It's not appropriate for this deposition.

BY MR. LOWINGER:

Q. Mr. Osterman, can you please identify



Bates numbers 1168 through 1174?

A. It is the current operations bulletin for the record retention policy for the NTSB, effective June of 2006.

Q. And it reflects the most -- and is this available on NTSB's Website?

A. Yes, as of June 2006.

Q. It's on its Website?

A. Yes.

Q. It's a publicly available document?

A. No. This is an internal policy of the agency. So it wouldn't be publicly available on the Website.

Q. So it's an intranet --

A. It's on the intranet, yes.

Q. But it reflects the official policy of NTSB?

A. As of June 2006, yes.

Q. Thank you.

(Document marked Deposition Exhibit Number 8 for identification and subsequently attached to the deposition.)



BY MR. LOWINGER:

Q. Mr. Osterman, Bates numbers 1079 through 1088, can you identify this document for me, please, sir?

A. This is NTSB board order 50, a copy of it, dated 11/25/1996 regarding the Marine Safety program.

Q. Does this reflect the Office of Marine Safety job, I guess role in its -- excuse me, I'm searching for a word late in the day.

Does this apply to the Office of Marine Safety, sir?

A. Partially. In a broader sense it is the order that describes the marine safety activity of the board, which includes the Office of Marine Safety. But it also includes the Office of Safety Recommendations and other functional offices within the organization, the Office of Research and Engineering and so on.

Q. Are you aware of a more up-to-date version of this document, sir?

A. No, I am not. This is the latest version.

Page 234

And it has since been canceled.
Q. When was it canceled, sir?
A. Just recently. And the reason it was canceled is the majority of the information is contained in the law, in the Act or elsewhere.
Q. I see. Thank you, sir.
(Document marked Deposition Exhibit Number 9 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Exhibit 9, Mr. Osterman, can you please tell me -- Bates numbers 301 through 308. Can you please tell me what this document is?
A. It appears to be the end-of-the-year performance appraisal for Marjorie Murtagh for the rating period August 1, 2002 to July 31, 2003.
Q. Thank you, sir.
(Document marked Deposition Exhibit Number 10 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Exhibit Number 10, Mr. Osterman. Bates

Page 235

number 297 through 298. Can you identify the document for me, please, sir?
A. It is two pages. It appears to be a partial performance evaluation -- a performance appraisal form for Marjorie Murtagh from August 2003 to July 2004.
Q. Would there be more -- you referred to it as being partial. Would there be more to it than this, sir?
A. I believe during this time frame the office directors received an appraisal form cover sheet and signature, but no substantial write-ups as with the 2003/'04.
MR. LOWINGER: Number 11.
(Document marked Deposition Exhibit Number 11 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Exhibit Number 11, sir, Bates numbers 753 through 758, can you identify the document, please, sir?
A. This appears to be the position

Page 236

description for Dr. Jack Spencer, and I can't make out the dates on this form, when it was signed.
Q. But this reflects his position description, sir?
A. It reflects the position description as of, I think, the summer of '05.
Q. Has it been revised?
A. I know that his performance appraisal has been revised since this time. I'm not sure that the position description has, but I believe it has.
MR. LOWINGER: Could we have the new performance description form if it's available?
MS. SILBAUGH: Uh-huh.
MR. LOWINGER: Thank you very much.
MS. SILBAUGH: And, actually, you have it. It's the second thing that Joe messaged and asked prior to.
THE WITNESS: You mean position description or performance appraisal.
MS. SILBAUGH: It's now called appraisal and performance plan, I believe, is what the document is titled.

