# EXHIBIT H

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - -x
MARJORIE MURTAGH COOKE, :
Plaintiff : Case No. 06-748C
vs. : (Judge Thomas C. Wheeler)
THE UNITED STATES, :
Defendants : PAGES 1 - 261
- - - - - - - - - - - - - - -x

Deposition of JOSEPH G. OSTERMAN, held at the offices of The Employment Law Group, 888 17th Street, N.W., Suite 900, Washington, D.C., commencing at 10:05 a.m., Thursday, May 24, 2007, before Elizabeth Mingione, Notary Public.

A P P E A R A N C E S O F C O U N S E L:

ON BEHALF OF THE PLAINTIFF:

THE EMPLOYMENT LAW GROUP, P.C.
BY: BRIAN M. LOWINGER, ESQUIRE
888 17th Street, Suite 900
Washington, D.C. 20006
(202) 261-2806

ON BEHALF OF THE DEFENDANT:

DEPARTMENT OF JUSTICE, COMMERCIAL
LITIGATION BRANCH
BY: MEREDYTH D. COHEN, ESQUIRE
1100 L Street, N.W., 8th Floor
Washington, D.C. 20530
(202) 353-7978

AND

NATIONAL TRANSPORTATION SAFETY BOARD
BY: KATHLEEN SILBAUGH, ESQUIRE
490 L'Enfant Plaza East, S.W.
Washington, D.C. 20594
(202) 314-6084



C O N T E N T S

WITNESS: JOSEPH G. OSTERMAN

EXAMINATION BY: PAGE
Mr. Lowinger ................................ 6



DEPOSITION EXHIBITS
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 1 | NTSB Position Description, Director, Office of Marine Safety | 221 |
| 2 | Position Description beginning with Bates 00753 | 224 |
| 3 | Position Description beginning with Bates 000759 | 226 |
| 4 | Position Description beginning with Bates 000766 | 229 |
| 5 | Memorandum of Understanding, NTSB and Coast Guard | 232 |
| 6 | Position Description beginning with Bates 000772 | 233 |
| 7 | Position Description of Robert Macintosh, Jr., 11/29/05 | 235 |
| 8 | Letter Dated July 18, 2003 to Delores Everett | 236 |
| 9 | Attachment F, Comparison of Average Compensation | 239 |
| 10 | NTSB Order 50, Marine Safety Program, Dated 11/25/96 | 241 |
| 11 | NTSB Order 20, Highway Safety Program, Dated 4/18/96 | 243 |
| 12 | NTSB Order 20A, Highway Safety Program, 5/17/02 | 244 |
| 13 | NTSB Order 40, Railroad Safety | 245 |




DEPOSITION EXHIBITS (Continued)
JOSEPH G. OSTERMAN


| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| 14 | NTSB Order 30, Hazardous Materials and Pipeline Safety Program, 4/18/96 | 247 |
| 15 | Notification of Personnel Action | 248 |
| 16 | Position Description, Office of Railroad, Pipeline and Hazardous Materials | 250 |
| 17 | Position Description, Director, Office of Aviation Safety | 252 |
| 18 | NTSB Performance Appraisal Form, Bates 233-240 | 252 |
| 19 | NTSB Performance Appraisal Form, Bates 231 and 232 | 253 |
| 20 | NTSB Organizational Chart, Bates 001008 | 256 |
| 21 | NTSB Draft Position Description, Director, Office of Marine Safety | 258 |


- - -

Page 6

P R O C E E D I N G S

Whereupon,

JOSEPH G. OSTERMAN,

having been first duly sworn by Elizabeth Mingione, a Notary Public within and for the District of Columbia, was examined and testified as follows:

\- - -

EXAMINATION CONDUCTED BY MR. LOWINGER:

Q. Good morning. My name is Brian Lowinger.
A. Good morning.
Q. And I am an attorney at the Employment Law Group here in Washington, D.C. And I'm representing Marjorie Murtagh Cooke in a lawsuit against the United States government related to her tenure as the Director of the Office of Marine Safety. And the complaint is for a violation of the Equal Pay Act.
So before we begin, could I ask you to state your name for the record?
A. Joseph Osterman, O-S-T-E-R-M-A-N.
Q. Okay. And have you ever been -- have you

Page 7

ever testified on behalf of the National Transportation Safety Board in a deposition before?
A. I have.
Q. Can you tell me the cases in which you have done that?
A. There have been a number of cases where I've been deposed regarding investigation activity.
Q. I see.
A. Almost all highway investigation activity.
Q. I see. And when you say almost all, are there any other topics in which you have been deposed as the representative of the National Transportation Safety Board?
A. Outside of accident investigation activity, I don't believe there are. I don't recall one.
Q. Okay. Is it possible that there's any employment law investigations in which you have been asked to testify?
A. I don't believe so.
Q. Okay. Just a few ground rules for going forward. This is going to be taken stenographically. So any -- I am sure you are aware of the rules in the

Page 8

sense that nodding of the head does not get recorded, whether it be yes or no. So I ask that every -- all your answers just be yes, no, or somehow verbalized other than an uh-huh or an uh-huh, because those don't seem to ever translate, and everyone's always left confused at a later date.
I'll be asking a series of questions and will ask that you respond to them. If you don't understand the question, I ask that you just ask me to either rephrase it or repeat it or in any other way help you better understand the question. Because if you do respond, I'll assume that you understood the question and that was the basis for your response. Is that okay?
A. I understand.
Q. And we'll go through a series of questions throughout the day. I only ask that you let me finish the question before you answer. And I will try to do the same in letting you respond to the -- in responding to the question so that we try not to interrupt each other and confuse the court stenographer.

Page 9

Along the way there may be some names that the court reporter doesn't recognize. She'll ask us to stop and repeat the question, repeat the name, maybe spell it out. And I ask that you just help her out with that. Is that okay?
A. That is fine. I understand.
Q. Okay. And we can take breaks throughout the day. If you want a break, just please ask. I only ask that you let me finish my line of questions before we take the break. If you want to take a break every hour or something like that for a few minutes just to, you know, catch a breath of fresh air, whatever, that's fine. Just please ask.
A. Certainly.
Q. It's very common during a deposition that your counsel will make objections on the record. And I ask that you respond to my question without -- just respond to the question without any reference to the objection, just because the objection is a part of the record and we'll let the Court determine whether the question is valid or not at a later date. Okay?
A. I understand.

Q. Okay. Thank you. A few personal questions. Are you under any medication at the moment that would impair your ability to understand and respond to the questions?
A. No.
Q. Okay. Are you -- have you had any alcohol or any other stimulant that would in any way impair your ability to respond to the questions?
A. No.
Q. Sometimes those -- I've had a situation where that actually was required, so excuse me. Okay.
This is a question that I don't like to ask but I do have to ask it. Have you ever been convicted of a crime in any way?
A. No.
Q. Without further ado, you are being asked to testify today in the matter of Murtagh Cooke versus the United States on behalf of the National Transportation Safety Board.
Can you tell me how you prepared for today's deposition?
A. I reviewed the documents that were provided



to me by my general counsel, that I think were also provided to you. And I met with the DOJ attorney and my general counsel on two occasions briefly to review the documents and the nature of the complaint.
Q. Okay. And can you tell me which documents you reviewed?
A. I probably can't give you the entire list, but most of the core documents that deal with the organizational activity of the agency, the board orders that deal with most of the modal investigative programs, the amended notice to take the deposition, that, the performance reviews of both Miss Cooke for a couple of different years and other executive staff in the agency, the general legislative rules of the agency, the CFR, and the Memorandum of Understanding for our marine cooperation with the Coast Guard.
Q. Okay. And did you take any notes along the way?
A. No.
Q. There's no written notes. Can you tell me about your tenure at -- your tenure at the National Transportation Safety Board, when you first started



working there and the progress since then?
A. Certainly. I started working for the National Transportation Safety Board, and I think we can probably abbreviate that NTSB --
Q. You okay with that?
A. -- the rest of this, to make your life easier; in 1986, as a field highway accident investigator in our New York office. In 1988 I was promoted through competitive -- a competitive announcement to the position of highway investigator in charge. In 1991 I was promoted again through a competitive announcement to the position of major highway investigations branch chief.
In 1993 or maybe 1994, I was promoted again to the position of highway division chief. And then as the byproduct of an agency reorganization, my title was changed in 1998, very early 1998 to Director, Office of Highway Safety. And in March of 2005 I was promoted again to the position of Managing Director.
Q. Earlier in your recital of your experience you said that you were promoted based on I guess it was some sort of competitive announcement?



A. Competitive announcement.
Q. Can you tell me what that is?
A. It is a typical federal competition for a position in which the announcement for the job is advertised and various candidates compete, are interviewed, and then a candidate is selected for the position.
Q. I see. And so it's just the job announcement that gets posted somewhere or the other, and everyone who's interested or is qualified or has an interest applies; yes?
A. Yes.
Q. Okay. Before 1986 what was your line of work?
A. I worked for a suburban police department in Philadelphia. I was a detective for awhile and before that a patrolman.
Q. I see. And how did you ever become involved in highway safety investigations?
A. I began my career in the military in a criminal defense unit of the U.S. Army. I left there to come to the police department. And in the police

department I, through a series of circumstances, found myself in the traffic accident investigation unit and began my career in accident investigation essentially there.

I was a detective before that, but my accident investigation activity began in the police department.

Q. I see. And how long were you with the Philadelphia police department?

A. Six years.

Q. From 1980 to 1986?

A. Um-hmm.

Q. And with the United States Army?

A. Four years before that, '76 to '80.

Q. And before that you were in college?

A. Before that I was in high school and college. I didn't finish my college until later at night school.

Q. I see. And what was your degree in?

A. Civil engineering.

Q. I see. And where did you graduate from?

A. Temple University.



Q. Sure. That's in Philadelphia?

A. Um-hmm.

Q. And can you tell me about your job duties and responsibilities that make you the best designee to respond to --

A. I need to correct my last answer.

Q. Sure.

A. You said graduated. I went to Temple University the majority of the time. My degree is actually from the New York State University Regents Program, Regents College.

Q. Okay. And do you have any other degrees in addition to that?

A. No.

Q. And civil engineering, is there any specific branch of civil engineering in which you have expertise?

A. No. I do have expertise that I gained not through education but through experience in bridge engineering and structures.

Q. I see. And what about your duties today make you qualified to speak to the issue of whether or



not Miss Murtagh Cooke was entitled to the equal pay as to her male counterparts for the years in question?

MS. COHEN: Objection. Asks for a legal opinion.

BY MR. LOWINGER:

Q. Can you respond to the question?

A. I am currently the Managing Director of the NTSB, the senior civil servant non-political position in the agency. I've had that position for two years. And prior to that I was the Director of Office of Highway Safety. And I have been with the agency for over 20 years.

Q. Okay. And other than the U.S. Attorney and the General Counsel, was there anyone else who you spoke with with regard to issues related to Ms. Murtagh Cooke's complaint related to -- with regard to her complaint?

A. I did. I spoke to the former Managing Director, Mr. Dan Campbell.

Q. And what did you speak to him about?

A. About his tenure as Ms. Murtagh Cooke's supervisor when he was the Managing Director from



roughly 2000 to 2005.

Q. I see. And can you tell me more about that conversation?

A. I asked him about what he knew about Miss Cooke's performance. I talked to him about his involvement in the request to obtain additional senior executive positions for the agency, about his knowledge of the reorganization and the assignment of SES and SL positions within the agency, and about his activities regarding marine safety.

Q. Okay. And what was Mr. Campbell's position with regard to Miss Murtagh Cooke's performance as the Director of the Office of Marine Safety?

A. That's kind of broad.

Q. Okay.

A. There's several different categories. Do you want to be a little more specific?

Q. Sure. What did Mr. -- describe to me whether or not Mr. Campbell was favorable in his opinion of Ms. Murtagh Cooke's performance as Director of Office of Marine Safety?

A. He was not favorable regarding her

Page 18

performance. He believed that during his tenure as Managing Director he was compelled to assist heavily in the development of marine investigations and the development of reports so that they would come to a satisfactory conclusion, and that he believed his need to do that was based on Ms. Murtagh Cooke's inability to execute her job as well as she could.

Q. Was there any specific instance in which he spoke about Miss Murtagh Cooke's inability to execute her position?

A. He spoke about several particular instances where he had difficulty and felt obligated or compelled to intercede. One was the -- one specific was the investigation involving a freighter and barge, I believe, off the coast of Rhode Island, in which he believed that Miss Cooke's decisions on the investigation and on the development of the report were not particularly sophisticated for the activities and he felt that he had to intercede.

He also mentioned a couple of investigations where he felt compelled to actually write parts of the report because they were simply not

Page 19

good enough for a board product.

Q. And do you know when that freighter accident was? Took place?

A. I don't. It was near 2000, I think though, maybe in the late '90s, early 2000.

Q. Describe whether or not it's your understanding that Miss Murtagh Cooke is in charge of writing parts of the report related to the crash of a marine vessel at this freighter?

A. As the Director of Marine Safety, she was ultimately responsible for not only the investigation of the marine accidents that were conducted by the NTSB but also the crafting, the design and crafting and development of the final reports that were issued as a byproduct of those investigations. Additionally, she was responsible for the development and presentation of recommendations which are a component of the report.

Q. Okay. Are you aware of any other instances where Mr. Campbell stated that he had to step in and help out with the preparation of a report?

A. He did. He referenced the director's

Page 20

reviews which is a procedural step within our -- the NTSB report development process in which he felt that each director review almost without exclusion for the marine investigations involved heavy engagement by he and some of the other office directors to correct the reports that were presented because they were insufficient and incomplete.

Q. What is a director's report? Can you describe that to me?

A. A director's review is a nearly final report. The idea is that the office conducting the investigation and crafting the report presents their best product in preparation for its review and consideration by the board. NTSB is composed of five independent board members.

A director's review is one step prior to the presentation to the board. And it is intended to ensure that the report is in satisfactory condition, not only procedurally but logic flow, that the recommendations presented are supported, that the probable cause presented is supported and valid. And it is conducted by the office directors of the agency

Page 21

that are appropriate for that particular report.

We have a research and engineering office. We have a safety recommendations office. We have a general counsel. Those directors are always involved in director's reviews, regardless of the modal nature of the report. And occasionally there are other office directors involved depending on the nature of the report.

Q. Did he give a time frame in which he stated he and other officials were involved in the director's reviews for Office of Marine Safety?

A. During his tenure, his entire tenure, he and the other directors were involved in all of the director's reviews for all of the reports for marine safety. So I believe his tenure extends from either late '99, 2000 to 2005.

Q. And describe to me the process for the review by the Managing Director of the Director of the Office of the Managing Director of a director's review before the matter gets to the -- gets to the board, the report gets to the board. Does the office of the Managing Director review every report?

Page 22

A. The office of the Managing Director reviews every report that will be placed on notation for the board's consideration. That review is concurrent with the other directors that I previously mentioned and their review. There's one director's review. And the director's review combines the Director of Research and Engineering Safety recommendations, the General Counsel and the Managing Director, and often the Deputy Managing Director, if there is one.

Those are the primary reviewers at that time.

Q. Okay. Let me make sure I get this. Safety and Recommendations, Office of General Counsel and Managing Director?

A. And Research and Engineering.

Q. And was it Mr. Campbell's position that all the -- that the Office of Safety and Recommendation, the Office of the General Counsel, the Office of the Managing Director and the Office of Research and Engineering all had to revise their report, the director's reviews for each and every report that the Office of Marine Safety prepared between 2000, 2005

Page 23

during Mr. Campbell's tenure?

MS. COHEN: Objection. Confusing.

Q. Did you understand the question, sir?

A. I think that I can break it out. The Managing Director, Mr. Campbell believed that he had to personally be more involved than the other directors. But his belief was that the other directors also were heavily engaged in the correction and improvement of the drafts that were presented by the Office of Marine Safety at this stage, without exception.

Q. And are the reports, the director reviews, describe to me how common it is that the office of the Managing Director of the office of safety and recommendations -- is that right?

A. Safety recommendations.

Q. Safety recommendations, Office of General Counsel and the Office of Research and Engineering are involved in editing the director's reviews for all the modal offices?

A. Those office directors are involved in every director's review for every report going to the

Page 24

board from every modal office. The frequency with which they have to provide substantive comment depends on the nature of the report and the office, but in general terms significant rewrites and substantive changes to the reports are uncommon as a byproduct of the director's review in the other modal offices.

Q. And for what period would that be, sir?

A. Well, the period from roughly 2000 to 2005. I think that is a fair generalization.

There are certainly -- let me elaborate -- there certainly were changes asked for by the directors during most of the director's reviews. But for the majority of the reports, highway, rail, pipeline, aviation, those changes were not substantive revisions and major changes in scope and direction of the reports. For marine, however, I believe in general terms they often were.

Q. And are you aware of any documents that indicate -- describe any documents that you have seen that indicate that those edits were made -- that substantive edits were made or suggested by the Office of Safety Recommendations, Office of General Counsel,

Page 25

Office of Managing Director and Research and Engineer -- and Office of Research and Engineering related to the director's reviews by the Office of Marine Safety?

MS. COHEN: Object. Vague. Specify the time frame.

Q. Do you understand the question, sir?

A. From when do you want it? When do you want to know?

Q. Between 1997 and 2005.

A. Okay. Between 1997 and 2005 the draft reports as presented by the offices are generally destroyed as they move onto their next evolutionary step. However, following the director's review, those directors that I mentioned must sign off, endorse the next draft, the notation draft, the draft that goes to the board members. And they will not do that if the requested changes have not been made.

Q. Okay. Is there any -- describe to me then --

A. So their signature to place the report on notation is an endorsement that the changes requested

Page 26

in the director's review are in fact done.
Q. Okay. But there's no -- where would the actual recommendations for changes by the Directors of Safety and Recommendations, Office of General Counsel, Office of Managing Director and Office of Research and Engineering, where would those suggested edits that eventually would require sign off by them, if they were incorporated, where would those suggested edits be located?
A. The office presenting the report to the directors in the director's review is responsible for taking notes and recording the changes that are requested by the directors during the meeting. Additionally, the directors frequently will provide handwritten comments on the draft report back to the originating office, Marine Safety or Highway Safety for incorporation.
Q. Let me just ask this question then. When you said during the meeting, is there -- describe this meeting process to me so that I understand it.
A. The meeting is convened with the directors that I mentioned, occasionally another director, if

Page 27

it's a multimodal accident, and appropriate staff. Frequently our investigations involve highly technical issues, and technical staff will be present.
In addition to the staff from the originating office, they generally comprise the investigator in charge, the office director, the report writer and other staff that had a significant part in the investigation. The meeting will be conducted in that larger -- in that large group. And it will be an open discussion of the proposed conclusions, the proposed probable cause, the proposed recommendations and the logic flow and occasionally the factual data that is included in the report.
Q. I see. Are there any written minutes of the meetings that exist anywhere?
A. There are not unless the offices hold them. And I'm not aware that any offices hold onto those notes that they take. It is the originating office's responsibility to take the notes during the meeting of the requested changes and execute those changes.
Q. I see.
A. There's not a representative from the MD's

Page 28

office, for example, taking notes.
Q. I see. You also stated that Mr. Campbell -- you spoke with Mr. Campbell about Miss Murtagh Cooke's request for -- to be bumped to the senior executive service level. Is that correct?
A. I don't -- I talked with Mr. Campbell about the approach of the agency and the agency's efforts to obtain additional senior executive billets for the agency.
Q. Okay.
A. I don't believe Mr. Campbell had recollections of any significant conversations with Miss Murtagh about her entry into the SES.
Q. I see. Are you personally aware of the steps that are needed to obtain SES positions for NTSB?
A. Yes.
Q. And you also mentioned that Mr. Campbell and you discussed activities of I believe the Office of Marine Safety. Is that correct?
A. The investigation activity, yes.
Q. Okay. And do you have any personal

Page 29

knowledge of the investigation activities of the Office of Marine Safety between 1997 and 2005?
A. I do.
Q. Okay. And when I say personal, I mean you in your capacity as the representative of the agency. Can you talk -- are you in a position to talk about that today?
A. I can.
Q. Okay. Have you had a chance to review -- you have had a chance to review all the topics in this first amended notice of deposition?
A. I have. Yes.
Q. Okay. And --
A. I've actually seen several, so I'm not -- I think I've got the latest.
Q. And the only questions we won't be asking you about are 14, 15, 16 and 17. And you are prepared to talk about all the other topics?
A. I am.
Q. Okay. Can you describe to me the primary duties required of the Director of the Office of Marine Safety, Miss Murtagh Cooke, between 1997 and

Page 30

2005?
A. During that time frame 2000 to 2005 Miss Cooke as a GS-15 office director was responsible for the general supervision of the Office of Marine Safety, the various standards set of supervisory responsibilities for a staff that ranged in the teens from budget execution to personnel actions performance, discipline, general supervision. She also was responsible for the conduct of the primary mission of that office which was the marine accident investigation activity of the NTSB.
She was also responsible for translating the investigative work of that office to -- into report products and recommendations and probable cause on investigations for each of those accidents. She was also responsible for the coordination of the marine accident activity with other units within the NTSB, namely the Office of Research and Engineering, and the Office of Safety Recommendations, but occasionally the Office of Highway Safety and the Office of Railroad Safety, when there was a marine accident that involved other modal activity, a marine

Page 31

tug striking a highway bridge, for example.
Miss Murtagh also had some responsibilities to represent the NTSB in marine safety with Congress, congressional staff. She also had some responsibility to represent the marine issues for the agency with some organizational groups that are involved in marine safety, including the Coast Guard, maritime administration and a number of other groups.
Q. Okay. Aside from general supervision of the Office of Marine Safety, the standards for ensuring for the standards of supervising of staff in terms of budget, execution, personnel and general supervision, conduct of -- ensuring for the conduct of the mission of marine investigations, translating investigation work for these reports --
A. Right.
Q. -- that you had mentioned before. And report product including probable cause, working with other offices within OMS and representing the agency before Congress and --
A. Not necessarily before Congress but with a congressional staff. There's a difference.

Page 32

Q. Okay. And working with organizational groups, is there anything else -- did she have any other duties as the Director of the Office of Marine Safety between 1997 and 2005?
A. Not that I'm aware of. Those were her primary functions, and the oversight and supervision of that office.
Q. Okay.
MS. COHEN: Can we take a break for one second?
MR. LOWINGER: Sure.
- - -
(Discussion off the Record)
- - -
BY MR. LOWINGER:
Q. We are back on the record. Please go ahead.
A. One thing that I need to clarify, between 1997 and 2005, Miss Murtagh was the Director of the Office of Marine Safety. Prior to 1997 she was the Chief of the Marine Safety Division. The organizational structure changed, and with that came a

Page 33

few responsibilities that she would not have had prior to 1997, primarily attending to congressional staff and dealing as often with outside organizational units.
Q. Okay. Other than as a result of the change in 1997, other than the increase in responsibility related to interacting with members of congressional staff and outside organizations, were there any other additions to her set of responsibilities?
A. No, not substantive additions.
Q. Okay. When you say -- okay. When you say not substantive additions, what do you mean by that? Can you describe to me?
A. It's really an organizational cascade. Prior to 1997 there was the Office of Surface Transportation Safety. The director or Deputy Director for that office would have had the internal responsibility of coordinating activity with the chairman and the Managing Director. It would not have been the division chief's responsibility to coordinate activity of the marine unit at that level.
After 1997 the direct line went from

Miss Murtagh to the Managing Director. That's the difference I'm speaking of.

