# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - x

MARJORIE MURTAGH COOKE, :

Plaintiff, :

vs. : Case No.:

MARK ROSENKER, Chairman, : 1:06CV01928

NATIONAL TRANSPORTATION :

SAFETY BOARD, :

Defendant. :

- - - - - - - - - - - - - - x

Deposition of JOSEPH OSTERMAN

Washington, D.C.

Monday, October 1, 2007

9:47 a.m.

Job No.: 1-112710

Pages: 1 - 104

Reported by: Sarah M. Bickel

Deposition of JOSEPH OSTERMAN, held at the offices of:

EMPLOYMENT LAW GROUP
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Sarah M. Bickel, Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:
BRIAN M. LOWINGER, ESQUIRE
DAVID SCHER, ESQUIRE
Employment Law Group
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF THE DEFENDANT:
QUAN LUONG, ESQUIRE
United States Department of Justice
555 4th Street, Northwest
Room 4417
Washington, D.C. 20001
(202) 514-9150

ALSO PRESENT: Marjorie Murtagh Cooke
Meredyth D. Cohen, Esquire
Denise M. D'Avella, Esquire



C O N T E N T S


EXAMINATION OF JOSEPH OSTERMAN PAGE
By Mr. Lowinger 5


E X H I B I T S

(Attached to the Transcript)


OSTERMAN DEPOSITION EXHIBIT PAGE
No. 1 Comparison of Average Compensation of Modal Office Directors 1/03 - 12/04 35
No. 2 Documents 41




P R O C E E D I N G S

JOSEPH OSTERMAN

having been first duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:

Q Can you please state your name for the record.

A Joseph Osterman.

Q And Mr. Osterman, we've deposed you before in an alternative capacity. Before we start, could you tell me your title?

A I am the managing director of the National Transportation Safety Board.

Q And how long have you been the managing director?

A Since March of 2005.

Q Okay. Mr. Osterman, can you tell me how you prepared for today's deposition?

A I didn't prepare very much for today's deposition.

Q Okay.

A I reviewed a few documents from our board

orders and operational bulletins and that's about it.
Q Okay. Which board orders did you review?
A The accident investigation board order and the marine safety board order.
Q And which marine safety board order, do you know?
A I don't remember the number of it. It's the board order dealing with the marine safety program. I'd have to look at it. It's something we have provided to you before.
Q Okay. Is there anything from your last deposition that you'd like to supplement or retract from any of your depositions --
MR. LUONG: Objection. This is a different deposition, it wasn't his last deposition.
BY MR. LOWINGER:
Q Why don't we do some ground rules too and I'll ask the question again. Standard rules, as we did last time, Mr. Osterman, it's a question and answer, period. I'll ask a series of questions, please answer them. Along the way, your counsel, Ms. Cohen and Mr. Luong, may interject some



objections, that's perfectly normal.
I ask that you respond to the questions along -- that you respond to the question despite the fact that there is an objection. The only time that we're going to expect you not to answer is if your counsel advises you not to answer, and that's generally in a situation of a privilege.
Do you understand?
A I do understand.
Q Okay. We're not taking your videotape today so everything is going to be stenographic. I'll probably be the one who says "uh-huh" or "huh-uh" or something like that, but let's all just try to say "yes" and "no" if there's a yes and no response. Okay?
A I understand.
Q If there's any question that you don't understand, please let me know. I can't promise that I'll be clear all day long, but I'll try my very best so if you don't understand, just let me know. Okay?
A I understand that, too.
Q Okay. And if you feel like you -- if you



actually do respond, then I'll assume that you understood the question and it was clear. Is that okay?
A Yes.
Q Have you had any medicine or anything that would affect your ability to hear and understand the questions today?
A No.
Q We'll be happy to take breaks as well, sir, at your convenience.
A That's fine.
Q We're here for two depositions today. Normally, we try to do one deposition in seven hours, we're going to try to do two within ten and we'll go from there.
Back to the question before. Is there anything about your prior depositions as the representative of NTSB for both the district court case and the court of federal claims case that you'd like to add to or retract?
MR. LUONG: I'm just going to renew our objection. This is not intended to be a continuation



of the 30(b)(6) deposition. This is a deposition of Mr. Osterman in his personal capacity.
MR. LOWINGER: I understand.
THE WITNESS: I made a change on the errata sheet to the last deposition regarding a mistake that I had made during the deposition.
BY MR. LOWINGER:
Q Okay. With regard to that document, sir, during your deposition -- your 30(b)(6) deposition you had mentioned that as a member of the Executive Resource Board ad hoc panel in 2005 you reviewed applications for the position of director of the Office of Marine Safety, and we're going to refer to that throughout the deposition as just OMS. And you said that there was an application that you reviewed that had a lot of handwriting or was poorly prepared. Have you found that document, sir?
A I did find that document. First of all, I correct your statement. It's not part of the executive resource board, it was part of the reviewing group --
Q Right.

Page 10

A -- for the job announcement.
Q Okay.
A I believe that the application was a handwritten one and I confused that document with another during my deposition. There was a handwritten application that I had reviewed in preparation for that deposition and it was the original application that Ms. Murtagh had put in in '93 for her position.
Q I see. It was not for the 2004, 2005 SES position?
A No.
Q In preparing for your deposition today, have you had an opportunity to review any documents from the 2004 application that -- Ms. Murtagh's 2004 application?
A I previously had an opportunity but I did not review any recently.
Q Okay. Have you seen the 2004 application?
A Yes.
MR. LOWINGER: Can we have a copy of that application, please? We requested it before. We'd

Page 11

like an actual copy of it.
MS. COHEN: We'll provide you a copy.
MR. LOWINGER: Do you know when that can happen by?
MS. COHEN: As I said in my letter, we'll get everything to you by October 15th.
MR. LOWINGER: Okay. And in the reference to the 2004 letter, its resumés. Will that include the application for Ms. Murtagh Cooke?
MS. COHEN: Your request asked only for resumés.
MR. LOWINGER: Okay.
THE WITNESS: May I clarify my answer?
BY MR. LOWINGER:
Q Sure.
A The document that I reviewed for the period 2004-2005 is a bit confusing. The document that I reviewed was the one that we supplied to you previously. It was an exhibit in the 30(b)(6) deposition.
Q Okay. So it's that same document?
A That same application, yeah.

Page 12

Q Have you had a chance to review Mr. John Spencer's 2004 application for the SES position?
A Again, I reviewed it previously, but I haven't reviewed it recently.
Q Would it be the same document that we showed you during the 30(b)(6) deposition, sir?
A It was.
Q And are you aware whether John Spencer was an applicant in 2004 for the director of OMS position?
A I'm not aware that he was.
Q Okay. When did you become the director of the Office of Highway Safety at NTSB?
A 1997, prior to that I was the division chief for the Highway Division.
Q And how long had you served as the division chief for the Highway Division?
A Since 1993.
Q Was there any change in your duties and responsibilities from the -- becoming division chief to becoming the director of the Office of Highway Safety?

Page 13

A Yes.
Q And can you tell me what those were?
A Becoming the director of the Office of Highway Safety was a by-product of the dissolvement of the previous office, the Office of Surface Transportation Safety wherein the operating divisions within that office, the modal divisions were elevated to the status of independent offices within the agency, headed each by an office director.
Other divisions within the Office of Surface Transportation and Safety such as human factors and survival factors were blended into the modal divisions, into the model offices. And the duties that I added were more in the budget and personnel and administrative areas, management for the staff and the function for highway safety.
Q Between -- well, as the director of Office of Highway Safety, did you continue from 1997 through 2005 to retain budget and personnel administrative duties?
A For the Office of Highway Safety I did.
Q Okay. Can you describe to me all of your

budget responsibilities for the director -- as the director of Highway Safety between 2000 and 2005?
A 2000 and 2005.
Q Right.
A My budget responsibilities were to formulate an office budget each year, to then take from it the appropriation that I was given, which was frequently different than the office budget request and apply that appropriation to the activity of the office. Additionally, I then had not only execution responsibilities, I also had the responsibility for verification and balancing of expenditures.
Q Tell me about, you had received money you said through appropriations. How did that budget come to you for your decision?
A From the chief financial officer.
Q Okay.
A Each year I was requested to provide a budget request that included all aspects of the office from the mission travel and activity of the investigators to training to advocacy travel. At that time things such as furniture, some



