# EXHIBIT J

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - - - - - - - - - - - - - - -x

MARJORIE MURTAGH COOKE, :

Plaintiff, :

vs. : Case No. 06-748C

: Judge Thomas C. Wheeler

THE UNITED STATES, :

Defendant. :

- - - - - - - - - - - - - - - -x

Deposition of JOHN S. SPENCER

Washington, D.C.

Wednesday, August 15, 2007

9:55 a.m.

Job No. 1-110022

Pages 1 - 255

Reported by: Paula J. Eastes

Deposition of JOHN S. SPENCER, held at the offices of:

THE EMPLOYMENT LAW GROUP, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

Pursuant to agreement, before Paula J. Eastes, Court Reporter and Notary Public in and for the District of Columbia.



A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF:

BRIAN M. LOWINGER, ESQUIRE
The Employment Law Group, P.C.
888 17th Street, Northwest
Suite 900
Washington, D.C. 20006
(202) 331-2883

ON BEHALF OF THE DEFENDANT:

LESLIE CAYER OHTA, ESQUIRE
Department of Justice
Commercial Litigation Branch
1100 L Street, N.W.
Washington, D.C. 20530
(202) 305-2061



A P P E A R A N C E S

ON BEHALF OF THE DEFENDANT:

KATHLEEN SILBAUGH, ESQUIRE
National Transportation Safety Board
Office of the General Counsel
490 L'Enfant Plaza, Southwest
Washington, D.C. 20594
(202) 314-6084

ALSO PRESENT:
MARJORIE MURTAGH COOKE



C O N T E N T S


| EXAMINATION OF JOHN S. SPENCER | PAGE |
|---|---|
| By Mr. Lowinger | 6 |


E X H I B I T S

(Exhibits attached to the transcript.)


| SPENCER DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 1 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements State Issues Enhance Recreational Boating Safety | 216 |
| No. 2 NTSB Recommendations & Accomplishments - Most Wanted Transportation Safety Improvements Federal Issues Marine - Reduce Accidents and Incidents Caused by Human Fatigue | 218 |
| No. 3 MOU Between NTSB and United States Coast Guard Regarding Marine Accident Investigation | 223 |
| No. 4 Application of John S. Spencer | 224 |
| No. 5 Weekly Reports | 225 |
| No. 6 Position Description of John S. Spencer | 232 |
| No. 7 Notifications of Personnel Action | 233 |
| No. 8 NTSB Senior Executive Service Performance Plan and Appraisal | 235 |
| No. 9 SES Rating Sheet for John Spencer | 247 |

Page 6

P R O C E E D I N G S
JOHN S. SPENCER
having been duly sworn, testified as follows:
EXAMINATION BY COUNSEL FOR PLAINTIFF
BY MR. LOWINGER:
Q Good morning, sir.
My name is Brian Lowinger. I am an attorney for the Employment Law Group. We are representing Marjorie Murtagh Cooke in this action against the United States currently before the Court of Federal Claims.
Can you please state your name for the record?
A John S. Spencer.
Do you want my middle name?
Q Sure.
A John Sherman Spencer.
Q Thank you.
Spencer, can you spell Spencer for the Court Reporter?
A S-P-E-N-C-E-R.
Q Mr. Spencer, just a few preliminary issues

Page 7

before we start today.
Have you ever been deposed before?
A No.
Q Really it is like a question and answer period.
I mean, given your years of experience, I am sure it is no different than some of the other things you have done in your life.
I am just going to ask a series of questions of you today. I ask that you wait for me to finish the question and then you respond. I will try not to interrupt you as well.
A Okay.
Q The next part of it all is this isn't going to be videotaped. This is all stenographic. So, we ask that your answers be verbal. Head nods and head shakes, they don't translate on to the record really.
The next part is that if you are thinking yes or uh-huh, if you would answer yes or no, because sometimes uh-huh looks like yes and sometimes it looks like it could also mean no just depending on what was meant by it the way it gets on to the record.

Page 8

Is that okay with you, sir?
A Yes. I understand.
Q Okay. Great.
I will be asking questions. Along the way your counsel, who is stepping in for Meredyth Cohen, Ms. Ohta, may assert some objections and that is perfectly normal. That is just part of the process. The judge will determine whether or not the objections are sustained or whether or not they are going to get into the record. I still ask that you respond. The only difference is if there is a claim of privilege and you are instructed not to respond, that is something different. We are not likely going to have that problem today.
Okay?
A Okay.
Q The next part is answering the questions. If you answer the question, I have assumed you heard it and understood it and are able to respond to it. So, if you don't understand any part of it, please just let me know and I will either have the Court Reporter read it back to you in case you didn't hear

Page 9

it or if it has to be rephrased, we will just rephrase the question.
Is that okay?
A Yes.
Q The next thing is just some personal issues.
Are you under any medication or have you taken anything that in any way affects your ability to hear, understand and respond to the questions?
A I am taking medication, but I don't believe it affects my ability to hear or answer.
Q Which medication is that?
MS. OHTA: I object to that. He does not have to disclose what medication he is on. He gave his opinion that no medication that he is taking at this time would impair his ability to hear, remember or answer the questions.
THE WITNESS: So, what am I supposed to do?
MS. OHTA: You are not supposed to do anything.
THE WITNESS: Okay.
BY MR. LOWINGER:

Page 10

Q Just some personal questions again, sir.
Have you ever been convicted of a crime?
A No.
Q Thank you.
MS. OHTA: I would like to advise the witness to please pause after the attorney's question so I have the opportunity to interpose an objection. That was an objectionable question and I would have objected to it, but you answered it.
THE WITNESS: I'm sorry.
BY MS. OHTA:
Q Can you tell me what you did to prepare for today's deposition today, sir?
MS. OHTA: You can --
MR. LOWINGER: Hold on. I will be happy to finish this off.
MS. OHTA: Then why don't you finish your complete question?
MR. LOWINGER: I will take care of it.
Thank you.
BY MS. OHTA:
Q As part of that, please don't disclose any

Page 11

communications you had with your counsel. If you spoke with your counsel, just say I met with counsel. If you read some documents, then please just let me know which documents you read. If you spoke to someone who wasn't counsel, please let me know who you spoke with. And if that person happens to be affiliated with your counsel, then please I am going to ask you about that as well.
MS. OHTA: Yes. With one clarification.
If you met with a person other than your counsel in the presence of your counsel, then that also is privileged.
THE WITNESS: Okay.
MR. LOWINGER: Well, you know what? As he answers, if there is a problem with privilege that comes up, what we will do is we will just put that question under seal or we can just strike it as it comes up so that there aren't any speaking objections as we go along.
MS. OHTA: I am not exactly sure what you mean by speaking objections, but I will object when I think it is appropriate to object.

Page 12

MR. LOWINGER: I understand that.
Thank you.
BY MR. LOWINGER:
Q Can you please tell me what you did to prepare for today's deposition?
A Well, the first thing I did when I heard about it was I put it on my calendar and set the day aside so I would be available.
Then the day before yesterday Kathy brought me a folder with some papers in it, which I read and gave back to her the same day.
Then yesterday I met with her for a short time.
Q Can you tell me which papers you reviewed, sir?
MS. OHTA: I object on the grounds of work product privilege. The selection of those documents was made by an attorney and represents a work product.
MR. LOWINGER: Well, if he is referring to the Complaint, that is publicly available. I don't see how that is privileged. I don't see how that is work product.

Page 13

How is that in any way associated with the preparation of litigation? She is just handing him documents that are otherwise available through the court.
MS. OHTA: What is work product is the attorney's selection of specific documents that the attorney believes are somehow relevant.
If he simply looked at a body of documents in which the attorney didn't go through any kind of a selection process, then it wouldn't be work product. But the public nature of the document itself has nothing to do with the work product privilege.
BY MR. LOWINGER:
Q So, you reviewed documents and you spoke with counsel. Other than that, did you speak with anyone else in preparation who wasn't counsel, who wasn't an attorney, or who was not in the presence of an attorney?
A Other than to say that I was going to be deposed today, I didn't discuss anything.
Q Sir, can you tell me your professional experience prior to joining NTSB?

A Starting with college?
Q Sure.
A All right.
I did my undergraduate work at Webb Institute.
Q Where is that?
A It is in Glen Cove, New York.
At that time it was called Webb Institute of Naval Architecture.
In 1969 I received a Bachelor of Science degree in Naval Architecture and Marine Engineering.
Then I joined the Coast Guard as an officer and was assigned to the Eighth Coast Guard District in New Orleans, where my work involved plan review of commercial vessels and correspondence involving plan review of commercial vessels and some limited handling of appeals. I also developed technical standards in some areas where they were lacking just for the sake of having some standard that we could review drawings by.
In around January 1972 I was transferred to Coast Guard Headquarters and was assigned to, I



believe it was called the Hull Arrangements Branch of Merchant Marine Technical in Washington. There I wrote some regulations or drafted regulations, staffed appeal actions and developed technical standards. I probably did other things too, but I think that was the majority of my work.
I got off of active duty in July, July 3rd, 1973, and went to MIT, where I received a Masters of Science in Naval Architecture and Marine Engineering in 1974.
In 1974 I returned to the Coast Guard as a civilian staff naval architect. I think it was still called the Hull Arrangements Branch back then. But anyway it was basically the same organization. I stayed with that group through some reorganizations. At one point it was changed to the Ship Design Branch, the name was.
I was promoted to a Section Chief, GS-14, somewhere along the way. I don't remember exactly when that was. I think it was the late 70s.
Then in, I think it was 1987, I was promoted to GS-15 Branch Chief of the Naval



Architecture Branch of the what had since become the Marine Technical and Hazardous Materials Division.
While I was working at Coast Guard Headquarters I also went to night school and I received my Doctorate in Structural Engineering from George Washington University.
1989 was when I received the degree and also in 1989 the Coast Guard selected me as what I believe was the first civilian to go full time to the Naval War College in Newport, where I was until around April or May, sometime in the spring, and I graduated from there with a Masters of Arts in National Security and Strategic Studies.
Then I returned to my position as Branch Chief after getting out of the school there.
In 1990 I left the Coast Guard. I was given a job offer with a classification society, which is a not-for-profit private company I guess you would call it, that developed standards for ships, does plan review for ships and then inspects ships and issues certificates, class certificates, according to their rules, and also statutory certificates were authorized



by governments.
My position there was Vice President of Technology and Business Development for the Americas Division, which was a new division.
ABS was reorganizing at that time and I moved to Houston, Texas.
Q I'm sorry. What year was that again, sir?
A 1990.
When I got off of active duty in 1974, I stayed affiliated with the Reserves. So, I had a whole career in the Coast Guard Reserves with various assignments. Training Officer. Executive Officer. I was Commanding Officer of two Reserve Units. I retired from the Coast Guard Reserve, I think it was in 1992, at the grade of Captain.
In 1995 I was promoted at ABS to become a Corporate Vice President and I was Vice President of Technology and transferred to the New York area, where I was at first responsible for leading the development of ABS's flagship technical product called SafeHull, where I led a team of about, I would guess it was about 70 engineers.

When that project started to wind down around 1997 I would guess or '98, in that time frame, I was transferred back to the main corporate office in the World Trade Center and was responsible for ABS's research program and rule development.

In 1999 they moved their corporate Headquarters to Houston. I moved back to Houston.

Then around 2004 I recognized that my chances for advancement in the company had pretty much ended at that point and that I was just going to be doing the same thing for the rest of my career and I became a little bit dissatisfied with that. So, I started to think about looking for other jobs.

Sometime in 2004 I found an advertisement for a job at NTSB which I applied for and nothing came of it. It was re-announced in 2005 and I applied for that one and was interviewed. I can't remember when I was interviewed. But I was interviewed and then offered the position, which I took, and I reported to NTSB in August of 2005 where I have been ever since.

Q Where did you find the application, the advertisement for the position for NTSB, sir?



A At usajobs. The Internet.

Q Just as a note, if it gets too bright when the sun comes through for anyone here, just please let me know and we will close the shades.

One thing I didn't mention to you, sir, is that any time you would like to take a break, please let me know and we will be happy to give you a break.

So, you found the position on usajobs. That is a website?

A Yes.

Q You submitted an application in 2004 and 2005?

A Yes.

Q But you only interviewed in 2005?

A That is right.

Q How did you find out that you were going to be interviewed, sir?

A I was called. I think I was called by the Human -- what is it? I was going to say Human Factors.

Q Human Resources?

A Human Resources. Right.



They called me up and just said can I come up for an interview?

Q Did your application in any way change between 2004 and your interview in 2005 when you resubmitted?

A Well, actually I don't know. I can't remember.

I know what I submitted in 2004 formed the basis of what I sent in in 2005, but I don't remember where they differed.

Q Did you make any follow-up calls for the 2004 vacancy announcement to find out whether you were going to be interviewed or anything like that?

A No.

I just assumed I didn't get it. I didn't think too much about it.

Q Had you spoken with anyone in the industry or in government about the vacancy at any time after you submitted your application either in 2004 or 2005?

A Not in 2004. In 2005 I did.

My boss at ABS was Admiral Jim Card, who is a good friend of mine and who I worked with since the



early 70s. He and I are friends on a personal basis and I just let him know that I was tired of working at ABS and was thinking about leaving. When I applied for the job at NTSB, I told him that I had done that. He said it sounded like a good job for me.

Q Are you referring to the first time you applied or the second time when you spoke to Mr. Card?

A Second time. I didn't talk to anybody but my wife the first time.

Q I'm sorry?

A I didn't talk to anybody about my application, my first application, to NTSB.

Q Just for a point of clarification, sir, how do you know Admiral Card?

A I first met him in January of 1972 when I was transferred to Headquarters and he was in the same branch. I think he was a Lieutenant at the time.

Around 1980 when he was a Commander he came back to Headquarters and he was my Branch Chief. So, I worked for him for about four years.

Then sometime after he retired from the Coast Guard he took a position at ABS in Houston,

where I worked for him again.
Q Did anyone make any calls on your behalf to NTSB to advocate your application?
A Not that I know of.
Q Did you speak with anyone else from the Coast Guard who was either active at the Coast Guard or retired from the Coast Guard regarding your application?
A I did not talk to anybody who was active at the Coast Guard.
I had some people listed as references and I talked to them and told them that I was applying for a job at NTSB and would they be agreeable to being a reference.
Q Did you ever follow-up with any of those people to find out if they received calls from anyone at NTSB?
A No. I never did.
Q I know that you have been very involved in the architecture and design of ships. What about actually going to sea? Have you ever been to sea as part of your work?



A Yes.
Part of the training at Webb is to go to sea. In the sophomore year, between the fall and spring semesters, we had to spend two months at sea.
I shipped out with Moore McCormick Lines for two months and sailed from between the U.S. and Africa, South Africa.
Then in the summer, between my junior and senior year, I shipped out for one month on Grace Line on a combination cargo/passenger ship.
Q Any other times, sir?
A No.
Q And those all were between I guess 1966 and 1970, both of those, the time you went out with Moore McCormick Lines and Grace?
A Yes.
Q You had mentioned that you were in the Reserves. I just had a few questions about the Reserves.
What did you do as a member of the Reserves?
A Well, I normally had to drill one weekend a month and I normally had to do two weeks active duty per year.



During the drills for most of my career my assignment was an administrative assignment in a Reserve Unit. Training Officer. Executive Officer. Commanding Officer.
For the last, I think it was about four years with the Reserves, I was in a Joint Service Unit at the Pentagon, where there were two of us Coast Guard Officers, where we supported the Secretary of Defense's Crisis Center.
Actually it was the Coast Guard who opened up the Crisis Center when the U.S. invaded Panama back in those days. So, I wasn't involved with that. But it was basically military support to the Secretary of Defense.
Also while I was on active duty for the two week periods that we had some of that would be training at Yorktown. I suppose there were maybe four or five periods of that, training in different sorts of skills that we needed to take. Most of it was what was called augmentation, where we would go to a regular Coast Guard unit and work for two weeks in some capacity. During the Mariel Boat Lift, which was what, around 1980 I guess, thereabouts, I can't remember --



Q I think it was 1979.
A Well, during the boat lift what happened was the Marine Safety Office in Baltimore sent a lot of their officers to Florida. So, I was called up to active duty for, I think a month or two, where I served as a Marine Inspector and I was a qualified Marine Inspector for the Coast Guard.
Q What is a Marine Inspector? What did you do as a Marine Inspector?
A What a Marine Inspector does, they have lots of different jobs, but for new construction, for example, what the Inspector would do is confirm for a U.S. flagship that the ship is built in accordance with the approved drawings. So, that involved going to the shipyard and looking at the drawings, checking the quality of the fabrication of the ship, the welds and that sort of thing, witnessing various tests.
I also conducted periodic inspections on

Page 26

existing ships. The certificates expired after a certain period of time and had to be renewed, which required an inspection. So, I would inspect life jackets or survival gear or check the interior condition of the hull and write-up a little report that went in the vessel's file.

I think that was it. That is most of what a Marine Inspector does.

Q Just as a point of clarification, because it is a little new to me, when you were referring to two week periods, you said during the two week periods, what is the two week period?

A Every year a Reservist has to spend two weeks of active duty. So, these two week periods were when I was called to active duty. I put on the uniform and went somewhere where I was ordered to go and did what they told me to do.

Q And during that time that you were on active duty, this was from 1974 through 1990, this is as a Reserve?

A Yes.

Q For example, during the Mariel Boat Lift

Page 27

you were called up for a couple of months and you were a Marine Quality Inspector; is that right?

A No. Marine Inspector.

Q Marine Inspector. I'm sorry.

And that would require you going to a shipyard and reviewing the drawings of a ship to see if the ship was built according to drawings or to advise with regard to the renewal of a certificate.

Is that correct, sir?

MS. OHTA: I object. You are mischaracterizing his testimony.

Why don't you just ask him a direct question?

BY MR. LOWINGER:

Q Please go ahead, sir.

A Well, what I did was as a Marine Inspector during that boat lift, when I was on duty there I worked at Sparrow Point Shipyard and I would come into the office and what the shipyard did for the Coast Guard Inspectors and for the classification society surveyors would be to give them a list of things that they wanted the authorities to check or to verify or

Page 28

to test or whatever. So, we would be told go check the quality on block such and such or go check the pipes over at this place at a certain time or witness a hydrostatic test of a ballast water tank.

So, what we were there to do is in accordance with the shipyard's construction schedule is to verify that the ship was built in accordance with plans and all the required tests were conducted and witnessed by either the Coast Guard or by the classification society.

Q Where is the Sparrow Shipyard, sir?

A It is outside of Baltimore across whatever that bridge is.

The Key Bridge? Is it called Key Bridge?

MS. OHTA: If you don't know, don't guess.

THE WITNESS: Okay.

MS. OHTA: Just answer the question as posed. And please don't interrupt me.

THE WITNESS: I'm sorry.

MS. OHTA: Thank you.

THE WITNESS: Baltimore. Near Baltimore.

BY MR. LOWINGER:

Page 29

Q You had mentioned also that you worked at a Crisis Center at the Pentagon.

A Yes.

Q When was that, sir?

A I don't know the exact years. It was late 80s.

This Crisis Center is --

MS. OHTA: There is no question posed. He simply asked you when you worked at the Crisis Center. It is very important for you to listen to the question. Let him finish his question and then answer.

BY MR. LOWINGER:

Q Please describe the work that you did while at the Crisis Center, working at the Crisis Center.

A The Secretary has a civilian staff of Assistant Secretaries and Deputy Secretaries and so forth and they have their staffs.

On the military side is the Joint Chiefs of Staff and their staffs and the military people do their operational work out of the National Military Command Center.

Page 30

Adjacent to that is the Secretary of Defense's Crisis Center and that is where the civilian leadership of the Pentagon would be briefed on military issues that were going on or other issues of national significance. And the role of the staff of the Crisis Center, the military people, my assignment, was to serve as an interface between the National Military Command Center and the Secretary of Defense's staff.

A lot of military actions that the military wished to take have got to be approved by the Civilian National Command Authority before they can take them. So, my job was to facilitate the communication between the military side of the Pentagon and the civilian side of the Pentagon and to make sure that pending actions were being staffed and acted on.

