# In the United States Court of Federal Claims

No. 06-748C

(Filed: December 22, 2008)

```
*****************************   *
                               *
MARJORIE MURTAGH COOKE,        *
                               *
              Plaintiff,       *   Gender Discrimination Claim; National
                               *   Transportation Safety Board, Office of
                               *   Surface Transportation Safety; Equal Pay
     v.                        *   Act, 29 U.S.C. § 206(d); Comparison of
                               *   GS and SES Positions; Willful Violation;
THE UNITED STATES,             *   Damages.
                               *
              Defendant.       *
                               *
*****************************   *
```

*R. Scott Oswald,* with whom was *Dave Scher,* The Employment Law Group, PC, Washington, D.C., for Plaintiff.

*Meredyth Cohen Havasy*, with whom were *Gregory G. Katsas*, Assistant Attorney General, *Jeanne E. Davidson*, Director, *Harold D. Lester, Jr.*, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., and *Kathleen Silbaugh*, National Transportation Safety Board, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

       This case arises from Plaintiff Marjorie Murtagh Cooke's employment as Director of the Office of Marine Safety at the National Transportation Safety Board ("NTSB") from 1997 to 2005. It comes to this Court after Plaintiff filed a complaint against the Government in the United States District Court for the District of Columbia ("District Court") on April 28, 2006, claiming violations of the Equal Pay Act, 29 U.S.C. § 206(d) (2006) and the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) (2006). The District Court transferred the Equal Pay Act claim to the Court of Federal Claims on October 26, 2006. Plaintiff alleges that the NTSB violated the Equal Pay Act by paying her less than similarly-situated male directors at the NTSB. Accordingly, she seeks compensation in the form of back pay and liquidated damages. Defendant opposes the claim on the ground that Plaintiff did not perform work requiring equal skill, effort and responsibility under similar working

conditions as the male directors. Even if she had, Defendant attributes any pay differential to the federal government's merit-based pay system and other gender-neutral considerations.

Based on the evidence submitted and testimony heard at a two-day trial on the merits, the Court concludes that Defendant violated the Equal Pay Act in compensating Plaintiff less than her male comparators. Defendant has failed to prove any gender-neutral affirmative defense justifying its actions. Furthermore, the Court finds that Defendant acted willfully and in bad faith in violating the Equal Pay Act and hereby awards Plaintiff damages in the form of back pay and liquidated damages.

Findings of Fact[1]

A. <u>Ms. Murtagh Cooke's Professional Background</u>

In 1972, Marjorie Murtagh Cooke became the first woman to attend a maritime college in United States history.[2] (Murtagh Cooke, Tr. 49-50). Upon graduating from the State University of New York Maritime College at Fort Schuyler in 1974 with a degree in marine engineering, Ms. Murtagh Cooke continued on at the university to assist in developing its curriculum for women. <u>Id.</u> at 52. Ms. Murtagh Cooke also served as an independent consultant to public military academies then required by law to open their doors to women. <u>Id.</u> During this time, Ms. Murtagh Cooke studied for and received a license from the United States Coast Guard ("Coast Guard") to become a marine engineer. <u>Id.</u> at 53.

In 1976, Ms. Murtagh Cooke accepted a position as a marine engineer with the Ford Motor Company where she monitored and repaired equipment onboard cargo ships. <u>Id.</u> at 54. In 1979, she went to work for the Santa Fe Corporation, a private consulting company, for which she researched methods for improving maritime systems for the Maritime Administration, Coast Guard, and the Department of the Navy ("Navy"). <u>Id.</u> at 55. In approximately 1982, the Navy's Military Sealift Command hired Ms. Murtagh Cooke to oversee marine engineering operations for ships that served as platforms for the United States Air Force, as well as for so-called "fleet oilers," vessels that provide oil tanker services for the Navy's ships. <u>Id.</u> at 56.

In 1984, Ms. Murtagh Cooke began working for the Coast Guard's Office of Marine Technical and Hazardous Materials in the Office of Marine Safety, Security, and Environmental Protection. <u>Id.</u> Her position required her to work in two different branches of the office – the

---

[1] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Rules of the Court of Federal Claims. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[2] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to trial exhibits as "JTX__" for the parties' joint trial exhibits, "PTX __" for Plaintiff's trial exhibits, and "DTX__" for Defendant's trial exhibits. The parties' joint pretrial stipulations of fact, filed on February 7, 2008, are referred to as "Stip. __." For multi-page exhibits, the Court has included citations to page numbers or to the parties' Bates numbers used during this case.

engineering branch and the fire-protection branch – where she evaluated new ship designs and drafted and interpreted marine regulations. Id. In approximately 1986, the Coast Guard promoted Ms. Murtagh Cooke to chief of fire protection, giving her responsibility for all domestic and international fire-protection regulations for ships. Id. at 57. In that position, she also served as the United States representative to the International Maritime Organization, where she was elected chairman of the Subcommittee on Fire Protection. Id. at 58-59.

B. The NTSB and Restructuring of the Office of Surface Transportation Safety

In 1994, the NTSB hired Ms. Murtagh Cooke as Chief of the Marine Division within the Office of Surface Transportation Safety ("OSTS"). Id. at 59. The NTSB is an independent governmental agency charged with determining the probable cause of transportation accidents and promoting transportation safety in the United States. (Stip. ¶ 1). The agency employs roughly 400 to 450 employees and operates under the supervision of a chairman, who, from 2003 to 2005 was Ellen Engleman Connors. Id. ¶ 2; Engleman Connors, Tr. 306. In her position as Chief of the Marine Division, Ms. Murtagh Cooke investigated marine accidents and developed the findings into reports. (Murtagh Cooke, Tr. 60). She also reported to the director and deputy director of the OSTS. Id.

In 1997, the NTSB restructured the OSTS by dividing it into four offices (collectively, the "surface modal offices"): the Office of Highway Safety ("OHS"), the Office of Railroad Safety ("ORS"), the Office of Pipeline and Hazardous Materials Safety ("OPHS"), and the Office of Marine Safety ("OMS"). (Stip. ¶ 3). Ms. Murtagh Cooke, who had served as Chief of the OSTS Marine Division since 1994, became Director of OMS. (Murtagh Cooke, Tr. 61; Stip. ¶ 5). The following individuals assumed the remaining three director positions: Joseph Osterman (OHS), Robert Lauby (ORS), and Robert Chipkevich (OPHS). (Stip. ¶ 6). Each director reported to Daniel Campbell, NTSB's Managing Director from 1999 to January 2005. Id. ¶ 7; Campbell, Tr. 128. In 2000, the NTSB merged ORS and OPHS to form the Office of Railroad, Pipeline, and Hazardous Materials Investigations ("ORPH"), of which Mr. Chipkevich became Acting Director. (Stip. ¶ 16). Prior to and after the OSTS restructuring, the NTSB had an Office of Aviation Safety ("OAS"), which operated as a separate unit from the other modal offices and was headed by John Clark. Id. ¶ 13. Mr. Clark was paid at the Senior Executive Service level. Id.

Immediately following the restructuring in 1998, the NTSB classified each of the surface modal office directors at the General Schedule ("GS")-15 level and paid the positions in accordance with the GS scale. Id. ¶ 12. The GS scale is the wage system used by the federal government to pay the vast majority of its federal employees. The system encompasses fifteen grades, each made up of ten steps, based on an employee's work experience and educational background. The NTSB intended to classify and pay each of the surface modal office director positions at the Senior Executive Service ("SES") level, but no SES slots were available, and the Office of Personnel Management ("OPM") denied the NTSB's request for additional SES slots. (Campbell, Tr. 130-31, 161; JTX 20). The SES is a corps of federal employees with managerial, supervisory, and policy expertise designated by OPM on a biennial basis. (JTX 2 at 3-6).

OPM sets the number of SES slots for a given federal agency, and the NTSB cannot create new SES slots without OPM authorization. See 5 U.S.C. § 3133 (2006); Stip. ¶ 8. When OPM allocates a new SES slot to a federal agency, that agency can either create a new SES position or convert an existing non-SES position to an SES slot. (Stip. ¶ 9). When a vacancy occurs in an existing SES slot, the agency may fill the slot or reallocate it to another position within the agency. Id. ¶ 10. An agency cannot promote a GS-level employee to an SES position without advertising the position and opening it up to competition unless the GS-level employee previously held a so-called "career" SES appointment. Id. ¶ 17; see 5 C.F.R. § 317.501 (2008), 317.701 (2008), 317.702 (2008). At the NTSB, the Chairman makes the decision of where to allocate an available SES slot, usually with input from his or her advisors. (Engleman Connors, Tr. 362-63). In deciding where to allocate available SES slots, Ms. Engleman Connors considered the recommendations of her advisors in accordance with the NTSB's long-term staffing plan and allocation of resources within the agency. Id. at 363. OPM requires a receiving agency to reserve a minimum number of SES positions for career, as opposed to non-career, employees. (Osterman, Tr. 483-84). Non-career SES slots are generally reserved for political appointments not hired through open competition. Id. at 475. From 2003 to 2005, the NTSB maintained its minimum requirement of nine career-reserved SES positions and had at least one non-career SES position vacant. (JTX 15; 17 at 2; 21).

In 2001, an SES slot opened up at the NTSB following the retirement of an SES-level employee. (Campbell, Tr. 161). Mr. Campbell recommended to NTSB's Chairman at the time, James Hall, that the SES slot be assigned to the director of ORPH. Id. at 162-64. He did so based on several factors: the size and complexity of the office compared to the others offices; the fact that the director of ORPH needed to have a command of three different disciplines rather than just one; his belief that the Chairman would be least comfortable addressing issues arising from these three modes of transportation; and the fact that the director of ORPH testified most frequently before Congress. Id. Mr. Campbell did not discuss the possibility of allocating the slot to the director of OMS because OMS was the smallest of the four offices and the one that, "historically, played the smallest role in NTBS's life." Id. at 165. OMS also had a "problematical jurisdiction" because it shared investigation authorities with the Coast Guard. Id. Mr. Hall initially believed that the SES slot should be awarded to the director of OHS because of the high number of highway deaths and larger-than-average size of the office but ultimately agreed with Mr. Campbell's recommendation. Id. at 164. Once Mr. Hall made the decision, the NTSB advertised the director of ORPH position as an SES slot and opened it up for competition. (Stip. ¶ 18). Mr. Chipkevich, who at the time held the position of ORPH director at the GS-15 level, applied for and was awarded the SES slot. Id. ¶ 19.

In July 2001, the NTSB requested additional SES slots from OPM for the positions of director of OHS and director of OMS, in that order of priority. Id. ¶ 20. OPM again denied the request. Id. In 2003, an SES slot became available at the NTSB after an individual occupying an SES slot at the NTSB Academy left the agency. (JTX 45 at 3). NTSB leadership decided to allocate the position to the director of OHS because of the office's size, budget, number of investigations handled, and presence of regional offices. (Campbell, Tr. 165; Engleman Conners, Tr. 366). Mr. Campbell explained that "if you can affect even a one-percent reduction in tragedies in Highway, you will have affected a very significant public safety achievement." (Campbell, Tr. 165). When Ms. Murtagh Cooke asked Mr. Campbell about the NTSB's decision not to allocate the SES slot for her position,

he responded, "I don't know when we're going to get to your position. I just know I have to do this for Joe [Osterman] right now." (Murtagh Cooke, Tr. 87-88). The NTSB then advertised the position as an SES slot and opened it up for competition. (Stip. ¶ 21). Mr. Osterman, who at the time occupied the director position at the GS-15 level, applied for and received the SES appointment. Id. ¶ 22, 24.