Page 237

THE WITNESS: That's the appraisal. That's not the PD.
MS. SILBAUGH: Okay. Then this is the latest.
THE WITNESS: Okay.
(Document marked Deposition Exhibit Number 12 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, Exhibit Number 12, Bates numbers 899 through 904, can you identify this document for me please, sir?
A. This is a position description, with the rating factors, for the GS-15, supervisory accident investigator director of safety position. And the back appears to be a rating -- not a rating, but a grading evaluation summary.
Q. When you say grading summary, what does that mean, sir?
A. To determine the appropriate grade based on the position description.
Q. I see. Are you aware of any -- this is as

of 2004. Are you aware of an earlier position description for Ms. Murtagh Cooke? Or would this one cover her earlier work as well, back to 1997?
A. This should substantially cover it back to 1997.
Q. Thank you.
(Document marked Deposition Exhibit Number 13 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Exhibit 13, sir, Bates numbers 873 through 894, can you please identify this document?
A. It appears to be the application for the position of the director of Office of Marine Safety of Jack Spencer.
Q. And this is the application that the board -- the executive resource board reviewed?
A. The panel reviewed, yes.
Q. Do you know whose handwriting is on page one, sir, on the first page?
A. I do not. It's not mine.
(Document marked Deposition Exhibit



Number 14 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Sir, Exhibit Number 14, Bates numbers 838 through 872, can you identify this document, sir?
A. This appears to be a qualification brief from Marjorie Murtagh for the position director of Office of Marine Safety.
Q. Just like Mr. Spencer's? Did we discuss this earlier today, sir?
A. We did.
Q. Thank you.
MR. LOWINGER: Next exhibit.
(Document marked Deposition Exhibit Number 15, then subsequently attached to Exhibit Number 2, for identification attached to the deposition.)
BY MR. LOWINGER:
Q. This is Exhibit Number 15, Mr. Osterman. You know what, all the pages aren't here.
A. I have a question about Exhibit 14.
Q. Yes, sir.



A. May I ask it?
Q. Of course.
A. Did we supply this to you?
Q. Yes, you did.
A. Okay.
(Discussion off the record.)
BY MR. LOWINGER:
Q. Mr. Osterman, Bates numbers 820 through 824, are these the documents that are -- are these the pages that reflect the executive resource board's ad hoc meeting panel's recommendation to Mr. --
A. (Indicating.)
Q. Yes. But if you go to Exhibit 2, sir -- excuse me for the confusion, sir, it's late in the day -- 820 through 824, does this reflect the executive resource board's ad hoc rating panel's recommendations to Mr. Campbell and Mr. Campbell's decision with regard to that recommendation?
A. Yes.
(Document marked Deposition Exhibit Number 15 for identification and subsequently



attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, Number 15, Bates numbers 1000 through 1007. Does this reflect the crediting plan, the rating plan for the SES position in 2005 that Ms. Magwood would have created as a result of the vacancy announcement?
A. Yes, it appears to be.
Q. And this is what was given to the panel members to review applications?
A. It appears to be. My recollection is that the format was slightly different than this. The substance was the same.
Q. Was there a different document in 2004, sir?
A. I don't know. I don't know. I can talk to the 2005 document. This appears to be the -- I will tell you this has the same information, but my recollection is that the format of the one used during the panel that I participated in was somewhat different.
Q. How was it different, sir?

A. Exclusively format. I believe the highly qualified, qualified, no qualified were in a right-hand column, not a left-hand column. And I'm saying this because I reviewed some of these in advance of the meeting today.
MR. LOWINGER: May we have those documents?
MS. SILBAUGH: You do. It's the rating sheets.
MR. LOWINGER: Oh, the rating sheet. But this is the crediting plan. This is the actual review plan.
THE WITNESS: Oh, all right.
MR. LOWINGER: This is the criteria for determining --
A. It's 4:25 in the afternoon. Yes, this is the crediting plan --
Q. This is what you are --
A. -- or the valuation plan --
Q. This is what you were given to --
A. -- to base the rating sheet against, yes.
Q. Was there a different one for 2004, sir?