Q. And in 1997 what were the circumstances that led the agency to believe that Miss Murtagh Cooke could handle the new position of director of OMS as opposed -- and the additional responsibilities involved?

A. In 1997 the chairman was -- at the time, Jim Hall, was critical of the performance of the Office of Surface Transportation Safety as a unit. He believed I think correctly that two things were happening. There was a production line problem with the management in that office, a leadership problem. And additionally it was a layer of management that may have been unnecessary for the agency.

So he disbanded the Office of Surface Transportation Safety and segregated the modal offices that had previously worked within that office. That was marine safety, pipeline safety, highway safety, and railroad safety. And there was also a hazardous materials unit in that group as well.

He segregated those into independent



offices blending pipeline and hazardous materials together.

Q. Okay.

A. So from one organizational unit, surface transportation was created for new organizational units: Pipeline and hazardous materials, railroad, highway, marine.

Q. And would you agree that by becoming the director as opposed to the chief, that Miss Murtagh Cooke received a promotion as a result?

A. I do not -- she did not receive a grade promotion. And she did not receive a salary promotion. A title change but in the federal vernacular promotion is a, I mean, it's a subjective term unless there's a grade, an absolute mathematical calculation grade.

All the directors at that time who went from division chief to director remained at their 15 grade, did not change. Their titles changed, however.

Q. And was it even though titles changed but salary and grade didn't change, was it considered a, well, let me say it this way. Can you describe that



or would you agree that the change in responsibilities was an indication of confidence in Miss Murtagh Cooke's abilities to handle an office, to handle the Office of Marine Safety?

A. I think that there was some level of confidence with all of the division chiefs in all of the modal offices, but the primary impetus for the change was the lack of confidence in the leadership of the Office of Surface Transportation.

Q. I understand.

A. That was the catalyst for change.

Q. How would you rank Miss Murtagh Cooke's primary duties that you had stated before, the supervision of the office, the ensuring for the standards of supervised -- the supervision of the staff in terms of supervision of staff, ensuring for budget execution, personnel, the conduct of the mission including the marine investigations, translating investigative work, report products into report products, working with the other offices in the agency and working with congressional staff in outside organizations; how would you rate those in importance?



MS. COHEN: Objection. Vague.

A. That's a very complicated question. I think that it would be easier for us to answer that or for me to answer that if you took them one at a time, because her performance in these different areas was various based on the items you have just listed.

Q. Okay. As far as the requirements of the job as the director of OMS, would you say that the marine investigation work of accidents was the most important position, the most important responsibility that she had during that time?

A. The investigation of marine accidents and the bookend piece of producing reports and recommendations was the most important part of her position. Yes.

Q. Okay.

A. You can't -- I don't segregate those as two different components. Investigations without a reporting mechanism and recommendations are an interesting workload activity, but don't serve the agency's purposes.

Q. Okay.

Page 38

A. You have to have the report.
Q. Okay. You have to have to report. What would be second of the list of her primary duties that would follow that?
A. After investigations and report development, it would be the general management of the office, I think.
Q. Okay. And after general management of the office, what would follow as third?
A. Her coordination with the other internal offices of the agency. And then fourth would be her coordination with outside organizations.
Q. And fifth?
A. Those four pretty much cover most of the broader categories, I think.
Q. Those are the primary, those are the most significant?
A. Those are the primary. Right.
Q. So investigation of accidents and reports, general management of the office, coordination with other offices within the agency and coordination with outside groups?

Page 39

A. Right.
Q. Are the most significant of the responsibilities of the director, of Ms. Murtagh Cooke as the Director of Office of Marine Safety between 1997 -- between 1997 and 2005?
A. Right. I think that I would put those in those four categories.
Q. And, therefore, would you say that meeting with congressional staff would be insignificant to --
A. I put that in the outside organization.
Q. Okay. Meeting with congressional staff is outside. Okay. Now, aside from those four, what would you say additional responsibilities are insignificant related to Miss Murtagh's Cooke's responsibilities as the Director of Office of Marine Safety?
A. I think that those four categories covered the majority of her responsibilities.
Q. Okay. Now, can you also tell me what skills are necessary, are required for Miss Murtagh Cooke to perform her primary duties as the Director of Office of Marine Safety between 1997 and 2005?

Page 40

A. I think the skills required for Miss Murtagh, the Director of Marine Safety would be, one, leadership and supervisory skills; two, logic and analytical process skills. Miss Murtagh needed to also have fundamental knowledge of the marine industry. And, finally, her ability to communicate both written and orally were fundamental skills necessary for that position.
Q. Okay. Aside from leadership and supervision, logic and analytical process skills, fundamental knowledge of the marine industry and written and oral communications, what other skills were required for Miss Murtagh Cooke to perform her position as Director of Office of Marine Safety?
A. Well, she needed to be able to coordinate and collaborate with other professionals, both internally within the NTSB and externally as part of the investigations or other advocacy work of the marine office. So coordination and collaboration with others is a highly useful skill.
Q. Okay. What about -- is there anything else other than leadership and supervision, logic and

Page 41

analytical process skills, fundamental knowledge of the marine industry, written and oral communications and coordination and collaboration with other offices and outside offices of NTSB?
A. That covers the broad aspects of what she needed to have to -- the skills she needed to have to be effective in that position.
Q. Okay. And how would you rank those in importance?
A. I would rank them based on the mission needs of the agency. The analytical skills would rank Number 1. Supervisory skills primarily because Miss Murtagh's an individual could not perform the mission of the marine safety function of the NTSB. It was the staff working that office that had to conduct the mission. So her supervisory skills were paramount.
Collaboration and coordination with others for exactly the same reason. The nature of the NTSB is such that we are a small organization and must work with others. We in fact have a built-in collaborative arrangement called the party system in our legislative

authority that requires us at times and enables us at other times to work with outside agencies to get our work done, our investigative work done.

And what were the other categories that I gave you?

Q. Written and oral communications, and fundamental knowledge of the marine industry.

A. Fundamental knowledge of the marine industry probably would rank last, but it's not -- it's difficult to rank these. They are all equally important. The oral and written communications is sequentially critical, but you have to have cooperation and collaboration before you can get to the written communication product.

Without the written product, the work of the agency is -- it doesn't impact the safety of the transportation system. If we can't communicate the results of our investigation, we have failed to conduct our mission.

So it's very difficult to rank those in priority. Analytical skills would be Number 1 because for the agency we need to be right first. We need to



be accurate and relevant first. The other ones are all very close to each other in their priority.

Q. Okay. Are there any other efforts outside of the ones that you just mentioned, analytical skills, supervisory skills, collaboration, knowledge of the industry and oral and written communications that are significant requirements for the position of Director of Office of Marine Safety between 1997 and 2005?

A. No. If you consider those categories as a little broad to incorporate other relatively insignificant activities, I mean, there's -- for example, under supervisory skills, there's a long list of what you would expect to be very standard activities from disciplining employees, performance of employees, budget execution, process development, internal planning. Those are all very subsets of that supervisory.

Q. Okay?

A. Relationship.

Q. Let's talk about those substantive supervisory. It includes personnel issues, hiring?



A. Um-hmm.

Q. Evaluating, promoting?

A. Hiring, evaluating, promoting, attending to the normal personnel needs of the staff with that office. We could probably come up with a list of 20 or so fairly, you know, from creating position descriptions, to providing performance evaluations, to ensuring travel vouchers are executed properly, to ensuring that travel is done within the parameters of the rules. There's a very long list of fundamental supervisory activities that go on.

Q. Okay. So that's -- and then you said process. Can you describe to me what you meant by process?

A. I segregate the written communication and the development of investigation and reports kind of into two different categories. It is one thing to develop a process for the efficient work flow from an investigation into a report and the ultimate production of that report. It is a different thing to have the content of that report be relevant and accurate.



There are two different skills, process flow, industrial engineering, if you will, how do you get from A to Z, and the steps necessary, and designing those kinds of steps based on the general rules or the parameters of the organization, and the development of the content of the reports and the impact of those reports.

Q. I see. So as far as process, we are talking about the actual production of the report, the investigation and the report or just the production of the report?

A. Both.

Q. Both. Okay. So when we say processes as far as supervisory skills, what we are talking about is designing a means for investigating an accident, a marine accident?

A. Yes.

Q. And how to generate -- and the steps necessary -- the steps necessary along the way to conduct this investigation, as well as the steps necessary to prepare and obtain approval of -- or obtain approval of a report related to the

investigation of the accident?
A. Correct.
Q. Is there anything else related to process?
A. For the investigation report, that pretty much sums it up.
Q. Okay. What other processes or processes are involved in the supervisory skills necessary to or required to perform the position of director of OMS between 1997 and 2005?
A. The processes for the supervisory component of that.
Q. Right.
A. Well, supervisory also transcends into everything else that's going on. But if we are talking about personnel and dealing with personnel, it is the identification of positions, necessary positions within the confinements of budget parameters. It is the recruitment and hiring of personnel to fill those positions. It is the development of personnel within those positions that either hold those positions or are new to the positions, which is training and counseling and



performance.
It is the oversight of their work and also the oversight of their personnel activity. I'm talking about, you know, payroll and that kind of activity, travel and things like that. And it is also the, in a broader sense, the management of the office, ensuring that the staff have tools to do their job within budget parameters, computers, furniture, other tools in addition to things like training.
Q. I see. And then you mentioned as far as the supervisory, well, let me just go back to this, actually. With regard to the processes for personnel issue, you said recruitment and hiring, development of personnel and positions, training and counseling personnel, oversight of their work, oversight of their personal activity including, for example, travel and payroll, identification of positions and within the budgetary parameters, and the overall management of the office.
Other than those, are there anything else related to the processes for the personnel issues related to the requirements for the position of



Director of Office of Marine Safety?
A. No. I may not have included every fine detail of personnel management, but it is the general supervision of the staff.
Q. I see. What about budgeting? Describe to me what processes are required for budgeting as part of the supervisory skills for the Director of Office of Marine Safety between 1997 and 2005?
A. During that period the budget execution and budget development, start with budget development and the budget execution requirements for the offices changed slightly. But in general terms the offices were responsible for providing a request for budget, for money.
And that money -- each fiscal year, fiscal year process in the federal government, and that money request included money for personnel, for overtime, for training, for mission execution, for equipment, for uniforms, for supplies, all of what you would expect in a normal budget category. The budget was in the NTSB during that time for the most part translated down to the offices. It was not for the most part



centralized, translated down to the offices to design and submit a request.
Those requests were then collected by the chief financial officer and the managing director's offices. And based on the allocation provided by Congress, the appropriation provided by Congress to the agency, managing director's office and CFO's office allocated back to the offices the amounts that the agency could afford for the offices to execute their mission.
It was almost never heard of that, I don't know of any circumstances where an office's budget request was completely filled when the allocation was returned to the office, simply because the agency did not have the level of appropriations that equaled the net sum of the budget requests.
Q. Sure. You said during your -- during that recent -- during the most recent answer you said that the offices were required. So is it correct to say that each of the offices, Office of Marine Safety, Office of Aviation Safety, Office of Highway Safety, Office of Railroad, Pipeline and Hazardous Material

Page 50

Safety all have the same requirement of their directors that they have skills and budget tear processes?

A. Yes.

Q. And those, were those budgetary processes the same for all the offices?

A. Yes.

Q. Okay. What skills are involved in the collaboration with -- well, let me ask this. Let's strike the earlier part of the question.

You mentioned as far as collaboration that NTSB has a party system. Is that what you said it was a party system?

A. Yes.

Q. Can you describe the party system as it applies to the Office of Aviation Safety, the Office of Highway Safety, the Office of Railroad, Pipeline and Hazardous Materials Safety and Office of Marine Safety?

A. Again, I'll need to take them one at a time.

Q. Okay.

Page 51

A. Because it is slightly different.

Q. Okay.

A. In general terms the NTSB operates its investigations with parties. What that means is that we select organizations to work with us on the investigation. That can be federal agencies. It can be in the industry. It can be other organizational groups that are not part of manufacturing.

It can be the carriers in an accident. And they are responsible under this arrangement to provide work force to the investigation to assist us in the development of the factual information that we need to gather during each investigation.

The exchange is that they work for us essentially on the investigation. And we provide in return an open book on the factual information that we are gathering during the investigation. It does not include -- the party system does not include the analytical aspects of our investigation.

So it is really a work force of -- work force multiplier for us.

Q. So, I apologize for interrupting you, sir.

Page 52

So each office is involved in this party system. Has each office director is -- has a skill requirement that he be able to engage in this party system that he or she actually the -- be able to engage in this party system and to actually execute that party system?

A. Correct.

Q. Concept?

A. Correct. With some variables between offices.

Q. Okay.

A. Okay.

Q. Can you describe the variables between the offices?

A. For aviation safety, the FAA is the only agency or entity that is automatically granted party status by the NTSB. It is in the statute. No other organizational entity or agency is automatically granted this statute.

Additionally, in aviation the parties to the investigation are generally well-known individuals and organizations to our aviation group. They are from Boeing or they are from Airbus or they are from

Page 53

General Electric or United Airlines, et cetera. They are the same groups. And we make a concerted effort to train those individuals in advance of the accident investigations.

We have the basic accident investigation school that we provide to these folks so that they can work on our investigation when the time comes to do that. So the industry, the aviation industry is rather large, but the individuals that we see as parties are people that we've seen before. And so there's familiarity there.

Q. Sure.

A. In the other modes, it is somewhat different.

Q. Okay. Let me just go back to aviation real quickly. What is the -- can you just describe to me a plane falls out of the sky or there's an aviation accident. Describe to me how the party system works between the FAA, NTSB and the private groups, Boeing and other groups that you train?

A. Certainly. A plane crashes. A commercial airliner crashes. And the NTSB arrives on the scene

and organizes their investigative teams.

Included in those investigative teams are representatives of the FAA, and where appropriate representative technical representatives from the airline, from the engine manufacturers, from the aircraft manufacturer. So, for example, we organization a series of investigative teams that collaborate together to form the larger work of the investigation.

We'll form a structures team. And on that structures team, we will have an NTSB leader lead the team. And we will often have one of the aircraft manufacturer's technical representatives. If it's a Boeing aircraft, it will be a Boeing engineer on this team. If it is a materials problem with the aircraft, we will often bring in a materials scientist.

The FAA will have a structures representative on this team. And the likelihood is that the carrier will also have a structures representative. If it is human performance team, we will likely have a representative from the -- we will always have a representative from the FFA. We will



likely have a representative from the carrier, and frequently ALPA, which is the Airline Pilots Association, because they can bring technical expertise about processes, skills, the rules, hours of service regulations and hours of service conduct, how the business of the industry is conducted to the investigation.

Our rules state that essentially that the members of these parties must be technically competent, and they must provide a technical expertise to the investigation in the NTSB. We don't permit lawyers. We don't permit public affairs people. We don't permit folks that are there for reasons other than the engineering or the science behind it, the particular discipline.

Q. Okay. So for every accident the FAA is an automatic party, that it becomes a member of any number of the teams related to the aviation accident?

A. Yes.

Q. An industry representative, for example, if the airplane is manufactured by Boeing, a Boeing representative contributes to a part of the team. If



it's -- and if it's an engine issue, the engine manufacturer contributes a member to the investigation team. And those individuals from industry are actually trained by NTSB.

In addition, there's -- if it's a personnel issue, members of personnel issues are -- members of I guess the best way to say it is consultants with personnel expertise generally from the airline pilots -- did you say airline pilots, sir?

A. Airline Pilots Association all contribute to the production of a report for aviation safety.

MS. COHEN: Objection. Mischaracterization of testimony.

Q. What did I say that was wrong, sir?

A. They contribute to the production of factual information that is collected as part of the investigation. The drafting of the report and the analytical content of the report is exclusively the purview of the NTSB. And only NTSB folks work on that.

Q. Okay. Now, as far as the party system works for Office of Marine Safety between 1997 and



2005, can you please describe me how the party system works for a marine accident between 1997 and 2005?

A. There is a difference in the party system between aviation and the other modes and marine for several reasons. One is the legislative authority of the agency. The agency in aviation, for example, is required to investigate every fatal commercial aviation accident that occurs in the United States.

That is not the case for Marine. Marine, the NTSB investigates marine accidents in conjunction with agreements with the Coast Guard. The Coast Guard has the primary responsibility in the United States for the investigation of marine accidents. Within their responsibility is a clause that allows the NTSB to investigate certain accidents.

Between 1997 and 2002, there was some significant disagreement between the NTSB and the Coast Guard on what those agreements meant, what that entry, NTSB's entry into the investigation meant. And I don't want to go off on a tangent on what ultimately became our new Memorandum of Understanding with the Coast Guard in 2002, because I want to get back to

Page 58

your question. We can talk about that later maybe.
But for the party system, when we, when the NTSB is the lead investigative agency, very much like the aviation, the Coast Guard is the primary federal agency that will be involved in our investigation as parties. We will also include as parties manufacturers of the ships, occasionally the U.S. Geological Survey for waterway issues, and of course the carriers.
So if you have a cruise ship, for example, that has an accident in U.S. waters, and the NTSB takes the lead, the Coast Guard will work with us as a party to the investigation and also the cruise ship company. And if we -- if it is a ship design issue or some structural issue like a fire, frequently the manufacturer of the ship will also participate.
We may also bring in expertise as parties from organizations that are not federal governments or manufacturers, but the international fire community or the international shipping board or something like that.
Q. I see. But you said something that I just

Page 59

want to clarify. You said that these industry groups may become involved?
A. Our choice.
Q. It's your choice?
A. It's our choice.
Q. Okay. Is there a requirement, is there any way that NTSB can require them to participate in the investigation?
A. For the federal agencies, and it gets a little mistier with the Coast Guard, but for the federal agencies, once we choose to make the investigation or conduct an investigation, they have a responsibility to work with us on our investigation as a subordinate federal group. For the industry, there is no requirement.
I can or any of our office directors can request that a manufacturer or a carrier or some other group become a party to our investigation, and they can certainly say, no, we don't want to do that. They will be excluded from the investigation. They won't be included in our investigative activities and, therefore, they will not have access to the data that

Page 60

we are gathering.
But they certainly have that right not to participate.
Q. I see. And does that right not to participate apply to all the other modal offices as well?
A. Essentially, yes.
Q. Okay.
A. I can't compel someone to participate in our investigation.
Q. But there's a little twist there. You can let them know that if they don't participate the facts as produced will be -- they will have no contribution to the facts that are produced and that eventually go into the analytical mix that eventually could come back and impact that private entity's, I guess operations in the future?
A. That's -- that's part of I wouldn't call it a twist, but that's part of the consequence of if you are not going to participate. Additionally, we do have subpoena authority for our investigations. And if a group is a party, we generally do not employee

Page 61

that subpoena because it is a cooperative activity. If you are not part of that, we will often provide subpoenas and take depositions and testimony.
Q. I see. Do all the modal office directors between 1997 and 2005, do they all have the subpoena authority to I guess enforce the party participation?
A. It's a delegated authority from the chairman who has the subpoena authority for the agency. But it is generally delegated to the investigator in charge, not to the office director. Our investigator in charge runs the investigation on scene, supervised by the office director.
But the delegated authority goes from our chairman, usually directly to the investigator in charge. And that's on a case-by-case basis.
Q. Sure.
A. It's not a standing delegation.
Q. And for the Office of Highway Safety, can you explain the party system for Office of Highway Safety between 1997 and 2005?
A. I will. Here's where one of the major differences comes in. In aviation, I mentioned that

Page 62

most of the party representatives are well-known to us. And they know the NTSB and the process of the NTSB investigation because we have trained them in advance. That is not so dissimilar to marine.

The Coast Guard investigators that work on our accidents have done so in the past, and they generally understand the rules. In highway safety, it's the other end of the spectrum. The NTSB investigators are usually meeting up with people who have never been involved our investigations again.

And we find that it is a very different exercise because there is an educational and informational component to the party system that doesn't exist in some of the other modes. Our highway IICs and our highway managers must educate and inform and communicate the parties of not only the responsibilities and the advantages but how the rules of the investigation are conducted almost each and every time that they go to an accident.

The reason is because there are 43,000 deaths on the U.S. highways. We rarely go back to the same community in highway accident investigations, and

Page 63

frequently find all new groups, new carriers, new manufacturers, new states that are not nearly as familiar with our investigations.

Q. And is there any sort of collaboration between required collaboration between the Office of Highway Safety and the state in which the accident occurs when the is an accident?

A. It is. The statute says that we will investigate essentially highway accidents including railroad grade crossing accidents that we choose to investigate in coordination with the states.

Q. Can you describe to me, please describe to me how the Director of Office of Highway Safety coordinates the party system with the states when there's an accident that NTSB decides that it will investigate?

A. In any highway accident, there is a local, at least a local state involvement through the police department. They are also investigating the accident. That is not necessarily the case in the other modes.

And frequently there is a state level involvement. If the accident happens on a state

Page 64

highway, and if the accident occurs on the interstate, there's frequently the state police and the state highway department involved. There are 50 different groups that are potentially out there just at the state level, 50 times several because you have state police, you have departments of public safety and you have maybe the state departments of transportation.

We will coordinate. When I was the Director of Highway Safety, our investigator in charge would generally coordinate with the police departments. And I would coordinate with the governor's representative. Most governors have a highway safety representative.

And with the Department of Transportation leadership to do primarily that educational piece, here is the authority of the NTSB. This is what we are going to do in the investigation. The is how we are going to segregate one of the biggest concerns of the segregation between our investigation and a criminal investigation that's going on.

How do we do that and how do we protect the evidence. Because there's always a great concern

Page 65

about that.

Q. Okay. And you said before that there's times where highway, you said that if highway safety becomes involved in an investigation, is there any discretion involved by highway safety in deciding to become involved in an investigation?

A. There's an enormous amount of discretion. In aviation, the statute says we will investigate or cause to be investigated every fatal aviation accident, civil or commercial. In marine safety there's a very established formula for the decision-making process on whether we would investigate or not.

It's a bright line score. It's part of the current MOU with the Coast Guard. In highway safety, however, it is each accident must be evaluated for its nature, the impact on the public confidence, the impact on safety in a national sense, can we make a difference by investigating this particular accident.

There's seven million accidents every year on the highways, three million injuries, 43,000 deaths, and less than 40 staff at the NTSB

Page 66

investigating highway accidents. So to choose the right accidents, to identify national issues in highway safety that we can then impact through our recommendations has to -- there has to be a very thoughtful process on -- and judicious process on deploying our limited resources to go to the right accidents.