telecommunications, some IT expenditures were all included in the budget request.
That request was collected by the chief financial officer and compared with other offices or put in the same pot with other offices and then from the appropriations that we received as an agency from Congress, the chief financial officer with the managing directors and the chairman distributed the available money to the offices under a particular formula and each year the formula changed somewhat.
Q And then you mentioned as part of -- I guess as part of your budget duties, the execution of your budget duties. Can you tell me what you meant by that?
A Once I'm given a budget pass back from the CFO, my responsibility would be to match my activities or keep my activities within the limits of that budget ceiling and to manage the money.
Q And with regard to your budget ceiling, does your budget ceiling increase between 2000 and 2005?
A I don't know the specifics, but I believe



it did, yes.
Q And had -- throughout the year had you ever exceeded your budget, the amount budgeted to your office?
A I have, but I have to clarify that. Our budget for years was distributed and continues to be distributed in two primary pots of money, mission activity and all other support activity which includes training and overtime and a number of other things. Occasionally, depending on the nature of the accidents, I would exceed the mission expenditures for the office, I think that's happened twice --
(Simultaneous conversation.)
BY MR. LOWINGER:
Q Do you know which year that happened, sir?
A I think 2000 -- and I'm not certain -- another instance when we had a number of accidents that exceeded our expectations for the year, this is -- you can't predict the accidents that we go to investigate and occasionally our offices, our modal offices will pick up more investigations or more costly investigations than we had predicted.



Q I see. What happened when you went over budget on your mission -- on your mission portion of your budget?
A On the mission, I was supported -- I was provided additional funds to cover the overage. Primarily the agency holds in reserve a significant amount of money exclusively for this particular dilemma.
Q And what did you do to -- what are the steps that you had to take to obtain the overage?
A Well, first of all, I had to report to the CFO and the managing director. I anticipated going over my budget ceiling and then give essentially an explanation why I was exceeding that and it's not a very complicated process. They would look at the explanation, and this happens not infrequently at the NTSB for mission activity, and the CFO then forwarded to my budget additional monies to cover it.
Q And when you said when you forwarded a request or notice that you anticipated going over, was that in writing?
A No. I -- the dollars, I would have

communicated with the CFO the actual numbers that I expected but the explanation on why I was going over was verbal, I believe. I don't think I even gave a written explanation.

Q So which portion, if any, was ever written to the CFO?

A Just the request for additional funds.

Q And how would you communicate that, by e-mail, by interoffice mail?

A I don't recall how I did it but it would likely have been e-mail.

Q So we have formulating the budget based on appropriations and execution and then you said verification. What did you mean by verification, sir?

A The auditing, verifying that the staff are appropriately using the funds, that they're following the -- whether they're OMB or other federal or internal agency rules on how funds can be used. That there was a regular review of appropriations versus expenditures to make sure that the checkbook was balanced, so to speak.



Q And how did you perform the audit, sir?

A I have an administrative officer who kept the regular books during the course of business and then I would perform monthly reviews of all the expenditure categories.

Q And you said you have administrative assistants or someone in an administrative capacity help you with that?

A Yes.

Q Who was that person?

A That person changed during that period 2000 to 2005 but for the most part it was either Annette Willis or Vicky Parezo.

Q And was their sole duty related to financial budgeting issues?

A No. They were administrative officer in a general sense. They were responsible for budget and finance. They were responsible for travel, for training, for administrative activities, personnel oversight, purchases. That person, for example, had the purchase card for the office. Each of our investigators has a travel card exclusively to be



used for travel. Our purchases are made with a purchase card and our administrative officer in Highway possessed that purchase card. So all the purchases would be made through her.

Q And was that a full time employee?

A Yes, it was.

Q And you said you, yourself, would do monthly reviews?

A I would do monthly reviews with that individual.

Q And how long would the monthly review take?

A They would take several hours.

Q Other than the monthly review, what other type of audit work would you do as the director of OHS?

A Well, as the director of OHS I had a few subordinate supervisors, but we all were responsible for the review of payroll and pay and time and attendance for approval and reviewing any expenditures and any obligations.

Q And when you said you were all responsible



for that, can you describe to me, I guess, the delegations responsibilities between yourself and your supervisors?

A Well, it depends on time and attendance, for example, the individual supervisors -- individuals report to a supervisor, that supervisor would verify time and attendance. For time and attendance, I also had individuals reporting directly to me that I had to verify time and attendance, which includes payroll and overtime and annual leave and sick leave and all of the payroll issues.

I also had oversight of the supervisors and their activities on time and attendance, the same basic chain of command and cascaded responsibilities for all the other areas.

Q What other areas, sir, besides time and attendance?

A Mission, travel, training, procurement. Those are really the big categories.

Q And describe to me the balancing part of the budget work that you had described before.

A Well, monthly I would take the

appropriations and the money that was provided to us which was distributed on a quarterly basis to the offices at the beginning of the year. We were given an indication of how much our total annual distribution would be, but it was then distributed in a quarterly distribution.

I would take the expenditures and the planned expenditures for the following month, match them against the distributed appropriations from the CFO, the money that was appropriated to the Office of Highway Safety and make certain that I wasn't planning or going over my balance in any particular category.

Q And where would you keep all the, I guess, budgeting information? Was that stored electronically?

A Much of it was electronically, yes.

Q What portion of it was electronic, what portion of it wasn't?

A Well, the majority, it depends on the year. The further along we got from 2000 to 2005, the more of it was electronic. The majority in any



of those years was electronic, but some of the documents were still paper.

Q And where would the electronic documents be stored, sir?

A I believe the general documents would likely be stored with the CFO's office.

Q Okay. Has the CFO changed since 2000?

A Yes.

Q And how many CFOs have there been at NTSB?

A I think since 2000 there have been two.

Q And have you ever had the occasion to go back and ask to take a look at prior budgets or other financial information stored or kept by the CFO as it applies to the Office of Highway Safety?

A Not kept by the CFO. I have looked historically at budget information from the prior year to plan the next year's budget request.

Q Where would you get that information from?

A The internal Highway documents that I had as Highway director.

Q I see. What kind of other information does the -- what kind of other information with



regards to salary is maintained by the CFO?

A Well, the CFO is primarily interested in financial aspects, so it's salary, overtime, pay and benefits, the cost of benefits.

Q Have you ever spoken or have you ever attended a meeting with the CFO with regard to salary?

A In what time frame?

Q Between 2000 and 2005?

A As the officer of director of Highway Safety?

Q Right.

A No meeting that was exclusively to discuss salaries. Salaries in the federal government are set by others outside of the agency. It is -- there's not a great deal of control other than overtime that the managers have regarding salaries. Benefits at the office directors level are not a calculation that we concern ourselves with because they are completely out of our control. That is a CFO level activity. And the only conversations I would have had with the CFO regarding salaries was to notify them of the



departure or arrival of new, or employees who were leaving.

Q Have you ever spoken with -- between 2000 and 2005 did you ever speak with the CFO about going over budget with regard to any salary or compensation paid to employees or contractors of your office?

A Not contractors. I do recall at least two occasions where because of the award program that was constituted in the Office of Highway Safety, there were a few people that were going to go over their prescribed percentage for their rating.

Let me see if I can describe that. The Office of Highway Safety instituted an award program that provided awards to staff during the year rather than at the end of the year rating cycle which was traditional.

Because of that accumulation of awards, occasionally I would have an employee who would exceed the percentage prescribed by our human resources office for awards. Each year I had one or two employees in this category and I would notify the CFO and the human resources office of this exception

to the internal rules.

Q Describe the award program, sir, at NTSB for staff as you had mentioned?

A During that time frame, 2000 to 2005?

Q Yes.

A There was a Board order on awards, on how to provide awards. It was in the performance management, Board-ordered, or a category in the performance management, Board-order. And most of the offices during that time provided end-of-the-year awards commensurate or associated with the end-of-the-year rating for the employees.

One or two offices, the Office of Highway Safety, initiated, with the approval of the managing director and the chairman, a different approach which was to provide cash awards during the year at particular milestones when programs or activities were achieved.

So instead of waiting until the end of the year, we gave awards out throughout the year and at the end of the year, there were no end-of-the-year awards because the aggregate constituted the award.