Q That was for a two-week period as well as a Reserve?

A As a Reserve it was once a month on a weekend and then it would be for various periods of one to two weeks whenever there was a national military exercise going on.

Page 31

Q What serves as a national military exercise? What is a national military exercise?

A Well, these would be drills.

For example, the crisis in Germany. This is before the wall came down. Crisis in Germany with a threat of a Soviet invasion, for example.

So, it would be a war game and actions that required National Command Authority approval would be staffed through the Crisis Center and those were the issues that we would handle.

Q I see.

While you were at ABS -- it is ABS, not ABC, right?

A ABS. Right.

Q Can you tell me what you did from 1990 through 1995 at ABS? Can you give me a little bit more detail?

I believe you mentioned that you were involved in certifications. But can you explain to me how you were involved in certifications?

A In 1990, I started in October of 1990, and at this point ABS was about to reorganize from a

Page 32

single ruled Headquarters type of an organization into an organization with a corporate office and three divisions. And so the divisions were new and one of the divisions was called the Americas Division, which was responsible for all of ABS's activities outside of the corporate office. That took place in North and South America. My job was to be the Vice President for Technology and Business Development.

So, the first part of that assignment was before we actually had our spaces in Houston and I helped get those set up and we moved this staff from Paramus, New Jersey where ABS was located to Houston in the summer of 1991. So, the first several months of that were just helping to get this new structure up and running.

Then after we were in place I had various responsibilities. One of my jobs was to project ABS as a technology oriented company. And in that capacity I would spend a lot of time on the road visiting ship owners and shipyards in North and South America and telling them about our products and what we could do and why they should class their ships with

Page 33

ABS.

When I was in Houston, I was also the Chairman of the various technical committees that ABS Americas had. We had a Naval Architecture Committee, Marine Engineering Committee, Mobile Offshore Drilling Committee. Those committees were made up of membership of influential technical people from the industry, knowledgeable people of the subject matter, and we would meet once a year and I would chair those meetings. I would put the agendas together and chair those meetings.

In addition, I was responsible for the quality of all of the engineering plan review work that was done by ABS Americas and that was not the day-to-day engineering work. What that was is if a decision had to be made that the rules didn't quite fit or they wanted to do something that was a little bit different, they would have to get their approval from me.

Also we were in the process during that time of getting ABS certified under an ISO 9000 quality system and I was responsible for leading that

effort in the Americas Division and serving as the Chairman of the Division Quality Steering Committee.
Q With regard to chairing the committees for the Houston committees, were you in charge of a committee yourself or did you just chair the entire I guess conference for the annual conference?
MS. OHTA: Objection. Vague. Ambiguous. Compound.
BY MR. LOWINGER:
Q Go ahead and answer, sir.
MS. OHTA: If you can understand what the question was.
THE WITNESS: This committee had one meeting per year and I chaired that meeting. So, I called the meeting to order and I went through the agenda of the meeting.
What we did is considered page by page all the proposed rules that were going before the committee that year and I ran the meeting.
BY MR. LOWINGER:
Q How long was the meeting?
A Usually about a half a day.



Q How long did it take to prepare for the meeting each year?
A For me to prepare?
Q Yes.
A Well, this starts out once a meeting ends in one year we start preparing for the next year's meeting. What we do there is we identify what rules we think need to be changed and then engineers in the Houston office and in the New York office would start developing and working on development of those new rules. Then we would review them in-house and when we were satisfied that they were ready to be proposed to the technical committees, we would prepare that in an annual booklet and review them at the meeting. And if they were approved by all the ABS technical committees, they became part of the ABS rules and a requirement for class.
Q Just so I that know, I want to clarify perhaps even, what does ABS do as a classification society? That is something I don't understand.
A ABS is one of many international classification societies. It is the main one in the



United States.
Classification societies started out basically as an independent third party means of verifying the seaworthiness of vessels.
So, if, for example, you wanted to buy a boat 100 years ago, a ship, how would you know that it was really a seaworthy vessel? You would go to a classification society and if it was classed with them, what that certificate meant was that the vessel was built in accordance with recognized standards and it was maintained in accordance with those standards and it was inspected periodically to verify that.
ABS started developing structural standards for ships more than 100 years ago and because they were the experts in that the Coast Guard did not have to develop structural regulations themselves. So, as Congress required the Coast Guard to take on more and more responsibility with marine safety, the Coast Guard never felt it was necessary to issue their own structural rules because ABS had them and in the Coast Guard regulations ABS was referenced as the acceptable standard for U.S. flagships.



Q So, what was your title between 1990 and 1995 at ABS?
MS. OHTA: Objection. Asked and answered. You went through earlier the various titles and positions he held at ABS.
BY MR. LOWINGER:
Q If you could just remind me, sir. Thank you.
A Vice President of Technology and Business Development.
Q Thank you.
Between 1995 and 1997 you were transferred to New York and working on the SafeHull Project.
Could you describe the SafeHull Project?
A Yes.
It was a first principles based design and analysis for ships. What that means is that for a ship you calculated what the weight loads were on it, the cargo loads, stresses and so forth, and determined what the required structure of the ship was in order to be approved for a class.
There was a computer program that went

along with it. It was a very complex set of rules. So, it could only be solved by a computer really.
So, this was the development of that computer program and of the technical standards behind it.
Q What was your role with regard to the development of the computer program, sir?
A Well, I led the group. I led the project.
Q Excuse me for just asking if you could just clarify what you mean by leading the group and leading the project.
What were your duties and responsibilities with regards to leading the group and the project?
A Well, my duties were to be sure that we had sufficient staff, sufficient capability to do the work, that we had a plan with deliverables, that the plan was being met. And then on the technical side, if there were questions that came up as to should we do it one way or another way, I would generally make the decision as to which way to go.
Q How many people worked for you in the SafeHull Project?



A It varied. But I think it was typically around 60 or 70.
Q And within those approximately two years that you were there, had the computer program been completed?
A Yes.
Q Is it still being used?
A I don't know. It has been two years since I left ABS. So, I don't know if they are still using it. They were using it when I left.
Q How does the SafeHull Program affect certification for ships?
A For ABS class ships the ships have got to meet all of the criteria of the SafeHull Program.
Q Okay.
And then in approximately 1997, '97 or '98, you went to the World Trade Center and worked with ABS in their research and rule development?
A Yes.
Q Can you tell me your duties and responsibilities, as well as your title, in that position please?



A Yes.
My title was Vice President of Technology. I reported to the Senior Vice President of Technology.
In Technology we had three groups.
In the New York office one group was research and that group sponsored research and conducted research in hydrodynamics and strength of materials, machinery, other sorts of things related to ships.
Another group was the rule development group. Since the rules were ABS-wide, these division technical committees ultimately reported up through the main technical committee at ABS. And so the rule development group at the ABS corporate office was responsible for finalizing the rules and publishing the rules and developing the rules to a certain extent.
The third group was a group we had at Paramus, which was a left over group from the SafeHull Project involved with maintenance of the SafeHull Program.
Q As the Vice President of Technology were



you in charge of all three of those groups?
A Well, functionally I was. But the Senior Vice President and I shared the responsibility. So, I don't know.
I ran the day-to-day operation I would say. So, the leaders of those groups reported up to me on a daily basis.
Q And how many people were part of all three of those groups?
A About 50.
Q Then in 1999 you transferred back to Houston.
Can you tell me what your title was when you went to Houston?
A The same title. The same job. We just moved offices.
Q You got your Masters of Arts and Science of Naval Architecture from MIT in 1973?
A Master of Science.
Q Master of Science.
From the War College in Rhode Island you had a Master of Arts?

A Yes.
Q What did you study as part of your Master of Arts, sir?
A The course was divided into three areas. I don't remember the exact names of what those trimesters were.
One of them was strategy and policy where we studied the history of warfare and the civilian leadership of warfare.
One of the trimesters had to do with operational command where we would study how a battle group Commander, for example, would operate.
One of the trimesters, the first one, had to do with what I remember was military procurement, how to develop specifications for a weapons system or something like that.
Q Can you tell me throughout the years whether there is any common theme as to the type of vessels that you did work on or that your work related to?
MS. OHTA: Objection.
MR. LOWINGER: Just let me clarify.



BY MR. LOWINGER:
Q For example, was it always commercial vessels? Were they cruise ships? Were they military ships?
I am just trying to find a common theme actually for the types of ships that you would be working on, sir.
MS. OHTA: Objection. Vague and ambiguous.
BY MR. LOWINGER:
Q If you understand the question, please answer.
A While I was in the Coast Guard the types of ships and boats I dealt with were those that were required to be inspected by the Coast Guard.
Q And what kind?
A U.S. flagships.
So, they included all kinds. Barges. Supply boats. Mobile offshore drilling units. Cargo ships. Tankers.
Q Did ABS limit its certification to any specific types of ships or was it all inclusive, including, for example, barges, commercial ships and



cruise ships, for example?
A They have rules for all types of ships. So, it was all ships.
Q And between the Coast Guard and ABS, did the ships also include military ships?
MS. OHTA: Objection.
Could you repeat that question? It sounds like a compound question.
MR. LOWINGER: Would you please restate the question, Madam Reporter?
(The reporter read the requested portion of the record.)
MS. OHTA: Objection. Asked and answered.
THE WITNESS: I don't remember in the Coast Guard if it was military ships or not.
With ABS the answer is we had increasing responsibilities with Navy ships and while I was there we were developing rules for naval vessels.
BY MR. LOWINGER:
Q While you were there was ABS certifying naval vessels?
A I don't know. I don't remember.



Q Which is it, sir, I don't know or I don't remember, just so that the record reflects that?
A I don't know.
MR. LOWINGER: We have been at it for an hour. Would you like a break, sir?
THE WITNESS: Sure.
(Recess.)
BY MR. LOWINGER:
Q Would you please tell me what you spoke about with your counsel during the break, sir?
MS. OHTA: Objection. Privileged.
MS. SILBAUGH: And don't answer.
MS. OHTA: That is so obnoxious of you and is so unprofessional when you see him in the hallway talking to his Department of Justice attorney and his Agency attorney to ask him the subject matter of those discussions.
BY MR. LOWINGER:
Q Sir, do you refuse to answer the question?
MS. OHTA: Upon advice of counsel, yes.
THE WITNESS: Yes.
BY MR. LOWINGER:

Page 46

Q Sir, I am just going to remind you throughout the day that you are under oath until the deposition is over.
Okay?
A Yes.
Q Okay. Thank you.
MS. OHTA: That was also gratuitous, unprofessional and mean spirited.
BY MR. LOWINGER:
Q Can you tell me your experience with any international or domestic organizations that weren't your employers prior to joining NTSB?
A Sure.
What would you like to know?
Q Which organizations did you attend conferences or meetings of during this period?
A I attended various professional conferences.
I attended meetings of the International Maritime Organization.
I attended various committee meetings.
Q Can you please give me the names of the

Page 47

professional conferences that you were either a member of or participated in during this period prior to joining NTSB?
A I can't give you all of them. I don't remember them all. But I will give you some.
The International Ship and Offshore Structures Congress.
The Offshore Mechanics and Arctic Engineering conferences. That is OMAE.
The Offshore Technology Conference. OTC.
There is another one called ISOPE, but I can't remember what that stood for.
The various symposiums sponsored by the Ship Structure Committee.
The Society of Naval Architects and Marine Engineers.
Those were the conferences open to the public.
At the International Maritime Organization I attended meetings of the Stability Subcommittee. I can't remember what the name of that committee was. But basically it covered stability of fishing vessels.

Page 48

I attended the Flag State Implementation Subcommittee.
The Design and Equipment Subcommittee.
Several meetings of all of those.
The Maritime Safety Committee.
The Marine Environment Protection Committee.
Those are the main committees that I know that I attended meetings at.
Then on the standards side, I was a member of the Mobile Offshore Drilling Unit Committee of ABS.
I attended meetings of the Naval Architecture Committee.
I attended at least one meeting of the Technical Committee of ABS.
I was on the American Petroleum Institute Committee 2U for Tension Leg Platforms.
I was on the Society of Naval Architects Papers Committee and their Council.
That is about all I can think of off the top of my head. If I had more time, I could come up with some more.

Page 49

Q I understand.
Now let's just focus on your period at ABS. Just a quick question.
This Ship Structure Committee, what is the Ship Structure Committee? Is that part of ABS or is that something outside of ABS?
A That is an interagency committee, the Coast Guard, the Navy, other government agencies and ABS.
Q Were there other standards groups involved as well? Private standards groups, for example?
A Not at the time I was affiliated with it.
Q The International Ship and Offshore Congress, were you involved in that while you were at ABS and prior to while you were with the Coast Guard or both?
A Both.
Q The Offshore Arctic Engineering Conference, Coast Guard or ABS or both?
A It is Offshore Mechanics and Arctic Engineering, OMAE.
It was both.
Q I apologize for getting that wrong, sir.

The Offshore Technical Conference?
A Offshore Technology Conference.
Q I apologize.
A That was both.
Q The Society of Naval Architects and Naval Engineers?
A And Marine Engineers.
Q Marine. I'm sorry.
Coast Guard or ABS or both?
A Both.
Q And IMO, the Stability Subcommittee, was that ABS, Coast Guard or both?
A Both.
Q Was it the Flag Stone?
A State.
Q State. I apologize.
Flag State Implementation Subcommittee.
A ABS.
Q There is an Equipment --
A Design and Equipment.
While I was with the Coast Guard.
Q The Maritime Safety Commission?



A Committee.
Q Committee.
A That was both.
Q And with regard to standards organizations, the standards organizations that you referred to, were any of those both or were they all ABS?
A Which ones are you referring to?
Q The Mobile Offshore Drilling Standards.
A That was Coast Guard.
Q The Naval Architecture Committee.
A Coast Guard.
Q The Naval Architecture Committee 2U.
A Pardon me?
Q Is that what you said? The Naval Architecture Committee 2U? Was that what it was called?
A No.
The Naval Architecture Committee.
Q The Society of Naval Architecture Committee, the Paper Committee, is that what you said?
A Papers Committee. The Society of Naval Architects and Marine Engineers.



That was ABS.
I was on the Hull Structure Committee of the Society of Naval Architects also. I forgot to include that. That was while I was with the Coast Guard.
Q Okay. Thank you very much.
If you happen to think of any others, just let me know.
Can you tell me about your work attending U.S. Coast Guard and IMO meetings on the development of international ship port facilities security code?
Can you tell me what that work involved?
A Yes.
I wasn't with the Coast Guard at that time. It was just ABS.
What that involved was going to working group meetings during Marine Safety Committee sessions and intercessional.
Q With regard to IMO, just if you could clarify for me, sir, how is IMO organized?
I know with ICAO, for example, which is the International Civil Aeronautics Organization part of



the U.N., IMO is the equivalent of the maritime equivalent, and I was wondering is it organized by regions or is it just one massive group for the entire world?
MS. OHTA: I have an objection to you testifying.
Is your question just the very last part? Is that true? You can exclude your narrative up front?
MR. LOWINGER: You can just say compound or you can ask me to rephrase it, and I will be happy to do that.
MS. OHTA: Would you please rephrase it?
MR. LOWINGER: Sure. No problem.
BY MR. LOWINGER:
Q With regard to IMO, is it an organization broken up into regions?
A Not that I have been involved with. All of my work with IMO has been at their Headquarters.
Q Where are the Headquarters, sir?
A In London.
Q In London.

So, every time there is a committee meeting do you travel to London?
A Most of the time. Yes.
Q Is IMO broken up into regions?
A You asked me that. I don't know the answer.
Q At any time while you were with either the Coast Guard or ABS were you called to testify before Congress?
A No.
Q While you were with the Coast Guard or ABS did you lobby Congress?
A No.
Q While you were with the Coast Guard or ABS were you involved in testifying before other organizations?
A What do you mean by testifying?
Q As if there was a committee conference or a committee hearing on a topic, for example, whether it be a topic related to ship architecture or whatever the topic would be.
Have you had any experience testifying



before a body at a hearing before?
A No.
Q That would include, for example, like a regulatory agency?
A That is right.
Just to be clear, I did speak to different groups, but I don't believe I testified. Testifying I think has some legal connotation to it.
Is that right?
It has never been called testifying whatever I have done.
Q Well, for example, which groups did you speak to?
A Well, these various conferences.
If we had a meeting with another agency, the Metals Management Agency, for example, we would speak there, have a dialogue there.
There were never any formal sessions of questions and answers like that.
Q It would be more like presenting papers?
A Or sitting on a panel or something like that.



Q Do you remember when in 2005 you interviewed for the position as Director of OMS, Office of Marine Safety, at NTSB?
A I remember doing it. I don't remember the month it was in.
Q Would it have been in May of 2005?
A It could have been.
I don't think it was May. It could have been before May. I don't remember. It could have been May. I just don't remember.
Q Describe for me the interview.
A All right.
I went into the conference room of the Managing Director. He was there and there were several other Directors, Office Directors, there. They asked me questions and I answered them.
Q I am going to skip backwards. I apologize. I am just going to give you a second to capture your thought.
I am going to ask you a question prior to NTSB again. So, let me know when you are ready. Then we will probably get back to NTSB in a second.



A I am ready.
Q Thank you for bearing with me.
While you were at ABS, please describe for me your work related to accident investigations of maritime accidents.
A When an ABS classed vessel was involved in an accident or had a problem we would investigate. There were several vessels where this happened and if it required technical analysis, then I was involved in generally supervising that.
The Castor, C-A-S-T-O-R, was one ship. I don't remember the names of others.
Q Describe for me ABS's investigative role with regard to ships that it certifies.
A Its role?
Q Yes.
A The reason ABS does an investigation is to see where it can improve its standards.
Q How does it go about learning of an accident that it is going to investigate?
A A vessel that is classed by ABS, any accident has got to be reported to ABS by the owner.

Q So, the owner contacts?
A Yes.
Q Then let's say it is an accident that involves an investigation by either the Coast Guard or NTSB.
Would ABS participate in the investigation?
A It may.
Q Are you aware of any instances where ABS was called on to participate in an investigation by NTSB or the Coast Guard?
A No.
Q I'm sorry. I didn't hear you, sir.
A No. I am not.
Q So, during your tenure at ABS how many investigations did you oversee when you provided your technology analysis expertise?
A I don't know the whole number. It was less than ten I would say.
Q Less than ten. Okay.
Would it be less than five?
A I don't know. No.
Q I'm sorry? There was a pause.



A I don't know.
Q I apologize. There was a pause and I didn't know if you were just getting ready to say something else. Excuse me.
Other than those up to possibly nine investigations, how else were you involved in the investigation of a maritime accident other than the reporting of it and as it applies to the rules?
A I wasn't.
Q What about at the Coast Guard? Describe your involvement in maritime accident investigations while with the Coast Guard.
A If there was an accident and there had to be some sort of technical assessment associated with it involving structures or hydrodynamics, then I was involved with that, either doing the work or supervising the work.
I was involved in drafting the Commandant's responses to Coast Guard investigations when the subject matter had to do with my responsibility.
I was also involved with drafting Commandant's responses to NTSB recommendations.



On one occasion I was sent to a company, a marine investigation, as the technical support.
Q While at ABS can you tell me what type of technological analysis you provided with regard to accidents?
A Analysis. I didn't do any of the analysis myself. I supervised the analysis or in one case arranged for the contractor to do an analysis.
Q Describe to me your oversight of the technological analysis while at ABS. What is involved in that? Can you just let me know?
A What is involved is first whatever has to happen leading up to the decision to do an analysis. Then deciding what analysis needed to be done, how it would be done and who would do it, when it would be done. Answering questions along the way if there were any and reviewing the work that was done at the completion.
Q Tell me about the drafting of comments in response to Coast Guard investigations or NTSB recommendations while you were at the Coast Guard.
A Tell you what?



Q Describe for me what is involved in drafting a response on behalf of the Commandant to a Coast Guard investigation.
A Well, a Coast Guard investigation might have recommendations in it. So, if it was an area that I was responsible for, then what I would do is look at what that comment said, compare it to what the regulations required and make a recommendation as to whether we needed to change the regulations or make new ones.
Q And with regard to NTSB recommendations?
A About the same thing.
Q Okay.
How would it differ?
A Well, the difference was that one of them was an internal Coast Guard process and the other one was a more public process.
Q Now we are going to jump back to NTSB. I apologize. Let me know when you are ready.
A Okay.
Q How soon after your interview were you informed that you were selected for the position?