Later in 2003, the NTSB requested two additional SES slots from OPM. Id. ¶ 25. OPM authorized one SES slot in May 2004, which the NTSB allocated to the position of director of OMS. Id. In July 2004, the NTSB advertised and opened up competition for the SES slot. Id. ¶ 26. Ms. Murtagh Cooke applied for the position, and the NTSB Executive Resource Board Ad-Hoc Rating Panel deemed her and four other candidates qualified for the position. Id.; Chipkevich, Tr. 428; PTX 1; PTX 2 at 4. Mr. Campbell served as the selecting official charged with reviewing the panel's evaluations and making a recommendation to Ms. Engleman Connors, who had final authority to award the SES position. (Campbell, Tr. 136-37, 192-93). Mr. Campbell testified that he did not recommend Ms. Murtagh Cooke for the SES position because he "was never in a position, either that [he] would want to have recommended her or that [he] would have recommended her. . . . From [his] standpoint, it would simply have been paying somebody more to do what they already were having some difficulty doing." Id. at 191-92.

Mr. Campbell admits to having procrastinated over the decision to fill the OMS director position for several months. Id. at 134-35. He was not interested in seeing the selection process move forward because he "did not believe that [Ms. Murtagh Cooke] was going to be selected for [the position]" and was "not necessarily interested in seeing [Ms. Murtagh Cooke] removed." Id. at 138. He stated further that "[i]t would have been a shock to [him] if Ms. Conners was looking to select [Ms. Murtagh Cooke] for that position, given the difficulties that [Ms. Murtagh Cooke] was having with not just production but with even understanding some of the difficulties in production." Id. at 191. When asked how Ms. Engleman Connors would react to such a recommendation, he anticipated that she would say: "Dan, have you lost your mind?" Id. at 148. However, Ms. Engleman Connors never discussed Ms. Murtagh Cooke's performance with any other NTSB employee and did not have an opinion as to whether Ms. Murtagh Cooke had the qualifications for the position. (Engleman Connors, Tr. 340-41, 352-54).

After months of delay, Mr. Campbell telephoned one of the qualified candidates, Captain Brusseau of the Coast Guard, and asked him if he still had an interest in the position. (Campbell, Tr. 166-67). Captain Brusseau responded that he had already taken another position and that he had understood the OMS director position to be "wired" for Ms. Murtagh Cooke. Id. at 167. Ultimately, Mr. Campbell rescinded and then readvertised the announcement for the OMS director position without discussing the initial pool of candidates with Ms. Engleman Connors. (Engleman Connors, Tr. 340-41; 352-53). Mr. Campbell explained that he did not believe "that the pool of candidates was as wide as it could have been," and he wanted to make "clear to all involved" that the position was not "wired" for a certain candidate. (Campbell, Tr. 152, 167). Mr. Campbell left his position as Managing Director, and Joe Osterman assumed it, in January 2005. Id. at 128; Osterman, Tr. 466.

In March 2005, the NTSB readvertised the OMS director position as an SES slot. (Stip. ¶ 28). Ms. Murtagh Cooke reapplied for the position, but the NTSB Executive Resource Board Ad-Hoc Rating Panel did not include her on the list of five candidates it deemed qualified. (PTX 4 at 1, 3). From the list, Mr. Osterman recommended, and the NTSB ultimately approved for the position, John Spencer, Vice President for Technology at the American Bureau of Shipping in Houston, Texas. Id. at 3; Stip. ¶ 29. During the first advertisement of the position, the panel had not found Dr. Spencer to be qualified. (Campbell, Tr. 143; PTX 2 at 4).

After the review panel finalized its list of recommended candidates, Mr. Osterman informed Ms. Murtagh Cooke that he would not interview her for the position but would try to give her one of three Senior Level ("SL") slots available at the NTSB. An SL slot represents a non-executive position above the GS-15 level that does not meet the criteria for an SES slot because the employee may not devote more than twenty-five percent of his or her time to managerial or supervisory duties. (JTX 2 at 9). Mr. Osterman asked Ms. Murtagh Cooke to draw up a job description that would meet the SL sytem requirements based on her international work, which she did. (Murtagh Cooke, Tr. 103). Several days later, Mr. Osterman reported back to her that Ms. Engleman Conners and other NTSB leadership would not grant her an SL slot. Id. at 104. He gave her two options: move from OMS to the Office of Safety Recommendations and Accomplishments or retire. Id. Ms. Murtagh Cooke expressed her desire to stay in OMS and suggested that she could assist with the transition to the new director. Id. Mr. Osterman responded by saying "Hell no. You're out of here. Everybody will know. You can't avoid it. You can't avoid this fallout. You're not staying here." Id. In June 2005, Ms. Murtagh Cooke was transferred to the Office of Safety Recommendations and Accomplishments. (Stip. ¶ 30). She retired from the NTSB on July 3, 2006. Id. ¶ 189.

C. Comparison of the Four Modal Offices

Following dissolution of the OSTS, the NTSB delegated to each of the four modal office directors the authority to investigate transportation accidents in its area of expertise, prepare reports for submission to the NTSB and for release to the public setting forth the facts and circumstances surrounding such accidents, determine the probable cause of accidents, and make safety recommendations to prevent future accidents. 49 C.F.R. § 800.25 (2008); Stip. ¶ 31. All of the directors shared the same title and reported to the Managing Director. (Murtagh Cooke, Tr. 70-71).

Ms. Engleman Connors has stated her belief that the four director positions require similar skill, effort, and responsibility, although the workload between them differs. (JTX 45 at 42). Each modal director position requires technical expertise in the respective transportation mode, knowledge of and expertise in accident investigation processes, leadership and supervisory skills, and the ability to communicate well and collaborate with other professionals. (Stip. ¶ 219). Some of the general efforts and responsibilities necessary are the ability to effectively manage information related to accident investigations, evaluate necessary and available resources, manage multiple priorities, respond to the contingencies of each investigation, conduct accident investigations and determine a probable cause, make safety recommendations, supervise and evaluate staff, provide support and information to NTSB staff and external parties, comply with rules and regulations related to human and monetary resource management, and be available twenty-four hours a day. Id. ¶ 220. Each

director, when not traveling, worked primarily in an office environment using electronic devices, computers, and telephones for communication.  Id. ¶ 221.

Despite the similarities, each modal office differs in size, presence of regional offices, and budget.  From 2003 to 2005, OAS had approximately 120 to 140 employees; ORPH had 40 to 50 employees; OHS had 30 to 40 employees; and OMS had 14 to 15 employees.  Id. ¶ 32, 34-36.  Each director had approximately 4 to 5 employees reporting directly to him or her.  (Murtagh Cooke, Tr. 112; Chipkevich, Tr. 417).  During this same time period, OAS had 10 regional offices; OHS had 5; ORPH had 3; and OMS had none.  (Stip. ¶ 37-40).  During fiscal years 2003, 2004, and 2005, OAS received 28.04 percent, 33.45 percent, and 45.04 percent of the NTSB's discretionary budget respectively;  OHS received 7.61 percent, 11.78 percent, and 7.81 percent respectively; ORPH received 4.67 percent, 7.52 percent, and 6.84 percent respectively; and OMS received 2.09 percent, 3.00 percent, and 1.84 percent respectively.  Id. ¶ 42-44.

The modal offices also vary in the authority and discretion they have to investigate accidents.  Pursuant to 49 U.S.C. §§ 1131 and 1132, the NTSB has exclusive authority to investigate all civil aviation accidents and highway, railroad, and pipeline accidents which meet certain criteria.  Id. ¶ 45-48; Engleman Connors, Tr. 356.  The directors of OHS and ORPH have broad discretion in deciding whether to investigate accidents based on their legislative mandate.  (Stip. ¶ 77-78).  However, the NTSB shares concurrent jurisdiction with the Coast Guard in the investigation of major marine casualties that occur in United States waters or that involve United States-flagged vessels.  49 U.S.C. § 1131(a)(1)(E); Campbell, Tr. 165.  The NTSB conducts such marine investigations pursuant to regulations and a 2002 memorandum of understanding issued jointly by the NTSB and Coast Guard.  (Stip. ¶ 52-55).  The Coast Guard conducts the preliminary investigation of a marine casualty and notifies the NTSB of any such casualties over which it has jurisdiction to investigate.  Id. ¶ 53.  OMS then evaluates whether to investigate an accident based in part on the bright-line rules set forth in the NTSB/Coast Guard memorandum of understanding.  Id. ¶ 75.

Each modal office differs in the number of accident reports it receives and investigations it conducts.  From 2003 to 2005, the NTSB reported approximately 38 aviation accidents per week; 18 highway accidents per week; 53 railroad accidents per week; 33 pipeline accidents per week; 119 incidents involving the release of hazardous materials per week; and 84 marine accidents per week.  Id. ¶ 68-73.  Notifications of accidents outside normal business hours occurred most commonly for aviation accidents, followed by highway, rail, marine, and pipeline.  Id. ¶ 74.  The NTSB investigates aviation accidents most frequently, followed in descending order by highway, railroad, marine, and pipeline.  Id. ¶ 56.  During that same time period, OAS investigated 4 major domestic and 5 foreign accidents in 2003, 7 major domestic and 10 foreign accidents in 2004, 16 major domestic and 17 foreign accidents in 2005, and nearly 2,000 investigations from its regional offices per year; OHS investigated 49 accidents in 2003, 45 accidents in 2004, and 33 accidents in 2005; ORPH investigated a total of 15 railroad, pipeline, and hazardous material accidents in 2003, 18 such accidents in 2004, and 11 such accidents in 2005; OMS investigated 8 accidents in 2003, 7 accidents in 2004, and 3 accidents in 2005.  Id. ¶ 79-94.

The complexity of accident investigations also varies depending on the modal office. (Engleman Conners, Tr. 351, 357-58). Aviation accident investigations are particularly complex because aviation systems are highly sophisticated and finely-designed to obtain maximum strength at the lightest weight and highest speed. (Clark, Tr. 398). Aviation systems also face severe destruction in accidents, rendering investigations very difficult. Id. at 399. OAS employs specialists in 13 to 18 different areas of investigation, including power plants, structures, pilots, and air traffic control and also incorporates party participants who supply information and technical expertise at the NTSB's direction. Id. at 400-01; Stip. ¶ 95. Thus, an investigation of a major aviation accident may involve up to 150 people, including 10 to 12 NTSB employees and participants from 6 or more parties. (Stip. ¶ 96, 101). Highway and rail, pipeline, and hazardous material accident investigations can also be complex because the parties often differ from investigation to investigation, requiring OHS and ORPH to educate them about the federal accident investigation process each time. (Osterman, Tr. 470-71). By contrast, marine accidents typically involve Coast Guard investigators who are well-versed in the rules and regulations pertaining to accident investigations. (Stip. ¶ 103). OMS investigations also usually involve 3 to 7 NTSB employees and 4 party participants represented by approximately 20 individuals. Id. ¶ 102.

Each modal office has responsibility for preparing reports setting forth the factual findings of an accident investigation, analyzing the probable cause, and making safety recommendations to the NTSB when necessary. Id. ¶ 107. OAS completed 4 major reports in each of 2003, 2004, and 2005 and developed 185 safety recommendations over the three-year period. Id. ¶ 108-10, 112. OHS issued 7 reports in 2003, 6 reports in 2004, and 4 reports in 2005 and provided 113 safety recommendations in that time. Id. ¶ 113-16. ORPH completed 13 reports in 2003, 16 reports in 2004 and 10 reports in 2005 and also issued 82 safety recommendations over the three years. Id. ¶ 117-20. Finally, OMS finalized 1 report in 2003, 4 in 2004, and 6 in 2005 while promulgating 20 safety recommendations. Id. ¶ 121-24.

Within their areas of responsibility, each director often focuses his or her attention on subject matters differently. For example, the OHS director frequently interacts with state government officials because he or she has responsibility for making safety recommendations at the state level; the other three directors primarily handle regulations at the federal level. Id. ¶ 173. Additionally, the directors of OHS and ORPH often handle investigations across several modes of transportation, which requires them to interact closely with other NTSB offices. Id. ¶ 174-76. Finally, the director of ORPH must also have expertise in three different modes of transportation, while the other directors need not. Id. ¶ 179.