A. I don't believe so.
Q. So this would be the same for 2004?
A. It would be the same for both, yes.
MR. LOWINGER: Are you aware of a 2004 version?
MS. SILBAUGH: No. We have almost no documents from 2004.
MR. LOWINGER: Number 16.
(Document marked Deposition Exhibit Number 16 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, Bates numbers 895 through 896, is this the rating sheet for Ms. Marjorie Murtagh Cooke for her position to be the SES -- to be the SES candidate for the director of OMS?
A. This is, in fact, two different rating sheets. Also, the last two pages are for Jack Spencer.
Q. Here, let me see that. I see the problem. I was wondering what happened there. Here, this will be your 16.



MR. LOWINGER: Quan, I'm going to give this to you. Do you have the same problem?
MR. LUONG: We do.
MR. LOWINGER: I was wondering where all the Jack Spencers were.
MR. LUONG: This one -- the one you just handed us has the same problems here.
MR. LOWINGER: Really?
MR. LUONG: Yeah.
MR. LOWINGER: Because mine don't. Let's do this right here. I'm going to make everyone's life a little easier. There's 895 and 896. So this will be the -- why don't we just do this all as one exhibit.
I'm going to give this back to you, sir, and I'm the one without all the pages. So now I have four pages. And that was the problem, is that they were all copied together.
Quan, here, this is your handwriting. So I'll give this one to you.
MR. LUONG: Thank you.
BY MR. LOWINGER:



Q. Mr. Osterman, Bates numbers 895 through 898, do these reflect the executive review board's reviews of Ms. Murtagh Cooke and Mr. Spencer?
A. They do from the first panel that was convened in 2005.
Q. Thank you very much.
(Document marked Deposition Exhibit Number 17 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, Bates number 5003 through 5010, can you -- does this reflect the second panel members' instructions/rating sheets for Ms. Murtagh Cooke, Mr. Spencer, including notes, handwritten notes and an ordinal ranking?
A. It is. It is the briefing sheet for the second panel, the evaluation for Ms. Murtagh, including handwritten notes, and then the -- another rating sheet for Ms. Murtagh and the rating sheet for Dr. Spencer, including handwritten notes.
Q. Whose handwritten notes are these, sir?
A. I believe they are Elaine Weinstein.

Q. That's on page 5006. And then on 5009, whose handwritten notes are those?
A. Those, I believe, are also Ms. Weinstein's.
MR. LOWINGER: Quan, we have a somewhat difficult-to-read version of it.
MR. LUONG: Ours is like that too.
BY MR. LOWINGER:
Q. And whose handwriting -- what does 5010 reflect?
A. 5010 reflects the ordinal ranking for this particular panel.
Q. The second panel?
A. Yes.
Q. Thank you.
Do you know whose handwriting that is, sir, on 5010?
A. No, I'm not certain. I don't believe it's Ms. Weinstein's. I'm not sure who it is.
(Document marked Deposition Exhibit Number 18 for identification and subsequently attached to the deposition.)



BY MR. LOWINGER:
Q. Mr. Osterman, Exhibit Number 18, Bates numbers 1008, I believe, is this the organizational structure for NTSB as of 2006, December 20 of 2006, and would this apply -- would this be the same organizational structure from the period of 2004 and 2005?
A. It is. It's reflective of the organizational structure as of 2006. The difference between this organizational structure and 2004 and 2005 would be that in 2004/2005, neither the Office of the Chief Information Officer nor the Office of Administration existed.
Q. Other than that everything else is the same?
A. Other than that it's all the same.
Q. Thank you.
A. I need to qualify the last statement now that I'm looking at Exhibit 18 again. The subblocks under the Office of Management are new to this organizational structure as well. You'll see the strategic management division, quality assurance



division, they did not exist in '04/'05.
Q. So the quality assurance division, the public affairs division --
A. Public affairs did.
Q. Quality assurance did not?
A. Quality assurance did not.
Q. Strategic management did not?
A. Training Center and Communication Center did.
Q. And what were -- and the other two, the Office of -- the Office of Information Officer and Office of Administration did not?
A. Correct.
(Document marked Deposition Exhibit Number 19 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Exhibit Number 19, Mr. Osterman, Bates numbers -- I think that's 1186 through 1189. Does this reflect Marjorie Murtagh Cooke's position description in the Office of Management?
A. It does.