Q. I see. And is there -- can you describe to me the bright line test that you had mentioned before with regard to the formula for cooperation with the Coast Guard as to deciding who -- which entity investigations the accident?

A. The bright line score is a table, a chart that is included in the back of our MOU with the Coast Guard, which I believe you have. I can't, without referencing it, I can give you the specific details of it, but prior to the bright line score, it was very subjective on who had the authority and who was going to take the lead on the accident investigation.

And frequently disagreements arose between the NTSB and the Coast Guard. This score now establishes a threshold for the NTSB to essentially

Page 67

choose to investigate a major marine accident. However, it still requires the approval, if you will, but the agreement of the Coast Guard to do so.

But it establishes a baseline decision on how to -- when to say we would like to investigate it and when to not investigate the accident. I think it provides the Coast Guard with a mechanism for determining when to energize the NTSB and when they don't need to.

Q. Why would the NTSB need to be energized with regard to an investigation?

A. Energized, I mean notified and when to discuss with the NTSB who should lead the investigation.

Q. What are the factors, well, let's go back to this, sir. There's a marine accident. And how is it determined whether the Coast Guard is involved at all?

A. The Coast Guard is always involved unless it is not within their purview. There are some marine accidents that happen in the continental United States in which the Coast Guard has no involvement. It has

Page 68

to be in a navigable waterway.

If you recall the Ethan Allen ship on Lake George that sank a year or so ago, that's not an navigable waterway. Navigable defined as one that can reach the ocean I think is really a fairly loose definition of how the Coast Guard sees that. They don't have jurisdiction in that particular instance.

But for the most part, most marine accidents in the U.S. they do have jurisdiction, and they do have the authority to investigate. Your question was how is this determination made now. Well, since they have the authority to investigate all marine accidents, and the NTSB also has concurrent authority to investigate selected marine accidents, the bright line score was developed to begin a baseline threshold of when the Coast Guard would engage the NTSB, not only notifying them of the accident but asking the NTSB whether the NTSB would like to take the lead.

Then the NTSB must choose to take the lead and communicate that with the Coast Guard. And then the Coast Guard must agree with that choice.

Page 69

Q. So it seems like that requires a lot of diplomacy by the director of OMS in order to get to the point where an -- where the OMS takes the lead in investigation of a marine accident.

A. I think that now that there's a bright line score and even before the bright line score there was a basic threshold. I think it does require some diplomacy by the marine director.

Q. I see. Are there any instances other than navigable waters not -- an accident not taking place in a navigable water in which the marine safety, the Office of Marine Safety has exclusive jurisdiction?

A. No. Over the Coast Guard?

Q. Yes.

A. No. I think that there is concurrent jurisdiction throughout. That is my understanding of the arrangement. When it's not, if it's on, you know, Lake Smith in the middle of Arkansas and doesn't lead to anywhere, there's no Coast Guard involvement. But otherwise, it is concurrent jurisdiction.

Q. What have it takes place outside of U.S. waters?

Page 70

A. There is an IMO Treaty, International Maritime Organization Treaty regarding U.S. flagged or U.S. manufactured vessels. There are very few of those anymore that are applying the waterways of the world, very few U.S. flag vessels, quite a difference from 30 or 40 years ago. And the Coast Guard has primacy. They have the responsibility under the international treaty to investigate those accidents.

We have a similar international treaty, ICAO, the International Civil Aviation Organization Treaty in which that primacy falls to the NTSB. So for U.S. flagged, U.S. manufactured, U.S. operated aircraft that crash overseas, we have -- the NTSB has the primary responsibility of providing a technical representative for the investigation.

The state where the plane will crash, for example, will conduct the investigation most times, if they are capable. And the NTSB will provide through treaty the investigators to participate in that investigation. Often we find especially in places like Africa, that we are actually doing the investigation because the state where it involved just

Page 71

doesn't have the capacity to do it.

In marine, that same treaty exists but the Coast Guard is the primary responsible party.

Q. And what if it's -- what if there's U.S. deaths, deaths of U.S. citizens on -- outside of U.S. -- outside of U.S. waters?

A. The United States can be included as an interested party. If it's not flagged, manufactured, or operated by a U.S. company, I don't believe the treaty covers U.S. involvement. If there are U.S. deaths, a cruise ship, let's say for example an Italian flag cruise ship built in France operated by the Greeks sinks in the Mediterranean but there's a 100 U.S. passengers, we are an interested party.

Certainly the U.S. government is certainly interested, but I don't believe there's any requirement for the investigative state, Italy or wherever it would be, to include us in the investigation. But if they did, they would go to the Coast Guard with that request.

Q. And would the Coast Guard look to NTSB's OMS to become involved in any instance?

Page 72

A. They would not necessarily, at least not prior to 2005. They would not necessarily automatically invite us to participate. We would have to make the request.

Q. Okay. Between 1997 and 2005 were there any requests made to participate in an accident in which U.S. citizens died outside of U.S. waters and in a -- on a ship that was not manufactured by aa U.S. Manufacturer, was not flagged by a U.S. Manufacturer?

A. This one I don't know the answer for.

Q. Okay.

A. I would have to research the files to find out.

Q. I see. What happened in 2005 that changed with regard to the Coast Guard?

A. The NTSB and the Coast Guard had a tenuous relationship between at least 1997 and 2005 about authority, who was responsible, who should be doing the investigations. You mentioned earlier diplomacy plays an important part. The lack of diplomacy plays an equally important part.

Since 2005, we have -- I have asked the

Page 73

current Director of the Office of Marine Safety to reengage the NTSB both with the Coast Guard and with the international community, recognizing that there are very few U.S. flagged vessels and U.S. manufactured vessels, but awful lot of U.S. citizens traveling abroad on U.S. ships, to reach agreement with the Coast Guard for collaborative work in those areas.

We have done that. We are now fully participating in the IMO meetings that discuss accident investigation protocols and conventions for international accident investigations. And we have developed over the last couple of years a working relationship with the Coast Guard that is much more analogous to our working relationship with the FAA on the aviation side.

It is a collaborative team, if you will, in dealing with the International Committee on Marine Safety Issues.

Q. Okay. And what is the party system as far as the Office of the Railroad --

A. -- Pipeline and Hazardous Materials.

Q. Yes. Explain that part of it.
A. It is Railroad Pipeline and Hazardous Materials is the most complicated office in the agency, I believe because it is a mixture of three different similar and wholly dissimilar disciplines.
For railroad accident investigations it is analogous to aviation. We know there are not that many railroads in the United States, but they are relatively large. We have working relationships and familiarity with the majority of the major railroads in the United States. And that includes the majority of the major Metropolitan Transit Authorities in the United States.
In the pipeline area, it is more analogous to probably the highway area. There is lots of miles of pipeline in the U.S. and lots of pipeline companies. And frequently our pipeline investigators are introducing themselves to the pipeline parties when they go to their investigations.
And then there is the third component of the rail pipeline hazardous materials, and that is the exclusive hazardous material part of that. Our



parties in hazardous material are generally new to the NTSB on each investigation, but the hazardous material function is as much a support role as it is a primary modal role.
Hazardous materials don't get there on their own. They go by truck or train or pipeline or ship or plane. So hazardous material is generally support activity for the agency.
We have occasionally issued hazardous material reports, but for the most part our hazardous material work and party system falls within the purview of another modal activity.
Q. I see. What type of education is required to perform the requirements of the Director of Office of Marine Safety between 1997 and 2005?
A. Well, the required education for the GS level employees that are not technical employees, not engineers, they are in federal government requires as you probably know degreed personnel for engineering positions, for lawyers, for some other billets. But for the Director of Marine Safety, there is no formal education requirement, but there is a practical



educational requirement and understanding of the marine industry within the United States and also internationally.
Q. And --
A. I think it would be difficult for a nonmariner -- it wouldn't be impossible but it would be difficult for a nonmariner to run the Office of Marine Safety. It would be difficult for a non-aviator or avionics engineer to run the Office of Aviation Safety. It would be difficult for a non-highway engineer or highway accident investigator to run the Office of Highway Safety.
Q. I see.
A. Not impossible but it's better with that background.
Q. Are there any specific educational requirements for the requirements of office of -- Director of the Office of Railroad, Pipeline and Hazardous Materials between 1997 and 2005?
A. There are no specific educational requirements required, but that is a relatively unique position in that you have to -- the gentleman who



holds that position now has a background and an understanding in all three disciplines that are contained within that organizational unit.
Q. Who's that individual?
A. Robert Chipkevich.
Q. I see.
A. C-H-I-P-K-E-V-I-C-H.
Q. And that's applicable, your statement that there's no educational requirement per se to fulfill the requirements of the position of Director of Office of Railroad, Pipeline and Hazardous Materials; Office of Marine Safety; Office of Aviation Safety and Office of Highway Safety; that's correct?
A. That's correct.
Q. Okay. Can you describe the abilities that are required for the position of Director of Office and Marine Safety between 1997 and 2005?
A. The abilities fall within the categories that we previously discussed, leadership, the ability to supervise employees and lead a -- the practical functional application of an office, process development skills, coordination, communication, oral

and written, analytical skills and an understanding of the marine industry.

Q. Anything else apart from those?

A. No. I think that we covered those in the previous answer.

Q. Sure. And can you describe the efforts that are required to perform the position of office -- Director of Office of Marine Safety between 1997 and 2005, what specific efforts or I guess efforts in general are required to perform that position?

A. The Director of the Office of Marine Safety needed to evaluate accidents, notifications, select accidents to recommend that the agency investigate, supervise and oversee the investigation of the accidents, supervise and oversee the development of the report and recommendations from those accidents, develop and put in place agreements and processes for all of those activities, collaborate and coordinate with other offices within the agency and outside of the agency to conduct those activities, and then represent with some organizational unit outside the agency and congressional staff essentially the results



of those investigations.

Q. So aside from evaluating accidents and selecting accidents and recommending accidents for investigation, supervising staff in the field, development of processes, collaboration and communication of results, is there any other -- are there any other efforts that are required in order to perform the position of Director of Office of Marine Safety between 1997 and 2005?

A. Well, broad categories cover the majority of the work, yes.

Q. We discussed a lot of these already; am I correct?

A. We did.

Q. We didn't discuss evaluating and selecting accidents to investigate. Can you describe the requirements in order to evaluate and select and recommend an accident to investigate?

A. Each of the office directors in the modes have the responsibility of ensuring that a robust notification system exists, not only through our communications center but through the organizations



that we generally work with, that our office directors work with, and Office of Marine Safety would be for example the Coast Guard as the primary and then potentially department of natural resource units within the states and the international community for notification.

Once the -- because that's the key, learning about the accidents that exist, that occur. Once that knowledge comes in, and once that system's been established, the office director would assess the nature of the accident, the number of deaths, location, issues involved, and based on their specific criteria, and each criteria is different for each mode, make a recommendation to the chairman, essentially to investigate a major accident.

Q. The criteria are different but all the directors between 1997 and 2005, all had the same I guess requirements that they obtain -- that once they obtain communication that they evaluate and determine whether it's an accident that should be investigated, determining to investigate it and then recommending the investigation. Is that correct?



A. Basically. It -- the office directors would need to evaluate the circumstances of the accident, then also look at their specific mandatory criteria or thresholds, evaluate resources, consider implications for other investigations and then make a recommendation.

Q. I see. And can you describe to me the working conditions under which Miss Murtagh Cooke was required to -- was required to perform her job between 1997 and 2005 as Director of Marine Safety?

A. The Managing Director between -- between 2000, 2005?

Q. I'm sorry, 1997 and 2005. I apologize.

A. In '97 and 2005 the managing directors were different during that time. The supervisors were different. And the chairman of the board were different. We had several different chairman and at least two, maybe three managing directors, both in a supervisory chain for Ms. Murtagh.

So the particular nuances of each of those individuals changed somewhat regarding notification and the process for notification. But the same

general parameters existed. And those were that the offices were relatively independent to do their work, expected to conduct the work assigned to them and the mission of the office, and to report upward through the Managing Director to the chairman the decisions and the progress and the developmental aspects of their work.

Q. So every time a Managing Director or a chairman changed or someone higher than the modal office director changed, the working conditions would be changed in the same manner for each of the office directors?

A. More so for the Managing Director and chairman. I am not sure, you mean, if the change in the office director?

Q. No, not officer.

A. Okay. With nuances for different chairmen, some chairmen wanted immediate contact on accidents and notifications. Some wanted to wait for the office director to gather more information and make a recommendation. Some managing directors wanted immediate contact first before the chairman was



notified. Others did not.

Those are the kinds of nuances. But the basic parameters of the office and running the office were left up to the office director.

Q. Okay. Can you describe to me the duties, the primary duties of the Office of Highway Safety between the requirements of the director of the Office of Highway Safety between 1997 and 2005?

A. Duties of the office of -- director of the Office of Highway Safety were to evaluate accident notifications, set up the accident notification process, evaluate accident notifications, make recommendations on those accidents that the office believed -- the office director believed should be investigated, then supervise and oversee the investigation of those accidents and the development of reports and recommendations.

The Office of Highway Safety director had an additional responsibility in the development of advocacy programs for state recommendation advocacy which the other modes do not have. And because there are 50 states, it is a different organizational



requirement. Everything else is federal for the most part, and the other modes from the investigative and from a regulatory perspective.

However, highway safety is regulated mostly at the state level. So that organizational and advocacy activity was required of the Office Director for Highway Safety. Additionally, the nature of highway safety issues lend themselves to the development of safety studies and public forums and hearings more conveniently than maybe some other modes.

And, therefore, the Director of Highway Safety had the responsibility of establishing and developing and deploying public hearings, public forums and safety studies more frequently than the other office directors.

MS. COHEN: I'd like to take a break here, if you don't mind.

MR. LOWINGER: Are you done, sir?

THE WITNESS: I am done. Yeah.

MS. COHEN: Can we take a ten-minute break please.



MR. LOWINGER: Sure.

\- - -

(Recessed at 11:53 a.m.)

(Reconvened at 12:05 p.m.)

\- - -

BY MR. LOWINGER:

Q. It's 12:05, 12:06. We are just coming back from a break. Mr. Osterman, during the break I understand that I was asked to come back because you were speaking with counsel. Can you tell me what you spoke about with your counsel during the break?

MS. COHEN: Objection. Attorney-client privilege. Don't answer the question.

MR. LOWINGER: There's no attorney-client privilege during a break, a recess in a deposition. Can you please tell me?

THE WITNESS: I am not going to answer it if my attorney tells me not to.

MR. LOWINGER: All right. We are going to go off the record.

\- - -

(Recessed at 12:06 p.m.)

(Reconvened at 12:09 p.m.)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman, with regard to your duties, the duties of the requirements of the duties of the Director of the Office of Highway Safety between 1997 and 2005, other than evaluating the setting up of -- setting up communications in order to receive notices of accidents, evaluating notices of accidents, requesting or recommending whether to investigate, supervising investigations, developing advocacy programs in public -- and conducting public hearings on investigations or accidents or highway safety issues, what other duties are there of the executive -- the Director of the Office of Highway Safety between 1997 and 2005?

A. There are also duties of the responsibilities of supervising a series of regional offices and regional investigators. There are more multimodal activities in highway -- in the Office of Highway Safety than the other modes of transportation because highways frequently interact with waterways



and especially the railroads. And primacy for those investigations falls internally within the NTSB to the Office of Highway Safety Director.

Additionally, the Office of Highway Safety Director was responsible for at that time and still is the representation of the NTSB's interests as it relates to vehicle design harmonization activities with especially the EU and Japan, when it comes to vehicle design, and the recommendations that stem from our investigations and harmonizing rules with NHTSA, National Highway Traffic Safety Administration which is the federal agency responsible for the regulatory rules on highway vehicle design.

Q. Okay. Apart from setting up communications to receive notice of accidents, evaluating, recommending whether to investigate and supervising investigations, developing advocacy programs, conducting public hearings, responding, supervision of regional offices and investigations, multimodal -- the aspects of multimodal investigations because of the highway and working with industry groups and international industry -- international groups related



to automobile safety, what other duties are there for the office -- were there for the Director of Highway Safety between 1997 and 2005?

A. Well I don't think you mentioned the broad responsibilities of coordinating with outside organizations for the work in the office, and also representing the agency with Congress, not only the congressional staff during that time frame but as the Director of Highway Safety I also testified in front of congressional committees several times on highway safety issues.

Q. Can you tell me when you testified before Congress?

A. I specifically testified in the late '90s on motor coach safety issues, the buses. And I also testified twice in front of congressional committees on the issues involving motor carrier oversight.

At the time Congress was establishing through legislation a federal motor carrier safety administration that did not previously exist. That function resided within the federal highway administration. And they specifically requested the



safety board to testify a number of times on the development of that legislation and the issues involving motor carrier safety. And I testified a couple times on that.

Q. Any other times testifying before Congress?

A. No. The rest of my involvement with Congress was briefing staff, coordinating with congressional staff and preparing generally our chairman to testify at other hearings.

Q. Do all the directors of modal offices between 1997 and 2005 have the responsibility of preparing the chairman to testify before Congress?

A. They do.

Q. They did?

A. Yes.

Q. Okay. Are you aware of whether Marjorie Murtagh Cooke helped prepare the chairperson between 1997 and 2005 to testify before Congress?

A. I don't know what testimony we conducted. I personally don't know what testimony we conducted on marine issues during that time frame. If our chairman would have gone up during that time frame, Ms. Murtagh

would have been responsible for providing him background material, but I don't -- I don't remember the testimony for marine during that time frame. I would have to go back to the record and look for that.

Q. Okay. During this deposition if you would just speak with me and not communicate -- not look towards your attorney regarding whether or not something happened, that would be appreciated. Okay?

A. Sure.

Q. Thank you. Other than all the duties we just mentioned, is there anything else that the Director of the Office of Highway Safety was responsible for, any other duties that the Director of Highway Safety was responsible for between 1997 and 2005?

A. Well, I want to caveat this. You've asked me in the other questions about marine safety and aviation safety, all of the duties. Well, there are a myriad duties as a director of the office everywhere from the mundane of time card verification to the very complicated and analytical component of our investigations and 100 or more steps in between



responsibilities.

So with the general characterization that I am covering broad ranges of duties, not all the specific items that may be done, I think that that's -- I've covered most of those.

Q. I see. How would you rate them in importance?

A. I think that like the marine office, it's difficult to rate all of those duties because they are all integrated and very important to each other. The primary duty of the Office Director for Highway Safety is the investigation of highway accidents and the companion piece of the producing the report and recommendations to the board on those investigations.

That for all the office directors would be Number 1. The rest are a blended priority list. They are all interdependent on each other in coordination with outside agencies, coordination internally is equally as important as oral and written skills. It's difficult to prioritize one over the other.

Q. I see. As long as we are on the mention of what each agency's -- what each office director's



responsibilities are, we've talked about highway safety. We've talked about marine safety. And you said that it was -- that all of them have a certain blend of responsibilities after the investigation and production of the report.

Are there any differences in responsibilities of the Director of Office of Railroad, Pipeline and Hazardous Materials and Office of Aviation Safety that are different than the responsibilities of Highway Safety and Marine Safety?

A. Yes.

Q. Can you describe those to me?

A. All the office directors have some unique aspects of their duties. In aviation safety, the office director is not only responsible for about 20 to 25 percent of the work force of the agency, it is the primary mode within the NTSB. They are also responsible for all general aviation accidents. They have -- that director has ten regional offices that they are responsible for. And they have a mission responsibility beyond the investigation of major accidents to that general aviation community.



We are responsible for conducting or causing to be conducted an investigation on every fatal aviation accident or serious incident that occurs, including general aviation. So there is a different kind of organizational structure in aviation and safety in that they have a very discrete regional investigation component.

Those regional investigations are conducted differently than the major investigations. They provide a different type of report. And there are many more of them than in highway or marine or rail.

Additionally, the aviation director has the responsibility of maintaining the national database on accidents. The NTSB maintains national statistics for accident, aviation accidents, whereas that doesn't occur in the other modes.

Q. What's the difference between the database of aviation accidents and just reporting on accidents investigated by the other offices?

A. Oh, the data from the other offices maintain -- are directed towards the investigations that we the NTSB have conducted. It is not a

representative of the national picture, if you will, of data. It doesn't represent the database nationally on accidents and incidents. The NTSB's data files do.
We are responsible for reporting out and actually produce a report every year on accident trends and accidents that have occurred nationwide.
Q. Okay. Who has responsibility for producing that report?
A. It is a collaborative responsibility between the Director of the Office of Aviation Safety and the director of the Office of Research and Engineering.
Q. For all the -- for all the modal offices as well?
A. No. Just aviation.
Q. So every year there's a specific aviation report?
A. Yes.
Q. Okay. And that's produced between --
A. Director of Aviation Safety and the Director of the Office of Research and Engineering.
Q. Okay. And how does that report differ than



an annual report from the agency?
A. The annual report from the NTSB is produced from the managing director's office, and it is report to Congress essentially of the agency's activities for the year. The data report on accident data for aviation is a national report. It does go to Congress as well. But it is a national report on aviation accidents in general nationwide.
It is an analytical report on trends, and the statistical report on the accidents that occur across the nation in aviation safety. It is not an activity of the agency report as the annual report is.
Q. I see. And you discussed regional reports.
A. Yes.
Q. Regional reports. Can you describe to me what that encompasses?
A. The Office of Aviation Safety has two primary arms. One is the major accident investigation function, and the other is the general aviation accident investigation function or regional accident investigation function.
The majority of aviation staff are actually



located in that general aviation office. They are spread around ten different regions around the country. And they respond to or oversee the FAA's response to as delegated by us, by the NTSB, every fatal accident and every serious incident and then the production of a report based on each one of those.
Q. What's the difference between a major accident and a general regional accident?
A. A general aviation accident -- major accident investigation is a little subjective definition within the NTSB, but it is a major commercial airline or a major incident where there's a significant number of deaths or injuries or a significant failure, system failure that has the potential to cause significant deaths or injuries. That would be a major accident.
A very simple definition is a 737 crash involving 150 passengers would be a major accident. A small Cessna personal aircraft with maybe one or two deaths would be a regional accident. But it is -- if it is not a major accident, it is a regional general aviation accident.



Q. I see.
A. You asked about rail as well.
Q. Right. Well, are those the only unique characteristics to aviation that -- that are applicable to the requirements of the duties of the requirements for the position of office -- the Director of Office of Aviation Safety between 1997 and 2005?
A. No. I think I mentioned previously early on in the deposition that the office director for aviation safety is also the primary responsible party for our work in the international treaty, the ICAO Treaty, which annex 13 of the International Civil Aviation Organization Treaty, which is signed by 190 countries, and it is the rules of civil aviation worldwide, if you will.
Annex 13 talks to accident investigation. And we are, the NTSB, is the primary U.S. government agency responsible for that component of the treaty. That office director, the aviation office director is our responsible person to oversee the work of that -- that Annex 13.

Q. Can you describe to me the work that's involved in the Annex 13?

A. It involves representational duties at ICAO meetings and representational duties in the development and modification of any clauses of Annex 13. Every three years ICAO holds -- ICAO is a subset of the United Nations. And they hold a general assembly in which they consider changes and alterations to the treaty essentially.