Q Sure. Did you have to obtain any special authority to provide the during-the-year awards as opposed to the end-of-the-year awards?

A I did. The performance management board order permitted the office directors to provide very small on-the-spot awards of their own volition prior to -- without having any additional approval. There was an awards budget provided to each of the offices so you had a -- and it was a percentage of the net salary for the employees. The more employees, the higher the award budget.

For the program of providing awards throughout the year, there was a mechanism within the Board order that provided the process, but it was a deviation from the basic norm of the agency. So I looked for the permission of the managing director and chairman to do this. There's no prohibition against it from OPM and there's no prohibition against it actually from the agency. It was just significantly different than what we had historically done.

Q And when you say the award budget was



applied to staff, at what levels of staff was it provided to? For example, was it all the way through GS-10, GS-11, GS-13, 14, or 15?

A When I said the awards were applied to staff, if that's what I said, I believe what I meant was awards were calculated -- the award budget per office was calculated based on the salary, the aggregate salary of that office. It was a percentage.

Q Is there anyone -- any employee within your office that because of their rank, their government rank, that you are precluded from giving an award to?

A No, it -- in the Office of Highway Safety, this is 2000 to 2005 period, all the employees who worked for me were eligible for awards. It doesn't mean they received them, but they were certainly eligible based on their performance.

There are different -- there is a different award program for the senior executive service employees, so as a senior executive service employee and director of Highway Safety, my award



activity was governed by the managing director and others. And the SES go into a different award program. Everybody else in the agency, all the GS employees -- we don't have any wage grade employees -- are covered in this general award category and all are potentially eligible.

Q Were you, before you became an SES, part of that general award category?

A I was.

Q And how -- who determined your awards?

A My supervisor.

Q And who was your supervisor?

A As the office director, my supervisor would have been the managing director.

Q And between 2000 and 2005 who was the managing director?

A It was Dan Campbell.

Q Between 2000 and 2005, how did Dan Campbell provide awards to you, through what mechanism?

A I'm not sure that I understand the question.

Q Describe for me how Mr. Campbell provided you awards as a GS-15, given that you stated that he was your supervisor.
A I received awards at the end of the rating cycle which was the traditional method that the agency used to provide awards. The awards were based on the rating and Mr. Campbell's assessment of my performance during that period. They're given as cash awards.
Q Okay. And you said at the end of the rating period. What do you mean by the end of the rating period, sir?
A Every federal employee at the NTSB has a year-long rating period, a period for which their performance is rated. The periods vary depending on whether you are a non-supervisor, a supervisor or a senior executive.
Q I see. And when you were a GS-15 level, were you a supervisor or non-supervisor?
A Supervisor.
Q And as a supervisor, when did your rating period end?



A It would have ended July 31st.
Q And when would you have received your performance -- or your awards?
A Frequently we didn't -- I didn't receive awards or performance ratings until November, December.
Q When you said frequently, do you mean were there ever any exceptions to the timing of the awards, sir?
A They were -- they were not on the same day every year, but they were some time from the end of the performance evaluation --
Q Okay, so --
A -- from the performance period, the end of the performance period.
Q I apologize for interrupting you. I'm sorry. For July, would you ever receive a bonus in August, for example?
A Not during that time frame.
Q Generally it was always during the November period?
A Much later in the year, yes.



Q Other than a performance award, had you ever -- between 2000 and 2005 had you ever received any other type of an award?
A I don't believe so.
Q Other than salary and performance awards, what other mechanisms of compensation did you receive between 2000 and 2005?
A Well, the only other mechanism is the pay -- the benefits program provided to all federal employees.
Q What do you mean by benefits, sir?
A It is generally governed by OPM and it is health care, annual leave, sick leave, those kinds of benefits.
Q Did you ever receive overtime as a GS-15 supervisory employee?
A No.
Q Could you also receive benefits from anyone else in the chain of command higher than you besides the managing director? For example, could a board member give you an award?
A A board member -- the short answer is no,



not any board member.
Q Could a specific board member?
A The chairman could provide awards through the chain of command, through the managing director to office directors, to other employees and cascade that down to GS-7 employees.
Q I see. Would that award that began with the chairman and cascaded through the managing director have been anything other than the performance award that you would receive at or around November of each year for the prior rating period that would end in July?
A Are you asking for me specifically?
Q Yes, for you specifically?
A No, I did not get any other award like that.
Q So other than salary and the end of the rating period performance award, there were no other bonuses or other additional means of compensation other than salary provided to you?
A Not to me, no.
Q Can you tell me about your

responsibilities as the -- in general, can you tell me about your responsibilities as the director of the Office of Highway Safety?

A My primary responsibility was to investigate highway accidents, selected highway accidents for the agency and to craft reports and recommendations from those accidents.

Secondary to that was the advocacy activity in support for the Board members and advocacy activity throughout the agency for those recommendations.

And then third category would be general administration of the office and the personnel.

Q So there's investigating accidents, generating reports, and the advocacy for having the reports be approved and then there's general administration?

MS. COHEN: Objection, mischaracterization of testimony.

MR. LOWINGER: Can you read back his answer, please?

(The reporter read the requested portion



of the record.)

BY MR. LOWINGER:

Q Between 2000 and 2005, sir, do you know what your salary was each year?

A I can't recite it here, but I do basically know, yes.

MR. LOWINGER: I'm going to go off the record for a quick second, okay?

(Recess.)

MR. LOWINGER: We'll start with an exhibit.

(Osterman Exhibit No. 1 was marked for identification and attached to the deposition transcript.)

BY MR. LOWINGER:

Q Mr. Osterman, this is Exhibit No. 1. It's a document taken out of the EEOC investigation file that's been produced to us any number of times. Your name -- your name is the second on the list, am I correct?

A Yes.

Q And the salary for 2003, does that reflect



your salary for 2003?

A I believe so.

Q And does the salary for 2004 reflect your salary for 2004 as well?

A I believe it does.

Q And does the salary for 2000 -- does the SES award for 2004 reflect the award that you received?

A It does.

Q In 2003, does that salary reflect a GS-15 or an SES salary?

A That is a GS-15 salary.

Q And who set your salary in 2003 at GS-15 at $136,872, sir?

A That would have been the managing director, it would have been a combination of the GS salary plus a retention allowance.

Q You received a retention allowance in 2003?

A I did.

Q When I was asking you bonuses and other sources of salary -- of compensation other than



salary, I was trying to find out about retention bonus as you're disclosing right now. Are there any other sources of financial compensation other than a retention bonus and performance award that you received between 2000 and 2005?

A I received -- a retention allowance is considered salary, so you were asking for bonuses and for other compensation, so it is part of the salary structure in the regulations. So that's why I didn't respond in the way you wanted me to.

Q Excuse me, sir. In what years between 2000 and 2005 did you receive a retention bonus?

A All years.

Q And what was the source of the retention bonus, sir?

A What was the source? Clarify the question?

Q What is the basis for receiving a retention bonus as an NTSB employee?

A In my case, the basis was that I had had a job offer in the late 1990s in which I was going to accept and the agency, in order to keep me, added

money in a retention allowance to my salary.
Q And what position were you going to accept in the late 90s?
A It was a position with Star Mountain which is a research company dealing in motor vehicle carrier operations.
Q And what year in late 1990s was the position offered?
A I don't recall exactly.
Q Was it a position that had a financial -- that had a salary or a financial package that was larger than what you were receiving at NTSB?
A Yes.
Q And normally is a retention bonus a one time -- can we call it the retention bonus or should we call it something else?
A It's called a retention allowance.
Q I apologize, sir. Is normally the attention allowance an annual year to year, I guess, compensation method or is it generally a one time thing?
A It can be either.



Q Okay. As the director of the Office of Highway Safety, have you ever given a retention allowance?
A Well, as the director of the Office of Highway Safety I have not given a retention allowance to any other employees, nor did I have the authority to do that.
Q Okay. And how much was the retention allowance in 2000?
A I don't remember.
Q Do you know what it was in 2001?
A It's a percentage.
Q It's a percentage?
A It would be a percentage.
Q Who sets the percentage?
A The managing director.
Q Did you have discussions with the managing director each year about the percentage?
A I did.
Q Describe to me the meetings between 2000 and 2005 when your retention percentage was discussed?