A A couple of months approximately. I don't know the dates.

Q Do you remember when you were told that you were offered the job?

A I don't remember the exact day, but I believe I was in London at the time at the Maritime Safety Committee meeting in 2005.

Q Do you remember when that committee conference took place?

A No. It was around May, but I don't know exactly when it was.

Q When did you start at NTSB?

A August.

Q Did you have communications with anyone at NTSB in the interim between May and August or were you finishing up at ABS?

MS. OHTA: Objection. Compound.

THE WITNESS: Both.

BY MR. LOWINGER:

Q Both. Okay.

Describe to me your communications with people at NTSB between May and August 2005.



A I believe the only communication I had was with the Human Resources Department and it had to do with things that I needed to do before I showed up there.

Q Sure.

Do you remember what those things were?

A Fill out some forms. I don't know what they were. Well, I can't remember what they were.

I was working on my ECQs at the time. So, I would send those out and get comments back and revise them and send them out again.

Q What, sir, are ECQs?

A Executive Core Qualifications.

Q And what are Executive Core Qualifications, sir?

A This is something that is required by OPM for an SES appointment I believe.

Q And you would draft them -- we are going to refer to them as ECQs -- is that okay with you?

A Yes.

Q Thank you very much.

You would draft the ECQs and then you would



send them up to NTSB and they would come back with comments to you with regard to them?

A Yes.

Q Do you know who was providing comments?

A I believe it was Collette Magwood. She was the person I spoke with.

Q What are the topics covered by the Executive Core Qualifications that you had to prepare responses for?

A I don't remember them all. They were general sorts of things like leadership or building coalitions. I don't remember specifically what the various ones were.

Q Was it a lot of work?

A For me it was. Yes.

Q Do you know how long that process took to complete your ECQs?

MS. OHTA: Objection. Vague and ambiguous with respect to the word process.

Are you referring to the entire process or just this witness' input into that process?

BY MR. LOWINGER:



Q Did you understand the question, sir?

A It was off and on over a period of a couple of months. Two months. Maybe a little more.

Q When I referred to process, I was referring to the total process between yourself and Human Resources at NTSB, Colette Magwood.

Was that your understanding when you responded to me, when you responded to the question, sir?

MS. OHTA: Wouldn't it have been simpler for you to have repeated your question in response to my objection?

BY MR. LOWINGER:

Q Please go ahead, sir.

A I was contacted by Colette sometime after I was selected for the position. It could have been in June sometime.

So, in June and in July we had probably three discussions on the telephone.

Q Okay.

Were those conversations limited to the ECQs?

A Yes.
Q Had you ever spoken with anyone with regard to Marjorie Murtagh Cooke and her duties or her tenure as the Director of OMS prior to joining NTSB?
A No.
Q In August when you joined NTSB did you speak with anyone about Marjorie Murtagh Cooke and her tenure as Director of OMS?
A Well, the topic came up. I never brought it up.
Q Please tell me what was discussed, sir.
A Well, some of the things that were discussed were the differences in how I did things and how she did things.
Q Besides the differences between how you and Marjorie Murtagh Cooke did things, what else was discussed?
A Nothing.
Q Who did you have those conversations with?
A My staff.
Q When you first started with the Office of Marine Safety how many staff members did you have?



A I believe it was 16.
Q And currently how many staff members do you have, sir?
A We have 12.
Q Have you added positions at all or added any individuals since you have started as the Director of OMS?
MS. OHTA: Objection. Compound. Positions and individuals refer to different things.
BY MR. LOWINGER:
Q Let me rephrase the question, sir.
Have you hired anyone since you started as the Director of OMS?
A No.
There is one person who came after I was there, but he was hired before I arrived.
Q Who is that person?
A Leon LaRue.
Q What is Mr. LaRue's title?
A Marine Investigator.
Q Do you know who hired Mr. LaRue?
A Who made the selection, I don't know.



Q Was Mr. LaRue interviewed by Marjorie Murtagh Cooke?
A I don't know because it happened before I got there. He was not interviewed by me.
Q Have you added any positions within OMS since you started your tenure, sir?
A No.
Q Have you reorganized the section at all?
A Yes.
Q Can you tell me how you reorganized the section?
A Yes.
I changed two writer positions to investigator positions.
I eliminated the reports division and I restructured the investigations division into three divisions.
Q Anything else with regard to the reorganization other than transferring -- did you say writer or writers to investigators?
A There were two writer editor positions that were vacant and we were advertising those as



investigator positions.
Q Then you eliminated the reports division and restructured the investigations into three separate divisions?
A Right.
Q Anything else other than those as part of your reorganization?
A Not that I know of.
Q I understand.
You had a little bit of attrition, four people.
Can you tell me the names of the people who left?
A Yes.
The one was an investigator named Bob Ford.
The two writers were Gloria Ruggiero and Pat Barnes.
And Morgan Turrell. T-U-R-R-E-L-L.
Q Is it Mr. or Mrs. Turrell?
A Captain.
Q Mr. or Mrs.?
A It is a male.

Page 70

Q Captain Turrell, what was his position within the division before he left?
A Marine Investigator.
Q Were any of those people terminated or did they just leave?
A They left. Nobody was terminated.
Q When you addressed the differences between how Marjorie Murtagh Cooke managed or operated or performed her duties and responsibilities as the Director of OMS and how you would do it, what did you say, sir?
A Ask the question again. I am not sure what you mean by what did I say.
Q You had said that there was differences between how you would --
A These were things that people told me. I couldn't say anything was done differently because I didn't know how she did things.
Q Okay.
What did people tell you about how Marjorie Murtagh Cooke did things?
A That she took a long time to get reports

Page 71

out.
Q Anything else besides that, sir?
A That was the main thing. I don't recall if there were other things.
Q You are saying you don't recall if there were other things. Are you saying you don't know or you just don't remember?
A There were other things. I don't remember what they were. It has been a while since I have had any of these discussions.
Q Why did you eliminate the reports division?
A Because I didn't believe it was necessary as it was structured. The workload didn't require three writers. And when it went down to one, there was no point in having a division with one person in it.
Q And you restructured investigation into three separate divisions. How many people are there in the investigation office?
A Right now?
Q Yes.
A I would have to get a piece of paper and go

Page 72

by names. I don't have the number off the top of my head.
Is that okay?
Q Sure.
A Let me take a minute.
(Witness complies.)
There are eight.
Q Who writes the reports for the division now, for the office now?
A The investigator in charge and the group Chairman.
Q Describe for me, sir, your duties and responsibilities as the Director of the Office of Marine Safety?
A Well, I am responsible to launch Go Teams.
I am responsible for the quality and timeliness of reports.
I am responsible for our budget.
I am responsible for hiring staff.
Training.
For complying with various NTSB directives and schedules and what not, administrative things.

Page 73

Some supervision, first level supervision.
Q I'm sorry, sir. What about supervision?
A The way we have been set up recently is I supervise the Deputy Director and the Deputy Director supervises the people who are in my division in what is called the MS-1 division.
I am responsible for representing the Agency in the marine arena, marine field, to the Coast Guard, other federal and international agencies, the public, commercial organizations and what not.
I am responsible for the morale of the office and complying with the directives of the Managing Director.
I am responsible for coordinating the work of the office with other offices of NTSB.
I write speeches for the Chairman and Board members.
I am an interface between the Board members and other management at NTSB with the industry and with the Coast Guard.
I review all correspondence and reports and do some of the writing myself.

I sit in the various planning meetings that we have associated with investigations, such as work planning meetings or report planning meetings.

I represent the Office Of Marine Safety at our Sunshine Meetings.

I participate in some committees or working groups.

I interface with my counterparts in other countries.

That is all I can think of off the top of my head. I might have left off some big ones, but that is my stream of consciousness.

Q Sure.

So this is what we have here. We have launch Go Teams, quality and timeliness of reports, budget, hiring staff, training staff, complying with NTSB administrative directives, supervision of your Deputy, representing the Agency as its marine representative to the U.S. Coast Guard and other federal and international agencies, commercial entities and the public, et cetera, morale of the office, directives of the Managing Director,



coordinating work with other offices at NTSB, drafting speeches for the Chairman and the Board members, interface between the Board members and the Coast Guard, review of all correspondence and reports, planning meetings and reports, representing the office at Sunshine Meetings, some committee and working groups and working with representing the Agency with counterparts in other countries.

A I also set priorities.

Q For what? For the office?

A For the office.

And I establish schedules.

Q Anything else?

A Probably. But that is all I can think of right now.

Q Describe to me which of these are the most important in your duties and responsibilities.

A I don't know how to answer that because they are all important at one time or another. You can't ignore any of those things. The primary purpose of the office is to investigate marine accidents and write reports.



Now, since I arrived the Managing Director has given me some assignments that I work on that are important to me because he wants them done.

I can't say that one is more important than another because if you omit something that is supposed to be done, it is a problem.

Q I understand, sir.

For example, the assignments from the Managing Director, what are they for?

A When I came here he gave me some assignments.

Q Okay.

A One assignment he gave me was to reduce the backlog in the office.

Q Okay.

A Another assignment was to get the reports out more quickly.

Q Okay.

A Another assignment was to restore a good working relationship with the Coast Guard.

Q Okay.

A Another was to give NTSB a greater presence



in the marine industry.

Q Okay.

A Another was to become more active in international activities.

Then the last one was to find a replacement for myself before I leave.

Q Are you leaving, sir?

A Not any time soon. I do have plans to leave at some point.

Q Which of these are the least important?

In other words, you don't really have it as day-to-day work, you don't follow it on a day-to-day basis. It is really something you only touch upon on an occasional basis.

MS. OHTA: Objection. Vague and ambiguous. I don't know if you are referring to initiatives that the Director gave him or to the areas of his responsibility that he previously identified.

THE WITNESS: Well, I don't think that that is a good question because one thing that is very important is launching Go Teams on accidents, but that happens infrequently. So, does that make it

unimportant? It is not because it is one of our primary functions.

So, getting back to what I said before, when you say least important, they are all important. There may be some things that I do that I don't have to do that I would consider perhaps least important. Maybe reviewing a draft three times instead of once. Okay?

I consider everything I do as important and my workload changes from day-to-day.

BY MR. LOWINGER:

Q You mentioned that you have a Deputy. Who is your Deputy?

A Chris Julius is my Deputy.

Q Is that a new position within the office?

A It is not really a position. It is more responsibility. He is detailed as my Deputy from the General Counsel's Office.

Q Has anyone else joined the office on a detail other than through hiring?

MS. OHTA: Objection. Vague and ambiguous. A detail and hiring are two distinct activities.



MR. LOWINGER: That is right.

MS. OHTA: Would you please rephrase the question?

BY MR. LOWINGER:

Q Did you understand the question, sir?

A Probably not. Why don't you go ahead and ask it again?

Q Aside from Mr. Julius, has anyone else been detailed to your office since you started as the Director of OMS?

A Yes.

Q Who?

A People who are in these executive development programs from other agencies, I have taken a number of them into the office to work on some projects.

Q How many people from other offices?

A Four I think.

Not other offices. They are from outside the Agency.

Q Do they come from the private sector or other government offices?



A Other government offices.

Q Which other government agencies?

A One was from the Army.

One was from the Navy. Maybe two were from the Navy.

I believe one was from the Coast Guard.

Q And what did they do?

A Different assignments that they could work on for the time they were there.

They would work on qualifications. Trying to develop the qualifications program for investigators is one.

Another one was looking at how we could improve the communication between investigators and writers.

Another one helped me in reorganizing the office.

I don't remember what the fourth one did.

Q How many launches have there been since you started your tenure as the Director of OMS?

A Let's see. Not too many.

(Witness writing.)



Seven.

Q Can you tell me the names of these accidents or the ships?

A Yes.

Ethan Allen.

Crown Princess.

New Delhi Express.

Massachusetts.

Empress of the North.

Star Princess.

Sidney Mae.

Q Have there been any accidents which you decided not to investigate on behalf of NTSB?

A Yes.

Q How many have there been?

A I couldn't tell you. The Coast Guard notifies us -- well, I will just say I don't know how many there were.

Q Is it more than the seven launches?

A Yes.

Q What are the factors in deciding not to launch a Go Team?

Page 82

A One is what are the issues? If I don't consider them to be significant issues, I won't launch. That is the main criteria.

Also I take into consideration what our current workload is and what the impact of launching would be on our workload.

Q Other than the significance of the accident and the current workload, are there any other factors?

A I don't believe so.

Q Okay.

Now, the number of accidents that you have decided not to launch on, is it much more than seven or is it within 20?

A I couldn't tell you. I don't know because those are logged and I don't go back and review that log. It would just be a wild guess on that.

Q Where are they logged, sir?

A Jim Scheffer, who is one of the division chiefs, keeps the log. I know they are on clipboard. He may keep them electronically as well.

Q So, the log is everything that the office has been called upon to make a decision whether or not

Page 83

to launch?

A No. No.

The log is just major marine accidents that we make a decision not to launch on. If we become aware of other accidents, you know, a rowboat capsize, we don't log it, we just don't do it.

Q Well, actually you mentioned the factor of significance.

Can you describe to me what you meant by the significance of the crash?

A Yes.

The significance has to do with things like national interest, the number of fatalities, the type of accident as far as what the regulations may be that would impact that.

There is one more. I have one other launch too. We can add one more. The Athena 106.

Q Thank you very much.

A Did I say the safety issues?

Q We were talking about significance. Why don't we stay on significance?

A All right.

Page 84

The significance would include the safety issues that they might involve.

We would generally launch if the Coast Guard asked us to.

There is another one. It is at the tip of my tongue.

Can you read that list back to me?

Q Sure.

MS. OHTA: Could we have the Court Reporter read the list back?

MR. LOWINGER: Sure. Go ahead.

(The reporter read the requested portion of the record.)

THE WITNESS: That is if it is an issue that has been identified as being of interest to the Safety Board.

BY MR. LOWINGER:

Q What are the national interests that affect the decision to launch?

A Did I say national interest?

Q Yes.

A What I meant was national significance.

Page 85

What that would be is if it is all over the front page, it is on TV, a Board member wants to go. We would launch on that.

Q What about the number of fatalities, is there a number of fatalities?

Describe to me what you meant by the number of fatalities.

A Well, that comes into play. If there is a large number of fatalities, we would launch.

If the number is less than six, then the Coast Guard may not notify us, but it may involve an issue that we were interested in.

But in general the more fatalities there are, the higher the likelihood that we would launch.

Q You just said that if it is less than six the Coast Guard may not notify you.

Isn't the Coast Guard required to notify you only if it is more than six?

A I thought it was six or more. It could be more than six.

Q And then the type of crash you said based on the regulations. What did you mean by that, sir?

A For example, if we believed there might be insufficient regulatory oversight of that type of vessel or operation.
Q What type of regulatory oversight are you referring to, sir?
A Government oversight.
Q What type of oversight does NTSB not have? What type of accident does NTSB not have oversight over?
A I am not talking about NTSB oversight. I am talking about regulatory oversight.
We don't have regulations for inspection. The Coast Guard has those. So, if it is an area that the Coast Guard doesn't regulate or doesn't regulate sufficiently, we might be interested in that.
Q Can you give me an example?
A Sure.
With the Athena 106, which was a work barge working in an oil field in Louisiana, in the course of transit it ruptured a gas pipeline. This was an uninspected vessel. The people working on the vessel were not licensed in any way. It was involved in



navigation at the time of the accident. So, the question is what is the Coast Guard's responsibility and what is the Occupational Safety and Health Administration's responsibility?
Q Are there any types of accidents that you do not have investigative oversight over?
A Foreign vessels in international waters or outside of the U.S. jurisdiction.
Q Any others?
A I don't think so.
Q And safety issues. What kind of safety issues play into the factors whether to launch or not?
A Life saving equipment.
Operational procedures.
Safety management systems.
Preventative maintenance.
Alcohol and drugs.
All kinds of things.
Q And then current workload. How does current workload affect whether to launch or not?
A Well, that comes into play with the significance. If it is a very significant accident,



we would launch irrespective of current workload. But if it is one where we might or we might not launch, a Board member is not interested in it, and everybody is busy with ongoing investigations, I probably would not launch because of the adverse impact on the other investigations.
Q What happens when it is an accident of significance and you have to launch a team?
A We launch.
Q Describe to me the launch. Describe to me what goes into launching a team.
A Well, I become notified. I am notified of the accident. I get all the information that I am able to gather about it. I seek the recommendations of my management team.
Then I will generally advise the Chairman. If I think we need to launch, I will advise the Chairman that I intend to launch and fill him in. He has always concurred with my decisions.
Q Who else is notified about a launch?
A Well, once we make the decision, then the member on duty is notified, the Go Team is notified,



other Office Directors and the Managing Director are notified. The Coast Guard is notified generally.
Q Who is involved in deciding to launch other than you?
A Well, it is basically my decision, but I get the advice of other people who I think can help me with the decision.
Q Is, for example, the Managing Director involved in deciding whether to launch or not?
A Generally not.
Q What about General Counsel?
A No.
Q Once the decision is made to launch, then what happens? Describe to me your duties and responsibilities once you make the decision to launch. What happens?
Getting the people out to the field, getting the investigation under way, getting a report, getting I guess a team of non-NTSB employees together as part of the investigation, those are just examples.
What are the steps that you take in launching a team?

MS. OHTA: Objection. Multiple questions. Compound questions. I don't know which question you want him to answer.
Could you please rephrase it or could you read back the last part?
MR. LOWINGER: Are you instructing him not to answer?
MS. OHTA: Did you hear me instruct him not to answer? Did you hear me assert attorney/client privilege, sir?
You asked multiple questions.
MR. LOWINGER: He was about to answer though.
MS. OHTA: You asked him compound questions. I asked you to identify which question you wanted him to answer, whether it was the last question.
MR. LOWINGER: He was about to answer. So, I think he might have understood.
BY MR. LOWINGER:
Q Did you understand the question, sir?
MS. OHTA: The questions.



THE WITNESS: I understood what I think was the last question.
BY MR. LOWINGER:
Q Okay.
MS. OHTA: Are you answering the last question posed?
THE WITNESS: Could you read the last question?
MR. LOWINGER: Let me rephrase it.
BY MR. LOWINGER:
Q Describe to me your duties and responsibilities in launching the Go Team.
A After the decision is made to launch?
Q Uh-huh.
MS. OHTA: I assume that was a yes.
You had instructed the witness not to use utterable tones and I think it goes for the attorney also.
So that the record is clear that you said yes, answer the question.
BY MR. LOWINGER:
Q Great. Please go ahead.



A I took that as a yes.
Q Yes.
A What I do is advise the duty officer to continue to collect information about the accident.
We have the Communications Center contact the members of the Go Team and start to make arrangements for them to go to the scene.
Captain Scheffer oversees all of these activities and he and the duty officer then report back to me periodically as to the progress of the launch.
I will call myself the Managing Director, the Chairman, appropriate members, to let them know that this is taking place.
If I feel that we need an investigator from another office, I will call that Office Director and ask for assistance.
Q Who is the duty officer, sir?
A That varies. We have a rotation.
Q What does the duty officer do, sir?
A The duty officer is the person who is available for the Comm Center to contact when they



become aware of an accident.
Q The duty officer is the person in charge of collecting the Go Team?
A No.
Q I have that once the decision is made to launch that you contact the duty officer to collect.
A Information.
Q Okay. To collect information.
How is the Go Team determined?
A That is also on the schedule. Every week the Communications Center puts out a schedule for all the offices of NTSB as to who the Go Team is.
So, what we do in our office is advise the Communications Center who will be the duty officer and who will be on the Go Team.
Q Who is Captain Scheffer?
A He is one of my Division Chiefs.
Q And he has an oversight role once a team is launched?
A Not oversight. He monitors what they do. I am the person who is responsible for oversight.
Q Describe to me your work with Captain

Scheffer once there is a launch.
A Well, what he will do is carry out the launch, make sure all the details are taken care of and keep me informed as to how it is going until the people are on the scene.
Q Anyone else other than agency officials or other government officials who launch on a marine accident?
A The parties may launch.
For example, the owner of the vessel is a party to our investigation. So, he will probably send somebody.
We may invite other people who we think or other organizations who we think can contribute to the investigation to become parties. They may or may not do it.
Q Have other third parties joined the Go Team before as a part of any of the eight accidents that you have launched on before?
A Well, I wouldn't say they are on the Go Team because the Go Team is our team. But there have been parties at some of the other accidents.