Several of the modal offices play a role in international accident investigations, albeit in different capacities. Pursuant to the International Maritime Organization code for the investigation of marine casualties and incidents, the United States may investigate any international marine accident involving United States-flagged vessels in which the United States has a substantial interest. Id. ¶ 125. The NTSB, the Coast Guard, or both agencies may investigate these accidents. Id. Between 2003 and 2005, OMS visited the site of approximately one international accident per year but did not take the lead on any international investigations. Id. ¶ 126-27. In accordance with the International Civil Aviation Organization ("ICAO") Treaty, OAS serves as the United States

representative charged with investigating international aviation accidents involving United States-operated or manufactured products. Id. ¶ 129; Campbell, Tr. 179-80. OAS also participates in accident investigations conducted by other nations under the ICAO Treaty, including 34 foreign investigations between 2003 and 2005 on virtually every continent. (Stip. ¶ 130-33; Campbell, Tr. 180). Finally, ORPH engages in international investigations and inquiries related to pipeline activity between the United States and Canada, foreign railroads, and shipment of hazardous materials to and from Europe and Asia. (Stip. ¶ 134). Between 2003 and 2005, ORPH communicated with foreign officials approximately 4 to 6 times per year. Id.

The modal office directors also represent the United States at their respective international organizations with varying degrees of authority. The Coast Guard represents the United States at the International Maritime Organization (IMO). Id. ¶ 136; Spencer, Tr. 437. The director of OMS serves as advisor to the head of the United States delegation but can only present an issue for discussion at the IMO's plenary session through the Coast Guard. (Stip. ¶ 136-37). From 2003 to 2005, Ms. Murtagh Cooke served as advisor to the head of the United States delegation and represented the NTSB at the Working Group on Accident Investigations at the IMO Subcommittee on Flag State Implementation. Id. ¶ 138. By contrast, the OAS director serves as the primary United States representative at ICAO on matters pertaining to accident investigations and civil aviation incidents. Id. ¶ 139. In this capacity, the OAS director participates in writing the international requirements for the investigation of aircraft accidents and incidents, as included in annex 13 of the ICAO Treaty, and speaks for the United States on technical aviation safety matters before the ICAO. Id. ¶ 140. The OAS director also represents the United States on other international bodies such as the European Civil Aviation Conference, the Flight Safety Foundation, and the International Society of Air Safety Investigators. Id. ¶ 141.

The modal office directors are often called upon to testify before Congress, prepare NTSB board members or staff to testify before Congress, or brief congressional staff members, all at the request of the NTSB chairman. Between 2003 and 2005, the NTSB chairman asked the OHS director to testify before Congress 3 times, the ORPH director to testify twice, and the OAS and OMS directors not at all. Id. ¶ 143, 145-46. During the same time period, the OHS and OAS directors each prepared other staff members to testify before Congress 6 times, the OMS director did so 3 times, and the ORPH director did so twice. Id. ¶ 147-50.

The directors also travel as part of their work to visit accident sites and represent the NTSB at official functions. From 2003 to 2005, the OHS director traveled to accident sites approximately twice per year and to official functions 8 times per year. Id. ¶ 153-54. The OAS director traveled to accident sites 4 times per year and to official events approximately 4 to 5 times per year. Id. ¶ 155, 157. The ORPH director traveled approximately 3 times per year to official events. Id. ¶ 159. No data is available concerning the director's travel to accident sites. Id. The OMS director did not travel to an accident site from 2003 to 2005, but traveled approximately twice per year for official functions. Id. ¶ 161-62. All of the directors traveled to their regional offices at least once per year. (Clark, Tr. 403-04; Chipkevich, Tr. 418; Osterman, Tr. 468). OMS does not have any regional offices. (Stip. ¶ 40).

The SES-level modal office directors all served on the NTSB's Executive Resources Board ("ERB").  Id. ¶ 163.  The ERB oversees NTSB staffing and selection of candidates for career appointments to the SES.  Id. ¶ 166.  Ms. Murtagh Cooke did not serve on the ERB because her position was not an SES slot during her tenure.  Id. ¶ 165.  However, she did occasionally attend ERB meetings.  (Murtagh Cooke, Tr. 107-08, 114).

For 2003 and 2004, the NTSB compensated the four modal directors as follows:  in 2003, the OAS and ORPH directors earned $142,022, the OHS director earned $136,872, and the OMS director earned $121,583.  (PTX 10 ¶ 17; JTX 45 at 29).  Three of the four directors also received an annual performance award:  the OAS director received $16,080, the ORPH director received $16,056, and the OMS director received $5,400.  (JTX 45 at 29).  In 2004, the OAS and ORPH directors' annual salary remained the same, while the OHS and OMS directors' salaries increased to $140,797 and $126,963 respectively.  Id.; PTX 10 ¶ 18.  All four directors received performance awards that year: the OAS director received $17,000, the ORPH director received $16,000, the OHS director received $9,500, and the OMS director received $3,400.  (JTX 45 at 29).

D.  Employment Compensation Within the Federal Government

1.  Comparison of the GS and SES systems

The SES is a separate and distinct employment system from the GS system.  SES members typically earn higher compensation than employees on the GS scale, although they are afforded fewer employment protections.  Unlike GS employees, SES members do not receive automatic cost-of-living adjustments to their pay, their salaries may be adjusted downward, and they may be reassigned to another agency or geographical location without their concurrence.  (Chipkevich, Tr. 424; Osterman, Tr. 479-80; JTX 2 at 19).  Furthermore, SES members have no right to regular step increases in pay or to compensatory time or overtime pay.  5 C.F.R. § 534.408 (2008); https:// www.opm.gov/ses.about_ses/faqs.asp.

The federal government also hires SES and GS candidates differently.  An agency may establish a new GS position at its discretion, whereas OPM must allocate an SES slot to an agency before that agency can fill it. (Stip. ¶ 8).  Unlike a GS employee, an SES candidate must possess five mandatory Executive Core qualifications in order to receive an SES slot.  (JTX 2 at 11).  They are: leading change, leading people, results driven, business acumen, and building coalitions/ communication.  (Stip. ¶ 186).  OPM must review and approve SES candidates, but GS candidates need only be considered by the employing agency.  (JTX 2 at 12).

SES-level positions, because they are at the highest level of civil service, require a certain level of professionalism, abilities, qualifications, and skills not necessary for GS-level positions. (Stip. ¶ 187).   Mr. Osterman and Mr. Chipkevich both testified that the work required of their director positions changed when they assumed SES slots.  Mr. Osterman stated that as an SES-level director, he had "broader upward hierarchical responsibilities as far as planning and the broader mission of the agency." (Osterman, Tr. 479).  Upon receiving the SES slot, both Mr. Osterman and Mr. Chipkevich became members of the ERB and took on greater responsibility for agency-wide

planning.  Id. at 477-78; Chipkevich, Tr. 423; Stip. ¶ 163-64.  Dr. Spencer, who assumed the OMS director position upon readvertisement at the SES level, testified that the SES designation enabled him to communicate with the other modal directors and private sector executives in the marine industry on a commensurate level, distinguish himself from his staff, and achieve more timely action from other NTSB offices.  (Spencer, Tr. 446-47).

### 2.  Other forms of compensation for GS employees

The NTSB must work within the confines of federal statutes and regulations when determining the pay of its employees.  (Stip. ¶ 188).  GS employees may receive "quality step increases" in their pay beyond the "within-grade step increases" they may earn upon demonstrating satisfactory performance and meeting certain length-of-service requirements established by OPM. Id. ¶ 196-97.  A GS employee may achieve a quality step increase if he or she attains an "outstanding" performance rating overall and has not received such an increase within the past 52 weeks.  Id. ¶ 197. From 2003 to 2005, Ms. Murtagh Cooke was awarded all within-grade step increases when she met the necessary criteria but did not receive any quality step increases.  Id. ¶ 198.

The federal government may give a GS-level employee a temporary, Limited Term appointment ("LT") to an SES-level position or detail the employee to an SES-position to meet emergency or short-term needs. Id. ¶ 203.  A detailed employee continues to earn income at the GS level, but the relevant statute does not restrict pay for LT appointees.  See id.  Typically, the NTSB has used its authority to make LT SES appointments during staff shortages and transitions.  Id.

Once a federal employee reaches GS-level 15, the federal government may classify that employee under the Senior Level ("SL") system.  (JTX 2 at 9).  The SL system is reserved for non-executive positions above GS-15 that do not meet the criteria of the SES system and do not involve fundamental research and development responsibilities.  Id.  An SL position may include some supervisory and related managerial duties, but these duties must not take up more than 25 percent of the employee's time.  Id.  In addition, an employee occupying the position must demonstrate technical competencies.  (Stip. ¶ 200).  The base pay range for an SL position begins at 120 percent of that of a GS-15 step 1 employee.  (JTX 2 at 9).

GS-level employees also are eligible to receive overtime pay up to a certain amount.  (Stip. ¶ 190-91).  Ms. Murtagh Cooke was eligible to receive overtime pay to the extent that her total salary did not exceed the greater of GS-15, step 10 or level V of the Executive Schedule, as set by Congress. Id. ¶ 191.  Between 2003 and 2005, the limit on her potential overtime pay was $3,800 per year.  Id. NTSB modal office directors do not routinely request overtime pay, and Mr. Campbell testified that an "understood policy" against awarding modal office directors overtime existed at the NSTB. (Campbell, Tr. 146, 181-82).

The federal government may pay a valued employee a retention allowance of up to 25 percent of the employee's basic pay to prevent that employee from leaving.  (JTX 7 at 4).  The agency must determine that "the unusually high or unique qualifications of the employee or a special need of the agency for the employee's services makes it essential to retain the employee and that the employee

would be likely to leave [the Federal service] in the absence of an incentive."  (Stip. ¶ 194; 5 C.F.R. § 575.301 (2008)).

The federal government may also grant "performance awards" to its employees based upon the most recent rating of their job performance.  (Stip. ¶ 199).  Performance awards take the form of lump sum cash payments or quality step increases and are allocated at the end of an appraisal period based on outstanding performance ratings.  Id.  They are not a substitute for overtime pay, job classification, or promotion.  (JTX 6 at 1).  In addition, federal employees may receive "special act awards," or recognition for outstanding achievement for work on a specific project or goal.  (Stip. ¶ 199).  NTSB employees are eligible for special act awards in the form of certificates and lump sum cash payment throughout the year.  Id.

E. Ms. Murtagh Cooke's Performance and Compensation at the NTSB[3]

1. Performance

During her tenure at the NTSB, Ms. Murtagh Cooke received high performance ratings in her annual performance appraisal forms.  (Stip. ¶ 198; JTX 45 at 29; PTX 11 at A; PTX 3).  The standardized appraisal form characterizes an employee's performance in five skill areas on a scale ranging from unacceptable, to minimally satisfactory, to fully successful, to excellent, to outstanding and also gives the employee an overall rating. (PTX 11).  The form does not describe the difference between an overall ranking of "outstanding" and "excellent," but a $2,000 end-of-the-year bonus differential divides them.  (Campbell, Tr. 183-84).  Mr. Campbell describes a director's downgrade from "outstanding" to "excellent" as a "slap in the face" because nearly eighty-percent of the investigators that director supervised would receive a higher bonus than the director.  Id. at 184.