Q. Thank you.
(Document marked Deposition Exhibit Number 20 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, Exhibit Number 20, Bates numbers 1193 through 1194, does this reflect the -- I guess position description of Marjorie Murtagh Cooke in the Office of Safety Recommendations and Communications?
A. It does.
Q. Thank you.
If we go to Exhibit Number 4, 834, I have the continuation pages for -- 833 through --
THE REPORTER: Do you want me to mark that?
MR. LOWINGER: Yeah, we're going to make this all part of 4.
Is that okay with you?
MR. LUONG: Yes.
MR. LOWINGER: Thank you.
(Documents being attached to Deposition

Page 250

Exhibit Number 4 for identification and subsequently attached to the deposition.)
BY MR. LOWINGER:
Q. Mr. Osterman, just to redo Exhibit Number 4, Bates numbers 833 through 837, does this document reflect the executive resource board's ad hoc rating panel's, review of applicants as of March 28, 2005?
A. It does. This is the second panel convened in 2005.
MR. LOWINGER: And do we have the -- we do not have the review for the first panel?
MR. LUONG: We do not. I think we talked about that earlier, didn't we?
MR. LOWINGER: No.
THE WITNESS: Yeah, I think we did, didn't we?
MR. LOWINGER: I mean for the first 2005 panel. This is the second 2005 panel. I don't think we have number one with Mr. Osterman's --
MS. SILBAUGH: And I'll verify for you whether it exists. I'm not sure that it exists.

Page 251

MR. LOWINGER: Thank you very much.
THE WITNESS: It is the one -- oh, I'm thinking of the -- never mind. I'm thinking of the rating sheets from the first panel.
MR. LOWINGER: No further questions.
MR. LUONG: Can we go off the record, take a short break?
MR. LOWINGER: Sure.
(A recess was taken.)
EXAMINATION BY COUNSEL FOR DEFENDANT
BY MR. LUONG:
Q. Mr. Osterman, we just have a few questions for you and then hopefully we'll be able to get you on your way.
Let me show you the document that's been marked as Exhibit 19 for this deposition. Do you recall seeing this document earlier, Mr. Osterman?
A. I do.
Q. And this is the position description that Ms. Murtagh Cooke was on during the time she was in the Office of Managing Director?
A. Yes.

Page 252

Q. And do you know if this position description was provided to Ms. Murtagh Cooke at some point during her assignment to the Office of Managing Director?
A. I believe it was, yes.
Q. Thank you.
I just want to go back to some other things that you talked about earlier. Can you explain to us, what is the rating cycle for a supervisor within the National Transportation Safety Board?
A. The rating cycle for a nonsupervisor ends on May 31, begins on June 1. For a supervisor it ends on July 31, begins on August 1. And for the senior executive service, it ends on September 30 and begins on October 1.
MR. LOWINGER: Can you just say those slower? That was pretty quick.
THE WITNESS: We don't have wage-grade employees at the NTSB. So there's only three categories of employees. Nonsupervisory general schedule. Their rating cycle begins June 1, ends

Page 253

May 31. Supervisory general schedule employees. Their rating cycle begins August 1 and ends July 31. And senior executive service employees, their rating cycle begins on October 1 and ends September 30.
BY MR. LUONG:
Q. And there was earlier some testimony about a midpoint or a progress review. Can you explain just the distinction between a midpoint review versus a full-year, end-of-the-year appraisal?
A. The end-of-the-year appraisal is the document that governs performance awards and the end-of-the-year rating for an employee for the entire year period. A midterm progress review is just that, it is a review of the employee's progress toward that end-of-the-year rating.
Q. And when we say end of the year, do you mean end of the rating year or end of the calendar year?
A. End of the rating year.
Q. And which of these two, the midpoint appraisal or the full-year appraisal, can serve as the basis for a performance bonus?