And ICAO also conducts audits of member states. And they do a number of other functions. And our responsibility when it comes to the United States is the accident investigation part of that.

Q. I see.

A. So that office director has that responsibility.

Q. Is there any similar sort of responsibility for international treaty-based work for the Office of Marine Safety?

A. There is, but it resides with the Coast Guard. There is an international maritime organization. I think we spoke about this earlier.



It is a equivalent organization to ICAO. It is part of the UN.

They do the same kind of work. And there is marine accident investigation components to the IMO Treaty. However, the NTSB is not the responsible party for the United States government on that. It is the U.S. Coast Guard.

Q. But would the -- would the director between 1997 and 2005 have responsibilities to IMO even though it's not primary responsibility?

A. We have an interest in being involved in the International Maritime Organization. And we have an interest, a very significant interest in being involved in the development of changes or modifications to the Marine Accident Investigation Treaty. And our interest has to flow through the Coast Guard.

Q. So the agency is still represented with regard to international matters, and there's still a requirement of performance of duties related to international matters, it's just that it's not -- it's just that it's through the Coast Guard?



A. The Coast Guard, the Coast Guard has a responsibility for representing the United States at IMO. The NTSB does not. But the NTSB has an interest in the outcome of the work done there.

So we attempt to influence the Coast Guard to include us and consider our concerns in their discussions with IMO. Whereas in the aviation side, we are the representatives for the accident investigation part. We do represent the U.S. government on that part.

Q. I understand. With regard to unique duties between regional and general investigations and regional reports and the maintaining the database and producing the report and working with ICAO, are there any other unique duties of the office of direct -- the director of the Office of Aviation Safety between 1997 and 2005?

A. We talked about, I know you covered -- I don't know that you covered everything we talked about, but it is in the testimony, the regional -- overseeing the regional activities. And we mentioned earlier that the international work of the Office of



Aviation Safety is significant because of our responsibilities in the treaty. So we do a lot of international work in aviation and safety.

We are responsible for supplying investigators to accidents worldwide that involve U.S. carriers, U.S. manufactured aircraft or components. And it's pretty difficult nowadays to find a major aviation accident that doesn't involve a U.S. manufactured air craft or component. Airbus puts Pratt and Whitney and GE engines on their aircraft. So we are involved in most international major events.

And we also have a responsibility to assist other nations at their request. And they have done that frequently, especially South America and Africa where they don't have the capacity to do it themselves.

Q. And that's all?

A. That's pretty much it for aviation. You had asked about railway.

Q. Right. Other than the general duties that we had discussed, the supervision of investigation of reports and production of reports, staffing of

personnel, budgeting, working with other offices within the NTSB, working with industry groups, and briefing congressional staffers and working with international and domestic industry groups, what else does the office of -- what are the other additional primary duties of the, if any, of the office of the -- the Director of the Office of Railroad, Pipeline and Hazardous Materials?

A. Well, the Director of Railroad Pipeline and Hazardous Materials also has regional offices and regional investigators elsewhere in the country other than Washington. We mentioned the multimodal aspect of his position. He also has international work, especially in the pipeline area, especially when it comes to Canada and the pipeline activity that goes on between the United States and Canada. Frequently there is -- there are accidents that originate in one country and end in the other when you think of pipelines. So that activity goes on and not infrequently.

He also had during '97 through 2005 the responsibility of testifying as an office director on



the Hill in front of committees and I believe he probably testified more than any -- than either the highway or the aviation director during that time frame.

Q. So aside from the supervising regional offices, working in multimodal situations given the nature of pipeline and hazardous materials and railroad work, working on international matters and testifying before Congress, what else is unique about the duties, what else is different about the duties of the office of the -- the responsibilities of the Director of the Office of Railroad and Hazardous Materials?

A. Probably unique to that position is the technical aspect of that position above some of the other office directors. Whereas the marine director and the highway director need to have a understanding and a fundamental knowledge of their industry, the director of rail pipeline and hazardous materials has to have a very specific knowledge of three different industries and their interaction together.

Q. I see.



A. There is a size component to these offices as well. The Office of Aviation Safety has, depending on the day you measure the balance has roughly always been the same, but they have anywhere from 120 to 140 employees roughly. The Office of Rail, Pipeline and Hazardous Materials have generally between 40 and 50 employees; Highway Safety between 30 and 40; and Marine Safety somewhere between the mid teens and 20.

So there's a volume component as well to each of those positions.

Q. And do the budgets allotted to each office reflect the volume of -- the size volume that you had just mentioned?

A. They do. And the majority of expenditures at the NTSB are personnel, salaries and associated costs with salaries. And so most of the budget is distributed based on that deployment of resources.

Q. I see. In the Office of Aviation Safety, I'm aware that there's a Deputy Director named Tom Haueter?

A. Yes.

Q. Can you tell me what Mr. Haueter's primary



responsibilities were between 1997 and 2005?

A. One, I don't believe that Mr. Haueter was the deputy during that entire period, but I -- we do know who they were. But I think for the majority of the time he was probably the deputy. As the deputy, either Mr. Haueter or his predecessor was responsible to be a chief advisor to the director and operational manager for the office director.

Mr. Haueter was also responsible for the conduct of most major investigations. Aviation investigations involve above other modes involve far more people, far more press and far more interest than some of the other modes.

And there is an enormous volume difference in the work load of the major aviation accidents than the workload of a major marine or even a major highway accident. And he was responsible for the conduct of those major investigations and reporting that operational work to the director.

Q. So how does -- how did the duties and responsibilities, well, let's just see. He's the chief, Mr. Haueter was the chief advisor. He was the

operate -- he was the operational manager for investigation -- for personnel issues. He was responsible for the conduct of investigations.

And factors in that you assert are press and people and interest in these investigations. Besides those, what other responsibilities were his primary responsibilities between 1997 and 2005 or during his tenure as the Deputy Director?

MS. COHEN: Objection. Mischaracterization of testimony.

A. The responsibilities of Mr. Haueter as I said before were to be the deputy for the director, and to execute the primary duties of operational oversight for the major investigations and also other assignments provided by the director.

Q. Well, do you know what those other assignments are?

A. In detail, I do not.

Q. Okay. Which of -- when you say conduct of investigations, can you describe to me what Mr. Haueter's role was with regard to the conduct of investigations?



A. Day-to-day oversight of the execution of major accident investigations, aviation accident investigations. It is for major aviation accident investigations a much more complicated process flow. Similar steps than some of the other modes, but far more involvement and far more scrutiny by parties and outside interests.

Q. How is there more -- how is it a more complicated flow? How is there more interest in an airline accident than there is in, for example, an aviation accident where there's still a -- in a highway accident in which there's a fatality or a marine accident in which a ferry goes down or something like that?

A. It's a fairly common sense answer in that all you have to do is read the paper. A major airline accident is a enormous public confidence and public interest issue in the United States.

In the year the TWA 800 crashed off of East Moriches, Long Island, it was the biggest news story during the year, even though we had a presidential election. It caused more public interest and



congressional interest than the presidential election that year. That's how large that kind of activity becomes.

And the demands of the public, and we are a sunshine agency, therefore our activity is done in the open. And the interests of hundreds and thousands of individuals and parties are applied to major aviation accidents that are not seen by the -- in that volume by the other modes.

Q. So, I guess my question then is, sir, is explain to me just because there's press involved, how do the duties change when the press becomes involved?

A. The duties don't change particularly by their nature. They change mostly by their volume. The press are involved in most of the accident investigations, not all, but most of the accident investigations conducted by the agency, even small investigations that are conducted.

But the sheer of volume and persistence of political officials, the industry at large, the press, and the public to a major aviation accident is not comparable to the other modes.



Q. Are you aware whether Mr. Haueter has any assistance in dealing with the press when there's an investigation that the press has an interest in?

A. It is not exclusively the press that I am speaking of that has an interest. We do have a public affairs office. It is relatively small. There are only four individuals in it at the moment.

But the nature of the interested parties and the size and scope of the investigation are always larger. I'll give you a comparison. A major marine accident investigation may involve on average four or five of our investigators plus twenty or so party representatives from different organizations that we spoke of earlier, the Coast Guard, the carriers and so on. A major airline accident investigation may involve 150 to 200 different people involved in our investigation.

Q. Is there a difference though in the actual accident? It would seem that a marine accident involves a sunken ship, whereas an aviation accident involves a plane that crashes on generally on land or floats -- or floats or is recovered?

Page 110

A. Planes don't float. Four-and-a-half million -- 30 million dollars later, we recovered TWA 800 from the bottom of the Atlantic Ocean.
Q. I see.
A. So frequently some of our most challenging investigations in the marine environment have been aviation accidents. Egypt Air, we recovered the wreckage for that accident at the bottom of the Atlantic. TWA 800, Swiss Air where we assisted the Canadians, all went into the ocean.
And as a matter of fact at the moment, one of our most challenging and internationally complex is the crash of the 737 off of Indonesia flown by Adams Air. It was a U.S. manufactured aircraft operated by an Indonesian country. So they do not conveniently land in places where it's easy to investigate. As a matter of fact, they are very inconvenient.
Q. And when there's a marine accident and the ship sinks, is it recovered the way an airliner would be recovered?
A. Generally not. When we have a major aviation accident that lands in the water, it is a

Page 111

search and recovery exercise, very complicated, in which we try to recover the majority of the aircraft and reconstruct that to determine what went on. Our first and foremost interest are the data recorders. But we also will recover the majority of that aircraft.
In the marina accidents, frequently ships do not disintegrate like planes do. A plane hitting the water at several hundred miles an hour will -- will disintegrate to some degree. And we must put that back together to determine what happened to the aircraft.
When ships sink, generally they sink in either one or two pieces. And we rarely recover the sunken ship from the bottom of the ocean. We generally do our work when that does happen through remote devices. We don't do that very often because major ships don't sink very often.
They are often damaged or frequently will have environmental problems with major surface vessel, major marine vessels where we have a ship that's hulled, hauled like the Exxon Valdez and deposits

Page 112

millions of gallons of oil, but the ship doesn't sink. There are very few instances where major marine ships have actually gone to the bottom, if you will.
Q. Okay.
A. But, no, we don't bring those back up. We do that through remote means.
Q. I see. Is there always a remote means -- remote investigation of a sunken ship?
A. No.
Q. Okay. And when there's an accident that, for example, a broken hull or some sort of an accident where the ship does not sink, can you describe to me the scope of the investigation by the Office of Marine Safety between 1997 and 2005, how is that any different than a highway accident where you have to investigate what happened to an automobile?
A. The general conduct of the investigation is similar. It is gathering facts in different baskets, if you will, of disciplines, vehicle and human performance and survival aspects and environmental aspects and so on. It is similar, that aspect of it in all the modes.

Page 113

Volume is different. Again in aviation, I'll bring that back because it's just so much larger by volume. But the general conduct of the investigation is similar in that we collect parties to the investigation. How we do that is different among the modes, but the nature of how you gather evidence, collect it, analyze it is -- is similar.
Q. I see. And the production of reports, what -- describe to me what are the responsibilities of the director of, for example, highway safety between 1997 and 2005 and supervising a -- the production of the report in the Office of Marine Safety and producing a report related to an accident between 1997 and 2005? Are there any differences in the creation and production and approval of the report?
A. Your example in comparison between highway safety and marine, there are some differences.
Q. Can you tell them to me?
A. Well, let me start by the basic process flow of the major investigation. Report development is similar among most of the modes. There are some

prescribed steps that the modes use in producing a report. Several drafts are reviewed by staff and ultimately will -- we get to the director's review that I mentioned previously and then ultimately is delivered to the board for their deliberation.

In highway safety area, the office director is also responsible for as I said previously safety studies, more often than other modal directors. And they are also responsible because of the nature of highway accidents for providing safety reports in addition to accident reports. Accident reports are generally discrete reports on a particular accident event.

Safety reports are generally a collection of a number of different accidents with the common issue in which the issue is thoroughly examined, for example, bus crash worthiness. I don't remember how many investigations were included in that safety report, but maybe a dozen in which we did a number of analytical activities to produce a report on the issue of bus crash worthiness.

Q. And did the Office of Marine Safety between



1997 and 2005 produce safety reports?

A. I don't believe they did. I believe they produced accident investigation reports.

Q. And to what extent would -- to what extent is it -- is marine safety -- let me see if I can rephrase that. Okay. So let's just go back to this.

You said before that there are a few prescribed steps in producing a report that's common to all the offices. What are those prescribed steps that are common?

A. Well, I can give you the basic steps. There are more finite detailed steps within the production of a report, but once the investigators are finished with their on-scene investigation, and that is a relatively fluid statement because on-scene investigations can sometimes be wrapped up in several weeks, and sometimes it will take much longer period. Like a TWA 800 that's at the bottom of the ocean, it may take months or even years to get all the data.

They will have a work planning meeting or series of work planning meetings in which the investigative staff and the office heads, not all of



them but the office heads that are involved in the investigation, namely the modal office director and frequently the director of research and engineering, if it's a technical problem, will evaluate the progress of the investigation and do two things. One is to evaluate what additional work needs to be done; and, two, what general time line and what general production flow should occur as far as when they think the investigation will be complete and assignment of resources and things like that.

Following the completion of the investigation, a writer will begin to take from a public document which is all of the factual information we compiled from the investigation, take that data and begin to craft it into a comprehensive report for the agency. Our data for TWA 800, for example, filled up an entire room full of file boxes, but the report is only several hundred pages long.

We talk the pertinent information from the investigation and write a report based on established format guidelines for the agency for the report. That report then once in draft goes through a series of



reviews, beginning at the investigative team review, then a review through the office, that is the originating office, marine safety or aviation safety.

It then goes to a technical review which is where the parties to the investigation, and sometimes we will hire experts from the outside to review our reports if they are very complicated, get an opportunity to look at the factual information only to make sure that what we've got is accurate; that we are representing it correctly, but only the factual part. Once that is all done, it goes through a series of editing and formatting cleansing operations and then comes to the director's review that I mentioned early on in the deposition.

Following the conclusion of the director's review, the report is modified based on the direction from the directors, Managing Director and the director of RE and SR, and then presented to the board for deliberation. Many of the reports, most of the major reports go to a sunshine meeting, a board meeting, public meeting where the board deliberates the report and the recommendation and votes on adoption or

changes, the content of the recommendations. And some are sent to the board for only a review without a public meeting. And they still vote on it.
Q. When it leaves editing and goes to the director review, you said other entities or other parties are involved in the director's review. Am I correct?
A. No. I said technical review.
Q. Okay. It goes from --
A. Technical review where we involve the parties in a review of the factual information to make sure one last time that it's correct.
Q. Okay. And who does this technical review for in general?
A. The parties who are involved in the investigation. And if we don't have -- in our opinion if we don't have satisfactory technical skill from the parties to ensure accuracy, we will occasionally enlist non-aligned technical experts to review some reports.
Q. I see. With regard to --
A. I think I have to pull one more piece of



that puzzle in for you because especially in aviation, but also in highway and rail, the office directors also have the responsibility of producing and approving reports on accidents that do not have recommendations associated with the reports without the process of going to the board. They have delegated authority to approve a report that is not -- does not contain recommendations.
Q. You said each office director has that authority?
A. The Office of Aviation, Rail, and, yeah, I think the Office of Marine Safety has it as well. It's mostly the majority of those cases come out of aviation, all the general aviation cases. Next would be highway and then rail and then marine, but I am not sure that marine frequently uses their delegated authority.
This is a report that does not have -- of an investigation we may have conducted where we do not have recommendations to present to the board. And it does not have other national implications.
I know that our current marine safety



director has signed one or two investigation reports as a delegated authority. I'm not sure. I would have to look for those episodes between '97 and 2005 for the former marine safety director. I just don't know.
Q. Is there any information anywhere that you are aware of that would list all the delegated reports produced between 1997 and 2005?
A. We can gather that. It's a brief extrapolation. If it was not adopted by the board through a vote, it was a delegated report to the office director.
Q. Are the delegated reports still published?
A. Yes.
Q. Back to Deputy Haueter, I just wanted to get back to this for a quick second. I apologize. But does Deputy Haueter have any budgetary responsibilities?
A. His budgetary responsibilities would be executed through authority delegated to him by the director. So if the aviation director wanted him to manage part of the budget, he could do that or would do that.



Q. Are you aware whether or not, well, describe to me the instances in which Deputy Haueter actually did do budgeting work for the Office of Aviation Safety during his tenure?
A. I do know that the Deputy of Aviation Safety managed a number of our contracts involved in major aviation investigation and activity. We frequently will contract with outside vendors to conduct technical work and sometimes recovery work.
747, for example, dropped an engine in Lake Michigan, and we contracted with a vendor to recover that engine. And he managed that contract.
Q. I see.
A. I know that he did that function while he was the deputy.
Q. What about, for example, coordination with outside organizations?
A. The deputy of Office of Aviation Safety had some activity and some responsibility for coordinating with outside organizations, specifically with the investigations that he was overseeing, but in a more general sense for the Office of Aviation Safety, that

usually fell to the office director.

Q. So the Deputy Director wasn't really involved with ICAO at all during his tenure?

A. Some but not nearly as much as the director.

Q. I see. And what about relations with congressional staff? Was Mr. Haueter, are you aware whether Mr. Haueter was involved with communications with congressional staff during his tenure?

A. Mr. Haueter was involved with communications with congressional staff. He certainly was involved when the director was not available. And he have also involved in some aspects due to his technical skills when it comes to air nautical engineering.

Q. Are you aware of instances, for example, how many times was he actually involved in actually the briefing of congressional staff during his tenure?

A. I don't know the specific number. I may be able to get that, but I know that he went to brief congressional staff and some congressmen on several different accidents, most notably as director and most



recently the Comair accident in Lexington, Kentucky.

Q. Well, did that take place before --

A. After 2005.

Q. After 2005?

A. Yeah.

Q. But between 1997 and 2005 he was just as needed? It wasn't his primary duty to --

A. No. The primary responsibility fell to the director and was sometimes delegated to the deputy depending on the nature of the request.

Q. I apologize for interrupting you, sir. Are you aware of how many times that responsibility was delegated to --

A. I don't know specifically.

Q. I see. What about the skills necessary for Deputy Haueter? What skills are required for a deputy of Aviation Safety in Mr. Haueter's role?

A. The skills are similar to the skills necessary for the director in the categories that I laid out before, coordination, collaboration, analytical skills and so on. They are identical.

One difference is the Deputy of Aviation



Safety needs more of a technical background generally because of the nature of the assignments than the director even in that office because they are managing the very complex activity involved in major investigations, the technical activity involved.

Q. And when you say that, is that anything -- how is that different than the fundamental knowledge of the industry that you mentioned before for the other directors for aviation, for marine safety and I believe for highway safety?

A. As you can imagine, there are many different sub skill sets in the different areas. In marine safety, for example, there are naval architects and there are master mariners, and there are pilots, and there are different kinds of marine skills.

A general understanding of the broad nature of the industry is necessary for the director position. But for the deputy position in aviation there was a -- the way that position existed between '97 and 2005, it was very technical in nature as far as the detail aspects of major investigations. So Mr. Haueter as an aeronautical engineer was much more



involved in the technical details of the investigation than the director would have been.

Q. Okay. Other than the technical knowledge, the skills are pretty much the same for all the directors and deputy directors, is the leadership and supervision, it's the analytical skills and processing skills, the fundamental knowledge of the industry, written and oral skills and coordination and collaboration. Is that correct?

A. I don't want to be confined to that list particularly but the oversight and the leadership of the office and the functions of that office, understanding that each office has different aspects to their operation.

Q. I see. And what about the efforts? What kind of efforts did Mr. Haueter have to set forth in order to perform his job?

A. Well, for the director and the Deputy Director of Aviation Safety --

Q. Actually, sir, just the Deputy Director?

A. The deputy? Their -- I think I need you to kind of refine the question. I am not sure what you

Page 126

mean by efforts.

Q. Sure. What, you know, what kind of -- what are the requirements of the job? Is it a 24/7, 24 hours and 7 days a week job? Is it something that can be done Monday through Friday? Is it something that he's frequently working overtime?

Is it something that he is -- is it something that he's constantly required to, I don't know, work more or expend different types of energies than the directors?

A. No. It is a 24/7-day job. In aviation by volume the National Transportation Safety Board investigates the causes to be investigated, thousands of accidents annually. And, therefore, there are constant notifications of accidents that occur nationwide. And the dispatching and the deployment of resources to investigate those accidents are a constant feed to both the director and the Deputy Director in aviation safety.

That goes on every day. My, for example, my pager goes off two to three times a day regarding an aviation accident. The notification comes to me

Page 127

but the deployment of resources and the decision to investigate and how to investigate falls to the Director of Aviation Safety, the deputy, and then the Deputy Director for regional investigations.

There are two deputies in the Office of Aviation Safety. You are aware of that?

Q. I am. I am.

A. Okay.

Q. I just want to ask a quick question. Did the working conditions for Mr. Haueter change the same way the other -- the working conditions would change when a -- when a new Managing Director or new chairperson was appointed during his tenure as well?

A. I suspect not as much because as a Deputy Director he has an intermediary supervisor and the director. The director is the direct line to the Managing Director and then the chairman. So as a deputy, unless the Director of the Office of Aviation Safety changed, I believe that his job would remain relatively the same.

Q. Did he -- did the deputy, did Deputy Haueter's -- did he have the same sort of report

Page 128

overview that the director has when a report finally gets through the process line after the factual -- the facts are gathered and the initial writing is done and then it goes to the groups and then the technical -- and then does he have that same oversight as a director?

A. Mostly.

Q. But not all?

A. Not completely.

Q. I see.

A. He would oversee the development of the report up to the office director's approval. Once the office director approved it and provided a draft to the other directors in the agency, the office director would generally campaign that report forward.

The Deputy Director in aviation safety have operational responsibilities for ensuring the changes were made to the report and that the board meeting was conducted properly and staff was prepared, but the promotion and delivery of that report became a director's responsibility.

Q. So did the directors all have actual

Page 129

authorship responsibility or is it more of a promotional obligation by the time the reports get to them?

A. I wouldn't call it -- probably a bad word, promotional obligation. And some office directors contributed a great deal to writing the reports. Others did not. But they had the responsibility for the quality and content of the report.

The office directors in general terms are responsible for the quality and the timeliness of the reports from their office.

MS. COHEN: Mr. Osterman, are you finished with your answer?

THE WITNESS: Yes.

MS. COHEN: I would like to take a break within the next five or ten minutes if you can finish this line of questioning.

MR. LOWINGER: Sure.