A Each were very brief. He indicated that he was going to continue my retention allowance at each year.
Q And "he" being Dan Campbell?
A Yes, sir.
Q Did you have to schedule these meetings with Mr. Campbell?
A No, he scheduled these meetings with me.
Q Did they take part of a review -- as part of a review or were they separate meetings?
A They were part of the end-of-the-year review.
Q Normally in November?
A At some point, yes, between September and January.
Q I see. Each year did you receive a new position -- a new offer from the entity that offered you a position in the late 90s?
A No.
Q So it was just this one time offer and each year as a result you kept getting this retention allowance?



A It was continued, yes.
Q I see. Other than the retention allowance and the performance award and your salary, what other sources of compensation did you receive other than the benefits, the health care benefits or anything like that?
A That's all.
(Osterman Exhibit No. 2 was marked for identification and attached to the deposition transcript.)
BY MR. LOWINGER:
Q Mr. Osterman, can you tell me what the Bates number at the bottom of the page on the first document is?
A That one? 00396 and I believe it's a 7.
Q Okay. At the top of the page for the notice of personnel action, the effective date, what does that say?
A The 20th of December, 2004.
Q And in 2004 were you SES or GS?
A In 2004 I was SES.
Q What was your salary award for that year,

sir?
A $9,500.
Q And the documents that follow, can you tell me what the next document is on 3969 ending on 39799?
A I think that --
Q 68 through 69 through 70, through 71 it would be.
A 003972 is the notice of personnel action.
Q Actually, sir. The one with the NTSB performance appraisal form for the prior document which was the first one for 2004 that we reviewed. I apologize. Is that your performance evaluation for 2004, sir?
A Yes.
Q And do you remember when you received it?
A I believe in December of 2004.
Q Do you remember having a meeting about that?
A I had a brief discussion with Mr. Campbell.
Q I see. What was discussed during your



brief discussion with Mr. Campbell?
A My performance during the past year and what he expected from me in the coming year.
Q What did he say?
A He thought my performance was quite good, that I was doing well, especially in the production area of reports and his expectation of performance for the coming year was to continue that work and continue to work on improving the quality of the investigators and the work of those investigators in the Office of Highway Safety.
Q Did you have a review with Mr. Campbell the year that you became an SES?
A 2004 was the year I became an SES.
Q Okay. And following that, sir, the next document -- the next paper clipped set in your pack of information.
A All right.
Q On the first page with the Bates number 3972, can you tell me the effective date?
A 11/24/03.
Q Just one quick second, actually, sir.



MR. LOWINGER: Ms. Cohen, we don't actually have a personnel action with his salary for 2004. May we please have it?
MS. COHEN: If it exists in his personnel file.
MR. LOWINGER: Would you please look in his personnel file and advise whether it exists?
MS. COHEN: Yes.
MR. LOWINGER: Can we also have it for 2005 as well?
MS. COHEN: Same thing.
MR. LOWINGER: I understand. Thank you. Would we be able to receive it by October 15th with the other information?
MS. COHEN: Yes.
MR. LOWINGER: Thank you very much.
BY MR. LOWINGER:
Q Mr. Osterman, back to 3972, I apologize for the interruption. Can you tell me what your salary award was for 2003?
A For 2003 was $5,900.
Q And Mr. Osterman, what I don't understand



is how come this chart says that you didn't receive an award for 2003 and this personnel action says that you did receive an award?
A Because the category under the top section of the chart on Exhibit 1 lists SES awards. In 2003 this was not an SES award, I was not in the SES at that time.
Q Thank you very much. Is the $5,900 under the 2003 on the first exhibit, is that part of the $136,872?
A Say that again.
Q Is the $5,900 bonus noted in your 2003 notice of personnel action, Bates number 3972, is that part of your $136,872 salary that's noted on Exhibit 1?
A I don't know.
Q The following pages, 3973, 3974, 3975, 3976, 3977, 3978, 3979, 3980, 3981, is that your performance appraisal for 2002 through 2003, sir?
A It is.
Q And that would have resulted in your performance award of $5,900, sir?

A It is.
MS. LOWINGER: Ms. Cohen, missing from this is the notice of personnel action regarding his salary and his retention allowance for 2003. If we could have a copy of that as well.
MS. COHEN: Same as before, if it's available, you can have a copy of it. Again, like he stated, the retention allowance would be part of the salary.
MR. LOWINGER: I see.
BY MR. LOWINGER:
Q Mr. Osterman, do you keep records of your own set of personnel records?
A I have what I've been given by the agency.
Q And do you keep those in your office, sir?
A I do.
MR. LOWINGER: That's part of our meet and confirm agreement if we can have them. If it's not in his official personnel file, if we could have them through his person --
MS. COHEN: That's not something that you requested. We can discuss this at a later time.



MR. LOWINGER: I believe your letter said that you would look into the personnel files of the individuals as well.
MS. COHEN: To respond to any document request that you had already made, but you didn't ask for this information from --
MR. SCHER: Off the record.
(Discussion off the record.)
BY MR. LOWINGER:
Q For -- the next document -- actually, sir, Bates number 3973 through 3981?
A Yes.
Q Is this your performance appraisal for 2002 through 2003?
A It is.
Q Did you have a meeting with someone about this?
A It would have been Mr. Campbell.
Q And do you remember the meeting?
A I don't, actually.
Q On document 3986, the last page, it has your base pay of $107,844 and a recommended amount of



$5,900?
A Yes.
Q Is the rest -- is the difference between that and the $136,872, would that be your retention allowance?
A I don't believe so. I think it's -- I believe it is a combination -- the difference is a combination of the cost of living calculation and the retention allowance.
Q Thank you very much, sir.
A I'm not certain.
Q And the next document is 3982. Does that reflect your performance appraisal for 2002, sir?
A It does.
Q And that amount was $5,000?
A Well, this reflects my individual cash award. You said performance appraisal. This is $5,000 individual cash award for the performance period 2001 to 2002.
Q And that's what you would receive as a result of your performance during that period that we discussed earlier?



A Correct.
Q And it would also be a cost of living adjustment as well as a retention allowance?
A The cost of living adjustment is across the board for all employees, non-SES employees and it's set by OPM. It's not something the agency controls.
Q I see. The next document is 3983.
A Can I correct something?
Q Yes.
A I don't think the correct document is cost of living, it's location differential and cost of living. I forget exactly how OPM sets that now.
There is a base salary for GS-15 at any particular grade and then there is a cost of living and location differential that OPM sets for every GS employee depending on geography. I just wanted to make sure there's no confusion.
Q For 2001, Bates number 3983?
A Yes.
Q Your performance award was $3,200; is that correct, sir?

Page 50

A Correct.
Q And following that on 3985 it states that your base pay was $98,309. One more, sir. There you go.
A Okay.
Q And your recommended award was 3,200?
A Yes.
Q Do you know what your retention allowance would have been for that year as well?
A I don't, not off the top of my head.
Q Do you have any sense of what your retention allowances were between 2000 and 2005?
A I don't recall the percentage.
Q Can you tell me what the percentage is made up of? Is it a percentage of your overall salary?
A It is a percentage of base pay. Federal pay is the base salary plus that cost of living, location differential. It is the base salary that the retention bonus is a percentage of, and the retention bonus can be anywhere from 1 to 25 percent of base pay.

Page 51

Q I see. On the next page, 3986 through 3993 -- it's hard to know what these numbers are, sir, but is this your performance evaluation for the year 2000 to 2001?
A It appears to be.
Q Did you have a meeting with someone about the result of your meeting, of your performance evaluation?
A I do not believe that I did.
Q It doesn't necessarily say what your performance was, what the overall decision was. Do you remember what it was, sir?
A I believe that the overall decision is formulated in an attachment to this particular exhibit.
Q And those would be documents 3993 through 3996?
A Yes -- no, I don't believe that -- actually, to respond to your question, I don't believe that is an overall rating. That gives individual assessment in each of the elements.
Q Are you aware of any document that

Page 52

indicates what your overall rating was for that year, sir?
A I'm not aware of one. There may be.
Q The next document, sir, is 3998, which is -- has an effective date of 11/16/2000.
A Right.
Q Does that list your performance award for the year?
A It does at $3,000.
Q Do you remember what your base pay was for that year, sir?
A No, I don't remember what my base pay was.
Q And the rest of the documents in this pile reflect your evaluation for that year, sir?
A Yes.
MS. COHEN: What Bates numbers are you referring to?
MR. LOWINGER: 3998, 3999 -- actually, no, 394 -- I am sorry, 400 it looks like through 403.
For 2001 and 2000 we do not have any of the salary information. Could we have a copy of that as well, Ms. Cohen?