Q Okay.
And who monitors their work?
A Well, as far as being a party to our investigation, the investigator in charge monitors their participation. However, what else they do is the responsibility of their company.
Q And then he reports back to you with regard to the progress of the launch, what is involved in that, sir?
A Well, normally when the team gets to the site and is assembled they give me a call and let me know the status, they are there, they got a motel room, whatever, and what their intentions are as far as conducting the investigation.
Then what they do is they will contact me once a day usually to inform me of the progress of the investigation. They may call at some other time if they have some issue that they want me to be aware of or to address.
Q You said that they normally contact you once a day. What is discussed during that once a day discussion?



A They just fill me in on how the investigation is proceeding.
Q I see.
Your calls to the Managing Director, describe to me what you discuss with the Managing Director with regard to the investigation.
A When we launch I tell him that we are intending to launch. He says, thank you. Then what I may do the next day is poke my head in and fill him in in five minutes as to what is going on. He is not involved at all in the day-to-day activities.
Q What about calling other offices? Which offices would you call in for a launch?
A If we needed a fire protection engineer, we would call the Office of Research and Engineering.
Q Have you ever called for a fire protection engineer as part of a launch?
A Have I?
We have done that in investigations that I have handled it. Now, whether it was a launch of mine -- yes. The answer is yes. Yes. We have.
We had a launch where we asked General



Counsel to send an attorney up with us.
I think as far as the launches go, that is about the extent of it since I have been there.
MR. LOWINGER: Could you just read back his answer? I didn't hear the first part.
(The reporter read the requested portion of the record.)
MS. OHTA: Could you please read back the question for the answer to which you just read?
I thought your question had to do with fire protection.
MR. LOWINGER: Yes. I did too.
(The reporter read the requested portion of the record.)
THE WITNESS: Okay. I'm sorry.
The answer is yes.
BY MR. LOWINGER:
Q You have?
A Yes.
Q In addition to an attorney from General Counsel's office?
A Yes.

Q Did you request that fire protection engineer on all the launches since you have become the Director of OMS?
A No.
Q Do you know on how many?
A One.
Q Have you called in for any other assistance from other offices?
A An attorney.
Q That is it.
What about from outside the agency with another government agency?
A We have not called in for assistance.
Q Has the Coast Guard done investigations on the same accident that you have investigated before?
A Yes.
Q On all of them or just some or one?
A All of them.
Q Have third parties been involved, although they are not part of the Go Team, as part of the investigation that is taking a look at the accident as well?



A Yes.
Q And who are they?
A The owner will send a representative.
The union may send a representative if it is a personnel matter.
The manufacturer of a piece of equipment.
OSHA was a party to one of our investigations.
The police.
Q Which unions have been involved in investigations?
A I don't know the name of the union.
Q Is it only one union?
A I believe so. Yes.
Q On how many accidents, sir?
A One accident.
Q And the manufacturer?
MS. OHTA: Is that a question?
MR. LOWINGER: I was going to fill it out. Thank you.
BY MR. LOWINGER:
Q Has a manufacturer been involved in



investigation on all or just some or only one investigation?
A Some.
Q Do you know how many?
A Two.
Q And OSHA, how many investigations has OSHA participated in?
A One.
Q And the police, how many investigations have the police been involved in?
A I believe one.
MS. OHTA: Is this a good time to take a break?
MR. LOWINGER: If you would like to, sure. No problem.
MS. OHTA: A lunch break?
MR. LOWINGER: Sure.
(Whereupon, at 12:25 p.m., the deposition was recessed for lunch, to reconvene at 1:00 p.m. that same day.)



AFTERNOON SESSION

( 1:15 p.m.)

JOHN S. SPENCER

having been previously duly sworn, was further examined and testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. LOWINGER:
Q On the eight accidents that you have launched on, sir, how many people have you launched, NTSB employees have you launched, on each?
A On each one?
Q You have your list in front of you. Why don't you list the accidents and tell me how many people you launched.
A For each accident?
Q Please.
A The Ethan Allen I don't know. That was my first one. I would have to go back and look that up. But it was a good size team.
Q Did you launch on that?
A No.
The Crown Princess was one person.

Q Was that you?
A No.
The New Delhi Express was one person.
Q Was that you?
A No.
Q Let me just ask you have you launched on any of these?
A No.
Q Thank you. I apologize for interrupting.
MS. OHTA: I'm sorry. Was the question have you launched any of these?
MR. LOWINGER: Have you launched on any of these?
MS. OHTA: Okay.
BY MR. LOWINGER:
Q Please go ahead, sir.
A New Delhi Express was one person.
Massachusetts was a full team. I don't recall how many.
Q What is a full team?
A Well, it varies with the accident. It could be four, five, three, six.



Q But it is anywhere from three to six?
A As a generalization I think you could say that, but it could be more than six.
And we are just talking about marine investigators, is that right, or are you talking about the entire NTSB party?
Q I believe the question was the entire NTSB party.
A Okay.
I don't determine the size of the launch of members and that sort of thing. I only have control over my own investigators.
Q Well, for the Massachusetts then how many marine investigators did you send?
A Well, I told you I don't remember. I would have to go back and look it up.
There was at least two.
Q At least two, but less than ten?
A Yes. Less than ten.
Q Was it less than seven?
A I don't know.
Q Have you ever had a launch with more than



seven?
A I don't believe so.
Q Have you ever had a launch with more than five?
A That I don't know.
Q Please go ahead, sir.
A The Empress of the North I believe there were six marine investigators on that one.
Q Okay.
A The Star Princess was one.
I'm sorry. Let's go back to the Crown Princess. That was two.
The Sidney Mae was one person.
The Athena 106 was at least three.
Q Was there more than six?
A No.
Q Somewhere between three and six?
A Yes.
Q Describe to me please, sir, your duties and responsibilities with regard to the press as it relates to an investigation.
A When there is a team on the scene I have



very little interaction with the press.
As the investigation progresses I may be called for a phone interview from the press, but it is rare.
After an investigation is completed I do get occasional calls from the press, which I take.
Also any press releases that go out involving a marine investigation are cleared by me.
Q When you say cleared, what do you mean by that, sir?
A As part of the review process before they go to the press I read them and comment on them, if necessary.
Q How many press releases has your office sent out during your tenure?
A We don't send any out. Public Affairs sends all the press releases out.
Q How many marine safety oriented press releases have been sent out that you have reviewed during your tenure?
A I couldn't tell you. I would say between 10 and 50, but I really don't have any idea.

Page 106

Q Is that something that takes up a lot of your time?
A No.
Q Is it a small amount of your time?
A Yes.
Q Let's go down that list. I asked you which were most important. They are all important when they become due, but let me ask a question and you tell me.
Launch Go Teams, how much does that take of your time, sir?
A During a launch it probably takes about four-hours of my time.
Q What about quality and timeliness of reports?
A That takes a lot of my time. I would guess with every report we are talking about perhaps 40 hours of my time.
Q What about budget?
A In the course of a year perhaps 40 hours.
Q Has your budget grown, stayed the same or been reduced since you started at NTSB?
A It has been more or less the same.

Page 107

Q More or less?
A Well, for example, I believe when I got there it was whatever budget existed before I got there and I don't know what that was.
With the following budget I think we were under a continuing resolution or something.
Then there was, I don't know. It has been about the same. I haven't received any increase.
Q Sure.
I know you said that you have never been deposed before. Just if you would, please don't look at counsel to see if they have any idea.
A Okay.
Q And I am not suggesting anything.
MS. OHTA: Excuse me.
I really object to that. I have not looked at him. I have been actually writing here. And the implication is that we were looking at each other for some untoward reason. That was really a totally unwarranted comment.
MR. LOWINGER: Actually while you were looking down he was looking at Ms. Silbaugh.

Page 108

It is okay. I am just saying if you could just maintain focus with me.
It is okay. I am not suggesting that you did anything wrong and I am not suggesting that she did anything wrong. I am just asking that the deponent look toward me.
Thank you.
THE WITNESS: When I think I kind of look off into space.
BY MR. LOWINGER:
Q It is okay, sir.
What about hiring staff?
A We talked about that before and we haven't hired any since I have been there.
Q What about the whole application process? Have you gone through the whole application process for somebody, even though you may not have hired someone?
A Well, I consider the whole process including the hiring end of the thing.
With each position I would guess it takes upwards of 40 hours.

Page 109

Q Have you put out any vacancy notices for staff for the office since you started and in your tenure?
A Yes.
Q How many?
A I believe two.
Q What positions are they, sir?
A Investigators.
Q Thank you.
What about training staff? How much time does that take of your time?
A What do you mean by training?
Q You had mentioned that that was one of your duties and responsibilities.
Why don't you describe to me what type of training you do?
A Well, I don't do teaching training. When I was talking about training there it was making sure that the staff were being trained and suitably trained.
I would guess perhaps 40 hours a year on that as well.

Page 110

Q And that is a guess though, right?
A Of course it is. Yes.
Q When you say making sure that they get training, what do you do to make sure that they get training, sir?
A I look at their performance evaluations and their individual development plans.
I look at the entire office's training plan and our budget and then I discuss it with the supervisors.
We have a program. One thing I set up after being there was a Training Council of the managers in the office because I didn't feel that the training program was a cohesive program, it was sort of done ad hoc. So, we do it in a much more deliberate fashion now.
Q And you call that the Training Council?
A Yes.
Q What about complying with NTSB administrative directives? What did you mean by that, sir? Describe to me your work and your duties and responsibilities related to that.

Page 111

A Well, there are two things there. One thing is just what we have to do, fill out certain reports. The other thing is what the constraints are and how we do what we do.
That takes a lot of my time.
Q What do you mean by fill out certain reports? What are you referring to, sir?
A Financial reports or a human capital plan or whatever.
Periodically we get asked to give the management or another office some sort of information. So, we have to gather that together and give it to them.
Q What is a human capital plan, sir?
A A human capital plan is my assessment of the long-term staffing needs of the office and what the various positions would be.
Q And how many human capital plans have you done since you started?
A Two.
Q How long do they take to do?
A Each one takes several full days. I would

Page 112

guess I spend 30 or 40 hours on each one.
Q And what about you said there was -- excuse me, I don't want to misquote you -- you said there was something financial. Was it paperwork or financial forms?
I don't know what followed. If you would like the Court Reporter to read back that phrase, I will be happy to have that done. If you want to fill in the blank, that will be great too.
A One of my responsibilities has to do with managing our budget. So, anything associated with the budget I had included in that financial forms thing. So, it is requesting a budget, reporting on expenditures, et cetera.
Q Why don't you tell me about managing a budget? Describe to me what you do as part of managing your office's budget, sir.
A What I do is at the beginning or prior to the beginning of the fiscal year is estimate what my budget will be or what my budget requirements will be and then I submit that to the CFO.
After the start of the fiscal year the CFO

Page 113

tells me what my expected budget is and I get quarterly reports on what we have spent. And what I do is make sure that we are financially within our budget, that we are spending the budget appropriately, and if it looks like we need more money than the budget has, then I go to the Managing Director and the CFO and try to get more money.
Q Have you ever asked for more money?
A Yes.
Q How many times?
A Three times.
Q What was the response?
A The response was affirmative. I got the money.
Q Each of the three times?
A Yes.
Q Describe to me what you mean by working within your budget. Describe to me your efforts or your responsibilities and your duties with regard to making sure that you are working within your budget.
A What we spend money on are supplies and travel that is not related to an investigation and

Page 114

training. So, what we do is we develop a plan to project what we are going to spend in the course of the year and then we monitor our expenditures over the year to make sure that we are within our budget.
Q You said that the travel portion of the budget is not related to investigations.
What do you mean by that?
A The investigations have their own pot of money because that is our primary mission. When we have to go, we have to go, and there are ways for the agency to have money for investigations.
The other money is money that we get in the budget that goes to the agency. It is divided up among the offices. And I am told what I am allowed to spend and that is what I work with.
Q Do you have any assistance with the budget?
A Yes.
Q Who assists you, sir?
A The managers assist me and the administrative assistant.
Q Which managers help you, sir?
A All three of them. Jim Scheffer, Rob Henry

Page 115

and Barry Strauch. And when I have a Deputy the Deputy helps me.
Q Who is the assistant?
A Lucille Walter.
Q Tell me how the work is divided up between the five of you then.
A How what work is divided up?
Q How the budget work is divided up between the three managers, the assistant and yourself, sir.
A What I normally do is have the managers give me the information as far as what they believe they will need.
The administrative assistant is the recorder for this information and she knows how the electronic systems work, how to put information in and get information out.
What I do primarily is see what they have done, ask them questions on what they have done, and approve what they have done.
Q And overall with budget work how much time does it take you during the course of a year?
A 60 or 80 hours I would suppose.

Page 116

Q When you say I would suppose --
A Well, I don't know. I don't keep track of it. I am trying to visualize what the occasions are when I am involved with budget and how much time I spend on those occasions.
Q Sure.
A I don't think I am off by an order of magnitude, but I can be off by a factor of several. I don't have reliable information for you there.
Q But it is not really a lot of your time, is it?
MS. OHTA: Objection. Vague. I don't know what you mean a lot of his time.
In a year period?
MR. LOWINGER: Thank you very much.
BY MR. LOWINGER:
Q During the year budgeting does not take up a lot of your time, sir.
Is that true, sir?
A I think it does.
Most of what I do is a lot of small things. And so anything that takes 60 hours in the course of

Page 117

the year is significant in my mind.
Q Okay.
Other than filling out certain reports and finances what is involved in the administrative directives from NTSB?
A Would you ask that question again?
Q Sure.
When you said complying with NTSB administrative directives, we have talked about budgets and human capital plans.
What else is involved in that?
A How we do our work.
For example, in the processing of a report, from when I sign-off on it until it goes to a Sunshine Meeting there are certain steps that have to be followed.
Q Is that part of the report process or is that part of the administrative process?
A You could divide it up any way you wanted to. It takes my time.
Q Well, as far as moving a report through the notation process, other than moving a report through

the notation process, human capital plans and the budget work, what other administrative duties and responsibilities are you putting within the category of complying with NTSB administrative directives?
A Performance evaluations. Performance plans.
Q Do you draft the performance evaluations for all the employees in the Office of Marine Safety?
A No. Only for those that I supervise.
Q And who would those be?
A Well, it varies. This present reporting period there are two people.
Q And who are they?
A Charlotte Cox, the writer, and my Deputy.
Q What else with regard to performance plans and evaluations, what other duties and responsibilities other than those two evaluations that you do?
A I review. I am the reviewing official for all the other evaluations that are done.
Q Do you conduct the in person evaluation?
A No. The supervisor conducts the in person



evaluation. If I am not the supervisor, I may be present for it. I may not be.
Q You said that currently you have two people that you do evaluations and personnel plans for.
Has that number changed since you started at NTSB?
A Yes.
Q How did it change, sir?
A Well, when I first came to NTSB I had four people report to me, two Division Chiefs, an Associate Director and a National Resource Specialist. So, I did their evaluations.
Q And why do you no longer do their evaluations, sir?
A Because I reorganized and people report to different people.
Q Got you.
What is the difference between a personnel plan and an evaluation, sir?
A It is a performance plan.
Q Excuse me. Performance plan.
A The performance plan is the plan that you



lay out at the beginning of the performance period where you state what the expectations are as far as work goes.
The evaluation is done at the end of the reporting period where you evaluate the person against the plan and the standards of the plan.
Q Do you have to do a performance plan for someone that you report to?
A No.
Q What, other than evaluations and performance plans, is involved in the human resources side of your duties and responsibilities, sir?
A Besides what?
Q Performance plans and evaluations.
A Well, the whole business of hiring.
Your question was what relating to human resources?
Q Yes.
A Well, I can't think of anything specifically, but whatever has to do with human resources that we deal with ultimately comes to me. So, there are probably lots of other tasks as well



that I haven't named.
Q So, other than hiring, which we said takes 30 to 40 hours, how much time per year do you spend on the human resources element of your duties and responsibilities?
A Well, it depends on how you define the human element thing.
For example, when I am in a meeting involving staff, we may talk about human resources or something may go on that relates to some sort of counseling of a person afterwards.
So, I couldn't quantify that.
Q Well, would you say that your human resources duties in general then are a lot of your work, a small portion of your work or a medium portion of your work on an annual basis?
A Medium.
Q Medium.
Would it be more than the budget?
A Yes.
Q Would it be much more than the budget?
A Yes.

Page 122

Q We said the budget was 60 to 80 hours. Would you say human resources is about 160? Would it be double?
A At least. I would say it is a lot more than that.
I don't know where you are going with this, but I don't --
MS. OHTA: You don't really have the opportunity to ask the attorney questions. You just are here to answer the questions that are posed provided they don't elicit privileged information.
THE WITNESS: Okay.
MS. OHTA: Even I can't ask him that question.
MR. LOWINGER: You could. If you want to go off the record, you could.
BY MR. LOWINGER:
Q Would you say that supervising your Deputy Chris Julius is part of the human resources that you were talking about just before or is it separate from?
A That is part of it.
Q Okay. Thank you.

Page 123

What about representing the agency in marine issues to the United States Coast Guard and other federal and international agencies? Can you tell me what that work involves?
A That involves all my phone calls with the Coast Guard, all my meetings with the Coast Guard personnel.
You said international as well?
Q Well, why don't we just stay with Coast Guard right now? And if you would like me to rephrase the question, I can, so that you are not answering just part of a question.
You had mentioned before that you represented the agency on marine issues with the Coast Guard as part of your duties and responsibilities.
A Yes.
Q Please describe that to me, sir.
A What that involves is a lot of telephone calls around launches.
It involves periodic calls to my counterpart in the Coast Guard, which may be once a week or several times a week, to talk about other

Page 124

things.
It involves calls that I make to other people in the Coast Guard.
It involves time that I spend with the Coast Guard at Coast Guard Headquarters or Coast Guard personnel spend with me at our office or time that I spend with Coast Guard personnel at some other place.
Q Who is your point of contact at the Coast Guard that you speak to approximately one time a week?
A My primary point of contact is Doug Rabe.
Q Can you spell his last name, sir?
A R-A-B-E.
Q And who are the other people at Coast Guard that you speak with?
A I speak with Admiral Selerno.
I speak with Jeff Lance.
I spoke with Admiral Bone before he was transferred.
I may speak with somebody who works for Doug Rabe if Doug Rabe is not available.
Rarely I speak with other staff people at Coast Guard Headquarters if I have a specific

Page 125

question.
Q Other than making calls with regard to conversations or communications with regards to a launch, what are the other reasons for speaking with the Coast Guard?
A Other than?
Q Other than surrounding a launch.
A Okay.
Well, there are lots.
On an issue of a recommendation that we have made, I may want to talk with them about either what they are doing or what they are thinking of doing or why they did what they did.
I may speak with them about issues that are going to be coming up before the IMO prior to the meeting or things that came up subsequent to the meeting.
I talk to them about opportunities for perhaps training together.
One of the things that I started since I have been there is when the Coast Guard trains their marine investigators in Yorktown we send one of our

investigators down to teach a module about NTSB.
If I get a negative comment from one of my staff relating to the Coast Guard, I will generally call the Coast Guard and talk it over with them to try to find out what is behind it.
If I become aware of something that I think they should know about, but I don't know if they do, I might call them up and talk about that.
If we need assistance from them in some respect, I will call them up and ask for that.
That is about all I can think of right now.
Q Okay.
So, recommendations and what they are doing and why, IMO, joint training, negative comments with regards to the Coast Guard relating to an incident, new issues and assistance on issues.
Can you think of anything else?
A Not at the moment.
Q How much time do these communications take per year, sir?
A I would say between two and eight hours a week.