In an eight-page performance evaluation for 2003, signed and affirmed by Ms. Engleman Connors, Mr. Campbell, and Ms. Murtagh Cooke jointly, the NTSB rated Ms. Murtagh Cooke's performance as "outstanding" overall.  (Engleman Connors, Tr. 378-80, 382-85; PTX 11). Specifically, the NTSB found her performance "outstanding" in the areas of managing investigations, producing reports and safety recommendations, participating in agency-wide budget development, and exercising leadership in financial matters and "excellent" in the area of managing resources. (Engleman Connors, Tr. 378-80, 382-85; PTX 11).   The 2003 performance review stated:

> During the rating period, Ms. Murtagh [Cooke] was confronted with many challenges in the management of the Office of Marine Safety

---

[3] Defendant highlights several statistics regarding the number of female employees and new female hires at the NTSB.  They are as follows:  During Mr. Campbell's tenure as General Counsel at the NTSB, he hired seven new employees, four of which were female.  (Stip. ¶ 204).  Several NTSB directors were female, including the Directors of Equal Employment Opportunity, Administration, Human Resources, and Office of Safety Recommendations.  (Engleman Connors, Tr. 358).  Between 2003 and 2005, three female employees occupied SES positions at the NTSB.  (Stip. ¶ 204).  The Court accepts these statistics but finds them irrelevant to the analysis of Plaintiff's claim under the Equal Pay Act.

(OMS): a demanding workload, vacant positions that were filled late in the year, new employees to get acclimated to the work processes and launches for major accidents. In spite of this, she provided oversight to an investigation that was completed and adopted by the Board within 11 months . . . . Seven recommendations were issued that addressed the Board's long-standing concern for the need for improvements in the oversight of nonstandard boat operations. Another example of how the work of the Office contributes to safety improvements in marine transportation.

(PTX 11 at C).

In 2004, the NTSB rated Ms. Murtagh Cooke's performance as "excellent" overall (PTX 3). The agency gave her the same rating in each of the five categories as the year before, except that it downgraded her performance in the area of producing reports and safety recommendations from "outstanding" to "excellent." Id. The two-page report contained no commentary describing her performance. Id.; Engleman Connors, Tr. 387. Unlike the previous year's report and contrary to NTSB policy, Ms. Murtagh Cooke never saw, nor did her supervisors sign, the 2004 report. (Carroll, Tr. 463; Osterman, Tr. 473-74; Murtagh Cooke, Tr. 101; Campbell, Tr. 186-87). Despite the downgrade in performance rating, Mr. Campbell, Ms. Murtagh Cooke's immediate supervisor, never documented any poor performance on her behalf. (Campbell, Tr. 185-86). Mr. Campbell stated that he declined to issue Ms. Murtagh Cooke a written warning because he did not want to jeopardize her chances of finding another job. Id. at 189-90.

During trial, Ms. Engleman Connors, Mr. Campbell, Mr. Chipkevich, and Mr. Osterman all testified as to their concerns about Ms. Murtagh Cooke's performance during her tenure as director of OMS. Ms. Engleman Connors stated that Ms. Murtagh Cooke was the NTSB's "weakest manager. The office was not well run. Reports were significantly delayed. The general reputation of the office outside of the NTSB was not positive, especially with our relationships with the Coast Guard . . . . [W]e had reports that had to be rewritten . . . ." (Engleman Connors, Tr. 370). During Ms. Engleman Connors' tenure as chairman of the NTSB, there were four to six "[marine] accidents in the queue, but no reports coming out." Id. at 375. Ms. Murtagh Conners stated that Ms. Murtagh Cooke did not understand the priority of the investigations handled by OMS, and Mr. Campbell had to rewrite several OMS reports before they could be presented to the NTSB. Id. at 354. She had particular concerns about Ms. Murtagh Cooke's handling of one of OMS's most high-profile investigations, the Barberi ferry accident in New York. During a meeting with Ms. Murtagh Cooke and Mr. Campbell, Ms. Engleman Connors expressed her frustration that she "couldn't seem to get [Ms. Murtagh Cooke] to understand . . . the importance of getting this accident investigation done, done well and on time." Id. at 371-72. Ms. Murtagh Cooke said that she would prioritize the investigation, but, according to Ms. Engleman Connors, "the delivery didn't occur." Id. at 373. Ms. Engleman Connors then asked Mr. Campbell to assist Ms. Murtagh Cooke with the report to help move it along. (Campbell, Tr. 153, 158-59). As a result, Mr. Campbell called a progress meeting on the status of the report and then wrote parts of the report himself. Id. at 158-59. He also testified about the accident before the New York City Council at the request of Ms. Engleman Connors and the vice chairman of the NTSB in lieu of Ms. Murtagh Cooke. Id. at 159.

Furthermore, Mr. Campbell stated that he had "significant, long-term, reoccurring difficulties with the judgment of the [OMS] office and the production of significant reports . . ." that he did not have with other modal offices. Id. at 183. He became substantially involved in negotiating the memorandum of understanding between the NTSB and the Coast Guard, work which fell under the director of OMS's purview. Id. at 175. He also conducted exit interviews with NTSB employees leaving OMS who described an office atmosphere filled with "reluctance to move on things." Id. at 155. On one occasion, Ms. Murtagh Cooke asked Mr. Campbell if he would fire her. Id. at 168. During his tenure as Managing Director, Mr. Osterman viewed OMS as producing poor morale, poor performance, and untimely reports. (Osterman, Tr. 490). Mr. Chipkevitch, who sat on the panel that reviewed candidates for the director of OMS position at the SES level, was also generally aware of management problems within OMS, including the inability to publish timely reports. (Chipkevich, Tr. 425-26).

### 2.   Compensation

In 2001, Ms. Murtagh Cooke and Mr. Osterman, then director of OHS, met with Mr. Campbell and expressed their concern that they were not receiving the same salary as the director of ORPH, Mr. Chipkevich. (Murtagh Cooke, Tr. 88-89). Mr. Campbell responded that the NTSB was in the process of requesting SES slots for their positions in order to resolve any pay differential. Id. In 2003, when Mr. Campbell informed Ms. Murtagh Cooke that the NTSB had granted an SES slot to Mr. Osterman as director of OHS, Ms. Murtagh Cooke again complained that she was not receiving equal compensation to the other three modal directors. Id. at 86-88.

In April 2004, Ms. Murtagh Cooke elevated her complaints to Chairman Engleman Connors in a one-on-one meeting. Id. at 89-90; Engleman Connors, Tr. 316-17; JTX 45 at 43; Stip. ¶ 192. Ms. Murtagh Cooke explained that she was not receiving equal compensation to the other modal directors because her position was classified at the GS-15 and not the SES level. (Murtagh Cooke, Tr. 89-90; Engleman Connors, Tr. 316-17; JTX 45 at 43; Stip. ¶ 192). Ms. Engleman Connors perceived that "Ms. Murtagh [Cooke] was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors." (JTX 45 at 43). In response, Ms. Engleman Connors explained that she had a six-month plan to make each of the modal directors an SES-level position. (Murtagh Cooke, Tr. 89). She also stated that she had decided to allocate the previously-available SES slot to the director of OHS position because that office had a large number of employees. Id. at 90. She assured Ms. Murtagh Cooke that she would allot the next SES slot to the director of OMS position, although Ms. Murtagh Cooke would have to compete openly for it. Id. at 90-91. Ms. Murtagh Cooke suggested that, in the interim, she might be entitled to overtime pay. Id. Ms. Engleman Connors responded that she would inquire with Human Resources and follow up with her, but she did not think that management-level employees could receive overtime pay. Id. at 91-92; JTX 45 at 43. During the meeting, Ms. Murtagh Cooke did not indicate that her pay differential resulted from gender discrimination or a violation of the Equal Pay Act. (Engleman Connors, Tr. 367; Murtagh Cooke, Tr. 109, 114). Ms. Engleman Connors did not ask for, and Ms. Murtagh Cooke did not provide, documentation justifying the request for overtime. (Murtagh Cooke, Tr. 109-10; Stip. ¶ 193).

Ms. Engleman Connors did not view Ms. Cooke's overtime request as legitimate because she did not perceive any inequity in her pay differential. (Engleman Connors, Tr. 351). She believed Ms. Murtagh Cooke's pay to be fair because of the small size of the OMS staff and budget, the relative simplicity of marine accident investigations, and the lack of regional offices. Id. She felt that Ms. Murtagh Cooke's request for overtime pay was odd because she had never received such a request from a manager in her previous tenure in the private sector or at the Department of Transportation. Id. at 366. According to Ms. Engleman Connors, Ms. Murtagh Cooke's complaint of unequal pay was the result of "personal dissatisfaction with her place in life." Id. at 350-51. Ms. Engleman Connors also described Ms. Murtagh Cooke's request for overtime as "like a child saying I'm not happy with something. I want you to fix it. I've decided how you're going to fix it and here it is." Id. at 333.

Later that day, Ms. Engleman Connors recounted Ms. Murtagh Cooke's complaint to Mr. Campbell, and Mr. Campbell said that he would discuss the matter with the Human Resources Department. Id. at 322-24. Ms. Engleman Connors never followed up with Mr. Campbell but said she "had full confidence that he would follow through." Id. at 325-26, 352. Mr. Campbell does not recall Ms. Engleman Connors having discussed Ms. Murtagh Cooke's salary complaint with him and did not investigate the possibility of providing Ms. Murtagh Cooke overtime pay. (Campbell, Tr. 144, 146, 148).

Following the meeting between Ms. Murtagh Cooke and Ms. Engleman Connors, Ms. Murtagh Cooke contacted the Human Resources Department and the director of the NTSB Equal Employment Office regarding her pay differential. (Murtagh Cooke, Tr. 92). The Human Resources Department confirmed that Ms. Murtagh Cooke could receive overtime pay. Id. Ms. Murtagh Cooke attempted to follow up with Ms. Engleman Connors on multiple occasions, but Ms. Engleman Connors would not meet with her. Id. at 92-93; Engleman Connors, Tr. 331-32; JTX 45 at 44. Ms. Engleman Connors admits that Ms. Murtagh Cooke emailed her scheduler to set up a meeting, but no meeting took place. (Engleman Connors, Tr. 330). Ms. Murtagh Cooke did not approach Mr. Campbell, her immediate supervisor, directly about receiving overtime pay. (Campbell, Tr. 145).

F. The Present Litigation

On April 28, 2006, Ms. Murtagh Cooke filed a complaint against the United States in the District Court, claiming violation of the Equal Pay Act and the Fair Labor Standards Act. On October 26, 2006, the District Court transferred Ms. Murtagh Cooke's Equal Pay Act claim to the Court of Federal Claims, and Plaintiff filed her complaint in this Court on November 14, 2006. Following the Court's denial of Plaintiff's motion for summary judgment and Defendant's two cross-motions for summary judgment, this Court held a two-day trial during August 14-15, 2008. The following witnesses testified in this order of appearance: Marjorie Murtagh Cooke, Plaintiff; Dan Campbell, former Managing Director of the NTSB; Ellen Engleman Connors, former Chairman of the NTSB; John C. Clark, Sr., former OAS Director of the NTSB; Robert Chipkevich, ORPH Director of the NTSB; John S. Spencer, OMS Director of the NTSB; Emily Carroll, Human Resources Specialist of the NTSB; and Joseph G. Osterman, Managing Director of the NTSB. Following trial, the parties submitted post-trial briefs on October 21, 2008 and reply briefs on November 4, 2008. The Court heard closing argument on November 24, 2008.

## Discussion

### A. Jurisdiction

The Tucker Act grants the Court of Federal Claims jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidation or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act, however, "does not create any substantive right[s] enforceable against the United States for money damages[;] . . . the Act merely confers jurisdiction upon it whenever the substantive right exists." United States v. Testan, 424 U.S. 392, 398 (1976) (citations omitted).

A plaintiff coming before this Court, therefore, must identify a separate provision of law conferring a substantive right for money damages against the United States. See Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004). A statute or regulation is money-mandating if it is "reasonably amenable to the reading that it mandates a right of recovery in damages" and while such a reading is not to be "'lightly inferred,'" a fair inference that money damages are allowable under the statute or regulation in question will suffice. Fisher v. United States, 364 F.3d 1372, 1377 (Fed. Cir. 2004) (quoting United States v. White Mountain Apache Tribe, 537 U.S. 465, 472-73 (2003)). The Equal Pay Act constitutes such a money-mandating statute over which this Court has jurisdiction. Mansfield v. United States, 71 Fed. Cl. 687, 692 (2006) (quoting Harbuck v. United States, 58 Fed. Cl. 266, 267-68 (2003), aff'd, 378 F.3d 1324 (Fed. Cir. 2004), cert. denied, 543 U.S. 1153 (2005)).