Page 254

A. The end-of-the-year appraisal.
Q. Let me show you the document that's been marked as Exhibit 10. Do you recall seeing this document earlier, Mr. Osterman?
A. I do.
Q. And this is an end-of-the-year, full-year rating appraisal for Ms. Murtagh Cooke for 2003 through 2004?
A. Yes.
Q. And does this reflect an evaluation of her performance in part for the year 2004?
A. It does.
Q. Thank you.
(The following testimony was marked confidential and bound separately.)

Page 255

THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

Page 256

THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

Page 257

(This concludes the confidential testimony.)
BY MR. LUONG:
Q. Mr. Osterman, I'm going to refer you to Exhibit 14 that you were provided with earlier. This is the qualifications brief for Marjorie Murtagh Cooke?
A. Yes.
Q. Do you recall being shown this document earlier?
A. Yes.
Q. Is this the application for Ms. Murtagh Cooke that you reviewed in your role on the review panel for the vacancy announcement, sir?
A. It may have been, but I don't recall. My recollection is that the application was handwritten, not completely prepared in this manner. I could be confusing that with other documents that I've reviewed.
MR. LUONG: Thank you very much, Mr. Osterman. That's all we have.
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. LOWINGER:

Page 258

Q. Just a few in follow-up, Mr. Osterman.
A. Sure.
Q. With regard to Exhibit Number 19, Attorney Luong asked you whether or not this is -- whether this may have been provided to Ms. Marjorie Murtagh Cooke and you said you believed so?
A. Yes.
Q. Do you know when it was provided to her?
A. It would have been provided shortly after it was signed here in December of '05.
Q. Do you know exactly when?
A. No.
Q. And when Ms. Murtagh Cooke was -- after her removal from the directorship of OMS, was she a nonsupervisory, a supervisory or an SES employee?
A. She was a supervisory 15 employee. Her status did not change.
(The following testimony was marked confidential and bound separately.)

Page 259

THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

Page 260

THIS PAGE WAS MARKED CONFIDENTIAL AND INTENTIONALLY LEFT BLANK

Page 261

(This concludes the confidential testimony.)
BY MR. LOWINGER:
Q. And Mr. Luong asked you about midyear evaluations, and he asked you specifically whether you get a bonus based on the end of the year or the midyear, and you said end of the year.
Is a midyear -- is a midyear evaluation still important to an employee?
A. It's not really an evaluation, it's a progress review. If the employee is not performing well, it has far more significance than if the employee's doing fine. Because it alerts the employee to performance decrements that they need to correct.
Q. So, for example, if someone's used to performing at an excellent or an outstanding and all of a sudden they're performing at fully successful, they would probably want to know through a midyear review. Is that correct?
MR. LUONG: Objection, calls for speculation.
A. Every employee should get a midyear

Page 262

progress review regardless of their relative rating.

MR. LOWINGER: Thank you very much. No further questions.

MR. LUONG: We have nothing else. We would like to read and sign.

MR. LOWINGER: Sure. And the question about the review after we dealt with the complaints, then we go off the seal. Anything about complaints is under seal.

(Whereupon, after signature having not been waived, the deposition concluded at 4:58 p.m.)

* * *

Page 263

ACKNOWLEDGMENT OF DEPONENT

I, JOSEPH G. OSTERMAN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me, and any corrections appear on the attached errata sheet signed by me.

______________ ____________________________

(Date) (Signature)

PAGE/LINE REASON

______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________

Page 264

PAGE/LINE REASON

______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________
______ ____________________________________

Page 265

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Paula Flint, Court Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed by notarial seal this 17th day of July, 2007

____________________________

Notary Public in and for the District of Columbia

My Commission Expires September 14, 2007