BY MR. LOWINGER:

Q. The directors have that obligation of quality and content and timeliness of the report. But which directors actually were involved in the

Page 130

authorship of the report?
A. I think each director to different levels was involved in modifying draft reports. Writing a report from a blank piece of paper, there were staff in each of the offices that conducted that activity. The office directors reviewed reports. And before those reports left the office, they had a hand in modifying the report.
Q. Okay. And what type of prior experience and training and education is required to be the Deputy Director, Mr. Haueter, to fill Mr. Haueter's role?
A. For aviation safety?
Q. Um-hmm.
A. Again it is not an engineering or professional GS position. Therefore, there's not a mandatory educational component. But the practical requirements are that the deputy of AS has a very specific understanding of aviation, why planes fly and why they don't, sometimes.
Q. I see. Would you say that Ms. Murtagh Cooke's job was a 24-hour 7-day-a-week job like the

Page 131

other directors' jobs?
A. I would say that it was 24/7 but it was not like the other directors' jobs. As I mentioned with the office of aviation safety, the level of notification and deployment of resources is constant and regular and always. Every weekend the NTSB is deploying aviation investigators to an accident somewhere, and frequently many accidents.
In highway safety, that is probably the next most cumbersome 24/7 job. All of the directors need to be available or have someone available 24/7 to take these responsibilities of evaluating accidents and deploying resources. But by volume, aviation certainly is -- happens all the time. Highway accident notifications are very frequent because of the nature of the sheer volume of accidents that occur nationally.
Railroad accident investigations are next. I would put marine in the fourth position and probably pipeline last.
Q. I see.
A. So you don't have to always -- you are not

Page 132

always taking calls on the weekend. You are not always taking calls at night in some of these modes. Aviation always is doing it; highway, mostly; rail, frequently; marine, not so frequently; and pipeline infrequently.
Q. I see. Do you need a break?
MS. COHEN: Yes. We'd like to take our lunch break now.
\- - -
(Recessed for lunch at 1:13 p.m.)
(Reconvened at 2:04 p.m.)
\- - -
BY MR. LOWINGER:
Q. Mr. Osterman, we are back on the record. It's 2:05. During the break did you have any communications about your testimony with your counsel?
MS. COHEN: Objection. Attorney-client privilege. Don't answer that.
Q. I am not asking what your communication is, sir. I'm just asking whether you had any communications about your testimony?
A. No.

Page 133

Q. Thank you. Could you please tell me, sir, whether Mr. Haueter during his tenure had the authority to hire and fire personnel?
A. Mr. Haueter as a supervisor.
Q. Yes.
A. Did have the authority to, within the parameters of the federal rules, to hire and attend to personnel matters.
Q. Okay. And what about -- how did the job of director of office of -- how did the requirements of the job of Director of Office and Marine Safety change in May 2005?
A. The requirements of the position in May of 2005, I am not sure that -- the requirements of the position didn't particularly change in May of 2005. They were relatively the same.
The requirements of the position changed with the advertisement of the position as an SES. And that happened earlier than May 2005. May 2005 was a selection of someone to fill that advertisement.
Q. I understand. Did the requirements of the actual job of Director of OMS change after

Miss Murtagh Cooke left the position?
A. Yes.
Q. Well, how did the requirements of the job change?
A. The nature of the fundamental job that we spoke about earlier, the accident investigation, supervision of the office and the other functions remained the same. But as an SES-level employee, the position was now responsible for broader agency-wide planning and program development activity.
Q. Can you --
A. The position became part of the executive resource board.
Q. What is the implication of you said a broader responsibility planning and what?
A. Process development for the agency.
Q. Can you explain how the responsibilities changed as far as planning and process development?
The senior executive service member, the position, the person who holds that now is responsible for participating in agency-wide planning, program development and decision-making for agency activities



that may or may not impact the Office of Marine Safety.
Q. Can you give me an example of a program development that may or may not affect --
A. The development of a new philosophy regarding the NTSB training center and the development of a business plan for that training center was an activity that was executed by staff with the review of the executive resource board and under the direction of the executive resource board, which are the senior executives in the agency, the SES members of the agency.
Q. During Miss Murtagh Cooke's tenure did she have any involvement in any of the planning with regard to the academy?
A. She had involvement in development of specific courses dealing with marine issues, but not in the overall direction of the academy plan. It was the academy until 2006, so we've changed the name to the training center.
Q. I see. What actually is more time intensive, determining the philosophy of the academy



or planning classes?
A. In this particular circumstance, developing the philosophy of the training center.
Q. How so?
A. How so, because the training center in this particular example that I gave you is very heavily overseen by the congressional committees. And its development based on the direction we have been given by Congress is being done as a business model, which is not a common practice for the federal executives, especially at the NTSB. And we have had to heavily engage in developing a business model approach with a contracted vendor for this training center. So it has been very labor intensive.
Q. Okay. And how does that -- and is that one of its primary responsibilities? Is that -- if you were to rate that among Mr. Spencer's -- John Spencer's primary responsibilities, how does that fall, rank?
A. Well, the business plan for the training center was an example. You asked for an example, so I gave you that as an example. One of his primary



responsibilities is the overall leadership and management decisions for the agency at large. Yes.
Q. So he's become a quasi-chairperson?
A. No. No. The chairman of the agency is the chief executive officer.
Q. Okay.
A. I would be, for example, the chief operating officer as the Managing Director.
Q. Okay.
A. But the senior executives in the agency at the senior executive service level convene as the executive resource board to evaluate and make decisions on planning and programming development and process development for the agency at large.
Q. Is that the only change in the requirements of the job since Mr. Spencer's taken the position?
A. That is the primary difference between that job as an SES level and that job as a 15 level. That's the primary difference. Mr. Spencer was given some direction by me about what to focus on in the position when he came on board. But their focus -- their issues are focusing on the primary

responsibilities of the office.
Q. Those would be the same requirements of the job that Miss Murtagh Cooke got?
A. Yes.
Q. I see. What percentage of Mr. Spencer's work is evaluating planning and program development for the agency?
A. I would think probably ten to fifteen percent maybe.
Q. When you say maybe?
A. Roughly.
Q. Could it be less?
A. No. It's about 10 to 15 percent. The Executive Resources Board, executive committee meets every week. The Executive Resources Board meets every quarter.
We have over the last year put in play a comprehensive strategic plan, and the guidelines for operating the plans, the guidelines for performance management. We have established a number of policies and operational bulletins from the committee on performance management, so, 10 to 15 percent.



Q. And was Miss Murtagh Cooke ever involved in any of those duties or requirements during her tenure?
A. No.
Q. She was never consulted as to planning and program development for the agency?
A. She may have been asked for input, but not as a comprehensive part of a executive resource board. There are a number of organizational units, some at the 15 level leadership and some subordinate to that that are requested for input into different products and activities of the board.
Q. I see. And was Miss Murtagh Cooke's -- was her input sought during her tenure as director of OMS?
A. I believe so. I believe that she was requested to provide input for a number of things, the agency's annual report, as were all the officers. A strategic plan that was developed I think in 2000 asked for some input specific to her.
When we go through our reauthorization every several years, each of the modal office directors are asked for their input and ideas on authorization language, and same thing for



appropriations and budgets, very standard.
Q. I see. Who is Bob Macintosh?
A. Bob Macintosh is the senior level employee in the Office of Aviation Safety responsible primarily for international activity within that office.
Q. And when was his tenure as a senior level international person?
A. I'm not going to give you exact dates because I can't recite them, but he has been involved in the international activity for over a decade in the office. And he moved from a GS-15 position to an SL position somewhere around 2000, thereabouts.
Q. Okay.
A. I am not sure that's exactly right. It may be 2001, it maybe 1999.
Q. And what about Mr. Haueter, what was his grade?
A. Mr. Macintosh or Mr. Haueter prior to becoming Deputy Director of the Office of Aviation Safety was the division chief for major investigations at the 15 level. When he assumed the duties of Deputy Director, I am not exactly certain.



He's had -- he's been the Deputy Director for some time.
Q. Is he still?
A. No. Now he is the director of the Office of Aviation and Safety.
Q. When he was the Deputy Director was he a senior executive or was he a GS-15?
A. No. He was a senior executive.
Q. I see. Between 1997 and 2005, do you know how much Mr. Haueter and Mr. Macintosh were paid as a senior executive for Mr. Haueter and senior level for Mr. Macintosh?
A. I would have to refer to the pay tables to give you the answer to that, what their salaries were on any given year. They were different each year between '97 and 2005. And I don't know the specific values of those differences.
Q. Where are the pay tables? Can you describe those documents for me, sir?
A. Well, I believe that we have provided you with some of that information as far as pay for those individuals. But there are no pay tables that I can

call up on a computer. It is the pay records and the personnel action records in their OPF, in their official personnel files because is where we gain that information.

Q. I see. I don't believe that I actually have that for Mr. Haueter and Mr. Macintosh.

A. Okay.

Q. Was the -- were Mr. Macintosh and Mr. Haueter paid more than Ms. Murtagh Cooke during from -- during their tenure?

A. Without looking at it directly to compare it, I can't tell you whether they were or were not. I can tell you that Mr. Macintosh and Mr. Haueter were paid less than the director of the Office of Aviation Safety.

In their relationship with Miss Murtagh's salary, I don't know. I'd have to see the match up year to year.

Q. Okay. Can you describe the primary duties required of Mr. Macintosh?

A. Mr. Macintosh primary duties are to coordinate our international accident -- aviation



accident investigation activity with foreign governments and within the parameters of the international treaty. He is the -- whereas our Director of Office of Aviation Safety is the primary representative for that international treaty on accident investigation, that component of the ICAO treaty that I spoke about earlier.

Mr. Macintosh is the operational leader of the that group. He is responsible for crafting language and for monitoring and the working group level activity involved with Annex 13. His primary responsibility is, however, the coordination of the NTSB's role and activity regarding international aviation accident investigation.

Q. And what does that involve?

A. It involves coordinating each of our international launches with the host countries and a number of other countries. For example, if you have -- if we have a Airbus aircraft with General Electric engines crash in Slovenia, he is responsible for coordinating the NTSB's activity and entry into the investigation with not only the U.S. State



Department but the Slovenian government, with the French and the EU who manufacture the Airbus aircraft, with General Electric, our U.S. manufacturer of the engines, and with the carrier, wherever that carrier may be from.

He is responsible for all of the diplomacy and negotiation and organizational development that goes with each of those investigations as they come up.

Q. Does he have hiring -- is he authorized to hire and promote and to discipline and terminate personnel?

A. No.

Q. Does he have budgetary responsibilities?

A. I don't believe so.

Q. Does he have -- does he draft reports?

A. He does draft reports. He does draft reports to the international committees, the ICAO and the ISASI committee. ISASI is the International Air Safety Investigators Society, I think. I don't think I got that right. But he drafts that language.

He does not generally write major accident



investigation reports. In an SL position, our SL positions like most of the federal government are not generally supervisory employees, although they may have some minor supervisory responsibilities. The SL positions are reserved for discrete technical competencies.

Q. What is Mr. Macintosh's discrete technical skills?

A. International relations.

Q. He has some unique ability in international relations?

A. He has very unique abilities in the international relations. He has not only worked for the state departments in a variety of different embassies over the years, he had previously been the flight safety director for Saudi Arabian Airlines. He was a retired Air Force officer, a pilot. He speaks several different languages.

He is a charter member of many of the international organizations and is internationally renowned for his work in aviation safety.

Q. And does he have any -- does he do any work

Page 146

with congressional staff?
A. He does. He does. Especially when it comes to the international accident investigation activity that is going on. Most notably and recently you may know about the Brazilian accident with the Canadian RJ that crashed into a Brazilian 737, and the difficult diplomatic situation, and our entry into that investigation. And he frequently communicated with not only the State Department but interested congressional players as well.
Q. What kind of education does he need to do his job, anything specific?
A. He does. He's not -- in the GS level you have to have a discrete technical job to have an educational requirement. You must be a licensed engineer or an attorney or something like that. For the SL positions you must demonstrate a very discrete technical competencies. Usually, although not always, there are educational components to that.
Now, Mr. Macintosh is a pilot. He holds a master's degree in aviation. I think it is aeronautical engineering, but I am not certain. He

Page 147

has educational skills and a number of different languages.
He is a graduate of the State Department diplomacy courses and the program at the State Department. And then his experiences provide him the rest of the background he needs for that position.
Q. What kind of working conditions does his job involve?
A. Relatively frequent travel to occasionally the scene of accidents. However, generally the on-scene investigation portion is conducted by others, but more often to attend diplomatic like negotiations or meetings with foreign governments and investigative bodies to work our issues in and our differences sometimes in international accident investigations.
The majority of the rest of his work is office level work and coordination with the Hill and State Department here in DC.
Q. I see. How frequently does he travel?
A. I don't think that I have a specific answer for that, but he travels eight or nine times a year.
Q. For how long?

Page 148

A. Maybe more. For a week or two at a time, a week at a time. It depends.
Q. As far as Mr. Haueter's duties what would you say is his least important duty?
A. The least important duty?
Q. Yes.
A. I don't know. I don't know. Drilling down to a specific duty is -- I'm sure there are some mundane and boring duties that he performs that are not critical to the organization necessarily but still required nonetheless. I don't know that I can answer that. I don't know how to answer that.
Q. Okay.
A. If he's doing something that's not important, he shouldn't be doing it. I think everything that he does is important.
Q. Well, let's see. He's a chief advisor to the director. He has operational management skill -- responsibilities for investigations?
A. Yes.
Q. He handles the press, works with the press and the Office of Public Affairs with regard to the

Page 149

press, and handles major investigations. Which of these is the least important?
A. I think that the least important within that group would be after he hands off the investigations to the office director, he no longer has much of a responsibility to carry the report through to the board as far as representing the report and championing the report with the board. That's the director's responsibility.
Q. Okay. So the group goes out to the field. I think you called that a launch?
A. Launch. Right.
Q. You launch in the field. The investigation is underway. And then they come back at some point?
A. Um-hmm.
Q. And start writing. When they start writing the facts, the analysis, is that when he hands it off?
A. No.
Q. Or is it before?
A. He generally hands it off -- and it's not a I've done it here and now I hand it off to you. The director has a lot of concurrent work going on. The

director is always involved and always aware of the development of their reports.
But once that report is complete at his level in draft, and the director is satisfied with the draft report, he then hands off the responsibility of taking that report to the board to the director.
Q. I see. Before you had stated that the volume of accidents in aviation, can you describe for me what you mean by volume? Do you mean quantity or the size of the accident?
A. Both.
Q. Okay.
A. Quantity -- since we are responsible for investigating every aviation fatality, we get notifications on every single accident, and we have to do something about it. And then the size of the major aviation accident reports is not comparable to the other modes.
Q. I see. But there's more people working on the project along the way?
A. Yes.
Q. Thank you. To what extent is -- you had



said before that aviation is the largest division, then highway?
A. No. Then rail.
Q. Then rail?
A. The combined group of rail pipeline and hazardous materials.
Q. Aviation, rail pipeline and hazardous materials, highway and then --
A. And then marine.
Q. And then marine all have different numbers of employees. Am I correct?
A. Correct.
Q. I see. And to what extent is it possible -- is a division more capable of producing more reports because it has more employees?
A. That's not an easy question to answer because the complexity of each investigation is different. There is no cookie cutter investigation. They all are different.
If you are involved in recovering wreckage from under -- from the bottom of the Atlantic versus a railroad derailment in a yard, the nature of those two



activities is vastly different.
So the staff applied are enormously different. I believe that the deployment of resources against the different modal operations in the agency reflect the nature of the requirements of those different divisions. Aviation has to investigate all of the accidents that occur.
Rail pipeline hazardous materials, a combined group, has to investigate most passenger train derailments, most significant environmental pollution activities, most excavation pipeline explosions. The highway group investigates accidents that it select so it can balance resources a little better, but it selects accidents in a whole bunch of different areas.
Highway vehicles, bridges, trucks, buses, there's lots of different venues that it is -- a pedestrian's, motor cycles, there's lots of different venues. So it has to have sufficient resources to address all of that myriad of the environment. And marine investigates major marine casualties.
So the deployment of resources is



reflective of the nature of the mandate for the offices.
Q. So when you say the marine investigates marine casualties, it's not marine -- if no one dies, does that mean the marine doesn't investigate?
A. No. The marine casualty is a more generic term. It's not a personal casualty, it's not a death, necessarily, although six fatalities is one of the bright line score measures. But at also significant damage, like an Exxon Valdez, nobody died in Exxon Valdez, or significant damage to property, the vessels.
It's been a long time since we've had a couple of ships run into each other, but back in the '80s we had the Eisenhower and a freighter run into each other in Newport News, significant -- nobody died but significant damage to the vessels. And then finally the potential for catastrophic consequences.
This latest cruise ship accident in Alaska that you may have read about, no fatalities. But the potential for a cruise ship in Alaskan waters running aground on hull, creating a hole in the hull are

Page 154

potentially catastrophic. So we will look at that.
Q. And as far as international investigations, for example, wasn't there an instance where Miss Murtagh Cooke had to conduct an investigation of a submarine hitting a Japanese fishing boat?
A. Um-hmm. That was U.S. Navy submarine that surfaced underneath a Japanese fishing both in U.S. territorial waters. That's the Safety Board's entry into that investigation.
Q. Can you repeat that standard again? What kind of waters?
A. It was in U.S. territorial waters.
Q. Didn't that occur in Japan though?
A. No. It occurred in Hawaii within sight of Diamond Head.
Q. I see.
A. The navy ship the U.S.S. Greenville was conducting a demonstration right off of Pearl Harbor and came up under the Japanese vessel.
Q. I see. You had mentioned a variety of topics that the Office of Marine Safety investigates. Can you -- I believe you said it was catastrophic, but

Page 155

it's hulling, it's environmental, it's of course if there's any threat of injury to --
A. Well, it's not hulling. It's damage to -- there's a bright line score of damage, if there is significant damage to property. That could also -- that doesn't necessarily mean the ship, but it usually does. It could be a ship.
I believe that the safety board conducted an investigation of a Chinese freighter that ran into the pier in New Orleans where the New Orleans mall was or is, and there was significant damage to the dock and the pier and so on, although I think the ship faired fairly well in that collision; so significant property damage.
Q. Okay. So we have significant damage, environmental?
A. Environmental.
Q. What else, sir?
A. Loss of life.
Q. Anything else?
A. Primarily potential, the potential for a catastrophic consequence.

Page 156

Q. And how do you describe a catastrophic consequence?
A. A fire aboard a cruise ship has the potential. We've investigated several of those, although they did not and do not normally -- the ones that we've investigated have not resulted in significant deaths. And the fires for the most part have been extinguished without catastrophic damage to the ships. The potential for a fire on a cruise ship, the potential for death and injury is high.
Q. I see. And are there any others than those? It's the bright -- significant damage to property, environmental, loss of life, potential for catastrophic. Any others?
A. Those are the broad categories. I'd have to look at the MOU and the Act, our legislative authority, to make sure that I covered it all. The Safety Board has looked at in the past collections, a few collections of investigations like personal water craft where there's maybe one death or two deaths on a small insignificant vessel like a jet ski. But we've looked at a series of those accidents.

Page 157

We've also looked at boating-while-intoxicated issues which is quite frankly the biggest personal water craft issue in the U.S, just like drunk driving.
Q. Sure.
A. Yeah.
Q. And has Miss Murtagh -- was Miss Murtagh Cooke involved in investigation of the series of personal water craft investigations?
A. She was.
Q. She was? Are there other -- and for example in the Office of Highway Safety, are there other topics outside of -- outside of investigation of highway accidents, you know, automobiles, bridges, railroad, rail lines?
A. Yes.
Q. What additional?
A. The Office of Highway Safety is far more frequent to find the investigators and program in the office investigating numerous accidents to support a -- in support of an issue. And over the last ten years or so, the office has investigated maybe a dozen

Page 158

of these bus crash worthiness, the consequences of cross-border motor carrier operations between Mexico and the United States, truck driver fatigue, transit coach, transit bus operations, motorcycle safety,
Q. Can you tell me about the personal water craft research that the Office of Marine Safety was involved in during Miss Murtagh Cooke's tenure?
A. I can tell you briefly that it was a collection of some accident investigations and a review of data that existed from the Coast Guard files, and also review of the laws that govern personal water crafts. And a report was crafted in collaboration with the Office of Research and Engineering.
Q. And was that a delegated report or was that a board report?
A. No, that was a board report.
Q. Was Miss Murtagh Cooke involved in that?
A. Yes. Yes.
Q. And aside from personal water craft and intoxicated boating, are there any other topics that Miss Murtagh Cooke was involved in as the Director of

Page 159

Marine Safety?
A. Those are the two that I recall. There may be another but, now, when you say topics, every investigation has topics.
Q. Sure.
A. But as a collection, or a collection or focused activity, either a collection of investigation or a focused research activity, those are the two that I recall.
Q. And for the collected research activities in Office of Highway Safety, for the issue topics like the buses, the cross-border transit, the truck fatigue, transit bus operators and motorcycle safety, are those reports prepared by the director?
A. They are prepared by the Office of Highway Safety in the same process concept as major investigation reports in which once the investigations and research are complete, a report is drafted. That draft report is managed by the office director of Highway Safety, reviewed, and ultimately presented to the other directors as a draft for the board.
Q. I see. And how is the work delegated on

Page 160

those issue reports? Is it delegated by the director?
A. A delegated for the most part by the office director. Yes.
Q. For the most part. Is there another aspect to it?
A. It's a little different depending. Over the last ten years or so, the board members have occasionally asked for a particular study to be accomplished on a particular topic. I think boating while intoxicated was one of those directed by the board.
Most of the ones that I mentioned to you for highway safety were organized and originated within the Office of Highway Safety. They were not directed by the board. There have been a couple directed by the board, one on school bus safety, and one on railroad grade crossings.
Those were ones in which the board asked the Office of Highway Safety to conduct a study.
Q. And the personal water craft report that originated out of the Office of Marine Safety?
A. I don't recall. I'm not sure. It's one of

Page 161

those two places.
Q. I see.
A. Came from direction from the board or the origin of it was within the Office of Marine Safety and probably also the Office of Research and Engineering.
Q. Any there any other modal offices involved in any of the issue reports by the Office of Highway Safety?
A. For the railroad grade crossing report the railroad group within the railroad pipeline has its material office, was involved in the collection of information, although the crafting of the report was done by the Office of Highway Safety. And the Office of Research and Engineering which is involved in most of our investigations and most of our -- regardless of mode, most of our studies or safety reports is almost always involved in one way or another.
Q. I see. In 2003 was Miss Murtagh Cooke the lowest paid director of a modal office?
A. I believe the answer to that is yes.
Q. And in 2004 was she the lowest paid

Page 162

director of a modal office?
A. I believe that is also yes.
Q. And for the period that she was a director of a modal office in 2005, was she the lowest paid director?
A. No, not exactly. I was appointed to Managing Director in March. Ms. Murtagh was still the marine director between March and May. And in the interim there was a new office director and highway safety was paid substantially less than Miss Murtagh.
Q. Who is that person?
A. Bruce Magladry.
Q. And did Mr. Magladry ever get a pay raise in response to his promotion?
A. Mr. Magladry, in 2006 the agency advertised that position at the SES level. He had been a 15. He had to apply and compete and was selected for that position. And that is when he received a pay raise from the GS-15 to the SES.
Q. And when he overtook the position of -- your position as Director of Highway Safety?
A. Yes.