Page 53

MS. COHEN: Again, if it's in the personnel file, you can have it.
MR. LOWINGER: And when we ask for salary information that's in the personnel file, if you don't have it and he has a copy in his personnel file, that would be in your custody and control, I believe, so we should be entitled to receive it.
MS. COHEN: If it's responsive to one of your document requests or if you make a new written request, give us three days to respond.
MR. LOWINGER: I believe it is responsive already.
THE WITNESS: May I clarify a previous question that you asked?
BY MR. LOWINGER:
Q Sure.
A You had asked what my overall rating was in 2001; correct?
Q Yes, sir.
A I recall by looking at these documents, even though it is not reflected in here, that my overall rating in 2003 was excellent.

Page 54

Q Thank you. Between 2000 and 2005 do you know how many "excellents" you received in your overall ratings?
A One.
Q That was -- that did not preclude you from receiving an SES award; is that correct?
A Did not preclude me from receiving a cash award as a GS-15. I was not in SES at the time.
Q But do you feel that your evaluation -- overall evaluation of excellent hindered your appointment to the SES status?
A No, I don't believe so.
Q 3998 through -- I think we just did these actually.
A We did this one.
Q And then 4003, is that your notice of personnel action for your bonus in 1999?
A This is not the performance award for 1999. This personnel action that I'm looking at here, 400 -- and I cannot make out the last number, is a special act award.
Q Okay. Do you remember receiving a

Page 55

performance award for that year, sir?
A I did. I believe the performance reward is reflected further in this exhibit 00400 -- I have no idea what that last number is.
Q That looks like a seven, doesn't it?
A I'm not sure.
Q In 1999 you received a special act for 2500 and a recommended performance award of 5,000; is that correct?
A Correct.
Q And a -- did you receive a retention allowance that year, sir?
A I did.
Q Do you know what your salary was for that year, sir?
A I do not.
MR. LOWINGER: I'm just putting it on the record, we're going to ask for 1999 well.
MS. COHEN: We've already agreed to only go back to 2000.
MR. LOWINGER: For the prior document request. We're only going to go back to 1999 as long

Page 56

as it applies to this retention allowance.
MS. COHEN: For any document request, we've agreed only to go back to 2000.
MR. LOWINGER: For the ones that we discussed in our discovery request.
MS. COHEN: Right.
MR. LOWINGER: I don't believe our agreement was universal to everything going forward.
MS. COHEN: Then we will object going forward.
MR. LOWINGER: Okay.
BY MR. LOWINGER:
Q And your performance award of 5,000 is also noted on document 4016, sir?
A 004007.
Q This document is 401 -- it might be a 5, it might be a 6, we don't know, but it's dated October 24th, 1999 and it has a $5,000 performance award; is that correct, sir?
A I think I may not have the same copy that you have. The only personnel action that I have for that year is the special act action.

Page 57

Q Then I shall give you this document as well as part of your pile. Does this document that I just handed you reflect a $5,000 performance award?
A It does.
Q Thank you. Mr. Osterman, if you could do me a favor please, if you could look at document 3986?
A Okay. I'm having trouble with the numbers. Can I see the document that you're looking at?
Q Sure. I'd be happy to. Sorry about that.
A Okay, I'm looking at that.
Q Halfway down the page it says award recommended is, and it lists an entire set of awards?
A Yes.
Q Is that the entire universe of -- entire universe of compensation awards available to an employee of NTSB each year?
A It is -- what's available to the GS employees each year at that time in -- whatever year this was, 2003.
Q Okay. So in 2003 what is necessary to

Page 58

receive a special acts service small monetary award?
A They are for discrete events, level of performance. An office director or supervisor would recommend to the chain of command for these awards. The monetary amount -- when it says small monetary amount, it's generally under a thousand dollars and the amount is usually established by the office director.
Q Have you ever -- other than the performance and the special acts service award that we mentioned earlier, have you ever received any of these -- any of the awards listed here?
A During what time frame?
Q Between 2000 and 2005?
A Other than the special act award that you mentioned earlier of 2500, no.
Q During your employment at NTSB, have you ever received the chairman's award?
A No.
Q Have you ever received the managing directors award?
A Yes.

Page 59

Q What year did you receive that?
A 1995.
Q Were you a GS-15 at that time?
A I was.
Q I see. What's the Joseph Trippe Nall Memorial Award?
A This is an award -- there is a description of the requirements for candidates but it is an annual award given to an employee of the agency who demonstrates essentially the characteristics represented by Joseph Trippe Nall, a former board member who passed away.
Q I see. And who awards the Joseph Trippe Nall Memorial Award?
A The Joseph Trippe Nall Award, the John K. Lauber Award, special recognition award, regional field award are recommended by a panel of the office directors, the candidates.
There are -- office directors are solicited for candidates and then the office directors as a group review those candidates and make a recommendation to the managing director on who

Page 60

should receive each of those awards.
The managing directors award and the chairman's award, the same process exists, however the chairman and the managing directors make the final call for each of those.
Q Did you ever receive any of these awards as a GS-15, sir?
A Only the managing directors award.
Q What is the other special recognition award at the bottom?
A That is generally an award with not very much cash value but for particular discrete events that occurred during the year. Occasionally it will be for a group effort. We've had over the -- my term at the NTSB a couple of staff members who have in their private lives saved a life, so the agency recognizes them with an award, generally some kind of display piece with a very small monetary award.
Q I see. And what about the special act -- I'm sorry, the special act/service moderate or high monetary award, what happens when you receive that?

Page 61

A It is similar to the special acts small monetary award. It is for discrete activity or event in which the employee performed above and beyond, and the value given to that activity is over a thousand dollars.
Q And are you aware of ever -- as the managing director have you ever awarded it to a GS-15 employee?
A The special acts service award?
Q Yes.
A Yes.
Q And have you ever given it to a director of a modal office?
A As the managing director?
Q Yes.
A I don't believe so.
Q When you were the -- while you were the director of OHS, did you ever oversee the -- or were you ever -- did you ever have knowledge of the award -- this special acts/service moderate or high monetary award for another GS-15 employee?
A Yes.

Q Which employee was that?
A Mr. Magladry who was then my deputy. I recommended him for a special act award. I could only recommend it, it took the managing director's approval.
Q Back to Exhibit No. 1, sir, this document right here (indicating). Mr. Osterman, the salaries all here are salaries that are higher than Ms. Murtagh Cooke's salary. When did you first learn that Ms. Murtagh Cooke received a salary lower than the other modal office directors?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: I think that I only became aware of what Ms. Murtagh's actual salary was when I became managing director in March of '05.
BY MR. LOWINGER:
Q Other than knowing what her actual salary was, did you ever know that she was receiving a salary lower than the other modal directors?
A I do. I do.
Q And when did you learn that?



A I don't know exactly. Maybe a couple of years before that or longer.
Q And how did you learn that, sir?
A Through discussions with Ms. Murtagh.
Q And was there ever anyone else present during those conversations?
A I don't recall. There may have been.
Q Do you remember Ms. Murtagh -- do you ever remember a conversation with Dan Campbell about the fact that Ms. Murtagh Cooke received a salary lower than the other modal directors?
A Did I have a conversation with Mr. Campbell or --
Q Were you ever a party to a conversation?
A I don't recall that.
Q Were you ever a party to a conversation with Dan Campbell during which he discussed the -- when individuals would receive an appointment to SES level or when their offices would?
A Yes, I was.
Q Can you describe that conversation, sir?
A Mr. Campbell had a conversation with



office directors in 2000 or so where he described what the agency was attempting to do as far as acquiring new SES billets from the Office of Personnel Management, and he also indicated that the intention was to cascade those billets.
And as we received them from OPM at the time, the expectation was to receive new billets from OPM and cascade them out in sequence based on the size and function of the organizations.
Q What's the importance of size? What did Mr. Campbell say was the importance of size as it applied to an SES billet?
A He indicated that the belief of the chairman and he was that all of the office directors should be SES if all those positions should be SES. But we did not have the billets, the necessary billets from OPM to do that. And as we acquired those billets, he would distribute those based on the complexity and the size of the office. And he identified those as rail first, highway, marine, in that sequence.
Q Rail, highway, marine?