Q And does that include launches as well?
A No.
Q Are your communications with the Coast Guard part of the four hours that you mentioned before with regard to the time that you spend relating to a launch or is there additional time that you in fact have there?
A That is additional time. That would be additional. That four hours is just to get our team out.
Q How much additional time do you spend speaking with the Coast Guard surrounding a launch?
A Eight to 40 hours per launch I guess.
Q So, a wide amount of hours.
Why so many hours speaking with the Coast Guard surrounding a launch?
A Well, because for most launches we have to depend on the Coast Guard for logistics at the scene of the accident. And normally I don't deal directly with the Coast Guard at the scene, but I deal through Coast Guard Headquarters. So, there is just a lot of back and forth on that. It includes e-mails as well.



Q So, aside from relying on them for logistics related to the investigation, what else is discussed?
A Well, we may discuss how we are going to work together in the course of the investigation as far as whose rules will we operate under or are there other issues to be concerned about.
Q Why would you operate under anyone else's rules other than NTSB's?
A Well, we have an MOU with the Coast Guard and that describes how we would work with them.
Q So, other than logistics and the MOU, the division of responsibilities, what else is discussed with the Coast Guard related to a launch?
A Just trying to get information from them as to what happened.
How we may want to meet up or proceed.
Perhaps some what ifs.
Basically what we try to do is to make the launch and the coordination as smooth as possible.
Q Sure.
Now, you had mentioned that you have a new



joint training program. And previously you also said that the Managing Director, who I believe at the time was Mr. Osterman, requested that you improve relations with the Coast Guard.
A Yes.
Q Can you describe for me why you have been asked to improve relations with the Coast Guard?
A My understanding is that our relationship with the Coast Guard before I was there was not very good.
Q And what about it was not good, sir?
A It appeared that the relationship between NTSB and the Coast Guard was adversarial. So, there was little cooperation and little communication.
Q Who at NTSB was an adversary to the Coast Guard?
A I don't know. I wasn't there.
Q Well, what is your understanding based upon what you have been told?
A I was just told to improve the relationship. So, I took it from there. I didn't bother to go back and figure out what was wrong.

Page 130

Q Well, have you figured out what was wrong?
A Yes. There was a lack of trust between the two agencies.
Q What about NTSB did the Coast Guard not trust?
A Our motives. They felt that NTSB would take any opportunity to make the Coast Guard look bad.
Q Anything else?
A I can't think of anything else right now.
Q What examples have you been made aware of where NTSB's motive was to make the Coast Guard look bad?
A Well, I can't think of any specifics right now.
Q When you say you can't think of any specifics, are you saying you don't know or you don't remember?
A I don't remember. I know they exist. I would have to go back and look them up.
Q Is there any piece of information that I could give you that might help you remember it? If I showed you the MOU, would that help you remember?

Page 131

A No. I think if you maybe showed me some reports that we had done.
Q Are you aware whether or not NTSB ever investigated the Coast Guard in its investigations?
A No. I am not.
Q What about representing NTSB and its marine related responsibilities to other federal agencies?
A Besides the Coast Guard?
Q Yes.
A And what do you mean by what about? What is your question?
Q Describe to me your work relating to representing NTSB in its marine responsibilities to other federal agencies.
A All right.
We did this with OSHA on the Athena 106 investigation.
We have spent considerable time in the last year with the U.S. Navy.
Those are the only agencies I can think of right now.
Q And did you spend a lot of time speaking

Page 132

wing OSHA regarding the Athena?
A Not me personally, but my office did.
Q What about the U.S. Navy? What about your responsibilities related to the U.S. Navy?
A Well, my responsibilities are to apply the law and regulations concerning investigations. There was an accident involving a commercial vessel and a naval vessel. So, we were trying to get the cooperation of the Navy and it was very difficult and time-consuming.
Q I see.
Did you ever prevail on getting the cooperation?
A We are not finished yet. It is still going on.
Q Which accident is that, sir?
A This was the accident between the submarine Newport News and the -- don't ask me to spell this one -- the Japanese tanker Mogamigawa.
Q When did that accident occur?
A At the beginning of this year.
Q Did NTSB launch on that one?

Page 133

A No. We decided not to launch on that one. What we did is we were in touch with the Japanese investigative agency and offered support.
Q What support did you provide, did NTSB provide?
A The primary support was to interface between the Japanese and the U.S. Navy.
Q Describe that interface please, sir.
A That the Japanese would tell us what information they wanted and we would go to the Navy and try to get that information.
Q And that is the difficult communications that you referred to earlier?
A Well, that is it. The Navy doesn't want to give it up.
Q What about international agencies? What type of communication or representation duties and responsibilities do you have with regard to representing the NTSB in its marine responsibilities related to international agencies?
A Well, the Japanese Marine Investigative Agency is one agency that we have been dealing with.

The United Kingdom Marine Accident Investigation Branch is another that we deal with quite frequently.
The International Maritime Organization.
Q Other than the U.S. Navy Newport News Mogamigawa -- is that what it was, sir?
A Mogamigawa.
Q -- Mogamigawa, have you had any other representations or communication with the Japanese Marine Safety Organization?
A Yes.
Q What was that?
A After that accident they came to the U.S., that agency came to the U.S. or several people from it, and spent time with us learning about our investigative processes.
Q And who was involved in helping them learn about that?
A I was and Captain Scheffer. And I think there were some others who were involved as well.
Q A little bit of a diplomatic mission I guess.



Yes?
A Yes.
Q That is nice.
What about the United Kingdom?
A Well, their branch, in my opinion, is the most efficient investigative branch. So, what I have been trying to do is work with them to improve our capabilities to be similar to their's.
Q And what have you done to do that, sir?
A Well, I have visited them twice.
I have brought the Managing Director there with me and the Chairman to learn about how they do their work to get them to understand what the changes were that I was interested in doing here.
I e-mail with my counterpart over there now and then. We call each other up now and then and we meet now and then.
Q And what changes have you implemented based on the United Kingdom model?
A Well, we have improved some of our capabilities with respect to using voyage data recorders as part of our investigation.



The reorganization that I made was modeled after how they are set up. And what I have been trying to do is to get our work schedules to be a little more consistent with what their's are.
Q How are their work schedules?
A They publish their reports routinely in seven months.
Q Do they have other or the exact same reporting requirements as NTSB?
A No. They don't. Their governance is different.
Q Their governance is different?
A Yes.
Q What about their reports? Is there a requirement in their reports that they be produced within seven months?
A Their Director requires them.
Q Their Director requires them.
Are you aware of any Director at NTSB who requires marine reports to be produced within seven months?
A Well, I am the only Director that has any



say over when marine reports get done. I have tried to encourage that.
Where the groups diverge is primarily after the notation process. So, what I have tried to do is set seven months as a goal to notation.
Q How has NTSB streamlined its Director review process since you have joined NTSB?
A I believe the meetings, the Director review meetings, are shorter and in some cases we dispense with the meeting entirely, although there are still Directors review.
One change that I have implemented is that I bring the other Directors in during our work planning meeting and our report planning meeting so that they are up to speed on what we are doing and when the report finally comes to them for review there aren't any big surprises.
Q Anything else other than shorter meetings, dispensing with the meetings altogether, bring the other Directors into the work planning meetings in order to streamline the Director review process?
A Not that I would consider a change. I

don't think so.
Q I understand.
The keeping the Director meetings shorter, is that as a result of Mr. Osterman's directive or your directive?
A Well, it is primarily because of his directive.
Q And what about dispensing with the meetings, is that because of Mr. Osterman or because of your directive?
A That is again his.
Q What about bringing the other managers into the work planning meeting?
A That was my choice.
Q That was your choice. Okay.
Since you joined NTSB, how many reports have you brought before the Board?
A Let me think.
For Sunshine Meetings?
Q Yes.
A Five.
Q What reports are those, sir?



A The Lady D.
The Express Shuttle.
Ethan Allen.
Massachusetts.
One more. Athena 106.
New Delhi Express.
So, there are six.
Q Lady D.
Express Shuttle?
A Yes.
Q Ethan Allen.
Massachusetts.
Athena Express?
A Athena 106.
Q I'm sorry. Athena 106.
New Delhi Express.
A Right.
Q Thank you.
And you said when you responded you said approved by the Board. That went before the Board is what you said.
Have there been other reports of yours that



have not gone before the Board but have been approved for publication?
A There has been one report that I have approved.
Q And which report is that, sir?
A That was the Selendang Ayu.
Q Is that an accident report, sir?
A It is an accident brief.
Q What is the difference between an accident brief and an accident report?
A That one seems to change regularly. But it just has to do with the extent of the investigation. The briefs are generally shorter.
Q And would that reflect a smaller investigation?
A Not necessarily. It would generally be fewer issues.
The reason that I decided to do some briefs rather than full reports is that we could get them out quicker. And some of the Board meetings have been on briefs, not just full reports.
Q Okay.



Other than the Selendang Ayu, how many other briefs have been approved?
A Well, wait a minute.
The Norwegian Dawn is another one I approved.
Q How much of the Lady D investigation was under way when you started at NTSB?
A All of it.
Q And what about the Express Shuttle? How much of that was under way when you started at NTSB?
A Well, when you say how much, it is either under way or it is not.
Q I can rephrase the question.
A Yes.
Q Was the Express Shuttle investigation under way when you started at NTSB?
A Yes. The launch was before I came to NTSB.
Q Was the Ethan Allen launch before you came to NTSB?
A No.
Q Was the Massachusetts launch before you came to NTSB?

A No.
Q The Athena 106?
A No.
Q And New Delhi Express?
A No.
Q What percentage, if we were to scale it on 100 percent, how far along on that scale, how long was the Lady D report when you started at NTSB?
A Do you mean as far as time spent or do you mean as far as amount of work completed?
Q Amount of work completed.
A On the Lady D I would say 50 percent.
Q 50?
A Yes.
Q And the Express Shuttle?
A About the same.
Q How much time between the accident occurring and the approval of the report elapsed for the Ethan Allen report?
A The Ethan Allen accident was on October 2nd, 2005 and the report was approved on July 25th, 2006.



Q Has there been any reconsideration of any reports, sir?
A No.
Q Are you aware of any concerns by the private industry or by the public in general with regards to the Ethan Allen report?
A I am aware of some dissatisfaction on the parts of certain people.
Q Can you describe that to me, sir?
A Well, I think what I would say, or at least what I am aware of, primarily is some stuff that has appeared on the Internet that seems to be prompted by a disgruntled ex-employee.
Q Who is that employee?
A Bob Ford.
Q Bob Ford.
And how much time between the accident and approval did it take for the Massachusetts report to be approved?
A I don't remember the dates of those. It was less than a year.
Q And what about the Athena 106?



A It was less than a year.
Q And the New Delhi Express?
A That was I think about 14 months.
Q Please describe for me, sir, your duties and responsibilities in getting an accident investigation report completed and approved.
A Well, after the investigative team comes back we have a work planning meeting and in the work planning meeting we talk about what the potential safety issues are, if we can, what the probable cause could be, what recommendations might be coming out of it. We talk about those things.
In the course of that meeting or subsequent meetings stemming from that I will make a decision as to what issues we will investigate. So, at that stage I tend to start to put a focus on the report.
As the report develops and the investigation continues if we get new information or something looks a little bit different, we will sit down and reconsider it and maybe revise the issues and the scope as necessary. But that is done with my approval.



At the time of the work planning meeting we set a schedule with milestones and who is going to do what. We find out if the people are available.
Then periodically thereafter I check with the supervisor as to how the progress is and I get involved off and on with the issues when we have to have meetings.
Then when the first draft of the report is finished I read it and decide if I consider it complete as far as the scope and send it back for revisions, if necessary.
Then when the next draft comes up I will read it more from the standpoint of style and content, is it complete, do the facts support the analysis, the analysis support the recommendations and probable cause, did we avoid discussing things that were not relevant to the probable cause or recommendations.
Then it goes back for another revision and then it goes to a writer who fixes it up to make it look good.
Then I get it back again and read it once more, comment on it. The writer may revise it a

little bit more.
Then it goes out for the Directors review.
Q At what stage do you make your recommendation with regard to the narrowing of the issues? Is that early in the process, mid way through the process, near the end of the process?
A It is at all stages in the process.
Q Describe to me the factors involved in narrowing the issues.
A If they are not significant issues, if it is just some detail, that during the course of the investigation they found one of the life jackets was missing or something, I might not spend a lot of time investigating that. If it is something that I notice might have been a deficiency, but it is something simple to fix, we may go ahead and let them fix it and not make that an issue of the report.
What I try to do with our reports is to gear them to cover significant recommendations at the end, recommendations that would have some sort of significant safety impact, be reasonably achievable in my mind, and not bog it down with lots and lots of



recommendations and not try to specify the details of what needs to be done, but rather what the safety problem is that the person we are making the recommendation to should address.
Q I guess the next question then is has the Office Of Marine Safety issued any safety recommendations since you started in NTSB?
A Yes.
Q What about safety recommendations related to your investigations and the report?
A Yes.
I think all of the reports that went to the Board had safety recommendations coming out of them.
Q Do you know how many?
A No.
Q Do you review those safety recommendations?
A Yes. I do.
Q Do you know which topics you issued safety recommendations on?
A In general. Let's see.
We have issued recommendations relating to the assumed weight of passengers on passenger vessels.



We have issued recommendations relating to stability criteria.
We have made recommendations relating to preventative maintenance, to fire detection and suppression.
We have made recommendations relating to how uninspected barges carrying people should be treated.
Recommendations relating to bridge resource management.
I think that is the bulk of it.
Q Those safety recommendations, have you had to obtain Board approval for them?
A Yes.
Q And as part of that process is there a Director's review?
A Yes.
Q In general with regard to an accident investigation report, describe to me the types of comments you have received back from the Directors meeting.
A I think almost exclusively they are



editorial, that perhaps a recommendation could be worded a little better for clarity. No substantial comments back.
Q Do you know where those comments are kept, sir? Do you maintain a folder of the comments on your reports?
MS. OHTA: Objection. Compound question. Or two questions depending upon the punctuation you put between them.
Could you rephrase the question?
MR. LOWINGER: Sure.
BY MR. LOWINGER:
Q Where do you keep the comments received from the managers?
A I believe the writer keeps them. I don't know where though.
MS. OHTA: Actually that question was where do you keep them?
THE WITNESS: I'm sorry.
MS. OHTA: It is very important to listen to the question.
THE WITNESS: I don't keep them anywhere.

BY MR. LOWINGER:
Q Do you review them?
A Yes.
Q Do you receive them?
A Yes.
Q By what means?
A Verbally sometimes. E-mail sometimes. Sometimes just written up on a recommendation itself.
Q And then they are transferred over to the writer?
A No.
Then what I normally do is sit down with the people involved in the investigation and we talk about the changes and decide whether we are going to incorporate them or not.
Q How much time do you spend on the report production process as part of your duties and responsibilities, sir?
A A significant amount of time. Probably upwards of 120 hours per report. Maybe more.
Q With regards to the narrowing of the issues that you mentioned before, you mentioned that you



narrowed the issues and then you mentioned that your reports are not really laundry lists of all the little matters that occur in an accident.
Is there any sort of policy at NTSB to keep the reports shorter like that than they have in the past, that NTSB wants to make the reports shorter?
A No.
Q Is that something that reflects your style itself, sir?
A Yes.
Q Who is involved in the managers report?
A Involved in the what?
Q The managers report process.
A I don't know what the managers report is.
Q The managers meeting with regard to a report.
A When I say I meet with my managers?
Q No. I meant like the managers like the General Counsel, the Managing Director.
A The Directors.
Q Yes. Thank you for helping me clarify that.



Who is involved in the Directors report process?
A For almost all of the reports the Directors review involves the Director of the Office of Safety Recommendations, the General Counsel, the Director of Research and Engineering and the Managing Director.
Q Who is the Director of Safety Recommendations?
A Elaine Weinstein.
Q And the General Counsel is Gary Halbert?
A Yes.
Q And the Director of Research and Engineering is?
A Vern Ellingstad.
Q Have they all participated in each one of the Directors meetings for each of your reports, sir?
A For the most part, yes. If any of them was not available, then the Deputy came.
Q Other than the Lady D and Express Shuttle, how many other reports were involved in the backlog that you referred to, sir?
A When I got there -- let's see -- at least



five that I can think of.
Q Which ones are those, sir?
A Greeneville.
Arctic Rose.
Norwegian Dawn.
Selendang Ayu.
Norway.
Q What was involved in completing the Greeneville report, sir?
A After I got there?
Q Yes, sir.
A It was some editing and I added a section on human performance and I added a section on the damage stability or subdivision -- I'm sorry -- subdivision of the Ehime Maru.
Q And when you said when you arrived there, are you aware whether your predecessor was involved in finishing the report at all?
A Who do you mean by my predecessor?
Q I believe there was a person in between Ms. Murtagh Cooke and you.
A Bob Barlett.

Q I'm sorry.
A Bob Barlett was his name.
Q Did Mr. Barlett assist in completing the report?
A It was my belief that they tried to get the report out before I got there. I don't know what his personal involvement was.
Q What percent complete was the Greeneville one when you arrived?
A 98 percent.
Q What about the Arctic Rose, what percent complete was it when you arrived?
A 30 percent.
Q Do you know when that accident took place, sir?
A No. I don't.
Q Was it before May of 2005?
A Yes.
Q What about the Norwegian?
A Norwegian Dawn?
Q Norwegian Dawn.
A What about it?



Q What percentage complete was that?
A I don't know.
Q Was it almost complete?
A I don't know because I didn't see it until it was complete. So, I don't know what stage it was in when I got there.
Q So, was it largely complete when you arrived there?
MS. OHTA: Objection. Asked and answered. This is the third time you asked him the same question.
THE WITNESS: I have no idea.
BY MR. LOWINGER:
Q What was involved in completing it when you arrived there, sir?
A To complete a report the investigation has to be complete and the report has to be written. I don't know what stage it was in when I got there.
Q What about the Selendang Ayu? How far along was that?
A Probably 25 percent.
Q And the Norway?



A 50 percent.
MR. LOWINGER: Can we go off the record for a second?
MS. SILBAUGH: Can we take a break?
MR. LOWINGER: Sure.
(Recess.)
BY MR. LOWINGER:
Q Sir, how many green sheets has your office issued since you started your tenure at NTSB?
A I don't know.
Q Are you aware of any?
A Yes. We have done a lot. But I don't know how many.
Q Would they be published anywhere?
A I don't know if green sheets are published or not. I don't believe so.
Q Do you know which accidents are related to any of the green sheets you issued?
A By a green sheet, what do you mean?
Q It is a recommendation. It is a safety recommendation issued to other agencies.
A Outside of a report?



Q Yes.
A Yes. We have.
I don't know what we have had before. We had one last month to the Coast Guard on some life saving appliances.
Q Any others?
A I don't know.
Q Would you be the person to review them and approve them before they leave the Office of Marine Safety?
A Yes.
Q If you can clarify for me something I don't understand, what is the difference between a brief report and another report?
For example, how is the Selendang Ayu a brief report and, for example, the Ethan Allen a different type of report?
MS. OHTA: Objection. Again you are asking multiple questions. And, secondly, asked and answered with respect to the first question, which was what is the difference between a brief and a report. That was already asked and answered.

MR. LOWINGER: I know. I am just trying to clarify. He said it could be any number of things. I am trying to figure out exactly how they differ.

MS. OHTA: Well, it is up to you to figure out what it is or else ask a question which is not compound, not ambiguous and not previously asked and answered.

BY MR. LOWINGER:

Q With regard to the Selendang Ayu, sir, when you said it is a brief report, did you mean that it is brief in size?

A No. It is the format of a report. It doesn't have a cover on it. It doesn't have conclusions in it.

Q What is the purpose of the report then, sir?

A Of using that format?

Q Yes.

A It was in order to get the report out quicker than it would have taken by means of another format.

Q But as far as what does it actually report



on, just the facts that occurred?

A No. It has facts and analysis and the probable cause, that particular report.