### B. The Equal Pay Act

Congress enacted the Equal Pay Act in 1963 as an amendment to the Fair Labor Standards Act "to remedy disparities in pay arising from traditional concepts of gender." Jenkins v. United States, 46 Fed. Cl. 561, 562-63 (2000) (quoting Ellison v. United States, 25 Cl. Ct. 481, 486 (1992)); see also Corning Glass Works v. Brennan, 417 U.S. 188, 195 (1974)). The statute was extended to the federal government in 1974. 29 U.S.C. § 203(e)(2)(2006). Under the Equal Pay Act,

> No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex.

29 U.S.C. § 206(d)(1).

   To establish a prima facie case under the Equal Pay Act, a plaintiff must show that (1) an employer pays different wages to employees of the opposite sex, (2) for equal work requiring equal skill, effort and responsibility, (3) performed under similar working conditions. Moorehead v. United States, No. 07-654C, 2008 WL 4951407, at * 3 (Fed. Cl. Nov. 18, 2008) (citation omitted); Mansfield, 71 Fed. Cl. at 692 (citation omitted); Behm v. United States, 68 Fed. Cl. 395, 399 (2005) (citation omitted); Hauschild v. United States, 53 Fed. Cl. 134, 138 (2002) (citation omitted); Lissak v. United States, 49 Fed. Cl. 281, 284 (2001) (citation omitted); Raymond v. United States, 31 Fed. Cl. 514, 518 (1994) (citation omitted); Molden v. United States, 11 Cl. Ct. 604, 610 (1987) (citation omitted); Corning Glass Works, 417 U.S. at 195. The plaintiff need not show that the wage disparity results from a gender bias or from a discriminatory practice on the part of the defendant. Hauschild, 53 Fed. Cl. at 141 (citing Ellison, 25 Cl. Ct. at 487); Jenkins, 46 Fed. Cl. at 563 (citing Molden, 11 Cl. Ct. at 610). Furthermore, the similar treatment of other employees of a different gender cannot defeat a plaintiff's prima facie showing that she received different pay than a similarly-situated employee of the opposite sex. Hauschild, 53 Fed. Cl. at 141-42 (citations omitted); Ellison, 25 Cl. Ct. at 487 (citing Molden, 11 Cl. Ct. at 610).

   Once the plaintiff has met this initial burden, "the statute presumes discrimination and requires defendant to proffer successfully an affirmative defense" based on one of the statute's four exceptions. Moorehead, 2008 WL 4951407, at * 3 (quoting Allison v. United States, 39 Fed. Cl. 471, 475 (1997)). The exceptions are: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based upon any factor other than sex. Mansfield, 71 Fed. Cl. at 693; Behm, 68 Fed. Cl. at 399; Lissak, 49 Fed. Cl. at 284; Hauschild, 53 Fed. Cl. at 138; Corning Glass Works, 417 U.S. at 196; County of Wash. v. Gunther, 452 U.S. 161, 169 (1981). The burden on an employer to establish an affirmative defense is "a heavy one." Mansfield, 71 Fed. Cl. at 693 (citations omitted); Hauschild, 53 Fed. Cl. at 139 (citing Ellison, 25 Cl. Ct. at 487)). The employer "must prove that the gender-neutral factor it identified is actually the factor causing the wage differential in question." Mansfield, 71 Fed. Cl. at 693 (citing Stanziale v. Jargowsky, 200 F.3d 101, 107-08 (3d Cir. 2000)). A plaintiff may rebut the employer's affirmative defense with evidence that the defendant's proffered reasons for the wage disparity are a mere pretext for sex discrimination. Id. (quoting Aldrich v. Randolph Cent. Sch. Dist., 963 F.2d 520, 526 (2d Cir. 1992)). If the Court finds the factor to be a mere pretext, then the affirmative defense fails. Id. (citing Kouba v. Allstate Ins. Co., 691 F.2d 873, 876-77 (9th Cir. 1982)).

   C. Plaintiff Has Established Her Prima Facie Case Under the Equal Pay Act.

   Defendant does not dispute that the NTSB compensated Ms. Murtagh Cooke less than the other three modal directors, who all are male. The NTSB's payroll records confirm that Ms. Murtagh Cooke earned a lower base salary and received smaller performance awards than Mr. Chipkevich, Mr. Clark, and Mr. Osterman for the years 2003 through 2005. Thus, the Court must determine whether Ms. Murtagh Cooke performed equal work on jobs requiring equal skill, effort, and responsibility under similar working conditions as her male comparators.

"Equal" work under the Equal Pay Act does not mean "identical" work. 29 C.F.R. §1620.13(a) (2008); Hauschild, 53 Fed. Cl. at 138 (citation omitted); Jenkins, 46 Fed. Cl. at 563; Allison, 39 Fed. Cl. at 475 (citation omitted); Ellison, 25 Cl. Ct. at 486-87 (citation omitted). The prevailing standard is one of "substantial equality" in the skill, effort, responsibility, and working conditions required. 29 C.F.R. §1620.13(a); Jenkins, 46 Fed. Cl. at 563 (citation omitted); Goodrich v. Int'l Bhd. of Elec. Workers, 815 F.2d 1519, 1524 (D.C. Cir. 1987) (citations omitted). "Insubstantial or minor differences in the degree or amount of skill, or effort, or responsibility required for the performance of jobs will not render the equal pay standard inapplicable." 29 C.F.R. §1620.14(a); see also Hauschild, 53 Fed. Cl. at 138 (quoting Ellison, 25 Cl. Ct. at 487); Molden, 11 Cl. Ct. at 610 (citing Corning Glass Works, 417 U.S. at 203 n.24). Differences in subject matter do not render jobs unequal if the jobs involve the same tasks. Ellison, 25 Cl. Ct. at 493 (citing Spaulding v. Univ. of Wash., 740 F.2d 686, 697 (9th Cir. 1984)).

In conducting this inquiry, the Court must focus on the primary duties of each job, not those which are incidental. Hauschild, 53 Fed. Cl. at 138 (citations omitted); Jenkins, 46 Fed. Cl. at 563 (citing Ellison, 25 Cl. Ct. at 487). Furthermore, the Court may only consider the skills *actually required* by the jobs, not the ability of the employees holding those positions. Goodrich, 815 F.2d at 1524 (citing Hein v. Or. Coll. of Educ., 718 F.2d 910, 914 (9th Cir. 1983)) (emphasis added). "[I]t is the job as a whole, not just selected aspects of it that must form the basis for comparison." Id. (citing Gunther v. County of Wash, 623 F.2d 1303, 1309 (9th Cir. 1979), aff'd, 452 U.S. 161 (1981)); Ellison, 25 Cl. Ct. at 487 (citation omitted). Although job titles hold some weight in assessing comparative responsibility, the controlling factor is job content. See Hauschild, 53 Fed. Cl. at 139 n.5 (citation omitted); Beck-Wilson v. Principi, 441 F.3d 353, 362 (6th Cir. 2006) (rehearing en banc denied, June 30, 2006) (citation omitted); Epstein v. Sec'y, United States Dep't of the Treasury, 739 F.2d 274, 277 n.6 (7th Cir. 1984); Pearce v. Wichita County, 590 F.2d 128, 133 n.7 (5th Cir. 1979) (citations omitted).

### 1. SES and GS Employees can be comparators as a matter of law.

Defendant argues first that the other three NTSB modal directors are not Plaintiff's comparators for the purposes of determining an Equal Pay Act violation because SES employees cannot be comparators to GS employees as a matter of law. In support of this argument, the Government cites Mintzmyer v. Babbitt for the proposition that SES members and non-SES employees are like "apples and oranges" and "[t]he two groups are not comparable." No. 93-0773, 1995 WL 25342, at *15 (D.D.C. Jan. 12, 1995) , aff'd, 72 F.3d 920 (D.C. Cir. 1995). Mintzmyer goes on to state that "SES and non-SES employees are two very different pools of employees and, from a management point of view, constitute very different types of resources for the staffing and efficient operation of the agency." Id. The Government emphasizes the "numerous distinctions between SES members and non-SES employees in terms of hiring, benefits, and many other employment factors." (Def.'s Br. at 34).

The Court rejects Defendant's argument as unfounded for several reasons. First, Mintzmyer is an unpublished District of Columbia District Court opinion that addressed actions for sex and age discrimination under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act of 1967, not an Equal Pay Act claim. It does not hold that SES and non-SES

employees cannot be comparators under the Equal Pay Act as a matter of law, nor does it constitute binding authority on this Court.   Second, Defendant has misconstrued Plaintiff's comparison. Plaintiff has offered as comparators to her *OMS director position* those of the *three other modal directors*, regardless of their wage system designation.   She has not compared her skills, efforts, and responsibilities as a *GS employee* to those of an *SES member*.   Finally, Defendant's admission that the NTSB intended to classify all of the modal director positions at the SES level following reorganization of the OSTS belies the argument that a director position at the GS level cannot compare to a director position at the SES level.   The NTSB created all three director positions at the GS level and eventually reclassified all of them under the SES system without changing the accompanying job descriptions or required responsibilities, skills, or efforts.[4]   Dr. Spencer, who replaced Ms. Murtagh Cooke as OMS director but at the SES level, testified that his designation as an SES member made his position easier and more effective, not less.   He held a title commensurate with executives in the private sector, could effect quicker action from other NTSB offices, and could communicate on an equal level as the other modal directors, yet he performed the same job responsibilities as Ms. Murtagh Cooke had in her position at the GS level.   The Government cannot argue on the one hand that GS and SES-level employees are not comparable as a matter of law, and, on the other, that all four of the GS-level modal director positions deserved to be designated at the SES level.

As an alternative, Defendant has proposed several of its own comparators in addition to those offered by Plaintiff.   These include the Director of Office Research and Engineering, Director of Office of Safety Recommendations and Advocacy, and Deputy Director for Regional Operations in OAS. (Def.'s Br. at 21).   However, "[t]he plaintiff need not compare herself to all similarly classified male employees, but may *choose* one or more among those allegedly doing substantially equal work." Ellison, 25 Cl. Ct. at 487 (quoting Goodrich, 815 F.2d at 1524) (emphasis added).   Plaintiff has made her choice of alleged comparators, and the Court will proceed by evaluating them and not those offered by Defendant.

### 2. Plaintiff performed work that required equal skill, effort, and responsibility as that of her comparators.

Even if the SES and GS employees can be comparators, Defendant asserts next that Ms. Murtagh Cooke has failed to show that she performed work that required equal skill, effort, and responsibility as that of the other three modal directors.   The Court concludes that Plaintiff has established that the OMS director position required substantially similar skill, effort, and responsibility as the other three modal directors, and any variation among the positions is inconsequential for the purposes of defining an Equal Pay Act violation.

As discussed above, Plaintiff has the burden of establishing substantial equality of skill, effort, and responsibility between her job and the jobs of her comparators.   E.g., Jenkins, 46 Fed. Cl. at 563 (citation omitted).   "Skill" requires consideration of such factors as experience, training, education,

---

[4] The OAS director position existed prior to the OSTS reorganization and was at all times classified at the SES level.

and ability.  29 C.F.R. § 1620.15(a).  The Court must assess "skill" in terms of the performance requirements of the job.  Id.  "Effort" measures the mental and physical exertion needed to perform the job.  29 C.F.R. § 1620.16(a).  Differences in only the kind of effort exerted, and not the amount, do not justify a wage differential.  Id.  "Responsibility" refers to the degree of accountability required by the job, with emphasis on the importance of the job obligation.  29 C.F.R. § 1620.17(a).