Page 163

Q. Did the requirements of the position and the efforts and the skills, did they change because it went down to a GS-15?
A. They did.
Q. They did?
A. They did. He was no longer, as I was as an SES director for the Office of Highway Safety, I was involved with the executive resource board. I was involved in agency-wide strategic planning and policy decisions. He was not included in those discussions. He is now that he is an SES employee, but he was not as a GS-15 employee.
Q. And what percentage of Mr. Magladry's time became involvement in planning and policy for the executive board?
A. About ten to fifteen percent of his time as an SES employee is now involved in the executive board work and policy decisions of the agency.
Q. I see. You had said that at some point during Miss Murtagh Cooke's tenure that there was, actually, I'll come back to that topic.
Question for you, sir. Why was

Page 164

Miss Murtagh Cooke paid less than the other modal directors during her tenure from -- during from 2003 through 2005?
A. The understanding or the issue is one of SES billet deployments. And I'll go back to that in a second. In 1997, '98, when the reorganization of the former Office of Surface Transportation occurred, four new groups were evolved from that.
Q. I understand.
A. The four divisions. And pipeline and rail were segregated at that time. The agency began an attempt to acquire additional SES positions.
The two SES members who had been the director and Deputy Director of the Office of Surface Transportation were still occupying the SES billets that they had previously had. And the agency attempted through OPM, you have to make a request through OPM to get more assigned billets.
Each year the agency requested more billets. We were not given the billets. And the requests were made with the intention of making the office directors for Rail and Pipeline and Highway and

Page 165

Marine, eligible for the SES, once the billets were distributed from OPM, from the Office of Personnel Management.
We had some difficulty obtaining -- the agency had some difficulty obtaining those additional billets. They just weren't approved by OPM. You can't just give them out.
And finally in 2002, one billet became available. And that billet was assigned to what at that time had been the combined Office of Rail Pipeline and Hazardous Material. Between '97 and 2002, and I think nearer 2000, maybe 2001, those two offices were put together. The railroad director left, was reassigned, and the two were combined.
Because the -- that office had the most complicated assignment and was the largest of the groups at the time, and the SES billet was assigned to the Office of Railroad Safety. Following 2002, the agency continued to try to gain additional SES billets from OPM and were unable to. But through transfer of some individuals from the SES to the SL, and the departure of other individuals who were occupying SES

Page 166

billets, some billets became available. And the Managing Director and chairman reassigned those as they became available to next the Office of Highway Safety and then finally the Office of Marine Safety.

And when I mean they were assigned those, the jobs were advertised then as SES with full competition. And the incumbents, the people who held those jobs at the 15 level and others were -- applied for those positions and selected.

Q. What year did the Office of Highway Safety get its SES?

A. The advertisement went out late in 2003. And I was selected for that position and I obtained my SES in 2004. The process is a little lengthy to get it through OPM.

Q. Okay. Describe how did your responsibilities change when you went from GS-15 to SES then?

A. I held all the same GS-15 responsibilities plus the added responsibility of agency-wide policy and process and planning implementation. I became a member of the Executive Resources Board. I was

Page 167

assigned quite frankly several new responsibilities including I became the cochair of the labor management partnership for the agency. I also was put temporarily in charge of our Human Resources office when we -- our Human Resources director left.

I was -- I was a caretaker so to speak of the HR function for awhile. These are the kinds of assignments that the SES members within the agency and Executive Resource Board can occasionally look forward to or not look forward to, depending on the assignment.

Q. How long were you the manager of HR or the head of HR?

A. About six to eight months.

Q. Six to eighth months. And what percentage of the time did that take?

A. It unfortunately took nearly 40 or 50 percent of my time until a new HR director was found.

Q. And what happened to your highway safety responsibilities during that time?

A. I continued to do the highway safety responsibilities. Truth is I worked very, very hard

Page 168

and many hours and over the weekend to do both jobs. And I delegated some of that to my GS-15 deputy.

Q. And who was your GS-15 deputy?

A. Bruce Magladry?

Q. And what did you delegate to him during that 6-months period?

A. I did not delegate the development of the report activity which I saw as a crucial component and one that I personally was able to influence in a very positive way. I delegated mostly administrative functions to him that I was otherwise doing myself.

Q. What were those administrative functions?

A. It ran the gamut from procurement to contracting to database management, coordination with our safety recommendation office, those kinds of activities.

Q. So why is it -- what I am not understanding, sir, is why is it that the only way -- I guess let me see if I can -- it's not clear to me that the only way to make up the difference in salary between equal jobs is the employment of an SES. Are there other means of making up the difference in

Page 169

salary between Miss Murtagh Cooke and the other modal directors?

A. Not particularly. The rules that govern salary are prescribed by the Office of Personnel Management, not by the agency. At the 15 level, as you well know, there are 10 steps. And within those steps there are time restrictions. We must be in -- there's three different categories of that. You must be in your position at a particular step for a certain amount of time before you can go to the next step. And your salary is set based on that scale.

At the SES level, it is now and was through most of 2000 a range that salaries could be set by in our case at the safety board, the chairman. And that range is also set by OPM, not by the agency. So the ranges of salaries and the opportunities are different between the 15 and the SES.

There are other salary activities, but they are not intended to be augmentations of pay. If you are a GS-15 step 10 employee, which is your highest GS-15 that you can be, you can receive a bonus at the end of the year. But that bonus has to be based on

your performance during the year. It is not permissible to give a bonus to augment a salary or to offset a salary that someone feels should be paid.

So once you reach that 15-10 step level, there are some other ways to get performance bonuses. But there is no other way to get necessarily greater salary in a very standard way.

Q. In 2005, other than Mr. Magladry, was as far as until March when Mr. Magladry took your position was Miss Murtagh Cooke the lowest paid director of a modal office?

A. I believe so. Yes.

Q. Okay. And who can apply -- I guess the question is if you are not a GS 15-10, level 10, and you are lower than that, what other means are there for you to obtain salary that makes your pay commensurate with the other -- the work of your counterparts who are directors of modal offices?

MS. COHEN: Objection. Asking for a legal conclusion.

A. There are some salary caps placed by regulation by OPM that you are only permitted to make



so much money when you are a 15-10 employee. We occasionally find that our employees reach that cap easily when they are 15-level employees and they go to accidents and are eligible for overtime, because they can't collect the overtime because they are -- they hit the ceiling set by OPM. And I can't tell you exactly what that ceiling level is, but it's very close to the 15-10.

Our 14-level employees who investigate accidents can collect overtime. And they can make more money in salary by picking up overtime. Our 15-10 level employees have a very difficult time getting overtime because they are already at the ceiling. OPM sets that, not the NTSB.

Q. What if you are not a 15-10? What if you are a 15-8 or a 15-9?

A. You can -- you are potentially eligible in the grade to collect overtime and get to that ceiling. However, for office directors at the agency, at the NTSB, it was never -- it was always understood by the office directors that overtime was not eligible for the office directors, for the managers.



Q. When you say it was understood, what was the understanding?

A. There's not a written document that says that. Fifteens are eligible for overtime in the federal system, considering that ceiling that I talked about. But at the NTSB the general understanding among the managers in conversations with the Managing Director and Chairman and various chairmen and various managing directors was that the office directors were not expected to apply for overtime.

Q. When you said there were -- the conversations, what conversations are you talking about?

A. Discussions about grade and positions.

Q. Are these discussions that you had?

A. Discussions that I had, yes.

Q. And who did you have -- which other GS-15 employees, management employees did you have discussions with about the unavailability of --

A. Frequently these discussions were held in groups. They included Miss Murtagh and many of the other 15-level employees including Mr. Chipkevich and



others, primarily as a byproduct of new authority that the NTSB gained. I'll give you a very brief background.

GS employees in the federal government are permitted to receive overtime pay once it's approved, once you are approved for overtime which you are allowed to work if you get your supervisor's approval at is GS-10 step level. Many of our employees are above that pay. So for this agency, for the NTSB there was great consternation by many of our employees that if they worked overtime, they would actually get paid less.

So the agency worked very hard to seek what is only usually permissible for law enforcement in the federal government, and that is true time and a half. We got that authority '99 or 2000, thereabouts. And in the discussions on how to apply that authority, what the parameters would be, how we would calculate it, how the money would be distributed, how we would as an agency manage that true time-and-a-half, and what confinements would be on it, it was openly discussed that the managers were not going to be

eligible for overtime.
Q. And you said Miss Murtagh Cooke was present at those meetings?
A. Yes.
Q. Can you tell me the dates of those meetings?
A. There are many that involve the development of the policy regarding true overtime. I don't have the specific dates.
Q. Well, were they in 2003?
A. I'd have to look back. My memory's not that good. I would have to look back on when we got the authority. But they were within the six- to eight-month period after the authority was granted to the NTSB.
Q. When was it granted to the NTSB again?
A. I am thinking 2001, maybe 2002.
Q. Are you aware of any GS-15 level 9s who received level 8s or 9s that received overtime?
MS. SILBAUGH: I am sorry. I didn't hear it, nonsupervisors that did or could you repeat your question?



Q. Are you aware of any GS-15 level 8 or level 9 employees who received overtime pay?
A. Yes. Nonsupervisory GS-15 employees who responded to accidents, I know of some that received overtime pay, some that worked for me in the Office of Highway Safety, but not very much because they quickly ran into the ceiling.
Q. Describe the ceiling again.
A. It is a salary cap set by the Office of Personnel Management that says you may not make more than X as a GS employee. A similar cap exists for the SES employees.
Q. Do you remember how many meetings there were about this issue?
A. There were at least a half dozen. There were many meetings about the overtime issue because it was a new authority and we were discussing the impact of time-and-a-half pay on the budget and on the operations of each individual office.
Q. I see.
A. Ultimately we established a policy for the eligibility of overtime, of true overtime.



Q. And is this policy written anywhere?
A. Yes.
Q. And where is it?
A. Well, the policy has changed once. It is currently on an operations bulletin. But the policy originally limited true overtime to 40 hours for an individual on an accident. And it was accident based. Twenty hours on a major investigation, 20 hours for a lesser than major -- a regional investigation.
And with the caveat that there is an OPM ceiling in there, you can't go past that ceiling. We did that because we were only allocated X -- $900,000 to pay true overtime for the agency. And we thought originally that we were going to go past that if we allowed it to be open-ended.
We discovered as we grew -- as our experience grew with overtime that we weren't going to go past that allocation. So we eliminated the 40- and the 20-hour rules. So our investigators when they go out to an accident, if they have to work over a two-week period 60 hours of overtime, they can collect 60 hours of overtime pay, if they are eligible to do



it by OPM rules.
Q. I see. That's if you go to an accident. You also said if you are writing a major report?
A. No, the true overtime -- we have two rules, true overtime and regular overtime. True overtime is for accident investigation activity on scene. Travel ing the accident, being out on the scene, conducting on-scene testing, that kind of activity.
Regular overtime is eligible for time over your 40-hour week, scheduled work for other purposes, including report writing or budget development or whatever that purpose may be. You are potentially as a GS employee eligible for regular overtime.
Q. For regular overtime, it's report writing, budget?
A. Anything else.
Q. Anything else?
A. Anything non-accident investigation.
Q. And --
A. On-scene accident investigation.
Q. And who is eligible for regular overtime?
A. All GS employees except for the supervisory

Page 178

employees.

Q. And where is it determined that only supervisory employees are not entitled to regular overtime?

A. I don't believe that that's written anywhere. That was an understanding from the meetings that occurred.

Q. I see.

A. The OPM rules say essentially that employees at the GS level are eligible within the parameters of the overtime rules.

Q. And are you aware of any GS-15 level 8s or 9s that were -- that ever obtained regular overtime for report writing, budget or any other type of work over 40 hours?

A. I'm aware of GS-15 employees receiving true overtime. I am not aware of GS-15 employees, nonsupervisory employees receiving regular overtime, but it may have happened. And I'm not aware of GS-15 supervisory employees receiving either.

Q. Are you aware of any requests for it other than by Miss Murtagh Cooke?

Page 179

A. I am not aware that any of the supervisory employees made requests or submitted requests for overtime.

Q. Is there a requirement that you submit a request for overtime?

A. Absolutely. Overtime must be approved in advance by your supervisor regardless of your grade. And then you must submit a record, a request for payment for that overtime.

Q. Where is it required that you must get prior approval from your supervisor?

A. Well, that is in the board order or the operational bulletin about overtime. It's also required in the OPM rules.

Q. Okay. Where is the -- describe to me the operations bulletin. Where is it? When was it updated? When was the initial I guess format of it and when was it updated?

A. Well, there was an -- operations bulletin is a relatively new term that appears now, since I have had this position. Prior to that it was agency policy documents or board orders. And the agency has

Page 180

always had a policy document regarding overtime throughout the '90s.

That policy document generally came out with the budget requirements to the managers. As we gained the authority for true overtime, the agency created a policy document for true overtime and for regular overtime. And ultimately now that exists as an operations bulletin.

It has been modified a couple of times over the years, but I can tell you that gaining your supervisor's approval has always been in there because it is part of the OPM requirements.

Q. And how would a person who's at a GS-15 level get -- who's in charge of a modal office get supervisory approval for overtime?

A. If a GS-15 in charge of modal offices wanted -- modal office wanted to request overtime, they would have to make that request to the Managing Director. And if approved, then they would have to submit essentially a claim for the overtime.

Q. Does everyone -- who knows about this policy and how it works?

Page 181

A. About the overtime policy?

Q. Yes.

A. All of the employees.

Q. What about management, upper-level management?

A. All the management. All the management know it. Believe me. Not all the policies of the agency are well-known to all the employees, but they definitely understand the overtime and pay policies.

Q. I see. So as a GS-15 level 9, how much overtime would Miss Murtagh Cooke be entitled to receive?

A. I'd have to calculate the value. But first of all, I would caveat that with saying that as I understood it and as the agency managers understood it, she was not entitled to overtime because she was an officer at the 15 level. She was a supervisory 15.

But had the agency granted her overtime, there would have been a dollar value between the nine and that ceiling from OPM. And that's year dependent.

Q. But that management level prohibition is an unwritten rule?

A. Yeah.
Q. I see.
- - -
(Discussion off the Record)
- - -
MR. LOWINGER: I'm entertaining keeping this open beyond today for all the topics because of the amount of time that it's taking to get through the first question. And I'm going to reserve that right.
MS. COHEN: You have a seven-hour limit. And we will not agree to extending that limit. Obviously you have the option of moving the Court for an extension.
MR. LOWINGER: Sure.
MS. COHEN: But we would not --
MR. LOWINGER: I believe the notice says it's day-to-day until complete.
MS. COHEN: Complete meaning seven hours, because that's your limit. If we don't have time to go the full 6 hours 15 minutes today, since you are reserving for the IT, then we can go -- you would be able to go another day. But if we do the full 6 hours



and 15 minutes today, we will not agree to additional time.
MR. LOWINGER: I see. All right. We'll take a break.
- - -
(Recessed at 3:11 p.m.)
(Reconvened at 3:23 p.m.)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, are you aware of any communications or documents related to Miss Murtagh Cooke's pay and the lack of equal pay to her male counterparts running modal offices?
A. I am aware that Miss Cooke had a conversation with our then chairman, Alan Engleman Connors, about overtime pay. In May of 2005, after I notified her that she was not selected for the SES position in the Office of Marine Safety, she indicated to me that she was interested in receiving equitable pay to an SES. Those are the only two that I am aware of.
Q. Are you aware of any documents or are you



aware of any documents that compare the payment of Miss -- of all the modal office directors from year to year when deciding policy issues or budgeting for pay issues or anything to that effect?
A. Not for -- I'm confused by your question.
Q. I understand. Prior to Miss Engleman, the conversation with, well, aside from the conversation with Engleman, Connors and your meeting in May 2005, were you ever aware that Miss Murtagh Cooke was paid less than the other modal directors?
A. No. No. I was not aware of the salary level of Miss Murtagh's pay while I was the Director of Highway Safety.
Q. Okay. But what about the agency? Is there any -- I'm not asking you in your individual capacity. I'm asking you as a representative of the agency.
A. Yes.
Q. As a representative of the agency, are you aware of any other documentation that indicates the level of pay of Miss Murtagh Cooke and the other modal officers?
A. I think I understand your question. I'm



not aware that there was ever a comparison made between SES employee modal directors and non SES employee modal directors, GS-15 directors. Within the SES, the pay and bonus pool is -- the SES members are combined onto a single document regarding their pay and their bonus, opportunities for bonuses, but that's exclusive to the SES employees. That comparison is made between the SES employees.
The GS level employees are paid at the rate that is commensurate with their grade and step. And that grade and step pay rate is prescribed by OPM or OMB. OMB, the Office of Management and Budget and OPM.
Q. What about performance bonuses at the end of the year for Miss Murtagh Cooke at a GS-15?
A. Performance bonuses are up to the supervisor based on a prescribed percentage based on the -- for the GS employees based on the rating. There are five possible ratings, outstanding, excellent, fully successful, minimally successful and unsatisfactory. There are percentage of salary possibilities for bonuses available to those who rate

excellent and outstanding.
And the supervisors can choose within that range for bonuses or occasionally alternatives. Occasionally office supervisors can award a GS employee a step increase in lieu of a bonus. It's called a -- it's getting late in the day -- a -- it's a step increase in between the time that the normal cycle would happen.
Q. I see. Was Miss Murtagh Cooke ever considered for a step increase in that scenario in between during the interim period of the normal cycle?
A. During what time frame?
Q. Between 2003 and 2005?
A. No. I don't believe so.
Q. At any time while she was the director of OMS was she considered for an interim step increase?
A. She did receive several interim step increases. I believe that they were the byproduct of the cyclical increase that I mentioned.
GS employees have ten steps, regardless of the grade. For the first four steps, one through four, there's a one-year waiting period, five through



seven, a two-year waiting period, eight through ten, a three-year waiting period between steps. And when that waiting period expires, there's an automatic form that is generated for the supervisor that says this employee is now eligible. Do you want to approve a step increase for them.
And more often than not, supervisors have endorsed that step increase and the employee receives a step increase.
Q. Are you aware of any instances where Miss Murtagh Cooke was not granted the step increase?
A. No, I am not.
Q. Are you saying that she was always granted the step increase?
A. As far as I know.
Q. Is that because she was considered a good employee?
A. Step increases are generally denied for unsatisfactory performance.
Q. So --
A. So if your performance is satisfactory or greater, the step increase is almost always granted in



the cyclical way that they are produced.
Q. I see. Are you aware of -- I want to make sure I understand this, because it seems like the only way Miss Murtagh Cooke could have ever obtained pay equal to her male counterparts is by obtaining SES status. Is that your position, sir?
MS. COHEN: Objection. Asks for a legal conclusion.
A. The movement into the SES pay system was one of two ways that I know of to reach a higher grade than the GS schedule. The other way is to a retention allowance. And a retention allowance is only granted when the employee is going to leave the agency, leave the federal government, not the agency. And you must pay them more to retain them, or they have such a unique skill that it cannot be found -- it cannot be easily replaced.
Q. So the only other way of -- aside from SES, the only other way of Ms. Murtagh Cooke obtaining equal pay would have been through the retention allowance?
A. Yes. And Miss Murtagh would have had to



have come forward and said -- and demonstrate that I am being given a job offer at a higher salary outside of the government. And the agency would then have had to decide that it was absolutely necessary for the government to retain her and, therefore, try to keep her by giving her a retention allowance.
Or, and this would not have applied to Miss Cooke, the skill for the position was so necessary to the government that we could not easily replace the person if they left. That does not happen very often, the second.
Q. What is it about Miss Murtagh Cooke's skills that are not unique enough to receive the retention bonus?
A. Generally the test is that if you can put out a job announcement and receive candidates that are equally qualified and equally capable of doing the position, then it is not so unique a skill that the government can't replace the person.
Q. And what about -- is that the only standard?
A. No, that plus leaving the government. If,

Page 190

as I said, Miss Cooke -- or anyone would have to demonstrate that, one, they had a legitimate credible job offer from outside the government for a much higher salary than they were able to make at that time, and then the agency would have to make a determination that it was critical to the function of the agency -- critical to the government to hold on to this individual and offer them a higher salary. But the salary can't go past I think -- I think, I'm not sure but I think it's 20 percent of the salary. It may be 25.

Q. Okay. Is there any written rule about this retention policy?

A. Yes. There are retention policy guidelines put out by OPM. And there is an agency policy on retention which is almost a mirror image of the OPM guidelines.

Q. And when was the agency policy promulgated?

A. Retention policy has been there throughout the '90s and exists today. And I don't know how far back it went.

Q. Other than --

Page 191

A. Prior to the '90s.

Q. I apologize. And then the OPM guidance?

A. The OPM guidance has been with the personal management system of the federal government for decades.

Q. I see. And other than the retention allowance and bump to SES and overtime, what other mechanisms are there for obtaining more -- were there available for Ms. Murtagh Cooke to obtain additional money?

A. The only other mechanisms are bonuses and awards.

Q. What bonuses and awards were available to Miss Murtagh Cooke?

A. The agency has a menu of possible bonuses in the standard performance management system that we have. There are end-of-the-year bonuses. And I discussed that there are parameters, percentage parameters on the excellent and the outstanding rating.

And there are special act bonuses or awards. They are really not bonuses. Bonus is the

Page 192

wrong term. These are awards. The federal government doesn't give out bonuses. They give out awards.

And there is a special act award for discrete and definable projects, programs, particular events. And then the agency also has a third method, and that is the end-of-the-year agency-wide awards. There are I think seven or eight awards that are in very specific categories.

There is a chairman's award, a managing director's award, a regional investigator or regional employee award and several other technical awards, several other categories of awards that are spelled out in a board order who is eligible, how the nomination process works. The Executive Resource Board determines the award recipients or makes a recommendation to chairman on the award recipients. And that happens every year.

Those are really the three mechanisms for awards.