A Right.
Q And what about aviation?
A Aviation was already SES.
Q I see. Other than the 2000 meeting, were there any other occasions during which Mr. Campbell discussed salaries and modal directors?
A Not salaries.
Q What about positions or, I guess, status?
A There were some changes between 2000 and 2005 that permitted the agency or allowed the agency to open up more SES. The SES slots were not forthcoming from the Office of Personnel Management, but through retirements and reassignments of existing SES employees, reassignment from the SES to the SL. In Mr. Arena's case, Mr. Campbell was able to make available a new SES billets.
Q Is that the only time that a new SES billet was made available?
A No. There was more -- there was several occasions. The director of the NTSB academy position was made an SES at some point and that position was identified as an SES, the office director for highway

Page 66

safety was identified as an SES. Prior to, that, the office director of rail, pipeline, hazardous materials, and then after the Office of Highway Safety, the director position for marine safety was identified for SES advertisement.
Q Who is Mr. Arena, sir?
A Mr. Arena was the former director of the Office of Surface Transportation. When that office was dissolved, he became the associate managing director at an SES level and then sometime in 2003 or 2004 he was reassigned to an SL billet. The agency was able to obtain SL billets from OPM but not SES billets.
Q What was Mr. Arena's specialty for an SL slot?
A Interagency coordination, strategic management, safety and security.
Q With regards to what issues?
A The agency, broad issues of the agency.
Q Was he a specialist?
MS. COHEN: Objection, lack of personal knowledge.

Page 67

THE WITNESS: He was -- he was assigned specialty duties in the safety and security area, yes.
BY MR. LOWINGER:
Q And safety and security for what modes of transportation, sir?
A For the agency at large.
Q So he was a generalist?
A No, no, not a generalist. This is not a modal specific billet. His assignment in the SEL is -- or SL is the safety and security of the staff and the facilities, to continuous operation planning for the agency, badge and identification control, that kind of activity.
Q I see.
A Internal investigations.
Q Do you remember him ever interviewing for the SL slot?
A I don't have any knowledge of that. That happened before I became managing director.
Q Do you remember there being a notice of a vacancy for the SL slot that Mr. Arena eventually

Page 68

obtained?
A I don't recall.
Q You're not saying it didn't happen, you're just saying you don't remember?
A I don't know. I don't know.
Q When you became SES, did you have an interview for the position?
A Yes.
Q And was there an announcement for the position?
A Yes.
Q And were there other candidates besides yourself?
A Yes.
Q Do you remember how many interviews you went on for that position, sir?
A How many -- I had a single interview.
Q Okay. And did you have to submit an application as well?
A I did.
Q When were the academy SES positions awarded?

Page 69

MS. COHEN: Objection, lack of personal knowledge.
THE WITNESS: I don't know and there's only -- there was only one. There was one position -- I don't know. I don't know. Some time ago, maybe before 2000.
BY MR. LOWINGER:
Q Are you aware of any other discussion or communications related to Ms. Murtagh Cooke's status between 2000 and 2005 as a GS-15 employee?
A In what context?
Q As not being an SES position.
A Ms. Murtagh Cooke and I and Mr. Chipkevich had maybe one or two conversations about what the agency was doing to get SES billets made available for those positions, for the office director position.
Q At the time was Mr. Chipkevich an SES employee?
A He may have -- he may have been both. Before he was an SES and after. I'm not sure.
Q I see. Did Dan Campbell ever speak to the

Page 70

employees about the other -- I am sorry, did Dan Campbell ever speak to the other directors about your retention allowance?

MS. COHEN: Objection, lack of personal knowledge.

THE WITNESS: I have no idea.

BY MR. LOWINGER:

Q Did the chief financial officer of NTSB ever prepare a chart of all the modal office directors, salaries and bonuses that they received for Dan Campbell that they discussed with the other modal directors?

MS. COHEN: Objection, lack of personal knowledge.

THE WITNESS: For Dan Campbell?

BY MR. LOWINGER:

Q Yes.

A I don't know.

Q Have you ever seen a document detailing all the modal office directors' salaries and bonuses prepared by the chief financial officer?

A For what time frame?

Page 71

Q Any time frame, sir.

A I have since I've been managing director, yes.

Q Okay. And prior to that?

A I believe that I saw the 2004 chart in the 2005 deliberation for bonuses. If you can follow when determining the 2005 SES bonuses, the human resources department also displayed for me what the bonuses had been the previous year.

Q I see. Is it understood at NTSB that if you have an SES, if you have a higher salary than a GS-15 level employee?

A Is it understood?

Q Is it known?

A Generally, that's correct.

Q Are you aware of any SES employees that have a lower salary than a GS-15 employee?

A Not today.

Q At any time in the past?

A Yes, there had been. In 2005 there were three, I believe, employees.

Q Were they modal directors, sir?

Page 72

A No.

MS. COHEN: Brian, I'd like a short break here.

MR. LOWINGER: That's fine.

(Recess.)

BY MR. LOWINGER:

Q Mr. Osterman, for the years 2000 through 2005 we didn't have your annual salary or the other information related to your bonuses. Do you happen to know at this point, are you able to remember it?

A At this meeting right now?

Q Yes.

A No.

Q Could you provide it to me at some point?

MS. COHEN: Objection. If you have a document request, please ask me or Quan, not the witness.

MR. LOWINGER: Could you just get back to us on that? It's just a matter of his preparation for the deposition or the Equal Pay Act case so --

MS. COHEN: There was no need to for him to prepare. This is based on his personal knowledge

Page 73

only. If he doesn't remember, he doesn't remember.

MR. SCHER: Off the record for a second.

(Discussion off the record.)

BY MR. LOWINGER:

Q Mr. Osterman, with regard to your duties and responsibilities as the director of the Office of Highway Safety, did you plan, manage, direct and evaluate the work for the Office of Highway Safety and exercise important policy making and policy determining decisions impacting highway safety at the Board at international organizations, other federal agencies and international domestic industry?

MS. COHEN: Objection, compound question. Can you split those up, please.

THE WITNESS: What time frame?

BY MR. LOWINGER:

Q Between 2000 and 2005.

A Do you have a document that I can refer to? That was a long question.

Q Actually, I don't. Do you need me to get you one? I'll go through it again.

A Ask it again.

Q As the director of Office of Highway Safety did you plan, manage, and evaluate the work of the Office of Highway Safety?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacted highway safety at the Board?
A Yes.
Q Did you exercise important policy making and policy determining decisions at international organizations?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other federal agencies?
A Yes.
Q Did you exercise important policy making and policy determining decisions impacting highway safety at other international domestic industry?
A Yes.
Q Okay. Did you provide for the overall direction and technical accuracy of the investigation



and reporting process for major highway safety accidents?
A I did.
Q Did you develop the overall requirements and schedules to accomplish the highway safety program?
A Yes.
Q Did you review, approve and promulgate schedules and milestones for assigned activities?
A Yes.
Q Did you review, evaluate and approve, disapprove or modify requests for changes to milestones in schedules?
A Yes.
Q Did you develop overall program review documentation and provide status reports on a regular basis?
A Yes.
Q Did you determine the level of response and resource allocation for NTSB highway safety program?
A Yes.



Q Upon notification of a highway accident that warrants NTSB response, did you notify NTSB's chairman and managing director, another federal agency -- did you notify NTSB's chairman and managing director of the accident?
A Yes.
Q Did you notify another federal agency?
A Yes.
Q Which agency?
A Depends on the accident.
Q But you would notify another agency depending on the accident?
A I would notify the Federal Highway Administration, the Federal Motor Carrier Safety Administration, the Research and Special Programs Administration. It depends on the nature of the accident.
Q I understand. Did you notify any international agencies as well?
A Yes.
Q Did you notify other federal agencies regarding international aspects of an accident,



including, for example, the State Department?
A Yes.
Q Okay. Did you ever notify foreign embassies and/or flag state representatives as appropriate?
A Yes.
Q As a director of highway safety, do you serve as a hearing officer for public hearings?
A As the director of highway safety I did not. I served as hearing officer prior to my appointment as director of highway safety.
Q Thank you. Did you coordinate the allocation of staff resources with other office directors involved in the investigation?
A Yes.
Q Did you resolve differences between modal and support staff views regarding accident investigation, scope, required resources and analysis?
A Yes.
Q Did you ensure through complete and comprehensive review of the draft report that

Page 78

essential issues are adequately addressed?