Q Does it have safety recommendations?

A That report did not have safety recommendations.

Q How far along was the report when you arrived at NTSB so that it could be put into the format for the brief report?

A I think you asked me how far along that report was when I arrived already.

Q And that 25 percent was applicable to the brief report?

A Is that what I said for the Selendang?

Q Yes.

A I don't remember what I said.

The only thing I recall about that is that it was old and I asked the report writers what could we do to get this thing out quicker. And the recommendation or the advice I got was that a brief report would get out quicker. Also a brief report is something that I could sign myself without having to



send them to the Board.

Q Does that also apply for the Norwegian Dawn?

A That was just a small report. I don't remember deliberating on the format of that one.

Q Describe for me, sir, work report planning meetings.

Have we discussed that before when you said that the Directors at the other offices come?

A Well, I mentioned that the Directors come to it. Yes.

Q Are those work report planning meetings?

A Yes.

Q So, is there any rule or requirement that Directors attend a work report planning meeting?

A No.

Q Do you have any obligations as a result of being a member of the Senior Executive Service?

A Obligations?

Q Yes. Duties and responsibilities.

A Yes. I do.

Q Could you please describe them to me, sir?



A Well, I have to do some sort of a financial report. That is the only thing I can think of.

Q What is the financial report that you do, sir?

A Some report that one of our attorneys gives me and I fill it out on an annual basis. It basically is for me to say what my sources of income are.

Q Anything else that comes to your mind with regard to being a member of what is called the SES?

A Not as far as the government goes. No.

Q Okay.

What about travel? Have you been traveling as a representative of NTSB with regard to marine safety issues since you have come on board at NTSB?

A Yes.

Q Can you describe your travel, sir?

A I have traveled several times with the Chairman to accompany the Chairman when he wants to go someplace that he has an interest.

I have traveled to IMO meetings.

I have traveled to a couple of conferences, professional type conferences.

Page 162

Last week I traveled with the Managing Director and one of the Board members to Miami to observe a mass evacuation exercise.
Q What is the role of NTSB at the IMO?
A Well, I don't believe NTSB has an official role, but I go as part of the U.S. delegation and what I do is advise the head of the delegation on NTSB positions on issues before the IMO that NTSB has an interest in.
Q What percentage of your work or how much time do you spend on IMO related issues?
A Three to four months a year.
Q Have you generated any reports for the IMO issued through the U.S. delegation?
A The only thing I have done is helped with the delegation memo that I believe goes to the Secretary of State on the parts of the meeting that I was participating in.
Q And with regard to counseling a delegate on NTSB related issues, have you had to write any reports related to that?
A No.

Page 163

Q Just providing oral counsel?
A Right. Or if there is a U.S. paper, I may offer some comments on the paper. But it is basically advice to the U.S. delegation.
Q How many papers have you provided advice on?
MS. OHTA: In connection with the IMO?
MR. LOWINGER: Yes. Thank you.
THE WITNESS: All of the meetings that I have been to?
BY MR. LOWINGER:
Q Yes.
A I would say half a dozen.
Q How many IMO meetings have you been to as the Director of OMS?
A I have been to four or five.
Q What about notice of proposed rule makings? Have you provided any advice or any comments with regard to notice of proposed rule makings?
A Yes. I have.
Q Which notice of proposed rule makings have you provided advice on?

Page 164

A We did one dealing with small passenger vessel stability.
We wrote one concerning proposed passenger weight.
I think there were others, but I don't remember what they were.
Q Do you know who were the agencies issuing proposed rules on the small passenger proposed and the passenger weight proposed rule makings?
A Yes. It was the Coast Guard.
Q How many times have you traveled with the Chairman?
A Four or five times.
Q Where have you traveled to with the Chairman?
A New York, Miami and Seattle.
Q Have you traveled to any of these more than once?
A With the Chairman?
Q Yes.
A I have traveled to New York twice with the Chairman.

Page 165

Miami I can't remember. Miami I believe it was twice.
Q What was the purpose of your trips to New York with the Chairman?
A One of the trips was to go aboard the Crown Princess with the Chairman and basically ride the thing out to the sea and then come back.
The other trip to New York with the Chairman, I can't remember what that was about. That was my first one with him. I don't remember what that one was.
I don't remember what the second one was. It may come to me later.
Q What about Miami? What was the purpose of your travel to Miami?
A It was to meet some cruise ship operators, to meet with cruise ship operators.
Q Do you know which cruise ship operators you met with?
A Yes. We met with Norwegian Cruise Line and we met with Royal Caribbean Cruise Line.
Q And what was the purpose of those meetings?

Page 166

A It was primarily to introduce the Chairman to the CEOs of those companies.
Q Do you happen to remember the basis for your second trip with the Chairman to Miami?
A That was to the Sea Trade Conference where he was delivering a speech.
Q Who wrote the speech?
A I did.
Q Have you written any other speeches for the Chairman?
A Yes.
Q How much speeches have you written for the Chairman?
A Three.
Q Are you the sole author of those speeches, sir?
A I am the sole author of two of them. The third one I am partly the author.
Q What did the speeches that you were sole author on pertain to?
A The one in Miami was a general speech about NTSB to introduce the audience to NTSB and then it

Page 167

touched a little bit on what the Office of Marine Safety does and what we see for the future.
Q And the other one that you were sole author on?
A That was a speech here in Washington to some sort of a ports conference. I don't remember the name of the conference.
Q The first speech, when was that delivered?
A Well, the Sea Trade speech was actually the last speech. That was in March.
Q Where was that?
A Miami.
Q And the one in D.C., do you know when that took place?
A That was last year sometime.
Q And the third one that you were a co-author on?
A I don't remember.
Wait a minute. I didn't go with him on that trip. I don't remember the audience. It was some marine group.
Q Is there a trip that you had mentioned

Page 168

before that you want to correct an answer on or are you referring to a speech?
A I don't understand your question.
Q During your prior answer you had said, or the answer prior to your prior answer you had said, that now that you remember you didn't go somewhere.
What were you referring to, sir?
A It was that speech that I co-authored with somebody else. I don't remember where he delivered it and I know I didn't go with him for that. So, I just don't remember.
Q Do you remember when that was?
A It was last year sometime.
I do remember my other trip to New York. That was to visit a ship as well.
Q What ship?
A That was the Norwegian Dawn.
Q Was that part of the accident investigation?
A No. The accident investigation was completed at that point. The purpose of that trip was to let the Chairman see what had happened, talk to the

Page 169

crew about the accident and to see what remedial action the shipping company had taken.
Q And what kind of work did you do to prepare the Chairman for that trip?
A I gave him a copy of the Norwegian Dawn brief and I talked him through it and told him what to look for on the ship and what questions he might want to ask.
Q How much time did you spend preparing the Chairman for the trip?
A About four hours perhaps.
Q What about your speeches, the three speeches you mentioned before, how much time did you spend on the speeches?
A Probably 6 to 12 hours on each one.
Q Have you written any other speeches for any other Board members?
A No.
Q Have you written any congressional testimony as the Director of OMS?
A No.
Q Have you appeared before Congress as the

Director of OMS?
A No.
Q Have you briefed congressional staff as the Director of OMS?
A Yes.
Q When did you do that, sir?
A I did it in October of 2005 after the Ethan Allen accident for some of the staff from some of the New York delegations.
Then I briefed staff, I guess about a month ago, in connection with the Ethan Allen.
Q How much work did it take for you to prepare for briefing the staff with regard to the Ethan Allen?
A With regard to?
Q To the congressional briefings related to the Ethan Allen.
A Well, the first briefing we had after the accident it didn't take any additional responsibility to prepare because it was right after the accident. We just went up to talk about it. So, there was really nothing additional that we had to prepare on



what I was doing anyway.
For the second briefing that we did this year it took me about six hours to prepare.
Q Any other speeches, sir, that you prepared?
A I have given some speeches, but I haven't written them down. I might have had an outline or something.
Q When you prepare an outline, how long does it take you to prepare?
A Half a day.
Q And do you know where you gave speeches, sir?
A I gave a speech at the Naval Academy. It was called the Bock Memorial Lecture. And that was in 2005.
I gave, I guess you would call it a speech, at the Cruise Line International Association about a month ago in Arlington to their Technical Committee.
I think that was all.
Q How much time did it take to prepare the Bock Memorial speech?
A I spent about two hours on it.



Q What about giving the speech? Was it a long speech?
A It was about a half hour.
Q And the Cruise Ship Association on tech issues, how long did it take for you to prepare that speech?
A I didn't prepare for it. I just spoke. I rambled for half an hour.
Q What is MAIIF 14?
A Well, MAIIF stands for the Marine Accident Investigators International Forum. The 14 stands for its 14th meeting.
Q Did you attend that meeting?
A I don't believe I did.
Q Did you represent NTSB at the meeting somehow?
A At that meeting?
Q Yes.
A I don't think so.
Do you know when that meeting was held?
MS. OHTA: It isn't up to you to ask questions, sir. You simply are to answer the



questions that are posed.
THE WITNESS: I'm sorry.
MS. OHTA: If he wants to help you, I am sure he has boxes full of documents that he can show you all this information contained therein.
THE WITNESS: Sorry.
MS. OHTA: I think you are enjoying this so much you don't want to finish by 5:30.
BY MR. LOWINGER:
Q I guess it would have been at some point in 2006.
A 2006. All right.
In 2006 I went to a MAIIF meeting. I didn't know it was number 14. I thought it was number 15. But that doesn't matter.
Yes. I went to that. It was in Panama last August I believe.
Q What did you do? What was your duty and responsibility with regard to that meeting, sir?
A Well, I went as the NTSB representative.
Q What does serving as the NTSB representative entail?

Page 174

A It means when we have our meetings and discuss the various issues that I give the NTSB point of view.

Q What was NTSB's point of view at that MAIIF meeting that you attended, whether it be 14 or 15?

A Well, I talked about what we were working on. We spent some time talking about different accidents that the other groups had done.

The MAIIF is an opportunity for the leaders of several marine accident investigation groups around the world to get together on an annual basis and talk about issues of common interest.

Q And how many MAIIF meetings have you gone to as the representative of NTSB?

A One.

Q How long did it take you to prepare your speech for MAIIF?

A Less than a day.

Q How long were you at the conference?

A I think it was a week.

Q What is MAIB?

A That is Marine Accident Investigation

Page 175

Branch.

Q What is that, sir?

A That is the United Kingdom version of the Marine Section of NTSB that investigates marine casualties under the U.K. jurisdiction.

Q Before we were talking about the reports.

Do you ever write any of the portions of the report, sir?

A Yes. I do.

Q Can you describe to me what your duties and responsibilities are with regard to writing reports?

A My duty and responsibility is to try to make the report clear. So, parts of the report that, in my opinion, are not clear, I may rewrite.

I did extensive writing on parts of the Lady D report and the Ethan Allen report dealing with stability because that is my area of technical expertise.

Q Have any Board members ever launched on any of the accident investigations that have occurred since you have been Director of OMS?

A Yes.

Page 176

Q And which accident?

A The Ethan Allen and the Empress of the North.

Q And how many Board members launched on each of those?

A One.

Q One on each?

A One on each.

Q How long were they out in the field for?

A I don't know exactly. They are normally out there three or four days.

Q What were your duties and responsibilities with regard to the Board member who was launched on those accident investigations?

A I didn't have any specific duty. I wasn't there.

Q Describe for me your duties and responsibilities with regard to interacting with private industry on behalf of NTSB.

A Well, one of the responsibilities would deal with addressing issues that arise out of specific accidents and the reports.

Page 177

Another one would be what we call outreach, visiting them in order to tell them about NTSB and what we are trying to achieve.

Q Anything other than accidents and outreach?

A Yes. Also familiarization for Board members.

Q What do you mean by that? Can you explain that to me, sir?

A Well, for example, my trip to Miami to visit the Norwegian Cruise Line and RCCL was intended to allow the Chairman to learn a little bit about the cruise industry and to talk with some of the leaders of the cruise industry.

We call those familiarization trips.

Q How long was the RCCL trip?

A I think it was one or two days.

Q And what about the -- you said it was Norway Cruise Lines?

A Yes.

Q Was that part of the same trip?

A I can't remember. I know there were two trips. I really don't remember which companies we

visited on which trip.
Q Are both trips approximately one to two days?
A For the marine part, yes.
Q Is there any work done prior to the trip to brief the Chairman for a familiarization trip?
A Yes.
Q Can you describe that to me please?
A Well, it is just briefing him as far as what we are going to do and what he might expect, what he might want to talk about when he is down there.
I also spend time dealing with the places we are going to visit to let them know what the Chairman's expectations are, what they might want to talk about and show him.
Also while we were in Miami we went up to the STAR Simulator Center, which was in the area. He went up there and met those people, saw their capabilities and talked with them a little bit.
Q The briefing with regard to what the Chairman can expect, what he could talk about and obtaining or providing the industry officials on what



their expectations for the trip are, for the visit are, how much time does that take?
A To brief the Chairman?
Q Right. On what he should expect.
A I spent less than an hour with him.
Q What about with regard to you said -- I don't want to misquote you, sir, or mischaracterize what you said -- you said speaking with the private industry officials to find out what they are going to show the Chairman?
A Right.
Q How much time does that take?
A Over the course of several days it probably takes a total of half an hour.
Q And the trip to the STAR Simulator?
A I didn't set that up. That was set up by Captain Scheffer.
Q What about outreach? Describe to me your outreach duties and responsibilities, sir.
A Well, I consider outreach or going on any travel, basically most travel, that is not investigation related, to talk about whatever it is



that we talk about.
I would consider the familiarization trips that the Chairman takes that I go with him would be outreach for me because I get to meet people, talk to them a little bit about what we are doing, ask them questions about what they think about things that we are doing, basically get to know the industry a little bit better.
Q Aside from the familiarization trips, what other types of outreach do you do, sir?
A Well, I think just because of the way we have to put things in certain categories, we classify my trips to IMO as outreach.
MAIIF is outreach.
If I were going to the annual meeting of the Society of Naval Architects, that would be outreach.
Q Private organization conferences would be outreach?
A Well, government conferences as well.
Just anything that is not training, not advocacy and not investigation.



Q Describe to me your work with the private industry on behalf of NTSB with regard to accidents.
A I am not sure what you mean by that.
Q Did you refer earlier, sir, that as part of your work representing NTSB that you speak with private, I guess members of I guess the marine industry, with regard to accidents or accident reports?
A Yes.
Q Can you describe to me what those duties and responsibilities are?
A Well, it depends on who I am talking to.
For example, last year I went to Berkeley. I don't know if you want to call that private enterprise. But I went there and I gave a lecture on an accident investigation.
When I go and just make a visit to a company, I don't do that very much by myself. But let's say, for example, I go over to the Cruise Line International Association office in Arlington, I will go over there and I will sit down and we will take a look at what open recommendations we have and how we

might address those sorts of things.

Next week a group of passenger vessel people are going to come into the office and talk to us about some of our recommendations.

So, it is not necessary to travel in order to have outreach. I just call it spending time with the industry or somebody else.

Q As far as it relates to accidents and accident reports, how much time do you spend dealing with private industry?

A I can't quantify it because when I am with private industry we may spend some time talking about specific accidents, we may spend time talking about NTSB processes. I couldn't tell you how much time we spent on any one thing.

Q Dealing with private industry on behalf of NTSB, does that take up a lot of or a little of your time?

A Between a little and medium.

Q Okay.

And over the course of a year how many hours would you say that is, sir?



A Including travel time?

Q Sure.

A Perhaps six weeks.

Q Excluding travel time, how much?

A Three weeks.

Q With regard to budgeting issues, sir, what is a time accounting approach?

A Well, I am not an expert in that. I will tell you what I consider it to be. This has to do with productivity of the people.

What I like to know is how my staff spend their time. And so what I would like them to do is to keep track of the hours they spend according to what they spend it on, as far as which specific accident, what phase of the accident and that sort of thing.

I believe that time accounting and accurate time accounting is necessary in order to gauge where we might be able to make productivity improvements.

Q Okay.

Is that applicable across the board for all your employees work or is that something that you are just implementing with regards to a certain accident?



A Well, in a very course way it is all the employees except for me and that is only on the accidents themselves and it is basically how many hours did they spend on what accident.

What I would like to implement, and I think what the agency wants to implement, is a way of being able to keep track of the time more accurately so that we can manage it better.

Q I see.

So, the time accounting approach, is that something that you are implementing because the Board requested it?

A No. It is something that we used when I was in private industry at ABS.

Q Sure.

A I thought it was very useful there and I wanted to see something similar here.

Q When I asked you what your duties and responsibilities were, you said one of them was the morale of the office.

What did you mean by that, sir?

A Well, what I felt when I arrived is that



the office had low productivity and that part of the cause was low morale and I would hear different negative things from staff about other staff and lots of complaining about this and that. And I believed that those sorts of problems were reflected in performance. This is something that I learned from my Coast Guard Reserve career.

So, what I would try to do is address what those issues were, try to improve communications in the office, and get any issues up on the table and try to address them as best as I could.

Q Have the morale issues been resolved?

A Well, I think they have been addressed to a large degree. I would say morale is a lot better now than it was.

Q How long did it take you to redirect morale?

A It is a continuous process.

Q How much time have you spent in the past year?

A You can't break the time out. It is a minute here and a minute there, 20 minutes here and

Page 186

there. No way.
Q But you would say it is probably a small part of your work?
A It is not a dedicated activity. I don't go around and say I am going to spend a half an hour on morale now. That is not how it is done. I think it is part of leadership. It is a responsibility that you can't really keep track of time for.
Q Have there been any petitions for reconsideration?
A No.
Q Back to morale --
A By the way, you asked that question before.
MS. OHTA: Wait until there is a question pending.
THE WITNESS: Okay.
MS. OHTA: So I can object, as opposed to you objecting.
BY MR. LOWINGER:
Q Is there an answer that needs to be changed?
A No.

Page 187

Q Is there a question that needs to be changed?
A No.
MS. OHTA: Well, he doesn't have the right to change your questions, does he?
BY MR. LOWINGER:
Q Is there an issue with the question?
MS. OHTA: An issue with what question? There is no question pending.
MR. LOWINGER: Well, there was an answer that there was a question.
MS. OHTA: Do you want to read back the question? There was no question pending.
MR. LOWINGER: I understand there was no question pending. But I had heard something and I thought it was about a question. I just wanted to give him an opportunity.
MS. OHTA: To?
MR. LOWINGER: Clarify an answer or correct an answer or ask for clarification of a question.
MS. OHTA: If he needs clarification for a question, he should ask for clarification before he

Page 188

answers the question.
If he needs to clarify an incorrect answer, then it is incumbent upon him to do so. But that isn't what he was doing.
MR. LOWINGER: Very good.
BY MR. LOWINGER:
Q Describe your work, sir, with regard to Sunshine Meetings that you mentioned before.
A At the meeting?
Q Leading up to and at.
A Well, leading up to I review all the presentation materials and what the speakers are going to say.
Then we have some practice sessions with volunteers from elsewhere in the agency to play the role of the Board members and we give sort of a rehearsal of our presentation and deal with questions from the mock board to help prepare us.
Then we have the meetings themselves.
At the meetings I am introduced by the Managing Director. I may give a very short introductory talk, very short. I turn it over to the

Page 189

IIC and other investigators. They follow through the thing.
When there are questions from the Board, if they are technical questions dealing with some detail of the investigation, the investigators usually answer those. If they deal more with policy of the marine group, then I will generally answer those questions.
Q How much time is spent on preparation for a Sunshine Meeting?
A By me?
Q Yes.
A Including the mock board meetings and everything, I would guess perhaps 16 hours.
Q What about actually meeting with Board members related to the notation?
A What we do is offer to meet with the Board members. They may pick us up on that. They may not.
What we will do generally is once the reports on notation, a few days before the meeting we like to meet with them and listen to concerns that they might have and try to address those to sort of either perfect their question to bring it up during

Page 190

the Board meeting or to explain what the issue is so that they might reconsider bringing those issues up.

So, it is sort of a one on one education process.

Q Have you met with all the Board members for all the reports that went before the Board?

A No.