### a.  Skill

Defendant acknowledges that each of the modal director positions calls for technical expertise in the respective transportation mode, knowledge of and expertise in accident investigation processes, leadership and supervisory skills, and the ability to communicate well and collaborate with other professionals.  (Stip. ¶ 219).  However, it argues that the skills required of the OMS director differ substantially from those of the rest.  The Government maintains that the ORPH, OHS, and OAS directors must demonstrate greater leadership and supervisory skills because they oversee larger staffs, possess regional offices, and handle larger accident investigations.  The Government also suggests that the OHS and OAS directors must use different communications skills because highway and aviation accident investigations receive greater public and media interest.  Furthermore, the technical expertise varies because the ORPH director must possess expertise in three modes of transportation, whereas the OMS director need only master one.  Finally, the Government contends that knowledge of and expertise in accident investigation required for the OMS position does not compare to that of the other director positions because marine accidents are generally less complex than aviation accidents, allow less discretion over investigations, and involve only one mode of transportation.

The Court finds that the OMS director position requires substantially the same skills as those of the other three director positions.  As agreed by the parties, each calls for technical expertise, knowledge of accident investigation procedures, strong leadership, and good communication skills.  In Jenkins, the Court held that the plaintiff did not possess substantially the same skills as her comparator where her comparator's position description required technical knowledge in the electronics field, and her position explicitly did not.  See 46 Fed. Cl. at 568.  Unlike in Jenkins, the present case is not one in which Plaintiff lacks a skill that her comparators possess.  The degree to which the directors uses these skills may vary, but not substantially.  Courts have not required the rigorous comparison of job skill sets that Defendant proposes.  Plaintiff need only demonstrate that she has essentially the same skills as her comparators, and she has met that burden.

### b.  Effort

Defendant asserts that Ms. Murtagh Cooke exerted less effort than her male comparators in her position as OMS director.  According to the Government, her position required less mental stress and fatigue because marine accident investigations are less complex than other investigations, occur less often, and involve fewer NTSB staff members or outside participants.  Additionally, the director of OMS has less authority and discretion in conducting an investigation because she must share jurisdiction with the Coast Guard and follow the bright-line rules set forth in the joint memorandum of understanding.  The Government also alleges that overseeing the office itself demands less effort because OMS has a smaller staff and budget than the other offices.  Finally, the Government

maintains that Ms. Murtagh Cooke allocated her time differently than the other directors because she did not testify before Congress, did not have membership on the ERB, and participated less in international investigations.

When comparing Plaintiff's position to that of her comparators, the Court may only consider the skills *actually required* by the jobs, not the ability of the employees holding those positions. Goodrich, 815 F.2d at 1524 (citation omitted) (emphasis added). All jobs have their ebbs and flows in workload and stress level. The question is whether, on average, the effort required by the OMS director position evens out substantially to that of the other directors. The Court finds that it does. Marine investigations may be less complex and occur less frequently than aviation accidents, but it is for these reasons that OAS has a larger staff and budget with which to respond to them. While there may be times when the OAS director must work late into the evenings and on weekends in furtherance of an accident investigation, so too there are times between investigations when the director need not. The same is the case with the OMS director position. All four of the directors are "on call" to respond to the pressures of their jobs 24 hours per day.

Defendant makes much of the fact that the OMS director position focused its time on various responsibilities differently than the other positions. For example, the Government submits that Plaintiff was less involved in international investigations than the OAS director and did not testify before Congress or sit on the ERB during her tenure. However, Ellison made clear that an attempt to differentiate positions by comparing the percentage of time devoted to a particular task is a flawed analysis. 25 Cl. Ct. at 494. Furthermore, the Government fails to mention that neither the ORPH director nor the OHS director participates in international investigations, and the OAS director did not testify before Congress either. Finally, Ms. Murtagh Cooke may not have sat on the ERB, but ERB membership did not represent a primary duty of any of the director positions. The Court need not concern itself with the directors' incidental responsibilities, but must instead consider the positions as a whole. See Hauschild, 53 Fed. Cl. at 138; Goodrich, 815 F.2d at 1524 (citation omitted). As the Court has emphasized above, the test is one of substantial equality in the efforts required of the positions, not one of identical effort.

### c. Responsibility

As provided under relevant statutes and regulations, each modal director is charged with the duties of investigating transportation accidents in his or her area of expertise, preparing reports for submission to the NTSB and for release to the public, determining the probable cause of accidents, and making safety recommendations to prevent future accidents. 49 C.F.R. § 800.25. Defendant does not dispute this generalized comparison of the positions, but points out correctly that the actual duties of the position, and not the job description, control the Court's inquiry. Ellison, 25 Cl. Ct. at 494 n.23 (citation omitted). However, job descriptions can be highly probative of equal work, and, in this case, the Court gives great weight to the uniformity in the four modal office director position descriptions. See id.

Defendant asserts that closer examination of the director positions reveals substantial variations in responsibility. Accordingly, the Government highlights several differences in the positions. First and foremost, the OMS director has less responsibility in conducting accident

investigations because marine accidents are less complex, involve fewer participants, and require the OMS director to share authority with the Coast Guard. This means that the OMS director has less discretion to determine when and how to investigate and less responsibility to educate local communities about the investigation process. Second, the OMS director has less responsibility in the human resources and management area because she oversees a smaller staff and budget. Third, the OMS director communicates much less with the press than the OAS director, who plays a central role in communicating the NTSB's mission to the public and media. Fourth, during Plaintiff's tenure, the OMS director did not testify before Congress as the ORPH and OHS directors did. Fifth, the OMS director plays a smaller role in conducting international investigations and representing the United States on international boards than the OAS director. Finally, during her tenure as OMS director, Plaintiff did not sit on the ERB as the other directors did.

Despite these minor differences in job responsibility, the Court finds significant overlap in the degree of accountability required by the positions. The relevant issue is not whether the positions are different, but whether the differences are substantial so as to justify a pay differential. Ellison, 25 Cl. Ct. at 493. Difference in subject matter does not render the jobs unequal if they involve the same tasks. Id. (citation omitted). In Ellison, the Court concluded that a female branch chief with the United States Marshals Service demonstrated substantial equality of work with higher-paid male branch chiefs where each of the four chiefs had the responsibilities of supervising professional and support staff and managing the branch's budget. Id. at 491-95. The Court found it irrelevant that one of the plaintiff's comparators also held responsibility for compensation and manpower allocation, for which plaintiff did not. Id. at 493. Likewise, in Allison, the Court held that substantial similarity existed between nurse practitioners and physician assistants based on an overlap in job descriptions in which they all assessed acute and chronic medical problems, ordered diagnostic tests, and prescribed medications. 39 Fed. Cl. at 475.

Here, as in Ellison and Allison, the similarities in job responsibilities outweigh the differences. All four directors have responsibility for conducting accident investigations and issuing reports to the public and media. That the director of OMS shares such authority with the Coast Guard does not change the nature of that responsibility in relation to her comparators. Like her comparators, the OMS director must dispatch staff to an accident scene, conduct interviews with witnesses, and determine the probable cause. Whether she oversees 25 participants or 150, the work required is substantially the same. Similarly, whether she oversees a staff of 5 or 140, her position requires her to run an office smoothly and to manage competently her employees.

Defendant's focus on the role the OMS director plays in media relations, conducting international investigations, and testifying before Congress misses the mark. In each of these cases, Defendant highlights one or more director positions that devote more attention to these areas without mentioning that other directors spend the same or less time than the OMS director in that same area. For example, while the OAS director plays a central media role and participates in international investigations, the ORPH and OHS directors do not; while the ORPH and OHS directors testified before Congress, the OAS director did not. By making these selective comparisons, Defendant ignores the fact that "it is the job a whole, not just selected aspects of it that must form the basis for comparison." Goodrich, 815 F.2d at 1524 (citation omitted). Therefore, Plaintiff has successfully

shown that her position as OMS director required substantially the same responsibilities as those of her male comparators.

### 3.  Plaintiff performed under similar working conditions as her comparators.

Finally, Defendant argues that Plaintiff did not perform her duties under similar working conditions as the other modal directors.  Defendant admits that each director worked in an office environment using electronic devices, computers, and telephones for communications.  (Stip. ¶ 221).  However, Defendant emphasizes that the other three directors traveled more than Plaintiff, both to their regional offices and to accident sites, which affected their working conditions.

The Equal Pay Act adopts a flexible standard for defining "similar working conditions."  29 C.F.R. § 1620.18(a).  In determining whether similar working conditions exist, the Court must make a practical judgment as to whether any differences are of the kind an employer customarily considers when setting wage levels.  Id.  This assessment involves taking into account both the surroundings and hazards of the work environment.  Id.  Slight or inconsequential differences in working conditions do not justify a pay disparity.  Id. § 1629.18(b).

The Court finds any difference in the working conditions of Ms. Murtagh Cooke and her comparators to be inconsequential.  The directors each worked in an office of roughly the same physical size and using the same technology.  Any temporary change in working conditions resulting from travel to another NTSB office or to an accident site does not rise to the level to justify a conclusion that Plaintiff performed under disparate working conditions.  In light of the foregoing, the Court concludes that Plaintiff has established her prima facie case under the Equal Pay Act because she has demonstrated that she performed equal work requiring equal skill, effort, and responsibility under similar working conditions as her comparators.

### D.  Defendant Has Failed to Prove Any Affirmative Defenses.

Once an employee has met her burden of establishing a prima facie case under the Equal Pay Act, the burden shifts to the employer to prove, by a preponderance of the evidence, that the pay disparity is justified by one of four statutory exemptions.  Mansfield, 71 Fed. Cl. at 693; Behm, 68 Fed. Cl. at 399; Lissak, 49 Fed. Cl. at 284; Hauschild, 53 Fed. Cl. at 138; Corning Glass Works, 417 U.S. at 196.  The burden on an employer is "a heavy one."  Mansfield, 71 Fed. Cl. at 693.  The employer "must prove that the gender-neutral factor it identified is actually the factor causing the wage differential in question."  Id. at 693 (citing Stanziale, 200 F.3d at 107-08).  In the present case, Defendant asserts two affirmative defenses:  the merit system defense and the "any other factor other than sex" defense.  For the reasons stated below, Defendant has failed to prove either affirmative defense by a preponderance of the evidence.

### 1.  Merit system defense

A merit system which measures quantity or quality of performance and compensates employees accordingly is a valid defense for a pay differential under the Equal Pay Act.  Equal Employment Opportunity Comm'n v. Aetna Ins. Co., 616 F.2d 719, 725 (4th Cir. 1980) (citing S.

Rep. No. 176, 88th Cong., at 4 (1963)).  In order to prove the merit system defense, an employer must show that it had in place an organized and structured procedure by which it evaluated employees systematically and in accordance with predetermined criteria.  Raymond, 31 Fed. Cl. at 518 (citing Ottaviani v. State Univ. of N.Y. at New Palz, 679 F.Supp. 288, 337 (S.D.N.Y. 1988), aff'd, 875 F.2d 365 (2d Cir. 1989), cert. denied, 493 U.S. 1021 (1990)).  Under such a merit system, an employer may reward employees financially for outstanding experience, training, and ability, so long as the pay differential is not based upon sex.  Aetna, 616 F.2d at 725.

An employer need not show that the merit system is devoid of subjectivity so long as it applies the subjectivity using clear, predetermined criteria.  Raymond, 31 Fed. Cl. at 519 (holding that the Secret Service's Merit Promotion Plan provided clear guidance to evaluators and limited subjectivity in determining employees' pay); Aetna, 616 F.2d at 726 (ruling that the trial court did not err in attributing an employee's pay differential to experience and background and not mere subjectivity); see also Hauschild, 53 Fed. Cl. at 144 (finding that the defendant's failure to promote the plaintiff was attributable solely to the Air Force's determination that the plaintiff had not assumed additional course director duties required to justify promotion, and therefore, the defendant had not met the merit system defense).  However, compliance with civil service laws alone does not establish a merit system defense.  Maxwell v. City of Tucson, 803 F.2d 444, 447 (9th Cir. 1986) (citing Marshall v. Kent State Univ., 589 F.2d 255, 255-56 (6th Cir. 1978) (per curiam)).  If the merit system is not in writing, the employer must also show that the employees were aware of it.  Aetna, 616 F.2d at 725.