Q. So there's the special management policy? Is that what you said?

A. Special act.

Page 193

Q. Special act. There's the end-of-the-year agency-wide awards, and then what was the third?

A. And then the performance award. The end-of-the year performance awards.

Q. Are you aware whether Miss Murtagh Cooke ever received end-of-the-year performance awards?

A. Yes, she did.

Q. Are you aware whether she was ever considered for special act awards?

A. Specifically, I don't know. It would be in the records if she received a special act award.

Q. Would she have been eligible for one?

A. Yes.

Q. And who would have had to have nominated her for?

A. Her supervisor?

Q. And who would that have been between 2003 and 2005?

A. Between 2003 and '05 it would have been Dan Campbell.

Q. I see. And what are the standards for a special act award?

Page 194

A. A discrete activity and achievement that benefits the agency, the work in the agency. It is for a particular project activity, success, assignment.
Q. Are you aware of any other GS-15s who have ever received a special act award?
A. Yes.
Q. Is it common for a GS-15 to receive a special act award?
A. Special act awards are less common than performance awards. And they happen throughout the year rather than at the end of the rating cycle. They are not uncommon. They are not frequent but they are not uncommon.
Q. Why do you believe -- why would Dan Campbell have not granted Miss Murtagh Cooke any special act award?
A. She would need to have a discrete success or project that warranted consideration for award specific to that activity.
Q. I see. And is it the agency's position that she never performed such a discrete and

Page 195

meritorious act to warrant the special act award?
A. What time frame?
Q. Between 2003 and 2005?
A. Yes. She didn't -- as far as I know, she did not perform such a discrete success or act to warrant the recommendation for a special act award. Okay.
Q. Okay. And the performance awards are only based on the evaluations?
A. The performance awards are based on the end of the year evaluations. Yes.
Q. I see. Does a level of performance -- a series of performance awards indicate that the person is -- can you describe to me between 1997 and 2005 whether Miss Murtagh Cooke received a series of performance awards?
A. Miss Murtagh Cooke did receive performance awards during that time period. I think the specific amounts probably have been provided to you. I can't recite them for you.
She received end-of-the-year performance ratings. And with those ratings came commensurate

Page 196

awards, cash awards.
Q. So, and what about agency end-of-the-year awards, the agency-wide awards? Was Miss Murtagh Cooke eligible for those?
A. She was eligible for those, but again it was tradition that the office directors, if nominated for those awards, declined to participate.
Q. Where is this, when you say tradition?
A. It is -- I was nominated for the chairman's award one year. I asked that my name be withdrawn. Mr. Chipkevich was nominated for the award one year. He asked that his name be withdrawn. It was simply tradition.
I don't believe that Ms. Murtagh was nominated any year that I am aware of between 1997 and 2005, but traditionally the office directors would withdraw themselves from consideration.
Q. What year were you nominated, sir?
A. We have a record of it, but maybe 2001.
Q. And what year was Mr. Chipkevich nominated for?
A. 2003 maybe. I am not exactly sure of the

Page 197

dates.
Q. You said earlier that when a person goes from GS-15 to SES that that person obtains a new responsibility as member of the agency policy board?
A. Executive Resource Board.
Q. Executive Resource Board. Where is that requirement reflected?
A. In the operations bulletin that describes the Executive Resource Board responsibilities for the agency.
Q. I'm sorry. Could you repeat that again?
A. It's an operations bulletin that describes the Executive Resource Board responsibilities for the agency. Additionally, OPM has required agencies for at least the last ten years to maintain an Executive Resource Board comprised of senior-level executives.
Q. Is it only senior executives that participate in the executive board?
A. Yes. There's one advisor from our HR department who participates, but all of the members are the senior executive service directors.
Q. Are there any SL members?

Page 198

A. No. And the deputy directors are also not part of that board.

Q. Between 1997 and 2005 did Miss Murtagh Cooke receive favorable evaluations for her performance?

A. She received I believe excellence or outstanding evaluations.

Q. And nothing below that?

A. I don't believe so.

Q. And what is the equivalent? What does excellent signify?

A. In the federal system, fully successful is supposed to be average.

Q. I see.

A. You are doing -- essentially the definition is you are doing the job at the level you are being paid, good work. Excellent is you are doing better than the level you are being paid. And outstanding is you are head and shoulders above your counterparts.

Q. I see.

A. At the NTSB our balance is not quite at fully successful. It's more toward excellent. If you

Page 199

averaged out our ratings for employees, the majority of our employees are more towards excellent than fully successful.

Q. Why was Miss Murtagh Cooke never considered for -- why was Miss Murtagh Cooke never considered for an SES position between 1997 and 2005?

A. Well, Miss Murtagh Cooke was considered for the SES position in the competitive application process in 2004 and 2005. Prior to 2004, an SES billet had not been assigned to the Office of Marine and Safety, but that did not prevent Miss Cooke from competing for other SES billets either within the NTSB or anywhere else in the government.

Q. I see. Was an -- and between 1997 and 2005 why was the directorship of OMS not considered for SES?

A. I think I went over this already. It's reflected in my testimony. But in the reorganization that occurred 1997, 1998 time frame, these new offices were created with the expectation from both the office directors and from the chairman and the Managing Director that they would seek billets for the SES for

Page 200

these positions.

And they began a process of requesting through OPM additional billets in the SES to assign to those positions.

Q. But why would OMS be the last of all the modal offices to receive a billet?

A. Because the Office of Railroad, Pipeline and Hazardous Material and the Office of Highway Safety were both larger in size. They were -- both had regional operations. The Office of Railroad, Pipeline and Hazardous Material had multimodal internal functions in addition to multimodal external functions.

And the Office of Highway Safety had original component and safety report and safety study component that was not prevalent in the Office of Marine Safety. Size, scope, the cascade for the agency was what I told you before. Aviation, for size and scope; rail pipeline, hazardous material; highway; marine.

\- - -

(Discussion off the Record)

Page 201

\- - -

BY MR. LOWINGER:

Q. Can you describe the day-to-day primary duties of Mr. John Clark as the director of OAS between 1997 and 2005?

A. Well, I think other than putting a name to the position, I've described the day-to-day duties of the office director of aviation and safety already in some detail.

Q. I think so. Yes.

A. I am just putting a name to the position.

Q. Can you just verify that for me please, that we asked about the responsibilities of aviation safety?

\- - -

(Discussion off the Record)

\- - -

BY MR. LOWINGER:

Q. Can you describe the working conditions under which Miss Murtagh Cooke would have to have done her -- Miss Murtagh Cooke did her work from 1997 between 2005?

A. In 1997 the conditions changed for Miss Cooke and the other office directors as I testified.

Q. Yeah. I think I have that. I am sorry, sir. And as far as the -- okay. Going back to the interagency work, what about Miss -- you had said that there was an agreement between the Coast Guard and OMS or the agency in 2002. Who negotiated that?

A. Memorandum of Understanding that ultimately was concluded with the Coast Guard in 2002 was negotiated primarily by the Managing Director Dan Campbell with the assistance of Marjorie Murtagh, the Director of the Office of Marine Safety. It was difficult to achieve because there had been not-so-smooth relations between the Coast Guard and the NTSB since the mid '90s regarding accident investigation launches and primacy and who would have the lead. And it took some effort to negotiate a new MOU.

Our chairman was also involved in the final stages of the negotiation.

Q. When you said that there was a rough



relationship between the mid '90s and 2002, describe the rough relationship?

A. The basic mandate of the -- or legislative authority of the NTSB regarding marine safety has not changed in the last 25 years or so. The Coast Guard had primary responsibility for the investigation of marine accidents. Throughout the 1980s and the early '90s the relationship between the NTSB and the Coast Guard was pretty congenial.

Q. What was the period again?

A. Throughout the '80s, 1980 to maybe 1993 or '4 or '5, thereabouts was pretty solid. We would request to investigate. They would agree with the NTSB taking the lead. And there was not much difficulty in deciding who would be the primary investigative agency for the federal government.

In the mid '90s, that began to dissolve. My observations and what I note from the records of the NTSB is a lot of that had to do with personal interactions between the Coast Guard command structure and primarily the Director of the Office of Marine Safety at that time. They dissolved to a sufficient



place in the late '90s where we had open arguments about who was going to take the lead on particular investigations, which lead to the beginning of the development of an MOU.

Because up to that point it had been left to interpretation of the law, of the statute, who was going to actually take the lead. And if you take the -- the Coast Guard language and the NTSB statute language and compare them, it's difficult to determine who exactly is going to lead the investigation.

Q. And as a result of the MOU was that cleared up?

A. It had been cleared up to some degree. There's now a bright line score for a threshold, although what that score tells us to do, or tells the Coast Guard to do is once you have reached this calculated bright line score, we must notify the NTSB of the accident and inquire of them what they would like to do.

The NTSB then needs to make a decision on whether they want to lead the investigation, not lead the investigation but participate, or not participate



at all. There are really three choices. And communicate that decision back to the Coast Guard, and then the Coast Guard still has to agree with the decision for us to execute a major investigation.

It isn't quite as vague, but it becomes incumbent on if there's a disagreement from the commandant of the Coast Guard and the Chairman of the Safety Board to get together on the phone and make a decision.

Q. I see. And it actually sounds somewhat complicated because how is it determined who takes the lead and whether or not NTSB will just participate?

A. If you read the -- if you read the letter of the law, it was awkward at the least to say who is responsible for it because it gives the authority to both parties. But it gives the primary authority of investigating marina accidents to the Coast Guard.

I didn't write the law. It's awkward. That's why an MOU was necessary to come up with this determination on when it is we would get involved in the decision-making on when we would take the lead.

There is one basic condition in which the

Page 206

Coast Guard doesn't have difficulty with us, and that is when there's a Coast Guard vessel involved. They do not -- for sunshine reasons they are perfectly willing to have the NTSB investigate the accident when a Coast Guard vessel or helicopter or such are involved the accident.

Q. Are you aware of any investigations of Coast Guard accidents?

A. Oh, yes. Yes.

Q. And between 1997 and 2005 how many investigations of Coast Guard accidents were there?

A. Two that I am aware of. There may have been more. There was a harbor patrol boat that had an accident in Florida that was investigated by the NTSB, a Coast Guard patrol boat. And there was a Coast Guard rescue of a freighter in distress in which there were some Coast Guard lives lost.

A helicopter crashed. Some divers were lost. And the NTSB investigated that as well.

Q. And do you know when that was?

A. The patrol boat was earlier, maybe 2000, 2001. And the other was a Selendang IU. That might

Page 207

have been 2002.

Q. I see.

A. Maybe three.

\- - -

(Discussion off the Record)

\- - -

BY MR. LOWINGER:

Q. Are any of the modal office directors involved in administrative rule makings?

A. In administrative rule makings? Define --

Q. Proposed rule makings or --

A. Yes.

Q. Okay. Which offices have -- what is the criteria for being involved in a administrative rule making?

A. The NTSB does not promulgate rules, federal rules, but we issue recommendations that impact federal rules. Frequently the recommendations issued by the NTSB prescribe that the Department of Transportation or other federal agencies promulgate rules for safety.

When those rule developments activity

Page 208

begins, the NTSB participates in two ways. We participate like any other entity. We comment when the public comment period is available, and we provide that for the record.

Additionally, we have a correspondence with the federal agency based on the recommendation that we issued, an exchange based on that recommendation. And we will frequently give our opinion of the rule making activity to congressional committees.

Q. After the MOU with the Coast Guard was entered into, did the relationship improve between NTSB and the Coast Guard?

A. The relationship improved in that we now had a structure for making a decision on when to make a decision. So it did improve in that regard. I think there was still strained relationships between the Coast Guard and the staff at the safety board, both the director of Office of Marine Safety, Miss Murtagh Cooke, and the Managing Director and even the chairman. That continued until those positions changed.

Q. I see. So it wasn't just Miss Murtagh

Page 209

Cooke. It was key people at NTSB were involved in this strained relationship?

A. I think that the basis of it was -- the basis of getting to an MOU was the relationship that existed between the Office of Marine Safety and the Coast Guard. But the development of the MOU and the conversations that took place brought into the discussion or brought into the situation the Managing Director and the chairman. And I think for the most part the relationships were strained at all levels.

Q. Okay. What additional training is required for the position of office of -- the Director of the Office of Marine Safety?

A. At which level, the 15 or the SES?

Q. At the, well, for Miss Murtagh Cooke.

A. For Miss Murtagh Cooke training was required in basic supervisory skills, leadership skills, writing and report development and project management. And I believe that she along with the other office directors attended courses on how Congress works in dealing with the regulatory bodies.

There were also technical training

opportunities for the Director of Marine Safety in the marine area, technical training in a variety of different places.

Q. And how does that change when -- how does that training differ between Miss Murtagh Cooke and the directors of Aviation Safety and Highway Safety between 1997 and 2005?

A. Well, the office directors who are elevated to the senior executive service must attend a senior executive development program that is prescribed by the office of personnel management. There are several different places to obtain that training. But you must have that to be eligible for the senior executive service.

Q. So what comes first, the training or the appointment?

A. Usually it's the training.

Q. And how does one become authorized for the training?

A. In the -- at the NTSB, during that time frame, '97 to 2005, the training was done by request. The office director, the individual, whoever it was



would ask their supervisor for training. On the flip side, the supervisor was responsible for developing a training plan for their office that included individual training opportunities for staff.

As part of the budget submission from the office, that training plan was a component of the budget submission. So if we go back to this morning's conversation, as the Director of Highway Safety or the Director of Marine Safety, those directors would put in a training plan for their staff, themselves included, submit that plan, and then based on available money, the allocation, the appropriation from Congress, the Managing Director and CFO would return a dollar amount for the offices.

The Managing Director nor -- neither Managing Director nor the CFO would prescribe individual training programs for individuals at the office level. They would simply give a budget value to the training which frequently was less than the request.

And the office directors then had the obligation to make -- to match their plan to the



available money.

Q. Do you know when -- do you remember when you in your individual capacity as the Director of Highway Safety went to the SES training, went through the SES training?

A. Yes. I went to the SES training in 1995.

Q. I see. And do you know when Mr. Magladry went to the SES training?

A. Mr. Magladry went to the SES training in 2002.

Q. And do you know when Miss Murtagh Cooke went to the SES training?

A. I do not. I would have to look at her records.

Q. And do you know when --

A. Mr. Chipkevich.

Q. Mr. Chipkevich attended?

A. I would have to look as his records.

Q. Are you aware that Miss Murtagh Cooke attended the training?

A. I'm not. I would have to look at her training records.



Q. And when did Mr. Spencer attend the training?

A. Let me qualify the answer that I gave previously. When you are an existing federal employee and you are moving from GS to the SES, they require the training. When you are not an existing federal employee and you have held equivalent positions in the private sector, OPM waves the required training.

However, Mr. Spencer was at the Naval War College. And the Naval War College is an equivalent training program.

Q. I see. What kind of training is -- are you aware whether Mr. Macintosh -- whether Mr. Haueter went through the training?

A. Mr. Haueter came from within the federal government. I am going to presume that he went through the training since he's now in the SES. I don't know when.

Mr. Macintosh may or may not have. He is in the SL. And that training is not required of the SL employees.

Q. I see. In your responses to the

interrogatories you had stated that the reason why -- one of the reasons why Office of Marine Safety was not -- is not considered to involve the same skills, efforts and responsibilities as -- has to do with the number of meetings with congressional staff, the number of speeches written, the advocacy efforts and the number of investigative reports presented to the safety board, and the number of reports approved through delegated authority, the number of launches.

Can you tell me why that's a basis for asserting that -- for the positions are not the -- that the Office of Marine Safety is not -- does not require the same skills, efforts and responsibilities as the office, for example, Highway Safety?

MS. COHEN: Objection. Ambiguous. Can you clarify whether you are talking about Mr. Osterman or the agency in terms -- you said you and interrogatories.

MR. LOWINGER: When I say "you", I mean the agency, the response from the agency.

A. For the Office Director of Marine Safety, what you mentioned there is volume and scope. There



were more responsibilities for the Office Director for Highway Safety, even for more for the Office of Railroad Safety, more volume by work, more staff by numbers, more accidents. More accidents occurred in those modes, more robust notification system and different -- in the different offices, different program responsibilities like the delegated authority responsibility.

There were many highway accident investigations and many rail accident investigations completed completely under the direction of the office director without the involvement of the board. That was not the case in the Office of Marine Safety.

Q. What about the Office of Marine Safety for example with regards to getting the -- I just want to make sure I understand this. If the Office of Marine Safety has less employees, how is it expected to produce as many reports as the other offices?

A. It's not expected to produce as many reports. It's expected to produce a commensurate number of investigations and reports based on the available resources.



Q. And when we say available resources what resources are you talking about?

A. Resources are mostly people.

Q. And did Marine Safety not produce commensurate -- produce the same number of -- engage in the same number of, I guess, an equivalent number of investigations and produce the equivalent number of reports based on available resources?

A. The Office of Marine Safety may have launched on an equivalent number based on resources of investigations, but they did not produce an equivalent number of reports. In 2003, there was no report and no public hearing from the Office of Marine Safety issued at a sunshine meeting with the board. And in 2004 there was only one.

That is substandard production performance based on the available resources.

Q. And where would there be any indication of that?

A. That is right on the public web site. If you look at the public web site and the reports, they are cataloged by year from current to 2000 -- or to



1997 going back by year, by calendar year, not fiscal year, and then also public hearings and forums. Those are an equivalent resource product to a major report.

It demands as many resources to execute a public hearing or a public forum as it does to execute a major report.

Q. I'm not sure I understand the distinction. Can you explain this to me? The reports that are reflected on the web site, how are they different than the reports that we've discussed before that eventually get to the sunshine meeting?

A. They are one and the same.

Q. They are one and the same?

A. Yes.

Q. And these reports are on the web site?

A. They are.

Q. And in which format, sir?

A. In which format? Define the question.

Q. For example, in an annual report --

A. No. They are individually -- they are mentioned in the annual report every year, but they are also reflected on our web page with a link to the

Page 218

report itself which is right on the web page. You can click right onto it and open up the report.

And it is cataloged by calendar year, by board reports, board meetings.

Q. I see.

A. I think the category is board meetings. And it will reflect all board meetings that were conducted in whatever year your choose, down back to 1997.

Q. And are board meetings required for the approval of a report?

A. No, they are not. But board meetings are required for major reports.

Q. Are all reports major reports other than the delegated authority reports?

A. Not all reports are major reports that warrant a sunshine meeting. Some are lesser activities, lesser reports. They also have lesser resource implications and are provided to the board and deliberated and voted on by the board through the mail system, through the -- without a public meeting.

There's also -- I also mentioned public

Page 219

hearings and forums. Those are not sunshine meetings. Those are investigative meetings conducted in roughly a court setting in which the investigation of the accident continues through those meetings.

Q. And did the Office of Marine Safety between 2003 and 2004 produce reports through that -- that were approved through the mail between the directors or through public hearings but not sunshine reports?

A. They produced some, yes.

Q. And given the resources -- and do you know how many reports were produced?

A. I would have to check the record. There were some.

Q. And did the highway safety produce reports that were non-major reports other than delegated reports that went through the, I guess the NTSB mail between the members or through the public hearing investigative --

A. Yes. All the offices produced reports that went to the board for consideration. Instead of mail, I'll call it notation, on the notation system during that time frame, not counting the delegated reports.

Page 220

And the other offices also produced reports, public hearings and forums for the sunshine meetings as well.

Q. And what does it take to get from a -- you said a notification report? Is that what you called it?

A. Notation.

Q. Notation report to -- what's the distinction between a notation report and a sunshine report?

A. The scope of the investigation, the scope of the report, public interest, and the safety issues are used to determine whether the report needs to go to a public meeting deliberated by the board, or whether the report can be distributed to the board for their consideration.

Q. Who decides that?

A. It is first and foremost the office director. And then that recommendation is forwarded to the managing director and offered to the board. The board has the opportunity to reverse that and request that any item that would be coming to them for notation be calendared for a board meeting.

Page 221

Q. I see.

A. And they do that occasionally.

Q. And did they ever do that for Marine Safety?

A. No.

Q. Is that because the recommendations were considered approved by the board?

A. No. It's because the scope and the public interest level and the complexity of the accidents and the safety issues in the board's opinion didn't warrant a sunshine meeting.

Q. I see.

\- - -

(A document was marked as Deposition Exhibit Number 1)

\- - -

BY MR. LOWINGER:

Q. Mr. Osterman, is this a copy of -- could you describe this document to me please?

A. This appears to be a copy of the position description for the Director of the Office of Marine Safety at the GS-15 level. And it's undated, so I am

Page 222

not sure what period of time it represents.
Q. This is the only one that has been produced to us. Is it possible that this is -- is this the only position description for the office of -- the Director of Office of Marine Safety?
A. It is possible that this is the only position description for the Director of Marine Safety at the 15 level. There is another position description for the office director at the SES level.
Q. I see. And are you aware -- how often are position descriptions created?
A. There's no need to recreate position descriptions once they are created unless there's a substantial change in the nature of the job. They should be reviewed periodically, and often are, and are updated when there is a change in the position.
Q. And was this document recorded at or near the time that it was created by the agency?
A. I don't understand the question.
Q. When the agency created this document, was it recorded and kept and recorded and I guess filed or maintained in a manner that was kept with its -- the

Page 223

agency's regular business practices?
MS. COHEN: Objection. This is outside the scope of the 30(b)(6).
MR. LOWINGER: We are just trying to find out how this is recorded.
BY MR. LOWINGER:
Q. Go ahead.
A. The position description would normally be developed in conjunction with the employee in the position and with the supervisory chain that was above that particular position, finalized, distributed to the employee and placed in their personnel file.
Q. Okay. And would this --
A. And also given to the supervisor.
Q. And is this -- so the position descriptions are recorded in the personnel files and given to the supervisors in the regular course of NTSB's business practices?
A. Yes.
Q. And was this document recorded in NTSB's regular business practices?
A. I don't -- this specific document I don't

Page 224

know when it was recorded in your context. It would have been placed in this individual's personnel file and given to the individual and also given to the supervisor once it was developed.
Q. Thank you very much. I just want to note that Exhibit Number 1 are bates numbers 899 through 902.
\- - -
(A document was marked as Deposition Exhibit Number 2)
\- - -
BY MR. LOWINGER:
Q. Exhibit Number 2, can you tell me what this document -- this is Bates Number 753 through -- actually, you know what.
A. I have some blanks.
Q. I do too. Sir.
A. They are just extra pages it looks like.
\- - -
(Discussion off the Record)
\- - -
BY MR. LOWINGER:

Page 225

Q. Okay. This is Bates Number 753 through 758.
A. Right.
Q. Can you describe this document. Sir?
A. This is a position description for the Director of Office of Marine Safety at the SES level.
Q. And was this document recorded at or near the time that the document was created with -- created by the agency?
MS. COHEN: Objection. Outside the scope.
A. This one I can tell you, although I cannot read the date, this one was developed I believe in 2005 and provided to the Director of the Office of Marine Safety who currently holds the SES position.
Q. And was it recorded in the regular course of business, of NTSB's business?
A. It would have been placed in the personnel file and provided to the supervisor. I am the supervisor and I have a copy of this position description.
Q. So I guess that's a yes?
A. Yes.

Page 226

Q. Thank you very much.
A. My problem is I don't understand the context of the term recorded.
Q. I guess placed in a file or maintained.
A. Yes.
- - -
(A document was marked as Deposition Exhibit Number 3)
- - -
MS. COHEN: I'd like to take a short break at this time please.
MR. LOWINGER: Sure.
- - -
(Recessed at 4:25 p.m.)
(Reconvened at 4:32 p.m.)
- - -
BY MR. LOWINGER:
Q. This is Exhibit Number 3. And can you tell me what this document portends to be, sir?
A. This appears to be the position description for the Director of the Office of Aviation Safety position at the senior executive level.