A Yes.

Q Did you ensure that through the review of the draft report that all findings and recommendations are supported by analysis and that the board -- and that the draft sent forward is best of quality?

A Yes.

Q And did you ensure, as the director of highway safety, the proper presentation of the draft report before the board at board hearings?

A Yes.

Q As the director of highway safety, did you review work product of other modal and support offices?

A Yes.

Q As the director of highway safety, did you ensure that quality is commensurate, the quality of work product of other modal and support offices is commensurate with NTSB standards to promote success of NTSB highway safety program -- of NTSB's highway safety program?

Page 79

A Yes.

Q Including investigations, reports, safety recommendations and the marine safe -- and marine -- highway safety advocacy?

A Yes.

Q As the director of highway safety, did you establish and maintain liaison with international and domestic industry?

A Yes.

Q And did you establish an maintain liaison with international -- I'm sorry, with safety groups?

A Yes.

Q Did you establish and maintain liaison with labor organizations?

A Yes.

Q With associations?

A Yes.

Q Did you establish and maintain liaison with societies?

A Yes.

Q Did you establish and maintain liaison with Congress?

Page 80

A Yes.

Q Did you establish and maintenance liaison with federal regulators?

A Yes.

Q Did you provide authoritative advice and expertise to these groups in the development of industry standards and regulations?

A Yes.

Q Did you provide authoritative advice and expertise in the development of industry standards and regulations?

A Yes.

Q Did you provide authoritative advice and expertise to these groups with regard to technology and new applications of existing technology?

A Yes.

Q As the director of highway safety were you called upon to provide congressional testimony?

A Yes.

Q As the director of highway safety did you represent NTSB and serve as a member of the United States delegation at any international meetings

Page 81

regarding highway safety accident investigation issues?

A I participated in many international meetings on highway safety issues. The phrase you used there is part of the delegation, delegation in an official capacity, no; delegation as U.S. representative -- as a representative of the NTSB, yes.

Q I see. Thank you. Did you develop and justify estimates for staff resource requirements including personnel funding, equipment, and office space?

A Yes.

Q Did you present, justify and defend budgets on all levels of management?

A Yes.

Q Did you implement concepts to get results through people?

A Yes.

Q And did you make selections, assign work, train and reward employees?

A Yes.

Q And did you correct poor performance in a manner that maximizes the use of staff skills and achieving organizational skills?
A Yes.
Q Did you monitor work status through formal and informal means and procedures?
A Yes.
Q Did you ensure the appropriate results are achieved and that OMS's policies and priorities are effectively understood and communicated?
A OHS, yes.
Q I'll ask it again. Did you ensure that appropriate results are achieved and that OHS's policies and priorities are effectively understood and communicated?
A Yes.
Q Were you as director of highway safety, were you responsible for the creation and maintenance of an atmosphere that promotes positive human relations and open communications between employees and their supervisors?
A Yes.



Q As the director of highway safety, did you ensure that employees are given real and continuing opportunity to influence their work environment?
A Yes.
Q Did you ensure that employees are given a real and continuing opportunity to be able to participate in discussions related to methods of work accomplishment?
A Yes.
Q As the director of highway safety, sir, did you ensure reasonable equity within the Office of Highway Safety of performance standards and rating techniques developed by subordinates?
A Yes.
Q As the director of highway safety, did you ensure equity in the subordinates' assessment of the adequacy of contractor capabilities and contractor completed work?
A Yes.
Q Did you evaluate subordinate supervisors and senior nonsupervisory managers and serve as the reviewing official in evaluation of nonsupervisory



employees rated by subordinate supervisors?
A Yes.
Q As the director of highway safety, did you evaluate program accomplishments and their overall effectiveness?
A Yes.
Q Did you identify program problem areas and solicit from the division chiefs and senior technical staff their recommendations concerning alternative courses or corrective actions as needed?
A Yes.
Q Did you work closely with human resources in approving their recruitment, placement and retention of a high quality Office of Highway Safety work force?
A Yes.
Q Did you ensure that crucial training courses needed to keep pace with today's technological improvements in marine -- in highway transportation safety are provided to the staff for their technical and operational currency?
A Within budget limitations, yes.



Q Okay. As well as with their development and nontechnological areas?
A Yes.
Q Do you provide effective management training to maintain a highly motivated and cohesive force?
A Yes.
Q As the director of highway safety, did you relate equal employment opportunity concepts to overall responsibilities?
A Yes.
Q Did you support an affirmative action plan while performing assigned responsibilities?
A Yes.
Q As the director of highway safety, were you available 24 hours a day, 7 days a week?
A Unfortunately, yes.
Q Is there any part of your job description as the director of highway safety that I did not discuss right here in regards to your responsibilities?
A That generally covers most of the duties.

Q What else is there that you're aware of, sir?
A Support for board members and the broader agency initiatives such as planning, participation and discussions on awards, the larger awards for agency staff. Broader agency-wide responsibility.
Q Your support for board members, can you describe that to me, sir?
A Board members are an advocacy tool for the agency. They frequently speak and discuss -- speak about and discuss issues with various groups internationally and nationally and they require support, modal support specifically, on the issues and information, both personal knowledge that I would have and the preparation of support material for their activities.
Q Was that a regular part of your responsibilities, sir?
A It was.
Q You also said supporting agency initiatives. Can you describe that work to me, sir?
A Agency initiatives, when necessary. For a



time, I was responsible for the supervision of the human resources office. Because of a change in management in that office, I had temporary management oversight of that particular function. I also had the EEO function through a subordinate employee for what was originally supposed to be a three month period. I had it for almost a year.
Q Is that it?
A Typical other duties as assigned.
Q And when were you involved in the human resources function?
A I am not sure this is correct, but 2001 maybe.
Q Okay. And when were you responsible for the EEO function through your subordinate for a one year period?
A Maybe 2000.
Q You've mentioned also that you had responsibility with regard to awards for staff?
A This is an office director-wide contribution to the discussion on agency-wide awards.
Q And describe that work for me, sir.



A That is essentially a meeting where candidates for the agency-wide awards are evaluated by the office directors and determined to be, made recommendation for a particular candidate as suggested by the group.
Q And you did that from 2000 to 2005?
A Yes.
Q Other than support for board members, supporting agency initiatives and meetings with regard to agency staff awards, what other than the responsibilities that I mentioned in there did you perform as the director of highway safety?
A In 2004 when I became an SES, I also was -- participated in the executive resource board meetings that were convened by the managing director to discuss a variety of issues. Usually, issues having to do with the acquisition of SES billets from OPM, SES and SL billets from OPM, the agency strategic planning and strategies for appropriations and authorization activity on the Hill. That's primarily what the executive resource board did at that time.



Q And how much time did you spend discussing with the managing director with regard to the acquisition of billets for SES and SL slots from OPM?
A Well, I was SES in 2004 and I did not participate in the ERB meetings prior to that. I don't know what happened in those meetings. At least two or three meetings, in 2004 ERB meetings, and at one meeting it was discussed the next year's request of OPM.
Q Did you attend meetings in 2005 as well?
A I did.
Q How much time between 2004 and 2005 would you say you spent attending ERB meetings discussing acquisition of billets for SES and SL slots?
A Maybe an hour and a half.
Q Altogether?
A Just that particular -- just that discreet topic, yes.
Q But altogether?
A Altogether.
Q And what about agency strategic planning? Can you describe that to me, please, sir?