Q What portion of the Board members have you met with with regard to all the reports that have gone before the Board?

A 80 percent.

Q How much time do these meetings take?

A They take anywhere from one to three hours.

Q Is there preparation in anticipation of the meeting?

A Not for those individual meetings. There is preparation involved in getting ready for the Board presentation.

Q Do you ever have to make edits or changes to the report as a result of your meeting with the Board?

A Yes.

Page 191

Q Can you describe to me what happens when they say that they want changes to this?

A Well, the way it works now, and it has changed recently, is that the Board members are required to give their comments to us in writing about two or three days before the Board meeting and then after we have the comments from all the Board members who are going to make comments, we write a reply to the Board and amend the report if we have to.

Q You said that is relatively new. How recent of an event is this change in procedure?

A It has been this year. It started in the spring I believe.

Q Before this change was implemented, was it easier or more difficult to meet and respond to Board members concerns with regard to a report?

A I considered it more difficult.

Q More difficult now or before?

A More difficult before.

Q Why was it more difficult before, sir?

A Because at some points what we were having to do were to try to develop compromise positions

Page 192

between two different Board members in realtime, so to speak. So, it was very hard to do it that way.

Q I see.

Beside the mock, actually attending the Sunshine, giving the introduction and discussing policy issues and meeting with the Board members either as now in response to their comments or before the new policy was implemented, what other parts of the Sunshine Meeting are implemented or are part of your duties and responsibilities as Director of OMS?

A I can't think of any additional ones.

Q Okay.

What is involved in setting the priorities for the office, sir?

A When I set the priorities for the office what I look at is what investigations are open, when did the accident occur, what are the issues that we are dealing with, what are the resources we have available to do the work, where do we need additional information or additional help, and other external constraints, for example, contracting, and then what is the significance of the accident as far as I see it

Page 193

or how I think the Board feels about it.

So, for example, the Ethan Allen, because it was the largest small passenger vessel accident we had, in memory anyway, became the top priority. And so when it came to trying to resolve conflicts in resources, I generally put them on the Ethan Allen to get that out quickly.

When I got to the Board there were several investigations that were still open and what I did was prioritize those and decided which ones I felt needed to come to the Board first and those were the ones we put most of our attention on to get them out.

So, that is what it is.

Q Is that something you do on a daily basis?

How often do you hold the meetings that you referred to?

A Well, they are not always meetings. I think about the priorities on a daily basis.

We only have to sit down and discuss those things when there is something new that comes up that might affect the priorities. For example, if some critical player gets sick for a while, how we are

going to handle that.
Q Is it a big part of your duties and responsibilities setting priorities?
A It is a big part as far as the impact on the office goes.
Q Is it something you spend a lot of time on?
A I would say so. I probably spend over five hours a week on that.
Q Are there any other factors in setting the priorities, including open investigations, the current issues that you are dealing with on investigations, resources available to do the work, additional work, contracting and the significance of issues?
A Yes. Input from the Managing Director and from the Board members.
Q Anything else?
A Not that I can think of.
Q What kind of input do you get from the Managing Director?
A As far as my work and priorities?
Q Yes.
A Very little unless I ask for it.



Q What about directives? Does he ever just give you directives?
A Not on the investigations. No.
Q What about outside other than investigations, sir?
A Yes. He might tell me to come to a meeting or something like that.
I don't think he singles me out for any directives. I think whatever directives he gives he gives to all the Directors pretty much across the board.
Q What did he say about reducing the backlog in the office?
A He just said that there was too much and it was taking too long to get reports out and what could I do to shorten it?
Q Anything else?
A About the backlog?
Q Yes.
A No.
Q Did you have meetings about the backlog with him?



A Yes. I did. We have regular meetings every three to four weeks and we go through all the ongoing work and where we are on it and what the key dates are.
Q Do you feel comfortable meeting with the Managing Director?
A Yes.
Q What did the Managing Director advise you with regard to enhancing or increasing the presence of the Office of Marine Safety in industry?
You had said that was something that he assigned to you.
A What I understood him to mean was that industry didn't particularly like us, they didn't particularly know what we did or who we were, and he knew that I had developed a lot of industry contacts in my prior jobs and that I was generally well-known and respected in the industry and he wanted me to use that to try to give us more credibility and more visibility.
Q And what have you done to do that, sir?
A Well, I have set up these trips with the



Chairman and some with the Managing Director and I have been in touch with different companies.
I am trying to get our people out among the industry more often.
When we have speaking opportunities at conferences or companies, I will generally try to send one of our investigators to go speak.
If there is some activity where we are asked to participate, I will do what I can to see that NTSB participates.
Q Describe to me your trips with the Managing Director, sir.
A I have had two trips with him.
Last year I had a trip with him to the initial control verification examination on a cruise ship. This is the examination that the Coast Guard conducts, safety examination that the Coast Guard conducts, on a new ship before it comes to the United States on the safety systems that the Coast Guard would check anyway when the ship came in. In case there were problems detected initially while the ship is at the yard, they could be fixed easily.

So, the Managing Director didn't have a lot of experience with ships, cruise ships in particular. And so when I identified an opportunity to go to one of these examinations, I asked him if he would go along so he could see what is actually done in one of these things.

Q How long of a trip was it?

A I think it was a total of about four days.

Q Where did you travel to?

A Germany.

Q Any other trips with the Managing Director, sir?

A Yes.

I had a trip with him last week to Miami where we witnessed the mass evacuation exercise that I told you about.

Q Sure.

How many conferences have investigators spoken at since you have assumed the duties and responsibilities?

A I would have to check. I would say at least four.



Q What about getting people out more, I guess mingling or making them more visible before industry? How has that been implemented?

A Well, if we identify an opportunity.

For example, tonight there is a new series of lectures going on at MITAGS, which is a training center up in Baltimore, and I have a bunch of my people going up there to watch the presentation and I have told the people at MITAGS that we might be willing to make a presentation there as well.

Q Sir, would you like a break?

A I would just as soon get this over with.

Q We are going to have a little bit more to go. So, if you want a break, just let me know.

MS. OHTA: What is a little?

MR. LOWINGER: A couple more topics and then documents.

MS. OHTA: I am talking about in terms of time, as opposed to subject matter.

MS. OHTA: Probably wrapping up in 40 minutes. I will probably be saying no further questions in about 40 minutes.



MS. OHTA: Then you will give me an opportunity.

MR. LOWINGER: Of course. And then he has to go.

MS. OHTA: I am just kidding.

THE WITNESS: You have to ask me questions too?

BY MR. LOWINGER:

Q Can you tell me what skills are essential in performing your duties and responsibilities?

A What skills I consider essential?

Q Uh-huh.

A That is a yes?

Q Please tell me, sir, what skills you consider essential in performing your duties and responsibilities.

A All right.

What I consider necessary and essential are technical expertise in marine safety, which means a good understanding of the international and national regulations.

A good understanding of the industry



itself.

Acquaintance with a large number of the people who were influential in the industry from the regulatory side, the professional side and the industry side as well.

I think the ability to plan is important and essential.

To be able to make good decisions relatively quickly and with limited information at times and if necessary.

I believe that it is important to be able to get along with your peers at the agency.

Leadership of the staff and basically leading by example to let them see that you are willing to work and for them to be confident in your ability to lead them.

I think being able to recognize where there might be problems and to be able to address those problems.

I think it is important to serve as a buffer between the staff and the other leadership in the agency, not as a wall, but basically to be able to

take criticism from on high and then deal with it without getting the staff upset.
Also to be able to represent the staff to other parts of the organization as well.
I think it is very important to be fair to everybody.
To communicate well.
To be honest.
I guess that is most of it.
Q Would you rank them in importance, sir?
A Not really. I might say some are more important than others, but I don't think I can rank them.
Q Which are more important than others?
A Maybe you could go through the list with me.
Q Okay.
Technical expertise in marine safety.
A Very important.
Q Good understanding of international and national regulations.
A Very important.



Q Good understanding of the industry itself.
A That is important.
Q Is important less important than --
A That is very important. Those three are very important.
Q Acquaintance with a large number of people in industry, influential in industry.
A Medium importance.
Q Ability to make decisions.
A High importance.
Q Is that more important than very important?
A No. Very important. Let's stick to that.
Q Ability to work with your peers.
A Very important.
Q Leadership. Leading by example.
A Very important.
Q Recognize where problems exist.
A I will say medium.
Q Serving as the buffer between staff and management.
A Medium.
Q Representing staff to management.



A Important.
Very important. Sorry.
Q Being fair.
A Very important.
Q And being honest.
A Of course, that is very important.
I would add to that list high ethical standard and good understanding of NTSB and NTSB's investigation processes.
Q The good understanding of NTSB and NTSB investigation processes, how does that rank?
A That would be medium I think.
Q And the high ethical standard?
A That is right up there. Very high.
Q What educational training that you have have you implemented or incorporated into your duties and responsibilities as the Director of OMS, sir?
A As far as formal training?
Q Yes.
A Well, on a technical side all of my education.
Q Okay.



A While I was a Coast Guard Officer I was sent many times to various leadership type schools. I have applied some of that.
While I was at ABS I was sent to the American Management Association's Presidents course, which helped me see how to start with a vision and work down to plans.
Then the War College was very good on the leadership and management side and analysis.
The training that I took in quality systems has been very important as far as being able to manage the group, support to reorganization and defining what the needs of the individuals are, what the qualifications should be, that sort of thing.
Q When did you attend quality systems training, sir?
A In the early 1990s.
Q Where was that, sir?
A That was at the Crosby Quality College in Orlando, Florida.
Q What about the Coast Guard leadership training that you had is applicable or is something

Page 206

that you apply?
How do you apply your Coast Guard leadership training?
A Well, that has to do with a lot of the qualities that I said are very important there. It is a matter of leading by example and that sort of thing.
Q What about the American Management Presidential course?
A That was the one that I said starts out with kind of a vision. Then you set perhaps the goals and the objectives, develop a strategy, that sort of thing.
Q And the War College, how was the War College training used in your day-to-day duties and responsibilities, sir?
A What the War College did for me mostly was taught me how to think in terms of the big picture and global objectives and the impact of what I do on other entities within the organization and external to the organization and how to address issues like that to come up with some sort of a solution.
Also I would like to add that going to MIT

Page 207

helped me to think analytically a lot better. That is a very good school for learning how to solve problems.
Q What other training is necessary to perform the duties of the Director job?
A That I need?
Q Yes.
A Well, I would like perhaps a little more training in government processes. Since I am relatively new to government still, I am occasionally surprised by how inefficient the Government is -- excuse me -- and how difficult it is to change.
Q What about your professional experiences, sir? What professional experiences that you had in the past are applicable to your duties and responsibilities?
A All of them.
Q Is your work as a Reserve applicable?
A Yes.
Q How so?
A In the management leadership side.
Q How so?
A Well, we talked about that a little bit.

Page 208

It is basically if you are a commanding officer of a unit, you have the organization under you, you have a lot people under you, you have a mission to accomplish, you have to oversee that that work is being done, you have to prepare the troops to do the job that they are supposed to do, you have got to keep the unit orderly and productive.
Q What about how does your work with regard to ABS's rules apply to your day-to-day work as the Director of OMS?
A Well, what that has done is it has taught me what the latest technical standards are for one thing.
Probably more importantly is how standards are developed by different parties in the industry to come up with a consensus.
Q How are those standards applicable to report an investigation?
A Well, it could be that a condition of class which is something in the ABS rules might not have been complied with.
What I found in the Selendang accident is

Page 209

that a lot of the issues had to do with the classification society and what they were supposed to do.
The Norway accident dealt a lot with what the classification society did or didn't do.
These are the technical standards for the structure of ships. So, if there is any sort of a structural problem with a vessel, an understanding of the class society was very important.
Q Was structure of the ship involved in any other accidents that you have investigated as the Director of OMS?
A I don't think so.
No.
Q And what about, sir, as the V.P. of Tech for ABS, how does that play into the performance of your duties and responsibilities?
A Well, that was a broad thing because there what we were doing we were involved with the cutting edge of technology in the marine industry there. So, really where I was was largely in the driver's seat of what the technology advances in the industry were.

So, we would work anything that was new coming along and also getting out to visit the industry and to be able to talk with them about these new concepts.
Q But the ships that have been investigated for the accidents -- I don't have my list in front of me -- how does the most up-to-date technological advances apply to those investigations?
A Well, if you are talking about those particular investigations, I think it varies from some to none when you get into that.
With the Express Shuttle there were issues dealing with preventive maintenance, which is certainly a very important thing with the class societies.
I don't know what accidents we are going to have in the future that may require some sort of structural analysis. I don't want to guess on that.
What I want to say is we don't have a lot of capability in the office other than me. The main thing I am getting at in there is the understanding of the marine industry and how it works. If NTSB doesn't operate consistent with how the rest of the world



works, we are very ineffective.
Q I see.
Has it been a problem at NTSB in general that it hasn't been as up-to-date as industry with regard to its own accident investigations, its knowledge base regarding accident investigations?
MS. OHTA: Objection. Lack of time frame and lack of foundation, depending upon the time frame.
BY MR. LOWINGER:
Q Since you have become Director, sir, have you become aware of NTSB in general as an agency not being up-to-date with industry and its standards related to technology in investigations?
A To a certain degree, yes.
Q When you say to a certain degree, what do you mean by that, sir?
A Well, I mean what we have had to do in some cases is educate ourselves in the course of the investigation.
The Crown Princess accident, for example, involved integrated navigation systems and we had no expertise in that area. So, it has taken us a long



time to learn about that before we can do an adequate investigation.
Voyage data recorders are something that is coming into the industry right now. We are behind on the technology to be able to use those effectively. So, we are focusing on that.
There are a number of other very technical areas in ships that are relatively new to ships that I think we tend to lack depth in.
So, what I am trying to do is figure out how can I train my people or how can I hire additional people with the skills that I need to be able to handle accidents that I think may happen in the future.
Q I see.
Is it hard to get the resources to train your people to bring them up-to-date?
A No. We haven't been turned down on any training requests.
Q What about hiring?
A Hiring is difficult.
Q What are the working conditions like in



which you perform your duties and responsibilities, sir?
A A very comfortable professional office environment.
Q Is it stressful?
A No.
Q Is it a 24/7 hour job?
A Yes. But I don't work 24/7.
Q What are your hours, sir?
A I normally get in around 8:00 o'clock in the morning, plus or minus 15 minutes. I normally go home at 5:45, plus or minus 15 minutes. And I normally work on Saturdays.
Q You normally do?
A Yes.
Q A full day?
A About six hours.
MR. LOWINGER: Excuse me. I am going to go off the record.
(Recess.)
BY MR. LOWINGER:
Q Sir, what reports are currently pending in

OMS right now?
A Right now we have the Crown Princess.
There is another I left off on the ones we are doing. I initiated one called the Kition.
So, the Crown Princess is pending.
The Empress of the North is pending.
The Kition is pending.
The Norway is pending.
Q What is the Kition, sir?
A The Kition is a tanker that ran into the I-10 bridge in Baton Rouge several months ago.
Q How many people launched on that?
A At least three.
Q Did any Board members launch?
A No.
Q Did you launch?
A No.
Q Did the Coast Guard also contribute to the investigation?
A They were a party. They were there. Yes.
Q Regarding training and travel, how is your budget regarding training, sir? How has your budget



for training been since you started as Director of OMS?
A It has been fine.
Q Has it been increased?
A No. But if we have needed extra funds, we could get extra funds.
Q When you sought extra funds before, was it for training?
A Well, the training and outreach are both in the same pot. So, as the money depleted we asked for more. So, you can't say whether it went to training or outreach. We never divided it.
Q What was depleting the training and outreach pot more, training or outreach, when you went and asked for additional funds?
A Outreach.
Q Regarding travel, has your budget for travel increased, maintained the same or been decreased since you started?
A Travel and the outreach are the same thing. Travel is the major component of outreach.
Q How much additional money did you need for



outreach or did you request for outreach?
A I think about $50,000.
Q Did you have any problem getting that money?
A No.
Q Who approved it?
A The Managing Director and the CFO.
Q What year did they do that, sir?
A 2006 and 2007.
Q How many times have they increased it, have they increased the training and travel outreach pot?
A Once each year.
Q Once each year.
Who is Bill Woody?
A Bill Woody is one of my marine investigators.
Q Describe for me, sir, his experience and knowledge of integrated bridges.
A I don't know that he has any.
MR. LOWINGER: This is Exhibit 1.
(Plaintiff's Exhibit No. 1 was marked for identification and is attached to the deposition



transcript.)
BY MR. LOWINGER:
Q Sir, Exhibit 1 is an item from the NTSB website. It is Most Wanted Transportation Safety Improvements State Issues.
Describe for me the work you have done on transportation safety improvement state issues related to recreational boating safety.
A Me personally?
Q Yes.
A What I have done is I have sat in on the Board meetings on this. We have had a couple of staff meetings on this.
Other than that, the staff has done most of the work.
Q How much time have you spent between the Board meetings and the staff meetings on enhancing recreational boating safety?
A Probably about 20 hours per year.
Q Would you say that is a lot or a little?
A Well, I think it is appropriate.
MS. OHTA: Objection. Vague in relation to

what.
BY MR. LOWINGER:
Q Per year. Per your other duties per year.
A It is appropriate for what the issue is.
Q I see.
MR. LOWINGER: This will be Exhibit No. 2.
(Plaintiff's Exhibit No. 2 was marked for identification and is attached to the deposition transcript.)
BY MR. LOWINGER:
Q Sir, this is another document of the NTSB website regarding Most Wanted Transportation Safety Improvement Federal Issues. And it says Marine and it is Reduce Accidents and Incidents Caused by Human Fatigue.
Can you describe to me the work that you have done on this safety issue?
A Yes. I have done quite a lot on this particular one.
Our recommendation had called for hours of service and what the Coast Guard decided to do instead was work on something called crew endurance



management, which isn't quite the same thing.
This is one of several fatigue related safety issues that are also on the list for other modes of transportation as well. It is a problem in transportation.
Q So, when you said you have lobbied for setting hours --
A No. I didn't say that.
Q You advocated?
A No. I didn't say that.
I said the Safety Board recommendation called for hours of service and this was a very open recommendation.
Q I am just a little confused, sir.
MS. OHTA: Do you mind giving the witness an opportunity to review this document before you ask him questions about it?
MR. LOWINGER: It will be a pleasure.
THE WITNESS: (Witness complies.)
Okay. I am ready.
BY MR. LOWINGER:
Q Describe to me your work regarding this



safety issue, this federal transportation.
MS. OHTA: I will object in not limited by either time or position.
BY MR. LOWINGER:
Q Do you understand the question, sir?
A No.
MS. OHTA: It doesn't matter. If the question is vague, it is objectionable. All you have to do is limit it to a time frame or to his position as Director.
BY MR. LOWINGER:
Q As the Director of OMS, since you started working at NTSB, describe to me your work in reducing accidents and incidents caused by human fatigue.
A What I have done is focused on the recommendation and how this recommendation is being addressed by the Coast Guard.
What the issue was here is the NTSB recommendation, which was made in 1999, set to establish within two years hours of service regulations. The Coast Guard has not done that. What the Coast Guard has done instead is develop a program,



a voluntary program, of crew endurance management.
So, what I have been trying to do is to get the other Directors in NTSB familiar with what the difference is between the two, up to speed on what the Coast Guard has done, and work with them to develop what our position should be going to the Board this year on this recommendation.
Q Describe your work in going to the Board with a recommendation. What is involved?
A In general terms?
Q With regard to reducing accidents and incidents caused by human fatigue.
A Well, what we will do is update this item and make a presentation to the Board at the Federal Most Wanted Board meeting.
Q Would it be based on the criteria of hours or will it be based on the criteria established by the Coast Guard?
A We are presently trying to decide what it is going to be.
Q I understand.
Describe to me any incidences where you

Page 222

have had to defend NTSB from the Coast Guard positions that you feel were contrary to NTSB's interest and how you went about resolving that.

A Well, this is an ongoing process. When we issue recommendation letters to the Coast Guard they send us letters back as far as what they intend to do with respect to those recommendations. Then we evaluate that and reply back to them.