Defendant attributes any pay disparity between Ms. Murtagh Cooke and her male comparators to a merit system based on the numerous statutes and regulations governing the Federal employee pay system.  Plaintiff, on the other hand, argues that, within this system, the NTSB had several options by which it could have reduced or eliminated her pay differential.  The NTSB could have allocated Ms. Murtagh Cooke one of the vacant SES slots that existed during her tenure; given her a Limited Term SES appointment; provided her with overtime pay; given her a quality step increase; granted her a higher performance award; designated her an SL position; or awarded her a retention allowance.

Defendant denies that the NTSB could have paid Ms. Murtagh Cooke at a rate equal to that of her comparators.  First, Defendant asserts that it could not have promoted Ms. Murtagh Cooke to an SES slot because no SES slots were available when the NTSB created the modal director positions, and when OPM eventually granted the NTSB additional slots, the NTSB allocated them to the director positions in order based on declining office size and complexity.  Any vacant SES slots in other NTSB offices were "non-career" slots, which, the Government contends based upon Mr. Osterman's testimony, could not have been assigned to the OMS director position because they are generally reserved for political appointees.  Furthermore, the NTSB would have had to open any available SES slot to competition, which did not guarantee that Ms. Murtagh Cooke would acquire the position.

The Government's contention that it could not have reassigned the non-career slot to the OMS director position is incorrect.  According to OPM, there are two types of SES positions:  general and career-reserved.  (JTX 2 at 4).  While a career-reserved SES position must at all times be occupied by a career appointee, a general SES position "may be filled by a career, noncareer, or limited appointee.  The same general position may be filled by a career appointee at one time and by a

noncareer or limited appointee at another time." Id.  The overall SES allocation granted to an agency "covers all SES positions, regardless of how they are filled, e.g., by career, noncareer, or limited appointment.  Each agency is responsible for making sure that the established number of career reserved positions equals or exceeds the floor . . . ." (JTX 21).  At all relevant times, the NTSB maintained its floor number of nine career SES slots but also had at least one general vacancy.  The NTSB had the discretion, and indeed the legal responsibility in complying with the Equal Pay Act, to reassign the vacant general SES slot to the OMS director position or at least convert the position to a Limited Term SES appointment.  Whether or not Ms. Murtagh Cooke would have won the competition for the SES-level slot is irrelevant; the controlling factor is that she was not given the same opportunity to compete for an SES level position as her male comparators.

Even if the NTSB could not have allocated an SES slot to the OMS director position sooner, the Court agrees with Plaintiff that the agency had several other alternatives by which it could have reduced or eliminated the pay disparity.  The NTSB could have provided Ms. Murtagh Cooke with overtime pay.  Defendant concedes that Ms. Murtagh Cooke was eligible for overtime pay but maintains that there was an "understood policy" that the modal office directors would not request it.  Additionally, the Government emphasizes that a $3,800 cap existed on any overtime pay Ms. Murtagh Cooke could have received, which would not have made up the entire pay differential.  The Government's excuses regarding overtime policy do not justify the NTSB's failure to make any effort to resolve Ms. Murtagh Cooke's pay differential.  Ms. Murtagh Cooke came to Ms. Engleman Connors in April 2004 and asked her to look into whether she qualified for overtime pay.  Ms. Engleman Connors did nothing in response aside from mentioning this conversation to Mr. Campbell in passing.  She never brought the matter up with the Human Resources Department herself, nor did she follow up with Mr. Campbell or seek documentation from Ms. Murtagh Cooke.  Even if there was an "understood policy" not to pay modal directors overtime, the policy does not override the NTSB's legal obligation to comply with the Equal Pay Act.  Furthermore, for an unwritten policy to qualify as a merit system defense, the employer must show that the policy is made clear to all employees.  See Aetna, 616 F.2d at 725.  The fact that Ms. Murtagh Cooke had to inquire about her eligibility for overtime with Ms. Engleman Connors and that Ms. Engleman Connors did not have an immediate answer demonstrates that the alleged "understood policy" was not "understood" at all.  Ms. Murtagh Cooke was technically eligible for overtime, and the NTSB could have used overtime pay as a mechanism for reducing her pay differential.

The NTSB also could have awarded Ms. Murtagh Cooke a quality step increase for her outstanding performance rating in 2003, above and beyond the within-grade step increases she received.  Furthermore, the NTSB could have given her larger performance awards for 2003 and 2004.  Ms. Murtagh Cooke received a performance award of $5,400 in 2003, which averaged $11,000 less than the performance awards received by her comparators, despite her achievement of the same overall "outstanding" performance rating.  In 2004, she received a performance award of $3,400 for an overall "excellent" performance rating, which fell below the next lowest director's performance award by $6,100, even though the difference between a rating of "outstanding" and one of "excellent" typically results in an end-of-the-year bonus differential of only $2,000.  The Government argues that performance awards are no substitute for overtime pay, job classification, or promotion. (See JTX 6 at 1).  The Court agrees.  However, the gross disparity between the performance awards granted Ms.

Murtagh Cooke and her comparators in 2003 for the same quality of work begs the question whether the NTSB applied the subjectivity "using clear, predetermined criteria." Raymond, 31 Fed. Cl. at 519.

Plaintiff cites other, less likely methods by which the NTSB could have addressed her pay differential but did not. These include designating her position as an SL slot or giving her a retention allowance. The Court understands that these two options may not have been possible. An SL slot is reserved for executives with technical expertise who do not devote more than 25 percent of their time to supervisory duties, and a factual dispute exists over whether the OMS director position meets these requirements. Likewise, the federal government may grant a retention allowance to a highly-qualified federal employee who "would be likely to leave [the Federal service] in the absence of an incentive," and there is no indication that Ms. Murtagh Cooke was likely to leave Federal service. See 5 C.F.R. § 575.301. However, the point is not that the NTSB failed to provide Ms. Murtagh Cooke with an SL slot or a retention allowance; it is that the NTSB never even considered these options. To be a valid defense to the Equal Pay Act, a merit system requires an employer to have in place an organized and structured procedure by which it evaluated employees systematically and in accordance with predetermined criteria. Raymond, 31 Fed. Cl. at 518 (citation omitted). Ms. Murtagh Cooke raised concerns about her pay differential with Mr. Campbell in 2001 and 2003 and elevated them to Ms. Engleman Connors in April 2004. The NTSB did nothing to respond to her grievances, despite her attempts to schedule followup meetings Ms. Engleman Connors. While a merit system need not be completely devoid of subjectivity, the NTSB's actions suggest *nothing but* subjectivity. The Court is not convinced that the gender-neutral factor Defendant has identified, the alleged merit system, is *actually* the factor that created the wage differential in question. See Mansfield, 71 Fed. Cl. at 693 (citation omitted). Therefore, Defendant has not met its heavy burden of proof under the merit system defense.

### 2.   "Any other factor other than sex" defense

A defendant may also defeat a plaintiff's Equal Pay Act Claim by demonstrating that the pay differential is "based on any other factor other than sex." 29 U.S.C. § 206(d)(1). A circuit split exists between courts which require employers to prove that the identified factor has an "acceptable" or "legitimate" business-related reason behind it and those which merely demand that the factor be gender-neutral on its face and applied in a good faith, non-discriminatory manner. Behm, 68 Fed. Cl. at 399-400 (citations omitted); Lissak, 49 Fed. Cl. at 285 (citations omitted). The Federal Circuit has not spoken on this issue, but the Court of Federal Claims has generally adopted the less rigorous "rational basis" scrutiny. Behm, 68 Fed. Cl. at 400. Thus, the employer need only prove that the factor is gender-neutral on its face and used in good faith and not in a discriminatory manner in its application. Id. at 401 (citations omitted). Regardless of which standard applies, the employer must establish that the gender-neutral factor it identified is actually the factor creating the wage differential in question. Mansfield, 71 Fed. Cl. at 693 (citing Stanziale, 200 F.3d at 107-08). A job classification system may be designed to be gender-neutral, but the manner in which it affects employees may not be gender-neutral. See Behm, 68 Fed. Cl. at 401 (citations omitted); Molden, 11 Cl. Ct. at 612-13.

Defendant offers as its gender-neutral explanation for Ms. Murtagh Cooke's pay differential the NTSB's decision to allocate SES slots as they became available to modal offices in declining order of size, complexity, and positive effect on transportation safety. According to the Government,

the OAS director position has always been an SES-level position because aviation safety is the NTSB's primary focus, the office handles more and highly complex accident investigations, aviation accidents garner more press and public interest, and the OAS director performs the most international work. Following restructuring of the OSTS into four modal offices, the NTSB intended to reclassify each modal director position at the SES level, but OPM denied its request for additional SES slots. When one became available in 2001, the NTSB allocated it to the ORPH director because ORPH handled three different transportation modes, the NTSB chairman felt least comfortable addressing issues arising in these modes, and the ORPH director testified the most frequently before Congress. The NTSB advertised the position and awarded it to Mr. Chipkevich, who had previously occupied it at the GS level. In 2003, the NTSB awarded a newly-available SES slot to the OHS director position because the office had the second largest staff and a larger budget than OMS, more highway deaths occurred each year than marine deaths, and the office handled more investigations than OMS. Again, the NTSB advertised the position and awarded it to Mr. Osterman, who had previously occupied it at the GS level, following open competition. Finally, in 2004 OPM authorized one additional SES slot, which the NTSB allocated to the OMS director position. The Government maintains that the NTSB opened the position up to competition, and after hearing concerns that it was "wired" for Ms. Murtagh Cooke, readvertised it to expand the pool of applicants. The review board assessed the qualified candidates and recommended Dr. Spencer for the position, who was then approved by the NTSB.

The order in which the NTSB allocated SES slots to modal director positions may have served a legitimate business purpose, but the process by which it filled the OMS director SES slot was arbitrary and not in good faith. Mr. Campbell admits that after he initially opened up the OMS director position to competition and received a list of qualified candidates from the review board, one of which was Ms. Murtagh Cooke, he procrastinated and failed to take action to fill it. He stalled because he "did not believe that [Ms. Murtagh Cooke] was going to be selected for it" and was "not necessarily interested in seeing [Ms. Murtagh Cooke] removed," even though he never discussed the list of candidates with Ms. Engleman Connors. (Campbell, Tr. 138). As a result, he decided to rescind the advertisement and open it up to a second round of competition. The review board then recommended Dr. Spencer, a candidate who did not make the list the first time around, and Ms. Murtagh Cooke's name mysteriously fell from the list of qualified candidates.

Gender bias may not have fueled Mr. Campbell's actions, but the Government must show more than gender neutrality in its decision to award Dr. Spencer the SES slot. It must show that the NTSB filled the position in good faith and that the gender-neutral reason it alleges caused the pay differential was, in fact, actually the factor that created the differential. Mr. Campbell's procrastination in filling the position and subsequent decision to readvertise it appears fueled by some personal animus toward Ms. Murtagh Cooke or a fear of Ms. Engleman Connors' rejection, neither of which was in the best interests of the NTSB. He could have given Ms. Engleman Connors the original list of five candidates the review panel had deemed qualified for the position so that she could make the final selection; instead, he sat on it for months and only provided her with a list when Ms. Murtagh Cooke's name did not appear on it. This suspicious behavior lacks good faith and fails to meet even the less rigorous rational basis review applied in this Court.