Page 227

Q. Are you aware of any other position descriptions for the Director of Aviation Safety?
A. There may be previous versions of this.
Q. Were there previous versions for -- do you know when those previous versions existed?
A. No, I don't.
Q. Do you know what happens to previous versions?
A. They are superseded.
Q. In?
A. By the current ones.
Q. And then what happens to the superseded versions?
A. The original position description is placed -- or the position description of record is placed in the personnel file. I do not know what happens to the former version.
Q. Are they destroyed?
A. I don't know.
Q. I see. And this reflects Mr. John Clark's duties as of 12/15/05. Are you aware of a prior version of this, sir, of this for Mr. Clark at the

Page 228

Director of Office of Aviation Safety level?
A. I am not aware of a prior version. And this was signed on 12/15/05, so there was a prior version position description for this position.
Q. Would that have been different than the one that's here?
A. No. It would have been substantially the same as this position description. The position has not significantly changed in the last seven or eight years.
Q. I see. And was this document recorded at or near the time that it was created?
MS. COHEN: Objection. Outside the scope.
A. This would have been placed in his personnel file in 2005 when it was signed.
Q. And recorded, and that would be recorded in the -- created and recorded in line with NTSB's recordkeeping?
A. Yes, in the OPF, in the official personnel file.
Q. Do you have a copy of it as well, sir?
A. I do have a copy of this. Yes.

Page 229

Q. Okay. Thanks. Just going back to Number 3, I just want to reflect that the Bates numbers are 759 through 765.
- - -
(A document was marked as Deposition Exhibit Number 4)
- - -
BY MR. LOWINGER:
Q. This is Exhibit Number 4 is Bates Number 766 through 771. And can you describe this document to me, sir?
A. This is a position description for the Director of the Office of Highway Safety at the senior executive service level.
Q. And when you look at that, what is the date of this?
A. The date that the position description was created was 12/15/05.
Q. And upon reviewing it, does this document reflect the position performed by you, Joseph Osterman, prior to 12/15/05?
A. Yes. It essentially reflects the position

Page 230

that was performed when I was the SES level Director of the Office of Highway Safety and was prepared in '05 after I became Managing Director. It was not provided to Mr. Magladry until '06 after he was made the Director of Highway Safety at the SES level.
Q. And would that position description level also apply to your duties as the Director of Highway Safety during your tenure at the SES level?
A. At the SES level.
Q. Yes.
A. Essentially, yes.
Q. When you say essentially: Are there any changes that I need to know about?
A. Substantially the position would not have changed from when I held the position to today. But because this is a new position description, there may have been slight modifications in the position description from the former version.
Q. Would those reflect requirements of the job or duties of the job or skills or abilities of the person or the efforts of the person performing the job?

Page 231

A. Generally not. They would be mostly editorial or procedural to address requirements or change in requirements from the Office of Personnel Management.
Q. I see. And was this document recorded at or near the time that it was created?
MS. COHEN: Objection. Outside the scope.
A. This document would not have been placed in the personnel file because there was no one at this level at that -- when the document was created. It was held and prepared for the execution of the competitive advertisement for the senior executive position Highway Director.
Q. And it applies though -- but it's been recorded since then in the regular course of business of NTSB's business?
A. Yes.
MS. COHEN: Objection. Outside the scope.
Q. Thank you. This is Exhibit Number 5, Bates numbers 138 through 1042.
MS. SILBAUGH: 1038?
MR. LOWINGER: 1038.

Page 232

\- - -
(A document was marked as Deposition Exhibit Number 5)
\- - -
BY MR. LOWINGER:
Q. Mr. Osterman, does this document reflect the Coast Guard -- the Memorandum of Understanding between the NTSB and the Coast Guard that we discussed during your testimony earlier today?
A. It does but it is incomplete.
Q. What is missing from it?
A. The calculation document for the rear of the MOU.
Q. And what is --
MS. SILBAUGH: Are you just missing pages. He's just missing pages, because we have it.
MR. LOWINGER: Oh. And are these the pages?
THE WITNESS: That would be it.
BY MR. LOWINGER:
Q. And that's the bright line test you have reflected during your testimony --

Page 233

A. Right.
Q. -- pages 1043 through 1044?
A. Yes.
Q. And this document has been maintained and recorded in the normal course of business of NTSB?
A. Yes.
MS. COHEN: Objection. Outside the scope.
THE WITNESS: Thank you.
MR. LOWINGER: This is Exhibit Number 6. And this is going to be document Bates numbered 772 through 777.
\- - -
(A document was marked as Deposition Exhibit Number 6)
\- - -
BY MR. LOWINGER:
Q. Can you describe this exhibit to me, Mr. Osterman, please?
A. This appears to be the position description for the Deputy Director of the Office of Aviation Safety.
Q. And what's the name of the person on that

document, sir?
A. At the SES level. Mr. Haueter.
Ms. SILBAUGH: Okay. Wait. I've got a different document here.
- - -
(Recessed at 4:42 p.m.)
(Reconvened at 4:55 p.m.)
- - -
BY MR. LOWINGER:
Q. Exhibit 6, Bates Number 772 through 777. Is this document a copy of the position description for Mr. Thomas Haueter?
A. This is. This is a position description for the Deputy Director, Office of Aviation Safety for Mr. Haueter at the SES level.
Q. And would this position description be applicable from throughout his tenure as the Deputy Director, because it's dated 12/1/2005? Will this have changed significantly from prior versions?
A. It would not have changed substantially, like the others. It would essentially be the same.
Q. And was this recorded in Mr. Haueter's



personnel file?
A. Yes.
Q. And do you have a copy of it in your file as well, as the Agency Managing Director?
A. I do not maintain a copy of this because his first line supervisor is Mr. Clark. I can get one when I need one.
Q. I see. Mr. Clark has a copy of it. Is that correct?
A. Yes.
Q. Okay.
A. At the time that this was issued, understanding that Mr. Haueter now is the Director of Aviation Safety.
Q. I understand.
MR. LOWINGER: This document actually doesn't have Bates numbers on it.
MS. SILBAUGH: That's because I wasn't sure where we left out where we wanted to start again as far as numbering was concerned.
MR. LOWINGER: I see.
- - -



(A document was marked as Deposition Exhibit Number 7)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, is this a copy of the position description for Mr. Robert Macintosh?
A. It is at the SL level.
Q. And would this have been applicable throughout his tenure as an SL employee?
A. As an SL employee, yes.
Q. And do you know the dates of his tenure as an SL employee?
A. He went from a GS-15 to an SL employee, I don't know specifically, but '99 through 2001, that range.
Q. I see. And is this also kept in Mr. Macintosh's personnel file in the regular course of NTSB's business operations?
A. Yes.
Q. Okay.
- - -
(A document was marked as Deposition



Exhibit Number 8)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, this is Exhibit Number 8. It has Bates numbers 001396 through 0013411, at the very end. There's a lot of blank pages that were produced with it.
Mr. Osterman, is this a -- can you describe this document to me?
A. Can you give me a moment to look it over. This document is the NTSB submission for 2003 to the Office of Personnel Management requesting an increase in the number of allocated billets for both SES and SL billets.
Q. And is this --
MS. COHEN: Mr. Osterman, I am sorry. Are you finished with your answer?
THE WITNESS: I am.
MS. COHEN: I just want to clarify, I don't think the blank pages were produced with it. I believe those came out in copies.
MR. LOWINGER: No. That's the way I have

it on my electronic version.
MS. COHEN: We didn't produce an electronic version.
MR. LOWINGER: And you know what, I --
MS. SILBAUGH: The numbers are sequential without the blank pages.
BY MR. LOWINGER:
Q. Can we all agree that this is the document that without the blank pages this is the request for SES billets submitted in 2003?
A. It appears to be. Yes.
Q. And is this document recorded in NTSB's regular course of business?
A. This document --
MS. COHEN: Objection. Outside the scope.
MR. LOWINGER: Do you want to do that just for all the documents I request, and we can just make that universal for all the documents?
MS. COHEN: Yes.
MR. LOWINGER: Okay. Fine. With regard to recording in the regular course of business.
MS. COHEN: Yes.



BY MR. LOWINGER:
Q. Very good. Was this document recorded in the regular course of business of NTSB?
A. Yes.
Q. And it's been kept and maintained in its regular course of business?
A. Yes.
Q. Thank you.
- - -
(A document was marked as Deposition Exhibit Number 9)
- - -
BY MR. LOWINGER:
Q. This is Exhibit Number 9 and it's Bates numbered 291. Mr. Osterman, is this the comparison of compensation that you referenced earlier in your deposition?
A. This appears to be the compensation comparison between Mr. Clark, Osterman, Chipkevich and Miss Murtagh for 2003 and 2004.
Q. Are you aware of any other compensation charts that you are referring to today during your



deposition?
A. No.
Q. Okay. And was this document created in the regular course of NTSB's business?
A. I don't know when this document was created.
Q. And has it been recorded in -- do you think it was recorded sometime after 2004?
A. Since there is no date on when this document was created, I'm not sure when it was created.
Q. Does the document --
A. It would have been created after 2004, obviously. It maintains 2004 figures.
Q. I see. Do the figures appear correct to you, sir?
A. To the best of my knowledge they do.
Q. And is document recorded in the regular course of business, recorded and maintained in the regular course of NTSB's business?
A. Yes.
Q. Thank you.



MS. SILBAUGH: There should be a second page to this.
MR. LOWINGER: Do you know what the second page looks like.
MS. SILBAUGH: The same thing but shorter. It just has two or three lines on it.
MR. LOWINGER: All right. Give it back. This isn't the document we are going to say it is. We'll just ask for it as stipulation.
- - -
(A document was marked as Deposition Exhibit Number 10)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, can you tell me what this exhibit is, this Exhibit 10?
A. This appears to be a copy of the NTSB Order 50 which prescribes the Marine Safety Program adopted by the board in 1996.
Q. Are you aware of any other different versions of the document since then?
A. No.

Q. Has the Marine Safety Program order been updated since then?
A. The Marine Safety Program order is in the process of being updated now.
Q. But it hasn't been since then?
A. No.
Q. Is this document correct? Is it a correct version of the Marine Safety Program?
A. Does it represent the Marine Safety Program?
Q. Is this -- does this document -- is this a correct version of the order for the Marine Safety Program?
A. Yes.
MS. SILBAUGH: If you need to look at it, you know, if you need to read it, take your time to do that.
THE WITNESS: Without reading every line, this appears to be the board order that is available on the web site.
BY MR. LOWINGER:
Q. I see. And it's been recorded and created,



recorded and maintained in the regular course of NTSB's business?
A. Yes.
Q. Thank you.
- - -
(A document was marked as Deposition Exhibit Number 11)
- - -
BY MR. LOWINGER:
Q. This is Exhibit Number 11, Mr. Osterman. Can you tell me what this document is?
A. This appears to be a copy of Board Order 20 which is the Highway Safety Program adopted by the board in 1996.
Q. And are you aware of any more recent versions of this document than the 1996?
A. No. Again it's currently being revised.
Q. I see. And is this a correct version of the document, sir?
A. As far as I can tell, it is. Without reading every line, it is the version on the web site.
Q. And when the document gets on the web site



does that mean that it's an official document recorded in the --
A. Yes. Is posted.
Q. Posted?
A. For the public. It's available.
Q. It's available. Okay.
- - -
(A document was marked as Deposition Exhibit Number 12)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, this is Bates numbers 1045 through 1055. Can you tell me what this document is sir?
A. This is the updated version, I'm going to have to correct what I said earlier, of the Highway Safety Program that was updated in 2002.
Q. Is this document -- are there any more recent versions of this document that you are aware of?
A. No. It is not. I apologize. I forgot about this. This supersedes NTSB Order 20 as the



Highway Safety Program Board order.
Q. And is this a correct version of the document, sir?
A. It appears to be.
Q. And is this document also available on the web site, on the agency's web site?
A. This is.
Q. And so that reflects that it's an official document of the NTSB?
A. Yes.
Q. Recorded and maintained in its normal course of business?
A. Yes.
Q. Thank you very much.
- - -
(A document was marked as Deposition Exhibit Number 13)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, can you tell me what this document Exhibit Number 13, Bates numbers 1067 through 1078 reflects?

Page 246

A. This reflects the Railroad Safety Program Board order 40 adopted by the Board in 1996.
Q. Is it still in effect, sir?
A. Based on my mistake from the last one, I think so. I am not sure that it's been updated or not.
Q. Are you aware of any other versions of this document?
A. This is the 1996 version of Board Order 40. I don't recall whether the Office of Railroad Safety created a subsequent version. I don't believe they did, but I know I did when I was in Highway Safety. I don't recall if Railroad did.
Q. I see. And has this document been created, recorded and maintained in the normal course of NTSB's business?
A. Yes.
Q. Thank you.
A. This, however, is an unsigned version, just to point that out.
Q. Is there a business practice that requires that a document be signed before it becomes official?

Page 247

A. Yes.
Q. Okay. Can I have the official version please?
MS. SILBAUGH: Yes, I'll try. We printed off what was there. It may not be.
MR. LOWINGER: I understand.
- - -
(A document was marked as Deposition Exhibit Number 14)
- - -
BY MR. LOWINGER:
Q. Mr. Osterman, can you tell me what this Exhibit 14, Bates numbers 1056 through 1066 is?
A. This is Board Order 30, the board order for the Hazardous Materials and Pipeline Safety Program adopted in 1996 by the Board.
Q. And is this a correct version of the document, sir?
A. It appears to be.
Q. Are you aware of any more recent versions of the document?
A. I am not.

Page 248

Q. I see. And has this document been recorded at the time that the business record was created and maintained in the normal course of NTSB's business operations?
A. Yes.
Q. Okay. There are a lot of documents in here, and I'm going to hand it to you. These are notice of personnel actions for Marjorie Murtagh Cooke for the period of '02 through '05 regarding pay.
- - -
(A document was marked as Deposition Exhibit Number 15)
- - -
BY MR. LOWINGER:
Q. The documents here are 294, 295, 296, 299, 300, 355, 356, 357, 358, 360, 361 and 363. I'll give you a second to look these over, sir, but are these the notification of personnel actions that apply to Marjorie Murtagh Cooke during her tenure of employment -- tenure as an employee of the National Transportation Safety Board? And of course take your time.

Page 249

A. They are all personnel actions that apply to Marjorie more tuck Cooke.
Q. And do these appear to be correct versions of the documents, sir?
A. They do. They are different. They are not -- some are award personnel actions. Some are pay adjustments. And some are with a grade increases, but they appear to be correct.
Q. And are these documents recorded in the normal course -- created and recorded and maintained in the normal course of NTSB's business operations?
A. Yes.
Q. Excuse me for one second. I just want to go off the record for a quick second.
- - -
(Discussion off the Record)
- - -
THE WITNESS: I need to clarify something.
BY MR. LOWINGER:
Q. Sure.
A. I mentioned that the board orders were on the web site. That's the intranet site, the internal

Page 250

web site of the agency.
Q. Okay.
A. It's not on the public site, just so you know.
Q. But as far as all the orders that we just went through --
A. Yes.
Q. -- and the exhibits, those are the official documents recorded --
A. Yes.
Q. -- created, recorded and maintained in the normal course of NTSB's business?
A. Yes.
Q. Thank you very much, sir.

\- - -

(A document was marked as Deposition Exhibit Number 16)

\- - -

BY MR. LOWINGER:

Q. Can you tell me what this document is, Mr. Osterman, please?
A. This appears to be the position description

Page 251

at the SES level for the Director of the Office of Railroad, Pipeline, and Hazardous Materials.
Q. And would this apply for the years 1997 through 2005?
A. Not completely. This would apply for the SES position of the director of the combined offices of Railroad and Pipeline and Hazardous Materials. In 1997 during the reorganization there were two different offices, one for Railroad and one for Pipeline and Hazardous Materials. Those were later combined to create this office.
Q. I see. And does this reflect the duties and responsibilities for the combined office performed by Mr. Chipkevich since he obtained that position.
A. At the SES level, yes.
Q. Was there -- and when did he obtain the SES level?
A. 2002.
Q. Okay. And has this document been created, recorded and maintained in the regular course of NTSB's business?
A. Yes.

Page 252

\- - -

(A document was marked as Deposition Exhibit Number 17)

\- - -

BY MR. LOWINGER:

Q. This is document Bates Number 759 through 765. Can you tell me what this document is, sir?
A. This appears to be a position description of the Director of Office of Aviation Safety that looks like also Exhibit Number 3.
Q. So we've done this one before. My apologies. Let's keep it as it is. There's a double. We've gone through so many.

\- - -

(A document was marked as Deposition Exhibit Number 18)

\- - -

BY MR. LOWINGER:

Q. This is Exhibit Number 18. Mr. Osterman, can you tell me what this document is? It's Bates numbers 233 through 240.
A. This document appears to be the performance

Page 253

evaluation, an appraisal form for Miss Marjorie Murtagh, Director, Office of Marine Safety for the period, rating period August 2002 to July 2003.
Q. Does this document appear correct to you, sir?
A. It does.
Q. Does it appear complete?
A. It is technically incomplete in that in the approving official category, although the chairman signed the document, it doesn't look like from this copy that they checked whether it was approved or disapproved. The natural assumption is it was approved. And additionally the rating elements and performance standards section is not filled in, although that is not unusual.
Q. I see. Is this document created, recorded and maintained in the normal course of NTSB's business operations?
A. Yes.
Q. Okay.

\- - -

(A document was marked as Deposition

Exhibit Number 19)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman, can you tell me what this Exhibit Number 19 is?

A. It is two pages of a performance appraisal for Miss Murtagh from the period of August 2003 to 2004.

Q. Is it a complete version of the document, sir?

A. I don't believe so.

Q. The Bates numbers are 231 and 232. And the last page appears to be 232. Would there be pages in between that?

A. There should be similar evaluation pages to Exhibit 18.

MR. LOWINGER: Miss Cohen, may I please have the rest of the documents?

MS. COHEN: If the rest of the documents still exist, yes, you may have it.

MR. LOWINGER: Will you please look into that.



BY MR. LOWINGER:

Q. But otherwise the actual rating on this document, sir, the summary rating is accurate?

A. It appears to be, yes.

Q. And do you have any doubts that it could not be accurate, given that we don't have the whole document?

A. No. And you could have the whole document.

Q. I see.

A. That's possible. I know that for the rating period 2003 to 2004 the Managing Director and chairman did not -- they rated all the employees but did not necessarily fill in all of the paperwork for the ratings.

Q. Why would they not have?

A. The overall rating was what was necessary. And the belief from my interview with Mr. Campbell is that if the rating was not substantially changing, it was not going to significantly impact the employee.

Q. I see.

A. But you may not have all the document. I simply don't know.



Q. Was this document created, recorded and maintained in the normal course of NTSB's business?

A. Yes.

Q. Thank you.

- - -

(A document was marked as Deposition Exhibit Number 20)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman this is, I don't know which way to read this, but it looks like it's either 801008 or 800108.

A. Okay.

MS. COHEN: It would be 1008.

MR. LOWINGER: Okay. That's what it is. It's 1008.

BY MR. LOWINGER:

Q. Mr. Osterman, can you tell me what this document is?

A. This is an organizational chart for the National Transportation Safety Board created in December of 2006.



Q. Okay. And can you verify that this is the way the organization -- this is what the organizational chart would have looked like from 1997 through 2006?

A. It is not necessarily the way it would have looked, but for the Office of Marine Safety it would have looked this way.

Q. And what changed in the Office of Marine Safety?

A. Nothing. It looked this way for Marine Safety. That was my point. This organizational chart includes the addition of an Office of the Chief Information Officer which didn't exist from '97 to 2005. This organizational chart reflects the combined railroad and pipeline groups which were separate in 1997.

So it is not exactly the organizational chart that existed in 1997. But the organizational chart for the flow for the modal offices is the same.

Q. I see.

A. Except for the railroad and pipeline combination that I spoke of earlier.

Q. I see. And the document's been created, recorded and maintained in the normal course of NTSB's business?

A. Yes.

- - -

(A document was marked as Deposition Exhibit Number 21)

- - -

BY MR. LOWINGER:

Q. Mr. Osterman, this is Bates number 031 through 34. At the top of it, it says, Draft for Review. Can you describe this document to me, sir?

A. This is a draft position description for the Director, Office of Marine Safety.

Q. Is this an accurate version of the, I mean, has this document -- was this document ever finalized?

A. I don't know when it was created. And there are no signatures or transmittal cover sheet on it, so as far as I know it is not a finalized document. There is a document for the Office Director of Marine Safety.

Q. And we dealt with that before?



A. We dealt with that before on one of these other exhibits.

Q. Right.

A. Two.

Q. For Miss Murtagh Cooke or for Mr. Spencer?

A. That's for Mr. Spencer.

Q. Okay. But this one says Murtagh Cooke; am I correct?

A. It does.

Q. Okay. Would this apply to Mr. Spencer or Miss Murtagh Cooke, sir?

A. Well, according to this document this applies to Miss Murtagh Cooke, but it's not a finalized document.

Q. Okay. What happens to drafts like this? Do you have any idea of what would happen to this document?

A. Position descriptions are created as I mentioned before in collaboration with the HR specialist, the employee and the supervisor. Once the position description is agreed to and we ensure that it follows the OPM guidelines, it would then be



signed.

As you see in Exhibit 2, the position description cover sheet with signatures, and issued to the employee, given to the supervisor and placed in the personnel file.

Q. Okay.

A. There could be numerous drafts of position descriptions as they are being developed.

Q. I see. Okay. No further questions.

THE WITNESS: Is that it?

MS. COHEN: No redirect for me.

- - -

(The deposition was concluded at 5:28 p.m.)

- - -



UNITED STATES OF AMERICA )

ss:

DISTRICT OF COLUMBIA )

I, JOSEPH G. OSTERMAN, the witness herein, having read the foregoing testimony of the pages of this deposition do hereby certify it to be a true and correct transcript, subject to the corrections, if any, shown on the attached page.

- - -

____________________________

JOSEPH G. OSTERMAN

Subscribed and sworn to before me this ______day of___________, 2007

____________________________________.

C E R T I F I C A T E

UNITED STATES OF AMERICA )
ss:
DISTRICT OF COLUMBIA )

I, ELIZABETH MINGIONE, Notary Public within and for the District of Columbia do hereby certify:

That the witness whose deposition is hereinbefore set forth was duly sworn and that the within transcript is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 7th day of June, 2007.

______________________________

My Commission Expires:
April 14, 2010



WITNESS: It is your right to read your deposition and make any changes in form or substance. Note the reason for any changes directly on the errata sheet.

Please sign and date the errata sheet and your deposition in the spaces provided. You are signing this transcript subject to the changes you have made on the errata sheet. Unless otherwise agreed to by counsel to this deposition, you must sign before a notary public.

Return the original errata sheet and signature page to the deposing attorney (attorney asking questions) promptly! Court rules require completion of this process within 30 days after receipt of the transcript or signature is deemed waived.

DEPOSING ATTORNEY: Upon receipt of the signed errata sheet and signature page, please distribute copies to all parties in attendance and place the original signed pages in the original transcript.

If you do not receive the signed errata sheet and signature page within 30 days after receipt of the original transcript, you may assume that signature has been waived.



E R R A T A S H E E T

PAGE LINE # CORRECTION AND REASON

----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------
----------------------------------------------------

___________________________ ___________________