A In 2004 the then managing director, Mr. Campbell began a renewed effort to produce a strategic plan for the agency and the ERB met a number of times to discuss the content of that strategic plan and review, draft strategic plans that Mr. Campbell had crafted.
Q And between 2004 and 2005 how much time do you spend discussing with the ERB or working on the agency strategic plan?
A Prior to becoming the managing director or after I became the managing director?
Q Prior to.
A I would estimate I probably spent about 24 hours.
Q And that was beginning in -- when in 2004 did you become an SES, sir?
A Spring -- winter, the early part. January maybe.
MR. LOWINGER: Hold on one second.
MR. SCHER: Off the record.
(Discussion off the record.)
MR. LOWINGER: We'd like to request all



salary information from Mr. Osterman and all other modal directors, Tom Hueter and Bob Macintosh from 2000 to 2005 including any and all bonuses, retention allowances or other forms of compensation.
MS. COHEN: We would request that you put that in a written request and at that point we will consider it.
MR. LOWINGER: Thank you very much.
BY MR. LOWINGER:
Q As the managing director, given your awareness of the salary differential, why didn't you make sure that Marjorie Murtagh Cooke received the same salary as the other directors or deputy directors?
A As the managing director I inherited the salary schedule for employees that was in place at that time and shortly thereafter the agency -- we made a decision to select from the SES announcement a candidate for the director of the Office of Marine Safety and that was not Ms. Murtagh.
Q I understand.
A So I'm not sure how to respond to your



question.
Q And when you realized that Ms. Murtagh -- as the managing director, that Ms. Murtagh Cooke had a lower salary than the other modal directors given her duties and responsibilities, why didn't you downgrade the other modal directors' salaries to equal that of Ms. Murtagh Cooke's?
MS. COHEN: Objection, assumes facts not in evidence.
THE WITNESS: Why didn't I downgrade the other modal directors?
BY MR. LOWINGER:
Q Yes.
A It makes -- the question make no sense. One, I don't have the authority to upgrade or downgrade salaries at will as the managing director. The salary rules are prescribed by OPM. There are some variations that can occur through promotions, retention allowances. There are -- but they are not variable.
Additionally, at that time for the SES the



agency was not certified through OPM, the current certification allows the chairman the authority, not me, but the chairman the authority to set SES salaries differently each year. That is new, that didn't exist in 2005.
In 2005, the salary adjustment was permitted in the upward direction. You could adjust senior executive salary by providing zero to some other percentage salary increase, but to reverse or go backwards in salary, which is the question you asked, would require a personnel or -- a disciplinary or performance action on the part of essentially the chairman for the SES.
For the GS level employees, it is exactly the same, to go backwards in salary you have to eventually demonstrate that grade needs to be reduced through the performance or discipline. That didn't exist elsewhere. There was no opportunity to do that at the time that I inherited this position.
Q What about actually giving a performance award to ensure that her salary was the same as the other modal directors or Mr. Hueter or Mr. Macintosh?

MR. LUONG: We're going to object to this line of questioning as argumentative as well.

MR. LOWINGER: I'm just asking why.

THE WITNESS: Performance awards are not intended to be salary offsets. Performance awards are intended to be representative of an award given for the level of performance for the prior year's activity or for discrete specific events. They're not intended and they're not permitted to be salary offsets.

BY MR. LOWINGER:

Q As the managing director, when you became managing director, what did you do to level the salaries, if at all?

A I did not have an opportunity to affect senior executives' salaries until the following year, 2006, when the agency was certified through OPM and I was able to recommend to the chairman a different salary structure for the senior executives.

Q When did you learn about Marjorie Murtagh Cooke's April 2004 meetings with Ellen, Engelman-Conners?



MS. COHEN: Objection, assumes facts not in evidence.

THE WITNESS: I didn't learn of her meeting with Ellen, Engelman-Conners before I became the managing director, but I did learn about it at some point after.

BY MR. LOWINGER:

Q And who told you?

A I can't remember if it was Ms. Murtagh herself or I learned it a different way. I don't remember.

Q Are you aware, sir, that Jack Spencer submitted an application for the SES position, the director of OMS position in 2004 and did not pass his application -- his application was not deemed acceptable by human resources as the first level of review?

A I'm not aware of that.

Q How many panels were -- how many ad hoc review panels were convened in 2005 for the SES position?

MS. COHEN: Objection, assumes facts not



in evidence.

THE WITNESS: The review panels for the SES position for --

BY MR. LOWINGER:

Q OMS, excuse me.

A In 2005.

Q Uh-huh.

A There were two.

Q How many did you participate on?

A One.

Q Which one did you participate in, the first one or the second one, sir?

A First one.

Q When was that?

A It was in the -- it was prior to March and it was between the new year and March. I don't remember the exact dates.

Q Was there any documentation written up about the review of the candidates?

A Not by me. I believe there may have been some notes taken by -- first of all, there was an evaluation that was sent back to the selected



official and -- with a recommendation on ranking the candidates. I think there may have been some notes taken by Ms. Weinstein.

MR. LOWINGER: Mr. Luong, are you in possession of the first ad hoc panel's recommendation to the managing director?

MR. LUONG: If that's something we have, we'll provide that to you.

MR. LOWINGER: Thank you. Do I have to make a request because I think I've requested it before?

MR. LUONG: We would say the same thing. If you haven't requested it before, if you want to put the request on the record, that's fine, but we request that you follow up with a written request.

BY MR. LOWINGER:

Q When you became managing director, sir, you knew there was a discrepancy between Ms. Murtagh Cooke's salary and that of the other modal directors?

A There was a different salary for every modal director and every SES. There was no standard salary.

Page 98

Q Were you aware that hers was lower than the others?
A Yes.
Q Did you do anything to ensure that Marjorie Murtagh Cooke's salary or other compensation was changed so that it was the same as everyone else's?
A No, and that wouldn't have been appropriate.
MR. LOWINGER: No further questions. Actually, you know what, one further questions.
BY MR. LOWINGER:
Q Who's Bob Bartlet?
A Bob Barlett, two Ts, B-A-R-L-E-T-T. Robert Barlett is currently the director -- the manager for the NTSB communication center and works in my office. He is a GS-14 level employee. He's had a variety of different positions within the agency.
Q What is his expertise in marine safety?
A Mr. Barlett has no expertise in marine safety.

Page 99

Q Who replaced Marjorie Murtagh Cooke immediately after she was no longer the director of OMS in 2005?
A Mr. Barlett was detailed as the acting director in the selection and arrival of the candidates for the SES.
Q Did Mr. Barlett appear before the board at any time as the acting director of OMS?
A In a board -- in a public board meeting, is that the context?
Q Yes.
A I don't believe so. I'd have to go back and look at the reports that were delivered to the board during that time frame that he was detailed.
Q And that would have been from -- when was his detail?
A Late May, early June of 2005 to August of 2005.
MR. LOWINGER: Thank you. No further questions.
MR. LUONG: Can we have five minutes off the record?

Page 100

MR. LOWINGER: Sure.
(Discussion off the record.)
MR. LUONG: We have no questions.
BY MR. LOWINGER:
Q Just as a follow up, Mr. Osterman, when did the ERB discuss Ms. Murtagh Cooke's complaints to the EEO.
MR. LUONG: Objection --
MS. COHEN: Objection.
MR. LUONG: -- assumes facts not in evidence.
THE WITNESS: To my knowledge, the ERB did not discuss Ms. Cooke's complaint to the EEO.
MR. LOWINGER: No further questions.
MR. LUONG: The witness would like to read and sign.

(Signature having not been waived, the deposition of JOSEPH OSTERMAN concluded at 12:24 p.m.)

Page 101

ACKNOWLEDGEMENT OF DEPONENT

I, JOSEPH OSTERMAN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached Errata sheet signed by me.

_______________ ______________________________
(DATE) (SIGNATURE)

CERTIFICATE OF COURT REPORTER - NOTARY PUBLIC

I, Sarah M. Bickel, commissioned as Sarah Marie Harple, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 2nd Day of October 2007.

My commission expires:
August 31, 2009

___________________________
NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA



E R R A T A  S H E E T

IN RE: Cooke v. Mark Rosenker

RETURN BY:__________________________________________

PAGE LINE CORRECTION AND REASON

____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________

____________ _________________________
(DATE) (SIGNATURE)



E R R A T A  S H E E T  C O N T I N U E D

IN RE: Cooke v. Mark Rosenker

RETURN BY:__________________________________________

PAGE LINE CORRECTION AND REASON

____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________
____ ____ __________________________

____________ _________________________
(DATE) (SIGNATURE)