If we consider that they have satisfactorily complied, we close the recommendation with acceptable action. If they refuse to do anything on it, we may close it with unacceptable action. If they are still working on it, we would probably keep it open and we would make a decision as to whether that action is acceptable or unacceptable.

Q When, if at all, have you ever closed a matter with unacceptable action by the Coast Guard?

A I have done it, but I can't give you a specific example. I would have to go back and look in the files.

Q Was it more than one time?

A I think so, but I don't know for sure.

Page 223

Q Do you remember what those issues were that were posed?

A I just said I didn't remember.

Q What was the impact of your closure with unacceptable actions on your relationship with the Coast Guard?

A It had no impact on the relationship.

What we did throughout this thing is I would talk with my counterpart and with others on the thing, discuss the issues and if we couldn't reach agreement, that is where it stood, at least we understood what the background was.

In fact, it is just part of the routine of staying in touch to keep that channel of communication open. The fact that we have differences of opinion on what should be done is really irrelevant.

MR. LOWINGER: Exhibit 3.

(Plaintiff's Exhibit No. 3 was marked for identification and is attached to the deposition transcript.)

BY MR. LOWINGER:

Q Sir, this Exhibit No. 3 is Bates numbered

Page 224

1038 through 1039, 1040, 1041, 1042, 1043 and 1044.

Can you identify this document for me, sir?

A Yes.

This is the Memorandum of Understanding between NTSB and the Coast Guard.

Q And how often is it applied in your day-to-day performance of your duties and responsibilities?

A Well, it is applied every time the Coast Guard tells us there is a major marine accident.

Q What is being done to update this or renegotiate it?

A We are working on that right now.

Q Who has requested the renegotiation?

A I have.

Q How has the Coast Guard responded?

A They are agreeable to reconsidering it.

Q Are they agreeable to the positions that you are talking?

A We haven't gotten that far.

(Plaintiff's Exhibit No. 4 was marked for identification and is attached to the deposition

Page 225

transcript.)

BY MR. LOWINGER:

Q Sir, is Exhibit No. 4 your application for 2005 for the Director of OMS position?

A Yes.

Q Formatting-wise alone how does it differ from your application in 2004?

MS. OHTA: Objection. Asked and answered.

THE WITNESS: Basically what I said before is that this drew heavily on what was done in 2004, but I don't know what all the differences are.

MR. LOWINGER: Exhibit 5.

(Plaintiff's Exhibit No. 5 was marked for identification and is attached to the deposition transcript.)

BY MR. LOWINGER:

Q Have you ever learned why you were not granted an interview for the 2004 vacancy notice?

A I was told that the advertisement was withdrawn.

Q Are you aware of whether or not you were considered for an interview?

MS. OHTA: Objection. Asked and answered.
MR. LOWINGER: No. The first one was granted.
MS. OHTA: It was if he knew why he wasn't. And he answered because the announcement was withdrawn.
BY MR. LOWINGER:
Q I guess what I am trying to get to are you aware of whether or not you passed the first review process from Human Resources to get to the review panel?
A Yes.
Q And did you?
A No.
Q Thank you.
And when you say no, you are referring to your application did not get past Human Resources; is that correct?
A That is my belief. But I don't know the details.
Q When you say belief what do you mean?
A Well, that is what somebody told me.



Q Who told you that, sir?
A Kathy Silbaugh.
Q Thank you.
Because she is agency counsel, because of the statute, I am not going to ask you about the conversation.
Actually I am going to.
What did Ms. Silbaugh tell you as to why you did not get interviewed on the first round?
A She didn't. We passed in the hall last evening before going home and I asked her --
MS. OHTA: You should not have answered that question.
THE WITNESS: I'm sorry.
MS. OHTA: I had no way of knowing what your answer was going to be or certainly I would have directed you not to answer that question.
MR. LOWINGER: I don't think he disclosed anything privilege. So, if you would like to instruct him not to answer the rest of the question, please do so or any part of the question.
MS. OHTA: Is there a pending question?



MR. LOWINGER: Yes. I asked what did Ms. Silbaugh tell him about why his application wasn't considered.
Do you want to read the question?
(The reporter read the requested portion of the record.)
MS. OHTA: Before interposing an objection I need to confer because I do not know what the discussion was about.
MR. LOWINGER: Sure.
Do you want to go off the record?
MS. OHTA: Sure.
(Discussion off the record.)
(Recess.)
MR. LOWINGER: Could we go back on the record please?
MS. OHTA: You can answer that question.
THE WITNESS: She did not tell me.
BY MR. LOWINGER:
Q Did anyone tell you how you could improve your application for the second vacancy announcement --



MS. OHTA: Objection. Vague.
Do you mean prior to its submittal?
MR. LOWINGER: At any time prior. At any time --
MS. OHTA: Wait. You said at any time prior and then you said at any time.
MR. LOWINGER: I was getting ready to finish the sentence. It is near the end of the day.
BY MR. LOWINGER:
Q At any time as part of the application process I guess before you had submitted the application.
A No.
Q Do you know who Doug Rabe is, sir?
A Yes.
Q Who is Doug Rabe?
A Doug Rabe is the Chief of the Marine Accidents Investigations Branch at Coast Guard Headquarters.
I might not have the title exactly right.
Q Is he a colleague or a friend or both?
A He is both.

Q Do you recall an e-mail sent by Doug Rabe citing your selection as Director of OMS?
A Not specifically.
Q Are you aware of an e-mail by Doug Rabe referring to your selection as Director of OMS?
A I don't recall that.
Q How long have you known Doug Rabe?
A I have known him since 1966.
Q Sir, Exhibit 5 are Bates numbers 371 through -- they go out of order a little bit -- 379, 380, 381, 382, 383, 384, 385, 386, 387.
A No. I have different numbers.
Q 3174 through 3191.
Are those the numbers that you have, sir, at the bottom?
A Yes.
Q Can you identify these documents for me please, sir?
A Yes. These are weekly reports from my office.
Q Did you prepare these weekly reports, sir?
A No.



Q Who prepares the weekly reports on behalf of your office?
A Generally the Deputy prepares them with the input of others in the office.
Q Are you aware of any other weekly reports other than these?
A Yes. We do them every week.
MR. LOWINGER: Are there more?
MS. SILBAUGH: You have them.
MR. LOWINGER: From Mr. Spencer's office?
MS. OHTA: This discussion could take place later I think.
MR. LOWINGER: I just want to clarify how many more do you believe that we have?
MS. SILBAUGH: Mr. Spencer I believe produced everything you asked for as far as Mr. Spencer is concerned.
MR. LOWINGER: I will check on that. We will get up-to-date with these.
BY MR. LOWINGER:
Q These documents reflect the weekly reports prepared by your office for the time periods reflected



on these documents?
A Yes.
Q How are these documents maintained by your office?
A We don't maintain them.
Q Are they kept anywhere?
A Well, I don't keep them. I don't know if somebody else does.
The purpose of these reports is to inform the management as to what we are working on at the time.
Q Are these documents maintained in your offices during the course of business, sir?
A Not that I know of.
Q You are not saying that they are not, you are just saying you don't know?
A That is right.
Q Thank you very much.
MR. LOWINGER: Exhibit 6.
(Plaintiff's Exhibit No. 6 was marked for identification and is attached to the deposition transcript.)



BY MR. LOWINGER:
Q Why don't you have a look at this document, sir?
This is Exhibit No. 6. It is Bates number 753 through 758.
A (Witness complies.)
Okay.
Q Does this document reflect your Position Description?
A Yes.
Q Does the Position Description reflect your duties and responsibilities as we discussed them today?
A It doesn't cover everything, but it covers most of the things.
Q What does it not cover, sir?
A I will have to read it and let you know.
Q Please do so.
A (Witness complies.)
(Plaintiff's Exhibit No. 7 was marked for identification and is attached to the deposition transcript.)

THE WITNESS: Well, what this doesn't address really is setting priorities.
BY MR. LOWINGER:
Q Other than setting priorities, anything else, sir?
A I don't believe it talks about continuous improvement.
Q Other than setting priorities and continuous improvement, what else does it not reflect?
A I don't see anything else at the moment.
Q This is Exhibit No. 7. It is a Notification of Personnel Action. It is Bates numbers 4013, 4014, 4015 and 4016.
A Okay.
Q Are these the Notification of Personnel Actions that you have received since you have been employed at NTSB?
A Yes.
Q Are there others?
A Not that I am aware of.
Q Have you received any bonuses, sir, as the Director of the Office of Marine Safety?



A Let me see. Wait a minute. What is the date of this last one?
I think there is one in '07, but I am not sure. I don't know off the top of my head. There might be one additional one.
Q Have you received any bonuses as the Director of OMS?
A Yes.
Q And how much was your bonus, sir?
A I don't know. I don't have any idea.
Q Do the Notification of Personnel Actions reflect your salary as you understand it to have been and be?
A I believe so. Yes.
MR. LOWINGER: This is the next exhibit.
(Plaintiff's Exhibit No. 8 was marked for identification and is attached to the deposition transcript.)
BY MR. LOWINGER:
Q This is Exhibit 8.
This document actually appears to have two sets of evaluations, a midyear and a final, but it is



an appraisal performance plan and appraisal documents 001413 through 1430.
A Why do you say it appears to have two?
MS. OHTA: It is a midyear and a final.
THE WITNESS: I only see one here.
BY MR. LOWINGER:
Q I think the only reason why I brought that up, sir, was that there is a date on page 1429 of 11/22/2006, but I guess it is all part of the same time period.
Please excuse me for causing any confusion. I sincerely apologize. I did not mean to do that.
A Okay.
Q Have you had any other performance appraisals?
Have you received any other performance appraisals? That would be the question that you should answer.
A I don't think so, but I don't know for sure.
Q I understand, sir.
Is this document an accurate reflection of



your performance appraisal for May 11, 2006 through September 30, 2006?
A Yes.
Q I want you to look this over, sir, take a moment, and tell me if there is anything on this document that we have not discussed today for your duties and responsibilities.
A (Witness perusing document.)
MR. LOWINGER: I have to.
MS. OHTA: Isn't it incumbent upon you to read the document and frame your questions accordingly, as opposed to putting the onus on a witness to both review the document and to recall without any notes whether or not you specifically asked him about something?
MR. LOWINGER: I believe I have. I want to see if there is anything that comes to his attention.
THE WITNESS: (Witness perusing document.)
MS. OHTA: I am going to really object to this.
For the witness to go through the key critical program objectives, for example, accident

investigation, those topics, if that is what you are asking him, were all of these topics covered and if he can recall and answer that, that is fine. But to ask him whether or not every comment was discussed I think that is your job as a questioner. It is not the witness' job.

BY MR. LOWINGER:

Q Okay, sir. I will tell you what. I will meet you halfway.

As you review this document --

MS. OHTA: Also it would help if all the pages were right side up.

MR. LOWINGER: Would you like me to arrange them for you, ma'am?

THE WITNESS: It is okay. Just tell me what page.

MR. LOWINGER: Would you? I will be happy to.

MS. OHTA: I said it would be helpful. Not necessary.

MR. LOWINGER: Okay.

I wasn't in charge of stapling these. I



apologize for the inconvenience.

BY MR. LOWINGER:

Q Who, sir, is ICCL?

A ICCL is the International Council of Cruise Lines.

Q Describe to me your leadership efforts with the ICCL?

A What page are you on?

Q I am on page four, Results Achieved.

A Okay. Let's see here.

MS. OHTA: What on page four are you referring to?

MR. LOWINGER: Number 1 at the bottom, Results Achieved.

THE WITNESS: Okay.

What this was it was in connection with the Star Princess fire, which was -- I forget -- I think it was Bohemian flag or possibly Bermuda cruise ship that had a fire in the international waters in which a United States citizen died.

Under the International Code for Investigation of Marine Accidents the United States is



a substantially interested state.

MS. OHTA: Excuse me for interrupting, but could you please read back the pending question?

THE WITNESS: It was what did I do.

MS. OHTA: Yes.

THE WITNESS: All right. I will start with that.

(The reporter read the requested portion of the record.)

THE WITNESS: What the Coast Guard and NTSB and MAIB decided was that there needed to be modification of the international standards for structural fire protection on passenger ships and what I did was work with the ICCL to get them to recognize the need for that and to submit a paper to IMO supporting that initiative.

BY MR. LOWINGER:

Q Who submitted a paper to IMO, NTSB or ICCL?

A ICCL.

Q Did you help prepare the paper?

A No.

Q So, you just advocated it. Just let me



understand this. You advocated to ICCL that they submit a paper to IMO.

A Right.

Q How much time did it take for you for that advocacy?

A Total time?

Q Yes.

A 20 hours perhaps.

Q When you say perhaps, could it be less?

A It could be.

MS. OHTA: That is what perhaps means. It may be more. It may be less. That is his best estimate.

MR. LOWINGER: Thank you very much.

BY MR. LOWINGER:

Q Sir, on number nine you wrote a speech given by the Chairman at the National Association of Marine Surveyors?

A Yes.

Q Have we discussed that today?

A Yes. We did.

Q And on number 11, sir, arranged Member

visits to Cove Point LNG facility and Norwegian Dawn, is that the trip to Germany to see the ship?

A No.

The Norwegian Dawn was a trip that I made with the Chairman to New York to tour the ship. The visits to Cove Point were familiarization trips that we arranged for Member Higgins and Member Hersman.

Q Did you go on the familiarization trip to Cove Point?

A No. I didn't.

Q How long does it take to arrange a familiarization trip to Cove Point?

A It can take anywhere from two to six hours I suppose.

Q Were you solely responsible for that?

A No. I didn't do it at all. I instructed that it be done.

Q Did you instruct or were you solely responsible for the visit to the Norwegian Dawn?

A I was solely responsible for that one.

Q On the next page, page five, sir, number two, page five at the bottom with Bates No. 1417 at



the top, number two, can you describe to me what you did in arranging and leading a meeting between NTSB Directors and two U.S. Coast Guard Admirals?

A Yes. I can.

MS. OHTA: First of all, do you mind asking him if he has already testified about it?

BY MR. LOWINGER:

Q Have you already testified about that meeting, sir?

A Not about that meeting. No.

Q Thank you very much.

Can you please respond to my question before? If you want, I can restate it.

A Please do.

Q Please tell me what you did in arranging the meeting between NTSB Directors and two U.S. Coast Guard Admirals.

A What I did was thought that it would help improve the relationship between the two agencies if the top people got to spend time together in a meeting.

So, first of all, I proposed the meeting to



the MD, who agreed to it, and then I worked with Doug Rabe to find a suitable date when the Directors from NTSB would be available and the two Admirals would be available. It took a long time and several rescheduling.

I happened to have known both of those Admirals before I came to NTSB and so I could speak with them directly and suggest it.

Then I put together an agenda for the meeting.

They came over to NTSB Headquarters. I introduced them to the Chairman and to the Vice Chairman.

Then we sat down in the MD's conference room and we had a meeting with me and the MD and Elaine Weinstein, who was the Director of Safety Recommendations, and there may have been other Directors there as well. I don't remember.

Q What did you do, sir, to lead the meeting?

A I put the agenda together. Decided what we would talk about. I briefed our Directors on what the issues were and what I hoped to achieve at the



meeting. And held it.

Q How much time did the arranging of the meeting take, sir?

A Perhaps 18 hours all together.

Q I see.

If you look down at number six, it says: Got conceptual agreement with the U.S. Coast Guard to revise CFR definition of major marine casualty.

A Yes.

Q Describe to me your work in obtaining a conceptual agreement with the U.S. Coast Guard to revise the CFR definition of major marine casualty.

A Well, this was one of the items that was discussed at that meeting.

Basically I felt that we needed to reevaluate the criteria for what a major marine casualty was, as well as reevaluate possibly revising the MOU with the Coast Guard. So, I viewed these two things as going hand in hand.

We talked about this at the meeting with those Admirals and they agreed that it was a good idea to do this.

Q What is your position, sir, with revising the MOU? How would you want it revised?
A I haven't decided that yet. It has been five years since we have had it. I thought it was time for a look at it.
I have put Chris Julius in charge of leading that project. He has gotten input back from the staff on what they think needs to be done and we have to go from there.
Q I see.
If you would look at Bates No. 1424, which at the bottom of the page is number 12.
A Okay. Number 12.
Q At the bottom of the page it says number 12.
A Okay.
Q The second from last sentence says: He has cycled employees through Acting Deputy Director positions and has evaluated not only those individuals but the other staff in MS for their future leadership potential.
I don't believe we have spoken about that.



Can you tell me about that, sir?
A Yes.
When I arrived I had an Acting Deputy Director, who was Bob Barlett, and he had been the Acting Director before I showed up. His detail with me -- and I guess I forgot to mention him before as being somebody detailed from an outside office -- his detail ended around the end of 2005.
At that point what I decided to do, since I had three GS-15s working for me, was to give each of them a collateral duty of being the Deputy for a period of time. So, I did cycle those.
MS. OHTA: Is that your last question on this document?
MR. LOWINGER: I believe so.
MS. OHTA: When you are done I want to take a quick break. Agency counsel needs to go.
MR. LOWINGER: I won't ask any questions.
Why don't we go off record?
(Recess.)
(Plaintiff's Exhibit No. 9 was marked for identification and is attached to the deposition



transcript.)
MS. SILBAUGH: These are two different documents.
MR. LOWINGER: What do you have?
MS. SILBAUGH: Both a Rating Sheet and a Crediting Plan.
MR. LOWINGER: They always seem to come together one after the other.
MS. OHTA: Well, they are not Bates stamped in sequence. They should be marked as separate documents.
MR. LOWINGER: It is all for the same job.
MS. OHTA: Can't we just unstaple them and make them two documents?
MR. LOWINGER: That will be fine.
Actually I am not going to ask questions about the Crediting Plan. I am just going to ask questions about the rating sheet.
BY MR. LOWINGER:
Q Sir, this is Bates numbers 897 through 898, Exhibit No. 9. At the bottom of page 898 there is a question that says: Demonstrated command and/or



responsibility of or for sea-going operations.
Can you describe to me how you demonstrated in your application command and/or responsibility of or for seagoing operations?
A I don't know. I would have to have my application to see what I said.
Q Okay.
Please describe to me your command and/or responsibility of or for seagoing operations prior to submitting your application.
A Well, you are just asking me to guess as to what this thing means to me. If this was listed as a desirable quality in my application, I should have addressed that. So, I would refer you back to that and see what I said.
MS. OHTA: I just object to lack of foundation on asking him why.
MR. LOWINGER: The question seems to beg for a series of different issues and what I was wondering is --
MS. OHTA: But you asked him about what his background was in seagoing operations. He already

asked and answered that. And you have his application. How would he know why somebody rated him?

I mean, I assume you will have the opportunity to depose the individuals if you so desire.

MR. LOWINGER: No further questions.

MS. OHTA: Thank you.

MR. LOWINGER: Any questions?

MS. OHTA: I have no questions of this witness.

MS. SILBAUGH: We will read and review.

(Signature having not been waived, the deposition of JOHN S. SPENCER was concluded at 5:25 p.m.)



* * *

ACKNOWLEDGMENT OF DEPONENT

I, JOHN S. SPENCER, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata Sheet signed by me.

(DATE) (SIGNATURE)



CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Paula J. Eastes, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 22nd day of August, 2007.

My commission expires: February 14, 2011

NOTARY PUBLIC IN AND FOR THE
DISTRICT OF COLUMBIA



ERRATA SHEET

IN RE: MARJORIE MURTAGH COOKE VS. THE UNITED STATES

RETURN BY: ________________________________

=====================================================

| PAGE | LINE | CORRECTION AND REASON |
|---|---|---|
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |
| ____ | ____ | ______________________________ |

ERRATA SHEET

IN RE: MARJORIE MURTAGH COOKE VS. THE UNITED STATES

RETURN BY: ______________________________________

=====================================================

PAGE LINE CORRECTION AND REASON

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________



ERRATA SHEET

IN RE: MARJORIE MURTAGH COOKE VS. THE UNITED STATES

RETURN BY: ______________________________________

=====================================================

PAGE LINE CORRECTION AND REASON

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________

____ ____ __________________________________