The Government offers as an alternative business reason for its decision not to award Ms. Murtagh Cooke an SES slot her alleged poor job performance. This excuse rings hollow. Ms. Murtagh Cooke received an overall "outstanding" performance review in 2003, which was accompanied by nearly eight pages of glowing commentary describing her good work. In 2004, her overall rating fell from "outstanding" to "excellent," but the review contained no written explanation for the slight downgrade, and her supervisors failed to show the evaluation to her as required by NTSB policy. Furthermore, neither Mr. Campbell nor Ms. Engleman Connors ever documented any alleged poor performance or misconduct by Ms. Murtagh Cooke. The facts here resemble those in Ellison, in which a female employee received high ratings in her performance evaluations, but her employer attributed her pay differential to an "inability to forge effective working relationships." 25 Cl. Ct. at 496. The Court there found no evidence that any of the employee's supervisors had complained about her alleged disloyalty and therefore dismissed the employer's stated business reason as invalid. Here too, the Government's attempt to taint Ms. Murtagh Cooke's professional record without any supporting evidence lacks any credibility as a good faith factor in her wage disparity.

Finally, the Government argues that the wage disparity between Ms. Murtagh Cooke and her comparators could not have resulted from gender bias because half of the SES appointments the NTSB made during the 2003 to 2005 time period went to female employees. These statistics are irrelevant. The similar treatment of other female employees does not defeat a plaintiff's prima facie showing of an Equal Pay Act violation. See, e.g. Hauschild, 53 Fed. Cl. at 141 (citations omitted). Gender-neutrality alone does not save the Government's actions from their own bad faith. Therefore, Defendant has failed to meet the heavy burden upon it to prove the "any other factor other than sex" defense or otherwise overcome Plaintiff's successful showing of an Equal Pay Act violation.

E. Defendant's Conduct Was Willful and Not in Good Faith.

To determine the appropriate remedy for an Equal Pay Act violation, the Court must first assess whether the defendant's conduct was "willful." Ellison, 25 Cl. Ct. at 498. Willful conduct extends the statute of limitations governing the Equal Pay Act claim, and thus recovery of actual damages, from 2 years to 3 years from the date on which the claim accrued. See 29 U.S.C. § 255(a) (2008); Adams v. United States, 350 F.3d 1216, 1229 (Fed. Cir. 2003) (rehearing en banc denied, Feb. 2, 2004); Allison, 39 Fed. Cl. at 478. A violation is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." Allison, 39 Fed. Cl. at 478 (quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128, 133 (1988)); see also Adams, 350 F.3d at 1229 (citation omitted); Nerseth v. United States, 17 Cl. Ct. 660, 666 (1989). "Willful" generally equates to voluntary or deliberate conduct. Angelo v. United States, 57 Fed. Cl. 100, 109 (2003). OPM has defined "reckless disregard" as a "failure to make adequate inquiry into whether conduct is in compliance with the Act." Id. at 108 (citing 5 C.F.R. § 551.104 (2008)); see also Equal Employment Opportunity Comm'n v. White & Son Enters., 881 F.2d 1006, 1012 (11th Cir. 1989) (affirming the district court's conclusion that the employer acted with reckless disregard by failing to investigate its legal obligations with respect to employment matters). The employee bears the burden of proving the willfulness of the employer's conduct. See Adams, 350 F.3d at 1229 (citations omitted); Angelo, 57 Fed. Cl. at 109 (citations omitted).

Actual damages in the form of unpaid wages refers to all payments made to an employee as remuneration for employment.  29 C.F.R. § 1620.10.  This includes salary, bonuses, and fringe benefits.  Id.  An employee may also be entitled to a retroactive promotion to the time when he or she normally would have received promotion but for the employer's violation of the Equal Pay Act.  Molden, 11 Cl. Ct. at 614 (granting plaintiffs a retroactive promotion and retroactive seniority from a G-11 level to a GS-12 or GS-13 level).  In addition to any judgment awarded to the plaintiff, the defendant must pay reasonable attorneys' fees and costs of the action.  29 U.S.C. § 216(b) (2006).

A plaintiff who has shown an Equal Pay Act violation will also receive liquidated damages unless the defendant proves that its failure to comply with the Equal Pay Act was in good faith, and that it had reasonable grounds for believing that its actions did not violate the statute. 29 U.S.C. § 216(b), 260; Ellison, 25 Cl. Ct. at 499.  The employer bears the burden of showing that its violation was in good faith and that it had reasonable grounds to believe that no violation took place.  Equal Employment Opportunity Comm'n v. 1st Citizens Bank of Billings, 758 F.2d 397, 403 (9th Cir. 1985) (citation omitted).  Absent such a showing, liquidated damages are mandatory.  Id.; Ellison, 25 Cl. Ct. at 499.  Courts define "good faith" as an "honest intention to ascertain what the Equal Pay Act requires and to act in accordance with it."  1st Citizens Bank of Billings, 758 F.2d at 403 (citation omitted).

### 1.  Willful

Plaintiff argues that the NTSB manifested a willful disregard of the Equal Pay Act by ignoring Ms. Murtagh Cooke's ongoing complaints about her pay disparity over a three-year period.  Ms. Murtagh Cooke first confronted Mr. Campbell about her salary during a 2001 meeting in which she and Mr. Osterman expressed concern that they were not receiving the same salary as fellow modal director Mr. Chipkevich.  In 2003 when the NTSB awarded Mr. Osterman the OHS director position at the SES level, Ms. Murtagh Cooke again complained to Mr. Campbell that her salary did not match those of the other modal directors.  Finally, in 2004 she elevated her concerns to Ms. Engleman Connors and asked if she could receive overtime pay to reduce the pay differential between her and her fellow modal directors. Ms. Engleman Connors testified that she asked Mr. Campbell to look into the matter, but no one ever followed up with Ms. Murtagh Cooke, despite her attempts to meet with Ms. Engleman Connors.  Defendant does not contest the NTSB's failure to respond to Ms. Murtagh Cooke's complaints.  Rather, it argues that the NTSB did not show a reckless disregard for whether its conduct violated the Equal Pay Act because neither Mr. Campbell nor Ms. Engleman Connors understood Ms. Murtagh Cooke's complaints to relate to gender discrimination.  According to Defendant, Ms. Murtagh Cooke never mentioned that her grievance related to gender, and Ms. Engleman Connors did not perceive any inequity in Ms. Murtagh Cooke's pay differential because the OMS director position oversaw a smaller staff and budget, and fewer accident investigations.

The Court finds that the NTSB's conduct in ignoring Ms. Murtagh Cooke's concerns about her pay differential demonstrated a reckless disregard of the Equal Pay Act's requirements.  Ms. Murtagh Cooke may not have spelled out to Ms. Engleman Connors that her grievance related to gender bias, but nothing under the law required her to do so.  An employer's failure to make adequate inquiry into whether conduct complies with the Equal Pay Act can constitute reckless disregard. E.g., Angelo, 57 Fed. Cl. at 108 (citing 5 C.F.R. § 551.104).  Furthermore, a pay differential need not be

based on gender bias to violate the Equal Pay Act. A plaintiff must only show that an employer paid her different wages than employees of the opposite sex for equal work requiring equal skill, effort and responsibility performed under similar working conditions. <u>E.g.</u>, <u>Moorehead</u>, 2008 WL 4951407, at * 3. Ms. Murtagh Cooke approached NTSB leadership on three occasions and explained that her pay fell short of that earned by her comparators, who were all male. Ms. Engleman Connors testified that she understood that "Ms. Murtagh [Cooke] was asking for a bonus or some other form of pay within the structure of the civil service pay system that could be used to make up the pay differential between herself and the other Office Directors." (JTX 45 at 43). Ms. Engleman Connors was sufficiently on notice of the pay disparity between a female employee and her male comparators, and yet she failed to investigate the Equal Pay Act's requirements. Had she done so, she would have found several possible remedies available within the civil service pay system.

Plaintiff also argues that the NTSB acted willfully in violating the Equal Pay Act by filling the OMS director position at the SES level based on some apparent animus toward Ms. Murtagh Cooke, which was not the best interests of the NTSB. The Court agrees. As discussed above, Mr. Campbell admits that he had no intention of moving the process forward because Ms. Murtagh Cooke's name was on the list of qualified candidates, and Ms. Engleman Connors would think he had "lost [his] mind[.]" (Campbell, Tr. 148). As soon as he readvertised the position and Ms. Murtagh Cooke's name disappeared from the list of qualified candidates, he immediately recommended, and the NTSB approved, Dr. Spencer for the position. The Government argues that Mr. Campbell did not act out of animus toward Ms. Murtagh Cooke, but rather, concern in the industry that the position was "wired" for her. The Court does not find this explanation credible. The facts here resemble those in <u>Ellison</u>, where the employer attributed its failure to promote the employee to the employee's disloyalty to her supervisors, when in reality, the evidence demonstrated that her supervisors had a "disparaging attitude" toward the employee. <u>See</u> 25 Cl. Ct. at 498. The Court in <u>Ellison</u> saw through the defendant's unfounded excuse and declined to find that the defendant had met its burden of proof. <u>Id.</u> Even if the industry's perception were true in the present case, it did not justify Mr. Campbell's decision to hold up the selection process. Mr. Campbell could have passed on the list of five candidates to Ms. Engleman Connors, who was free to choose anyone she deemed qualified for the position. Instead, he acted deliberately and willfully in preventing Ms. Murtagh Cooke from receiving fair consideration. The process for filling the OMS director position was nothing but arbitrary and fueled by Mr. Campbell's apparent ill feelings toward Ms. Murtagh Cooke. Therefore, the Court finds that the NTSB, through Mr. Campbell, demonstrated reckless disregard in violating the Equal Pay Act.

### 2. Not in good faith

Defendant asserts that it made a good faith effort to comply with federal pay regulations and further the NTSB's transportation safety mission, and that it had reasonable grounds to believe its actions did not violate the Equal Pay Act. "Good faith" is defined as an "honest intention to ascertain what the Equal Pay Act requires and to act in accordance with it. " <u>Citizens Bank of Billings</u>, 758 F.2d at 403 (citation omitted). The NTSB made no effort at all to ascertain what the Equal Pay Act required in its treatment of Ms. Murtagh Cooke. Neither Ms. Engleman Connors nor Mr. Campbell ever contacted the Human Resources Department to inquire about options for rectifying Ms. Murtagh

Cooke's pay differential, despite their knowledge that she earned significantly less than her male comparators. Nor did the process by which the NTSB filled the OMS director position demonstrate good faith. As discussed above, Mr. Campbell did not act in the NTSB's best interest in procrastinating over the selection process and then readvertising the position, even though the review panel had deemed five candidates qualified. Defendant has not met its burden of showing good faith, and therefore, the Court must award Plaintiff liquidated damages.

### 3. Damages

In light of the Court's determination that Defendant's violation of the Equal Pay Act was willful, Plaintiff is entitled to actual damages for a three-year period. In awarding actual damages, the Court has the discretion to provide any lost wages, including salary, bonuses, and fringe benefits. Plaintiff also is entitled to liquidated damages due to Defendant's failure to prove that it acted in good faith. The parties have stipulated as to damages based on various scenarios. In accordance with this stipulation, the Court hereby awards Plaintiff a total of $466,816.00, which includes salary for three years, bonus based on the average percentage of salary of the bonuses awarded to Plaintiff's comparators, cost-of-living adjustments, interest, and lost pension.

### Conclusion

For the foregoing reasons, Plaintiff has established a violation of the Equal Pay Act, and Defendant has failed to prove by a preponderance of the evidence that the wage disparity between Plaintiff and her comparators was not gender-based. Furthermore, the Court concludes that Defendant's violation of the Equal Pay Act was willful because the NTSB acted with reckless disregard as to whether its conduct was prohibited by the Equal Pay Act, and Defendant failed to show that its noncompliance was in good faith. Accordingly, the Court instructs the Clerk of the Court to enter judgment for Plaintiff in the amount of $466,816.00. The Court also grants Plaintiff her reasonable costs and attorneys' fees, and will consider proper and timely applications for recovery of these items pursuant to Rule 54(d) of the Rules of the Court of Federal Claims.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge